# EXHIBITS A-O

# EXHIBIT A



U.S. Department of Energy

Portsmouth Gaseous
Diffusion Plant

Annual Site
Environmental Report
2017

Tuliptree silkmoth

January 2019

# U.S. Department of Energy
# Portsmouth Gaseous Diffusion Plant
# Annual Site Environmental Report – 2017
# Piketon, Ohio



# U.S. Department of Energy
# DOE/PPPO/03-0862&D1

# January 2019

# By
# Fluor-BWXT Portsmouth LLC, under Contract DE-AC30-10CC40017

# FBP-ER-RCRA-WD-RPT-0288, Revision 3

This document has been approved for public release:

| | |
|---|---|
| *Samuel C. Eldridge* (signature on file) | 1/24/2019 |
| Classification Office | Date |

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# CONTENTS

FIGURES .................................................................................................................................. vii

TABLES .................................................................................................................................... ix

ACRONYMS AND ABBREVIATIONS ................................................................................ xi

DEFINITIONS ......................................................................................................................... xiii

EXECUTIVE SUMMARY ...................................................................................................... ES-1

1. INTRODUCTION ............................................................................................................. 1-1
   1.1 SUMMARY ................................................................................................................ 1-1
   1.2 BACKGROUND INFORMATION .......................................................................... 1-1
   1.3 DESCRIPTION OF SITE LOCALE ......................................................................... 1-3
   1.4 DESCRIPTION OF SITE OPERATIONS ................................................................. 1-3

2. COMPLIANCE SUMMARY ............................................................................................ 2-1
   2.1 SUMMARY ................................................................................................................ 2-1
   2.2 COMPLIANCE INTRODUCTION .......................................................................... 2-1
   2.3 COMPLIANCE STATUS .......................................................................................... 2-2
       2.3.1 Environmental Restoration and Waste Management ...................................... 2-2
             2.3.1.1 Comprehensive Environmental Response, Compensation, and Liability Act ...... 2-2
             2.3.1.2 Emergency Planning and Community Right-to-Know Act ................. 2-2
             2.3.1.3 Resource Conservation and Recovery Act ........................................ 2-3
             2.3.1.4 Federal Facility Compliance Act ...................................................... 2-4
             2.3.1.5 Toxic Substances Control Act .......................................................... 2-4
             2.3.1.6 Federal Insecticide, Fungicide, and Rodenticide Act ....................... 2-5
       2.3.2 Radiation Protection ...................................................................................... 2-5
             2.3.2.1 DOE Order 458.1, *Radiation Protection of the Public and the Environment* ...... 2-5
             2.3.2.2 DOE Order 435.1, *Radioactive Waste Management* ....................... 2-6
       2.3.3 Air Quality and Protection ............................................................................ 2-6
             2.3.3.1 Clean Air Act .................................................................................... 2-6
             2.3.3.2 Clean Air Act, Title VI, Stratospheric Ozone Protection ................. 2-7
             2.3.3.3 National Emission Standards for Hazardous Air Pollutants .............. 2-7
       2.3.4 Water Quality and Protection ........................................................................ 2-7
             2.3.4.1 Clean Water Act ............................................................................... 2-7
             2.3.4.2 Safe Drinking Water Act ................................................................... 2-8
       2.3.5 Other Environmental Statutes ....................................................................... 2-8
             2.3.5.1 Underground storage tank regulations .............................................. 2-8
             2.3.5.2 National Environmental Policy Act .................................................. 2-9
             2.3.5.3 Endangered Species Act .................................................................... 2-9
             2.3.5.4 National Historic Preservation Act ................................................... 2-9
             2.3.5.5 Archaeological and Historic Preservation Act and Archaeological Resources Protection Act ...... 2-10
       2.3.6 DOE Order 436.1, *Departmental Sustainability* .......................................... 2-11

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

2.3.7 Executive Orders ....................................................................................2-11
    2.3.7.1 Executive Order 11988, *Floodplain Management*, and Executive Order 11990,
        *Protection of Wetlands* ...........................................................................2-11
    2.3.7.2 Executive Order 13693, *Planning for Federal Sustainability in the*,
        *Next Decade* ...........................................................................................2-11
2.4 OTHER MAJOR ENVIRONMENTAL ISSUES AND ACTIONS ...........................2-12
2.4.1 Environmental Program Inspections .................................................................2-12
2.4.2 Notices of Violation ..........................................................................................2-12
2.5 UNPLANNED RELEASES .............................................................................................2-12
2.6 SUMMARY OF PERMITS ..............................................................................................2-13

3. ENVIRONMENTAL PROGRAM INFORMATION ...............................................................3-1
3.1 SUMMARY ...........................................................................................................................3-1
3.2 D&D PROGRAM ...................................................................................................................3-1
3.2.1 Process Buildings and Other Facilities ..................................................................3-1
3.2.2 Site-wide Waste Disposition ..................................................................................3-2
3.3 ENVIRONMENTAL RESTORATION PROGRAM ...........................................................3-2
3.3.1 Quadrant I ...............................................................................................................3-3
    3.3.1.1 X-749/X-120 groundwater plume .............................................................3-4
    3.3.1.2 PK Landfill ................................................................................................3-6
    3.3.1.3 Quadrant I Groundwater Investigative (5-Unit) Area ...............................3-6
3.3.2 Quadrant II ..............................................................................................................3-7
    3.3.2.1 Quadrant II Groundwater Investigative (7-Unit) Area ..............................3-7
    3.3.2.2 X-701B Former Holding Pond ..................................................................3-8
    3.3.2.3 X-633 Former Recirculating Cooling Water Complex .............................3-8
3.3.3 Quadrant III .............................................................................................................3-8
3.3.4 Quadrant IV .............................................................................................................3-9
    3.3.4.1 X-611A Former Lime Sludge Lagoons .....................................................3-9
    3.3.4.2 X-734 Landfills .........................................................................................3-9
    3.3.4.3 X-630 Former Recirculating Cooling Water Complex .............................3-9
3.4 WASTE MANAGEMENT PROGRAM .............................................................................3-10
3.5 ENVIRONMENTAL SUSTAINABILITY PROGRAM ....................................................3-11
3.6 PUBLIC AWARENESS PROGRAM .................................................................................3-14

4. ENVIRONMENTAL RADIOLOGICAL PROGRAM INFORMATION ..................................4-1
4.1 SUMMARY ...........................................................................................................................4-1
4.2 ENVIRONMENTAL RADIOLOGICAL PROGRAM INTRODUCTION ............................4-2
4.3 RADIOLOGICAL EMISSIONS AND DOSES ....................................................................4-3
4.3.1 Dose Terminology ...................................................................................................4-3
4.3.2 Airborne Emissions .................................................................................................4-4
4.3.3 Dose Calculation Based on Airborne Emissions ....................................................4-5
4.3.4 Dose Calculation Based on Ambient Air Monitoring ............................................4-6
4.3.5 Discharges of Radionuclides from NPDES Outfalls ..............................................4-6
    4.3.5.1 FBP outfalls ...............................................................................................4-6
    4.3.5.2 Centrus outfalls .......................................................................................4-11
4.3.6 Dose Calculation for Releases to Surface Water ..................................................4-12
4.3.7 Radiological Dose Calculation for External Radiation .........................................4-12
4.3.8 Radiological Dose Results for DOE Workers and Visitors ...................................4-13
4.3.9 Radiological Dose Calculations for Off-site Environmental Monitoring Data .............4-13
    4.3.9.1 Dose calculation for sediment ................................................................4-14
    4.3.9.2 Dose calculation for soil .........................................................................4-15

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

4.3.9.3 Dose calculation for vegetation ................................................................... 4-15
4.4 PROTECTION OF BIOTA ........................................................................................ 4-16
  4.4.1 Aquatic and Riparian Animals ..................................................................... 4-16
  4.4.2 Terrestrial Plants and Animals .................................................................... 4-16
4.5 UNPLANNED RADIOLOGICAL RELEASES .......................................................... 4-17
4.6 ENVIRONMENTAL RADIOLOGICAL MONITORING .......................................... 4-17
  4.6.1 Ambient Air Monitoring ............................................................................. 4-17
  4.6.2 External Radiation ...................................................................................... 4-18
  4.6.3 Surface Water from Cylinder Storage Yards ............................................... 4-20
    4.6.3.1 FBP cylinder storage yards ............................................................. 4-20
    4.6.3.2 MCS cylinder storage yards ........................................................... 4-20
  4.6.4 Local Surface Water ................................................................................... 4-21
  4.6.5 Sediment ..................................................................................................... 4-21
  4.6.6 Settleable Solids ......................................................................................... 4-23
  4.6.7 Soil ............................................................................................................. 4-23
  4.6.8 Biological Monitoring ................................................................................. 4-25
    4.6.8.1 Vegetation ...................................................................................... 4-25
    4.6.8.2 Deer ................................................................................................ 4-25
    4.6.8.3 Fish ................................................................................................. 4-25
    4.6.8.4 Crops .............................................................................................. 4-26
    4.6.8.5 Milk and eggs ................................................................................ 4-26
4.7 RELEASE OF PROPERTY CONTAINING RESIDUAL RADIOACTIVE MATERIAL ....... 4-26
  4.7.1 FBP Releases .............................................................................................. 4-26
  4.7.2 MCS Releases ............................................................................................. 4-26

5. ENVIRONMENTAL NON-RADIOLOGICAL PROGRAM INFORMATION ................ 5-1
5.1 SUMMARY .............................................................................................................. 5-1
5.2 ENVIRONMENTAL NON-RADIOLOGICAL PROGRAM INTRODUCTION .......... 5-1
5.3 AIR ........................................................................................................................... 5-1
  5.3.1 Airborne Discharges ................................................................................... 5-1
  5.3.2 Ambient Air Monitoring ............................................................................. 5-2
5.4 WATER ..................................................................................................................... 5-2
  5.4.1 Water Discharges (NPDES Outfalls) .......................................................... 5-2
    5.4.1.1 FBP NPDES outfalls ...................................................................... 5-3
    5.4.1.2 MCS NPDES outfalls ..................................................................... 5-5
    5.4.1.3 Centrus NPDES outfalls ................................................................ 5-5
  5.4.2 Surface Water Monitoring Associated with MCS Cylinder Storage Yards ..... 5-6
5.5 SEDIMENT ............................................................................................................... 5-6
  5.5.1 Local Sediment Monitoring ......................................................................... 5-6
  5.5.2 Sediment Monitoring Associated with MCS Cylinder Storage Yards ............ 5-6
5.6 BIOLOGICAL MONITORING - FISH ...................................................................... 5-7

6. GROUNDWATER PROGRAMS .................................................................................. 6-1
6.1 SUMMARY .............................................................................................................. 6-1
6.2 GROUNDWATER PROGRAMS INTRODUCTION .................................................. 6-1
6.3 OVERVIEW OF GROUNDWATER MONITORING AT PORTS .............................. 6-1
  6.3.1 Regulatory Programs ................................................................................... 6-1
  6.3.2 Groundwater Use and Geology .................................................................... 6-2
  6.3.3 Monitoring Activities .................................................................................. 6-2
6.4 GROUNDWATER MONITORING AREAS ............................................................... 6-2
  6.4.1 X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility ......... 6-4

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

6.4.1.1 X-749 Contaminated Materials Disposal Facility ................................................6-7
6.4.1.2 X-120 Former Training Facility ...................................................................6-7
6.4.1.3 Monitoring results for the X-749 Contaminated Materials Disposal Facility/
X-120 Former Training Facility in 2017 ......................................................6-8
6.4.2 PK Landfill ...............................................................................................................6-10
6.4.2.1 Monitoring results for the PK Landfill in 2017 ..........................................6-10
6.4.3 Quadrant I Groundwater Investigative (5-Unit) Area ..............................................6-10
6.4.3.1 Monitoring results for the Quadrant I Groundwater Investigative (5-Unit)
Area in 2017 ...............................................................................................6-11
6.4.4 X-749A Classified Materials Disposal Facility ........................................................6-11
6.4.4.1 Monitoring results for the X-749A Classified Materials Disposal Facility
in 2017 .......................................................................................................6-13
6.4.5 Quadrant II Groundwater Investigative (7-Unit) Area .............................................6-13
6.4.5.1 Monitoring results for the Quadrant II Groundwater Investigative (7-Unit)
Area in 2017 ...............................................................................................6-13
6.4.6 X-701B Former Holding Pond ..................................................................................6-15
6.4.6.1 Monitoring results for the X-701B Former Holding Pond in 2017 .................6-16
6.4.7 X-633 Former Recirculating Cooling Water Complex ............................................6-16
6.4.7.1 Monitoring results for the X-633 Former Recirculating Cooling
Water Complex in 2017 ...............................................................................6-18
6.4.8 X-616 Former Chromium Sludge Surface Impoundments...........................................6-18
6.4.8.1 Monitoring results for the X-616 Former Chromium Sludge Surface
Impoundments in 2017 ................................................................................6-18
6.4.9 X-740 Former Waste Oil Handling Facility .............................................................6-18
6.4.9.1 Monitoring results for the X-740 Former Waste Oil Handling Facility
in 2017 .......................................................................................................6-21
6.4.10 X-611A Former Lime Sludge Lagoons ....................................................................6-21
6.4.10.1 Monitoring results for the X-611A Former Lime Sludge Lagoons in 2017 .....6-21
6.4.11 X-735 Landfills .......................................................................................................6-21
6.4.11.1 Monitoring results for the X-735 Landfills in 2017.........................................6-24
6.4.12 X-734 Landfills .......................................................................................................6-24
6.4.12.1 Monitoring results for the X-734 Landfills in 2017.........................................6-26
6.4.13 X-533 Former Switchyard Complex ........................................................................6-26
6.4.13.1 Monitoring results for the X-533 Former Switchyard Complex in 2017 .........6-26
6.4.14 X-344C Former Hydrogen Fluoride Storage Building ..............................................6-26
6.4.14.1 Monitoring results for the X-344C Former Hydrogen Fluoride Storage
Building in 2017 ..........................................................................................6-29
6.4.15 Surface Water Monitoring ........................................................................................6-29
6.4.15.1 Monitoring results for surface water in 2017.................................................6-29
6.4.16 Water Supply Monitoring .........................................................................................6-31
6.5 DOE ORDER MONITORING PROGRAMS .........................................................................6-33
6.5.1 Exit Pathway Monitoring .........................................................................................6-33
6.6 GROUNDWATER TREATMENT FACILITIES ...................................................................6-35
6.6.1 X-622 Groundwater Treatment Facility ...................................................................6-35
6.6.2 X-623 Groundwater Treatment Facility ...................................................................6-35
6.6.3 X-624 Groundwater Treatment Facility ...................................................................6-36
6.6.4 X-627 Groundwater Treatment Facility ...................................................................6-36

7. QUALITY ASSURANCE..............................................................................................................7-1
7.1 SUMMARY ...........................................................................................................................7-1
7.2 QUALITY ASSURANCE INTRODUCTION ........................................................................7-1

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

7.3 FIELD SAMPLING AND MONITORING ........................................................................ 7-2
7.4 ANALYTICAL QUALITY ASSURANCE ...................................................................... 7-2

8. REFERENCES ................................................................................................................... 8-1

APPENDIX A: RADIATION.................................................................................................. A-1
APPENDIX B: ENVIRONMENTAL PERMITS.................................................................... B-1
APPENDIX C: RADIONUCLIDE AND CHEMICAL NOMENCLATURE ........................ C-1

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# FIGURES

1    Comparison of dose from various common radiation sources ................................................. ES-8

1.1    The Portsmouth Gaseous Diffusion Plant ...................................................................... 1-1

1.2    Location of PORTS ........................................................................................................ 1-3

3.1    Location of the OSWDF at PORTS ............................................................................... 3-2

4.1    DOE ambient air and radiation monitoring locations ................................................... 4-7

4.2    PORTS NPDES outfalls/monitoring points and cylinder storage yards
       sampling locations ......................................................................................................... 4-8

4.3    On-site radiation and cylinder yard dose monitoring locations .................................... 4-19

4.4    Local surface water and sediment monitoring locations ............................................... 4-22

4.5    DOE settleable solids monitoring locations .................................................................. 4-24

6.1    Groundwater monitoring areas at PORTS ..................................................................... 6-3

6.2    TCE-contaminated Gallia groundwater plume at the X-749 Contaminated Materials Disposal
       Facility/X-120 Former Training Facility – 2017 .......................................................... 6-9

6.3    TCE-contaminated Gallia groundwater plume at the Quadrant I Groundwater
       Investigative (5-Unit) Area – 2017 ............................................................................... 6-12

6.4    TCE-contaminated Gallia groundwater plume at the Quadrant II Groundwater
       Investigative (7-Unit) Area – 2017 ............................................................................... 6-14

6.5    TCE-contaminated Gallia groundwater plume at the X-701B Former Holding Pond – 2017 .... 6-17

6.6    Metal concentrations in groundwater at the X-633 Former Recirculating Cooling Water
       Complex and X-533 Former Switchyard Complex – 2017 ........................................... 6-19

6.7    TCE and metal concentrations in groundwater at the X-616 Former Chromium Sludge
       Surface Impoundments – 2017 ...................................................................................... 6-20

6.8    TCE-contaminated Gallia groundwater plume near the X-740 Former Waste Oil
       Handling Facility – 2017 ............................................................................................... 6-22

6.9    Metal concentrations in groundwater at the X-611A Former Lime Sludge Lagoons – 2017 ..... 6-23

6.10   Monitoring wells at the X-735 Landfills .......................................................................... 6-25

6.11   Monitoring wells at the X-734 Landfills .......................................................................... 6-27

6.12   Monitoring well at the X-344C Former Hydrogen Fluoride Storage Building .......................... 6-28

6.13   Surface water monitoring locations ................................................................................. 6-30

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

6.14    Water supply monitoring locations ............................................................................... 6-32

6.15    Exit pathway monitoring locations ................................................................................ 6-34

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# TABLES

2.1    Chemicals reported in the Hazardous Chemical Inventory Report for 2017 ................................2-3

2.2    Environmental inspections of DOE activities at PORTS for 2017 .............................................2-12

3.1    Remedial actions at PORTS in groundwater monitoring areas ...................................................3-5

3.2    Waste Management Program off-site treatment, disposal, and recycling accomplishments for 2017 ......................................................................................................................................3-12

4.1    Summary of potential doses to the public from PORTS in 2017 ................................................4-1

4.2    Summary of potential doses to the public from radionuclides detected by DOE environmental monitoring programs in 2017 ...............................................................................4-14

5.1    FBP NPDES exceedances in 2017 ............................................................................................5-4

6.1    Analytical parameters for monitoring areas and programs at PORTS in 2017 ...........................6-5

6.2    Summary of TCE removed by PORTS groundwater treatment facilities in 2017 .....................6-35

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACP | American Centrifuge Plant |
| Bq | becquerel |
| BSFR | bulk survey for release |
| BWCS | BWXT Conversion Services, LLC |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | *Code of Federal Regulations* |
| Ci | curie |
| D&D | decontamination and decommissioning |
| DAS | Disposal Authorization Statement |
| DFF&O | *The April 13, 2010 Director's Final Findings and Orders for Removal Action and Remedial Investigation and Feasibility Study and Remedial Design and Remedial Action, including the July 16, 2012 Modification thereto* (Ohio EPA 2012) |
| DOE | U.S. Department of Energy |
| dps | disintegration per second |
| DUF$_6$ | depleted uranium hexafluoride |
| EA | environmental assessment |
| EMS | Environmental Management System |
| EPEAT | Electronic Product Environmental Assessment Tool |
| FBP | Fluor-BWXT Portsmouth LLC |
| Gy | gray |
| IRM | interim remedial measure |
| kg | kilogram |
| lbs | pounds |
| LFRG | Low-level Waste Disposal Facility Review Group |
| LLW | low-level radioactive waste |
| µg/g | microgram per gram (equivalent to part per million) |
| µg/kg | microgram per kilogram (equivalent to part per billion) |
| µg/L | microgram per liter (equivalent to part per billion) |
| µg/m$^3$ | microgram per cubic meter |
| MCS | Mid-America Conversion Services, LLC |
| mg | milligram |
| mg/L | milligram per liter (equivalent to part per million) |
| mrem | millirem |
| mSv | millisievert |
| ng/L | nanogram per liter |
| NCRP | National Council on Radiation Protection |
| NEPA | National Environmental Policy Act |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| NHPA | National Historic Preservation Act |
| NPDES | National Pollutant Discharge Elimination System |
| Ohio EPA | Ohio Environmental Protection Agency |
| OSWDF | on-site waste disposal facility |
| OVEC | Ohio Valley Electric Corporation |
| PCB | polychlorinated biphenyl |
| pCi/g | picocurie per gram |
| pCi/L | picocurie per liter |
| pCi/mL | picocurie per milliliter |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

| pCi/m$^3$ | picocurie per cubic meter |
| PEGASIS | PORTS Environmental Geographic Analytical Spatial Information System |
| PK | Peter Kiewit |
| PMA | Portsmouth Mission Alliance, LLC |
| PORTS | Portsmouth Gaseous Diffusion Plant |
| ppb | part per billion |
| ppm | part per million |
| rad | radiation absorbed dose |
| RCRA | Resource Conservation and Recovery Act |
| rem | roentgen equivalent man |
| SODI | Southern Ohio Diversification Initiative |
| Sv | sievert |
| TCE | trichloroethene |
| TLD | thermoluminescent dosimeter |
| TSCA | Toxic Substances Control Act |
| USEC | United States Enrichment Corporation |
| U.S. EPA | U.S. Environmental Protection Agency |
| VOC | volatile organic compound |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# DEFINITIONS

**absorption** – In radiological terms, the taking up of energy from radiation by the medium or tissue through which the radiation is passing.

**activity** – See "radioactivity."

**air stripper** – Equipment that bubbles air through water to remove volatile organic compounds from the water.

**alpha activity** – The rate of emission of alpha particles from a given material.

**alpha particle** – A positively charged particle consisting of two protons and two neutrons, identical with the nucleus of a helium atom; emitted by several radioactive substances.

**ambient air** – The atmosphere around people, plants, and structures. Ambient air usually means outdoor air (as opposed to indoor air).

**analyte** – The specific component that is being measured in a chemical analysis.

**aquifer** – A permeable layer of sand, gravel, and/or rock below the ground surface that is capable of yielding quantities of groundwater to wells and springs. A subsurface zone that yields economically important amounts of water to wells.

**atom** – Smallest unit of an element capable of entering into a chemical reaction.

**background radiation** – The radiation in humans' natural environment, including cosmic rays and radiation from the naturally-occurring radioactive elements.

**beta activity** – The rate of emission of beta particles from a given material.

**beta particle** – A negatively charged particle emitted from the nucleus of an atom during radioactive decay. It has a mass and charge equal to those of an electron.

**biota** – Animal and plant life characterizing a given region.

**categorical exclusion** – A class of actions that either individually or cumulatively do not have a significant effect on the human environment and therefore do not require preparation of an environmental assessment or environmental impact statement under the National Environmental Policy Act.

**chain-of-custody** – A process that documents custody and control of a sample through sample collection, transportation and analysis.

**closure** – Formal shutdown of a hazardous waste management facility under the Resource Conservation and Recovery Act or Comprehensive Environmental Response, Compensation, and Liability Act.

**compliance** – Fulfillment of applicable regulations or requirements of a plan or schedule ordered or approved by a government authority.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)** – An act to provide for liability, compensation, cleanup, and emergency response for hazardous substances released to the environment and the cleanup of inactive hazardous waste disposal sites.

**concentration** – The amount of a substance contained in a unit volume or mass of a sample.

**contaminant** – Any substance that enters a system (the environment, food, the human body, etc.) where it is not normally found. Contaminants include substances that spoil food, pollute the environment, or cause other adverse effects.

**cosmic radiation** – Ionizing radiation with very high energies that originates outside the earth's atmosphere. Cosmic radiation is one contributor to natural background radiation.

**critical habitat** – Specific geographic areas, whether occupied by a species listed under the Endangered Species Act or not, that are essential for conservation of the species and that have been formally designated by a rule published in the Federal Register.

**curie (Ci)** – A unit of radioactivity, defined as that quantity of any radioactive nuclide which has $3.7 \times 10^{10}$ (37 billion) disintegrations per second. Several fractions of the curie are commonly used:

> **millicurie (mCi)** – $10^{-3}$ Ci, one-thousandth of a curie; $3.7 \times 10^{7}$ disintegrations per second.
> **microcurie (µCi)** – $10^{-6}$ Ci, one-millionth of a curie, $3.7 \times 10^{4}$ disintegrations per second.
> **picocurie (pCi)** – $10^{-12}$ Ci, one-trillionth of a curie; 0.037 disintegration per second.

**decontamination and decommissioning (D&D)** – Removing equipment, demolishing buildings, disposing of wastes, and investigating potential contamination in areas of PORTS that are no longer part of current operations.

**deferred unit** – An area at PORTS that was in or adjacent to the gaseous diffusion production and operational areas such that remedial activities would have interrupted operations, or an area that could have become recontaminated from ongoing operations.

**derived concentration standard** – The concentration of a radionuclide in air or water that under conditions of continuous exposure for one year by one exposure mode (i.e., ingestion of water, submersion in air, or inhalation) would result in either a dose of 0.1 rem (100 mrem) or a dose of 5 rem to any tissue, including skin and the lens of the eye. The DOE publication *Derived Concentration Technical Standard* (DOE 2011a) provides the derived concentration standards.

**dose** – In this document, "dose" is used exclusively to refer to a radiological dose; the energy imparted to matter by ionizing radiation.

- **absorbed dose** – The quantity of ionizing radiation energy absorbed by an organ divided by the organ's mass. The unit of absorbed dose is the rad, equal to 0.01 joule per kilogram in any medium. (1 rad = 0.01 gray).

- **dose** – The product of the absorbed dose (rad) in tissue and a quality factor. Dose is expressed in units of rem (or sievert) (1 rem = 0.01 sievert).

- **effective dose** – The sum of the doses received by all organs or tissues of the body after each one has been multiplied by the appropriate weighting factor. In this document, the term "effective dose" is often shortened to "dose."

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- **collective dose/collective effective dose** – The sums of the doses of all individuals in an exposed population expressed in units of person-rem (or person-sievert). The collective effective dose is also frequently called the "population dose."

Note that "dose" can also be used to refer to a chemical dose; however, chemical doses are not discussed in this document.

**downgradient** – The direction that groundwater flows; similar to downstream for surface water.

**downgradient well** – A well installed downgradient of a site that may be capable of detecting migration of contaminants from a site.

**duplicate sample** – a sample collected from the same location at the same time and using the same sampling device (if possible) as the regular sample.

**effluent** – A liquid or gaseous discharge to the environment.

**effluent monitoring** – The collection and analysis of samples or measurement of liquid and gaseous effluents to characterize and quantify the release of contaminants, assess radiation exposures to the public, and demonstrate compliance with applicable standards.

**Environmental Restoration** – A DOE program that directs the assessment and cleanup of its sites (remediation) and facilities (decontamination and decommissioning) contaminated as a result of nuclear-related activities.

**exposure (radiation)** – The incidence of radiation on living or inanimate material by accident or intent. Background exposure is the exposure to natural background ionizing radiation. Occupational exposure is exposure to ionizing radiation that takes place at a person's workplace. Population exposure is the exposure to the total number of persons who inhabit an area.

**external radiation** – The exposure to ionizing radiation when the radiation source is located outside the body.

**gamma ray** – High-energy short-wavelength electromagnetic radiation emitted from the nucleus of an excited atom. Gamma rays are identical to X-rays except for the source of the emission.

**glove box** – An enclosure with built-in sleeves and gloves used by a person to manipulate hazardous materials such as highly enriched uranium without directly exposing the person to the material.

**groundwater** – Any water found below the land surface.

**half-life, radiological** – The time required for half of a given number of atoms of a specific radionuclide to decay. Each nuclide has a unique half-life; half-lives can range in duration from less than a second to many millions of years.

**industrial solid waste landfill** – A type of landfill that exclusively disposes of solid waste generated by manufacturing or industrial operations.

***in situ*** – In its original place; field measurements taken without removing the sample from its original location; remediation performed while the contaminated media (e.g., groundwater or soil) remains below the surface or in place.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**interim remedial measure (IRM)** – Cleanup activities initiated after it has been determined that contamination or waste disposal practices pose an immediate threat to human health and/or the environment.  These measures are implemented until a more permanent solution can be made.

**internal radiation** – Occurs when radionuclides enter the body, for example, by ingestion of food or liquids or by inhalation.

**irradiation** – Exposure to external radiation.

**isotopes** – Forms of an element having the same number of protons but differing numbers of neutrons in their nuclei.

**maximally exposed individual** – A hypothetical individual who remains in an uncontrolled area and would, when all potential routes of exposure from a facility's operations are considered, receive the greatest possible dose.

**maximum contaminant level (MCL)** – The maximum permissible level of a contaminant in drinking water provided by a public water system.

**migration** – The transfer or movement of a material through air, soil, or groundwater.

**millirem (mrem)** – The dose that is one-thousandth of a rem.

**monitoring** – Process whereby the quantity and quality of factors that can affect the environment or human health are measured periodically to regulate and control potential impacts.

**natural radiation** – Radiation from cosmic and other naturally occurring radionuclide sources (such as radon) in the environment.

**nuclide** – An atom specified by atomic weight, atomic number, and energy state.

**outfall** – The point of conveyance (e.g., drain or pipe) of wastewater or other effluents into a ditch, pond, or river.

**part per billion** – A unit measure of concentration equivalent to the weight to volume ratio expressed as microgram per liter ($\mu$g/L) or the weight to weight ratio of microgram per kilogram ($\mu$g/kg).

**part per million** – A unit measure of concentration equivalent to the weight to volume ratio expressed as milligram per liter (mg/L), the weight to weight ratio expressed as milligram per kilogram (mg/kg), or the weight to weight ratio of microgram per gram ($\mu$g/g).

**person-rem** – A unit of measure for the collective dose to a population group.  For example, a dose of 1 rem to 10 individuals results in a collective dose of 10 person-rem.

**pH** – A measure of the hydrogen ion concentration in an aqueous solution.  Acidic solutions have a pH from 0 to 7, neutral solutions have a pH equal to 7, and basic solutions have a pH from 7 to 14.

**polychlorinated biphenyls (PCBs)** – Man-made chemicals that range from oily liquids to waxy solids. PCBs were used in hundreds of industrial and commercial applications due to their chemical properties until production in the United States ceased in 1977.  PCBs have been demonstrated to cause a variety of adverse health effects in animals and possibly cause cancer and other adverse health effects in humans.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**preliminary remediation goal** – An initial clean-up goal developed early in the decision-making process that is 1) protective of human health and the environment, and 2) complies with applicable or relevant and appropriate requirements.  Preliminary remediation goals are intended to satisfy regulatory cleanup requirements.  For groundwater at PORTS, preliminary remediation goals are the National Pollutant Discharge Elimination System (NPDES) drinking water standards (maximum contaminant levels).

**quality assurance** – Any action in environmental monitoring to demonstrate the reliability of monitoring and measurement data.

**quality control** – The routine application of procedures within environmental monitoring to obtain the required standards of performance in monitoring and measurement processes.

**rad** – The unit of absorbed dose deposited in a volume of material.

**radioactivity** – The spontaneous emission of radiation, generally alpha or beta particles or gamma rays, from the nucleus of an unstable isotope.

**radionuclide** – A radioactive nuclide capable of spontaneous transformation into other nuclides by changing its nuclear configuration or energy level.  This transformation is accomplished by the emission of photons or particles.

**release** – Any discharge to the environment.  "Environment" is broadly defined as any water, land, or ambient air.

**rem** – The unit of dose (absorbed dose in rads multiplied by the radiation quality factor).  Dose is frequently reported in units of millirem (mrem), which is one-thousandth of a rem.

**remediation** – The correction or cleanup of a site contaminated with waste.  See "Environmental Restoration."

**reportable quantity** – A release to the environment that exceeds reportable quantities as defined by the Comprehensive Environmental Response, Compensation, and Liability Act.

**Resource Conservation and Recovery Act (RCRA)** – Federal legislation that regulates the transport, treatment, and disposal of solid and hazardous wastes.

**riparian** – Related to the banks of a river or wetlands adjacent to rivers and streams.

**settleable solids** – Material settling out of suspension in a liquid within a defined period of time.

**source** – A point or object from which radiation or contamination emanates.

**Superfund** – The program operated under the legislative authority of the Comprehensive Environmental Response, Compensation, and Liability Act and Superfund Amendments and Reauthorization Act that funds and conducts U.S. EPA emergency and long-term removal and remedial actions.

**surface water** – All water on the surface of the earth, as distinguished from groundwater.

**suspended solids** – Particles suspended in water, such as silt or clay, that can be trapped by a filter.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**terrestrial radiation** – Ionizing radiation emitted from radioactive materials in the earth's soils such as potassium-40, radon, thorium, and uranium. Terrestrial radiation contributes to natural background radiation.

**transuranics** – Elements such as americium, plutonium, and neptunium that have atomic numbers (the number of protons in the nucleus) greater than 92 (uranium). All transuranics are radioactive.

**trichloroethene (TCE)** – A colorless liquid used in many industrial applications as a cleaner and/or solvent. One of many chemicals that is classified as a volatile organic compound. High levels of TCE may cause health effects such as liver and lung damage and abnormal heartbeat; moderate levels may cause dizziness or headache. The U.S. Environmental Protection Agency Integrated Risk Information System characterizes TCE as carcinogenic to humans by all routes of exposure. This conclusion is based on convincing evidence of a causal association between TCE exposure in humans and kidney cancer.

**trip blank** – A quality control sample of water that accompanies sample containers from the analytical laboratory, to the field sampling location where environmental samples are collected, back to the analytical laboratory to determine whether environmental samples have been contaminated during transport, shipment, and/or site conditions.

**turbidity** – A measure of the concentration of sediment or suspended particles in a liquid.

**upgradient** – In the opposite direction of groundwater flow; similar to upstream for surface water.

**upgradient well** – A well installed hydraulically upgradient of a site to provide data to compare to a downgradient well to determine whether the site is affecting groundwater quality.

**volatile organic compounds (VOCs)** – Organic (carbon-containing) compounds that evaporate readily at room temperature. These compounds are present in solvents, degreasers, paints, thinners, and fuels. Due to a number of factors including widespread industrial use, they are commonly found as contaminants in soil and groundwater. VOCs found at PORTS include TCE, vinyl chloride, benzene, and dichloroethenes.

**weighting factor** (radiation) – The factor by which an absorbed dose (rad) is multiplied to obtain a quantity that expresses, on a common scale for all ionizing radiation, the biological damage to an exposed person. The weighting factor is used because some types of radiation, such as alpha particles, are more biologically damaging than others.

**weighting factor** (tissue) – A tissue specific number that represents the fraction of the total potential health risk resulting from uniform, whole body irradiation to the specific organ or tissue (bone marrow, lungs, thyroid, etc.).

**wetland** – An area that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, floodplains, fens, and similar areas. A jurisdictional wetland is one that falls under state or federal regulatory authority; a non-jurisdictional wetland does not.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# EXECUTIVE SUMMARY

**PURPOSE**

This Annual Site Environmental Report is prepared to summarize environmental monitoring and compliance activities conducted at the U.S. Department of Energy (DOE) Portsmouth Gaseous Diffusion Plant (PORTS) for calendar year 2017.  Environmental monitoring is conducted to assess the impact, if any, that site operations may have on public health and the environment.  The report fulfills a requirement of DOE Order 231.1B, *Environment, Safety and Health Reporting*, for preparation of an annual summary of environmental data to characterize environmental management performance.  The Annual Site Environmental Report also provides the means by which DOE demonstrates compliance with the radiation protection requirements of DOE Order 458.1, *Radiation Protection of the Public and the Environment*.

**SITE AND OPERATIONS OVERVIEW**

PORTS, which produced enriched uranium via the gaseous diffusion process from 1954 to 2001, is one of three uranium enrichment facilities originally built in the United States; the other two were constructed in Oak Ridge, Tennessee and Paducah, Kentucky, respectively.  PORTS is located on 5.9 square miles in Pike County, Ohio.  The county has approximately 28,270 residents (U.S. Census Bureau 2018).

DOE is responsible for decontamination and decommissioning (D&D) of the gaseous diffusion process buildings and associated facilities, environmental restoration, waste management, depleted uranium hexafluoride ($DUF_6$) conversion, and management of other non-leased facilities at PORTS.  DOE contractors Fluor-BWXT Portsmouth LLC (FBP), Portsmouth Mission Alliance, LLC (PMA), Mid-America Conversion Services, LLC (MCS), and BWXT Conversion Services, LLC (BWCS) managed DOE programs at PORTS in 2017.

FBP was responsible for the following activities:

- D&D of the former gaseous diffusion process building and associated facilities;
- environmental restoration of contaminated areas;
- monitoring and reporting on environmental compliance;
- disposition of legacy radioactive waste;
- uranium management; and
- operation of the site's waste storage facilities.

PMA was responsible for the following facility support services:

- computer and telecommunications services;
- security;
- training;
- records management;
- fleet management;
- non-nuclear facility preventive and corrective maintenance;
- grounds and road maintenance;
- snow removal; and
- janitorial services.

BWCS was responsible for operations associated with the $DUF_6$ Conversion Facility through January 2017.  On February 1, 2017 MCS assumed responsibility for the $DUF_6$ Conversion Facility including surveillance and maintenance of $DUF_6$ cylinders, and environmental compliance and monitoring activities

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

associated with operation of the DUF$_6$ Conversion Facility. DUF$_6$, which is a product of the uranium enrichment process, is stored in cylinders on site. The DUF$_6$ Conversion Facility converts DUF$_6$ into uranium oxide and aqueous hydrogen fluoride. The uranium oxide is made available for beneficial reuse, storage, or disposal, and the aqueous hydrogen fluoride is sold for reuse.

Centrus Energy Corp. (Centrus), formerly USEC, Inc., continues to lease facilities at PORTS that were intended for the development of a gaseous centrifuge uranium enrichment facility – the American Centrifuge Plant (ACP). The project has been shut down, and D&D of the demonstration cascade associated with the project began in 2016.

With the exception of Chapter 2, Compliance Summary; Chapter 4, Environmental Radiological Program Information; and Chapter 5, Environmental Non-Radiological Program Information, this report does not cover Centrus operations at PORTS because their operations are not subject to DOE Orders. Centrus data are included in these chapters to provide a more complete picture of the operations in place at PORTS to detect and assess potential impacts to human health and the environment resulting from PORTS activities.

## ENVIRONMENTAL MONITORING AND RADIOLOGICAL DOSE SUMMARY

Extensive environmental monitoring is completed at PORTS to comply with environmental regulations, permit requirements, and DOE Orders, and assess the impact, if any, that site operations may have on public health and the environment. The *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b) describes the DOE environmental monitoring programs at PORTS, with the exception of groundwater monitoring. Groundwater monitoring, which also includes related surface water monitoring and residential water supply monitoring, is described in the *Integrated Groundwater Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017d).

Environmental monitoring includes the collection of samples of air, water, soil, sediment, and biota (vegetation, deer, fish, crops, milk, and eggs). Samples are collected at varying frequencies (weekly, monthly, quarterly, annually, or biennially). In 2017, environmental monitoring information was collected for the following programs:

- ambient air
- external radiation
- discharges to surface water
- local surface water
- sediment
- soil
- biota (vegetation, deer, fish, crops, milk, and eggs)
- groundwater.

Samples are analyzed for radionuclides, metals, and/or other chemicals that could be present in the environment due to PORTS activities, although many of these analytes also occur naturally or can be present due to human activities not related to PORTS. Over 3000 samples from these programs are collected on an annual basis.

Potential impacts on human health from radionuclides released by PORTS operations are calculated based on environmental monitoring data. This impact, if any, is calculated in terms of a dose. A dose can be caused by radionuclides released into the air and/or water, or radiation emanating directly from buildings or other objects at PORTS. PORTS complies with the following dose limits:

- The U.S. Environmental Protection Agency (U.S. EPA) has established a dose limit of 10 millirem (mrem)/year from radionuclides released to the air in Title 40 of the *Code of Federal Regulations*

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

(CFR), Part 61, National Emission Standards for Hazardous Air Pollutants (NESHAP), Subpart H, National Emission Standards for Emissions of Radionuclides Other Than Radon from DOE Facilities (40 CFR Part 61, Subpart H).

- The DOE has established a dose limit for members of the general public in DOE Order 458.1, which is as low as reasonably achievable[1], but no more than 100 mrem/year for the dose from radionuclides from all potential pathways of exposure including inhalation, ingestion of water and soil/sediments, consumption of food, and direct external radiation.

To aid in comparing sampling results for air and water to the 100 mrem/year dose limit, the 100 mrem/year limit is converted into a derived concentration standard (DCS) (DOE 2011a). The derived concentration standard is the concentration of a radionuclide in air or water that under conditions of continuous exposure for one year by one exposure mode (ingestion of water or inhalation of air) would result in a dose of 100 mrem. A concentration of 100% of the derived concentration standard would equate to a dose at the DOE limit of 100 mrem/year.

Environmental monitoring data collected in 2017 are consistent with data collected in previous years and indicate that radionuclides, metals, and other chemicals released by PORTS operations have a minimal effect on human health and the environment. The following sections summarize the results of environmental monitoring conducted at PORTS in 2017:

**Ambient air.** Radionuclides in ambient air are monitored at 15 monitoring stations that are located on site, at the site perimeter, within the local area, and west of PORTS in an area not potentially impacted by PORTS operations (the background location). Samples are analyzed monthly or quarterly for radionuclides that can be associated with PORTS operations. These radionuclides are transuranics (manmade elements greater than atomic number 92 [americium-241, neptunium-237, plutonium-238, plutonium-239/240]), a fission product (technetium-99), uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238).

Uranium, uranium isotopes, neptunium-237, and technetium-99 were detected at the ambient air monitoring stations in 2017. The highest levels of each radionuclide in air were 0.08% or less of the DOE derived concentration standards (DOE 2011a). Maximum activities of detected radionuclides were located at stations A41A (Zahns Corner) and A36 (on site near the X-611 Water Treatment Plant) and are listed below (in picocurie per cubic meter [pCi/m$^3$]):

| Radionuclide | Maximum activity (pCi/m$^3$) | Location | Derived Concentration Standard (DCS) (DOE 2011a) | Percentage of DCS |
|---|---|---|---|---|
| Neptunium-237 | 0.00015 | A41A | 0.18 | 0.08% |
| Technetium-99 | 0.0077 | A36 | 920 | 0.0008% |
| Uranium-233/234 | 0.00025 | A36 | 1.1 | 0.02% |
| Uranium-238 | 0.00017 | A36 | 1.3 | 0.01% |

---

[1] "As low as reasonably achievable" is an approach to radiation protection to manage and control releases of radioactive material to the environment, the workforce, and members of the public so that levels are as low as reasonable, taking into account societal, environmental, technical, economic, and public policy considerations. As low as reasonably achievable is not a specific release or dose limit, but a process that has the goal of optimizing control and managing release of radioactive material to the environment and doses so they are as far below the applicable limits as reasonably achievable. This approach optimizes radiation protection.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The ambient air monitoring data were used to calculate the potential worst case dose from the air pathway to a hypothetical person living at the monitoring station. This approach is unlikely to underestimate the dose because it assumes an individual resides at the location of the monitoring station breathing the air at that location for 24 hours/day, 365 days/year. The highest net dose calculation for the ambient air stations (0.00046 mrem/year) was at station A36, which is on site near the X-611 Water Treatment Plant. This net dose was calculated by subtracting the dose at the background station from the dose at the monitoring stations closer to PORTS. This hypothetical dose is well below the 10 mrem/year limit applicable to PORTS in NESHAP (40 CFR Part 61, Subpart H).

Fluoride is also monitored at 15 ambient air monitoring stations in and around PORTS. In 2017, fluoride was not detected in 88 percent of the samples collected for the ambient air monitoring program. If fluoride is not detected in a sample, the ambient concentration of fluoride is calculated assuming that fluoride is present at the detection limit. The average ambient concentration of fluoride measured in samples collected at the background station was 0.016 microgram per cubic meter ($\mu g/m^3$). Average ambient concentrations of fluoride measured at the stations around PORTS ranged from 0.0076 $\mu g/m^3$ at station A15 (east-southeast of PORTS on Loop Road) to 0.021 $\mu g/m^3$ at station A12 (east of PORTS on McCorkle Road). There is no standard for fluoride in ambient air. The data indicate that ambient concentrations of fluoride at off-site and background locations are not appreciably different from concentrations at PORTS.

**Discharges to surface water.** Discharges of chemicals and other parameters that measure water quality are regulated by the National Pollutant Discharge Elimination System (NPDES) under the Clean Water Act. Water from PORTS is discharged to off-site water bodies through 11 locations called NPDES outfalls. The Ohio Environmental Protection Agency (Ohio EPA) selects the chemicals monitored at the outfalls based on the chemical characteristics of the water discharged from the outfall. Outfalls are also monitored for radionuclides. Sampling frequencies vary from weekly to quarterly.

Transuranic radionuclides were not detected in any of the samples collected from FBP NPDES external outfalls in 2017. Plutonium-239/240 was detected at 0.036 picocurie per liter (pCi/L) in one sample collected from Centrus NPDES Outfall 013. Uranium discharges from the FBP and Centrus external outfalls were estimated at 7.1 kilograms (kg). Total radioactivity (technetium-99 and isotopic uranium) released from the FBP outfalls was estimated at 0.030 curie (Ci).

Water from the NPDES outfalls is discharged to or eventually flows to the Scioto River. Data for radionuclide discharges is used to calculate a potential worst case dose to a hypothetical member of the public who is exposed to water from the Scioto River. Exposure pathways considered were ingestion of water, ingestion of fish, swimming, boating, and shoreline activities. This exposure scenario is unlikely to underestimate the dose because the Scioto River is not used for drinking water downstream of PORTS (97% of the hypothetical dose from liquid effluents is from drinking water). The dose from radionuclides released to the Scioto River in 2017 (0.0012 mrem) is significantly less than the 100 mrem/year DOE limit in DOE Order 458.1 for all radiological releases from a facility.

Discharges of chemicals and other non-radiological parameters that affect water quality are regulated by Ohio EPA in NPDES permits issued to FBP, MCS, and Centrus. In 2017, the overall FBP NPDES compliance rate with the NPDES permit was 99%. Discharge limitations at the FBP NPDES monitoring locations were exceeded on 11 occasions.

Four exceedances of a preliminary effluent limit were due to concentrations of mercury in holding pond discharges. In May through August of 2017, the average monthly concentration preliminary effluent limit for mercury was exceeded at Outfall 001 (the X-230J7 East Holding Pond). The outfall was in compliance with the preliminary effluent limit in the other eight months of 2017. The average monthly

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

concentration preliminary effluent limit is 12 nanograms/liter (ng/L). Average monthly concentrations at Outfall 001 ranged from 16.75 to 23.8 ng/L. FBP has initiated an investigation to identify the source of the mercury detected at Outfall 001 so that corrective measures can be implemented. The drinking water standard for mercury is 2 µg/L (2000 ng/L). The preliminary effluent limit for mercury (12 ng/L) is lower than the drinking water standard (2000 ng/L) to minimize the accumulation of mercury in biota, such as fish and birds.

Three exceedances were due to concentrations of copper at Outfall 004 in September and October of 2017. The exceedances appeared to be due to insufficient amounts of an additive used to control copper corrosion in the recirculating cooling water system during periods of biocide treatment applications. Two exceedances were due to pH measurements that were less than minimum allowable level due to temporary operational issues at Outfalls 002 and 004 that were immediately corrected. Two additional discharge limitations (E. coli and carbonaceous biochemical oxygen demand) were exceeded at Outfall 003 (X-6619 Sewage Treatment Plant) during 2017. These exceedances were corrected within 24 hours.

Ohio EPA did not issue a Notice of Violation for any of these exceedances. The overall Centrus and MCS compliance rates were 100%.

**External radiation.** External radiation is measured continuously with thermoluminescent dosimeters (TLDs) at five locations near the $DUF_6$ cylinder storage yards and 19 on-site and off-site locations (12 of the ambient air monitoring stations and seven additional on-site locations). TLDs are placed at the monitoring locations at the beginning of each quarter, remain at the monitoring location throughout the quarter, and are removed from the monitoring location at the end of the quarter and sent to the laboratory for processing. A new TLD replaces the removed device. Radiation is measured as a whole body dose (in mrem), which is the dose that a person would receive if they were continuously present at the monitored location.

The external radiation measured for the PORTS environmental monitoring program includes both external background radiation and radiation emanating PORTS activities such as storage of $DUF_6$ cylinders. Data from radiation monitoring at the cylinder yards are used to assess potential exposure to a representative on-site member of the public that drives on Perimeter Road. The radiological exposure to an on-site member of the general public is estimated as the time that a person drives on Perimeter Road past the cylinder yards, which is estimated at 8.7 hours per year (1 minute per trip, 2 trips per day, 5 work-days per week, and 52 weeks per year). In 2017, the average annual dose (8736 hours) recorded at the cylinder yards near Perimeter Road was 739 mrem/year. Based on these assumptions, exposure to an on-site member of the public from radiation from the cylinder yards is approximately 0.74 mrem/year.

A person living in the United States receives an average dose of approximately 311 mrem/year from natural sources of radiation (National Council on Radiation Protection [NCRP] 2009). The potential estimated dose from external radiation to a member of the public (0.74 mrem/year to a member of the public allowed to drive on Perimeter Road past the cylinder yards) is approximately 0.2% of the average yearly natural radiation exposure for a person in the United States and is significantly less than the 100 mrem/year limit to a member of the public in DOE Order 458.1 for all radiological releases from a facility.

**Local surface water.** Samples of surface water are collected semiannually from three on-site and eleven off-site locations upstream and downstream from PORTS at locations on the Scioto River, Little Beaver Creek, Big Beaver Creek, and Big Run Creek and background locations on local streams approximately 10 miles north, south, east, and west of PORTS. Samples are analyzed for radionuclides.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Maximum detections of technetium-99 and uranium isotopes in local surface water samples were located at off-site sampling locations RW-13 (Big Beaver Creek) and RW-7 (Little Beaver Creek) and are listed below:

| Radionuclide | Maximum activity (pCi/L) | Location | Derived Concentration Standard (DCS) (DOE 2011a) | Percentage of DCS |
|---|---|---|---|---|
| Technetium-99 | 9.12 | RW-13 | 44,000 | 0.02% |
| Uranium-233/234 | 4.72 | RW-7 | 680 | 0.7% |
| Uranium-235/236 | 0.214 | RW-7 | 720 | 0.03% |
| Uranium-238 | 1.02 | RW-7 | 750 | 0.1% |

These detected concentrations of radionuclides were 0.7% or less of the DOE derived concentration standards (DOE 2011a). This derived concentration standard is based upon direct use of the surface water as drinking water. This comparison is unlikely to underestimate the dose because surface water around PORTS is not used for drinking water.

**Sediment.** Samples of sediment are collected annually at 18 monitoring locations, which include the 14 locations sampled for the local surface water monitoring program (Scioto River, Little Beaver Creek, Big Beaver Creek, Big Run Creek, and background locations on local streams), three on-site NPDES outfalls on the east and west sides of PORTS, and an upstream monitoring location on Big Beaver Creek. Samples are analyzed for radionuclides, metals, and polychlorinated biphenyls (PCBs).

Neptunium-237 was detected at 0.00975 picocurie per gram (pCi/g) at Big Beaver Creek sampling location RM-13. Plutonium-239/240 was detected at 0.00961 pCi/g at the southern background monitoring location (RM-10S). Technetium-99 was detected in sediment samples collected from Big Beaver Creek at RM-13, Big Run Creek at RM-3, on-site near NPDES Outfall 001 (RM-11), and downstream locations on Little Beaver Creek (RM-7 and RM-8). The highest detection of technetium-99 (3.62 pCi/g) was on-site location RM-11 (Little Beaver Creek at the X-230J7 East Holding Pond [NPDES Outfall 001]).

Uranium and uranium isotopes were also detected at each of the sediment sampling locations, including upstream and background sampling locations. Maximum detections of uranium and uranium isotopes in sediment samples were detected at on-site sampling locations RM-11 (Little Beaver Creek) and RM-3 (Big Run Creek) as follows.

Uranium: 4.57 micrograms per gram (µg/g) (RM-3 – duplicate sample)
Uranium-233/234: 6.88 pCi/g (RM-11)
Uranium-235/236: 0.291 pCi/g (RM-11)
Uranium-238: 1.52 pCi/g (RM-3 – duplicate sample).

A dose assessment was completed based on the detections of radionuclides in sediment at the off-site sediment sampling location with the detections of radionuclides that could cause the highest dose to a member of the public (RM-7 on Little Beaver Creek). Detections of technetium-99 (3.42 pCi/g), uranium-233/234 (2.55 pCi/g), uranium-235/236 (0.128 pCi/g), and uranium-238 (0.774 pCi/g) result in a calculated dose of 0.019 mrem/year, which is well below the DOE standard of 100 mrem/year in DOE Order 458.1.

PCBs were detected in sediment samples collected from Little Beaver Creek (RM-7, RM-8, and RM-11), Big Beaver Creek (RM-13), Big Run Creek (RM-2 and RM-3), and the Scioto River (RM-1A). The highest detection of PCBs (208 micrograms per kilogram [µg/kg]) was on site in Little Beaver Creek at

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

the discharge from the X-230J7 Holding Pond (RM-11). None of the detections of PCBs in sediment around PORTS were above the risk-based regional screening level developed by U.S. EPA and utilized by Ohio EPA of 240 µg/kg or parts per billion (ppb) (U.S. EPA 2017).

The results of metals sampling conducted in 2017 indicate that no appreciable differences are evident in the concentrations of metals present in sediment samples taken upstream from PORTS, at background sampling locations, and downstream from PORTS.

**Soil.** Soil samples are collected annually at 15 locations that are co-located with the ambient air monitoring stations (on-site, fence line, off-site and background locations) and analyzed for radionuclides.

Plutonium-239/240 was detected in soil at six of the 15 ambient air monitoring stations including the background monitoring station (A37). These detections were most likely present due to atmospheric fallout from nuclear weapons testing. The detections were 0.0152 pCi/g or less, which is much less than the soil screening level for plutonium-239/240 – 3.78 pCi/g. These screening levels were calculated using the exposure assumptions in the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e).

Uranium, uranium-233/234, uranium-235/236, and/or uranium-238 were detected in soil at each of the sampling locations. Uranium and uranium isotopes are usually detected at similar levels at all the soil sampling locations, including the background location (A37), which suggests that the uranium detected in these samples is due to naturally-occurring uranium.

A dose assessment was completed based on the detections of radionuclides in soil at the off-site ambient air station with the concentrations of radionuclides that could cause the highest dose to a member of the public (station A12, east of PORTS on McCorkle Road). Detections of uranium-233/234 (0.513 pCi/g), uranium-235/236 (0.0285 pCi/g), and uranium-238 (0.435 pCi/g) result in a calculated dose of 0.018 mrem/year, which is well below the DOE limit of 100 mrem/year in DOE Order 458.1.

**Biota (vegetation, deer, fish, crops, milk, and eggs).** Vegetation samples are collected annually at 15 locations that are co-located with the ambient monitoring stations (on-site, fence line, off-site and background locations). Deer samples are collected annually or as available from deer killed on site in motor vehicle collisions. Fish are collected annually from on-site and off-site streams (Little Beaver Creek, Big Beaver Creek and the Scioto River, as available). Crops, milk, and eggs are collected annually (as available) from the local community. All samples are analyzed for radionuclides. Fish are also analyzed for PCBs.

Radionuclides were not detected in samples of deer (muscle), fish, crops, milk, and eggs collected in 2017.

Uranium, uranium-233/234, and/or uranium-238 were detected in two of the vegetation samples collected in 2017. The dose calculation for vegetation is based on the following detections of radionuclides in vegetation (primarily grass) and soil at ambient air monitoring station A12 (east of PORTS on McCorkle Road):

Vegetation
- uranium-233/234:  0.0363 pCi/g  uranium-238:  0.0265 pCi/g

Soil
- uranium-233/234:  0.513 pCi/g  uranium-235/236:  0.0285 pCi/g
- uranium-238:  0.435 pCi/g.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The dose assessment for a member of the public based on consumption of beef cattle that would eat grass (and soil) contaminated with these radionuclides calculated a dose of 0.00078 mrem/year, which is well below the DOE Order 458.1 limit of 100 mrem/year.

PCBs were detected in the fish samples collected from Little Beaver Creek at 241 and 290 µg/kg. PCBs were also detected in upstream and downstream Big Beaver Creek fish samples at 22 to 30.6 µg/kg. PCBs were detected in catfish collected from upstream and downstream Scioto River sampling locations at 18.5 and 20.2 µg/kg, respectively. These detections were compared to the Ohio Fish Consumption Advisory Chemical Limits provided in the *State of Ohio Cooperative Fish Tissue Monitoring Program Sport Fish Tissue Consumption Advisory Program* (Ohio EPA 2010). These limits are set for the following consumption rates: unrestricted, 1/week, 1/month, 6/year, and do not eat. The concentrations of PCBs detected in the fish caught on site in Little Beaver Creek (RW-8) are above the 1/week maximum limit (220 µg/kg) and below the 1/month maximum limit (1000 µg/kg). The concentrations of PCBs detected in fish collected from Big Beaver Creek and the Scioto River (18.5 to 30.6 µg/kg) are less than the unrestricted limit (50 µg/kg). The Ohio Department of Health advises that everyone limit consumption of sport fish caught from all waterbodies in Ohio to one meal per week, unless there is a more or less restrictive advisory (Ohio EPA 2018).

**Groundwater.** Groundwater contamination at PORTS is contained on site. More than 300 wells are sampled at varying frequencies to monitor corrective actions, movement of groundwater contaminants, and groundwater quality. Samples are analyzed for volatile organic compounds (VOCs), radionuclides, metals, and other parameters, specific to the contaminants present at the monitoring area. In general, concentrations of contaminants detected within the groundwater plumes at PORTS were stable or decreasing in 2017. No VOCs were detected in any of the seven off-site monitoring wells that monitor the X-749/X-120 groundwater plume near the southern boundary of PORTS. Residential water supplies near PORTS were monitored to verify that site contaminants have not migrated into off-site drinking water wells. Results of this program indicate that PORTS has not affected drinking water wells outside the site boundaries.

**Dose.** To demonstrate compliance with DOE Order 458.1, this Annual Site Environmental Report includes radiological dose calculations for the dose to the public from radionuclides released to the environment based on environmental monitoring data collected by DOE contractors and Centrus (discussed in the previous paragraphs). Figure 1 provides a comparison of the doses from various common radiation sources.

The maximum dose that a member of the public could receive from radiation released by PORTS in 2017 is 0.90 mrem. This maximum dose assumes that the same individual, or representative person, routinely drives on Perimeter Road past the cylinder yards, and lives in the immediate vicinity of PORTS.



**Figure 1. Comparison of dose from various common radiation sources.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The representative person is assumed to be exposed to the maximum dose calculated from each pathway. The dose is based on:

- 0.0012 mrem from radionuclides released to the Scioto River,

- 0.74 mrem from external radiation near the cylinder yards on the northwest portion of Perimeter Road (the dose to a person who works at the Ohio Valley Electric Corporation in 2017 was lower [0.22 mrem]),

- 0.038 mrem based on exposure to radionuclides detected at off-site monitoring locations in 2017 (sediment [0.019 mrem], soil [0.018 mrem], and biota [0.00078 mrem]), and

- 0.12 mrem from radionuclides released to the air (the dose calculated by the U.S. EPA model required to demonstrate compliance with the NESHAP 10 mrem/year standard [40 CFR Part 61 Subpart H]).

This dose (0.90 mrem) is significantly less than the 100 mrem/year limit set in DOE Order 458.1 for the dose to a member of the public from radionuclides from all potential pathways. The dose to a member of the public from airborne radionuclides released by PORTS (0.12 mrem) is also significantly less than the 10 mrem/year standard set by U.S. EPA in NESHAP (40 CFR Part 61 Subpart H). A person living in the United States receives an average dose of approximately 311 mrem/year from natural sources of radiation (NCRP 2009).

**ENVIRONMENTAL COMPLIANCE**
DOE and/or the responsible DOE contractor (FBP or MCS) have been issued permits for discharge of water to surface streams, air emission permits, and a permit for the storage of hazardous waste.

FBP and MCS are responsible for preparing a number of reports for compliance with environmental regulations. These reports may include all or a subset of the following reports (for MCS): an annual groundwater monitoring report; a biennial hazardous waste report; an annual PCB document log; an annual summary of radionuclide air emissions and the associated dose to the public from these emissions; annual or biennial reports of specified non-radiological air emissions; a monthly report of NPDES monitoring data; an annual hazardous chemical inventory; and an annual toxic chemical release inventory.

Centrus is responsible for compliance activities directly associated with the ACP including NPDES outfalls, and management of wastes generated by their current operations.

FBP received a Notice of Violation from Ohio EPA in 2018 related to the operation of PORTS drinking water system in 2017. The Notice of Violation was due to a failure to collect required water samples for *E. coli* from the PORTS drinking water system in October and November of 2017. Notices of this violation were posted throughout the plant as required by Ohio EPA. FBP has implemented procedures to track required sampling so that samples are not missed. No further actions were required.

**ENVIRONMENTAL PROGRAMS**
D&D, Environmental Restoration, Waste Management, and Public Awareness Programs are conducted at PORTS to protect and inform the local population, improve the quality of the environment, and comply with federal and state regulations.

**D&D Program**
D&D of the PORTS gaseous diffusion process buildings and associated facilities is proceeding in accordance with *The April 13, 2010 Director's Final Findings and Orders for Removal Action and Remedial Investigation and Feasibility Study and Remedial Design and Remedial Action (which includes*

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

*the July 16, 2012 Modification thereto)* (D&D DFF&O) (Ohio EPA 2012). The D&D DFF&O is a legal agreement between Ohio EPA and DOE that governs the process for D&D of the buildings/structures that are no longer in use at PORTS.

Ohio EPA concurred with the records of decision for the process buildings and waste disposition in 2015. The record of decision for the process buildings and other facilities selected controlled removal of stored waste and materials, demolition of the buildings or structures, and characterization of materials for disposal or disposition (DOE 2015c). The record of decision for waste disposition selected a combination of on-site and off-site disposal (DOE 2015d), which includes construction of an on-site waste disposal facility (OSWDF).

Implementation of the selected remedial actions began after completion of the records of decision. Activities underway in 2017 in the process buildings included disassembly and removal of equipment, removal of wastes including asbestos, PCBs, and hazardous waste, and deactivation of utilities and other systems. Initial site construction activities for the OSWDF included tree clearing, fencing, and utility installation, as well as construction of erosion and sediment controls, retention ponds for surface water runoff, and installation of office trailers.

**Environmental Restoration Program**
The Environmental Restoration Program was established by DOE in 1989 to identify, control, and remediate environmental contamination at PORTS. The initial assessment and investigation of PORTS under the Resource Conservation and Recovery Act (RCRA) corrective action process was completed in the 1990s. Corrective actions, also called remedial actions, are underway in each quadrant. The Environmental Restoration Program monitors and maintains five closed landfills in accordance with Ohio EPA regulations and operates four groundwater treatment facilities to treat contaminated groundwater from the on-site groundwater plumes that are contaminated with industrial solvents, including trichloroethene (TCE).

With the beginning of D&D, investigation of areas known as "deferred units" is beginning to occur. Deferred units are areas that were in or adjacent to the gaseous diffusion production and operational areas such that remedial activities would have interrupted operations, or were areas that could have become recontaminated from ongoing operations. Ohio EPA deferred investigation/remedial action of soil and groundwater associated with these units until D&D of PORTS (or until the area no longer met the requirements for deferred unit status). Chemical and/or radionuclide contaminants present in the deferred units were contained on site and were not a threat to the public. Ongoing environmental monitoring and on-site worker health and safety programs monitor the contaminants in these areas prior to D&D.

The *Deferred Units RCRA Facility Investigation/Corrective Measures Study Work Plan* was approved by Ohio EPA in 2015 (DOE 2015a). Soil and groundwater sampling in the work plan started in 2015 and was completed in 2016. The *Deferred Units RCRA Facility Investigation/Corrective Measures Study Report* (DOE 2017a) was submitted to Ohio EPA on September 27, 2017. Ohio EPA was reviewing the report at the end of 2017 and submitted draft comments to DOE in 2018.

**Waste Management Program**
The DOE Waste Management Program at PORTS directs the safe storage, treatment, and disposal of waste generated from D&D of facilities that are no longer in use, past plant operations, ongoing plant maintenance, and ongoing environmental restoration projects. In 2017, FBP shipped approximately 2218 tons of waste or other materials to off-site facilities for treatment, disposal, recycling, or reuse.

With the beginning of D&D at PORTS, DOE is placing increased emphasis on the evaluation of materials generated by D&D for reuse or recycling. An agreement between DOE and the Southern Ohio

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Diversification Initiative (SODI) allows DOE to transfer excess equipment, clean scrap materials, and other assets to SODI. SODI first attempts to reuse the excess equipment and property within the local community. Pursuant to the agreement, if SODI is unable to place the property for reuse in the local community, SODI may sell the property. When SODI sells the property, the proceeds are used to support economic development in the southern Ohio region. In 2017, SODI received approximately 596 tons of materials from PORTS, primarily recyclable metals, recyclable oil, and reusable equipment.

**Public Awareness Program**

DOE provides a public Environmental Information Center to allow access to all documents used to make decisions on remedial actions being taken at PORTS. The information center is located just north of PORTS at the Ohio State University Endeavor Center (Room 207), 1862 Shyville Road, Piketon, Ohio 45661. The Information Center is open 9 a.m. to noon Monday and Tuesday, noon to 4 p.m. Wednesday and Thursday, or by appointment (call 740-289-8898). The email address is portseic@ports.pppo.gov and web site is energy.gov/pppo/portsmouth-environmental-information-center. The Environmental Information Center Online Document Repository is eic.ports.pppo.gov.

Additional information is provided by the DOE Site Office (740-897-5010) and the FBP Office of Public Affairs (740-897-2964). This Annual Site Environmental Report and other information can also be obtained from the DOE web site for PORTS at energy.gov/pppo or the FBP web site at fbportsmouth.com. PORTS Environmental Geographic Analytical Spatial Information System (PEGASIS) is designed to provide a dynamic mapping and environmental monitoring data display. The web site is https://gisviewer.fbports.com/default.aspx.

Public update meetings and public workshops on specific topics are also held to keep the public informed and to receive their comments and questions. Periodically, fact sheets about major projects are written for the public. Additionally, notices of document availability and public comment periods, as well as other communications on the program, are regularly distributed to the local newspaper and those on the community relations mailing list, neighbors within 2 miles of the plant, and plant employees.

The PORTS Site Specific Advisory Board, comprised of citizens from the local area, provides public input and recommendations to DOE on environmental remediation, waste management, and related issues at PORTS. Regularly scheduled meetings that are open to the public are held between DOE and the PORTS Site Specific Advisory Board. Additional information about the board can be obtained at energy.gov/pppo/ports-ssab or by calling 740-289-5249.

The PORTS Envoy Program matches employee volunteers with community stakeholders such as families living next to DOE property, community groups, and local government organizations. The envoys communicate information about PORTS D&D and other site issues to the stakeholders and are available to answer stakeholder questions about PORTS.

An educational outreach program facilitated by a DOE grant administered by Ohio University includes a project in which local high school students produce a summary of the Annual Site Environmental Report for distribution to the public. The DOE Portsmouth/Paducah Project Office web site at energy.gov/pppo provides additional information about this project.

DOE has worked with the State Historic Preservation Office, Advisory Council on Historic Preservation, Tribal Nations, and individual members of the public interested in historic preservation to determine how best to document the history associated with the gaseous diffusion process buildings and other areas that are part of D&D. The PORTS Virtual Museum (portsvirtualmuseum.org) preserves photos, video, oral histories, and other information associated with operation, remediation, and D&D of PORTS.

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 1. INTRODUCTION

## 1.1 SUMMARY

The Portsmouth Gaseous Diffusion Plant (PORTS) is located on a 5.9-square-mile site in a rural area of Pike County, Ohio (see Figure 1.1).  U.S. Department of Energy (DOE) activities at PORTS include decontamination and decommissioning (D&D) of the process buildings and associated facilities formerly used for the gaseous diffusion process of uranium enrichment, environmental restoration, waste management, and uranium operations.  Fluor-BWXT Portsmouth LLC (FBP) is the DOE contractor responsible for D&D of PORTS, which includes the three gaseous diffusion process buildings and other associated facilities.  The Depleted Uranium Hexafluoride ($DUF_6$) Conversion Facility at PORTS began full scale operations in 2011 to manage the inventory of $DUF_6$, which was a product of the gaseous diffusion process.  Mid-America Conversion Services, LLC (MCS) assumed responsibility for the $DUF_6$ Conversion Facility on February 1, 2017.  BWXT Conversion Services, LLC (BWCS) was responsible for operations associated with the $DUF_6$ Conversion Facility through January 2017.

## 1.2 BACKGROUND INFORMATION

PORTS, which produced enriched uranium via the gaseous diffusion process from 1954 through 2001, is owned by DOE.  In 1993, DOE leased the uranium production facilities at the site to United States Enrichment Corporation (USEC), which was established by the Energy Policy Act of 1992.  USEC produced enriched uranium in the gaseous diffusion process facilities through 2001.

DOE is responsible for D&D of the gaseous diffusion process buildings and associated facilities, environmental restoration, waste management, and uranium operations.  DOE contractors FBP, Portsmouth Mission Alliance LLC (PMA), MCS, and BWCS managed DOE programs at PORTS in 2017.



Gaseous diffusion process buildings

**Figure 1.1 The Portsmouth Gaseous Diffusion Plant.**

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

FBP was responsible for the following activities:

- D&D of the former gaseous diffusion process building and associated facilities;
- environmental restoration of contaminated areas;
- monitoring and reporting on environmental compliance;
- disposition of legacy radioactive waste;
- uranium management; and
- operation of the site's waste storage facilities.

PMA was responsible for the following facility support services:

- computer and telecommunications services;
- security;
- training;
- records management;
- fleet management;
- non-nuclear facility preventive and corrective maintenance;
- grounds and road maintenance;
- snow removal; and
- janitorial services.

BWCS was responsible for operations associated with the $DUF_6$ Conversion Facility through January 2017. On February 1, 2017, MCS assumed responsibility for the $DUF_6$ Conversion Facility including surveillance and maintenance of $DUF_6$ cylinders, and environmental compliance and monitoring activities associated with operation of the facility. $DUF_6$, which is a product of the uranium enrichment process, is stored in cylinders on site. The $DUF_6$ Conversion Facility converts $DUF_6$ into uranium oxide and aqueous hydrogen fluoride. The uranium oxide is made available for beneficial reuse, storage, or disposal, and the aqueous hydrogen fluoride is sold for reuse.

USEC, Inc. (the parent company of USEC) became Centrus Energy Corp. (Centrus) in 2014 after a financial restructuring. Centrus continues to lease facilities at PORTS that were intended for the development of gaseous centrifuge uranium enrichment technology; however, this project has been shut down. The project included a small scale demonstration facility and a commercial scale uranium enrichment facility (the American Centrifuge Plant [ACP]). The demonstration cascade operated from 2006-2016. The commercial scale ACP was under development. Both of these facilities (the demonstration cascade and the ACP) were housed in existing buildings at PORTS. D&D of the demonstration cascade began in 2016.

This report is intended to fulfill the requirements of DOE Order 231.1B, *Environment, Safety and Health Reporting*. This DOE Order requires development of an annual site environmental report that includes information on regulatory compliance, environmental programs, radiological and non-radiological monitoring programs, groundwater programs, and quality assurance. The Annual Site Environmental Report also provides the means by which DOE demonstrates compliance with the radiation protection requirements of DOE Order 458.1 *Radiation Protection of the Public and the Environment*.

This report is not intended to present all of the monitoring data at PORTS. Additional data collected for other site purposes, such as D&D, environmental restoration, and waste management, are presented in other documents that have been prepared in accordance with applicable legal agreements and regulations. These data are presented in other reports, such as the *2017 Groundwater Monitoring Report* (DOE 2018), which are available at the PORTS Environmental Information Center.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

## 1.3 DESCRIPTION OF SITE LOCALE

PORTS is located in a rural area of Pike County, Ohio, on a 5.9-square-mile site. The site is 2 miles east of the Scioto River in a small valley running parallel to and approximately 120 feet above the Scioto River floodplain. Figure 1.2 depicts the plant site within the State of Ohio and its immediate environs.

Pike County has approximately 28,270 residents (U.S. Census Bureau 2018). Scattered rural development is typical; however, the county contains a number of small villages such as Piketon and Beaver that lie within a few miles of the plant. The county's largest community, Waverly, is about 10 miles north of the plant and has a population of about 4,309 residents (U.S. Census Bureau 2018). The nearest residential center in this area is Piketon, which is 1 to 4 miles north of the plant and has a population of about 2,174 (U.S. Census Bureau 2018). A number of residences are located adjacent to the plant boundary.



**Figure 1.2. Location of PORTS.**

Additional cities within 50 miles of the plant are Portsmouth (population 20,443), 22 miles south; Chillicothe (population 21,499), 27 miles north; and Jackson (population 6,252), 18 miles east (U.S. Census Bureau 2018). The total population within 50 miles of the plant is approximately 662,000 persons.

## 1.4 DESCRIPTION OF SITE OPERATIONS

DOE, through its managing contractors, is responsible for D&D of the gaseous diffusion uranium enrichment buildings and associated facilities, environmental restoration, and waste management associated with DOE activities. DOE is also responsible for uranium management, which includes the $DUF_6$ Conversion Facility.

D&D includes the gaseous diffusion process buildings and associated facilities subject to *The April 13, 2010 Director's Final Findings and Orders for Removal Action and Remedial Investigation and Feasibility Study and Remedial Design and Remedial Action, including the July 16, 2012 Modification thereto* (D&D DFF&O) [Ohio Environmental Protection Agency (Ohio EPA) 2012]. D&D activities can consist of deactivation of equipment; removal and cleaning of process residues from equipment, structures, and piping; and dismantlement, demolition, and removal of equipment, structures, piping, and concrete foundations. The D&D Program is also responsible for conducting an evaluation of alternatives for disposition of waste generated by D&D.

Environmental restoration is the investigation and remediation of environmental contamination associated with the past operation of the gaseous diffusion uranium enrichment facilities. Remedial investigations and remedial actions define the nature and extent of environmental contamination, evaluate the potential risk to public health and the environment, remediate areas of environmental contamination, and monitor/evaluate ongoing remedial actions. The goal of the Environmental Restoration Program is to verify that releases from past operations at PORTS are thoroughly investigated and that remedial actions are taken to protect human health and the environment.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Waste management includes managing wastes generated by DOE activities at PORTS, including wastes generated by D&D, environmental restoration, the $DUF_6$ Conversion Facility, and other DOE site operations.  Wastes must be identified and stored in accordance with all environmental regulations.  The responsible DOE contractor also arranges the transportation and off-site disposal of wastes.  The goal of the Waste Management Program is to manage waste from the time it is generated to its ultimate treatment, recycling, or disposal in accordance with all applicable regulations.

DOE is also responsible for uranium management, which includes management of uranium product, coordination of the $DUF_6$ program, and warehousing of other uranium materials such as normal uranium hexafluoride, uranium oxides, and uranium metal.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 2. COMPLIANCE SUMMARY

## 2.1 SUMMARY

In 2017, DOE and/or the responsible DOE contractor (FBP or MCS) held permits for discharge of water to surface streams, air emission permits, and a permit for the storage of hazardous wastes. FBP is responsible for the National Pollutant Discharge Elimination System (NPDES) outfalls and air emission permits that were associated with the gaseous diffusion plant. MCS is responsible for activities associated with the DUF$_6$ Conversion Facility.

FBP and MCS are responsible for preparing a number of reports for compliance with various applicable environmental regulations. These reports may include all or a subset of the following reports (for MCS): an annual groundwater monitoring report, a biennial hazardous waste report, an annual polychlorinated biphenyl (PCB) document log, an annual summary of radionuclide air emissions and the associated dose to the public from these emissions, annual or biennial reports of specified non-radiological air emissions, a monthly report of NPDES monitoring data, an annual hazardous chemical inventory, and an annual toxic chemical release inventory. Additional information on each of these reports is provided within this chapter.

DOE activities at PORTS are inspected regularly by the federal, state, and local agencies responsible for enforcing environmental regulations at PORTS. FBP received a Notice of Violation from Ohio EPA in 2018 related to the operation of PORTS drinking water system in 2017. The Notice of Violation was due to a failure to collect required water samples for *E. coli* from the PORTS drinking water system in October and November of 2017. Notices of this violation were posted throughout the plant as required by Ohio EPA. FBP has implemented procedures to track required sampling so that samples are not missed. No further actions were required.

An unplanned release occurred on January 3, 2017 when an oil sheen on water in the X-230J5 Northwest Holding Pond and West Drainage Ditch was discovered during a heavy rainstorm. The release was reported to the National Response Center, Ohio EPA, and Pike County Local Emergency Planning Committee in accordance with the Clean Water Act. After investigation, the release appeared to be transformer oil from the X-530 Switchyard that was present in the storm drainage system. Heavy precipitation allowed a small quantity of oil and water to escape the containment within the storm drain system in the switchyard area and be released to the X-230J5 Northwest Holding Pond and West Drainage Ditch. A maximum of 0.25 gallon of oil was estimated to have been released. The oil sheen was contained by the use of absorbents, skimmers, and a wet vacuum. The area of the sheen was located on site and did not impact the public. Improvements were made to the oil capture system associated with the X-530 Switchyard.

## 2.2 COMPLIANCE INTRODUCTION

DOE is responsible for the D&D Program, Environmental Restoration Program, Waste Management Program, uranium operations, and maintenance of all facilities not leased to Centrus. FBP is responsible for air emission permits and NPDES outfalls associated with the former gaseous diffusion plant operations. MCS is responsible for activities associated with the DUF$_6$ Conversion Facility.

Centrus is responsible for compliance activities directly associated with the ACP including NPDES outfalls and management of wastes generated by their current operations.

DOE and/or DOE contractors (FBP or MCS) held two NPDES permits for discharge of water to surface streams, numerous air emission permits, and a Resource Conservation and Recovery Act (RCRA) Part B permit for the storage of hazardous wastes. Appendix B lists the active environmental permits and registrations held by DOE and/or DOE contractors (FBP and MCS) at the end of 2017.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Several federal, state, and local agencies are responsible for enforcing environmental regulations at PORTS. Primary regulatory agencies include Ohio EPA and the U.S. Environmental Protection Agency (U.S. EPA). These agencies issue permits, review compliance reports, conduct joint monitoring programs, inspect facilities and operations, and oversee compliance with applicable regulations.

DOE and/or DOE contractors conduct self-assessments to identify environmental issues and consult the regulatory agencies to identify the appropriate actions necessary to achieve and maintain compliance.

## 2.3 COMPLIANCE STATUS
This section discusses the DOE compliance status at PORTS with respect to environmental laws and regulations, DOE Orders, and Executive Orders.

### 2.3.1 Environmental Restoration and Waste Management
This section discusses the DOE compliance status at PORTS with Ohio EPA and U.S. EPA regulations pertaining to environmental restoration and waste management.

#### 2.3.1.1 Comprehensive Environmental Response, Compensation, and Liability Act
PORTS is not on the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) National Priorities List of sites. However, D&D of PORTS is proceeding in accordance with the D&D DFF&O and CERCLA. The D&D DFF&O describes the regulatory process for D&D of the gaseous diffusion process buildings and associated facilities that are no longer in use. Chapter 3, Section 3.2, provides additional information about the D&D Program.

Environmental remediation, or the cleanup of soil, groundwater and other environmental media contaminated by PORTS operations, has been conducted in accordance with the Consent Decree with the State of Ohio, issued on August 29, 1989 and the U.S. EPA Administrative Order by Consent, issued on September 29, 1989 (amended in 1994 and 1997 and terminated on February 13, 2017). Ohio EPA oversees environmental remediation activities at PORTS under the RCRA Corrective Action Program and CERCLA Program. Chapter 3, Section 3.3, provides additional information on the Environmental Restoration Program.

Section 103 of CERCLA requires notification to the National Response Center if hazardous substances are released to the environment in amounts greater than or equal to the reportable quantity. Reportable quantities are listed in CERCLA and vary depending on the type of hazardous substance released. During 2017, DOE contractors had no reportable quantity releases of hazardous substances subject to Section 103 notification requirements.

#### 2.3.1.2 Emergency Planning and Community Right-To-Know Act
The Emergency Planning and Community Right-To-Know Act of 1986, also referred to as the Superfund Amendments and Reauthorization Act Title III, requires reporting of emergency planning information, hazardous chemical inventories, and releases to the environment. Emergency Planning and Community Right-To-Know Act reports are submitted to federal, state, and local authorities.

For emergency planning purposes, facilities must submit information on chemicals present on site above specified quantities (called the threshold planning quantity) to state and local authorities. When a new chemical is brought on site or increased to exceed the threshold planning quantity, information about the new chemical must be submitted to state and local authorities within three months.

Section 304 of the Emergency Planning and Community Right-To-Know Act requires reporting of off-site reportable quantity releases to state and local authorities. During 2017, FBP and MCS had no off-site reportable quantity releases subject to Section 304 reporting requirements.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The Hazardous Chemical Inventory Report includes the identity, location, storage information, and hazards of the chemicals present on site in amounts above the threshold planning quantities specified by U.S. EPA. This report is submitted annually to state and local authorities. Table 2.1 lists the chemicals reported by the PORTS site, which included DOE contractors or lessees (FBP, PMA, MCS, and Centrus) for 2017:

**Table 2.1. Chemicals reported in the Hazardous Chemical Inventory Report for 2017**

| | | |
|---|---|---|
| 1,2-propanediol | full range straight run middle distillate | petroleum distillates |
| aluminum oxide | gasoline | potassium hydroxide |
| aluminum oxide hydrate | hydrogen fluoride | sodium chloride |
| argon | kerosene | sodium fluoride |
| asbestos | lime calcium oxide | sodium hydroxide |
| calcium chloride | lubricating oils | sodium polyacrylate |
| carbon dioxide | methanol | sulfuric acid |
| chlorine | mineral oils | triuranium octaoxide |
| citric acid | nitric acid | uranium oxide |
| dichlorotetrafluoroethane (CFC-114) | nitrogen | uranium hexafluoride |
| diesel fuel #2 (ultralow sulfur) | PCBs | uranium metal |
| ethylene glycol | perfluoro-1,3-dimethylcyclohexane | uranium tetrafluoride |
| fluorotrichloromethane (CFC-11) | | |

The Toxic Chemical Release Inventory is sent annually to U.S. EPA and Ohio EPA. This report details releases to the environment of specified chemicals when they are manufactured, processed, or otherwise used by the entire site in amounts that exceed threshold quantities specified by U.S. EPA. For this report, U.S. EPA defines a release to include on-site treatment, off-site disposal, and recycling conducted in accordance with regulations.

For 2017, DOE contractors reported the permitted release and/or off-site treatment of one chemical:

- nitrate compounds: approximately 36,000 lbs released to the Scioto River through permitted NPDES outfalls (from water treatment).

### 2.3.1.3 Resource Conservation and Recovery Act

RCRA regulates the generation, accumulation, storage, transportation, and disposal of solid and hazardous wastes. "Solid wastes," as defined by Ohio EPA, can be solids, liquids, sludges, or other materials. Hazardous wastes are a subset of solid wastes, and are designated as hazardous by Ohio EPA because of various chemical properties, including ignitability, corrosivity, reactivity, and toxicity.

**Hazardous waste.** DOE and FBP hold a permit to store hazardous waste at PORTS. The permit, often called a Part B Permit, was issued to DOE and the responsible DOE contractor in 1995, and renewed by Ohio EPA in 2001 and 2011. The permit governs the storage of hazardous waste and includes requirements for waste identification, inspections of storage areas and emergency equipment, emergency procedures, training requirements, and other information required by Ohio EPA.

Facilities such as PORTS that generate or store hazardous waste are required to submit a biennial report to Ohio EPA (in even-numbered years) that covers waste shipped in the previous odd-numbered year (i.e., waste shipped in even-numbered years no longer requires reporting). DOE submitted the report for calendar year 2017 to Ohio EPA in February 2018. This biennial report contains the name and address of each facility that waste was shipped to during the previous calendar year, the name and address of the transporter for each waste shipment, the description and quantity of each waste stream shipped off site, and a description of waste minimization efforts. Chapter 3, Section 3.4, Waste Management Program,

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

provides additional information on wastes from DOE activities at PORTS that were recycled, treated, or disposed in 2017.

RCRA also requires groundwater monitoring at certain hazardous waste management units. As discussed in Chapter 6, groundwater monitoring requirements at PORTS have been integrated into one document, the *Integrated Groundwater Monitoring Plan* (DOE 2017d). Hazardous waste management units monitored in accordance with the *Integrated Groundwater Monitoring Plan* include the X-749 Contaminated Materials Disposal Facility (northern portion), X-231B Southwest Oil Biodegradation Plot (Quadrant I Groundwater Investigative [5-Unit] Area), X-701C Neutralization Pit (Quadrant II Groundwater Investigative [7-Unit] Area), X-701B Former Holding Pond, X-701B retention basins, X-744Y Waste Storage Yard (X-701B area), X-230J7 Holding Pond (X-701B area), X-616 Former Chromium Sludge Surface Impoundments, and X-735 RCRA Landfill (northern portion). Chapter 6 discusses the groundwater monitoring requirements for these units.

A groundwater report that summarizes the results of monitoring completed in accordance with the *Integrated Groundwater Monitoring Plan* is submitted annually to Ohio EPA (DOE 2018). Chapter 6 discusses these monitoring results for 2017.

MCS is regulated as a small quantity hazardous waste generator. Small quantity hazardous waste generators are subject to requirements for generation and accumulation of hazardous waste. These requirements include proper waste identification, use of appropriate containers, availability of emergency equipment, and specified shipment information.

**Solid waste.** Groundwater monitoring may be required at closed solid waste disposal facilities, such as landfills. Groundwater monitoring requirements for the closed X-734 Landfills, X-735 Industrial Solid Waste Landfill, and X-749A Classified Materials Disposal Facility are included in the *Integrated Groundwater Monitoring Plan* (DOE 2017d). Chapter 6 discusses the groundwater monitoring results for these units in 2017. There are no solid waste landfills currently operating at PORTS.

## 2.3.1.4 Federal Facility Compliance Act
Waste that is a mixture of RCRA hazardous waste and low-level radioactive waste (LLW) is currently stored at PORTS. RCRA hazardous waste is subject to Land Disposal Restrictions, which with limited exceptions do not allow the storage of hazardous waste for longer than one year. The Federal Facility Compliance Act, enacted by Congress in 1992, allows for the storage of mixed hazardous/LLW for longer than one year because treatment for this type of waste is not readily available. The Act also requires federal facilities to develop and submit site treatment plans for treatment of mixed wastes. On October 4, 1995, Ohio EPA issued a Director's Final Findings and Orders allowing the storage of mixed waste beyond one year and approving the proposed Site Treatment Plan. An annual update to the Site Treatment Plan is required by these Director's Final Findings and Orders. The annual update to the Site Treatment Plan for fiscal year 2017 was submitted to Ohio EPA in December 2017.

## 2.3.1.5 Toxic Substances Control Act
The Toxic Substances Control Act (TSCA) regulates the use, storage, and disposal of PCBs, which are most commonly found in older electrical power system components, such as transformers and capacitors. The PCB transformers and capacitors that were present in the gaseous diffusion process buildings have been removed from service. Four PCB transformers were in service at PORTS at the end of 2017: one in the X-530 Switchyard and three pole-mounted transformers within the PORTS facility.

An annual document log is prepared to meet TSCA regulatory requirements. The document log provides an inventory of PCB items in use, in storage as waste, and shipping/disposal information for PCB items disposed in 2017. The *2017 PCB Document Log for the Portsmouth Gaseous Diffusion Plant* was

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

prepared in June 2018. Approximately 760.6 tons of PCB waste (gross weight) was generated in 2017. Approximately 75.2 tons of PCB waste (gross weight), which includes 64.4 tons of bulk product, was shipped for disposal in 2017. Waste contaminated with PCBs was generated during 2017 through D&D activities in the process buildings and other areas.

A Uranium Enrichment TSCA Compliance Agreement between DOE and U.S. EPA, effective in 1992, was modified in 2017. At PORTS, the Compliance Agreement:

- addresses the use, management, storage, and disposal of PCBs in ventilation duct gaskets and its associated collection and containment system;

- provides a negotiated schedule for clean-up, removal, and management of PCB wastes and contaminated items; and

- requires on-going air monitoring and management of PCB spill clean-ups.

Annual reports of progress made toward milestones specified in the TSCA Compliance Agreement are submitted to U.S. EPA. DOE was in compliance with the requirements and milestones of this TSCA Compliance Agreement during 2017.

The $DUF_6$ Conversion Facility stores and processes cylinders containing $DUF_6$ that may have paint containing greater than 50 parts per million (ppm) of PCBs present on the outside of the cylinders. The cylinders are stored in the X-745C, X-745E and X-745G Cylinder Storage Yards. The cylinders are stored in accordance with an agreement with U.S. EPA that includes monitoring of PCBs in surface water and sediment in drainage basins downstream from the cylinder storage yards. Chapter 5, Sections 5.4.2 and 5.5.2 provide the results of this surface water and sediment sampling, respectively.

### 2.3.1.6 Federal Insecticide, Fungicide, and Rodenticide Act
No restricted-use pesticides were used by DOE contractors in 2017.

### 2.3.2 Radiation Protection
This section discusses the DOE compliance status with DOE Orders pertaining to radiation protection and management of radioactive waste.

### 2.3.2.1 DOE Order 458.1, *Radiation Protection of the Public and the Environment*
The purpose of DOE Order 458.1 is to establish requirements to protect the public and the environment against undue risk from radiation associated with radiological activities conducted under the control of the DOE pursuant to the Atomic Energy Act of 1954, as amended. The objectives of DOE Order 458.1 are:

- to conduct DOE radiological activities so that exposure to members of the public is maintained within the dose limits established in the Order and are as low as reasonably achievable, and

- ensure that DOE sites have the capabilities, consistent with the types of radiological activities conducted, to monitor routine and non-routine radiological releases and assess the radiation dose to members of the public.

DOE Order 458.1 requires that off-site radiation doses do not exceed 100 millirem (mrem)/year above background for all exposure pathways. Chapter 4 provides the dose calculations or monitoring results that demonstrate compliance with this DOE Order.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**2.3.2.2 DOE Order 435.1, *Radioactive Waste Management***
The objective of DOE Order 435.1 is to ensure that all DOE radioactive waste is managed in a manner that is protective of worker and public health and safety, and the environment. DOE Order 435.1 applies to all high-level waste, transuranic waste, and LLW, including the radioactive component of mixed waste for which DOE is responsible. Only LLW and mixed LLW are found at PORTS. Chapter 3, Section 3.4 provides additional information about the DOE Waste Management Program at PORTS.

An on-site waste disposal facility (OSWDF) has been selected per the record of decision for waste disposition for disposal of waste generated by D&D that meets criteria for on-site disposal (see Chapter 3, Section 3.2.2). The DOE Low-level Waste Disposal Facility Review Group (LFRG) has completed an independent review of the design and planned operation of the OSWDF as presented in a Performance Assessment and Composite Analysis and determined compliance with performance objectives in DOE Order 435.1. PORTS received a Disposal Authorization Statement (DAS) for design and construction of the OSWDF from the DOE Office of Site Restoration in 2015. This DAS requires completion of the construction, along with a comparison of the as-built facility to that reviewed, and satisfaction of the conditions in the DAS, as verified by the LFRG, prior to issuance of the DAS for Operations.

**2.3.3 Air Quality and Protection**
This section discusses the DOE compliance status with U.S. EPA and Ohio EPA regulations pertaining to air emissions (both radionuclides and non-radiological pollutants) and stratospheric ozone protection. Chapter 4, Figure 4.1 is a map of the PORTS ambient air monitoring locations.

**2.3.3.1 Clean Air Act**
FBP is responsible for numerous air emission sources associated with the former gaseous diffusion production facilities and support facilities. These sources, which included the boilers at the X-600 Steam Plant Complex (prior to demolition in 2013), emitted more than 100 tons per year of non-radiological air pollutants specified by Ohio EPA, which caused DOE to become a major source of air pollutants as defined in Title 40 of the *Code of Federal Regulations* (CFR) Part 70. Ohio EPA issued the final Title V Air Permit to FBP in 2014.

FBP is required to submit quarterly Title V Deviation Reports that document any deviations from requirements of the Title V permit. These quarterly reports are summarized in an annual Title V Compliance Certification. In 2017, FBP did not have any deviations from the Title V Permit requirements.

Ohio EPA requires an annual report called the Ohio EPA Fee Emissions Report to report emissions of selected non-radiological air pollutants. U.S. EPA requires an annual report of greenhouse gas emissions. Chapter 5, Section 5.3.1 provides more information about these reports and the reported emissions for 2017.

In 2017, MCS was responsible for four permitted sources associated with the $DUF_6$ Conversion Facility. The Annual Permit Evaluation Report for the MCS air emission sources did not report any deviations from applicable emission limits or control requirements. Chapter 5, Section 5.3.1, provides more information about air emissions from MCS in 2017.

Appendix B lists the FBP and MCS air emission sources at PORTS. Radiological air emissions from the DOE air emission sources are discussed in Chapter 4 and non-radiological air emissions are discussed in Chapter 5.

**2.3.3.2 Clean Air Act, Title VI, Stratospheric Ozone Protection**
DOE has instituted a record-keeping system consisting of forms and labels to comply with the Title VI record-keeping and labeling requirements. These requirements affect all areas that use ozone-depleting substances. The service record and retrofit or retirement plan forms apply to units with a capacity of more than 50 pounds. The refrigeration equipment disposal log and associated appliance disposal label are used by all units regardless of capacity. The technicians who service equipment under DOE control are trained in accordance with U.S. EPA requirements.

An ozone-depleting substance, specifically dichlorotetrafluoroethane (CFC-114), was used as a coolant in the gaseous diffusion cascade system formerly used to produce enriched uranium. The CFC-114 was removed from the cascade system in 2012 and was stored in tanks within the X-333 Process Building. Most of this CFC-114 was shipped off site in 2017, but some remained in the X-333 Process Building at the end of 2017.

**2.3.3.3 National Emission Standards for Hazardous Air Pollutants**
The National Emission Standards for Hazardous Air Pollutants (NESHAP), Subpart H, National Emission Standards for Emissions of Radionuclides Other Than Radon from DOE Facilities (40 CFR Part 61, Subpart H) requires DOE to submit an annual report for radiological emissions from DOE air emission sources. DOE contractors FBP and MCS were both responsible for radiological air emission sources. Chapter 4, Section 4.3.3, provides the radiological dose calculations from these emissions.

**FBP sources.** In 2017, FBP was responsible for numerous air emission sources including 1) continuously monitored vents in the X-330 and X-333 Process Buildings and the X-344A Uranium Hexafluoride Sampling Building; 2) room ventilation exhausts and/or pressure relief vents associated with the X-710 Technical Services Building, X-705 Decontamination Facility, the X-326 L-Cage Glove Box, the XT-847 Glove Box; and 3) the X-622, X-623, X-624, and X-627 Groundwater Treatment Facilities.

Radiological emissions from the vents in the X-330 and X-333 Process Buildings and the X-344A Uranium Hexafluoride Sampling Building were measured by continuous monitoring, if in use. Emissions from the room ventilation exhausts and vents (if in use) were estimated based on operating data and U.S. EPA emission factors. Emissions from the groundwater treatment facilities were estimated based on quarterly influent/effluent sampling and quarterly throughput. Total radiological airborne emissions from FBP sources in 2017 were 0.067 curie (Ci) (6.70E-02 Ci).

**MCS sources.** In 2017, MCS was responsible for emissions from the $DUF_6$ Conversion Facility. Emissions from the $DUF_6$ Conversion Facility were based on continuous monitoring of the conversion building stack. Total radiological airborne emissions from the $DUF_6$ Conversion Facility in 2017 were 0.0000442 Ci (4.42E-05 Ci).

**2.3.4 Water Quality and Protection**
This section discusses the DOE compliance status with U.S. EPA and Ohio EPA regulations pertaining to water quality and protection.

**2.3.4.1 Clean Water Act**
DOE contractors FBP and MCS held NPDES permits during 2017 that allowed discharges of water to surface streams. FBP was responsible for 18 monitoring locations identified in the FBP NPDES permit. Nine outfalls discharge directly to surface water, six outfalls discharge to another outfall before leaving the site, and three other locations that are not outfalls were also monitored. Chapter 4, Section 4.3.5.1, and Chapter 5, Section 5.4.1.1, provide additional information on the FBP NPDES outfalls. Chapter 4, Figure 4.2 is a map of the PORTS NPDES outfalls.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The MCS NPDES permit allows the discharge of process wastewaters from the $DUF_6$ Conversion Facility. The MCS NPDES permit provides monitoring requirements for MCS Outfall 001 that are only effective when process wastewater is being discharged through the outfall. The permit also includes requirements for MCS Outfall 602, which are effective when process wastewater is being discharged to the sanitary sewer system that flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). No process wastewater was discharged through MCS Outfall 001 in 2017. Chapter 4, Section 4.3.5, and Chapter 5, Section 5.4.1.2, provide additional information on the MCS NPDES outfalls.

Data required to demonstrate compliance with the NPDES permits are submitted to Ohio EPA in monthly discharge monitoring reports (see Chapter 5, Section 5.4.1.1). Eleven permit limitations associated with the FBP NPDES permit were exceeded during 2017 (see Chapter 5, Section 5.4.1.1). The overall FBP NPDES compliance rate for 2017 was 99%. There were no exceedances of MCS permit limitations in 2017; therefore, the overall MCS NPDES compliance rate for 2017 was 100%.

Most of the FBP NPDES outfalls are also monitored for radionuclides (see Chapter 4, Section 4.3.5). The MCS outfalls are not monitored for radionuclides.

Stormwater runoff, water from precipitation that flows over land and is not absorbed into the ground, is regulated under the Clean Water Act because it can accumulate debris, chemicals, or other pollutants that affect water quality. Stormwater Pollution Prevention Plans are prepared for the site industrial activities under the FBP NPDES permit. Construction activities are covered by the NPDES Construction Stormwater General Permit. The Stormwater Pollution Prevention Plans include descriptions of the activities and the controls to be used to minimize impacts to stormwater runoff.

Stormwater management and drainage design will be part of site redevelopment after D&D and remediation are completed.

### 2.3.4.2 Safe Drinking Water Act

In 2017, FBP was responsible for operation of the PORTS drinking water system. Drinking water systems are regulated by the Safe Drinking Water Act, which sets requirements for water testing, treatment, and disinfection, as well as distribution system maintenance and operator training. The Safe Drinking Water Act also sets health-based standards for naturally-occurring and man-made contaminants that may be found in drinking water.

PORTS obtains its drinking water from two water supply well fields west of PORTS in the Scioto River Valley buried aquifer near the Scioto River. Ohio EPA provides the parameters and schedule for sampling the drinking water for various parameters, including nitrate, lead, disinfection byproducts, total coliform, and chlorine. Sampling results are submitted to Ohio EPA in a monthly report. Section 2.4.2 provides information about a Notice of Violation received by FBP related to operation of the PORTS drinking water system.

### 2.3.5 Other Environmental Statutes

This section discusses the DOE compliance status with other applicable environmental statutes and regulations including underground storage tank regulations and the Endangered Species Act.

### 2.3.5.1 Underground storage tank regulations

The Underground Storage Tank Program is managed in accordance with the Ohio State Fire Marshal's Bureau of Underground Storage Tank Regulations. Seven underground storage tanks in the former gaseous diffusion plant buildings and associated facilities are owned by DOE. At the end of 2017, FBP was responsible for six tanks and Centrus was responsible for one tank. These tanks include six diesel

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

fuel tanks ranging in size from 550 to 20,000 gallons and a 20,000 gallon gasoline tank. The registrations for these tanks are renewed annually.

### 2.3.5.2 National Environmental Policy Act

The National Environmental Policy Act (NEPA) requires evaluation of the environmental impacts of activities at federal facilities and of activities funded with federal dollars.

DOE has a formal program dedicated to compliance pursuant to DOE Order 451.1B, *National Environmental Policy Act Compliance Program*. Restoration actions, waste management, enrichment facilities maintenance, and other activities are evaluated to determine the appropriate level of evaluation and documentation. In 2017, DOE completed an environmental assessment (EA) for potential economic development at PORTS via granting a lease, easement, or title transfer of several parcels of property owned by DOE. DOE prepared the EA to analyze the potential environmental consequences associated with the potential property transfers. The draft EA was available for public comment from January 4, 2017 through April 19, 2017. All comments were considered and responses included in the final EA. Based on the results of the final EA, the potential transfer of property would have no significant impact on the environment. Documents associated with this EA are available on the DOE Portsmouth/Paducah Project Office website (energy.gov/pppo).

Routine operation and maintenance activities are also evaluated to assess potential environmental impacts. Activities not regulated under CERCLA may be covered under a categorical exclusion or other NEPA determination as defined in the regulations. These activities are considered routine and have no significant individual or cumulative environmental impacts. DOE has implemented a policy to post online specific classes of categorical exclusions as found in 10 CFR Part 1021, Appendix B to Subpart D. Categorical exclusions for PORTS are posted on the DOE Portsmouth/Paducah Project Office website (energy.gov/pppo).

### 2.3.5.3 Endangered Species Act

The Endangered Species Act of 1973, as amended, provides for the designation and protection of endangered and threatened wildlife and plants, and the habitat on which such species depend. When appropriate, formal consultations are made with the U.S. Fish and Wildlife Service and the Ohio Department of Natural Resources.

A study was conducted in 2013 to identify the potential presence of the federally-endangered Indiana bat (*Myotis sodalis*) and the northern long-eared bat (*Myotis septentrionalis*), in the northeastern area of PORTS that is the planned location for the OSWDF (see Chapter 3, Section 3.2.2). The study did not identify the presence of the federally-endangered Indiana bat in the study area. Both foraging and roosting activities were identified for the northern long-eared bat, which is listed as a threatened species. In 2015, the U.S. Fish and Wildlife Service issued a Biological Opinion that the OSWDF is not likely to jeopardize the continued existence of the northern long-eared bat. Measures will be taken during construction and operation of the OSWDF to minimize potential impacts to bats.

### 2.3.5.4 National Historic Preservation Act

The National Historic Preservation Act of 1966 (NHPA) is the primary law governing the protection of historic properties. NHPA reviews consider both architectural and archeological properties. Coordination and/or consultation with the State Historic Preservation Office and other stakeholders are made as a part of the reviews. The cultural resources of three broad time periods of occupation of the PORTS property have been assessed: the prehistoric era (occupation by Native Americans until approximately 1650), the historic era (occupation by Native Americans and early settlers from 1650 through 1952) and the DOE era (from 1952 to the present).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Fifty-four prehistoric archaeological sites have been identified on PORTS property. Each of these sites was investigated, and four of the sites included sufficient artifacts such as tools, earth ovens, and pottery to be determined eligible for inclusion on the National Register of Historic Places. One of the sites eligible for inclusion on the National Register of Historic Places was located in the northeast corner of PORTS in the support area for the OSWDF. DOE worked with the State Historic Preservation Office and Tribal Nations to develop a data recovery approach for this area so that artifacts and other information could be recovered from the area (approximately 1 acre) prior to construction activities. Field work, including hand excavation of selected areas, was completed in 2015. No significant artifacts were found. A technical report documenting the data recovery processes and results was submitted to the State Historic Preservation Office in July 2017. A summary-level report intended for a general audience is being prepared.

Sixty-one historic era sites have been identified on PORTS property. Most of these sites were farmstead/residential sites, and investigations of the farmstead/residential sites determined that the sites were not eligible for inclusion on the National Register of Historic Places. Two sites, the Holt Cemetery and Mount Gilead Church and Cemetery are treated as if they are eligible for the National Register.

DOE has worked with the State Historic Preservation Office, Advisory Council on Historic Preservation, Tribal Nations, and individual members of the public interested in historic preservation to determine how best to document the DOE era of site history, that is, the history associated with the buildings and other areas that are part of D&D. The NHPA review for site D&D was performed as a part of the CERCLA process. The PORTS Virtual Museum (portsvirtualmuseum.org) preserves photos, video, oral histories, and other information associated with operation, remediation, and D&D of PORTS. The records of decision for process buildings and waste disposition (see Chapter 3, Section 3.2) list the activities selected to preserve the history associated with the PORTS site.

The following activities selected to preserve the history of the PORTS site have been completed:

- a Comprehensive Summary Report summarizing all NHPA-related investigations (FBP 2014);

- a Historic Context Report that documents the history of operations and facilities at PORTS from 1952 through the end of the Cold War (DOE 2017f); and

- expansion of the PORTS virtual museum to include information on prehistoric activities.

Activities selected to preserve the history of the PORTS site and document ongoing activities are:

- collection and evaluation of items recovered from PORTS facilities for potential future display;
- public outreach to local school districts and others; and
- panoramic and aerial photographs taken at regular intervals.

**2.3.5.5 Archaeological and Historic Preservation Act and Archaeological Resources Protection Act**
The Archaeological and Historic Preservation Act and the Archaeological Resources Protection Act require the Secretary of the Department of Interior to report to Congress on various federal archaeological activities. The Archaeological Resources Protection Act requires federal land managers to provide archaeology program information to the Secretary of the Interior for this report; information for PORTS is included in the overall DOE headquarters report.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**2.3.6 DOE Order 436.1** *Departmental Sustainability*
DOE Order 436.1, *Departmental Sustainability*, requires development and implementation of an Environmental Management System (EMS) in order to protect air, water, land, and other natural or cultural resources potentially impacted by DOE operations.

FBP serves as the coordinating contractor for EMS implementation among the DOE site contractors (FBP, PMA, and MCS). A report of progress in achieving specified EMS goals is submitted annually to DOE Headquarters. These EMS goal areas, specified in Executive Order 13963 (see Section 2.3.7.2), include objectives related to the following:

- reduction of greenhouse gas emissions,
- reduction of energy consumption and intensity in site buildings,
- increased use of clean or renewable energy,
- enhanced water use efficiency and management,
- fleet management to reduce petroleum use and/or increase alternative fuel/vehicle use,
- sustainable acquisition, and
- pollution prevention and waste reduction.

In 2017, DOE PORTS (FBP, PMA, and MCS) reported that at least 80% of the EMS goal areas for fiscal year 2017 were addressed in the EMS. Some of the EMS goal areas are not applicable to PORTS because the facility is not operating and is preparing for D&D.

Chapter 3, Section 3.5, provides information about the DOE Environmental Sustainability Program at PORTS.

**2.3.7 Executive Orders**
Executive Orders are issued by the President to various federal agencies, including DOE. This section discusses the DOE compliance status at PORTS with Executive Orders pertaining to the environment.

**2.3.7.1 Executive Order 11988,** *Floodplain Management,* **and Executive Order 11990,** *Protection of Wetlands*
Title 10 of the CFR Part 1022 establishes policy and procedures for compliance with Executive Order 11988, *Floodplain Management*, and Executive Order 11990, *Protection of Wetlands*.

A site-wide wetland survey report was completed and submitted to the Corps of Engineers in 1996. The 1996 survey identified 41 jurisdictional wetlands and four non-jurisdictional wetlands totaling 34.361 acres at PORTS.

A wetland and stream assessment was completed in 2013 for the northeast area of PORTS where the OSWDF will be constructed. DOE is developing mitigation strategies for wetlands and streams that will be impacted by the construction of the OSWDF in accordance with CERCLA requirements.

**2.3.7.2 Executive Order 13693,** *Planning for Federal Sustainability in the Next Decade*
Executive Order 13693 establishes a framework to maintain federal leadership in sustainability and greenhouse gas emission reductions. Existing activities that are part of compliance with DOE Order 436.1 (see Section 2.3.6) and the DOE Environmental Sustainability Program at PORTS (see Chapter 3, Section 3.5) support this executive order. These existing activities include improving energy and water use efficiency; encouraging site-wide recycling and material reuse; and increasing the use of alternative fuel and alternative fuel vehicles.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Green and sustainable remediation is the abatement, cleanup, or use of methods to contain, remove, or destroy contaminants while seeking to minimize the environmental, economic, and social costs of the remediation. FBP is incorporating green and sustainable remediation into the D&D activities discussed in Chapter 3. Actions being taken to support green remediation include efficient movement of materials to reduce fuel usage, efforts to minimize water usage and control runoff, and recycling/reuse of materials.

## 2.4 OTHER MAJOR ENVIRONMENTAL ISSUES AND ACTIONS
This section summarizes environmental inspections of DOE activities at PORTS during 2017 and the results of these inspections.

### 2.4.1 Environmental Program Inspections
During 2017, five inspections of DOE activities at PORTS were conducted by federal, state, or local agencies. Table 2.2 lists these inspections.

**Table 2.2. Environmental inspections of DOE activities at PORTS for 2017**

| Date | DOE contractor | Agency | Type | Notices of Violation |
|---|---|---|---|---|
| April 25-26 | FBP | U.S. EPA | RCRA compliance | None |
| June 7 | FBP | Ohio EPA | Drinking water system (Safe Drinking Water Act) | None |
| July 12 | FBP | Ohio EPA/Pike County Health District | Closed solid waste landfills (X-735, X-749, X-749A) | None |
| October 26 | FBP | Ohio EPA | NPDES compliance | None |
| November 2 | FBP | Ohio EPA | Clean Air Act – Title V permit | None |

### 2.4.2 Notices of Violation
FBP received a Notice of Violation from Ohio EPA in 2018 related to the operation of PORTS drinking water system in 2017. The Notice of Violation was due to a failure to collect required water samples for *E. coli* from the PORTS drinking water system in October and November of 2017. Notices of this violation were posted throughout the plant as required by Ohio EPA. FBP has implemented procedures to track required sampling so that samples are not missed. No further actions were required.

### 2.5 UNPLANNED RELEASES
An unplanned release occurred on January 3, 2017 when an oil sheen on water in the X-230J5 Northwest Holding Pond and West Drainage Ditch was discovered during a heavy rainstorm. The release was reported to the National Response Center, Ohio EPA, and Pike County Local Emergency Planning Committee in accordance with the Clean Water Act. After investigation, the release appeared to be transformer oil from the X-530 Switchyard that was present in the storm drainage system. Heavy precipitation allowed a small quantity of oil and water to escape the containment within the storm drain system in the switchyard area and be released to the X-230J5 Northwest Holding Pond and West Drainage Ditch. A maximum of 0.25 gallon of oil was estimated to have been released. The oil sheen was contained by the use of absorbents, skimmers, and a wet vacuum. The area of the sheen was located

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

on site and did not impact the public. Improvements were made to the oil capture system associated with the X-530 Switchyard.

## 2.6 SUMMARY OF PERMITS

Appendix B lists the permits held by DOE and/or DOE contractors in 2017.

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 3. ENVIRONMENTAL PROGRAM INFORMATION

## 3.1 SUMMARY

Ohio EPA concurred with the records of decision for the process buildings and waste disposition in 2015. The record of decision for the process buildings and other facilities selected controlled removal of stored waste and materials, demolition of the buildings or structures, and characterization of materials for disposal or disposition (DOE 2015c). The record of decision for waste disposition selected a combination of on-site and off-site disposal (DOE 2015d), which includes construction of an OSWDF.

Soil and groundwater is being investigated and remediated, if necessary, as part of the Environmental Restoration Program at PORTS. Ohio EPA approved the *Deferred Units RCRA Facility Investigation/Corrective Measures Study Work Plan for Solid Waste Management Units* in 2015 (DOE 2015a). This work plan was developed to investigate "deferred units" at PORTS, which are areas of potential soil and/or groundwater contamination that were in or adjacent to the gaseous diffusion production and operational areas such that remedial activities prior to D&D would have interrupted operations, or were areas that could have become recontaminated from ongoing operations. Soil and groundwater sampling in the work plan started in 2015 and was completed in 2016. The *Deferred Units RCRA Facility Investigation/Corrective Measures Study Report* (DOE 2017a) was submitted to Ohio EPA on September 27, 2017. Ohio EPA was reviewing the report at the end of 2017 and submitted draft comments to DOE in 2018.

In 2017, FBP shipped approximately 2218 tons of waste or other materials to off-site facilities for treatment, disposal, recycling, or reuse. Activities undertaken by the Environmental Sustainability and Public Awareness programs are also discussed in this chapter.

Chapter 2, Section 2.3.6, provides information on implementation of the DOE EMS at PORTS.

## 3.2 D&D PROGRAM

On April 13, 2010, Ohio EPA issued the D&D DFF&O, which is an enforceable agreement between Ohio EPA and DOE that governs the process for D&D of the gaseous diffusion process buildings and associated facilities that are no longer in use at PORTS. The D&D DFF&O was revised in 2011 and 2012 to add structures that were inadvertently omitted from the original orders. The D&D DFF&O, which applies to the D&D of buildings down to and including the building slab and disposal of wastes generated by D&D, uses the CERCLA framework for determining appropriate removal and remedial actions. Documents are submitted to Ohio EPA for either concurrence or approval. Chapter 2, Section 2.3.1.1, provides additional information about the D&D DFF&O.

Community involvement is an important part of the CERCLA process and the D&D DFF&O. Opportunities for public comment are built into the D&D process as described in Sections 3.2.1 and 3.2.2. The PORTS Community Relations Plan (DOE 2010, DOE 2012) identifies opportunities to provide information to the public and obtain public input. Additionally, the PORTS Site Specific Advisory Board provides recommendations to DOE based on the concerns of the communities surrounding PORTS. Section 3.6 provides additional information on the PORTS Public Awareness Program.

### 3.2.1 Process Buildings and Other Facilities

D&D of the process buildings and other facilities at PORTS is proceeding in accordance with the record of decision for process buildings concurred with by Ohio EPA in 2015 (DOE 2015c). The record of decision includes:

- Demolition of the buildings or structures;
- Characterization and demolition of underground man-made features;

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- Treatment as needed to meet transportation and disposal requirements;
- Packaging of generated waste for final disposal; and
- Transportation and disposal of the waste in accordance with the waste disposition record of decision.

The Process Buildings Deactivation Remedial Design/Remedial Action Work Plan (DOE 2016c) was developed by DOE and concurred with by Ohio EPA in 2016. The Work Plan provides the information to demonstrate that deactivation activities to prepare the three main process buildings and associated support structures for demolition meet the requirements of the D&D DFF&O, the Process Buildings and Waste Disposition records of decision, and other applicable requirements. Activities underway in 2017 included disassembly and removal of equipment, removal of wastes including asbestos, PCBs, and RCRA hazardous waste, and deactivation of utilities and other systems.

### 3.2.2 Site-wide Waste Disposition

The record of decision for site-wide waste disposition was concurred with by Ohio EPA in 2015 (DOE 2015d). The record of decision selected a combination of on-site and off-site disposal, including construction of an OSWDF.



Figure 3.1 shows the location of the planned OSWDF in the northeast portion of PORTS. Ohio EPA concurred with Phase I and Phase II of the remedial design/remedial action work plan for the OSWDF (DOE 2015e) in 2015, which allowed initial site construction activities such as tree clearing, fencing, utility installation, and installation of erosion and sediment controls. These activities began after approval of the work plan. An addendum to the Phase II work plan was completed and concurred with by Ohio EPA in 2016, which allowed additional construction to support the OSWDF (DOE 2016a). These activities included construction of retention ponds for surface water runoff and installation of office trailers and utilities. The activities authorized by the addendum continued in 2017.

**Figure 3.1. Location of the OSWDF at PORTS.**

The OSWDF Pre-Final (90%) Design Package was submitted to Ohio EPA on March 9, 2017. After several meetings to discuss the submittal, Ohio EPA provided comments on the Design Package to DOE on July 7, 2017. DOE worked on addressing Ohio EPA's comments for the remainder of 2017 and submitted responses in 2018.

### 3.3 ENVIRONMENTAL RESTORATION PROGRAM

DOE established the Environmental Restoration Program in 1989 to identify, control, and remediate environmental contamination at PORTS. Environmental restoration has been conducted in accordance with the RCRA corrective action process, under a Consent Decree with the State of Ohio, issued on August 29, 1989 and a U.S. EPA Administrative Order by Consent, issued on September 29, 1989 (amended in 1994 and 1997 and terminated on February 13, 2017). With implementation of D&D, removal of facilities and structures down to and including the building slab is controlled by the D&D

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

process (see Section 3.2). Investigation and remediation of environmental contamination is completed under the RCRA corrective action process and in accordance with the Consent Decree with the State of Ohio.

In general, the RCRA corrective action process consists of the following:

1)  an assessment to identify releases of hazardous waste and hazardous constituents and determine the need for further investigation (the RCRA facility assessment),

2)  an investigation to determine the nature and extent of any contamination (the RCRA facility investigation), and

3)  a study to identify and evaluate remedial alternatives to address contamination (the corrective measures study).

Following the approval of the final corrective measures study, Ohio EPA selects the remedial alternatives that will undergo further review to determine the final remedial actions (the preferred plan). Upon completion of the public review and comment period, Ohio EPA selects the final remedial actions. Ohio EPA issues a decision document to select the final remedial actions and the remedial actions are implemented by DOE. Final remedial actions are reviewed by Ohio EPA on a schedule agreed upon by Ohio EPA and DOE (approximately every five years) to ensure that the remedial actions are performing as intended by the decision document and are protective of human health and the environment.

The initial assessment and investigation of PORTS under the RCRA corrective action process was completed in the 1990s. Because PORTS is a large facility, it was divided into quadrants (Quadrant I, II, III, and IV) to facilitate the cleanup process (see Chapter 6, Figure 6.1). Remedial actions have been implemented in each of the PORTS quadrants.

With the beginning of D&D, investigation of areas known as "deferred units" has begun. Deferred units are areas that were in or adjacent to the gaseous diffusion production and operational areas such that remedial activities prior to D&D would have interrupted operations, or were areas that could have become recontaminated from ongoing operations. Ohio EPA deferred investigation/remedial action of soil and groundwater associated with these units until D&D of PORTS (or until the area no longer met the requirements for deferred unit status). Ongoing environmental monitoring and on-site worker health and safety programs monitor the contaminants in these areas prior to D&D.

The *Deferred Units RCRA Facility Investigation/Corrective Measures Study Work Plan* was approved by Ohio EPA in 2015 (DOE 2015a). Soil and groundwater sampling in the work plan started in 2015 and was completed in 2016. The *Deferred Units RCRA Facility Investigation/Corrective Measures Study Report* (DOE 2017a) was submitted to Ohio EPA on September 27, 2017. Ohio EPA was reviewing the report at the end of 2017 and submitted draft comments to DOE in 2018.

The following sections describe the remedial actions underway in each quadrant as well as ongoing activities at any formerly deferred units. Table 3.1 lists remedial activities for the groundwater monitoring areas at PORTS, which include remedial actions required by decision documents and other actions.

### 3.3.1 Quadrant I

The *Quadrant I Cleanup Alternative Study/Corrective Measures Study* was approved by Ohio EPA in 2000 (DOE 2000). Ohio EPA issued the Decision Document for Quadrant I in 2001, which provided the required remedial actions for the X-749/X-120 groundwater plume and the Quadrant I Groundwater

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Investigative (5-Unit) Area (the Five-Unit Groundwater Investigative Area and X-231A/X-231B Oil Biodegradation Plots) (Ohio EPA 2001).

Remedial actions required for the X-749B Peter Kiewit Landfill (PK Landfill) were provided in separate Decision Documents issued by Ohio EPA in 1996 (Ohio EPA 1996a) and U.S. EPA in 1997 (U.S. EPA 1997b). The following sections discuss the remedial actions required for the X-749/X-120 groundwater plume, PK Landfill, and the Quadrant I Groundwater Investigative (5-Unit) Area. Chapter 6 provides 2017 groundwater monitoring results for the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility, (Section 6.4.1.3 and Figure 6.2), PK Landfill (Section 6.4.2.1 and Figure 6.2) and Quadrant I Groundwater Investigative (5-Unit) Area (Section 6.4.3.1 and Figure 6.3).

### 3.3.1.1 X-749/X-120 groundwater plume

The remedial actions identified for X-749/X-120 groundwater plume (see Chapter 6, Figure 6.2) include phytoremediation of the groundwater plume, installation of a barrier wall around the eastern and southern portion of the X-749 Landfill, and continued operation of the groundwater collection trenches installed at the PK Landfill and X-749 Landfill. In addition, groundwater extraction wells were installed in 2007, 2008, and 2010 to control migration of the plume and remediate areas of higher trichloroethene (TCE) concentrations within the plume.

Phytoremediation is a process that uses plants to remove, degrade, or contain contaminants in soil and/or groundwater. Phytoremediation at the X-749/X-120 groundwater plume was installed in two phases during 2002 and 2003. The barrier wall around the eastern and southern portion of the X-749 Landfill was completed in 2002.

The *First Five-Year Review for the X-749/X-120 Groundwater Plume*, submitted to Ohio EPA in 2011, found that the remedial actions implemented for the X-749/X-120 groundwater plume (both the remedial actions required by the Decision Document and the extraction wells installed in 2007 and 2008) were achieving remedial action objectives by preventing migration of contaminants from the X-749 Landfill and controlling migration of the X-749/X-120 groundwater plume (DOE 2011b). However, Ohio EPA and DOE agreed that the phytoremediation system was not as successful as anticipated in reducing concentrations of TCE in groundwater. The extraction wells that began operating in 2007-2008 in the groundwater collection trench on the southwest side of the X-749 Landfill and the X-749 South Barrier Wall Area, as well as the barrier wall on the south and east sides of the landfill (completed in 2002), appeared to be primarily responsible for the reductions in TCE concentrations within the X-749/X-120 groundwater plume.

The *Second Five-Year Review for the X-749/X-120 Groundwater Plume at the Portsmouth Gaseous Diffusion Plant* (DOE 2016d) was submitted to Ohio EPA in June 2016. The five-year review presented an evaluation of the effectiveness of the remedial actions implemented for the X-749/X-120 groundwater plume. Ohio EPA approved the report in July 2016 and agreed that the remedial actions are working effectively to meet the remedial action objectives for the X-749/X-120 groundwater plume. The next review of the remedial actions implemented for the X-749/X-120 groundwater plume will be submitted to Ohio EPA in 2021.

A potential source area to the X-749/X-120 groundwater plume was identified recently north of the X-749 Landfill. This area has been investigated as part of the *Deferred Units RCRA Facility Investigation/ Corrective Measures Study Work Plan for Solid Waste Management Units* (DOE 2015a).

Chapter 6, Section 6.4.1.3 and Figure 6.2, provide additional information about the 2017 groundwater monitoring results for the X-749/X-120 groundwater plume.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 3.1.  Remedial actions at PORTS in groundwater monitoring areas**

| Quadrant/monitoring area | Remedial action/year completed |
|---|---|
| Quadrant I<br>X-749/X-120 groundwater plume | X-749 multimedia cap – 1992<br>X-749 barrier wall (north and northwest sides of landfill) – 1992<br>X-749 subsurface drains and sumps – 1992<br>South barrier wall – 1994<br>X-120 horizontal well – 1996<br>X-625 Groundwater Treatment Facility – 1996<br>X-749 barrier wall (east and south sides of landfill) – 2002<br>Phytoremediation (22 acres) – 2002 & 2003<br>Injection of hydrogen release compounds – 2004<br>X-749 South Barrier Wall Area extraction wells – 2007<br>Two additional extraction wells in the groundwater collection<br>  trench on the southwest side of the X-749 Landfill – 2008<br>X-749/X-120 groundwater plume extraction wells – 2010 |
| Quadrant I<br>Peter Kiewit (PK) Landfill (X-749B) | Relocation of Big Run Creek – 1994<br>Groundwater collection system – 1994<br>Groundwater collection system expansion – 1997<br>PK Landfill Subtitle D cap – 1998 |
| Quadrant I<br>Quadrant I Groundwater<br>Investigative (5-Unit) Area | Groundwater extraction wells (3) – 1991<br>X-622 Groundwater Treatment Facility – 1991<br>  (upgraded in 2001)<br>Interim soil cover at X-231B – 1995<br>X-231A/X-231B multimedia caps – 2000<br>Groundwater extraction wells (11) – 2002<br>Groundwater extraction well (1) – 2009<br>Removal of contaminated soil at former X-770 Building – 2010 |
| Quadrant I<br>X-749A Classified Materials<br>Disposal Facility | Cap – 1994 |
| Quadrant II<br>Quadrant II Groundwater<br>Investigative (7-Unit) Area | Operation of X-700 and X-705 building sumps – 1989<br>X-622T Groundwater Treatment Facility – 1992<br>Removal of X-720 Neutralization Pit – 1998<br>Removal of X-701C Neutralization Pit – 2001<br>Removal of contaminated soil near X-720 Neutralization<br>  Pit – 2001<br>X-627 Groundwater Treatment Facility – 2004<br>  (replaced the X-622T facility)<br>Enhanced anaerobic bioremediation – 2011 |
| Quadrant II<br>X-701B Former Holding Pond | X-237 Groundwater Collection System – 1991<br>X-624 Groundwater Treatment Facility – 1991 (upgraded 2006)<br>Extraction wells (3) – 1993 (removed 2009-2011)<br>X-623 Groundwater Treatment Facility – 1993<br>X-701B sump – 1995<br>Groundwater remediation by oxidant injection – 2008<br>Groundwater and soil remediation by oxidant mixing – 2011 |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 3.1.  Remedial actions at PORTS in groundwater monitoring areas (continued)**

| Quadrant/monitoring area | Remedial action/year completed |
|---|---|
| Quadrant III<br>    X-740 Former Waste Oil Handling<br>    Facility Area | Phytoremediation – 1999<br>Oxidant injections – 2008<br>Enhanced anaerobic bioremediation – 2011 |
| Quadrant IV<br>    X-611A Former Lime Sludge<br>    Lagoons | Soil cover – 1996<br>Prairie vegetation planted – 1997 |
| Quadrant IV<br>    X-735 Landfills | Cap on northern portion – 1994<br>Cap on southern portion – 1998 |
| Quadrant IV<br>    X-734 Landfills | Cap on X-734B Landfill (Phase I) – 1999<br>Cap on X-734 and X-734A Landfills (Phase II) – 2000 |
| Quadrant IV<br>    X-533 Former Switchyard Complex | Contaminated soil removal – 2010 |

### 3.3.1.2 PK Landfill

The remedial actions required by the PK Landfill Decision Documents consisted of the continued operation of the eastern groundwater collection system installed in 1994 and construction of an engineered cap that meets the RCRA Subtitle D and related requirements (Ohio EPA 1996a and U.S. EPA 1997b).  In addition, the southeastern groundwater collection system was constructed in 1997 to contain surface seeps, groundwater from the southern slope of the PK Landfill, and the groundwater plume migrating toward Big Run Creek from the X-749 Landfill.

Five-year reviews for the PK Landfill (DOE 2008d, DOE 2013d) have found that the corrective actions implemented at the PK Landfill (the groundwater collection systems, landfill cap, and institutional controls) were continuing to achieve corrective action objectives by eliminating exposure pathways and reducing the potential for contaminant transport.  Concentrations of many of the contaminants detected in the PK Landfill wells, sumps, and manholes have decreased.  The next review of the remedial actions implemented at the PK Landfill will be submitted to Ohio EPA in 2018.

Chapter 6, Section 6.4.2.1 and Figure 6.2, provide 2017 groundwater monitoring results for the PK Landfill area.

### 3.3.1.3 Quadrant I Groundwater Investigative (5-Unit) Area

Remedial actions identified for the Quadrant I Groundwater Investigative (5-Unit) Area (Chapter 6, Figure 6.3) are:  1) installation of multimedia caps over the X-231A and X-231B Oil Biodegradation Plots; and 2) installation of 11 additional groundwater extraction wells to extract contaminated groundwater for treatment in the X-622 Groundwater Treatment Facility (Ohio EPA 2001).  The caps were constructed in 2000 and operation of the groundwater extraction wells began in 2002.  In 2009, an additional extraction well was installed south of the X-326 Process Building to control and remediate a newly identified source of TCE beneath the building.  Table 3.1 lists the remedial actions completed for the Quadrant I Groundwater Investigative (5-Unit) Area.

Five-year reviews of both the groundwater extraction system for the Quadrant I Groundwater Investigative (5-Unit) Area and the multi-layered caps for the X-231A and X-231B Oil Biodegradation Plots was completed in 2008 (DOE 2008a) and 2013 (DOE 2013a).  The reports found that the remedial

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

actions implemented for the X-231A and X-231B Oil Biodegradation Plots and the Five-Unit Groundwater Investigative Area (the multimedia caps and groundwater extraction system) were continuing to eliminate potential exposure pathways to contaminants, control migration of the groundwater plume, and remove volatile organic compounds (VOCs) from groundwater. The next review of the remedial actions implemented at the Quadrant I Groundwater Investigative (5-Unit) Area and X-231A/B Oil Biodegradation Plots will be submitted to Ohio EPA in 2018.

Chapter 6, Section 6.4.3.1 and Figure 6.3, provide information on the groundwater monitoring completed in the Quadrant I Groundwater Investigative (5-Unit) Area during 2017.

### 3.3.2 Quadrant II

The *Quadrant II Cleanup Alternative Study/Corrective Measures Study* was approved by Ohio EPA in 2001 (DOE 2001). After approval of the document, however, Ohio EPA requested an amendment to the approved study to address additional remedial alternatives for the X-701B area. Amendments were submitted in 2001 and 2002. In 2003, Ohio EPA informed DOE that a separate Decision Document would be prepared for the X-701B area, and the X-701B Decision Document was issued in 2003 (Ohio EPA 2003).

Chapter 6 provides 2016 groundwater monitoring results for the following areas in Quadrant II that require groundwater monitoring: Quadrant II Groundwater Investigative (7-Unit) Area (Section 6.4.5.1 and Figure 6.4), X-701B Former Holding Pond (Section 6.4.6.1 and Figure 6.5), and X-633 Former Recirculating Cooling Water Complex (Section 6.4.7.1 and Figure 6.6).

### 3.3.2.1 Quadrant II Groundwater Investigative (7-Unit) Area

A number of deferred units are in the groundwater plume in the Quadrant II Groundwater Investigative (7-Unit) Area (Chapter 6, Figure 6.4). A special investigation conducted in 2009, which sampled soil and groundwater, identified areas of higher TCE concentrations that appeared to be associated with continuing sources of groundwater contamination in the southeastern portion of the plume. In 2010, Ohio EPA approved an interim remedial measure (IRM) for this area called enhanced anaerobic bioremediation. Enhanced anaerobic bioremediation utilizes injections of fermentable carbon compounds such as sodium lactate (a common ingredient in soaps and face creams) to provide additional food for naturally-occurring microorganisms in soil that degrade TCE to harmless substances. The project began in 2010 and was completed in 2013.

The *Final Report for the 7-Unit Interim Remedial Measure* was submitted to Ohio EPA in 2014 (DOE 2014). Overall, the results indicated that appropriate conditions could be established at the site to degrade TCE despite the high TCE concentrations in soil and groundwater. Enhanced anaerobic bioremediation successfully reduced TCE to *cis*-1,2-dichloroethene, and with bioaugmentation, some of the *cis*-1,2-dichloroethene was converted to ethane. The report concluded that after the six injection events plus a bioaugmentation event (injection of additional microorganisms that degrade VOCs), overall there was not a measureable reduction in the average concentration of TCE in groundwater, most likely due to the potential presence of dense non-aqueous phase liquid TCE in the area, and the decision was made to conclude the IRM.

DOE and Ohio EPA have agreed that selection of a remedial action for the Quadrant II Groundwater Investigative (7-Unit) Area will be incorporated into the deferred units preferred plan and decision document.

Chapter 6, Section 6.4.5.1 and Figure 6.4, provide information about the groundwater monitoring completed at the Quadrant II Groundwater Investigative (7-Unit) Area during 2017.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

### 3.3.2.2 X-701B Former Holding Pond

Remedial actions required by the Decision Document for X-701B, issued in 2003, include groundwater remediation by injection of a chemical oxidant (Ohio EPA 2003). The oxidant injections required by the Decision Document took place between 2006 and 2008. Following the end of the injections in 2008, an independent review of the X-701B project was completed by DOE Headquarters to evaluate remediation results and provide recommendations for a path forward.

The review of the X-701B oxidant injections determined that the method used to inject oxidant into the contaminated area was not able to address contaminants in the deepest portion of the contaminated soil. If contaminants remained in this portion of the soil, they would continue to be released into the groundwater plume. Therefore, DOE proposed an IRM to excavate soil in the western portion of the X-701B plume area and directly mix oxidant into the contaminated soil. The IRM began in December 2009 and was completed in January 2011. Chapter 6, Section 6.4.6.1 and Figure 6.5, provide information about the groundwater monitoring completed at the X-701B Former Holding Pond during 2017.

### 3.3.2.3 X-633 Former Recirculating Cooling Water Complex

The X-633 Recirculating Cooling Water Complex was demolished in 2010. A RCRA investigation of soil and groundwater in the area was implemented in 2011. Areas of soil potentially contaminated with metals were identified, but the higher concentrations of metals may have been present in these areas (15 to 20 ft below ground surface) due to naturally-occurring variations in the geology of the area.

Chromium and TCE were detected in groundwater at concentrations above the preliminary remediation goals during the 2011 RCRA investigation for the X-633 area. DOE agreed to sample eight wells around the area annually to continue evaluation of chromium and TCE in groundwater at this area. The *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* provides the data for this monitoring (DOE 2018).

### 3.3.3 Quadrant III

The *Quadrant III Cleanup Alternative Study/Corrective Measures Study* was approved by Ohio EPA in 1998 (DOE 1998a). The Decision Document for Quadrant III, issued in 1999, required phytoremediation of the groundwater plume near the X-740 Waste Oil Handling Facility (Ohio EPA 1999a).

Over 700 hybrid poplar trees were planted on a 2.6-acre area above the X-740 groundwater plume (Chapter 6, Figure 6.8) in 1999. Evaluation reports for this remedial action were completed in 2003 and 2007. The reports concluded that the phytoremediation system had not performed as expected to remove TCE from groundwater in this area (DOE 2003 and DOE 2007b).

In response to Ohio EPA concerns about the performance of the phytoremediation system, DOE implemented additional remedial activities for the X-740 area. Three rounds of oxidant injections were completed in 2008 to remove TCE from the groundwater. Although the oxidant briefly reduced TCE concentrations detected in some of the wells, TCE concentrations in groundwater returned to typical levels in 2009.

In 2010, Ohio EPA approved a pilot study of enhanced anaerobic bioremediation for the X-740 area. Section 3.3.2.1 provides additional information about enhanced anaerobic bioremediation. Emulsified oil, a slow-acting fermentable carbon compound, was injected into the selected portions of the X-740 groundwater plume during December 2010 and January 2011. TCE has decreased in wells within the area of the groundwater plume that was treated during the pilot study (see Chapter 6, Section 6.4.9.1 and Figure 6.8).

The *Final Report for the X-740 Pilot Study* (DOE 2016b) was approved by Ohio EPA in June 2016. A summary of the results of the pilot study is included in the *Deferred Units RCRA Facility Investigation/Corrective Measures Study Report* (DOE 2017a).

Chapter 6 provides 2017 groundwater monitoring results for the following areas in Quadrant III that require groundwater monitoring: X-616 Former Chromium Sludge Surface Impoundments (Section 6.4.8.1 and Figure 6.7) and X-740 Former Waste Oil Handling Facility (Section 6.4.9.1 and Figure 6.8).

### 3.3.4 Quadrant IV

The *Quadrant IV Cleanup Alternative Study/Corrective Measures Study* was approved by Ohio EPA in 1998 (DOE 1998b). DOE received the Decision Document for Quadrant IV in 2000 (Ohio EPA 2000). No new remedial actions were required in Quadrant IV (remedial actions had already taken place at the X-344D Hydrogen Fluoride Neutralization Pit, X-735 Landfills, X-611A Former Lime Sludge Lagoons, and X-734 Landfills).

Chapter 6 provides 2017 groundwater monitoring results for the following areas in Quadrant IV that require groundwater monitoring: X-611A Former Lime Sludge Lagoons (Section 6.4.10.1 and Figure 6.9), X-735 Landfills (Section 6.4.11.1 and Figure 6.10), X-734 Landfills (Section 6.4.12.1 and Figure 6.11), X-533 Former Switchyard Complex (Section 6.4.13.1 and Figure 6.6), and X-344C Former Hydrogen Fluoride Storage Building (Section 6.4.14.1 and Figure 6.12).

### 3.3.4.1 X-611A Former Lime Sludge Lagoons

Ohio EPA and U.S. EPA issued a Decision Document for the X-611A area (Chapter 6, Figure 6.9) in 1996, which required a soil cover over the former lagoons and establishment of a prairie habitat (Ohio EPA 1996b). The soil cover and planting of the prairie were completed in 1997. Five-year reviews completed in 2002, 2008, and 2013 (DOE 2002b, DOE 2008c, and DOE 2013c) found that the soil cover and prairie habitat were meeting the remedial action objectives for this unit by eliminating exposure pathways to the contaminants in the sludge at this area. The next review of the remedial actions implemented at the X-611A area will be submitted to Ohio EPA in 2018.

### 3.3.4.2 X-734 Landfills

Ohio EPA issued a Decision Document for the X-734 Landfills (Chapter 6, Figure 6.11) in 1999 (Ohio EPA 1999b). Remedial actions required by the Decision Document included construction of a multimedia cap over the northern portion of the landfills and a soil cap over the southern portion of the area. These caps were installed in 1999 and 2000.

Five-year reviews completed in 2008 and 2013 found that the landfill caps have achieved remedial action objectives by isolating contaminants in soil and sediment from potential receptors (DOE 2008b and DOE 2013b). The caps were also preventing contaminants from migrating from soil to groundwater and from groundwater to surface water. The next review of the remedial actions implemented at the X-734 Landfills will be submitted to Ohio EPA in 2018.

### 3.3.4.3 X-630 Former Recirculating Cooling Water Complex

The X-630 Recirculating Cooling Water Complex, located in Quadrant IV within Perimeter Road and west of the X-533 Switchyard Complex, was removed during 2011 as part of D&D. A RCRA investigation of soil and groundwater at the X-630 Recirculating Cooling Water Complex was implemented in 2011.

Areas of soil potentially contaminated with metals were identified, but the higher concentrations of metals may have been present in these areas (15 to 20 ft below ground surface) due to naturally-occurring variations in the geology of the area.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Chromium and TCE were detected in groundwater at concentrations above the preliminary remediation goals during the 2011 RCRA investigation for the X-630 area. DOE agreed to sample four wells around the area annually to continue evaluation of chromium and TCE in groundwater at this area. The *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* provides the data for this monitoring (DOE 2018).

## 3.4 WASTE MANAGEMENT PROGRAM

The DOE Waste Management Program directs the safe storage, treatment, and disposal of waste generated by past and present operations and from current D&D and Environmental Restoration projects at PORTS. Waste managed under the program is divided into the following seven categories, which are defined below:

- *LLW* – radioactive waste not classified as high level or transuranic waste. Some LLW is also classified as bulk survey for release (BSFR) waste. BSFR waste consists of solid materials such as building rubble, soil, paper, or plastics that have extremely low levels of radioactivity. BSFR waste is evaluated by an intermediate facility to ensure it meets criteria for radioactivity and other parameters, and then it is disposed at one of four authorized landfills in Tennessee.

- *Hazardous (RCRA) waste* – waste listed under RCRA or waste that exhibits one or more of the four RCRA hazardous characteristics: ignitability, corrosivity, reactivity, and toxicity. Universal waste, which includes common items such as batteries and light bulbs, is a subset of RCRA waste that is subject to reduced requirements for storage, transportation, and disposal or recycling.

- *PCB wastes* – waste containing PCBs, a class of synthetic organic chemicals. Disposal of PCB-contaminated materials is regulated under TSCA.

- *RCRA/low-level radioactive mixed waste* – waste containing both hazardous and radioactive components. The waste is subject to RCRA, which governs the hazardous components, and to the Atomic Energy Act that governs the radioactive components.

- *PCB/low-level radioactive mixed waste* – waste containing both PCB and radioactive components. The waste is subject to TSCA regulations that govern PCB components, and to the Atomic Energy Act that governs radioactive components.

- *PCB/RCRA/low-level radioactive mixed waste* – waste containing PCB and radioactive components that is also a RCRA hazardous waste. The waste is subject to RCRA regulations, TSCA regulations that govern PCBs, and to the Atomic Energy Act that governs radioactive components.

- *Solid waste* – Waste that includes construction and demolition debris, industrial waste, and sanitary waste, as defined by Ohio regulations. These wastes can include waste from construction or demolition activity and office waste. Waste contaminated with asbestos may also be included in this category if it is not included in any of the categories listed above (PCB, RCRA, and/or LLW).

Waste management requirements are varied and are sometimes complex because of the variety of waste streams generated by DOE activities at PORTS. DOE Orders, Ohio EPA regulations, and U.S. EPA regulations must be satisfied to demonstrate compliance with waste management activities. Additional policies have been implemented for management of radioactive, hazardous, and mixed wastes. These policies include the following:

- minimizing waste generation;

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- characterizing and certifying wastes before they are stored, processed, treated, or disposed;

- pursuing volume reduction (such as blending and bulking) as well as on-site storage in preparation for safe and compliant final treatment and/or disposal; and

- recycling.

With the beginning of D&D at PORTS, DOE is placing increased emphasis on the evaluation of materials generated by D&D for reuse or recycling. An agreement between DOE and the Southern Ohio Diversification Initiative (SODI) allows DOE to transfer excess equipment, clean scrap materials and other assets to SODI. SODI first attempts to reuse the excess equipment and property within the local community. Pursuant to the agreement, if SODI is unable to place the property for reuse in the local community, SODI may sell the property. When SODI sells the property, the proceeds are used to support economic development in the southern Ohio region. In 2017, SODI received approximately 596 tons of materials from PORTS, primarily recyclable metals, recyclable oil, and reusable equipment.

In 2017, FBP shipped approximately 2218 tons of materials to off-site facilities for treatment, disposal, recycling, or reuse (see Table 3.2).

The following materials from FBP were sent off-site for recycling in 2017:

- aluminum cans: 2000 lbs
- batteries: 78,623 lbs
- electronic materials (computer equipment, etc.): 12,506 lbs
- recyclable fuel (diesel, gasoline, kerosene): 32,319 lbs
- light bulbs: 5402 lbs
- paper/cardboard: 108,000 lbs
- plastic bottles: 12,500 lbs
- tires: 40,400 lbs
- toner cartridges: 3000 lbs
- recyclable materials to SODI (excess equipment, recyclable metals, recyclable oil, etc.): 596 tons.

## 3.5 ENVIRONMENTAL SUSTAINABILITY PROGRAM

DOE is committed to reducing potential environmental risks, costs, wastes, and future liability by effectively integrating environmental sustainability principles into DOE activities at PORTS in a cost effective and environmentally conscious manner. The DOE Environmental Sustainability Program is a balanced, holistic approach that links planning, budgeting, measuring, and improving PORTS overall environmental performance to specific goals and outcomes. The *Fiscal Year 2018 Site Sustainability Plan* describes the Environmental Sustainability Program and integrates the tenets of an EMS (see Chapter 2, Section 2.3.6) (DOE 2017c). The Environmental Sustainability Program includes elements of pollution prevention, waste minimization, affirmative procurement, sustainable design, and energy and water efficiency.

DOE is committed to minimizing and/or eliminating the amounts and types of wastes generated and to achieving reduced life cycle costs for managing and dispositioning property and wastes during all of DOE projects and activities at PORTS.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 3.2. Waste Management Program off-site treatment,
disposal, and recycling accomplishments for 2017**

| Waste type | Waste stream | Quantity (lbs[a]) | Treatment or disposal, facility |
|---|---|---|---|
| RCRA | Aerosol cans and other liquids classified as hazardous waste | 1396 | Environmental Quality Co. |
| RCRA | Battery acid and air filters contaminated with metals | 1559 | Michigan Disposal Waste Treatment Plant/Wayne Disposal Inc. |
| LLW | Used oils | 81,392 | Diversified Scientific Solutions |
| LLW | Sludges, contaminated liquids, scrap metal, and other debris | 69,315 | EnergySolutions Clive, UT |
| LLW | Contaminated paper | 2295 | EnergySolutions Bear Creek, TN |
| LLW | Ash and other solids | 676 | Materials & Energy Corp. |
| LLW | D&D waste, uranium materials, scrap metal, and other solids | 1,747,657 | Nevada National Security Site |
| LLW/BSFR | Assorted solids (wood, metal, plastic, etc.) | 192,370 | Omega Waste Logistics |
| RCRA/LLW | Lab wastes, gas cylinders, and other liquids | 3556 | Diversified Scientific Solutions |
| RCRA/LLW | D&D waste, soil, lab wastes, and other materials | 70,437 | EnergySolutions Clive, UT |
| RCRA/LLW | Metal turnings, carbon filters, and other materials | 124,212 | Materials & Energy Corp. |
| RCRA/LLW | Solids contaminated with RCRA metals | 5613 | Perma-Fix Florida |
| LLW/PCB | Oil/water mixture contaminated with PCBs | 11,675 | Diversified Scientific Solutions |
| LLW/PCB | PCB ballasts, wire, and other D&D waste | 51,803 | Nevada National Security Site |
| RCRA/LLW/ PCB | Used PCB oil | 353 | Diversified Scientific Solutions |
| PCB | PCB transformer | 427 | Environmental Protection Services |
| Solid waste | D&D waste, concrete, asphalt, metal, office waste, and other solid materials | 562,600 | Rumpke/Pike Sanitation Landfill |
| Solid waste | Non-hazardous liquids (antifreeze, refrigerant) | 21,011 | Environmental Quality Co. |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 3.2. Waste Management Program off-site treatment,
disposal, and recycling accomplishments for 2017 (continued)**

| Waste type | Waste stream | Quantity (lbs[a]) | Treatment or disposal, facility |
|---|---|---|---|
| - | Recyclable aluminum cans, batteries, electronic materials, plastic, batteries, light bulbs, etc. (see Section 3.4) | 294,750 | Various (not including SODI) |
| - | Recyclable materials transferred to SODI (see Section 3.4) | 1,192,021 | - |

[a]lbs in net weight (waste only).

Effective environmental sustainability management begins with an integrated strategy. In order to achieve the objectives and targets of the Environmental Sustainability Program, DOE has developed and implemented a well-defined strategy for setting, updating, and achieving objectives and targets in line with the EMS and in conjunction with DOE pollution prevention goals. The broad objectives are core elements of the Environmental Sustainability Program. These objectives, presented below, are both qualitative and quantitative and reduce the life cycle cost and liability of DOE programs and operations at PORTS:

- eliminating, minimizing, or recycling wastes that would otherwise require storage, treatment, disposal, and long-term monitoring and surveillance;

- eliminating or minimizing use of toxic chemicals and associated environmental releases that would otherwise require control, treatment, monitoring, and reporting;

- maximizing the use (procurement) of recycled-content materials and environmentally preferable products and services, thereby minimizing the economic and environmental impacts of managing by-products and wastes generated in the conduct of mission-related activities; and

- reducing the life-cycle cost of managing personal property at PORTS.

DOE continued energy reduction programs at PORTS that focused on accomplishing the goals of Executive Order 13693, *Planning for Federal Sustainability in the Next Decade*. Executive Order 13693 provides goals for greenhouse gas emission reductions and environmental sustainability (including energy and water efficiency; waste and pollution prevention; and electronics stewardship).

In support of this Executive Order, the *Fiscal Year 2018 Site Sustainability Plan for the Portsmouth Gaseous Diffusion Plant* provides goals and progress through fiscal year 2017 for reductions in greenhouse gas emissions, water consumption, recycling/waste diversion, electronic stewardship, and other areas (DOE 2017c). The following accomplishments were listed for fiscal year 2017:

- a decrease of 60% in greenhouse gas emissions (primarily associated for electricity consumption) versus the fiscal year 2008 baseline emissions.

- a decrease in water consumption of 13% in fiscal year 2017 versus fiscal year 2016.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- Replaced chlorine gas used as a disinfectant in the X-611 Water Treatment Plant and X-6619 Sewage Treatment Plant with less hazardous alternatives (sodium hypochlorite and ultraviolet light disinfectant, respectively).

PORTS received a 2-Star Electronic Product Environmental Assessment Tool (EPEAT) Purchasing Award from the Green Electronics Council for its policies and procedures for the purchase of EPEAT-certified products in 2017.

## 3.6 PUBLIC AWARENESS PROGRAM

A comprehensive community relations and public participation program is in place at PORTS. The purpose of the program is to foster a spirit of openness and credibility between PORTS officials and local citizens, elected officials, business, media, and various segments of the public. The program also provides the public with opportunities to become involved in the decisions affecting environmental issues at PORTS.

The PORTS Site Specific Advisory Board, comprised of citizens from the local area, provides public input and recommendations to DOE on D&D, environmental remediation, waste management, and related issues at PORTS. Regularly scheduled meetings that are open to the public are held between DOE and the PORTS Site Specific Advisory Board. Additional information about the PORTS Site Specific Advisory Board can be obtained at energy.gov/pppo/ports-ssab or by calling 740-289-5249.

The PORTS Envoy Program matches employee volunteers with community stakeholders such as families living next to DOE property, community groups, and local government organizations. The envoys communicate information about PORTS D&D and other site issues to the stakeholders and are available to answer stakeholder questions about PORTS.

DOE also maintains a public Environmental Information Center to provide public access to documents used to make decisions on remedial actions being taken at PORTS. The Information Center is located just north of PORTS at the Ohio State University Endeavor Center (Room 207), 1862 Shyville Road, Piketon, Ohio 45661. Hours for the Information Center are 9 a.m. to noon Monday and Tuesday, noon to 4 p.m. Wednesday and Thursday, or by appointment (call 740-289-8898). The email address is portseic@ports.pppo.gov and web site is energy.gov/pppo/portsmouth-environmental-information-center. The Environmental Information Center Online Document Repository is eic.ports.pppo.gov.

Other information, including this Annual Site Environmental Report, can also be obtained from the DOE Portsmouth/Paducah Project Office web site at energy.gov/pppo or the FBP web site at fbportsmouth.com. PORTS Environmental Geographic Analytical Spatial Information System (PEGASIS) is designed to provide a dynamic mapping and environmental monitoring data display. The web site is https://gisviewer.fbports.com/default.aspx.

Public update meetings and public workshops on specific topics are also held to keep the public informed and to receive their comments and questions. Periodically, fact sheets about major projects are written for the public. Additionally, notices of document availability and public comment periods, as well as other communications on the program, are regularly distributed to the local newspaper and those on the community relations mailing list, neighbors within 2 miles of the plant, and plant employees.

An educational outreach program facilitated by a DOE grant administered by Ohio University includes a project in which local high school students produce a summary of the Annual Site Environmental Report for distribution to the public. The DOE Portsmouth/Paducah Project Office web site at energy.gov/pppo provides additional information about this project.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Points of contact have been established for the public to obtain information or direct questions regarding the Environmental Management Program.  The DOE Site Office may be contacted at 740-897-5010.  The FBP Office of Public Affairs (740-897-2964) also provides information on the program.

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 4. ENVIRONMENTAL RADIOLOGICAL PROGRAM INFORMATION

## 4.1 SUMMARY

Environmental monitoring at PORTS measures both radiological and chemical parameters in air, water, soil, sediment, and biota (animals, vegetation, and crops). This chapter discusses the radiological component of environmental monitoring programs at PORTS; Chapter 5 discusses the non-radiological parameters for the monitoring programs.

Environmental monitoring programs are required by state and federal regulations, permits, and DOE Orders. These programs may also be developed to address public concerns about plant operations. In 2017, environmental monitoring information was collected by DOE contractors (FBP and MCS) and Centrus. This chapter includes information water discharges from Centrus to provide a more complete summary of environmental monitoring at PORTS.

Environmental monitoring data collected at PORTS are used to assess potential impacts to human health and the environment from radionuclides released by current and historical PORTS operations. This impact, called a dose, can be caused by radionuclides released to air and/or water, or radiation emanating directly from buildings or other objects at PORTS. U.S. EPA sets a 10 mrem/year limit for the dose from radionuclides released to the air in the NESHAP (40 CFR Part 61, Subpart H). DOE sets a dose limit as low as reasonably achievable[1], but no more than 100 mrem/year for the dose from radionuclides from all potential pathways in DOE Order 458.1. A person living in the United States receives an average dose of approximately 311 mrem/year from natural sources of radiation (National Council on Radiation Protection [NCRP] 2009).

This chapter includes radiological dose calculations for the dose to the public from radionuclides released to the air and surface water (the Scioto River), from external radiation, and from radionuclides detected by environmental monitoring programs. The maximum dose a member of the public could receive from radiation released by PORTS in 2017 or detected by environmental monitoring programs in 2017 is 0.90 mrem/year. This summary of the dose calculations assumes that the same individual, or representative person, routinely drives on Perimeter Road past the cylinder yards and lives in the immediate vicinity of PORTS. The representative person is assumed to be exposed to the maximum dose calculated from each pathway. Table 4.1 summarizes this dose information.

**Table 4.1. Summary of potential doses to the public from PORTS in 2017**

| Source of dose | Dose (mrem/year) |
|---|---|
| Airborne radionuclides (off-site individual) | 0.12[a] |
| Radionuclides released to the Scioto River | 0.0012 |
| External radiation near cylinder yards (northwest portion of Perimeter Rd) | 0.74 |
| Radionuclides detected by environmental monitoring programs | 0.038 |
| Total | 0.90[b] |

[a]10 mrem/year is U.S. EPA limit for airborne radionuclides in the NESHAP (40 CFR Part 61, Subpart H).
[b]100 mrem/year is the DOE limit for all potential pathways in DOE Order 458.1.

---

[1] "As low as reasonably achievable" is an approach to radiation protection to manage and control releases of radioactive material to the environment, the workforce, and members of the public so that levels are as low as reasonable, taking into account societal, environmental, technical, economic, and public policy considerations. As low as reasonably achievable is not a specific release or dose limit, but a process that has the goal of optimizing control and managing release of radioactive material to the environment and doses so they are as far below the applicable limits as reasonably achievable. This approach optimizes radiation protection.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**4.2 ENVIRONMENTAL RADIOLOGICAL PROGRAM INTRODUCTION**

Environmental monitoring programs at PORTS are designed to detect the effects (if any) of PORTS operations on human health and the environment. Multiple samples are collected throughout the year and analyzed for radionuclides that could be present from PORTS activities. The results of these monitoring programs are used to gauge the environmental impact of PORTS operations and to set priorities for environmental improvements.

Environmental regulations, permits, DOE Orders, and public concerns are all considered in developing environmental monitoring programs. State and federal regulations drive some of the monitoring conducted at PORTS such as limitations on discharges to air and water. DOE Orders 231.1B, *Environment Safety and Health Reporting*, and 458.1, *Radiation Protection of the Public and the Environment,* also address environmental monitoring requirements.

The DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* describes the environmental monitoring programs for DOE activities at PORTS (DOE 2017b). Specific radionuclides monitored at PORTS are selected based on the materials handled at PORTS and on historic monitoring data. For example, samples are analyzed for uranium and isotopic uranium because of the uranium enrichment process. Samples are analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240) and technetium-99 because these radionuclides are produced during the fission process in nuclear reactors and were introduced to PORTS via the use of recycled uranium beginning in the late 1950s.

In 2017, environmental monitoring data were collected by DOE contractors (FBP and MCS) and Centrus. This chapter provides information on the Centrus NPDES monitoring. Centrus data are provided for informational purposes only; DOE cannot ensure the quality of Centrus data.

Data from the following environmental monitoring programs are included in this chapter:

- airborne discharges
- ambient air
- external radiation
- discharges to surface water
- surface water
- sediment
- soil
- biota.

DOE also conducts an extensive groundwater monitoring program at PORTS. Chapter 6 provides information on the groundwater monitoring program, associated surface water monitoring, and water supply monitoring.

As discussed in this chapter, dose is a measure of the potential biological damage that could be caused by exposure to and subsequent absorption of radiation to the body. Because there are many natural sources of radiation, a person living in the United States receives an average dose of approximately 311 mrem/year from sources of natural radiation (NCRP 2009). Appendix A provides additional information on radiation and dose.

Releases of radionuclides from PORTS activities can result in a dose to a member of the public in addition to the dose received from natural sources of radiation. PORTS activities that release radionuclides are regulated by U.S. EPA and DOE. Airborne releases of radionuclides from DOE facilities are regulated by U.S. EPA under the NESHAP (40 CFR Part 61, Subpart H). These regulations

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

set an annual dose limit of 10 mrem/year to any member of the public as a result of airborne radiological releases.

DOE regulates radionuclide emissions to all environmental media through DOE Orders 436.1, *Departmental Sustainability,* and 458.1, *Radiation Protection of the Public and the Environment.* DOE Order 458.1 sets a dose limit as low as reasonably achievable, but no more than 100 mrem/year to any member of the public from all radionuclide releases from a facility. The annual dose limit in NESHAP (10 mrem/year) applies only to airborne radiological releases.

To aid in comparing sampling results for air and water to the 100 mrem/year dose limit, the 100 mrem/year limit is converted into a derived concentration standard (DOE 2011a). The derived concentration standard is the concentration of a radionuclide in air or water that under conditions of continuous exposure for one year by one exposure mode (ingestion of water or inhalation of air) would result in a dose of 100 mrem.

Small quantities of radionuclides were released to the environment from PORTS operations during 2017. This chapter describes the methods used to estimate the potential doses that could result from radionuclides released from PORTS operations. In addition, this chapter assesses the potential doses that could result from radionuclides historically released by PORTS and detected in 2017 by environmental monitoring programs.

## 4.3 RADIOLOGICAL EMISSIONS AND DOSES

Exposure to radioactive materials can occur from releases to the atmosphere, surface water, or groundwater and from exposure to external radiation emanating from buildings or other objects. For 2017, doses are estimated for exposure to atmospheric releases, external radiation, and releases to surface water (the Scioto River).

Doses are also estimated for exposure to radionuclides from PORTS operations that were detected in 2017 as part of the DOE environmental monitoring programs for sediment, soil, residential drinking water (well water – excluding naturally-occurring detections of uranium isotopes) and selected biota (vegetation, deer, fish, crops, and dairy products). Analytical data from the environmental monitoring programs are assessed to determine whether radionuclides were detected at locations accessible to the public. If radionuclides were detected at locations accessible to the public, a dose assessment is completed based on the monitoring data. Exposure to radionuclides detected in groundwater at PORTS is not included because contaminated groundwater at PORTS is not a source of drinking water.

In 2017, doses are estimated for exposure to radionuclides detected by the monitoring programs for sediment, soil, and vegetation. Radionuclides were not detected in 2017 in samples of residential drinking water, deer (muscle), fish, crops, and dairy products.

In addition, DOE Order 458.1 sets absorbed dose rate limits for aquatic animals, riparian animals, terrestrial plants, and terrestrial animals. This chapter discusses the dose calculations completed to demonstrate compliance with these limits.

DOE staff, DOE contractors, and visitors to DOE areas who may be exposed to radiation are also monitored. These results are also provided in this chapter.

### 4.3.1 Dose Terminology

Most consequences associated with radionuclides released to the environment are caused by interactions between human tissue and various types of radiation emitted by the radionuclides. These interactions involve the transfer of energy from radiation to tissue, potentially resulting in tissue damage. Radiation

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

may come from radionuclides outside the body (in or on environmental media or objects) or from radionuclides deposited inside the body (by inhalation, ingestion, and, in a few cases, absorption through the skin). Exposures to radiation from radionuclides outside the body are called external exposures, and exposures to radiation from radionuclides inside the body are called internal exposures. This distinction is important because external exposure occurs only as long as a person is near the external radionuclide; simply leaving the area of the source will stop the exposure. Internal exposure continues as long as the radionuclide remains inside the body.

The three naturally-occurring uranium isotopes (uranium-234, uranium-235, and uranium-238) and technetium-99 are the most commonly detected radionuclides in environmental media samples collected around PORTS. Other radioactive isotopes (americium-241, neptunium-237, plutonium-238, plutonium-239/240, and uranium-236) are occasionally detected at PORTS and may be included in the calculations to ensure the potential dose from PORTS operations is not underestimated. Technetium-99 and transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240) are present in the world-wide environment in very small amounts due to radioactive fallout in the atmosphere from nuclear weapons testing by various countries around the world.

A number of specialized measurement units have been defined for characterizing exposures to ionizing radiation. Because the damage associated with exposure to radiation results primarily from the exposure of tissue to ionizing radiation, the units are defined in terms of the amount of ionizing radiation absorbed by human (or animal) tissue and in terms of the biological consequences of the absorbed energy. These units include the following:

- *Absorbed dose* – the quantity of ionizing radiation energy absorbed by an organ divided by the organ's mass. The unit of absorbed dose is the rad, equal to 0.01 joule per kilogram in any medium (1 rad = 0.01 gray).

- *Equivalent dose* – the product of the absorbed dose (rad) in tissue and a radiation weighting factor. Equivalent dose is expressed in units of rem or sievert (1 rem = 0.01 sievert).

- *Effective dose* – the sum of the doses received by all organs or tissues of the body after each one has been multiplied by the appropriate tissue weighting factor. It includes the dose from radiation sources internal and/or external to the body. Effective dose is expressed in units of rem (or sievert). In this report, the term "effective dose" is often shortened to "dose."

- *Collective dose* – the sum of the effective doses to all persons in a specified population received in a specified period of time. Collective dose is expressed in units of person-rem or person-sievert. The collective dose is also frequently called the "population dose."

### 4.3.2 Airborne Emissions

Airborne discharges of radionuclides from PORTS are regulated under the NESHAP (40 CFR Part 61, Subpart H). Releases of radionuclides are used to calculate a dose to members of the public, which is reported annually to U.S. EPA and Ohio EPA. Section 4.3.3 discusses the results of this dose calculation.

In 2017, FBP was responsible for air emission sources associated with the former gaseous diffusion plant operations, including continuously monitored vents in the X-330 and X-333 Process Buildings and the X-344A Uranium Hexafluoride Sampling Building. The vents in the X-330 and X-333 Process Buildings were in use to support D&D activities. The X-344A vents were in use for ongoing sampling activities of uranium product. Vents in the X-326 Process Building have been permanently shut down as part of D&D activities.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Other radionuclide air emission sources included room ventilation exhausts and/or pressure relief vents associated with the X-710 Technical Services Building, X-705 Decontamination Facility, X-326 L-cage Glove Box (inactive), and the XT-847 Glove Box (inactive). These emission sources were not continuously monitored; emissions from these sources (when in use) were estimated based on operating data and U.S. EPA emission factors. The X-622, X-623, X-624, and X-627 Groundwater Treatment Facilities treated groundwater contaminated with radionuclides or other site water (in accordance with the FBP NPDES permit). Emissions from the groundwater treatment facilities were calculated based on quarterly influent and effluent sampling at each facility and quarterly throughput. Total emissions from the FBP airborne sources in 2017 were calculated to be 0.0670 Ci (6.70E-02 Ci).

MCS was responsible for air emission sources associated with the $DUF_6$ Conversion Facility. Emissions from the $DUF_6$ Conversion Facility were based on continuous monitoring of the conversion building stack. Total emissions from the MCS airborne sources in 2017 were calculated to be 0.0000442 Ci (4.42E-05 Ci).

The Centrus demonstration cascade was the only source of radionuclide air emissions from Centrus that was subject to NESHAP reporting. The demonstration cascade was shut down in 2016; therefore, there were no emissions from Centrus in 2017.

### 4.3.3 Dose Calculation Based on Airborne Emissions

A dose calculation for atmospheric, or airborne, radionuclides is required by U.S. EPA under NESHAP and is provided to U.S. EPA in an annual report. The effect of radionuclides released to the atmosphere by PORTS during 2017 was characterized by calculating the effective dose to the maximally exposed person (the individual who resides at the most exposed point near the plant) and to the entire population (approximately 662,000 residents) within 50 miles of the plant. Dose calculations were made using a computer program called CAP88-PC Version 4.0, which was developed under sponsorship of U.S. EPA for use in demonstrating compliance with the radionuclide NESHAP. The program uses models to calculate levels of radionuclides in the air, on the ground, and in food (e.g., vegetables, meat, and milk) and subsequent intakes by individuals. The program also uses meteorological data collected at PORTS such as wind direction, wind speed, atmospheric stability, rainfall, and average air temperature.

Radionuclide emissions were modeled for each of the air emission sources discussed in Section 4.3.2. The dose calculations assumed that each person remained unprotected, resided at home (actually outside the house) during the entire year, and obtained food according to the rural pattern defined in the NESHAP background documents. This pattern specifies that 70% of the vegetables and produce, 44% of the meat, and 40% of the milk consumed by each person are produced in the local area (e.g., in a home garden). The remaining portion of each food is assumed to be produced within 50 miles of PORTS. These assumptions most likely result in an overestimate of the dose received by a member of the public, since it is unlikely that a person spends the entire year outside at home and consumes food from the local area as described above.

The maximum potential dose to an off-site individual from radiological releases from PORTS air emission sources in 2017 was 0.12 mrem/year. This dose is well below the 10-mrem/year limit applicable to PORTS and the approximate 311-mrem/year dose that the average individual in the United States receives from natural sources of radiation (NCRP 2009).

The collective dose (or population dose) is the sum of the individual doses to the entire population within 50 miles of PORTS. In 2017, the population dose from PORTS emissions was 0.47 person-rem/year. The population dose based on PORTS emissions was insignificant; for example, the average population dose to all people within 50 miles of PORTS from the ingestion of naturally-occurring radionuclides in

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

water and food was approximately 19,630 person-rem/year based on an average dose of approximately 29 mrem/year to an individual (NCRP 2009).

### 4.3.4 Dose Calculation Based on Ambient Air Monitoring

DOE collects samples from 15 ambient air monitoring stations (see Figure 4.1) and analyzes them for the radionuclides that could be present in ambient air due to PORTS activities. These radionuclides are isotopic uranium (uranium-233/234, uranium-235/236, and uranium-238), technetium-99, and selected transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240). The ambient air monitoring stations measure radionuclides released from DOE point sources (the sources described in Section 4.3.2), fugitive air emissions (emissions that are not associated with a specific release point such as a stack), and background levels of radiation (radiation that occurs naturally in the environment and is not associated with PORTS operations).

The CAP88 model generates a dose conversion factor that was used to calculate a dose for a given level of each radionuclide in air. The following assumptions were made to calculate the dose at each station: 1) the highest level of each radionuclide detected in 2017 was assumed to be present for the entire year; or 2) if a radionuclide was not detected, the radionuclide was assumed to be present for the entire year at half the highest undetected result.

The dose associated with each radionuclide at each ambient air monitoring station was added to obtain the gross dose for each station. The net dose for each station was obtained by subtracting the dose measured at the background station (A37). The net dose for each station ranged from 0 at stations with a lower dose than the background station to 0.00046 mrem/year at station A36, which is on site near the X-611 Water Treatment Plant (see Figure 4.1).

The highest net dose measured at the ambient air monitoring stations (0.00046 mrem/year at station A36) is 0.4% of the dose calculated from the DOE point source emissions (0.12 mrem/year). This dose is significantly less than the 10 mrem/year NESHAP limit for airborne radiological releases (40 CFR Part 61, Subpart H) and 100 mrem/year DOE limit in DOE Order 458.1 for all radiological releases from a facility.

### 4.3.5 Discharges of Radionuclides from NPDES Outfalls

FBP, MCS, and Centrus were responsible for NPDES outfalls at PORTS during 2017. The MCS NPDES outfall is not monitored for radionuclides; therefore, it is not discussed in this section. A description of the FBP and Centrus outfalls and the discharges of radionuclides from these outfalls during 2017 are included in this section.

#### 4.3.5.1 FBP outfalls

In 2017, FBP was responsible for 18 monitoring locations identified in the FBP NPDES permit. Nine outfalls discharge directly to surface water, six outfalls discharge to another outfall before leaving the site, and three other locations that are not outfalls are also monitored (see Figure 4.2). A brief description of each FBP outfall or monitoring location at PORTS follows.

*FBP NPDES Outfall 001 (X-230J7 East Holding Pond)* – The X-230J7 East Holding Pond receives non-contact cooling water, steam condensate, foundation drainage, storm runoff, hydro-testing water from cylinders, and sanitary water for eyewash/shower station testing and flushing. The pond provides an area where materials suspended in the influent can settle, chlorine can dissipate, oil can be diverted/contained, and pH can be adjusted. Water from this holding pond is discharged to a tributary that flows to Little Beaver Creek.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 4.1. DOE ambient air and radiation monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 4.2. PORTS NPDES outfalls/monitoring points and cylinder storage yards sampling locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

*FBP NPDES Outfall 002 (X-230K South Holding Pond)* – The X-230K South Holding Pond receives non-contact cooling water, boiler blowdown, steam condensate, foundation drainage, treated runoff from the former coal pile area, storm runoff, fire-fighting training and fire suppression system water, and sanitary water for eyewash/shower station testing and flushing. The pond provides an area where materials suspended in the influent can settle, chlorine can dissipate, oil can be contained, and pH can be adjusted. Water from this holding pond is discharged to Big Run Creek.

*FBP NPDES Outfall 003 (X-6619 Sewage Treatment Plant)* – The X-6619 Sewage Treatment Plant treats PORTS sewage, some Pike County sewage, and process wastewater from MCS as well as water discharged from DOE groundwater treatment facilities, the X-700 Biodenitrification Facility, the X-705 Decontamination Microfiltration System, and miscellaneous waste streams. The X-6619 Sewage Treatment Plant uses screening, aeration, clarification, and filtering followed by disinfection to treat wastewater prior to release to the Scioto River.

*FBP NPDES Outfall 004 (Cooling Tower Blowdown)* – Outfall 004 is located within the X-680 Blowdown Sample and Treatment Building at PORTS. It monitors blowdown water from cooling towers on site prior to being discharged to the Scioto River.

*FBP NPDES Outfall 005 (X-611B Lime Sludge Lagoon)* – The X-611B Lime Sludge Lagoon is used to settle lime sludge used in a water-softening process. The X-611B also receives rainwater runoff. Currently the lagoon only discharges during periods of excess precipitation.

*FBP NPDES Outfall 009 (X-230L North Holding Pond)* – The X-230L North Holding Pond receives non-contact cooling water, steam condensate, storm runoff, fire suppression system water, and sanitary water for eyewash/shower station testing and flushing. The pond provides an area where materials suspended in the influent can settle, chlorine can dissipate, oil can be contained, and pH can be adjusted. Water from this holding pond is discharged to a tributary that flows to Little Beaver Creek.

*FBP NPDES Outfall 010 (X-230J5 Northwest Holding Pond)* – The X-230J5 Northwest Holding Pond receives non-contact cooling water, steam condensate, storm runoff, fire-fighting training and fire suppression system water, and sanitary water for eyewash/shower station testing and flushing. The pond provides an area where materials suspended in the influent can settle, chlorine can dissipate, oil can be diverted/contained, and pH can be adjusted. Water from this holding pond is discharged to a tributary commonly referred to as the West Ditch, which flows to the Scioto River.

*FBP NPDES Outfall 011 (X-230J6 Northeast Holding Pond)* – The X-230J6 Northeast Holding Pond receives non-contact cooling water, steam condensate, storm runoff, fire suppression system water, and sanitary water for eyewash/shower station testing and flushing. The pond provides an area where materials suspended in the influent can settle, chlorine can dissipate, oil can be diverted/contained, and pH can be adjusted. Water from this holding pond is discharged to a tributary that flows to Little Beaver Creek.

*FBP NPDES Outfall 015 (X-624 Groundwater Treatment Facility)* – The X-624 Groundwater Treatment Facility removes VOCs from contaminated groundwater collected in the X-237 Groundwater Collection System in the X-701B Holding Pond area. This collection system was constructed to control the migration of groundwater contaminated with VOCs toward Little Beaver Creek. Treated water is released to a tributary that flows to Little Beaver Creek.

*FBP NPDES Outfall 602 (X-621 Coal Pile Runoff Treatment Facility)* – Prior to D&D of the X-600 Steam Plant Complex, the X-621 Coal Pile Runoff Treatment Facility treated storm water runoff from the coal pile at the X-600 Steam Plant Complex. The X-600 Steam Plant Complex was removed in 2013.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The X-621 Treatment Facility currently operates intermittently to treat precipitation runoff from the area of the former facility. The treated water is discharged to the X-230K South Holding Pond (FBP NPDES Outfall 002).

*FBP NPDES Outfall 604 (X-700 Biodenitrification Facility)* – The X-700 Biodenitrification Facility receives solutions from plant operations that are high in nitrate. At the X-700, these solutions are diluted and treated biologically using bacteria prior to being discharged to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003).

*FBP NPDES Outfall 605 (X-705 Decontamination Microfiltration System)* – The X-705 Decontamination Microfiltration System treats process wastewater using microfiltration and pressure filtration technology. The treated water is discharged to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003).

*FBP NPDES Outfall 608 (X-622 Groundwater Treatment Facility)* – The X-622 Groundwater Treatment Facility removes VOCs from contaminated groundwater originating from site remediation activities in the southern portion of the site, which is Quadrant I in the RCRA Corrective Action Program (see Chapter 3, Section 3.3.1). Treated water is discharged to the sanitary sewer and then through FBP NPDES Outfall 003.

*FBP NPDES Outfall 610 (X-623 Groundwater Treatment Facility)* – The X-623 Groundwater Treatment Facility formerly treated contaminated groundwater from extraction wells in the X-701B groundwater plume. The groundwater extraction wells were removed between 2009 and 2011. Currently, the facility removes VOCs from miscellaneous water associated with site activities (in accordance with the FBP NPDES permit). Treated water is discharged to the sanitary sewer and then through FBP NPDES Outfall 003.

*FBP NPDES Outfall 611 (X-627 Groundwater Treatment Facility)* – The X-627 Groundwater Treatment Facility removes VOCs from groundwater collecting in sumps located in the basements of the X-700 and X-705 buildings, which are part of Quadrant II. Treated water is discharged to the sanitary sewer and then through FBP NPDES Outfall 003.

FBP is also responsible for three additional monitoring points that are not discharge points as described in the previous paragraphs. FBP NPDES Station Number 801 is a surface water background monitoring location on the Scioto River upstream from FBP NPDES Outfalls 003 and 004 that is used for biotoxicity studies. FBP NPDES Station Number 902 is a monitoring location on Little Beaver Creek downstream from FBP NPDES Outfall 001, and FBP NPDES Station Number 903 is a monitoring location on Big Run Creek downstream from FBP NPDES Outfall 002. Water temperature is the only parameter measured at FBP NPDES Station Numbers 902 and 903.

FBP NPDES Outfalls 001, 002, 003, 004, 005, 009, 010, 011, 015, 608, 610, and 611 were monitored for radiological discharges by collecting water samples and analyzing the samples for uranium, uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238), technetium-99, and transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240).

Discharges of radionuclides in liquids through FBP NPDES outfalls have no significant impact on public health and the environment. In 2017, uranium discharges from the FBP external outfalls (Outfalls 001, 002, 003, 004, 005, 009, 010, 011, and 015) were estimated at 6.6 kg. Total radioactivity (technetium-99 and isotopic uranium) released from the same outfalls was estimated at 0.030 Ci.

Discharges of radionuclides were calculated using monthly monitoring data from the NPDES outfalls. Analytical results below the detection limit were assigned a value of zero in the calculations to determine

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

the quantities of uranium and technetium-99 discharged through the outfalls. Discharges of radionuclides from the outfalls are used in the dose calculation for releases to surface water (Section 4.3.6). The dose calculated with these data is significantly less than the 100 mrem/year limit in DOE Order 458.1 for all radiological releases from a facility.

No transuranics (americium-241, neptunium-237, plutonium-238, and plutonium-239/240) were detected in samples collected from the external FBP outfalls (Outfalls 001, 002, 003, 004, 005, 009, 010, 011, and 015) during 2017.

### 4.3.5.2 Centrus outfalls

In 2017, Centrus was responsible for three NPDES outfalls through which water is discharged from the site (see Figure 4.2). Two outfalls discharge directly to surface water, and one discharges to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003) before leaving the site. A brief description of each Centrus NPDES outfall follows.

*Centrus NPDES Outfall 012 (X-2230M Southwest Holding Pond)* – The X-2230M Southwest Holding Pond accumulates precipitation runoff, non-contact cooling water, and steam condensate from the southwestern portion of PORTS. The pond provides an area where solids can settle, chlorine can dissipate, and oil can be separated from the water prior to its release to an unnamed stream that flows to the Scioto River.

*Centrus NPDES Outfall 013 (X-2230N West Holding Pond)* – The X-2230N West Holding Pond accumulates precipitation runoff, non-contact cooling water, and steam condensate from the western portion of PORTS. The pond provides an area where solids can settle, chlorine can dissipate, and oil can be separated from the water prior to its release to a tributary commonly referred to as the West Ditch, which flows to the Scioto River.

*Centrus NPDES Outfall 613 (X-6002 Particulate Separator)* – The X-6002 Particulate Separator removes suspended solids from water used in the X-6002 Recirculating Hot Water Plant, which provides heat to a number of buildings at PORTS. The treated water is discharged to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003).

Centrus Outfalls 012 and 013 were monitored for radiological discharges by collecting water samples and analyzing the samples for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, and uranium. Technetium-99 was not detected in any of the samples collected from Centrus NPDES outfalls in 2017.

Plutonium-239/240 was detected at 0.036 pCi/L in the third quarter sample collected at Outfall 013. No other transuranic radionuclides were detected in any of the samples collected from Centrus NPDES outfalls in 2017.

Uranium discharges in 2017 from external Centrus NPDES outfalls (Outfalls 012 and 013) were estimated at 0.51 kg. These values were calculated using quarterly discharge monitoring reports for the Centrus NPDES outfalls. Analytical results below the detection limit were assigned a value of zero in the calculations to determine the quantities of uranium discharged through the Centrus NPDES outfalls.

Discharges of radionuclides from Centrus Outfalls 012 and 013 are used in the dose calculation for releases to surface water (Section 4.3.6). The dose calculated with these data and data from external FBP outfalls is significantly less than the 100 mrem/year limit in DOE Order 458.1 for all radiological releases from a facility.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

### 4.3.6 Dose Calculation for Releases to Surface Water

Radionuclides are measured at the FBP and Centrus NPDES external outfalls (nine FBP outfalls and two Centrus outfalls). Water from these external outfalls is either directly discharged to the Scioto River or eventually flows into the Scioto River from Little Beaver Creek, Big Run Creek, or unnamed tributaries to these water bodies. A hypothetical dose to a member of the public was calculated using the measured radiological discharges and the annual flow rate of the Scioto River.

Activity (in picocuries per liter [pCi/L]) for americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, and isotopic uranium (uranium-233/234, uranium-235/236, and uranium-238) were measured in the water discharged from the FBP outfalls. Uranium mass (in micrograms per liter [µg/L]) and activity (in pCi/L) for americium-241, neptunium-237, plutonium-238, plutonium-239/240, and technetium-99 were measured in the water discharged from the Centrus outfalls. Radionuclides that were not detected were assumed to be present at the detection limit. Uranium measured at the Centrus outfalls was assumed to be 5.2% uranium-235, 94% uranium-238, and 0.8% uranium-234 based on the highest enrichment of uranium produced by PORTS in the years prior to shutdown of the gaseous diffusion uranium enrichment operations. The maximum individual dose was calculated using the above-mentioned measured radionuclide discharges from the plant outfalls and the annual flow rate of the Scioto River.

The dose calculations were derived from the procedures developed for a similar DOE facility: *LADTAP XL: An Improved Electronic Spreadsheet Version of LADTAP II* (Hamby 1991) and *LADTAP-PA: A Spreadsheet for Estimating Dose Resulting from E-Area Groundwater Contamination at the Savannah River Site* (Jannik and Dixon 2006), which updates the 1991 LADTAP XL. Specific exposure scenarios provided in the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e) were also used when available. Environmental pathways considered were ingestion of water, ingestion of fish, swimming, boating, and shoreline activities. This exposure scenario is unlikely to underestimate the dose because the Scioto River is not used for drinking water downstream of PORTS (97% of the hypothetical dose from liquid effluents is from drinking water). The dose from radionuclides released to the Scioto River in 2017 (0.0012 mrem) is significantly less than the 100 mrem/year DOE limit in DOE Order 458.1 for all radiological releases from a facility.

### 4.3.7 Radiological Dose Calculation for External Radiation

Radiation is emitted from DUF$_6$ cylinders stored on site at PORTS in the cylinder storage yards located in the northwest portion of the site near Perimeter Road. External radiation is measured at five locations along Perimeter Road near the boundaries of the cylinder storage yards in accordance with the DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b). External radiation is measured using thermoluminescent dosimeters (TLDs), which measure both external background radiation and radiation emanating from the DUF$_6$ cylinders. Section 4.6.2 and Figure 4.3 provide more information about the external radiation monitoring program.

Data from radiation monitoring at the cylinder yards are used to assess potential exposure to a representative on-site member of the public that drives on Perimeter Road. The radiological exposure to an on-site member of the general public is estimated as the time that a person drives on Perimeter Road past the cylinder yards, which is estimated at 8.7 hours per year (1 minute per trip, 2 trips per day, 5 work-days per week, and 52 weeks per year). In 2017, the average annual dose (8736 hours) recorded at the cylinder yards near Perimeter Road was 739 mrem/year, based on TLD measurements for an entire year at locations #41, #868, #874, #882, and #890 (see Section 4.6.2 and Figure 4.3). Based on these assumptions, exposure to an on-site member of the public from radiation from the cylinder yards is approximately 0.74 mrem/year.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

External radiation is also measured using TLDs at 19 locations that include 12 of the ambient air monitoring stations and seven additional on-site locations in accordance with the DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b). The total annual dose measured in 2017 at station A29, near the Ohio Valley Electric Corporation (OVEC), was 88 mrem/year (see Section 4.6.2 and Figure 4.3). The total dose measured at eight of the off-site or background monitoring stations averaged 86 mrem/year. A dose calculation was completed for a representative off-site member of the public, such as a worker at OVEC, based on the 2 mrem/year difference between the average off-site background dose (86 mrem/year) and the dose at station A29 (88 mrem/year). Assuming that the worker was exposed to this radiation for 250 days/year, one hour outdoors and 8 hours indoors, the dose to this worker is 0.22 mrem.

A person living in the United States receives an average dose of approximately 311 mrem/year from natural sources of radiation (NCRP 2009). The higher potential estimated dose from external radiation to a member of the public (0.74 mrem/year to a delivery person on Perimeter Road versus 0.22 mrem/year to a worker near station A29) is approximately 0.2 percent of the average yearly natural radiation exposure for a person in the United States and is significantly less than the 100 mrem/year limit in DOE Order 458.1 for all radiological releases from a facility.

### 4.3.8 Radiological Dose Results for DOE Workers and Visitors

The DOE Radiological Protection Organization at PORTS monitors external radiation levels in active DOE facilities at PORTS on a continual basis. This radiation monitoring assists in determining the radiation levels that workers are exposed to and in identifying changes in radiation levels. These measurements provide 1) information for worker protection, 2) a means to trend radiological exposure data for specified facilities, and (3) a means to estimate potential public exposure to radiation from DOE activities at PORTS.

The Radiation Exposure Monitoring System report is an electronic file created annually to comply with DOE Order 231.1B. This report contains exposure results for all monitored DOE employees, DOE contractors, and visitors to DOE areas at PORTS with a positive exposure during the previous calendar year. The 2017 Radiation Exposure Monitoring System report indicated that no visitors received a measurable dose (10 mrem or more).

More than 2500 DOE employees and DOE contractors were monitored throughout 2017. These workers received an average dose of 1.0 mrem. Approximately 1.5% of the monitored workers, primarily workers handling $DUF_6$ cylinders, received a measurable dose (10 mrem total effective dose or more). No administrative guidelines or regulatory dose limits were exceeded in 2017.

### 4.3.9 Radiological Dose Calculations for Off-site Environmental Monitoring Data

Environmental monitoring at PORTS includes collecting samples at off-site locations around PORTS and analyzing the samples for radionuclides that could be present due to PORTS operations. Radiological monitoring programs at PORTS include ambient air, surface water, sediment, soil, residential drinking water (well water), and biota (vegetation, deer, fish, crops, milk, and eggs).

Samples are analyzed for uranium, uranium isotopes, technetium-99, and/or selected transuranics (americium-241, neptunium-237, plutonium-238, and plutonium-239/240). Uranium occurs naturally in the environment; therefore, detections of uranium cannot necessarily be attributed to PORTS operations. Technetium-99 and transuranics could come from PORTS operations because they were present in recycled uranium processed by PORTS during the Cold War. Technetium-99 and transuranic radionuclides could also come from sources other than PORTS because they are generally present in the world-wide environment in very small amounts due to radioactive fallout in the atmosphere from nuclear weapons testing by various countries around the world.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

DOE sets a limit as low as reasonably achievable, but no more than 100 mrem/year in DOE Order 458.1 for a potential dose to a member of the public via exposure to all radionuclide releases from a DOE facility. To ensure that PORTS meets this standard, dose calculations may be completed for environmental media.

Dose calculations for ambient air and surface water were presented in Sections 4.3.4 and 4.3.6, respectively. Dose calculations are also completed for detections of radionuclides in sediment, soil, residential drinking water (well water – excluding naturally-occurring detections of uranium isotopes), and biota (vegetation, deer, fish, crops, and dairy products) at off-site sampling locations. If radionuclides are not detected in the samples, a dose assessment is not completed. Off-site sampling locations are selected based on detections of radionuclides that could cause the highest dose to a member of the public. Detections of radionuclides in sediment and soil on the PORTS facility are not used to assess potential risk because the public does not have access to the sampled areas of the facility.

The summary of these dose calculations assumes that the same individual is exposed to the maximum dose calculated from each pathway. In 2017, dose calculations were completed for public exposure to radionuclides detected in sediment, soil, and vegetation. Radionuclides were not detected in 2017 in samples of residential drinking water, deer (muscle), fish, crops, and dairy products.

The following sections provide brief descriptions of the dose calculations for sediment, soil, and vegetation. Methodologies used to complete each risk calculation are based on information developed and approved by U.S. EPA including the *Exposure Factors Handbook* (U.S. EPA 1997a) and *Federal Guidance Report No. 11 (FGR 11) Limiting Values of Radionuclide Intake and Air Concentration and Dose Conversion Factors for Inhalation, Immersion, and Ingestion* (U.S. EPA 1988).

In addition, specific exposure scenarios provided in the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e) were used when available. This document integrates the results of technical meetings between Ohio EPA and DOE and provides methods for completing risk analyses at PORTS to promote consistency in the risk approach.

Table 4.2 summarizes the results of each dose calculation. Potential doses to the public from radionuclides detected by the PORTS environmental monitoring program in 2017 are significantly less than the 100 mrem/year limit in DOE Order 458.1.

**Table 4.2. Summary of potential doses to the public
from radionuclides detected by DOE
environmental monitoring
programs in 2017**

| Source of dose | Dose (mrem/year)[a] |
|---|---|
| Sediment | 0.019 |
| Soil | 0.018 |
| Vegetation | 0.00078 |
| Total | 0.038 |

[a]100 mrem/year is the limit for all potential pathways in DOE Order 458.1.

### 4.3.9.1 Dose calculation for sediment

The dose calculation for sediment is based on the following detections of radionuclides in the sample collected in 2017 from monitoring location RM-7, an off-site sampling location on Little Beaver Creek (see Section 4.6.5 and Figure 4.4):

- technetium-99:          3.42 picocuries per gram (pCi/g)
- uranium-233/234:        2.55 pCi/g
- uranium-235/236:        0.128 pCi/g
- uranium-238:            0.774 pCi/g.

Based on an incidental ingestion rate of 200 milligrams (mg)/day (0.0007 ounces/day) and an exposure frequency of 100 days/year, which are consistent with the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e)*,* and exposure factors in U.S. EPA's *Exposure Factors Handbook* (U.S. EPA 1997a), the dose that could be received by an individual from sediment contaminated at these levels is 0.019 mrem/year.  Section 4.6.5 provides additional information on the sediment monitoring program as well as a map of sediment sampling locations.

### 4.3.9.2 Dose calculation for soil
The dose calculation for soil is based on the detections of the following uranium isotopes in the soil sample collected at the ambient air monitoring station A12, east of PORTS on McCorkle Road (see Section 4.6.7 and Figure 4.1):

- uranium-233/234:        0.513 pCi/g
- uranium-235/236:        0.0285 pCi/g
- uranium-238:            0.435 pCi/g.

Based on an incidental ingestion rate of 200 mg/day (0.0007 ounces/day) and an exposure frequency of 350 days/year, which are consistent with the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e)*,* and exposure factors in U.S. EPA's *Exposure Factors Handbook* (U.S. EPA 1997a), the dose that could be received by an individual from soil contaminated at these levels is 0.018 mrem/year.  Section 4.6.7 provides additional information on the soil monitoring program.

### 4.3.9.3 Dose calculation for vegetation
The dose calculation for vegetation is based on the following detections of radionuclides in vegetation (primarily grass) and soil at ambient air monitoring station A12 (east of PORTS on McCorkle Road – see Section 4.6.8.1 and Figure 4.1):

Vegetation
- uranium-233/234:        0.0363 pCi/g
- uranium-238:            0.0265 pCi/g
Soil
- uranium-233/234:        0.513 pCi/g
- uranium-235/236:        0.0285 pCi/g
- uranium-238:            0.435 pCi/g.

The dose calculation is based on human consumption of beef cattle that would eat grass (and soil) containing these radionuclides.  Based on an ingestion rate for beef of 2 ounces/day and an exposure frequency of 100 days/year, which are consistent with the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e) and U.S. EPA's *Exposure Factors Handbook* (U.S. EPA 1997a), the dose that could be received by an individual eating beef from cattle that grazed on vegetation and soil contaminated at these levels is 0.00078 mrem/year.  Section 4.6.8.1 provides additional information on the vegetation monitoring program.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

## 4.4 PROTECTION OF BIOTA

DOE Order 458.1 sets absorbed dose rate limits for aquatic animals, riparian animals (animals that live on the banks of a river or in wetlands adjacent to a body of water), terrestrial plants, and terrestrial animals. DOE Technical Standard *A Graded Approach for Evaluating Radiation Doses to Aquatic and Terrestrial Biota* (DOE 2002a) was used to demonstrate compliance with these limits.

### 4.4.1 Aquatic and Riparian Animals

Analytical data for surface water and sediment samples collected during 2017 from the east side of the PORTS reservation [surface water sampling location EDD-SW01 (see Chapter 6, Section 6.4.15 and Figure 6.13) and sediment sampling location RM-11 (see Section 4.6.5 and Figure 4.4)] were used to assess the dose limits for aquatic and riparian animals (1 rad/day to aquatic animals and 0.1 rad/day to riparian animals). These locations were selected because levels of radionuclides detected in surface water and sediment from these locations were among the highest detected in samples collected in 2017. Section 4.6.5 and Chapter 6, Section 6.4.15 provide more information about these sediment and surface water sampling programs, respectively.

The maximum levels of radionuclides (technetium-99 and uranium isotopes) were as follows:

| Radionuclide | EDD-SW01 | RM-11 |
|---|---|---|
| Technetium-99 | 35.3 pCi/L | 3.62 pCi/g |
| Uranium-233/234 | 2.89 pCi/L | 6.88 pCi/g |
| Uranium-235/236 | 0.153 pCi/L | 0.291 pCi/g |
| Uranium-238 | 0.46 pCi/L | 1.11 pCi/g. |

These values were entered into the RESRAD-BIOTA software that is designed to implement the DOE Technical Standard (DOE 2002a). The software provides a screening method with generic limiting concentrations of radionuclides in environmental media. If the measured maximum levels of radionuclides detected at the selected PORTS sampling locations result in an output from the software calculations of less than 1, the doses to aquatic and riparian animals are within the dose limits (1 rad/day to aquatic animals and 0.1 rad/day to riparian animals).

In 2017, the RESRAD-BIOTA software output for the maximum levels of radionuclides detected at sampling locations EDD-SW01 (surface water) and RM-11 (sediment) was 0.0191, which is less than 1. Therefore, the assessment indicates that the levels of radionuclides detected in water and sediment at these locations did not result in a dose of more than 1 rad/day to aquatic animals and 0.1 rad/day to riparian animals.

### 4.4.2 Terrestrial Plants and Animals

Analytical data for surface water and soil samples collected during 2017 from the northern side of the PORTS reservation [surface water sampling location LBC-SW04 (see Chapter 6, Section 6.4.15 and Figure 6.13) and soil sampling location A8 (see Figure 4.1)] were used to assess the dose limits for terrestrial plants and animals. These locations were selected because levels of radionuclides detected in surface water and soil from these locations were among the highest detected in samples collected in 2017. Section 4.6.7 and Chapter 6, Section 6.4.15 provide additional information about these soil and surface water sampling programs, respectively.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

No transuranic radionuclides were detected in 2017 from samples collected LBC-SW04 (surface water) and A8 (soil).  The maximum levels of technetium-99 (surface water only) and uranium isotopes were as follows:

| Radionuclide | LBC-SW04 | A8 |
|---|---|---|
| Technetium-99 | 16.1 pCi/L | not detected |
| Uranium-233/234 | 1.69 pCi/L | 1.12 pCi/g |
| Uranium-235/236 | 0.113 pCi/L | 0.0494 pCi/g |
| Uranium-238 | 0.425 pCi/L | 0.953 pCi/g. |

These values were entered into the RESRAD-BIOTA software that is designed to implement the DOE Technical Standard (DOE 2002a).  The software provides a screening method with generic limiting concentrations of radionuclides in environmental media.  If the measured maximum levels of radionuclides detected at the selected PORTS sampling locations result in an output from the software calculations of less than 1, the doses to terrestrial plants and animals are within the dose limits (1 rad/day to terrestrial plants and 0.1 rad/day to terrestrial animals).

In 2017, the RESRAD-BIOTA software output for the maximum levels of radionuclides detected at sampling locations LBC-SW04 (surface water) and A8 (soil) was 0.000847, which is less than 1. Therefore, the assessment indicates that the levels of radionuclides detected in water and soil at these locations did not result in a dose of more than 1 rad/day to terrestrial plants and 0.1 rad/day to terrestrial animals.

## 4.5 UNPLANNED RADIOLOGICAL RELEASES

No unplanned releases of radionuclides took place at PORTS in 2017.

## 4.6 ENVIRONMENTAL RADIOLOGICAL MONITORING

This section discusses the radiological monitoring programs at PORTS:  ambient air monitoring, external radiation, surface water, sediment, settleable solids, soil, vegetation, and biota (deer, fish, crops, milk, and eggs).

### 4.6.1 Ambient Air Monitoring

The ambient air monitoring stations measure radionuclides released from 1) DOE point sources (the sources discussed in Section 4.3.2), 2) fugitive air emissions (emissions from PORTS that are not associated with a stack or pipe such as remediation sites or normal building ventilation), and 3) background levels of radionuclides (radionuclides that occur naturally, such as uranium).  These radionuclides are isotopic uranium (uranium-233/234, uranium-235/236, and uranium-238), technetium-99, and selected transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240).

In 2017, samples were collected from 15 ambient air monitoring stations located within and around PORTS (see Section 4.3.4, Figure 4.1), including a background ambient air monitoring station (A37) located approximately 13 miles southwest of the plant.  The analytical results from air sampling stations closer to the plant are compared to the background measurements.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Maximum activities of detected radionuclides are listed below (in picocurie per cubic meter [pCi/m$^3$]):

| Radionuclide | Maximum activity (pCi/m$^3$) | Location | Derived Concentration Standard (DCS) (DOE 2011a) | Percentage of DCS |
|---|---|---|---|---|
| Neptunium-237 | 0.00015 | A41A | 0.18 | 0.08% |
| Technetium-99 | 0.0077 | A36 | 920 | 0.0008% |
| Uranium-233/234 | 0.00025 | A36 | 1.1 | 0.02% |
| Uranium-238 | 0.00017 | A36 | 1.3 | 0.01% |

To confirm that air emissions from PORTS are within regulatory requirements and are not harmful to human health, the ambient air monitoring data were used to calculate a dose to a hypothetical person living at the monitoring station. The highest net dose calculation for the ambient air stations (0.00046 mrem/year) was at station A36, which is on site near the X-611 Water Treatment Plant. This hypothetical dose is well below the 10 mrem/year limit applicable to PORTS in NESHAP (40 CFR Part 61, Subpart H). Section 4.3.4 provides additional information about this dose calculation.

**4.6.2 External Radiation**

External radiation is measured continuously with TLDs at five locations near the DUF$_6$ cylinder storage yards (see Figure 4.3), 19 locations that include 12 of the ambient air monitoring stations (see Section 4.3.4, Figure 4.1), and seven additional on-site locations (see Figure 4.3). TLDs are placed at the monitoring locations at the beginning of each quarter, remain at the monitoring location throughout the quarter, and are removed from the monitoring location at the end of the quarter and sent to the laboratory for processing. A new TLD replaces the removed device. Radiation is measured in millirems as a whole body dose, which is the dose that a person would receive if they were continuously present at the monitored location.

External radiation is measured at five locations around the northwest corner of PORTS just inside Perimeter Road near the cylinder storage yards (see Figure 4.3). The average annual dose for these five locations (#41, #868, #874, #882, and #890) is 739 mrem. Section 4.3.7 provides a dose calculation for the representative on-site member of the public, such as a delivery person, that is allowed on the portion of Perimeter Road near the cylinder storage yards (the general public is not allowed on the portion of Perimeter Road near the cylinder storage yards). The potential estimated dose from the cylinder yards to a delivery person (0.74 mrem/year) is significantly less than DOE's 100 mrem/year dose limit to the public for radionuclides from all potential pathways.

In 2017, the average annual dose measured at eight off-site or background locations (A3, A6, A9, A12, A15, A23, A24, and A28) was 86 mrem. Two locations within PORTS measured levels of radiation approximately 50% higher or more than the average off-site radiation (86 mrem): location #874 (626 mrem) near the X-745C Cylinder Storage Yard and location #862 (124 mrem) south of the cylinder yards and west of the X-530A Switchyards. Three other on-site locations (X-230J2, A8, and A29) measured radiation at levels slightly higher than the average background (ranging from 2 mrem to 10 mrem above average).

The on-site locations with higher doses than the off-site average are not used by the general public, with the exception of location #874 near the cylinder yards and station A29, near OVEC. The dose calculation for the representative on-site member of the public exposed to the cylinder yards is discussed above and

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 4.3. On-site radiation and cylinder yard dose monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

in Section 4.3.7. Section 4.3.7 also includes a dose calculation for the representative off-site member of the public who works at OVEC near station A29. The potential estimated dose to this off-site worker (0.22 mrem/year) is significantly less than the 100 mrem/year dose limit to the public for radionuclides from all potential pathways in DOE Order 458.1.

Section 4.3.8 provides dose results for DOE workers, including workers in the cylinder yards. No administrative guidelines or regulatory dose limits were exceeded in 2017.

### 4.6.3 Surface Water from Cylinder Storage Yards

In 2017, FBP collected surface water samples from the X-745B, X-745D, and X-745F Cylinder Storage Yards. MCS collected surface water samples at the cylinder yards associated with the DUF$_6$ Conversion Facility (X-745C, X-745E, and X-745G Cylinder Storage Yards). Sections 4.6.3.1 and 4.6.3.2 provide the results of sampling completed in 2017 by FBP and MCS, respectively.

### 4.6.3.1 FBP cylinder storage yards

In 2017, FBP collected surface water samples from seven locations at the X-745B, X-745D, and X-745F Cylinder Storage Yards. Figure 4.2 shows the sampling locations. Samples were analyzed for alpha activity, beta activity, and uranium. Samples were collected monthly if water was available.

Maximum levels of alpha activity, beta activity, and uranium were detected as follows:

Alpha activity: 303 pCi/L (X-745B1, November 2017)
Beta activity: 232 pCi/L (X-745B1, November 2017)
Uranium: 44.5 µg/L (X-745B2, April 2017).

Surface water from the cylinder storage yards flows to FBP NPDES outfalls prior to discharge from the site; therefore, releases of radionuclides from the cylinder yards are monitored by sampling conducted at the FBP outfalls. Radionuclides detected at FBP outfalls (see Section 4.3.5.1) are used in the dose calculation for releases to surface water (see Section 4.3.6). The dose from radionuclides released to surface water (the Scioto River) in 2017 (0.0012 mrem) is significantly less than the 100 mrem/year limit for all radiological releases from a facility in DOE Order 458.1.

### 4.6.3.2 MCS cylinder storage yards

Ohio EPA requires monthly collection of surface water samples from seven locations at the X-745C, X-745E, and X-745G Cylinder Storage Yards. Figure 4.2 shows the sampling locations. Samples were analyzed for alpha activity, beta activity, and uranium.

Maximum levels of alpha activity, beta activity, and uranium were detected as follows:

Alpha activity: 7.1 pCi/L (X-745G2, August 2017)
Beta activity: 10.5 pCi/L (X-745C2, July 2017)
Uranium: 13 µg/L (X-745C4, February 2017).

Surface water from the cylinder storage yards flows to FBP NPDES outfalls prior to discharge from the site; therefore, releases of radionuclides from the cylinder yards are monitored by sampling conducted at the FBP outfalls. Radionuclides detected at FBP outfalls (see Section 4.3.5.1) are used in the dose calculation for releases to surface water (see Section 4.3.6). The dose from radionuclides released to surface water (the Scioto River) in 2017 (0.0012 mrem) is significantly less than the 100 mrem/year limit for all radiological releases from a facility in DOE Order 458.1.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

### 4.6.4 Local Surface Water

Local surface water samples are collected from 14 locations upstream and downstream from PORTS. These samples were taken from the Scioto River, Little Beaver Creek, Big Beaver Creek, and Big Run Creek (see Figure 4.4). As background measurements, samples were also collected from local streams approximately 10 miles north, south, east, and west of PORTS.

Samples were collected semiannually and analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238) in accordance with the DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b).

No transuranic radionuclides were detected in the local surface water samples collected during 2017. Maximum detections of technetium-99 and uranium isotopes in local surface water samples are listed below:

| Radionuclide | Maximum activity (pCi/L) | Location | Derived Concentration Standard (DCS) (DOE 2011a) | Percentage of DCS |
|---|---|---|---|---|
| Technetium-99 | 9.12 | RW-13 | 44,000 | 0.02% |
| Uranium-233/234 | 4.72 | RW-7 | 680 | 0.7% |
| Uranium-235/236 | 0.214 | RW-7 | 720 | 0.03% |
| Uranium-238 | 1.02 | RW-7 | 750 | 0.1% |

### 4.6.5 Sediment

Sediment samples are collected from the same locations upstream and downstream from PORTS where local surface water samples are collected, at the NPDES outfalls on the east and west sides of PORTS, and at an upstream location on Big Beaver Creek (see Figure 4.4). Samples are collected annually and analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238) in accordance with the DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b).

Neptunium-237 was detected at 0.00975 pCi/g in the duplicate sample collected at Big Beaver Creek sampling location RM-13. Plutonium-239/240 was detected at 0.00961 pCi/g at the southern background sampling location RM-10S (the creek at State Route 728 and Pleasant Drive). No other transuranics were detected in the sediment samples collected in 2017.

Technetium-99 is often detected in sediment samples collected at locations downstream from PORTS. In 2017, technetium-99 was detected in the samples collected from the following locations:

- Big Beaver Creek at RM-13,
- Big Run Creek at RM-3, and
- Little Beaver Creek (RM-11, RM-7 and RM-8).

The highest detection (3.62 pCi/g) was at on-site location RM-11 (Little Beaver Creek at the X-230J7 East Holding Pond).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 4.4. Local surface water and sediment monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Uranium and uranium isotopes are naturally occurring, but may also be present due to PORTS activities. Maximum detections of uranium and uranium isotopes in sediment samples were detected at on-site sampling locations RM-11 (Little Beaver Creek) and RM-3 (Big Run Creek) as follows.

Uranium:  4.57 micrograms per gram ($\mu$g/g) (RM-3 – duplicate sample)
Uranium-233/234: 6.88 pCi/g (RM-11)
Uranium-235/236:  0.291 pCi/g (RM-11)
Uranium-238:  1.52 pCi/g (RM-3 – duplicate sample).

Uranium and uranium isotopes detected in the 2017 samples have been detected at similar levels in previous sampling events from 2002 through 2016.

Section 4.3.9.1 provides a dose assessment based on the detections of technetium-99 (3.42 pCi/g), uranium-233/234 (2.55 pCi/g), uranium-235/236 (0.128 pCi/g), and uranium-238 (0.774 pCi/g) at the off-site sediment sampling location with the detections of radionuclides that could cause the highest dose to a member of the public (RM-7 on Little Beaver Creek).  The total potential dose to a member of the public resulting from PORTS operations (0.90 mrem/year), which includes this dose calculation (0.019 mrem/year), is well below the DOE standard of 100 mrem/year in DOE Order 458.1.

### 4.6.6 Settleable Solids

DOE collects semiannual water samples from nine effluent locations and three background locations (see Figure 4.5) to determine the concentration of radioactive material that is present in the sediment suspended in the water sample. The data are used to determine compliance with DOE Order 458.1, *Radiation Protection of the Public and the Environment*, which states that operators of DOE facilities discharging or releasing liquids containing radionuclides from DOE activities must ensure that the discharges do not exceed an annual average (at the point of discharge) of either of the following:

•   5 pCi/g above background of settleable solids for alpha-emitting radionuclides, and
•   50 pCi/g above background for beta-gamma-emitting radionuclides.

When a low concentration of settleable solids is detected in a water sample, accurate measurement of the alpha and beta-gamma activity in the settleable solids portion of the sample is not practical due to the small sample size.  A DOE memo (DOE 1995) states that settleable solids of less than 40 milligrams per liter (mg/L) are in *de facto* compliance with the DOE Order 458.1 limits (5 pCi/g above background for alpha activity and 50 pCi/g above background for beta-gamma activity).  In 2017, settleable solids were not detected at concentrations above 40 mg/L at any of the monitoring locations; therefore, monitoring results for the settleable solids monitoring program are in compliance with DOE Order 458.1.  Detections of settleable solids that monitor PORTS effluent and background locations ranged from 5 to 23.6 mg/L.

### 4.6.7 Soil

Soil samples are collected annually from ambient air monitoring locations (see Figure 4.1) and analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238) in accordance with the DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b).

Plutonium-239/240 was detected in soil at six of the 15 ambient air monitoring stations including the background monitoring station (A37).  The highest off-site detection was 0.0152 pCi/g at station A9 (southwest of the plant on Old U.S. Route 23).  These detections are much less than the soil screening level for plutonium-239/240 in residential soil (3.78 pCi/g) calculated using the exposure assumptions in

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 4.5. DOE settleable solids monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

the *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant* (DOE 2017e). No other transuranic radionuclides were detected at off-site sampling locations in 2017.

Technetium-99 was not detected in any of the soil samples collected during 2017. Uranium, uranium-233/234, uranium-235/236, and/or uranium-238 were detected at each of the sampling locations. Uranium and uranium isotopes are usually detected at similar levels at all the soil sampling locations, including the background location (A37), which suggests that the uranium detected in these samples is due to naturally-occurring uranium.

Section 4.3.9.2 provides a dose assessment based on the detections of uranium-233/234 (0.513 pCi/g), uranium-235/236 (0.0285 pCi/g), and uranium-238 (0.435 pCi/g) in soil at the off-site ambient air station with the detections of radionuclides that could cause the highest dose to a member of the public (station A12, east of PORTS on McCorkle Road). The total potential dose to a member of the public resulting from PORTS operations (0.90 mrem/year), which includes this dose calculation (0.018 mrem/year), is well below the DOE limit of 100 mrem/year in DOE Order 458.1.

### 4.6.8 Biological Monitoring

The DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b) requires biological monitoring to assess the uptake of radionuclides into selected local biota (vegetation, deer, fish, crops, milk, and eggs).

### 4.6.8.1 Vegetation

To assess the uptake of radionuclides into plant material, vegetation samples (primarily grass) are collected in the same areas where soil samples are collected at the ambient air monitoring stations (see Figure 4.1). Samples are collected annually and analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238).

Uranium, uranium-233/234, and uranium-238 were detected in the vegetation sample collected at Station A12 (east of PORTS on McCorkle Road) and uranium-233/234 was detected at Station A9 (southwest of PORTS on old US Route 23). Uranium and/or uranium isotopes were also detected at on-site sampling locations A10, A36, and A8. Uranium and uranium isotopes are detected occasionally in vegetation samples, and have been detected at similar levels in previous sampling. Section 4.3.9.3 provides a dose assessment for a member of the public based on consumption of beef cattle that would eat grass contaminated with radionuclides at station A12. The total potential dose to a member of the public resulting from PORTS operations (0.90 mrem/year), which includes this dose calculation (0.00078 mrem/year), is well below the DOE Order 458.1 limit of 100 mrem/year.

### 4.6.8.2 Deer

Samples of liver, kidney, and muscle from deer killed on site in motor vehicle collisions are collected annually, if available. Samples are analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238). Deer samples were collected in August and October of 2017. No radionuclides were detected in any of the deer samples collected in 2017.

### 4.6.8.3 Fish

Fish samples are collected annually (if available) from locations on Little Beaver Creek (RW-8), Big Beaver Creek (RW-13 and RW-15), and the Scioto River (RW-1A and RW-6) as shown on Figure 4.4. In 2017, fish were caught at each of these locations. The samples were analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99,

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238).  No radionuclides were detected in the fish samples collected during 2017.

### 4.6.8.4 Crops

In 2017, crop samples, including corn, tomatoes, and beans, were collected from five off-site locations near PORTS.  The samples were analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238).  No radionuclides were detected in the crop samples collected during 2017.

### 4.6.8.5 Milk and eggs

Samples were collected in 2017 of milk and eggs produced near PORTS.  The samples were analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238).  No radionuclides were detected in the milk and egg samples collected during 2017.

### 4.7 RELEASE OF PROPERTY CONTAINING RESIDUAL RADIOACTIVE MATERIAL

DOE Order 458.1 establishes limits for unconditional release of personal and real property from DOE facilities.  Real property is defined as land and anything permanently affixed to the land such as buildings, fences, and those things attached to the buildings, such as light fixtures, plumbing, and heating fixtures, or other such items, that would be personal property if not attached.  Personal property is defined as property of any kind, except for real property.

No real property was released from PORTS in 2017.  Sections 4.7.1 and 4.7.2 provide information about personal property released from FBP and MCS, respectively.

### 4.7.1 FBP releases

FBP uses pre-approved authorized limits established by DOE Orders to evaluate and release materials defined as personal property.  In 2017, FBP authorized approximately 1625 release requests for materials/items of personal property, which includes vehicles, equipment, waste/recyclables (such as batteries, light bulbs, used oil, and construction debris), and other materials.

### 4.7.2 MCS releases

In late 2017, MCS shipped dilute hydrogen fluoride rinse water resulting from hydrogen fluoride storage tank cleanout and inspection; no hydrogen fluoride was actually produced by the $DUF_6$ Conversion Facility, which converts $DUF_6$ into uranium oxide and aqueous hydrogen fluoride.  Each shipment must meet the release limit of less than 3 picocuries/milliliter (pCi/mL), or 0.003 pCi/L, of total uranium activity.  Approximately 9,025 gallons of dilute hydrogen fluoride were shipped.  The average total uranium activity of the shipment was 0.016 pCi/mL (0.000016 pCi/L).
.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 5. ENVIRONMENTAL NON-RADIOLOGICAL PROGRAM INFORMATION

## 5.1 SUMMARY

Non-radiological environmental monitoring at PORTS includes air, water, sediment, and fish. Monitoring of non-radiological parameters is required by state and federal regulations and/or permits, but is also performed to reduce public concerns about plant operations.

Non-radiological data collected in 2017 are similar to data collected in previous years.

## 5.2 ENVIRONMENTAL NON-RADIOLOGICAL PROGRAM INTRODUCTION

Environmental monitoring programs at PORTS usually monitor both radiological and non-radiological constituents that could be released to the environment as a result of PORTS activities. The radiological components of each monitoring program were discussed in the previous chapter. The DOE *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b) specifies non-radiological monitoring requirements for ambient air, surface water, sediment, and fish. Non-radiological data are not collected for all sampling locations or all monitoring programs.

Environmental permits issued by Ohio EPA to FBP, MCS, or Centrus specify discharge limitations, monitoring requirements, and/or reporting requirements for air emissions and water discharges. Centrus data for NPDES water discharges are included in this section to provide a more complete picture of environmental monitoring at PORTS. Centrus information for discharges to water is provided for informational purposes only; DOE is not certifying the accuracy of the Centrus data.

Data from the following environmental monitoring programs are included in this chapter:

- air
- surface water
- sediment
- biota (fish).

DOE also conducts an extensive groundwater monitoring program at PORTS that includes both radiological and non-radiological constituents. Chapter 6 provides information on the groundwater monitoring program, associated surface water monitoring, and water supply monitoring.

## 5.3 AIR

Permitted air emission sources at PORTS emit non-radiological air pollutants. In addition, the ambient air monitoring program measures fluoride at monitoring stations within PORTS boundaries and in the surrounding area. Chapter 4, Figure 4.1 is a map of the PORTS ambient air monitoring locations.

### 5.3.1 Airborne Discharges

FBP is responsible for numerous air emission sources associated with the former gaseous diffusion production facilities and support facilities. These sources, which included the boilers at the X-600 Steam Plant Complex (prior to demolition in 2013), emitted more than 100 tons per year of non-radiological air pollutants specified by Ohio EPA, which caused FBP air emission sources to become a major source of air pollutants as defined in 40 CFR Part 70.

FBP is required to submit an annual report called the Ohio EPA Fee Emissions Report to report emissions of selected non-radiological air pollutants. FBP reported the following emissions of non-radiological air pollutants for 2017: 17.36 tons of particulate matter and 2.144 tons of organic compounds. Emissions for

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

2017 are associated with the X-627 Groundwater Treatment Facility, the X-670A Cooling Tower, X-333 Coolant System, and plant roads/parking areas.

The $DUF_6$ Conversion Facility emits only a small quantity of non-radiological air pollutants. Because of these small emissions, Ohio EPA requires a Fee Emissions Report only once every two years (in odd-numbered years). MCS reported less than 10 tons/year of specified non-radiological air pollutants in 2017 (the report requires reporting in increments of emissions: zero, less than 10 tons, 10-50 tons, more than 50 tons, and more than 100 tons).

U.S. EPA also requires annual reporting of greenhouse gas emissions (carbon dioxide, methane, and nitrous oxide). In 2017, FBP reported emissions of 14,695 metric tons of carbon dioxide, 0.28 metric ton of methane, and 0.028 metric ton of nitrous oxide. These emissions result from combustion of natural gas used at the X-690 Boilers.

Another potential air pollutant present at PORTS is asbestos released by D&D of plant facilities. Asbestos emissions are controlled by a system of work practices. The amount of asbestos removed and disposed is reported to Ohio EPA. In 2017, 27.2 tons of asbestos-containing materials (net weight) were shipped from PORTS.

### 5.3.2 Ambient Air Monitoring

In addition to the radionuclides discussed in Chapter 4, DOE ambient air monitoring stations also measure fluoride. Fluoride detected at the ambient air monitoring stations could be present due to background concentrations (fluoride occurs naturally in the environment), activities associated with the former gaseous diffusion process, and operation of the $DUF_6$ Conversion Facility.

In 2017, samples for fluoride were collected weekly from 15 ambient air monitoring stations in and around PORTS (see Chapter 4, Figure 4.1), including a background ambient air monitoring station (A37) located approximately 13 miles southwest of the plant.

In 2017, fluoride was not detected in 88 percent of the samples collected for the ambient air monitoring program. If fluoride is not detected in a sample, the ambient concentration of fluoride is calculated assuming that fluoride is present at the detection limit. The average ambient concentration of fluoride measured in samples collected at background station A37 was 0.016 microgram per cubic meter ($\mu g/m^3$). Average ambient concentrations of fluoride measured at the stations around PORTS ranged from 0.0076 $\mu g/m^3$ at station A15 (east-southeast of PORTS on Loop Road) to 0.021 $\mu g/m^3$ at station A12 (east of PORTS on McCorkle Road). There is no standard for fluoride in ambient air. The data indicate that ambient concentrations of fluoride at off-site and background locations are not appreciably different from concentrations at PORTS.

### 5.4 WATER

Surface water and groundwater are monitored at PORTS. Groundwater monitoring is discussed in Chapter 6, along with surface water monitoring conducted as part of the groundwater monitoring program. Non-radiological surface water monitoring primarily consists of sampling water discharges associated with the FBP, MCS, and Centrus NPDES-permitted outfalls. PCBs are monitored in surface water downstream from the cylinder storage yards.

### 5.4.1 Water Discharges (NPDES Outfalls)

In 2017, DOE contractors (FBP and MCS) were responsible for 21 NPDES discharge points (outfalls) or sampling points at PORTS. Centrus was responsible for three outfalls. This section describes non-radiological discharges from these outfalls during 2017.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

### 5.4.1.1 FBP NPDES outfalls

In 2017, FBP was responsible for 18 outfalls or sampling points. Nine outfalls discharge directly to surface water, and six outfalls discharge to another outfall before leaving the site. FBP also monitors three additional sampling points that are not discharge locations. Chapter 4, Section 4.3.5.1, provides a brief description of each FBP outfall or sampling point and provides a site diagram showing each FBP NPDES outfall/sampling point (see Chapter 4, Figure 4.2).

Ohio EPA selects the chemical parameters that must be monitored at each outfall based on the chemical characteristics of the water that flows into the outfall and sets discharge limitations for some of these parameters. For example, some of the FBP outfalls discharge water from the groundwater treatment facilities; therefore, the outfalls are monitored for selected VOCs (*trans*-1,2-dichloroethene and/or TCE) because the groundwater treatment facilities treat water contaminated with VOCs. Chemicals and water quality parameters monitored at each FBP outfall in 2017 are as follows:

- FBP NPDES Outfall 001 (X-230J7 East Holding Pond) – cadmium, chlorine, copper, dissolved solids, fluoride, mercury, oil and grease, pH, silver, suspended solids, and zinc.

- FBP NPDES Outfall 002 (X-230K South Holding Pond) – cadmium, fluoride, mercury, ammonia-nitrogen, oil and grease, pH, selenium, silver, suspended solids, and thallium.

- FBP NPDES Outfall 003 (X-6619 Sewage Treatment Plant) – acute toxicity, ammonia-nitrogen, carbonaceous biochemical oxygen demand, chlorine (May-October only), copper, E. coli (May-October only), mercury, nitrite + nitrate, oil and grease, pH, silver, thallium, suspended solids, and zinc.

- FBP NPDES Outfall 004 (Cooling Tower Blowdown) – acute toxicity, chlorine, copper, dissolved solids, mercury, oil and grease, pH, suspended solids, and zinc.

- FBP NPDES Outfall 005 (X-611B Lime Sludge Lagoon) – lead, mercury, pH, selenium, and suspended solids.

- FBP NPDES Outfall 009 (X-230L North Holding Pond) – bis(2-ethylhexyl)phthalate, copper, fluoride, mercury, oil and grease, pH, silver, suspended solids, and zinc.

- FBP NPDES Outfall 010 (X-230J5 Northwest Holding Pond) – lead, mercury, oil and grease, pH, selenium, suspended solids, and zinc.

- FBP NPDES Outfall 011 (X-230J6 Northeast Holding Pond) – cadmium, chlorine, copper, fluoride, oil and grease, pH, selenium, suspended solids, thallium, and zinc.

- FBP NPDES Outfall 015 (X-624 Groundwater Treatment Facility) – arsenic, barium, total PCBs, pH, silver, and TCE.

- FBP NPDES Outfall 602 (X-621 Coal Pile Runoff Treatment Facility) – iron, manganese, pH, and suspended solids.

- FBP NPDES Outfall 604 (X-700 Biodenitrification Facility) – copper, iron, nickel, nitrate-nitrogen, pH, and zinc.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- FBP NPDES Outfall 605 (X-705 Decontamination Microfiltration System) – ammonia-nitrogen, chromium, hexavalent chromium, copper, Kjeldahl nitrogen, nickel, nitrate-nitrogen, nitrite-nitrogen, oil and grease, pH, sulfate, suspended solids, TCE, and zinc.

- FBP NPDES Outfall 608 (X-622 Groundwater Treatment Facility) – TCE, pH, and *trans*-1,2-dichloroethene.

- FBP NPDES Outfall 610 (X-623 Groundwater Treatment Facility) – TCE, pH, and *trans*-1,2-dichloroethene.

- FBP NPDES Outfall 611 (X-627 Groundwater Treatment Facility) – pH and TCE.

The FBP NPDES Permit also identifies additional monitoring points that are not discharge points as described in the previous paragraphs. FBP NPDES Station Number 801 is a surface water background monitoring location on the Scioto River upstream from FBP NPDES Outfalls 003 and 004. Samples are collected from this monitoring point to measure toxicity to minnows and another aquatic organism, *Ceriodaphnia*.

FBP NPDES Station Number 902 is a monitoring location on Little Beaver Creek downstream from FBP NPDES Outfall 001. FBP NPDES Station Number 903 is a monitoring location on Big Run Creek downstream from FBP NPDES Outfall 002. Water temperature is the only parameter measured at each of these monitoring points.

The monitoring data detailed in the previous paragraphs are submitted to Ohio EPA in a monthly discharge monitoring report. In 2017, discharge limitations at the FBP NPDES monitoring locations were exceeded on 11 occasions (see Table 5.1).

### Table 5.1 FBP NPDES exceedances in 2017

| Outfall | Parameter (unit)[a] | Limit | Result | Date |
|---|---|---|---|---|
| 001 | Mercury (ng/L) | 12 ng/L | 18.3 | May |
| 001 | Mercury (ng/L) | (maximum | 23.8 | June |
| 001 | Mercury (ng/L) | monthly average) | 16.75 | July |
| 001 | Mercury (ng/L) | | 19.7 | August |
| 004 | Copper (µg/L) | 66 µg/L | 140 | September 6 |
| 004 | Copper (µg/L) | (maximum daily) | 67 | September 20 |
| 004 | Copper (µg/L) | | 83 | October 5 |
| 002 | pH (SU) | 6.5 SU | 5.1 | June 21 |
| 004 | pH (SU) | (minimum daily) | 6.25 | March 2 |
| 003 | E.coli (#/100 mL) | 284/100 mL (maximum daily) | 1010 | June 21 |
| 003 | Carbonaceous biochemical oxygen demand (kg/day) | 22.7 kg/day (maximum daily loading) | 23.7 | May 9 |

[a]Units: nanogram per liter (ng/L). microgram per liter (µg/L). Standard Unit (SU). Number of organisms per 100 milliters ((#/100 mL). kilogram per day (kg/day).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The average monthly concentration preliminary effluent limit for mercury was exceeded at Outfall 001 (the X-230J7 East Holding Pond) in May through August of 2017. FBP has initiated an investigation to identify the source of the mercury detected at Outfall 001 so that corrective measures can be implemented. The drinking water standard for mercury is 2 µg/L (2000 ng/L). The preliminary effluent limit for mercury (12 ng/L) is lower than the drinking water standard (2000 ng/L) to minimize the accumulation of mercury in biota, such as fish and birds.

In September and October of 2017, the maximum daily concentration limit for copper (66 µg/L) at Outfall 004 (recirculating cooling water blowdown) was exceeded in three samples. The exceedances appeared to be due to insufficient amounts of an additive used to control copper corrosion in the recirculating cooling water system during periods of biocide treatment applications. Adjustments were made to the feed system that controls the additives used in the recirculating cooling water system.

Discharge limits for pH were exceeded twice in 2017: once in June at Outfall 002 and once in March at Outfall 004. At Outfall 002, the exceedance was caused by an overfeed of citric acid from a defective feed pump in the pH neutralization control system. At Outfall 004, the exceedance was caused by a temporary overfeed of a dechlorinating chemical. Compliance was restored at both outfalls in less than two hours.

Two discharge limitations were exceeded at Outfall 003 (X-6619 Sewage Treatment Plant) during 2017. The maximum daily concentration limit for E. coli (284/100 mL) was exceeded due to a malfunction in the sewage treatment system that caused a backup of sludge in the west clarifier. The conditions that caused the exceedance were corrected within several hours. A sample collected the following day was well within the discharge limitation at 1/100 mL. The maximum daily loading limit for carbonaceous biochemical oxygen demand was exceeded due to a release of cooling water containing propylene glycol from an air compressor into the sanitary sewer system. Upon discovery, the wastewater contaminated with propylene glycol was isolated in an off-line aeration basin to be properly treated.

In 2017, the overall FBP NPDES compliance rate with the NPDES permit was 99%.

### 5.4.1.2 MCS NPDES outfalls

MCS is responsible for the NPDES permit for the discharge of process wastewaters from the DUF$_6$ Conversion Facility. The MCS NPDES permit provides monitoring requirements for two outfalls: MCS Outfall 001 and MCS Outfall 602. Chapter 4, Figure 4.2 shows the location of the MCS NPDES outfalls. Monitoring requirements for MCS Outfall 001 are only effective when process wastewater is being discharged through the outfall. No process waste water was discharged through Outfall 001 in 2017; therefore, no monitoring was required.

MCS Outfall 602 monitors the discharge of MCS process wastewater to the sanitary sewer, which flows to the X-6619 Sewage Treatment Plant that discharges through FBP NPDES Outfall 003. Process wastewater discharged from MCS Outfall 602 was monitored for pH and total flow.

The monitoring data collected in accordance with the MCS permit are submitted to Ohio EPA in a monthly discharge monitoring report. No exceedances of permit limitations at MCS Outfall 602 occurred during 2017; therefore, the overall MCS compliance rate with the NPDES permit was 100%.

### 5.4.1.3 Centrus NPDES outfalls

Centrus is responsible for three NPDES outfalls through which water is discharged from the site (see Chapter 4, Figure 4.2). Two outfalls discharge directly to surface water, and one outfall discharges to FBP NPDES Outfall 003 before leaving the site. Chapter 4, Section 4.3.5.2, provides a brief description

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

of each Centrus NPDES outfall. Chemicals and water quality parameters monitored at each Centrus outfall are as follows:

- Centrus NPDES Outfall 012 (X-2230M Southwest Holding Pond) – cadmium, chlorine, copper, iron, oil and grease, pH, selenium, silver, suspended solids, total PCBs, thallium, and TCE.

- Centrus NPDES Outfall 013 (X-2230N West Holding Pond) – antimony, arsenic, chlorine, copper, oil and grease, pH, suspended solids, thallium, total PCBs, and zinc.

- Centrus NPDES Outfall 613 (X-6002A Recirculating Hot Water Plant particle separator) – chlorine, pH, and suspended solids.

The monitoring data are submitted to Ohio EPA in a monthly discharge monitoring report. No exceedances of permit limitations at Centrus Outfalls 012, 013, and 613 occurred during 2017; therefore, the overall Centrus compliance rate with the NPDES permit was 100%.

### 5.4.2 Surface Water Monitoring Associated with MCS Cylinder Storage Yards

Surface water samples (filtered and unfiltered) are collected quarterly from four locations in the drainage basins downstream from the MCS X-745C, X-745E, and X-745G Cylinder Storage Yards (UDS X01, RM-8, UDS X02, and RM-10 – see Chapter 4, Figure 4.2) and analyzed for PCBs. PCBs were not detected in any of the surface water samples (filtered or unfiltered) collected during 2017. Section 5.5.2 presents the results for sediment samples collected as part of this program.

## 5.5 SEDIMENT

In 2017, sediment monitoring at PORTS included local streams and the Scioto River upstream and downstream from PORTS and drainage basins downstream from the MCS cylinder storage yards.

### 5.5.1 Local Sediment Monitoring

Sediment samples are collected annually at the same locations upstream and downstream from PORTS where local surface water samples are collected, at the NPDES outfalls on the east and west sides of PORTS, and at an upstream location on Big Beaver Creek (see Chapter 4, Figure 4.4). In 2017, samples were analyzed for 20 metals and PCBs, in addition to the radiological parameters discussed in Chapter 4.

PCBs were detected in sediment samples collected upstream and downstream from PORTS. PCBs were detected in downstream samples collected from Little Beaver Creek (RM-7, RM-8, and RM-11), Big Beaver Creek (RM-13), Big Run Creek (RM-2 and RM-3), and the Scioto River (RM-1A). PCBs were also detected in the sample collected from the upstream sampling location on the Scioto River (RM-6).

None of the detections of PCBs in sediment around PORTS were above the risk-based regional screening level for PCB-1254/1260 developed by U.S. EPA and utilized by Ohio EPA: 240 micrograms per kilogram (µg/kg) or parts per billion (ppb) (U.S. EPA 2017). The highest detection of PCBs (208 µg/kg) was on site in Little Beaver Creek at the discharge from the X-230J7 Holding Pond (RM-11).

The results of metals sampling conducted in 2017 indicate that no appreciable differences are evident in the concentrations of metals present in sediment samples taken upstream from PORTS, at background sampling locations, and downstream from PORTS. Metals occur naturally in the environment. Accordingly, the metals detected in the samples most likely did not result from activities at PORTS.

### 5.5.2 Sediment Monitoring Associated with MCS Cylinder Storage Yards

Sediment samples are collected quarterly from four locations in the drainage basins downstream from the MCS X-745C, X-745E, and X-745G Cylinder Storage Yards (UDS X01, RM-8, UDS X02, and RM-10)

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

and analyzed for PCBs. These locations are on site at PORTS and not accessible to the public (see Chapter 4, Figure 4.2).

In 2017, PCBs were detected in at least one of the sediment samples collected at each location. The maximum concentration of PCBs (230 µg/kg) was detected at sampling location UDS X02. The concentrations of PCBs detected in 2017 are below the 1 ppm (1000 µg/kg) reference value set forth in the U.S. EPA Region 5 *TSCA Approval for Storage for Disposal of PCB Bulk Product (Mixed) Waste,* which applies to the storage of $DUF_6$ cylinders at PORTS that may have paint on the exterior of the cylinders that contains more than 50 ppm PCBs. None of the samples contained PCBs above the risk-based regional screening level for PCB-1254/1260 developed by U.S. EPA and utilized by Ohio EPA: 240 µg/kg (ppb) (U.S. EPA 2017).

Section 5.4.2 presents the results for surface water samples collected as part of this program.

## 5.6 BIOLOGICAL MONITORING - FISH

Fish samples are collected annually (if available) from locations on Little Beaver Creek (RW-8), Big Beaver Creek (RW-13 and RW-15), and the Scioto River (RW-1A and RW-6). In 2017, fish were caught at each of these locations. Chapter 4, Figure 4.4, shows the surface water monitoring locations where the fish were caught.

Fish samples were analyzed for PCBs, in addition to the radiological parameters discussed in Chapter 4. Fish samples collected for this program included only the fish fillet, that is, only the portion of the fish that would be eaten by a person. The fish samples collected at Little Beaver Creek (RW-8) and Big Beaver Creek (RW-13 and RW-15) were bass. The fish samples collected from the Scioto River (RW-1A and RW-6) were drum and catfish, respectively.

PCBs were detected in the bass collected from Little Beaver Creek at 241 and 290 µg/kg (regular and duplicate samples, respectively). PCBs were also detected in upstream and downstream Big Beaver Creek bass samples at 22 and 30.6 µg/kg, respectively. PCBs were detected in catfish and drum collected from upstream and downstream Scioto River sampling locations at 18.5 and 20.2 µg/kg, respectively. These detections were compared to the Ohio Fish Consumption Advisory Chemical Limits provided in the *State of Ohio Cooperative Fish Tissue Monitoring Program Sport Fish Tissue Consumption Advisory Program* (Ohio EPA 2010). These limits are set for the following consumption rates: unrestricted, 1/week, 1/month, 6/year, and do not eat. The concentration of PCBs detected in the fish caught on site in Little Beaver Creek (RW-8) is above the 1/week maximum limit (220 µg/kg) and below the 1/month maximum limit (1000 µg/kg). The concentrations of PCBs detected in fish collected from Big Beaver Creek (22 and 30.6 µg/kg) and the Scioto River (18.5 and 20.2 µg/kg) are less than the unrestricted limit (50 µg/kg).

The Ohio Sport Fish Consumption Advisory, available from Ohio EPA, Division of Surface Water, advises the public on consumption limits for sport fish caught from all water bodies in Ohio and should be consulted before eating any fish caught in Ohio waters (Ohio EPA 2018). The advisory recommends a limit of one meal per month for white bass (12 inches and over), common carp, and channel or flathead catfish caught in the Scioto River in Pike and Scioto Counties due to mercury and/or PCB contamination. The Ohio Department of Health advises that everyone limit consumption of sport fish caught from all waterbodies in Ohio to one meal per week, unless there is a more or less restrictive advisory.

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 6. GROUNDWATER PROGRAMS

## 6.1 SUMMARY

Groundwater monitoring at PORTS is required by a combination of state and federal regulations, legal agreements with Ohio EPA, and DOE Orders. More than 400 monitoring wells are used to track the flow of groundwater and to identify and measure groundwater contaminants. Groundwater programs also include on-site surface water monitoring and water supply monitoring.

Groundwater plumes that consist of VOCs, primarily TCE, are found at five of the PORTS monitoring areas: X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility, Quadrant I Groundwater Investigative (5-Unit) Area, Quadrant II Groundwater Investigative (7-Unit) Area, X-701B Former Holding Pond, and X-740 Former Waste Oil Handling Facility. In general, concentrations of contaminants detected within these plumes were stable or decreasing during 2017.

The groundwater plume at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility is near the southern boundary of PORTS. In 2017, no VOCs were detected in any of the seven off-site monitoring wells. TCE has not been detected in groundwater beyond the DOE property boundary at concentrations that exceed the Ohio EPA drinking water standard of 5 µg/L. Data collected in 2017 indicate that the groundwater extraction wells installed in the X-749/X-120 groundwater plume are succeeding in reducing TCE concentrations within the plume.

The *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* provides further details on the groundwater plumes at PORTS, specific monitoring well identifications, and analytical results for monitoring wells (DOE 2018). This document and other documents referenced in this chapter are available in the PORTS Environmental Information Center.

## 6.2 GROUNDWATER PROGRAMS INTRODUCTION

This chapter provides an overview of groundwater monitoring at PORTS and the results of the groundwater monitoring program for 2017. The following sections provide an overview of the PORTS groundwater monitoring program followed by a review of the history and 2017 monitoring data for each area. Chapter 3, Section 3.3, provides additional information about the remedial actions implemented at a number of the areas discussed in this chapter to reduce or eliminate groundwater contamination.

This chapter also includes information on the groundwater treatment facilities at PORTS. These facilities receive contaminated groundwater from the groundwater monitoring areas and treat the water prior to discharge through the permitted FBP NPDES outfalls.

## 6.3 OVERVIEW OF GROUNDWATER MONITORING AT PORTS

This section provides an overview of the regulatory basis for groundwater monitoring at PORTS, groundwater use and geology, and monitoring activities and issues.

### 6.3.1 Regulatory Programs

Groundwater monitoring at PORTS was initiated in the 1980s. Groundwater monitoring has been conducted in response to state and/or federal regulations, regulatory documents prepared by DOE, agreements between DOE and Ohio EPA or U.S. EPA, and DOE Orders.

Because of the numerous regulatory programs applicable to groundwater monitoring at PORTS, an *Integrated Groundwater Monitoring Plan* was developed to address all groundwater monitoring requirements for PORTS. The initial plan was approved by Ohio EPA and implemented at PORTS starting in April 1999. The *Integrated Groundwater Monitoring Plan* is periodically revised by DOE and

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

approved by Ohio EPA. An annual groundwater report is submitted to Ohio EPA in accordance with the *Integrated Groundwater Monitoring Plan*.

Groundwater monitoring in January through June of 2017 was completed in accordance with the *Integrated Groundwater Monitoring Plan* dated July 2015 (DOE 2015b). Groundwater monitoring in July through December of 2017 was completed in accordance with the *Integrated Groundwater Monitoring Plan* dated August 2017 (DOE 2017d). The August 2017 *Integrated Groundwater Monitoring Plan* incorporated minor revisions to the monitoring program that were previously approved by Ohio EPA. These revisions included a reduction in sampling parameters and frequency at the X-740 Former Waste Oil Handling Facility and deletion of one well from the monitoring program for the X-735 Landfills because the well required removal due to construction activities for the OSWDF.

Groundwater monitoring is also conducted to meet DOE Order requirements. Exit pathway monitoring assesses the effect of PORTS on off-site groundwater quality. DOE Orders are the basis for radiological monitoring of groundwater at PORTS.

### 6.3.2 Groundwater Use and Geology

Two water-bearing zones are present beneath the industrialized portion of PORTS: the Gallia and Berea formations. The Gallia is the uppermost water-bearing zone and contains most of the groundwater contamination at PORTS. The Berea is deeper than the Gallia and is usually separated from the Gallia by the Sunbury shale, which acts as a barrier to impede groundwater flow between the Gallia and Berea formations. Additional information about site hydrogeology is available in the PORTS Environmental Information Center.

Groundwater directly beneath PORTS is not used as a domestic, municipal, or industrial water supply, and contaminants in the groundwater beneath PORTS do not affect the quality of the water in the Scioto River Valley buried aquifer. PORTS is the largest industrial user of water in the vicinity and obtains water from water supply well fields north or west of PORTS in the Scioto River Valley buried aquifer. DOE has filed a deed notification at the Pike County Auditor's Office that restricts the use of groundwater beneath the PORTS site.

### 6.3.3 Monitoring Activities

Groundwater monitoring at PORTS includes several activities. Samples of water are collected from groundwater monitoring wells and analyzed to obtain information about contaminants and naturally-occurring compounds in the groundwater. Monitoring wells are also used to obtain other information about groundwater. When the level of water, or groundwater elevation, is measured in a number of wells over a short period of time, the groundwater elevations, combined with information about the subsurface soil, can be used to estimate the rate and direction of groundwater flow. The rate and direction of groundwater flow can be used to predict the movement of contaminants in the groundwater and to develop ways to control or remediate groundwater contamination.

### 6.4 GROUNDWATER MONITORING AREAS

The *Integrated Groundwater Monitoring Plan* requires groundwater monitoring of the following areas within the quadrants of the site designated by the RCRA Corrective Action Program (DOE 2017d). These areas (see Figure 6.1) are:

- Quadrant I
  - X-749 Contaminated Materials Disposal Facility /X-120 Former Training Facility,
  - PK Landfill,
  - Quadrant I Groundwater Investigative (5-Unit) Area,
  - X-749A Classified Materials Disposal Facility,

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.1. Groundwater monitoring areas at PORTS.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

- Quadrant II
  - Quadrant II Groundwater Investigative (7-Unit) Area,
  - X-701B Former Holding Pond,
  - X-633 Former Recirculating Cooling Water Complex,
- Quadrant III
  - X-616 Former Chromium Sludge Surface Impoundments,
  - X-740 Former Waste Oil Handling Facility,
- Quadrant IV
  - X-611A Former Lime Sludge Lagoons,
  - X-735 Landfills,
  - X-734 Landfills,
  - X-533 Former Switchyard Complex, and
  - X-344C Former Hydrogen Fluoride Storage Building.

The *Integrated Groundwater Monitoring Plan* also contains requirements for 1) surface water monitoring in creeks and drainage ditches at PORTS that receive groundwater discharge; and 2) water supply monitoring (DOE 2017d).

In general, samples are collected from wells (or surface water locations) at each area listed above and are analyzed for metals, VOCs, and/or radionuclides. Table 6.1 lists the analytical requirements for each groundwater monitoring area and other monitoring programs described in this chapter. Constituents detected in the groundwater are then compared to standards called preliminary remediation goals to assess the potential for each constituent to affect human health and the environment. Preliminary remediation goals are initial clean-up goals developed early in the decision-making process that are 1) protective of human health and the environment, and 2) comply with applicable or relevant and appropriate requirements. Preliminary remediation goals are intended to satisfy regulatory cleanup requirements. For groundwater at PORTS, preliminary remediation goals are the NPDES drinking water standards (maximum contaminant levels).

Five areas of groundwater contamination, commonly called groundwater plumes, have been identified at PORTS. Groundwater contamination consists of VOCs (primarily TCE) and radionuclides such as technetium-99. The areas that contain groundwater plumes are X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility, Quadrant I Groundwater Investigative (5-Unit) Area, Quadrant II Groundwater Investigative (7-Unit) Area, X-701B Former Holding Pond, and X-740 Former Waste Oil Handling Facility. Other areas are monitored to evaluate groundwater contaminated with metals, to ensure past uses of the area (such as a landfill) have not caused groundwater contamination, or to monitor remediation that has taken place in the area.

The following sections describe the history of each groundwater monitoring area and groundwater monitoring results for each area in 2017.

### 6.4.1 X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility

In the southernmost portion of PORTS in Quadrant I, groundwater concerns focus on three contaminant sources: X-749 Contaminated Materials Disposal Facility (also called the X-749 Landfill), X-120 Former Training Facility, and PK Landfill. A contaminant plume consisting of VOCs, primarily TCE, is associated with the X-749 Contaminated Materials Disposal Facility and X-120 Former Training Facility. The PK Landfill, located immediately northeast of the X-749 Landfill, is not a contaminant source to the X-749/X-120 groundwater plume.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 6.1. Analytical parameters for monitoring areas and programs at PORTS in 2017**

| Monitoring Area or Program | Analytes | |
|---|---|---|
| X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility[a,b] | VOCs<br>transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U<br>total metals:   Be, Cd, Cr, Mn, Ni |
| PK Landfill[b] | VOCs | total metals:   Be, Cd, Cr, Mn, Ni |
| Quadrant I Groundwater Investigative (5-Unit) Area[a,b] | VOCs<br>transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U<br>total metals:   Be, Cd, Cr, Mn, Ni |
| X-749A Classified Materials Disposal Facility | VOCs–2<br>technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U<br>alkalinity<br>chloride<br>sulfate<br>chemical oxygen demand<br>total dissolved solids | total metals   Sb, As, Ba, Be, Cd, Ca, Cr, Co, Cu, Fe, Pb, Mg, Mn, Ni, K, Se, Ag, Na, Tl, V, Zn<br>nitrate/nitrite<br>ammonia |
| Quadrant II Groundwater Investigative (7-Unit) Area[a,b] | VOCs<br>transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U<br>total metals:   Be, Cd, Cr, Mn, Ni |
| X-701B Former Holding Pond[a,b] | VOCs<br>transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu<br>technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U | alkalinity<br>chloride<br>sulfate<br>total dissolved solids<br>total metals:   Be, Cd, Cr, Mn, Ni |
| X-633 Former Recirculating Cooling Water Complex | total metals:   Cr | |
| X-616 Former Chromium Sludge Surface Impoundments | VOCs | total metals:   Be, Cd, Cr, Mn, Ni |
| X-740 Former Waste Oil Handling Facility[a] | VOCs | |
| X-611A Former Lime Sludge Lagoons | total metals:   Be, Cr | |
| X-735 Landfills | VOCs–2<br>technetium-99<br>U, $^{233/234}$U, $^{235/236}$U, $^{238}$U<br>alkalinity<br>chloride<br>sulfate<br>chemical oxygen demand<br>total dissolved solids | total metals:   Sb, As, Ba, Be, Cd, Ca, Cr, Co, Cu, Fe, Hg, Pb, Mg, Mn, Ni, K, Se, Ag, Na, Tl, V, Zn<br>nitrate/nitrite<br>ammonia |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table 6.1. Analytical parameters for monitoring areas and programs at PORTS in 2017 (continued)**

| Monitoring Area or Program | Analytes | | |
|---|---|---|---|
| X-734 Landfills | VOCs transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | total metals: | Be, Cd, Cr, Mn, Ni, Na |
| | technetium-99 U, $^{233/234}$U, $^{235/236}$U, $^{238}$U alkalinity chloride | ammonia chemical oxygen demand nitrate/nitrite sulfate total dissolved solids | |
| X-533 Former Switchyard Complex | total metals: | Cd, Ni | |
| X-344C Former Hydrogen Fluoride Storage Building | VOCs | | |
| Surface Water | VOCs transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99 U, $^{233/234}$U, $^{235/236}$U, $^{238}$U | |
| Water Supply | VOCs transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99 U, $^{233/234}$U, $^{235/236}$U, $^{238}$U alpha activity | |
| Exit Pathway | VOCs transuranics: $^{241}$Am, $^{237}$Np, $^{238}$Pu, $^{239/240}$Pu | technetium-99 U, $^{233/234}$U, $^{235/236}$U, $^{238}$U | |

[a]Selected well(s) in this area are sampled once every two years for a comprehensive list of more than 200 potential contaminants (40 CFR Part 264 Appendix IX – Appendix to Ohio Administrative Code Rule 3745-54-98).
[b]Not all wells in this area are analyzed for all listed analytes.

Notes:
VOCs: Acetone, benzene, bromodichloromethane, bromoform, carbon disulfide, carbon tetrachloride, chlorobenzene, chloroethane, chloroform, dibromochloromethane, 1,2-dichlorobenzene, 1,4-dichlorobenzene, 1,1-dichloroethane, 1,2-dichloroethane, 1,1-dichloroethene, cis-1,2-dichloroethene, trans-1,2-dichloroethene, ethylbenzene, bromomethane, chloromethane, methylene chloride, 2-butanone (methyl ethyl ketone), 4-methyl-2-pentanone (methyl isobutyl ketone), 1,1,2,2-tetrachloroethane, tetrachloroethene, toluene, 1,1,1-trichloroethane, 1,1,2-trichloroethane, TCE, trichlorofluoromethane (CFC-11), vinyl chloride, xylenes (m,p-xylenes).

VOCs–2: VOCs listed above plus: acrylonitrile, bromochloromethane, 1,2-dibromo-3-chloropropane, 1,2-dibromoethane, trans-1,4-dichloro-2-butene, 1,2-dichloropropane, cis-1,3-dichloropropene, trans-1,3-dichloropropene, 2-hexanone (methyl butyl ketone), dibromomethane, iodomethane, styrene, 1,1,1,2-tetrachloroethane, 1,2,3-trichloropropane, and vinyl acetate.

Appendix C lists the symbols for metals and transuranic radionuclides.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**6.4.1.1 X-749 Contaminated Materials Disposal Facility**

The X-749 Contaminated Materials Disposal Facility is a landfill located in the south-central section of the facility in Quadrant I. The landfill covers approximately 11.5 acres and was built in an area of highest elevation within the southern half of PORTS. The landfill operated from 1955 to 1990, during which time buried wastes were generally contained in metal drums or other containers compatible with the waste.

The northern portion of the X-749 Landfill contains waste contaminated with industrial solvents, waste oils from plant compressors and pumps, sludges classified as hazardous, and low-level radioactive materials. The southern portion of the X-749 Landfill contains non-hazardous, low-level radioactive scrap materials.

The initial closure of the X-749 Landfill in 1992 included installation of 1) a multimedia cap; 2) a barrier wall along the north side and northwest corner of X-749 Landfill; and 3) subsurface groundwater drains on the northern half of the east side and the southwest corner of the landfill, including one sump within each of the groundwater drains. The barrier wall and subsurface drains extended down to bedrock. An additional barrier wall on the south and east sides of the X-749 Landfill was constructed in 2002. The groundwater drain and sump on the east side of the landfill were removed for construction of this barrier wall. Groundwater from the remaining subsurface drain is treated at the X-622 Groundwater Treatment Facility and discharged through FBP NPDES Outfall 608, which flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003).

The leading edge of the contaminated groundwater plume emanating from the X-749 Landfill is near the southern boundary of PORTS. In 1994, a subsurface barrier wall was completed across a portion of this southern boundary of PORTS. The X-749 South Barrier Wall was designed to inhibit migration of the plume off plant property prior to the implementation of a final remedial measure; however, VOCs moved beyond the wall. In 2007, four groundwater extraction wells were installed in the X-749 South Barrier Wall Area, and in 2008, two extraction wells were installed in the groundwater collection system on the southwest side of the landfill. These extraction wells are controlling migration of the plume off plant property and reducing concentrations of TCE in groundwater. Two additional groundwater extraction wells were installed in 2010 to further control migration of the X-749/X-120 groundwater plume and remediate areas of higher TCE concentrations within the plume. A third extraction well was installed in the X-120 area of the plume (see Section 6.4.1.2). Chapter 3, Section 3.3.1.1, provides additional information about the remedial actions implemented to address the X-749/X-120 groundwater plume.

Ninety-eight wells and one sump/extraction well were sampled during 2017 to monitor the X-749/X-120 area. Table 6.1 lists the analytical parameters for the wells and sump in this area.

**6.4.1.2 X-120 Former Training Facility**

The X-120 Former Training Facility (originally called the Goodyear Training Facility and also called the X-120 Old Training Facility), which is west and north of the X-749 Contaminated Materials Disposal Facility, covered an area of approximately 11.5 acres west of the present-day XT-847 building. The X-120 Former Training Facility included a machine shop, metal shop, paint shop, and several warehouses used during the construction of PORTS in the 1950s.

Groundwater in the vicinity of this facility is contaminated with VOCs, primarily TCE. In 1996, a horizontal well was installed along the approximate axis of the X-120 plume. Contaminated groundwater flowed from this well to the X-625 Groundwater Treatment Facility. In 2003, operation of the X-625 Groundwater Treatment Facility and horizontal well ceased with the approval of Ohio EPA due to the limited amount of groundwater collected by the well. A groundwater extraction well was installed in 2010 in the area west of the X-120 Former Training Facility to remediate the higher concentrations of

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

TCE in groundwater in this area. Chapter 3, Section 3.3.1.1, provides additional information about the remedial actions implemented to address the X-749/X-120 groundwater plume.

Ninety-eight wells and one sump/extraction well were sampled during 2017 to monitor the X-749/X-120 area. Table 6.1 lists the analytical parameters for the wells and sump in this area.

### 6.4.1.3 Monitoring results for the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility in 2017

The most extensive and most concentrated constituents associated with the X-749/X-120 plume (see Figure 6.2) are VOCs, particularly TCE.

In general, concentrations of TCE were stable or decreasing within the X-749/X-120 groundwater plume. The area within the plume where TCE concentrations are less than 5 µg/L changed slightly in 2017 compared to 2016 (5 µg/L defines the boundary of the groundwater plume). TCE was detected at 5.1 µg/L in the third quarter sample collected from well X749-36G, which is on the southern edge of the area. TCE was detected at approximately 3 µg/L in samples collected between 2013 and 2016. Concentrations of TCE remained less than 5 µg/L in 2017 in the other three wells that define the area (X120-05G, X749-PZ07G, and X749-42G).

Groundwater in the area north of the X-749 Landfill was investigated in 2015 as part of the Deferred Units RCRA Facility Investigation. The results of this investigation have expanded the X-749/X-120 Gallia groundwater plume in the northern portion of the monitoring area. Analytical data for this investigation are provided in the *Deferred Units Resource Conservation and Recovery Act Facility Investigation/Corrective Measures Study Report* (DOE 2017a).

The boundary of the eastern portion of X-749 groundwater plume that emanates from the east side of the X-749 Landfill remained similar to previous years. In the northern portion of the X-749/X-120 groundwater plume (the area directly north of the X-749 Landfill), concentrations of TCE remained elevated in two wells, PK-09G and X749-115G. Concentrations of TCE detected in wells within the X-749 Landfill remained stable or decreased in 2017, with concentrations of TCE above 100 µg/L isolated in the western portion of the landfill.

Extraction well X749-EW09G was installed in 2010 to remediate higher concentrations of TCE associated with the former X-120 facility in the northern portion of the X-749/X-120 groundwater plume. Well X120-11G, which is immediately north of X749-EW09G, monitors the highest concentrations of TCE in this area. The average concentration of TCE detected in 2017 in well X120-11G (215 µg/L) is similar to average concentrations in 2014–2016 (235-200 µg/L) and has decreased from 2013 (245 µg/L) (see Figure 6.2).

Extraction well X749-EW08G is intended to control migration of the southwestern portion of the X-749/X-120 groundwater plume. TCE was not detected in the downgradient well X749-66G in 2017.

Groundwater extraction well X749-EW07G was installed in 2010 to remediate areas of higher TCE concentrations south of the X-749 Landfill. Wells X749-67G and X749-110G monitor the performance of extraction well X749-EW07G. The average concentration of TCE detected in 2017 in well X749-67G (208 µg/L) has decreased from the average annual concentrations detected in 2013–2016 (see Figure 6.2). The average concentration of TCE detected in 2017 in well X749-110G (22 µg/L) has decreased from the average annual concentrations detected in 2013–2016 (see Figure 6.2). These results indicate that extraction well X749-EW07G is functioning as intended to reduce concentrations of TCE south of the X-749 Landfill.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.2.  TCE-contaminated Gallia groundwater plume
at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility– 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

The concentrations of TCE detected in on-site monitoring wells downgradient of the X-749 South Barrier Wall area groundwater extraction wells (wells X749-EW01G, EW02G, EW03G, and EW04G) have decreased to below 5 µg/L in most sampling events since 2011, with the exception of well X749-67G (discussed in the previous paragraph). However, TCE was detected at 30 µg/L in the fourth quarter sample collected from well X749-PZ05G, which caused the southern edge of the plume to expand. TCE and other VOCs were detected in some or all of the quarterly samples collected from well X749-103G at concentrations of 1.1 µg/L or less. Continued operation of groundwater extraction wells X749-EW01G and X749-EW02G in the South Barrier Wall area may be causing low concentrations of VOCs to move into the area monitored by well X749-103G. The groundwater extraction well system in the X-749 South Barrier Wall area is being evaluated. No VOCs were detected in any of the seven off-site monitoring wells.

Samples from selected groundwater monitoring wells in the X-749/X-120 groundwater plume were analyzed for radionuclides (americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, uranium, uranium-233/234, uranium-235/236, and/or uranium-238). If detected, radionuclides were present in groundwater at levels below Ohio EPA drinking water standards (900 pCi/L for technetium-99 based on a 4 mrem/year dose from beta emitters and 30 µg/L for uranium).

### 6.4.2 PK Landfill

The PK Landfill is located west of Big Run Creek just south of the X-230K Holding Pond in Quadrant I and northeast of the X-749 Landfill. PK Landfill, which began operations in 1952, was used as a salvage yard, burn pit, and trash area during the construction of PORTS. After the initial construction, the disposal site was operated as a sanitary landfill until 1968, when soil was graded over the site and the area was seeded with native grasses.

During site investigations, intermittent seeps were observed emanating from the PK Landfill into Big Run Creek. In 1994, a portion of Big Run Creek was relocated approximately 50 feet to the east. A groundwater collection system was installed in the old creek channel to capture the seeps emanating from the landfill. A second collection system was constructed in 1997 on the southeastern landfill boundary to contain the groundwater plume migrating toward Big Run Creek from the southern portion of the PK Landfill. Although the PK Landfill is adjacent to the X-749 Landfill and X-749/X-120 groundwater plume, it is not a source of contaminants detected in the X-749/X-120 groundwater plume. A cap was constructed over the landfill in 1998. Chapter 3, Section 3.3.1.2, provides additional information about the remedial actions implemented at PK Landfill.

In 2017, nine wells, two sumps, and two manholes were sampled to monitor the PK Landfill area. Table 6.1 lists the analytical parameters for the wells, sumps, and manholes in this area.

### 6.4.2.1 Monitoring results for the PK Landfill in 2017

The PK Landfill is not part of the X-749/X-120 groundwater plume, although some of the wells associated with the PK Landfill are contaminated with low levels of VOCs, including TCE (see Figure 6.2). Most of the detections of VOCs in the PK Landfill monitoring wells are below preliminary remediation goals. In 2017, vinyl chloride was detected in samples collected from wells PK-17B and PK-21B at concentrations ranging from 11 to 14 µg/L, which exceed the preliminary remediation goal of 2 µg/L. Vinyl chloride is typically detected in these wells at concentrations above the preliminary remediation goal. No other VOCs were detected in the PK Landfill monitoring wells at concentrations that exceeded the preliminary remediation goals.

### 6.4.3. Quadrant I Groundwater Investigative (5-Unit) Area

The Quadrant I Groundwater Investigative (5-Unit) Area consists of a groundwater plume resulting from a number of potential sources of groundwater contamination in the northern portion of Quadrant I: the

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

X-231A and X-231B Oil Biodegradation Plots, X-600 Former Steam Plant Complex, X-600A Former Coal Pile Yard, X-621 Coal Pile Runoff Treatment Facility, X-710 Technical Services Building, the X-760 Former Pilot Investigation Building, and the X-770 Former Mechanical Testing Facility. The X-231B Southwest Oil Biodegradation Plot was monitored prior to implementation of the *Integrated Groundwater Monitoring Plan*.

Three groundwater extraction wells were installed in 1991 as part of an IRM for the X-231B Southwest Oil Biodegradation Plot. Eleven additional groundwater extraction wells were installed in 2001-2002 as part of the remedial actions required by the Quadrant I Decision Document. These wells began operation in 2002. An additional extraction well south of the X-326 Process Building began operating in 2009. The extracted groundwater is treated at the X-622 Groundwater Treatment Facility and discharged through FBP NPDES Outfall 608, which flows into the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). Multimedia landfill caps were installed over the X-231B area and a similar area, X-231A, in 2000 to minimize water infiltration and control the spread of contamination. Chapter 3, Section 3.3.1.3, provides additional information about the remedial actions implemented in the Quadrant I Groundwater Investigative (5-Unit) Area.

Thirty-four wells were sampled in 2017 as part of the monitoring program for the Quadrant I Groundwater Investigative (5-Unit) Area. Table 6.1 lists the analytical parameters for the wells in this area.

### 6.4.3.1 Monitoring results for the Quadrant I Groundwater Investigative (5-Unit) Area in 2017

A contaminated groundwater plume consisting primarily of TCE is associated with the Quadrant I Groundwater Investigative (5-Unit) Area (see Figure 6.3). Other VOCs are also present in the plume.

TCE is increasing in well X231B-36G, which monitors the northern portion of the plume on the south side of the X-710 Technical Services Building. TCE was detected at 540 µg/L in 2017, which has increased from 220 µg/L in 2016 (see Figure 6.3).

TCE also increased in well X326-09G, which monitors the northwestern portion of the plume on the south end of the X-326 Process Building. TCE was detected at 71,000 µg/L in third quarter of 2017, which has increased from 22,000-27,000 µg/L in 2013-2016.

The eastern edge of the groundwater plume changed slightly in 2017 based on detections of TCE in wells X231A-01G (2.3 µg/L) and X622-PZ01G (2.8 µg/L). TCE is usually detected in these wells at concentrations just above or below the preliminary remediation goal (5 µg/L), and was below the preliminary remediation goal in 2017 (see Figure 6.3). No other significant changes in TCE concentrations were identified in wells that monitor the Quadrant I Groundwater Investigative (5-Unit) Area in 2017.

Samples from selected wells that monitor the Quadrant I Groundwater Investigative (5-Unit) Area were analyzed for radionuclides (americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, uranium, uranium-233/234, uranium-235/236, and/or uranium-238). If detected, radionuclides were present at levels below Ohio EPA drinking water standards (900 pCi/L for technetium-99 based on a 4 mrem/year dose from beta emitters, and 30 µg/L for uranium).

### 6.4.4 X-749A Classified Materials Disposal Facility

The 6-acre X-749A Classified Materials Disposal Facility (also called the X-749A Landfill) is a landfill that operated from 1953 through 1988 for the disposal of wastes classified under the Atomic Energy Act (see Figure 6.3). Potential contaminants include PCBs, asbestos, radionuclides, and industrial waste. Closure of the landfill, completed in 1994, included the construction of a multilayer cap and the

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.3. TCE-contaminated Gallia groundwater plume at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

installation of a drainage system to collect surface water runoff. The drainage system discharges via the X-230K South Holding Pond (FBP NPDES Outfall 002). Although the X-749A Classified Materials Disposal Facility is located at the eastern edge of the Quadrant I Groundwater Investigative (5-Unit) Area groundwater plume, the X-749A Landfill is not the source of the VOCs detected in some of the X-749A monitoring wells at the eastern edge of the Quadrant I Groundwater Investigative (5-Unit) Area groundwater plume.

Ten wells associated with the landfill were sampled in 2017. Table 6.1 lists the analytical parameters for the wells in this area.

### 6.4.4.1 Monitoring results for the X-749A Classified Materials Disposal Facility in 2017

Under the detection monitoring program for the X-749A Landfill, concentrations of alkalinity, ammonia, calcium, chloride, iron, nitrate/nitrite, sodium, and sulfate in downgradient Gallia wells were evaluated using two statistical procedures to monitor potential impacts to groundwater and trends in concentrations of these parameters. Ohio EPA is notified when the statistical control limit for any of the indicator parameters using the first statistical procedure is exceeded at any of the downgradient Gallia wells in two consecutive semiannual sampling events. The second statistical procedure monitors long-term trends in concentrations of the indicator parameters and does not require Ohio EPA notification.

None of the control limits requiring Ohio EPA notification were exceeded in the X-749A wells in 2017.

### 6.4.5 Quadrant II Groundwater Investigative (7-Unit) Area

The Quadrant II Groundwater Investigative (7-Unit) Area consists of an area of groundwater contamination with several potential sources. One of these sources, the X-701C Neutralization Pit, was monitored prior to implementation of the *Integrated Groundwater Monitoring Plan*. The X-701C Neutralization Pit was an open-topped neutralization pit that received process effluents and basement sump wastewater such as acid and alkali solutions and rinse water contaminated with TCE and other VOCs from metal-cleaning operations. The X-701C Neutralization Pit was located within a TCE plume centered around the X-700 and X-705 buildings. The pit was removed in 2001. In 2010, Ohio EPA approved an IRM to remediate contaminant source areas within the southeastern portion of the groundwater plume, which was completed in 2013. Chapter 3, Section 3.3.2.1 provides additional information about the Quadrant II Groundwater Investigative (7-Unit) Area.

The natural groundwater flow direction in this area is to the east toward Little Beaver Creek. The groundwater flow pattern has been changed in this area by use of sump pumps in the basements of the X-700 and X-705 buildings. Thus, the groundwater plume in this area does not spread but instead flows toward the sumps where it is collected and then treated at the X-627 Groundwater Treatment Facility. This facility discharges through FBP NPDES Outfall 611, which flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). Twenty-four wells are part of the routine monitoring program for this area. Table 6.1 lists the analytical parameters for the wells in this area.

### 6.4.5.1 Monitoring results for the Quadrant II Groundwater Investigative (7-Unit) Area in 2017

A contaminated groundwater plume consisting primarily of TCE is associated with the Quadrant II Groundwater Investigative (7-Unit) Area (see Figure 6.4).

Concentrations of TCE detected in the Quadrant II Groundwater Investigative (7-Unit) Area plume were generally stable or decreasing in 2017, with the exception of X701-45G in the southern perimeter of the plume. TCE increased to 11 µg/L in 2017 in well X701-45G. TCE is also increasing in well X701-27G, which monitors the eastern side of the plume (see Figure 6.4).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.4. TCE-contaminated Gallia groundwater plume at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Groundwater in the western and northwestern portion of the monitoring area, beneath and adjacent to the X-333 and X-330 Process Buildings, was investigated in 2015 as part of the Deferred Units RCRA Facility Investigation. The results from the sampling locations that were part of this investigation have expanded the Gallia groundwater plume in the western and northwestern portion of the monitoring area.

Samples from selected wells that monitor the Quadrant II Groundwater Investigative (7-Unit) Area were analyzed for radionuclides (americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, uranium, uranium-233/234, uranium-235/236, and/or uranium-238). If detected, radionuclides were present at levels below Ohio EPA drinking water standards (900 pCi/L for technetium-99 based on a 4 mrem/year dose from beta emitters, and 30 µg/L for uranium).

**6.4.6 X-701B Former Holding Pond**
In the eastern portion of Quadrant II, groundwater concerns focus on three areas: the X-701B Former Holding Pond, the X-230J7 Holding Pond, and the X-744Y Waste Storage Yard.

The X-701B Former Holding Pond was used from the beginning of plant operations in 1954 until 1988. The pond was designed for neutralization and settlement of acid waste from several sources. TCE and other VOCs were also discharged to the pond. Two surface impoundments (sludge retention basins) were located west of the holding pond. The X-230J7 Holding Pond received wastewater from the X-701B Former Holding Pond. The X-744Y Waste Storage Yard is south of the X-701B Former Holding Pond. The yard was approximately 15 acres and surrounded the X-744G Bulk Storage Building. RCRA hazardous waste was managed in this area.

A contaminated groundwater plume extends from the X-701B Former Holding Pond towards Little Beaver Creek. Three groundwater extraction wells were installed in 1993 southeast of the X-701B Former Holding Pond and a sump was installed in 1995 in the bottom of the pond as part of the RCRA closure of the unit. These wells and sump were designed to intercept contaminated groundwater emanating from the holding pond area before it could join the existing groundwater contaminant plume. The extraction wells and sump were removed between 2009 and 2011 because of the X-701B IRM (see Chapter 3, Section 3.3.2.2).

Two groundwater interceptor trenches (French drains) are used to intercept TCE-contaminated groundwater in the eastern portion of the monitoring area. These interceptor trenches, called the X-237 Groundwater Collection System, control TCE migration into Little Beaver Creek. The 660-foot-long primary trench has two sumps in the backfill and a 440-foot-long secondary trench intersects the primary trench. The extracted groundwater is treated at the X-624 Groundwater Treatment Facility and discharges through FBP NPDES Outfall 015, which flows to Little Beaver Creek.

Groundwater remediation in the X-701B Former Holding Pond Area was initiated in 2006 (see Chapter 3, Section 3.3.2.2). Oxidant was injected into the subsurface in the western portion of the area from 2006 through 2008 to remediate VOCs in soil and groundwater. The X-701B IRM was initiated in December 2009 and completed in 2011 to further address contaminants remaining in soil and groundwater following the oxidant injections. Contaminated soil in the X-701B IRM area was removed and mixed with oxidant, with additional oxidant mixed into soil remaining at the bottom of the excavation.

Sixty-three wells that monitor the X-701B Former Holding Pond area were sampled in 2017. Table 6.1 lists the analytical parameters for the wells that are part of the *Integrated Groundwater Monitoring Plan* (DOE 2017d).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**6.4.6.1 Monitoring results for the X-701B Former Holding Pond in 2017**
In general, concentrations of TCE detected in wells within the X-701B plume in 2017 were similar to previous years. TCE is decreasing in well X701-EW121G, which is downgradient of the IRM treatment area. Over the last five years, TCE has decreased in well X701-EW121G from 140,000 µg/L in the third quarter of 2013 to 76,000 µg/L in the third quarter of 2017 (see Figure 6.5).

The southern edge of the X-701B plume has expanded based on the detection of TCE in the sample collected from well X701-23G at 5.6 µg/L. TCE has increased from 0.95 µg/L in this well in 2013 to 5.6 µg/L in 2017. The concentration of TCE detected in well X701-79G, which also monitors the southern portion of the plume, increased to 230 µg/L in 2017. TCE was detected at 160 µg/L in 2016 and less than 100 µg/L in 2013-2015 (see Figure 6.5). TCE is also increasing in well X701-24G, which monitors the eastern portion of the plume. During and just after implementation of the IRM, TCE concentrations typically detected in well X701-24G decreased to less than 10,000 µg/L. TCE concentrations have rebounded in this well since 2015.

Samples from 48 wells that monitor the X-701B Holding Pond were analyzed for radionuclides (americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, uranium, uranium-233/234, uranium-235/236, and/or uranium-238). Technetium-99 or uranium were detected above Ohio EPA drinking water standards (900 pCi/L for technetium-99 based on a 4 mrem/year dose from beta emitters, and 30 µg/L for uranium) in four wells near the former X-701B Pond and east retention basin and in wells installed within the IRM area. Concentrations of radionuclides present in groundwater in the X-701B area can be affected by the oxidant used in the X-701B IRM and the oxidant injections conducted in 2006 through 2008 that were part of the X-701B groundwater remedy. The oxidant, which affects the oxidation/reduction potential and pH of the soil and/or groundwater, temporarily causes metals in soil to be mobilized into the groundwater. It is expected that the metals will move downgradient with groundwater flow for a short distance and then be re-adsorbed into the soil matrix as the geochemistry of the soil and groundwater returns to ambient conditions.

Samples from five wells that monitor the area near the X-744G Bulk Storage Building and X-744Y Storage Yard were analyzed for cadmium and nickel, which were detected above preliminary remediation goals in three of the five wells (X701-01G, X744G-01G, and X744G-02G). These results are typical for the X-744 area wells. Nickel was also detected at concentrations above the preliminary remediation goal in samples collected from wells X701-20G and X701-127G, which monitor the center of the plume downgradient from the IRM treatment area and the area in which oxidant was injected from 2006 through 2008. This area is likely affected by the oxidant used in the X-701B IRM and the oxidant injections conducted in 2006 through 2008.

**6.4.7 X-633 Former Recirculating Cooling Water Complex**
The X-633 Former Recirculating Cooling Water Complex in Quadrant II consisted of a recirculating water pumphouse and four cooling towers with associated basins. Chromium-based corrosion inhibitors were added to the cooling water until the early 1990s, when the system was converted to a phosphate-based inhibitor. D&D of the facilities was completed in 2010. Chapter 3, Section 3.3.2.3 provides additional information about the RCRA investigation of soils and groundwater in this area.

The X-633 Former Recirculating Cooling Water Complex was identified as an area of concern for potential metals contamination in 1996 based on historical analytical data for groundwater wells in this area. Samples from wells in this area were collected in 1998 and 1999 to assess the area for metals contamination. Based on detections of chromium above the preliminary remediation goal, this area was added to the PORTS groundwater monitoring program. Two wells are sampled semiannually for chromium as part of the monitoring program for this area.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.5. TCE-contaminated Gallia groundwater plume at the X-701B Former Holding Pond – 2017.**

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**6.4.7.1 Monitoring results for the X-633 Former Recirculating Cooling Water Complex in 2017**
Chromium was detected in both of the X-633 monitoring wells in 2017. Samples collected from well X633-07G contained chromium at concentrations above the preliminary remediation goal of 100 µg/L: 1400 µg/L (second quarter) and 1300 µg/L (fourth quarter). Samples collected from well X633-PZ04G also contained chromium but at concentrations well below the preliminary remediation goal. These results are typical for these wells. Figure 6.6 shows the chromium concentrations detected in the X-633 Former Recirculating Cooling Water Complex wells.

**6.4.8 X-616 Former Chromium Sludge Surface Impoundments**
The X-616 Former Chromium Sludge Surface Impoundments in Quadrant III were two unlined surface impoundments used from 1976 to 1985 for storage of sludge generated by the treatment of water from the PORTS process cooling system. A corrosion inhibitor containing chromium was used in the cooling water system. Sludge containing chromium was produced by the water treatment system and was pumped into and stored in the X-616 impoundments. The sludge was removed from the impoundments and remediated as an interim action in 1990 and 1991. The unit was certified closed in 1993. Sixteen wells are sampled as part of the monitoring program for this area. Table 6.1 lists the analytical parameters for the wells in this area.

**6.4.8.1 Monitoring results for the X-616 Former Chromium Sludge Surface Impoundments in 2017**
Chromium is of special concern at X-616 because of the previous use of the area. In 2017, chromium was detected above the preliminary remediation goal of 100 µg/L in one well that monitors the X-616 area: well X616-05G (on the northeastern boundary of the area). Chromium is typically detected above the preliminary remediation goal in this well. Nickel was detected above the preliminary remediation goal (100 µg/L for Gallia wells) in two wells (X616-05G and X616-25G). Nickel is typically detected above the preliminary remediation goal in these two wells. Figure 6.7 shows the concentrations of chromium and nickel in wells at the X-616 Former Chromium Sludge Surface Impoundments.

TCE was detected above the preliminary remediation goal of 5 µg/L in three wells west of the former surface impoundments: wells X616-09G, X616-13G, and X616-20B. TCE has been detected above 5 µg/L in wells X616-09G and X616-20B since 2004 or earlier. Concentrations of TCE increased to above 5 µg/L in well X616-13G in 2013. Figure 6.7 shows the concentrations of TCE detected in the X-616 wells in 2017.

**6.4.9 X-740 Former Waste Oil Handling Facility**
The X-740 Former Waste Oil Handling Facility, which was demolished in 2006, was located on the western half of PORTS south of the X-530A Switchyard in Quadrant III. The X-740 Facility, which operated from 1983 until 1991, was used as an inventory and staging facility for waste oil and waste solvents that were generated from various plant operational and maintenance activities. A sump within the building was used between 1986 and 1990 to collect residual waste oil and waste solvents from containers crushed in a hydraulic drum crusher at the facility. The facility and sump were initially identified as hazardous waste management units in 1991. The X-740 Former Waste Oil Handling Facility (both the facility and sump identified as hazardous waste management units) underwent closure, and closure certification was approved by Ohio EPA in 1998.

In 1999, poplar trees were planted in a 2.6-acre phytoremediation area above the groundwater plume near the X-740 Former Waste Oil Handling Facility. Because phytoremediation did not work as anticipated to reduce the concentrations of VOCs in groundwater in this area, three rounds of oxidant injections were completed during 2008. Additional alternatives for groundwater remediation in this area were evaluated in 2009, and a pilot study of enhanced anaerobic bioremediation took place from 2010 through 2015. Chapter 3, Section 3.3.3, provides additional information about the remedial activities for the X-740 area.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.6.  Metal concentrations in groundwater at the X-633 Former Recirculating Cooling Water Complex and X-533 Former Switchyard Complex – 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.7. TCE and metal concentrations in groundwater at the X-616 Former Chromium Sludge Surface Impoundments – 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Twenty-three wells that monitor the X-740 Former Waste Oil Handling Facility were sampled during 2017.

**6.4.9.1 Monitoring results for the X-740 Former Waste Oil Handling Facility in 2017**
The TCE groundwater plume near the X-740 Former Waste Oil Handling Facility in Quadrant III became smaller in 2017 (see Figure 6.8).  Concentrations of TCE decreased to below 5 µg/L in wells X740-02G and X740-04G that monitor the eastern and northeastern boundaries of the plume.  In addition, the area of higher TCE concentrations within the plume is no longer present because TCE decreased to less than 100 µg/L in well X740-10G (41 µg/L), which was the only Gallia well in which TCE was detected at greater than 100 µg/L in 2016.  Concentrations of TCE are decreasing due to the bioremediation project that took place in this area (see Chapter 3, Section 3.3.3).

**6.4.10 X-611A Former Lime Sludge Lagoons**
The X-611A Former Lime Sludge Lagoons in Quadrant IV were comprised of three adjacent unlined sludge retention lagoons constructed in 1954 and used for disposal of lime sludge waste from the site water treatment plant from 1954 to 1960.  The lagoons covered a surface area of approximately 18 acres and were constructed in a low-lying area that included Little Beaver Creek.  As a result, approximately 1500 feet of Little Beaver Creek were relocated to a channel just east of the lagoons.

As part of the RCRA Corrective Action Program, a prairie habitat has been developed in this area by placing a soil cover over the north, middle, and south lagoons.  A soil berm was also constructed outside the northern boundary of the north lagoon to facilitate shallow accumulation of water in this low-lying area.  Chapter 3, Section 3.3.4.1, provides more information about this remediation.  Six wells are sampled semiannually as part of the monitoring program for this area.  Table 6.1 lists the analytical parameters for the wells in this area.

**6.4.10.1 Monitoring results for the X-611A Former Lime Sludge Lagoons in 2017**
The six monitoring wells at X-611A are sampled and analyzed semiannually for beryllium and chromium.  In 2017, chromium was detected in the samples collected from four of the six wells in this area at concentrations between 0.54 and 14 µg/L, which are below the preliminary remediation goal (100 µg/L).

In 2017, beryllium was detected in two of the six wells in this area at concentrations of 1.7 µg/L or less, which are less than the preliminary remediation goals (6.5 µg/L for Gallia wells and 7 µg/L for Berea wells).  Figure 6.9 shows the concentrations of beryllium and chromium detected in the X-611A wells in 2017.

**6.4.11 X-735 Landfills**
Several distinct waste management units are contained within the X-735 Landfills area in Quadrant IV.  The main units consist of the hazardous waste landfill, referred to as the X-735 RCRA Landfill, and the X-735 Industrial Solid Waste Landfill.  The X-735 Industrial Solid Waste Landfill includes the industrial solid waste cells, asbestos disposal cells, and the chromium sludge monocells A and B.  The chromium sludge monocells contain a portion of the chromium sludge generated during the closure of the X-616 Chromium Sludge Surface Impoundments.

Initially, a total of 17.9 acres was approved by Ohio EPA and Pike County Department of Health for landfill disposal of conventional solid wastes.  The landfill began operation in 1981.  During operation of the landfill, PORTS investigations indicated that wipe rags contaminated with solvents had inadvertently been disposed in the northern portion of the landfill. The contaminated rags were considered a hazardous waste.  Waste disposal in the northern area ended in 1991, and Ohio EPA determined that the area required closure as a RCRA hazardous waste landfill.  Consequently, this unit of the sanitary landfill was identified as the X-735 RCRA Landfill.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.8. TCE-contaminated Gallia groundwater plume near the X-740 Former Waste Oil Handling Facility – 2017.**

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.9. Metal concentrations in groundwater at the X-611A Former Lime Sludge Lagoons － 2017.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

A buffer zone was left unexcavated to provide space for groundwater monitoring wells and a space between the RCRA landfill unit and the remaining southern portion, the X-735 Industrial Solid Waste Landfill. Routine groundwater monitoring has been conducted at the X-735 Landfills since 1991.

The industrial solid waste portion of the X-735 Landfills included a solid waste section and an asbestos waste section. The X-735 Industrial Solid Waste Landfill, not including the chromium sludge monocells, encompasses a total area of approximately 4.1 acres. Operation of the X-735 Industrial Solid Waste Landfill ceased in 1997; this portion of the landfill was capped in 1998.

The *Integrated Groundwater Monitoring Plan* incorporates monitoring requirements for the hazardous and solid waste portions of the X-735 Landfills (DOE 2017d). In addition, the *Corrective Measures Plan for the X-735 Landfill* was approved by Ohio EPA in 2008 (DOE 2007a). This plan provides the monitoring requirements for Gallia wells that monitor the X-735 Landfill. Corrective measures monitoring was implemented because Ohio EPA determined that assessment monitoring of the landfill, completed between 2005 and 2007, identified that a small release of leachate constituents is occurring or has occurred from the X-735 Landfills. Twenty-one wells were sampled in 2017 as part of the monitoring programs for this area. Table 6.1 lists the analytical parameters and Figure 6.10 shows the monitoring wells in this area.

### 6.4.11.1 Monitoring results for the X-735 Landfills in 2017

The monitoring program at the X-735 Landfills includes corrective measures monitoring for Gallia wells and detection monitoring for Berea wells. As required by the corrective measures monitoring program, concentrations of three metals (cobalt, mercury, and nickel) and five indicator parameters (alkalinity, chloride, sodium, sulfate, and total dissolved solids) detected in downgradient Gallia wells are compared to concentration limits based on drinking water standards or site background concentrations. None of these concentration limits were exceeded in 2017.

The detection monitoring program for X-735 Berea wells continued in 2017. Concentrations of alkalinity, ammonia, calcium, chloride, iron, nitrate/nitrite, potassium, sodium, and sulfate in downgradient Berea wells were evaluated to monitor potential impacts to groundwater and trends in concentrations of these parameters. None of the control limits used to determine a statistically significant change in the indicator parameters requiring Ohio EPA notification was exceeded in the X-735 Berea wells in 2017.

Samples from each of the wells were also analyzed for technetium-99, uranium, and isotopic uranium (uranium-233/234, uranium-235/236, and uranium-238). Technetium-99 was not detected in any of the wells. Uranium and uranium isotopes, if detected, were present at low levels typical for the wells in this area and below the drinking water standard (30 µg/L for uranium).

### 6.4.12 X-734 Landfills

The X-734 Landfills in Quadrant IV consisted of three landfill units that were used until 1985. Detailed records of materials disposed in the landfills were not kept. However, wastes known to be disposed at the landfills included trash and garbage, construction spoils, wood and other waste from clearing and grubbing, and empty drums. Other materials reportedly disposed in the landfills may have included waste contaminated with metals, empty paint cans, and uranium-contaminated soil from the X-342 area.

The X-734 Landfills were closed in accordance with regulations in effect at that time, and no groundwater monitoring of the area was required. However, the RCRA Facility Investigation conducted in the early 1990s identified the presence of VOCs, metals, and radionuclides in soil and/or groundwater in the area. The X-734 Landfills were capped in 1999-2000 as part of the remedial actions required for Quadrant IV. Chapter 3, Section 3.3.4.2, provides more information about the remedial actions for this area.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.10. Monitoring wells at the X-735 Landfills.**

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Fifteen wells (see Figure 6.11) are sampled semiannually as part of the monitoring program for this area. Table 6.1 lists the monitoring parameters for the wells in this area.

### 6.4.12.1 Monitoring results for the X-734 Landfills in 2017

VOCs are routinely detected in a number of the wells that monitor the X-734 Landfills, but generally at concentrations below preliminary remediation goals. In 2017, no VOCs were detected at concentrations above the preliminary remediation goals in the samples collected from the X-734 monitoring wells.

Samples from the nine of the X-734 monitoring wells were also analyzed for five metals (beryllium, cadmium, chromium, manganese, and nickel). None of the samples contained metals at concentrations above the respective preliminary remediation goal.

Samples collected from each well in the second quarter were also analyzed for transuranic radionuclides (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and isotopic uranium (uranium-233/234, uranium-235/236, and uranium-238). No transuranics or technetium-99 were detected in the samples. Detections of uranium and uranium isotopes were typical for these wells and below the drinking water standard (30 µg/L for uranium).

### 6.4.13 X-533 Former Switchyard Complex

The X-533 Former Switchyard Complex in Quadrant IV consisted of a switchyard containing electrical transformers and circuit breakers, associated support buildings, and a transformer cleaning pad. The groundwater area of concern is located north of the switchyard and associated support buildings near the transformer cleaning pad. D&D of the facilities began in 2010 and was completed in 2011. Soil contaminated with PCBs or metals was removed from three areas within the complex in 2010; however, none of the soil removal areas were located near the groundwater area of concern (the north side of the area near the transformer cleaning pad).

The X-533 Former Switchyard Complex was identified as an area of concern for potential metals contamination in 1996 based on historical analytical data for groundwater wells in this area. Samples from wells in this area were collected in 1998 and 1999 to assess the area for metals contamination. The area was added to the PORTS groundwater monitoring program because the sampling identified metals that may have contaminated groundwater in this area. Three wells are sampled semiannually for cadmium and nickel.

### 6.4.13.1 Monitoring results for the X-533 Former Switchyard Complex in 2017

Three wells that monitor the X-533 Former Switchyard Complex (F-03G, TCP-01G, and X533-03G) were sampled in the second and fourth quarters of 2017 and analyzed for cadmium and nickel. Each of the wells contained these metals at concentrations above the preliminary remediation goals (6.5 µg/L for cadmium and 100 µg/L for nickel). Concentrations of cadmium detected in the wells ranged from 9.7 to 60 µg/L, and concentrations of nickel detected in the wells ranged from 130 to 680 µg/L. Figure 6.6 shows the concentrations of metals detected in the X-533 wells in 2017.

### 6.4.14 X-344C Former Hydrogen Fluoride Storage Building

The X-344C Former Hydrogen Fluoride Storage Building and associated hydrogen fluoride storage tanks were demolished and removed in 2006. In 2009, an investigation of soils and groundwater near the former building determined that groundwater in one monitoring well south of the former building contained two VOCs (*cis*-1,2-dichloroethene and *trans*-1,2-dichloroethene) at concentrations well below the preliminary remediation goals.

This area was added to the PORTS groundwater monitoring program in 2010. One well is sampled annually for VOCs under the monitoring program for this area (see Figure 6.12).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.11. Monitoring wells at the X-734 Landfills.**

6-27

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.12.  Monitoring well at the X-344C Former Hydrogen Fluoride Storage Building.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**6.4.14.1 Monitoring results for the X-344C Former Hydrogen Fluoride Storage Building in 2017**
Four VOCs, *cis*-1,2-dichloroethene, *trans*-1,2-dichloroethene, TCE, and vinyl chloride, were detected in the sample collected in the first quarter of 2017 at low concentrations less than 2 µg/L, which are below the preliminary remediation goals. These detections are consistent with the data collected at this well in 2009 through 2016.

**6.4.15 Surface Water Monitoring**
Surface water monitoring is conducted in conjunction with groundwater assessment monitoring to determine if contaminants present in groundwater are detected in surface water samples. Surface water is collected quarterly from 14 locations (see Figure 6.13). Surface water samples are analyzed for the parameters listed in Table 6.1. The purpose for each surface water monitoring location is described as follows:

•   Little Beaver Creek and East Drainage Ditch sample locations LBC-SW01, LBC-SW02, and EDD-SW01 assess possible X-701B area groundwater discharges.

•   Little Beaver Creek sample locations LBC-SW02 and LBC-SW03 assess potential contamination from the X-611A Former Lime Sludge Lagoons.

•   Big Run Creek sample location BRC-SW01 assesses potential groundwater discharges from the Quadrant I Groundwater Investigative (5-Unit) Area.

•   Big Run Creek sample location BRC-SW05 monitors potential discharges from the X-749/PK Landfill groundwater collection system on the east side of the landfills, as well as the Quadrant I Groundwater Investigative (5-Unit) Area.

•   Big Run Creek sample location BRC-SW02 (downstream from BRC-SW01 and BRC-SW05) monitors potential discharges from the Quadrant I Groundwater Investigative (5-Unit) Area, X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility, and PK Landfill.

•   Southwestern Drainage Ditch sample locations UND-SW01 and UND-SW02 assess potential groundwater releases to this creek and the X-2230M Southwest Holding Pond from the western portion of the X-749/X-120 groundwater plume.

•   North Holding Pond sample location NHP-SW01 and Little Beaver Creek sample location LBC-SW04 assess potential groundwater discharges from the X-734 Landfill and other Quadrant IV sources.

•   Western Drainage Ditch sample locations WDD-SW01, WDD-SW02, and WDD-SW03 assess potential groundwater discharges from the X-616 and X-740 areas to the Western Drainage Ditch and the X-2230N West Holding Pond.

**6.4.15.1 Monitoring results for surface water in 2017**
Trihalomethanes are a category of VOCs that are byproducts of water chlorination and include bromodichloromethane, bromoform, chloroform, and dibromochloromethane. These compounds are detected at most of the surface water sampling locations because the streams receive discharges that contain chlorinated water from the PORTS NPDES outfalls. These detections were well below the Ohio EPA non-drinking water quality criteria for the protection of human health in the Ohio River drainage basin (bromodichloromethane – 460 µg/L; bromoform – 3600 µg/L; chloroform – 4700 µg/L; and dibromochloromethane – 340 µg/L).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.13. Surface water monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Since the 1990s, TCE has been detected regularly at low levels in samples collected from the Southwestern Drainage Ditch (UND-SW01, located inside Perimeter Road). In 2017, TCE was detected at 1.0 to 4.4 µg/L in each of the four samples collected from the Southwestern Drainage Ditch at UND-SW01. *Cis*-1,2-dichloroethene, 1,1-dichloroethane, and 1,1-dichloroethene were also detected at estimated concentrations less than 0.5 µg/L in samples collected at UND-SW01. VOCs were not detected in the samples collected from the Southwestern Drainage Ditch at UND-SW02. The detections of TCE were well below the Ohio EPA non-drinking water quality criterion for TCE (810 µg/L) for the protection of human health in the Ohio River drainage basin.

TCE and *cis*-1,2-dichloroethene were detected in samples collected from the East Drainage Ditch and Little Beaver Creek at a maximum concentration of 1.5 µg/L. TCE and other VOCs are routinely detected in East Drainage Ditch and Little Beaver Creek at low concentrations. All detections of TCE were well below the Ohio EPA non-drinking water quality criterion for TCE (810 µg/L) for the protection of human health in the Ohio River drainage basin.

Samples collected in the second and fourth quarters of 2017 were analyzed for selected transuranics (americium-241, neptunium-237, plutonium-238, and plutonium-239/240). No transuranics were detected in the surface water samples collected during 2017.

Technetium-99 was detected at levels up to 35.3 pCi/L in samples collected from the East Drainage Ditch (EDD-SW01) and Little Beaver Creek (LBC-SW01, LBC-SW02, LBC-SW03, and LBC-SW04). These detections are within the historical range of technetium-99 detected in surface water at PORTS, and are 0.08% or less of derived concentration standard for technetium-99 in water (44,000 pCi/L – DOE 2011a).

The concentrations of uranium detected in the surface water samples were 0.25% or less of the DOE derived concentration standards for uranium isotopes (680 pCi/L for uranium-233/234, 720 pCi/L for uranium-235, and 750 pCi/L for uranium-238) (DOE 2011a). The detections of uranium and uranium isotopes in surface water during 2017 were within the historical range of uranium detected in surface water at PORTS.

### 6.4.16 Water Supply Monitoring

Routine monitoring of private residential drinking water sources is completed at PORTS in accordance with the requirements of Section VIII of the September 1989 Consent Decree between the State of Ohio and DOE and the *Integrated Groundwater Monitoring Plan* (DOE 2017d).

The purpose of the program is to determine whether PORTS has had any impact on the quality of the private residential drinking water sources. Although this program may provide an indication of contaminant transport off site, it should not be interpreted as an extension of the on-site groundwater monitoring program, which bears the responsibility for detection of contaminants and determining the rate and extent of contaminant movement. Data from this program will not be used in environmental investigations due to the lack of knowledge of how residential wells were constructed and due to the presence of various types of pumps (which may not be ideal equipment for sampling).

Four residential drinking water sources participated in the program in 2017. Two residential drinking water sources that are included in the water supply monitoring program (RES-004 and RES-005) were not able to be sampled in 2017 because the well pumps were not operable. The PORTS water supply is also sampled as part of this program. Figure 6.14 shows the drinking water sources that were part of the monitoring program in 2017. Sampling locations may be added or deleted if requested by a resident and as program requirements dictate. Typically, sampling locations are deleted when a resident obtains a public water supply. Wells are sampled semiannually with samples analyzed for the parameters listed in Table 6.1.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.14. Water supply monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

In the first and third quarters of 2017, TCE was detected at estimated concentrations ranging from 0.16 to 0.58 µg/L in the samples collected from RES-017, which is south of PORTS on Big Run Road. No other VOCs were detected in the samples at this location. Since this residential water supply was added to the monitoring program in 2009, TCE has routinely been detected in the water supply samples at concentrations up to 1 µg/L. These detections are less than the drinking water standard for TCE (5 µg/L). Big Run Creek is located between RES-017 and the affected water-bearing formation (i.e., Gallia groundwater) located in the southern portion of the plant site west of Big Run Creek. The Gallia groundwater drains into Big Run Creek.

Chlorination byproducts called trihalomethanes (bromodichloromethane, bromoform, chloroform, and dibromochloromethane), which are common residuals in treated drinking water, were detected in the first and third quarter samples collected from residential sampling location RES-015. The total concentration of these trihalomethanes was less than the Ohio EPA drinking water standard (80 µg/L for total trihalomethanes).

Each sample was analyzed for transuranics (americium-241, neptunium-237, plutonium-238, and plutonium-239/240), technetium-99, uranium, and uranium isotopes (uranium-233/234, uranium-235/236, and uranium-238). No transuranics or technetium-99 were detected in any of the water supply samples collected in 2017. Low levels of uranium and uranium isotopes detected in some of the wells are consistent with naturally-occurring concentrations found in groundwater in the area.

## 6.5 DOE ORDER MONITORING PROGRAMS

One of the DOE surveillance monitoring programs at PORTS is exit pathway monitoring. Exit pathway monitoring assesses the effect of the facility on off-site surface water and groundwater quality.

### 6.5.1 Exit Pathway Monitoring

Selected locations on local streams and drainage channels near the PORTS boundary are sampling points of the exit pathway monitoring program because surface water from PORTS NPDES outfalls and groundwater discharge to these surface waters. Monitoring wells near the PORTS boundary are also used in the exit pathway monitoring program. Figure 6.15 shows the sampling locations for exit pathway monitoring and Table 6.1 lists the analytical parameters.

Surface water sampling points on Big Run Creek (BRC-SW02), Little Beaver Creek (LBC-SW04), Southwestern Drainage Ditch (UND-SW02), and Western Drainage Ditch (WDD-SW03) are part of the exit pathway monitoring program (see Figure 6.13). Trihalomethanes (bromodichloromethane, bromoform, chloroform, and dibromochloromethane), which are common residuals in chlorinated drinking water, were detected in samples collected from the Western Drainage Ditch at concentrations well below Ohio EPA non-drinking water quality criteria for trihalomethanes for the protection of human health in the Ohio River drainage basin (see Section 6.4.15.1).

Technetium-99 was detected at 16.1 and 7.59 pCi/L in the first and fourth quarter samples collected at the surface water exit pathway monitoring location on Little Beaver Creek (LBC-SW04). These detections were 0.037% or less of the derived concentration standard for technetium-99 in water (44,000 pCi/L – DOE 2011a).

VOCs were also detected in several on-site groundwater monitoring wells that are part of the exit pathway monitoring program. TCE and other VOCs were detected in several wells that monitor the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility (see Section 6.4.1.3). TCE was detected in on-site well X749-45G at 8.4 µg/L which is above the Ohio EPA drinking water standard (5 µg/L). All other detections of TCE and other VOCs in the exit pathway monitoring wells were below Ohio EPA drinking water standards.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019



**Figure 6.15. Exit pathway monitoring locations.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Samples from exit pathway monitoring wells were analyzed for radionuclides (americium-241, neptunium-237, plutonium-238, plutonium-239/240, technetium-99, uranium, uranium-233/234, uranium-235/236, and uranium-238). If detected, radionuclides were present at levels below Ohio EPA drinking water standards (900 pCi/L for technetium-99 based on a 4 mrem/year dose from beta emitters, and 30 µg/L for uranium).

## 6.6 GROUNDWATER TREATMENT FACILITIES
In 2017, a combined total of approximately 35.5 million gallons of water were treated at the X-622, X-623, X-624, and X-627 Groundwater Treatment Facilities. Approximately 21.4 gallons of TCE were removed from the water. All processed water is discharged through NPDES outfalls before exiting PORTS. Facility information is summarized in Table 6.2.

**Table 6.2. Summary of TCE removed by PORTS groundwater treatment facilities in 2017[a]**

| Facility | Gallons of water treated | Gallons of TCE removed |
|---|---|---|
| X-622 | 20,403,000 | 1.9 |
| X-623 | 11,580 | < 0.0002 |
| X-624 | 3,545,300 | 9.2 |
| X-627 | 11,502,399 | 10.3 |

[a]Source: *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* (DOE 2018)

### 6.6.1 X-622 Groundwater Treatment Facility
The X-622 Groundwater Treatment Facility consists of an air stripper with aqueous-phase activated carbon filtration. This facility processes groundwater from the following systems in Quadrant I (see Figures 6.2 and 6.3):

- groundwater collection system with associated sump (X749-WPW) and extraction wells X749-EW05G and X749-EW06G on the southwest boundary of the X-749 Landfill;

- groundwater extraction wells X749-EW01G, X749-EW02G, X749-EW03G, and X749-EW04G installed in 2007 in the X-749 South Barrier Wall area;

- groundwater extraction wells (X749-EW07G, X749-EW08G, and X749-EW09G) installed in 2010 in the X-749/X-120 groundwater plume;

- groundwater collection system and associated sumps (PK-PL6 and PK-PL6A) on the eastern boundary of the PK Landfill; and

- fifteen extraction wells located in the Quadrant I Groundwater Investigative (5-Unit) Area.

The facility processed approximately 20.4 million gallons of groundwater during 2017, thereby removing approximately 1.9 gallons of TCE from the water. Treated water from the facility discharges through FBP NPDES Outfall 608, which flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). No NPDES permit limitations were exceeded at Outfall 608 in 2017.

### 6.6.2 X-623 Groundwater Treatment Facility
The X-623 Groundwater Treatment Facility consists of an air stripper with offgas activated carbon filtration and aqueous-phase activated carbon filtration. Prior to implementation of the X-701B IRM in 2009, the X-623 Groundwater Treatment Facility treated TCE-contaminated groundwater from a sump in

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

the bottom of the X-701B Former Holding Pond and three groundwater extraction wells (X623-EW01G, X623-EW02G, and X623-EW03G) east of the holding pond. The sump and extraction wells were removed in 2009-2011 to facilitate implementation of the IRM.

During 2017, the X-623 Groundwater Treatment Facility operated intermittently to treat miscellaneous water associated with site activities in accordance with the NPDES permit. The X-623 Groundwater Treatment Facility did not operate in January, February, March, April, May, July, November, and December of 2017.

The facility treated 11,580 gallons of water during 2017, thereby removing less than 0.002 gallon of TCE from the water. Treated water from the facility discharges through FBP NPDES Outfall 610, which flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). No NPDES permit limitations were exceeded at Outfall 610 in 2017.

### 6.6.3 X-624 Groundwater Treatment Facility

At the X-624 Groundwater Treatment Facility, groundwater is treated via an air stripper with offgas activated carbon filtration and aqueous-phase activated carbon filtration. This facility processes TCE-contaminated groundwater from the X-237 Groundwater Collection System on the east side of the X-701B groundwater plume. The X-237 Groundwater Collection System consists of north-south and east-west collection trenches and two sumps/pumping wells (see Figure 6.5).

The X-624 Groundwater Treatment Facility treated approximately 3.5 million gallons of water in 2017, thereby removing approximately 9.2 gallons of TCE from the water. Treated water from the facility discharges through FBP NPDES Outfall 015, which discharges to Little Beaver Creek. No NPDES permit limitations were exceeded at Outfall 015 in 2017.

### 6.6.4 X-627 Groundwater Treatment Facility

The X-627 Groundwater Treatment Facility consists of an air stripper with offgas activated carbon filtration and aqueous phase activated carbon filtration. The X-700 and X-705 buildings are located above the Quadrant II Groundwater Investigative (7-Unit) Area plume, and contaminated water is collected in the sumps located in the basement of each building (see Figure 6.4).

Almost 11.5 million gallons of groundwater were processed during 2017, thereby removing approximately 10.3 gallons of TCE from the water. Treated water from the facility discharges through FBP NPDES Outfall 611, which flows to the X-6619 Sewage Treatment Plant (FBP NPDES Outfall 003). No NPDES permit limitations were exceeded at Outfall 611 in 2017.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 7. QUALITY ASSURANCE

## 7.1 SUMMARY

Quality assurance and quality control are essential components of DOE environmental monitoring programs at PORTS. Quality is integrated into sample preservation, field data and sample collection, sample transportation, and sample analysis. Numerous program assessment activities in the field and within the facilities are conducted at regular intervals to demonstrate that quality is built into and maintained in all DOE programs. Analytical laboratories used by DOE contractors during 2017 participated in the DOE Consolidated Audit Program and Mixed-Analyte Performance Evaluation Program.

## 7.2 QUALITY ASSURANCE INTRODUCTION

Quality assurance, an integral part of environmental monitoring, requires systematic control of the processes involved in sampling the environment and in analyzing the samples. To demonstrate accurate results, DOE uses the following planned and systematic controls:

- implementation of standard operating procedures for sample collection and analysis;

- training and qualification of surveyors and analysts;

- implementation of sample tracking and chain-of-custody procedures to demonstrate traceability and integrity of samples and data;

- participation in external quality control programs;

- frequent calibration and routine maintenance of measuring and test equipment;

- maintenance of internal quality control programs;

- implementation of good measurement techniques and good laboratory practices; and

- frequent assessments of field sampling, measurement activities, and laboratory processes.

Environmental sampling is conducted by DOE contractors at PORTS in accordance with state and federal regulations and DOE Orders. Sampling plans and procedures are prepared, and appropriate sampling instruments or devices are selected in accordance with practices recommended by U.S. EPA, the American Society for Testing and Materials, or other authorities. Chain-of-custody forms document sample custody from sample collection through receipt by the analytical laboratory. The samples remain in the custody of the sampling group until the samples are received at the laboratory. Samples shipped to an off-site laboratory are sealed within the shipping container to prevent tampering until they are received by the sample custodian at the off-site laboratory.

The analytical data are reviewed to determine compliance with applicable regulations and permits. The data are used to identify locations and concentrations of contaminants of concern, to evaluate the rate and extent of contamination at the site, and to help determine the need for remedial action. Adequate and complete documentation generated as a result of these efforts supports the quality standards established by DOE. Quality Assurance Project Plans were used by FBP and MCS during 2017 to ensure a consistent system for collecting, assessing, and documenting environmental data of known and documented quality.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

## 7.3 FIELD SAMPLING AND MONITORING

Personnel involved in field sampling and monitoring are properly trained through a combination of classroom, on-line, and/or on-the-job training as required by environmental, health, and safety regulations and DOE contract requirements. Procedures are developed from guidelines and regulations created by DOE or other regulatory agencies that have authority over PORTS activities. These procedures specify sampling protocol, sampling devices, containers, and preservatives to be used. Chain-of-custody procedures (used with all samples) are documented, and samples are controlled and protected from the point of collection to the generation of analytical results.

Data generated from field sampling can be greatly influenced by the methods used to collect and transport the samples. A quality assurance program provides the procedures for proper sample collection so that the samples represent the conditions that exist in the environment at the time of sampling. The DOE quality assurance program at PORTS mandates compliance with written sampling procedures, use of clean sampling devices and containers, use of approved sample preservation techniques, and collection of field blanks, trip blanks, and duplicate samples. Chain-of-custody procedures are strictly followed to maintain sample integrity. In order to maintain sample integrity, samples are delivered to the laboratory as soon as practicable after collection.

## 7.4 ANALYTICAL QUALITY ASSURANCE

DOE contractors at PORTS only use analytical laboratories that demonstrate compliance in the following areas through participation in independent audits and surveillance programs:

- compliance with federal waste disposal regulations,
- data quality,
- materials management,
- sample control,
- data management,
- electronic data management,
- implementation of a laboratory quality assurance plan, and
- review of external and internal performance evaluation program.

After analytical laboratory data are received by DOE contractors, they are independently evaluated using a systematic process that compares the data to established quality assurance/quality control criteria. An independent data validator checks documentation produced by the analytical laboratory to verify that the laboratory has provided data that meet established criteria.

In 2017, samples collected for DOE environmental monitoring programs at PORTS such as NPDES monitoring, groundwater monitoring required by the *Integrated Groundwater Monitoring Plan* (DOE 2017d), and environmental monitoring required by the *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant* (DOE 2017b), were sent to analytical laboratories that participated in DOE programs to ensure data quality. The DOE Consolidated Audit Program implements annual performance qualification audits of environmental laboratories. The DOE Mixed-Analyte Performance Evaluation Program provides semiannual performance testing and evaluation of analytical laboratories.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

# 8. REFERENCES

American Nuclear Society 1986. *Glossary of Terms in Nuclear Science and Technology*, LaGrange Park, IL.

Biological Effects of Ionizing Radiations 1990. *Health Effects of Exposure to Low Levels of Ionizing Radiation*, Committee on the Biological Effects of Ionizing Radiations (BEIR V), National Research Council, National Academy of Sciences, National Academy Press, Washington, D.C.

DOE 1995. Memorandum, Pelletier to Pearson: *Requirements for Control of Settleable Solids*, Air, Water and Radiation Division: EH-412, Washington D.C., December 6.

DOE 1998a. *Quadrant III Cleanup Alternatives Study/Corrective Measures Study Final Report for Portsmouth Gaseous Diffusion Plant, Piketon, Ohio*, DOE/OR/12-1360&D3, POEF-ER-4619&D3, U.S. Department of Energy, Piketon, OH, April.

DOE 1998b. *Quadrant IV Cleanup Alternatives Study/Corrective Measures Study Final Report for Portsmouth Gaseous Diffusion Plant, Piketon, Ohio*, DOE/OR/12-1332&D3, POEF-ER-4609&D3, U.S. Department of Energy, Piketon, OH, August.

DOE 2000. *Quadrant I Cleanup Alternatives Study/Corrective Measures Study Final Report for Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio*, DOE/OR/12-1248&D6, U.S. Department of Energy, Piketon, OH, May.

DOE 2001. *Quadrant II Cleanup Alternatives Study/Corrective Measures Study Final Report for Portsmouth Gaseous Diffusion Plant, Piketon, Ohio*, DOE/OR/12-1223&D5, U.S. Department of Energy, Piketon, OH, February.

DOE 2002a. *A Graded Approach for Evaluating Radiation Doses to Aquatic and Terrestrial Biota*, DOE-STD-1153-2002, U.S. Department of Energy, Washington, D.C., July.

DOE 2002b. *X-611A Prairie and X-749B Peter Kiewit Landfill Five-Year Evaluation Report for the Portsmouth Gaseous Diffusion Plant*, DOE/OR/11-3110&D1, U.S. Department of Energy, Piketon, OH, August.

DOE 2003. *Five-Year Evaluation Report for the X-740 Phytoremediation Project at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/OR/11-3135&D1, U.S. Department of Energy, Piketon, OH, October.

DOE 2007a. *Corrective Measures Plan for the X-735 Landfill at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0019&D4, U.S. Department of Energy, Piketon, OH, October.

DOE 2007b. *Supplemental Evaluation to the 2003 Five Year Evaluation Report for the X-740 Phytoremediation Area at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0038&D1, U.S. Department of Energy, Piketon, OH, January.

DOE 2008a. *First Five-Year Review for the Five-Unit Groundwater Investigative Area and X-231A/ X-231B Oil Biodegradation Plots at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0054&D2, U.S. Department of Energy, Piketon, OH, April.

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

DOE 2008b. *First Five-Year Review for the X-734 Landfill Area at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0073&D2, U.S. Department of Energy, Piketon, OH, December.

DOE 2008c. *Second Five-Year Review for the X-611A Prairie at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0072&D2, U.S. Department of Energy, Piketon, OH, December.

DOE 2008d. *Second Five-Year Review for the X-749B Peter Kiewit Landfill at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0053&D2, U.S. Department of Energy, Piketon, OH, March.

DOE 2010. *Community Relations Plan for the U.S. Department of Energy's Decontamination and Decommissioning Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0128&D1, U.S. Department of Energy, Piketon, OH, June.

DOE 2011a. *Derived Concentration Technical Standard,* DOE-STD-1196-2011, U.S. Department of Energy, Washington, D.C., April.

DOE 2011b. *First Five-Year Review for the X-749/X-120 Groundwater Plume at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0187V1&D1, DOE/PPPO/03-0187V2&D1, U.S. Department of Energy, Piketon, OH, January.

DOE 2012. *Addendum to the Community Relations Plan for the U.S. Department of Energy's Decontamination and Decommissioning Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0128&D2/A1, U.S. Department of Energy, Piketon, OH, September.

DOE 2013a. *Second Five-Year Review for the Five-Unit Groundwater Investigative Area and X-231A/X-231B Oil Biodegradation Plots at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0490&D1, U.S. Department of Energy, Piketon, OH, September.

DOE 2013b. *Second Five-Year Review for the X-734 Landfill Area at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0559&D1, U.S. Department of Energy, Piketon, OH, December.

DOE 2013c. *Third Five-Year Review for the X-611A Prairie at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0482&D2, U.S. Department of Energy, Piketon, OH, July.

DOE 2013d. *Third Five-Year Review for the X-749B Peter Kiewit Landfill at the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0489&D1, U.S. Department of Energy, Piketon, OH, September.

DOE 2014. *Final Report for the 7-Unit Interim Remedial Measure at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0606&D1, U.S. Department of Energy, Piketon, OH, October.

DOE 2015a. *Deferred Units Resource Conservation and Recovery Act Facility Investigation/Corrective Measures Study Work Plan at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0252&D3, U.S. Department of Energy, Piketon, OH, March.

DOE 2015b. *Integrated Groundwater Monitoring Plan for the Portsmouth Gaseous Diffusion Plant*, *Piketon, Ohio,* DOE/PPPO/03-0032&D8, U.S. Department of Energy, Piketon, OH, July.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

DOE 2015c. *Record of Decision for Process Buildings and Complex Facilities Decontamination and Decommissioning Evaluation Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0425&D2, U.S. Department of Energy, Piketon, OH, July.

DOE 2015d. *Record of Decision for the Site-wide Waste Disposition Evaluation Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0513&D2, U.S. Department of Energy, Piketon, OH, June.

DOE 2015e. *Remedial Design/Remedial Action Work Plan for the On-site Waste Disposal Facility Initial Site Preparation and Construction Activities at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0691&D1, U.S. Department of Energy, Piketon, OH, September.

DOE 2016a. *Addendum to Remedial Design/ Remedial Action Work Plan for On-site Waste Disposal Facility Initial Site Preparation and Construction Activities at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio, Phase II Initial Site Construction – Addendum,* DOE/PPPO/03-0691&D1/A1, U.S. Department of Energy, Piketon, OH, September.

DOE 2016b. *Final Report for the X-740 Pilot Study at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPO/03-0748&D1, U.S. Department of Energy, Piketon, OH, May.

DOE 2016c. *Remedial Design/Remedial Action Work Plan and Remedial Design for the Process Buildings Deactivation at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio – Deactivation of X-326, X-330, X-333, X-111A, X-111B, X-232C1, X-232C2, X232C3, X-232C4, and X-232C5,* DOE/PPPO/03-0665&D2, U.S. Department of Energy, Piketon, OH, April.

DOE 2016d. *Second Five-Year Review for the X-749/X-120 Groundwater Plume at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0756&D1, U.S. Department of Energy, Piketon, OH, June.

DOE 2017a. *Deferred Units Resource Conservation and Recovery Act Facility Investigation/Corrective Measures Study Report at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0772&D1, U.S. Department of Energy, Piketon, OH, September.

DOE 2017b. *Environmental Monitoring Plan for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0009&D5, U.S. Department of Energy, Piketon, OH, April.

DOE 2017c. *Fiscal Year 2018 Site Sustainability Plan for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0838&D1, U.S. Department of Energy, Piketon, OH, December.

DOE 2017d. *Integrated Groundwater Monitoring Plan for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0032&D10, U.S. Department of Energy, Piketon, OH, August.

DOE 2017e. *Methods for Conducting Human Health Risk Assessments and Risk Evaluations at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0127&D9, U.S. Department of Energy, Piketon, OH, June.

DOE 2017f. *The Role of the Portsmouth Gaseous Diffusion Plant in Cold War History,* DOE/PPPO/03-0683&D1, U.S. Department of Energy, Piketon, OH February.

DOE 2018. *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0847&D1, U.S. Department of Energy, Piketon, OH, March.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

FBP 2014. *Comprehensive Summary Report of Cultural Resource Investigations Conducted at the Portsmouth Gaseous Diffusion Plant (PORTS Facility), Scioto and Seal Townships, Pike County, Ohio,* FBP-ER-GEN-BG-RPT-0055, Revision 4, Gray & Pape, Inc., Cincinnati, OH, May.

Hamby, D. M. 1991. *LADTAP XL: An Improved Electronic Spreadsheet Version of LADTAP II*, DE93003179, Westinghouse Savannah River Company, Aiken, SC.

Health Physics Society 2010. *Environmental Radiation* (Fact Sheet – Adopted January 2010), available at hps.org (accessed March 2, 2016).

Jannik and Dixon 2006. *LADTAP-PA: A Spreadsheet for Estimating Dose Resulting from E-Area Groundwater Contamination at the Savannah River Site*, Savannah River National Laboratory, Aiken, SC.

McGraw-Hill 1989. *McGraw-Hill Dictionary of Scientific and Technical Terms,* 4th ed., McGraw-Hill, Inc., NY.

National Council on Radiation Protection 2009. *Ionizing Radiation Exposure of the Population of the United States*, NCRP Report No. 160, National Council on Radiation Protection and Measurements, Bethesda, MD.

Ohio EPA 1996a. *Decision Document Peter Kiewit Landfill, U.S. DOE Portsmouth, Pike County, Ohio*, Ohio Environmental Protection Agency, Columbus, OH, May.

Ohio EPA 1996b. *Decision Document X-611A Solid Waste Management Unit U.S. DOE Portsmouth, Pike County, Ohio*, Ohio Environmental Protection Agency, Columbus, OH, June.

Ohio EPA 1999a. *Ohio Environmental Protection Agency's Decision Document for Quadrant III of the Portsmouth Gaseous Diffusion Plant*, Ohio Environmental Protection Agency, Columbus, OH, March.

Ohio EPA 1999b. *The Decision Document for the X-734 Landfill Area in Quadrant IV of the Portsmouth Gaseous Diffusion Plant*, Ohio Environmental Protection Agency, Columbus, OH, September.

Ohio EPA 2000. *U.S. DOE Portsmouth QIV Decision Document*, Ohio Environmental Protection Agency, Columbus, OH, September.

Ohio EPA 2001. *U.S. DOE Portsmouth Quadrant I Decision Document Portsmouth Gaseous Diffusion Plant*, Ohio Environmental Protection Agency, Columbus, OH, March.

Ohio EPA 2003. *Ohio EPA's Decision Document for the X-701B SWMU in Quadrant II of the U.S. DOE Portsmouth Facility, Piketon, Ohio*, Ohio Environmental Protection Agency, Columbus, OH, December.

Ohio EPA 2010. *State of Ohio Cooperative Fish Tissue Monitoring Program Sport Fish Tissue Consumption Advisory Program*, State of Ohio, Columbus, OH, October.

Ohio EPA 2012. *The April 13, 2010 Director's Final Findings and Orders for Removal Action and Remedial Investigation and Feasibility Study and Remedial Design and Remedial Action, including the July 16, 2012 Modification thereto,* Ohio EPA, Columbus, OH, July 16.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Ohio EPA 2018. *Ohio Sport Fish Consumption Advisory,* Ohio EPA Division of Surface Water, Columbus, OH, April.

U.S. Census Bureau 2018. U.S. Census Bureau, census.gov, population estimates for 2017, (accessed July 10, 2018).

U.S. EPA 1988. *Federal Guidance Report No. 11 (FGR 11) Limiting Values of Radionuclide Intake and Air Concentration and Dose Conversion Factors for Inhalation, Immersion, and Ingestion*, EPA-520/1-88-020, U.S. Environmental Protection Agency, Washington, D.C.

U.S. EPA 1997a. *Exposure Factors Handbook,* EPA/600/P-95/002Fa, U.S. Environmental Protection Agency, Washington, D.C.

U.S. EPA 1997b. *Record of Decision/Statement of Basis Peter Kiewit Landfill United States Department of Energy Portsmouth Gaseous Diffusion Plant Pike County, Ohio,* U.S. Environmental Protection Agency, Washington, D.C. May.

U.S. EPA 2017. Regional Screening Level (RSL) Summary Table (TR=1E-06, HQ=1) June 2017, Screening level for PCB-1254/PCB-1260 in residential soil, epa.gov/risk/risk-based-screening-table-generic-tables (accessed November 3, 2017).

Westinghouse Savannah River Company 1994. *Savannah River Site Environmental Report for 1993, Summary Pamphlet,* Savannah River, GA.

This page intentionally left blank.

**APPENDIX A**

**RADIATION**

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

This appendix presents basic facts concerning radiation. The information is intended as a basis for understanding the dose associated with releases from PORTS, not as a comprehensive discussion of radiation and its effects on the environment and biological systems. *The McGraw-Hill Dictionary of Scientific and Technical Terms* defines radiation and radioactivity as follows:

> *radiation*—1) The emission and propagation of waves transmitting energy through space or through some medium; for example, the emission and propagation of electromagnetic, sound, or elastic waves. 2) The energy transmitted through space or some medium; when unqualified, usually refers to electromagnetic radiation. Also known as radiant energy. 3) A stream of particles, such as electrons, neutrons, protons, alpha particles, or high-energy photons, or a mixture of these (McGraw-Hill 1989).

> *radioactivity*—A particular type of radiation emitted by a radioactive substance, such as alpha radioactivity (McGraw-Hill 1989).

Radiation occurs naturally; it was not invented but discovered. People are constantly exposed to radiation. For example, radon in air, potassium in food and water, and uranium, thorium, and radium in the earth's crust are all sources of radiation. The following discussion describes important aspects of radiation, including atoms and isotopes; types, sources, and pathways of radiation; radiation measurement; and dose information.

## A.1 ATOMS AND ISOTOPES

All matter is made up of atoms. An atom is "a unit of measure consisting of a single nucleus surrounded by a number of electrons equal to the number of protons in the nucleus" (American Nuclear Society 1986). The number of protons in the nucleus determines an element's atomic number, or chemical identity. With the exception of hydrogen, the nucleus of each type of atom also contains at least one neutron. Unlike protons, the number of neutrons may vary among atoms of the same element. The number of neutrons and protons determines the atomic weight. Atoms of the same element with a different number of neutrons are called isotopes. In other words, isotopes have the same chemical properties but different atomic weights. Figure A.1 depicts isotopes of the element hydrogen.

Another example is the element uranium, which has 92 protons; all isotopes of uranium, therefore, have 92 protons. However, each uranium isotope has a different number of neutrons. Uranium-238 (also denoted $^{238}$U) has 92 protons and 146 neutrons; uranium-235 has 92 protons and 143 neutrons; uranium-234 has 92 protons and 142 neutrons.



| | PROTONS | NEUTRONS |
|---|---|---|
| HYDROGEN | 1 | 0 |
| DEUTERIUM | 1 | 1 |

**Figure A.1. Isotopes of the element hydrogen.**

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

Some isotopes are stable, or nonradioactive; some are radioactive. Radioactive isotopes are called radioisotopes, or radionuclides. In an attempt to become stable, radionuclides "throw away," or emit, rays or particles. This emission of rays and particles is known as radioactive decay. Each radionuclide has a "radioactive half-life," which is the average time that it takes for half of a specified number of atoms to decay. Half-lives can be very short (less than a second) or very long (millions of years), depending on the radionuclide. Appendix C presents the half-lives of radionuclides of interest at PORTS.

## A.2 RADIATION

Radiation, or radiant energy, is energy in the form of waves or particles moving through space. Visible light, heat, radio waves, and alpha particles are examples of radiation. When people feel warmth from the sunlight, they are actually absorbing the radiant energy emitted by the sun.

Electromagnetic radiation is radiation in the form of electromagnetic waves; examples include gamma rays, ultraviolet light, and radio waves. Particulate radiation is radiation in the form of particles; examples include alpha and beta particles. Radiation also is characterized as ionizing or nonionizing radiation by the way in which it interacts with matter.

### A.2.1 Ionizing Radiation

Normally, an atom has an equal number of protons and electrons; however, atoms can lose or gain electrons in a process known as ionization. Some forms of radiation can ionize atoms by "knocking" electrons off atoms. Examples of ionizing radiation include alpha, beta, and gamma radiation.

Ionizing radiation is capable of changing the chemical state of matter and subsequently causing biological damage and thus is potentially harmful to human health. Figure A.2 shows the penetrating potential of different types of ionizing radiation.



**Figure A.2. Penetrating power of radiation.**

### A.2.2 Nonionizing Radiation

Nonionizing radiation bounces off or passes through matter without displacing electrons. Examples include visible light and radio waves. Currently, it is unclear whether nonionizing radiation is harmful to human health. In the discussion that follows, the term radiation is used to describe ionizing radiation.

## A.3 SOURCES OF RADIATION

Radiation is everywhere. Most occurs naturally, but a small percentage is human-made. Naturally occurring radiation is known as background radiation.

### A.3.1 Background Radiation

Many materials are naturally radioactive. In fact, this naturally occurring radiation is the major source of radiation in the environment. Although people have little control over the amount of background radiation to which they are exposed, this exposure must be put into perspective. Background radiation remains relatively constant over time; background radiation present in the environment today is much the same as it was hundreds of years ago.

Sources of background radiation include uranium in the earth, radon in the air, and potassium in food. Background radiation is categorized as space, terrestrial, or internal, depending on its origin.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**A.3.1.1 Space radiation**

Energetically charged particles from outer space continuously hit the earth's atmosphere. These particles and the secondary particles and photons they create are called space or cosmic radiation. Because the atmosphere provides some shielding against space radiation, the intensity of this radiation increases with altitude above sea level. For example, a person in Denver, Colorado, is exposed to more space radiation than a person in Death Valley, California.

**A.3.1.2 Terrestrial radiation**

Terrestrial radiation refers to radiation emitted from radioactive materials in the earth's rocks, soils, and minerals. Radon (Rn); radon progeny, the relatively short-lived decay products of radium-226 ($^{226}$Ra); potassium ($^{40}$K); isotopes of thorium (Th); and isotopes of uranium (U) are the elements responsible for most terrestrial radiation.

**A.3.1.3 Internal radiation**

Radioactive material in the environment can enter the body through the air people breathe and the food they eat; it also can enter through an open wound. Natural radionuclides that can be inhaled and ingested include isotopes of uranium, thorium, radium, radon, polonium, bismuth, and lead in the $^{238}$U and $^{232}$Th decay series. In addition, the body contains isotopes of potassium ($^{40}$K), rubidium ($^{87}$Rb), and carbon ($^{14}$C).

**A.3.2 Human-made Radiation**

Most people are exposed to human-made sources of radiation. Examples include consumer products, medical sources, and industrial or occupational sources. About one-half of 1% of the U.S. population performs work in which radiation in some form is present. Atmospheric testing of atomic weapons was a source of human-made radiation, but testing has been suspended in the United States and most parts of the world. Fallout from atmospheric weapons testing is not currently a significant contributor to background radiation (Health Physics Society 2010).

**A.3.2.1 Consumer products and activities**

Some consumer products are sources of radiation. In some consumer products, such as smoke detectors, watches, or clocks, radiation is essential to the performance of the device. In other products or activities, such as smoking tobacco products or building materials, the radiation occurs incidentally to the product function. Commercial air travel is another consumer activity that results in exposure to radiation (from space radiation).

**A.3.2.2 Medical sources**

Radiation is an important tool of diagnostic medicine and treatment, and, in this use, is the main source of exposure to human-made radiation. Exposure is deliberate and directly beneficial to the patients exposed. Generally, medical exposures result from beams directed to specific areas of the body. Thus, all body organs generally are not irradiated uniformly. Radiation and radioactive materials are also used in a wide variety of pharmaceuticals and in the preparation of medical instruments, including the sterilization of heat-sensitive products such as plastic heart valves. Nuclear medicine examinations and treatment involve the internal administration of radioactive compounds, or radiopharmaceuticals, by injection, inhalation, consumption, or insertion. Even then, radionuclides are not distributed uniformly throughout the body.

**A.3.2.3 Industrial and occupational sources**

Other sources of radiation include emissions of radioactive materials from nuclear facilities such as uranium mines, fuel processing plants, and nuclear power plants; emissions from mineral extraction facilities; and the transportation of radioactive materials. Workers in certain occupations may also be

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

exposed to radiation due to their jobs. These occupations include positions in medicine, aviation, research, education, and government.

## A.4 PATHWAYS OF RADIATION

Radiation and radioactive materials in the environment can reach people through many routes (see Figure A.3). Potential routes for radiation are referred to as pathways. For example, radioactive material in the air could fall on a pasture. The grass could then be eaten by cows, and the radioactive material on the grass would be present in the cow's milk. People drinking the milk would thus be exposed to this radiation. Or people could simply inhale the radioactive material in the air. The same events could occur with radioactive material in water. Fish living in the water would be exposed; people eating the fish would then be exposed to the radiation in the fish. Or people swimming in the water would be exposed.



**Figure A.3. Possible radiation pathways.**

## A.5 MEASURING RADIATION

To determine the possible effects of radiation on the environment and the health of people, the radiation must be measured. More precisely, its potential to cause damage must be determined.

### A.5.1 Activity

When measuring the amount of radiation in the environment, what is actually being measured is the rate of radioactive decay, or activity. The rate of decay varies widely among the various radionuclides. For that reason, 1 gram of a radioactive substance may contain the same amount of activity as several tons of another material. This activity is expressed in a unit of measure known as a curie (Ci). More specifically, 1 Ci = 3.7E+10 (37,000,000,000) atom disintegrations per second (dps). In the international system of units, 1 dps = 1 becquerel (Bq). Table A.1 provides units of radiation measure and applicable conversions.

**Table A.1. Units of radiation measures**

| Current System | International System | Conversion |
| --- | --- | --- |
| curie (Ci) | Becquerel (Bq) | $1 \text{ Ci} = 3.7 \times 10^{10} \text{ Bq}$ |
| rad (radiation absorbed dose) | Gray (Gy) | 1 rad = 0.01 Gy |
| rem (roentgen equivalent man) | Sievert (Sv) | 1 rem = 0.01 Sv |

### A.5.2 Absorbed Dose

The total amount of energy absorbed per unit mass as a result of exposure to radiation is expressed in a unit of measure known as a rad. In the international system of units, 100 rad equals 1 gray (Gy). In terms of human health, however, it is the effect of the absorbed energy that is important, not the actual amount.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**A.5.3 Dose**

The measure of potential biological damage caused by exposure to and subsequent absorption of radiation is expressed in a unit of measure known as a rem. One rem of any type of radiation has the same total damaging effect. Because a rem represents a fairly large dose, dose is expressed as a millirem (mrem) or 1/1000 of a rem. In the international system of units, 100 rem equals 1 sievert (Sv); 100 mrem equals 1 millisievert (mSv). Specific types of dose are defined as follows:

- **equivalent dose** – The product of the absorbed dose (rad) in tissue and a radiation weighting factor. Equivalent dose is expressed in units of rem (or sievert) (1 rem = 0.01 sievert).

- **committed equivalent dose** – The calculated equivalent dose to a tissue or organ over a 50-year period after known intake of a radionuclide into the body. Contributions from external dose are not included. Committed equivalent dose is expressed in units of rem (or sievert).

- **committed effective dose** – The sum of the committed equivalent doses to various tissues in the body, each multiplied by the appropriate tissue weighting factor. Committed effective dose is expressed in units of rem (or sievert).

- **effective dose** – The sum of the doses received by all organs or tissues of the body after each one has been multiplied by the appropriate tissue weighting factor. It includes the dose from radiation sources internal and/or external to the body. Effective dose is expressed in units of rem (or sievert). In this report, the term "effective dose" is often shortened to "dose".

- **collective dose** – The sum of the effective doses to all persons in a specified population received in a specified period of time. Collective dose is expressed in units of person-rem (or person-sievert). This dose is also called the population dose.

**A.6 DOSE**

Determining dose is an involved process using complex mathematical equations based on several factors, including the type of radiation, the rate of exposure, weather conditions, and typical diet. Basically, ionizing radiation is generated from radioactive decay, or activity. People absorb some of the energy to which they are exposed. This absorbed energy is calculated as part of an individual's dose. Whether radiation is natural or human-made, its effects on people are the same.

**A.6.1 Comparison of Dose Levels**

Table A.2 presents a scale of dose levels. Included is an example of the type of exposure that may cause such a dose or the special significance of such a dose. This information is intended to familiarize the reader with the type of doses individuals may receive.

**A.6.1.1 Dose from space radiation**

The average annual dose received by residents of the United States from space radiation is about 33 mrem (0.33 mSv) (NCRP 2009). The average dose to a person living in Honolulu, Hawaii (at sea level and near the equator) is about 20 mrem (0.2 mSv), while the average dose to a person living in Colorado Springs, Colorado (high altitude and latitude) is about 70 mrem (0.7 mSv) (Health Physics Society 2010).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table A.2. Comparison and description of various dose levels**[a]

| Dose level | Description |
|---|---|
| 0.85 mrem (0.0085 mSv) | Approximate daily dose from natural background radiation, including radon |
| 1.92 mrem (0.0192 mSv) | Cosmic dose to a person on a one-way airplane flight from Washington D.C. to Seattle |
| 10 mrem (0.10 mSv) | Annual exposure limit, set by U.S. EPA, for exposures from airborne emissions from operations of nuclear fuel cycle facilities, including power plants and uranium mines and mills |
| 36 mrem (0.36 mSv) | Average annual dose to a person who smokes one pack of cigarettes per day |
| 36 mrem (0.36 mSv) | Mammogram (two views) |
| 46 mrem (0.46 mSv) | Estimate of the largest dose any off-site person could have received from the March 28, 1979, Three Mile Island nuclear power plant accident |
| 60 mrem (0.60 mSv) | X-ray (single exposure) of abdomen or hip |
| 100 mrem (1.00 mSv) | Annual limit of dose from all DOE facilities to a member of the public who is not a radiation worker |
| 244 mrem (2.44 mSv) | Average dose from an upper gastrointestinal diagnostic X-ray series |
| 300 mrem (3.00 mSv) | Average annual dose to a person in the United States from all sources of medical radiation |
| 311 mrem (3.11 mSv) | Average annual dose to a person in the United States from all sources of natural background radiation |
| 700 mrem (7.0 mSv) | Computed tomography – chest |
| 1-5 rem (0.01-0.05 Sv) | U.S. EPA protective action guideline calling for public officials to take emergency action when the dose to a member of the public from a nuclear accident will likely reach this range |
| 5 rem (0.05 Sv) | Annual limit for occupational exposure of radiation workers set by the Nuclear Regulatory Commission and DOE |
| 10 rem (0.10 Sv) | The Biological Effects of Ionizing Radiation V report estimated that an acute dose at this level would result in a lifetime excess risk of death from cancer of 0.8% (Biological Effects of Ionizing Radiation 1990) |
| 25 rem (0.25 Sv) | U.S. EPA guideline for voluntary maximum dose to emergency workers for non-lifesaving work during an emergency |
| 75 rem (0.75 Sv) | U.S. EPA guideline for maximum dose to emergency workers volunteering for lifesaving work |
| 50-600 rem (0.50-6.00 Sv) | Doses in this range received over a short period of time will produce radiation sickness in varying degrees. At the lower end of this range, people are expected to recover completely, given proper medical attention. At the top of this range, most people would die within 60 days |

[a]Adapted from Savannah River Site Environmental Report for 1993, Summary Pamphlet, WSRC-TR-94-076, Westinghouse Savannah River Company, 1994 and NCRP Report No. 160, *Ionizing Radiation Exposure of the Population of the United States* (NCRP 2009).

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

### A.6.1.2 Dose from terrestrial radiation

The average annual dose received from terrestrial gamma radiation is about 21 mrem (0.21 mSv) in the United States (NCRP 2009). Similar to space radiation, this dose varies geographically across the country with the lowest doses on the Atlantic and Gulf coastal plains and highest doses in the mountains in the western United States.

### A.6.1.3 Dose from internal radiation

Inhalation of the short-lived decay products of radon are the major contributors to the annual dose equivalent for internal radionuclides (mostly $^{222}$Rn). They contribute an average dose of about 228 mrem (2.28 mSv) per year (NCRP 2009). The average dose from ingestion of radionuclides is about 29 mrem (0.29 mSv) per year, which can be attributed to the naturally occurring radioisotope of potassium, $^{40}$K; and radioisotopes of thorium (Th), uranium (U), and their decay series (NCRP 2009).

### A.6.1.4 Dose from consumer products

The U.S. average annual dose received by an individual from consumer products is about 13 mrem (0.13 mSv) (NCRP 2009). Almost 90 percent of this dose results from smoking cigarettes, commercial air travel, and building materials (radionuclides present in brick, masonry, cement, concrete, and other materials).

### A.6.1.5 Dose from medical sources

Medical exams and procedures account for the largest portion of the average annual dose received from human-made sources. These procedures include x-rays, computed tomography (a more sophisticated type of x-ray), and fluoroscopy, and nuclear medicine. The increase in the use of medical imaging procedures, especially computed tomography, over the last 25 years has resulted in a marked increase in the average annual dose from medical sources received by a person in the United States: 53 mrem/year in the early 1980s to 300 mrem/year in 2006 (NCRP 2009). The actual doses received by individuals who complete such medical exams can be much higher than the average value because not everyone receives such exams each year.

### A.6.1.6 Doses from industrial and occupational sources

Small doses received by individuals occur as a result of emissions of radioactive materials from nuclear facilities, emissions from certain mineral extraction facilities, and transportation of radioactive materials. The combination of these sources contributes less than 1 mrem (0.01 mSv) per year to the average dose to an individual (NCRP 2009).

This page intentionally left blank.

**APPENDIX B**

**ENVIRONMENTAL PERMITS**

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table B.1.  DOE environmental permits and registrations at PORTS**

| Permit/registered source | Source no. | Issue date | Expiration date | Status |
|---|---|---|---|---|
| *FBP– Clean Air Act Permits* | | | | |
| Title V Permit | P0109662 | 4/28/2014 | 5/19/2019 | Active |
| Permit to Install X-627 Groundwater Treatment Facility (06-07283) | P474, T104, T105 | 3/15/2005 | None | Active |
| Permit to Install and Operate X-326 L-cage Glove Box (P0104170) | P022 | 11/12/2008 | 11/12/2018 | Active |
| Permit to Install and Operate X-735 Landfill Cap and Venting System (northern portion) (P0104170) | P023 | 11/12/2008 | 11/12/2018 | Active |
| Permit to Install X-670A Cooling Tower (P0106292) | P539 | 07/29/2010 | None | Active |
| Permit to Install X-333 Low Assay Withdrawal Seal Exhaust System (06-07984) | P117 | 01/10/2006 | None | Inactive |
| Permit to Install Biodenitrification Vent #1 (06-07928) | P040 | 11/03/2005 | None | Active |
| Permit to Install Biodenitrification Vent #2 (06-07928) | P041 | 11/03/2005 | None | Active |
| Permit to Install Biodenitrification Vent #3 (06-07928) | P042 | 11/03/2005 | None | Active |
| Permit to Install X-700 Radiation Calibration Lab Fume Hood (06-07928) | P045 | 11/03/2005 | None | Active |
| Permit to Install X-705 Calciners (B Area) (06-07928) | P053 | 11/03/2005 | None | Active |
| Permit to Install X-720 Instrument Cleaning Room Hood 4 (06-07928) | P065 | 11/03/2005 | None | Active |
| Permit to Install X-720 Motor Shop Steam Cleaning Booth (06-07928) | P067 | 11/03/2005 | None | Active |
| Permit to Install X-344 Pigtail Gulper (06-07760) | P430 | 05/17/2005 | None | Active |
| Permit to Install X-701B In Situ Chemical Oxidation with Recirculation Treatment System (06-07666) | P475, T106 | 03/15/2005 | None | Inactive |
| Permit to Install X-720 Instrument Cleaning Room Glove Box (06-07000) | P474 | 11/19/2002 | None | Active |
| Permit to Install X-705 Dry Ice Blaster with HEPA Filter (06-06752) | P473 | 04/11/2002 | None | Active |
| Permit to Install X-705 8 inch, 12 inch, and 2.5 Ton Uranium Cylinders, Cleaned for Reuse or Disposal (06-06703) | P470 | 04/11/2002 | None | Active |
| Permit to Install X-344 Toll Transfer Facility (06-06303) | P469 | 12/12/2000 | None | Active |
| Permit to Install X-343 Feed Vaporization and Sampling (06-06302) | P468 | 12/12/2000 | None | Inactive |
| Permit to Install 85 Horsepower Trash Pump (06-06170) | P467 | 05/24/2000 | None | Active |
| Permit to Install X-847 Glove Box (06-5682) | P466 | 07/21/1999 | None | Active |

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table B.1.  DOE environmental permits and registrations at PORTS (continued)**

| Permit/registered source | Source no. | Issue date | Expiration date | Status |
|---|---|---|---|---|
| *FBP– Clean Air Act Permits (continued)* | | | | |
| X-624 Groundwater Treatment Facility (now considered a *de minimis* source) | P019 | 10/28/1992 | None | Active |
| Permit to Install X-623 Groundwater Treatment Facility (06-4613) | P018 | 01/08/1992 | None | Active |
| Permit to Install X-749 Contaminated Materials Disposal Facility (06-2999) | P027 | 04/17/1991 | None | Active |
| Permit to Install Gasoline Dispensing Facility (06-02906) | G001 | 10/31/1990 | None | Active |
| *MCS – Clean Air Act Permits* | | | | |
| Permit No. P0109511 to Install and Operate Process Line 1 (DUF$_6$ Conversion Facility) | P001 | 3/23/2012 | 3/23/2022 | Active |
| Permit No. P0109511 to Install and Operate Process Line 2 (DUF$_6$ Conversion Facility) | P002 | 3/23/2012 | 3/23/2022 | Active |
| Permit No. P0109511 to Install and Operate Process Line 3 (DUF$_6$ Conversion Facility) | P003 | 3/23/2012 | 3/23/2022 | Active |
| Permit No. P0109511 to Install and Operate HVAC System (DUF$_6$ Conversion Facility) | P004 | 3/23/2012 | 3/23/2022 | Active |
| *FBP – Clean Water Act/Safe Drinking Water Act Permits* | | | | |
| NPDES Permit | 0IO00000*MD | 6/1/2017 (effective date) | 8/31/2020 | Active |
| Safe Drinking Water Act – License to Operate a Public Water System | OH6632414 | | Renewed annually | Active |
| Permit to Install X-622 Groundwater Treatment Facility | 06-2951 | 11/20/1990 | None | Active |
| Permit to Install X-623 Groundwater Treatment Facility | 06-3528 | 1/9/1996 | None | Active |
| Permit to Install X-624 Groundwater Treatment Facility | 06-3556 | 10/28/1992 | None | Active |
| Permit to Install X-627 Groundwater Treatment Facility | 06-07283 | 1/13/2004 | None | Active |
| *MCS – Clean Water Act Permit* | | | | |
| NPDES Permit | 0IS00034*BD | 5/13/2014 | 5/31/2019 | Active |
| *FBP – Hazardous Waste Permit* | | | | |
| RCRA Part B Permit (DOE/FBP) | Ohio Permit No. 04-66-0680 | 3/25/2011 | 3/25/2021 | Active |
| *FBP – Registrations* | | | | |
| Underground Storage Tank Registration | 66005107 | | Renewed annually | Active |

**APPENDIX C**

**RADIONUCLIDE AND CHEMICAL NOMENCLATURE**

This page intentionally left blank.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table C.1.  Nomenclature for elements and chemical constituents**

| Constituent | Symbol |
| --- | --- |
| Aluminum | Al |
| Ammonia | $NH_3$ |
| Antimony | Sb |
| Arsenic | As |
| Barium | Ba |
| Beryllium | Be |
| Cadmium | Cd |
| Calcium | Ca |
| Chromium | Cr |
| Cobalt | Co |
| Copper | Cu |
| Iron | Fe |
| Lead | Pb |
| Lithium | Li |
| Magnesium | Mg |
| Manganese | Mn |
| Mercury | Hg |
| Nickel | Ni |
| Nitrogen | N |
| Nitrate ion | $NO_3^-$ |
| Nitrite ion | $NO_2^-$ |
| Phosphorus | P |
| Phosphate ion | $PO_4^{2-}$ |
| Potassium | K |
| Selenium | Se |
| Silver | Ag |
| Sodium | Na |
| Sulfate ion | $SO_4^-$ |
| Sulfur dioxide | $SO_2$ |
| Thallium | Tl |
| Uranium | U |
| Vanadium | V |
| Zinc | Zn |

FBP / 2017 ASER 1/24/2019

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

**Table C.2.  Nomenclature and half-life for radionuclides**

| Radionuclide | Symbol | Half-life (years) |
|---|---|---|
| Americium-241 | $^{241}$Am | 432.2 |
| Neptunium-237 | $^{237}$Np | 2,140,000 |
| Plutonium-238 | $^{238}$Pu | 87.7 |
| Plutonium-239 | $^{239}$Pu | 24,100 |
| Plutonium-240 | $^{240}$Pu | 6,564 |
| Technetium-99 | $^{99}$Tc | 211,000 |
| Uranium-233 | $^{233}$U | 159,000 |
| Uranium-234 | $^{234}$U | 246,000 |
| Uranium-235 | $^{235}$U | 704,000,000 |
| Uranium-236 | $^{236}$U | 23,400,000 |
| Uranium-238 | $^{238}$U | 4,470,000,000 |

Source: *Derived Concentration Technical Standard* (DOE 2011a), Table A.3.

DOE/PPPO/03-0862&D1
FBP-ER-RCRA-WD-RPT-0288
Revision 3
January 2019

DOE/PPPO/03-0862&D1

# RECORD COPY DISTRIBUTION

File—FBP RMDC—RC



**U.S. Department of Energy**

**Portsmouth Gaseous Diffusion Plant**

**Annual Site Environmental Data 2017**

Tuliptree silkmoth

December 2018

# U.S. Department of Energy
# Portsmouth Gaseous Diffusion Plant
# Annual Site Environmental Data – 2017
# Piketon, Ohio



# U.S. Department of Energy
# DOE/PPPO/03-0863&D1

# December 2018

# By
# Fluor-BWXT Portsmouth LLC, under Contract DE-AC30-10CC40017

## FBP-ER-RCRA-WD-RPT-0289, Revision 1

This document has been approved for public release:

| | |
|---|---|
| *Samuel C. Eldridge* (signature on file) | 12/20/2018 |
| Classification Office | Date |

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# CONTENTS

TABLES ..................................................................................................................................... iii

ACRONYMS AND ABBREVIATIONS ................................................................................... v

1. INTRODUCTION ............................................................................................................. 1-1

2. ENVIRONMENTAL MONITORING ............................................................................. 2-1

3. DOSE ................................................................................................................................. 3-1

4. GROUNDWATER ............................................................................................................ 4-1

5. REFERENCES .................................................................................................................. 5-1

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# TABLES

2.1    Radionuclide concentrations in FBP and Centrus NPDES outfall water samples – 2017 ............ 2-2

2.2    FBP NPDES permit summary – 2017 ................................................................................ 2-5

2.3    MCS NPDES permit summary – 2017 ............................................................................. 2-10

2.4    FBP NPDES discharge and compliance rates – 2017 ........................................................ 2-11

2.5    MCS NPDES discharge and compliance rates – 2017 ....................................................... 2-16

2.6    Centrus NPDES discharge monitoring results – 2017 ....................................................... 2-17

2.7    Radionuclides in surface water runoff samples from FBP and MCS cylinder storage yards – 2017 ................................................................................................................. 2-18

2.8    Drainage basin monitoring of surface water and sediment for MCS cylinder storage yards – 2017 ................................................................................................................. 2-20

2.9    Ambient air monitoring program summary for radionuclides and fluoride – 2017 .................... 2-21

2.10   External radiation monitoring program (mrem) – 2017 ...................................................... 2-25

2.11   External radiation monitoring (mrem) at locations near cylinder storage yards – 2017 ............ 2-25

2.12   Settleable solids monitoring results – 2017 ..................................................................... 2-26

2.13   Local surface water monitoring program results – 2017 .................................................... 2-27

2.14   Sediment monitoring program results – 2017 .................................................................. 2-31

2.15   Soil and biota (vegetation) monitoring at ambient air monitoring stations – 2017 .................. 2-37

2.16   Biota (fish) monitoring program results – 2017 ............................................................... 2-40

2.17   Biota (crops) monitoring program results – 2017 ............................................................. 2-41

2.18   Biota (deer) monitoring program results – 2017 .............................................................. 2-43

2.19   Biota (off-site dairy) monitoring – 2017 ......................................................................... 2-44

3.1    Emissions (Ci/year) from DOE air emission sources – 2017 .............................................. 3-1

3.2    Predicted radiation doses from airborne releases at PORTS – 2017 .................................... 3-2

3.3    Dose calculations for ambient air monitoring stations – 2017 ............................................ 3-2

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

4.1    VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former
       Training Facility – 2017.................................................................................................4-4

4.2    Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120
       Former Training Facility – 2017 ...............................................................................4-14

4.3    VOCs detected at the PK Landfill – 2017...................................................................4-20

4.4    VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017.................4-21

4.5    Results for radionuclides at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017 ..4-25

4.6    VOCs detected at the X-749A Classified Materials Disposal Facility – 2017 ..........................4-26

4.7    Results for radionuclides at the X-749A Classified Materials Disposal Facility – 2017...........4-27

4.8    VOCs detected at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017................4-28

4.9    Results for radionuclides at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017.4-31

4.10   VOCs detected at the X-701B Former Holding Pond – 2017....................................................4-33

4.11   Results for radionuclides at the X-701B Former Holding Pond – 2017 ...................................4-40

4.12   Results for chromium at the X-633 Former Recirculating Cooling Water
       Complex – 2017..........................................................................................................4-47

4.13   VOCs detected at the X-616 Former Chromium Sludge Surface Impoundments – 2017 ..........4-48

4.14   Results for chromium at the X-616 Former Chromium Sludge Surface
       Impoundments – 2017.................................................................................................4-49

4.15   VOCs detected at the X-740 Former Waste Oil Handling Facility – 2017................................4-50

4.16   Results for beryllium and chromium at the X-611A Former Lime Sludge Lagoons – 2017......4-53

4.17   VOCs detected at the X-735 Landfills – 2017 ........................................................................4-54

4.18   Results for radionuclides at the X-735 Landfills – 2017 .........................................................4-55

4.19   VOCs detected at the X-734 Landfills – 2017 ........................................................................4-58

4.20   Results for radionuclides at the X-734 Landfills – 2017 .........................................................4-59

4.21   Results for cadmium and nickel at the X-533 Former Switchyard Complex – 2017 ................4-62

4.22   VOCs detected at the X-344C Former Hydrogen Fluoride Storage Building – 2017 ...............4-63

4.23   VOCs detected at surface water monitoring locations – 2017..................................................4-64

4.24   Results for radionuclides at surface water monitoring locations – 2017 ..................................4-65

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| #/100 mL | number per 100 mL |
| ACP | American Centrifuge Plant |
| BWCS | BWXT Conversion Services, LLC |
| °C | degrees Celsius |
| Ci | curie |
| cm | centimeter |
| DOE | U.S. Department of Energy |
| $DUF_6$ | depleted uranium hexafluoride |
| FBP | Fluor-BWXT Portsmouth LLC |
| °F | degrees Fahrenheit |
| g | gram |
| GPD | gallons per day |
| in. | inch |
| kg | kilogram |
| L | liter |
| m | meter |
| $m^3$ | cubic meter |
| µg | microgram |
| mg | milligram |
| MCS | Mid-America Conversion Services, LLC |
| MGD | million gallons per day |
| mrem | millirem |
| ND | not detected |
| ng | nanogram |
| NPDES | National Pollutant Discharge Elimination System |
| Ohio EPA | Ohio Environmental Protection Agency |
| OVEC | Ohio Valley Electric Corporation |
| PCB | polychlorinated biphenyl |
| pCi | picocurie |
| PK | Peter Kiewit |
| PORTS | Portsmouth Gaseous Diffusion Plant |
| SU | standard unit |
| TUa | acute toxicity unit |
| VOC | volatile organic compound |

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# 1. INTRODUCTION

Environmental monitoring at the Department of Energy (DOE) Portsmouth Gaseous Diffusion Plant (PORTS) is conducted throughout the year.  Monitoring demonstrates the site is a safe place to work, plant operations do not adversely affect neighboring communities, and activities comply with federal and state regulations.

This document is a compilation of the environmental monitoring data for calendar year 2017 and is intended as a tool for analysts in environmental monitoring, environmental restoration, and other related disciplines.  The data in this document form the basis for the summary information in the *Portsmouth Gaseous Diffusion Plant Annual Site Environmental Report – 2017* (DOE 2019).

Radiological monitoring data presented in this Data Report and discussed in the *Annual Site Environmental Report for 2017* indicate that the maximum dose a member of the public could receive from radionuclides released by PORTS in 2017 or detected by environmental monitoring programs in 2017 is 0.90 millirem (mrem).  This dose is significantly less than the 100 mrem limit set in DOE Order 458.1, *Radiation Protection of the Public and the Environment*.

Other non-radiological chemicals such as polychlorinated biphenyls (PCBs), metals, and volatile organic compounds (VOCs) are also monitored.  Discharges of metals and other chemicals to surface water are controlled by National Pollutant Discharge Elimination System (NPDES) permits.  Emissions of non-radiological air pollutants are controlled by air emission permits issued by Ohio Environmental Protection Agency (Ohio EPA).  The *Portsmouth Gaseous Diffusion Plant Annual Site Environmental Report – 2017* (DOE 2019) provides more information about non-radiological chemicals released from PORTS or detected by PORTS monitoring programs during 2017.

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# 2. ENVIRONMENTAL MONITORING

This section provides environmental monitoring data collected in 2017 by DOE contractors Fluor-BWXT Portsmouth LLC (FBP), Mid-America Conversion Services, LLC (MCS), and BWXT Conversion Services, LLC (BWCS). MCS assumed operation of the depleted uranium hexafluoride conversion facility at PORTS from BWCS on February 1, 2017. Data collected by Centrus for NPDES outfalls associated with the American Centrifuge Plant (ACP) are also reported in this section.

The following tables are provided in this section:

- Table 2.1. Radionuclide concentrations in FBP and Centrus NPDES outfall water samples – 2017

- Table 2.2. FBP NPDES permit summary  –  2017

- Table 2.3. MCS NPDES permit summary – 2017

- Table 2.4. FBP NPDES discharge and compliance rates – 2017

- Table 2.5. MCS NPDES discharge and compliance rates – 2017

- Table 2.6. Centrus NPDES discharge monitoring results – 2017

- Table 2.7 Radionuclides in surface water runoff samples from FBP and MCS cylinder storage yards – 2017

- Table 2.8. Drainage basin monitoring of surface water and sediment for MCS cylinder storage yards – 2017

- Table 2.9. Ambient air monitoring program summary for radionuclides and fluoride – 2017

- Table 2.10. External radiation monitoring program (mrem) – 2017

- Table 2.11. External radiation monitoring (mrem) at locations near cylinder storage yards – 2017

- Table 2.12. Settleable solids monitoring results – 2017

- Table 2.13. Local surface water monitoring program results – 2017

- Table 2.14. Sediment monitoring program results – 2017

- Table 2.15. Soil and biota (vegetation) monitoring at ambient air monitoring stations – 2017

- Table 2.16. Biota (fish) monitoring program results – 2017

- Table 2.17. Biota (crops) monitoring program results – 2017

- Table 2.18. Biota (deer) monitoring program results – 2017

- Table 2.19. Biota (off-site dairy) monitoring program results – 2017.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.1. Radionuclide concentrations in FBP and Centrus
NPDES outfall water samples – 2017**

| NPDES outfall[a] | Parameter[b] | Number of samples[c] | Minimum[d] | Maximum[d] | Average[e] |
|---|---|---|---|---|---|
| | | *FBP Outfalls* | | | |
| 001 | Americium-241 | 4(4) | < 0.00493 | < 0.0462 | |
| | Neptunium-237 | 4(4) | 0 | < 0.0188 | |
| | Plutonium-238 | 4(4) | 0 | < 0.013 | |
| | Plutonium-239/240 | 4(4) | < 0.0222 | < 0.0391 | |
| | Technetium-99 | 12(4) | < 0.0884 | 89.2 | |
| | Uranium | 12(0) | 0.359 | 3.3 | 1.03 |
| | Uranium-233/234 | 12(0) | 0.697 | 6.55 | 1.88 |
| | Uranium-235/236 | 12(8) | < 0.0233 | 0.332 | |
| | Uranium-238 | 12(0) | 0.115 | 1.06 | 0.330 |
| 002 | Americium-241 | 4(4) | < 0.00534 | < 0.037 | |
| | Neptunium-237 | 4(4) | 0 | < 0.00486 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0292 | |
| | Plutonium-239/240 | 4(4) | 0 | < 0.0268 | |
| | Technetium-99 | 12(11) | 0 | 3.77 | |
| | Uranium | 12(0) | 0.312 | 1.05 | 0.72 |
| | Uranium-233/234 | 12(0) | 0.489 | 1.15 | 0.70 |
| | Uranium-235/236 | 12(12) | < 0.0181 | < 0.0764 | |
| | Uranium-238 | 12(0) | 0.101 | 0.346 | 0.234 |
| 003 | Americium-241 | 4(4) | < 0.00974 | < 0.0255 | |
| | Neptunium-237 | 4(4) | 0 | < 0.00938 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0142 | |
| | Plutonium-239/240 | 4(4) | 0 | < 0.0332 | |
| | Technetium-99 | 12(2) | < 4.53 | 55.7 | |
| | Uranium | 12(0) | 0.367 | 2.61 | 1.70 |
| | Uranium-233/234 | 12(0) | 0.195 | 2.14 | 1.42 |
| | Uranium-235/236 | 12(7) | < 0.027 | 0.14 | |
| | Uranium-238 | 12(0) | 0.119 | 0.856 | 0.559 |
| 004 | Americium-241 | 4(4) | < 0.0103 | < 0.0529 | |
| | Neptunium-237 | 4(4) | 0 | < 0.0114 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0103 | |
| | Plutonium-239/240 | 4(4) | < 0.00535 | < 0.0258 | |
| | Technetium-99 | 12(12) | 0 | < 4.5 | |
| | Uranium | 12(12) | < 0.0308 | < 0.196 | |
| | Uranium-233/234 | 12(11) | < 0.0307 | 0.103 | |
| | Uranium-235/236 | 12(12) | 0 | < 0.0257 | |
| | Uranium-238 | 12(12) | < 0.0103 | < 0.0659 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.1. Radionuclide concentrations in FBP and Centrus
NPDES outfall water samples – 2017 (continued)**

| NPDES outfall[a] | Parameter[b] | Number of samples[c] | Minimum[d] | Maximum[d] | Average[e] |
|---|---|---|---|---|---|
| | | *FBP Outfalls* | | | |
| 005 | Americium-241 | 1(1) | < 0.0296 | | |
| | Neptunium-237 | 1(1) | 0 | | |
| | Plutonium-238 | 1(1) | 0 | | |
| | Plutonium-239/240 | 1(1) | < 0.00519 | | |
| | Technetium-99 | 4(4) | 0 | < 1.06 | |
| | Uranium | 4(3) | < 0.14 | 0.251 | |
| | Uranium-233/234 | 4(2) | < 0.059 | 0.0906 | |
| | Uranium-235/236 | 4(4) | < 0.00559 | < 0.0291 | |
| | Uranium-238 | 4(4) | < 0.0453 | < 0.0797 | |
| 009 | Americium-241 | 4(4) | 0 | < 0.0793 | |
| | Neptunium-237 | 4(4) | 0 | < 0.00937 | |
| | Plutonium-238 | 4(4) | 0 | < 0.00636 | |
| | Plutonium-239/240 | 4(4) | < 0.0112 | < 0.0509 | |
| | Technetium-99 | 12(11) | 0 | 3.98 | |
| | Uranium | 12(0) | 1.91 | 6.49 | 4.07 |
| | Uranium-233/234 | 12(0) | 0.776 | 2.89 | 1.62 |
| | Uranium-235/236 | 12(8) | < 0.0281 | 0.151 | |
| | Uranium-238 | 12(0) | 0.638 | 2.16 | 1.36 |
| 010 | Americium-241 | 6(6) | < 0.0209 | < 0.041 | |
| | Neptunium-237 | 6(6) | 0 | < 0.03118 | |
| | Plutonium-238 | 6(6) | 0 | < 0.09153 | |
| | Plutonium-239/240 | 6(6) | 0 | < 0.04727 | |
| | Technetium-99 | 14(11) | 0 | 12.3 | |
| | Uranium | 14(0) | 1.251 | 2.66 | 1.71 |
| | Uranium-233/234 | 14(0) | 0.522 | 1.49 | 0.851 |
| | Uranium-235/236 | 14(14) | < 0.0165 | < 0.0952 | |
| | Uranium-238 | 14(0) | 0.4157 | 0.885 | 0.568 |
| 011 | Americium-241 | 4(4) | < 0.0119 | < 0.0307 | |
| | Neptunium-237 | 4(4) | 0 | 0 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0203 | |
| | Plutonium-239/240 | 4(4) | < 0.00678 | < 0.033 | |
| | Technetium-99 | 12(12) | 0 | < 4.94 | |
| | Uranium | 12(0) | 0.697 | 2.52 | 1.49 |
| | Uranium-233/234 | 12(0) | 0.325 | 1.19 | 0.672 |
| | Uranium-235/236 | 12(11) | < 0.00711 | 0.0906 | |
| | Uranium-238 | 12(0) | 0.231 | 0.836 | 0.495 |
| 015 | Americium-241 | 4(4) | < 0.0251 | < 0.0478 | |
| | Neptunium-237 | 4(4) | 0 | < 0.0238 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0137 | |
| | Plutonium-239/240 | 4(4) | < 0.00497 | < 0.0274 | |
| | Technetium-99 | 12(11) | 0 | < 5.62 | |
| | Uranium | 12(0) | 0.588 | 1.85 | 1.03 |
| | Uranium-233/234 | 12(0) | 0.442 | 1.83 | 0.951 |
| | Uranium-235/236 | 12(10) | < 0.0177 | 0.093 | |
| | Uranium-238 | 12(0) | 0.195 | 0.607 | 0.340 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.1. Radionuclide concentrations in FBP and Centrus
NPDES outfall water samples – 2017 (continued)**

| NPDES outfall[a] | Parameter[b] | Number of samples[c] | Minimum[d] | Maximum[d] | Average[e] |
|---|---|---|---|---|---|
| | | *FBP Outfalls* | | | |
| 608 | Americium-241 | 4(4) | < 0.00495 | < 0.0344 | |
| | Neptunium-237 | 4(4) | 0 | < 0.0102 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0108 | |
| | Plutonium-239/240 | 4(4) | < 0.0107 | < 0.051 | |
| | Technetium-99 | 12(1) | < 4.82 | 174 | 77.4 |
| | Uranium | 12(0) | 0.349 | 1.17 | 0.732 |
| | Uranium-233/234 | 12(0) | 0.148 | 0.667 | 0.327 |
| | Uranium-235/236 | 12(12) | < 0.0115 | < 0.0569 | |
| | Uranium-238 | 12(0) | 0.111 | 0.393 | 0.242 |
| 610 | Americium-241 | 3(3) | 0 | < 0.0372 | |
| | Neptunium-237 | 3(3) | 0 | 0 | |
| | Plutonium-238 | 3(3) | 0 | < 0.0162 | |
| | Plutonium-239/240 | 3(3) | < 0.0122 | < 0.022 | |
| | Technetium-99 | 4(1) | < 5.02 | 38.4 | |
| | Uranium | 4(0) | 0.816 | 7.42 | 3.91 |
| | Uranium-233/234 | 4(0) | 0.786 | 9.66 | 4.99 |
| | Uranium-235/236 | 4(1) | < 0.0786 | 0.496 | |
| | Uranium-238 | 4(0) | 0.262 | 2.41 | 1.27 |
| 611 | Americium-241 | 4(4) | < 0.0196 | < 0.0407 | |
| | Neptunium-237 | 4(4) | < 0.0134 | < 0.0449 | |
| | Plutonium-238 | 4(4) | 0 | < 0.0211 | |
| | Plutonium-239/240 | 4(4) | 0 | < 0.0527 | |
| | Technetium-99 | 12(0) | 5.31 | 640 | 241 |
| | Uranium | 12(0) | 4.03 | 18.9 | 5.87 |
| | Uranium-233/234 | 12(0) | 3.36 | 20.8 | 5.77 |
| | Uranium-235/236 | 12(0) | 0.146 | 1.37 | 0.331 |
| | Uranium-238 | 12(0) | 1.32 | 6.15 | 1.92 |
| | | *Centrus Outfalls* | | | |
| 012 | Americium-241 | 4(4) | < 0.031 | < 0.039 | |
| | Neptunium-237 | 4(4) | < 0.052 | < 0.084 | |
| | Plutonium-238 | 4(4) | < 0.038 | < 0.07 | |
| | Plutonium-239/240 | 4(4) | < 0.024 | < 0.07 | |
| | Technetium-99 | 52(52) | < 5.88 | < 8.52 | |
| | Uranium | 52(0) | 0.31 | 1.80 | 1.01 |
| 013 | Americium-241 | 4(4) | < 0.034 | < 0.042 | |
| | Neptunium-237 | 4(4) | < 0.031 | < 0.109 | |
| | Plutonium-238 | 4(4) | < 0.038 | < 0.055 | |
| | Plutonium-239/240 | 4(3) | < 0.029 | < 0.061 | |
| | Technetium-99 | 52(52) | < 6.68 | < 8.64 | |
| | Uranium | 52(0) | 0.23 | 2.2 | 0.92 |

[a]FBP internal NPDES Outfalls 608, 610, and 611 discharge to NPDES Outfall 003 (X-6619 Sewage Treatment Plant).
[b]Uranium is reported in µg/L; all other radionuclides are reported in pCi/L.
[c]Number in parentheses is the number of samples that were below the detection limit.
[d]Minimum or maximum values reported as "0" may actually be negative results. Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out. These negative value results are reported as "0" in the table for simplicity.
[e]Averages were not calculated for outfalls that had greater than 15% of the results below the detection limit. For outfalls with less than 15% of the results below the detection limit, any result below the detection limit was assigned a value at the detection limit to calculate the average for the parameter.

2-4

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.2. FBP NPDES permit summary – 2017**

| Effluent characteristics | | Monitoring requirements | | Discharge limitations | |
|---|---|---|---|---|---|
| Parameter | Units | Measurement frequency | Sampling type | Concentration/Loading[a] | |
| | | | | Monthly | Daily |
| *FBP Outfall 001 (X-230J7 East Holding Pond)* | | | | | |
| Cadmium, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Chlorine, total residual | mg/L | 1/week | Grab | | |
| Copper, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Dissolved solids | mg/L | 1/week | 24-hr composite | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Fluoride, total | mg/L | 1/quarter | 24-hr composite | | |
| Mercury, total (low level) | ng/L | 1/month | Grab | 12 | |
| Oil & grease | mg/L | 1/week | Grab | 10 | 15 |
| pH | SU | 1/week | Grab | | 6.5–9.0 |
| Precipitation, total | in. | Daily | 24-hr total | | |
| Silver, total recoverable | µg/L | 1/month | 24-hr composite | | |
| Total suspended solids[b] | mg/L | 1/week | 24-hr composite | 20 | 45 |
| Zinc, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| *FBP Outfall 002 (X-230K South Holding Pond)* | | | | | |
| Cadmium, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Fluoride, total | mg/L | 1/quarter | 24-hr composite | | |
| Mercury, total (low level) | ng/L | 1/quarter | Grab | | |
| pH | SU | 1/week | Grab | | 6.5–9.0 |
| Nitrogen, ammonia ($NH_3$) | mg/L | 1/month | 24-hr composite | | |
| Oil & grease | mg/L | 1/week | Grab | | 10 |
| Selenium, total recoverable | µg/L | 1/month | 24-hr composite | | |
| Silver, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Thallium, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Total suspended solids[b] | mg/L | 1/week | 24-hr composite | 20 | 45 |
| *FBP Outfall 003 (X-6619 Sewage Treatment Plant)* | | | | | |
| Acute toxicity, *Ceriodaphnia dubia* | TUa | 1/quarter | 24-hr composite | | |
| Acute toxicity, *Pimephales promelas* | TUa | 1/quarter | 24-hr composite | | |
| Carbonaceous biochemical oxygen demand, 5-day | mg/L | 1/week | 24-hr composite | 10 (15.1) | 15 (22.7) |
| Chlorine, total residual[c] | mg/L | Daily | Grab | | 0.038 |
| Copper, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| E. coli[c] | #/100 mL | 1/week | Grab | 126 | 284 |
| Flow rate | MGD | Daily | 24-hr total | | |
| Mercury, total | ng/L | 1/month | Grab | 66 (0.000099) | 1700 (0.0025) |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.2. FBP NPDES permit summary – 2017 (continued)**

| Effluent characteristics | | Monitoring requirements | | Discharge limitations | |
|---|---|---|---|---|---|
| | | | | Concentration/Loading[a] | |
| Parameter | Units | Measurement frequency | Sampling type | Monthly | Daily |
| *FBP Outfall 003 (X-6619 Sewage Treatment Plant)* | | | | | |
| Nitrogen, ammonia (NH₃) | mg/L | 1/2 weeks | 24-hr composite | | |
| Nitrite plus nitrate | mg/L | 1/quarter | 24-hr composite | | |
| Oil & grease | mg/L | 1/quarter | Grab | | |
| pH | SU | 3/week | Grab | | 6.5–9.0 |
| Silver, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Thallium, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| Total suspended solids | mg/L | 1/week | 24-hr composite | 12 (18.2) | 18 (27.3) |
| Zinc, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| *FBP Outfall 004 (Cooling Tower Blowdown)* | | | | | |
| Acute toxicity, *Ceriodaphnia dubia* | TUa | 1/quarter | 24-hr composite | | |
| Acute toxicity, *Pimephales promelas* | TUa | 1/quarter | 24-hr composite | | |
| Chlorine, total residual | mg/L | 1/week | Grab | | 0.038 |
| Copper, total recoverable | µg/L | 1/month | 24-hr composite | | 66 (0.160) |
| Dissolved solids | mg/L | 1/month | 24-hr composite | 3500 (8480) | 4000 (9690) |
| Flow rate | MGD | Daily | 24-hr total | | |
| Mercury, total | ng/L | 1/quarter | Grab | | |
| Oil & grease | mg/L | 1/month | Grab | 15 | 20 |
| pH | SU | 1/month | Grab | | 6.5–9.0 |
| Total suspended solids | mg/L | 1/month | 24-hr composite | 18 (43) | 27 (65) |
| Zinc, total recoverable | µg/L | 1/quarter | 24-hr composite | | |
| *FBP Outfall 005 (X-611B Lime Sludge Lagoons)* | | | | | |
| Flow rate | MGD | 3/week | 24-hr total (estimate) | | |
| Lead, total recoverable | µg/L | 1/month | Grab | | |
| Mercury, total | ng/L | 1/month | Grab | | |
| pH | SU | 1/week | Grab | | 6.5–10.0 |
| Selenium, total recoverable | µg/L | 1/month | Grab | | 5 |
| Total suspended solids[b] | mg/L | 1/week | Grab | 10 | 15 |
| *FBP Outfall 009 (X-230L North Holding Pond)* | | | | | |
| Bis(2-ethylhexyl)phthalate | µg/L | 1/month | Composite | 8.4 | 1105 |
| Copper, total recoverable | µg/L | 1/month | Grab | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Fluoride, total | mg/L | 1/quarter | Grab | | |
| Mercury, total | ng/L | 1/quarter | Grab | | |
| Oil & grease | mg/L | 1/month | Grab | 10 | 15 |
| pH | SU | 1/week | Grab | | 6.5–9.0 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.2. FBP NPDES permit summary – 2017 (continued)**

| Effluent characteristics | | Monitoring requirements | | Discharge limitations | |
|---|---|---|---|---|---|
| Parameter | Units | Measurement frequency | Sampling type | Concentration/Loading[a] | |
| | | | | Monthly | Daily |
| *FBP Outfall 009 (X-230L North Holding Pond)* | | | | | |
| Silver, total recoverable | µg/L | 1/month | Grab | 1.3 | 2.7 |
| Total suspended solids[b] | mg/L | 1/week | Grab | 30 | 45 |
| Zinc, total recoverable | µg/L | 1/quarter | Grab | | |
| *FBP Outfall 010 (X-230J5 Northwest Holding Pond)* | | | | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Lead, total recoverable | µg/L | 1/month | 24-hr composite | | |
| Mercury, total | ng/L | 1/quarter | Composite | | |
| Oil & grease | mg/L | 1/month | Grab | 10 | 15 |
| pH | SU | 1/2 weeks | Grab | | 6.5–9.0 |
| Precipitation, total | in. | Daily | 24-hr total | | |
| Selenium, total recoverable | µg/L | 1/month | 24-hr composite | | 5.6 |
| Total suspended solids[b] | mg/L | 1/2 weeks | 24-hr composite | 30 | 45 |
| Zinc, total recoverable | µg/L | 1/month | 24-hr composite | | |
| *FBP Outfall 011 (X-230J6 Northeast Holding Pond)* | | | | | |
| Cadmium, total recoverable | µg/L | 1/quarter | Grab | | |
| Chlorine, total residual | mg/L | 1/2 weeks | Grab | | 0.038 |
| Copper, total recoverable | µg/L | 1/month | Grab | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Fluoride, total | mg/L | 1/quarter | Grab | | |
| Oil & grease | mg/L | 1/2 weeks | Grab | 10 | 15 |
| pH | SU | 1/2 weeks | Grab | | 6.5–9.0 |
| Precipitation, total | in. | Daily | 24-hr total | | |
| Selenium, total recoverable | µg/L | 1/month | Grab | | |
| Thallium, total recoverable | µg/L | 1/quarter | Grab | | |
| Total suspended solids[b] | mg/L | 1/2 weeks | Grab | 30 | 45 |
| Zinc, total recoverable | µg/L | 1/month | Grab | | |
| *FBP Outfall 015 (X-624 Groundwater Treatment Facility)* | | | | | |
| Arsenic, total recoverable | µg/L | 1/quarter | Grab | | |
| Barium, total recoverable | µg/L | 1/quarter | Grab | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| PCBs | µg/L | 1/quarter | Grab | | *d* |
| pH | SU | 1/2 weeks | Grab | | 6.5–9.0 |
| Silver, total recoverable | µg/L | 1/month | Grab | 1.3 | 6.8 |
| Trichloroethene | µg/L | 1/2 weeks | Grab | 10 | 10 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.2. FBP NPDES permit summary – 2017 (continued)**

| Effluent characteristics | | Monitoring requirements | | Discharge limitations | |
|---|---|---|---|---|---|
| | | | | Concentration/Loading[a] | |
| Parameter | Units | Measurement frequency | Sampling type | Monthly | Daily |
| *FBP Outfall 602 (X-621 Coal Pile Runoff Treatment Facility)* | | | | | |
| Flow rate | MGD | Daily | 24-hr total (estimate) | | |
| Iron, total[b] | µg/L | 1/2 weeks | Grab | 3500 | 7000 |
| Manganese, total[b] | µg/L | 1/2 weeks | Grab | 2000 | 4000 |
| pH | SU | 1/2 weeks | Grab | | 6.0–10.0 |
| Precipitation, total | in. | Daily | 24-hr total | | |
| Total suspended solids[b] | mg/L | 1/2 weeks | Grab | 35 | 50 |
| *FBP Outfall 604 (X-700 Biodenitrification Facility)* | | | | | |
| Copper, total | µg/L | 1/month | 24-hr composite | | |
| Iron, total | µg/L | 1/month | 24-hr composite | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Nickel, total | µg/L | 1/month | 24-hr composite | | |
| Nitrogen, nitrate | mg/L | 1/month | 24-hr composite | | |
| pH | SU | 1/month | Grab | | 6.5–9.0 |
| Zinc, total | µg/L | 1/month | 24-hr composite | | |
| *FBP Outfall 605 (X-705 Microfiltration Treatment System)* | | | | | |
| Chromium, hexavalent | µg/L | 1/month | Grab | | |
| Chromium, total | µg/L | 1/month | 24-hr composite | | |
| Copper, total | µg/L | 1/month | 24-hr composite | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| Nickel, total | µg/L | 1/month | 24-hr composite | | |
| Nitrogen, ammonia ($NH_3$) | mg/L | 1/month | 24-hr composite | | |
| Nitrogen, nitrate | mg/L | 1/month | 24-hr composite | | |
| Nitrogen, nitrite | mg/L | 1/month | 24-hr composite | | |
| Nitrogen, Kjeldahl | mg/L | 1/month | 24-hr composite | | |
| Oil & grease | mg/L | 1/month | Grab | | |
| pH | SU | 1/month | Grab | | 6.5–10.0 |
| Sulfate ($SO_4$) | mg/L | 1/month | 24-hr composite | | |
| Total suspended solids | mg/L | 1/month | 24-hr composite | 20 | 30 |
| Trichloroethene | µg/L | 1/month | Grab | | |
| Zinc, total | µg/L | 1/month | 24-hr composite | | |
| *FBP Outfall 608 (X-622 Groundwater Treatment Facility)* | | | | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| pH | SU | 1/2 weeks | Grab | | |
| *trans*-1,2-dichloroethene | µg/L | 1/2 weeks | Grab | 25 | 66 |
| Trichloroethene | µg/L | 1/2 weeks | Grab | 10 | 10 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.2. FBP NPDES permit summary – 2017 (continued)**

| Parameter | Units | Measurement frequency | Sampling type | Concentration/Loading[a] | |
|---|---|---|---|---|---|
| | | | | Monthly | Daily |
| *FBP Outfall 610 (X-623 Groundwater Treatment Facility)* | | | | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| pH | SU | 1/2 weeks | Grab | | |
| *trans*-1,2-dichloroethene | µg/L | 1/2 weeks | Grab | 25 | 66 |
| Trichloroethene | µg/L | 1/2 weeks | Grab | 10 | 10 |
| *FBP Outfall 611 (X-627 Groundwater Treatment Facility)* | | | | | |
| Flow rate | MGD | Daily | 24-hr total | | |
| pH | SU | 1/2 weeks | Grab | | |
| Trichloroethene | µg/L | 1/2 weeks | Grab | 10 | 10 |
| *FBP Monitoring Station 801 (Upstream Monitoring)* | | | | | |
| 48-hr acute toxicity, *Ceriodaphnia dubia* | % affected | 1/quarter | Grab | | |
| 96-hr acute toxicity, *Pimephales promelas* | % affected | 1/quarter | Grab | | |
| *FBP Monitoring Station 902 (Downstream Far Field Monitoring)* | | | | | |
| Water temperature | °C | 2/week | 24-hr maximum | 27.8[c] | 29.4[c] |
| *FBP Monitoring Station 903 (Downstream Far Field Monitoring)* | | | | | |
| Water temperature | °C | 2/week | 24-hr maximum | 27.8[c] | 29.4[c] |

Effluent characteristics — Monitoring requirements — Discharge limitations

[a]If provided in the permit, the loading limit, in kg/day or kg/month, is provided in parentheses.
[b]Limitations do not apply if flow increases as a result of a precipitation or snow melt event and conditions specified in the permit are met.
[c]Summer only (May through October).
[d]No detectable PCBs.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.3. MCS NPDES permit summary – 2017**

| Effluent characteristics | | Monitoring requirements | | Discharge limitations | |
|---|---|---|---|---|---|
| | | | | Concentration | |
| Parameter | Units | Measurement frequency | Sampling type | Monthly | Daily |
| *MCS Outfall 001[a]* | | | | | |
| Biochemical oxygen demand, 5-day | mg/L | 1/week | 24-hr composite | | |
| Chlorine, total residual | mg/L | Daily | Grab | | 0.05 |
| Dissolved solids, sum of | mg/L | 1/week | 24-hr composite | | 1500 |
| Flow rate | GPD | Daily | 24-hr total | | |
| Nitrogen, ammonia | mg/L | 1/week | 24-hr composite | | |
| Oil and grease, total | mg/L | 1/month | Grab | | |
| pH | SU | Daily | Grab | | 6.5–9.0 |
| Phosphorus, total | mg/L | 1/week | 24-hr composite | | |
| Total suspended solids[b] | mg/L | 1/week | 24-hr composite | 30 | 45 |
| Water temperature | °F | Daily | Maximum | *c* | *c* |
| *MCS Outfall 602* | | | | | |
| Flow rate | GPD | Daily | 24-hr total | | |
| pH | SU | Daily | Grab | | |

[a]These monitoring requirements and limits apply only when process water is being discharged through the outfall.
[b]Limitations do not apply if flow increases as a result of a precipitation or snow melt event and conditions specified in the permit are met.
[c]Maximum daily and monthly average limits vary according to month.

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.4. FBP NPDES discharge and compliance rates – 2017**

| Parameter | NPDES compliance rate (%)[a] | Number of measurements[b] | Concentration (and loading if applicable) | | | Units |
| | | | Minimum | Maximum | Average[c] | |
|---|---|---|---|---|---|---|
| *Outfall 001 (X-230J7 East Holding Pond)* | | | | | | |
| Cadmium, total recoverable | - | 4(2) | < 0.04 | 0.058 | | μg/L |
| Chlorine, total residual | - | 48(16) | < 0.02 | 0.07 | | mg/L |
| Copper, total recoverable | | 4(0) | 1.3 | 2.7 | 2.2 | μg/L |
| Dissolved solids | - | 48(0) | 130 | 330 | 192 | mg/L |
| Flow rate | - | 365 | 0.148 | 2.463 | 0.604 | MGD |
| Fluoride, total | - | 4(2) | < 0.06 | 0.12 | | mg/L |
| Mercury, total (low level) | - | 14(0) | 2.49 | 25.8 | 11.9 | ng/L |
| monthly average[d] | 67 | 12 | 2.49 | 23.8 | 10.9 | ng/L |
| Oil & grease | 100 | 48(42) | < 1.6 | 9.1 | | mg/L |
| monthly average[d] | 100 | 12 | 0 | 2.3 | | mg/L |
| pH | 100 | 53 | 6.98 | 8.60 | 7.99 | SU |
| Precipitation, total | - | 365 | 0 | 2.52 | 0.12 | in. |
| Silver, total recoverable | - | 12(8) | < 0.02 | 0.036 | | μg/L |
| Total suspended solids | 100 | 48(5) | < 1.1 | 26 | 3.2 | mg/L |
| monthly average[d] | 100 | 12 | 1.2 | 8.8 | 3.2 | mg/L |
| Zinc, total recoverable | - | 4(0) | 8.6 | 43 | 29 | μg/L |
| *Outfall 002 (X-230K South Holding Pond)* | | | | | | |
| Cadmium, total recoverable | - | 4(3) | < 0.04 | 0.0575 | | μg/L |
| Flow rate | - | 365 | 0.017 | 2.083 | 0.528 | MGD |
| Fluoride, total | - | 4(0) | 0.072 | 0.13 | 0.093 | mg/L |
| Mercury, total (low level) | - | 4(0) | 1.345 | 6.145 | 3.065 | ng/L |
| Nitrogen, ammonia (NH₃) | | 12(3) | < 0.022 | 0.22 | | mg/L |
| Oil & grease | 100 | 48(43) | < 1.65 | 2.0 | | mg/L |
| pH | 98 | 48 | 5.10 | 8.80 | 8.03 | SU |
| Selenium, total recoverable | | 12(12) | < 1 | < 1 | | μg/L |
| Silver, total recoverable | - | 4(2) | < 0.02 | 0.011 | | μg/L |
| Thallium, total recoverable | - | 4(4) | < 0.066 | < 0.066 | | μg/L |
| Total suspended solids | 100 | 48(2) | < 1.1 | 20 | 6.6 | mg/L |
| monthly average[d] | 100 | 12 | 2.5 | 12 | 6.6 | mg/L |
| *Outfall 003 (X-6619 Sewage Treatment Plant)* | | | | | | |
| Acute toxicity, *Ceriodaphnia dubia* | - | 4(4) | < 1 | < 1 | | TUa |
| Acute toxicity, *Pimephales promelas* | - | 4(4) | < 1 | < 1 | | TUa |
| Carbonaceous biochemical oxygen demand, 5-day | 100 | 48(29) | < 5.0 | 14.65 | | mg/L |
| monthly average[d] | 100 | 12 | 0 | 10 | | mg/L |
| Carbonaceous biochemical oxygen demand, 5-day (loading) | 98 | 48 | 0 | 24 | | kg/day |
| monthly average[d] | 100 | 12 | 0 | 11 | | kg/day |
| Chlorine, total residual[b] | 100 | 31(6) | < 0.02 | 0.03 | | mg/L |
| Copper, total recoverable | - | 5(0) | 1.4 | 23 | 6.1 | μg/L |
| E. coli[b] | 96 | 25(5) | < 1 | 1010 | | #/100 mL |
| Flow rate | - | 365 | 0.179 | 0.627 | 0.319 | MGD |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.4. FBP NPDES discharge and compliance rates – 2017 (continued)**

| Parameter | NPDES compliance rate (%)[a] | Number of measurements[b] | Concentration (and loading if applicable) | | | Units |
|---|---|---|---|---|---|---|
| | | | Minimum | Maximum | Average[c] | |
| *Outfall 003 (X-6619 Sewage Treatment Plant)* | | | | | | |
| Mercury, total (low level) | - | 14(0) | 2.24 | 18.4 | 8.57 | ng/L |
| monthly average[d] | - | 12 | 2.24 | 14.2 | 8.29 | ng/L |
| Mercury, total (low level) (loading) | - | 14 | 0.00000253 | 0.0000210 | 0.00000951 | kg/day |
| monthly average[d] | - | 12 | 0.00000253 | 0.0000187 | 0.0000101 | kg/day |
| Nitrite plus nitrate (NH₃) | - | 5(0) | 6.7 | 9.4 | 8.4 | mg/L |
| Nitrogen, ammonia | - | 24(12) | < 0.022 | 5.1 | | mg/L |
| Oil & grease | - | 5(5) | < 1.8 | < 1.9 | | mg/L |
| pH | 100 | 213 | 6.95 | 8.79 | 7.73 | SU |
| Silver, total recoverable | - | 5(3) | < 0.02 | 0.21 | | µg/L |
| Thallium, total recoverable | | 5(5) | < 0.066 | < 0.066 | | µg/L |
| Total suspended solids | 100 | 48(1) | 0.8 | 16 | 4.1 | mg/L |
| monthly average[d] | 100 | 12 | 1.3 | 11 | 4.1 | mg/L |
| Total suspended solids (loading) | 100 | 48 | 0 | 17 | 5.0 | kg/day |
| monthly average[d] | 100 | 12 | 1.5 | 12 | 4.9 | kg/day |
| Zinc, total recoverable | - | 5(0) | 23 | 160 | 23 | µg/L |
| *Outfall 004 (Cooling Tower Blowdown)* | | | | | | |
| Acute toxicity, *Ceriodaphnia dubia* | | 4(4) | < 1 | < 1 | | TUa |
| Acute toxicity, *Pimephales promelas* | | 4(4) | < 1 | < 1 | | TUa |
| Chlorine, total residual | 100 | 62(41) | < 0.02 | 0.03 | | mg/L |
| Copper, total recoverable | 77 | 13(0) | 26 | 140 | 55 | µg/L |
| Copper, total recoverable (loading) | 100 | 13(0) | 0.0025 | 0.020 | 0.0074 | kg/day |
| Dissolved solids | 100 | 12(0) | 440 | 860 | 620 | mg/L |
| monthly average[d] | 100 | 12 | 440 | 860 | 620 | mg/L |
| Dissolved solids (loading) | 100 | 12 | 23 | 111 | 73 | kg/day |
| monthly average[d] | 100 | 12 | 53 | 115 | 81 | kg/day |
| Flow rate | - | 271 | 0.005 | 0.125 | 0.035 | MGD |
| Mercury, total (low level) | - | 4(0) | 1.34 | 2.92 | 2.31 | ng/L |
| Oil & grease | 100 | 12(12) | < 1.6 | < 2 | | mg/L |
| monthly average[d] | 100 | 12 | 0 | 0 | | mg/L |
| pH | 92 | 13 | 6.25 | 8.20 | 7.05 | SU |
| Total suspended solids | 100 | 13(0) | 1.6 | 20 | 6.7 | mg/L |
| monthly average[d] | 100 | 12 | 1.6 | 15 | 6.0 | mg/L |
| Total suspended solids (loading) | 100 | 12 | 0.07 | 3.0 | 0.92 | kg/day |
| monthly average[d] | 100 | 12 | 0.21 | 2.3 | 0.81 | kg/day |
| Zinc, total recoverable | - | 4(0) | 43 | 81 | 54 | µg/L |
| *Outfall 005 (X-611B Lime Sludge Lagoons)* | | | | | | |
| Flow rate | - | 22 | 0.003 | 7.069 | 0.831 | MGD |
| Lead, total recoverable | - | 4(0) | 0.28 | 1 | 0.54 | µg/L |
| Mercury, total (low level) | - | 4(0) | 1.76 | 5.42 | 3.04 | ng/L |
| pH | 100 | 7 | 8.41 | 9.41 | 9.09 | SU |
| Selenium, total recoverable | - | 4(4) | < 1 | < 1 | | µg/L |
| Total suspended solids | 100 | 5(0) | 5.2 | 10 | 7.0 | mg/L |
| monthly average[d] | 100 | 4 | 6.0 | 10 | 7.2 | mg/L |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.4. FBP NPDES discharge and compliance rates – 2017 (continued)**

| Parameter | NPDES compliance rate (%)[a] | Number of measurements[b] | Concentration (and loading if applicable) | | | Units |
|---|---|---|---|---|---|---|
| | | | Minimum | Maximum | Average[c] | |
| *Outfall 009 (X-230L North Holding Pond)* | | | | | | |
| Bis(2-ethylhexyl)phthalate | 100 | 12(12) | < 0.57 | < 0.65 | | µg/L |
|   monthly average[d] | 100 | 12 | 0 | 0 | | µg/L |
| Copper, total recoverable | | 12(0) | 0.50 | 3.8 | 2.0 | µg/L |
| Flow rate | - | 365 | 0.044 | 2.093 | 0.569 | MGD |
| Fluoride, total | - | 4(0) | 0.06 | 0.15 | 0.10 | mg/L |
| Mercury, total | | 4(0) | 1.92 | 2.58 | 2.27 | ng/L |
| Oil & grease | 100 | 12(11) | < 1.6 | 2.0 | | mg/L |
|   monthly average[d] | 100 | 12 | 0 | 2.0 | | mg/L |
| pH | 100 | 48 | 7.43 | 8.67 | 8.10 | SU |
| Silver, total recoverable | 100 | 12(10) | < 0.02 | 0.026 | | µg/L |
|   monthly average[d] | 100 | 12 | 0 | 0.026 | | µg/L |
| Total suspended solids | 100 | 42(4) | < 1.1 | 43 | 8.3 | mg/L |
|   monthly average[d] | 100 | 12 | 1.8 | 19 | 8.4 | mg/L |
| Zinc, total recoverable | - | 4(0) | 5.2 | 37 | 22 | µg/L |
| *Outfall 010 (X-230J5 Northwest Holding Pond)* | | | | | | |
| Flow rate | - | 365 | 0.004 | 1.818 | 0.457 | MGD |
| Lead, total recoverable | | 12(1) | < 0.1 | 2.3 | 0.76 | µg/L |
| Mercury, total | - | 4(0) | 1.53 | 3.53 | 2.45 | ng/L |
| Oil & grease | 100 | 13(13) | < 1.6 | < 1.9 | | mg/L |
|   monthly average[d] | 100 | 12 | 0 | 0 | | mg/L |
| pH | 100 | 162 | 7.20 | 8.64 | 7.95 | SU |
| Precipitation, total | - | 365 | 0 | 2.52 | 0.12 | in. |
| Selenium, total recoverable | 100 | 12(12) | < 1 | < 1 | | µg/L |
| Total suspended solids | 100 | 24(2) | < 1.1 | 25 | 6.6 | mg/L |
|   monthly average[d] | 100 | 12 | 0 | 13 | 6.3 | mg/L |
| Zinc, total recoverable | - | 12(0) | 5.2 | 43 | 21 | µg/L |
| *Outfall 011 (X-230J6 Northeast Holding Pond)* | | | | | | |
| Cadmium, total recoverable | - | 4(2) | < 0.04 | 0.10 | | µg/L |
| Chlorine, total residual | | 24(11) | < 0.02 | 0.03 | | mg/L |
| Copper, total recoverable | - | 12(0) | 0.61 | 3.5 | 1.89 | µg/L |
| Flow rate | - | 365 | 0.002 | 0.335 | 0.031 | MGD |
| Fluoride, total | - | 4(0) | 0.07 | 1.6 | 0.12 | mg/L |
| Oil & grease | 100 | 24(22) | < 1.6 | 3.0 | | mg/L |
|   monthly average[d] | 100 | 12 | 0 | 1.5 | | mg/L |
| pH | 100 | 27 | 7.40 | 8.92 | 8.07 | SU |
| Precipitation, total | - | 365 | 0 | 2.52 | 0.12 | in. |
| Selenium, total recoverable | | 12(12) | < 1.0 | < 1.0 | | µg/L |
| Thallium, total recoverable | | 4(1) | < 0.066 | 0.092 | | µg/L |
| Total suspended solids | 100 | 24(2) | < 1.1 | 12 | 3.8 | mg/L |
|   monthly average[d] | 100 | 12 | 0.55 | 7.8 | 3.8 | mg/L |
| Zinc, total recoverable | - | 12(0) | 5.8 | 74 | 41 | µg/L |

2-13

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.4. FBP NPDES discharge and compliance rates – 2017 (continued)**

| Parameter | NPDES compliance rate (%)[a] | Number of measurements[b] | Concentration (and loading if applicable) | | | Units |
|---|---|---|---|---|---|---|
| | | | Minimum | Maximum | Average[c] | |
| *Outfall 015 (X-624 Groundwater Treatment Facility)* | | | | | | |
| Arsenic, total recoverable | - | 4(3) | < 0.5 | 0.625 | | µg/L |
| Barium, total recoverable | - | 4(0) | 25 | 32 | 30 | µg/L |
| Flow rate | - | 363 | 0.001 | 0.0308 | 0.010 | MGD |
| PCBs | 100 | 4(4) | < 0.098 | < 0.11 | | µg/L |
| pH | 100 | 24 | 7.35 | 8.07 | 7.81 | SU |
| Silver, total recoverable | - | 12(9) | < 0.02 | 0.061 | | µg/L |
| Trichloroethene | 100 | 24(5) | < 0.16 | 2.9 | | µg/L |
| monthly average[d] | 100 | 12 | 0.078 | 2.3 | | µg/L |
| *Outfall 602 (X-621 Coal Pile Runoff Treatment Facility)* | | | | | | |
| Flow rate | - | 21 | 0.036 | 0.210 | 0.112 | MGD |
| Iron, total | 100 | 10(0) | 87 | 270 | 148 | µg/L |
| monthly average[d] | 100 | 8 | 87 | 270 | 148 | µg/L |
| Manganese, total | 100 | 10(0) | 66.5 | 230 | 115 | µg/L |
| monthly average[d] | 100 | 8 | 66.5 | 230 | 120 | µg/L |
| pH | 100 | 10 | 7.53 | 9.68 | 8.56 | SU |
| Precipitation, total | - | 242 | 0 | 2.53 | 0.15 | in. |
| Total suspended solids | 100 | 10(0) | 5.6 | 16 | 9.0 | mg/L |
| monthly average[d] | 100 | 8 | 6 | 13 | 8.7 | mg/L |
| *Outfall 604 (X-700 Biodenitrification Facility)* | | | | | | |
| Copper, total | - | 4(0) | 0.80 | 1.5 | 1.2 | µg/L |
| Flow rate | - | 33 | 0.0024 | 0.01059 | 0.0098 | MGD |
| Iron, total | - | 4(0) | 150 | 220 | 193 | µg/L |
| Nickel, total | - | 4(0) | 0.73 | 0.90 | 0.84 | µg/L |
| Nitrogen, nitrate | - | 4(0) | 3.95 | 50.6 | 28 | mg/L |
| pH | 100 | 4 | 7.62 | 8.70 | 8.15 | SU |
| Zinc, total | - | 4(0) | 4.2 | 11 | 7.4 | µg/L |
| *Outfall 605 (X-705 Microfiltration Treatment System)[e]* | | | | | | |
| *Outfall 608 (X-622 Groundwater Treatment Facility)* | | | | | | |
| Flow rate | - | 365 | 0.0004 | 0.0923 | 0.056 | MGD |
| pH | - | 24 | 7.00 | 8.29 | 7.97 | SU |
| Trichloroethene | 100 | 24(18) | < 0.16 | 1.7 | | µg/L |
| 1,2-*trans*-dichloroethene | 100 | 24(24) | < 0.15 | < 0.15 | | µg/L |
| monthly average[d] | 100 | 12 | 0 | 0 | | µg/L |
| *Outfall 610 (X-623 Groundwater Treatment Facility)* | | | | | | |
| Flow rate | - | 4 | 0.001 | 0.0066 | 0.0029 | MGD |
| pH | - | 4 | 7.71 | 8.20 | 7.91 | SU |
| Trichloroethene | 100 | 4(4) | < 0.16 | < 0.16 | | µg/L |
| monthly average[d] | 100 | 4 | 0 | 0 | | µg/L |
| 1,2-*trans*-dichloroethene | 100 | 4(4) | < 0.15 | < 0.15 | | µg/L |
| monthly average[d] | 100 | 4 | 0 | 0 | | µg/L |

2-14

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.4. FBP NPDES discharge and compliance rates – 2017 (continued)**

| Parameter | NPDES compliance rate (%)[a] | Number of measurements[b] | Concentration (and loading if applicable) | | | Units |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Minimum | Maximum | Average[c] | |
| *Outfall 611 (X-627 Groundwater Treatment Facility)* | | | | | | |
| Flow rate | - | 365 | 0.007 | 0.0568 | 0.032 | MGD |
| pH | - | 24 | 7.13 | 8.50 | 8.05 | SU |
| Trichloroethene | 100 | 24(2) | < 0.16 | 1.9 | 0.83 | μg/L |
| monthly average[d] | 100 | 12 | 0.31 | 1.5 | 0.83 | μg/L |
| *Monitoring Station 801 (upstream monitoring)* | | | | | | |
| 48-hr acute toxicity, *Ceriodaphnia dubia* | - | 6(5) | 0 | 5 | | % affected |
| 96-hr acute toxicity, *Pimephales promelas* | - | 7(4) | 0 | 10 | | % affected |
| *Monitoring Station 902 (downstream far field monitoring)* | | | | | | |
| Water temperature | 100 | 97 | 1.49 | 28.70 | 17.50 | °C |
| monthly average | 100 | 12 | 5.52 | 26.74 | 17.45 | °C |
| *Monitoring Station 903 (downstream far field monitoring)* | | | | | | |
| Water temperature | 100 | 97 | 1.95 | 27.54 | 17.02 | °C |
| monthly average | 100 | 12 | 5.98 | 25.99 | 16.98 | °C |

[a]Compliance rates are provided only for those parameters with a limit specified in the NPDES permit (many parameters require monitoring only). At all outfalls except Outfalls 003, 004, and 605, permit limitations do not apply to total suspended solids (and iron and manganese at Outfall 605) if flow increases as a result of precipitation or snow melt and conditions set in the permit are met.
[b]Number in parentheses is the number of samples that were below the detection limit.
[c]Averages were not calculated for outfalls that had greater than 15% of the results below the detection limit. For outfalls with less than 15% of the results below the detection limit, any result below the detection limit was assumed to be zero for calculating the average for the parameter.
[d]To compute the monthly average, parameters that were undetected were assumed to be zero. Exceedances due to flow increases from precipitation or snow melt (see footnote a) were not included in the monthly average calculation.
[e]The X-705 Microfiltration Treatment System (Outfall 605) did not operate in 2017.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.5. MCS NPDES discharge and compliance rates – 2017**

| Parameter | NPDES compliance rate (%) | Number of measurements | Result | | | Units |
|---|---|---|---|---|---|---|
| | | | Minimum | Maximum | Average | |
| *Outfall 001[a]* | | | | | | |
| *Outfall 602* | | | | | | |
| Flow rate | 100 | 365 | 289 | 15,591 | 8279 | GPD |
| pH | 100 | 256 | 5.89 | 8.79 | 6.93 | SU |

[a]This outfall was not used for process water discharges in 2017; therefore, monitoring was not required.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.6. Centrus NPDES discharge monitoring results – 2017**

| Parameter | Number of samples[a] | Minimum | Maximum | Average[b] | Unit |
|---|---|---|---|---|---|
| *Outfall 012 (X-230M Southwest Holding Pond)* | | | | | |
| Cadmium | 12(0) | 0.061 | 0.48 | 0.24 | µg/L |
| Chlorine | 26(0) | 0 | 0.08 | 0.03 | mg/L |
| Copper | 12(0) | 0.40 | 2.4 | 1.3 | µg/L |
| Flow rate | 365 | 0.0032 | 1.489 | 0.216 | MGD |
| Iron | 12(0) | 280 | 1200 | 609 | µg/L |
| Oil and grease | 24(23) | < 1.6 | 2.3 | | mg/L |
| PCBs, total | 1(1) | < 0.1 | | | µg/L |
| pH | 24 | 7.52 | 8.69 | 8.19 | SU |
| Selenium | 12(12) | < 1 | < 1 | | µg/L |
| Silver | 12(9) | < 0.02 | 0.025 | | µg/L |
| Suspended solids | 24(0) | 1.6 | 13 | 5.8 | mg/L |
| Thallium | 12(11) | < 0.066 | 0.094 | | µg/L |
| Trichloroethene | 12(12) | < 0.16 | < 0.16 | | µg/L |
| *Outfall 013 (X-230N West Holding Pond)* | | | | | |
| Antimony | 12(0) | 0.32 | 0.86 | 0.49 | µg/L |
| Arsenic | 12(0) | 0.51 | 0.97 | 0.77 | µg/L |
| Chlorine | 24(0) | 0 | 0.05 | 0.03 | mg/L |
| Copper | 12(0) | 0.83 | 2.4 | 1.6 | µg/L |
| Flow rate | 365 | 0.0127 | 1.790 | 0.166 | MGD |
| Oil and grease | 24(21) | < 1.7 | 8.7 | | mg/L |
| PCBs, total | 1(1) | < 0.098 | | | µg/L |
| pH | 24 | 7.74 | 8.68 | 8.24 | SU |
| Suspended solids | 24(0) | 1.2 | 23 | 4.4 | mg/L |
| Thallium | 12(9) | < 0.066 | 0.12 | | µg/L |
| Zinc | 12(0) | 3.4 | 59 | 20 | µg/L |
| *Outfall 613 (X-6002 Particulate Separator)* | | | | | |
| Chlorine | 16(0) | 0 | 2.4 | 0.20 | mg/L |
| Flow rate | 273 | 0 | 0.022 | 0.0002 | MGD |
| Suspended solids | 16(4) | 0.03 | 5.6 | | mg/L |

[a]Number in parentheses is the number of samples that were below the detection limit.
[b]Averages were not calculated for outfalls that had greater than 15% of the results below the detection limit. For outfalls with less than 15% of the results below the detection limit, any result below the detection limit was assigned a value at the detection limit for calculating an average for the parameter.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.7. Radionuclides in surface water runoff samples from FBP and MCS
cylinder storage yards – 2017**

| Sample location | Parameter | Unit | Number of samples[a] | Minimum[b] | Maximum | Average[c] |
|---|---|---|---|---|---|---|
| | | | *FBP cylinder storage yards* | | | |
| X745-B1 | Alpha activity | pCi/L | 10(5) | < 0.278 | 303 | |
| | Beta activity | pCi/L | 10(3) | < 1.84 | 232 | |
| | Uranium | μg/L | 10(1) | 0.157 | 21.1 | 3.21 |
| X745-B2 | Alpha activity | pCi/L | 10(2) | < 4.12 | 70.2 | |
| | Beta activity | pCi/L | 10(4) | < 1.72 | 72.5 | |
| | Uranium | μg/L | 10(0) | 1.57 | 44.5 | 14.4 |
| X745-B3 | Alpha activity | pCi/L | 10(3) | < 1.18 | 66.4 | |
| | Beta activity | pCi/L | 10(2) | < 3.19 | 105 | |
| | Uranium | μg/L | 10(1) | < 0.067 | 5.15 | 1.39 |
| X745-D1 | Alpha activity | pCi/L | 10(5) | < 0.0514 | 12.1 | |
| | Beta activity | pCi/L | 10(1) | < 3.75 | 17.2 | 9.86 |
| | Uranium | μg/L | 10(0) | 0.166 | 7.84 | 3.17 |
| X745-F1 | Alpha activity | pCi/L | 11(7) | 0 | 81.7 | |
| | Beta activity | pCi/L | 11(4) | < 0.63 | 74.9 | |
| | Uranium | μg/L | 11(0) | 0.187 | 5.62 | 1.53 |
| X745-F2 | Alpha activity | pCi/L | 11(7) | < 0.362 | 19.2 | |
| | Beta activity | pCi/L | 11(2) | 3.92 | 23.1 | |
| | Uranium | μg/L | 11(0) | 0.93 | 7.45 | 2.92 |
| X745-F3 | Alpha activity | pCi/L | 11(8) | < 1.3 | 10.1 | |
| | Beta activity | pCi/L | 11(7) | < 0.754 | 11.8 | |
| | Uranium | μg/L | 11(0) | 1.29 | 3.19 | 2.10 |
| | | | *MCS cylinder storage yards* | | | |
| X745-C1 | Alpha activity | pCi/L | 12(0) | 0.939 | 3.76 | 2.24 |
| | Beta activity | pCi/L | 12(0) | 0.953 | 7.28 | 3.42 |
| | Uranium | μg/L | 12(0) | 0.81 | 3.4 | 2.1 |
| X745-C2 | Alpha activity | pCi/L | 13(0) | 1.20 | 6.44 | 3.35 |
| | Beta activity | pCi/L | 13(0) | 1.07 | 10.5 | 3.88 |
| | Uranium | μg/L | 13(0) | 1.4 | 12 | 5.1 |
| X745-C3 | Alpha activity | pCi/L | 12(0) | 0.414 | 2.53 | 1.50 |
| | Beta activity | pCi/L | 12(0) | 0.532 | 3.40 | 2.03 |
| | Uranium | μg/L | 12(1) | 0 | 3.4 | 1.6 |
| X745-C4 | Alpha activity | pCi/L | 12(1) | 0 | 5.58 | 2.35 |
| | Beta activity | pCi/L | 12(0) | 1.49 | 5.68 | 3.34 |
| | Uranium | μg/L | 12(0) | 1.2 | 13 | 4.3 |
| X745-E1 | Alpha activity | pCi/L | 12(1) | 0 | 2.44 | 1.20 |
| | Beta activity | pCi/L | 12(0) | 3.86 | 8.98 | 5.63 |
| | Uranium | μg/L | 12(1) | 0 | 1.9 | 0.93 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.7. Radionuclides in surface water runoff samples from FBP and MCS
cylinder storage yards – 2017 (continued)**

| Sample location | Parameter | Unit | Number of samples[a] | Minimum[b] | Maximum | Average[c] |
|---|---|---|---|---|---|---|
| | | | *MCS cylinder storage yards (continued)* | | | |
| X745-G1A | Alpha activity | pCi/L | 12(0) | 0.714 | 4.37 | 2.52 |
| | Beta activity | pCi/L | 12(0) | 1.21 | 8.48 | 4.30 |
| | Uranium | µg/L | 12(0) | 1.6 | 4.1 | 2.7 |
| X745-G2 | Alpha activity | pCi/L | 12(0) | 1.25 | 7.10 | 2.41 |
| | Beta activity | pCi/L | 12(0) | 1.63 | 5.90 | 3.40 |
| | Uranium | µg/L | 12(0) | 1.1 | 3.8 | 2.3 |

[a]Number in parentheses is the number of samples that were below the detection limit.
[b]Minimum values reported as "0" may actually be negative results. Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out. These negative value results are reported as "0" in the table for simplicity.
[c]Averages were not calculated for locations that had greater than 15% of the results below the detection limit. For locations with less than 15% of the results below the detection limit, any result below the detection limit was assigned a value at the detection limit to calculate the average for the parameter.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.8. Drainage basin monitoring of surface water and sediment for MCS
cylinder storage yards – 2017**

| Location | Parameter[a] | First quarter[b] | | | Second quarter[b] | | |
|---|---|---|---|---|---|---|---|
| | | SW-F | SW-UF | Sed | SW-F | SW-UF | Sed |
| UDS X01 | Total PCB | 0.21U | 0.20U | 11U | 0.21U | 0.21U | 10U |
| RM-8 | Total PCB | 0.21U | 0.21U | 210 | 0.21U | 0.22U | 91 |
| UDS X02 | Total PCB | 0.21U | 0.21U | 230 | 0.21U | 0.21U | 68 |
| RM-10 | Total PCB | 0.21U | 0.21U | 17J | 0.21U | 0.21U | 24J |

| Location | Parameter[a] | Third quarter[b] | | | Fourth quarter[b] | | |
|---|---|---|---|---|---|---|---|
| | | SW-F | SW-UF | Sed | SW-F | SW-UF | Sed |
| UDS X01 | Total PCB | 0.35U | 0.34U | 41J | 0.33U | 0.33U | 27J |
| RM-8 | Total PCB | 0.35U | 0.36U | 25J | 0.33U | 0.34U | 13U |
| UDS X02 | Total PCB | 0.35U | 0.34U | 12U | 0.33U | 0.33U | 67 |
| RM-10 | Total PCB | 0.39U | 0.33U | 13U | 0.33U | 0.34U | 12U |

[a]Results for surface water (SW) are reported in µg/L; results for sediment (Sed) are reported in µg/kg.
[b]Abbreviations and data qualifiers are as follows: SW-F – filtered surface water; SW-UF – unfiltered surface water;
Sed – sediment; J – the reported value is an estimated concentration greater than the method detection limit but less than the
reporting limit; U – undetected.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.9. Ambient air monitoring program summary for radionuclides
and fluoride − 2017**

| Sampling Location | Parameter[a] | No. of measurements[b] | Minimum[c, d] | Maximum[c, d] | Average[c, e] |
|---|---|---|---|---|---|
| | | *On-site air samplers* | | | |
| A8 | Americium-241 | 4(4) | 2.1E-06 | 4.0E-06 | |
| | Fluoride | 20(20) | 8.8E-03 | 2.0E-02 | |
| | Neptunium-237 | 4(4) | 0 | 2.5E-06 | |
| | Plutonium-238 | 4(4) | 0 | 1.4E-06 | |
| | Plutonium-239/240 | 4(4) | 0 | 2.2E-06 | |
| | Technetium-99 | 12(4) | 1.6E-05 | 3.9E-03 | |
| | Uranium | 12(12) | 4.0E-05 | 9.7E-05 | |
| | Uranium-233/234 | 12(11) | 1.7E-05 | 4.5E-05 | |
| | Uranium-235/236 | 12(12) | 0 | 5.4E-06 | |
| | Uranium-238 | 12(12) | 1.3E-05 | 3.2E-05 | |
| A10 | Americium-241 | 4(4) | 1.8E-06 | 5.1E-06 | |
| | Fluoride | 39(37) | 7.7E-03 | 2.3E-02 | |
| | Neptunium-237 | 4(4) | 0 | 3.1E-06 | |
| | Plutonium-238 | 4(4) | 0 | 3.3E-06 | |
| | Plutonium-239/240 | 4(4) | 0 | 3.2E-06 | |
| | Technetium-99 | 12(2) | 1.2E-04 | 2.5E-03 | |
| | Uranium | 12(12) | 4.2E-05 | 1.4E-04 | |
| | Uranium-233/234 | 12(10) | 2.1E-05 | 4.9E-05 | |
| | Uranium-235/236 | 12(12) | 4.8E-07 | 6.2E-06 | |
| | Uranium-238 | 12(12) | 1.4E-05 | 4.6E-05 | |
| A29 | Americium-241 | 4(4) | 1.3E-06 | 6.7E-06 | |
| | Fluoride | 49(49) | 8.1E-03 | 2.3E-02 | |
| | Neptunium-237 | 4(4) | 0 | 1.3E-06 | |
| | Plutonium-238 | 4(4) | 0 | 2.0E-06 | |
| | Plutonium-239/240 | 4(4) | 6.8E-07 | 4.7E-06 | |
| | Technetium-99 | 12(6) | 0 | 2.1E-03 | |
| | Uranium | 12(12) | 2.7E-05 | 1.1E-04 | |
| | Uranium-233/234 | 12(12) | 1.4E-05 | 5.1E-05 | |
| | Uranium-235/236 | 12(12) | 5.3E-07 | 3.5E-06 | |
| | Uranium-238 | 12(12) | 8.8E-06 | 3.7E-05 | |
| A36 | Americium-241 | 4(4) | 7.1E-07 | 5.1E-06 | |
| | Fluoride | 35(33) | 9.5E-03 | 2.6E-02 | |
| | Neptunium-237 | 4(4) | 1.2E-06 | 2.5E-06 | |
| | Plutonium-238 | 4(4) | 0 | 5.0E-06 | |
| | Plutonium-239/240 | 4(4) | 0 | 3.6E-06 | |
| | Technetium-99 | 12(3) | 3.4E-05 | 7.7E-03 | |
| | Uranium | 12(9) | 3.5E-05 | 5.0E-04 | |
| | Uranium-233/234 | 12(8) | 2.5E-05 | 2.5E-04 | |
| | Uranium-235/236 | 12(12) | 5.2E-07 | 8.6E-06 | |
| | Uranium-238 | 12(9) | 1.1E-05 | 1.7E-04 | |
| A40A | Fluoride | 45(42) | 7.6E-03 | 2.1E-02 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.9. Ambient air monitoring program summary for radionuclides
and fluoride − 2017 (continued)**

| Sampling Location | Parameter[a] | No. of measurements[b] | Minimum[c, d] | Maximum[c, d] | Average[c, e] |
|---|---|---|---|---|---|
| | *On-site air samplers* | | | | |
| T7 | Americium-241 | 4(4) | 1.4E-06 | 3.9E-06 | |
| | Neptunium-237 | 4(4) | 0 | 1.4E-06 | |
| | Plutonium-238 | 4(4) | 0 | 2.0E-06 | |
| | Plutonium-239/240 | 4(4) | 6.8E-07 | 4.1E-06 | |
| | Technetium-99 | 12(4) | 6.0E-05 | 1.7E-03 | |
| | Uranium | 12(12) | 3.1E-05 | 1.1E-04 | |
| | Uranium-233/234 | 12(11) | 1.7E-05 | 5.5E-05 | |
| | Uranium-235/236 | 12(12) | 0 | 5.0E-06 | |
| | Uranium-238 | 12(12) | 1.1E-05 | 3.8E-05 | |
| | *Off-site air samplers* | | | | |
| A3 | Americium-241 | 4(4) | 2.0E-06 | 6.0E-06 | |
| | Fluoride | 36(30) | 7.1E-03 | 2.8E-02 | |
| | Neptunium-237 | 4(4) | 0 | 1.3E-06 | |
| | Plutonium-238 | 4(4) | 0 | 0 | |
| | Plutonium-239/240 | 4(4) | 6.7E-07 | 4.8E-06 | |
| | Technetium-99 | 11(4) | 6.6E-06 | 5.7E-03 | |
| | Uranium | 11(11) | 5.1E-05 | 1.0E-04 | |
| | Uranium-233/234 | 11(10) | 1.8E-05 | 4.9E-05 | |
| | Uranium-235/236 | 11(11) | 1.6E-06 | 3.8E-06 | |
| | Uranium-238 | 11(11) | 1.7E-05 | 3.4E-05 | |
| A6 | Americium-241 | 4(4) | 2.0E-06 | 4.8E-06 | |
| | Fluoride | 38(34) | 5.7E-03 | 2.6E-02 | |
| | Neptunium-237 | 4(4) | 0 | 1.2E-06 | |
| | Plutonium-238 | 4(4) | 0 | 1.4E-06 | |
| | Plutonium-239/240 | 4(4) | 1.3E-06 | 3.4E-06 | |
| | Technetium-99 | 12(8) | 0 | 3.6E-03 | |
| | Uranium | 12(12) | 4.9E-05 | 1.3E-04 | |
| | Uranium-233/234 | 12(11) | 1.6E-05 | 4.4E-05 | |
| | Uranium-235/236 | 12(12) | 9.6E-07 | 5.1E-06 | |
| | Uranium-238 | 12(12) | 1.6E-05 | 4.5E-05 | |
| A9 | Americium-241 | 4(4) | 7.0E-07 | 3.1E-06 | |
| | Fluoride | 51(50) | 8.6E-03 | 2.4E-02 | |
| | Neptunium-237 | 4(4) | 0 | 6.6E-07 | |
| | Plutonium-238 | 4(4) | 0 | 3.0E-06 | |
| | Plutonium-239/240 | 4(4) | 7.5E-07 | 4.4E-06 | |
| | Technetium-99 | 12(7) | 0 | 3.4E-03 | |
| | Uranium | 12(11) | 4.4E-05 | 1.3E-04 | |
| | Uranium-233/234 | 12(11) | 1.9E-05 | 5.0E-05 | |
| | Uranium-235/236 | 12(12) | 1.0E-06 | 4.5E-06 | |
| | Uranium-238 | 12(11) | 1.4E-05 | 4.4E-05 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.9. Ambient air monitoring program summary for radionuclides
and fluoride − 2017 (continued)**

| Sampling Location | Parameter[a] | No. of measurements[b] | Minimum[c, d] | Maximum[c, d] | Average[c, e] |
|---|---|---|---|---|---|
| A12 | Americium-241 | 4(4) | 1.9E-06 | 3.0E-06 | |
| | Fluoride | 39(18) | 8.0E-03 | 4.2E-02 | |
| | Neptunium-237 | 4(4) | 0 | 0 | |
| | Plutonium-238 | 4(4) | 0 | 7.6E-07 | |
| | Plutonium-239/240 | 4(4) | 2.0E-06 | 3.9E-06 | |
| | Technetium-99 | 12(4) | 2.2E-05 | 2.1E-03 | |
| | Uranium | 12(12) | 4.3E-05 | 1.2E-04 | |
| | Uranium-233/234 | 12(11) | 1.4E-05 | 6.6E-05 | |
| | Uranium-235/236 | 12(12) | 7.4E-07 | 5.0E-06 | |
| | Uranium-238 | 12(12) | 1.4E-05 | 3.8E-05 | |
| A15 | Americium-241 | 4(4) | 1.3E-06 | 4.3E-06 | |
| | Fluoride | 10(10) | 5.9E-03 | 8.8E-03 | |
| | Neptunium-237 | 4(4) | 0 | 6.6E-07 | |
| | Plutonium-238 | 4(4) | 7.1E-07 | 2.2E-06 | |
| | Plutonium-239/240 | 4(4) | 1.4E-06 | 2.8E-06 | |
| | Technetium-99 | 12(5) | 0 | 3.3E-03 | |
| | Uranium | 12(12) | 2.6E-05 | 1.0E-04 | |
| | Uranium-233/234 | 12(12) | 1.0E-05 | 3.9E-05 | |
| | Uranium-235/236 | 12(12) | 0 | 3.9E-06 | |
| | Uranium-238 | 12(12) | 8.3E-06 | 3.3E-05 | |
| A23 | Americium-241 | 4(4) | 2.0E-06 | 5.8E-06 | |
| | Fluoride | 37(29) | 7.3E-03 | 2.0E-02 | |
| | Neptunium-237 | 4(4) | 6.0E-07 | 2.1E-06 | |
| | Plutonium-238 | 4(4) | 0 | 3.0E-06 | |
| | Plutonium-239/240 | 4(4) | 6.6E-07 | 5.1E-06 | |
| | Technetium-99 | 12(4) | 5.0E-05 | 3.0E-03 | |
| | Uranium | 12(11) | 4.0E-05 | 1.4E-04 | |
| | Uranium-233/234 | 12(10) | 1.9E-05 | 6.3E-05 | |
| | Uranium-235/236 | 12(12) | 4.8E-07 | 3.9E-06 | |
| | Uranium-238 | 12(11) | 1.3E-05 | 4.7E-05 | |
| A24 | Americium-241 | 4(4) | 1.9E-06 | 4.9E-06 | |
| | Fluoride | 44(42) | 8.8E-03 | 2.3E-02 | |
| | Neptunium-237 | 4(4) | 0 | 2.5E-06 | |
| | Plutonium-238 | 4(4) | 0 | 2.2E-06 | |
| | Plutonium-239/240 | 4(4) | 1.5E-06 | 3.3E-06 | |
| | Technetium-99 | 12(3) | 0 | 2.5E-03 | |
| | Uranium | 12(11) | 3.8E-05 | 1.3E-04 | |
| | Uranium-233/234 | 12(9) | 1.9E-05 | 6.4E-05 | |
| | Uranium-235/236 | 12(12) | 4.9E-07 | 4.7E-06 | |
| | Uranium-238 | 12(11) | 1.2E-05 | 4.3E-05 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.9. Ambient air monitoring program summary for radionuclides
and fluoride – 2017 (continued)**

| Sampling Location | Parameter[a] | No. of measurements[b] | Minimum[c, d] | Maximum[c, d] | Average[c, e] |
|---|---|---|---|---|---|
| A28 | Americium-241 | 4(4) | 1.9E-06 | 8.8E-06 | |
| | Fluoride | 51(47) | 7.3E-03 | 3.4E-02 | |
| | Neptunium-237 | 4(3) | 0 | 2.1E-05 | |
| | Plutonium-238 | 4(4) | 0 | 2.5E-06 | |
| | Plutonium-239/240 | 4(4) | 1.9E-06 | 3.7E-06 | |
| | Technetium-99 | 12(9) | 0 | 1.9E-03 | |
| | Uranium | 12(12) | 4.1E-05 | 1.1E-04 | |
| | Uranium-233/234 | 12(12) | 1.3E-05 | 3.3E-05 | |
| | Uranium-235/236 | 12(12) | 5.1E-07 | 3.2E-06 | |
| | Uranium-238 | 12(12) | 1.4E-05 | 3.5E-05 | |
| A37 (background) | Americium-241 | 4(4) | 1.9E-06 | 7.9E-06 | |
| | Fluoride | 42(38) | 9.0E-03 | 2.3E-02 | |
| | Neptunium-237 | 4(4) | 0 | 2.0E-06 | |
| | Plutonium-238 | 4(4) | 6.4E-07 | 1.3E-06 | |
| | Plutonium-239/240 | 4(4) | 0 | 3.8E-06 | |
| | Technetium-99 | 12(9) | 7.4E-06 | 3.1E-03 | |
| | Uranium | 12(12) | 4.2E-05 | 1.1E-04 | |
| | Uranium-233/234 | 12(12) | 1.2E-05 | 3.1E-05 | |
| | Uranium-235/236 | 12(12) | 4.9E-07 | 3.5E-06 | |
| | Uranium-238 | 12(12) | 1.4E-05 | 3.7E-05 | |
| A41A | Americium-241 | 4(4) | 1.2E-06 | 5.0E-06 | |
| | Fluoride | 51(36) | 7.1E-03 | 4.3E-02 | |
| | Neptunium-237 | 4(3) | 0 | 1.5E-04 | |
| | Plutonium-238 | 4(4) | 0 | 2.9E-06 | |
| | Plutonium-239/240 | 4(4) | 1.3E-06 | 5.0E-06 | |
| | Technetium-99 | 12(7) | 6.9E-06 | 3.6E-03 | |
| | Uranium | 12(11) | 4.6E-05 | 1.2E-04 | |
| | Uranium-233/234 | 12(11) | 1.9E-05 | 5.2E-05 | |
| | Uranium-235/236 | 12(12) | 5.1E-07 | 4.6E-06 | |
| | Uranium-238 | 12(11) | 1.5E-05 | 3.9E-05 | |

[a]All parameters are measured in pCi/m³ with the exception of uranium and fluoride which are measured in µg/m³.
[b]Radiological samples for technetium-99, uranium, and uranium isotopes are analyzed monthly, samples for americium-241, neptunium-237, plutonium-238, and plutonium-239/240 are analyzed one month per quarter, and samples for fluoride are analyzed weekly. Number in parentheses is the number of samples that were below the detection limit. If the analytical result for a sample was below the detection limit, the ambient air concentration was calculated based on the detection limit for the sample.
[c]Results are provided in scientific notation. The number and sign (+ or -) to the right of the "E" indicate the number of places to the right or left of the decimal point. For example, 3.4E-04 is 0.00034 (the decimal point moves four places to the left); 2.1E+02 is 210 (the decimal point moves two places to the right).
Ambient concentrations of uranium and uranium isotopes reported in 2017 may be slightly elevated and should be considered estimated. Uranium and uranium isotopes were detected in quality control samples associated with the ambient air samples and subsequently in unused filters obtained from the manufacturer that are placed at the ambient air stations to collect samples. The presence of uranium and uranium isotopes in the unused filters may have caused slightly elevated analytical results for uranium and uranium isotopes. Levels of these constituents in ambient air are calculated based on the analytical results and therefore may be slightly elevated as well. Reported minimum and maximum values include these estimated results.
Ambient concentrations of radionuclides should be considered estimated due to a slightly higher than acceptable deviation (up to -1.55% with an acceptable limit of ±1%) in flow meter calibration for 2017.
[d]Values reported as "0" may actually be negative results. Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out. These negative value results are reported as "0" in the table for simplicity.
[e]Averages are not calculated for locations that had greater than 15% of the results below the detection limit. For locations with less than 15% of the results below the detection limit, any result below the detection limit was assigned a value at the detection limit to calculate the average for the parameter.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.10. External radiation monitoring program (mrem) – 2017**

| Location | First quarter | Second quarter | Third quarter | Fourth quarter | Cumulative annual whole body dose[a] |
|---|---|---|---|---|---|
| A12 | 20 | 21 | 24 | 20 | 85 |
| A15 | 20 | 24 | 25 | 20 | 89 |
| A23 | 20 | 20 | 25 | 20 | 85 |
| A24 | 21 | 24 | 25 | 22 | 92 |
| A28 | 20 | 21 | 22 | 19 | 82 |
| A29 | 20 | 23 | 25 | 20 | 88 |
| A3 | 19 | 23 | 24 | 19 | 85 |
| A36 | 19 | 21 | 23 | 19 | 82 |
| A40A | 19 | 20 | 23 | 21 | 83 |
| A6 | 20 | 20 | 24 | 19 | 83 |
| A8 | 23 | 24 | 25 | 24 | 96 |
| A9 | 20 | 23 | 25 | 20 | 88 |
| UPOLE-1404A | 19 | 21 | 23 | 18 | 81 |
| UPOLE-518 | 18 | 21 | 23 | 19 | 81 |
| UPOLE-862 | 28 | 33 | 36 | 27 | 124 |
| UPOLE-874 | 144 | 165 | 166 | 151 | 626 |
| UPOLE-906 | 17 | 20 | 21 | 17 | 75 |
| UPOLE-933 | 18 | 19 | 23 | 17 | 77 |
| X230-J2 | 21 | 22 | 25 | 20 | 88 |

[a]The annual occupational whole body dose limit set by Title 10 of the *Code of Federal Regulations* Part 20 is 5000 mrem.

**Table 2.11. External radiation monitoring (mrem) at locations
near cylinder storage yards – 2017**

| Location | First quarter | Second quarter | Third quarter | Fourth quarter | Cumulative annual whole body dose[a] |
|---|---|---|---|---|---|
| UPOLE-41 | 151 | 125 | 134 | 116 | 526 |
| UPOLE-868 | 286 | 314 | 370 | 299 | 1269 |
| UPOLE-874 | 149 | 166 | 170 | 145 | 630 |
| UPOLE-882 | 235 | 252 | 285 | 244 | 1016 |
| UPOLE-890 | 72 | 59 | 69 | 53 | 253 |

[a]The annual occupational whole body dose limit set by Title 10 of the *Code of Federal Regulations* Part 20 is 5000 mrem.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.12. Settleable solids monitoring results – 2017**

| Sampling location | Parameter[a] | Unit | Results[b] June | October |
|---|---|---|---|---|
| *Little Beaver Creek* | | | | |
| EDD-SW01 (FBP Outfalls 001& 015) | Settleable solids | mg/L | 4U     10[c] | 23.6 |
| | Suspended solids | mg/L | 4*U     17*[c] | 28.4 |
| FBP Outfall 005 | Settleable solids | mg/L | 4U[d] | ns |
| | Suspended solids | mg/L | 4U[d] | ns |
| FBP Outfall 009 | Settleable solids | mg/L | 4U | 4U |
| | Suspended solids | mg/L | 4*U | 4UJ |
| FBP Outfall 011 | Settleable solids | mg/L | 4U | 4U     4U[c] |
| | Suspended solids | mg/L | 4*U | 4UJ     4UJ[c] |
| *Big Run Creek* | | | | |
| FBP Outfall 002 | Settleable solids | mg/L | 4U | 4U |
| | Suspended solids | mg/L | 4*U | 4UJ |
| *Scioto River* | | | | |
| ACP NPDES Outfall 012 | Settleable solids | mg/L | 5 | 4U |
| | Suspended solids | mg/L | 5* | 4U |
| WDD-SW03 (FBP Outfall 010 & ACP Outfall 013) | Settleable solids | mg/L | 4U | 4U     4U[c] |
| | Suspended solids | mg/L | 4*U | 4UJ     4UJ[c] |
| FBP Outfall 003 | Settleable solids | mg/L | 4U     4U[c] | 17.2 |
| | Suspended solids | mg/L | 4*U     4*U[c] | 23.6 |
| FBP Outfall 004 | Settleable solids | mg/L | 4U | 4U |
| | Suspended solids | mg/L | 7* | 4UJ |
| *Background locations* | | | | |
| RW-6 (Scioto River) | Settleable solids | mg/L | 16 | 21.2 |
| | Suspended solids | mg/L | 36* | 21.2 |
| RW-5 (Big Beaver Creek) | Settleable solids | mg/L | 7 | 4U |
| | Suspended solids | mg/L | 12* | 4UJ |
| LBC-SW12 (Little Beaver Creek) | Settleable solids | mg/L | 4U | 4U |
| | Suspended solids | mg/L | 4*U | 4UJ |

[a]Suspended solids are the solids in a water sample (such as silt or clay particles) that can be trapped by a filter. Settleable solids are a component of suspended solids defined as the particles that settle out of suspension in water within a defined time period.
[b]Abbreviations and data qualifiers are as follows:   * – duplicate analysis is not within control limits.  J – estimated.  U – undetected. ns – not sampled.
[c]This result is for the duplicate sample collected from this location. A duplicate sample is a sample collected from the same location at the same time and using the same sampling device (if possible) as the regular sample.
[d]Sample collected in January 2017.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.13. Local surface water monitoring program results – 2017**

| Location | Parameter[a] | Second quarter[b,c] | Fourth quarter[b,c] | |
|---|---|---|---|---|
| Scioto River | Americium-241 | -0.00617U | 0.0453U | |
| RW-1A | Neptunium-237 | 0.00562U | -0.00492U | |
| (downstream) | Plutonium-238 | 0.00611U | 0.00509U | |
| | Plutonium-239/240 | 0U | 0.0204U | |
| | Technetium-99 | -1.9U | 3.19U | |
| | Uranium | 1.67 | 2.18 | |
| | Uranium-233/234 | 0.667 | 0.639 | |
| | Uranium-235/236 | 0.0345U | 0.0292U | |
| | Uranium-238 | 0.556 | 0.729 | |
| Scioto River | Americium-241 | 0.0369U | 0U | |
| RW-6 | Neptunium-237 | 0.0067U | 0.0095U | |
| (upstream) | Plutonium-238 | 0U | 0U | |
| | Plutonium-239/240 | 0U | 0.0216U | |
| | Technetium-99 | -3.05U | -0.0221U | |
| | Uranium | 2.46 | 2.03 | |
| | Uranium-233/234 | 0.694 | 0.662 | |
| | Uranium-235/236 | 0.0359U | 0.0248U | |
| | Uranium-238 | 0.821 | 0.677 | |
| Little Beaver | Americium-241 | 0.00576U | 0.00523U | |
| Creek | Neptunium-237 | 0.017U | 0U | |
| RW-7 | Plutonium-238 | -0.00551U | 0.00515U | |
| (downstream) | Plutonium-239/240 | 0.0165U | 0U | |
| | Technetium-99 | 5.84U | 5.85UJ | |
| | Uranium | 1.18 | 3.13 | |
| | Uranium-233/234 | 1.5 | 4.72 | |
| | Uranium-235/236 | 0.111U | 0.214 | |
| | Uranium-238 | 0.379 | 1.02 | |
| RW-8 | Americium-241 | 0.0253U | 0.0146U | |
| (downstream) | Neptunium-237 | 0.006U | 0.00488U | |
| | Plutonium-238 | -0.0202U | 0.00574U | |
| | Plutonium-239/240 | 0.0135U | 0.0115U | |
| | Technetium-99 | 3.21U | 4.5UJ | |
| | Uranium | 0.812 | 2.64 | |
| | Uranium-233/234 | 1.06 | 3.29 | |
| | Uranium-235/236 | 0.0536U | 0.137 | |
| | Uranium-238 | 0.265 | 0.865 | |
| RW-12 | Americium-241 | 0.0372U | 0.0259U | 0.0409U[d] |
| (upstream) | Neptunium-237 | -0.0165U | 0U | 0U[d] |
| | Plutonium-238 | 0.00609U | 0U | 0.00558U[d] |
| | Plutonium-239/240 | 0.00609U | 0.0232U | 0.00559U[d] |
| | Technetium-99 | 0.565U | 3.94U | 1.74U[d] |
| | Uranium | 0.107U | 0.0735U | 0.0668U[d] |
| | Uranium-233/234 | 0.075U | 0.0504UJ | 0.0404UJ[d] |
| | Uranium-235/236 | 0.00622U | 0.0114U | 0U[d] |
| | Uranium-238 | 0.035U | 0.0229U | 0.0224U[d] |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.13. Local surface water monitoring program results – 2017 (continued)**

| Location | Parameter[a] | Second quarter[b,c] | | Fourth quarter[b,c] | |
|---|---|---|---|---|---|
| Big Beaver Creek | Americium-241 | 0.0242U | 0.0113U[d] | 0.0234U | |
| RW-13 | Neptunium-237 | 0U | 0U[d] | -0.00535U | |
| (downstream) | Plutonium-238 | -0.00634U | 0.0223U[d] | 0U | |
| | Plutonium-239/240 | 0.00634U | 0.0223U[d] | 0.0111U | |
| | Technetium-99 | 0.832U | -0.0999U[d] | 9.12 | |
| | Uranium | 0.297 | 0.228U[d] | 1.26J | |
| | Uranium-233/234 | 0.291 | 0.328[d] | 1.46 | |
| | Uranium-235/236 | 0.00682U | 0.0376U[d] | 0.0878UJ | |
| | Uranium-238 | 0.0987 | 0.0706U[d] | 0.41 | |
| RW-5 | Americium-241 | 0.0274U | | 0.0101U | |
| (upstream) | Neptunium-237 | 0.00487U | | 0.0104U | |
| | Plutonium-238 | -0.00675U | | -0.00546U | |
| | Plutonium-239/240 | 0.0337U | | 0.0164U | |
| | Technetium-99 | 0.72U | | 1.41U | |
| | Uranium | 0.33 | | 0.273J | |
| | Uranium-233/234 | 0.0844U | | 0.109 | |
| | Uranium-235/236 | 0.015U | | 0.00564U | |
| | Uranium-238 | 0.109 | | 0.0908J | |
| Big Run Creek | Americium-241 | 0.0105U | | 0.0344U | |
| RW-2 | Neptunium-237 | -0.0153U | | 0.00504U | |
| (downstream) | Plutonium-238 | 0.0118U | | 0.0105U | |
| | Plutonium-239/240 | 0.0178U | | 0.0105U | |
| | Technetium-99 | 0.653U | | 1.19U | |
| | Uranium | 0.179U | | 0.417J | |
| | Uranium-233/234 | 0.128 | | 0.252 | |
| | Uranium-235/236 | 0.00613U | | 0.0336U | |
| | Uranium-238 | 0.0592U | | 0.135 | |
| RW-3 | Americium-241 | 0.0165U | 0.0232U[d] | 0.0152U | 0.0101U[d] |
| (downstream) | Neptunium-237 | 0U | 0.0054U[d] | 0.0106U | 0U[d] |
| | Plutonium-238 | 0.017U | -0.00591U[d] | 0.00582 | 0.0156U[d] |
| | Plutonium-239/240 | 0.0227U | 0.00591U[d] | 0.0233U | 0.0104U[d] |
| | Technetium-99 | 0.899U | 0.277U[d] | 2.16U | 2.22U[d] |
| | Uranium | 1.05 | 0.752[d] | 0.482J | 0.684J[d] |
| | Uranium-233/234 | 0.82 | 0.739[d] | 0.489 | 0.403[d] |
| | Uranium-235/236 | 0.0581U | 0.019U[d] | 0.0239U | 0.0173U[d] |
| | Uranium-238 | 0.342 | 0.25[d] | 0.158 | 0.227[d] |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.13. Local surface water monitoring program results – 2017 (continued)**

| Location | Parameter[a] | Second quarter[b,c] | Fourth quarter[b,c] |
|---|---|---|---|
| Big Run Creek | Americium-241 | 0.0113U | 0.0203U |
| (continued) | Neptunium-237 | 0U | 0.00472U |
| RW-33 | Plutonium-238 | -0.0178U | 0.00551U |
| (upstream) | Plutonium-239/240 | 0.0178U | 0.011U |
| | Technetium-99 | -1.67U | 1.86U |
| | Uranium | 0.0956U | 0.0684U |
| | Uranium-233/234 | 0.0252U | 0.0512UJ |
| | Uranium-235/236 | 0.0125U | 0.0106U |
| | Uranium-238 | 0.0302U | 0.0213U |
| Background creeks | Americium-241 | 0.0132U | 0.0191U |
| RW-10N | Neptunium-237 | 0.00588U | 0.0134U |
| | Plutonium-238 | -0.00668U | 0U |
| | Plutonium-239/240 | 0.0468U | 0.0166U |
| | Technetium-99 | -1.01U | 2.96U |
| | Uranium | 0.302U | 0.471J |
| | Uranium-233/234 | 0.189 | 0.125 |
| | Uranium-235/236 | 0.00733U | 0.00576U |
| | Uranium-238 | 0.1 | 0.157 |
| RW-10S | Americium-241 | 0.0333U | 0.0354U |
| | Neptunium-237 | -0.00493U | 0U |
| | Plutonium-238 | 0.00612U | 0.0167U |
| | Plutonium-239/240 | 0.0184U | 0.0223U |
| | Technetium-99 | -1.16U | 3.85U |
| | Uranium | 0.131U | 0.17UJ |
| | Uranium-233/234 | 0.0906 | 0.0592UJ |
| | Uranium-235/236 | 0.025U | 0.017U |
| | Uranium-238 | 0.0403U | 0.0546UJ |
| RW-10E | Americium-241 | 0.0349U | 0.0106U |
| | Neptunium-237 | -0.00517U | -0.0152U |
| | Plutonium-238 | -0.00592U | 0.00544U |
| | Plutonium-239/240 | 0.00592U | 0U |
| | Technetium-99 | -2.54U | 2.21U |
| | Uranium | 0.0726U | 0.0566U |
| | Uranium-233/234 | 0.0195U | 0.0363UJ |
| | Uranium-235/236 | 0U | 0.00564U |
| | Uranium-238 | 0.0244U | 0.0182U |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.13. Local surface water monitoring program results – 2017 (continued)**

| Location | Parameter[a] | Second quarter[b,c] | Fourth quarter[b,c] |
|----------|--------------|---------------------|---------------------|
| Background creeks RW-10W | Americium-241 | -0.00619U | 0.0242U |
| | Neptunium-237 | 0.00611U | -0.00957U |
| | Plutonium-238 | 0U | 0U |
| | Plutonium-239/240 | -0.0062U | 0.0217U |
| | Technetium-99 | -0.655U | 2.91U |
| | Uranium | 0.0161U | 0.0685U |
| | Uranium-233/234 | 0.0217U | 0.0443UJ |
| | Uranium-235/236 | 0U | 0.00551U |
| | Uranium-238 | 0.00541U | 0.0221U |

[a]Results are reported in µg/L (uranium) and pCi/L (all other parameters).
[b]Abbreviations and data qualifiers are as follows: U – undetected. J – the reported result is estimated.
[c]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.
[d]This result is for the duplicate sample collected from this location. A duplicate sample is a sample collected from the same location at the same time and using the same sampling device (if possible) as the regular sample.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017**

| Parameter | Unit | Location/results[a,b] | | | |
|---|---|---|---|---|---|
| | | *Scioto River and outfalls that discharge to the Scioto River* | | | |
| | | *RM-6 Upstream @ Piketon* | *RM-1A Downstream @ Lucasville* | *RM-9 Outfall 012* | *RM-10 Outfall 010/Outfall 013* |
| Aluminum | mg/kg | 7710D | 4010D | 4770D | 6040D |
| Americium-241 | pCi/g | 0.00301U | 0.000458U | 0.00125U | 0U |
| Antimony | mg/kg | 0.0735DJ | 0.0723DJ | 0.125DJ | 0.0455DU |
| Arsenic | mg/kg | 11.9 | 8.35 | 16.3 | 12 |
| Barium | mg/kg | 96.1D | 48.3D | 65.3D | 83.9D |
| Beryllium | mg/kg | 0.38D | 0.272D | 0.459D | 0.619D |
| Cadmium | mg/kg | 0.543D | 0.33D | 0.948D | 0.0725D |
| Calcium | mg/kg | 39000D | 41800D | 2090D | 876D |
| Chromium | mg/kg | 11.5 | 7.35 | 14.8D | 10.1 |
| Copper | mg/kg | 21.7D | 11.1 | 17.6D | 6.56 |
| Iron | mg/kg | 21000D | 14200D | 42400D | 21700D |
| Lead | mg/kg | 15.6 | 9.39 | 12.1 | 12.5 |
| Magnesium | mg/kg | 17500D | 17900D | 1840D | 864D |
| Manganese | mg/kg | 573D | 383D | 1110D | 618D |
| Mercury | mg/kg | 0.0426J | 0.0249J | 0.0161J | 0.0171J |
| Neptunium-237 | pCi/g | 0.00045U | 0U | 0U | 0.0103U |
| Nickel | mg/kg | 23.5D | 15.6D | 39.7D | 7.2 |
| Plutonium-238 | pCi/g | 0U | 0.000592U | -0.00163U | -0.00117U |
| Plutonium-239/240 | pCi/g | 0.00178U | 0.00414U | 0.00272U | 0.00293U |
| PCB, total | µg/kg | 47.6 | 68.2 | 17.7U | 19.9U |
| Selenium | mg/kg | 0.812D | 0.565D | 0.413D | 0.922D |
| Silicon | mg/kg | 654D | 538D | 450D | 515D |
| Silver | mg/kg | 0.471U | 0.485U | 0.448U | 0.488U |
| Technetium-99 | pCi/g | -0.0265U | -0.0106U | -0.0401U | -0.00569U |
| Thallium | mg/kg | 0.274D | 0.173D | 0.176D | 0.118D |
| Uranium | µg/g | 1.51 | 0.982 | 1.47 | 1.06 |
| Uranium-233/234 | pCi/g | 0.442 | 0.296 | 0.517 | 0.355 |
| Uranium-235/236 | pCi/g | 0.0237 | 0.0169 | 0.0257 | 0.0203 |
| Uranium-238 | pCi/g | 0.504 | 0.328 | 0.491 | 0.352 |
| Zinc | mg/kg | 92.9D | 60.7D | 146D | 25.8D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/results[a,b] | | | |
|---|---|---|---|---|---|
| | | | Little Beaver Creek | | |
| | | RM-12 Upstream | RM-11 X-230J7 Discharge | RM-8 Downstream @ Outfall 009 Discharge | RM-7 Downstream @ Confluence |
| Aluminum | mg/kg | 8860D | 3750D | 7290D | 5010D |
| Americium-241 | pCi/g | 0.000504U | 0.00212U | 0.00355U | 0.00225U |
| Antimony | mg/kg | 0.0474DU | 0.405D | 0.1DJ | 0.107DJ |
| Arsenic | mg/kg | 10.5 | 16.5 | 28.2 | 14.6 |
| Barium | mg/kg | 71.1D | 30.1D | 126D | 67.7D |
| Beryllium | mg/kg | 0.62D | 0.314D | 0.904D | 0.456D |
| Cadmium | mg/kg | 0.0474DU | 0.533D | 0.926D | 0.534D |
| Calcium | mg/kg | 570D | 51400D | 5550D | 27900D |
| Chromium | mg/kg | 14.6D | 11.1 | 28.3D | 13.4D |
| Copper | mg/kg | 8.64 | 26.9D | 18.8D | 14.6D |
| Iron | mg/kg | 23500D | 19400D | 40100D | 22800D |
| Lead | mg/kg | 15.7 | 15.1 | 29.3D | 27.3D |
| Magnesium | mg/kg | 1110D | 23500D | 2600D | 14300D |
| Manganese | mg/kg | 110D | 423D | 1870D | 744D |
| Mercury | mg/kg | 0.0234J | 0.528 | 0.0731J | 0.0572J |
| Neptunium-237 | pCi/g | -0.00115U | 0.00403U | 0.0103U | 0.00876U |
| Nickel | mg/kg | 12.8D | 23.6D | 46.9D | 24.1D |
| Plutonium-238 | pCi/g | 0.0013U | 0.00173U | 0.00263U | 0.00161U |
| Plutonium-239/240 | pCi/g | 0.0013U | 0.00604U | 0.0046U | 0.00588U |
| PCB, total | µg/kg | 19.2U | 208 | 175 | 57.1 |
| Selenium | mg/kg | 0.57D | 1.57D | 1.02D | 0.647D |
| Silicon | mg/kg | 544D | 467D | 500D | 486D |
| Silver | mg/kg | 0.476U | 0.494U | 0.474U | 0.485U |
| Technetium-99 | pCi/g | -0.127U | 3.62 | 2.49 | 3.42 |
| Thallium | mg/kg | 0.126D | 0.24D | 0.26D | 0.184D |
| Uranium | µg/g | 0.81 | 3.43 | 3.39 | 2.36 |
| Uranium-233/234 | pCi/g | 0.34 | 6.88 | 3.14 | 2.55 |
| Uranium-235/236 | pCi/g | 0.0128U | 0.291 | 0.16 | 0.128 |
| Uranium-238 | pCi/g | 0.27 | 1.11 | 1.11 | 0.774 |
| Zinc | mg/kg | 39.2D | 329D | 149D | 92.1D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/results[a,b] | | |
|---|---|---|---|---|
| | | *RM-15 Upstream* | *Big Beaver Creek RM-15 Upstream (duplicate sample)* | *RM-5 Confluence with Little Beaver Creek* |
| Aluminum | mg/kg | 3270D | 3170D | 5260D |
| Americium-241 | pCi/g | 0.00199U | 0.00132U | 0.00134U |
| Antimony | mg/kg | 0.0533*DNJ | 0.0619*DNJ | 0.0468DU |
| Arsenic | mg/kg | 7.4 | 7.73 | 8.16 |
| Barium | mg/kg | 37D | 39.5D | 65.9D |
| Beryllium | mg/kg | 0.264D | 0.255D | 0.378D |
| Cadmium | mg/kg | 0.255D | 0.254D | 0.302D |
| Calcium | mg/kg | 8920D | 8450D | 10400D |
| Chromium | mg/kg | 6.85 | 7.95 | 9.83 |
| Copper | mg/kg | 8.65 | 8.37 | 10.9 |
| Iron | mg/kg | 13400D | 13500D | 17000D |
| Lead | mg/kg | 7.63 | 7.23 | 11.7 |
| Magnesium | mg/kg | 4060D | 4100D | 5520D |
| Manganese | mg/kg | 460D | 463D | 749D |
| Mercury | mg/kg | 0.0116 | 0.0125 | 0.0201J |
| Neptunium-237 | pCi/g | 0.001U | 0.000591U | 0.000522U |
| Nickel | mg/kg | 16.6D | 16.6D | 17.3D |
| Plutonium-238 | pCi/g | 0.00112U | 0U | 0.00337U |
| Plutonium-239/240 | pCi/g | 0U | 0.00263U | 0U |
| PCB, total | µg/kg | 19.8U | 19.4U | 18.9U |
| Selenium | mg/kg | 0.412D | 0.417D | 0.469D |
| Silicon | mg/kg | 543D | 588D | 480D |
| Silver | mg/kg | 0.47U | 0.485U | 0.49U |
| Technetium-99 | pCi/g | -0.0688U | -0.0037U | -0.00502U |
| Thallium | mg/kg | 0.108D | 0.105D | 0.123D |
| Uranium | µg/g | 0.967 | 0.811 | 0.912 |
| Uranium-233/234 | pCi/g | 0.286J | 0.228J | 0.337 |
| Uranium-235/236 | pCi/g | 0.0137 | 0.0152 | 0.0169 |
| Uranium-238 | pCi/g | 0.323 | 0.27 | 0.304 |
| Zinc | mg/kg | 47.4D | 45.6D | 52.2D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/results[a,b] | |
|-----------|------|-----------------------|---|
| | | *Big Beaver Creek* | |
| | | *RM-13 Downtream* | *RM-13 Downtream (duplicate sample)* |
| Aluminum | mg/kg | 4960D | 4210D |
| Americium-241 | pCi/g | 0U | 0.0012U |
| Antimony | mg/kg | 0.222DJ | 0.173DJ |
| Arsenic | mg/kg | 25.2 | 19.1 |
| Barium | mg/kg | 61.7D | 45.9D |
| Beryllium | mg/kg | 0.513D | 0.436D |
| Cadmium | mg/kg | 0.794D | 0.53D |
| Calcium | mg/kg | 16600D | 25000D |
| Chromium | mg/kg | 22.5D | 15.3D |
| Copper | mg/kg | 24D | 17.8D |
| Iron | mg/kg | 33400D | 27400D |
| Lead | mg/kg | 16.8 | 12.1 |
| Magnesium | mg/kg | 5950D | 8160D |
| Manganese | mg/kg | 570D | 504D |
| Mercury | mg/kg | 0.0308J | 0.0249J |
| Neptunium-237 | pCi/g | 0.00503U | 0.00975 |
| Nickel | mg/kg | 31D | 25.8D |
| Plutonium-238 | pCi/g | -0.000582U | -0.000575U |
| Plutonium-239/240 | pCi/g | 0.00349U | 0.00288U |
| PCB, total | µg/kg | 24.3 | 22.4 |
| Selenium | mg/kg | 0.528D | 0.479D |
| Silicon | mg/kg | 406D | 411D |
| Silver | mg/kg | 0.473U | 0.469U |
| Technetium-99 | pCi/g | 2.8 | 2.1 |
| Thallium | mg/kg | 0.157D | 0.137D |
| Uranium | µg/g | 2.38 | 2.04 |
| Uranium-233/234 | pCi/g | 1.95 | 1.51 |
| Uranium-235/236 | pCi/g | 0.0859 | 0.0872 |
| Uranium-238 | pCi/g | 0.786 | 0.672 |
| Zinc | mg/kg | 105D | 86.3D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/results[a,b] | | | |
|-----------|------|------|------|------|------|
| | | *Big Run Creek* | | | |
| | | *RM-33 Upstream* | *RM-3 Downstream* | *RM-3 Downstream (duplicate sample)* | *RM-2 Downstream @ Wakefield* |
| Aluminum | mg/kg | 6690D | 7740D | 8730D | 7330D |
| Americium-241 | pCi/g | 0.00249U | 0.000703U | 0.0029U | 0.00238U |
| Antimony | mg/kg | 0.302D | 0.158DJ | 0.17DJ | 0.054DJ |
| Arsenic | mg/kg | 37.6 | 39.8 | 49.9 | 20.4 |
| Barium | mg/kg | 51.7D | 98.9D | 145D | 70.5D |
| Beryllium | mg/kg | 1.22D | 1.06D | 1.42D | 0.548D |
| Cadmium | mg/kg | 0.475D | 0.41D | 0.45D | 0.418D |
| Calcium | mg/kg | 2740D | 1910D | 1880D | 1150D |
| Chromium | mg/kg | 46.6D | 24.9D | 32D | 19D |
| Copper | mg/kg | 19.1D | 16.4D | 20.4D | 14.3D |
| Iron | mg/kg | 86600D | 49200D | 67300D | 28300D |
| Lead | mg/kg | 37.5D | 33.9D | 49.9D | 20.4 |
| Magnesium | mg/kg | 1750D | 1070D | 1030D | 1420D |
| Manganese | mg/kg | 759D | 1780D | 2980D | 933D |
| Mercury | mg/kg | 0.0318J | 0.0381J | 0.0379J | 0.0363J |
| Neptunium-237 | pCi/g | 0.00128U | 0.000789U | 0.00341U | 0.000893U |
| Nickel | mg/kg | 38D | 28.2D | 36.5D | 23D |
| Plutonium-238 | pCi/g | 0U | 0.00123U | 0.000552U | 0.00139U |
| Plutonium-239/240 | pCi/g | 0.000665U | 0.00432U | 0.0011U | 0.00697U |
| PCB, total | µg/kg | 19.3U | 32.1 | 34.8 | 40.9 |
| Selenium | mg/kg | 0.512D | 0.893D | 0.855D | 0.586D |
| Silicon | mg/kg | 291D | 535D | 540D | 531D |
| Silver | mg/kg | 0.454U | 0.482U | 0.481U | 0.474U |
| Technetium-99 | pCi/g | -0.0479U | 0.356 | 0.393 | 0.067U |
| Thallium | mg/kg | 0.15D | 0.275D | 0.34D | 0.163D |
| Uranium | µg/g | 2.78 | 3.84 | 4.57 | 1.46 |
| Uranium-233/234 | pCi/g | 0.987 | 2.05 | 2.37 | 0.856 |
| Uranium-235/236 | pCi/g | 0.0489 | 0.104 | 0.125 | 0.0449 |
| Uranium-238 | pCi/g | 0.928 | 1.27 | 1.52 | 0.485 |
| Zinc | mg/kg | 154D | 107D | 120D | 76.3D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.14. Sediment monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/results[a,b] | | | |
|---|---|---|---|---|---|
| | | Background creeks | | | |
| | | RM-10N North background | RM-10S South background | RM-10E East background | RM-10W West background |
| Aluminum | mg/kg | 4450D | 5820D | 951D | 5890D |
| Americium-241 | pCi/g | 0.00131U | 0.00354U | 0.00142U | 0.00329U |
| Antimony | mg/kg | 0.0614DJ | 0.0643DJ | 0.0488DU | 0.455D |
| Arsenic | mg/kg | 6.84 | 23 | 5.22 | 41 |
| Barium | mg/kg | 51D | 71D | 12.4D | 58.2D |
| Beryllium | mg/kg | 0.362D | 0.613D | 0.143D | 0.906D |
| Cadmium | mg/kg | 0.686D | 0.0882D | 0.0488DU | 2.09D |
| Calcium | mg/kg | 7210D | 2770D | 157D | 3200D |
| Chromium | mg/kg | 7.8 | 29.4DJ | 6.67 | 21.9D |
| Copper | mg/kg | 11.3 | 9.7 | 1.43J | 24.6D |
| Iron | mg/kg | 13700D | 41800D | 8830D | 50400D |
| Lead | mg/kg | 13.1 | 20.5 | 2.87 | 21.6 |
| Magnesium | mg/kg | 4100D | 1290D | 83.5D | 2130D |
| Manganese | mg/kg | 445D | 1110D | 109D | 888D |
| Mercury | mg/kg | 0.026J | 0.0187J | 0.0111U | 0.0188J |
| Neptunium-237 | pCi/g | 0.00148U | 0.000642U | 0U | 0.000739U |
| Nickel | mg/kg | 23.9D | 13.6D | 2.37 | 53.5D |
| Plutonium-238 | pCi/g | 0.00295U | 0.000566U | -0.00134U | 0.00108U |
| Plutonium-239/240 | pCi/g | 0.00236U | 0.00961 | 0U | 0.00163U |
| PCB, total | µg/kg | 19.8UJ | 19.8UJ | 18.8U | 17.9U |
| Selenium | mg/kg | 0.493D | 0.327DJ | 0.0976DU | 0.726D |
| Silicon | mg/kg | 501D | 533D | 188D | 463D |
| Silver | mg/kg | 0.486U | 0.466U | 0.463U | 0.498U |
| Technetium-99 | pCi/g | -0.083U | -0.0682U | -0.0592U | -0.041U |
| Thallium | mg/kg | 0.135D | 0.0632DJ | 0.0488DU | 0.357D |
| Uranium | µg/g | 1.02 | 1.09 | 0.186 | 3.31 |
| Uranium-233/234 | pCi/g | 0.368 | 0.437 | 0.0602 | 1.16 |
| Uranium-235/236 | pCi/g | 0.021 | 0.0192 | 0.00205U | 0.0584 |
| Uranium-238 | pCi/g | 0.338 | 0.363 | 0.0622 | 1.1 |
| Zinc | mg/kg | 68.2D | 53.7D | 9 | 189D |

[a]Abbreviations and data qualifiers are as follows: * – duplicate analysis is not within control limits. D – the result is reported from a dilution.
J – the reported result is estimated. N – sample spike recovery is not within control limits. U – undetected.
[b]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.15. Soil and biota (vegetation) monitoring at ambient air monitoring stations – 2017**

| Parameter[a] | Location/results[b,c] | | | |
|---|---|---|---|---|
| | A8 – On site at northwest boundary | | T7 – On site near X-230L North Holding Pond | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.00129U | 0.00277U | 0U | 0.00449UJ |
| Neptunium-237 | -0.000324U | -0.00154U | 0.000336U | 0.000795U |
| Plutonium-238 | 0.000414U | -0.000348U | 0.00126U | 0.000361U |
| Plutonium-239/240 | 0.00166U | -0.000348U | -0.00126U | 0.00578UJ |
| Technetium-99 | 0.0481U | 0.0402U | 0.0216U | 0.0484U |
| Uranium | 0.00927U | 2.86 | 0.00211U | 1.05 |
| Uranium-233/234 | 0.00648 | 1.12 | 0.000647U | 0.369 |
| Uranium-235/236 | 0.0011U | 0.0494 | 0.000402U | 0.0159 |
| Uranium-238 | 0.00295U | 0.953 | 0.000647U | 0.35 |
| | A10 – On site on northwest segment of Perimeter Road | | A29 – On site at OVEC | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.00148U | 0.00192U | -0.000634U | 0.0021U |
| Neptunium-237 | 0U | 0U | -0.000666U | 0.00125U |
| Plutonium-238 | 0U | -0.000671U | -0.000775U | 0.000343U |
| Plutonium-239/240 | 0.00325U | 0.00201U | 0.000388U | 0.00618U |
| Technetium-99 | 0.0586U | 0.0321U | 0.0467U | 0.0432U |
| Uranium | 0.0311 | 0.839 | 0.0119U | 0.944 |
| Uranium-233/234 | 0.0135 | 0.352 | 0.00493U | 0.272 |
| Uranium-235/236 | 0.000714U | 0.0172 | 0U | 0.0172 |
| Uranium-238 | 0.0103 | 0.279 | 0.00401U | 0.315 |
| | A36 – On site at X-611 Water Treatment Plant | | A6 – North of PORTS in Piketon | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.00135U | 0.00863J | 0.000604U | 0.00303U |
| Neptunium-237 | 0.000332U | -0.000595U | 0.000667U | -0.000953U |
| Plutonium-238 | 0.000786U | 0.000349U | 0.000356U | 0.000394U |
| Plutonium-239/240 | 0.000393U | 0.0154 | 0.000356U | 0.00472UJ |
| Technetium-99 | 0.0494U | 0.0191U | 0.04U | 0.0244U |
| Uranium | 0.016U | 0.742 | 0.00631U | 1.01 |
| Uranium-233/234 | 0.00656 | 0.353 | 0.00308U | 0.298 |
| Uranium-235/236 | 0U | 0.0182 | 0.00104U | 0.0204 |
| Uranium-238 | 0.00537U | 0.247 | 0.00196U | 0.338 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.15. Soil and biota (vegetation) monitoring at ambient air
monitoring stations – 2017 (continued)**

| Parameter[a] | Location/results[b,c] | | | |
|---|---|---|---|---|
| | *A24 – North of PORTS at Schuster Road* | | *A41A - North of PORTS at Zahns Corner* | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.000631U | 0.00365U | 0.000638U | 0.00045U |
| Neptunium-237 | -0.000346U | 0U | 0U | 0U |
| Plutonium-238 | 0.000345U | -0.000376U | 0.000711U | 0.000336U |
| Plutonium-239/240 | 0.00172U | 0.00865 | 0.00249U | 0.00235U |
| Technetium-99 | -0.0165U | 0.00363U | 0.0327U | 0.0458U |
| Uranium | 0.00171U | 0.777 | 0.00393U | 0.818 |
| Uranium-233/234 | 0.00143U | 0.283 | 0.000865U | 0.291 |
| Uranium-235/236 | 0U | 0.0188 | 0.00108U | 0.0124 |
| Uranium-238 | 0.000574U | 0.258 | 0.00115U | 0.273 |
| | *A23 – Northeastern PORTS boundary* | | *A12 – Eastern PORTS boundary* | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.00283U | 0.00179U | 0.00273U | 0.000614U |
| Neptunium-237 | 0U | -0.000527U | -0.000688U | 0.000373U |
| Plutonium-238 | -0.000711U | -0.000811U | 0.000348U | 0U |
| Plutonium-239/240 | 0.000711U | 0.00122U | 0.00174U | 0.00624UJ |
| Technetium-99 | 0.0779U | 0.0306U | 0.0605U | 0.0688U |
| Uranium | 0.0121U | 0.72 | 0.08 | 1.31 |
| Uranium-233/234 | 0.00169U | 0.254 | 0.0363 | 0.513 |
| Uranium-235/236 | 0.000702U | 0.015 | 0.00243U | 0.0285 |
| Uranium-238 | 0.00395U | 0.24 | 0.0265 | 0.435 |
| | *A15 – Southeast of PORTS on Loop Road* | | *A3 – Southern PORTS boundary* | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.00228U | 0.00333UJ | 0.000305U | 0.00405UJ |
| Neptunium-237 | 0.000645U | 0.000347U | 0U | 0U |
| Plutonium-238 | 0.000488U | -0.000342U | 0.000369U | 0.000954U |
| Plutonium-239/240 | 0.00244U | 0.0144 | 0.00185U | 0.00604J |
| Technetium-99 | 0.0523U | 0.0855UJ | -0.00913U | 0.0782U |
| Uranium | 0.00694U | 0.889 | 0.00162U | 0.858 |
| Uranium-233/234 | 0.000947U | 0.321 | 0.0012U | 0.307 |
| Uranium-235/236 | 0.000785U | 0.0169 | -0.000374U | 0.0172 |
| Uranium-238 | 0.00221U | 0.296 | 0.000601U | 0.286 |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.15. Soil and biota (vegetation) monitoring at ambient air monitoring stations – 2017 (continued)**

| Parameter[a] | Location/results[b,c] | | | |
|---|---|---|---|---|
| | *A9 – South of PORTS* | | *A28 – Southwest of PORTS on Camp Creek Road* | |
| | Vegetation | Soil | Vegetation | Soil |
| Americium-241 | 0.000914U | 0.00667UJ | 0.00127U | 0.00425U |
| Neptunium-237 | -0.000339U | 0.000332U | 0.000906U | 0.00073U |
| Plutonium-238 | 0.000351U | 0.00292U | 0.00117U | -0.00035U |
| Plutonium-239/240 | 0.000703U | 0.0152 | 0.00117U | 0.00491UJ |
| Technetium-99 | 0.0378U | 0.0605U | 0.0443U | 0.0498U |
| Uranium | 0.0141U | 0.843 | 0.00626U | 0.808 |
| Uranium-233/234 | 0.00519 | 0.271 | 0.00234U | 0.276 |
| Uranium-235/236 | 0.000679U | 0.0119 | 0.000364U | 0.0143 |
| Uranium-238 | 0.00464U | 0.282 | 0.00205U | 0.269 |
| | *A37 – Background station near Otway* | | | |
| | Vegetation | Soil | | |
| Americium-241 | 0.00187U | 0.0073UJ | | |
| Neptunium-237 | 0U | 0U | | |
| Plutonium-238 | 0.00106U | 0U | | |
| Plutonium-239/240 | 0.000354U | 0.0145 | | |
| Technetium-99 | 0.0243U | 0.0554U | | |
| Uranium | 0.00543U | 0.927 | | |
| Uranium-233/234 | 0.00343U | 0.325 | | |
| Uranium-235/236 | 0.000711U | 0.0128 | | |
| Uranium-238 | 0.00172U | 0.31 | | |
| | *Duplicate vegetation samples* | | *Duplicate soil samples* | |
| | A28 | A37 | A10 | A41A |
| Americium-241 | 0.00183U | 0.000939U | 0.00187U | 0.000389U |
| Neptunium-237 | -0.00062U | 0.00102U | 0.000315U | -0.000426U |
| Plutonium-238 | -0.000377U | 0U | -0.000355U | 0.000374U |
| Plutonium-239/240 | 0.00113U | 0.00109U | 0.00213U | 0.0015U |
| Technetium-99 | 0.0491U | -0.0352U | 0.0158U | 0.087U |
| Uranium | 0.00899U | 0.00263U | 0.84 | 0.839 |
| Uranium-233/234 | 0.00229U | 0.00221U | 0.378 | 0.297 |
| Uranium-235/236 | 0.00107U | 0.000344U | 0.0127 | 0.0148 |
| Uranium-238 | 0.00286U | 0.000829U | 0.28 | 0.28 |

[a]All parameters are measured in pCi/g with the exception of uranium which is measured in µg/g.
[b]Abbreviations and data qualifiers are as follows: U – undetected. J – the reported result is estimated.
[c]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.16. Biota (fish) monitoring program results – 2017**

| Parameter | Unit | Location/fish/results[a,b] | | |
|---|---|---|---|---|
| | | *Scioto River (RW-1A) drum* | *Scioto River (RW-6) catfish* | *Big Beaver Creek (RW-15) bass* |
| Americium-241 | pCi/g | 0.0028U | 0.00212U | 0.00132U |
| Neptunium-237 | pCi/g | 0.0019U | -0.000322U | 0.000291U |
| Plutonium-238 | pCi/g | 0.000315U | 0.000703U | -0.000317U |
| Plutonium-239/240 | pCi/g | 0.00157U | 0.00106U | 0.00126U |
| PCB, total | µg/kg | 20.2 | 18.5Q | 22 |
| Technetium-99 | pCi/g | -0.0805U | -0.1U | -0.0324U |
| Uranium | µg/g | 0.00114UJ | -0.000228UJ | 0.000718UJ |
| Uranium-233/234 | pCi/g | 0.000322U | 0.00159U | 0.000312U |
| Uranium-235/236 | pCi/g | 0.000401UJ | -0.000494UJ | 0.00155UJ |
| Uranium-238 | pCi/g | 0.000322U | 0U | 0U |
| | | *Big Beaver Creek (RW-13) bass* | *Little Beaver Creek (RW-8) bass* | *Little Beaver Creek (RW-8) bass (duplicate sample)* |
| Americium-241 | pCi/g | 0.00131U | 0U | 0.00229U |
| Neptunium-237 | pCi/g | -0.000323U | 0.000662U | 0.000592U |
| Plutonium-238 | pCi/g | 0.000674U | 0.000351U | 0.000891U |
| Plutonium-239/240 | pCi/g | 0.00101U | 0.0021U | 0.00089U |
| PCB, total | µg/kg | 30.6 | 241D | 290D |
| Technetium-99 | pCi/g | -0.064U | -0.119U | -0.0945U |
| Uranium | µg/g | 0.000358UJ | 0.00228UJ | 0.00106UJ |
| Uranium-233/234 | pCi/g | 0.00186U | 0.000642U | 0.00119U |
| Uranium-235/236 | pCi/g | 0.000773UJ | 0.000798UJ | 0.00037UJ |
| Uranium-238 | pCi/g | 0U | 0.000642U | 0.000298U |

[a]Abbreviations and data qualifiers are as follows: U – undetected. D – the result is reported from a dilution. Q – one or more quality control criteria failed. J – estimated.
[b]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.17. Biota (crops) monitoring program results – 2017**

| Parameter | Unit | Location/crop/results[a,b] | | |
|---|---|---|---|---|
| | | *Off-site #2 corn* | *Off-site #2 cucumbers* | *Off-site #2 tomatoes* |
| Americium-241 | pCi/g | 0.000929U | 0.000335U | 0.000346U |
| Neptunium-237 | pCi/g | -0.000303U | -0.000657U | 0.000351U |
| Plutonium-238 | pCi/g | -0.000295U | 0.000347U | 0.000359U |
| Plutonium-239/240 | pCi/g | 0.000885U | 0.000694U | -0.000359U |
| Technetium-99 | pCi/g | -0.068U | -0.0259U | -0.0422U |
| Uranium | µg/g | 0.000159U | 0.0024U | 0.00292U |
| Uranium-233/234 | pCi/g | -0.000276U | 0.00135U | 0.000615U |
| Uranium-235/236 | pCi/g | 0.000344U | 0.000842U | 0.000382U |
| Uranium-238 | pCi/g | 0U | 0.000677U | 0.000922U |
| | | *Off-site #3 cucumbers* | *Off-site #3 cucumbers (duplicate sample)* | *Off-site #3 gourds* |
| Americium-241 | pCi/g | 0.00163U | 0.00209U | 0.00222U |
| Neptunium-237 | pCi/g | 0U | -0.000319U | 0.000295U |
| Plutonium-238 | pCi/g | -0.000316U | 0.000357U | -0.000343U |
| Plutonium-239/240 | pCi/g | 0U | 0.00107U | 0.000685U |
| Technetium-99 | pCi/g | -0.0149U | -0.0144U | -0.0224U |
| Uranium | µg/g | 0.000000153U | 0.00107U | 0.000882U |
| Uranium-233/234 | pCi/g | 0.000952U | 0.000302U | 0.00178U |
| Uranium-235/236 | pCi/g | 0U | 0.000375U | 0U |
| Uranium-238 | pCi/g | 0U | 0.000302U | 0.000296U |
| | | *Off-site #3 tomatoes* | *Off-site #4 corn* | *Off-site #4 green beans* |
| Americium-241 | pCi/g | 0.00067U | 0.00142U | 0.00195U |
| Neptunium-237 | pCi/g | -0.000937U | -0.000317U | -0.000309U |
| Plutonium-238 | pCi/g | -0.00141U | 0.000395U | -0.000644U |
| Plutonium-239/240 | pCi/g | 0.000703U | 0.00079U | 0.00129U |
| Technetium-99 | pCi/g | -0.0113U | -0.0691U | -0.0472U |
| Uranium | µg/g | 0.000166U | -0.000000108U | 0.00378U |
| Uranium-233/234 | pCi/g | 0U | -0.000669U | 0.00029U |
| Uranium-235/236 | pCi/g | 0.000359U | 0U | 0.00072U |
| Uranium-238 | pCi/g | 0U | 0U | 0.00116U |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.17. Biota (crops) monitoring program results – 2017 (continued)**

| Parameter | Unit | Location/crop/results[a,b] | | |
|---|---|---|---|---|
| | | *Off-site #4 tomatoes* | *Off-site #5 blackberries* | |
| Americium-241 | pCi/g | 0.000327U | 0.00206U | |
| Neptunium-237 | pCi/g | 0.00104U | 0U | |
| Plutonium-238 | pCi/g | 0U | 0U | |
| Plutonium-239/240 | pCi/g | 0U | 0.0012U | |
| Technetium-99 | pCi/g | 0.00552U | -0.0311U | |
| Uranium | µg/g | -0.00214U | 0.000331U | |
| Uranium-233/234 | pCi/g | 0.000657U | 0U | |
| Uranium-235/236 | pCi/g | -0.000409U | 0.000715U | |
| Uranium-238 | pCi/g | -0.00657U | 0U | |
| | | *Off-site #5 corn* | *Off-site #5 corn (duplicate sample)* | *Off-site #5 hops* |
| Americium-241 | pCi/g | 0.000315U | 0.00212U | 0.00179U |
| Neptunium-237 | pCi/g | -0.000579U | 0U | 0U |
| Plutonium-238 | pCi/g | 0.00058U | -0.000708U | 0U |
| Plutonium-239/240 | pCi/g | 0.00029U | 0.00283U | 0.0012U |
| Technetium-99 | pCi/g | -0.0329U | -0.0837U | 0.0145U |
| Uranium | µg/g | 0.00205U | 0.00207U | 0.00376U |
| Uranium-233/234 | pCi/g | 0.000289U | 0.000582U | 0.000822U |
| Uranium-235/236 | pCi/g | 0.000719U | 0.000724U | -0.000682U |
| Uranium-238 | pCi/g | 0.000578U | 0.000582U | 0.00137U |
| | | *Off-site #6 corn* | *Off-site #6 tomatoes* | *Off-site #6 zucchini* |
| Americium-241 | pCi/g | 0.00261U | 0.00128U | 0.00156U |
| Neptunium-237 | pCi/g | 0.000289U | 0U | 0.000979U |
| Plutonium-238 | pCi/g | 0.000343U | 0.000637U | 0.0007U |
| Plutonium-239/240 | pCi/g | 0.00137U | 0.00191U | 0.0014U |
| Technetium-99 | pCi/g | -0.0849U | 0.00681U | 0.0389U |
| Uranium | µg/g | -0.000755U | 0.00106U | 0.00422U |
| Uranium-233/234 | pCi/g | 0.000315U | 0.000894U | 0.000338U |
| Uranium-235/236 | pCi/g | 0.000392U | 0.000371U | 0.000421U |
| Uranium-238 | pCi/g | -0.000315U | 0.000298U | 0.00135U |

[a]Abbreviations and data qualifiers are as follows: U – undetected.
[b]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.18. Biota (deer) monitoring program results – 2017**

| Parameter | Unit | August 2017[a,b] | October 2017[a,b] | October 2017[a,b] |
|---|---|---|---|---|
| | | *liver* | | |
| Americium-241 | pCi/g | 0.00152U | 0.000301U | 0.00275UJ |
| Neptunium-237 | pCi/g | -0.00042U | 0.0003U | 0U |
| Plutonium-238 | pCi/g | 0.00133U | -0.00073U | 0U |
| Plutonium-239/240 | pCi/g | 0U | 0.000367U | 0.000727U |
| Technetium-99 | pCi/g | -0.0118U | 0.0758U | 0.0332U |
| Uranium | µg/g | 0.00136UJ | 0.000964U | 0.000586U |
| Uranium-233/234 | pCi/g | 0.00137U | 0.00163U | -0.00051U |
| Uranium-235/236 | pCi/g | 0UJ | 0.000338U | 0.00127U |
| Uranium-238 | pCi/g | 0.000458U | 0.000271U | 0U |
| | | *muscle* | | |
| Americium-241 | pCi/g | 0.000845U | 0.00091U | 0.000857U |
| Neptunium-237 | pCi/g | -0.00078U | -0.00033U | -0.00029U |
| Plutonium-238 | pCi/g | 0.000453U | -0.00031U | -0.00031U |
| Plutonium-239/240 | pCi/g | 0.000454U | 0.00094U | 0.000314U |
| Technetium-99 | pCi/g | -0.0213U | 0.0826U | 0.0485U |
| Uranium | µg/g | 0.0054UJ | 0.00275U | 0.00203U |
| Uranium-233/234 | pCi/g | 0.000433U | 0.000545U | 0U |
| Uranium-235/236 | pCi/g | 0.000538UJ | 0.000678U | -0.00047U |
| Uranium-238 | pCi/g | 0.00173U | 0.000818U | 0.000757U |
| | | *kidney* | | |
| Americium-241 | pCi/g | 0.0015U | 0.000779U | 0.000293U |
| Neptunium-237 | pCi/g | 0.000385U | 0.000548U | -0.00026U |
| Plutonium-238 | pCi/g | 0U | -0.00028U | 0U |
| Plutonium-239/240 | pCi/g | 0.00211U | 0.00111U | 0.000377U |
| Technetium-99 | pCi/g | -0.00558U | 0.045U | 0.0891UJ |
| Uranium | µg/g | 0.00207UJ | 0.00398U | 0.000827U |
| Uranium-233/234 | pCi/g | 0.000861U | 0.000772U | 0.000556U |
| Uranium-235/236 | pCi/g | -0.00107UJ | 0.00032U | 0U |
| Uranium-238 | pCi/g | 0.000861U | 0.00129U | 0.000278U |

[a]Abbreviations and data qualifiers are as follows: U – undetected.  J – the reported result is estimated.
[b]Because of the statistical nature of radiation detection, results for samples that have no radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 2.19. Biota (off-site dairy) monitoring program
results– 2017**

| Parameter | Unit | Milk[a,b] | Eggs[a,b] |
|-----------|------|-----------|-----------|
| Americium-241 | pCi/g | 0U | 0.000319U |
| Neptunium-237 | pCi/g | -0.00031U | 0U |
| Plutonium-238 | pCi/g | 0U | 0U |
| Plutonium-239/240 | pCi/g | 0.0012U | -0.00034U |
| Technetium-99 | pCi/g | -0.114U | -0.0782U |
| Uranium | µg/g | 0.00175U | 0.00176U |
| Uranium-233/234 | pCi/g | -0.0008U | 0U |
| Uranium-235/236 | pCi/g | 0.000333U | 0U |
| Uranium-238 | pCi/g | 0.000536U | 0.000591U |

[a]Abbreviations and data qualifiers are as follows: U – undetected.
[b]Because of the statistical nature of radiation detection, results for samples that have no
radioactivity are often negative values because background radioactivity is subtracted out.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# 3. DOSE

This section provides summary tables of air emissions and dose assessments completed by DOE for compliance with the National Emission Standards for Hazardous Air Pollutants for airborne radionuclide emissions. The following tables are provided in this section:

- Table 3.1. Emissions (Ci/year) from DOE air emission sources – 2017

- Table 3.2. Predicted radiation doses from airborne releases at PORTS – 2017

- Table 3.3. Dose calculations for ambient air monitoring stations – 2017.

**Table 3.1. Emissions (Ci/year) from DOE air emission sources – 2017**

| Radionuclide | Group 1[a] | Group 2[b] | Group 3[c] | DUF$_6$ facility[d] |
|---|---|---|---|---|
| Americium-241 | 2.95E-07 | - | 5.43E-06 | - |
| Neptunium-237 | 4.19E-08 | - | 1.16E-05 | - |
| Plutonium-238 | 6.04E-08 | - | 5.56E-07 | - |
| Plutonium-239/240 | 2.45E-07 | - | 3.92E-05 | - |
| Technetium-99 | 5.25E-04 | 2.34E-03 | 6.10E-02 | - |
| Uranium-233/234 | 5.64E-05 | 2.46E-05 | 1.10E-03 | 1.70E-06 |
| Uranium-235 | 4.12E-06 | 3.01E-06 | 6.16E-05 | 7.90E-08 |
| Uranium-238 | 4.357E-04 | 2.41E-05 | 3.11E-04 | 4.20E-06 |
| Thorium-228 | 3.74E-08 | 1.39E-07 | 1.39E-07 | - |
| Thorium-230 | 3.75E-05 | 4.27E-06 | 3.28E-06 | - |
| Thorium-231 | 3.61E-06 | 2.46E-05 | 3.54E-05 | 2.1E-07 |
| Thorium-232 | 2.29E-09 | 1.49E-07 | 1.13E-07 | - |
| Thorium-234 | 4.18E-04 | 3.01E-06 | 4.30E-05 | 1.9E-05 |
| Protactinium-234m | 4.18E-04 | 3.01E-06 | 4.30E-05 | 1.9E-05 |
| Total | 1.90E-03 | 2.43E-03 | 6.27E-02 | 4.42E-05 |

[a]Group 1 consists of the X-710 Vents and X-622 Groundwater Treatment Facility.
[b]Group 2 consists of the X-344A Gulper Vent and X-344A Cold Trap Vent.
[c]Group 3 consists of the X-330 Vents, X-333 Vents, X-705 Vents, X-623 Groundwater Treatment Facility, X-624 Groundwater Treatment Facility, and X-627 Groundwater Treatment Facility.
[d]DUF$_6$ – depleted uranium hexafluoride.

Note: Measurements are provided in scientific notation. The number and sign (+ or -) to the right of the "E" indicate the number of places to the right or left of the decimal point. For example, 3.4E-04 is 0.00034 (the decimal point moves four places to the left); 2.1E+02 is 210 (the decimal point moves two places to the right).

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 3.2. Predicted radiation doses from airborne releases
at PORTS – 2017**

| Effective dose to: | |
|---|---|
| Maximally exposed individual (mrem/year) | 0.12 |
| Population[a] (person-rem/year) | 0.47 |

[a]Population within 50 miles (80 kilometers) of plant site.

**Table 3.3. Dose calculations for ambient air monitoring stations – 2017**

| Station | Parameter[a] | Dose[b] (mrem/year) | Total dose for station[c] | Net dose for station[d] |
|---|---|---|---|---|
| A3 | Americium-241 | 3.6E-09 | | |
| | Neptunium-237 | 1.4E-09 | | |
| | Plutonium-238 | 0 | | |
| | Plutonium-239/240 | 2.4E-09 | | |
| | **Technetium-99** | 5.8E-04 | | |
| | **Uranium-233/234** | 9.4E-07 | | |
| | Uranium-235/236 | 2.5E-08 | (0.00058) | (0.00026) |
| | Uranium-238 | 3.5E-07 | 5.8E-04 | 2.6E-04 |
| A6 | Americium-241 | 2.9E-09 | | |
| | Neptunium-237 | 1.3E-09 | | |
| | Plutonium-238 | 7.8E-10 | | |
| | Plutonium-239/240 | 1.7E-09 | | |
| | **Technetium-99** | 3.6E-04 | | |
| | **Uranium-233/234** | 7.5E-07 | | |
| | Uranium-235/236 | 3.3E-08 | (0.00037) | (0.000050) |
| | Uranium-238 | 4.6E-07 | 3.7E-04 | 5.0E-05 |
| A8 | Americium-241 | 2.4E-09 | | |
| | Neptunium-237 | 2.8E-09 | | |
| | Plutonium-238 | 1.1E-09 | | |
| | Plutonium-239/240 | 1.1E-09 | | |
| | **Technetium-99** | 3.9E-04 | | |
| | **Uranium-233/234** | 7.6E-07 | | |
| | Uranium-235/236 | 3.5E-08 | (0.00039) | (0.000070) |
| | Uranium-238 | 3.0E-07 | 3.9E-04 | 7.0E-05 |
| A9 | Americium-241 | 1.9E-09 | | |
| | Neptunium-237 | 7.4E-10 | | |
| | Plutonium-238 | 7.0E-10 | | |
| | Plutonium-239/240 | 2.2E-09 | | |
| | **Technetium-99** | 3.4E-04 | | |
| | **Uranium-233/234** | 8.5E-07 | | |
| | Uranium-235/236 | 2.9E-08 | (0.00034) | (0.000020) |
| | **Uranium-238** | 8.9E-07 | 3.4E-04 | 2.0E-05 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 3.3. Dose calculations for ambient air monitoring stations – 2017 (continued)**

| Station | Parameter[a] | Dose[b] (mrem/year) | Total dose for station[c] | Net dose for station[d] |
|---|---|---|---|---|
| A10 | Americium-241 | 6.8E-07 | | |
| | Neptunium-237 | 5.0E-08 | | |
| | Plutonium-238 | 2.0E-09 | | |
| | Plutonium-239/240 | 1.5E-08 | | |
| | **Technetium-99** | 2.5E-04 | | |
| | **Uranium-233/234** | 1.1E-06 | | |
| | Uranium-235/236 | 4.1E-08 | (0.00025) | |
| | Uranium-238 | 4.7E-07 | 2.5E-04 | 0 |
| A12 | Americium-241 | 1.9E-06 | | |
| | Neptunium-237 | 3.6E-08 | | |
| | Plutonium-238 | 1.7E-09 | | |
| | Plutonium-239/240 | 1.5E-08 | | |
| | **Technetium-99** | 1.7E-04 | | |
| | **Uranium-233/234** | 1.1E-06 | | |
| | Uranium-235/236 | 3.3E-08 | (0.00017) | |
| | Uranium-238 | 3.9E-07 | 1.7E-04 | 0 |
| A15 | Americium-241 | 8.8E-07 | | |
| | Neptunium-237 | 7.2E-08 | | |
| | Plutonium-238 | 2.6E-09 | | |
| | Plutonium-239/240 | 1.9E-08 | | |
| | **Technetium-99** | 3.3E-04 | | |
| | Uranium-233/234 | 3.3E-07 | | |
| | Uranium-235/236 | 2.5E-08 | (0.00033) | (0.000010) |
| | Uranium-238 | 3.4E-07 | 3.3E-04 | 1.0E-05 |
| A23 | Americium-241 | 5.9E-07 | | |
| | Neptunium-237 | 3.8E-08 | | |
| | Plutonium-238 | 1.7E-09 | | |
| | Plutonium-239/240 | 1.6E-08 | | |
| | **Technetium-99** | 3.0E-04 | | |
| | **Uranium-233/234** | 7.7E-07 | | |
| | Uranium-235/236 | 2.6E-08 | (0.00030) | |
| | **Uranium-238** | 9.7E-07 | 3.0E-04 | 0 |
| A24 | Americium-241 | 1.7E-06 | | |
| | Neptunium-237 | 2.8E-07 | | |
| | Plutonium-238 | 4.7E-09 | | |
| | Plutonium-239/240 | 2.5E-08 | | |
| | **Technetium-99** | 2.5E-04 | | |
| | **Uranium-233/234** | 9.4E-07 | | |
| | Uranium-235/236 | 2.6E-08 | (0.00026) | |
| | **Uranium-238** | 8.7E-07 | 2.6E-04 | 0 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 3.3. Dose calculations for ambient air monitoring stations – 2017 (continued)**

| Station | Parameter[a] | Dose[b] (mrem/year) | Total dose for station[c] | Net dose for station[d] |
|---------|-----------|---------------|------------------|----------------|
| A28 | Americium-241 | 3.2E-07 | | |
| | **Neptunium-237** | 1.1E-07 | | |
| | Plutonium-238 | 1.4E-09 | | |
| | Plutonium-239/240 | 1.3E-08 | | |
| | **Technetium-99** | 1.9E-04 | | |
| | Uranium-233/234 | 3.7E-07 | | |
| | Uranium-235/236 | 2.1E-08 | (0.00019) | |
| | Uranium-238 | 3.6E-07 | 1.9E-04 | 0 |
| A29 | Americium-241 | 7.9E-07 | | |
| | Neptunium-237 | 4.8E-08 | | |
| | Plutonium-238 | 1.1E-09 | | |
| | Plutonium-239/240 | 1.6E-08 | | |
| | **Technetium-99** | 2.1E-04 | | |
| | Uranium-233/234 | 4.3E-07 | | |
| | Uranium-235/236 | 2.3E-08 | (0.00022) | |
| | Uranium-238 | 3.8E-07 | 2.2E-04 | 0 |
| A36 | Americium-241 | 3.1E-09 | | |
| | Neptunium-237 | 2.8E-09 | | |
| | Plutonium-238 | 2.8E-09 | | |
| | Plutonium-239/240 | 1.8E-09 | | |
| | **Technetium-99** | 7.8E-04 | | |
| | **Uranium-233/234** | 2.5E-06 | | |
| | Uranium-235/236 | 3.5E-08 | (0.00078) | (0.00046) |
| | **Uranium-238** | 3.4E-06 | 7.8E-04 | 4.6E-04 |
| A37 | Americium-241 | 4.8E-09 | | |
| | Neptunium-237 | 2.3E-09 | | |
| | Plutonium-238 | 7.0E-10 | | |
| | Plutonium-239/240 | 1.9E-09 | | |
| | **Technetium-99** | 3.2E-04 | | |
| | Uranium-233/234 | 2.7E-07 | | |
| | Uranium-235/236 | 2.3E-08 | (0.00032) | |
| | Uranium-238 | 3.8E-07 | 3.2E-04 | - |
| A41A | Americium-241 | 3.0E-09 | | |
| | **Neptunium-237** | 3.3E-07 | | |
| | Plutonium-238 | 1.6E-09 | | |
| | Plutonium-239/240 | 2.5E-09 | | |
| | **Technetium-99** | 3.6E-04 | | |
| | **Uranium-233/234** | 7.5E-07 | | |
| | Uranium-235/236 | 3.0E-08 | (0.00037) | (0.000050) |
| | **Uranium-238** | 7.9E-07 | 3.7E-04 | 5.0E-05 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 3.3. Dose calculations for ambient air monitoring stations – 2017 (continued)**

| Station | Parameter[a] | Dose[b] (mrem/year) | Total dose for station[c] | Net dose for station[d] |
|---------|-----------|------|------|------|
| T7 | Americium-241 | 2.4E-09 | | |
| | Neptunium-237 | 1.5E-09 | | |
| | Plutonium-238 | 3.7E-10 | | |
| | Plutonium-239/240 | 2.1E-09 | | |
| | **Technetium-99** | 1.7E-04 | | |
| | **Uranium-233/234** | 7.2E-07 | | |
| | Uranium-235/236 | 3.3E-08 | (0.00017) | |
| | Uranium-238 | 3.9E-07 | 1.7E-04 | 0 |

[a]Parameters listed in **bold** type were detected at least once in the samples collected in 2017 (see Table 2.9).
[b]The dose calculation is based on the maximum detection of each parameter at each station. For parameters that were not detected, half of the highest undetected result for the parameter was used to calculate the activity of each parameter in ambient air that is the basis for the dose. Measurements are provided in scientific notation. The number and sign (+ or -) to the right of the "E" indicate the number of places to the right or left of the decimal point. For example, 3.4E-04 is 0.00034 (the decimal point moves four places to the left); 2.1E+02 is 210 (the decimal point moves two places to the right).
[c]The total dose is provided in scientific notation and standard numeric format (in parentheses).
[d]The net dose is calculated by subtracting the total dose at Station A37 (background) from the total dose calculated for each station (the net dose is recorded as zero for stations with a gross dose less than the background station). The net dose is provided in scientific notation and standard numeric format (in parentheses).

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# 4. GROUNDWATER

This section summarizes analytical results for routine groundwater monitoring at PORTS in 2017 at the following locations:

- X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility
- Peter Kiewit (PK) Landfill
- Quadrant I Groundwater Investigative (5-Unit) Area
- X-749A Classified Materials Disposal Facility
- Quadrant II Groundwater Investigative (7-Unit) Area
- X-701B Former Holding Pond
- X-633 Former Recirculating Cooling Water Complex
- X-616 Former Chromium Sludge Surface Impoundments
- X-740 Former Waste Oil Handling Facility
- X-611A Former Lime Sludge Lagoons
- X-735 Landfills
- X-734 Landfills
- X-533 Former Switchyard Complex
- X-344C Former Hydrogen Fluoride Storage Building
- Surface water monitoring locations
- Exit pathway monitoring locations.

Results for radiological parameters and VOCs are reported in this section. Only those VOCs that were detected in at least one sampling event are listed in this section.

All results are included for radiological parameters, even if a specific constituent was not detected at a specific well or location during any sampling event in 2017. Sampling for radionuclides is not part of the monitoring programs for PK Landfill, X-633 Former Recirculating Cooling Water Complex, X-616 Former Chromium Sludge Surface Impoundments, X-740 Former Waste Oil Handling Facility, X-611A Former Lime Sludge Lagoons, X-533 Former Switchyard Complex, and X-344C Former Hydrogen Fluoride Storage Building.

Results for chromium at the X-616 Former Chromium Sludge Surface Impoundments are included in this section because chromium is a primary contaminant in this area. Results are provided for metals at the X-633 Former Recirculating Cooling Water Complex, X-611A Former Lime Sludge Lagoons, and X-533 Former Switchyard Complex because metals are the only analytical parameters for these areas.

Two VOCs, acetone and methylene chloride, were frequently detected in both environmental and blank samples (field and trip blanks) collected in 2017. Acetone and methylene chloride are common laboratory contaminants that are not typically detected in the PORTS groundwater plumes. Detections of acetone and methylene chloride are often qualified by the laboratory with a "B", which indicates that the analyte was also detected in the laboratory blank associated with the environmental sample and may be present due to laboratory contamination.

Other VOCs, including 2-butanone, tetrachloroethene, TCE, and 1,2-dichlorobenzene were detected in trip and/or field blanks during 2017. These detections indicate that samples (both environmental samples and blank samples) may become contaminated with low concentrations of VOCs during other portions of the sampling process, although contamination can still occur in the laboratory. Other sources of contamination may include storage areas for sampling equipment (such as bottles and blank water), areas

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

in which samples are collected or prepared, sample containers, and storage areas after samples are collected (such as refrigerators or sample shipping containers).

The primary purpose of the groundwater data is to determine the nature and extent of contamination in groundwater and associated surface water at PORTS. Data collected in 2017 meet this purpose.

Complete groundwater monitoring results for sampling completed as required by the *Integrated Groundwater Monitoring Plan* (DOE 2015, DOE 2017) are provided in the *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* (DOE 2018). The *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant* also provides the following information not included in this Data Report:

- Results for special studies conducted during 2017 at the X-633 Former Recirculating Cooling Water Complex and X-630 Former Recirculating Cooling Water Complex.

- Results for duplicate samples (samples collected from the same location, at the same time, and from the same sampling device as the regular sample), which are collected at a frequency of one per ten sampling locations per groundwater monitoring area. Duplicate samples are analyzed for the same parameters as the regular sample associated with the sampling location.

The following tables are included in this section:

- Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017

- Table 4.2. Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017

- Table 4.3. VOCs detected at the PK Landfill – 2017

- Table 4.4. VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017

- Table 4.5. Results for radionuclides at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017

- Table 4.6. VOCs detected at the X-749A Classified Materials Disposal Facility – 2017

- Table 4.7. Results for radionuclides at the X-749A Classified Materials Disposal Facility – 2017

- Table 4.8. VOCs detected at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017

- Table 4.9. Results for radionuclides at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017

- Table 4.10. VOCs detected at the X-701B Former Holding Pond – 2017

- Table 4.11. Results for radionuclides at the X-701B Former Holding Pond – 2017

- Table 4.12. Results for chromium at the X-633 Former Recirculating Cooling Water Complex – 2017

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

- Table 4.13. VOCs detected at the X-616 Former Chromium Sludge Surface Impoundments – 2017

- Table 4.14. Results for chromium at the X-616 Former Chromium Sludge Surface Impoundments – 2017

- Table 4.15. VOCs detected at the X-740 Former Waste Oil Handling Facility – 2017

- Table 4.16. Results for beryllium and chromium at the X-611A Former Lime Sludge Lagoons – 2017

- Table 4.17. VOCs detected at the X-735 Landfills – 2017

- Table 4.18. Results for radionuclides at the X-735 Landfills – 2017

- Table 4.19. VOCs detected at the X-734 Landfills – 2017

- Table 4.20. Results for radionuclides at the X-734 Landfills – 2017

- Table 4.21. Results for cadmium and nickel at the X-533 Former Switchyard Complex – 2017

- Table 4.22. VOCs detected at the X-344C Former Hydrogen Fluoride Storage Building – 2017

- Table 4.23. VOCs detected at surface water monitoring locations – 2017

- Table 4.24. Results for radionuclides at surface water monitoring locations – 2017.

Tables for VOCs and radionuclides detected at exit pathway monitoring location F-29B are not provided because none were detected. Results for exit pathway monitoring locations sampled during 2017 (that are part of the monitoring programs for other areas) are provided in the tables for their respective monitoring areas as follows:

- Tables 4.1 and 4.2: VOCs and/or radionuclides detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility (wells X749-14B, X749-44G, X749-45G, X749-64B, X749-68G, X749-96G, X749-97G, and X749-98G).

- Table 4.11: Results for radionuclides at X-701B Former Holding Pond area well X701-48G (VOCs were not detected in well X701-48G in 2017).

- Tables 4.23 and 4.24: VOCs and/or radionuclides detected at surface water monitoring locations BRC-SW02, LBC-SW04, UND-SW02, and WDD-SW03.

The following laboratory data qualifiers are used in the tables in this section:

| Data qualifier | Meaning |
|---|---|
| B | The analyte was detected in the laboratory blank sample. |
| D | The reported result is from a dilution. |
| J | The reported value is estimated. |
| Q | One or more quality control criteria failed. |
| U | Undetected |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| F-27G | 1,1-Dichloroethane | µg/L | | | 0.71 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.73 J | |
| | Trichloroethene | µg/L | | | 1.8 Q | |
| PK-07G | Trichloroethene | µg/L | | | 0.38 J | |
| PK-08G | cis-1,2-Dichloroethene | µg/L | | | 0.34 J | |
| | Trichloroethene | µg/L | | | 15 | |
| PK-09G | cis-1,2-Dichloroethene | µg/L | | | 8.6 D | |
| | Trichloroethene | µg/L | | | 480 D | |
| STSW-101G | 1,1,1-Trichloroethane | µg/L | | 4.6 | | 3.9 |
| | 1,1,2-Trichloroethane | µg/L | | 0.46 J | | 0.32 U |
| | 1,1-Dichloroethane | µg/L | | 15 J | | 14 |
| | 1,1-Dichloroethene | µg/L | | 35 J | | 31 |
| | 1,2-Dichloroethane | µg/L | | 2.8 | | 1.9 |
| | Chloroform | µg/L | | 1.2 | | 0.96 J |
| | cis-1,2-Dichloroethene | µg/L | | 10 | | 9.3 |
| | Tetrachloroethene | µg/L | | 0.71 J | | 0.7 J |
| | Trichloroethene | µg/L | | 37 J | | 36 |
| STSW-102G | 1,1,1-Trichloroethane | µg/L | | 5.1 | | 5 |
| | 1,1-Dichloroethane | µg/L | | 55 | | 75 D |
| | 1,1-Dichloroethene | µg/L | | 28 | | 34 J |
| | 1,2-Dichloroethane | µg/L | | 19 | | 21 |
| | Acetone | µg/L | | 1.9 U | | 7.4 JQ |
| | Benzene | µg/L | | 0.17 J | | 0.16 U |
| | Chloroform | µg/L | | 2.9 | | 3 |
| | cis-1,2-Dichloroethene | µg/L | | 18 | | 19 |
| | trans-1,2-Dichloroethene | µg/L | | 0.15 U | | 0.21 J |
| | Trichloroethene | µg/L | | 160 DJ | | 170 D |
| | Vinyl chloride | µg/L | | 0.22 J | | 0.22 J |
| WP-01G | Acetone | µg/L | | 1.9 U | | 5 J |
| WP-06G | Acetone | µg/L | | 1.9 U | | 8.8 J |
| X120-03G | Chloroform | µg/L | | | 0.25 J | |
| X120-05G | Trichloroethene | µg/L | | | 2 | |
| X120-06B | Trichloroethene | µg/L | | | 0.76 J | |
| X120-08G | 1,1,1-Trichloroethane | µg/L | | | 3.2 | |
| | 1,1,2-Trichloroethane | µg/L | | | 0.61 J | |
| | 1,1-Dichloroethane | µg/L | | | 7.4 | |
| | 1,1-Dichloroethene | µg/L | | | 24 J | |
| | 1,2-Dichloroethane | µg/L | | | 0.77 J | |
| | Chloroform | µg/L | | | 0.83 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.68 J | |
| | Tetrachloroethene | µg/L | | | 0.22 J | |
| | Trichloroethene | µg/L | | | 15 J | |
| X120-09G | 1,1,1-Trichloroethane | µg/L | | | 3.7 | |
| | 1,1,2-Trichloroethane | µg/L | | | 0.5 J | |
| | 1,1-Dichloroethane | µg/L | | | 7.1 | |
| | 1,1-Dichloroethene | µg/L | | | 21 | |
| | 1,2-Dichloroethane | µg/L | | | 0.77 J | |
| | Chloroform | µg/L | | | 0.76 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.79 J | |
| | Tetrachloroethene | µg/L | | | 0.26 J | |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X120-09G | Trichloroethene | µg/L | | | 16 | |
| X120-10G | 1,1,1-Trichloroethane | µg/L | | | 4.4 | |
| | 1,1,2-Trichloroethane | µg/L | | | 1.2 | |
| | 1,1-Dichloroethane | µg/L | | | 15 | |
| | 1,1-Dichloroethene | µg/L | | | 50 J | |
| | 1,2-Dichloroethane | µg/L | | | 1.2 | |
| | Chloroform | µg/L | | | 1.4 | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.72 J | |
| | Methylene chloride | µg/L | | | 0.77 J | |
| | Trichloroethene | µg/L | | | 12 J | |
| X120-11G | 1,1-Dichloroethene | µg/L | | 0.59 J | | 0.76 J |
| | Acetone | µg/L | | 1.9 QU | | 13 |
| | cis-1,2-Dichloroethene | µg/L | | 8.7 | | 11 |
| | trans-1,2-Dichloroethene | µg/L | | 0.21 J | | 0.29 J |
| | Trichloroethene | µg/L | | 220 D | | 210 D |
| | Vinyl chloride | µg/L | | 0.1 JQU | | 0.19 J |
| X749-04G | Chloroform | µg/L | | | 0.24 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.48 J | |
| | Tetrachloroethene | µg/L | | | 0.56 J | |
| | Trichloroethene | µg/L | | | 260 D | |
| X749-05G | 1,1-Dichloroethane | µg/L | | | 0.61 J | |
| | 1,1-Dichloroethene | µg/L | | | 0.35 J | |
| | Carbon tetrachloride | µg/L | | | 0.29 J | |
| | Chloroform | µg/L | | | 0.86 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.88 J | |
| | Tetrachloroethene | µg/L | | | 1.7 | |
| | Trichloroethene | µg/L | | | 100 D | |
| X749-06G | 1,1,1-Trichloroethane | µg/L | | 28 D | | 22 D |
| | 1,1,2-Trichloroethane | µg/L | | 1.3 QU | | 3.7 D |
| | 1,1-Dichloroethane | µg/L | | 160 D | | 200 D |
| | 1,1-Dichloroethene | µg/L | | 110 D | | 120 D |
| | 1,2-Dichloroethane | µg/L | | 4.1 D | | 3.5 D |
| | Benzene | µg/L | | 0.64 U | | 0.33 DJ |
| | Chloroform | µg/L | | 16 D | | 16 D |
| | cis-1,2-Dichloroethene | µg/L | | 39 D | | 50 D |
| | Tetrachloroethene | µg/L | | 12 D | | 14 D |
| | Trichloroethene | µg/L | | 610 D | | 640 D |
| | Vinyl chloride | µg/L | | 0.4 U | | 1.2 DJ |
| X749-07G | 1,1,1,2-Tetrachloroethane | µg/L | | 0.17 J | | |
| | 1,1,1-Trichloroethane | µg/L | | 8.3 | | 7.5 |
| | 1,1-Dichloroethane | µg/L | | 35 J | | 30 |
| | 1,1-Dichloroethene | µg/L | | 21 J | | 18 |
| | 1,2-Dichloroethane | µg/L | | 19 J | | 14 |
| | Chloroform | µg/L | | 1.4 | | 1.2 |
| | cis-1,2-Dichloroethene | µg/L | | | | 6 |
| | Tetrachloroethene | µg/L | | 0.35 J | | 0.38 J |
| | Trichloroethene | µg/L | | 70 DQJ | | 64 D |
| | Vinyl chloride | µg/L | | 0.1 U | | 0.28 J |
| X749-08G | 1,1,1-Trichloroethane | µg/L | | 7.5 | | 4.2 |
| | 1,1-Dichloroethane | µg/L | | 1.9 | | 1.1 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1.  VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-08G | 1,1-Dichloroethene | µg/L | | 7.6 | | 4.5 |
| | Chloroform | µg/L | | 0.21 J | | 0.16 U |
| | cis-1,2-Dichloroethene | µg/L | | | | 1.1 |
| | Trichloroethene | µg/L | | 14 | | 8 |
| X749-09GA | 1,1,1-Trichloroethane | µg/L | | 14 | | 6.8 |
| | 1,1-Dichloroethane | µg/L | | 4.3 | | 2.1 |
| | 1,1-Dichloroethene | µg/L | | 9.8 | | 4.9 |
| | 1,2-Dichloroethane | µg/L | | 0.69 J | | 0.13 U |
| | Chloroform | µg/L | | 0.36 J | | 0.16 U |
| | cis-1,2-Dichloroethene | µg/L | | 3.1 | | 1.3 |
| | trans-1,2-Dichloroethene | µg/L | | 0.23 J | | 0.15 U |
| | Trichloroethene | µg/L | | 13 | | 4.7 |
| X749-10GA | 1,1-Dichloroethane | µg/L | | 2.8 | | 1.5 |
| | 1,1-Dichloroethene | µg/L | | 4.9 | | 2.8 |
| | cis-1,2-Dichloroethene | µg/L | | | | 1.3 |
| | Trichloroethene | µg/L | | 0.27 J | | 0.28 J |
| | Vinyl chloride | µg/L | | 0.97 J | | 0.54 J |
| X749-13G | 1,1,1-Trichloroethane | µg/L | | 2.3 | | 2.8 |
| | 1,1-Dichloroethane | µg/L | | 0.84 J | | 0.86 J |
| | 1,1-Dichloroethene | µg/L | | 3.2 | | 4.4 |
| | Acetone | µg/L | | 2.3 J | | 1.9 U |
| | Chloroform | µg/L | | 0.16 U | | 0.2 J |
| | cis-1,2-Dichloroethene | µg/L | | 0.75 J | | 0.79 J |
| | Trichloroethene | µg/L | | 7.2 J | | 7.8 |
| X749-14B | Acetone | µg/L | | 2.4 J | | 1.9 U |
| X749-20G | 1,1,1-Trichloroethane | µg/L | | | 0.51 J | |
| | 1,1-Dichloroethane | µg/L | | | 1.3 | |
| | 1,1-Dichloroethene | µg/L | | | 1 | |
| | cis-1,2-Dichloroethene | µg/L | | | 1 | |
| | Methylene chloride | µg/L | | | 1.2 J | |
| | Trichloroethene | µg/L | | | 12 | |
| X749-21G | 1,1,1-Trichloroethane | µg/L | | 1.5 | | 4 |
| | 1,1-Dichloroethane | µg/L | | 0.48 J | | 1.3 |
| | 1,1-Dichloroethene | µg/L | | 0.93 J | | 2.6 |
| | cis-1,2-Dichloroethene | µg/L | | 0.22 J | | 0.6 J |
| | Trichloroethene | µg/L | | 2.2 | | 4.9 |
| X749-22G | 1,1,1-Trichloroethane | µg/L | | 0.18 J | | 0.16 U |
| | 1,1-Dichloroethane | µg/L | | 2.9 | | 3.2 |
| | 1,1-Dichloroethene | µg/L | | 3.6 | | 4.2 |
| | cis-1,2-Dichloroethene | µg/L | | 1.1 | | 1.2 |
| | Vinyl chloride | µg/L | | 0.63 J | | 0.64 J |
| X749-26G | 1,1,1-Trichloroethane | µg/L | | 3.7 | | 0.9 J |
| | 1,1-Dichloroethane | µg/L | | 11 | | 2.5 |
| | 1,1-Dichloroethene | µg/L | | 15 J | | 2.5 |
| | 1,2-Dichloroethane | µg/L | | 5.1 | | 1.1 |
| | Chloroform | µg/L | | 1.2 | | 0.21 J |
| | cis-1,2-Dichloroethene | µg/L | | 2.9 | | 0.47 J |
| | Tetrachloroethene | µg/L | | 0.28 J | | 0.2 U |
| | Trichloroethene | µg/L | | 25 J | | 4.8 J |
| X749-27G | 1,1,1-Trichloroethane | µg/L | | 30 | | 16 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-27G | 1,1,2-Trichloroethane | µg/L | | 1.1 Q | | 1 |
| | 1,1-Dichloroethane | µg/L | | 130 DQ | | 41 |
| | 1,1-Dichloroethene | µg/L | | 180 DQ | | 83 D |
| | 1,2-Dichloroethane | µg/L | | 75 DQ | | 14 |
| | Acetone | µg/L | | 1.9 U | | 6.2 J |
| | Benzene | µg/L | | 0.16 J | | 0.16 U |
| | Chloroethane | µg/L | | 1.5 J | | 0.48 J |
| | Chloroform | µg/L | | 14 Q | | 5.7 |
| | cis-1,2-Dichloroethene | µg/L | | 32 | | 13 |
| | Tetrachloroethene | µg/L | | 1.6 | | 1.5 |
| | trans-1,2-Dichloroethene | µg/L | | 0.33 JQ | | 0.15 J |
| | Trichloroethene | µg/L | | 230 D | | 130 D |
| | Vinyl chloride | µg/L | | 0.1 U | | 0.19 J |
| X749-28G | 1,1,1-Trichloroethane | µg/L | | | 4.3 | |
| | 1,1-Dichloroethane | µg/L | | | 3.2 | |
| | 1,1-Dichloroethene | µg/L | | | 9.4 | |
| | 1,2-Dichloroethane | µg/L | | | 0.35 J | |
| | Chloroform | µg/L | | | 0.67 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.64 J | |
| | Methylene chloride | µg/L | | | 1.3 BJ | |
| | Trichloroethene | µg/L | | | 29 J | |
| X749-29G | 1,1-Dichloroethene | µg/L | | | 0.32 J | |
| | Chloroform | µg/L | | | 0.3 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.61 J | |
| | Trichloroethene | µg/L | | | 34 | |
| X749-30G | 1,1-Dichloroethene | µg/L | | | 1.7 | |
| | Chloroform | µg/L | | | 0.59 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 1.2 | |
| | Trichloroethene | µg/L | | | 57 | |
| X749-33G | 1,1,1-Trichloroethane | µg/L | | 11 | | 14 |
| | 1,1,2-Trichloroethane | µg/L | | 0.32 QU | | 1.3 |
| | 1,1-Dichloroethane | µg/L | | 37 Q | | 41 |
| | 1,1-Dichloroethene | µg/L | | 55 Q | | 76 D |
| | 1,2-Dichloroethane | µg/L | | 15 Q | | 15 |
| | Acetone | µg/L | | 1.9 U | | 8.1 J |
| | Chloroethane | µg/L | | 0.51 J | | 0.43 J |
| | Chloroform | µg/L | | 4.2 Q | | 4.9 |
| | cis-1,2-Dichloroethene | µg/L | | 5.9 | | 9.3 |
| | Tetrachloroethene | µg/L | | 1.2 | | 1.4 |
| | Trichloroethene | µg/L | | 100 D | | 120 D |
| X749-35G | 1,1,1-Trichloroethane | µg/L | | | 36 | |
| | 1,1-Dichloroethane | µg/L | | | 5.7 | |
| | 1,1-Dichloroethene | µg/L | | | 19 | |
| | cis-1,2-Dichloroethene | µg/L | | | 3.5 | |
| | Tetrachloroethene | µg/L | | | 0.24 J | |
| | Trichloroethene | µg/L | | | 57 | |
| | Vinyl chloride | µg/L | | | 0.34 J | |
| X749-36G | 1,1,1-Trichloroethane | µg/L | | | 0.74 J | |
| | 1,1-Dichloroethane | µg/L | | | 1.5 | |
| | 1,1-Dichloroethene | µg/L | | | 5.2 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-36G | Chloroform | µg/L | | | 0.22 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.31 J | |
| | Trichloroethene | µg/L | | | 5.1 | |
| X749-37G | 1,1,1-Trichloroethane | µg/L | | 1.9 | | 2.1 |
| | 1,1-Dichloroethane | µg/L | | 7.6 Q | | 8.9 |
| | 1,1-Dichloroethene | µg/L | | 15 Q | | 21 J |
| | 1,2-Dichloroethane | µg/L | | 0.13 JQU | | 0.74 J |
| | Chloroform | µg/L | | 0.36 JQ | | 0.37 J |
| | cis-1,2-Dichloroethene | µg/L | | 3.3 | | 3.9 |
| | Tetrachloroethene | µg/L | | 0.34 J | | 0.4 J |
| | Trichloroethene | µg/L | | 17 | | 19 J |
| X749-38G | 1,1,1-Trichloroethane | µg/L | | 5.6 | | 8.9 |
| | 1,1,2-Trichloroethane | µg/L | | 0.61 J | | 0.32 U |
| | 1,1-Dichloroethane | µg/L | | 14 | | 23 |
| | 1,1-Dichloroethene | µg/L | | 39 | | 58 |
| | 1,2-Dichloroethane | µg/L | | 1.5 | | 2.4 |
| | Acetone | µg/L | | 1.9 U | | 2.6 J |
| | Chloroform | µg/L | | 1.3 | | 1.8 |
| | cis-1,2-Dichloroethene | µg/L | | 10 | | 14 |
| | Tetrachloroethene | µg/L | | 0.88 J | | 1.2 |
| | Trichloroethene | µg/L | | 41 | | 57 D |
| X749-40G | Chloroform | µg/L | | | 0.43 J | |
| | Trichloroethene | µg/L | | | 0.23 J | |
| X749-41G | Acetone | µg/L | | 7.6 U | | 22 D |
| | Chloroform | µg/L | | 0.64 U | | 0.36 DJ |
| | cis-1,2-Dichloroethene | µg/L | | 2.4 DJ | | 2.7 D |
| | trans-1,2-Dichloroethene | µg/L | | 1.1 DJ | | 0.85 DJ |
| | Trichloroethene | µg/L | | 370 D | | 590 D |
| X749-42G | 1,1,1-Trichloroethane | µg/L | | 0.54 J | | 0.52 J |
| | 1,1-Dichloroethane | µg/L | | 0.83 J | | 1.1 |
| | 1,1-Dichloroethene | µg/L | | 3.3 | | 3.8 |
| | Acetone | µg/L | | 1.9 U | | 5.9 J |
| | Chloroform | µg/L | | 0.16 U | | 0.18 J |
| | Trichloroethene | µg/L | | 3.1 | | 4.2 |
| X749-43G | 1,1,1-Trichloroethane | µg/L | | | 0.24 J | |
| | 1,1-Dichloroethane | µg/L | | | 0.47 J | |
| | 1,1-Dichloroethene | µg/L | | | 1.2 J | |
| | Trichloroethene | µg/L | | | 0.84 J | |
| X749-44G | 1,1-Dichloroethane | µg/L | 0.22 U | 0.18 J | 0.3 J | 0.16 J |
| | 1,1-Dichloroethene | µg/L | 0.23 U | 0.14 U | 0.23 J | 0.14 U |
| | Trichloroethene | µg/L | 0.36 J | 0.25 J | 0.6 J | 0.27 J |
| X749-45G | 1,1,1-Trichloroethane | µg/L | 0.24 J | 0.16 U | 0.16 U | 0.16 U |
| | 1,1-Dichloroethane | µg/L | 4.1 | 1.5 | 0.25 J | 0.23 J |
| | 1,1-Dichloroethene | µg/L | 2.8 | 0.93 J | 0.17 J | 0.14 U |
| | 1,2-Dichloroethane | µg/L | 1.2 | 0.13 U | 0.13 U | 0.13 U |
| | Acetone | µg/L | 1.9 U | 1.9 U | 1.9 U | 20 |
| | cis-1,2-Dichloroethene | µg/L | 4.9 | 1.2 | 0.21 J | 0.2 J |
| | Trichloroethene | µg/L | 8.4 | 3.6 | 0.73 J | 0.58 J |
| X749-50B | 1,1-Dichloroethane | µg/L | | | 0.88 J | |
| | Methylene chloride | µg/L | | | 0.87 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1.  VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-51B | Methylene chloride | µg/L | | | 0.85 J | |
| X749-54B | 1,1-Dichloroethane | µg/L | | 2.6 Q | | 2.8 |
| | Acetone | µg/L | | 1.9 U | | 6.6 J |
| | Trichloroethene | µg/L | | 0.72 J | | 5.1 |
| | Vinyl chloride | µg/L | | 0.1 U | | 0.45 J |
| X749-60B | Trichloroethene | µg/L | | | 1.8 | |
| X749-64B | Methylene chloride | µg/L | | | 0.83 J | |
| X749-67G | 1,1,1-Trichloroethane | µg/L | 6 | 7.8 | 7.6 | 6 |
| | 1,1,2-Trichloroethane | µg/L | 0.46 J | 0.32 JQU | 0.47 J | 0.38 J |
| | 1,1-Dichloroethane | µg/L | 73 D | 66 D | 85 D | 74 D |
| | 1,1-Dichloroethene | µg/L | 54 | 53 J | 58 | 50 |
| | 1,2-Dichloroethane | µg/L | 24 | 30 JQ | 24 | 22 |
| | Chloroethane | µg/L | 0.91 J | 1 J | 0.81 J | 0.69 J |
| | Chloroform | µg/L | 3.5 | 4 | 3.4 | 3.2 |
| | cis-1,2-Dichloroethene | µg/L | 42 | 45 J | 37 | 36 |
| | Tetrachloroethene | µg/L | 0.31 J | 0.23 J | 0.24 J | 0.2 U |
| | trans-1,2-Dichloroethene | µg/L | 0.42 J | 0.44 J | 0.39 J | 0.31 J |
| | Trichloroethene | µg/L | 220 D | 170 D | 240 D | 200 D |
| | Vinyl chloride | µg/L | 0.27 J | 0.4 J | 0.33 J | 0.24 J |
| X749-96G | Trichloroethene | µg/L | | 0.16 U | | 1.7 |
| X749-97G | 1,1-Dichloroethane | µg/L | 0.76 J | 0.16 U | 0.16 U | 0.2 J |
| | 1,1-Dichloroethene | µg/L | 0.25 J | 0.14 U | 0.14 U | 0.14 U |
| | 1,2-Dichloroethane | µg/L | 0.2 J | 0.13 U | 0.13 U | 0.13 U |
| | cis-1,2-Dichloroethene | µg/L | 0.39 J | 0.15 U | 0.15 U | 0.15 U |
| | Toluene | µg/L | 0.17 U | 0.21 J | 0.5 J | 0.17 QU |
| | Trichloroethene | µg/L | 1.4 | 0.28 J | 0.16 U | 0.16 U |
| X749-98G | Acetone | µg/L | | 3.5 J | | 1.9 U |
| | Trichloroethene | µg/L | | 0.16 U | | 0.2 J |
| X749-102G | 1,1,1-Trichloroethane | µg/L | 0.17 J | 0.19 J | 0.16 U | 0.16 U |
| | 1,1-Dichloroethane | µg/L | 0.76 J | 0.72 J | 0.19 J | 0.33 J |
| | 1,1-Dichloroethene | µg/L | 1 | 0.92 J | 0.21 J | 0.47 J |
| | 1,2-Dichloroethane | µg/L | 0.14 J | 0.13 U | 0.13 U | 0.13 U |
| | cis-1,2-Dichloroethene | µg/L | 0.16 J | 0.15 U | 0.15 U | 0.15 U |
| | Trichloroethene | µg/L | 1.2 | 1.1 | 0.28 J | 0.48 J |
| X749-103G | 1,1,1-Trichloroethane | µg/L | 0.18 J | 0.16 U | 0.16 U | 0.16 U |
| | 1,1-Dichloroethane | µg/L | 0.24 J | 0.22 U | 0.56 J | 0.75 J |
| | 1,1-Dichloroethene | µg/L | 0.33 J | 0.24 J | 0.9 J | 1.1 |
| | Acetone | µg/L | 1.9 U | 1.9 U | 1.9 U | 16 |
| | cis-1,2-Dichloroethene | µg/L | 0.15 U | 0.15 U | 0.15 U | 0.19 J |
| | Trichloroethene | µg/L | 0.44 J | 0.34 J | 0.87 J | 1.1 |
| X749-106G | 1,1,1-Trichloroethane | µg/L | | 12 | | 31 |
| | 1,1,2-Trichloroethane | µg/L | | 1.2 | | 2 |
| | 1,1-Dichloroethane | µg/L | | 22 | | 36 |
| | 1,1-Dichloroethene | µg/L | | 69 D | | 97 D |
| | 1,2-Dichloroethane | µg/L | | 2.1 | | 3.2 |
| | Acetone | µg/L | | 1.9 U | | 5.4 J |
| | Chloroform | µg/L | | 2.2 | | 3.6 |
| | cis-1,2-Dichloroethene | µg/L | | 3.4 | | 5 |
| | Tetrachloroethene | µg/L | | 0.88 J | | 1.5 |
| | Trichloroethene | µg/L | | 50 | | 87 D |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-106G | Vinyl chloride | µg/L | | 0.1 U | | 0.22 J |
| X749-107G | 1,1,1-Trichloroethane | µg/L | | 14 | | 12 |
| | 1,1,2-Trichloroethane | µg/L | | 1.6 | | 1.6 |
| | 1,1-Dichloroethane | µg/L | | 27 | | 26 |
| | 1,1-Dichloroethene | µg/L | | 83 D | | 70 DJ |
| | 1,2-Dichloroethane | µg/L | | 2.6 | | 2.6 |
| | Chloroform | µg/L | | 2.9 | | 2.4 |
| | cis-1,2-Dichloroethene | µg/L | | 4.4 | | 4.1 |
| | Tetrachloroethene | µg/L | | 0.96 J | | 0.85 J |
| | Trichloroethene | µg/L | | 57 D | | 58 |
| X749-108G | 1,1,1-Trichloroethane | µg/L | | 28 | | 11 |
| | 1,1,2-Trichloroethane | µg/L | | 1.8 | | 1.2 |
| | 1,1-Dichloroethane | µg/L | | 31 | | 23 |
| | 1,1-Dichloroethene | µg/L | | 86 D | | 63 D |
| | 1,2-Dichloroethane | µg/L | | 2.9 | | 2.2 |
| | Chloroform | µg/L | | 3.5 | | 2 |
| | cis-1,2-Dichloroethene | µg/L | | 4.8 | | 3.7 |
| | Tetrachloroethene | µg/L | | 1.4 | | 0.92 J |
| | trans-1,2-Dichloroethene | µg/L | | 0.15 J | | 0.15 U |
| | Trichloroethene | µg/L | | 83 D | | 49 |
| X749-109G | 1,1,1-Trichloroethane | µg/L | | 1.9 | | 1.3 |
| | 1,1-Dichloroethane | µg/L | | 7.3 | | 5.7 |
| | 1,1-Dichloroethene | µg/L | | 12 | | 8.8 |
| | 1,2-Dichloroethane | µg/L | | 1.6 | | 1 |
| | Acetone | µg/L | | 1.9 U | | 8.8 J |
| | Chloroform | µg/L | | 0.47 J | | 0.34 J |
| | cis-1,2-Dichloroethene | µg/L | | 4.7 | | 3.2 |
| | Tetrachloroethene | µg/L | | 0.28 J | | 0.2 U |
| | Trichloroethene | µg/L | | 15 | | 11 |
| X749-110G | 1,1,1-Trichloroethane | µg/L | | 0.64 J | | 1 |
| | 1,1-Dichloroethane | µg/L | | 3.9 | | 4.8 |
| | 1,1-Dichloroethene | µg/L | | 4.1 | | 7 |
| | 1,2-Dichloroethane | µg/L | | 1.5 | | 1.5 |
| | Acetone | µg/L | | 2.9 J | | 1.9 U |
| | Chloroform | µg/L | | 0.53 J | | 0.43 J |
| | cis-1,2-Dichloroethene | µg/L | | 4.6 | | 5.9 |
| | trans-1,2-Dichloroethene | µg/L | | 0.15 U | | 0.26 J |
| | Trichloroethene | µg/L | | 19 | | 25 |
| X749-112G | Acetone | µg/L | | 3.2 J | | 1.9 U |
| X749-113G | 1,1,1-Trichloroethane | µg/L | | 10 | | 13 |
| | 1,1-Dichloroethane | µg/L | | 16 | | 20 |
| | 1,1-Dichloroethene | µg/L | | 21 | | 32 |
| | 1,2-Dichloroethane | µg/L | | 9.7 | | 10 |
| | Acetone | µg/L | | 2.9 J | | 1.9 QU |
| | Chloroform | µg/L | | 1.9 | | 2.1 |
| | cis-1,2-Dichloroethene | µg/L | | 2.2 | | 3.1 |
| | Tetrachloroethene | µg/L | | 0.29 J | | 0.37 JQ |
| | Trichloroethene | µg/L | | 38 | | 47 |
| | Vinyl chloride | µg/L | | 0.1 U | | 0.13 J |
| X749-114G | Benzene | µg/L | | | 0.26 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-114G | cis-1,2-Dichloroethene | µg/L | | | 1.2 | |
| X749-115G | Acetone | µg/L | | | 2 J | |
| | Chloroform | µg/L | | | 0.16 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 6.9 | |
| | Trichloroethene | µg/L | | | 260 D | |
| X749-117G | Chloroform | µg/L | | | 1.9 | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.25 J | |
| | Trichloroethene | µg/L | | | 21 | |
| X749-118G | 1,1-Dichloroethane | µg/L | | | 1.7 | |
| | 1,1-Dichloroethene | µg/L | | | 0.3 J | |
| | Carbon tetrachloride | µg/L | | | 0.21 J | |
| | Chloroform | µg/L | | | 0.4 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 1.8 | |
| | Tetrachloroethene | µg/L | | | 2 | |
| | Trichloroethene | µg/L | | | 99 D | |
| X749-119G | Acetone | µg/L | | | 2.1 J | |
| | Chloroform | µg/L | | | 1.2 | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.48 J | |
| | Trichloroethene | µg/L | | | 14 | |
| X749-120G | 1,1,1-Trichloroethane | µg/L | | | 600 D | |
| | 1,1,2-Trichloroethane | µg/L | | | 81 D | |
| | 1,1-Dichloroethane | µg/L | | | 5300 D | |
| | 1,1-Dichloroethene | µg/L | | | 2400 D | |
| | 1,2-Dichloroethane | µg/L | | | 86 D | |
| | Acetone | µg/L | | | 460 D | |
| | Benzene | µg/L | | | 7 DJ | |
| | Chloroform | µg/L | | | 290 D | |
| | cis-1,2-Dichloroethene | µg/L | | | 1600 D | |
| | Methylene chloride | µg/L | | | 72 DJ | |
| | Tetrachloroethene | µg/L | | | 330 D | |
| | Trichloroethene | µg/L | | | 9800 D | |
| X749-121G | 1,1,1-Trichloroethane | µg/L | | | 45 | |
| | 1,1,2-Trichloroethane | µg/L | | | 0.8 JQ | |
| | 1,1-Dichloroethane | µg/L | | | 15 | |
| | 1,1-Dichloroethene | µg/L | | | 380 D | |
| | 1,2-Dichloroethane | µg/L | | | 1.7 | |
| | Acetone | µg/L | | | 11 Q | |
| | Chloroethane | µg/L | | | 4.9 | |
| | Chloroform | µg/L | | | 1.2 | |
| | cis-1,2-Dichloroethene | µg/L | | | 10 | |
| | Tetrachloroethene | µg/L | | | 0.33 J | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.46 J | |
| | Trichloroethene | µg/L | | | 82 D | |
| | Vinyl chloride | µg/L | | | 1.3 | |
| X749-122G | 1,1,1-Trichloroethane | µg/L | | | 230 D | |
| | 1,1,2-Trichloroethane | µg/L | | | 1.7 DJQ | |
| | 1,1-Dichloroethane | µg/L | | | 64 D | |
| | 1,1-Dichloroethene | µg/L | | | 220 D | |
| | 1,2-Dichloroethane | µg/L | | | 3.4 D | |
| | Acetone | µg/L | | | 8.5 DJQ | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1. VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-122G | Benzene | µg/L | | | 2.5 D | |
| | Chloroform | µg/L | | | 2.5 D | |
| | cis-1,2-Dichloroethene | µg/L | | | 40 D | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.86 DJ | |
| | Trichloroethene | µg/L | | | 670 D | |
| | Vinyl chloride | µg/L | | | 1.6 DJ | |
| X749-BG9G | Trichloroethene | µg/L | | 0.27 J | | 0.29 J |
| X749-PZ02G | 1,1-Dichloroethene | µg/L | | 0.14 QU | | 0.27 J |
| | Trichloroethene | µg/L | | 0.38 J | | 0.59 J |
| X749-PZ04G | 1,1,1-Trichloroethane | µg/L | 0.21 J | 0.16 U | 0.16 U | 0.16 U |
| | 1,1-Dichloroethane | µg/L | 0.74 J | 0.74 J | 0.56 J | 0.48 J |
| | 1,1-Dichloroethene | µg/L | 0.28 J | 0.32 J | 0.21 J | 0.16 J |
| | 1,2-Dichloroethene | µg/L | 0.23 J | 0.13 U | 0.13 U | 0.16 J |
| | cis-1,2-Dichloroethene | µg/L | 0.24 J | 0.15 U | 0.16 J | 0.15 U |
| | Trichloroethene | µg/L | 1.9 | 1.8 | 1.2 | 1.5 |
| X749-PZ05G | cis-1,2-Dichloroethene | µg/L | 0.15 U | 0.15 U | 0.15 U | 0.17 J |
| | Trichloroethene | µg/L | 0.16 U | 0.16 U | 0.47 J | 30 |
| X749-PZ06G | 1,1,1-Trichloroethane | µg/L | | 9.5 | | 9.5 |
| | 1,1,2-Trichloroethane | µg/L | | 1.1 | | 1.1 |
| | 1,1-Dichloroethane | µg/L | | 23 | | 25 J |
| | 1,1-Dichloroethene | µg/L | | 71 D | | 68 D |
| | 1,2-Dichloroethene | µg/L | | 2 | | 2.2 |
| | Chloroform | µg/L | | 2.1 | | 2.1 |
| | cis-1,2-Dichloroethene | µg/L | | 3.8 | | 3.9 |
| | Tetrachloroethene | µg/L | | 0.56 J | | 0.53 J |
| | Trichloroethene | µg/L | | 49 | | 51 J |
| X749-PZ07G | 1,1,1-Trichloroethane | µg/L | | | 0.16 J | |
| | 1,1-Dichloroethane | µg/L | | | 0.2 J | |
| | 1,1-Dichloroethene | µg/L | | | 0.61 J | |
| | Trichloroethene | µg/L | | | 1.3 | |
| X749-PZ08G | 1,1-Dichloroethane | µg/L | | 0.32 J | | |
| | Chloroform | µg/L | | 0.17 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 0.73 J | | |
| | Trichloroethene | µg/L | | 1.3 | | |
| X749-PZ09G | 1,1,1-Trichloroethane | µg/L | | 1.4 | | |
| | 1,1-Dichloroethane | µg/L | | 3 | | |
| | 1,1-Dichloroethene | µg/L | | 5.7 | | |
| | cis-1,2-Dichloroethene | µg/L | | 15 | | |
| | Trichloroethene | µg/L | | 27 | | |
| | Vinyl chloride | µg/L | | 0.55 J | | |
| X749-PZ10G | 1,1,1-Trichloroethane | µg/L | | 7.6 D | | 6.7 D |
| | 1,1-Dichloroethane | µg/L | | 0.78 DJ | | 0.63 DJ |
| | 1,1-Dichloroethene | µg/L | | 82 D | | 90 D |
| | 1,2-Dichloroethene | µg/L | | 0.6 DJ | | 0.56 DJ |
| | Acetone | µg/L | | 3.8 U | | 70 DQ |
| | Chloroform | µg/L | | 23 D | | 25 D |
| | cis-1,2-Dichloroethene | µg/L | | 0.48 DJ | | 0.62 DJ |
| | Trichloroethene | µg/L | | 370 D | | 360 D |
| X749-PZ11G | 1,1,1-Trichloroethane | µg/L | | 7.3 | | |
| | 1,1-Dichloroethane | µg/L | | 4.7 | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.1.  VOCs detected at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-PZ11G | 1,1-Dichloroethene | µg/L | | 4.4 | | |
| | Benzene | µg/L | | 0.18 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 13 | | |
| | trans-1,2-Dichloroethene | µg/L | | 0.3 J | | |
| | Trichloroethene | µg/L | | 47 J | | |
| | Vinyl chloride | µg/L | | 1.1 | | |
| X749-PZ12G | 1,1,1-Trichloroethane | µg/L | | 3.5 | | |
| | 1,1-Dichloroethane | µg/L | | 25 | | |
| | 1,1-Dichloroethene | µg/L | | 23 | | |
| | 1,2-Dichloroethane | µg/L | | 0.44 J | | |
| | Benzene | µg/L | | 0.78 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 7.7 | | |
| | trans-1,2-Dichloroethene | µg/L | | 0.49 J | | |
| | Trichloroethene | µg/L | | 4.2 | | |
| | Vinyl chloride | µg/L | | 1.5 | | |
| X749-PZ13G | 1,1,1-Trichloroethane | µg/L | | 17 | | |
| | 1,1-Dichloroethane | µg/L | | 36 | | |
| | 1,1-Dichloroethene | µg/L | | 60 | | |
| | 1,2-Dichloroethane | µg/L | | 1.8 | | |
| | Benzene | µg/L | | 3.2 | | |
| | Chloroethane | µg/L | | 0.63 J | | |
| | Chloroform | µg/L | | 0.7 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 17 | | |
| | trans-1,2-Dichloroethene | µg/L | | 0.53 J | | |
| | Trichloroethene | µg/L | | 44 | | |
| | Vinyl chloride | µg/L | | 1.5 | | |
| X749-WPW | 1,1,1-Trichloroethane | µg/L | | 54 | | 87 D |
| | 1,1,2-Trichloroethane | µg/L | | 0.71 J | | 3.2 U |
| | 1,1-Dichloroethane | µg/L | | 56 | | 65 D |
| | 1,1-Dichloroethene | µg/L | | 94 D | | 180 D |
| | 1,2-Dichloroethane | µg/L | | 12 | | 1.3 U |
| | Acetone | µg/L | | 4.3 J | | 19 U |
| | Benzene | µg/L | | 0.47 J | | 6.9 DJ |
| | Carbon tetrachloride | µg/L | | 0.24 J | | 1.9 U |
| | Chloroform | µg/L | | 15 | | 1.6 U |
| | cis-1,2-Dichloroethene | µg/L | | 29 | | 350 D |
| | Tetrachloroethene | µg/L | | 3.1 | | 2 U |
| | trans-1,2-Dichloroethene | µg/L | | 0.22 J | | 1.5 U |
| | Trichloroethene | µg/L | | 300 D | | 1300 D |
| | Vinyl chloride | µg/L | | 6.1 | | 1 U |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2.  Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| STSW-101G | Technetium-99 | pCi/L | | 1.96 U | | |
| | Uranium | µg/L | | 0.301 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.053 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.101 J | | |
| STSW-102G | Technetium-99 | pCi/L | | 33.6 | | |
| | Uranium | µg/L | | 1.59 | | |
| | Uranium-233/234 | pCi/L | | 0.754 | | |
| | Uranium-235/236 | pCi/L | | 0.0169 U | | |
| | Uranium-238 | pCi/L | | 0.533 | | |
| WP-01G | Technetium-99 | pCi/L | | -1.75 U | | |
| | Uranium | µg/L | | 0.086 U | | |
| | Uranium-233/234 | pCi/L | | 0.0311 U | | |
| | Uranium-235/236 | pCi/L | | 0.0193 U | | |
| | Uranium-238 | pCi/L | | 0.0259 U | | |
| WP-02G | Technetium-99 | pCi/L | | -2.52 U | | |
| | Uranium | µg/L | | 0.107 U | | |
| | Uranium-233/234 | pCi/L | | 0.0206 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.036 U | | |
| WP-03G | Technetium-99 | pCi/L | | -2.28 U | | |
| | Uranium | µg/L | | 0.173 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0885 UJ | | |
| | Uranium-235/236 | pCi/L | | 0.00648 U | | |
| | Uranium-238 | pCi/L | | 0.0573 UJ | | |
| WP-04G | Technetium-99 | pCi/L | | -2.42 U | | |
| | Uranium | µg/L | | 0.0692 U | | |
| | Uranium-233/234 | pCi/L | | 0.029 U | | |
| | Uranium-235/236 | pCi/L | | -0.0060 U | | |
| | Uranium-238 | pCi/L | | 0.0242 U | | |
| WP-05G | Technetium-99 | pCi/L | | -1.91 U | | |
| | Uranium | µg/L | | 0.135 U | | |
| | Uranium-233/234 | pCi/L | | 0.0655 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0453 UJ | | |
| WP-06G | Technetium-99 | pCi/L | | -4.11 U | | |
| | Uranium | µg/L | | 8.31 J | | |
| | Uranium-233/234 | pCi/L | | 2.68 | | |
| | Uranium-235/236 | pCi/L | | 0.121 J | | |
| | Uranium-238 | pCi/L | | 2.77 | | |
| WP-07G | Technetium-99 | pCi/L | | -0.929 U | | |
| | Uranium | µg/L | | 0.229 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0337 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0769 UJ | | |
| X120-08G | Technetium-99 | pCi/L | | | 3.19 U | |
| | Uranium | µg/L | | | 0.546 J | |
| | Uranium-233/234 | pCi/L | | | 0.259 | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.184 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2. Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-06G | Technetium-99 | pCi/L | | 14.4 | | |
| | Uranium | µg/L | | 0.274 | | |
| | Uranium-233/234 | pCi/L | | 0.0476 U | | |
| | Uranium-235/236 | pCi/L | | 0.0118 U | | |
| | Uranium-238 | pCi/L | | 0.0904 | | |
| X749-07G | Americium-241 | pCi/L | | 0.0159 U | | |
| | Neptunium-237 | pCi/L | | 0.0202 U | | |
| | Plutonium-238 | pCi/L | | 0 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0278 U | | |
| | Technetium-99 | pCi/L | | 12.6 | | |
| | Uranium | µg/L | | 0.192 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.101 J | | |
| | Uranium-235/236 | pCi/L | | 0.012 U | | |
| | Uranium-238 | pCi/L | | 0.0626 UJ | | |
| X749-08G | Americium-241 | pCi/L | | 0.0321 U | | |
| | Neptunium-237 | pCi/L | | 0.00945 U | | |
| | Plutonium-238 | pCi/L | | -0.0055 U | | |
| | Plutonium-239/240 | pCi/L | | 0.011 U | | |
| | Technetium-99 | pCi/L | | 8.36 | | |
| | Uranium | µg/L | | 0.184 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.122 J | | |
| | Uranium-235/236 | pCi/L | | 0.00583 U | | |
| | Uranium-238 | pCi/L | | 0.0609 UJ | | |
| X749-10GA | Americium-241 | pCi/L | | 0.00517 U | | |
| | Neptunium-237 | pCi/L | | 0.00963 U | | |
| | Plutonium-238 | pCi/L | | -0.0052 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0104 U | | |
| | Technetium-99 | pCi/L | | 0.166 U | | |
| | Uranium | µg/L | | 0.112 U | | |
| | Uranium-233/234 | pCi/L | | 0.0425 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0378 UJ | | |
| X749-13G | Technetium-99 | pCi/L | | 1.5 U | | |
| | Uranium | µg/L | | 0.655 J | | |
| | Uranium-233/234 | pCi/L | | 0.267 | | |
| | Uranium-235/236 | pCi/L | | 0.0292 U | | |
| | Uranium-238 | pCi/L | | 0.216 J | | |
| X749-14B | Americium-241 | pCi/L | | 0.0325 U | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | 0.0119 U | | |
| | Plutonium-239/240 | pCi/L | | 0.00593 U | | |
| | Technetium-99 | pCi/L | | -1.21 U | | |
| | Uranium | µg/L | | 0.2 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.024 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0672 UJ | | |
| X749-20G | Technetium-99 | pCi/L | | | 34.9 | |
| | Uranium | µg/L | | | 1.47 | |
| | Uranium-233/234 | pCi/L | | | 0.476 | |
| | Uranium-235/236 | pCi/L | | | 0.023 U | |

4-15

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2.  Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-20G | Uranium-238 | pCi/L | | | 0.489 | |
| X749-26G | Technetium-99 | pCi/L | | 6.17 UJ | | |
| | Uranium | µg/L | | 0.0456 U | | |
| | Uranium-233/234 | pCi/L | | 0.0181 U | | |
| | Uranium-235/236 | pCi/L | | 0.0113 U | | |
| | Uranium-238 | pCi/L | | 0.0136 U | | |
| X749-27G | Technetium-99 | pCi/L | | 83 | | |
| | Uranium | µg/L | | 0.169 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0559 UJ | | |
| | Uranium-235/236 | pCi/L | | 0.0058 U | | |
| | Uranium-238 | pCi/L | | 0.0559 UJ | | |
| X749-28G | Technetium-99 | pCi/L | | | 3.88 U | |
| | Uranium | µg/L | | | 0.086 U | |
| | Uranium-233/234 | pCi/L | | | 0.0382 U | |
| | Uranium-235/236 | pCi/L | | | -0.00528 U | |
| | Uranium-238 | pCi/L | | | 0.0297 U | |
| X749-33G | Technetium-99 | pCi/L | | 14 | | |
| | Uranium | µg/L | | 0.0412 U | | |
| | Uranium-233/234 | pCi/L | | 0.0369 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0138 U | | |
| X749-37G | Technetium-99 | pCi/L | | -4E-15 U | | |
| | Uranium | µg/L | | 0.672 J | | |
| | Uranium-233/234 | pCi/L | | 0.272 | | |
| | Uranium-235/236 | pCi/L | | 0.0226 U | | |
| | Uranium-238 | pCi/L | | 0.222 J | | |
| X749-44G | Americium-241 | pCi/L | | 0.0359 U | | |
| | Neptunium-237 | pCi/L | | -0.0096 U | | |
| | Plutonium-238 | pCi/L | | 0.0204 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0305 U | | |
| | Technetium-99 | pCi/L | | -1.73 U | | |
| | Uranium | µg/L | | 0.402 J | | |
| | Uranium-233/234 | pCi/L | | 0.163 J | | |
| | Uranium-235/236 | pCi/L | | 0.019 U | | |
| | Uranium-238 | pCi/L | | 0.132 J | | |
| X749-45G | Americium-241 | pCi/L | | 0.0125 U | | |
| | Neptunium-237 | pCi/L | | -0.0145 U | | |
| | Plutonium-238 | pCi/L | | -0.0166 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0111 U | | |
| | Technetium-99 | pCi/L | | -1.79 U | | |
| | Uranium | µg/L | | 0.0308 U | | |
| | Uranium-233/234 | pCi/L | | 0.0158 U | | |
| | Uranium-235/236 | pCi/L | | 0.0327 U | | |
| | Uranium-238 | pCi/L | | 0.00525 U | | |
| X749-54B | Technetium-99 | pCi/L | | -2.58 U | | |
| | Uranium | µg/L | | 0.0542 U | | |
| | Uranium-233/234 | pCi/L | | 0 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0182 U | | |
| X749-64B | Americium-241 | pCi/L | | | 0.0499 U | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2.  Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-64B | Neptunium-237 | pCi/L | | | 0.00478 U | |
| | Plutonium-238 | pCi/L | | | 0.0103 U | |
| | Plutonium-239/240 | pCi/L | | | -0.00515 U | |
| | Technetium-99 | pCi/L | | | 3.06 U | |
| | Uranium | µg/L | | | 0.986 J | |
| | Uranium-233/234 | pCi/L | | | 1.4 | |
| | Uranium-235/236 | pCi/L | | | 0.0112 U | |
| | Uranium-238 | pCi/L | | | 0.33 | |
| X749-67G | Technetium-99 | pCi/L | | 26.3 | | |
| | Uranium | µg/L | | 0.361 | | |
| | Uranium-233/234 | pCi/L | | 0.0801 U | | |
| | Uranium-235/236 | pCi/L | | 0.0235 U | | |
| | Uranium-238 | pCi/L | | 0.118 | | |
| X749-68G | Americium-241 | pCi/L | | | 0.0292 U | |
| | Neptunium-237 | pCi/L | | | 0 U | |
| | Plutonium-238 | pCi/L | | | 0.00715 U | |
| | Plutonium-239/240 | pCi/L | | | 0.0286 U | |
| | Technetium-99 | pCi/L | | | 2.97 U | |
| | Uranium | µg/L | | | 0.621 J | |
| | Uranium-233/234 | pCi/L | | | 0.228 | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.209 J | |
| X749-96G | Americium-241 | pCi/L | | 0.0348 U | | |
| | Neptunium-237 | pCi/L | | 0.00904 U | | |
| | Plutonium-238 | pCi/L | | 0.0163 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0217 U | | |
| | Technetium-99 | pCi/L | | -1.39 U | | |
| | Uranium | µg/L | | 0.127 U | | |
| | Uranium-233/234 | pCi/L | | 0.0664 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0427 UJ | | |
| X749-97G | Americium-241 | pCi/L | | 0.0198 U | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | 0.00544 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0272 U | | |
| | Technetium-99 | pCi/L | | -1.31 U | | |
| | Uranium | µg/L | | 0.198 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0744 UJ | | |
| | Uranium-235/236 | pCi/L | | 0.0123 U | | |
| | Uranium-238 | pCi/L | | 0.0645 UJ | | |
| X749-98G | Americium-241 | pCi/L | | 0.0228 U | | |
| | Neptunium-237 | pCi/L | | 0.00443 U | | |
| | Plutonium-238 | pCi/L | | 0.0118 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0355 U | | |
| | Technetium-99 | pCi/L | | -1.68 U | | |
| | Uranium | µg/L | | 0.118 U | | |
| | Uranium-233/234 | pCi/L | | 0.0593 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0395 UJ | | |
| X749-106G | Technetium-99 | pCi/L | | 1.15 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2.  Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-106G | Uranium | µg/L | | 0.0607 U | | |
| | Uranium-233/234 | pCi/L | | 0.00465 U | | |
| | Uranium-235/236 | pCi/L | | 0.0116 U | | |
| | Uranium-238 | pCi/L | | 0.0186 U | | |
| X749-108G | Technetium-99 | pCi/L | | 3.25 U | | |
| | Uranium | µg/L | | 0.0952 U | | |
| | Uranium-233/234 | pCi/L | | 0.00914 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.032 U | | |
| X749-109G | Technetium-99 | pCi/L | | -1.06 U | | |
| | Uranium | µg/L | | 0.459 J | | |
| | Uranium-233/234 | pCi/L | | 0.155 J | | |
| | Uranium-235/236 | pCi/L | | 0.0227 U | | |
| | Uranium-238 | pCi/L | | 0.151 J | | |
| X749-110G | Technetium-99 | pCi/L | | 1.35 U | | |
| | Uranium | µg/L | | 11.1 J | | |
| | Uranium-233/234 | pCi/L | | 3.43 | | |
| | Uranium-235/236 | pCi/L | | 0.195 J | | |
| | Uranium-238 | pCi/L | | 3.69 | | |
| X749-113G | Technetium-99 | pCi/L | | 7.73 | | |
| | Uranium | µg/L | | 0.168 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0517 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0564 UJ | | |
| X749-120G | Technetium-99 | pCi/L | | | 73.2 | |
| | Uranium | µg/L | | | 0.399 J | |
| | Uranium-233/234 | pCi/L | | | 0.0751 JU | |
| | Uranium-235/236 | pCi/L | | | 0.011 U | |
| | Uranium-238 | pCi/L | | | 0.133 J | |
| X749-121G | Technetium-99 | pCi/L | | | 703 | |
| | Uranium | µg/L | | | 0.732 J | |
| | Uranium-233/234 | pCi/L | | | 0.281 | |
| | Uranium-235/236 | pCi/L | | | 0.0113 U | |
| | Uranium-238 | pCi/L | | | 0.244 | |
| X749-PZ02G | Technetium-99 | pCi/L | | -0.396 U | | |
| | Uranium | µg/L | | 0.0461 U | | |
| | Uranium-233/234 | pCi/L | | 0.00914 U | | |
| | Uranium-235/236 | pCi/L | | 0.0114 U | | |
| | Uranium-238 | pCi/L | | 0.0137 U | | |
| X749-PZ04G | Technetium-99 | pCi/L | | 1.76 U | | |
| | Uranium | µg/L | | 0.148 U | | |
| | Uranium-233/234 | pCi/L | | 0.0488 U | | |
| | Uranium-235/236 | pCi/L | | 0.00607 U | | |
| | Uranium-238 | pCi/L | | 0.0488 U | | |
| X749-PZ09G | Technetium-99 | pCi/L | | 220 | | |
| | Uranium | µg/L | | 6 | | |
| | Uranium-233/234 | pCi/L | | 2.17 | | |
| | Uranium-235/236 | pCi/L | | 0.135 | | |
| | Uranium-238 | pCi/L | | 2 | | |
| X749-PZ10G | Technetium-99 | pCi/L | | 21.3 | | |

4-18

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.2.  Results for radionuclides at the X-749 Contaminated Materials Disposal Facility/X-120 Former Training Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749-PZ10G | Uranium | µg/L | | 0.103 U | | |
| | Uranium-233/234 | pCi/L | | 0.108 | | |
| | Uranium-235/236 | pCi/L | | 0.0117 U | | |
| | Uranium-238 | pCi/L | | 0.0328 U | | |
| X749-PZ11G | Technetium-99 | pCi/L | | 0.43 U | | |
| | Uranium | µg/L | | 1.67 | | |
| | Uranium-233/234 | pCi/L | | 0.759 | | |
| | Uranium-235/236 | pCi/L | | 0.0423 U | | |
| | Uranium-238 | pCi/L | | 0.554 | | |
| X749-PZ12G | Technetium-99 | pCi/L | | 1.72 U | | |
| | Uranium | µg/L | | 0.315 | | |
| | Uranium-233/234 | pCi/L | | 0.118 | | |
| | Uranium-235/236 | pCi/L | | 0.019 U | | |
| | Uranium-238 | pCi/L | | 0.103 | | |
| X749-PZ13G | Technetium-99 | pCi/L | | 1.01 U | | |
| | Uranium | µg/L | | 0.807 | | |
| | Uranium-233/234 | pCi/L | | 0.44 | | |
| | Uranium-235/236 | pCi/L | | 0.0291 U | | |
| | Uranium-238 | pCi/L | | 0.267 | | |
| X749-WPW | Americium-241 | pCi/L | | 0.0409 UJ | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | 0.00503 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0151 U | | |
| | Technetium-99 | pCi/L | | 1720 | | |
| | Uranium | µg/L | | 0.579 J | | |
| | Uranium-233/234 | pCi/L | | 0.27 | | |
| | Uranium-235/236 | pCi/L | | 0.012 U | | |
| | Uranium-238 | pCi/L | | 0.193 J | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.3  VOCs detected at PK Landfill – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| MH GW-4 | Acetone | µg/L | | | 9.5 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.42 J | |
| MH GW-5 | 1,1-Dichloroethane | µg/L | | | 0.37 J | |
| | Acetone | µg/L | | | 7.6 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 1.7 | |
| PK-10G | Trichloroethene | µg/L | | 0.18 J | | 0.16 U |
| PK-15B | Acetone | µg/L | | 4.9 J | | 1.9 QU |
| | Vinyl chloride | µg/L | | 0.38 J | | 0.1 U |
| PK-16G | Acetone | µg/L | | 4.3 J | | 1.9 JU |
| | cis-1,2-Dichloroethene | µg/L | | 0.22 J | | 0.15 U |
| PK-17B | 1,1-Dichloroethane | µg/L | | 3 | | 3.6 |
| | 1,1-Dichloroethene | µg/L | | 0.45 J | | 0.67 J |
| | Acetone | µg/L | | 2 J | | 1.9 U |
| | Benzene | µg/L | | 0.37 J | | 0.34 J |
| | Chlorobenzene | µg/L | | 1.3 | | 1.7 |
| | cis-1,2-Dichloroethene | µg/L | | 38 J | | 58 |
| | trans-1,2-Dichloroethene | µg/L | | 1.4 | | 1.8 |
| | Trichloroethene | µg/L | | 0.77 J | | 1.6 |
| | Vinyl chloride | µg/L | | 14 J | | 14 |
| PK-19B | 1,1-Dichloroethane | µg/L | | 0.31 J | | 0.16 U |
| | Chloroethane | µg/L | | 2.2 | | 2 |
| | Tetrachloroethene | µg/L | | 0.22 J | | 0.2 U |
| PK-21B | 1,1-Dichloroethane | µg/L | | 110 D | | 120 D |
| | 1,1-Dichloroethene | µg/L | | 1 | | 0.61 J |
| | 1,2-Dichloroethane | µg/L | | 0.13 U | | 0.27 J |
| | Benzene | µg/L | | 0.7 J | | 0.34 J |
| | cis-1,2-Dichloroethene | µg/L | | 9.5 | | 9.8 |
| | Trichloroethene | µg/L | | 0.32 J | | 0.16 U |
| | Vinyl chloride | µg/L | | 13 | | 11 |
| PK-PL6 | 1,1,1-Trichloroethane | µg/L | 0.2 J | 1.3 | 1.1 | 1.5 |
| | 1,1-Dichloroethane | µg/L | 0.94 J | 4.1 | 3.3 | 7.1 |
| | 1,1-Dichloroethene | µg/L | 0.23 U | 0.75 J | 0.57 J | 1.2 |
| | cis-1,2-Dichloroethene | µg/L | 0.74 J | 1.1 | 1.3 | 1.6 |
| | Trichloroethene | µg/L | 0.17 J | 1.1 | 0.99 J | 1.4 |
| | Vinyl chloride | µg/L | 0.1 U | 0.17 J | 0.1 U | 0.1 U |
| PK-PL6A | 1,1,1-Trichloroethane | µg/L | 2.5 | 3.9 | 1.8 | 2.4 |
| | 1,1-Dichloroethane | µg/L | 11 | 10 | 3.4 | 9.7 |
| | 1,1-Dichloroethene | µg/L | 1.8 | 2.7 | 0.59 J | 2.2 |
| | Acetone | µg/L | 1.9 U | 1.9 U | 2.6 J | 1.9 U |
| | cis-1,2-Dichloroethene | µg/L | 2 | 2.1 | 0.51 J | 2.1 |
| | Trichloroethene | µg/L | 1.9 | 2.9 | 1.5 | 2 |
| | Vinyl chloride | µg/L | 0.24 J | 0.7 J | 0.12 J | 0.32 J |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.4.  VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X230K-14G | cis-1,2-Dichloroethene | µg/L | | | 0.3 J | |
| | Trichloroethene | µg/L | | | 4.1 | |
| X230K-15G | cis-1,2-Dichloroethene | µg/L | | | 0.15 J | |
| | Trichloroethene | µg/L | | | 1 | |
| X231A-01G | 1,1-Dichloroethane | µg/L | | | 1.5 | |
| | Benzene | µg/L | | | 0.21 JQ | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.46 J | |
| | Trichloroethene | µg/L | | | 2.3 Q | |
| X231A-02G | 1,1,1-Trichloroethane | µg/L | | | 3.6 | |
| | 1,1,2-Trichloroethane | µg/L | | | 0.6 J | |
| | 1,1-Dichloroethane | µg/L | | | 6 | |
| | 1,1-Dichloroethene | µg/L | | | 73 D | |
| | Benzene | µg/L | | | 0.19 J | |
| | Chloroform | µg/L | | | 1.4 | |
| | cis-1,2-Dichloroethene | µg/L | | | 11 | |
| | Tetrachloroethene | µg/L | | | 0.43 J | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.25 J | |
| | Trichloroethene | µg/L | | | 230 DJ | |
| | Trichlorofluoromethane | µg/L | | | 0.34 J | |
| X231A-04G | 1,1,1-Trichloroethane | µg/L | | | 0.16 J | |
| | 1,1-Dichloroethane | µg/L | | | 0.6 J | |
| | Chloroform | µg/L | | | 0.25 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 6.4 | |
| | Trichloroethene | µg/L | | | 47 | |
| | Trichlorofluoromethane | µg/L | | | 1.3 J | |
| X231B-02G | 1,1-Dichloroethane | µg/L | 1.2 J | | 2.6 D | |
| | Chloroform | µg/L | 1 J | | 0.73 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 35 | | 20 D | |
| | Methylene chloride | µg/L | 1.8 BJ | | 0.64 U | |
| | trans-1,2-Dichloroethene | µg/L | 0.92 J | | 0.89 DJ | |
| | Trichloroethene | µg/L | 630 | | 270 D | |
| X231B-03G | 1,1,1-Trichloroethane | µg/L | 1.4 | | 1.3 | |
| | 1,1,2-Trichloroethane | µg/L | 0.71 J | | 0.57 J | |
| | 1,1-Dichloroethane | µg/L | 1.9 | | 1.6 | |
| | 1,1-Dichloroethene | µg/L | 95 D | | 74 D | |
| | 1,2-Dichloroethane | µg/L | 0.4 J | | 0.13 U | |
| | Benzene | µg/L | 0.18 J | | 0.16 J | |
| | Chloroform | µg/L | 0.35 J | | 0.23 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 4.5 J | |
| | Tetrachloroethene | µg/L | 0.25 J | | 0.22 JQ | |
| | trans-1,2-Dichloroethene | µg/L | 0.35 J | | 0.15 U | |
| | Trichloroethene | µg/L | 110 D | | 100 D | |
| X231B-06G | 1,1,1-Trichloroethane | µg/L | 25 | | 14 | |
| | 1,1,2-Trichloroethane | µg/L | 0.37 J | | 0.48 J | |
| | 1,1-Dichloroethane | µg/L | 28 | | 23 | |
| | 1,1-Dichloroethene | µg/L | 66 DJ | | 52 | |
| | 1,2-Dichloroethane | µg/L | 0.59 J | | 0.13 U | |
| | Chloroform | µg/L | 0.45 J | | 0.66 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 2.6 | |
| | Tetrachloroethene | µg/L | 0.4 J | | 0.36 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.4.  VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X231B-06G | Trichloroethene | µg/L | 64 D | | 52 | |
| | Trichlorofluoromethane | µg/L | 0.29 U | | 0.7 J | |
| X231B-07G | Chloroform | µg/L | 1.7 | | | |
| | cis-1,2-Dichloroethene | µg/L | 7.2 | | | |
| | Trichloroethene | µg/L | 57 | | | |
| X231B-11G | 1,1,1-Trichloroethane | µg/L | 0.97 J | | | |
| | 1,1-Dichloroethane | µg/L | 3.3 | | | |
| | Trichloroethene | µg/L | 0.71 J | | | |
| X231B-12G | 1,1,1-Trichloroethane | µg/L | | | 1.1 | |
| | 1,1-Dichloroethane | µg/L | | | 0.18 J | |
| | 1,1-Dichloroethene | µg/L | | | 5.3 | |
| | Trichloroethene | µg/L | | | 2.5 | |
| X231B-14G | 1,1,1-Trichloroethane | µg/L | | | 0.68 J | |
| | 1,1-Dichloroethane | µg/L | | | 0.82 J | |
| | 1,1-Dichloroethene | µg/L | | | 14 J | |
| | Chloroform | µg/L | | | 0.55 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 3.9 | |
| | Trichloroethene | µg/L | | | 69 D | |
| X231B-15G | 1,1-Dichloroethene | µg/L | | | 0.24 J | |
| | Chloroform | µg/L | | | 0.61 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.17 J | |
| | Trichloroethene | µg/L | | | 0.67 J | |
| X231B-16G | 1,1,1-Trichloroethane | µg/L | | | 0.38 J | |
| | 1,1-Dichloroethene | µg/L | | | 2 | |
| | Chloroform | µg/L | | | 4.3 | |
| | Trichloroethene | µg/L | | | 0.26 J | |
| X231B-20G | 1,1,1-Trichloroethane | µg/L | | | 0.21 J | |
| | 1,1-Dichloroethene | µg/L | | | 8.8 | |
| | Chloroform | µg/L | | | 0.93 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.28 J | |
| | Trichloroethene | µg/L | | | 34 | |
| | Trichlorofluoromethane | µg/L | | | 0.53 J | |
| X231B-23G | 1,1,1-Trichloroethane | µg/L | | | 0.18 J | |
| | 1,1-Dichloroethene | µg/L | | | 1.1 | |
| | Trichloroethene | µg/L | | | 1.3 | |
| X231B-24B | Methylene chloride | µg/L | 0.32 BJ | | | |
| X231B-29G | cis-1,2-Dichloroethene | µg/L | 0.26 J | | | |
| | Trichloroethene | µg/L | 4.5 | | | |
| X231B-32B | 1,2-Dimethylbenzene | µg/L | | | 0.2 J | |
| | m,p-Xylenes | µg/L | | | 0.44 J | |
| | Toluene | µg/L | | | 0.37 J | |
| | Trichloroethene | µg/L | | | 0.53 J | |
| X231B-36G | Chloroform | µg/L | | | 0.95 DJ | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.84 DJ | |
| | Trichloroethene | µg/L | | | 540 D | |
| X231B-37G | 1,1-Dichloroethane | µg/L | | | 1.4 | |
| | 1,1-Dichloroethene | µg/L | | | 1.5 | |
| | Benzene | µg/L | | | 0.17 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 7.3 | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.92 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.4. VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X231B-37G | Trichloroethene | µg/L | | | 12 | |
| | Vinyl chloride | µg/L | | | 0.49 J | |
| X231B-38G | 1,1,1-Trichloroethane | µg/L | 0.39 J | | | |
| | 1,1-Dichloroethane | µg/L | 0.25 J | | | |
| | 1,1-Dichloroethene | µg/L | 0.62 J | | | |
| | 1,2-Dichlorobenzene | µg/L | 0.26 J | | | |
| | Trichloroethene | µg/L | 0.17 J | | | |
| X326-09G | 1,1-Dichloroethene | µg/L | 280 D | | 180 D | |
| | Bromodichloromethane | µg/L | 34 U | | 32 DJ | |
| | Chloroform | µg/L | 290 D | | 670 D | |
| | cis-1,2-Dichloroethene | µg/L | 180 DJ | | 560 D | |
| | Methylene chloride | µg/L | 88 DJ | | 13 U | |
| | Trichloroethene | µg/L | 27000 D | | 71000 DJ | |
| | Vinyl chloride | µg/L | 20 U | | 27 DJ | |
| X326-10G | 1,1-Dichloroethene | µg/L | | | 8.6 | |
| | cis-1,2-Dichloroethene | µg/L | | | 0.81 J | |
| | Trichloroethene | µg/L | | | 9.3 | |
| X622-PZ01G | 1,1-Dichloroethene | µg/L | | | 0.24 J | |
| | Benzene | µg/L | | | 0.17 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 11 | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.72 J | |
| | Trichloroethene | µg/L | | | 2.8 | |
| | Vinyl chloride | µg/L | | | 0.23 J | |
| X622-PZ02G | 1,1,1-Trichloroethane | µg/L | | | 1.1 | |
| | 1,1-Dichloroethane | µg/L | | | 1.2 | |
| | 1,1-Dichloroethene | µg/L | | | 15 | |
| | Chloroform | µg/L | | | 0.75 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 8 | |
| | Trichloroethene | µg/L | | | 140 D | |
| | Trichlorofluoromethane | µg/L | | | 1.5 J | |
| X622-PZ03G | 1,1,1-Trichloroethane | µg/L | | | 0.71 DJ | |
| | 1,1-Dichloroethane | µg/L | | | 0.97 DJ | |
| | 1,1-Dichloroethene | µg/L | | | 2.8 D | |
| | cis-1,2-Dichloroethene | µg/L | | | 6.1 D | |
| | Trichloroethene | µg/L | | | 270 D | |
| | Trichlorofluoromethane | µg/L | | | 6.7 D | |
| X626-07G | 1,1,1-Trichloroethane | µg/L | 5.7 D | | 5.4 D | |
| | 1,1,2-Trichloroethane | µg/L | 3.5 DJ | | 4.5 D | |
| | 1,1-Dichloroethane | µg/L | 3.1 DJ | | 3.4 D | |
| | 1,1-Dichloroethene | µg/L | 410 D | | 430 D | |
| | Benzene | µg/L | 1.1 DJ | | 1.3 DJ | |
| | Chloroform | µg/L | 0.96 DJ | | 0.85 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 1.5 DJ | | 1.7 DJ | |
| | Methylene chloride | µg/L | 1.5 DJ | | 0.64 U | |
| | Trichloroethene | µg/L | 680 D | | 620 D | |
| X710-01G | cis-1,2-Dichloroethene | µg/L | 0.45 J | | | |
| | Trichloroethene | µg/L | 22 | | | |
| X760-02G | Trichloroethene | µg/L | 0.39 J | | | |
| X760-03G | Chloroform | µg/L | | | 0.24 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 1.1 | |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.4.  VOCs detected at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X760-03G | Trichloroethene | µg/L | | | 150 D | |
| X760-07G | 1,1-Dichloroethene | µg/L | | | 0.42 J | |
| | Chloroform | µg/L | | | 0.29 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 12 | |
| | Trichloroethene | µg/L | | | 400 D | |
| | Vinyl chloride | µg/L | | | 0.35 J | |
| X770-17GA | cis-1,2-Dichloroethene | µg/L | 1 DJ | | 1.2 | |
| | Methylene chloride | µg/L | 0.65 DJ | | 0.32 U | |
| | Trichloroethene | µg/L | 370 D | | 400 D | |

4-24

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.5.  Results for radionuclides at the Quadrant I Groundwater Investigative (5-Unit) Area – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X231A-01G | Technetium-99 | pCi/L | | | 21.4 | |
| | Uranium | µg/L | | | 20.8 | |
| | Uranium-233/234 | pCi/L | | | 23.3 | |
| | Uranium-235/236 | pCi/L | | | 1.21 | |
| | Uranium-238 | pCi/L | | | 6.79 | |
| X231A-02G | Technetium-99 | pCi/L | | | 9.52 | |
| | Uranium | µg/L | | | 0.0836 U | |
| | Uranium-233/234 | pCi/L | | | 0.0774 JU | |
| | Uranium-235/236 | pCi/L | | | -0.00602 U | |
| | Uranium-238 | pCi/L | | | 0.029 U | |
| X231A-04G | Technetium-99 | pCi/L | | | 3.28 U | |
| | Uranium | µg/L | | | 0.343 J | |
| | Uranium-233/234 | pCi/L | | | 0.126 J | |
| | Uranium-235/236 | pCi/L | | | 0.0241 U | |
| | Uranium-238 | pCi/L | | | 0.112 J | |
| X231B-02G | Technetium-99 | pCi/L | | | 52.6 | |
| | Uranium | µg/L | | | 0.234 JU | |
| | Uranium-233/234 | pCi/L | | | 0.0617 JU | |
| | Uranium-235/236 | pCi/L | | | 0.0177 U | |
| | Uranium-238 | pCi/L | | | 0.076 JU | |
| X231B-03G | Americium-241 | pCi/L | | | 0.0387 UJ | |
| | Neptunium-237 | pCi/L | | | 0 U | |
| | Plutonium-238 | pCi/L | | | -0.00537 U | |
| | Plutonium-239/240 | pCi/L | | | 0.0107 U | |
| | Technetium-99 | pCi/L | | | 11 | |
| | Uranium | µg/L | | | 0.364 J | |
| | Uranium-233/234 | pCi/L | | | 0.112 J | |
| | Uranium-235/236 | pCi/L | | | 0.0058 U | |
| | Uranium-238 | pCi/L | | | 0.121 J | |
| X231B-06G | Americium-241 | pCi/L | | | 0.0153 U | |
| | Neptunium-237 | pCi/L | | | 0.0099 U | |
| | Plutonium-238 | pCi/L | | | -0.00525 U | |
| | Plutonium-239/240 | pCi/L | | | 0.0105 U | |
| | Technetium-99 | pCi/L | | | 28.5 | |
| | Uranium | µg/L | | | 2.4 | |
| | Uranium-233/234 | pCi/L | | | 3.44 | |
| | Uranium-235/236 | pCi/L | | | 0.226 | |
| | Uranium-238 | pCi/L | | | 0.773 | |
| X326-09G | Technetium-99 | pCi/L | | | 1.95 U | |
| | Uranium | µg/L | | | 0.214 UJ | |
| | Uranium-233/234 | pCi/L | | | 0.0791 UJ | |
| | Uranium-235/236 | pCi/L | | | 0.0109 U | |
| | Uranium-238 | pCi/L | | | 0.0703 UJ | |
| X626-07G | Technetium-99 | pCi/L | | | 3.29 U | |
| | Uranium | µg/L | | | 0.282 J | |
| | Uranium-233/234 | pCi/L | | | 0.0759 U | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.0949 J | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.6  VOCs detected at the X-749A Classified Materials Disposal Facility – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749A-12G | 1,1-Dichloroethane | µg/L | | 0.22 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 5.1 | | |
| | Trichloroethene | µg/L | | 4 | | |
| X749A-16G | Acetone | µg/L | | 2.7 J | | |
| X749A-18G | cis-1,2-Dichloroethene | µg/L | | 0.21 J | | |
| | Trichloroethene | µg/L | | 4.2 | | |
| X749A-19G | cis-1,2-Dichloroethene | µg/L | | 3.2 | | |
| | Trichloroethene | µg/L | | 14 | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.7  Results for radionuclides at the X-749A Classified Materials Disposal Facility – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X749A-02G | Technetium-99 | pCi/L | | -0.566 U | | |
| | Uranium | µg/L | | 0.131 U | | |
| | Uranium-233/234 | pCi/L | | 0.132 J | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.044 UJ | | |
| X749A-03G | Technetium-99 | pCi/L | | 0.411 U | | |
| | Uranium | µg/L | | 0.306 J | | |
| | Uranium-233/234 | pCi/L | | 0.13 J | | |
| | Uranium-235/236 | pCi/L | | 0.00577 U | | |
| | Uranium-238 | pCi/L | | 0.102 J | | |
| X749A-04G | Technetium-99 | pCi/L | | -2.83 U | | |
| | Uranium | µg/L | | 0.0546 U | | |
| | Uranium-233/234 | pCi/L | | 0.0642 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0183 U | | |
| X749A-07G | Technetium-99 | pCi/L | | -2.65 U | | |
| | Uranium | µg/L | | 6.93 | | |
| | Uranium-233/234 | pCi/L | | 2.7 | | |
| | Uranium-235/236 | pCi/L | | 0.151 J | | |
| | Uranium-238 | pCi/L | | 2.3 | | |
| X749A-12G | Technetium-99 | pCi/L | | -1.76 U | | |
| | Uranium | µg/L | | 0.234 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0961 J | | |
| | Uranium-235/236 | pCi/L | | 0.012 U | | |
| | Uranium-238 | pCi/L | | 0.0769 UJ | | |
| X749A-14G | Technetium-99 | pCi/L | | -1.43 U | | |
| | Uranium | µg/L | | 0.194 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.045 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.065 UJ | | |
| X749A-16G | Technetium-99 | pCi/L | | 2.67 U | | |
| | Uranium | µg/L | | 0.151 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0329 U | | |
| | Uranium-235/236 | pCi/L | | -0.0058 U | | |
| | Uranium-238 | pCi/L | | 0.0516 UJ | | |
| X749A-17G | Technetium-99 | pCi/L | | -3.19 U | | |
| | Uranium | µg/L | | 0.218 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0498 UJ | | |
| | Uranium-235/236 | pCi/L | | 0.00563 U | | |
| | Uranium-238 | pCi/L | | 0.0724 UJ | | |
| X749A-18G | Technetium-99 | pCi/L | | -0.872 U | | |
| | Uranium | µg/L | | 0.105 U | | |
| | Uranium-233/234 | pCi/L | | 0.0271 U | | |
| | Uranium-235/236 | pCi/L | | 0.0225 U | | |
| | Uranium-238 | pCi/L | | 0.0316 U | | |
| X749A-19G | Technetium-99 | pCi/L | | -0.387 U | | |
| | Uranium | µg/L | | 0.134 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0846 UJ | | |
| | Uranium-235/236 | pCi/L | | 0.0175 U | | |
| | Uranium-238 | pCi/L | | 0.0423 UJ | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.8. VOCs detected at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X700-02G | 1,1,1-Trichloroethane | µg/L | 5.2 J | | | |
| | 1,1-Dichloroethane | µg/L | 14 | | | |
| | 1,1-Dichloroethene | µg/L | 130 | | | |
| | Chloroethane | µg/L | 4.7 J | | | |
| | Chloroform | µg/L | 1.6 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 1800 | | | |
| | trans-1,2-Dichloroethene | µg/L | 4.6 J | | | |
| | Trichloroethene | µg/L | 4400 | | | |
| | Vinyl chloride | µg/L | 160 | | | |
| X700-04G | 1,1-Dichloroethane | µg/L | 4.7 J | | | |
| | 1,1-Dichloroethene | µg/L | 21 | | | |
| | Chloroethane | µg/L | 41 | | | |
| | cis-1,2-Dichloroethene | µg/L | 2800 | | | |
| | trans-1,2-Dichloroethene | µg/L | 21 | | | |
| | Trichloroethene | µg/L | 950 | | | |
| | Vinyl chloride | µg/L | 5200 | | | |
| X700-05G | 1,1,2-Trichloroethane | µg/L | 67 J | | | |
| | 1,1-Dichloroethene | µg/L | 100 J | | | |
| | Chloroform | µg/L | 32 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 44000 | | | |
| | Trichloroethene | µg/L | 89000 | | | |
| | Vinyl chloride | µg/L | 1200 | | | |
| X700-06G | 1,1,2-Trichloroethane | µg/L | 950 J | | | |
| | Chloroform | µg/L | 530 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 2100 | | | |
| | Trichloroethene | µg/L | 1100000 | | | |
| X701-26G | 1,1-Dichloroethene | µg/L | 0.23 U | | 0.93 J | |
| | Chloroform | µg/L | 0.31 J | | 0.32 J | |
| | Methylene chloride | µg/L | 0.32 BJ | | 0.32 U | |
| | Tetrachloroethene | µg/L | 1.4 | | 1.6 | |
| | Trichloroethene | µg/L | 0.58 J | | 0.4 J | |
| X701-27G | 1,1,1-Trichloroethane | µg/L | 0.68 J | | 0.79 J | |
| | 1,1-Dichloroethane | µg/L | 0.51 J | | 0.51 J | |
| | 1,1-Dichloroethene | µg/L | 1 | | 1.4 | |
| | cis-1,2-Dichloroethene | µg/L | 3.8 | | 6.2 | |
| | trans-1,2-Dichloroethene | µg/L | 0.15 U | | 0.2 J | |
| | Trichloroethene | µg/L | 9.7 | | 19 | |
| X701-45G | cis-1,2-Dichloroethene | µg/L | 0.7 J | | | |
| | Trichloroethene | µg/L | 11 | | | |
| X701-68G | 1,1,1-Trichloroethane | µg/L | 0.35 J | | | |
| | 1,1-Dichloroethane | µg/L | 0.28 J | | | |
| | 1,1-Dichloroethene | µg/L | 1.5 | | | |
| | Chloroform | µg/L | 0.19 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 15 | | | |
| | trans-1,2-Dichloroethene | µg/L | 0.23 J | | | |
| | Trichloroethene | µg/L | 56 | | | |
| | Trichlorofluoromethane | µg/L | 0.82 J | | | |
| X701-69G | cis-1,2-Dichloroethene | µg/L | 210 | | | |
| | Methylene chloride | µg/L | 2.4 BJ | | | |
| | trans-1,2-Dichloroethene | µg/L | 4.8 | | | |

4-28

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.8. VOCs detected at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-69G | Trichloroethene | µg/L | 750 | | | |
| | Vinyl chloride | µg/L | 0.52 J | | | |
| X701-70G | cis-1,2-Dichloroethene | µg/L | 250 | | | |
| | Methylene chloride | µg/L | 8.3 BJ | | | |
| | Trichloroethene | µg/L | 1400 | | | |
| | Vinyl chloride | µg/L | 1.1 J | | | |
| X701-117GA | 1,1-Dichloroethene | µg/L | 1.5 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 190 | | | |
| | Methylene chloride | µg/L | 2.7 BJ | | | |
| | trans-1,2-Dichloroethene | µg/L | 0.65 J | | | |
| | Trichloroethene | µg/L | 920 | | | |
| X705-01GA | Carbon tetrachloride | µg/L | 0.25 J | | | |
| | Chloroform | µg/L | 13 | | | |
| | Methylene chloride | µg/L | 0.35 BJ | | | |
| | Tetrachloroethene | µg/L | 0.37 J | | | |
| | Trichloroethene | µg/L | 40 | | | |
| X705-02G | 1,1-Dichloroethene | µg/L | 0.3 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 0.51 J | | | |
| | Trichloroethene | µg/L | 33 | | | |
| X705-03G | 1,1-Dichloroethane | µg/L | 1.3 | | | |
| | 1,1-Dichloroethene | µg/L | 9.8 | | | |
| | cis-1,2-Dichloroethene | µg/L | 8 | | | |
| | Tetrachloroethene | µg/L | 0.62 J | | | |
| | trans-1,2-Dichloroethene | µg/L | 0.29 J | | | |
| | Trichloroethene | µg/L | 90 | | | |
| X705-04G | 1,1-Dichloroethene | µg/L | 0.34 J | | | |
| | Carbon tetrachloride | µg/L | 8.7 | | | |
| | Chloroform | µg/L | 190 | | | |
| | Tetrachloroethene | µg/L | 1.4 | | | |
| | Trichloroethene | µg/L | 18 | | | |
| X705-06G | Chloroform | µg/L | 1.2 | | | |
| | cis-1,2-Dichloroethene | µg/L | 0.6 J | | | |
| | Tetrachloroethene | µg/L | 3.7 | | | |
| | Trichloroethene | µg/L | 10 | | | |
| X705-07G | Bromodichloromethane | µg/L | 0.17 J | | | |
| | Chloroform | µg/L | 1.3 | | | |
| | Chloromethane | µg/L | 0.42 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 0.19 J | | | |
| | Trichloroethene | µg/L | 7.1 | | | |
| X705-08G | 1,1-Dichloroethene | µg/L | 27 | | | |
| | Trichlorofluoromethane | µg/L | 14 | | | |
| X720-01G | 1,1,1-Trichloroethane | µg/L | 8.1 DJ | | | |
| | 1,1-Dichloroethene | µg/L | 57 D | | | |
| | Trichloroethene | µg/L | 6500 D | | | |
| | Vinyl chloride | µg/L | 85 D | | | |
| X720-08G | 1,1-Dichloroethene | µg/L | 93 | | | |
| | cis-1,2-Dichloroethene | µg/L | 27 J | | | |
| | Methylene chloride | µg/L | 14 J | | | |
| | Tetrachloroethene | µg/L | 24 J | | | |
| | Trichloroethene | µg/L | 10000 | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.8. VOCs detected at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X720-09G | 1,1,1-Trichloroethane | µg/L | 2800 | | | |
| | 1,1,2-Trichloroethane | µg/L | 72 J | | | |
| | 1,1-Dichloroethane | µg/L | 170 | | | |
| | 1,1-Dichloroethene | µg/L | 7500 J | | | |
| | 1,2-Dichloroethane | µg/L | 88 J | | | |
| | 1,2-Dimethylbenzene | µg/L | 220 | | | |
| | Acetone | µg/L | 1300 | | | |
| | Chloroform | µg/L | 65 J | | | |
| | cis-1,2-Dichloroethene | µg/L | 2400 | | | |
| | Ethylbenzene | µg/L | 150 | | | |
| | m,p-Xylenes | µg/L | 400 | | | |
| | Methylene chloride | µg/L | 52 J | | | |
| | Tetrachloroethene | µg/L | 620 | | | |
| | Toluene | µg/L | 770 | | | |
| | Trichloroethene | µg/L | 330000 | | | |
| | Vinyl chloride | µg/L | 100 | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.9.  Results for radionuclides at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X700-02G | Technetium-99 | pCi/L | 21.8 | | | |
| | Uranium | µg/L | 2.44 J | | | |
| | Uranium-233/234 | pCi/L | 0.668 | | | |
| | Uranium-235/236 | pCi/L | 0.0364 UJ | | | |
| | Uranium-238 | pCi/L | 0.815 | | | |
| X700-04G | Technetium-99 | pCi/L | 29.6 | | | |
| | Uranium | µg/L | 9.86 J | | | |
| | Uranium-233/234 | pCi/L | 4.39 | | | |
| | Uranium-235/236 | pCi/L | 0.202 J | | | |
| | Uranium-238 | pCi/L | 3.28 | | | |
| X700-05G | Technetium-99 | pCi/L | 2.12 U | | | |
| | Uranium | µg/L | 1.87 J | | | |
| | Uranium-233/234 | pCi/L | 0.983 | | | |
| | Uranium-235/236 | pCi/L | 0.031 UJ | | | |
| | Uranium-238 | pCi/L | 0.624 | | | |
| X700-06G | Technetium-99 | pCi/L | 21.9 | | | |
| | Uranium | µg/L | 12.2 J | | | |
| | Uranium-233/234 | pCi/L | 5.89 | | | |
| | Uranium-235/236 | pCi/L | 0.193 J | | | |
| | Uranium-238 | pCi/L | 4.05 | | | |
| X701-26G | Technetium-99 | pCi/L | 27 | | | |
| | Uranium | µg/L | 4.4 J | | | |
| | Uranium-233/234 | pCi/L | 2.41 | | | |
| | Uranium-235/236 | pCi/L | 0.0777 UJ | | | |
| | Uranium-238 | pCi/L | 1.47 | | | |
| X701-68G | Technetium-99 | pCi/L | 21.1 | | | |
| | Uranium | µg/L | 4.06 J | | | |
| | Uranium-233/234 | pCi/L | 1.6 | | | |
| | Uranium-235/236 | pCi/L | 0.0534 UJ | | | |
| | Uranium-238 | pCi/L | 1.35 | | | |
| X701-69G | Technetium-99 | pCi/L | 0 U | | | |
| | Uranium | µg/L | 5.74 J | | | |
| | Uranium-233/234 | pCi/L | 2.77 | | | |
| | Uranium-235/236 | pCi/L | 0.0793 UJ | | | |
| | Uranium-238 | pCi/L | 1.92 | | | |
| X701-70G | Technetium-99 | pCi/L | 13.7 | | | |
| | Uranium | µg/L | 2.04 J | | | |
| | Uranium-233/234 | pCi/L | 1 | | | |
| | Uranium-235/236 | pCi/L | 0.056 UJ | | | |
| | Uranium-238 | pCi/L | 0.676 | | | |
| X705-01GA | Americium-241 | pCi/L | 0.0315 U | | | |
| | Neptunium-237 | pCi/L | 0.00476 U | | | |
| | Plutonium-238 | pCi/L | 0.017 U | | | |
| | Plutonium-239/240 | pCi/L | 0.0284 U | | | |
| | Technetium-99 | pCi/L | 154 | | | |
| | Uranium | µg/L | 0.826 J | | | |
| | Uranium-233/234 | pCi/L | 0.461 | | | |
| | Uranium-235/236 | pCi/L | 0.0174 U | | | |
| | Uranium-238 | pCi/L | 0.275 | | | |
| X705-02G | Technetium-99 | pCi/L | 1.8 U | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.9. Results for radionuclides at the Quadrant II Groundwater Investigative (7-Unit) Area – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X705-02G | Uranium | µg/L | 4.53 J | | | |
| | Uranium-233/234 | pCi/L | 1.38 | | | |
| | Uranium-235/236 | pCi/L | 0.0834 UJ | | | |
| | Uranium-238 | pCi/L | 1.51 | | | |
| X705-07G | Technetium-99 | pCi/L | 74.7 | | | |
| | Uranium | µg/L | 1.19 J | | | |
| | Uranium-233/234 | pCi/L | 0.424 J | | | |
| | Uranium-235/236 | pCi/L | 0.0543 UJ | | | |
| | Uranium-238 | pCi/L | 0.393 J | | | |
| X720-01G | Technetium-99 | pCi/L | 1.99 U | | | |
| | Uranium | µg/L | 26 | | | |
| | Uranium-233/234 | pCi/L | 8.3 | | | |
| | Uranium-235/236 | pCi/L | 0.476 | | | |
| | Uranium-238 | pCi/L | 8.65 | | | |
| X720-08G | Technetium-99 | pCi/L | 191 | | | |
| | Uranium | µg/L | 3.58 J | | | |
| | Uranium-233/234 | pCi/L | 2.62 | | | |
| | Uranium-235/236 | pCi/L | 0.114 J | | | |
| | Uranium-238 | pCi/L | 1.19 | | | |
| X720-09G | Technetium-99 | pCi/L | 1.22 U | | | |
| | Uranium | µg/L | 9.02 | | | |
| | Uranium-233/234 | pCi/L | 7.63 | | | |
| | Uranium-235/236 | pCi/L | 0.429 | | | |
| | Uranium-238 | pCi/L | 2.96 | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10.  VOCs detected at the X-701B Former Holding Pond – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| LBC-PZ03G | 1,1-Dichloroethene | µg/L | 0.23 U | | 0.2 J | |
| | cis-1,2-Dichloroethene | µg/L | 110 | | 110 D | |
| | trans-1,2-Dichloroethene | µg/L | 0.85 J | | 1.4 | |
| | Trichloroethene | µg/L | 26 J | | 52 | |
| | Vinyl chloride | µg/L | 0.1 U | | 0.53 J | |
| LBC-PZ07G | Acetone | µg/L | | | 1.9 JQ | |
| X230J7-01GA | 1,1-Dichloroethene | µg/L | 0.46 U | | 0.21 J | |
| | Chloroform | µg/L | 0.32 U | | 0.18 J | |
| | cis-1,2-Dichloroethene | µg/L | 0.86 J | | 0.94 J | |
| | Trichloroethene | µg/L | 360 | | 340 D | |
| X230J7-02GA | Chloroform | µg/L | 0.32 U | | 0.2 J | |
| | cis-1,2-Dichloroethene | µg/L | 8.7 | | 10 | |
| | Tetrachloroethene | µg/L | 0.4 U | | 0.31 J | |
| | Trichloroethene | µg/L | 370 | | 340 DQ | |
| | Vinyl chloride | µg/L | 0.2 U | | 0.52 J | |
| X230J7-03GA | 1,1,2-Trichloroethane | µg/L | 1.1 DJ | | 1.6 U | |
| | cis-1,2-Dichloroethene | µg/L | 130 D | | 200 D | |
| | Tetrachloroethene | µg/L | 1.3 DJ | | 1.1 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 2.5 DJ | | 4.9 DJ | |
| | Trichloroethene | µg/L | 1200 D | | 1300 D | |
| | Vinyl chloride | µg/L | 1.8 DJ | | 8 D | |
| X237-EPW | cis-1,2-Dichloroethene | µg/L | | | 1900 DJ | |
| | Tetrachloroethene | µg/L | | | 8 DJ | |
| | trans-1,2-Dichloroethene | µg/L | | | 11 DJ | |
| | Trichloroethene | µg/L | | | 5800 D | |
| X237-WPW | 1,1,1-Trichloroethane | µg/L | | | 8.7 DJ | |
| | 1,1,2,2-Tetrachloroethane | µg/L | | | 75 D | |
| | 1,1,2-Trichloroethane | µg/L | | | 46 D | |
| | 1,1-Dichloroethene | µg/L | | | 16 DJ | |
| | Chloroform | µg/L | | | 4.8 DJ | |
| | cis-1,2-Dichloroethene | µg/L | | | 3500 D | |
| | Tetrachloroethene | µg/L | | | 67 D | |
| | trans-1,2-Dichloroethene | µg/L | | | 48 D | |
| | Trichloroethene | µg/L | | | 38000 D | |
| | Vinyl chloride | µg/L | | | 240 D | |
| X701-01G | 1,1-Dichloroethene | µg/L | 0.62 J | | 1.8 | |
| | cis-1,2-Dichloroethene | µg/L | 15 | | 40 J | |
| | trans-1,2-Dichloroethene | µg/L | 0.5 J | | 1.6 | |
| | Trichloroethene | µg/L | 83 D | | 190 D | |
| | Vinyl chloride | µg/L | 0.19 J | | 0.75 J | |
| X701-02G | 1,1-Dichloroethene | µg/L | 0.23 U | | 0.21 J | |
| | cis-1,2-Dichloroethene | µg/L | 2.8 | | 2.7 | |
| | Trichloroethene | µg/L | 9.1 | | 9.5 | |
| X701-06G | 1,1-Dichloroethane | µg/L | 0.23 J | | 0.8 J | |
| | 1,1-Dichloroethene | µg/L | 2.2 | | 5.9 | |
| | Chloroform | µg/L | 0.16 U | | 0.33 J | |
| | cis-1,2-Dichloroethene | µg/L | 16 | | 22 | |
| | trans-1,2-Dichloroethene | µg/L | 0.26 J | | 0.6 J | |
| | Trichloroethene | µg/L | 97 D | | 180 D | |
| | Vinyl chloride | µg/L | 0.34 J | | 0.74 J | |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10. VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-15G | 1,1-Dichloroethene | µg/L | 0.23 U | | 0.85 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 190 | | 780 D | |
| | trans-1,2-Dichloroethene | µg/L | 3.6 | | 8.4 D | |
| | Trichloroethene | µg/L | 3 | | 8.4 D | |
| | Vinyl chloride | µg/L | 0.1 U | | 2.2 DJ | |
| X701-16G | Trichloroethene | µg/L | 0.16 U | | 0.17 J | |
| X701-20G | 1,1,2,2-Tetrachloroethane | µg/L | 150 DJ | | 160 D | |
| | 1,1,2-Trichloroethane | µg/L | 140 U | | 65 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 1200 D | | 1000 D | |
| | Methylene chloride | µg/L | 180 DJ | | 32 U | |
| | Tetrachloroethene | µg/L | 120 DJ | | 130 D | |
| | trans-1,2-Dichloroethene | µg/L | 75 U | | 67 DJ | |
| | Trichloroethene | µg/L | 60000 D | | 51000 D | |
| X701-21G | 1,1,2,2-Tetrachloroethane | µg/L | 0.21 U | | 0.52 J | |
| | 1,1-Dichloroethane | µg/L | 0.22 U | | 0.23 J | |
| | 1,1-Dichloroethene | µg/L | 0.23 U | | 0.35 J | |
| | 1,2-Dichlorobenzene | µg/L | 0.29 J | | 0.31 J | |
| | Chloroform | µg/L | 0.16 U | | 0.18 J | |
| | cis-1,2-Dichloroethene | µg/L | 38 | | 54 | |
| | Tetrachloroethene | µg/L | 0.2 U | | 0.34 J | |
| | trans-1,2-Dichloroethene | µg/L | 0.3 J | | 1.2 | |
| | Trichloroethene | µg/L | 30 | | 120 D | |
| | Vinyl chloride | µg/L | 2 | | 3.7 | |
| X701-23G | cis-1,2-Dichloroethene | µg/L | | | 0.41 J | |
| | Trichloroethene | µg/L | | | 5.6 | |
| X701-24G | 1,1,2-Trichloroethane | µg/L | 4.1 DJ | | 16 U | |
| | 1,1-Dichloroethene | µg/L | 2.3 U | | 9.8 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 340 D | | 1400 D | |
| | Methylene chloride | µg/L | 3.4 DJ | | 16 U | |
| | trans-1,2-Dichloroethene | µg/L | 4 DJ | | 32 DJ | |
| | Trichloroethene | µg/L | 3600 D | | 15000 D | |
| | Vinyl chloride | µg/L | 6.2 DJ | | 61 D | |
| X701-30G | cis-1,2-Dichloroethene | µg/L | 0.18 J | | 0.16 J | |
| | Trichloroethene | µg/L | 4.4 | | 4.5 | |
| | Trichlorofluoromethane | µg/L | 0.67 J | | 0.9 J | |
| X701-31G | Trichloroethene | µg/L | | | 0.18 J | |
| X701-38G | Acetone | µg/L | | | 2.2 J | |
| X701-42G | 1,2-Dichlorobenzene | µg/L | | | 0.3 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 31 | |
| | Trichloroethene | µg/L | | | 7.2 | |
| | Vinyl chloride | µg/L | | | 1.9 | |
| X701-61B | 1,2-Dimethylbenzene | µg/L | | | 0.21 J | |
| | Acetone | µg/L | | | 200 J | |
| | m,p-Xylenes | µg/L | | | 2.7 | |
| X701-66G | 1,1-Dichloroethene | µg/L | 2.4 DJ | | 3 DJ | |
| | Chloroform | µg/L | 4 DJ | | 4.1 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 180 D | | | |
| | Tetrachloroethene | µg/L | 4.9 DJ | | 6.2 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 1.6 DJ | | 2.7 DJ | |
| | Trichloroethene | µg/L | 3300 D | | 4700 D | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10.  VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-66G | Vinyl chloride | µg/L | 5.5 DJ | | 11 UJ | |
| X701-77G | 1,1,1-Trichloroethane | µg/L | | | 1.6 DJ | |
| | 1,1-Dichloroethene | µg/L | | | 2.6 DJ | |
| | Chloroform | µg/L | | | 1.7 DJ | |
| | cis-1,2-Dichloroethene | µg/L | | | 46 D | |
| | Methylene chloride | µg/L | | | 4 DJ | |
| | Tetrachloroethene | µg/L | | | 9 DJ | |
| | trans-1,2-Dichloroethene | µg/L | | | 2 DJ | |
| | Trichloroethene | µg/L | | | 2400 D | |
| X701-79G | 1,1-Dichloroethene | µg/L | | | 0.19 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 4.7 | |
| | Trichloroethene | µg/L | | | 230 D | |
| X701-127G | 1,1,2,2-Tetrachloroethane | µg/L | 42 DJ | | 80 DJ | |
| | 1,1,2-Trichloroethane | µg/L | 58 DJ | | 67 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 850 D | | 1000 D | |
| | Methylene chloride | µg/L | 79 DJ | | 64 U | |
| | Tetrachloroethene | µg/L | 40 U | | 51 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 30 U | | 39 DJ | |
| | Trichloroethene | µg/L | 36000 D | | 52000 D | |
| X701-128G | 1,1,2-Trichloroethane | µg/L | 29 DJ | | 32 U | |
| | cis-1,2-Dichloroethene | µg/L | 440 D | | 340 D | |
| | Methylene chloride | µg/L | 34 DJ | | 32 U | |
| | Tetrachloroethene | µg/L | 40 DJ | | 41 DJ | |
| | Trichloroethene | µg/L | 32000 D | | 26000 D | |
| X701-130G | Chloroform | µg/L | | | 170 DJ | |
| | cis-1,2-Dichloroethene | µg/L | | | 690 D | |
| | Tetrachloroethene | µg/L | | | 220 DJ | |
| | Trichloroethene | µg/L | | | 150000 D | |
| X701-141G | 1,1-Dichloroethene | µg/L | | | 0.22 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 2.7 | |
| | Tetrachloroethene | µg/L | | | 0.21 J | |
| | Trichloroethene | µg/L | | | 220 D | |
| X701-142G | 1,1,2-Trichloroethane | µg/L | 15 DJ | | 15 DJ | |
| | 1,1-Dichloroethene | µg/L | 11 DJ | | 7.7 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 4100 D | | 3500 D | |
| | Methylene chloride | µg/L | 13 U | | 19 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 45 D | | 37 DJ | |
| | Trichloroethene | µg/L | 4500 D | | 5400 D | |
| | Vinyl chloride | µg/L | 19 DJ | | 91 D | |
| X701-143G | 1,1-Dichloroethene | µg/L | 0.46 U | | 1.6 DJ | |
| | 1,2-Dichloroethane | µg/L | 0.26 U | | 1.1 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 260 D | | 890 D | |
| | Methylene chloride | µg/L | 0.64 U | | 1.6 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 3.9 D | | 7 D | |
| | Trichloroethene | µg/L | 69 D | | 29 D | |
| | Vinyl chloride | µg/L | 2.5 D | | 260 D | |
| X701-144G | cis-1,2-Dichloroethene | µg/L | 88 D | | | |
| | trans-1,2-Dichloroethene | µg/L | 0.95 J | | | |
| | Trichloroethene | µg/L | 0.28 J | | | |
| | Vinyl chloride | µg/L | 42 | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10. VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-BW2G | 1,1-Dichloroethene | µg/L | | | 79 DJ | |
| | Chloroform | µg/L | | | 240 D | |
| | cis-1,2-Dichloroethene | µg/L | | | 480 D | |
| | Methylene chloride | µg/L | | | 91 DJ | |
| | Tetrachloroethene | µg/L | | | 47 DJ | |
| | Trichloroethene | µg/L | | | 53000 D | |
| X701-BW3G | 1,1-Dichloroethane | µg/L | | | 0.34 J | |
| | 1,1-Dichloroethene | µg/L | | | 0.85 J | |
| | cis-1,2-Dichloroethene | µg/L | | | 61 D | |
| | Tetrachloroethene | µg/L | | | 0.2 J | |
| | trans-1,2-Dichloroethene | µg/L | | | 0.28 J | |
| | Trichloroethene | µg/L | | | 62 D | |
| | Vinyl chloride | µg/L | | | 10 | |
| X701-BW4G | cis-1,2-Dichloroethene | µg/L | 5.6 | | 7.9 | |
| | trans-1,2-Dichloroethene | µg/L | 0.41 J | | 0.45 J | |
| | Trichloroethene | µg/L | 1.3 | | 2.3 | |
| | Vinyl chloride | µg/L | 0.1 U | | 0.5 JQ | |
| X701-EW121G | 1,1,2,2-Tetrachloroethane | µg/L | 220 DJ | | 160 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 760 D | | 670 D | |
| | Methylene chloride | µg/L | 160 DJ | | 260 DJ | |
| | Tetrachloroethene | µg/L | 120 DJ | | 130 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 76 DJ | | 70 DJ | |
| | Trichloroethene | µg/L | 81000 D | | 76000 D | |
| X701-EW122G | 1,1,2,2-Tetrachloroethane | µg/L | 110 D | | 78 DJ | |
| | 1,1,2-Trichloroethane | µg/L | 33 DJ | | 64 U | |
| | cis-1,2-Dichloroethene | µg/L | 320 D | | 320 D | |
| | Methylene chloride | µg/L | 47 DJ | | 130 DJ | |
| | Tetrachloroethene | µg/L | 110 D | | 77 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 37 DJ | | 30 U | |
| | Trichloroethene | µg/L | 27000 D | | 42000 D | |
| X701-IRMPZ03G | 1,1,2-Trichloroethane | µg/L | 2.3 DJ | | 1.6 U | |
| | 1,1-Dichloroethene | µg/L | 0.92 U | | 1.7 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 220 D | | 610 D | |
| | Methylene chloride | µg/L | 1.3 U | | 2.3 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 4.4 D | | 6 D | |
| | Trichloroethene | µg/L | 470 D | | 1100 D | |
| | Vinyl chloride | µg/L | 0.4 U | | 1.9 DJ | |
| X701-IRMPZ05G | cis-1,2-Dichloroethene | µg/L | 370 D | | | |
| | trans-1,2-Dichloroethene | µg/L | 5.1 DJ | | | |
| | Trichloroethene | µg/L | 1000 D | | | |
| | Vinyl chloride | µg/L | 5.4 DJ | | | |
| X701-IRMPZ06G | 1,1-Dichloroethene | µg/L | | | 0.36 DJ | |
| | Benzene | µg/L | | | 0.36 DJ | |
| | cis-1,2-Dichloroethene | µg/L | | | 440 D | |
| | trans-1,2-Dichloroethene | µg/L | | | 16 D | |
| | Trichloroethene | µg/L | | | 14 D | |
| | Vinyl chloride | µg/L | | | 30 D | |
| X701-IRMPZ07G | cis-1,2-Dichloroethene | µg/L | 5400 D | | | |
| | Tetrachloroethene | µg/L | 98 DJ | | | |
| | trans-1,2-Dichloroethene | µg/L | 79 DJ | | | |

4-36

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10.  VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-IRMPZ07G | Trichloroethene | µg/L | 56000 D | | | |
| | Vinyl chloride | µg/L | 410 D | | | |
| X701-IRMPZ08G | cis-1,2-Dichloroethene | µg/L | 23 | | 37 | |
| | trans-1,2-Dichloroethene | µg/L | 0.28 J | | 0.43 J | |
| | Trichloroethene | µg/L | 21 | | 46 | |
| X701-TC01G | 1,1,1-Trichloroethane | µg/L | 2.3 DJ | | 67 D | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 1 DJ | | 19 DJ | |
| | 1,1-Dichloroethane | µg/L | 0.88 U | | 8.1 DJ | |
| | 1,1-Dichloroethene | µg/L | 0.92 U | | 26 DJ | |
| | Chloromethane | µg/L | 1.2 U | | 41 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 90 DJ | | 5400 D | |
| | Tetrachloroethene | µg/L | 2.9 DJ | | 26 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 3 DJ | | 190 D | |
| | Trichloroethene | µg/L | 630 D | | 11000 D | |
| | Vinyl chloride | µg/L | 2.1 DJ | | 83 D | |
| X701-TC03G | 1,1,1-Trichloroethane | µg/L | 120 DJ | | 86 DJ | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 230 D | | 120 DJ | |
| | Chloromethane | µg/L | 60 U | | 99 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 6700 D | | 6400 D | |
| | Tetrachloroethene | µg/L | 89 DJ | | 56 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 710 D | | 610 D | |
| | Trichloroethene | µg/L | 60000 D | | 29000 D | |
| | Vinyl chloride | µg/L | 95 DJ | | 43 DJ | |
| X701-TC05G | 1,1,1-Trichloroethane | µg/L | 91 DJ | | 79 DJ | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 180 D | | 130 D | |
| | Acetone | µg/L | 190 U | | 200 DJ | |
| | Chloromethane | µg/L | 65 DJ | | 98 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 2900 D | | 2200 D | |
| | Tetrachloroethene | µg/L | 52 DJ | | 29 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 460 D | | 350 D | |
| | Trichloroethene | µg/L | 24000 D | | 10000 D | |
| X701-TC10G | 1,1,1-Trichloroethane | µg/L | 20 DJ | | 12 DJ | |
| | 1,1-Dichloroethene | µg/L | 23 U | | 12 DJ | |
| | cis-1,2-Dichloroethene | µg/L | 1500 D | | 1400 DJ | |
| | Tetrachloroethene | µg/L | 25 DJ | | 20 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 79 DJ | | 47 D | |
| | Trichloroethene | µg/L | 11000 D | | 9800 D | |
| | Vinyl chloride | µg/L | 50 DJ | | 44 DJ | |
| X701-TC17G | 1,1,1-Trichloroethane | µg/L | 26 DJQ | | 14 DJ | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 21 QU | | 18 DJQ | |
| | Acetone | µg/L | 190 QU | | 600 D | |
| | Chloroform | µg/L | 16 QU | | 13 DJ | |
| | Chloromethane | µg/L | 96 DJQ | | 88 D | |
| | cis-1,2-Dichloroethene | µg/L | 190 DQJ | | 73 D | |
| | Tetrachloroethene | µg/L | 53 DJ | | 21 DJQ | |
| | trans-1,2-Dichloroethene | µg/L | 15 QU | | 7.4 DJ | |
| | Trichloroethene | µg/L | 14000 D | | 6100 D | |
| X701-TC22G | 1,1,1-Trichloroethane | µg/L | 29 DJ | | 64 U | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 49 DJ | | 80 U | |
| | cis-1,2-Dichloroethene | µg/L | 1300 D | | 830 D | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10.  VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-TC22G | Tetrachloroethene | µg/L | 94 DJ | | 180 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 180 D | | 100 DJ | |
| | Trichloroethene | µg/L | 33000 D | | 57000 D | |
| | Vinyl chloride | µg/L | 40 DJ | | 40 U | |
| X701-TC28G | 1,1,1-Trichloroethane | µg/L | 180 DJ | | 160 U | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 160 DJ | | 200 QU | |
| | cis-1,2-Dichloroethene | µg/L | 530 D | | | |
| | Tetrachloroethene | µg/L | 1100 D | | 800 DJQ | |
| | Trichloroethene | µg/L | 170000 D | | 190000 DJ | |
| X701-TC48G | 1,1,1-Trichloroethane | µg/L | 4.8 DJ | | 2.6 DJ | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 14 D | | 11 D | |
| | 1,1,2-Trichloroethane | µg/L | 17 D | | 14 D | |
| | 2-Butanone | µg/L | 100 D | | 69 D | |
| | Acetone | µg/L | 720 D | | 750 D | |
| | Benzene | µg/L | 2.9 DJ | | 2.5 DJ | |
| | Bromomethane | µg/L | 5.2 DJ | | 3.3 DJ | |
| | Chloroform | µg/L | 5.4 DJ | | 4.5 DJ | |
| | Chloromethane | µg/L | 95 D | | 48 D | |
| | cis-1,2-Dichloroethene | µg/L | 50 D | | 34 D | |
| | Tetrachloroethene | µg/L | 22 DJ | | 8.9 DJQ | |
| | trans-1,2-Dichloroethene | µg/L | 7.5 DJ | | 4.4 DJ | |
| | Trichloroethene | µg/L | 2900 D | | 1200 D | |
| X701-TC54G | 1,1,2,2-Tetrachloroethane | µg/L | 890 D | | 770 DJ | |
| | 1,1,2-Trichloroethane | µg/L | 85 DJ | | 320 U | |
| | Acetone | µg/L | 260 DJ | | 1900 U | |
| | Chloroform | µg/L | 17 DJ | | 160 U | |
| | Chloromethane | µg/L | 34 DJ | | 300 U | |
| | cis-1,2-Dichloroethene | µg/L | 410 D | | 320 DJ | |
| | Methylene chloride | µg/L | 49 DJ | | 320 U | |
| | Tetrachloroethene | µg/L | 600 D | | 440 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 46 DJ | | 150 U | |
| | Trichloroethene | µg/L | 340000 DJ | | 140000 D | |
| X701-TC61G | 1,1,1-Trichloroethane | µg/L | 120 D | | 160 U | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 700 D | | 710 DJ | |
| | 1,1,2-Trichloroethane | µg/L | 87 DJ | | 320 U | |
| | Acetone | µg/L | 320 DJ | | 1900 U | |
| | cis-1,2-Dichloroethene | µg/L | 890 D | | 900 DJ | |
| | Methylene chloride | µg/L | 44 DJ | | 320 U | |
| | Tetrachloroethene | µg/L | 470 D | | 470 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 130 D | | 150 U | |
| | Trichloroethene | µg/L | 160000 D | | 150000 D | |
| X701-TC67G | 1,1,1-Trichloroethane | µg/L | 11 DJ | | 16 U | |
| | 1,1,2,2-Tetrachloroethane | µg/L | 22 DJ | | 20 U | |
| | cis-1,2-Dichloroethene | µg/L | 190 D | | 180 D | |
| | Methylene chloride | µg/L | 23 DJ | | 32 U | |
| | Tetrachloroethene | µg/L | 49 DJ | | 52 DJ | |
| | trans-1,2-Dichloroethene | µg/L | 10 DJ | | 15 U | |
| | Trichloroethene | µg/L | 15000 D | | 14000 D | |
| X744G-01G | Trichloroethene | µg/L | 0.16 J | | 0.16 U | |
| X744G-02G | cis-1,2-Dichloroethene | µg/L | 1.6 | | 2 | |

4-38

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.10.  VOCs detected at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X744G-02G | Trichloroethene | µg/L | 24 | | 31 | |
| | Trichlorofluoromethane | µg/L | 4.1 | | 5.4 | |
| X744G-03G | cis-1,2-Dichloroethene | µg/L | 0.62 J | | 0.66 J | |
| | Trichloroethene | µg/L | 7 | | 8.2 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11.  Results for radionuclides at the X-701B Former Holding Pond – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| LBC-PZ03G | Technetium-99 | pCi/L | -0.764 U | | | |
| | Uranium | µg/L | 0.0695 U | | | |
| | Uranium-233/234 | pCi/L | 0.045 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.00559 U | | | |
| | Uranium-238 | pCi/L | 0.0225 U | | | |
| LBC-PZ06G | Technetium-99 | pCi/L | 0.61 U | | | |
| | Uranium | µg/L | 0.225 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.0897 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.0062 U | | | |
| | Uranium-238 | pCi/L | 0.0747 UJ | | | |
| X230J7-01GA | Technetium-99 | pCi/L | 9.16 | | | |
| | Uranium | µg/L | 0.232 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.059 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.00564 U | | | |
| | Uranium-238 | pCi/L | 0.0771 UJ | | | |
| X230J7-02GA | Technetium-99 | pCi/L | 131 | | | |
| | Uranium | µg/L | 0.198 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.0411 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.0171 U | | | |
| | Uranium-238 | pCi/L | 0.064 UJ | | | |
| X230J7-03GA | Americium-241 | pCi/L | 0.0345 U | | | |
| | Neptunium-237 | pCi/L | 0.00432 U | | | |
| | Plutonium-238 | pCi/L | 0.0184 U | | | |
| | Plutonium-239/240 | pCi/L | 0.049 U | | | |
| | Technetium-99 | pCi/L | 90 | | | |
| | Uranium | µg/L | 0.4 J | | | |
| | Uranium-233/234 | pCi/L | 0.142 J | | | |
| | Uranium-235/236 | pCi/L | 0.0122 U | | | |
| | Uranium-238 | pCi/L | 0.132 J | | | |
| X230J7-04GA | Technetium-99 | pCi/L | | | 3.44 U | |
| | Uranium | µg/L | | | 0.192 U | |
| | Uranium-233/234 | pCi/L | | | 0.0689 U | |
| | Uranium-235/236 | pCi/L | | | 0.00659 U | |
| | Uranium-238 | pCi/L | | | 0.0636 U | |
| X701-01G | Technetium-99 | pCi/L | -1.96 U | | | |
| | Uranium | µg/L | 2.84 J | | | |
| | Uranium-233/234 | pCi/L | 1.27 | | | |
| | Uranium-235/236 | pCi/L | 0.0709 UJ | | | |
| | Uranium-238 | pCi/L | 0.945 | | | |
| X701-02G | Technetium-99 | pCi/L | -0.366 U | | | |
| | Uranium | µg/L | 0.713 J | | | |
| | Uranium-233/234 | pCi/L | 0.648 | | | |
| | Uranium-235/236 | pCi/L | 0.0167 U | | | |
| | Uranium-238 | pCi/L | 0.237 J | | | |
| X701-06G | Technetium-99 | pCi/L | 26.2 | | | |
| | Uranium | µg/L | 8.45 | | | |
| | Uranium-233/234 | pCi/L | 5.79 | | | |
| | Uranium-235/236 | pCi/L | 0.345 | | | |
| | Uranium-238 | pCi/L | 2.79 | | | |
| X701-15G | Technetium-99 | pCi/L | 0.943 U | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11.  Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-15G | Uranium | µg/L | 0.088 U | | | |
| | Uranium-233/234 | pCi/L | 0.0371 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.0115 U | | | |
| | Uranium-238 | pCi/L | 0.0278 U | | | |
| X701-16G | Technetium-99 | pCi/L | 1.29 U | | | |
| | Uranium | µg/L | 0.182 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.0464 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.00577 U | | | |
| | Uranium-238 | pCi/L | 0.0603 UJ | | | |
| X701-18G | Technetium-99 | pCi/L | | | 3.22 U | |
| | Uranium | µg/L | | | 0.0749 U | |
| | Uranium-233/234 | pCi/L | | | 0.0302 U | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.0252 U | |
| X701-19G | Technetium-99 | pCi/L | 3.56 U | | | |
| | Uranium | µg/L | 0.0303 U | | | |
| | Uranium-233/234 | pCi/L | 0.0186 U | | | |
| | Uranium-235/236 | pCi/L | 0.00578 U | | | |
| | Uranium-238 | pCi/L | 0.0093 U | | | |
| X701-20G | Americium-241 | pCi/L | 0.0155 U | | 0.0157 U | |
| | Neptunium-237 | pCi/L | 0.00483 U | | 0.00951 U | |
| | Plutonium-238 | pCi/L | 0.0107 U | | 0 U | |
| | Plutonium-239/240 | pCi/L | 0.0107 U | | 0.0107 U | |
| | Technetium-99 | pCi/L | 228 | | 244 | |
| | Uranium | µg/L | 0.34 J | | 0.377 J | |
| | Uranium-233/234 | pCi/L | 0.0759 UJ | | 0.189 J | |
| | Uranium-235/236 | pCi/L | 0.0189 UJ | | 0.00602 U | |
| | Uranium-238 | pCi/L | 0.111 J | | 0.126 J | |
| X701-21G | Technetium-99 | pCi/L | 431 | | | |
| | Uranium | µg/L | 0.225 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.0462 UJ | | | |
| | Uranium-235/236 | pCi/L | 0.0115 UJ | | | |
| | Uranium-238 | pCi/L | 0.0739 U | | | |
| X701-23G | Technetium-99 | pCi/L | | | 22 | |
| | Uranium | µg/L | | | 0.0612 U | |
| | Uranium-233/234 | pCi/L | | | 0.00981 U | |
| | Uranium-235/236 | pCi/L | | | 0.0061 U | |
| | Uranium-238 | pCi/L | | | 0.0196 U | |
| X701-24G | Americium-241 | pCi/L | 0.00482 U | | | |
| | Neptunium-237 | pCi/L | -0.00471 U | | | |
| | Plutonium-238 | pCi/L | 0.00546 U | | | |
| | Plutonium-239/240 | pCi/L | 0.0437 UJ | | | |
| | Technetium-99 | pCi/L | 5.52 UJ | | | |
| | Uranium | µg/L | 0.398 J | | | |
| | Uranium-233/234 | pCi/L | 0.11 J | | | |
| | Uranium-235/236 | pCi/L | 0.0057 U | | | |
| | Uranium-238 | pCi/L | 0.133 J | | | |
| X701-25G | Technetium-99 | pCi/L | 0.85 U | | | |
| | Uranium | µg/L | 0.0326 U | | | |
| | Uranium-233/234 | pCi/L | 0.00918 U | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11.  Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-25G | Uranium-235/236 | pCi/L | 0.0114 U | | | |
| | Uranium-238 | pCi/L | 0.00918 U | | | |
| X701-30G | Technetium-99 | pCi/L | 2.51 U | | | |
| | Uranium | µg/L | 0.308 J | | | |
| | Uranium-233/234 | pCi/L | 0.124 J | | | |
| | Uranium-235/236 | pCi/L | 0.011 UJ | | | |
| | Uranium-238 | pCi/L | 0.102 J | | | |
| X701-31G | Technetium-99 | pCi/L | | | 0.264 U | |
| | Uranium | µg/L | | | 0.14 JU | |
| | Uranium-233/234 | pCi/L | | | 0.08 JU | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.047 JU | |
| X701-38G | Technetium-99 | pCi/L | | | -0.331 U | |
| | Uranium | µg/L | | | 0.0157 U | |
| | Uranium-233/234 | pCi/L | | | 0.0133 U | |
| | Uranium-235/236 | pCi/L | | | 0.00551 U | |
| | Uranium-238 | pCi/L | | | 0.00443 U | |
| X701-42G | Technetium-99 | pCi/L | | | 422 | |
| | Uranium | µg/L | | | 0.126 U | |
| | Uranium-233/234 | pCi/L | | | 0.0519 JU | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.0425 JU | |
| X701-48G | Americium-241 | pCi/L | | | 0 U | |
| | Neptunium-237 | pCi/L | | | -0.00506 U | |
| | Plutonium-238 | pCi/L | | | 0.00576 U | |
| | Plutonium-239/240 | pCi/L | | | 0.0173 U | |
| | Technetium-99 | pCi/L | | | 0.954 U | |
| | Uranium | µg/L | | | 0.0959 U | |
| | Uranium-233/234 | pCi/L | | | 0.0143 U | |
| | Uranium-235/236 | pCi/L | | | 0.0237 U | |
| | Uranium-238 | pCi/L | | | 0.0286 U | |
| X701-58B | Technetium-99 | pCi/L | | | 3.18 U | |
| | Uranium | µg/L | | | 0.155 | |
| | Uranium-233/234 | pCi/L | | | 0.164 | |
| | Uranium-235/236 | pCi/L | | | 0.024 U | |
| | Uranium-238 | pCi/L | | | 0.0483 U | |
| X701-61B | Technetium-99 | pCi/L | | | 2 U | |
| | Uranium | µg/L | | | 0.2 U | |
| | Uranium-233/234 | pCi/L | | | 0.106 | |
| | Uranium-235/236 | pCi/L | | | 0.0599 U | |
| | Uranium-238 | pCi/L | | | 0.0578 | |
| X701-66G | Americium-241 | pCi/L | 0.0342 U | | 0.0319 U | |
| | Neptunium-237 | pCi/L | 0.00429 U | | 0 U | |
| | Plutonium-238 | pCi/L | 0 U | | 0 U | |
| | Plutonium-239/240 | pCi/L | 0.0434 U | | -0.0121 U | |
| | Technetium-99 | pCi/L | 316 | | 360 | |
| | Uranium | µg/L | 0.303 J | | 0.379 | |
| | Uranium-233/234 | pCi/L | 0.0832 UJ | | 0.171 | |
| | Uranium-235/236 | pCi/L | 0.0194 U | | 0.0125 U | |
| | Uranium-238 | pCi/L | 0.0988 J | | 0.125 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11.  Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-77G | Technetium-99 | pCi/L | | | 37.5 | |
| | Uranium | µg/L | | | 0.171 JU | |
| | Uranium-233/234 | pCi/L | | | 0.0926 J | |
| | Uranium-235/236 | pCi/L | | | 0.0115 U | |
| | Uranium-238 | pCi/L | | | 0.0555 JU | |
| X701-79G | Technetium-99 | pCi/L | | | 53.5 | |
| | Uranium | µg/L | | | 0.0527 U | |
| | Uranium-233/234 | pCi/L | | | 0.0198 U | |
| | Uranium-235/236 | pCi/L | | | 0.0185 U | |
| | Uranium-238 | pCi/L | | | 0.0148 U | |
| X701-127G | Americium-241 | pCi/L | 0.0103 U | | 0.00492 U | |
| | Neptunium-237 | pCi/L | -0.00447 U | | 0 U | |
| | Plutonium-238 | pCi/L | 0.0171 U | | -0.00601 U | |
| | Plutonium-239/240 | pCi/L | 0.0114 U | | 0.0542 U | |
| | Technetium-99 | pCi/L | 92.9 | | 134 | |
| | Uranium | µg/L | 0.302 J | | 0.174 U | |
| | Uranium-233/234 | pCi/L | 0.0936 J | | 0.0496 U | |
| | Uranium-235/236 | pCi/L | 0.0184 UJ | | -0.00618 U | |
| | Uranium-238 | pCi/L | 0.0985 J | | 0.0596 U | |
| X701-128G | Americium-241 | pCi/L | -0.0155 U | | | |
| | Neptunium-237 | pCi/L | 0.0091 U | | | |
| | Plutonium-238 | pCi/L | -0.00571 U | | | |
| | Plutonium-239/240 | pCi/L | 0.0114 U | | | |
| | Technetium-99 | pCi/L | 40.8 | | | |
| | Uranium | µg/L | 0.23 UJ | | | |
| | Uranium-233/234 | pCi/L | 0.101 J | | | |
| | Uranium-235/236 | pCi/L | 0.0164 UJ | | | |
| | Uranium-238 | pCi/L | 0.0748 U | | | |
| X701-130G | Technetium-99 | pCi/L | | | 1150 | |
| | Uranium | µg/L | | | 5.26 | |
| | Uranium-233/234 | pCi/L | | | 8.24 | |
| | Uranium-235/236 | pCi/L | | | 0.372 | |
| | Uranium-238 | pCi/L | | | 1.71 | |
| X701-BW1G | Technetium-99 | pCi/L | | | 6.69 UJ | |
| | Uranium | µg/L | | | 0.0555 U | |
| | Uranium-233/234 | pCi/L | | | 0.0534 UJ | |
| | Uranium-235/236 | pCi/L | | | 0.00553 U | |
| | Uranium-238 | pCi/L | | | 0.0178 U | |
| X701-BW2G | Technetium-99 | pCi/L | | | 1260 | |
| | Uranium | µg/L | | | 0.156 JU | |
| | Uranium-233/234 | pCi/L | | | 0.0428 JU | |
| | Uranium-235/236 | pCi/L | | | 0 U | |
| | Uranium-238 | pCi/L | | | 0.0523 JU | |
| X701-BW3G | Technetium-99 | pCi/L | | | 108 | |
| | Uranium | µg/L | | | 0.0516 U | |
| | Uranium-233/234 | pCi/L | | | 0.0194 U | |
| | Uranium-235/236 | pCi/L | | | 0.0181 U | |
| | Uranium-238 | pCi/L | | | 0.0145 U | |
| X701-BW4G | Technetium-99 | pCi/L | 81.6 | | | |
| | Uranium | µg/L | 0.0333 U | | | |

4-43

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11. Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-BW4G | Uranium-233/234 | pCi/L | 0.0217 U | | | |
| | Uranium-235/236 | pCi/L | 0.0162 U | | | |
| | Uranium-238 | pCi/L | 0.00867 U | | | |
| X701-EW121G | Technetium-99 | pCi/L | 174 | | 160 | |
| | Uranium | µg/L | 0.291 UJ | | 0.155 | |
| | Uranium-233/234 | pCi/L | 0.153 J | | 0.125 | |
| | Uranium-235/236 | pCi/L | 0 U | | 0 U | |
| | Uranium-238 | pCi/L | 0.0978 UJ | | 0.0522 | |
| X701-EW122G | Technetium-99 | pCi/L | 323 | | 272 | |
| | Uranium | µg/L | 0.712 J | | 0.622 | |
| | Uranium-233/234 | pCi/L | 0.208 J | | 0.171 | |
| | Uranium-235/236 | pCi/L | 0.0123 UJ | | 0.0343 U | |
| | Uranium-238 | pCi/L | 0.237 J | | 0.204 | |
| X701-TC01G | Americium-241 | pCi/L | 0.0442 U | | 0.00542 U | |
| | Neptunium-237 | pCi/L | 0.00906 U | | 0.0152 U | |
| | Plutonium-238 | pCi/L | 0.01 U | | -0.0117 U | |
| | Plutonium-239/240 | pCi/L | 0.0301 U | | 0.0117 U | |
| | Technetium-99 | pCi/L | 41.5 | | 280 | |
| | Uranium | µg/L | 20.1 J | | 8.3 | |
| | Uranium-233/234 | pCi/L | 13.7 | | 4.52 | |
| | Uranium-235/236 | pCi/L | 0.811 J | | 0.237 | |
| | Uranium-238 | pCi/L | 6.63 | | 2.75 | |
| X701-TC03G | Americium-241 | pCi/L | 0.0105 U | | 0.0207 U | |
| | Neptunium-237 | pCi/L | 0.00503 U | | 0 U | |
| | Plutonium-238 | pCi/L | -0.016 U | | 0.0116 U | |
| | Plutonium-239/240 | pCi/L | 0.00534 U | | 0.0407 U | |
| | Technetium-99 | pCi/L | 887 | | 634 | |
| | Uranium | µg/L | 4.87 J | | 5.07 | |
| | Uranium-233/234 | pCi/L | 1.53 | | 2.07 | |
| | Uranium-235/236 | pCi/L | 0.0854 UJ | | 0.114 | |
| | Uranium-238 | pCi/L | 1.62 | | 1.68 | |
| X701-TC05G | Americium-241 | pCi/L | 0.0157 U | | 0.0205 U | |
| | Neptunium-237 | pCi/L | 0 U | | 0.00968 U | |
| | Plutonium-238 | pCi/L | 0.0048 U | | 0.00557 U | |
| | Plutonium-239/240 | pCi/L | 0.0144 U | | 0.0223 U | |
| | Technetium-99 | pCi/L | 887 | | 731 | |
| | Uranium | µg/L | 13.2 J | | 17.5 | |
| | Uranium-233/234 | pCi/L | 5.5 | | 6.68 | |
| | Uranium-235/236 | pCi/L | 0.296 J | | 0.373 | |
| | Uranium-238 | pCi/L | 4.4 | | 5.83 | |
| X701-TC10G | Americium-241 | pCi/L | 0.0305 U | | 0.0227 U | |
| | Neptunium-237 | pCi/L | 0 U | | 0.00535 U | |
| | Plutonium-238 | pCi/L | -0.0106 U | | -0.00627 U | |
| | Plutonium-239/240 | pCi/L | 0.0213 U | | 0.00627 U | |
| | Technetium-99 | pCi/L | 232 | | 168 | |
| | Uranium | µg/L | 6.81 J | | 11.2 | |
| | Uranium-233/234 | pCi/L | 2.51 | | 4.12 | |
| | Uranium-235/236 | pCi/L | 0.0895 UJ | | 0.244 | |
| | Uranium-238 | pCi/L | 2.27 | | 3.74 | |
| X701-TC17G | Americium-241 | pCi/L | 0.0319 U | | -0.0218 U | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11.  Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-TC17G | Neptunium-237 | pCi/L | 0.00449 U | | -0.0156 U | |
| | Plutonium-238 | pCi/L | 0.0101 U | | 0.0117 U | |
| | Plutonium-239/240 | pCi/L | 0.0203 U | | 0.0234 U | |
| | Technetium-99 | pCi/L | 339 | | 334 | |
| | Uranium | µg/L | 31.7 J | | 45.5 | |
| | Uranium-233/234 | pCi/L | 11.9 | | 17.9 | |
| | Uranium-235/236 | pCi/L | 0.773 J | | 1.04 | |
| | Uranium-238 | pCi/L | 10.5 | | 15.1 | |
| X701-TC22G | Americium-241 | pCi/L | 0.037 U | | 0.026 U | |
| | Neptunium-237 | pCi/L | 0.00447 U | | -0.00485 U | |
| | Plutonium-238 | pCi/L | -0.00481 U | | -0.0122 U | |
| | Plutonium-239/240 | pCi/L | 0.0144 U | | 0.00612 U | |
| | Technetium-99 | pCi/L | 393 | | 316 | |
| | Uranium | µg/L | 1.11 J | | 1.11 | |
| | Uranium-233/234 | pCi/L | 0.328 | | 0.381 | |
| | Uranium-235/236 | pCi/L | 0.03 UJ | | 0.0241 U | |
| | Uranium-238 | pCi/L | 0.367 | | 0.368 | |
| X701-TC28G | Americium-241 | pCi/L | -0.0105 U | | 0.0106 U | |
| | Neptunium-237 | pCi/L | -0.00473 U | | 0 U | |
| | Plutonium-238 | pCi/L | 0.00509 U | | 0.00619 U | |
| | Plutonium-239/240 | pCi/L | 0.0255 U | | 0.0124 U | |
| | Technetium-99 | pCi/L | 364 | | 339 | |
| | Uranium | µg/L | 17.2 J | | 20.6 | |
| | Uranium-233/234 | pCi/L | 6.97 | | 7.46 | |
| | Uranium-235/236 | pCi/L | 0.316 J | | 0.394 | |
| | Uranium-238 | pCi/L | 5.73 | | 6.85 | |
| X701-TC48G | Americium-241 | pCi/L | 0.0446 U | | 0.00495 U | |
| | Neptunium-237 | pCi/L | 0.00474 U | | 0.0135 U | |
| | Plutonium-238 | pCi/L | 0.00478 U | | 0.00559 U | |
| | Plutonium-239/240 | pCi/L | 0.0143 U | | 0.0168 U | |
| | Technetium-99 | pCi/L | 284 | | 271 | |
| | Uranium | µg/L | 68.7 J | | 90.5 | |
| | Uranium-233/234 | pCi/L | 24.7 J | | 31.7 | |
| | Uranium-235/236 | pCi/L | 1.07 J | | 1.63 | |
| | Uranium-238 | pCi/L | 22.9 J | | 30.1 | |
| X701-TC54G | Americium-241 | pCi/L | 0.0147 U | | 0.027 U | |
| | Neptunium-237 | pCi/L | -0.00447 U | | -0.00496 U | |
| | Plutonium-238 | pCi/L | -0.00989 U | | 0.0194 U | |
| | Plutonium-239/240 | pCi/L | 0.0099 U | | 0.0324 U | |
| | Technetium-99 | pCi/L | 466 | | 435 | |
| | Uranium | µg/L | 2.04 J | | 2.64 | |
| | Uranium-233/234 | pCi/L | 0.527 | | 0.792 | |
| | Uranium-235/236 | pCi/L | 0.0321 UJ | | 0.0242 U | |
| | Uranium-238 | pCi/L | 0.682 | | 0.882 | |
| X701-TC61G | Americium-241 | pCi/L | 0.0401 U | | 0 U | |
| | Neptunium-237 | pCi/L | -0.00529 U | | -0.00468 U | |
| | Plutonium-238 | pCi/L | -0.0157 U | | 0 U | |
| | Plutonium-239/240 | pCi/L | 0.00524 U | | 0.0227 U | |
| | Technetium-99 | pCi/L | 523 | | 458 | |
| | Uranium | µg/L | 2.11 J | | 1.58 | |

4-45

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.11. Results for radionuclides at the X-701B Former Holding Pond – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X701-TC61G | Uranium-233/234 | pCi/L | 0.547 | | 0.546 | |
| | Uranium-235/236 | pCi/L | 0.0851 UJ | | 0.021 U | |
| | Uranium-238 | pCi/L | 0.694 | | 0.529 | |
| X701-TC67G | Americium-241 | pCi/L | 0.025 U | | 0.0103 U | |
| | Neptunium-237 | pCi/L | 0.00471 U | | -0.0142 U | |
| | Plutonium-238 | pCi/L | 0.00511 U | | -0.0114 U | |
| | Plutonium-239/240 | pCi/L | 0.00511 U | | 0.0342 U | |
| | Technetium-99 | pCi/L | 125 | | 112 | |
| | Uranium | µg/L | 0.62 J | | 1.32 | |
| | Uranium-233/234 | pCi/L | 0.143 J | | 0.323 | |
| | Uranium-235/236 | pCi/L | 0.0237 UJ | | 0.0175 U | |
| | Uranium-238 | pCi/L | 0.205 J | | 0.44 | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.12.  Results for chromium at the X-633 Former Recirculating Cooling Water Complex –
2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X633-07G | Chromium | µg/L | | 1400 J | | 1300 J |
| X633-PZ04G | Chromium | µg/L | | 48 | | 46 |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.13. VOCs detected at the X-616 Former Chromium Sludge Surface Impoundments – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X616-02G | 1,1-Dichloroethene | µg/L | 0.25 J | | | |
| | Trichloroethene | µg/L | 0.35 J | | | |
| X616-09G | 1,1,1-Trichloroethane | µg/L | 2.7 | | 4 | |
| | 1,1-Dichloroethane | µg/L | 2.9 | | 4 | |
| | 1,1-Dichloroethene | µg/L | 25 | | 40 | |
| | cis-1,2-Dichloroethene | µg/L | 3.3 | | 2.9 | |
| | Trichloroethene | µg/L | 23 | | 29 | |
| | Trichlorofluoromethane | µg/L | 0.3 J | | 0.84 J | |
| X616-13G | 1,1,1-Trichloroethane | µg/L | 3.4 | | 3.8 | |
| | 1,1-Dichloroethane | µg/L | 0.98 J | | 1.1 | |
| | 1,1-Dichloroethene | µg/L | 25 | | 28 J | |
| | cis-1,2-Dichloroethene | µg/L | 0.52 J | | 0.59 J | |
| | Trichloroethene | µg/L | 14 | | 18 J | |
| | Trichlorofluoromethane | µg/L | 8.3 | | 8.6 J | |
| X616-14G | 1,1,1-Trichloroethane | µg/L | 1.4 | | 1.7 | |
| | 1,1-Dichloroethane | µg/L | 0.35 J | | 0.4 J | |
| | 1,1-Dichloroethene | µg/L | 8.5 | | 11 J | |
| | Trichloroethene | µg/L | 2.7 | | 3.7 J | |
| | Trichlorofluoromethane | µg/L | 0.93 J | | 1.3 J | |
| X616-16G | cis-1,2-Dichloroethene | µg/L | 0.94 J | | | |
| | Trichloroethene | µg/L | 0.69 J | | | |
| X616-20B | 1,1,1-Trichloroethane | µg/L | 0.35 JQ | | 0.3 J | |
| | 1,1-Dichloroethane | µg/L | 0.58 J | | 0.44 J | |
| | 1,1-Dichloroethene | µg/L | 5.3 QJ | | 4.6 | |
| | cis-1,2-Dichloroethene | µg/L | 0.55 J | | 0.44 J | |
| | Trichloroethene | µg/L | 16 | | 11 | |
| X616-25G | 1,1-Dichloroethane | µg/L | 0.22 U | | 0.19 J | |
| | cis-1,2-Dichloroethene | µg/L | 0.61 J | | 0.54 J | |
| | Trichloroethene | µg/L | 2.9 | | 1.3 | |
| X616-28B | 1,1,1-Trichloroethane | µg/L | 0.79 JQ | | | |
| | 1,1-Dichloroethane | µg/L | 0.64 JQ | | | |
| | Trichloroethene | µg/L | 0.48 J | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.14.  Results for chromium at the X-616 Former Chromium Sludge Surface Impoundments – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X616-02G | Chromium | µg/L | 0.51 J | | | |
| X616-05G | Chromium | µg/L | 530 J | | | |
| X616-09G | Chromium | µg/L | 6.3 | | | |
| X616-10G | Chromium | µg/L | 0.5 U | | | |
| X616-13G | Chromium | µg/L | 0.5 U | | | |
| X616-14G | Chromium | µg/L | 1.6 J | | | |
| X616-16G | Chromium | µg/L | 0.5 U | | | |
| X616-17G | Chromium | µg/L | 14 J | | | |
| X616-19B | Chromium | µg/L | 17 | | | |
| X616-20B | Chromium | µg/L | 2.4 | | | |
| X616-21G | Chromium | µg/L | 1.4 J | | | |
| X616-22G | Chromium | µg/L | 0.58 J | | | |
| X616-24B | Chromium | µg/L | 5.3 | | | |
| X616-25G | Chromium | µg/L | 3.2 | | | |
| X616-26G | Chromium | µg/L | 7.7 | | | |
| X616-28B | Chromium | µg/L | 0.56 J | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.15.  VOCs detected at the X-740 Former Waste Oil Handling Facility – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X740-02G | 1,1,1-Trichloroethane | µg/L | | 1.7 | | |
| | 1,1-Dichloroethane | µg/L | | 2 | | |
| | 1,1-Dichloroethene | µg/L | | 3 | | |
| | Trichloroethene | µg/L | | 4.4 | | |
| X740-03G | 1,1-Dichloroethane | µg/L | | 2.6 D | | |
| | 1,1-Dichloroethene | µg/L | | 52 D | | |
| | 1,2-Dichloroethane | µg/L | | 6.5 D | | |
| | Chloroethane | µg/L | | 6.8 D | | |
| | trans-1,2-Dichloroethene | µg/L | | 0.76 DJ | | |
| | Trichloroethene | µg/L | | 4.8 D | | |
| | Vinyl chloride | µg/L | | 9.1 D | | |
| X740-04G | 1,1-Dichloroethene | µg/L | | 0.25 J | | |
| | Trichloroethene | µg/L | | 2.6 | | |
| X740-08G | 1,1,1-Trichloroethane | µg/L | | 1.1 | | |
| | 1,1-Dichloroethane | µg/L | | 13 | | |
| | 1,1-Dichloroethene | µg/L | | 1.7 | | |
| | cis-1,2-Dichloroethene | µg/L | | 14 | | |
| | trans-1,2-Dichloroethene | µg/L | | 3.7 | | |
| | Trichloroethene | µg/L | | 7.4 | | |
| X740-09B | 1,1,1-Trichloroethane | µg/L | | 7.6 D | | |
| | 1,1-Dichloroethane | µg/L | | 25 D | | |
| | 1,1-Dichloroethene | µg/L | | 240 D | | |
| | 1,2-Dichloroethane | µg/L | | 68 D | | |
| | Chloroform | µg/L | | 1.3 DJ | | |
| | cis-1,2-Dichloroethene | µg/L | | 1600 D | | |
| | Methylene chloride | µg/L | | 2.2 DJ | | |
| | Tetrachloroethene | µg/L | | 8.1 D | | |
| | trans-1,2-Dichloroethene | µg/L | | 1.9 DJ | | |
| | Trichloroethene | µg/L | | 490 D | | |
| | Vinyl chloride | µg/L | | 4.3 DJ | | |
| X740-10G | 1,1,1-Trichloroethane | µg/L | | 0.29 J | | |
| | 1,1-Dichloroethane | µg/L | | 2 | | |
| | 1,1-Dichloroethene | µg/L | | 9.3 | | |
| | 1,2-Dichloroethane | µg/L | | 3.2 | | |
| | cis-1,2-Dichloroethene | µg/L | | 57 | | |
| | Tetrachloroethene | µg/L | | 0.77 J | | |
| | Trichloroethene | µg/L | | 41 | | |
| X740-11G | 1,1,1-Trichloroethane | µg/L | | 0.9 J | | |
| | 1,1-Dichloroethane | µg/L | | 0.49 J | | |
| | 1,1-Dichloroethene | µg/L | | 7.1 J | | |
| | 1,2-Dichloroethane | µg/L | | 2.1 | | |
| | Chloroform | µg/L | | 0.23 J | | |
| | Trichloroethene | µg/L | | 28 J | | |
| X740-13G | Acetone | µg/L | | 3.9 J | | |
| X740-14B | Trichloroethene | µg/L | | 1.6 | | |
| X740-18G | 1,1-Dichloroethene | µg/L | | 1.8 | | |
| | 2-Butanone | µg/L | | 120 | | |
| | Acetone | µg/L | | 280 D | | |
| | Chloroethane | µg/L | | 1.3 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 17 | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.15. VOCs detected at the X-740 Former Waste Oil Handling Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X740-18G | trans-1,2-Dichloroethene | µg/L | | 0.33 J | | |
| | Trichloroethene | µg/L | | 0.23 J | | |
| | Vinyl chloride | µg/L | | 4.9 | | |
| X740-19G | 1,1-Dichloroethane | µg/L | | 0.29 J | | |
| | 1,1-Dichloroethene | µg/L | | 1.6 | | |
| | 1,2-Dichloroethane | µg/L | | 0.66 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 11 | | |
| | Tetrachloroethene | µg/L | | 0.44 J | | |
| | Trichloroethene | µg/L | | 7.6 | | |
| X740-20G | cis-1,2-Dichloroethene | µg/L | | 1.8 | | |
| | Trichloroethene | µg/L | | 2.3 | | |
| X740-21G | 1,1-Dichloroethene | µg/L | | 0.24 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 0.79 J | | |
| | Trichloroethene | µg/L | | 5 | | |
| X740-22G | 1,1,1-Trichloroethane | µg/L | | 1 | | |
| | 1,1-Dichloroethane | µg/L | | 0.89 J | | |
| | 1,1-Dichloroethene | µg/L | | 9.5 | | |
| | 1,2-Dichloroethane | µg/L | | 3.1 Q | | |
| | Chloroform | µg/L | | 0.19 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 11 | | |
| | Tetrachloroethene | µg/L | | 1.5 | | |
| | Trichloroethene | µg/L | | 77 DJ | | |
| X740-PZ04M | Acetone | µg/L | | 1.9 J | | |
| X740-PZ10G | 1,1,1-Trichloroethane | µg/L | | 0.19 J | | |
| | 1,1-Dichloroethane | µg/L | | 0.17 J | | |
| | 1,1-Dichloroethene | µg/L | | 0.28 J | | |
| | Tetrachloroethene | µg/L | | 0.22 J | | |
| | Trichloroethene | µg/L | | 7.2 | | |
| X740-PZ12G | 1,1,1-Trichloroethane | µg/L | | 1.3 | | |
| | 1,1-Dichloroethane | µg/L | | 0.58 J | | |
| | 1,1-Dichloroethene | µg/L | | 4.1 | | |
| | 1,2-Dichloroethane | µg/L | | 3 Q | | |
| | Chloroform | µg/L | | 0.31 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 0.15 J | | |
| | Tetrachloroethene | µg/L | | 0.73 J | | |
| | Trichloroethene | µg/L | | 56 | | |
| X740-PZ14G | 1,1,1-Trichloroethane | µg/L | | 1.2 | | |
| | 1,1-Dichloroethane | µg/L | | 0.75 J | | |
| | 1,1-Dichloroethene | µg/L | | 11 | | |
| | 1,2-Dichloroethane | µg/L | | 3.8 | | |
| | Chloroform | µg/L | | 0.36 J | | |
| | cis-1,2-Dichloroethene | µg/L | | 0.98 J | | |
| | Tetrachloroethene | µg/L | | 1.1 | | |
| | Trichloroethene | µg/L | | 82 DJ | | |
| X740-PZ17G | 1,1,1-Trichloroethane | µg/L | | 0.7 J | | |
| | 1,1-Dichloroethane | µg/L | | 0.27 J | | |
| | 1,1-Dichloroethene | µg/L | | 3.1 | | |
| | 1,2-Dichloroethane | µg/L | | 1.7 | | |
| | Acetone | µg/L | | 2.4 J | | |
| | Chloroform | µg/L | | 0.16 J | | |

Nav

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.15.  VOCs detected at the X-740 Former Waste Oil Handling Facility – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X740-PZ17G | Trichloroethene | µg/L | | 20 | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.16.  Results for beryllium and chromium at the X-611A Former Lime Sludge Lagoons – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| F-07G | Beryllium | µg/L | 0.11 J | | 1.7 | |
| | Chromium | µg/L | 4.6 | | 14 | |
| F-08B | Beryllium | µg/L | 0.08 U | | 0.08 U | |
| | Chromium | µg/L | 0.5 U | | 0.5 U | |
| X611-01B | Beryllium | µg/L | 0.08 U | | 0.08 U | |
| | Chromium | µg/L | 0.5 U | | 1.9 J | |
| X611-02BA | Beryllium | µg/L | 0.08 U | | 0.08 U | |
| | Chromium | µg/L | 0.55 J | | 0.54 J | |
| X611-03G | Beryllium | µg/L | 0.08 U | | 0.08 U | |
| | Chromium | µg/L | 0.5 U | | 4.7 | |
| X611-04BA | Beryllium | µg/L | 0.23 J | | 0.75 J | |
| | Chromium | µg/L | 0.5 U | | 0.5 U | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.17.  VOCs detected at the X-735 Landfills – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X735-01GA | Methylene chloride | µg/L | | 0.49 J | | |
| X735-02GA | 1,1-Dichloroethane | µg/L | | 0.33 J | | |
| X735-03G | Methylene chloride | µg/L | | 0.6 J | | |
| | Trichloroethene | µg/L | | 0.28 J | | |
| X735-03GA | Methylene chloride | µg/L | | 0.62 J | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.18.  Results for radionuclides at the X-735 Landfills – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X735-01GA | Technetium-99 | pCi/L | | -2.31 U | | |
| | Uranium | µg/L | | 0.0825 U | | |
| | Uranium-233/234 | pCi/L | | 0.0248 U | | |
| | Uranium-235/236 | pCi/L | | 0.0185 U | | |
| | Uranium-238 | pCi/L | | 0.0248 U | | |
| X735-02GA | Technetium-99 | pCi/L | | -1.66 U | | |
| | Uranium | µg/L | | 0.0366 U | | |
| | Uranium-233/234 | pCi/L | | 0.0177 U | | |
| | Uranium-235/236 | pCi/L | | 0.022 U | | |
| | Uranium-238 | pCi/L | | 0.00886 U | | |
| X735-03G | Technetium-99 | pCi/L | | -1.21 U | | |
| | Uranium | µg/L | | 0.426 J | | |
| | Uranium-233/234 | pCi/L | | 0.177 J | | |
| | Uranium-235/236 | pCi/L | | 0.011 U | | |
| | Uranium-238 | pCi/L | | 0.141 J | | |
| X735-03GA | Technetium-99 | pCi/L | | -0.83 U | | |
| | Uranium | µg/L | | 0.038 U | | |
| | Uranium-233/234 | pCi/L | | 0.0273 U | | |
| | Uranium-235/236 | pCi/L | | -0.0057 U | | |
| | Uranium-238 | pCi/L | | 0.0137 U | | |
| X735-04G | Technetium-99 | pCi/L | | -0.763 U | | |
| | Uranium | µg/L | | 0.0326 U | | |
| | Uranium-233/234 | pCi/L | | 0.0183 U | | |
| | Uranium-235/236 | pCi/L | | 0.0114 U | | |
| | Uranium-238 | pCi/L | | 0.00917 U | | |
| X735-04GA | Technetium-99 | pCi/L | | -0.344 U | | |
| | Uranium | µg/L | | 0.131 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.014 U | | |
| | Uranium-235/236 | pCi/L | | 0.0116 U | | |
| | Uranium-238 | pCi/L | | 0.0421 UJ | | |
| X735-05G | Technetium-99 | pCi/L | | -2.64 U | | |
| | Uranium | µg/L | | 0.325 J | | |
| | Uranium-233/234 | pCi/L | | 0.0982 J | | |
| | Uranium-235/236 | pCi/L | | 0.0116 U | | |
| | Uranium-238 | pCi/L | | 0.108 J | | |
| X735-05GA | Technetium-99 | pCi/L | | -1.32 U | | |
| | Uranium | µg/L | | 0.125 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0881 J | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0419 UJ | | |
| X735-06GAA | Technetium-99 | pCi/L | | -1.22 U | | |
| | Uranium | µg/L | | 0.0304 U | | |
| | Uranium-233/234 | pCi/L | | 0.0186 U | | |
| | Uranium-235/236 | pCi/L | | 0.00579 U | | |
| | Uranium-238 | pCi/L | | 0.00932 U | | |
| X735-12G | Technetium-99 | pCi/L | | -2.11 U | | |
| | Uranium | µg/L | | 0.186 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0625 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0625 UJ | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.18.  Results for radionuclides at the X-735 Landfills – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X735-13GA | Technetium-99 | pCi/L | | -0.729 U | | |
| | Uranium | µg/L | | 0.191 UJ | | |
| | Uranium-233/234 | pCi/L | | 0.0596 UJ | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0642 UJ | | |
| X735-16B | Technetium-99 | pCi/L | | -1.61 U | | |
| | Uranium | µg/L | | 0.0631 U | | |
| | Uranium-233/234 | pCi/L | | 0.0145 U | | |
| | Uranium-235/236 | pCi/L | | 0.012 U | | |
| | Uranium-238 | pCi/L | | 0.0193 U | | |
| X735-17B | Technetium-99 | pCi/L | | -2.85 U | | |
| | Uranium | µg/L | | 0.0835 U | | |
| | Uranium-233/234 | pCi/L | | 0.0996 J | | |
| | Uranium-235/236 | pCi/L | | 0.00563 U | | |
| | Uranium-238 | pCi/L | | 0.0272 U | | |
| X735-18B | Technetium-99 | pCi/L | | -0.829 U | | |
| | Uranium | µg/L | | 2.1E-06 U | | |
| | Uranium-233/234 | pCi/L | | 0.0132 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0 U | | |
| X735-19G | Technetium-99 | pCi/L | | -1.14 U | | |
| | Uranium | µg/L | | 0.102 U | | |
| | Uranium-233/234 | pCi/L | | 0.0333 U | | |
| | Uranium-235/236 | pCi/L | | 0.00591 U | | |
| | Uranium-238 | pCi/L | | 0.0333 U | | |
| X735-20B | Technetium-99 | pCi/L | | 0.705 U | | |
| | Uranium | µg/L | | 0.011 U | | |
| | Uranium-233/234 | pCi/L | | 0.0239 U | | |
| | Uranium-235/236 | pCi/L | | 0.0238 U | | |
| | Uranium-238 | pCi/L | | 0 U | | |
| X735-21G | Technetium-99 | pCi/L | | -1.39 U | | |
| | Uranium | µg/L | | 0.531 J | | |
| | Uranium-233/234 | pCi/L | | 0.197 J | | |
| | Uranium-235/236 | pCi/L | | 0.0292 U | | |
| | Uranium-238 | pCi/L | | 0.174 J | | |
| X737-05B | Technetium-99 | pCi/L | | -0.683 U | | |
| | Uranium | µg/L | | 0.00776 U | | |
| | Uranium-233/234 | pCi/L | | 0.00899 U | | |
| | Uranium-235/236 | pCi/L | | 0.0168 U | | |
| | Uranium-238 | pCi/L | | 0 U | | |
| X737-06G | Technetium-99 | pCi/L | | 0.97 U | | |
| | Uranium | µg/L | | 0.0276 U | | |
| | Uranium-233/234 | pCi/L | | 0.0278 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.00926 U | | |
| X737-07B | Technetium-99 | pCi/L | | -2.02 U | | |
| | Uranium | µg/L | | -0.0026 U | | |
| | Uranium-233/234 | pCi/L | | 0.00451 U | | |
| | Uranium-235/236 | pCi/L | | -0.0056 U | | |
| | Uranium-238 | pCi/L | | 0 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.18.  Results for radionuclides at the X-735 Landfills – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X737-09G | Technetium-99 | pCi/L | | -0.997 U | | |
| | Uranium | µg/L | | 0.0814 U | | |
| | Uranium-233/234 | pCi/L | | 0.0309 U | | |
| | Uranium-235/236 | pCi/L | | 0.00549 U | | |
| | Uranium-238 | pCi/L | | 0.0265 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.19.  VOCs detected at the X-734 Landfills – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| RSY-02B | Methylene chloride | µg/L | | 0.32 U | | 0.36 J |
| X734-01G | Methylene chloride | µg/L | | 0.32 U | | 0.33 J |
| X734-02B | Methylene chloride | µg/L | | 0.32 U | | 0.35 J |
| X734-03G | Methylene chloride | µg/L | | 0.32 U | | 0.35 J |
| X734-04G | Methylene chloride | µg/L | | 0.32 U | | 0.32 J |
| X734-05B | 1,2-Dimethylbenzene | µg/L | | 0.26 J | | 0.19 U |
| | Benzene | µg/L | | 0.66 J | | 1.8 |
| | Ethylbenzene | µg/L | | 0.42 J | | 0.21 J |
| | Methylene chloride | µg/L | | 0.32 U | | 0.62 BJ |
| | Toluene | µg/L | | 0.35 J | | 0.69 J |
| X734-06G | Methylene chloride | µg/L | | 0.32 U | | 0.55 BJ |
| X734-10G | Methylene chloride | µg/L | | 0.32 U | | 0.66 BJ |
| X734-14G | Methylene chloride | µg/L | | 0.32 U | | 1 BJ |
| X734-15G | Methylene chloride | µg/L | | 0.32 U | | 0.83 BJ |
| X734-16G | Acetone | µg/L | | 5.7 JQ | | 18 |
| X734-23G | cis-1,2-Dichloroethene | µg/L | | 7.1 | | 5.5 |
| | trans-1,2-Dichloroethene | µg/L | | 0.37 J | | 0.28 J |
| | Vinyl chloride | µg/L | | 1.9 | | 1.5 |

FBP / 2017 Data Report 12/20/2018

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.20.  Results for radionuclides at the X-734 Landfills – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| RSY-02B | Americium-241 | pCi/L | | 0.0255 U | | |
| | Neptunium-237 | pCi/L | | 0.0089 U | | |
| | Plutonium-238 | pCi/L | | -0.005 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0198 U | | |
| | Technetium-99 | pCi/L | | -0.783 U | | |
| | Uranium | µg/L | | 0.112 U | | |
| | Uranium-233/234 | pCi/L | | 0.0561 U | | |
| | Uranium-235/236 | pCi/L | | 0.0127 U | | |
| | Uranium-238 | pCi/L | | 0.0357 U | | |
| X734-01G | Americium-241 | pCi/L | | 0.0257 U | | |
| | Neptunium-237 | pCi/L | | 0.00462 U | | |
| | Plutonium-238 | pCi/L | | -0.0052 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0367 U | | |
| | Technetium-99 | pCi/L | | 1.1 U | | |
| | Uranium | µg/L | | 0.211 U | | |
| | Uranium-233/234 | pCi/L | | 0.0681 U | | |
| | Uranium-235/236 | pCi/L | | 0.0181 U | | |
| | Uranium-238 | pCi/L | | 0.0681 U | | |
| X734-02B | Americium-241 | pCi/L | | 0.0195 U | | |
| | Neptunium-237 | pCi/L | | -0.0142 U | | |
| | Plutonium-238 | pCi/L | | 0.01 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0301 U | | |
| | Technetium-99 | pCi/L | | -1.11 U | | |
| | Uranium | µg/L | | 0.0164 U | | |
| | Uranium-233/234 | pCi/L | | 0.0324 U | | |
| | Uranium-235/236 | pCi/L | | 0.00575 U | | |
| | Uranium-238 | pCi/L | | 0.00463 U | | |
| X734-03G | Americium-241 | pCi/L | | 0.0334 U | | |
| | Neptunium-237 | pCi/L | | 0.0095 U | | |
| | Plutonium-238 | pCi/L | | -0.0239 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0299 U | | |
| | Technetium-99 | pCi/L | | -1.18 U | | |
| | Uranium | µg/L | | 2.85 | | |
| | Uranium-233/234 | pCi/L | | 1.59 | | |
| | Uranium-235/236 | pCi/L | | 0.11 | | |
| | Uranium-238 | pCi/L | | 0.94 | | |
| X734-04G | Americium-241 | pCi/L | | 0 U | | |
| | Neptunium-237 | pCi/L | | 0.00473 U | | |
| | Plutonium-238 | pCi/L | | 0.0227 U | | |
| | Plutonium-239/240 | pCi/L | | 0.034 U | | |
| | Technetium-99 | pCi/L | | -2.06 U | | |
| | Uranium | µg/L | | 1.96 | | |
| | Uranium-233/234 | pCi/L | | 0.847 | | |
| | Uranium-235/236 | pCi/L | | 0.037 U | | |
| | Uranium-238 | pCi/L | | 0.654 | | |
| X734-05B | Americium-241 | pCi/L | | 0.0199 U | | |
| | Neptunium-237 | pCi/L | | 0.02 U | | |
| | Plutonium-238 | pCi/L | | 0.0128 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0256 U | | |
| | Technetium-99 | pCi/L | | -0.807 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.20. Results for radionuclides at the X-734 Landfills – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X734-05B | Uranium | µg/L | | 0.361 | | |
| | Uranium-233/234 | pCi/L | | 0.308 | | |
| | Uranium-235/236 | pCi/L | | 0.00599 U | | |
| | Uranium-238 | pCi/L | | 0.12 | | |
| X734-06G | Americium-241 | pCi/L | | 0.0317 U | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | 0.0055 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0275 U | | |
| | Technetium-99 | pCi/L | | -0.716 U | | |
| | Uranium | µg/L | | 0.0114 U | | |
| | Uranium-233/234 | pCi/L | | 0.019 U | | |
| | Uranium-235/236 | pCi/L | | -0.0059 U | | |
| | Uranium-238 | pCi/L | | 0.00475 U | | |
| X734-10G | Americium-241 | pCi/L | | 0 U | | |
| | Neptunium-237 | pCi/L | | 0.00498 U | | |
| | Plutonium-238 | pCi/L | | -0.0125 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0188 U | | |
| | Technetium-99 | pCi/L | | -0.231 U | | |
| | Uranium | µg/L | | 0.336 | | |
| | Uranium-233/234 | pCi/L | | 0.105 | | |
| | Uranium-235/236 | pCi/L | | 0.0179 U | | |
| | Uranium-238 | pCi/L | | 0.11 | | |
| X734-14G | Americium-241 | pCi/L | | 0.0151 U | | |
| | Neptunium-237 | pCi/L | | 0.0149 U | | |
| | Plutonium-238 | pCi/L | | 0.0115 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0287 U | | |
| | Technetium-99 | pCi/L | | -1.95 U | | |
| | Uranium | µg/L | | 0.987 | | |
| | Uranium-233/234 | pCi/L | | 0.436 | | |
| | Uranium-235/236 | pCi/L | | 0.0233 U | | |
| | Uranium-238 | pCi/L | | 0.328 | | |
| X734-15G | Americium-241 | pCi/L | | 0.0432 U | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | -0.0053 U | | |
| | Plutonium-239/240 | pCi/L | | 0.016 U | | |
| | Technetium-99 | pCi/L | | -1.9 U | | |
| | Uranium | µg/L | | 0.101 U | | |
| | Uranium-233/234 | pCi/L | | 0.0339 U | | |
| | Uranium-235/236 | pCi/L | | 0 U | | |
| | Uranium-238 | pCi/L | | 0.0339 U | | |
| X734-16G | Americium-241 | pCi/L | | -0.0127 U | | |
| | Neptunium-237 | pCi/L | | 0 U | | |
| | Plutonium-238 | pCi/L | | -0.0118 U | | |
| | Plutonium-239/240 | pCi/L | | 0.00592 U | | |
| | Technetium-99 | pCi/L | | -1.03 U | | |
| | Uranium | µg/L | | 3.6 | | |
| | Uranium-233/234 | pCi/L | | 1.89 | | |
| | Uranium-235/236 | pCi/L | | 0.11 U | | |
| | Uranium-238 | pCi/L | | 1.19 | | |
| X734-18G | Americium-241 | pCi/L | | -0.0108 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.20.  Results for radionuclides at the X-734 Landfills – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X734-18G | Neptunium-237 | pCi/L | | -0.01 U | | |
| | Plutonium-238 | pCi/L | | -0.017 U | | |
| | Plutonium-239/240 | pCi/L | | 0.017 U | | |
| | Technetium-99 | pCi/L | | -1.49 U | | |
| | Uranium | µg/L | | 1.76 | | |
| | Uranium-233/234 | pCi/L | | 1.06 | | |
| | Uranium-235/236 | pCi/L | | 0.0293 U | | |
| | Uranium-238 | pCi/L | | 0.588 | | |
| X734-20G | Americium-241 | pCi/L | | 0.0152 U | | |
| | Neptunium-237 | pCi/L | | -0.014 U | | |
| | Plutonium-238 | pCi/L | | 0 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0566 U | | |
| | Technetium-99 | pCi/L | | -1.29 U | | |
| | Uranium | µg/L | | 0.00275 U | | |
| | Uranium-233/234 | pCi/L | | 0.0477 U | | |
| | Uranium-235/236 | pCi/L | | 0.00593 U | | |
| | Uranium-238 | pCi/L | | 0 U | | |
| X734-22G | Americium-241 | pCi/L | | 0.0213 U | | |
| | Neptunium-237 | pCi/L | | 0.00475 U | | |
| | Plutonium-238 | pCi/L | | -0.0059 U | | |
| | Plutonium-239/240 | pCi/L | | 0.00585 U | | |
| | Technetium-99 | pCi/L | | -2.57 U | | |
| | Uranium | µg/L | | 0.918 | | |
| | Uranium-233/234 | pCi/L | | 0.493 | | |
| | Uranium-235/236 | pCi/L | | 0.0184 U | | |
| | Uranium-238 | pCi/L | | 0.306 | | |
| X734-23G | Americium-241 | pCi/L | | 0.0222 U | | |
| | Neptunium-237 | pCi/L | | 0.00968 U | | |
| | Plutonium-238 | pCi/L | | -0.0066 U | | |
| | Plutonium-239/240 | pCi/L | | 0.0198 U | | |
| | Technetium-99 | pCi/L | | -1.51 U | | |
| | Uranium | µg/L | | 0.0258 U | | |
| | Uranium-233/234 | pCi/L | | 0.0164 U | | |
| | Uranium-235/236 | pCi/L | | 0.0205 U | | |
| | Uranium-238 | pCi/L | | 0.00548 U | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.21.  Results for cadmium and nickel at the X-533 Former Switchyard Complex – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| F-03G | Cadmium | µg/L | | 47 | | 60 |
| | Nickel | µg/L | | 430 | | 680 |
| TCP-01G | Cadmium | µg/L | | 9.7 | | 0.27 U |
| | Nickel | µg/L | | 130 | | 0.67 J |
| X533-03G | Cadmium | µg/L | | 28 | | 36 |
| | Nickel | µg/L | | 360 J | | 490 J |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.22.  VOCs detected at the X-344C Former Hydrogen Fluoride Storage Building – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| X344C-01G | cis-1,2-Dichloroethene | µg/L | 1.9 | | | |
| | trans-1,2-Dichloroethene | µg/L | 0.27 J | | | |
| | Trichloroethene | µg/L | 0.54 J | | | |
| | Vinyl chloride | µg/L | 0.23 J | | | |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.23.  VOCs detected at surface water monitoring locations – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| BRC-SW01 | Acetone | µg/L | 100 | 4.3 J | 2.8 J | 33 |
| | Bromodichloromethane | µg/L | 0.17 U | 0.9 J | 0.79 J | 0.45 J |
| | Chloroform | µg/L | 0.16 U | 1.5 | 0.93 J | 0.52 J |
| | Dibromochloromethane | µg/L | 0.17 U | 0.64 J | 0.59 J | 0.51 J |
| | Methylene chloride | µg/L | 0.4 J | 0.32 U | 0.32 U | 0.32 U |
| BRC-SW05 | Acetone | µg/L | 7.9 J | 1.9 U | 1.9 U | 1.9 U |
| EDD-SW01 | Bromodichloromethane | µg/L | 0.82 J | 1 | 1 | 0.62 J |
| | Bromoform | µg/L | 1 | 0.19 U | 0.19 U | 0.19 U |
| | Chloroform | µg/L | 0.49 J | 2.2 | 1.4 | 0.92 J |
| | cis-1,2-Dichloroethene | µg/L | 0.47 J | 0.49 J | 0.31 J | 1.1 |
| | Dibromochloromethane | µg/L | 1.2 | 0.5 J | 0.85 J | 0.56 J |
| | Toluene | µg/L | 0.17 U | 0.24 J | 0.17 U | 0.17 U |
| | Trichloroethene | µg/L | 0.94 J | 1 | 0.61 J | 1.5 |
| LBC-SW01 | Bromodichloromethane | µg/L | 0.38 J | 0.17 U | 0.17 U | 0.17 U |
| | Chloroform | µg/L | 0.21 J | 0.16 U | 0.16 U | 0.16 U |
| | cis-1,2-Dichloroethene | µg/L | 0.41 J | 0.15 U | 0.15 U | 0.15 U |
| | Dibromochloromethane | µg/L | 0.7 J | 0.17 U | 0.17 U | 0.17 U |
| | Trichloroethene | µg/L | 0.55 J | 0.16 U | 0.16 U | 0.16 U |
| LBC-SW02 | Bromodichloromethane | µg/L | 0.22 J | 0.26 J | 0.17 J | 0.17 U |
| | Chloroform | µg/L | 0.16 U | 0.49 J | 0.28 J | 0.22 J |
| | cis-1,2-Dichloroethene | µg/L | 0.2 J | 0.17 J | 0.15 U | 0.23 J |
| | Dibromochloromethane | µg/L | 0.51 J | 0.17 U | 0.2 J | 0.17 U |
| | Trichloroethene | µg/L | 0.26 J | 0.26 J | 0.16 J | 0.37 J |
| NHP-SW01 | Chloroform | µg/L | 0.16 U | 0.28 J | 0.16 U | 0.16 U |
| UND-SW01 | 1,1-Dichloroethane | µg/L | 0.22 U | 0.16 U | 0.17 J | 0.16 U |
| | 1,1-Dichloroethene | µg/L | 0.26 J | 0.18 J | 0.29 J | 0.14 U |
| | cis-1,2-Dichloroethene | µg/L | 0.23 J | 0.3 J | 0.45 J | 0.15 U |
| | Trichloroethene | µg/L | 2.8 | 4.3 | 4.4 J | 1 |
| UND-SW02 | Methylene chloride | µg/L | 0.36 J | 0.32 U | 0.32 U | 0.32 U |
| WDD-SW01 | Bromoform | µg/L | 0.19 U | 0.19 U | 0.87 J | 0.19 U |
| | Chloroform | µg/L | 0.16 U | 0.16 U | 0.16 U | 0.25 J |
| | Dibromochloromethane | µg/L | 0.17 U | 0.17 U | 0.43 J | 0.17 U |
| WDD-SW03 | Bromodichloromethane | µg/L | 0.19 J | 0.17 U | 0.17 U | 0.17 U |
| | Bromoform | µg/L | 0.5 J | 0.19 U | 0.19 U | 0.19 U |
| | Dibromochloromethane | µg/L | 0.44 J | 0.2 J | 0.17 U | 0.17 U |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.24.  Results for radionuclides at surface water monitoring locations – 2017**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| BRC-SW01 | Americium-241 | pCi/L | | 0 U | | -0.00528 U |
| | Neptunium-237 | pCi/L | | -0.0235 U | | 0.00539 U |
| | Plutonium-238 | pCi/L | | -0.0109 U | | 0.00617 U |
| | Plutonium-239/240 | pCi/L | | 0.0109 U | | 0.0247 U |
| | Technetium-99 | pCi/L | 2.62 U | 0.488 U | 1.65 U | 2.91 U |
| | Uranium | µg/L | 2.65 J | 0.351 J | 1.01 | 0.6 J |
| | Uranium-233/234 | pCi/L | 1.5 | 0.34 | 0.653 | 1.95 |
| | Uranium-235/236 | pCi/L | 0.0726 UJ | 0.0179 U | 0.0235 U | 0.117 J |
| | Uranium-238 | pCi/L | 0.88 | 0.115 J | 0.336 | 0.183 J |
| BRC-SW02 | Americium-241 | pCi/L | | 0.0158 U | | 0.00955 U |
| | Neptunium-237 | pCi/L | | 0 U | | 0.00975 U |
| | Plutonium-238 | pCi/L | | 0.00516 U | | 0.00554 U |
| | Plutonium-239/240 | pCi/L | | 0.00516 U | | 0.0111 U |
| | Technetium-99 | pCi/L | 3.16 U | 0.488 U | 4.59 U | 3.71 U |
| | Uranium | µg/L | 1.33 J | 0.693 J | 0.403 | 0.494 J |
| | Uranium-233/234 | pCi/L | 0.912 | 0.631 | 0.491 | 0.456 |
| | Uranium-235/236 | pCi/L | 0.0491 UJ | 0.042 U | 0.0252 U | 0.0296 U |
| | Uranium-238 | pCi/L | 0.438 | 0.226 J | 0.132 | 0.162 J |
| BRC-SW05 | Americium-241 | pCi/L | | 0.021 U | | 0.0525 U |
| | Neptunium-237 | pCi/L | | 0.00513 U | | -0.00503 U |
| | Plutonium-238 | pCi/L | | -0.0053 U | | 0.00567 U |
| | Plutonium-239/240 | pCi/L | | 0.0105 U | | 0.0227 U |
| | Technetium-99 | pCi/L | 0.716 U | -1.06 U | 1.4 U | 1 U |
| | Uranium | µg/L | 1.62 J | 1.18 J | 0.607 | 0.571 J |
| | Uranium-233/234 | pCi/L | 1.15 | 0.841 | 0.61 | 0.54 |
| | Uranium-235/236 | pCi/L | 0.0952 UJ | 0.0902 UJ | 0.037 U | 0.0654 UJ |
| | Uranium-238 | pCi/L | 0.531 | 0.382 | 0.198 | 0.182 J |
| EDD-SW01 | Americium-241 | pCi/L | | 0.00998 U | | 0.0566 UJ |
| | Neptunium-237 | pCi/L | | 0 U | | -0.0049 U |
| | Plutonium-238 | pCi/L | | 0.0239 U | | -0.00634 U |
| | Plutonium-239/240 | pCi/L | | 0.0179 U | | 0.00635 U |
| | Technetium-99 | pCi/L | 35.3 | 2.99 U | 5.13 UJ | 4.25 U |
| | Uranium | µg/L | 1.44 J | 0.686 J | 1.21 J | 0.51 J |
| | Uranium-233/234 | pCi/L | 2.89 | 1.42 | 1.84 | 0.886 |
| | Uranium-235/236 | pCi/L | 0.153 J | 0.0824 UJ | 0.0925 JU | 0.041 U |
| | Uranium-238 | pCi/L | 0.46 | 0.218 J | 0.392 | 0.165 J |
| LBC-SW01 | Americium-241 | pCi/L | | 0.00484 U | | 0.00951 U |
| | Neptunium-237 | pCi/L | | 0.0047 U | | 0 U |
| | Plutonium-238 | pCi/L | | 0.00553 U | | 0 U |
| | Plutonium-239/240 | pCi/L | | 0.0387 U | | 0.00572 U |
| | Technetium-99 | pCi/L | 21.9 | -1.81 U | 0.507 U | 3.58 U |
| | Uranium | µg/L | 0.817 J | 0.0801 U | 0.0882 U | 0.188 UJ |
| | Uranium-233/234 | pCi/L | 1.91 | 0.0278 U | 0.079 JU | 0.0932 J |
| | Uranium-235/236 | pCi/L | 0.112 J | -0.0058 U | 0 U | 0.0174 U |
| | Uranium-238 | pCi/L | 0.257 | 0.0278 U | 0.0296 U | 0.0606 U |
| LBC-SW02 | Americium-241 | pCi/L | | -0.0052 U | | 0 U |
| | Neptunium-237 | pCi/L | | 0 U | | 0.0044 U |
| | Plutonium-238 | pCi/L | | 0 U | | -0.0179 U |
| | Plutonium-239/240 | pCi/L | | 0.00605 U | | 0.0357 U |
| | Technetium-99 | pCi/L | 19.5 | 4.33 U | 7.75 | 5.94 UJ |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.24. Results for radionuclides at surface water monitoring locations – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| LBC-SW02 | Uranium | µg/L | 0.856 J | 0.526 J | 1.59 J | 0.499 J |
| | Uranium-233/234 | pCi/L | 1.58 | 1.08 | 2.62 | 0.75 |
| | Uranium-235/236 | pCi/L | 0.0644 UJ | 0.0297 U | 0.119 J | 0.029 U |
| | Uranium-238 | pCi/L | 0.278 | 0.172 J | 0.515 | 0.163 J |
| LBC-SW03 | Americium-241 | pCi/L | | 0.0488 UJ | | 0.00548 U |
| | Neptunium-237 | pCi/L | | 0.0135 U | | 0 U |
| | Plutonium-238 | pCi/L | | 0.00541 U | | -0.00604 U |
| | Plutonium-239/240 | pCi/L | | 0.0108 U | | 0.00604 U |
| | Technetium-99 | pCi/L | 18.6 | 2.54 U | 8.27 | 5.65 UJ |
| | Uranium | µg/L | 0.964 J | 0.668 J | 1.67 J | 0.745 J |
| | Uranium-233/234 | pCi/L | 1.65 | 0.955 | 2.51 | 1.06 |
| | Uranium-235/236 | pCi/L | 0.066 UJ | 0.0582 UJ | 0.133 J | 0.0542 U |
| | Uranium-238 | pCi/L | 0.314 | 0.215 J | 0.54 | 0.242 |
| LBC-SW04 | Americium-241 | pCi/L | | 0.0292 U | | 0.0145 U |
| | Neptunium-237 | pCi/L | | 0 U | | 0.00506 U |
| | Plutonium-238 | pCi/L | | 0 U | | 0.023 U |
| | Plutonium-239/240 | pCi/L | | 0.0358 U | | 0.0115 U |
| | Technetium-99 | pCi/L | 16.1 | 2.27 U | 4.08 U | 7.59 |
| | Uranium | µg/L | 1.32 J | 1.08 J | 1.94 J | 1.12 J |
| | Uranium-233/234 | pCi/L | 1.69 | 1.49 | 2.29 | 1.56 |
| | Uranium-235/236 | pCi/L | 0.113 J | 0.0517 UJ | 0.113 JU | 0.087 UJ |
| | Uranium-238 | pCi/L | 0.425 | 0.356 | 0.634 | 0.364 |
| NHP-SW01 | Americium-241 | pCi/L | | 0.0155 U | | 0.0152 U |
| | Neptunium-237 | pCi/L | | 0.00464 U | | 0 U |
| | Plutonium-238 | pCi/L | | 0.0169 U | | 0 U |
| | Plutonium-239/240 | pCi/L | | 0 U | | 0.0115 U |
| | Technetium-99 | pCi/L | -0.0993 U | 0.62 U | 0.509 U | 2.9 U |
| | Uranium | µg/L | 5.05 J | 3.65 J | 4.83 J | 2.42 |
| | Uranium-233/234 | pCi/L | 2.51 | 1.35 | 1.94 | 0.838 |
| | Uranium-235/236 | pCi/L | 0.0988 UJ | 0.0807 UJ | 0.148 J | 0.0291 U |
| | Uranium-238 | pCi/L | 1.68 | 1.21 | 1.6 | 0.81 |
| UND-SW01 | Americium-241 | pCi/L | | 0.0251 U | | 0.00984 U |
| | Neptunium-237 | pCi/L | | 0.019 U | | 0.00949 U |
| | Plutonium-238 | pCi/L | | 0.0057 U | | 0 U |
| | Plutonium-239/240 | pCi/L | | 0.0228 U | | -0.00544 U |
| | Technetium-99 | pCi/L | -0.143 U | 0.243 U | -0.11 U | 0.52 U |
| | Uranium | µg/L | 2.49 | 2.25 | 1.93 | 1.34 |
| | Uranium-233/234 | pCi/L | 1.07 | 0.809 | 0.941 | 0.585 |
| | Uranium-235/236 | pCi/L | 0.0353 U | 0.0394 U | 0.023 U | 0.0172 U |
| | Uranium-238 | pCi/L | 0.832 | 0.75 | 0.646 | 0.447 |
| UND-SW02 | Americium-241 | pCi/L | | 0.0344 U | | 0.021 U |
| | Neptunium-237 | pCi/L | | 0.00996 U | | -0.00534 U |
| | Plutonium-238 | pCi/L | | 0 U | | 0.00585 U |
| | Plutonium-239/240 | pCi/L | | 0.023 U | | 0.0117 U |
| | Technetium-99 | pCi/L | -0.895 U | -1.56 U | 1.32 U | 1.14 U |
| | Uranium | µg/L | 1.98 | 1.54 | 1.25 | 1.26 |
| | Uranium-233/234 | pCi/L | 0.876 | 0.643 | 0.492 | 0.488 |
| | Uranium-235/236 | pCi/L | 0.0391 U | 0.0118 U | 0.042 U | 0.0303 U |
| | Uranium-238 | pCi/L | 0.661 | 0.515 | 0.415 | 0.42 |
| WDD-SW01 | Americium-241 | pCi/L | | -0.005 U | | 0.0406 UJ |

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

**Table 4.24.  Results for radionuclides at surface water monitoring locations – 2017 (continued)**

| Sampling Location | Parameter | Unit | First quarter | Second quarter | Third quarter | Fourth quarter |
|---|---|---|---|---|---|---|
| WDD-SW01 | Neptunium-237 | pCi/L | | 0 U | | 0.0215 U |
| | Plutonium-238 | pCi/L | | 0.011 U | | -0.0218 U |
| | Plutonium-239/240 | pCi/L | | 0.011 U | | 0.00546 U |
| | Technetium-99 | pCi/L | 1.75 U | -3.4 U | 4.18 U | 3.1 U |
| | Uranium | μg/L | 2.77 | 1.42 | 2.37 | 2.18 J |
| | Uranium-233/234 | pCi/L | 1.68 | 0.823 | 0.916 | 0.895 |
| | Uranium-235/236 | pCi/L | 0.0391 U | 0.0463 U | 0.0674 JU | 0.0655 UJ |
| | Uranium-238 | pCi/L | 0.924 | 0.47 | 0.786 | 0.722 |
| WDD-SW02 | Americium-241 | pCi/L | | 0.0165 U | | 0 U |
| | Neptunium-237 | pCi/L | | 0 U | | 0.00471 U |
| | Plutonium-238 | pCi/L | | -0.0054 U | | 0 U |
| | Plutonium-239/240 | pCi/L | | 0.00544 U | | 0.00657 U |
| | Technetium-99 | pCi/L | 1.03 U | -0.133 U | 2.53 U | 4.5 UJ |
| | Uranium | μg/L | 3.07 J | 2.97 J | 2.01 | 1.33 |
| | Uranium-233/234 | pCi/L | 1.96 | 2.05 | 1.05 | 1.16 |
| | Uranium-235/236 | pCi/L | 0.139 J | 0.0874 UJ | 0.0407 U | 0.0405 U |
| | Uranium-238 | pCi/L | 1.01 | 0.984 | 0.668 | 0.442 |
| WDD-SW03 | Americium-241 | pCi/L | | 0.0205 U | | 0.021 U |
| | Neptunium-237 | pCi/L | | 0 U | | 0 U |
| | Plutonium-238 | pCi/L | | -0.0103 U | | -0.011 U |
| | Plutonium-239/240 | pCi/L | | 0.00517 U | | 0.0219 U |
| | Technetium-99 | pCi/L | -0.055 U | -0.954 U | 4 U | 1.4 U |
| | Uranium | μg/L | 2.96 J | 1.39 J | 2.1 | 1.19 |
| | Uranium-233/234 | pCi/L | 1.49 | 0.608 | 1.12 | 0.647 |
| | Uranium-235/236 | pCi/L | 0.0686 UJ | 0.0504 UJ | 0.0282 U | 0.0175 U |
| | Uranium-238 | pCi/L | 0.985 | 0.46 | 0.702 | 0.399 |

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

# 5. REFERENCES

DOE 2015. *Integrated Groundwater Monitoring Plan for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0032&D8, U.S. Department of Energy, Piketon, OH, July.

DOE 2017. *Integrated Groundwater Monitoring Plan for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0032&D10, U.S. Department of Energy, Piketon, OH, August.

DOE 2018. *2017 Groundwater Monitoring Report for the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio,* DOE/PPPO/03-0847&D1, U.S. Department of Energy, Piketon, OH, March.

DOE 2019. *U.S. Department of Energy Portsmouth Gaseous Diffusion Plant Annual Site Environmental Report – 2017, Piketon, Ohio,* DOE/PPPO/03-0862&D1, U.S. Department of Energy, Piketon, OH, January.

This page intentionally left blank.

DOE/PPPO/03-0863&D1
FBP-ER-RCRA-WD-RPT-0289
Revision 1
December 2018

DOE/PPPO/03-0863&D1

# RECORD COPY DISTRIBUTION

File—FBP RMDC—RC

# EXHIBIT B

DE 90 008 195

DOE/EH-0144

DE90008195

# ENVIRONMENT, SAFETY, AND HEALTH



# COMPLIANCE ASSESSMENT OF THE PORTSMOUTH GASEOUS DIFFUSION PLANT

**APRIL 1990**

**U.S. DEPARTMENT OF ENERGY**
**WASHINGTON, DC 20585**

REPRODUCED BY: **NTIS.**
U.S. Department of Commerce
National Technical Information Service
Springfield, Virginia 22161

**PREFACE**

**THE DEPARTMENT OF ENERGY**

**TIGER TEAM ASSESSMENT**

**OF THE**

**PORTSMOUTH GASEOUS DIFFUSION PLANT**

**PIKETON, OHIO**

This document contains the findings identified during the Tiger Team assessment of the Department of Energy's (DOE) Portsmouth Gaseous Diffusion Plant in Piketon, Ohio, conducted by the Department's Office of Environment, Safety and Health between October 23 and November 17, 1989. The scope of the assessment of the Portsmouth Complex was comprehensive, covering all areas of the environment, safety and health (ES&H) activities, including compliance with Federal, state and local regulations, requirements, permits, agreements, orders and consent decrees, and DOE ES&H Orders.

At the conclusion of the onsite assessment activities, the preliminary findings were submitted to the Office of Nuclear Energy, the Oak Ridge Operations Office, the Portsmouth Enrichment Office, and regulatory agencies for review and comment on technical accuracy. Final modifications and any other appropriate changes are incorporated herein.

The Tiger Team assessment of the Portsmouth Gaseous Diffusion Plant is part of the larger Tiger Team Assessment Programs, which will encompass over 100 DOE operating facilities. The assessment program is part of a 10-point initiative announced by the Secretary of Energy, James D. Watkins, on June 27, 1989, to strengthen environmental protection and waste management activities in the Department. The results of the program will provide the Secretary with information on the compliance status of DOE facilities with regard to ES&H requirements, root causes for noncompliance, adequacy of DOE and site contractor ES&H management programs, response actions to address the identified problem areas, and DOE-wide ES&H compliance trends.

The leader of the Tiger Team was Joseph Fitzgerald.  The
Environmental Team was headed by Richard Aiken, with James Daniel
leading the National Environmental Policy Act, Environmental Sub-
Team.  Irv Spickler lead the Health and Safety Team, and John
Patterson lead the Management and Organization Team.  Kathy Volk
served as Administrative Assistant to the Tiger Team.


March 1990
Washington, D.C.

# Table of Contents

Section                                                Page

EXECUTIVE SUMMARY                       ES-1

1.0 INTRODUCTION                          1-1
     1.1 Purpose                              1-1
     1.2 Scope                                 1-1
     1.3 Approach                            1-2
     1.4 Portsmouth Facility Description     1-4

2.0 KEY FINDINGS AND PROBABLE ROOT CAUSES     2-1
     2.1 Environmental Assessment            2-1
         2.1.1     Key Findings             2-1
         2.1.2     Probable Root Causes     2-2
     2.2 Safety and Health Assessment        2-4
         2.2.1     Key Findings             2-4
         2.2.2     Probable Root Causes     2-7
     2.3 Management and Organization Assessment     2-9
         2.3.1     Key Findings             2-9
         2.3.2     Probable Root Causes    2-11

3.0 ENVIRONMENTAL ASSESSMENT              3-1
     3.1 Purpose                             3-1
     3.2 Scope                                3-1
     3.3 Approach                          3-1
         3.3.1     Pre-Assessment Planning    3-2
         3.3.2     Onsite Audit             3-2
         3.3.3     Report Writing and Verification    3-2
     3.4 Environmental Assessment Summary     3-3
         3.4.1     Air                      3-6
         3.4.2     Surface Water/Drinking Water    3-7
         3.4.3     Groundwater/Soils        3-7
         3.4.4     Active Waste Management/Underground    3-8
                         Storage Tanks
         3.4.5     Toxic and Hazardous Materials    3-8
                         Management
         3.4.6     Quality Assurance        3-8
         3.4.7     Radioactive Materials Management    3-9
         3.4.8     Inactive Waste Sites/Emergency    3-9
                         Response
         3.4.9     National Environmental Policy Act    3-9
         3.4.10    Environmental Monitoring and    3-10
                         Surveillance
     3.5 Environmental Assessment Findings     3-11
         3.5.1     Air                      3-11
             3.5.1.1   Overview              3-11
             3.5.1.2   Compliance Findings       3-13
             3.5.1.3   Best Management Practice Findings    3-18

## Table of Contents (continued)

| Section | Page |
|---|---|
| 3.5.2 Surface Water/Drinking Water | 3-23 |
| 3.5.2.1 Overview | 3-23 |
| 3.5.2.2 Compliance Findings | 3-25 |
| 3.5.2.3 Best Management Practice Findings | 3-32 |
| 3.5.3 Groundwater/Soils | 3-43 |
| 3.5.3.1 Overview | 3-43 |
| 3.5.3.2 Compliance Findings | 3-45 |
| 3.5.3.3 Best Management Practice Findings | 3-47 |
| 3.5.4 Active Waste Management/Underground Storage Tanks | 3-48 |
| 3.5.4.1 Overview | 3-48 |
| 3.5.4.2 Compliance Findings | 3-51 |
| 3.5.4.3 Best Management Practice Findings | 3-56 |
| 3.5.5 Toxic and Hazardous Materials Management | 3-60 |
| 3.5.5.1 Overview | 3-60 |
| 3.5.5.2 Compliance Findings | 3-64 |
| 3.5.5.3 Best Management Practice Findings | 3-72 |
| 3.5.6 Quality Assurance | 3-77 |
| 3.5.6.1 Overview | 3-77 |
| 3.5.6.2 Compliance Findings | 3-79 |
| 3.5.6.3 Best Management Practice Findings | 3-79 |
| 3.5.7 Radioactive Materials Management | 3-85 |
| 3.5.7.1 Overview | 3-85 |
| 3.5.7.2 Compliance Findings | 3-88 |
| 3.5.7.3 Best Management Practice Findings | 3-92 |
| 3.5.8 Inactive Waste Sites/Emergency Response | 3-93 |
| 3.5.8.1 Overview | 3-93 |
| 3.5.8.2 Compliance Findings | 3-96 |
| 3.5.8.3 Best Management Practice Findings | 3-96 |
| 3.5.9 National Environmental Policy Act | 3-97 |
| 3.5.9.1 Overview | 3-97 |
| 3.5.9.2 Compliance Findings | 3-99 |
| 3.5.9.3 Best Management Practice Findings | 3-110 |
| 3.5.10 Environmental Monitoring and Surveillance | 3-114 |
| 3.5.10.1 Overview | 3-114 |
| 3.5.10.2 Compliance Findings | 3-115 |
| 3.5.10.3 Best Management Practice Findings | 3-118 |
| 3.5.11 Special Issue | 3-122 |
| 3.5.11.1 Special Nuclear Material Inventory Difference | 3-122 |
| 3.5.12 Environmental Assessment Findings | 3-136 |

## Table of Contents (continued)

| Section | Page |
|---|---|
| 4.0 SAFETY AND HEALTH ASSESSMENT | 4-1 |
|   4.1 Purpose | 4-1 |
|   4.2 Scope | 4-1 |
|   4.3 Approach | 4-1 |
|   4.4 Safety and Health Assessment Summary | 4-2 |
|     4.4.1 Operations | 4-2 |
|     4.4.2 Maintenance | 4-3 |
|     4.4.3 Training and Certification | 4-3 |
|     4.4.4 Emergency Preparedness | 4-4 |
|     4.4.5 Technical Support | 4-4 |
|     4.4.6 Criticality Safety | 4-4 |
|     4.4.7 Radiation Protection | 4-5 |
|     4.4.8 Industrial Safety | 4-5 |
|     4.4.9 Industrial Hygiene | 4-5 |
|     4.4.10 Radiological Engineering | 4-6 |
|   4.5 Safety and Health Assessment Findings | 4-6 |
|     4.5.1 Operations | 4-6 |
|       4.5.1.1 Overview | 4-6 |
|       4.5.1.2 Regulatory or DOE Order Requirement Findings | 4-8 |
|       4.5.1.3 Best Management Practice Findings | 4-10 |
|     4.5.2 Maintenance | 4-13 |
|       4.5.2.1 Overview | 4-13 |
|       4.5.2.2 Regulatory or DOE Order Requirement Findings | 4-14 |
|       4.5.2.3 Best Management Practice Findings | 4-14 |
|     4.5.3 Training and Certification | 4-18 |
|       4.5.3.1 Overview | 4-18 |
|       4.5.3.2 Regulatory or DOE Order Requirement Findings | 4-19 |
|       4.5.3.3 Best Management Practice Findings | 4-19 |
|     4.5.4 Emergency Preparedness | 4-24 |
|       4.5.4.1 Overview | 4-24 |
|       4.5.4.2 Regulatory or DOE Order Requirement Findings | 4-24 |
|       4.5.4.3 Best Management Practice Findings | 4-24 |
|     4.5.5 Technical Support | 4-26 |
|       4.5.5.1 Overview | 4-26 |
|       4.5.5.2 Regulatory or DOE Order Requirement Findings | 4-27 |
|       4.5.5.3 Best Management Practice Findings | 4-27 |
|     4.5.6 Criticality Safety | 4-27 |
|       4.5.6.1 Overview | 4-27 |
|       4.5.6.2 Regulatory or DOE Order Requirement Findings | 4-28 |
|       4.5.6.3 Best Management Practice Findings | 4-28 |
|     4.5.7 Radiation Protection | 4-29 |
|       4.5.7.1 Overview | 4-29 |
|       4.5.7.2 Regulatory or DOE Order Requirement Findings | 4-32 |

# Table of Contents (continued)

Section                                                                   Page

        4.5.7.3   Best Management Practice Findings  4-35
    4.5.8    Industrial Safety  4-39
        4.5.8.1   Overview  4-39
        4.5.8.2   Regulatory or DOE Order
            Requirement Findings  4-40
        4.5.8.3   Best Management Practice Findings  4-44
    4.5.9    Industrial Hygiene  4-46
        4.5.9.1   Overview  4-46
        4.5.9.2   Regulatory or DOE Order
            Requirement Findings  4-48
        4.5.9.3   Best Management Practice Findings  4-54
    4.5.10   Radiological Engineering  4-60
        4.5.10.1  Overview  4-60
        4.5.10.2  Regulatory and DOE Order
            Requirement Findings  4-60
        4.5.10.3  Best Management Practice Findings  4-60
    4.5.11   Special Issues  4-61
        4.5.11.1  PORTS Medical Services  4-61
        4.5.11.2  Operations with Valved Off
            Compressor Seals  4-62
        4.5.11.3  Improper Operations with Chlorine  4-63
        4.5.11.4  Odors at Building X-705
            Wastewater Treatment Plant  4-64
        4.5.11.5  Building X-344 Contamination
            and Housekeeping Issues  4-65
        4.5.11.6  Segregation of Contaminated
            Laundry in Building X-705  4-66
    4.5.12   Safety and Health Assessment Findings  4-68

5.0  MANAGEMENT AND ORGANIZATION ASSESSMENT  5-1
  5.1  Purpose  5-1
  5.2  Scope  5-1
  5.3  Approach  5-1
  5.4  Management and Organization Assessment Summary  5-1
  5.5  Management and Organization Assessment Findings  5-3
    5.5.1   ES&H Organization and Resources  5-3
        5.5.1.1  Managing ES&H Resource Constraints  5-3
        5.5.1.2  Health Physics Staffing  5-5
        5.5.1.3  Employee Training Programs  5-6
    5.5.2   Managing Change at PORTS-Communication
        of ES&H Objectives  5-7
        5.5.2.1  Consistency of Implementation  5-8
        5.5.2.2  Strengthening ES&H Expectations  5-8
        5.5.2.3  Feedback on ES&H Effectiveness  5-9
    5.5.3   ES&H Management Planning  5-10
        5.5.3.1  Establishment of Planning Goals
            and Objectives  5-10
        5.5.3.2  Effectiveness of Interim Measures  5-11
        5.5.3.3  PORTS ES&H Management Initiatives  5-12
    5.5.4   Criteria and Assessment  5-15
        5.5.4.1  Status of ES&H Procedures  5-16

## Table of Contents (continued)

Section | Page
---|---
5.5.4.2   Use of Technical Procedures | 5-16
5.5.5    DOE Management and Oversight | 5-17
5.5.5.1   Contractual Elements | 5-17
5.5.5.2   DOE Organization and Staffing | 5-17
5.5.5.3   Roles and Responsibilities | 5-19
5.5.5.4   DOE Assessments of PORTS ES&H Program | 5-20
5.5.6    Management and Organization Assessment Findings | 5-22

REFERENCES | RF-1

APPENDICES

A.  ASSESSMENT PERSONNEL AND BIOGRAPHICAL SKETCHES

B.  "IMMEDIATE ACTION CONCERNS FOR BUILDINGS 720, 700, AND 705 AT PORTSMOUTH GASEOUS DIFFUSION PLANT (PORTS)", MEMORANDUM FROM JOSEPH FITZGERALD TO PETER BRUSH (OCTOBER 27, 1989)

C.  DOE/ORO AND MMES RESPONSES TO IMMEDIATE ACTION CONCERNS

D.  MEETING MINUTES--EPA AND PORTS UNION REPRESENTATIVES

E.  VALVED-OFF SEAL REVIEW REFERENCED ATTACHMENTS

F.  ACRONYMS

FIGURES & TABLES

| Figure No. | Title/Section | Page |
|---|---|---|
| 1.3-1 | Tiger Team Compliance Assessment Methodology | 1-3 |
| 1.4-1 | Portsmouth Gaseous Diffusion Plant | 1-5 |
| 3.5.11-1 | Inventory Difference Cause and Effect Diagram | 3-123 |

| Table No. | Title/Section | Page |
|---|---|---|
| 1.4-1 | Selected Facility Description | 1-8 |
| 3.5.1-1 | Applicable Air Statutes/Regulations/Orders | 3-12 |
| 3.5.2-1 | Applicable Surface Water Statutes/Regulations/Orders | 3-24 |
| 3.5.3-1 | Applicable Groundwater/Soils Statutes/Regulations/Orders | 3-44 |
| 3.5.4-1 | Applicable Active Waste Management/UST Statutes/Regulations/Orders | 3-49 |
| 3.5.5-1 | Applicable Toxic and Hazardous Materials Management Statutes/Regulations/Orders | 3-61 |
| 3.5.6-1 | Applicable Quality Assurance Statutes/Regulations/Orders | 3-78 |
| 3.5.7-1 | Applicable Radioactive Materials Management Statutes/Regulations/Orders | 3-86 |
| 3.5.8-1 | Applicable Inactive Waste Sites/Emergency Response Statutes/Regulations/Orders | 3-94 |
| 3.5.9-1 | Applicable National Environmental Policy Act (NEPA) Statutes/Regulations/Orders | 3-98 |
| 3.5.9-2 | PORTS Projects Lacking Completed NEPA Documentation | 3-102 |
| 3.5.11-1 | Status of the Portsmouth ID Investigation | 3-125 |

# EXECUTIVE SUMMARY

## EXECUTIVE SUMMARY

This report provides an overall environmental, safety, and health (ES&H) compliance assessment of the Portsmouth Gaseous Diffusion Plant (PORTS) at Piketon, Ohio. This plant is a Department of Energy (DOE) government-owned, contractor-operated (Martin Marietta Energy Systems [MMES] facility). It is managed by the Portsmouth Enrichment Office of the Oak Ridge Operations (ORO) Office under the Nuclear Energy Program Office. The single mission at PORTS is to produce "enriched uranium", which has an increased concentration of the U-235 isotope. The Plant was last reviewed by DOE Headquarters in an Environmental Survey and a Technical Safety Appraisal, for environmental and health and safety issues, respectively, both performed in 1986.

Environment, Safety, and Health programs at PORTS are in a state of change. A risk-based approach founded on performance as measured by occupational safety and public exposure statistics has given way to one oriented to full compliance with ES&H requirements. Until recently, however, this evolution has been a reactionary one, responding to external regulatory pressures rather than an overall ES&H strategy. The result has been an imbalance in the PORTS management approach to ES&H. Notable progress has been achieved in environmental compliance, but longstanding and fundamental workplace safety deficiencies remain unresolved.

Both the corporate and onsite management of MMES recognize and support the need for the changes embodied in Secretary Watkins' ES&H policies and directives. Initiatives such as the Long Range Health and Safety Plan at the corporate level and the Model Facility Program at PORTS are first steps to a more proactive posture in identifying root ES&H problems, setting priorities, and effectively allocating resources. However, this Tiger Team assessment has found a wide gap between the expectations of management and the way in which those expectations are actually carried out within the plant by supervisors and workers. The prevailing safety culture within the workplace has impeded the progress of the management goals being established. Key elements of the ES&H program -- procedures, inplant inspections, and training -- are not being implemented effectively, making this transition more difficult at PORTS.

The lack of technical self-sufficiency among PORTS employees is seen as the most fundamental challenge facing MMES management in ES&H areas. The transition from an industrial environment to one more consistent with nuclear facility practices requires a workforce that 1) meets the demand for formality and discipline in operations, and 2) better understands workplace hazards and the basis for procedures. This transition requires not only an influx of new expertise, but more importantly, a concerted effort

to retrain and reorient the current workforce. Resolution of these and other issues raised in this report resides less with capital improvements or even new standards, but rather with DOE and MMES line management's commitment and capability to manage lasting change.

A brief summary of environment, safety and health, and management concerns follows. An overall summary of all major Tiger Team Assessment findings and noteworthy practices is presented in Section 2.0.

Environment

Several of the more significant compliance findings are beyond the ability of PORTS to address alone. These findings include the issue of leaking PCB gaskets in the process buildings, protracted storage of restricted land-banned mixed wastes, and lack of National Environmental Policy Act (NEPA) and Resource Conservation and Recovery Act (RCRA) integration. These issues are being resolved through discussions with the Environmental Protection Agency (EPA) and DOE Headquarters guidance activities. No major exclusions were noted from either air or National Pollution Discharge Elimination System (NPDES) permits. Efforts toward addressing waste handling and past releases demonstrated notable improvements over past performances in addressing compliance issues.

Other concerns reflect an inattention by the site to basic requirements of the environmental compliance process. Most notably, NEPA approvals must be completed before initiating projects, and air emission points must be properly permitted. Shortcomings in environmental program management were reflected by the lack of formality in several areas of the program. For example, self-assessment activities, documentation of sampling and analysis procedures, and quality assurance and control for radiological measurements were found lacking.

A review was conducted of current practices (i.e., controls on, monitoring of, and experience with) $UF_6$ releases from process operations. The results were compared to past practices where such releases (actual or where postulated) posed an environmental protection issue. The results showed that the potential for such events having environmental implications now, and in the future, has been substantially reduced.

Safety and Health

While strengths in the PORTS safety and health program were noted in emergency preparedness, operations (in terms of more stringent $UF_6$ release controls), and aspects of the radiation control program, fundamental weaknesses were found in implementing the

radiological contamination, occupational safety, and worker training programs.

Contamination control is a major concern at PORTS. Efforts have been underway to reduce contamination levels in the major process building. Inadequate contamination control and occupational safety practices in three PORTS maintenance support facilities were considered sufficiently serious to warrant immediate corrective measures by the contractor. These measures were accomplished while the Team was on site. A breakdown in standard workplace controls was found in these facilities, with widespread evidence of eating, drinking, and smoking in contaminated areas; a lack of routine contamination surveys being conducted; and little follow-up and accountability to contamination surveys and tagging. The larger issue of upgrading the PORTS contamination control program is being addressed in the implementation plan for DOE Order 5480.11 (Occupational Radiation Protection).

Occupational safety concerns centered on basic Occupational Safety and Health Administration (OSHA) and DOE requirements and procedures not being implemented in the workplace. Although many of these requirements and procedures are prescribed by the PORTS Safety Manual, they are neither understood by workers, nor enforced by supervisors. Unsafe practices requiring prompt abatement were observed during Team member walk-throughs. Management is cognizant of the scope of these deficiencies (raised in an earlier ORO appraisal) and is determining how best to implement an OSHA compliance program consistent with the Secretary's 10-Point Initiative.

Management from MMES has recognized that the PORTS safety analysis report (SAR) is inadequate. It is being revised, although the time frame for completion (FY 1994) seems protracted. Derivative operational safety requirements (OSRs) are not clearly prescribed; written procedures to define acceptable conduct of operations in the context of OSRs and DOE requirements are incomplete and not consistently enforced. The formality and discipline that guide typical nuclear operations are lacking at PORTS, a root cause for many findings.

Management and Organization

Martin Marietta Energy Systems management at PORTS is in the process of adjusting to the change in ES&H expectations. Management performance over the past three years has been reactionary, focusing on needed ES&H upgrades when prompted by audits, appraisals, and regulatory activity. This attitude is now changing, with MMES taking a number of initiatives to establish realistic ES&H goals, allocate resources, and instill greater accountability to ES&H in the conduct of operations at PORTS. These initiatives are too recent to be judged for their effectiveness. To be successful, the roles and responsibilities

of the Nuclear Energy Program Office and the ORO Office must be clarified; the technical isolation of the PORTS facility must be diminished; the technical ES&H self-sufficiency of DOE and MMES at the site must be strengthened; and the adversarial labor relations environment at PORTS must be lessened.  Positive first steps by MMES were noted on all these issues.

However, oversight of the contractor (by DOE), onsite surveillance (by the Area Office), ES&H appraisals (by ORO), and programmatic reviews (by the Nuclear Energy Program Office) have not been effectively performed in the past.  Each area needs to be included as an integral aspect of implementing SEN-6, the Secretarial directive on governing line ES&H responsibility.

ES-4

# 1.0 INTRODUCTION

## 1.0    INTRODUCTION

On June 27, 1989, Secretary of Energy Watkins announced a 10-point Initiative to strengthen environmental protection and waste management activities in the Department of Energy (DOE). One of the initiatives involves conducting Tiger Team assessments at DOE's operating facilities.

## 1.1    <u>Purpose</u>

The purpose of the Portsmouth Gaseous Diffusion Plant (PORTS) Tiger Team Assessment is to provide the Secretary of Energy with concise information on:

- current environmental, safety, and health (ES&H) compliance status of each facility at the Plant and associated vulnerabilities;

- root causes for noncompliance;

- adequacy of DOE and site contractor ES&H management programs;

- response actions to address identified problem areas; and

- DOE-wide ES&H compliance trends and root causes.

## 1.2    <u>Scope</u>

The scope of the PORTS Tiger Team Assessment is broad and includes, but is not limited to, the following areas:

- compliance with applicable Federal, state, and local regulations, requirements, permits, agreements, orders, and consent decrees;

- compliance with DOE Order requirements for ES&H activities;

- adequacy of DOE and site contractor's ES&H management programs, including planning, organization, resources, training, and relationships with regulatory agencies and the public;

- conformance with applicable "best" or "accepted industry practices;" and

- identification of root causes.

1-1

## 1.3        **Approach**

The Tiger Team assessment at PORTS was conducted in accordance with the Draft Tiger Team Guidance Manual, September 1989, and followed accepted audit techniques.  The PORTS Tiger Team was composed of three component teams, i.e., environment, safety and health, and management and organization.  A listing of the Tiger Team personnel and biographical sketches are contained in Appendix A.  The Tiger Team assessment of PORTS included three distinct phases:  planning, onsite activities, and reporting.

PLANNING

Planning for the PORTS assessment included the issuance of an introduction and information request memorandum, a Pre-Assessment Site visit, and an initial review of documentation that was sent to the Tiger Team by PORTS personnel as a result of the information request memorandum.

The Pre-Assessment Site visit was conducted on October 11-12, 1989.  The DOE Portsmouth Enrichment Office and the site operating contractor - Martin Marietta Energy Systems (MMES) - provided an overview of site operations and of the ES&H program. Discussions were held to provide the site with the scope and purpose of the Tiger Team Assessment Program and needed support requirements for the actual assessment.  Federal and state regulators were invited to attend and participate in all activities.  Representatives from the Ohio Environmental Protection Agency (OEPA) participated and presented their concerns with respect to environmental protection activities.  In addition, the Director of OEPA, Richard Shanks, was briefed on the purpose and objectives of the Tiger Team in a meeting held on October 25, 1989.

ONSITE ACTIVITIES

The onsite activities for the PORTS Tiger Team assessment took place from October 23, 1989, to November 17, 1989.  Onsite activities included document review; observation of site operations; interviews with DOE and site contractor personnel, and personnel from Federal, state, and local regulatory agencies; and review of previous audits and assessments.

The Tiger Team developed findings using these sources of information.  The findings fall into three general categories (i.e., compliance findings, best management practices [BMP] findings, and noteworthy practices).  Compliance findings are conditions which, in the judgment of the assessment team, may not satisfy applicable environmental or safety and health regulations, DOE Orders, consent orders, agreements with regulatory agencies, or permit conditions.  The BMP findings are conditions where, in the judgment of the assessment team, best

management practices could and should be employed. Compliance findings and BMP findings were then evaluated to determine root causes for the non-compliances identified. The methodology of determining findings is depicted in Figure 1.3-1. In addition to these two types of findings, the assessment team may identify practices, which in their judgment, may be noteworthy and have general application to DOE facilities and should be documented for the purposes of information transfer.

REPORTING

The findings are presented under sections identified by media (e.g., Air, Surface Water), issue (e.g., Emergency Preparedness and Security and Safety Interface), or regulation (e.g., National Environmental Policy Act [NEPA]). Each finding is preceded by a Performance Objective. The Performance Objectives for Regulatory or DOE Order Requirement Findings are derived from promulgated regulations and final DOE Orders, consent orders, agreements, and permit conditions. The Performance Objectives for BMP findings are derived from regulatory agency guidance, accepted industry practices, and professional judgment. The findings within each section are not arranged in order of relative significance.



Figure 1.3-1  Tiger Team Compliance Assessment Methodology

1-3

The Section Overview, which precedes the findings in Sections 3.0, 4.0, and 5.0, summarizes the more significant section-specific findings and noteworthy practices for the environment, safety and health, and management assessments, respectively. An overall summary of all major Tiger Team Assessment findings and noteworthy practices is presented in Section 2.0.

The assessment reflects a fixed point in time. As a result, improvements in the ES&H areas that were planned, but were not completed at the time of this assessment, are identified as findings if the Team judged them to be necessary to satisfy ES&H requirements of BMPs.

The findings, audit observations, BMPs, and noteworthy practices made by the Assessment Team were verbally presented to representatives from the Office of Nuclear Energy, the Oak Ridge Operations (ORO) Office, the Portsmouth Enrichment Office, MMES, and Federal and state regulators at a close-out briefing on November 17, 1989.

Comments on the draft Report from Nuclear Energy, ORO, the Area Office, and the site contractor will be incorporated, as appropriate, in a Final Tiger Team Assessment Report. In addition, the Program Secretarial Officer, in this case, the Assistant Secretary for Nuclear Energy, will prepare a draft and final action plan to address the findings identified during the Tiger Team Assessment of PORTS. The Secretary will approve the final action plan and direct the Program Secretarial Officer to implement the plan.

## 1.4     Facility Description

The PORTS site is located on 3,800-acres in rural south-central Ohio. (See Figure 1.4-1.) It consists of the Portsmouth Gaseous Diffusion Plant constructed between 1952 and 1956, and the Gas Centrifuge Enrichment Plant (GCEP) whose construction was halted in 1985. Management of PORTS became the responsibility of Martin Marietta Energy Systems, Inc., (MMES) on November 16, 1986, with the transfer of the contract for the PORTS from the Goodyear Tire and Rubber Company (Goodyear Atomic Corporation) to Martin Marietta Corporation. PORTS is one of two operating uranium enrichment facilities owned by DOE. The other facility is located in Paducah, Kentucky.

The mission at PORTS is singlefold: producing "enriched uranium," which has an increased concentration of the U-235 isotope. This enriched uranium is produced to meet private and government needs, both domestic and foreign. Since 1955, production at the Portsmouth site has been by the gaseous diffusion process.



**Figure 1.4-1 Portsmouth Gaseous Diffusion Plant**

This process utilizes uranium in the form of uranium hexafluoride ($UF_6$), which is a white crystalline solid at ambient conditions and a gas at process conditions. The enrichment method achieves increased U-235 concentrations by physical processes; the process gas is not chemically altered.

The gaseous diffusion process utilizes a series of compressors and converters to enrich the process gas. The compressors and converters are interconnected to provide what is known as a cascade. The compressors are driven by electric motors and are used to compress the process gas and maintain flow through the cascade. The converters contain porous tubes or "barriers" through which the process gas is diffused. In each converter, a portion of the process gas diffuses through the barrier and is fed to the next higher stage, with the undiffused gas being recycled to the next lower state. The diffused stream is slightly enriched with respect to U-235, while the undiffused stream is depleted of U-235 to the same degree.

The gaseous diffusion enrichment process is performed in three large process buildings: X-333, X-330, and X-326. These buildings house over 4,000 stages of compressors and converters and contain over 8 million square feet of floor space.

To support the process operations, PORTS includes facilities for administrative activities, utilities operations, chemical operations, maintenance, laboratory functions, storage, and other miscellaneous activities. Generally, the complex is self-sufficient, except that it receives electric power generated offsite by the Ohio Valley Electrical Corporation (OVEC). All of the supporting operations are located within the DOE reservation with the exception of the water well fields, which are located west of the complex along the Scioto River.

The X-500 series facilities at PORTS relate to the power operations facilities. These facilities include switchyards, switchhouses, valve houses, and test and repair facilities. The two large switchyards, X-530 and X-533, each cover approximately 20 acres and receive power at a nominal 345 kV from OVEC. In turn, 13.8 kV nominal power is delivered from the switchyards to the switchhouses for distribution to the process and support areas.

The X-600 series facilities are used for utility-related functions. Included are a steam plant, well fields, pumphouses, a water treatment plant, a sewage treatment plant, and numerous cooling towers. In addition, dry air and nitrogen generation facilities are housed in the gaseous diffusion plant process buildings. The original gaseous diffusion plant sewage treatment plant was eliminated and a new combined facility has been constructed.

The X-700 series facilities house chemical operations, radiological decontamination, a laboratory, maintenance shops (for contaminated and non-contaminated equipment), and numerous

storage facilities.  The major maintenance facility is the X-720 Building.  This building contains over 300,000 square feet of space for various shop activities, offices, and storage of parts.

Selected facilities are identified in the accompanying site map and legend.  A description of selected PORTS facilities is found in Table 1.4-1.  PORTS consists of 109 permanent buildings containing over 100 million square feet of gross floor area.  In addition to an extensive road and railroad network, the site has extensive utility systems for electrical power distribution; process and sanitary water supply, treatment, and distribution; storm drainage; sewage treatment; and dry air supply.  The current plant population (excluding construction forces) is approximately 2,300 people.

Table 1.4-1
Selected Facility Description

| PERMANENT FACILITY NUMBER | DESCRIPTION OF FACILITY |
|---|---|
| X-100 | Administration Building |
| X-230K | South Holding Pond |
| X-230L | North Holding Pond |
| X-326 | Process Building |
| X-330 | Process Building |
| X-333 | Process Building |
| X-343 | Feed Vaporization and Sampling Facility |
| X-334A | $UF_6$ Sampling Facility |
| X-345 | SNM Storage Building |
| X-600 | Steam Plant |
| X-611A | Lime Sludge Lagoons |
| X-611B | Sludge Lagoon |
| X-611C | Filter Building |
| X-615 | Sewage Plant |
| X-617 | South pH Control Facility |
| X-618 | North Holding Pond Storage Building |
| X-621 | Coal Pile Runoff Treatment Facility |
| X-626-2 | Cooling Tower |
| X-630-2A | Cooling Tower |
| X-630-2B | Cooling Tower |
| X-633-2A | Cooling Tower |
| X-633-2B | Cooling Tower |
| X-633-2C | Cooling Tower |
| X-633-2D | Cooling Tower |
| X-700 | Converter Shop and Cleaning Building |
| X-701B | Holding Pond |
| X-701F | Effluent Monitoring Facility |
| X-705 | Decontamination Building |
| X-705A | Incinerator |
| X-705B | Contaminated Burnable Storage Facility |
| X-710 | Technical Services Building |
| X-720 | Building Maintenance and Stores |
| X-734 | Old Sanitary Landfill |
| X-735 | Sanitary Landfill |
| X-747J | Decontamination Storage Yard |
| X-749 | South Contaminated Materials Storage Yard |
| X-749A | Classified Burial Yard |
| X-2230M | Holding Pond No. 1 |
| X-2230N | Holding Pond No. 2 |
| X-3001 | GCEP Process Building |
| X-3002 | GCEP Process Building |
| X-3012 | GCEP Process Support Building |
| X-3346 | GCEP Feed and Withdrawal Facility |
| X-7721 | Maintenance, Stores, and Training Building |
| X-7725 | GCEP Recycle/Assembly Building |

1-8

# 2.0  KEY FINDINGS AND PROBABLE ROOT CAUSES

## 2.0      KEY FINDINGS AND PROBABLE ROOT CAUSES

## 2.1      Environmental Assessment

The purpose of the environmental portion of the DOE Tiger Team
assessment of PORTS was to evaluate the activities of the Oak
Ridge Operations Office (ORO) and the plants operating
contractor, Martin Marietta Energy Systems (MMES), with regard to
compliance with Federal, state, and local environmental
requirements, and DOE environmental Orders.

### 2.1.1    Key Findings

The environmental programs at PORTS demonstrate a degree of
responsiveness to concerns expressed by external groups such as
regulators and outside auditors.  No major excursions were noted
from either air or National Pollution Discharge Elimination
System (NPDES) permits, and efforts toward addressing waste
handling and past releases demonstrate notable improvements over
past performances.  However, many changes are occurring in the
environmental regulatory area that challenge plant management to
become more proactive in their environmental management of the
plant.

Several of the most significant environmental compliance findings
involve issues that are beyond the ability of PORTS to address
alone.  These include:

- leaking PCB gaskets in the process buildings;

- storage of restricted land-banned wastes; and

- a lack of NEPA and Resource Conservation and Recovery
  Act (RCRA) integration.

Resolution of the PCB gasket issue requires agreements with the
Environmental Protection Agency (EPA) on the appropriate course
of action.  The storage of land-banned wastes primarily results
from the lack of an approved facility for disposal of mixed
waste; off-site disposal is available for non-mixed land-banned
waste at PORTS.  The lack of Headquarters' guidance on
integrating NEPA into the RCRA process could create difficulties
in meeting deadlines agreed to in a consent decree with the State
of Ohio.

Other significant findings, however, reflect an inattention to the more routine aspects of the environmental compliance structure. The most significant of these findings include:

- approving and initiating projects before completing required NEPA documentation, and

- allowing a number of unpermitted air sources to exist.

In many regards, the more significant findings address the failure to apply recognized BMP and epitomize the most consequential deficiencies that the Team noted in the environmental programs. Some examples include inadequate:

- internal oversight and self-appraisal of environmental compliance;

- documentation of laboratory standard operating procedures and practices; and

- radiological measurement QA/QC practices.

Generally, these deficiencies appear to reflect a lack of attention toward documentation and general environmental oversight of operations. The ineffectiveness of oversight leads to deficiencies that, although minor in and of themselves, have implications for the future. Continuation of the practices included within these deficiencies will make it difficult for the facility to move beyond its current reactive mode to a more proactive one.

One environmental issue requires special attention in this report. Secretary Watkins requested an assessment of the current compliance implications of a reported U-235 inventory difference in the 1981-1984 time period. It is concluded that the potential for such events having environmental implications in the future has been substantially reduced. (See section 3.5.11, Special Issue.)

## 2.1.2    Probable Root Causes

The concerns identified by the environmental assessment team were evaluated for their root causes. The objective of the root cause evaluation is to focus planned corrective action on the underlying reasons for the deficiencies and thus guide DOE's sites toward a more proactive stance. Each compliance and BMP finding at PORTS was evaluated individually for both surface and root causes. All of the root causes within a media section were then evaluated to provide an overall evaluation of the media or management area. This media or management area evaluation provided the basis for the overall evaluation of the environmental programs.

The deficiencies within the environmental programs at PORTS appear to stem from inadequacies in oversight, incomplete policy implementation, and a general lack of detailed procedures.

Oversight - The single most commonly cited concern in the environmental area was a need for more effective oversight.

PORTS staff have been in a reactive mode on environmental matters. Requirements of the workload include striving to adequately address concerns raised by regulators, maintaining the paperwork required by the regulations, keeping up with shifting guidance from DOE, and reacting to the latest issues raised by outside auditors. This workload has minimized their ability to drive the environmental process: to plan monitoring programs, to conduct regular inspections, and to ensure the application of good management practices.

Policy Implementation - A second concern that surfaced in the environmental assessment was the failure to completely implement established policies. Specific examples of this failure exist in findings addressing inconsistencies with either national, DOE, or site policies. Many of the findings concerning NEPA are examples of the failure to fully implement national and DOE policies. Examples of inconsistencies with site policies include actions taken in a manner inconsistent with the Environmental Control procedures (e.g., inconsistent application of the NEPA checklist) or with site hazardous materials transport policy (e.g., failure to placard vehicles on site).

Lack of Procedures - A third reason for many of the findings is rooted in the lack of documented procedures for many of the environmental activities conducted at the site. Lack of procedures is usually considered a surface, not a root cause, for audit deficiencies. However, at PORTS, the environmental assessment identified this concern on such a pervasive scale that it deserves addressing as an issue itself.

A lack of documented procedures provides the potential for inappropriate actions to be taken by new or inexperienced personnel. The environmental responsibilities of PORTS, and all other industrial facilities, have grown substantially in the past few years. This trend will continue. PORTS can be expected to increasingly turn to new staff and additional contractors to fulfill these new responsibilities. These new individuals can not be expected to be knowledgeable in the details of the many environmental activities that are conducted if the procedures by which these activities are conducted are not documented.

## 2.2        Safety and Health Assessment

### 2.2.1        Key Findings

Martin Marietta Energy Systems has sustained a favorable
industrial safety record at PORTS, based on standard reporting
statistics, with recorded worker radiation doses relatively low
compared with other DOE sites.  A past concern involving
inadvertent $UF_6$ releases from process areas has been largely
resolved with more stringent operational procedures, and improved
inplant and stack monitoring.  However, many internal and
external changes are challenging management to not only sustain
safety performance in this traditional context, but to ensure
workplace practices satisfy current safety standards.  These
include:

- a level of formality and discipline to be introduced in
  a workplace culture unfamiliar with the many tenets of
  nuclear facility management;

- more stringently implemented safety requirements, e.g.,
  for contamination control and OSHA-related standards;

- higher power operation with concomitant demands on
  operations and maintenance personnel, as well as safety
  programs; and

- an aging workforce, which is being replaced by new
  personnel who did not "grow up with the plant."

The Safety and Health Team found MMES management open and
responsive to the need for such changes, yet struggling with how
best to accomplish them.  The team found that one root cause to
several key safety findings was an insufficient understanding or
ownership among management and workers of the actions needed to
implement change.  Likewise, a long history of operating the
plant without the rigor and discipline demanded by contemporary
workplace standards has conditioned management to accept
practices that are today considered substandard.

The PORTS safety analysis report (SAR) has been recognized as
being inadequate, and is being revised.  Derivative operational
safety requirements (OSRs) are not clearly prescribed in a number
of cases; written guidelines or procedures to define acceptable
conduct of operations against OSRs and DOE requirements are
incomplete and not enforced consistently in the workplace.
Informal mechanisms have been used that allow for individual
worker interpretation and do not provide for either consistent
implementation or monitoring of plant activities.  Such
discrepancies, taken together, raise questions regarding the
validity and demonstrability of the "operating envelope" for
safety at PORTS.

With an aging work force, the importance of documentation, formality, and training is increased because less experienced personnel are replacing veteran employees. While training and certification programs are becoming more structured and formal, the Team was concerned that the PORTS operating philosophy and training methods were leading employees to commit procedures to memory, rather than teaching them the reason behind the procedures.

Management at MMES has recognized the need to address these issues and has, at both the corporate and plant level, taken a number of initiatives to bring about change. These initiatives include the development of a "Long Range Health and Safety Management Plan", dated June 1989, designed to "permit effective assignment of plant resources, responsibility, accountability, and tracking" of PORTS safety goals. Other changes include the recent (September 1989) assignment of ES&H program managers (for contamination control, PCB, NPDES, and OSHA implementation programs) at PORTS; the establishment of eleven PORTS ES&H building coordinates; and most notably, the PORTS Model Facility Program, which targets one PORTS facility as the focal point to achieve major changes in the overall conduct of operations. While all of these steps are positive, it is too soon to gauge their actual effectiveness in implementation.

Although some ninety findings are identified in the Safety and Health Assessment (over half being OSHA-related field findings in two buildings), the team concluded that none of these findings presented an imminent hazard. Prompt abatement of some observed unsafe practices was required, however. Inadequate contamination control and occupational safety practices in three maintenance support facilities -- Buildings 720, 700 (chemical operations area), and 705 -- were considered sufficiently serious to warrant immediate corrective measures. This recommendation is found in a memorandum dated October 27, 1989 (Attachment B), and provided for in actions prescribed by a MMES action plan dated October 28, 1989 (Attachment C). A follow-up review by the Team before closeout confirmed that the more immediate concerns had been resolved and that more permanent operational improvements were being accelerated. However, the depth and scope of deficiencies found are indicative of serious shortcomings in the contamination control and OSHA-related personnel protection programs that will require long-term management effort to correct.

The following discussion summarizes key findings in three areas: radiological contamination control, personnel protection (occupational safety/industrial hygiene), and worker training. While compliance findings were made against DOE Orders and standards in other safety disciplines, e.g., maintenance and operations, these three findings reflected more generic plant shortcomings in the conduct of operations as opposed to an overall program deficiency.

Radiological Contamination

Contamination control is a major concern at PORTS. Contamination levels have been reduced in the process buildings, but improvements in contamination control are needed in other radiological buildings, particularly in the maintenance support facilities, Buildings 720, 705, and 700. To maintain radiation exposures to "as-low-as-reasonably-achievable", DOE Order 5480.11 recommends restricting contamination to its source. To date, this contamination containment has not been accomplished effectively in some PORTS buildings. The Team found that contamination surveys are not performed routinely when personnel exit some radiological areas. Administrative controls to preclude eating, drinking, and smoking in contaminated areas were not being enforced in the maintenance buildings. Because ingestion and inhalation represent the primary means of exposure to uranium, these findings were particularly troublesome. Any follow-up response to surface contamination surveys was largely lacking, with frequented surfaces such as chairs, phones, and operational equipment exhibiting aged contamination survey tags. In this case, appropriate decontamination was left to the building managers, who did not always fulfill their responsibility. Actions taken by MMES while the Team was on site were compensatory in nature, as a bridge to the more permanent contamination control program under consideration in response to DOE 5480.11.

Personnel Protection (Occupational Safety/Industrial Hygiene)

The status of compliance with OSHA and other occupational safety requirements and accepted practices was reviewed for selected PORTS facilities, as a sampling of overall PORTS program adequacy. While occupational safety statistics compare favorably with commercial industry, the Team found that basic OSHA and DOE requirements and procedures were not being implemented in the buildings visited. Many of these are prescribed in the PORTS Safety Manual, but are not enforced by management. Throughout the facilities toured, operations supervision demonstrated a lack of understanding of the need for operating procedures, a failure to adhere to established guidelines, and an inability to recognize workplace hazards. During limited walk-throughs, Team members observed several unsafe practices in Buildings 720 and 700 that required prompt abatement. Other practices necessitated immediate management response as part of the MMES action plan. These practices indicate work performance counter to OSHA, DOE, and even PORTS requirements and guidelines and ranged from minimally adequate to substandard.

Specific deficiencies of note include the following: 1) work permit systems are not being rigorously followed to ensure the use of proper safety procedures; and 2) numerous violations of National Electrical Code (NEC) standards, the DOE Hoisting and

Rigging Manual, and the equipment guarding provisions of 29 CFR 1910 were observed. Other observed violations involved improper handling of respirators, inadequate hazard communication, and lack of routine exhaust ventilation testing.

## Worker Training

Past Technical Safety Appraisals (TSAs) and other appraisals at PORTS have documented that operations training and retraining programs did not have the rigor or documentation required by DOE 5480.5. While this condition continues to exist, considerable resources have been devoted during the past two years to develop training materials to address these inadequacies. This is considered crucial to effectively address the "safety culture" issues identified above, as well as the challenges posed by an aging workforce. A key finding was that operating philosophy and training methods lead operators to commit procedures to memory rather than gaining an understanding of what they are doing. There are no documented criteria for remediation or removal from duties of job incumbents who fail requalification exams. Plant personnel do not have adequate working knowledge of criticality safety, emergency response, and radiation protection. Radiation Protection technicians are inadequately trained and only periodically retrained.

## 2.2.2    Probable Root Causes

The concerns identified by the safety assessment team were evaluated for their root causes. The objective is to focus planned corrective action on the underlying reasons for the deficiencies found, not merely the deficiencies themselves.

The following deficiencies were judged to be significant:

1.  Formality and discipline in the conduct of operations is inadequate. While the basic elements of a sound ES&H program are in place at the plant, the incompleteness and inadequate enforcement of procedures, documentation, and quality assurance hampers effectiveness. This is evidenced by a majority of the Team findings, but most notably in contamination control (e.g., RP-2, administrative procedures for controlling contaminated equipment not exercised; eating and drinking in contaminated areas), industrial safety (e.g., IS-1, work permit systems are not rigorously followed), and maintenance (e.g., MA-2, procedures not consistently used or kept current).

2.  Lack of technical self-sufficiency in safety. Instituting a more vigorous approach to ES&H as envisioned by MMES management will entail expanded staff resources (numbers and qualifications), as well as a better informed management and workforce. In the recent past, PORTS has relied on external

reviews to "calibrate" the status of its safety program. The lack of adequate staff capabilities manifests itself in several key findings in training (e.g., TC-1, operating philosophy and training/examination methods lead to operators committing procedures to memory, rather than gaining an understanding of what they are doing), criticality safety (e.g., CS-2, operating personnel interviewed had minimal knowledge of the fundamentals of criticality safety), and radiation protection (health physics staff resources have not been adequate to implement required elements of the radiation protection program).

3.  Historic risk-based approach to uranium contamination undercuts effective implementation of ALARA (as low as reasonably achievable). Although fundamental changes in contamination control practice are being instituted in response to DOE 5480.11, progress is hampered by a workplace culture tolerant of workplace contamination. Based on past bioassay data (and measurement thresholds), intakes have been low, which has served to reinforce this view. This root issue is reflected in the "immediate action concerns" identified by the Team in Buildings 720, 705, and 700, as well as in findings RP-2 (regarding effective administrative procedures not being exercised for control of contaminated equipment), RP-5 (lack of contamination posting and periodic surveys), and RP-6 (interim contamination control procedures not fully implemented).

4.  Oversight by DOE and contractor line management is inadequate. Although key changes to workplace practice were being ordered by PORTS management, little feedback existed on how effectively they were being implemented. The routine inplant surveillance program required by PORTS procedure has not been implemented effectively. (A more rigorous program has since been required for Buildings 720, 705, and 700.) Reliance has been placed on outside reviewers to find problems, which underscores the lack of native capabilities. First-line supervisory enforcement of even minimal safety provisions (e.g., prohibition on eating, drinking, and smoking in contaminated areas) was lacking. As a consequence, day-to-day accountability to safety requirements and procedures is poor. This root cause is reflected in findings for industrial hygiene (e.g., IH-20, eating and drinking in Buildings 700 and 720), radiation protection (e.g., RP-8, inadequate technician resources to support required surveys), and in the overall number of observable deficiencies found in the Team's limited walk-throughs.

2.3       **Management and Organization Assessment**

**2.3.1     Key Findings**

Overall management of ES&H programs at the PORTS facility is in a state of change.  For the past several years, ES&H upgrades were driven by reactionary response to audits, appraisals, and regulatory actions.  In safety and health, there has been little evidence of comprehensive management action toward compliance as long as injury and exposure records indicated favorable statistics, and no external entity was demanding change.  Past practice has been to apply management attention to the crisis of the moment, which has led to an ES&H program wherein ownership is often lacking and compliance is inconsistent.  Progress in achieving environmental compliance with State of Ohio and EPA regulations has been more notable, with recently negotiated compliance agreements/orders now  in place with both agencies.

General agreement exists within the responsible DOE and MMES management to move toward a more formalized conduct of operations and a compliance-based measurement of ES&H performance.  They also recognize that the reactionary approach of the past several years will not effectively deal with the magnitude of the change required.  Within the last several months, several MMES initiatives have begun to bring about a better planned and integrated process of ES&H compliance.  The effectiveness of these initiatives cannot as yet be judged.  DOE must overcome several barriers if these initiatives are to be successful.  These barriers include resolving the roles and responsibilities of the affected DOE offices (Nuclear Energy Program Office and ORO), the technical isolation of the PORTS facility, difficulties in staffing the DOE and PORTS organizations, an adverse labor/management climate, and the need for greater subject area expertise, grounded in current nuclear industry practice.  In the findings and assessments that follow, we have attempted to characterize the degree to which these challenges are recognized by the PORTS management and have prepared effective approaches to deal with them.

DOE ES&H Program Responsibilities Need Clarification

Differing and evolving views by the responsible DOE offices (Nuclear Energy and ORO) of the program mission, ES&H performance objectives and priorities, and roles and responsibilities for ES&H performance have characterized the uranium enrichment program at Portsmouth for the past several years.  Lines of authority and accountability have not been formally established or agreed upon.  These factors have led to confusion within the DOE staff and a contentious climate within line management.  Each of the parties expresses a sense that this issue has had some adverse effect on past ES&H performance.  Several actions have been taken within the last few months that have improved this

situation. These actions include the designation of the Area Office manager as the Contracting Officer's Representative, and improvements in the day-to-day working relationship between the program office and Operations Office. The changes in roles brought about by SEN-6, residual issues regarding the division of responsibility between Area Office and Operations Office enrichment division, and the now recognized need to manage significant ES&H change in the program, have reopened the question of lines of authority, as well as the capability of each office to carry out assigned responsibilities. There is a clear need to clarify the uranium enrichment program mission, related ES&H program goals and objectives, and assigned organizational roles and responsibilities. Without clear lines of accountability, a commitment to common objectives will continue to be compromised to the detriment of the program.

Formal Conduct of Operations Needs Direction

Responsible DOE and MMES managers recognize the need to move to a more formal and disciplined conduct of operations, although a consensus does not exist on the scope, timing, or degree of application. In fact, an overall understanding of what formal conduct of operations entails is in a relatively immature state. The current PORTS management team has little nuclear expertise external to the Uranium Enrichment program nor has it availed itself to external technical expertise in this area. In the absence of personnel knowledgeable in formal nuclear operations and the discipline inherent in such operations, the success of contractor initiatives in this area is uncertain. The same is true, to a lesser extent, in the environmental area where similar informality was found, (e.g., sampling self-assessment and analysis programs).

Many of the findings in the Environment, Safety and Health, and Management team reports have their roots in the formality and discipline of operations in the workplace. A response to those individual findings must be based on 1) a systematic analysis of overall conduct of operation, and 2) a decision by DOE and MMES management concerning the scope and extent to which a more formalized process is called for at PORTS; if not, implementation may be inconsistent, ineffective, and costly. Therefore, we would encourage interim compensatory measures, not abrupt solutions, be implemented until a competent and comprehensive process of decision-making has been applied to this area of need.

Management of Human Resources Has Been a Program Constraint

Both DOE and MMES management recognize that an upgraded ES&H program will require additional staffing in both organizations and better management control over the use of the existing staff at PORTS. However, actions to date have not successfully overcome difficulties in hiring, clearance restraints,

compensation issues, and an adverse labor/management climate. Management at MMES has recognized these problems and often has taken actions available to them in dealing with these problems. Given the importance of this issue, further commitments by DOE and MMES Corporate will be necessary if meaningful advancement in ES&H performance is to be sustained.

## A Program for Management of Cultural Change is Needed

PORTS is a program tied to historic methods and practice. Little intermixing has taken place between the uranium enrichment personnel at the plant with those from other nuclear disciplines at other nuclear installations. A major portion of the workforce is trained and spends its entire career at the PORTS facility. A demographic survey of the workforce and discussions with facility personnel indicate a high degree of satisfaction with the safety practices and environmental protection afforded by the PORTS program. While there are undeniable positive aspects of this characteristic, it is indicative of the difficulty with which change will be assimilated. Thirty years of familiarity with a substandard situation develops a tolerance for its persistence. While MMES management recognizes the need for change, it is not clear they fully appreciate the challenge that confronts them in addressing deep set cultural attitudes. For example, the Long Range Health and Safety Management Plan does not recognize this issue. The Development Program for Enrichment Performance Improvement Program has not progressed to the point where such practical implementation issues have been broached. As options, MMES should consider using consultative help as well as identifying successful models in commercial industry to guide broad-scale implementation of ES&H improvement programs at PORTS.

## 2.3.2    Probable Root Causes

### Performance Versus Compliance-Based Measurement

PORTS has historically demonstrated low levels of lost work injury and low employee exposure. As long as these numerical safety indicators remained low, the past perception has been that the intent of codes and standards, regulations, and procedures was being met. Based on interviews with PORTS management, this appears to have been true independent of whether the origin of the requirement was a DOE- or a company-prescribed policy or procedure. Evidence suggests that both have been casually applied in some instances without an established system of feedback to measure safety performance. There appears to have been no sustained emphasis to evolve to a more compliance-based system of safety performance measurement in the absence of appraisals or regulatory actions.

For environmental protection, the response has been dramatically different. Full compliance to increasingly more stringent Federal and state regulations has been mandated by DOE/ORO as a goal. Concerted efforts have been pursued with the state and EPA Region V to promulgate a Federal Facility Compliance Agreement and Compliance Order, respectively. A conservative remedial program to control PCBs, RCRA wastes, and air emissions have been put in place. The contrast between safety and environmental protection programs is clear from a comparison of the findings of the health and safety team and those of the environmental team, as well as through interviews with plant personnel. This contrast is exemplified in observed contamination control and OSHA performance when compared to RCRA compliance issues, where a rigid compliance environment has dictated a highly disciplined approach to compliance.

The attainment of low levels of injury and dose, and the absence of an effective feedback on inplant safety performance, has led to an internally inconsistent approach by management to ES&H compliance. Despite the presence of mandated standards in DOE Orders, we conclude that DOE has not established the same level of incentive to attain compliance in the health and safety area as in those undergoing high-visibility regulatory compliance proceedings.

## Industrial Versus Nuclear Environment

The history of the PORTS facility has been dominated by management to industrial standards rather than nuclear standards. The operating culture has retained its more industrial character rather than reflecting today's nuclear expectations for several reasons, including 1) the operating contractor (Goodyear for all but the last three years), 2) the composition of the workforce (industrial/agricultural background), 3) low turnover (many employees have worked their entire careers at the facility), and 4) limited opportunity for infusion of new thinking (most employees are trained on site to current procedures). The formality and discipline of operations represented by the Institute of Nuclear Power Operations (INPO) good practices, for example, have not been infused into the workplace at PORTS.

Consensus does not exist within DOE as to the degree of formality with which operations at PORTS should be conducted. The lack of inhouse knowledge on this issue will make such a determination more difficult. However, the nature of the risk to employees, the public, and the environment, is sufficiently different from that associated with reactor operation that consideration should be given to a graded approach to applying nuclear precepts to PORTS operation. Such an approach would dictate a more formalized and disciplined operation than currently demonstrated at PORTS, but not one more appropriate for the source term and technological complexities associated with nuclear reactors.

2-12

Reactive Versus Anticipatory Management

The operating contract for the PORTS facility was assumed by MMES in November 1986. The contract transition did not provide for a corporate ES&H assessment of the operation as was the case for the Hanford and Savannah River transitions. Management at MMES commented that this assessment was considered unnecessary because of the retention in the program of prior uranium enrichment managers and their resultant familiarity with PORTS performance. However, it is clear that just such a corporate assessment is being pursued.

During the past three year period (1986-1989), the operation has been the subject of a TSA, an environmental survey, a security and safeguards inspection, as well as a number of internal and external audits and appraisals. Management has responded to each review individually with little cause analysis and prioritization of identified corrective actions. The result has been a series of action plans, which has effectively saturated the contractor's ability to deal effectively with evolving ES&H needs.

The contractor prides itself on customer responsiveness and consequently has not challenged, on either a technical or resource allocation basis, those findings that may have been considered questionable. This has led to a situation where the contractor has acquiesced to DOE and has not been a dominant force in critical self-assessment. In some instances, the contractor's implementation of an externally prescribed corrective action results in a safety practice which is incoherent or illogical. The overall credibility of the safety program suffers in the eyes of PORTS employees and external auditors when this occurs.

MMES management is aware of both of these behaviors. They intend to address the first behavior by a structured Uranium Enrichment Improvement Program and through a root cause/lessons learned action plan. These programs are still developing, and a judgment cannot yet be made as to their effectiveness.

The second behavior pattern, that of the responsive (or reactive) contractor, does not appear to be addressed in actions taken to date by contractor management. In addition, DOE incentives (past and proposed award fee performance objectives) do not appear to have effectively challenged the contractor to deliver a product with a greater sense of ownership (e.g., current Cost Plus Award Fee and ES&H objectives).

Changing Standards

The PORTS facility was designed in the 1950's when performance standards were dramatically different than they are today. Occupational safety, radiation protection, environmental

monitoring, and security standards are examples of areas that have undergone significant change in the past ten years. The complexity of dealing with this challenge is two-fold; first, the facility design cannot be easily retrofitted to accommodate design changes. Second, the new requirements have been imposed incrementally so that the response to one creates real barriers to the achievement of a later set of requirements. Until recently the contractor has not taken an opportunity to stand back and evaluate the collective effect of the new requirements. As a consequence of this, the PORTS organization appears to be struggling with the challenge of compliance with contemporary ES&H expectations. In some cases, this appears to have been exacerbated by mixed signals from DOE relative to practices that would be viewed as compliant. This phenomenon is most pronounced in the interaction between security and nuclear material safeguards requirements, and those for radiation protection and waste management. Operations, ES&H, and security personnel, both at MMES and at the DOE level, have not dealt effectively with these conflicts.

## Mission/Budget Environment

Management views the PORTS mission to be one of providing economically competitive enrichment services. It performs this mission in a budgetary environment controlled both by marketplace forces and the traditional governmental budgetary controls, i.e., Congressional controls on operating and capital expenditures. Decision-making in this environment has suffered from the adverse effects of both budgeting controls. For example, staff reductions were made in areas associated with ES&H performance (training support) to balance budget with revenues; however, because of government constraints, the program is unable to borrow capital to take advantage of favorable power costs and establish an operating reserve that could fund ES&H upgrades.

# 3.0   ENVIRONMENTAL ASSESSMENT

**3.0      ENVIRONMENTAL ASSESSMENT**

**3.1      <u>Purpose</u>**

This section presents the environmental assessment findings identified during the Tiger Team Compliance Assessment of PORTS conducted from October 23 to November 17, 1989.

The purpose of the environmental assessment is to present an independent environmental audit of PORTS.  By identifying areas of noncompliance, efforts can be initiated to implement corrective measures and ensure a sound environmental program. One aspect of this assessment is a focus on procedures and reports associated with identifying, presenting, and documenting the compliance status of the facility.

**3.2      <u>Scope</u>**

The PORTS environmental assessment was a comprehensive, facility-wide evaluation covering all environmental media and adherence to applicable Federal, state, and local regulations, requirements, and best management practices.  The environmental areas addressed include air, surface water/drinking water, groundwater/soils, active waste management/underground storage tanks, toxic and hazardous materials management, quality assurance, radioactive materials management, inactive waste sites/emergency response, and the National Environmental Policy Act (NEPA).  Team specialists in each of the disciplines evaluated their respective concerns facility-wide through extensive reviews of Portsmouth plant production processes, training, record keeping, and procedures.

**3.3      <u>Approach</u>**

The environmental assessment at PORTS was conducted in accordance with the Draft Tiger Team Guidance Manual, September 1989, and followed accepted audit techniques.

The PORTS environmental assessment was conducted by a team managed by a Team Leader and Assistant Team Leader from the Office of Environmental Audit, and technical specialists from other DOE offices and support contractors.  The names, responsibilities, and affiliation of the team members are provided in Appendix A.

The environmental assessment included three distinct phases: pre-assessment planning, onsite auditing, and report writing and verification.

### 3.3.1    Pre-Assessment Planning

Pre-assessment planning for the PORTS assessment included the issuance of an introduction and information request memorandum, a pre-assessment site visit, and initial review of documentation that was sent to the team by PORTS as a result of the information request memorandum.

The pre-assessment site visit was conducted on October 11-12, 1989.  The Portsmouth Enrichment Office and the site operating contractor, MMES, provided an overview of site operations and of the ES&H program.  Discussions were held to provide the site with the scope and purpose of the Tiger Team Assessment Program and needed support requirements for the actual assessment.  Federal and state regulators were invited to attend and participate in all activities.

### 3.3.2    Onsite Audit

The onsite activities for the environmental assessment took place from October 23, 1989, to November 17, 1989.  Onsite activities included document review; observation of site operations; interviews with DOE and site contractor personnel, and personnel from Federal and state regulatory agencies; and review of previous audits and assessments.

### 3.3.3    Report Writing and Verification

The Environmental Team developed findings which fall into the following two general categories:  compliance findings (CF) and best management practices (BMP).  Compliance findings are conditions which, in the judgment of the assessment team, may not satisfy applicable Federal, state, or local environmental regulations, DOE Orders, consent orders, agreements with regulatory agencies, or permit conditions.  BMP findings are conditions where, in the judgment of the assessment team, best management practices could and should be employed to improve environmental management.

Compliance and BMP findings were further evaluated to determine the reasons for the identified noncompliance.  Both surface (or immediate) causes and root (or underlying) causes are identified. Most root causes relate to either failures of policy, policy implementation, or oversight.

The findings are presented under subchapters identified by media or environmental management area.  Each finding is preceded by a performance objective.  The performance objectives are derived from promulgated regulations and DOE Orders, consent orders and decrees, and permit conditions for compliance findings.  For BMP findings, the performance objectives are derived from regulatory

agency guidance (including draft regulations), accepted industry practices, and professional judgment.

The assessment reflects conditions at a fixed point in time. As a result, improvements in the environmental area that were planned but not completed at the time of the assessment are identified as findings if the team judged them to be necessary to satisfy environmental requirements or BMPs. Where the team has been able to confirm implementation of improvements which materially affect the findings and which result from the identification of the deficiency by the team, the improvements are discussed within the finding.

## 3.4     Environmental Assessment Summary

The environmental assessment identified 72 findings.  None of the findings were of a nature that indicated that continued operation of the facility would present an undue risk to public health or the environment.  The findings do, however, identify areas of potential noncompliance with Federal and state regulations, DOE Orders, and failure to apply acceptable BMPs.

As part of the pre-assessment activities of the environmental assessment, both Region V of the USEPA and the OEPA were invited to participate in whatever capacity that they felt appropriate. As a result of these invitations, five meetings were held during the assessment with both state and regional representatives of the OEPA.

With one exception, most of the meetings were of a technical nature and dealt with aspects of the OEPA regulatory structure and the regulators' views concerning PORTS compliance.  The exception was a meeting with the OEPA Director and Deputy Director where the general views of the agency concerning the Portsmouth Plant were provided.  In general, it appears from all of the meetings that the state is pleased with the progress made by the Portsmouth Plant in addressing their concerns.

Of the 72 findings, 35 involve possible noncompliance with Federal or state regulations or DOE Orders; 37 involve nonattainment with best management practices.  All of the findings of the environmental assessment are included at the end of this section in Section 3.5.12.

Overall, the team found few major noncompliances with environmental permits.  However, adverse regulatory situations exist at PORTS that need to be addressed expeditiously and others situations that, if not remedied, could result in future

problems. The most significant compliance findings identified
during the assessment include the following:

- Leaking PCB gaskets in the process buildings constitute
  use of PCBs in a manner "other than totally enclosed."

- There are potentially a number of unpermitted air
  sources at Portsmouth.

- Projects at PORTS have been approved and initiated
  prior to completion of NEPA review of the proposals.

- A lack of integration for NEPA and RCRA activities, in
  part caused by lack of guidance from DOE-HQ.

- Storage of restricted land-banned wastes beyond one
  year.

Several of these findings involve issues that are beyond the
ability of PORTS to address alone. Resolution of the PCB gasket
issue requires agreements with USEPA on the appropriate course of
action. The storage of land-banned wastes beyond the allowable
one-year period primarily results from the lack of an approved
facility for disposal of mixed waste. The lack of Headquarters
guidance on integrating NEPA into the RCRA process could create
difficulties in meeting deadlines agreed to in a consent decree
with the state.

Other findings, however, reflect an inattention to the more
routine aspects of the environmental compliance. This is
particularly applicable to the numerous deficiencies in the NEPA
program at PORTS, when projects are started before the NEPA
process is completed. This is also reflected in the situation
identified with respect to the air permits. Many sources exist
on the site which will at least need to be registered; several
may need permits.

The most notable findings of the BMP category include the
following:

- Rigorous internal oversight and self-appraisal of
  environmental compliance is lacking.

- Documentation of laboratory standard operating
  procedures and practices is inadequate.

- Radiological measurement QA/QC practices are
  inadequate.

In many regards, the nonattainment of these BMPs epitomize the
most significant deficiencies that the team noted in the
environmental programs. The team at times perceived a casual

3-4

attitude towards documentation and general environmental
oversight of operations. The ineffectiveness of oversight leads
to deficiencies that, although minor in and of themselves, have
implications for the future. Continuation of the practices
included within these deficiencies will make it difficult for the
facility to move beyond its current reactive mode into a more
proactive stance.

One environmental issue was identified which merits special
attention. It involves a request by Secretary Watkins to assess
the current compliance implications of a reported $^{235}$U inventory
difference in the 1981-1984 time period.

The concerns identified by the environmental assessment team were
evaluated for their root causes. The objective of the root cause
evaluation is to focus planned corrective action on the
underlying reasons for the deficiencies and thus guide DOE's
sites toward a more proactive stance. Each individual compliance
and BMP finding at PORTS was evaluated for both surface and root
causes. All of the root causes within a media section were then
evaluated to provide an overall evaluation of the media or
management area. This media or management area evaluation
provided the basis for the overall evaluation of the
environmental programs.

The deficiencies within the environmental programs at PORTS
appear to stem from inadequacies in oversight, incomplete policy
implementation, and a general lack of detailed procedures.

Oversight - The single most commonly cited concern in the
environmental area was a need for more effective oversight.
PORTS staff have been in a reactive mode on environmental
matters. Requirements of the workload include striving to
adequately address concerns raised by regulators, maintaining the
paperwork required by the regulations, keeping up with shifting
guidance from DOE, and reacting to the latest issues raised by
outside auditors. This workload has minimized their ability to
drive the environmental process: to plan monitoring programs, to
conduct regular inspections, and to ensure the application of
good management practices.

Policy Implementation - A second concern that surfaced in the
environmental assessment was the failure to completely implement
established policies. Specific examples of this failure exist in
findings addressing inconsistencies with either national, DOE, or
site policies. Many of the findings concerning NEPA are examples
of the failure to fully implement national and DOE policies.
Examples of inconsistencies with site policies include actions
taken in a manner which are inconsistent with the Environmental
Control procedures (e.g., inconsistent application of the NEPA
checklist) or with site hazardous materials transport policy
(e.g., failure to placard vehicles on site).

Lack of Procedures - A third reason for many of the findings is rooted in the lack of documented procedures for many of the environmental activities conducted at the site. Lack of procedures is usually considered a surface, not a root cause, for audit deficiencies. However, at PORTS, the environmental assessment identified this concern on such a pervasive scale that the concern deserves to be addressed as an issue itself.

A lack of documented procedures provides the potential for inappropriate actions to be taken by new or inexperienced personnel. The environmental responsibilities of PORTS, as with other industrial facilities, have grown substantially in the past few years. This trend will continue. PORTS can be expected to increasingly turn to new staff and additional contractors to fulfill these new responsibilities. These new individuals can not be expected to be knowledgeable in the details of the many environmental activities that are conducted if the procedures by which these activities are conducted are not documented.

In addition, although not specifically addressed by the environmental team, the Tiger Team's management team noted a large number of vacancies in PORTS' ES&H areas. In general, the environmental team did not attempt to assess the appropriate staffing levels for specific environmental areas; nor did it attempt to identify the extent, if any, that this issue may have been the participatory cause of the identified deficiencies. However, the team noted that because of recent transfers, no staff are assigned in two important compliance oversight areas: air and groundwater.

## 3.4.1    Air

The air discipline findings include five regulatory or DOE Order requirements, and five BMP findings. The majority of the ten findings were administrative in nature. These findings include inadequacies in the location and design of ambient air monitoring stations, improper disposal of asbestos, and an inadequate High Efficiency Particluate Air (HEPA) filter program. Probably the most significant finding involves the failure of the site to obtain permits for various air-contaminant sources.

A lack of rigorous procedures and a casual attitude toward monitoring and appraising its own activities may be contributing to deficiencies in its air program.

## 3.4.2    Surface Water/Drinking Water

The surface water/drinking water findings include five compliance and eleven BMP findings. Overall, PORTS demonstrated improvement in complying with limitations established in its NPDES permit from 1984 to 1988. In addition, the water treatment plant at

PORTS has performed well over the last few years and has contributed to a good compliance record for potable water.

Various deficiencies, however, are noted in surface water activities at PORTS. Among the more significant was the use of unapproved analytical test procedures for some parameters monitored in the NPDES permit. Although the methods used should have provided results which are as precise as the methods specified under the NPDES permit, it indicates that oversight and self-appraisal of the NPDES sampling and analysis programs need to be strengthened. Other findings that indicate inadequate oversight in the surface water program include the lack of up-to-date sampling procedures or water quality management plans.

The spill control and countermeasures outlined in the Spill Prevention Control and Countermeasures (SPCC) plan are generally adequate in terms of guidance for initial spill response and notification. However, spill containment measures for bulk oil storage and grounding transformers at two PORTS switch yards were found to have some deficiencies.

### 3.4.3    Groundwater/Soils

The groundwater/soils findings include one regulatory and one BMP finding. Overall, the PORTS facility has developed and implemented a comprehensive remedial action program which is designed to complete site characterization and develop corrective action measures. This program, along with continued compliance groundwater monitoring, provides PORTS with a hydrogeologic data base that generally exceeds the requirements of the consent decree and order.

Nevertheless, a potential pathway of contaminant migration which has not been adequately addressed is the migration of contaminated groundwater through vertical or high-angle fractures in the shallow bedrock beneath the facility. Also, because of the complexity of the groundwater monitoring network at PORTS, the facility should develop and maintain a groundwater sampling and analysis plan. A current plan which covers all aspects of the monitoring network is not available, although portions of a comprehensive plan can be found in various site documents.

The lack of personnel training and adequate technical resources may have contributed to the apparent incomplete review of technical documents. The absence of a comprehensive sampling and analysis plan may be due to insufficient management oversight to environmental monitoring activities such as groundwater sampling.

### 3.4.4    Active Waste Management/Underground Storage Tanks

The active waste management/underground storage tanks (USTs) findings include five regulatory and five BMP findings. The PORTS waste management and UST program has significantly improved since the 1986 Environmental Survey. In these areas PORTS appears to be in compliance with Federal and state laws and DOE Orders; the major exception is the storage of certain land-banned RCRA waste, primarily consisting of radioactive mixed waste beyond the one-year limit.

The remaining compliance findings appear to be relatively isolated instances rather than widespread problems. These findings include inadequate aisle spacing in RCRA storage areas and storage of waste drums in the wrong areas. The BMP findings included deficiencies in drum labeling and inventory-tracking problems; incomplete waste minimization efforts; and the current UST practice that does not allow an actual liquid volume to be determined, which can also affect tank-filling procedures.

The major waste management findings may be due to an inadequate inspection and corrective action program, an insufficient waste minimization program, and deficient tracking of non-radioactive land-banned RCRA waste.

### 3.4.5    Toxic and Hazardous Materials Management

The findings for toxic and hazardous materials management include seven regulatory and five BMP findings. Among the major challenges facing PORTS is the long-term storage of radioactively contaminated PCB wastes because of the current lack of a disposal or treatment method. There are, however, inadequacies in areas where this material currently is being stored (e.g., the use of unlabeled and undated drums). Implementation of MMES PCB-related policies is inadequate; more rigorous self-inspection and monitoring of PCB waste storage and transformer areas could help mitigate these problems.

In addition, other concerns center around leaks from PCB-contaminated oil lubrication systems and ventilation system gaskets in the process buildings.

### 3.4.6    Quality Assurance

There are six best management findings in the Quality Assurance section. Three of the findings deal with the issues of inadequacies in documentation and monitoring to verify data quality. The remaining three findings involve deficiencies in specific laboratory practices.

The major findings are due to a lack of procedures and training for laboratory technicians, as well as deficiencies in monitoring activities by the Quality and Technical Services Division.

### 3.4.7     Radioactive Materials Management

There are three radioactive materials management regulatory findings. Findings in Radioactive Materials Management range from deficiencies in the radiological dose assessment program to improper Thermoluminescent Dosimeter (TLD) locations around PORTS. Deficiencies in the dose assessment program parallel those found in Quality Assurance in general. They include lack of written procedures and a dose assessment plan, failure to independently verify computer-generated dose assessment calculations, and lack of criteria for performing dose assessments.

Deficiencies in this field, when related to radioactive materials management and dose assessments, may indicate a complacent attitude toward strict adherence to radiological control and regulatory requirements. The low specific activity and relatively low gamma radiation associated with the radioactive materials handled, along with PORTS long-operating history without significant radiological incidents, may actually contribute to this complacency.

### 3.4.8     Inactive Waste Sites/Emergency Response

No findings are included for this portion of the assessment. Overall, the PORTS Remedial Action Program is successfully meeting the regulatory requirements as well as those of the legal agreements with the OEPA (a Consent Decree) and with USEPA (a Consent Order). PORTS has developed a Remedial Action Program under RCRA for four land-based disposal units that are in the first stages of closure. Closure plans have been developed for all four sites, and one closure option study has been drafted. Three of the closure sites are associated with significant contamination plumes.

### 3.4.9     National Environmental Policy Act

The NEPA findings include six regulatory and three BMP findings. The review of NEPA compliance at the PORTS site identified a variety of deficiencies that have contributed to an ineffective NEPA program at PORTS. Oversight and coordination of the NEPA processes between MMES, the DOE site office and ORO, and DOE Headquarters has led to incomplete NEPA review of proposed activities at the site or NEPA documentation that is not in accordance with DOE NEPA guidance. In general, DOE and contractor managers and staff are not knowledgeable about implementing NEPA; as a consequence, it has been given low priority relative to other environmental regulations.

3-9

### 3.4.10    Environmental Monitoring and Surveillance

There are two regulatory and two BMP findings in this section.
Despite the significant number of complex, regulatory-driven
sampling and monitoring activities at PORTS, oversight of these
activities appeared to lack sufficient formality.  The site
operates with inadequate written guidance for environmental
monitoring and sampling, and no environmental monitoring plan is
available.  In the opinion of the environmental assessment team,
many findings in various environmental media could have been
identified earlier if internal audits and inspections occurred
regularly at PORTS.  Such self-appraisals, plus better follow-up
to correcting problems identified, could help the site take a
more proactive approach to environmental compliance.

## 3.5 Environmental Assessment Findings

### 3.5.1 Air

#### 3.5.1.1 Overview

The air assessment at PORTS included a review of the PORTS air pollution control program. Areas under review were the air monitoring programs, air surveillance programs, air emissions controls, air permit requirements, air-related aspects of the emergency response plan, and standard operating procedures for the operation and maintenance of pollution control equipment. Table 3.5.1-1 lists applicable air regulations and/or requirements used to evaluate compliance.

Particulate radionuclides and fluorides are the principal emissions of concern at PORTS. Although uranium hexafluoride is processed as a gas, all emissions immediately form hydrogen fluoride and the particulate uranyl fluoride on contact with moist air. Particulate emissions to the air warrant emphasis because air is the critical pathway by which contaminants may reach the environment and the community.

The PORTS program is carried out primarily by three departments in the Site Operations Division and by the Environmental Control Department of the Environment, Safety and Health Division. Controls are operated by the Production Department and maintained by the Maintenance Department. Stack sampling is carried out by the Quality and Technical Services Department. Ambient air monitoring stations are the responsibility of the Environmental Control Department. Oversight of the entire program is carried out by the Environmental Control Department. All sample analyses are performed by the Quality and Technical Services Department.

There are seven operating sources of radionuclide air releases at PORTS that have satisfied the USEPA National Emission Standards for Hazardous Air Pollutants (NESHAPs) notification/application requirements. There is one NESHAP source (installed but not operated) for which no application for approval has been made. PORTS has seven state-issued permits to operate non-radioactive air sources and seventy-six sources under registration. There are at least two air emission sources for which proper Permit to Operate (PTO) applications (to the state) have not been made.

The PORTS air monitoring program includes both stack and ambient air monitoring for radioactivity and fluorides. The program is sound and comprehensive (11 offsite ambient air monitoring stations and 7 continuous stack monitors) but has some minor deficiencies.

Table 3.5.1-1
Applicable Air Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| 40 CFR Part 15 | Administration of the Clean Air Act and the Clean Water Act - list of violating facilities |
| 40 CFR Parts 50 to 87 | Clean Air Act Regulations |
| Ohio Environmental Protection Agency Regulations | |
| Number 3745-15 | General Provisions on Air Pollution Control |
| Number 3745-17 | Particulate Matter Standards |
| Number 3745-18 | Sulfur Dioxide Regulations |
| Number 3745-19 | Open Burning Standards |
| Number 3745-31 | Permits to Install New Sources of Pollution |
| Number 3745-35 | Air Permits to Operate and Variances |
| DOE Order 5400.1 | General Environmental Protection Program |
| DOE Order 5480.1 | Environmental, Safety, and Health Protection Standards |
| DOE Order 5400.xy Environmental Surveillance | Radiological Effluent Monitoring and |
| 40 CFR Part 372 | Toxic Chemical Release Reporting |

The air discipline findings include five regulatory or DOE Order requirements, and five BMP findings. The majority of the ten findings were administrative in nature. These include location and design of ambient air monitoring stations, disposal of asbestos, and an inadequate HEPA filter program. The most significant finding involves lack of proper permit applications and notifications.

The surface causes of many of the findings is a lack of effective procedures and/or reviews, pointing to a lack of management oversight. At least some of the lack of procedures is caused by a shortage of qualified personnel; recent loss of staff in this area may have adverse impact on the site's program.

### 3.5.1.2    Compliance Findings

**Finding Number:**  A/CF-1

**Finding Title:**  Unpermitted Air Sources

**Performance Objective:**  Ohio Environmental Protection Agency (OEPA) regulations (Ohio Administrative Code 3745-35-02) require that: "...no person may cause, permit or allow the operation or other use of any air contaminant source without applying for and obtaining a permit to operate from the OEPA..." Permits to Operate (PTOs) are only issued after successful completion of Permits to Install (PTI). In addition, air contaminant sources which include radionuclides require notification/application to USEPA under regulations promulgated under USEPA National Emission Standards for Hazardous Air Pollutants (NESHAPs). USEPA has not delegated responsibility for NESHAPs to OEPA.

**Finding:**  There are a number of air contaminant sources at PORTS that are not properly permitted.

The above finding was developed during reviews of present permits, visits to the various PORTS facilities, and interviews with site personnel. In addition, a meeting was held with OEPA to solicit their input on this problem.

Most of the units that lack PTOs are small sources with less than 25 tons per year of total emissions which require only registration. Registration permits do not require periodic renewal. PORTS is in the process of reviewing many sources prior to making applications for PTOs. Examples of sources that have not been reviewed and have not had PTO applications prepared are the large sandblaster at the northeastern corner of

Building X-700 and the much smaller sandblaster at the southeastern corner of X-700. It is probable that this smaller unit will require only registration.

- Miscellaneous Sources - There are many other units that may require permit applications or even permits, depending on OEPA's interpretation of the need for permitting and the definition of "air contaminant source." The battery rooms in the process buildings (X-333, X-330, and X-326), for example, emit trace amounts of sulfuric acid vapor. OEPA could conceivably view these rooms as "air contaminant sources." A survey of vents conducted in 1985 (GAT, 1989) listed about 250 vents, including those which might be "air contaminant sources" as well as "standard ventilation exhausts." Ventilation exhausts were included in the PORTS survey since these are frequently related to sources (e.g., the building exhausts for X-333, X-330, and X-326 contain the freon-114 lost from the heat exchange systems).

- Cooling Towers - Recently PORTS applied for a PTO and PTI for the cooling towers as advised by OEPA since these are a source of airborne chromium. Based on discussion with OEPA personnel, it appears as if OEPA will probably conduct studies of the health risk involved prior to acting on the PTO application (Personal Interview with OEPA Personnel, 1989).

- Air Stripper - An example of a unit which requires NESHAPs notification/application is the new air stripper in building X-700. This unit is expected to contain low levels of radionuclides. Since these represent a potential (although small) air source, application for approval is required prior to installation.

- Landfill - Recently PORTS was late in applying for the renewal of the air permit for the sanitary landfill (X-735). PORTS curtailed operations at the landfill, upon the expiration of the previous permit on October 17, 1989. The landfill's parking lot and roadways were permitted separately from the landfill. This permit expired on October 24, 1989. Therefore, the use of the parking lot and roadways has also been suspended. Trash and debris normally disposed of in the landfill are currently being sent to a private landfill in Pike County. The expired permit covered the disposal of asbestos in the landfill. However, no asbestos projects are planned at this time, so current disposal of asbestos wastes is not a problem.

3-14

Lack of permits can have a major impact on overall plant
operations since units which emit air contaminants cannot be
operated without permits. The current problem at the landfill is
an excellent example. In that instance, alternatives were
available. However, similar alternatives do not exist for many of
the other units identified in this finding. Most of the units
lacking permits are not directly related to production. However,
restrictions on use of these units could have a major impact on
the overall completion of PORTS' mission.

The failure to identify all air sources requiring OEPA permits
(and USEPA NESHAPs notification/approval) and the failure to
apply for a new landfill permit in a timely manner appears to be
the result of inadequate procedures for periodically assessing
the compliance status of air sources. In addition, it is
apparent that previous audits did not address this subject.

Finding Number:  A/CF-2

Finding Title:  Asbestos Items in Scrap Yard

Performance Objective:  Regulations promulgated for National
Emission Standards for Hazardous Air Pollutants (NESHAPs) (40 CFR
Part 61) require that all asbestos removed from use be disposed
of in approved landfills.

Finding:  Several items containing asbestos were improperly
stored in the contaminated scrap yard (X-747H). This scrap yard
is not a permitted asbestos disposal facility.

This finding is based on inspection of various scrap yards.

A total of 18 items were found during a subsequent inspection by
PORTS personnel. Of the 18 items, only one was believed to be
friable asbestos. Many of the items were a type of asbestos
cloth used to wrap expansion joints prior to 1980. It is
suspected therefore that many of these items have been in the
yard for many years. Prompt corrective action was taken to
double bag and drum the items identified in the inspections. The
total volume of material involved was less than one 55-gallon
drum. PORTS personnel have suggested that they will survey the
other scrap yards and will add the scrap yards to their annual
inspections to determine asbestos inventories.

The surface cause appears to be inadequate procedures for
controlling and assessing asbestos removal projects. The root
cause is incomplete oversight.

3-15

<u>Finding Number:</u>  A/CF-3

<u>Finding Title:</u>  Incomplete Superfund Amendments and
Reauthorization Act (SARA) Part 313 Air Release Report

<u>Performance Objective:</u>  Annual reporting of releases of selected
chemicals to all media is required by SARA Part 313.  Reporting
is required once threshold amounts used or produced are exceeded,
regardless of the quantities released.  Releases to air present
more complexities than releases to water or land since air
releases are generally more difficult to quantify.  USEPA
guidance allows the use of many methods of estimation.  However,
such estimates must be made and the results reported (Right-to-
Know Hotline).

<u>Finding:</u>  The PORTS SARA 313 report for 1988 is deficient in the
following areas:

- air releases of two chemicals, chlorine and sulfuric
  acid, are listed as "N/A" or not applicable. These
  emissions should have been quantified.

- several air releases were reported as fugitive
  emissions  whereas they should have been reported as
  stack  emissions.

- releases (to all media) are reported to more than the
  specified number of significant figures.

These deficiencies were noted during examination of the annual
SARA 313 reports and interviews with personnel responsible for
report preparation. Most of these deficiencies are minor and do
not significantly affect accomplishment of the objectives of the
reporting requirement.

Incomplete oversight and ineffective review at PORTS of
preparation of the Part 313 report could be contributing to
deficiencies in the report.

<u>Finding Number:</u>  A/CF-4

<u>Finding Title:</u>  Lack of Proper Gasoline Pump Labels

<u>Performance Objective:</u>  Regulations promulgated under the Clean
Air Act (40 CFR 80.22) require that gasoline pumps contain the
message:

    Federal law prohibits the introduction of any gasoline
    containing lead or phosphorus into any motor vehicle
    labeled: "UNLEADED GASOLINE ONLY."

<u>Finding:</u>  During an inspection of the X-750 area, it was noted that although the gasoline pumps were properly labeled "Unleaded Gasoline", the above message was not displayed.  PORTS management took corrective action in applying labels during the assessment.

Attaching labels containing the above message to unleaded gasoline pump stands is obviously not as significant as the labeling of pumps dispensing leaded gasoline.  Nevertheless, compliance with the letter of the regulation requires that both leaded and unleaded gasoline pump stands be so labeled.

The surface cause appears to be lack of knowledge of regulations and lack of effective audits and reviews since this deficiency was not mentioned in previous reviews.  The apparent root cause is incomplete oversight.

<u>Finding Number:</u>  A/CF-5

<u>Finding Title:</u>  Steam Plant Non-Compliance

<u>Performance Objective:</u>  Ohio Environmental Protection Agency (OEPA) regulations (OAC 3745-17-05) require that the opacity of emissions from stacks from coal-fired boilers be constantly less than 20 percent, except for one 6-minute period in any 60-minute period when opacity in the range of 20 to 60 percent is allowed. Continuous monitoring is required with results integrated over 6-minute periods.

<u>Finding:</u>  During the 21-month period from January 1988, through September 1989, the steam plant (X-600) at PORTS achieved compliance with opacity standards approximately 99.93 percent of the time.  Of the approximately 666 minutes of non-compliance, 26 percent is attributed to dirty lenses (on the opacity monitor), 19 percent to power outages, and 11 percent to low loads.  The remaining 44 percent of non-compliances is attributed to a wide variety of equipment malfunctions.  Compliance with other limitations (mass, sulfur dioxide, etc.) is achieved 100 percent of the time.

This information was determined primarily from an examination of quarterly reports submitted to OEPA during the 1988-89 period, supplemented by an inspection of the plant and interviews with plant personnel.  Discussions were held with OEPA personnel at both the state and regional levels (see Section 3.5.1.1).  OEPA personnel are aware of the record. Compliance testing of the No. 2 and 3 boilers is scheduled for December 1989, since the PTO expires on March 19, 1990.  The PTO for the No. 1 boiler expires on December 3, 1990.

Although nearly exemplary for a 35-year-old facility, the compliance record indicates that the current preventive maintenance program has not been able to achieve 100 percent

compliance. OEPA regulations recognize several types of non-compliance that are allowed as long as they are reported. These include startup, shutdown, and malfunctions. The OEPA, although not entirely satisfied with the current compliance performance, has not taken action to require the submission of a new preventive maintenance program.

Although most of the exceedances appear to be equipment related, the surface cause appears to be lack of completely effective procedures which are necessary to improve the performance of aging equipment. The root cause is implementation of policies.

### 3.5.1.3   Best Management Practice Findings

Finding Number:   A/BMP-1

Finding Title:   Air Monitoring Station Deficiencies

Performance Objective:   Draft DOE Order 5400.xy states that the air surveillance requirements of 40 CFR Part 58, Appendix E "should be considered" when monitoring for airborne radionuclide particulates. The Appendix E guidance is not a regulatory requirement unless the data are intended for use in applying for a PSD (prevention of significant deterioration) permit for a new facility.

Finding:   Many of the air monitoring stations (AMSs) at PORTS are improperly located or designed.

This information was developed during inspection of the AMSs and review of the annual monitoring reports.

Nearby trees probably adversely affect results at stations A-24 (North), A-23 (Northeast), and A-15 (Southeast). Station A-29 (West), while not impacted by trees, probably has a similar interference from the large sign to which it is attached. Most of the air intakes are too close to the ground. The current draft of DOE Order 5400.xy (June 15, 1989) specifies a height above ground level of 2 meters. Prior versions of appropriate orders specified a height of 1.5 meters. Most of the PORTS stations are about 1.5 meters above ground level. None of the AMSs utilize the conventional "High Volume" samplers described in 40 CFR Part 58. No station has a co-located sampler as suggested in 40 CFR Part 58, Appendix B.

PORTS collects samples once per week at each AMS for gaseous fluorides. Many problems are evident in the collection of fluoride samples. In 1988, for example, all stations had many samples "missing" for a variety of reasons. "Missing" data ranged from 12 samples (out of 52) to as high as 19, or 23 to 37 percent of the samples. While the current procedure in use at PORTS was intended to be identical to that used at the Paducah

Gaseous Diffusion Plant and at Y-12, it differs in that the sample for particulates and fluorides are collected in the same sampling train. At Paducah and at Y-12 separate trains are used for the two samples (particulates and fluorides). While this may not explain the low sample recovery rate, data from the three plants are not comparable since the sample procedures are different.

The surface cause appears to be inadequate audits and reviews since previous audits or inspections to assess compliance with DOE orders could have identified these problems sooner. The root cause is incomplete oversight.

Finding Number: A/BMP-2

Finding Title: HEPA Filter Systems Testing and Maintenance

Performance Objective: Written procedures dictating annual testing, continuous determination of the pressure drop across the filter, and other policies to assure performance of HEPA filters are standard within DOE and are implied by DOE Orders.

Finding: PORTS does not have written policies and procedures stipulating testing and maintenance of HEPA filters.

This information was developed during inspection of air sources and controls, and interviews with Environmental Control Department personnel.

A bank of HEPA filters at the building X-705 annex had not been tested in the past three years. A set of HEPA filters recently installed at the indoor firing range had a defective pressure drop monitor. No detailed list of HEPA filter locations is available.

HEPA filters have received wide acceptance within DOE as state-of-the-art controls against release of radionuclide particulates. In some instances, such as the firing range cited above, HEPA filters are excellent controls against release of non-radionuclide particulates. The high efficiency (99.97% removal) can only be assured if precautions are taken to demonstrate that improper installation or excessive wear or loadings have not compromised the designed performance.

No written procedures addressing installation, maintenance, and testing of HEPA are available at PORTS. The root cause appears to be inadequate implementation of policies.

Finding Number:  A/BMP-3

Finding Title:  Out-of-Date Vent Survey

Performance Objective:  Sound industrial practice requires that each site periodically conduct an inventory of all potential air sources.  Frequently the term "Roof Map" is used to describe the portion of the inventory showing the location of each source on the various building roofs.  A complete inventory will also contain information relative to the type and quantity of emissions and data on the stack itself (elevation, materials of construction, size, etc.).

Finding:  PORTS does not have an up-to-date inventory of potential air sources. This information was developed during the review of sources and permits and was supplemented by interviews with site personnel.  A vent survey was conducted in 1985 and the vents in existence at PORTS were tabulated (GAT, 1989).  The survey was never completed since information on the emissions and stack data were never added.  Vents were categorized as radionuclide, toxic chemicals, volatile organic compounds, low volatile organic compounds, inorganic chemicals, ventilation exhausts, sewer vents, and miscellaneous vents. An up-to-date vent survey would be of substantial use in analyzing the need for additional permits (see A/CF-1).

The surface cause is inadequate audits and reviews since no recent reviews have recognized this need.  The apparent root cause is incomplete oversight.

Finding Number:  A/BMP-4

Finding Title:  Incomplete Air Emissions Inventories

Performance Objective:  Annual reporting of releases of selected chemicals to all media (including air) is required by SARA Part 313.  In addition, sound management practices require that emissions of other large volume chemicals (not on the SARA Part 313 list) be estimated on an annual basis.  Data for chemicals on the 313 list, but for which release quantities have not been reported because the amounts used are below reporting thresholds, should also be estimated on an annual basis.

Finding:  PORTS' report of annual releases of "Other Large Volume Chemicals" (MMES, 1989), which was intended to fulfill the best management practice requirement noted above, was incomplete in 1988 since several chemicals, (e.g., fluorine, chlorine trifluoride, and carbon tetrafluoride) were not included.  These omissions are minor, and MMES efforts to establish a formal emission release report (supplementing the SARA Part 313 report) is an example of a sound management practice.  Some counties and states, but not Ohio, require reporting of chemicals from a much

3-20

longer list with lower reporting thresholds. Fluorine is an example of a chemical which, although used in large quantities, may not be released in large amounts. Chlorine trifluoride and carbon tetrafluoride (produced in the freon degrader) may vary significantly in amounts released from year to year.

These deficiencies were noted during examination of the reports and interviews with personnel responsible for report preparation.

The surface cause appears to be quality control since the chemicals emissions report does not receive adequate review. The root cause is inadequate oversight.

Finding Number: A/BMP-5

Finding Title: Meteorological Tower Limitations-Data Availability

Performance Objective: Most larger DOE sites utilize a meteorological tower for assessing impacts of planned and unplanned airborne releases. Draft DOE Order 5400.xy requires that such towers will be equipped so that the system "shall provide data recovery of at least 90% on an annual basis for wind direction, wind speed, those parameters necessary to classify atmospheric stability, and other meteorological elements required for dose assessment." This draft order quantifies broad qualitative statements in DOE Order 5400.1.

Finding: In the past two years the meteorological tower at PORTS has been plagued by problems that have limited the availability of data. This information was acquired from the annual reports supplemented by interviews with site personnel. The Site Annual Environmental Monitoring Report (Rogers, et al., 1989) for 1988 estimated 68.9% data availability. Data availability in 1987 was 96.6%, while in 1989 it has been about 93%. The 1987 report (Rogers et al., 1988) discussed problems related to lightning in August which severely limited availability of some data. Other interruptions of continuous operation have occurred because of telephone transmission problems.

The data acquired by a meteorological tower is essential at PORTS, not only for dose assessment calculations, but also to guide emergency response personnel. An assessment at the meteorological tower was prepared during 1989 by the National Oceanic and Atmospheric Administration for PORTS to determine the needs for the Emergency Response program (Pendergrass, 1988). In response to this assessment, PORTS is planning to install a new primary tower supplemented by five smaller towers in locations up to 15 km from the site. The present tower will be retained to provide data during periods of data interruption from the new primary tower.

The surface causes appear to be lack of maintenance and budgetary constraints, and the root cause is implementation of policies.

### 3.5.2    Surface Water/Drinking Water

#### 3.5.2.1    Overview

The surface water assessment evaluates compliance with regulations promulgated in response to the Clean Water Act (CWA) and the Safe Drinking Water Act (SDWA), and includes a review of the adequacy of the water treatment plant, the various effluent treatment facilities, and the NPDES program.  This assessment also includes a review of the Best Management Practices (BMP) and Spill Prevention Control and Countermeasures Plan (SPCC) for protection of surface waters from contamination due to unplanned releases.  Table 3.5.2-1 lists applicable regulations and/or requirements used to evaluate the surface water discipline.

PORTS' compliance with its NPDES permit has shown steady improvement from 1984 to 1987.  In 1988, while PORTS had improved performance in compliance with most parameters, it had a number of  recurring compliance problems.  PORTS has initiated several long-term projects to improve the facility's NPDES compliance.  The facility has added a NPDES Implementation Program Manager to work with the NPDES Compliance Manager and to act as liaison to other sites, DOE, and regulatory agencies on implementation of NPDES corrective actions.

PORTS has generally complied with the terms of their present permit.  The facility applied for permit renewal in 1985 and received a draft NPDES permit in 1988.  PORTS' current permit is a revision made of its previous permit by the Directors Findings and Orders in 1985.  The draft NPDES permit was given public notice in July 1988, and is expected to be issued in early 1990.

PORTS discharges non-contact cooling water, chromated blowdown water, steam condensate, coal pile runoff, wastewater from decontamination activities, and domestic sewage through 18 permitted outfalls.  From January 1988, until September 1989, most of the PORTS daily exceedances occurred in July and March.  Slightly more than half are pH and Total Suspended Solids (TSS) exceedances associated with the management of lagoons and holding ponds.  More than 20% of the daily maximum exceedances are caused by operator error, primarily associated with the optimization of the Biodenitrification Treatment Facility.

The PORTS facility has a good program of compliance with the SDWA.  The water treatment plant, which provides process and potable water for PORTS, has performed well over the last several years.  Although not required, water treatment plant supervisory personnel at PORTS have initiated a program to encourage and assist all operators in obtaining state certification.

Table 3.5.2-1
Applicable Surface Water Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
| --- | --- |
| 40 CFR Part 112 | Oil Pollution Prevention |
| 40 CFR Part 122/123/125 | National Pollutant Discharge Elimination System |
| 40 CFR Part 130/131 | Water Quality Planning and Management |
| 40 CFR Part 136 | Test Procedures for the Analysis of Pollutants |
| 40 CFR Part 141/142 | National Primary Drinking Water Regulations |
| 40 CFR Part 143 | National Secondary Drinking Water Regulations |
| Ohio Administrative Code, Title 3745 | Water Quality Standards |
| Ohio Administrative Code, Regulations 3745-33-01 through 3745-33-10 | Ohio NPDES Permit Regulations |
| Ohio Administrative Code, 3745-83-05 | Ohio Drinking Water Regulations |
| DOE Order 5400.1 | General Environmental Protection Program |
| DOE Order 5484.1 | Environmental Protection, Safety, and Health Protection Information Reporting Requirements |

Overall, the BMP is consistent with regulations specifying format, scope, and content of BMP and SPCC plans. Inconsistencies in storage tank inventories between the BMP and the Remedial Action Plan prepared as a requirement of the Consent Degree were noted.  The spill control and countermeasures outlined in the SPCC are generally adequate in terms of guidance for initial spill response and notification.  However, spill containment measures for bulk oil storage and grounding transformers at two PORTS switch yards were found deficient.  The building personnel who were questioned about their spill response and notification responsibilities appeared to be informed and prepared in this area.

Almost one-half of the surface water findings represent noncompliance with regulatory requirements.  Some of the more serious of the findings include discharges that are not specified in the NPDES permit and excursions outside the limits set in the permit.  The most serious finding was the use of an unapproved analytical test procedures for some parameters monitored in the NPDES permit.  However, the methods used should provide results as precise as the methods specified under PORTS' NPDES permit.

After review of PORTS' compliance with the CWA, SDWA, and BMP/SPCC, there are 16 findings, five compliance and eleven best management practices.  Most of the surface causes associated with the findings are attributed to deficiencies in training, supervision, inspection, and audit/review functions, along with the development of useable procedures.  The overall root cause is attributed to insufficient oversight of policy implementation functions.

3.5.2.2    Compliance Findings

Finding Number:    SW/CF-1

Finding Title:    Unapproved Analytical Test Procedures Used for NPDES Reporting

Performance Objective:  Under NPDES Permit OH 006092, Part I, D, (4), (5), the permittee must collect and analyze samples in accordance with test procedures which conform to regulations published pursuant to Section 402 of the Clean Water Act of 1977 and 40 CFR Part 136.

Finding:  The facility has used analytical methods which do not conform to the appropriate test methods identified in 40 CFR Section 136.3, as described in the facility's NPDES permit. Unapproved analytical methods were used for several organic and metal parameters which have monitoring requirements and specific concentration based limitations in the permit.  During the period when the unapproved methods were used for metals and organics, the facility did not apply under 40 CFR Section 136.4,

3-25

Application for Alternative Test Procedures, to request a variance for the test procedures required under their NPDES permit.

Permit requirements specify procedures for monitoring, analyzing, and reporting data. Data presented in Discharge Monitoring Reports (DMRs) are used to assess compliance with the specific limitations and standards required by the existing NPDES permit (Donnelly, 1988a).

This finding is based on interviews with laboratory personnel and review of laboratory records (Vita, 1989), along with correspondence among the several components of the Environmental Control Department (ECD) (Anderson, 1985 and Boyd, 1985).

Starting about January 1988, the facility's laboratory used Method 3005, Acid Digestion of Water For Total Recoverable Or Dissolved Metals For Analysis By FLAA Or ICP Spectrometry, and Method 6010, Inductively Coupled Plasma Atomic Emission Spectrometry as described in Test Methods for Evaluating Solid Waste, Vol. 1A, SW-846, September 1986, for the reporting of metals data on their monthly DMRs. Methods 3005 and 6010 are approved methods for use in the analysis of solid waste as described in RCRA, but are not approved methods for NPDES analyses.

Starting about January 1986, the facility's laboratory used Method 8010, SW-846 (an unapproved method for NPDES), for chlorinated solvent scan of all water samples. The approved test methods for reporting under NPDES for chlorinated organics are Methods 601, 602, 624, 1624 and 1625. The facility is required to monitor trichloroethylene (TCE) under the terms of its NPDES permit.

During this period, over 3,100 metal samples (copper, iron, nickel, zinc, and total chromium) and over 150 organic (TCE) samples were analyzed by the facility's laboratory and reported in monthly DMRs sent to the State of Ohio. Of the approximately 9,050 samples taken over the last two years for all parameters monitored or specifically limited in the facility's NPDES permit, about one-third are reported using unapproved analytical methods (Vita, 1989) (Schwab, 1988). In response to this finding, the facility has recently changed to NPDES approved analytical methods for metals (October 30, 1989) and organics (November 10, 1989).

Interviews with laboratory personnel revealed that all NPDES metal analyses were conducted prior to January 1988, using atomic absorption techniques contained in Methods For Chemical Analysis of Water and Waste, EPA-600/4-79-020, March 1983. Laboratory management personnel noted that in late 1985, the laboratory experienced an increase in sample analysis requests as a result

of increased reporting requirements under RCRA and NPDES. Laboratory management made a decision to use Methods 3005 and 6010 as a way of increasing laboratory efficiency. In doing this, laboratory management only took into account technical considerations in the selection of analytical methods.

Methods 3005 and 6010 are generally more sensitive and can result in more precise analyses than existing NPDES approved methods. Results reported to the state by these methods should not significantly differ from the NPDES approved methods.

Environmental control procedures used by the laboratory are insufficient to assure that all laboratory personnel have a clear understanding of the regulatory requirements on which data quality objectives should be based. The laboratory has inadequate procedures for assessing the regulatory significance of methods employed to analyze a sample once it enters the laboratory.

Finding Number:   SW/CF-2

Finding Title:   Unpermitted Surface Water Discharge

Performance Objective:  Under 40 CFR 122.41 (a), Permit Conditions, Duty To Comply and Ohio Administrative Code 3745-33-05, General Permit Conditions, the permittee must comply with all conditions of the NPDES permit.

Finding:  The facility has issued eleven unpermitted discharge reports to the OEPA (Gillespie, 1989a).

This finding is based on review of OEPA Discharge Monitoring Reports (DMRs), which the facility is required to file monthly with the state, and NPDES exceedances reported to the Southeast District, OEPA (Donnelly, 1987 and Donnelly, 1988a).

Unpermitted discharges occurred between November 1988 and August 1989, from process wastewaters entering the building sump and being pumped to the East Drainage Ditch.  On August 14, 1989, the facility discovered that a floor drain located in the X-705 Decontamination Building was allowing process wastewater to discharge to the East Drainage Ditch (NPDES Outfall 001).  This discharge occurred over a nine-month period and involved several hundred gallons of wastewater with trace quantities of uranium and acids.

From December 1988 until August 1989, three reported unpermitted discharges were a result of leaks of chromated recirculating cooling water (RCW) that was discharged to storm sewer and drainage ditches prior to discharge to Little Beaver Creek. An adequate review and audit is taking place of the barriers and controls used to prevent unpermitted discharges.  The facility

3-27

failed to fully implement a drain "uprating" project which would
have prevented several discharges.

Finding Number:   SW/CF-3

Finding Title:   NPDES Permit Exceedances

Performance Objective:  As described in 40 CFR Part 122 and under
the terms of the facility's NPDES Permits OH 006092 and the State
of Ohio's Directors Findings and Orders (issued April 8, 1985),
and NPDES Permit No. OIO00000*AD and No. OIO00000*BD, the
facility is required to comply with the limitations and standards
established in its permit.

Finding:  The facility has not complied with all the limitations
and standards established in its NPDES discharge permit.

This finding is based on a review of the facility Discharge
Monitoring Reports required under 40 CFR Part 122 and the NPDES
permit (Donnelly, 1987 and Donnelly, 1988a).

The State of Ohio obtained primacy for NPDES permit program in
1983.  Prior to 1983, the facility had two NPDES discharge
permits.  In June of 1983, the NPDES Permit for the GCEP facility
expired and was consolidated into the permit for the GDP
facility.  On July 31, 1985, the PORTS GDP permit expired, and
the facility is presently operating under the OEPA Director's
Findings and Orders.

Paragraph 5, page 3 of the Directors Findings and Orders states
that DOE shall report any noncompliance with the schedules
included in the Order, as well as the effluent limitations and
monitoring requirements by the Orders in accordance with Part I,
paragraph D of the NPDES Permit No. OIO00000*AD.

The facility has complied with most of the Orders established by
the Director of the Ohio EPA but has had exceedances of specific
limitations in its permit.  From January 1988 until September
1989, the facility has had 132 daily and 35 monthly exceedances
of its NPDES Permit No. OIO00000*AD and the Director's Findings
and Orders.

A review of the monitoring data since 1988 indicates frequent
exceedance of permit limitations at Outfall 604.  There have been
occasional exceedances for TSS and Iron at Outfalls 602 and 009
during this same period.

Most of the facility's TSS exceedances of their permit has been
at Outfalls 008, G002, and G003 from lagoons and holding ponds.
These exceedances appear to coincide with the natural process of
algae growth from photosynthesis and respiration associated with
spring and summer in the lagoons.  Most of the daily maximum

exceedances occur in July and March. Slightly more than half of the exceedances are associated with the management of the lagoons and holding ponds.

Review of documents revealed that more than 20% of the daily maximum exceedances are caused by operator error, and equipment malfunctions, primarily associated with the optimization of the Biodenitrification Treatment Facility.

The facility is suffering from inadequate preventive maintenance associated with the management of the lagoons which cause most of the permit exceedances. The compliance component of the Environmental Control Department has not implemented the necessary barriers and controls to minimize discharge exceedances.

Finding Number: SW/CF-4

Finding Title: Failure to Comply with Reporting Requirements Under NPDES

Performance Objective: The facility is required to address the following reporting requirements associated with its NPDES Permit:

As described in 40 CFR 122.21 each applicant for an NPDES permit must indicate whether it knows or has reason to believe that any Appendix D Table II and IV pollutants are discharged through existing NPDES outfalls at levels greater than 10 ppb; if so, the applicant must submit data. In addition, for every pollutant expected to be discharged in concentrations less than 10 ppb the applicant must either submit quantitative data or briefly describe the reasons the pollutant is expected to be discharged.

The facility should report or indicate that it has reason to believe that toxics are discharged to the surface water through permitted outfalls, as described in 40 CFR Section 122.62, (a), (2), Information (for General Permits 40 CFR Section 122.28). The NPDES program requires that data collected by other analytical methods or for other regulatory programs be used, if possible, as an indication of surface water impacts.

Finding: PORTS Environmental Compliance has inadequate procedures for assessing regulatory reporting requirements. The facility does not use technical data collected under different regulatory programs to meet the reporting requirements of the NPDES program and the intent of the CWA.

This finding is based on review of the facility's 2C Permit application, Discharge Monitoring Reports (DMRs), and data

collected on volatile organics in the surface water under several regulatory programs (Donnelly, 1988a,b).

The facility has collected data for parameters which are not specifically required to be monitored or limited in the NPDES permit and for which it should report in writing to the OEPA Water Pollution Control Division, and in its permit renewal application, as described in 40 CFR Section 122.21.

Water samples collected at Outfall 004 have contained methylene chloride, a Table II Appendix D pollutant, at levels approaching 10 ppb. The facility has not sent this data to OEPA, nor has the facility provided the state with a brief explanation as to why the pollutant is expected to be discharged from permitted Outfall 004. The pollutant was reported at levels below detection (5 ppb) on the facility's most recent NPDES 2C Permit Application.

Currently four RCRA closure sites can be found at the facility. Each of these sites was analyzed for their potential to contaminate groundwater and surface water at the facility. An investigation and evaluation of corrective measures necessary to mitigate environmental impact on groundwater and surface water near the RCRA closure sites (Geraghty & Miller, Inc., 1989a) revealed the following:

- Storm drains that are below the water table intercept contaminated groundwater plumes from X-749 and X-231B. The storm drains discharge to NPDES permitted outfalls.

- Contaminated groundwater could potentially enter the east-west drainage ditch north of X-701B, both above and below the NPDES monitoring point, but before the actual discharge of water from the permitted Outfall 001 to Little Beaver Creek. Upon learning of this problem, PORTS officially notified OEPA-Southeast Region, Division of Water Pollution Control, on November 14, 1989, of the potential for surface water contamination from groundwater sources near several RCRA closure sites (Gillespie, 1989c).

The facility has collected data from a number of activities associated with the control of environmental contaminants released to the groundwater and surface water. Most of this data is the result of several regulatory programs, namely RCRA, CERCLA, and NPDES. The data collected provides an overall assessment of the movement of contaminants at the facility.

PORTS has no policy on the management and use technical information collected under different regulatory programs to meet reporting requirements as required under the CWA.

Finding Number:  SW/CF-5

Finding Title:  Deficient Transformer Oil Spill Control at X-530 and X-533 Switchyards

Performance Objective:  All dischargers which use, store, handle, or discharge toxic or hazardous substances as listed by sections 307 (a) (1) and 311 of the CWA, respectively, are subject to the implementation of BMP as specified in 40 CFR Part 125.  Discharge of harmful quantities of oil into natural waterways is prohibited by 40 CFR Part 110.  Specific BMP regulations covering oil storage tanks specify types of secondary containment required for spill control (40 CFR, Part 112).

Finding:  Secondary containment for several above ground bulk oil storage tanks do not comply with applicable Federal regulations.

This finding is based on a detailed review of the BMP SPCC plan and an inspection of several large bulk oil storage tanks.  The inspection focused on the adequacy of secondary spill containment relative to regulatory requirements.  In addition, discussions were held with appropriate facility operators.

Secondary spill containment for two 34,000 gallon and two 15,900 gallon transformer oil storage tanks located at the X-533 switch yard, and two 34,000 gallon and two 12,000 gallon transformer oil storage tanks located at the X-530 switch yard are deficient relative to specific regulatory requirements.  None of these tank settings are diked and all tanks are located in proximity to surface water drainages.  The lack of integral secondary containment (i.e., dikes or trenches around the tanks) as specified in 40 CFR Section 112.7 is inconsistent with applicable regulations covering bulk oil storage installations.

While comprehensive spill control plans exist for these facilities, the lack of integral secondary containment and the proximity of surface drainage channels could result in oil entering either or both surface and groundwater systems where complete onsite containment and recovery would be very difficult.  Use of dikes around these tank settings would essentially eliminate the possibility of any significant release of oil associated with failure of the tanks.  The certifying engineer in the PORTS BMP plan recommended dikes around these tank settings.  This engineering certification recommended that all transformer oil storage tanks at the X-530 and X-533 locations be diked to retain the maximum potential oil spill for each tank setting.

These deficiencies noted in this finding may result from incorrect understanding and interpretation of applicable Federal regulations by facility personnel concerning alternatives to diking of the tanks as an allowable method of secondary containment.

### 3.5.2.3   Best Management Practice Findings

**Finding Number:**   SW/BMP-1

**Finding Title:**   No Standard Operating Procedures for Managing Wastewater from Spray Paint Booths

**Performance Objective:**   Standard operating procedures should be written and available to instruct personnel on the proper disposal of wastewater from spray paint booths.

**Finding:**   There are no standard operating procedures in place at the X-720 building for the disposition of wastewater from the paint spray booth.   The wastewater had been discharged to a sanitary sewer drain located in the southwest corner of the X-720 building.

This finding is based on an inspection of the X-720 Spray Paint area, discussions with Environmental Control Department and Waste Management personnel, and a review of pertinent documents including laboratory analysis of spray paint booth wastewater.

PORTS has no Standard Operating Procedures (SOPs) in place at the spray paint area to instruct personnel on the proper disposal of wastewater from the spray paint booth.   As a result, there is confusion over appropriate method of disposal.   Facility personnel in the spray paint area stated that they were instructed by Waste Management personnel to discharge spray paint booth wastewater to the sanitary sewer.   Accumulated waste paint and water is removed from the paint spray booth tub, drummed, then allowed to settle.   The liquid "tops" are sampled; then, if deemed non-hazardous by Waste Management, the liquid is then poured down the sanitary sewer.   Waste Management personnel were not aware of this practice as described by spray paint area personnel and specifically disagreed with the frequency of disposal stated by personnel in the spray paint area.

The lack of a waste management policy which can be followed by all personnel at the facility has resulted in the potential for improper disposal of waste not suited for discharge to the sanitary sewer.   Personnel in the Spray Paint area are not adequately   trained in the proper procedures for disposing of liquid waste.

**Finding Number:**   SW/BMP-2

**Finding Title:**   Unacceptable Risk of By-Passing Permitted Discharge Point

**Performance Objective:**   The facility should minimize the risk of violating Part II, (3) of its NPDES permit (OH 0006092) which

states that the permittee should take all steps to avoid adverse impacts on the surface water.

Finding:  The operational sample line for the microfiltration unit is near a partially plugged sanitary sewer drain and poses an unacceptable risk of uranium-bearing waste discharging to the sanitary sewer untreated.  When alerted to this situation, the facility sealed the remaining floor drains in building X-705 on October 28, 1989.

A building tour and inspection of the Microfiltration Waste Treatment Facility in building X-705 revealed a partially open drain near a sample point.  The drain flows to the sanitary sewer.

The facility initiated an "uprating" project to reduce existing building drains, but inadvertently omitted three floor drains from that project, one of which being the subject drain (PORTS, 1989a).  In 1987, the state estimated that there were 36 storm sewer and 6 sanitary sewer drains still active in the X-705 building.

The PORTS facility did not conduct audit and review inspections necessary to eliminate the potential environmental hazard posed from uranium-bearing waste discharging to the sanitary sewer untreated (Homerosky, 1989).

Finding Number:    SW/BMP-3

Finding Title:    Inadequate Chain-of-Custody for NPDES Samples

Performance Objective:  As described in 40 CFR Part 122, 40 CFR 136, Sampling Analytical and Reporting Procedures for Wastewater, OEPA (revised 1976), and standard industry BMPs, the facility should maintain a documented chain-of-custody for all NPDES samples collected at the facility.

Finding:  The chain-of-custody of samples collected at several NPDES outfalls cannot be adequately documented for samples taken by automatic composite samplers because of an insufficient number of locks.  The quality of the samples collected for reporting under the NPDES program cannot be demonstrated to be representative, since the samples are not controlled.

This finding is based on observations made while inspecting environmental monitoring points used to collect NPDES samples.

The Environmental Control Department provides sampling and analyses services to PORTS for compliance monitoring under the NPDES program.  The facility does not have enough locks on automatic composite samplers to assure chain-of-custody of its NPDES samples collected by them.

Field surveyors collect samples at NPDES outfalls at intervals required by PORTS discharge permit; both composite and grab NPDES samples are required. Surveyors maintain a chain-of-custody form for all samples taken at each respective outfall (Tomlin, 1988).

Since grab samples are collected when the surveyor is present, the chain-of-custody form serves as documentation of the handling of the sample. Because some composite samples are automatically collected at PORTS, they must be secured with locks to establish chain-of-custody. The facility does not have locks on the head covers on some of the automatic samplers used at the facility to collect NPDES samples.

The environmental monitoring group appears to have inadequate chain-of-custody procedures and is unaware of the significance of implementing quality assurance procedures. The Environmental Control Department has inadequate audit/review and inspection procedures and provides little oversight in the implementation of existing quality assurance procedures.

Finding Number:   SW/BMP-4

Finding Title:   Signatories for Drinking Water Monitoring Reports Are Not Complete

Performance Objective:   As described in Code 3745-83-05 of the Ohio EPA, Rules and Regulations, Public Water Systems, non-community water systems must file and prepare an operation report in writing on forms provided by the Director and must contain such information as may be necessary or desirable for the Director to carry out his duties under Chapter 6109 of the State of Ohio revised code.

Finding:   Drinking Water Monitoring Reports submitted to the OEPA have not been signed and dated by a responsible official at the facility for several years. The Drinking Water Monitoring Reports are currently submitted with a DOE cover letter which is sent by contractor personnel to OEPA.

State of Ohio drinking water regulations require that reporting forms provide complete information as determined by the Director, and allow the Director to fulfill his responsibilities.

This finding is based on review of the facility's Monthly Drinking Water Operation and Contaminant Reports for the past several years. Interviews were conducted with facility contractor staff (Personal Interview with Industrial Hygiene Personnel, 1989), and with OEPA staff (Hultgren, 1988).

As of August 1, 1988, the facility contractor was requested to submit the Monthly Drinking Water Operation Reporting (EPA 5002)

and the Contaminant Report (EPA 5001) directly to the OEPA with a copy to the DOE Safety and Health Division. This allowed the submittal to be expedited for the purpose of meeting required submittal dates. Previously, the reports were sent to the DOE ORO Office for review and forwarding to the OEPA resulting in delays. Since this time, however, Contracting Officer Authority has been delegated to the Portsmouth Enrichment Office (PEO), which has resulted in shorter processing times for required regulatory reports. This unusual delegation of DOE authority to the site contractor, however, has not been rescinded.

DOE has not provided PORTS personnel with sufficient supervision and policy concerning signatories on forms required under state drinking water regulations.

Finding Number: SW/BMP-5

Finding Title: Undocumented NPDES Sampling Procedures

Performance Objective: As described in 40 CFR Part 122, 40 CFR 136, Sampling Analytical and Reporting Procedures for Wastewater, OEPA (revised 1976), and standard industry BMP, the facility should maintain controlled and documented sampling procedures.

Finding: The facility does not maintain current documentation of sample collection methods used for reporting under the NPDES program. Sampling at NPDES outfalls is conducted without formal guidance and specific instructions on sampling procedures being available to field sampling personnel (Valentine, 1985).

The lack of specific instructions on sampling procedures at NPDES outfalls was revealed through review of environmental procedures documents; interviews with surveyors, supervisors, and ECD personnel; and inspection of the X-100L Staging and Control Building.

The general environmental control procedure available to the surveyors was last revised in 1985; they do not appear to reflect changes in sampling procedures used by the surveyors.

There are no specific instructions for sampling at NPDES outfalls available to field sampling personnel at X-100L. The staging and bottle preparation area of X-100L had outdated NPDES sampling bottle preparation methods and several-year-old water sampling scheduling documents displayed prominently at the bottle preparation station.

Techniques used by surveyors to conduct routine NPDES sampling were observed. For some outfalls, the location selected as appropriate for samples depends on the analytical parameter. The selection appeared logical and followed general guidelines for collection of water and wastewater samples recommended by the

3-35

OEPA. However, documentation of procedures for selecting locations at PORTS did not exist.

PORTS NPDES permit describes in very general terms, the location at which samples for each outfall must be taken. The language in the permit affords the facility latitude in the physical collection point of samples. An interview with a representative of the OEPA revealed that the facility was given verbal guidance and instructions on how to sample at each outfall. The facility, however, does not have written procedures which reflect implementation of guidance given by the state. Instead, the information was given to the NPDES environmental compliance and monitoring groups, then verbally passed on to the surveyors.

The lack of specific written procedures for sampling at NPDES outfalls appears to be a result of an over reliance by the managers in the NPDES compliance and monitoring groups on the verbal dissemination of technical information. Responses received from interview questions regarding unwritten NPDES sampling procedures indicate inadequate or limited training in quality assurance by managers in the environmental monitoring group.

Finding Number:   SW/BMP-6

Finding Title:  Deficiencies in Reported Inventories for Aboveground Storage Tanks

Performance Objective:  Storage tank inventories presented in a document prepared in compliance with regulations or for other compliance purposes should be comprehensive.

Finding:  The BMP SPCC plan is deficient in that the inventory of aboveground outside storage tanks is not complete and accurate. Likewise, the tank inventory presented in a report required by a Consent Decree is also deficient in terms of accuracy and consistency with the inventory in the BMP SPCC plan.

This finding was based on a review of tank inventories reported in the BMP SPCC and the report entitled, "Remedial Action Plan for Spills around Storage Areas for Petroleum Products, Waste, and Hazardous Material" (Anderson et al., 1989), conversations with Environmental Control Department personnel, and an inspection tour of aboveground tanks.

The storage tank inventory presented in the BMP SPCC plan was prepared to comply with 40 CFR Part 125, Subpart K which requires examination of each facility component that could result in a spill of hazardous or toxic materials. The second facility storage tank inventory was prepared commensurate with Consent Decree requirements to prepare and implement a plan for remedial actions for spills around storage areas. The inconsistencies and

editorial problems indicate that one or both of the storage tank inventories are inaccurate.

- SPCC deficiencies - Table 1 in the BMP SPCC plan (pages A-24 through A-29) does not list 10 fuel oil storage tanks shown in the Consent Decree report (Anderson et al., 1989). In addition, two chemical storage tanks listed in the consent decree report were not shown in the BMP inventory. Editorial errors also exist in Table 1 of the SPCC plan.

- Consent Decree report deficiencies - Seven fuel storage tanks listed in the SPCC Table 1 and four chemical storage tanks in Table 2 do not appear in the Consent Decree report. One 10,000 gallon gasoline storage tank in SPCC Table 1 appears to be shown in the Consent Decree report as an alcohol storage tank, and a large chlorine tank in Table 2 is identified as being located at a building that no longer exists.

Although these deficiencies do not relate to a specific BMP regulatory requirement, the inconsistency brings into question the accuracy of the inventories of both the BMP plan and the Remedial Action Plan prepared for the Consent Decree.

The inconsistent inventories appear to be related to a lack of communication and coordination among the various groups within PORTS which have responsibilities for remedial action plans and spill prevention and countermeasures planning.

Finding Number:     SW/BMP-7

Finding Title:  Inadequate Containment of Non-Oil Spills

Performance Objective:  All dischargers which use, store, handle, or discharge toxic or hazardous substances as listed by sections 307(a)(1) and 311 of the CWA respectively, are subject to provisions for implementation of BMP as specified in 40 CFR Part 125. In developing BMP programs, owners or operators should consider the requirements of proposed 40 CFR Part 151 (40 CFR Part 125, Subpart K, comment) which would require facilities subject to NPDES to develop and implement SPCC plans to prevent discharges of reportable quantities of designated hazardous substances.

Finding:  There are inadequate provisions for containment of spills at two PORTS facilities which store or handle toxic or hazardous chemicals.

This finding was based on a review of the BMP SPCC plan and a subsequent inspection of containment provisions at selected facilities which appeared during the BMP SPCC review to have the

potential for release of hazardous or toxic chemicals to the environment.

- Biodenitrification tanks - Secondary spill containment for the two 12,000 gallon biodenitrification mixing/process tanks in X-700 is inadequate. In addition, a smaller pilot system with two 1,000 gallon tanks is located adjacent to the larger system, and is not diked.

- Open drains - Open drains in the fluorine generator repair/cleaning building (building X-344 which is connected to the fluorine generation complex in X-342) were observed during an inspection of that area. One open drain at the front of the building leads to the storm water system, and the other leads into a holding tank which overflows into an outside, unused neutralization pit. Spills of hydrofluoric acid during handling of fluorine generators for repair or cleaning could result in small but potentially environmentally significant releases of the hazardous liquid. The supervisors of the fluorine cleaning/repair facility stated that no hydrofluoric acid spills have been recorded in building X-344 during at least the past 10 years.

The 12,000-gallon mixing tank (and the corresponding 1,000-gallon tank on the pilot system) contains water with nitrate concentrations of about 60,000 ppm. The 12,000 gallon process tank contains water with nitrate concentrations of about 6,000 ppm. The two large tanks are enclosed within an approximately five-inch high dike; however, the platforms are contiguous with the top of the dike along an approximate 1.3 meter section. This low dike (capacity of about 2,500 gallons) would be insufficient to fully contain any major spill from a failure of one tank. A 200 gallon sump within the dike would contain small spills. This sump is normally used to hold denitrified water prior to release to the sewage collection system.

All of the tanks are located close to the overhead truck entrance doors and the pedestrian door. Thus, any major spill potentially could escape the confines of the building. The approximate 5° slope of the entrance road away from the building could allow the spill to eventually reach storm water drains in the depression paralleling 18th Street. It is about 30 meters from the tanks to the storm drains.

Finding Number:  SW/BMP-8

Finding Title:  Deficient Transformer Oil Spill Control

Performance Objective:  All dischargers which use, store, handle, or discharge toxic or hazardous substances as listed by sections 307(a)(1) and 311 of the CWA, respectively, are subject to the implementation of BMP as specified in 40 CFR Part 125.  Discharge of harmful quantities of oil into natural waterways is prohibited by 40 CFR Part 110.  Procedure ESH-E-101 in the PORTS Environmental Control Procedure Manual establishes PCB control designed to minimize or eliminate any impact on the environment from PCB waste materials.

Finding:  Six grounding transformers located within the building at the X-530 switchyard, and another 10 such transformers located inside the building at the X-533 switchyard do not meet best management practice for containment of potential oil and PCB spills.

This finding is based on a review of the BMP-SPCC plan and a subsequent inspection of containment provisions at selected facilities.

A total of 16 grounding transformers, each containing around 25 gallons of transformer oil with concentrations of PCBs higher than 500 ppm, are located within buildings at the X-530 and X-533 switchyards.  While these transformers do have dikes sufficient to contain the maximum leak or spill from an individual transformer, the diked areas do not extend a sufficient distance from the transformers to completely contain a spill that could result from a major failure of the equipment. Additionally, each grounding transformer room is adjacent and open to a surge protector cubicle that contains an open drain leading to the site storm water system.  Although a comprehensive spill control plan exists for these equipment areas, it would not under certain spill circumstances result in containment of oil and PCBs within the building and eliminate the possibility of their entry into the storm water system.  Therefore, containment provided for this installation does not represent best management practices, and is inconsistent with Procedure ESH-E-101 in the PORTS Environmental Control Procedure Manual.

Finding Number:  SW/BMP-9

Finding Title:  Discharges of Chromated Water from Spills

Performance Objective:  Administrative and/or other controls to prevent accidental discharge to surface waters should be utilized.  All facilities which use, store, handle or discharge toxic substances are subject to the implementation of BMP as specified in 40 CFR Part 125.  Standard industry practice

includes maintenance of equipment and review of spill prevention control plans.

Finding:  PORTS has not implemented administrative and/or other controls to prevent accidental discharge to surface waters.

This finding is based on review of incident reports provided to the OEPA as part of notification under PORTS NPDES permit.

From November 1988 until August 1989, six spills occurred at PORTS; all involved chromated water.  Several of these spills reached the storm sewer and drainage ditches prior to discharge to the creeks and unnamed tributaries surrounding PORTS.  PORTS reported these appropriately and took appropriate action.  However, the number and frequency of these spills is a concern and may represent a weakness in the Spill Prevention Plan.

A spill of chromated recirculating heating water (RHW) occurred when a leak developed in a 42-inch RHW line between the X-326 and X-330 buildings.  An estimated 500 gallons of chromated RHW (with $CrO_4$ 18.0 mg/l) were discharged before the drainage ditches were sealed and the system shut down for repairs.  All the spill was contained further downstream near the X-230J-3 emergency impoundment facility.

An unplanned release of recirculating cooling water (RCW) occurred when an RCW line ruptured allowing approximately 4000 gallons of RCW water to enter the GCEP 002 pond.  Sampling results indicated a total chromium concentration of 3.2 mg/l in pond inlet, 0.10 mg/l in the pond effluent, and <0.05 mg/l at the PORTS property line.  Total chromium discharged was calculated at 0.33 lb.  The RCW system was promptly isolated and repairs were made.

A spill of chromated acid occurred when several drums located in the X-752 warehouse leaked and entered a drainage ditch leading to the North Holding Pond (NPDES 009).  The ditch was blocked to contain the spill and the North Holding Pond was closed and monitored as possible backup containment.  Heavy rainfall caused additional chromate contaminated wastewater to discharge from the holding pond.  The holding pond was sampled for about a month before the chromate concentration was below detectable levels.

A spill of RCW water occurred when a valving error resulted in several thousand gallons being discharged to NPDES Outfall 011.  Attempts were made to contain the spill in temporary dams.  Effluent monitoring for total chromium was performed at NPDES Outfall 011 and the Little Beaver Creek for several days.  Monitoring at Outfall on November 8 to 11, 1988, revealed total chromium concentrations of 0.160 mg/l, 0.290 mg/l, 0.200 mg/l and 0.070 mg/l, respectively.  Monitoring of Little Beaver Creek from

3-40

November 8 to 15, 1988, revealed less than detectable levels of chromium.

More recently (August 11, 1989) a small leak of chromated RCW cooling water was discovered in a return line in the X-5000 Building. Approximately 5 to 10 gallons leaked to the storm sewer leading to GCEP 001 pond. The GCEP 001 pond was closed at the time of the incident so the spill was contained.

The number and frequency of these spills brings into question the adequacy of oversight of spill prevention forcing a reliance on spill control. This may reflect a root cause of failure in implementation of spill prevention policy.

<u>Finding Number:</u>    SW/BMP-10

<u>Finding Title:</u>    Inadequate Alarm Settings on Continuous pH Monitors

<u>Performance Objective:</u>    The facility should minimize the effects of unplanned release on water quality as described in DOE Order 5400.1, Environmental Monitoring Requirements, Water Monitoring-Environmental Surveillance. Analysis of data collected from a fixed station monitoring network should support in detecting reporting unplanned releases and in characterizing their effects on water quality.

<u>Finding:</u>    The facility is unable to minimize the effects of high unplanned releases on water quality at several outfalls because the pH monitor alarms are set above levels necessary to detect unplanned releases.

This finding is based on inspection of Liquid Effluent Monitoring Stations X-230J5, X-230J6, X-230J7 and X-230L; these effluent monitoring points are analyzed continuously for pH. Interviews with Instrument Maintenance Division (ISM) personnel were conducted to assess the maintenance history of the instruments. The instruments were well maintained and calibrated weekly. ISM set pH monitor alarms based on documented service request from the Environmental Monitoring group (Stone & Milam, 1989).

The pH analyzers are important in monitoring plant effluent to holding ponds which ultimately discharge through NPDES outfalls to Little Beaver Creek, Big Bear Creek, and the Scioto River. These holding ponds serve as final containment for spills at the facility.

The Environmental Monitoring group at PORTS provided inadequate supervision to ISM on appropriate alarm settings for continuous pH monitors.

Finding Number:  SW/BMP-11

Finding Title:  Lack of a Water Quality Management Plan

Performance Objective:  The elements of the Water Quality
Management (WQM) processes are described in 40 CFR Part 130.6;
Ohio Administrative Code, Title 3745 - EPA, Chapter 1 - Water
Quality Standards; and 40 CFR 264.111, (b) - RCRA Closure
Performance Standards.  The facility should have a Water Quality
Management Plan as described in DOE Order 5400.1, Water
Monitoring -Environmental Surveillance.

Finding:  The facility does not have an overall Water Quality
Management Plan.  In the "Ambient Environmental Monitoring
Program Assessment Portsmouth Reservation" (CH2M Hill, 1988a),
the facility references DOE Order 5400.1, but has not implemented
it.

This finding is based on interviews with Environmental Control
staff and review of an environmental monitoring assessment at the
facility in 1988 (CH2M Hill, 1988a).

The Water Quality Management Plan described in DOE Order 5400.1
does not make distinctions between water quality management
associated with different regulatory requirements such as the
CWA, SDWA, and RCRA.  Under the National Pollution Discharge
Elimination System (NPDES), 40 CFR Part 122 and Water Quality
Planning and Management, 40 CFR Part 130, specific guidance is
given concerning the management of ambient water quality at the
facility.  The facility has addressed some aspects of water
quality management associated with compliance under the CWA and
RCRA, but not as an overall water quality focus.  However,
implementation of the DOE Order 5400.1 must occur across media
and regulatory specific requirements.

Ambient water quality monitoring serves to confirm compliance
with the CWA.  Under DOE Order 5400.1, General Ambient Water
Quality Monitoring, the facility is required to establish
baselines of water quality.  This requires continuing assessment
of water quality, along with the identification of new water
quality problems, by detection, characterization, and reporting
of unplanned releases and their effects on water quality.  PORTS
has not developed procedures needed to implement DOE Order 5400.1
for water quality management at the facility.

3-42

### 3.5.3     Groundwater/Soils

#### 3.5.3.1    Overview

The groundwater/soils program assessment includes an evaluation of the current programs involving groundwater and soil monitoring and hydrogeologic characterization at PORTS.  The scope of the assessment includes a review and evaluation of the hydrogeologic setting and physical conditions at the site, a review of the current groundwater and soil monitoring program, and a review of plans for future programs and studies.  Table 3.5.3-1 lists the applicable regulatory requirements and guidelines used to evaluate the PORTS groundwater/soils program.

Groundwater/soil issues at the site overlap some issues from other discipline categories:  1) Storm drains intercept contaminated groundwater in the X-231B oil biodegradation plot and the X-749 low-level waste disposal area and discharge this water through the outfalls where NPDES samples are collected; 2) soil samples are obtained on site as part of routine internal radiological monitoring, and offsite for evaluation of radionuclide airborne migration; 3) groundwater monitoring is an integral part of the compliance monitoring portion of the four RCRA closure disposal units on site; and 4) proposed groundwater and soil monitoring will be a major portion of the investigation of solid waste management units in quadrants I-IV.  Details of NPDES permit requirements, radiological monitoring, and waste management issues are contained in other appropriate sections of this report.

Information for this assessment was obtained through a review of site groundwater and soil contamination assessment reports, RCRA closure plans, RCRA Facility Investigation (RFI) work plans, and many other pertinent files and documents.  Additional information was gathered through interviews with Environmental Control Department personnel, by inspection of monitoring locations and equipment, and by observation of sampling events.

The PORTS program in groundwater and soils consists of several past site characterization studies, closure of four RCRA units, a site-wide remedial action program, offsite residential well sampling, onsite and offsite radiological soil/vegetation sampling, and groundwater monitoring for an active sanitary landfill (X-735).  The PORTS facility currently has 261 onsite monitoring wells of which 22 are sampled quarterly for compliance monitoring and 50 to 75 sampled annually for assessment monitoring.  An indeterminant number will be sampled during the RFIs planned for each site quadrant over the next three years. In addition, the site investigation phase of the RFIs will include the installation of over 50 new wells in Quadrant I and 20 in Quadrant II.  The number of wells to be installed in Quadrants III an IV has not been determined.  Approximately 150

Table 3.5.3-1
Applicable Groundwater/Soils/Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
| --- | --- |
| 40 CFR Part 264 Subpart F | RCRA- Releases from Solid Waste Management Units |
| 40 CFR Part 265 Subpart F | RCRA- Interim Status Releases From SWMUs |
| 40 CFR Section 270.14 | RCRA-Part B Groundwater Requirements |
| Ohio Admin. Code Title 3745 Chapters 50-69 | Ohio Hazardous Waste Regulations |
| DOE Order 5400.1 | General Environmental Protection |
| DOE Order 5400.xy | Radiological Effluent Monitoring and Environmental Surveillance |
| NA | RCRA Groundwater Monitoring Compliance Order Guidance |

soil borings have been drilled onsite for environmental sampling during past investigations and many more are planned in the RFIs.

The facility had a site-wide groundwater flow model developed which was used to identify gaps in the groundwater data base and to serve as a basis for analyzing remedial alternatives in the RCRA corrective action program. It was apparent from successive model runs that the site had not been completely characterized; therefore, additional groundwater and soil data will be collected during the remedial action program. The RFIs will be conducted to fulfill the requirements of the OEPA Consent Decree and USEPA Consent Order. Compliance with the Consent Decree is on schedule and no findings directly related to the planned RFIs were identified.

Overall, the PORTS facility has developed and implemented a comprehensive remedial action program which is designed to complete the site characterization and develop corrective action measures. This program, along with continued groundwater compliance monitoring, provides PORTS with a hydrogeologic data base that generally exceeds the requirements of both the Consent Decree and Consent Order. Nevertheless, a potential pathway of contaminant migration which was not adequately discussed in existing site reports is the migration of contaminated groundwater through vertical or high-angle fractures in the shallow bedrock beneath the facility. Also, because of the complexity of the groundwater monitoring network at PORTS, the facility should develop and maintain a groundwater sampling and analysis plan. A current plan which covers all aspects of the monitoring network is not available although portions of a comprehensive plan can be found in various site documents. There were no findings exclusively related to the soil monitoring program.

The lack of personnel training and adequate technical resources have contributed to the apparent incomplete review of technical documents. The absence of a comprehensive sampling and analysis plan is due to insufficient management oversight and the lack of a procedure to set monitoring program priorities. Recent loss of staff in this area may have adverse impact on the site's program.

3.5.3.2    Compliance Findings

Finding Number:  GW/CF-1

Finding Title:  Incomplete Determination of the Rate and Extent of Migration of Hazardous Waste Constituents

Performance Objective:  The owner of a solid waste management unit must implement a groundwater quality assessment plan and at a minimum determine the rate and extent of migration and

3-45

concentrations of hazardous waste constituents in groundwater according to 40 CFR Section 265.93 (OAC 3745 Section 65.93).

Finding: The groundwater quality assessment for the four RCRA units being closed under 40 CFR Part 265 (OAC 3745) does not include a complete determination of the rate and extent of contaminant migration in bedrock fractures beneath the site. This omission also occurs in the RFI work plans for Quadrants I and II.

A discussion and description of groundwater flow in horizontal (or low-angle) bedding plane fractures have been included in pertinent reviewed documents (Geraghty & Miller, Inc., 1989a, b, c, d, e). Groundwater flow in the bedding plane fractures closely parallels that of the Gallia sand and has been monitored with wells completed in the Berea Formation. However, the description of current conditions (Geraghty & Miller, Inc., 1989b) states "....two distinct joint sets are visible in outcrops of the Sunbury and Berea Formations. These joint sets measure approximately N65 degrees E and N25 degrees W." Observation of bedrock outcrops along Little Beaver Creek has confirmed the presence of both horizontal and vertical fracture systems in the Berea and Sunbury Formations.

The vertical fractures in the bedrock represent a potential contaminant migration pathway in which the directions of ground water flow may be markedly different than that determined by the existing monitoring well network. Because an assessment of this potential pathway has not been completed, the determination of the rate and extent of groundwater contaminant migration at PORTS is incomplete. An evaluation of the current groundwater quality data base and hydrogeologic conditions in relation to the bedrock fracture system should be provided in the quadrant RFIs.

It should be noted that the OEPA has approved the closure plans and groundwater quality assessment for the four RCRA units and did not require an additional evaluation of groundwater flow in bedrock fractures.

The lack of a discussion in the current site characterization on groundwater flow in vertical bedrock fractures indicates an inadequate technical review by site personnel. The lack of recognition of this potential migration pathway is a result of insufficient technical oversight by the site staff to the review which may be an indication of incomplete training of review personnel in the site characterization process.

### 3.5.3.3  Best Management Practice Findings

Finding Number:  GW/BMP-1

Finding Title:  Need for a Comprehensive Groundwater Sampling and Analysis Plan

Performance Objective:  A comprehensive groundwater sampling and analysis plan is needed to effectively implement and manage changes in the groundwater monitoring requirements at the facility.

Finding:  A comprehensive groundwater sampling and analysis plan which describes and defines the current detection, compliance, and assessment groundwater monitoring being conducted or planned at the PORTS facility is not available.  A groundwater sampling and analysis plan for the site was prepared in 1985, but has not been updated and is not adequate for the complex monitoring requirements now imposed on the facility.

Review of the RCRA closure plans, RCRA Part B permit application, and the RFI work plans, in addition to interviews with Environmental Control Department personnel, indicated that the site had not developed a comprehensive groundwater sampling and analysis plan which could serve as a source book for personnel responsible for implementation of groundwater monitoring requirements.  As a result, the facility's knowledge of these requirements has depended on one or two key individuals and the implementation on their verbal or otherwise informal directions to sampling personnel.

The PORTS facility is in the process of developing a comprehensive  groundwater sampling and analysis plan, but a draft was not available at the time of this audit.  There are no written procedures available that define the responsibilities for updating and revising environmental media sampling plans and procedures.  Without a source book, there is no current mechanism for documenting revisions to sampling schedules or to control the transfer of revision information to the surveyors.

Previous audit findings (PEER Consultants, 1989) have identified similar problems with  groundwater sampling, but changes to the sampling plans have not been implemented.  This appears to be due to insufficient management oversight and the lack of a procedure to set priorities for the monitoring program.  Communication between sampling managers, supervisors, and surveyors has been informal and mostly verbal with little or no documentation of orders received or written feedback to managers of sampling events completed.

### 3.5.4    Active Waste Management/Underground Storage Tanks

#### 3.5.4.1  Overview

This section includes an assessment of activities associated with the generation, storage, treatment, transportation, and disposal of solid, radioactive, and hazardous waste, and waste that is both radioactive and hazardous (mixed waste), as well as underground storage tanks (USTs).  The applicable statutes, regulations, and orders are listed in Table 3.5.4-1

The assessment included discussions with MMES, DOE, and OEPA personnel; review of regulatory requirements, standard operating procedures, permits and permit applications, and other relevant documents; and inspections of all plant waste management and UST activities.

The State of Ohio received its Resource Conservation and Recovery Act (RCRA) delegation from USEPA on June 30, 1989.  Ohio does not have authority to administer the 1984 RCRA amendments (i.e., RCRA corrective action) or regulate radioactive mixed waste.  New USTs installations are permitted by OEPA as air emission sources; USTs are regulated by the State Fire Marshall's Office (Inspection Bureau and Bureau of Underground Storage Tank Regulation).  PORTS is currently operating under a Consent Decree with the OEPA (Ohio EPA, 1989), which covers mixed waste and RCRA corrective action. An USEPA Administrative Order, signed on November 2, 1989, focuses on remedial action at solid waste management units and inactive hazardous waste sites rather than active hazardous waste facilities (EPA, 1989).  PORTS is, in general, managing its hazardous and radioactive mixed wastes and USTs in accordance with applicable laws.  PORTS filed a RCRA Part A permit application (revised on July 22, 1988) and a revised Part B permit application (April 27, 1987) with the OEPA.  PORTS is presently revising its Part B permit application to delete the four RCRA closure units from the list of active facilities, add additional solid waste management units, and update the discussion of active hazardous waste facilities.

The active RCRA facilities included in the Part A application are storage units located in X-752, X-326, and X-744G.  Ninety-day RCRA storage areas and waste accumulation areas are located in X-700, X-705, and X-720.  An accumulation area is also maintained in the X-710 laboratory.  No hazardous wastes are currently being disposed of on the site.  Radioactive waste storage areas are located in X-744G, X-326, and outside the X-705 building.  Metals with fixed radioactive contamination are stored in X-747H and X-747G.  A low-level radioactive waste burial ground, X-749, is being operated until mid-1990, when it will be closed.  PORTS also operates a State-permitted sanitary waste landfill, X-735.

Table 3.5.4-1
Applicable Waste Management/UST Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| 42 USC Sections 6901 et seq. | Resource Conservation and Recovery Act (RCRA) |
| 40 CFR Parts 260 to 272 | EPA Hazardous Waste Regulations |
| 40 CFR Part 280 | EPA Underground Storage Tank Regulations |
| 10 CFR Part 962 | DOE Mixed Waste Rule |
| Ohio Admin. Code Title 3745, Chapters 50 - 69 | Ohio Hazardous Waste Management Regulations |
| Ohio Admin. Code Title 3745, Chapters 27 and 37 | Ohio Solid Waste Disposal Regulations |
| Ohio Revised Code Sections 3734.021 and 3734.022 | Ohio Infectious Waste Management Law |
| Ohio Admin. Code 1301: 7-7-28 & 7-7-35 | Ohio Underground Storage Tank Regulations |
| DOE Order 5820.2A | Radioactive Waste Management |
| DOE Order 5400.1 | General Environmental Protection Program |
| DOE Order 5400.3 | Hazardous and Radioactive Mixed Waste Program |

There are currently 41 permitted USTs at the facility, including 6 in-ground cooling water basins. None of these tanks contain RCRA hazardous wastes. There is one tank used for the storage of used oil. Most of the tanks were installed after 1975 and are constructed of fiberglass-reinforced plastic. There are, however, several old steel USTs that were installed prior to 1965.

The permitted USTs, under both the state and Federal UST regulations, must meet release detection requirements by December 22, 1989. The plant also has a number of other USTs that would have required release detection by December 22, 1989. However, a series of permits for temporary closure have been filed to enable PORTS to empty the tanks and eventually take them out of service completely. For other tanks that are not due to come under regulation until December 22, 1990 or later, the Environmental Control Department has implemented a program to measure liquid levels.

Relevant findings from the 1986 Environmental Survey (DOE, 1987) included lack of storage capacity, inadequate waste characterization, incinerating hazardous waste without a permit, improper storage of radioactive used oil, training, waste storage parameters, disposal of organic hazardous waste, and structural integrity testing of USTs.

Overall, the PORTS waste management and UST programs have significantly improved since the 1986 Survey. The PORTS waste management and UST programs appear to be in compliance with Federal and state laws and DOE Orders, except for certain land-banned RCRA waste stored beyond one year. These materials primarily consist of radioactive mixed waste. The remaining compliance findings appear to be relatively isolated instances rather than widespread problems. These include problems concerning container spacing, containment system, and drums found in the wrong place. The BMP findings involve drum labeling deficiencies, inventory problems, waste minimization concerns, noncompliance with internal procedures, and the current UST practice that does not allow an actual liquid volume to be determined, which also can affect tank filling procedures. Several of these findings, primarily those involving storage and land disposal restrictions, were noted in the USEPA RCRA inspection of April 11-12, 1989.

The major waste management findings may be due to inadequate inspection or corrective action programs, inadequate implementation of the waste minimization program, and inadequate tracking of non-radioactive land-banned RCRA waste for disposal purposes. The UST concern is the result of a lack of tank-specific information and a lack of procedures for tank custodians.

3.5.4.2   Compliance Findings

Finding Number:   AWM/CF-1

Finding Title:   Restricted Land-Banned Waste

Performance Objective:  Storage of restricted hazardous waste is
prohibited unless it is stored solely for the purpose of
accumulating such quantities as necessary to facilitate proper
recovery, treatment, or disposal.  Storage for any other purpose
after the restrictions become effective, is prohibited.  For the
first year after the restricted waste is put into storage, the
regulating Agency (USEPA or an authorized state) bears the burden
of proof in an enforcement action and must demonstrate that the
storage was not for the purpose stated above.  After one year,
the facility bears the burden of proof and must demonstrate to
the regulator that the waste is being stored for the purposes
described above.  (See 40 CFR 268.50(b) and (c)).  The OEPA
Consent Decree requires PORTS to comply with Federal hazardous
waste laws and regulations (OEPA, 1989).  DOE Order 5400.3
requires DOE facilities to manage mixed waste according to the
requirements of Subtitle C of RCRA.

Finding:  Restricted land-banned waste is being stored in the
RCRA storage area.  In the event of an enforcement action by
USEPA, it would be necessary to justify to USEPA that the waste
is being stored for accumulation to facilitate proper recovery,
treatment, or disposal (40 CFR Part 268).  However, PORTS has no
need to store non-radioactive land-banned waste and has a program
for its disposal.  Spent solvent wastes F001 and F002 were
restricted from land disposal by the USEPA, effective November 8,
1986 (40 CFR Section 268.30).

In RCRA Storage Facility X-752, a drum of land-banned RCRA waste
was found, but it did not contain radioactive waste.  A container
with an F001 waste has been stored since November 18, 1987.  A
container with an F002 waste has been stored since May 26, 1988;
its lab analysis has not been completed.  Poly bottles containing
mixed liquid waste (flammable solvent solution with uranium),
which is restricted from land disposal because of the spent
solvents, have been stored in X-326 and X-747G.  In addition,
X-752 contains land-banned waste stored in drums.  Another drum
containing both uranium and an F001 waste has been stored since
August 1987.

PORTS sends its non-radioactive land-banned hazardous waste to
offsite incinerators for disposal after adequate accumulation has
occurred (Personal Interview with Waste Management Personnel,
1989).  A review of manifest and shipping records showed that
normally all containers of such waste are shipped off site for
disposal within a year.  The last shipment of hazardous waste to
an incinerator occurred in February 1989; therefore, apparently

the drum of land-banned waste (non-mixed) was not being accumulated to facilitate proper recover, treatment, or disposal; or this was an isolated oversight. PORTS manually tracks land-banned waste containers.

PORTS has no approved disposal facility for mixed land-banned waste. An incinerator built to dispose of radioactive mixed waste, not permitted as of this writing, is being tested at Oak Ridge. The current burn schedule for the Oak Ridge incinerator, dated October 1989, indicates that waste from PORTS is scheduled to be burned starting in February 1990. The PORTS waste currently stored at Oak Ridge consists of contaminated soil, which will not be burned until after 1993 (Anderson, 1987). The draft burn plan for PORTS is for waste that is currently located at the PORTS site, and not at Oak Ridge (PORTS, undated a). If the incinerator is permitted on schedule, and the burn schedule is met, disposal of land-banned mixed waste will begin in 1990.

The manual tracing system for land-banned waste does not appear to be adequate to ensure that disposal occurs on time. The procedure does not ensure that waste analysis is performed so that non-mixed land-banned waste drums that need to be disposed of can be identified in a timely manner. The mixed land-banned waste finding is a regulatory problem concerning disposal of mixed waste that is beyond the control of this facility.

Finding Number:  AWM/CF-2

Finding Title:  Deficiencies in RCRA Storage Facility Operations

Performance Objective:  Hazardous waste containers must be inspected for leaks and deterioration (40 CFR Section 264.174; OAC 3745-55-74). PORTS Procedure RD 5.6.4, Section 5.4.2, also requires inspections. Aisle space must be maintained to allow the unobstructed movement of personnel, fire protection equipment, spill control equipment, and decontamination equipment to any area of facility operation in an emergency, unless aisle space is not needed for such purposes (40 CFR Section 264.35; OAC 3745-54-35).

Finding:  Operating deficiencies were found in two of the three RCRA storage facilities for aisle spacing and inspection requirements.

Several 5-gallon containers (old paint cans) in X-752 are stored such that inspection is difficult without moving the cans. An inspector could not clearly see all sides of the cans. In addition, although not considered a compliance issue, several waste containers in X-744G High-Bay RCRA Storage Facility were stored close together, outside of the aisle spacing that is being maintained in this building. However, this particular deficiency

is not a compliance concern since emergency equipment access to these drums is not clearly needed.

These deficiencies appear to be isolated cases. Reinspection of X-752 confirmed that the cans have been restacked properly. Installation of the container elevation equipment that was observed during the inspection of X-744G will help prevent inadequate aisle spacing from occurring in the future.

The deficiencies noted in this finding are due to inadequate inspections of the RCRA storage facilities. The present inspection or corrective action programs does not appear to be sufficiently thorough to prevent these isolated instances from occurring.

Finding Number: AWM/CF-3

Finding Title: Deficiency in X-744G High-Bay RCRA Storage Facility Containment

Performance Objective: Container storage areas must have a containment system consisting of a sloped base for drainage purposes, unless the containers are elevated or are otherwise protected from contact with accumulated liquids (40 CFR Section 264.175; OAC 3745-55-75). This requirement is also included in PORTS Procedure RD 5.6.4, Section 5.4.1.

Finding: A deficiency in the required containment system in the X-744G High-Bay Area exists for some of the hazardous waste drums. The regulations allow the operator to elevate the drums to meet the containment system requirements when the floor is not sloped, as is the case in X-744G. However, many of the containers of solid hazardous waste in X-744G High-Bay RCRA Storage Facility were sitting directly on the floor. The floor is not sloped nor are the drums elevated.

The equipment to elevate the remaining portion of X-744G was observed during the inspection. PORTS is in the process of elevating all solid waste containers in this area, but has not yet completed the project (Personal Interview with Waste Management Personnel, 1989).

The deficiency identified in this finding is due to a policy implementation problem. The plant has a procedure that requires compliance with this regulatory requirement, but it has not been completely implemented in X-744G.

Finding Number: AWM/CF-4

Finding Title: Hazardous Waste Drums Located Outside of Designated RCRA Storage Areas

Performance Objective: Hazardous waste containers may be placed only in designated RCRA storage facilities, 90-day storage areas, or satellite accumulation areas (40 CFR Sections 262.34 and 264.170; OAC 3745-52-34 and 3745-55-70).

Finding: Hazardous waste drums were inappropriately placed in PCB storage areas and in other areas that were not designated RCRA storage areas.

One drum (LO 85-92) marked "PCBs and solvents" was found in the Liquid PCB Storage Area in Building X-333. The internal manifest system showed this waste container to contain approximately 200 ppm solvents. In addition, six containers labeled "hazardous waste" were found in the X-333 PCB Electrical Storage Area. Two drums were empty, and according to building process personnel, were mislabeled and were not going to be used for hazardous waste (Personal Interview with Process Personnel, 1989a). Four drums were full; examination of their content records revealed that the material is not hazardous. The PCB storage areas are not approved for RCRA waste. Drum number LO 85-92 was subsequently removed from the PCB storage area by Waste Management. In addition, in the X-720 Maintenance Building, one hazardous waste drum that appeared to be full was found outside of the building, which is outside of the 90-day RCRA storage area.

Although out-of-place hazardous waste drums were not found at all storage facilities, these observations may indicate that procedures for tracking and inspecting waste containers are inadequate. Thus, this finding is due to inadequate procedures for tracking waste drums and inadequate inspections or corrective action.

Finding Number: AWM/CF-5

Finding Title: Inadequate Storage of Low-Level Waste

Performance Objective: Low-level waste shall be managed in a manner to protect the public health and safety as specified in DOE Order 5820.2A.

Finding: The storage of low-level waste from the chromium reduction facility (X-616) is not in full compliance with DOE Order 5820.2A.

Contaminated and uncontaminated sludge material is stored in piles near the X-616 treatment facility outside the security fence, and thus conceivably accessible by the public. There are

no postings or placards at this unfenced area to indicate the presence of radioactive material or radiation.

The radioactivity level of the waste piles (175 to 525 pCi/g) is well below the level that would result in exceedances of the 25 mrem/year dose to any member of the public or the 100 mrem/year continuous exposure or the 500 mrem single acute exposure of a committed effective dose equivalent received by individuals who inadvertently may intrude into the facility after the loss of active institutional control (100 years) (Personal Interview with Environmental Control Department Personnel, 1989). However, the failure to post and monitor the storage area is not in compliance with the DOE Order 5820.2A requirement to make every reasonable effort to maintain releases of radioactivity as low as reasonably achievable.

The uncontaminated and contaminated material is filter cake from the sludge stabilization process in X-616. The material is stored on a plastic-covered cement pad. The material is also covered with plastic sheeting. The plastic sheeting is arranged over and under wooden beams to prevent the plastic from blowing off and to preclude runoff draining to the surrounding soil.

Environmental Control Department personnel have requested that operations personnel establish inspection logs. The inspections to be performed do not include radiological monitoring of potential runoff on the surrounding soil (Personal Interview with Environmental Control Department Personnel, 1989).

The production of low-level waste at the X-616 facility is the result of operations that began about mid-November 1988. Prior to November 1988, the sludge from the chromate reduction facility was not contaminated and was discharged to the X-616 surface impoundment. Sludge discharge was discontinued in November in conjunction with the closure plans for the X-616 impoundments (Personal Interview with Environmental Control Department Personnel, 1989).

Short-term plans, made several weeks prior to this assessment, for storage of this low-level waste is to place the material in large containers (Personal Interview with Environmental Control Personnel, 1989). Long-term storage plans will be based on the results of low-level waste disposal development and demonstration programs.

The failure to take proper actions to post and monitor the low-level waste storage can be related to failure to follow procedures and inadequate follow-up and review by supervision. These inadequacies are directly related to a root cause of policy implementation.

### 3.5.4.3    Best Management Practice Findings

Finding Number:  AWM/BMP-1

Finding Title:    Deficiencies in Waste Minimization
Implementation

Performance Objective:  Waste minimization measures are required
to reduce the volume and toxicity of hazardous and mixed waste
(DOE Order 5400.1, Chapter III, Section 4.b; DOE Order 5400.3,
Section 6.d; Sections 3002(b) and 3005(h) of RCRA; 40 CFR Section
264.73(b)(9)).  DOE Order 5820.2A, Chapter III, Section 3.c(3)
states that uncontaminated waste shall be separated from low-
level waste to facilitate cost-effective treatment and disposal.

Finding:  Although PORTS has a waste minimization program as
required by RCRA, evidence of a waste minimization implementation
problem exists around the plant.  In the X-720 Maintenance
Building, four drums labeled for radioactive waste had
unidentified trash in them.  Because the procedures at PORTS
require all waste coming from certain buildings to be handled,
stored, and disposed of as radioactive contaminated waste, such
practices increase the amount of waste that must be so handled.

PORTS' current waste minimization program consists of an annual
waste minimization award program since 1987 (LaGrone, 1987); a
draft waste minimization plan (Blake, 1988); and waste
minimization procedures concerning such items as steel pallets,
canister control, and shipping packages (Vournazos, 1988).  PORTS
meets the minimum RCRA requirements for waste minimization
measures.  However, the PORTS program could be improved to the
economic benefit of the plant.  For example, waste sorting to
segregate radioactive waste from non-radioactive waste is not
practiced throughout the plant.  Thus, the overall quantity of
radioactive waste for disposal may be much larger than necessary.
PORTS is currently evaluating a proposal for waste minimization
consulting (Personal Interview with Waste Management Personnel,
1989).

This finding is primarily due to a policy implementation problem
related to enforcing waste minimization rules by area foreman and
to a lack of operator training regarding the importance of waste
minimization.

Finding Number:  AWM/BMP-2

Finding Title:  Mixed Waste Drum Labeling Deficiency

Performance Objective:  Waste that contains more than 3 ppm
uranium must be manifested as mixed waste if it also contains
RCRA waste, and it must be properly labeled (PORTS Draft
Procedure RD 5.6-3, Section 4.7).  Section 5.1.2.1 requires all

drums that contain hazardous waste to be labeled "Hazardous Waste", and Section 5.1.2.4 requires all drums that contain radioactive waste to be labeled "Radioactive Waste." PORTS does not have a "mixed waste" label. Therefore, this procedure will require mixed waste drums to be affixed with both a radioactive waste and hazardous waste labels before mixed wastes are placed in the container and before the drums are sent to storage. Best management practice requires that the contents of waste drums be obvious from the label.

Finding: Mixed waste drums in X-752 are not labeled according to their content. In X-752, mixed waste drums RFD-888 were only labeled "hazardous waste" and not "radioactive waste."

This finding appears to be a widespread problem at PORTS RCRA storage facilities. However, there is no regulatory requirement applicable to this situation, and only draft plant procedures exist. A new drum issuance procedure was implemented on October 1, 1989 that will help prevent this problem in the future, but it will not alleviate the present situation.

This problem is due to a lack of policy. Although a new drum issuance and labeling procedure appears to be working, no effort was observed to correct the labeling deficiency of existing drums.

Finding Number: AWM/BMP-3

Finding Title: Waste Drum Inventory Problems

Performance Objective: To ensure the proper storage of waste containers, best management practices require tracking the location of the containers.

Finding: There appears to be a waste drum inventory problem at PORTS. This is not in accordance with best management practices.

In X-744G High-Bay RCRA Storage Facility, a drum of waste oil was found. The drum had been labeled as empty. Orphan drums with unknown contents were also found in one of the X-720 90-day storage areas. In addition, six containers labeled "Hazardous Waste" were found in the X-333 PCB Electrical Storage Area, which is not approved for RCRA waste. Two drums were empty, and according to building process personnel, had been mislabeled and were not going to be used for hazardous waste (Personal Interview with Process Personnel, 1989a). Four drums were full. Examination of the content records of these four drums revealed that the material was not hazardous.

Although these may be isolated instances, they may indicate a larger problem concerning proper tracking of waste drums and an inadequate inspection program.

Finding Number:  AWM/BMP-4

Finding Title:  Noncompliance with PORTS Procedure Requiring the Covering of Radioactive Waste Drums Stored Outside

Performance Objective:  Radioactive waste drums stored outside next to X-705A are required by PORTS Procedure RR 3.6-4, Section 4.2, to be covered in such a manner that water can neither enter nor collect on top of the containers.

Finding:  PORTS Procedure RR 3.6-4 was not being followed for one of the full radioactive waste drums in storage.

In the radioactive waste storage area outside of X-705A, one radioactive waste burnable drum was found uncovered.  All other radioactive waste drums stored outside were found to be in compliance with internal procedures.

The deficiency noted within this finding may be due to inadequate inspection or corrective action programs.

Finding Number:  AWM/BMP-5

Finding Title:  Incomplete Method of Release Detection Used for Some Underground Storage Tanks

Performance Objective:  The method of release detection must meet the requirements of 40 CFR Section 280.43 and OAC 1301:7-28(J) by December 22, 1990.  Best management practice also dictates that Standard Operating Procedures (SOPs) be available for such an activity.

Finding:  Current methods of release detection on some underground tanks are inadequate to meet the requirements that will come into effect on December 22, 1990.  This lack of information does not become critical unless tank volumes cannot be determined by 1990, when the next set of tanks becomes subject to release detection requirements.

This finding is based on a review of the present tank level measuring activities conducted at the various buildings as requested by the Environmental Control Department (Blake, 1989) and on discussions with various people responsible for the actual measuring (Personal Interview with Process Personnel, 1989b).

The PORTS Environmental Control Department is aware of this data gap and is presently gathering all available data on all USTs and is resolving discrepancies between the tank survey, the tank permits, engineering drawings, and manufacturer's specifications.

3-58

The following observations were noted relative to this finding:

- Tank liquid levels are not converted to volumes. This is necessary to determine whether or not there has been a release. Manual tank gauging is an acceptable method of release detection in both the state and the Federal regulations. However, there must be a mechanism by which a change in physical liquid level can be converted to a change in volume. At the present time, specific tank dimensions are not known for all the USTs that fall under 1990 or later release detection requirements.

- There is a lack of SOPs for tank level measurement activities. Individual tank custodians have been tasked with preparing SOPs for their specific tanks, with input from the personnel responsible for measuring, and final regulatory compliance review by Environmental Control (Blake, 1989). Although the development of SOPs is slightly behind schedule, there is no indication that they will not be available when needed in December 1990. SOPs are necessary to ensure that personnel engaged in this activity are able to determine whether or not a tank is leaking.

- There is potential for overfilling USTs by the tanker truck operators because the current volume of liquid in the tanks is unknown. No indication of tank overflow was evident at any of the tanks visited.

The major factors contributing to this finding are the lack of tank-specific technical information and detailed procedures for tank level measurement.

### 3.5.5    Toxic and Hazardous Materials Management

#### 3.5.5.1    Overview

The toxic and hazardous materials management assessment evaluated
the status of the PORTS facility with regard to applicable Toxic
Substance Control Act; Federal Insecticide, Fungicide, and
Rodenticide Act; Hazardous Materials Transportation Act; and DOE
Order requirements.  PCBs, pesticides, and chemicals stored in
bulk quantities (e.g., acids, bases, and solvents) were covered
in this assessment.  This assessment does not deal with SARA
Title III as it relates to toxic chemical reporting and release.
These topics are addressed in the Inactive Sites/Emergency
Response section 3.5.9 with the exception of annual emissions
reporting found in the Air section 3.5.1.  In addition, asbestos
issues are covered in the Air section (see finding A/CF-1).

The specific regulatory requirements against which the PORTS
Facility was assessed are presented in Table 3.5.5-1.

The scope of this review included discussions with MMES and DOE
personnel; a review of written policies, procedures, internal
inspection reports and inventories, and external audit reports;
and inspection tours of the process buildings and support
facilities.

PCB - The PORTS facility has 157 PCB transformers and over 11,000
capacitors presently in service, as well as six designated PCB
waste storage areas.  The majority of PCB sources are
concentrated in process buildings X-326, X-330, and X-333.  An
overriding issue confronting the site is storage of radioactively
contaminated PCB wastes and their eventual disposal.  Other
deficiencies observed involve labeling, required inspections,
adequacy of waste storage areas, and PCB transformer concerns.
One best management finding noted involves waste drum management.

The Ohio Consent Decree (August 29, 1989) requires the submission
of PCB Spill Cleanup Plan to cover areas not addressed in the
RCRA Facilities Investigation (RFI).  DOE sent a letter to the
state (Gillespie, 1989b) declaring that all areas are covered
under the RFI, and therefore no plan is required.  The state is
currently reviewing the letter and the site is awaiting formal
response.

Table 3.5.5-1
Applicable Toxic And Hazardous Materials Management
Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| 40 CFR Part 761 | EPA PCB Use Prohibition Regulations |
| 40 CFR Part 165 | EPA Pesticide Storage and Disposal Regulations |
| DOE Order 5482.1 | Environmental Safety and Health |
| 49 CFR Parts 171-179 | DOT Hazardous Materials Regulations |
| DOE Order 5500.2A | Emergency Notification, Reporting, and Response Levels |
| DOE Order 5480.3 | Safety Requirements for the Packaging and Transportation of Hazardous Materials, Hazardous Substances, and Hazardous Wastes |

In addition, other concerns center around PCB leaks from eight PCB-contaminated oil lubrication systems and from ventilation system gaskets that are contaminated with PCBs on to the floors and equipment of the process buildings. The leaks from the oil lubrication system have a workable solution which is being pursued; however, the leaking gaskets presents a significantly more difficult resolution. Oil from various sources is leaking into the over head ventilation ducts where it comes into contact with PCB containing joint gaskets. Although the source of the PCBs is not known, it may date to the construction of the plant when vendors may have saturated the gaskets with PCB-containing material and glued them to the metal of the flange joints. Lubricating oil in the motor exhaust ducts has been seeping through these gaskets, leaching out PCBs, and dripping onto the operating floor and equipment underneath the ventilation system. These leaks constitute PCB use in "other than a totally enclose manner" and thus counter to the requirements of TSCA.

Within the three process buildings PORTS (X-326, X-330, and X-333) there are approximately 106,000 feet of motor exhaust ducts with 27,550 joints that have the potential for developing leaks. In addition, there are approximately 68,400 feet of supply ducts with 18,200 joints that would have to be replaced should that become necessary. Due to the method of gasket attachment, it would be necessary to scrape each flange joint clean to remove contamination and prepare for installation of new gaskets. Analysis of the gaskets has shown they also contain measurable quantities of asbestos, chromates, and uranium.

Actions are being taken to ensure that any leaks are identified and cleaned-up. Absorbent materials are placed to catch leaks and areas where such leaks occur are cordoned off. In an effort to remediate the problem of the oil drips, PORTS has embarked on an effort to install troughs under those gaskets which are presently leaking. The troughs are connected to a manifold piping system which has "droplines" to taps every 200 feet for collection of the leaking oil. This effort is presently underway in all three process buildings and is scheduled for completion by mid-1990. The tentative plan is to then monitor the remaining gaskets regularly and install additional troughs, as needed.

Since the initial identification of this problem, DOE and its contractor have taken steps toward resolving the physical and regulatory aspects of this issue. An abbreviated chronology of events and activities is summarized below:

    1982 PORTS discovered high PCB concentrations in oil drips
         on the process floor

    1983 PORTS identified gaskets as the PCB source, informed
         EPA Region V, and began installing troughs

1984 EPA TSCA inspection at PORTS -- PCBs in gaskets and the consequent leaks are identified as a problem;

1985 EPA issued a Notice of Noncompliance (NON) and cited oil seepage from the duct gaskets -- response provided to EPA described troughs and drip clean-up efforts;

1987 EPA TSCA inspection at PORTS cited oil seepage and required certification than clean-up program is on-going;

1988 EPA issued a second NON and cited oil seepage from the duct gaskets -- response provided to EPA described troughs and drip clean efforts;

1988 Meeting was held with EPA Region V to discuss the response to the NON and possible long-term solutions to the noncompliance issue, including removal of the gaskets and the troughing system;

1988 On 9/22, a meeting was held with DOE-HQ to discuss the issue, strategies for corrective action, and plans for meeting with EPA-HQ to present DOE approach;

1988 Information regarding presence of asbestos and chromates was confirmed and, after testing, the material was classified as both a RCRA and PCB waste.

1989 On March 22, a meeting was held with DOE, EPA Region V, and EPA-HQ to discuss the background and the two possible corrective actions (removal or troughs) to authorize continued use. EPA was receptive to discussions and referred the issue to higher management to set priorities. Additional meetings were held on this issue on August 31 and September 22, 1989.

Review of the Notices of Noncompliance (NON) (May 16, 1985 and July 22, 1988) indicates that EPA Region V has cited PORTS with improper disposal of PCBs under 40 CFR Section 761.60(d)(1). The notices state that "inspectors observed isolated oil spots which had accumulated drippage that appeared not to have been cleaned-up for an extended period of time" and that this constituted improper disposal of PCBs. The NONs did not address the issue of PCB use in a totally enclosed manner, but rather, focused on the requirement to clean up PCB spills within 24 hours. As a result of the noted noncompliances, PORTS is required to certify "that the ventilation duct seam seepage cleanup program is still being implemented and efforts are taken to prevent seepage from contaminating floors." To meet the requirements of TSCA, the troughing installation and clean-up program would have to eliminate any "unreasonable risk of injury to health or the environment".

3-63

DOE has been actively discussing options for action with the cognizant regulators including rulemaking, a consent order/compliance agreement, and immediate removal of the gaskets. USEPA staff reportedly have expressed a reluctance to pursue the rulemaking option due to concerns about setting a precedent with regard to PCB gasket use, and the availability of resources required for a multi-year process of rulemaking. The consent order or compliance agreement option would be an interim remedy with a schedule for eventual removal of the gaskets as the final compliance endpoint. Lastly, according to a risk assessment analysis conducted by MMES (J.B.F. Associated, 1988), employing the option of starting immediate gasket removal would entail high cost, potentially high risks to health and the environment, and would have significant impact on production operations at the facility.

Pesticides/Herbicides - None of the pesticides applied at the facility are categorized as restricted-use chemicals. There are two best management practice findings noted involving storage practices and program oversight.

Hazardous Materials Management - This assessment touches on issues of chemical purchase and tracking, onsite transportation, and proper storage of chemicals. The two best management practice findings involve inadequate secondary containment and placarding of vehicles for onsite transportation.

The major findings of the toxic and hazardous materials management assessment are due to lack procedures and oversight regarding PCB program operations. Implementation of some MMES PCB-related policies is also inadequate.

3.5.5.2    Compliance Findings

Finding Number:    THMM/CF-1

Finding Title:  Deficiencies in Response and Reporting of PCB Transformer Leaks

Performance Objective:  Upon identification of a leak on or around a PCB transformer, the transformer must be repaired or replaced to eliminate the source of the leak. Clean-up must be initiated within 48 hours of discovery and inspections of the transformer done daily until appropriate actions are completed. In addition, records of PCB transformer inspections and maintenance must contain information regarding dates and description of cleanup and repair/replacement activity, as well as results of the daily inspections (40 CFR Section 761.30(a)).

3-64

<u>Finding:</u> There is no documentation to support any repairs/ replacement, cleaning, or inspection that may have occurred concerning PCB transformers with reported leaks.

Upon review of the annual 1988 PCB transformer inspection records, it was noted that there were numerous leaks identified; however, there was a lack of documentation regarding response activities. In a follow-up conversation with Environmental Control personnel, it was stated that there was no centralized record of this information available. Attempts made to reconstruct and verify response actions by tracing maintenance work records proved ineffective.

Conversations with both Environmental Control personnel and the PCB Program Manager confirm there is no written guidance on the performance of inspections and reporting of leaks with regard to PCB transformers. There has been a recognition of the need to generate such guidance (i.e., checklists and operating procedures) and to centralize PCB-related inspection records, but at present no specific plans to implement such a program have been approved.

<u>Finding Number:</u>    THMM/CF-2

<u>Finding Title:</u>    Combustible Material Found Near PCB Transformers

<u>Performance Objective:</u>    Combustible materials must not be stored within a PCB transformer enclosure or within 5 meters of an enclosure (40 CFR Section 761.30 (a)).

<u>Finding:</u>    Various combustible items were noted within or in proximity to the diking of PCB transformers in two buildings on the site.

This finding is the result of inspection tours of all PCB transformers and interviews of Waste Management and operations personnel. Particular note was taken of the X-333 process building because of the extent of the housekeeping problems found in this building, in contrast to the X-330 process building.

In the X-333 process building, the following combustible items were specifically noted within, or in close proximity to, the diking of the transformers. The transformer number is provided in parentheses.

- cigarette butts (361a, 363a, 365a, 365b)
- absorbent pads (366a, 371a)
- brushes (386b)
- wooden blocks (389b)
- carpeting (spare #17)

Cardboard boxes, paper, and a locked flammable chemical cabinet were being stored within 5 meters of the transformer in building X-770.

With regard to observations made on X-770, it should be noted that neither this building nor the transformer is presently in use. When site personnel became aware of these problems, immediate cleanup was initiated or scheduled.

Officials responsible for the X-333 building were not familiar with the regulation that led to the concern regarding combustibles. This finding is due in part to lack of knowledge, by operational staff, on the use and servicing of PCB transformers, and to a lack of implementation guidance regarding procedures associated with these regulatory requirements.

Finding:  THMM/CF-3

Finding Title:  Improper or Insufficient PCB Markings

Performance Objective:  Each of the following items must be marked with the PCB label as described in 40 CFR Sections 761.40 (b) and 761.45(a):

- PCB containers, transformers, article containers, and storage areas;

- All vehicles that transport more than 45 kg of PCBs in the liquid phase;

- All vehicles that transport one or more transformers with a PCB concentration greater than 50 ppm; and

- Any means of access to a PCB transformer.

In addition, all labels must be easily read by any persons conducting inspections, service, or fire prevention (40 CFR Section 761.40).

Finding:  There are numerous instances where the site has either not marked or has improperly marked PCB items, transformers, transport vehicles, and storage areas.

This finding is based on inspection tours of the onsite buildings. The following observations were noted during these inspections:

- Improper labeling - In building X-326, approximately 60 to 70% of the drums in the waste storage area had improper labels. In the X-330 building waste storage area near pole A87 approximately 40 to 50% of drums had improper labels.

3-66

- <u>No labeling</u> - The lack of marking on drums was observed but was rare within the designated storage areas. However, in the cleanup staging areas of the process buildings, approximately 10% of drums designated for PCB waste storage had no PCB labels. In addition, four out of five drums in the maintenance area of building X-720 were observed with no marking.

- <u>No marking</u> - Storage areas with no markings were observed in the X-330 building near pole G81 and the X-333 building near pole T50. In addition, no marking was evident at many of the cleanup staging areas located around the process floors in these buildings and building X-326.

  No marking was found on the entrances to either the buildings or PCB Transformer vaults at the X-530 and X-533 switchyards. In addition three of the four entrances to the X-600 Steam Plant PCB transformer were not marked.

  No onsite vehicles are marked, permanently or with removable placards, when used to transport PCB transformers or drums. This was confirmed in interviews with the chemical operators, building coordinators, and Waste Management staff.

- <u>Poorly placed</u> - Approximately 50% of the markings on transformers in X-333 are placed such that they are not easily read. The labels are placed just below the junction of the cooling tubes ventilation duct and the transformer body. The determination that label placement was not easily read was made by two auditors, independently, during the inspection tour.

  A majority of the PCB waste drums in the process building storage areas lack marking that are easily read. In X-330 and X-333, drums are turned so that labels were facing away from the inspection aisles. In X-326, the pallets of waste drums are clustered in a manner which totally prohibited inspection of interior drums.

The absence of the PCB labels on drums and transformer entrances was usually resolved as the audit inspection was in progress. Verbal plans to implement corrective actions on other labelling deficiencies were made as the problems were identified.

The PCB marking problems stem from deficiencies in the inspection process, as well as program oversight and task implementation. Personnel are instructed to inspect PCB areas but are not

provided guidance on how to conduct the inspection. There has been an inconsistent inspection of the PCB waste storage areas (THMM/CF-4) and there is no written corrective action mechanism geared to inspection findings. The Waste Management procedure (MMES, 1988a) delegates responsibilities for inspections, generating operational procedures, and program oversight to functional groups, but the lack of coordinated oversight has hampered proper implementation.

Finding Number: THMM/CF-4

Finding Title: Deficiencies in Dating and Inspection of PCB Waste Storage Drums

Performance Objective: All PCB articles and PCB containers in storage for disposal must be dated when placed in storage and must be checked for leaks at least once every 30 days (40 CFR Section 781.65(c)).

Finding: Dates on drums in the PCB waste storage areas are sometimes missing or partially obliterated, unclearly defined, and inconsistently placed. In addition, the site has not inspected the waste storage areas every 30 days as required.

This finding is based on inspection tours of all onsite PCB waste storage areas, review of inspection record, and interviews with Waste Management staff.

The system and means of dating waste drums for storage has widespread deficiencies. Inconsistency in the placement and coding of dates was evident in the fact that, when present, there is no location on PCB waste drums where dates are consistently displayed (e.g., next to the PCB label). Sometimes dates are encoded in the drum number. Other drums (such as in the liquid PCB waste storage area in building X-333) are undated. The practice of marking directly on drums with marking pens or crayons has led to dates on numerous drums which were partially obliterated by smearing. In addition, the drums may have other identification markings which are also written using the same type of marking tool. At times, this practice made it difficult to clearly identify which was the date of storage.

Inspection of PCB waste storage areas were not done every 30 days and large gaps existed between inspection dates in 1989. Throughout 1988, the inspection schedule occasionally varied by a day or two from the 30-day requirement. In 1989, inspection records are missing for the following periods:

| | | |
|---|---|---|
| • | Buildings X-330 and X-333 | 4/26/89 to 8/29/89 |
| • | Building X-326 | 2/16/89 to 7/31/89 |

3-68

Waste Management staff confirmed that no inspections were conducted during these periods. In addition, inspections of drums in the cleanup staging areas have not been initiated.

The draft PCB implementation plan (Sheward, 1989), includes no requirements for centralized preparation of advanced inspection schedules, training for inspection personnel, or generating standardized checklists or operational procedures for assuring regulatory compliance with the issues presented.

Site staff did not interpret the regulation to require inspections of temporary storage, however, the regulation makes no distinction between temporary and designated storage areas. The deficiencies cited are due to a lack of procedures, training, program oversight, and implementation.

Finding Number: THMM/CF-5

Finding Title: Inadequately Constructed Waste Storage Areas

Performance Objective: A PCB waste storage area must have floors and curbing constructed of smooth and impervious materials. The curbing must be continuous, at least six inches high, and have no openings that would permit liquids to flow out (40 CFR Section 761.65(b)).

Finding: None of the curbing observed in the waste storage areas of the process buildings fit all the requirements of 40 CFR Section 761.65(b).

This finding was based on inspection tours of all onsite waste storage areas and conversation with Waste Management, Environmental Control, and operations personnel.

In the X-330 and X-333 solid PCB storage areas, the following observations were made:

- The plastic sheeting used for containment can not be classed as impervious material. Conversations with operations staff established that the plastic had been torn on three occasions by forklifts during the drum storage procedure. There is no assurance that undetected tears are not present.

- The curbing used is not continuous. At the corners of the curbing, the plastic sheeting was observed to have slipped between the piping sections. This makes the curbing discontinuous and decreases the curb height to less than six inches. During the loading and unloading of drums, piping sections must be removed to permit access. This activity creates openings in the curbing which is clearly prohibited by the regulations.

3-69

In the X-326 PCB storage area there is no curbing for storage of PCB solids. Also, the plastic sheeting used for containment of liquid PCB waste can not be classed as impervious material because it is thin and brittle. The floor and curbing in the liquid PCB waste storage area is not impervious to leaks as flooring is cracked and curbing is constructed of painted cinder block.

The deficiencies noted in the plastic-lined storage areas are due to inaccurate technical guidance on acceptable materials for curbing. In building X-326, criticality concerns must be addressed in constructing curbs. This problem has been addressed in plans for construction of a new storage area.

Finding Number: THMM/CF-6

Finding Title: PCB Wastes Stored Longer Than One Year

Performance Objectives: No PCB waste can be kept in storage for greater than one year. PCB containers may be temporarily stored outside of designated waste storage areas for up to 30 days while being filled (40 CFR Section 761.65(c)).

Finding: PCB waste storage drums are being stored for longer than one year and PCB waste drums in use are being stored for greater than 30 days.

This finding is based on inspection tours of the X-326, X-330, and X-333 process buildings and the Building X-720 maintenance area.

The PCB waste that is being kept for more than one year is all radioactively contaminated PCB waste. At present, there is no disposal facility that is legally permitted to incinerate this waste. An incinerator designed to dispose of radioactively contaminated PCB waste is presently being tested at Oak Ridge. The current burn schedule for the Oak Ridge incinerator, dated October 1989, indicates that waste from PORTS is scheduled for incineration in February 1990. The PORTS waste currently stored at Oak Ridge consists of contaminated soil (Anderson, 1987), which will not be burned until after 1993. The draft burn plan refers to waste currently located at PORTS, and not the waste stored at Oak Ridge (PORTS, undated, c). If the incinerator is permitted on schedule and if the burn schedule is kept, disposal of radioactively contaminated PCB waste will begin in 1990.

PCB waste drums in use are being stored for greater than 30 days at the cleanup staging areas in the process buildings and the Building X-720 maintenance area. These are drums not entirely filled within 30 days and full drums that have not been addressed quickly enough by the "Request for Disposal" system.

The deficiencies addressed in this finding are due to insufficient task performance in tracking and transporting drums from the staging areas to designated PCB waste storage areas; and PCB waste problems beyond the control of this facility because no permanent disposal option presently exists for radioactivity - contaminated PCB waste.

Finding Number:  THMM/CF-7

Finding Title:  Leaking PCB gaskets and oil lubrication systems in the process buildings constitutes use of PCBs "other than in a totally enclosed manner."

Performance Objective:  It is prohibited to use any PCB or PCB item, regardless of concentration, in any manner other than in a totally enclosed manner, unless authorized (40 CFR Section 761.20 (a)).

Finding:  The leaking PCB gaskets and PCB-contaminated oil lubrication systems in the process buildings constitute the use of PCBs other than in a totally enclosed manner.

This finding is based on inspection tours of the process buildings; interviews with DOE and MMES staff; and reviews of technical documents, letters, memoranda, and reports.

In the X-326, X-330, and X-333 process buildings, there are extensive oil leaks that are derived from the lubrication system and the ventilation ducts.  Leaks from the ventilation system have been found to contain PCBs from the wool joint gaskets. This problem exists in all three process buildings.  PCB-contaminated oil leaks come from eight units of the oil lubrication system which are restricted to areas located in the X-330 and X-333 Buildings.

The lubrication system oil is believed to have been mistakenly contaminated and a solution of this PCB compliance issue is presently being addressed.  A USEPA sanctioned chemical decontamination system is commercially available and PORTS presently is accepting bids for evaluation.  Full-scale pilot testing and contract award are scheduled to be completed within the first half of 1990 with ultimate resolution by year's end.

The leaking ventilation gaskets present a significantly more difficult issue to resolve.  The ventilation ducts consist of flanged duct sections with wool felt gaskets in each of the flanged joints.  Although the source of the PCBs is not known, it may date back to the construction of the plant when vendors may have saturated the gaskets with PCB-containing material and glued them to the metal flanges.  Lubricating oil in the motor exhaust ducts has been seeping through these gaskets, leaching out PCBs,

and dripping onto the operating floor. Within the three process buildings at PORTS are approximately 106,000 feet of motor exhaust ducts with 27,550 joints that have the potential for developing leaks. In addition, there are approximately 68,400 feet of supply ducts with 18,200 joints that would have to replaced should that option become necessary. Due to the method of gasket attachment, it would be necessary to scrape each flange joint clean to remove the contamination and prepare for installation of new gaskets.

In an effort to remediate the problem of the oil drips, PORTS has embarked on an effort to install troughs under those gaskets which are presently leaking. The troughs are connected to a manifold piping system which has "droplines" to taps every 200 feet for collection of the leaking oil. This effort is presently underway in all three process building and is scheduled for completion by mid-1990. The tentative plan is to then monitor the remaining gaskets regularly and install additional troughs, as needed.

With the initial identification of this problem, DOE and its contractor have taken steps toward resolving the physical and regulatory aspects of this issue and initiated negotiations with the USEPA that are in progress. The options available for resolution of this situation are: continued troughing of leaks and seeking of a USEPA rule to authorize use of PCBs; entering into a consent order/compliance agreement for scheduling eventual regulatory compliance; or beginning the sequential shutdown of the process area cascade and beginning gasket removal and replacement activities.

### 3.5.5.3    Best Management Practice Findings

Finding Number:    THMM/BMP-1

Finding Title:    Insufficient Management of PCB Waste Drum Storage Areas

Performance Objective:    PCB waste drum storage areas should be managed so that all drums can be located by the date they entered storage to facilitate visual tracking of waste for disposal within the required time constraints. Drum storage should allow for thorough inspection of drums for general condition, marking, and leak identification (40 CFR Section 761.65 (c)(8)).

Finding:    The physical handling of PCB waste drums in the storage areas does not allow visual tracking of waste for proper disposal or thorough inspection of drums.

This finding is based on inspection tours of all the PCB waste storage areas in Buildings X-326, X-330, X-333, and X-752, as

well as confirming conversations with Waste Management and waste
operations staff.

Operations personnel cannot physically locate drums easily by
date of storage in any of the PCB storage areas. No effort is
made to cluster drums with similar dates of storage. Nor is
there segregation of the radioactively contaminated PCB waste
which cannot presently be disposed of legally. This would be a
best management practice in avoiding the human error of
mistakenly sending a radioactively contaminated PCB waste
container for incineration.

There is no aisle spacing of drums for most solid PCB waste
stored in the X-326 Building and there are no aisles on the
outside of the liquid PCB waste storage area in Building X-333.
Proper single pallet aisle spacing would be a best management
practice to ensure the proper inspection of drums.

This finding results from a lack of policy concerning management
of PCB waste drum storage areas and a failure to identify these
deficiencies in audit activities.

Finding Number:  THMM/BMP-2

Finding Title:   Pesticide Program Deficiencies

Performance Objective:  All pesticides should be stored in a
sound manner (40 CFR 165.10) and excess or unused pesticides
should be disposed of properly (40 CFR 165.6). A quarterly
inventory of pesticides is to be generated and sent to
Environmental Control (Maintenance Method SSG-506). To ensure
safe use and disposal of pesticides, there should be periodic
monitoring of the pesticide program activities.

Finding:   Some pesticides are not being stored in a sound manner
and other pesticides no longer in use at PORTS continue to be
stored in Building X-344B. The quarterly pesticide inventories
are not being generated and sent, and there has been no evidence
of periodic audits of the pesticide program.

This finding is based on interviews with Environmental Control
and Roads and Grounds staff, an inspection tour of the pesticide
storage area in Building X-344B, and a review of pesticide
application records for 1987-1989.

A bag of Treflan 6G herbicide was found open and its contents
were observed spilled on other stored boxes and the floor
underneath it. A container of Weedone, not used for
approximately 5 to 6 years, was still being stored. In addition,
highly flammable items (e.g., gasoline) were stored with
pesticides that have "do not burn" warnings displayed on their
labels.

3-73

There has been no generation of a quarterly pesticide inventory and Environmental Control has made no inquiries on its whereabouts. Furthermore, there is no written evidence that any periodic onsite monitoring is done on the pesticide program. In addition, no site inspections of pesticide application events are done by Environmental Control personnel, contrary to their stated responsibility to assure proper application procedures (Personal Interview with Environmental Control Personnel, 1989).

This finding is due in part to a lack of written guidance and scheduling for audit activities, as well as, deficiencies in management oversight.

Finding Number:  THMM/BMP-3

Finding Title:  Lack of Placarding on Vehicles Engaged in Onsite Hazardous Materials Transport

Performance Objective:  Placarding of vehicles is required when transporting hazardous materials on site, but outside the perimeter security fence (General Notice 30-89).

Finding:  Vehicles transporting hazardous materials on site but outside of the security fence are not being placarded.

This finding is based on interviews with Materials and Services and Shipping and Receiving personnel.

In-plant training on transportation of hazardous materials engendered some debate on whether Title 49 regulations applied to onsite roads. In response, a General Notice (PORTS, 1989b) was released on July 25, 1989 clarifying site policy. However, implementation of placarding requirements by Materials and Services is awaiting release of a new procedure, that is presently under review.

This finding is the result of a failure in communication and policy implementation.

Finding Number:  THMM/BMP-4

Finding Title:  Deficiencies in Hazardous Material Storage

Performance Objective:  Reasonable storage procedures should be employed to ensure that hazardous materials are not released to the environment, in keeping with the intent of DOE Order 5480.1.

Finding:  Reasonable storage procedures are not being employed to prevent the potential release of hazardous materials to the environment.

3-74

This finding is based on inspection tours to the drum storage building X-741 and the warehouse building X-744H, and interviews with Materials and Services personnel.

Drums stored in the X-741 storage area were rusting and the labels on many of the containers were no longer legible. This building affords minimal protection from the weather and there is no regular schedule for drum inspection. In addition, there is no diking to prevent run-off to the surrounding environment. In Building X-744H, acids and degreasing agents are being stored in an undiked area. The junction of the floor and wall adjacent to the storage location of these materials would not prevent run-off to the surrounding environment. In addition, there is no temporary spill-containment materials in the building. There is no regular or thorough inspection program for drum storage areas in either X-744H or X-741.

This finding rests with a lack of hazard analysis and an absence of a clear policy by Materials and Services management.

Finding Number:  THMM/BMP-5

Finding Title:  Lack of formal procedures for gasket spill PCB program.

Performance Objective:  Site procedures should be written and/or updated to reflect the requirements for full implementation of the Polychlorinated Biphenyl (PCB) Cleanup standard issued on August 14, 1989 (M. E. Mitchell, MMES Internal Correspondence, 8/14/89). Adequate formal procedures are needed to ensure compliance with environmental standards and requirements, and are a necessary tool in effective quality assurance oversight.

Finding:  Formal site procedures for the full implementation of the PCB Cleanup Standard (Number 1.1) have not been written.

This finding is based on review of letters and technical documents; and interviews with Cascade and Chemical Operations staff.

Two Notices of Noncompliance (NON) were issued by EPA Region V (May 16, 1985 and July 22, 1988) to the PORTS facility with regard to the improper disposal of PCBs resulting from leaks of the PCB-containing oil lubrication system and the ventilation gaskets onto the floors of the process buildings (S-326, X-330, and S-333). In an effort to respond to the initial NON, PORTS set-up a cleanup program to deal with the spills. Upon issuance of the second NON, the facility was required to continue cleanup activities and certify, in writing, that the program was continuing on an on-going basis.

MMES Headquarters established a standard, dated August 10, 1989, to act as guidance for proceeding to cleanup PCB spills for each of its three uranium enrichment facilities: PORTS, Paducah Gaseous Diffusion Plant, and Oak Ridge Gaseous Diffusion Plant. This five page standard focused mainly on responding to drips (spills) from the ventilation gaskets and was accompanied by an internal correspondence which stated that site procedures were to ensure that the requirements found in the standard were fully implemented. On November 15, 1989, the standard was forwarded by DOE to EPA Region V for their written concurrence.

While on site, requests were made for all implementing procedures and guidance for the PCB program. However, the above standard on PCB Cleanup was not forthcoming. The receipt of this document and the aforementioned letters were obtained subsequent to the completion of the onsite audit.

Comparing onsite staff interviews with the MMES standard indicated that there was a verbal transmittal of the requirements and the implementation of PCB gasket and lubrication oil spill procedures had begun. However, at the time of the onsite audit, a review of documents turned up no evidence that formal procedures for the PCB cleanup program, as it was described, had been written or distributed to cognizant staff. There is a draft PCB implementation plan (Sheward, 1989) for PORTS; however, this was only a general outline of issues and concerns that had not yet been supported with implementing procedures.

The policy requirements for establishing and implementing a PCB spill cleanup program have been clearly defined. The failure of PORTS to follow through with formal procedures appears to result from an inadequate understanding of the importance of formal procedures, as well as a lack of management oversight with regard to policy implementation.

## 3.5.6    Quality Assurance

### 3.5.6.1    <u>Overview</u>

This section addresses the quality assurance aspects of the chemical and radiological analyses done in support of the environmental monitoring and waste management activities at the PORTS facility.  Data generated by the PORTS Analytical Laboratories is used to demonstrate compliance with Federal and state regulations as well as DOE Orders.  Table 3.5.6-1 lists the applicable regulations and/or requirements used to evaluate the quality assurance assessment.

The scope of this review included discussion with MMES staff; a review of written policies, procedures, analytical methods, previous audit reports, and laboratory record books; and evaluation of radiological instrument calibration methods.

The PORTS Analytical Laboratories are responsible for the analysis of all radiological and environmental monitoring samples.  These include water samples required under the NPDES permit, SDWA, and RCRA.  In addition, stack samples and soil/sediment samples are also analyzed.  The laboratory also analyzes most of the drum samples in an effort to characterize waste for eventual disposal.  The site occasionally contracts outside laboratories to reduce the backlog of waste characterization samples.

There are six findings in the Quality Assurance section.  Three of the findings deal with the issues of inadequacies in documentation and monitoring to verify data quality.  The remaining three findings involve deficiencies in specific laboratory practices.

The major findings are due to a lack of procedures and training for laboratory technicians, as well as deficiencies in monitoring activities by the Quality and Technical Services Division.

Table 3.5.6-1
Applicable Quality Assurance Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| DOE Order 5400.1 | General Environmental Protection Program |
| DOE Order 5400.xy | Guide for Environmental Radiological Surveillance at DOE Installations |
| DOE Order 5484.1 | Environmental Protection, Safety, and Health Protection Information Reporting Requirements |
| DOE Order 5700.6B | Quality Assurance |
| 40 CFR Part 136 | Guidelines Establishing Test Procedures for the Analysis of Pollutants |
| 40 CFR Part 58 | Air Surveillance Requirements |
| U.S. EPA-600/4-79-020 | Methods of Analysis for Water and Wastes |
| U.S. EPA CLP Users Guide | Guidelines for the EPA Contract Laboratory Program |
| ANSI/ASME NQA-1 | Quality Assurance Program Requirements for Nuclear Power Plants |
| NRC Regulatory Guide 4.15 | Quality Assurance for Radiological Monitoring Programs (Normal Operations)-Effluent Streams and the Environment |

### 3.5.6.2   Compliance Findings

None.

### 3.5.6.3   Best Management Practice Findings

**Finding Number:**  QA/BMP-1

**Finding Title:** Inadequate Documentation of Laboratory Standard Operating Procedures and Practices.

**Performance Objective:**  Standard operating procedures should be written for each task that assure the quality of data, and sufficient information should be recorded for independent verification (DOE Order 5700.6B).

**Finding:**  There is inadequate documentation of laboratory standard operating procedures (SOPs) and record-keeping to verify the quality of data.

This finding is based on review of QTS-501-010, interviews with laboratory and divisional personnel, and inspection tours of the laboratories in Building X-710.

Standard operating procedures have not been written for the following laboratory tasks:

- data review, checking, and sign-off;

- specific instrument calibration techniques;

- general operations and maintenance for each instrument;

- glassware cleaning;

- systematic checks for water purity;

- preparation of calibration standards and reagent materials; and

- content and format of laboratory log books.

The following data have not been formally recorded in most of the laboratory areas inspected:

- temperatures of refrigerators, ovens, and incubators;

- dates of receipt for stored reagents and standards;

- dates and information concerning prepared reagents and standards;

- calculation of sample weights including tare, total and calculated weights; and

- daily balance calibration check data.

This finding is due to a lack of policy guidance from laboratory management, technical information on current laboratory practices, and insufficient audit and review by Quality and Technical Services.

Finding Number:  QA/BMP-2

Finding Title:   Ineffective External Proficiency Testing Program

Performance Objective:  Samples received from external proficiency testing sources (governmental or private) should be given to laboratory staff in a double-blind manner to evaluate the actual quality of laboratory performance (Standard Industry Practice).

Finding:   The laboratory does not present any samples from an external source in a double-blind manner.  The proficiency samples received by the PORTS Analytical Laboratories are dispersed to the laboratories for analysis without disguising their origin.

This finding is based on interviews with PORTS Analytical Laboratories management and quality assurance staff.

The laboratory has a program where it generates its own double-blind samples with which it monitors laboratory performance. However, this is not done with proficiency samples derived from external sources.  Without employing double-blind procedures, no true performance evaluations can be made because there can be a natural tendency by the technical staff to treat these samples more carefully.  As a result, there would be an unaccounted bias in the results that are submitted.

This finding is due to deficiencies in policy implementation by quality control staff, technical information of current laboratory practice, and updating of quality control procedures.

Finding Number:  QA/BMP-3

Finding Title:  Deficiencies in Laboratory Sample Custody Practices

Performance Objective:   The Sample Custodian has the responsibility to track samples in the laboratory from arrival through disposal (USEPA Contract Laboratory Program Users Guide). All samples should receive a unique laboratory-assigned identity, be entered into a bound logbook, be checked for proper

3-80

preservation, and be immediately locked in a proper storage area awaiting dispersement (EPA-600/4-79-020).

Finding:   While in the sample handling area, samples do not receive a unique laboratory tracking number, are not permanently logged, are not checked for proper preservation, and are not in appropriate storage.  The Sample Custodian at PORTS Analytical Laboratories serves solely a sample receipt and dispersement role.
This finding is based on interviews with laboratory staff and observations during an inspection tour of the laboratory building X-710.

There is no single person tasked with sample tracking from arrival through disposal.  At present, the tracking of samples stops after dispersement from the sample receiving area.  A laboratory computer system is being installed that will simplify sample tracking, but based on conversations with laboratory personnel, this system is at least a year from operation.

The laboratory has no established procedure for labelling samples with a unique identification number and for entering those samples in a permanent logbook.  Samples are identified only by field designations.  The loose chain-of-custody records are the only sample reference in the receiving area.

There is little guidance on proper sample handling.  Samples are stored on shelves and tables in an unsecured manner.  Water samples have on occasion been left-out, unsecured and unrefrigerated, for hours awaiting the arrival of laboratory personnel.

This finding is the result of deficiencies in sample custody procedures, technical guidance supplied to technical staff, and audit review by quality assurance personnel.

Finding Number:  QA/BMP-4

Finding Title:  No Active Audit or Corrective Action Program in the Analytical Laboratories

Performance Objective:   An audit program should assure that audits are planned, scheduled, performed, reviewed, and that corrective actions are taken (PORTS Site Quality Assurance Manual QAS.18).  Following all audits there should be a formal record of findings, recommendations for corrective action, a formal reply to the recommendations, and follow-up activities (QTS-501-010 Section 14.1).

Finding:   There has been no internal audit on laboratory analysis and handling of environmental samples performed since

3-81

January 1988. There is no formal corrective action program in place within the laboratory.

This finding is based on a review of all reports of monitoring activities done at the Analytical Laboratories since January 1988. It also is based on interviews with laboratory management and quality assurance staff.

A review of all internal monitoring activities revealed that there has been one surveillance of twenty laboratory notebooks (MMES, 1988b). There have also been four external laboratory audits in the asbestos and drinking water laboratories (Applegate, 1988; PORTS, 1989c; DOE-ORO, 1988; and American Industrial Hygiene Association, 1988).

In interviews with site and division QA personnel, it was stated that due to staffing priorities there was a "conscious decision" not to audit the laboratory because of the considerable amount of Quality Assurance oversight afforded internally by the Standards and Controls Department, and externally by outside agencies and proficiency testing programs.

However, the validity of the proficiency testing programs is questioned in finding BMP-2 of this section, the external audits have been concentrated on only two of the laboratories, and the Standards and Controls Department are not involved with audits.

This finding is due to a lack of policy implementation, procedures, and oversight. Laboratory personnel do not satisfactorily appreciate the value of or place enough importance on periodic, thorough self-assessments.

Finding Number: QA/BMP-5

Finding Title: Inadequate Radiological Measurement QA/QC Practices

Performance Objective: Quality assurance with respect to sampling, analytical procedures, data processing, and reporting shall be an integral part of the environmental monitoring plan for compliance with DOE Order 5484.1, Chapter III. Maintenance of an analytical QA program adequate to document and control the accuracy and precision of the analytical results is required by Draft DOE Order 5400.xy, Chapter X, paragraph 5.c. The basic requirements of a QA program prescribed by ANSI/ASME NQA-1 shall be followed in accordance with draft DOE 5400.xy, Chapter X, paragraph 3.c.

Finding: Quality assurance and quality control practices related to radiological monitoring are inconsistent with DOE Order 5484.1, draft DOE Order 5400.xy, and best management practices

and QA/QC requirements identified in ANSI/ASME NQA-1, and NRC Regulatory Guide 4.15 Rev. 1.

This finding is based on a review of laboratory operations and discussions with laboratory personnel. This review indicated a general weakness in QA/QC practices and documentation. Inadequacies include the following:

- Shelf life program for trace element standards, working solutions, and samples are not established.

- Acceptance criteria for uranium check standards by fluorimetric methods are not statistically based.

- No acceptance criteria have been established for receipt of samples at chain-of-custody station.

- Radiation counting instrument energy calibration and efficiency calibrations are not consistently documented.

- Acceptance criteria applied to check standard analyses and background determinations for radiation counting instrument performance are not statistically based.

- Control charts are historical and do not provide real time validation of instrument/analyses performance. Good analytical practice requires plotting QC data on QC charts at the time of analysis.

- Follow-up/corrective actions for results outside acceptance criteria are not documented.

Quality assurance programs and quality control requirements for the PORTS Analytical Laboratories, delineated in QTS-501-010, in general, adequately meet DOE Order requirements. The deficiencies observed are the result of failure to follow procedural requirements or to provide statistical evaluations in a timely manner. The root cause of these deficiencies can be incomplete training of personnel and inadequate audit and review functions by laboratory supervision.

<u>Finding:</u>  QA/BMP-6

<u>Finding Title:</u>  Inadequate Oversight of Contracted Laboratory Analyses

<u>Performance Objective:</u>  Correct documents will be used when specifying quality requirements or prescribing activities which affect quality (PORTS Site Quality Assurance Manual QAS 7.0). Onsite audits should be done for all laboratories used for analytical activities (Standard Industry Practice).

3-83

<u>Finding:</u>   Some outside analytical services do not require specific Quality Assurance documents to be submitted for contract awards, and no onsite audits of these laboratories are done.

This finding is based on interviews with Environmental Control personnel.

On contracted laboratory analyses that are not driven by regulatory compliance issues, no specific quality assurance documents are requested from potential vendors, and no offsite laboratory audit is done.  Assessments of competence are based on supplied documentation; however, if none is supplied by any of the responding vendors, a choice will be made and a contract awarded.  For those analyses that are driven by regulatory issues, the appropriate procedures are followed.

This finding is the result of deficiencies in policy implementation and audit and review.

### 3.5.7    Radioactive Materials Management

#### 3.5.7.1    Overview

The PORTS radioactive materials management program was assessed
to determine compliance with radiological standards and
applicable Federal and state regulations, DOE Order requirements,
and applicable "best" or "accepted industry practices."  Table
3.5.7-1 lists the regulations and/or requirements used for the
evaluation.  The radioactive materials management assessment
evaluated various aspects of the environmental radiological
monitoring program at PORTS including sample point selection,
collection, and analyses; procedures, documentation, and
reporting; dose assessment, source terms, and biological pathway
analyses; and instrument calibration and maintenance.  Several of
the media- specific radioactive materials management issues are
addressed in other sections of this report (e.g., low-level waste
in Active Waste Management [Section 3.5.4] and radiological QA in
Quality Assurance [Section 3.5.6]).

The PORTS environmental radiological program includes emission
monitoring networks for air and surface water discharges; waste
sampling and characterization; and ambient sampling networks for
air, surface water, groundwater, drinking water, vegetation, food
crops, fish, soil, stream sediments, and direct radiation.  The
Annual Environmental Monitoring Report for 1988 (Rogers, et al.,
1989) provides a comprehensive description of the environmental
and effluent monitoring activities performed at the site.

The three findings in this discipline, all of a compliance
nature, range in decreasing significance from the radiological
dose assessment program deficiencies to the thermoluminescent
dosimeter (TLD) location deficiencies.  In addition, the findings
are primarily related to administrative, procedural, and quality
assurance weaknesses.  Deficiencies in these areas, when related
to radioactive materials management and dose assessments, are
generally indicative of a complacent attitude toward strict
adherence to radiological control and regulatory requirements.
The low specific activity and relatively low gamma radiation
associated with the radioactive materials handled, along with
PORT's long operating history without significant radiological
incidents, may actually contribute to this complacency.

Table 3.5.7-1
Applicable Radioactive Materials Management
Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| 40 CFR Part 61 | National Emission Standards for Hazardous Air Pollutants |
| 10 CFR Part 71 | Packaging and Transportation of Radioactive Material |
| 10 CFR Part 20 | Radiological Controls |
| ANSI/ASME NQA-1 | Quality Assurance Program Requirements for Nuclear Power Plants |
| NRC Regulatory Guide 4.15 Rev. 1 | Quality Assurance for Radiological Monitoring Programs (Normal Operations) - Effluent Streams and the Environment |
| DOE Order 5400.1 | General Environmental Protection Program |
| DOE Order 5400.3 | Hazardous and Radioactive Mixed Waste Program |
| DOE Order 5400.xx (Draft) | Protecting the Public and the Environment (July 17, 1989) |
| DOE Order 5400.xy (Draft) | Radiological Effluent Monitoring and Environmental Surveillance (June 15, 1989) |
| DOE Order 5480.1B | Environmental Safety and Health Programs for Department of Energy Operations |
| DOE Order 5480.3 | Safety for Packaging and Transportation of Hazardous Materials, Hazardous Substances, and Hazardous Wastes |

3-86

Table 3.5.7-1
Applicable Radioactive Materials Management
Statutes/Regulations/Orders
Page 2

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| DOE Order 5480.4 | Environmental Protection, Safety, and Health Protection Standard |
| DOE Order 5484.1 | Environmental Protection, Safety and Health Protection Information Reporting Requirements |
| DOE Order 5482.1B | Environmental Protection, Safety and Health Appraisal Program |
| DOE Order 5820.2A | Radioactive Waste Management |
| DOE/EH-0071 | Internal Dose Conversion Factors for Calculation of Dose to the Public |

3.5.7.2   <u>Compliance Findings</u>

<u>Finding Number:</u>  RAD/CF-1

<u>Finding Title:</u>  Deficiencies in Dose Assessment Methods

<u>Performance Objective:</u>  Dose assessments should be performed in a manner that ensures compliance with Federal and DOE requirements in 40 CFR Part 61, DOE Orders 5484.1 and 5400.1, and Draft DOE Order 5400.xy.

<u>Finding:</u>  The dose assessment is not sufficiently documented to demonstrate compliance with Federal and DOE requirements.

The following dose assessment deficiencies were observed during a review of the program with Environmental Control Department and ORNL personnel:

- Written procedures and/or a documented dose assessment plan for compiling, evaluating, and reporting the environmental monitoring data used as input to the computer programs do not exist.  Such procedures or plans assure the dose assessment is as accurate and realistic as practical, in accordance with DOE Order 5484.1 and as detailed in draft DOE Order 5400.xy.

- Written procedures for dose assessment computer programs do not exist as required for full compliance with DOE Order 5484.1 and further requirements delineated in draft DOE Order 5400.xy.

- Computer programs used to perform dose assessment calculations are not periodically verified as required by DOE Orders 5484.1 and 5400.1, and Draft DOE Order 5400.xy.

Written procedures and/or a documented dose assessment program plan do not exist.  The environmental monitoring program data for airborne emissions are manually compiled for submittal to ORNL. The Portsmouth Analytical Laboratory reports total monthly emissions for total uranium and uranium-235 in grams (Personal Interview with Environmental Control Department, 1989).  This data is used to calculate the $^{234}U$ and $^{236}U$ concentrations based on process gradient data (isotopic analyses of samples taken at various steps along the cascade) plotted on curves as $^{235}U$ versus $^{234}U$ and $^{235}U$ versus $^{236}U$.  The difference between the sum of these isotopes and the total uranium value is assigned to $^{238}U$.  The weight of each uranium isotope is converted to millicuries of uranium.  The monthly uranium activities calculated for each of the seven monitored vents is then summed for the year.  These calculations are not documented and the required calculation steps are not translated into written procedures; only the

3-88

results are tabulated. The uranium daughters [234]Th, [234]Pa, and [231]Th are calculated assuming equilibrium with their parent activity. The equations and methodology for these calculations were not available during the interview and were not known by responsible ECD personnel. Waterborne radionuclide emissions are manually calculated in a manner similar to that for the airborne emissions.

Written procedures for dose assessment computer programs do not exist. The assessment of offsite doses from PORTS is performed by Oak Ridge National Laboratory (ORNL) personnel using data supplied by the PORTS ECD personnel. PORTS currently relies on the personal knowledge and the experience of the ORNL staff members to properly operate these programs.

Documentation of standard test data results does not exist to demonstrate the validity of the AIRDOS-EPA atmospheric transport code used to calculate concentrations of released radionuclides in air, on the ground, and in foodstuffs. Through the DARTAB computer code, the Dose Conversion Factors (DCFs) in the RADRISK data base are applied to estimate individual and collective committed dose equivalents from the various pathways (Rogers et al., 1989). All computer programs selected for environmental dose assessments should be periodically checked using standardized test data for comparison of output against documented sample problem results. It is important that standard test data be periodically documented to ensure that the codes as used for PORTS radionuclide dose assessments are running correctly. This is a necessary task in effective QA/QC oversight.

The lack of a dose assessment plan or procedures resulted in other deficiencies in the methods including lack of documentation and validation of pathways (failure to do periodic land-use censuses, necessary for calculating potential dose) and lack of criteria for performance of a dose assessment (i.e., doses not calculated for activity observed in turnip samples and fish samples).

Although the dose equivalents to the maximally exposed individual and the highest organ dose reported by PORTS have consistently been well below the respective NESHAP limits of 25 mrem/year and 75 mrem/year, and the environmental monitoring data confirms offsite contamination is near background levels (Rogers, et al., 1989), the program as it exists today is not capable of defending the quality aspects required by existing and draft DOE Orders.

The deficiencies noted for the PORTS dose assessment methodology are attributed to the lack of procedures requiring specific quality assurance actions and documentation of actions. The deficiencies are directly related to a root cause of insufficient oversight.

**Finding Number:** RAD/CF-2

**Finding Title:** X-344 Toll Transfer Autoclave and Cylinder Vent Not Monitored

**Performance Objective:** Environmental monitoring is required by DOE Order 5400.1 to verify compliance with effluent regulations and evaluate the effectiveness of effluent treatment and control. Monitoring and reporting of onsite discharges, liquid and airborne, and the environmental conditions in the vicinity of DOE sites is required by DOE Order 5484.1 to assess the levels of radioactive and non-radioactive pollutants and their impact on the public and the environment.

**Finding:** Monitoring of the effluent from the X-344 Toll Transfer Operations (Building X-344) is not in full compliance with the DOE Order requirements.

This finding is based on an inspection of X-344 Toll Transfer operations, discussions with operating personnel, and review of applicable documents.

The effluent from the evacuation of the autoclave, cylinder, and pig tail following transfer operations passes through a cold trap and a sodium fluoride trap before going out the unmonitored stack. The degradation of vacuum pump oil is used as the indication of leakage of $UF_6$/HF. The sensitivity or amount of uranium required to cause oil degradation is unknown and the frequency of vacuum pump oil degradation is not documented. The other emission sources in X-344 (i.e., gulper [wisp] system and steam condensate from the autoclave heating process) are monitored by alumina sample traps and conductivity measurements, respectively. The effluent vents for similar operations in X-342A and X-343 are monitored. PORTS identified sources of small emissions to be evaluated for monitored requirements (GAT, 1989). The X-344 unmonitored vent is not currently included on this list for evaluation (see finding A/CF-1).

The rationale and bases for not monitoring this potential emission source is not documented, but is attributed to lack of procedure direction and personnel awareness of regulatory requirements for monitoring potential emissions.

**Finding Number:** RAD/CF-3

**Finding Title:** Inappropriate External Radiation Monitor Mounting Positions

**Performance Objective:** Monitoring environmental conditions in the vicinity of DOE sites to assess the levels of radioactive and nonradioactive pollutants and their impact on the public and the

environment is required by DOE Order 5484.1 paragraph 5. TLDs are required to be mounted facing the plant site (Environmental Control Procedure ESH-E-508). Dosimeter locations should avoid structures that could alter the measurement results (Draft DOE Order 5400.xy, Chapter 5, paragraph 6.a.(3)).

<u>Finding:</u> External radiation monitoring devices are not mounted in a manner that is in full compliance with DOE Order 5484.1, plant operating procedure ESH-E-508, and Draft DOE Order 5400.xy.

This finding is based on an inspection of TLD locations and discussions with environmental monitoring personnel.

A number of TLDs are mounted such that they are shielded from and/or face away from the site. Two of nine TLDs in areas accessible to the public (Site Group I) are shielded from the plant sources by telephone poles and face away from the site. One of these was caused by the mounting wire being bent around the pole; it was immediately corrected. In addition, three of the eight off-site monitors (Site Group II) are shielded from the plant sources and face away from the site. Two of these three are mounted behind the metal air monitoring stations and one is behind a telephone pole.

TLDs are used to measure gamma radiation from sources external to the body. The TLDs used at PORTS have a cadmium filter placed on the front face to minimize variations in response from the variable wavelength of the incident radiation. Mounting TLDs such that they face the site (as required by ESH-E-508) provides assurance of a uniform response to direct radiation from plant sources.

Even though some of the TLDs whose orientation, are inaccurate are located at distances up to 8 km from the plant and the effect of the surrounding hills and ridges preclude measurement of direct radiation from plant operations, proper orientation is necessary to observe established procedures. Under normal operating conditions, the gamma radiation levels detected by the TLDs are primarily measurements of radioactivity deposited from air emissions, natural background, and cosmic radiation. With the exception of TLD location 874 (near a uranium tails storage yard), the radiation detected by these TLDs is not affected by shielding from the plant site nor by the direction the TLD is facing.

The Site Group II TLDs are co-located with the offsite air monitoring stations. There are no specific instructions to the monitoring personnel to inspect the TLDs for proper mounting when changing air monitor filters. It does not appear that periodic inspection of these TLDs is occurring.

The failure to properly mount the TLDs results from the lack of training and technical information provided for the monitoring personnel on the design of the TLDs, i.e., location and purpose of the cadmium filter and the design of the mounting devices for the TLDs.

3.5.7.3    Best Management Practice Findings

None.

## 3.5.8    Inactive Waste Sites/Emergency Response

### 3.5.8.1    Overview

The Inactive Waste Sites/Emergency Response assessment included evaluation of activities undertaken at PORTS to identify and investigate inactive hazardous, radioactive, and mixed waste sites and remediate releases from those sites.  It also included an assessment of unplanned release notification requirements, emergency planning, community right-to-know, and toxic chemical release reporting.

Two Federal laws were the focus of this section of this appraisal:  (1) the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA); and (2) the Resource Conservation and Recovery Act (RCRA) which govern identification, investigation, and remediation activities at PORTS (see Table 3.5.8-1 for the list of appropriate state and Federal regulations).  CERCLA and its 1986 amendments, known as the Superfund Amendments and Reauthorization Act (SARA), and particularly SARA Title III and CERCLA Section 103(c), establish the requirements for notification, planning, and inventory and release reporting.  Spill response activities governed by the Clean Water Act are included in the Surface Water portion of this report.  In addition, this assessment also includes an evaluation of the way in which the facility responded to findings of the 1986 Environmental Survey (DOE, 1987).

Inactive waste site identification, investigation, and remediation at PORTS is regulated under RCRA.  At the PORTS facility, the OEPA has primacy for RCRA activities and has entered into a Consent Decree with PORTS for the required site closure and facility investigations (Ohio EPA, 1989).  A USEPA Consent Order (EPA, undated and Stewart, 1989) separately regulates the site investigations.  The technical requirements of the two agreements are very similar, with the Federal Order being somewhat more detailed and more in line with CERCLA requirements.

PORTS has established a Remedial Action Program to ensure compliance with the OEPA Consent Decree and the USEPA Consent Order.  Identification and agency notification of solid waste management units (SWMUs) is currently being handled under RCRA Section 3016.  The 1988 update included an expanded list of sites over the original 1981 CERCLA  notification.  It is this list that formed the basis for the sites required to be investigated under the Consent Order and Consent Decree.  This list is due to be updated in January 1990.

Table 3.5.8-1
Applicable Inactive Waste Sites/Emergency Response
Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| 42 USC Sections 6901, et seq. | Resource Conservation and Recovery Act (RCRA) |
| 42 USC Sections 9601, et seq. Environmental | Comprehensive Response, Compensation, and Liability Act (CERCLA) |
| Public Law 99-499 | Emergency Planning and Community Right-to-Know Act of 1986 (SARA Title III) |
| 40 CFR Part 300 (proposed) | National Oil and Hazardous Substances Pollution Contingency Plan (NCP) |
| 40 CFR Part 302 Reportable Notification | EPA Designation, Quantities, and Requirements for Hazardous Substances under CERCLA |
| 40 CFR Part 355 | EPA Regulations for Emergency Planning and Notification Under CERCLA |
| 40 CFR Part 370 | EPA Hazardous Chemical Reporting and Community Right-to-Know Requirements |
| 40 CFR Part 372 | EPA Toxic Chemical Release Reporting Requirements |
| DOE Order 5400.4 | CERCLA Requirements |
| DOE Order 5500.2A | Emergency Notification, Reporting, and Response Levels |

Although a few small spill areas were remediated prior to 1986, no major remediations have occurred under RCRA. Four SWMUs have been identified as major potential contributors to groundwater contamination. They are land-based disposal units that are in the first stages of closure. Closure plans have been developed for all four sites, and one closure option study has been drafted. Compliance monitoring data collected by the facility indicate that three of the sites are associated with significant contaminant plumes (X-749, X-701B, and X-231B), while the fourth site (X-616) exhibits no groundwater contamination. As per the plans, X-616 will undergo clean closure, while the other facilities will require some risk-based cleanup levels to be established in the forthcoming corrective measures studies.

The site characterization required under RCRA is being addressed by the activities undertaken to fulfill the requirements of the Consent Decree and Consent Order. The overall groundwater flow characteristics of the site have been defined, and the results of that exercise were used to provide data to support an evaluation of the nature and extent of contamination at four RCRA-regulated units. The site was subsequently divided into four quadrants whose boundaries are loosely based on the defined groundwater flow directions. Each quadrant has been evaluated in detail to identify all possible sources of groundwater or soil contamination (approximately 70 to date), which in turn will be used in the 1990 RCRA notification and in the development of four individual RCRA Facility Investigation (RFI) work plans. The determination of groundwater flow and contaminant transport will be evaluated in more detail during the RFIs for each quadrant.

The PORTS facility has a tracking system in place for community right-to-know reporting (SARA Parts 311 and 312). All purchase requisitions are reviewed by Industrial Hygiene staff, and all MSDS sheets are circulated to various persons, including the Environmental Control personnel responsible for SARA reporting activities. If a substance is deemed hazardous (under RCRA, CERCLA, or SARA) by Environmental Control, it is tracked in the Hazardous Material Control Inventory system along with other (e.g., OSHA) hazardous chemicals. This inventory is updated quarterly by the chemical users, and this information is provided annually to Environmental Control. PORTS also submitted an annual Toxic Chemical Release Report, as required by SARA Part 313. This report is discussed in the Air section of this report because the only problems with it are air related.

Overall, the PORTS Remedial Action Program meets the requirements of the regulations as well as those of the legal agreements. Therefore, there are no findings associated with this portion of the assessment.

### 3.5.8.2   Compliance Findings

None.

### 3.5.8.3   Best Management Practice Findings

None.

### 3.5.9    National Environmental Policy Act

#### 3.5.9.1    Overview

The purpose of the review of the NEPA process at PORTS was to
evaluate the adequacy of (1) management of the NEPA decision
making process for project activities, (2) NEPA review for
ongoing activities, and (3) current plans for NEPA review for
proposed actions.  Table 3.5.9-1 lists applicable regulations
and/or requirements used to evaluate NEPA compliance.

The scope of this review included discussions with Martin
Marietta Energy Systems, Inc. (MMES) staff and DOE staff at
Portsmouth, Oak Ridge Operations (ORO), and HQ; a review of
written NEPA policies and procedures; and a review of the
adequacy of documentation prepared for NEPA compliance relating
to ongoing activities.  Documents were not reviewed for their
technical adequacy.

Support for the NEPA review process for the PORTS site is
provided by MMES, which reports to and is overseen by DOE's
Portsmouth Enrichment Office (PEO).  PEO staff are overseen by
the ORO, which receives its programmatic direction and NEPA
approval authority from Nuclear Energy (NE) at DOE-HQ.

The review of NEPA activity at PORTS extended back to the two
EISs prepared in 1977 to address (a) continued operation of the
existing plant, and (b) the expansion of the gaseous diffusion
enrichment capacity (with the gas centrifuge enrichment project
[GCEP] as an alternative).  Since 1977 the basic mission and
operations at PORTS have changed very little.  The major actions
at the site have involved (1) implementing and then (in 1985)
terminating the GCEP project, (2) upgrading systems for
environmental protection, safeguards, and security; and,
recently, initiating a RCRA remedial action program (RAP).

The fundamental intent of NEPA is to ensure that environmental
factors are systematically considered by government agencies in
their decisionmaking.  Although NEPA has been in effect for
almost 20 years (January 1, 1970), DOE and MMES have not
implemented the full scope of the NEPA process for the PORTS site
and are not incorporating NEPA into decisionmaking at the
earliest stage.  Several systematic deficiencies in the
implementation of NEPA make it possible for decisions to be made
without full consideration of the environmental implications.

Table 3.5.9-1
Applicable National Environmental Policy Act
Statutes/Regulations/Orders

| Statutes/Regulations/Orders | Subject/Title |
|---|---|
| Public Law 91-190 (January 1, 1970) as amended | NEPA |
| 40 CFR 1500-1508 | Regulations for Implementing the Procedural Provisions of the NEPA |
| DOE Order 5440.1C (April 9, 1985) | NEPA |
| DOE Notice 5400.4 (August 2, 1988) | Integration of Environmental Compliance Processes (CERCLA RI/ FS and NEPA) |
| 52 FR 47662-47670 (December 15, 1987) | Department of Energy Compliance with the (NEPA); Amendments to the DOE NEPA Guidelines |
| N/A | DOE Environmental Compliance Guide (1981) |
| N/A | NEPA Guidance Related to Memoranda-to-File and Categorical Exclusions (March 25, 1988) |
| Floodplains/Wetlands Environmental | Compliance with Review Requirements |

The review of NEPA compliance at the PORTS site identified 6 compliance findings (CF) and 3 best management practices (BMP) findings, and indicate the following problems that contribute to an ineffective NEPA program:

1. Fragmented oversight of PORTS has caused incomplete NEPA review of proposed activities.

2. The NEPA review procedure prepared by MMES does not conform with DOE NEPA guidance, and PEO and ORO have no written NEPA procedures.

3. DOE and MMES managers who have oversight of NEPA planning are not knowledgeable about CEQ or DOE regulations implementing NEPA or about DOE's NEPA Compliance Guide.

4. MMES, PEO and ORO, and NE-33 have not dedicated adequate staff resources to NEPA compliance.

5. Staff training aimed specifically at NEPA compliance has not occurred.

In general, DOE and MMES have given low priority to NEPA compliance relative to other environmental regulations and requirements.

## 3.5.9.2   Compliance Findings

Finding Number:   NEPA/CF-1

Finding Title:   Projects have been approved and started before completion of NEPA review.

Performance Objective:   Appropriate NEPA determinations should be completed before projects are started (40 CFR 1501.2 and DOE NEPA Guidelines, Par. B.2.a and B.3.c).   The Responsible Supervisory Official (RSO) should notify EH-HQ at the earliest possible time in the planning process of actions under consideration that may potentially have a significant effect upon the quality of the human environment (DOE Order 5440.1C(6)(c)(1)).   The RSO should also determine if a proposed action falls within the typical classes of actions listed in Section D of DOE's NEPA Guidelines or would result in environmental impacts that would be clearly insignificant.

Finding:   Projects have been undertaken at PORTS prior to the completion of NEPA review.   CEQ regulations establish a process to determine whether a federal action falls under the purview of NEPA.   DOE's NEPA Guidelines and DOE Order 5440.1C designate a system by which proposed activities should be reviewed to

3-99

determine the appropriate level of NEPA documentation. This system has not been systematically implemented for PORTS.

This finding is based upon examination of records, interviews with personnel who prepare NEPA documentation, and site visits. All available NEPA project files were reviewed and compared with logs of project activities. This finding is also supported by the results of a review of Action Description Memoranda (ADMs) and Memoranda-to-File (MTFs) requested by the Secretary of Energy (Donnelly, 1989).

The NEPA process at PORTS is the responsibility of the RSO who resides in the Office of Operations and Facility Reliability (NE-33). General oversight of PORTS comes (since April 1989) from DOE's Portsmouth Enrichment Office (PEO) and, prior to that, from the Enriching Operations Division at ORO.

Evaluation of proposed actions at PORTS typically begins with MMES, the site contractor at PORTS. MMES has an Environmental Control Procedure for PORTS (ESH-E-903) that describes initial project evaluation for NEPA documentation. Early in the project lifecycle, MMES prepares an environmental checklist to determine documentation requirements. If a project may be environmentally significant, based on the results of the checklist, an MMES-ADM might be prepared. The MMES-ADM serves as a project description memorandum, which is forwarded to the PEO and subsequently to the NEPA support staff person at ORO. At ORO, the ADM should be briefly reviewed and forwarded to the RSO.

The RSO may make one of the following three determinations:

1.  The activity does not require an EA or EIS and can be "categorically excluded" under Section D of the DOE NEPA Guidelines;

2.  The activity is environmentally "clearly insignificant" and subject to a Memorandum-to-File (MTF) or,

3.  The activity fits into neither of the above two categories. In this case, a DOE-ADM is prepared and forwarded to the Office of NEPA Project Assistance, so that a determination can be made whether an environmental assessment or environmental impact statement must be prepared.

From 1985 to 1988, many of the contractor-prepared ADMs were forwarded to ORO but did not reach NE-33. (NE-33 is now in the process of assembling and evaluating these contractor-ADMS). Before April 1989, the MMES-ADMs were transmitted to the Contracting Office Technical Representative (COTR) within ORO's Enriching Operations Division. The COTR forwarded the MMES-ADMs

to ORO's Environmental Protection Division. However, no record is available of the subsequent handling of these MMES-ADMs.

In its response to the Secretary of Energy's August 7, 1989, request for all MTFs and Categorical Exclusions (Donnelly, 1989), NE-33 has identified 25 ADMs that were prepared by Goodyear Atomic Corporation (GAT) or MMES for projects at PORTS from 1985 to present. NE-33 has prepared two MTFs that cover six of these projects. MMES has started work on most of these projects. Table 3.5.9-2 identifies 34 PORTS projects where a NEPA review has not been completed by NE-33 and where the work has been authorized. Although all these projects have MMES-ADMs in MMES' files, 13 of them were not listed by NE-33 in their response to the Secretary's request. These projects have been completed, are in process, or are anticipated to be initiated shortly.

This situation is the result of fragmented oversight of the NEPA process at PORTS. This situation has resulted in the failure of NEPA documentation to reach the RSO at NE-33 and incomplete NEPA review of proposed activities. Oversight of technical and budgetary aspects of planning for PORTS rested with ORO, while NEPA oversight was retained at NE-33 at DOE-HQ.

Finding Number: NEPA/CF-2

Finding Title: MMES Environmental Control Procedure is Not Consistent With Federal Regulatory Procedures

Performance Objective: MMES Environmental Control Procedure should comply with the CEQ Regulations for Implementing NEPA (40 CFR Parts 1500 through 1508), DOE NEPA Order 5440.1C, and DOE NEPA Guidelines (52 FR 47662).

Finding: MMES has prepared an Environmental Control Procedure (ECP) (ESH-E-903) that is inconsistent with CEQ NEPA Regulations and DOE Orders and Guidelines. The ECP inaccurately defines the ADM and its use, fails to consider categorical exclusions, improperly describes the responsibility of MMES and DOE relative to NEPA documentation, and prescribes the use of an unclear and inaccurate environmental checklist.

Table 3.5.9-2
PORTS Projects Lacking Completed NEPA Documentation

## Project Title

X-744G Recovery Storage Facility

X-231A, B Closure

Plantsite Roof Upgrading

Cylinder Handling Project

X-749A Closure

Cathodic Protection System

X-750 Gasoline Systems

X-705 Waste Treatment Facility

X-705 Material Balance System

X-749 Closure/X-753 Construction

Spoils Area Disposal Site

X-749 Materials Disposal Facility

X-231A, B Closure, Oil Biodegradation Plots

X-616 Closure

X-621 Coal Pile Facility Mods

Utilities Upgrade, Phase IV

X-333 Ventilation Control System

Lithium Repackaging

X-114A Firing Range

X-215B Overhead Electrical Feeder Upgrade

HF Supply Feed

Process Building PCB Contamination Reduction (Line Item)

Process Building PCB Contamination Reduction (Interim Measure: Manifolds)

Contaminated Lube Oil Replacement

Autoclave Capacity Expansion

X-705 Waste Treatment

X-3000 Electronic Maintenance Building

FY '88 Security Modifications

POEF-E-347; Waste Treatment

Residual Energy Utilization Project

X-630-2A Cooling Tower Upgrade

Groundwater Corrective Actions (RCRA)

GCEP Warehouse Leasing

Cooling Tower Inhibitor Conversion

3-102

This finding is based on a review of the MMES ECP and a comparison of this document to the pertinent regulations including CEQ Regulations for Implementing NEPA (40 CFR Parts 1500 through 1508), DOE NEPA Order 5440.1C, and DOE NEPA Guidelines (52 FR 47662).

- ADM - The ECP defines an ADM as "a statement which describes a proposed project and potential environmental impacts. It requires a description of the proposed action, the location of the action, and a thorough discussion of the potential impacts". In actuality, an ADM is a DOE instrument that is to be prepared by DOE and not the contractor, unless requested by the Responsible Supervisory Official (RSO). The proper flow of documents is for the contractor to prepare a project description memorandum, which is forwarded to the Contracting Officer Representative (COR). The COR then forwards the project description to the RSO who then makes an initial NEPA determination. This determination can result in either a Categorical Exclusion or a Memorandum-to-File (MTF). If the RSO cannot determine if either of these situations applies, the RSO prepares an ADM, submits it to the DOE Office of NEPA Project Assistance (EH-25), and requests that a determination be made concerning the appropriate level of NEPA documentation. These procedures are presented in a memorandum from former Assistant Secretary William A. Vaughan, October 29, 1981, "Initiation of NEPA Documentation," the Draft DOE NEPA Compliance Guide, Volume I, Part II-2, page 37, and in the March 25, 1988 Memorandum from EH-1, entitled "Guidance Related to Memorandums-to-File and Categorical Exclusions."

- Categorical exclusions - The ECP makes no mention of activities that do not normally require an EA or EIS, i.e., activities that are "categorically excluded," as defined in Section D of the DOE/NEPA Guidelines (see 52 FR 47662). A project description memorandum or environmental checklist should be able to suggest to the COR that a project could be classified by the RSO as a categorical exclusion. Use of categorical exclusions during NEPA reviews can reduce paperwork and enhance timely accomplishment of projects.

- NEPA responsibility - The appropriate level of NEPA documentation is to be decided by the RSO but can be suggested by the contractor. However, the ECP implies contractor responsibility for NEPA determinations which has not been delegated by the RSO. The ECP places responsibility for the production of ADMs and EAs on the contractor, which is inappropriate unless requested

3-103

by the RSO. In the ECP, the Environmental Control
Department is charged with completing a "NEPA
Environmental Checklist". Based upon the results of
this checklist, the Environmental Control Department
assumes the responsibilities of determining whether an
activity is environmentally significant. The
determination of the environmental significance of a
project is the responsibility of the RSO.

- Environmental checklist - MMES uses an environmental
  checklist to determine the appropriate level of NEPA
  documentation. This checklist has been prepared
  without apparent guidance or approval by the RSO. The
  following items on the environmental checklist are
  inconsistent with CEQ regulations and DOE Orders and
  Guidelines:

  - No consideration of impacts under the Endangered
    Species Act, Fish and Wildlife Coordination Act,
    Executive Orders on Floodplains/Wetlands, National
    Historic Preservation Act, Wild and Scenic River
    Act, and Federal actions abroad.

  - No consideration of Categorical Exclusions.

  - No consideration of cumulative impacts.

  - The use of project cost as a conclusive
    determinant of the level of NEPA documentation.

In addition there are several unclear definitions (new
discharges; solid, radioactive, and hazardous wastes;
environmental impacts).

The problems with the MMES ECP represent an apparent failure to
implement correct DOE NEPA policies. This failure may stem from
a lack of proper training for PEO and MMES staff and ineffective
oversight of environmental compliance activities at PORTS.

Finding Number: NEPA/CF-3

Finding Title: Inappropriate Use of Memoranda-to-File

Performance Objective: RSOs should use Memoranda-to-File (MTF)
only for proposed actions that are clearly insignificant, as per
Memoranda from EH entitled "Initiation of NEPA Documentation",
October 29, 1981, and "NEPA Guidance Related to Memorandums-to-
File and Categorical Exclusions," March 25, 1988, and DOE Order
5440.1C.

Finding: In two MTFs covering six projects at PORTS, the Office
of Operations and Facility Reliability (NE-33) determined that no

significant impacts would result and that no further
environmental impact assessment was required for these projects.
This conclusion was not supported by the information provided for
three of the six projects reviewed, and DOE Action Description
Memoranda should have been prepared and forwarded to the Office
of NEPA Project Assistance, EH-25, for the determination of
appropriate NEPA documentation.

This finding is based on a review of the MMES-ADMs and MTFs for
the following six projects:

- X-326 Hazardous Waste Storage Areas (Bennett, 1989)

- X-701B Holding Pond and Containment Area Closure
  (Bennett, 1989)

- Air Stripping of Groundwater Contaminated with
  Chlorinated Hydrocarbons (Bennett, 1989)

- Insecticide and Rodenticide Service Contract (Bennett,
  1988)

- Cathodic Protection System Repair and Supplement
  (Bennett, 1988)

- X-600 Transformer Replacement (Bennett, 1988)

During review of these MTFs and their MMES-ADMs, it was
determined that three of these projects involved proposed actions
and potential impacts that were not clearly insignificant, and
that an MTF was inappropriate.

An MTF is to be prepared by the Responsible Supervisory Official
(RSO) under specified criteria.  The criteria were presented in a
Memorandum from then Assistant Secretary W.A. Vaughan, October
29, 1981 (DOE, 1981), which stated, "If a proposed action
requires analysis of questions related to DOE control and
jurisdiction, or environmental data gathering or analysis to
reach a conclusion, then it **fails** the test of clearly
insignificant and an ADM should be prepared and submitted" for
the appropriate level of NEPA determination (emphasis added).

The project for X-701B Holding Pond and Containment Area Closure
involves removal of solvent-contaminated soils.  The MMES-ADM
provides no description of the fate of these contaminated soils
or the potential environmental impacts of contaminated soils
disposal.  No consideration is presented of the impacts on worker
health from working around airborne contaminated soil or the
drift of contaminated soil offsite where other human exposure
could occur.  Permits may be required to support the closure
activities.  Based on these observations, it is felt that the
environmental impacts from the removal of contaminated soil are

**not clearly insignificant**, and that an MTF is not the appropriate level of NEPA documentation.

For the Air Stripping of Groundwater Contaminated with Chlorinated Hydrocarbons MMES-ADM, activities described include air stripping of TCE-contaminated groundwater and exhaust of the volatile TCE to the atmosphere.  This activity is considered to be **not clearly insignificant**, because the MMES-ADM required calculations to compare the quantity of atmospheric emissions with existing emissions.  Additionally, the OEPA requires a Permit to Install and a Permit to Operate the air stripping column.  Activities that require environmental permits of this type from regulatory authorities are not clearly insignificant.

Finally, the X-600 Transformer Replacement involves the drainage and disposal of PCB-contaminated oil from an electrical transformer.  In the description of the existing environment for this project, it is noted that "in the event of a spill, this [transformer] oil would seriously contaminate the X-600 basement and could contaminate two storm sewers (F and G) with PCBs".  The section on the environmental consequences of construction does not discuss preventive measures to reduce X-600 PCB contamination if a spill would occur during transformer removal, nor is the issue of an accidental spill into the storm sewer discussed.  The MMES-ADM considers the possibility of a PCB spill but states that "this is not significantly greater than the current danger of leakage".  This conclusion requires a risk analysis.  Environmental impacts would not be clearly insignificant, as handling and spills could lead to worker exposure, and disposal of this TSCA waste could lead to environmental contamination and exposure.

The situation appears to result from a lack of training on NEPA regulations, which contributes to inaccurate review of project descriptions and improper determinations of NEPA documentation requirements.  In a more general sense, this represents a lack of implementation of DOE NEPA policy.

Finding Number:  NEPA/CF-4

Finding Title:  Failure to Incorporate NEPA into Decision Making at the Earliest Stage

Performance Objective:  DOE and CEQ regulations state that NEPA should be integrated into the planning process as early as possible to ensure that environmental factors are considered in decision making (CEQ Regulations 40 CFR 1501.2 and DOE Order 4700.1).

Finding:  Several projects are occurring at PORTS for which no NEPA documentation is available.  An additional project is planned for which the NEPA process has not yet been initiated.

This finding is based upon interviews with MMES-ADM and DOE personnel responsible for NEPA compliance and their managers. This finding also is supported by the review of available NEPA documents and files and review of the procedures applicable to the implementation of NEPA at PORTS.

Instances in which NEPA was not or is not being factored into decision making as early as possible include: (1) conversion of cooling towers from chromate to phosphate corrosion inhibitors, (2) possible development of a low-level radioactive waste (LLW) incinerator, and (3) development of a new LLW disposal facility to replace the X-749 landfill. The PORTS remedial action program is discussed in NEPA/CF-6.

MMES procedures require completion of an environmental analysis checklist for engineering orders that require a detailed cost estimate, line item projects, or major procurements. Occasionally, projects do not fall into one of these three categories, and NEPA documentation is not prepared. In other cases projects pass major decision thresholds without triggering a NEPA analysis.

PORTS is currently in the process of phasing out use of chromates as the corrosion inhibitor in its cooling tower water. This conversion involves a gradual replacement of the chromate-containing cooling waters from the cooling towers with cooling water containing phosphate-based corrosion inhibitors. Residual chromate is being removed via routine treatment of cooling system blowdown. No record of a NEPA analysis for this activity was found at PORTS, even though worker health issues are associated with the handling of chromates and net positive environmental effects would be expected from this conversion.

The incinerator and disposal facility for LLW represent proposed actions for which NEPA could play a major role in planning and public involvement. These proposals are likely to be controversial, and the NEPA process should be well planned and started long in advance. MMES has prepared an MMES-ADM for the LLW incinerator, but no NEPA analysis (checklist or MMES-ADM) has been started for the LLW disposal facility. Because long lead times would be very desirable for the NEPA processes on these LLW facilities, the current criteria for triggering an NEPA analysis specified in the MMES Engineering Control Procedure may not be appropriate.

The fundamental cause associated with this finding appears to be a lack of understanding of NEPA; its requirements; and its potential benefits, especially the early stages of project planning and decision making. This represents an apparent failure of DOE NEPA policy implementation.

Finding Number:  NEPA/CF-5

Finding Title:  Inappropriate Tiering From Old Environmental Impact Statements

Performance Objective:  Use of tiering of NEPA documents is encouraged (40 CFR 1502.20).  When an EIS is prepared and a subsequent action is proposed requiring NEPA consideration, agencies may incorporate by reference discussions from the broader statement.  However, agencies are required to prepare supplements to final environmental impact statements when there are significant new circumstances or information relevant to environmental concerns that bear upon the proposed action or its impacts (40 CFR 1502.9(c)(1)(ii)).

Finding:  The one EA and numerous ADMs prepared for proposed actions at PORTS refer to either the Final EIS for the Portsmouth Gaseous Diffusion Plant Site (ERDA, 1977a) or the Final EIS for the Portsmouth Gaseous Diffusion Plant Expansion (ERDA, 1977b). For ongoing and future NEPA reviews, such reference to these documents is no longer appropriate.  Many changes have been made to the operation of the facility and the site since 1977.  In addition, many new laws and regulations (including NEPA - specific regulations) have been promulgated that are applicable to the operation of the facility.  As a result of reliance on outdated NEPA documents, current NEPA documents give incomplete consideration to wetlands, floodplains, historic preservation, and threatened and endangered species.

This finding is based upon review of the two EISs, the Environmental Assessment for the GCEP Raw Water Well Field Easements dated February 25, 1981, and all available contractor-ADMs prepared.  Also reviewed were the CEQ Regulations (40 CFR 1500-1508), "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" (55 FR 18026-18038), and the DOE NEPA Guidelines (52 FR 47663-47670).

Question 32 in the Forty Most Asked Questions bears upon this finding.  The question is:

Under what circumstances do old EISs have to be supplemented before taking action on a proposal?

The response is:

As a rule of thumb, if the proposal has not yet been implemented, or if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement.  If an agency has made a substantial change to the proposed action that is relevant to environmental concerns, or **if there are**

> **significant new circumstances or information relevant to environmental concerns and bearing on the proposed action, a supplemental EIS must be prepared for an old EIS so that the agency has the best possible information to make any necessary substantive changes in its decision regarding the proposal.** (emphasis added)

The amendments to the DOE NEPA Guidelines (52 FR 47664) state in Section C.2(a) that DOE will prepare, circulate, and file a supplement to a draft or final EIS, if required, in accordance with 40 CFR 1502.9(c). If it is unclear whether an EIS supplement is required, DOE will prepare an analysis that provides sufficient information to support a determination with respect to these criteria, and, based upon this analysis, determine whether to prepare an EIS supplement. Even if DOE determines that a supplement is not required, DOE will prepare a brief memorandum that explains the basis for this determination.

The two FEISs were written in 1977 to assess (a) the environmental impacts of continued operation of a facility constructed in the early 1950s before the promulgation of NEPA, and (b) the expansion of the facility. Some of the new laws and regulations promulgated since preparation of ERDA 1555 twelve years ago include: The CEQ Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (40 CFR Parts 1500-1508) published in the Federal Register on November 29, 1978; DOE compliance with Floodplain/Wetlands Environmental Review Requirements adopted by DOE on March 7, 1979; RCRA, enacted on October 21, 1976 (latest amendment November 8, 1984); CERCLA enacted on December 11, 1980 (latest amendment October 17, 1986); and TSCA, enacted in 1976, just one year prior to the preparation of the FEIS.

Because no major projects have been proposed for the PORTS site since GCEP (considered to be covered by the ERDA 1549 document finalized in 1977), it appears that there has been no incentive for preparing an up-to-date environmental document. NE-HQ, ORO and MMES staff apparently were not aware of the NEPA requirements for reviewing old documents and making decisions relative to the need for updates. This is most likely due to lack of knowledge of and training in the DOE NEPA compliance process. The overall problem seems to be failure to implement appropriate policy.

Finding Number:  NEPA/CF-6

Finding Title:  Lack of NEPA/RCRA Integration

Performance Objective:  DOE is required, to the fullest extent possible, to integrate NEPA with other planning and environmental review procedures required by law or agency practice to ensure that all such procedures run concurrently rather than consecutively (CEQ Regulations, 40 CFR 1500.2(c)).

<u>Finding</u>: PORTS is implementing the Remedial Action Program Plan to ensure compliance with RCRA in the absence of a clear strategy to integrate NEPA.

This finding is based on interviews with the NE-33, PEO, and MMES Environmental Control/Remedial Action Program staffs and a review of project files and DOE Notice 5400.4.

DOE has negotiated agreements for remedial actions at PORTS with the State of Ohio (Consent Decree) and USEPA (Administrative Consent Order), which call for the accomplishment of specific tasks according to an agreed schedule. The agreements identify four areas (Quadrants I-IV) for RCRA corrective actions. Remedial action is scheduled to begin in the 1st Quarter of FY 90 with the preparation of a RCRA Facility Investigation (RFI) for Quadrant I.

The Remedial Action Program (RAP) Plan does not consider NEPA compliance requirements. Although PORTS DOE and MMES staff reported that the site intends to integrate NEPA with the RCRA process, the RAP has already passed a potentially significant decision threshold (i.e., division into four quadrants) without the benefit of NEPA review. However, PORTS has recently taken the initiative and awarded a contract for the development of a NEPA/RCRA integration strategy.

To effectively integrate the NEPA and RCRA processes, timely guidance is needed from EH-HQ. DOE Notice 5400.4 (expired August 2, 1989) established a DOE policy to integrate NEPA and CERCLA document requirements, with a purpose of not having DOE's remedial actions delayed on procedural grounds. The Notice further stated that removal actions under RCRA would be the subject of subsequent guidance. (On October 6, 1989, DOE issued Order 5400.4 entitled Comprehensive Environmental Response, Compensation, and Liability Act Requirements.)

Given the circumstances (i.e., the initial focus on RCRA/CERCLA issues due to the threat of court action by the State of Ohio) and the lack of procedures and technical information in dealing with such a complex problem from EH-HQ, there appears to be no consideration given to the NEPA/RCRA integration question. The underlying reason appears to be the lack of DOE-HQ policy.

### 3.5.9.3  Best Management Practice Findings

<u>Finding Number:</u>  NEPA/BMP-1

<u>Finding Title:</u>  Inadequate Tracking and Record Keeping for NEPA Documentation

<u>Performance Objective</u>: A system should exist for accurate and timely tracking of NEPA documentation as it moves between MMES, PEO, ORO, NE, and EH. Adequate records should be kept to document compliance with NEPA.

<u>Finding</u>: NEPA documentation for PORTS is not being adequately tracked. Record keeping by MMES, PEO, ORO, and NE is not adequate to demonstrate past or present compliance with NEPA requirements.

This finding is based on a review of available NEPA files and tracking records as received from the above mentioned offices. Interviews with the staff of the various offices also support this finding.

After MMES prepares an environmental checklist for a project, a satisfactory method has not been implemented to determine if the appropriate NEPA decision has been made at NE-33. No NEPA documents prepared by NE-33 (e.g., MTFs and Categorical Exclusions) appear in MMES Environmental Control Department files to prove that the reviews have occurred and that the NEPA portion of the project lifecycle has been approved.

There are significant gaps in MMES Environmental Control Department files for the period before 1976 and for the period 1980-1986. No NEPA-associated documentation (such as MMES-ADMs) were found in site files for these time periods when GAT was the contractor. The files from 1976-1979 are available, but do not reflect contemporary methods of environmental documentation for NEPA.

ORO's Enriching Operations Division does not track the status of NEPA documentation that it receives from PORTS, assuming that ORO Environmental Protection Division is performing this function. ORO's Enriching Operations Division tracks only the engineering status of PORTS projects using monthly status reports generated by MMES engineering.

ORO's Environmental Protection Division receives copies of NEPA-related correspondence from PORTS; however, the Environmental Protection Division has no authority to serve as an approval checkpoint for PORTS projects, relying on NE-33 for this function.

NE-33's tracking report has recorded the reception of seven MMES-ADMs; six of these MMES-ADMs were determined by NE-33 to be MTFs, and the final MMES-ADM was determined to be a categorical exclusion. NE-33 is aware of nearly 20 projects for which PORTS has written MMES-ADMs but which have not been received from ORO.

The lack of a clear system for determining the NEPA status of projects in the review and approval chain constitutes an

impediment to NEPA compliance for PORTS projects. Poor oversight of this process by all parties involved is the fundamental cause of this situation.

Finding Number: NEPA/BMP-2

Finding Title: Insufficient Attention to NEPA Compliance at PORTS

Performance Objective: DOE and MMES NEPA compliance should receive the same emphasis as compliance with other environmental statutes.

Finding: DOE and MMES have given little attention to NEPA compliance for PORTS relative to other environmental laws and regulations.

This finding is based upon interviews with personnel responsible for NEPA compliance and their managers. This finding is also supported by the review of available NEPA documents and files.

The conclusion that NEPA compliance is given low priority is supported by the following observations:

- DOE's site office and ORO have no written NEPA procedure.

- MMES and DOE have not dedicated adequate staff resources to NEPA compliance.

- Little or no training specifically directed at NEPA by PEO or MMES has occurred.

- DOE and MMES managers responsible for the oversight of NEPA planning are not knowledgeable about CEQ or DOE regulations concerning implementation of NEPA or DOE's NEPA Compliance Guide.

Within the past 6 to 12 months, DOE and MMES personnel have become aware of the deficiencies in the PORTS NEPA program and have acted to rectify several shortcomings. ORO is in the process of drafting a procedure for handling NEPA documentation, and MMES has requested DOE-HQ's Office of NEPA Project Assistance (EH-25) to conduct a training program on NEPA.

DOE-HQ, ORO, PEO, and MMES all share in the failure to place adequate emphasis on NEPA. Factors that contribute to this include lack of knowledge and experience with NEPA, especially as to the role NEPA can play in guiding the planning process for a facility, project, or program. The overall cause of this problem appears to be inadequate managerial oversight of all aspects of NEPA compliance.

<u>Finding Number</u>:  NEPA/BMP-3

<u>Finding Title</u>: Failure to Follow Environmental Control Procedure (ECP)

<u>Performance Objective</u>:  A MMES procedure should be followed by MMES staff when determining whether or not to prepare an ADM.

<u>Finding</u>:  MMES-ADMs are not being prepared in all cases when the answers on the environmental checklist indicate that one should be completed.

This finding is based on a review of the MMES ECP and Environmental Checklists prepared by MMES staff.

The MMES environmental checklist considers such things as cost, waste production, construction requirements, and local socioeconomic impacts in deciding whether or not an ADM is necessary.  The guidance states that if there are no positive responses to any questions on the checklist, an MMES-ADM does not need to be prepared.  However, if any question is answered affirmatively, an MMES-ADM is to be prepared.

A random review was conducted of 17 files from the Environmental Control Department for projects where the environmental checklists were prepared and where no MMES-ADMs were prepared. On four of these checklists there was one positive response, while on two checklists multiple positive responses were noted. Of the positive responses, four checklists noted projects whose values were greater than $250,000, three noted some degree of construction, and one noted that wastes of some form would be generated.  These results are inconsistent with ECP policy to prepare an MMES-ADM whenever a positive response is encountered.

It appears that failure to follow procedures and a lack of proper supervision has contributed to the failure to implement an established policy.

3-113

### 3.5.10    Environmental Monitoring and Surveillance

#### 3.5.10.1  Overview

The environmental monitoring and surveillance portion of the assessment includes all activities associated with the development of the annual monitoring report, management of environmental sampling for compliance and other purposes, and oversight of environmental compliance efforts. These activities come under the general environmental protection requirements of DOE Order 5400.1.

The focus of the environmental monitoring and surveillance portion of the assessment is to assess the adequacy of the procedures at PORTS designed to "characterize site environmental management performance, confirm compliance with environmental standards and requirements, and highlight significant programs and efforts." (DOE Order 5400.1, Chapter II.)

The general approach to the assessment included observation of sampling routines, sampling equipment, monitoring systems, control devices, and analytical laboratories. Personnel responsible for the environmental monitoring programs, data reduction, data interpretation, dose assessment evaluation, preparation of the annual monitoring report, and QA/QC activities were interviewed. Documentation associated with the environmental monitoring programs that was reviewed included, but was not limited to, sampling procedures, analytical procedures, instrument calibration procedures, and the annual monitoring report.

The MMES organization at PORTS with primary responsibility for environmental surveillance is the Environmental Control Department (ECD) of the Environment, Safety, and Health (ES&H) Division. ECD, together with Environmental and Safety Activities of Martin Marietta Energy Systems, Inc., of Oak Ridge, Tennessee, are responsible for developing the "Portsmouth Gaseous Diffusion Plant Site Environmental Report", which is the annual monitoring report required under DOE Order 5400.1. Together with the Waste Management Department, the ECD is also responsible for ensuring that operating elements of PORTS comply with environmental requirements. To support environmental compliance reporting, ECD oversees and conducts environmental sampling in air, water, soil, and vegetation. A separate Remedial Action Program within ES&H is responsible for planning and implementing facility investigations and corrective actions under the Consent Decree with the OEPA and the Consent Order with USEPA. Onsite laboratory analysis of environmental samples is performed by the Quality and Technical Services Division.

Findings contained in this section are generic to all environmental monitoring programs at PORTS. Findings on

environmental monitoring that are specific to individual media or management areas are contained in the respective sections of the environmental assessment report.

Overall, routine environmental monitoring and surveillance activities at PORTS at times were perceived by the team as operating in a casual manner. This observation does not apply to activities being conducted under the Remedial Action Program. However, this conclusion has consistently surfaced in many findings that are included in the media-management area-specific sections of this assessment. Significant guidance is provided verbally, and as such makes compliance verification difficult. Findings of a more generic nature that are included herein include:

- Quality assurance of major documents at times is ineffective. Minor errors were found in the annual monitoring report.

- There is no overall environmental monitoring plan.

- Sampling schedules and procedures are uncontrolled.

- Internal oversight appraisals have been inadequate.

In general, the planning and procedural problems may be attributed to a perceived casual attitude towards documentation of sampling and other monitoring activities and a lack of guidance, supervision, and follow-up to monitoring issues and requirements.

3.5.10.2  Compliance Findings

Finding Number:  EMS/CF-1

Finding Title:  Deficiencies in the Annual Monitoring Report

Performance Objective:  DOE Order 5484.1 requires the preparation of an environmental monitoring report annually. Quality assurance must be consistent with respect to the reporting and sampling and analytical procedures used in determining the data. Information concerning the precision of the data is stipulated in the order.

Finding:  PORTS' annual monitoring report for 1988 is deficient for a number of reasons:

- Some incorrect figures are presented.
- Some inaccurate summary statements are made.
- Precision information for much of the data is lacking.

This finding was developed from data and information shown in the annual monitoring report for 1988 as well as other data sets and reports.

An example of the first type is found in the data for steam plant opacity compliance, (Table 2.1.1 in the report). Total minutes out of compliance in the fourth quarter are shown as 402 minutes. The quarterly report to OEPA correctly indicated a total of 168 minutes of non-compliance. The percent of time in compliance was presented as 99.85 %, whereas use of the time from the report to OEPA indicates 99.94% compliance.

An example of the second type is found in the comments regarding the ambient fluoride data. The text of Section 2.1.2.2. (Page 21 and 24) states that "These results are consistently higher than those obtained during 1987, with 4 of the 17 air stations (A3, A24, A39, A40) having average fluoride concentrations that exceed the Kentucky standard of 0.8 ug/m$^3$." However, the data in Table 2.1.4 shows the annual average for station A3 to be 0.75 ug/m$^3$ and the annual average for station 24 to be 0.67 ug/m$^3$. Guidance from the DOE Order states that onsite monitoring data need not be included unless needed to demonstrate compliance. Stations A39 and A40 are both on site, yet the data are used in assessing ambient fluoride concentrations.

With respect to precision, the DOE Order states that the "Report shall include for each sampling station the number of samples taken with an indication of the central tendency and spread of the data. Where appropriate, this should include concentration (C) maximum, and C minimum, the mean concentration per report period (C mean) and two standard deviations..." No standard deviations are shown in the 1988 report for many groundwater samples. Standard deviations are shown for all surface water data. The incorrect figures and inaccurate statements cited above may be isolated examples and do not result in the report being significantly inaccurate. The lack of attention to reporting of precision has occurred in all recent annual monitoring reports examined.

Incomplete quality assurance reviews appear to have contributed to these deficiencies in the annual report. Reviews both at the site and at Oak Ridge Operation contribute to these deficiencies.

Finding Number:  EMS/CF-2

Finding Title:  Inadequate Oversight of Environmental Sample Scheduling and Sampling Procedures.

Performance Objective:  Effective management of environmental media sampling requires the use of controlled procedures and documentation of sample scheduling as described in the quality

assurance sections of DOE Order 5400.1 chapter IV which includes, by reference, DOE Orders 5700.6A & 6B on quality assurance.

Finding:  The Environmental Control Procedures book (PORTS, undated b) available for use by department managers, supervisors, and surveyors at PORTS is an uncontrolled document with inadequate procedures for documentation of updates, revisions, or distribution.  In addition, the scheduling of environmental media sampling is based on a system of verbal direction, informal memos, and worker experience.

The unmanaged nature of the sampling program was revealed through review of procedures documents, chain-of-custody records, previous audit results, and interviews with surveyors, supervisors, and managers of the Environmental Control Department.  Inspection of the sampling office, which is an onsite trailer, indicated that the scheduling of sampling and the assignment of personnel is conducted through a system of clipboards and telephone instructions.  This system provides a limited means of documenting changes to sample schedules.  Chain-of-custody and laboratory records have to be reviewed to trace any changes in the schedule.  Also, nine procedures in the procedures book were identified as needing revisions based on an internal review completed on June 22, 1988.  The revisions were scheduled to be completed  by December 30, 1988, but six of the nine had not been revised at the time of this assessment.

The Environmental Control Department provides sampling and analyses services to PORTS for routine sampling events, compliance monitoring, and in response to special sampling requests due to accidents or non-routine studies.  The procedures used by the surveyors to obtain samples appear to be technically appropriate; however, there is no system (such as signed and dated procedures books, document control checklists, and revision schedules) of documenting updates and revisions to them.  Many of the procedures for water, soil, sediment, and air sampling for chemical and radiological analyses have "Goodyear Atomic Corporation" designations and have no evidence of being reviewed on an annual basis.  The procedures book available to the surveyors in the trailer is an unnumbered photocopy with unsigned, handwritten notes and changes.  Because of the lack of control over sampling procedures and scheduling of sampling events, the quality assurance requirements of the DOE 5400.1 environmental monitoring program have not been adequately implemented.  The lack of sampling schedules also made it difficult to plan audit activities for the Tiger Team assessment.  For example, a special sampling event had to be planned to observe groundwater sampling procedures.

Responses received from interview questions regarding uncontrolled procedures suggest that supervisory personnel have not received ample training in the development of controlled

procedures while surveyors have not received sufficient training in use of a controlled document system. The lack of a written sample scheduling system appears to be a result of limited training in QA/QC requirements and also represents an incomplete follow-up of previous audit/reviews. The failure to document annual reviews and to follow-up with revisions of the monitoring procedures may reflect a casual attitude toward and lack of appreciation for procedures and documentation of activities.

### 3.5.10.3 Best Management Practice Findings

Finding Number: EMS/BMP-1

Finding Title: Lack of an Environmental Monitoring Plan

Performance Objective: An environmental monitoring plan shall be prepared for each site, facility, or process that uses, generates, releases or manages significant pollutants or hazardous materials in accordance with DOE 5400.1 Chapter IV.4, Environmental Monitoring Program Plans.

Finding: Portsmouth has not prepared an Environmental Monitoring Plan to support implementation of its environmental monitoring program. Best management practice dictates that an Environmental Monitoring Program Plan be available even though not required by DOE Order 5400.1 Chapter IV until November 1991.

The lack of a written environmental monitoring plan was ascertained during interviews with Portsmouth Environmental Control Department personnel. The Environmental Monitoring Program Plan was requested to obtain an overview of the environmental monitoring and surveillance conducted at the Portsmouth site.

Management of the comprehensive environmental monitoring program without a plan that identifies the rationale and design criteria for monitoring makes verification of compliance with regulatory requirements difficult. In addition, the plan should identify the extent and frequency of monitoring and measurements, procedures for sampling and analyses, quality assurance requirements, and requirements for data records and disposition of reports.

Martin Marietta is developing an environmental monitoring program that will be standardized for the Y-12, Paducah, and Portsmouth plants. A report assessing the existing environmental monitoring programs, issued by CH2M Hill on December 15, 1988, will be the basis for the plan. Task teams from each site have been formed for the various disciplines to develop the plan which has an estimated completion date in late 1990.

The policy requirements for establishing and implementing an environmental monitoring program plan have been clearly identified in the DOE Orders. The failure of Portsmouth to follow through with interim guidelines and procedures appears to result from what the team perceives as a casual attitude toward the need for procedures and documentation of implementation activities, as well as minimal follow-up by supervision to deficiencies noted in audits. The root cause for these weaknesses is less than adequate policy implementation.

Finding Number: EMS/BMP-2

Finding Title: Inadequate Internal Oversight and Self-Appraisal of Environmental Compliance

Performance Objective: The USEPA encourages regulated entities to develop and implement internal audits as a quality insurance tool to help assure, maintain and monitor compliance with environmental regulations, and to improve the effectiveness of environmental management (50 CFR 217). Criteria and standards for inspections of PCB waste areas are addressed in 40 CFR Section 761.65, and General Facility Standards for RCRA wastes by 40 CFR Section 265.15.

Finding: Casual oversight of environmental monitoring activities and the lack of rigorous internal inspection or self-appraisal programs is leading to deficiencies in environmental compliance at PORTS. As a consequence, PORTS cannot as effectively take a proactive stance to meeting environmental regulatory requirements.

This finding is based on inspection of waste management and environmental monitoring facilities and procedures, review and inspection of QA/QC records, procedures, and monitoring reports; and interviews with operations, laboratory, and environmental monitoring personnel.

Team members of the Environmental Assessment subteam identified the lack of thorough oversight and self-appraisals as contributing to many findings including:

- deficiencies in dating, labeling, and aisle spacing requirements in PCB waste storage areas;

- hazardous waste drums being stored outside of designated RCRA storage areas or placed in PCB storage areas;

- failure to identify air sources lacking required OEPA permits;

3-119

- deficiencies in the air monitoring stations, including the positioning of TLDs on the stations;

- lack of review of procedures and the ignoring of trends in data that may have pointed to problems in radiation dose assessment;

- inadequate tracking of permit documents to ensure they are being properly submitted, leading to situations such as the failure to submit the application for a new landfill permit in time; and

- deficiencies in the sample chain-of-custody and record-keeping procedures for sample analysis in the PORTS Analytical Laboratories.

The above list is only representative of areas where, in the opinion of the assessment team, more rigorous self-appraisals could have helped the site recognize and correct these problems sooner and on its own. Details of these findings are found in the environmental media sections of this report.

There have been several appraisals, audits, and/or reviews of PORTS conducted during the last few years. For example, external appraisals in 1988 included a Martin Marietta Energy Systems Environmental Appraisal and an Ohio EPA Survey of the PORTS Water Laboratory (Rogers et al., 1989). While external audits can be useful, over reliance on them tends to create a reactive mode to environmental compliance. Internal audits conducted in 1988 included an Environmental Safety and Health Quality Assurance audit, and an Adequacy of Administrative Controls evaluation (Rogers et al., 1989). In addition, several self-assessments were conducted just prior to the arrival of the Tiger Team.

Unfortunately, many findings by the Tiger Team were not identified in these previous audits, be they internal or external, calling to question their thoroughness. In addition, a corrective action plan was prepared in response to 1988 audits; however, tracking of corrective actions eventually taken as a result of these audits is inadequate.

Other inspections, such as those to look at drum conditions in the TSCA and RCRA storage areas, are regulatory requirements and are conducted at PORTS. In addition, site operating and program implementation personnel have mentioned walk-throughs and self-appraisals that have been conducted. However, these apparently have not been sufficiently rigorous to be effective tools to confirm and help meet compliance with environmental requirements and standards. And as mentioned previously, there is no record or tracking system of corrective actions initiated as a result of these programs.

3-120

Several factors may be contributing to inadequate internal inspection and oversight programs for environmental monitoring activities at PORTS.  These include:

- a need for clearer site-wide policies regarding internal inspections and oversight;

- lack of guidance on how to conduct inspections and what to cover;

- inspections being conducted by persons who are unfamiliar with the details of regulatory requirements and lacking technical experience for recognizing deficiencies and problems; and

- failure of PORTS personnel to appreciate the value of or place importance on periodic self-assessments.

### 3.5.11    Special Issue

#### 3.5.11.1   Special Nuclear Material Inventory Difference

**Introduction**

As a result of a request from Representative John D. Dingell, Chairman Subcommittee on Oversight and Investigations (Dingell, 1989), James D. Watkins, Secretary of Energy, instructed the Portsmouth Tiger Team to evaluate the current compliance implications with regard to an inventory difference (ID) during the 1981-1984 time period.  A discussion of pertinent facts regarding IDs, environmental concerns associated with the ID in question, and conditions for evaluating IDs as they exist today, follows.

Investigative Process

This Special Issue assessment involved review of numerous documents (some of which remain classified) from PORTS, LLNL, and ORNL; telephone conversations and interviews with PORTS, ORO, ORNL, and DOE-HQ personnel associated with various program areas at that time; review of environmental programs; and observations of plant operations described.

Inventory Difference - A Definition

An inventory difference (ID), when referring to nuclear materials accountability (in layman's terms) is an unaccountable discrepancy between the quantity of material ($^{235}U$ in this case) that is on the accountability book records and the amount that is measured in a particular location at the time the inventory is taken.  IDs can come from any of the following sources: 1) uncertainty in any of the thousands of process data points used to obtain the "physical inventory" of the material in process equipment, 2) materials put into the inventory called "feeds", 3) materials withdrawn from the inventory called "withdrawals" and, 4) "technically justified estimates" of material removed from the process system.  Accounting to determine how much, if any, of the four areas contributes to the overall ID requires thousands of measurements and subsequent calculations.  Figure 3.5.11-1 depicts a more complete listing of causes contributing to this ID.



Figure 3.5.11-1 Inventory Difference Cause and Effect Diagram

Routine Nature of ID

Inventory differences are part of normal operating conditions and
are expected, although not desired, at the end of any inventory
period.  Inventory differences require monthly reconciliations
not unlike that required by wholesalers and retailers of more
common products.  Although absolute values of IDs remain
classified for a specified period of time, generally speaking,
materials accountability personnel routinely anticipate and
observe IDs of less than 1% of the system's throughput (Personal
Interviews with Materials Accountability Personnel, 1989).

Brief History of the Inventory Difference of 1981-1984

In September 1981, Oak Ridge Operations (ORO) of the Department
of Energy became concerned with a trend in the inventory
difference associated with the cascade at Portsmouth (ORO, 1985).
An investigation of the problem was initiated in late September
1981. Four national laboratories, LLNL, BNL, LANL, and ORNL, were
asked to assist ORO in their respective areas of expertise.
Projects were initiated as follows:

- LLNL - safeguards evaluation;

- LANL - uranium deposit quantification in process
  equipment;

- BNL  - evaluation of cascade inventory measurement
  techniques; and

- ORNL - environmental studies for the purpose
  of quantifying potential vent releases

A status report of Goodyear Atomic Corporation's (GAT) (the site
contractor at the time) investigation of the ID covering the
period from October 1, 1980 to March 31, 1983, was issued
November 30, 1983 (Towne and Van Meter, 1983).  The report
evaluated and discussed all of the cause and effects shown in
Figure 3.5.11-1.  Table 3.5.11-1 lists engineering and
administrative controls that were implemented as a result of the
GAT ID investigation.  The principal cause of the ID was deduced
as deposition of material in equipment in one area of the cascade
(the X-27 area) caused by in-leakage of moist air via flanges in
type 7A compressors.  Implementation of corrective actions
resulted in a substantial recovery of $^{235}$U in fiscal years 1983
and 1984 (Shepler, 1986).  Thus, according to review of
accountability records covering the period of FY 1981 to 1984,
the total mass of $^{235}$U that was on the accountability book records
for the cascade ID was 218 kg. (Shepler, 1986).  Due to rounding,
217 kg. has also been reported.

(Excerpt from GAT/GDP 1115)

Table 3.5.11-1
Status of the Portsmouth ID Investigation
March 31, 1983

| IMPACT AREA | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| **Non-Gaseous Inventory** | | | |
| Wet Air Deposits | 7A compressor flange inleakage major cause of ID problem | Correct 7A problem. <br> - Temporary: (1) Install buffers on all 7A compressors; (2) Lower operating temperatures to reduce rate of inleakage. <br> - Long-term: flange and compressor shell modifications on all 7A compressors | Compressor modification program. TCD*: Not determined. |
| | Methods for deposit identification and recovery could be improved | - Improve methods for deposit identification and recovery. <br> - Develop computer program to identify potential problem areas; <br> - Modify procedures to expedite cell recovery treatments. | LANL project to quantify deposits TCD: 3/84 |
| Freeze-outs | Equipment housings removed during CIP activity lowered temperatures to freeze-out point and increased rate of freeze-outs | Maintenance procedures modified and potential freeze-out areas identified so that vaporization could be effected prior to inventory | Further effort not warranted. |
| Hidden Inventory | Impact uncertain | ------ | Three-plant study in progress TCD (first part of study): 9/84 Further work contingent on results of first part of study. |

*TCD = target completion date

3-125

Table 3.5.11-1 page 2
Status of the Portsmouth ID Investigation

| IMPACT AREA | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| Vent Monitoring | | | |
| Top and Side Purge | Several vent monitoring activities were found to require improvement: | | |
| | - Side purge lab sample tap in inadequate location; led to uncertain lab analyses | Tap was relocated | No further effort warranted. |
| | - Data base for method of calculating vent losses was based on daily average rates (average of 3 gas bulb samples; may not accurately reflect (may understate) vent losses during excursion | Sample frequency increased; Computer program developed to perform iterative hourly weighted average calculations | No further effort warranted. |
| | - Monitoring instruments (space recorders) inadequate:<br>  - too much downtime<br>  - results uncertain because of Tc interference<br>  - insufficient spares | Initiate space recorder improvement program:<br>- Improve maintenance procedures<br>- use all-nickel containers<br>- Increase number of space recorders spares from 4 to 11 | Continue space recorder improvement program<br>TCD: 9/84 |
| | | Initiate development of improved monitors:<br>- proportional flow analyzer<br>- wet chemical uranium analyzer | Complete development of proportional flow and wet chemical uranium analyzers<br>TCD: 9/84 |
| | - May have understated losses from purge vents during past excursions | | ORNL project to attempt to quantify past vent losses by determination of uranium uptake in vegetation<br>TCD: Not determined |

Table 3.5.11-1 page 3
Status of the Portsmouth ID Investigation

| IMPACT AREA | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| Vent Monitoring (cont.) | | | |
| Cell Service & Wet Air Evacuation Syst. | Trap loading rates higher than suspected; UF6 concentration in excess of 10-ppm limit being purged to the system. | Purging procedure improved to reduce possibility of exceeding limit in the future. | Improve methods for detecting low conc. uranium; improve trap monitoring methods. TCO: Not yet determined |
| X-330 and X-333 Cold Recovery System | Measurement uncertainty between results of space recorders that monitor losses from cold recovery and lab sample data for for the losses is high but the U-235 losses from this system would be insignificant. | Improvements not warranted because U-235 losses from system would be insignificant. | |
| Seal Exhaust Traps | Problem in seal exhaust system at withdrawal station (for <5% material (ERP station) led to trap saturation and lube oil contamination (see next item) but insignificant vent losses | System modified to eliminate seal exhaust problem. | Special traps to be installed to prevent future saturation of normal seal exhaust traps. TCO: Not yet determined |
| | | | Space recorders being installed to monitor vent streams in X-330 and X-333. TCO: 3/84 |
| Uranium in Lube Oil | No accountability records were being kept for U and U-235 in lube oil (discarded to biodegradation plots) from seal exhaust pumps. | Accountability practices are being implemented At least some of the material discarded has been estimated. | Completion of implementation of accountability practices. TCO: 12/83 |
| | | | Biodegradation plots to be sampled to determine if additional losses have occurred. TCO: 9/84 |

Table 3.5.11-1 page 4
Status of the Portsmouth ID Investigation

| IMPACT AREA | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| Liquid Effluent & Pond Sludge | An appreciable amount of material leaving decontamination and cleaning operations was not being accounted for by existing methods | Amount of material previously unaccounted for was estimated. Criteria are being developed to ensure future discharges of U and U-235 to holding pond are measured | Continuous inlet sampling system to be installed. TCD: 9/84 |
| Feeds and Withdrawals (All aspects of feeds and withdrawals accountability were reviewed, but only the following were determined to be areas for which improvement could be implemented.) | | | |
| Toll Enriching Normal (TEN) Feed Purity | Theoretical values have been assumed for 80% of Allied and BNFL cylinders. There is a discrepancy between the theoretical and the measured purity that leads to overstatement of U-235 fed. | Bias due to this error will henceforth be carried as an explained ID adjustment. | Bias associated with use of theoretical purity will continue to be estimated and carried as an explained adjustment. |
| TEN Cylinder Assay | Assay of TEN cylinders were being measured, but book values were not adjusted and an ID discrepancy resulted | Bias due to this error will henceforth be carried as an explained ID adjustment. | Future cylinder book assays will be adjusted once measurements are made TCD: 10/83

Explained adjustment will be estimated for the 80% of the Allied and BNFL cylinders which are not measured. TCD: 3/84 |

3-128

Table 3.5.11-1 page 5
Status of the Portsmouth ID Investigation

| IMPACT AREA Feeds and Withdrawals (continued) | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| TEH Cylinder Weight | TEH cylinders were found to contain approximately 2.5 lbs air/cylinder, resulting in a feed overstatement | The magnitude of the possible overstatement error was calculated | No work in progress at this time. However, more effort will be expended in this area once manpower becomes available. |
| Paducah Product Feed (PPF) Purity & Assay | A discrepancy between Paducah and GAT PPF purity & assay values was found. If GAT values are correct, PPF has been overstated | A study was done to estimate the error associated with the loss and corrections for sampled cylinders were booked. | Evaluation of need to increase sample size to provide statistically significant sample for an inventory adjustment. TCD: 3/84 |
| Side Feed | Inaccuracies in purity and assay, as well as in loss of cylinder weight by rusting resulted in overstating feed. | ——————— | Perform study to obtain sufficient data for inventory adjustment TCD: To be determined |
| Tails Withdrawal + Cylinder Weights | A worn notch on a GAT cylinder scale resulted in an understatement of material withdrawn. | The worn notch was corrected and the understatement estimated. | The error was detected by monitoring differences between GAT and Paducah weights. Such monitoring will be continued for early detection of scale problems. |
| Tails Cylinder Assay | Assays are determined from data taken during cylinder filling. A calculated assay method is used because it is more cost-effective than individual samples. However, there are biases associated with the method, especially when there are cascade disturbances (as with CIP changeout) near the Tails Withdrawal Area. | Calculated tails assay method was improved in data acquisition and calculations. Operational changes were made to increase stability of tails withdrawal. | Review of need for further efforts to be completed. TCD: 3/84 |

3-129

Table 3.5.11-1 page 6
Status of the Portsmouth ID Investigation

| IMPACT AREA | FINDINGS | ACCOUNTABILITY IMPROVEMENTS | CONTINUING EFFORTS |
|---|---|---|---|
| Cascade Physical Inventory | There have been no recent changes to data acquisition methods that would have had significant impact on the inventory problem. However, there are areas where improvements can be made. | | Efforts to improve the math model used to estimate the amount of material in the cascade are in progress. TCD: 9/85<br><br>Error of propagation study by BNL to better establish uncertainties in the monthly ID measurement is in progress. TCD: 9/84<br><br>Review equipment characterization constants TCD: 9/84 |
| Diversion | A preliminary study by LLNL did not establish any kind of relationship between diversion and the Portsmouth ID problem. | | The diversion study will be completed and a report issued. TCD: Not yet determined |

3-130

**Environmental Concerns Associated with the 1981-1984 ID**

It is not definite how much material was lost to the environment.
In fact, one study concluded there was no evidence of any offsite
radioactive contamination from plant operations. Three studies
have addressed this issue and result in inconsistent conclusions.
They are capsulated as follows:

- The ORNL study previously mentioned was requested for
  the purpose of determining the quantity of $^{235}$U that may
  have escaped process vents undetected (Carter, 1983).
  Pine needle samples were obtained and analyzed for
  excess $^{235}$U (that quantity above background). Although
  samples indicated the presence of excess $^{235}$U,
  quantification of sufficient reliability to satisfy
  materials accountability personnel was not possible.
  Pine needles that were collected later were not
  analyzed because the statistical reliability of results
  obtained would not have been sufficient to record the
  material as vent releases in the material
  accountability books.

- EG&G conducted an aerial radiological survey in May
  1984 (Colton, 1985). The conclusion of the
  investigators was that "No evidence of any radioactive
  contamination, which might have occurred off-site as a
  result of plant operations, was inferred from the
  aerial survey data."

- The LLNL report, which primarily focused on
  effectiveness of safeguards, also devoted considerable
  attention to measurement uncertainties (LLNL, 1984).
  To put measurement of the 218 kg. $^{235}$U ID in
  perspective, the total measurement uncertainty at the
  time of LLNL's investigation (1982) was 525 $\pm$ 98 (kg.).
  This is somewhat equivalent to measuring a baby's 7
  ounce weight gain on a bathroom scale that reads out in
  2-pound increments. Their report stated that "...the
  divergence of opinion among experts was greater on vent
  emissions than on any other contributor...", and that
  there was "... no disagreement that 50 - 350 kg were
  vented..." ($^{235}$U). It is not known if these estimates
  include information on amounts recovered in 1983 and
  1984.

Apparent inconsistencies are reached by reading DOE initiated
reports describing environmental aspects of this ID. The LLNL
report states that there was no disagreement regarding an
environmental release while the EG&G report appears to conclude
the opposite. The conversion factor of 0.34 microcuries per
square meter multiplied by counts per second reported in the EG&G
study implies relatively large statistical variations may be

inherent to the measurement method, and that aerial survey results should only be used in a qualitative sense. The ORNL report appears to be somewhere in between and was described by DOE as inconclusive.

For the Tiger Team assessment, a quick analysis of the data from the four off-site air monitoring stations in use from 1978 through 1984 was made by comparing the ratios of annual averages to the average for the background station. The comparison was made for alpha and beta radioactivity and also for fluorides. This technique has the advantage of compensating for changes in methods of sampling and/or analysis.

The annual average for 1981 showed a higher ratio to background for alpha radioactivity than for any other year. The data for fluoride showed an unusually high ratio for the north station (A24) in 1981. Beta-emitting radionuclide data indicates that all stations (including background) were elevated. This suggests that, during the period 1978 through 1984, 1981 may have been the year of the maximum release of radionuclides and fluorides to the air at PORTS. Tabulation of amounts reported to be released indicate the opposite, that is, 1981 was a year of near minimum release of uranium to the air. This supports a conclusion that an undetected release(s) of uranium hexafluoride might have occurred in 1981.

In 1985, DOE concluded, based on information available to them at the time, that "The deficiency was caused by a combination of malfunctioning production equipment and weaknesses in measurement systems for quantifying $^{235}U$ in waste streams and containers of low equity material. Even though material was released to the environment during this time, environmental monitoring stations showed amounts in the environment to be well within limits established by state and Federal agencies." (ORO, 1985)

Unfortunately, evidence does not exist that a formal dose assessment and subsequent reporting of results was ever requested. Interviews with PORTS personnel did reveal that an informal dose assessment was performed, however, no records of this assessment were available. Personal recollections were "...the results, which indicated approximately a doubling of existing exposures which were less than one millirem..." (Anderson, 1989). Additionally, documentation does not exist describing how DOE came to the conclusion that dose limits were not exceeded for materials (not just $^{235}U$) likely to be present in purge cascade vent emissions.

## Current Conditions

As described earlier, IDs are occurring at levels generally within control limits. Materials accountability personnel plot monthly and cumulative IDs, as well as evaluate trends, in an

attempt to identify emerging problems. In addition, significant changes in process equipment, engineering controls, and environmental monitoring techniques are in place which reduce the potential for concluding that portions of these IDs are going to the environment. Some of the more important improvements in source controls, environmental controls, and dose assessments which form the basis of this conclusion are discussed below.

Source Controls

Engineering and source control improvements listed in Table 3.5.11-1 aid in identifying that portion of an ID that is ascribed to non-environmental categories. Thus, by compiling data on the effectiveness of these controls, the site is able to better identify quantities of ID found in non-environmental areas, thus reducing the amount that constitutes actual inventory differences. Of the engineering and source controls implemented some of the more important permanent upgrades include:

- Improved methods for deposit identification including more frequent "over-the-converter" gamma surveying and computerized modeling have been implemented.

- Improved methods for deposit recovery including higher temperature and pressure gradients have been implemented which help to reduce the unmeasurable inventory.

- Continuous process monitoring of significant sources has improved with reliable, independent backup sampling techniques.

Environmental Controls and Monitoring

Changes in environmental controls and monitoring have also aided in a more reliable detection and early warning system. Improvements in design, maintenance, and procedures have contributed to the site's ability to more accurately assess potential environmental consequences. Furthermore, some of these improvements provide additional verification that portions of IDs are not being released to the environment. A partial listing of some of the more important upgrades would include:

- Continuous sampling equipment replaced gas bulb sampling of process vents. Because of gas bulb analysis method underestimations, vent emissions may have been 50% greater in the past.

- Continuous on-line monitoring of trap inlet and outlet uranium concentrations has improved and a backup monitoring system has been put in place to provide two

independent measures. This data is used as both a process and environmental control.

- Top and side purge operating procedures specify action criteria including valving off of the purge vent thus minimizing the source of potential environmental releases in instances of equipment malfunction.

- Trap saturation monitoring and change-out procedures have been upgraded and now require more frequent readings and change-outs. Trap materials are used to capture the small amounts of uranium left in the process stream immediately before venting to the atmosphere.

- The number of offsite ambient air monitoring stations has more than doubled since the ID and most importantly, one station has been located in the prevailing downwind direction.

Modeling and Dose Assessment

PORTS performs dose assessments using AIRDOS-EPA on both routine and unscheduled radionuclide releases as required by NESHAPs 40 CFR 61 subpart H and DOE Order 5400.1 IV (7)(b). PORTS does not include any amounts associated with IDs in its dose calculations. This is because the material accountability personnel have not felt the evidence of environmental release associated with any particular ID sufficient to "book" the material to the environmental portion of the cascade account.

Evaluation of dose assessment trends is difficult because calculation methods, conversion factors, and reporting have evolved over the years. Effective dose equivalents calculated from 1982 through 1988 using consistent methodology indicate a decreasing trend. This decreasing dose trend is a result of lower total uranium releases during that time period. Although this assessment noted significant deficiencies in documentation of dose assessment activities, these deficiencies are not expected to cause order-of-magnitude levels of changes in estimated doses, if any.

Summary

Based on review of documents, interviews, evaluation of past and current practices, and observations of operations, conflicting information exists regarding releases of $^{235}U$ and whether or not any such release deposited material offsite during the 1981 – 1984 ID period. Formal documentation of hypothetical dose calculations and subsequent assessment does not exist for the incident. However, it appears that because of upgrades in engineering and source controls, and more reliable monitoring

systems, the likelihood of such an event being ascribed to the environment in the future has been reduced.

## 3.5.12    Environmental Assessment Findings

### Air

| Finding # | Finding Title |
|---|---|
| A/CF-1 | Unpermitted Air Sources |
| A/CF-2 | Asbestos Items in Scrap Yard |
| A/CF-3 | Incomplete SARA 313 Air Release Report |
| A/CF-4 | Lack of Proper Gasoline Pump Labels |
| A/CF-5 | Steam Plant Non-Compliance |
| A/BMP-1 | Air Monitoring Station Deficiencies |
| A/BMP-2 | HEPA Filter Systems Testing and Maintenance |
| A/BMP-3 | Out-of-Date Vent Survey |
| A/BMP-4 | Incomplete Air Emissions Inventories |
| A/BMP-5 | Meteorological Tower-Data Availability Limitations |

### Surface Water/Drinking Water

| Finding # | Finding Title |
|---|---|
| SW/CF-1 | Unapproved Analytical Test Procedures Used for NPDES Reporting |
| SW/CF-2 | Unpermitted Surface Water Discharge |
| SW/CF-3 | NPDES Permit Exceedances |
| SW/CF-4 | Failure to Comply with Reporting Requirements Under NPDES |
| SW/CF-5 | Deficient Transformer Oil Spill Control at X-530 and X-533 Switchyards |
| SW/BMP-1 | No Standard Operating Procedures for Managing Wastewater from Spray Paint Booth |
| SW/BMP-2 | Unacceptable Risk of By-Passing Permitted Discharge Point |
| SW/BMP-3 | Inadequate Chain-of-Custody for NPDES Samples |
| SW/BMP-4 | Signatories for Drinking Water Monitoring Reports are Not Complete |
| SW/BMP-5 | Undocumented NPDES Sampling Procedures |
| SW/BMP-6 | Deficiencies in Reported Inventories for Above Ground Storage Tanks |
| SW/BMP-7 | Inadequate Containment of Non-Oil Spills |
| SW/BMP-8 | Deficient Transformer Oil Spill Control |
| SW/BMP-9 | Discharges of Chromated Water From Spills |
| SW/BMP-10 | Inadequate Alarm Settings on Continuous pH Monitors |
| SW/BMP-11 | Lack of a Water Quality Management Plan |

## Groundwater/Soils

| Finding # | Finding Title |
|-----------|---------------|
| GW/CF-1 | Incomplete Determination of the Rate and Extent of Migration of Hazardous Waste Constituents |
| GW/BMP-1 | Need for a Comprehensive Groundwater Sampling and Analysis Plan |

## Active Waste Management/Underground Storage Tanks

| Finding # | Finding Title |
|-----------|---------------|
| AWM/CF-1 | Restricted Land-Banned Waste Stored Beyond One Year |
| AWM/CF-2 | Deficiencies in RCRA Storage Facility Operations |
| AWM/CF-3 | Deficiency in X-744G High-Bay RCRA Storage Facility Containment |
| AWM/CF-4 | Hazardous Waste Drums Located Outside of Designated RCRA Storage Areas |
| AWM/CF-5 | Inadequate Storage of Low-Level Waste |
| AWM/BMP-1 | Deficiencies in Waste Minimization Implementation |
| AWM/BMP-2 | Mixed Waste Drum Labeling Deficiency |
| AWM/BMP-3 | Waste Drum Inventory Problems |
| AWM/BMP-4 | Noncompliance with PORTS Procedure Requiring the Covering of Radioactive Waste Drums Stored Outside |
| AWM/BMP-5 | Incomplete Method of Release Detection Used for Some Underground Storage Tanks |

## Toxic and Hazardous Materials Management

| Finding # | Finding Title |
|-----------|---------------|
| THMM/CF-1 | Deficiencies in Response and Reporting PCB Transformer Leaks |
| THMM/CF-2 | Combustible Material Found Near PCB Transformers |
| THMM/CF-3 | Improper or Insufficient PCB Markings |
| THMM/CF-4 | Deficiencies in Dating and Inspection of PCB Waste Storage Drums |
| THMM/CF-5 | Inadequately Constructed Waste Storage Areas |
| THMM/CF-6 | PCB Wastes Stored Longer Than One Year |
| THMM/CF-7 | Leaking PCB Gaskets and Oil Lubrication Systems |
| THMM/BMP-1 | Insufficient Management of PCB Waste Drum Storage Areas |

3-137

THMM/BMP-2   Pesticide Program Deficiencies
THMM/BMP-3   Lack of Placarding on Vehicles Engaged in Onsite Hazardous Materials Transport
THMM/BMP-4   Deficiencies in Hazardous Material Storage
THMM/BMP-5   Lack of Formal Procedures for Gasket Spill PCB Program

## Quality Assurance

| Finding # | Finding Title |
| --- | --- |
| QA/BMP-1 | Inadequate Documentation of Laboratory Standard Operating Procedures and Practices |
| QA/BMP-2 | Ineffective External Proficiency Testing Program |
| QA/BMP-3 | Deficiencies in Laboratory Sample Custody Practices |
| QA/BMP-4 | No Active Audit or Corrective Action Program in the Analytical Laboratories |
| QA/BMP-5 | Inadequate Radiological Measurement QA/QC Practices |
| QA/BMP-6 | Inadequate Oversight of Contracted Laboratory Analyses |

## Radioactive Materials Management

| Finding # | Finding Title |
| --- | --- |
| RAD/CF-1 | Deficiencies in Dose Assessment Methods |
| RAD/CF-2 | X-344 Toll Transfer Autoclave and Cylinder Vent Not Monitored |
| RAD/CF-3 | Inappropriate External Radiation Monitor Mounting Positions |

## Inactive Waste Sites/Emergency Response

No Findings

## NEPA

| Finding # | Finding Title |
| --- | --- |
| NEPA/CF-1 | Projects Have Been Approved and Initiated Prior to Completion of NEPA Review |
| NEPA/CF-2 | MMES Environmental Control Procedure is Not Consistent with Federal Regulatory Procedures |

3-138

| | |
|---|---|
| NEPA/CF-3 | Inappropriate Use of Memoranda-to-File |
| NEPA/CF-4 | Failure to Incorporate NEPA Into Decision Making at the Earliest Stage |
| NEPA/CF-5 | Inappropriate Tiering From Old Environmental Impact Statements |
| NEPA/CF-6 | Lack of NEPA/RCRA Integration |
| NEPA/BMP-1 | Inadequate Tracking and Record Keeping for NEPA Documentation |
| NEPA/BMP-2 | Insufficient Attention to NEPA Compliance at PORTS |
| NEPA/BMP-3 | Failure to Follow Engineering Control Procedure Checklist |

## Environmental Monitoring and Surveillance

| Finding # | Finding Title |
|---|---|
| EMS/CF-1 | Deficiencies in Annual Monitoring Report |
| EMS/CF-2 | Inadequate Oversight of Environmental Sample Scheduling and Sampling Procedures |
| EMS/BMP-1 | Lack of Environmental Monitoring Plan |
| EMS/BMP-2 | Inadequate Internal Oversight and Self-Appraisal of Environmental Compliance |

---------------------------------

CF--Compliance Finding
BMP--Best Management Practice

3-139

# 4.0 SAFETY AND HEALTH ASSESSMENT

## 4.0 SAFETY AND HEALTH ASSESSMENT

### 4.1 Purpose

The purpose of the Safety and Health Subteam was to assess the effectiveness of safety and health programs at PORTS through the assessment of activities in selected functional areas.

### 4.2 Scope

The Safety and Health assessments were conducted by a nine-member team during the two-week period of October 23 through November 3, 1989. The determinations concerning general areas to be assessed, as well as specific program features within these general areas which were identified for evaluation, were recommended by the Team and approved by the Team Leader. This scoping process was based on prior experience in conducting assessments at other DOE facilities, as well as the technical judgments of Team members concerning the known PORTS operational status, facility design and layout, and the results of prior TSAs and other safety-related evaluations of PORTS. Assessments were made in the nine areas of operations, maintenance, training and certification, emergency preparedness, technical support, criticality safety, radiation protection, industrial safety, industrial hygiene, and radiological engineering.

### 4.3 Approach

The safety and health assessment at PORTS focused on the identification of substantive findings relative to compliance with DOE orders and OSHA regulations and applicable "best" and "accepted" industry practices. Limited assessments were made in all of the aforementioned areas.

The Team conducted a broad review punctuated by spot checks into several specific areas and by deep vertical slices into a few topics. Relevant DOE Orders and performance objectives from the "Technical Safety Appraisal Reference Manual, Appendix A, July 1989" served as standards for the evaluation. Information gathered through direct observation of operations, interviews with site personnel, and reviews of documentation was exchanged and validated in frequent interactions among members of the Team and personnel from the site. Input was regularly received from organized labor representatives through weekly debriefings, as well as Team review of grievance histories, specific safety issues, and allegations brought to the Team's attention. The findings and their supporting bases are documented in Section 4.5 of this report. Section 4.5.12 lists all safety- and health-related findings. Appendix A contains the names, affiliations, and biographical sketches of the Team members.

The Team attempted to perform a root cause analysis for findings in each of the assessed areas. These analyses, in part, are based upon the past experience of the team in evaluating similar findings at the other facilities and tracking findings to their sources by interviews or documents.

## 4.4    Safety and Health Assessment Summary

While strengths in the PORTS safety program were noted in emergency preparedness, operations (in terms of more stringent $UF_6$ release controls), and aspects of the radiation control program, fundamental weaknesses were found in implementation of the radiological contamination control, personnel protection (OSHA-related industrial safety and hygiene), and training programs. A total of 95 findings of non-compliance or non-conformance with accepted industry practice were made, the majority (54) resulting from an OSHA-oriented inspection performed in Buildings 700 and 720, as a sampling exercise.

The overall findings associated with the maintenance support facilities (720, 700, and 705) were of sufficient importance to entail an immediate response by the contractor, which was recommended by the Team Leader (memorandum on October 27, 1989, provided in Attachment B). Actions in response were requested by the DOE Area Office and presently prescribed by MMES (Attachment C). Progress against the action plan were verified by Team members in subsequent walk-throughs, as well as by the Team Leader in a follow-up review of the three buildings on November 9, 1989.

The importance of addressing root causes as opposed to symptomatic findings was emphasized at all stages of the appraisal, including response to the stated immediate action concerns.

## 4.4.1    Operations

The MMES staff's conduct of production operations was categorized by the Team as competent and knowledgeable, but lacking in the rigor and discipline currently expected within the U.S. nuclear industry.

For the first time, production operations were being conducted during this assessment at sustained high rates and at pressures above atmospheric pressure in many cells. Appropriate safety provisions for these conditions were in place. The operating staff was found to be competent and dedicated. Housekeeping was generally satisfactory, with the exception of Buildings X-700, X-705, and X-720. Operations is in a transitional status, heading toward a more rigorous disciplined system with many aspects of this transition not yet resolved. Potential hazards from unplanned $UF_6$ releases were being adequately addressed.

Findings were related to improper responses to alarms, incomplete incorporation of Operational Safety Requirements (OSRs) into operating procedures, lack of thorough safety review of operating procedures, absence of disciplined conduct of control room activities, and human factors problems created by use of artificial rather than real units on many instruments and in some instructions and communications.

### 4.4.2    Maintenance

Maintenance was determined to have notable weaknesses with respect to use and understanding of procedures and industry standards.  Further, documentation of maintenance performed was, in some areas, considered poor.

PORTS has developed a draft maintenance performance improvement program that is modeled after the Institute of Nuclear Power Operations (INPO) maintenance guidelines.  However, while observed maintenance activity was competently performed, several weaknesses were noted by the Team, when comparing current maintenance, practices to these guidelines. Particular weaknesses related to formality and documentation of maintenance activities. These weaknesses included:  absence of documented standards and procedures for some activities; failure to use procedures at work locations; failure to update procedures; poor lock and tag control systems; and inefficient systems for calibration of tools, such as torque wrenches.

### 4.4.3    Training and Certification

The training and certification programs have not been effective in promoting a thorough understanding of plant processes, criticality safety, radiological protection, and industrial safety.

Past TSAs and other appraisals/reviews of PORTS have documented that operator training and retraining programs did not have the rigor or documentation required by DOE 5480.5.  While this condition continues to exist, considerable resources have been devoted during the past two years to develop training materials to address these inadequacies. Schedules indicate that these programs will largely be implemented during the coming year.  The approach of a central training organization to establish policy and standards and to evaluate training against these standards, with line organizations having principal responsibility for training conduct, is apparently working effectively.  However, policy and standards have not yet been documented for functions such as:  remediation and removal from duties for demonstrated substandard knowledge/performance, training record retention, and training program evaluation.  The principal training weakness identified by the Team was that the operating philosophy, combined with training and examination practices, was encouraging

4-3

operators to commit procedures to memory and not use them at
their work stations. This situation was further manifested by
operators who were neither trained in, nor knowledgeable of, the
physical processes underlying their operating procedures.

## 4.4.4    Emergency Preparedness

A limited review of onsite emergency preparedness was conducted
and, for the most part, PORTS has adequately demonstrated its
ability to respond to an emergency. The emergency operations
center is a well designed and equipped facility. Emergency plans
and procedures are well coordinated with local and DOE
authorities. Drills and exercises dealing with criticality
accidents and chemical-release scenarios have successfully
demonstrated emergency response capabilities. However, there
were two findings, and their resolution will improve
preparedness. First, a concern exists about the videotape that
is used for training plant personnel on emergency alarms and
signals. Many of the signals and alarms are similar, and the
appropriate response is not always made by personnel hearing the
alarm. Second, cross training between security, operations, and
emergency response personnel has not been conducted to reduce the
risk of personal injuries during a real emergency.

## 4.4.5    Technical Support

Technical support was considered adequate, although recognized
inadequacies in the PORTS Safety Analysis Report (SAR) has led to
a multi-year upgrade effort (scheduled completion in FY 1994).
Current OSRs and procedures to control the development and
revision of OSRs were reviewed, as were configuration control
procedures. No findings were noted by the Team in these areas,
although weaknesses in incorporating OSRs into procedures were
found in the Operations area as noted in Section 4.4.1.

## 4.4.6    Criticality Safety

Elements of the criticality safety program were reviewed, and
three weaknesses were identified. First, only two technically
qualified individuals on the criticality safety staff are
performing all the required evaluations and audits. With the
increased number of evaluations needed to assess criticality
safety in process and waste streams, the depth of evaluations and
audits is limited. The second weakness is that written and
approved operating procedures that address criticality safety
limits and controls were not conspicuously located in the
workplace. The third weakness is that there is evidence of a
significant lack of understanding of criticality safety
fundamentals among the PORTS operating staff.

### 4.4.7    Radiation Protection

The radiation protection program is generally adequate to protect the health and safety of PORTS employees.  Ten findings of specific deficiencies were noted.  Four of the findings involved non-compliance with DOE 5480.11 requirements:  two of these findings dealt with contamination control and two dealt with training of radiation protection technicians.  Finding RP-1 noted the present non-compliance with the DOE 5480.11 requirement for exit monitoring for contamination control.  PORTS is preparing to implement a major program designed to achieve compliance. Finding RP-2 identified a breakdown in a management system and a deficiency in maintenance procedures that has permitted maintenance activities on contaminated equipment without required protective equipment/clothing and contamination controls. Findings RP-3 and RP-4 addressed deficiencies in training radiation protection technicians and related record keeping.  The remaining six findings noted specific deficiencies in the implementation of practices recommended by DOE 5480.11 and relevant standards.

### 4.4.8    Industrial Safety

The industrial safety program has a good record in terms of accident statistics, but there is room for significant improvement throughout the PORTS facility. Many work areas and operations had serious deficiencies, including unsafe practices and procedures, which indicated lack of management enforcement of basic safety procedures, practices, and regulations.  There appeared to be poor communication between top management and line management concerning implementation of procedures and policy. Many of the unsafe practices observed in the work place were addressed by the PORTS safety manual, but were not ingrained into the work force.  This was illustrated by the lack of enforcement of plant regulations and a lack of awareness of the underling reasons for specific safety related requirements.  Fundamental to the deficiencies was across-the-board ignorance of industrial safety regulations and general industry practice.

### 4.4.9    Industrial Hygiene

The Industrial Hygiene (IH) program provides adequate protection for PORTS employees but shows signs of management neglect.  Past and present inadequacies in staffing negatively impact program effectiveness and further reduce management's sensitivity to this area, due to the reduced ability of staff to identify deficiencies.  Examples include the failure of operations supervision to implement the Hazard Communication Program throughout the workplace, lack of preventative maintenance for health related engineering controls, and supervision's failure to enforce basic safety and health requirements.  As a result, the

implementation of some OSHA, DOE, and even PORTS guidelines
varies from minimally adequate to substandard.

There are several causes for the current status of the PORTS IH
program.   One is the failure of Operations management to
recognize its responsibility to implement OSHA, DOE, and PORTS
standards for health and safety.  This is perceived to be the
responsibility solely of the Industrial Hygiene and Safety
Departments.  Another is Managements' failure to  provide an
adequate number of trained professionals to permit the
identification and prioritization of health issues so that
corrective action can be implemented.  A third involves the
history of benign neglect toward health and safety because DOE
facilities are exempt from OSHA guidelines.  As a result,
compliance with OSHA guidelines has remained a low priority.

### 4.4.10     Radiological Engineering

#### 4.4.10.1   Overview

The radiological engineering aspects of controlling potential
releases of enriched uranium hexafluoride were reviewed.  PORTS
management and the DOE Site Office have given considerable
attention to the importance of reducing the number and quantity
of $UF_6$ releases to the environment.  A committee reviewed
approximately 9000 process system openings performed during the
first seven months of 1989 and found that only 25 had resulted in
small (1 to 10 grams) releases.  None of the releases resulted in
internal doses to workers, which was confirmed by urine bioassay
analyses.

### 4.5      Safety and Health Assessment Findings

### 4.5.1     Operations

#### 4.5.1.1   Overview

A competent operating staff was in place at PORTS to conduct the
many highly sophisticated operations in a safe manner.  However,
weaknesses in procedures and training and an over all lack of
rigor and discipline in operations was noted.  Based on
discussions and interviews conducted during this assessment, the
staff is considered to be dedicated to achieving production goals
with appropriate attention to safety and health considerations.
Manpower shortages are slowing down the implementation of some
desired safety improvements that have been identified and there
appears to be a lack of management emphasis on health and safety.

Operations at PORTS were being conducted during this assessment
at a sustained high rate.  In terms of the power input compared
to a plant design maximum of 2260 MW, the current quarterly goal
is the use of about 2100 MW, and the usage ranged from about

4-6

2000 MW to 2050 MW during the assessment. This required
judicious use of both committed and off-peak power, and caused
many of the cells in the gaseous diffusion process to be above
atmospheric pressure. All of the cells in Building X-333, and
about half of those in Building X-330, had been above atmospheric
pressure since September 1, 1989. With minor temporary
exceptions, this is the first period of sustained operation at
PORTS with a large number of cells above atmospheric pressure.
Operating above atmospheric pressure requires the application of
additional safety requirements and precautions, and these were
being applied.

Housekeeping at PORTS was found to be generally satisfactory in
frequently visited areas, but many isolated areas were less than
satisfactory.

Conduct of operations at PORTS was found to be in a transitional
status which should lead toward a more rigorously disciplined
system, but many issues associated with implementing such a
system were not yet resolved. Unplanned $UF_6$ releases were
receiving significant attention. For many sampling and cylinder
disconnecting operations at PORTS, where small $UF_6$ releases have
a relatively high probability, a number of precautions were being
exercised. Several purges and one or more leak tests were being
employed prior to opening the associated pigtail connectors.
Precautionary vacuum systems were used for many of these
operations, and additional vacuum systems were being prepared for
near-term use.

The potential for unplanned releases from the cascade has been
increased by operation of much of the cascade equipment above
atmospheric pressure. However, the cascade equipment was
designed to operate in this manner, and features were being used
to prevent outleakages. A $UF_6$ release detection system was being
used to provide early warning of such leaks and appropriate
procedures were in place to deal with any leaks that did develop.
An entire cell with a leak or other operational problem can be
shut down and taken off line by activating only two buttons or
levers in any of three separate locations.

About three months ago, MMES Management recognized the need for
improvement in conduct of operations throughout the five DOE
plants for which it is the operating contractor. Both the
Paducah and Portsmouth Gaseous Diffusion Plants then began the
preparation of a "Development Plan For Uranium Enrichment
Performance Improvement Program". This plan for performance
improvement draws heavily on INPO practices for conduct of
maintenance and operations. This plan is in a first-draft state,
and many years and much effort will be required for its
implementation.

Findings in this assessment are related to improper responses to alarms, to incomplete incorporation of Operational Safety Requirements in operating procedures, to a lack of a thorough documented safety review of operating procedures, to an absence of rigor in the conduct of control room operations, to the need for discipline in the use of signs in the operating areas, and to human factors problems created by use of artificial rather than real units on some instruments.

Most of these findings have their root cause in the lack of prior management dedication to rigorous and disciplined operations; a situation that appears to be addressed by the newly drafted program plan.

4.5.1.2    Regulatory or DOE Order Requirement Findings

4.5.1.2.1 Incorporation of Operational Safety Requirements into Operating Procedures

Performance Objective:  All Operational Safety Requirements should be stated as crisply worded requirements and should be effectively incorporated into the appropriate operating procedures.

Finding OP-1:  Some Operational Safety Requirements are not stated crisply and/or are not effectively incorporated into operating procedures.

For the most part, Operational Safety Requirements (OSRs) are clearly incorporated into operating procedures at PORTS.  In addition, a stamp stating "OSR" is placed in the margin of the procedure pages beside each provision that is derived from an OSR.  This stamp serves as a reminder to operating personnel of the origin or reason for the provision.

According to the Production Services Supervisor, no comprehensive independent audit has ever been performed at PORTS to assure that all OSRs are effectively incorporated into operating procedures. Approximately 20 OSRs were reviewed in detail by a Team member as to the manner in which they were incorporated into operating procedures.  One OSR stated that solution depth in the Small Parts Steam Pit in Building X-705 will not exceed 1.5 inches, but this requirement was not addressed at all in the operating procedures.  This grated pit is about 4 inches in depth at its lowest point and is fitted with a drain which appeared to be within 1.5 inches of the lowest point.  This drain leads to a pump which transfers any drainage to the geometrically safe 7000-gallon feed storage system in numerous lengths of pipe located under the ceiling of the high-bay portion of this building.  This drain is equipped with a valve and has openings that are subject to plugging by debris.  No procedure requirement or other identifiable instruction was evident that would assure that the

4-8

drain was open and unplugged before uranium-bearing equipment is cleaned over this pit. Such plugging could result in sump depths exceeding the 1.5-inch limit.

A problem evident during this assessment was that the OSRs are not written as concise, unambiguous requirements. Many are incorporated in narrative descriptions, while some are stated in terms of what "is done" instead of what is "required" and others are vague or incomplete.

An example of incompleteness is contained in the "OSR for the X-333 and X-330 Uranium Enrichment Cascades" for the cell $UF_6$ detection system when operating above 14.45 psia. This OSR states that the detection system must be "operational" under such conditions and that if a portion of the manual $UF_6$ detection system is not operational observers must be placed on the operating floor to visually monitor the operating equipment. However, the OSR document does not address similar requirements when in the usual automatic (computer coordinated) monitoring mode. Consequently, the operating procedures require floor observers only when less than half of the detectors in any separate cell (or half-cell in Building X-330) are inoperable when in the automatic mode. From a technical and safety viewpoint, this provision appears appropriate, but the failure to address this practice in the OSR indicates less than satisfactory rigor in the OSR documentation system.

Another inadequacy in the OSRs for this system is evidenced by an event that occurred approximately one week prior to this assessment. A very small $UF_6$ leak started in Cell 33-5-3 in Building X-333 when a pin-hole leak developed from abrasion on an instrument line when its protective collar failed at a wall penetration point. The monitors were set to alarm if the trip voltage was at least five standard deviations below the average of the past 10 trip voltages on each detector. In this case, the leak rate was low enough that, although the successive trip voltages kept lowering, they remained within the permitted five standard deviations of the continually decreasing average of the last 10 trip voltages. Thus, the sophisticated program had backfired and obscured this slowly developing actual leak (a total of about 10 grams of $UF_6$) without alarming. Operations management elected to consider this system, with at least a partially faulty software program, still to be an "operable" system until a better software program was developed and applied. At the conclusion of the assessment, a new, simpler software program was being employed that operations supervision believed would avoid repetition of this type of occurrence. Since it appears that a large $UF_6$ leak would have been detected by the original software system, this was probably a proper decision, but the vaguely worded OSR document fails to provide clear guidance.

4.5.1.2.2  Response to Alarms

Performance Objective:  Operations personnel should respond
promptly to all alarms in a manner that is effective and safe;
regardless of whether the alarm is real or false.

Finding OP-2:  Operating personnel were being dispatched
frequently in Building X-333 to visually inspect cascade cells
from which a UF$_6$ leak detection system alarm had been obtained.
These personnel were not required to carry respirators.

On October 24, 1989, during a facility walk-through in Building
333, operators were dispatched frequently from the control room
for visual inspections of cells from which UF$_6$ detection system
alarms had been received.  These personnel were not taking
respirators with them for the cell inspections.  Respirators
would have been needed had the alarm indicated an actual UF$_6$
release.  On a second walk-through of this building on October
27, 1989, operators were being dispatched with respirators on
each occasion.  Since there were about 16 such alarms during each
shift, and each proved by visual inspection not to represent a
UF$_6$ release, the alarm system obviously requires improvement.
Engineers were giving considerable attention to this matter,
especially to the software program that determines what detector
response results in an alarm. During walk-throughs of other
operating areas, prompt and proper operator response to a wide
variety of other alarms was observed.

4.5.1.3   Best Management Practice Findings

4.5.1.3.1 Conduct of Control Room Activities

Performance Objective:  Control room activities should be
conducted in a business-like manner and present a disciplined
appearance.

Finding OP-3:  The area monitoring/control rooms in Buildings X-
326, X-330 and X-333 lacked the appearance of a well disciplined
operation.

The area monitoring/control rooms in Building X-326, X-330, and
X-333 at PORTS provided adequate control of process operations
but did not exhibit the appearance of a well disciplined
operation.  Part of this was caused by requiring control room
operators to eat lunch in a portion of the control room rather
than creating a designated nearby lunch room.  Additionally, more
people were present than are needed for normal operations in
order to be able to respond quickly to abnormal occurrences.
There also appears to be a long history of permitting informality
and a relaxed atmosphere in these locations.

4-10

On the other hand, Building X-300, which is the central cascade monitoring station, is a very up-to-date, well operated facility even though the building and much of its equipment are over 30 years old. The comprehensive and effective control of over 2000 MW of electric power to the cascade is exemplary. Except for early start-up difficulties, PORTS has never experienced a total loss of power, and a wide variety of power distribution problems have been solved in this building. Distribution of added power, beyond the basic contracted amount, is effectively accomplished in this building. Good communication between Building X-300 and the various area monitoring/control rooms was being maintained.

4.5.1.3.2 Safety Review of Operating Procedures

Performance Objective: A documented comprehensive independent safety review should be performed in the process of issuing and revising all operating procedures.

Finding OP-4: An independent safety review is given for Operational Change Memos (OCMs) only when the Production Services Supervisor chooses to request one. None is employed in the annual or biennial review process.

At PORTS, operating procedures are called "Operating Methods, (OMs)" but the Process Improvement Program getting underway infers that they will all be renamed operating procedures and will require a uniform format. This will be a constructive move. Currently all new or reissued OMs do receive a documented independent safety review, but it is unclear that each such review incorporates every safety discipline. However, only about half of the OCMs receive any independent safety review, and the reviews do not necessarily cover each safety discipline. There are about 950 OMs at PORTS. About 100 per year are issued or reissued. About 200 OCMs are issued each year.

Approximately 90% of the OMs at PORTS receive an annual review and the remaining 10% receive a biennial review. However, these reviews are usually performed only by the responsible operations supervision and seldom include an independent safety review. The upgrading of safety and health practices is continually occurring, but independent safety reviews are not a part of the periodic OM review process.

4.5.1.3.3 Workplace Signs

Performance Objective: Workplace signs and notices should be clear and have an official appearance.

Finding OP-5: Some signs and notices in the workplace were misleading, and others were very informal.

In the high-enriched product withdrawal area there is a sign with the heading "NCS Administrative Control", which purportedly lists four criticality safety requirements. However, one of these gave a numerical upper weight limit for the geometrically safe shipping cylinders. This fill limit is actually derived from an OSR and is for the purpose of assuring adequate void volume to permit safe reheating of the cylinder; it has nothing whatsoever to do with critically safety (as the other 3 items on the sign did). Such signs can be very confusing to workers. For example, in this instance, when asked what would be the consequence of having more product in the cylinder than the weight limit, the seasoned operator replied "it might cause a criticality event."

Another pair of "NCS Administrative Control" signs observed in Building X-343 was also troublesome. Both stated "Do not allow water to enter a cylinder during a $UF_6$ release." Since some of the cylinders in the area could contain up to 5% $^{235}U$ (although most of them are either natural uranium or Paducah product), the author of the sign had a basis for a criticality concern. However, in nearly all imaginable situations the rapid reaction of water with $UF_6$ (creating voluminous amounts of hydrofluoric acid gas and uranyl fluoride smoke) would cause a reverse flow of these hazardous materials preventing enough water from being present to cause moderation, and hence criticality. The major reason for preventing water contact with $UF_6$, where it is open to the atmosphere, is to avoid creating these hazardous gases.

An example of excessive informality in notices was observed in a control room in Building X-330 on the valve status pin chart. There were two handwritten notices on scrap paper pinned to this board relating to possible defects in two valves. One note was dated over a year earlier and signed; the other was neither dated nor signed. Reminders on this board may well be helpful to operations. However, official valve condition information is in a computer record, which is the source to be relied upon (according to the building supervisor). Official reminders concerning defects could be created for the pin board relatively easily (from plastic discs for example), but that was not being done.

4.5.1.3.4 Use of Proper Units on Numerical Readings

<u>Performance Objective</u>: Human factors considerations should be incorporated in operations to facilitate operator control, information control, and proper responses to instruments and other equipment.

<u>Finding OP-6</u>: Many instruments at PORTS read out in "divisions" rather than in actual units; and some logs, instructions, and other communications are given in the same terms.

4-12

As an example, the differential pressure gauges on compressor
seal monitoring panels all have dimensionless scales of 0 to 100
units. During a continuing training session on compressor seals,
Building X-330 cascade operators had difficulty converting
different pressure/differential pressure units, and also in
understanding the operational implications of changes in seal
differential pressures.

The use of real units on all instrument readings, instructions,
and communications would serve to promote better understanding of
workplace activities and reduce the opportunities for errors or
misunderstandings in using and communicating data.

### 4.5.2    Maintenance

#### 4.5.2.1   Overview

Maintenance programs were evaluated through:  observation of the
conduct of maintenance in both process buildings and maintenance
shops; discussions and interviews with Maintenance Division
managers, supervisors, and crafts personnel; and reviews of
policies, procedures, and other documents related to plant
maintenance.  Based on a review of the 1986 TSA and subsequent
follow-up and action plans, the following maintenance areas were
identified for a focused review:  administration, material
condition, conduct of maintenance, maintenance facilities and
equipment, work control, and procedures and documentation.

Close working relations were in evidence between the maintenance
and operations organizations.  One of the most visible examples
of this cooperative environment was that the managers responsible
for the Maintenance Division and the Production Division have
exchanged jobs within the past year.  Proper maintenance is very
important to the continued operation of PORTS, as most current
process components were in the plant for the initial startup.
Components are refurbished after they fail and are then returned
to service.  The PORTS has developed a draft maintenance
performance improvement program that is modeled after INPO
guidelines.  However, while observed maintenance activities were
competently performed, several weaknesses were noted by the Team
when comparing current maintenance practices to these guidelines;
particularly those related to formality and documentation of
maintenance activities.  These weaknesses included:  a lack of
documented standards and procedures for some activities; absence
of policy for procedure use; failure to use and update procedures
at work locations;  incomplete control of lock and tag systems;
and ineffective mechanisms for ensuring that torque wrenches are
properly tested and calibrated.  The principal root cause of
these maintenance weaknesses is that management has not yet
assimilated contemporary nuclear industry standards for
maintenance programs and determined how to apply these standards
at PORTS.

<div align="center">4-13</div>

### 4.5.2.2    Regulatory or DOE Order Requirement Findings

None observed.

### 4.5.2.3    Best Management Practice Findings

#### 4.5.2.3.1 Establishment of Standards

Performance Objective:  Standards should be established for conduct of maintenance.

Finding MA-1:  Standards for items such as mechanical clearances, testing/acceptance criteria, fastener torquing, and lubrication have not been documented for some maintenance activities.

A member of the team observed the rebuilding of a Duo-Seal vacuum pump.  Vacuum pumps of this type are used throughout Buildings X-326, X-330, and X-333 for seal evacuation.  The only documentation available for the conduct of this work was the owner's manual.  This manual does not provide any standards or specifications for these pumps.  Thus, experience is used to determine standards for items such as rotor/intake clearances, lubricants, and acceptance testing.

None of these standards developed through experience have been documented in maintenance procedures.  None of the fasteners on these pumps are torqued.  No statistics are maintained on these pumps with respect to rework needed as a result of the failure of acceptance testing, although the foreman estimated rework as two percent.  The acceptance testing criterion for these pumps was defined as a vacuum of 10 microns of mercury, although no time limit for reaching this value was identified.

#### 4.5.2.3.2 Procedure Use and Updating

Performance Objective:  Maintenance procedures should be required by policy, followed, and updated periodically.

Finding MA-2:  Maintenance procedures are not consistently used or kept current.  Policy on when/how these procedures are to be used has not been promulgated.

The team reviewed, with cognizant personnel, the operation and maintenance of the varnish baking oven in Building X-720 used for curing motor windings.  Maintenance personnel indicated that there were no written procedures for the operation or maintenance of this equipment.

A member of the Team observed the calibration of digital manometers that are used to determine the inventory/enrichment of $UF_6$.  Personnel conducting the calibration were knowledgeable of the process, but did not use the applicable procedure (IMI-7 of

November 2, 1981). This procedure was found to be inconsistent with current calibration methods; the calibration data sheet referred to in the procedure has been replaced with a different form; and a manometer control box has been added, which is not included in the procedure.

Discussions with Maintenance Division managers indicated that there is no written guidance provided to maintenance personnel concerning procedural compliance (e.g., when procedures are to be used, when deviations from procedures are allowed).

4.5.2.3.3 Equipment Designed for Seismic Loads

Performance Objective: Equipment, systems, and structures required for safe facility operation should be designed for seismic and other external loads.

Finding MA-3: Spare parts stored in process buildings are not adequately secured to ensure that they do not cause safety system damage as the result of a seismic event.

Multi-ton spare parts, such as converters, are stored on the operating floors in Buildings X-326, X-330, and X-333 in proximity to operating cells. These large spare parts are not restrained in any way. During a seismic event, these components could move and damage or even rupture converters/compressors, or other safety system components.

Finding MA-4: Electrical equipment is not securely mounted to a concrete pad or floor.

In Building X-330, electrical equipment labeled "131 Capacitor for Power Improvement Type PL-7495" (Unit 3, Cell 1) could not be verified by inspection as having been fastened to the concrete floor. In Building X-333 inspection of Battery Room No. 1 revealed that the battery racks were not fastened to the floor and that the batteries on the shelves were not restrained. This equipment is not classified as safety equipment or safety related, therefore the condition does not constitute a violation of DOE Orders. However, to seismically qualify electrical equipment, the current nuclear industry program has shown, through experience, that anchoring electrical equipment is beneficial.

These racks were purchased and installed to protect the electrical equipment from damage from a seismic event. However, the racks themselves are not protected from seismic events because they are not properly mounted.

4-15

4.5.2.3.4 Overtime Policy

Performance Objective:  Policy should be established for the overall direction of the maintenance program.

Findings MA-5:  Management has not established comprehensive guidelines for acceptable amounts of overtime.

Operations during CY 1989 have been at higher than planned power levels, resulting in greater than anticipated workloads. Retirement of plant personnel has exceeded expectations during 1989.  Maintenance personnel are not allowed to work at the plant without a "Q" clearance.  Currently, the plant is experiencing an 18-month period for obtaining a "Q" clearance.  The combination of above factors has contributed to high workloads and considerable overtime for operations and maintenance personnel. Written guidelines have been established for personnel who are directly involved with liquid $UF_6$, limiting their work to no more than 16 consecutive hours.  However, no similar guidelines have been established for other plant personnel.  The Nuclear Regulatory Commission (NRC) and Federal Aviation Administration (FAA) have established work time standards that are more comprehensive than the above guideline.

4.5.2.3.5 Maintenance Performance Indicators

Performance Objective:  Indicators of maintenance performance should be established and periodically assessed to enhance maintenance effectiveness.

Finding MA-6:  Plant performance indicators do not include sufficient indicators for maintenance.

A report entitled "Portsmouth Plant Performance Indicators" is produced monthly.  The report includes indicators for major functions selected by the Plant Manager.  One senior manager's meeting each month is devoted to reviewing this report.

The only plant performance indicator related to maintenance is "seals valved off."  While this indicator is relevant to maintenance organization performance, it does little to provide an overall measure of maintenance status or quality, and only relates to production.  The Maintenance Division tracks other performance indicators which would also be important to highlight at this level, and which are related to safety.  These include: overdue preventive maintenance items and overtime hours.  The Maintenance Division also monitors the "backlog" of maintenance work and planned vs. unplanned work, but the definitions used for these terms are not the same as those in INPO guidelines and are therefore somewhat misleading.

## 4.5.2.3.6 Identification of Critical Items

<u>Performance Objective:</u>  Systems and components important to safety should be identified to ensure that appropriate priority is given to their maintenance.

<u>Finding MA-7:</u>  Not all safety system components are identified as critical items.

The PORTS has established a definition for "critical items" that encompasses all safety system components.  However, the implementation of this critical item program, which is intended to provide greater priority to the maintenance of these items, has not included safety system components.  The rationale given for this decision is that these components have already been flagged as safety system components, and will receive appropriate special attention.  This implementation is not consistent with either the definition of critical items or the intent of designation of critical items.

## 4.5.2.3.7 Calibration and Testing of Torque Wrenches

<u>Performance Objective:</u>  Measurement and test equipment should be calibrated and controlled to ensure accuracy and traceability.

<u>Finding MA-8:</u>  Torque wrenches are not adequately controlled to ensure that they have been properly calibrated at intervals.

Torque wrenches are not uniquely identified or labeled to allow determination of whether the wrench has been tested/calibrated within a prescribed frequency.  Mechanics in Building X-720 indicated that they know if a torque wrench is acceptable to use if it has masking tape on it with an indicated setting (e.g., "35 lbs.")  Many mechanics have torque wrenches in their personal tool boxes, some of which had handwritten, partially worn off labels indicating "no good."  The team concluded that current methods for controlling, calibrating, and testing torque wrenches provide no documented assurance that torque values identified in specifications for fasteners are properly implemented.  Although the Team did not have sufficient time to investigate the calibration of other measurement and test equipment, the absence of management controls in this area suggests that the weaknesses identified here apply to other such equipment.

## 4.5.2.3.8 Surveillance of Emergency Electrical Power Systems

<u>Performance Objective:</u>  Emergency electrical power system surveillance should include testing to ensure the reliability and operability of this equipment.

<u>Finding MA-9:</u>  Tests are not performed on the diesel oil supply to determine if biological organisms are active in the diesel

oil. Diesel oil can serve as a host to biological organisms, which can change the properties of the oil (e.g., the PANTEX Plant had a positive finding in their last oil sample with a recommendation from the analysis laboratory to use a specific additive to suppress growth of the organism). These organisms can cause the diesel engines to become inoperable.

### 4.5.3    Training and Certification

#### 4.5.3.1  Overview

Training and certification programs were evaluated through observation of classroom and on-the-job training; discussions and interviews with personnel from both training and line organizations; and reviews of policies, procedures, training materials and other documentation. Based on a review of the 1986 TSA and subsequent follow-up and action plans, the following training areas were selected for review: organization and administration, facility operations, maintenance, emergency preparedness, criticality safety, and personnel protection.

Past TSAs and other appraisals/reviews of the PORTS have documented that operations training and retraining programs did not have the rigor or documentation required by DOE 5480.5. While this condition continues to exist, considerable resources have been devoted during the past two years to develop training materials to address these inadequacies. Schedules indicate that these programs will largely by implemented during the coming year. The PORTS approach of using a central training organization to establish policy and standards and to evaluate training programs, with line organizations having principal responsibility for conduct of training is apparently working effectively. However, policy and standards have not yet been documented for functions such as:  remediation and removal from duties for demonstrated substandard knowledge/performance, training record retention, and training program evaluation.

The principal training weakness identified by the Team was that a combination of operating philosophy and training and examination practices were encouraging operators to commit procedures to memory and not use them at their work stations. This situation further manifested itself by operators who were neither trained in, nor knowledgeable of, the physical processes underlying their operating procedures. One operator weakness of particular concern to the Team was their lack of knowledge of nuclear criticality mechanisms at their work areas.

Plant personnel also demonstrated an inability to correctly identify some plant emergency alarm signals. This weakness is discussed in Section 4.5.4. The large number of PORTS emergency alarms was judged by the team to be a principal contributor to this situation.

The primary root causes of training weaknesses are felt by the Team to be an operating philosophy that neither encourages nor requires knowledge about the underlying processes that are the basis for plant operation, and a lack of policies and procedures for training program implementation.

### 4.5.3.2    Regulatory or DOE Order Requirement Findings

None identified

### 4.5.3.3    Best Management Practice Findings

#### 4.5.3.3.1 Operating Philosophy

Performance Objective:  Nuclear facility operator and supervisor training and certification programs should develop and improve the knowledge and skills necessary to perform assigned job functions.

Finding TC-1:  Operating philosophy and training/examination methods lead to operators committing procedures to memory, rather than gaining an understanding of what they are doing.

Team members observation of cascade operations indicated the operators do not generally use operating procedures (called operating methods [OMS] by the plant) when they perform plant operations.  Discussions with operations and training personnel indicated that OMs are not "user-friendly" and that they are organized in such a manner that several different procedures are needed to conduct many operations.  This contributes to OMs not generally being used at work locations.  There are no written directives that define "procedural compliance" (e.g., when/which procedures are to be followed verbatim).

Computer-based evaluations are under development, for use in continuing training, to determine whether operators need refresher training.  If operators do not achieve a passing score on these examinations, then retraining is required.  Those who pass the examination will "validate" the training.  The test questions intended to be used for these computer-based evaluations were reviewed by the Team.  It was determined that these questions do not test operator knowledge of why things are being done as they are; rather, they test recall of the operating procedures.

The Team observed the conduct of refresher training for three qualified Cascade Operators related to compressor seals.  None of these operators had sufficient knowledge of compressor seals to understand the significance of changes in seal differential pressures or to diagnose the cause of a change in differential pressure.  The operators also had difficulty in converting

different units of pressure/differential pressure. Subsequent discussions with the instructor indicated that these knowledge weaknesses were representative of general Cascade Operator knowledge levels.

### 4.5.3.3.2 Remediation and Removal from Duties

Performance Objective: Retraining and recertification should be up-to-date and individuals who fail a recertification examination should be relieved of their duties until they successfully meet recertification requirements.

Finding TC-3 There are no documented criteria or procedures for remediation or removal from duties of job incumbents who fail requalification examinations or show other evidence of substandard performance.

The Team observed the conduct of refresher training for three Cascade Operators on compressor seal operation. Two of the three operators received a grade of less than 80 percent on the subsequent examination. Eighty percent is identified on the examination as the minimum acceptable score. The instructor indicated that these two individuals would be required to complete the training and then be re-examined. The instructor indicated that removal from duties pending retesting was not required for this system but would be for other more critical systems. Subsequent discussions with the Plant Training Manager indicated that there was an understood, but undocumented, requirement for "two and out" (two failures on the same topic and the individual is removed from the program), although this approach has never been used. He indicated that there is no written policy in this area. He also indicated that because the monthly training/testing is focused on individual systems, operators can be reassigned to other duties, without removing them from their shift. This deficiency was identified in the 1986 TSA of PORTS.

### 4.5.3.3.3 Nuclear Criticality Knowledge

Performance Objective: Personnel should receive training in nuclear criticality safety consistent with their assigned tasks.

Finding TC-3 Plant personnel do not have adequate knowledge of the mechanisms for nuclear criticality in their work areas.

During discussions with Team members, plant personnel demonstrated that they had basic misconceptions concerning nuclear criticality. Two Cascade Operators in Building X-330 were asked what would cause a criticality in their work areas, and how a criticality could be recognized. One answered that if the process gas (PG) went solid, a criticality would result, and the other answered that a criticality would be recognized by a

wisp of smoke. An operator in Building X-700 told a Team member that there was no radioactive contamination in this building, because if there was any "we would have a criticality problem, and we don't." The Building Supervisor in Building X-330 indicated that waste oil containers in the building are separated to prevent an inadvertent criticality. (No feasible mechanism exists for sufficient fissile material to be held in these containers to cause a criticality). Cascade operators in Building X-326 did not know that the weight limit for cylinders on a posted criticality safety limit was incorrectly identified as being for criticality protection. (The actual reason for the limit is to prevent overfilling the cylinder and subsequent rupture on expansion).

Personnel responsible for nuclear criticality training for the personnel mentioned above indicated that PORTS Plant Training provides a 45-minute videotape overview, followed by "job-specific" training provided by the cognizant line organization. This job-specific training is conducted in the classroom, and does not include any practical training at the individual's workplace.

4.5.3.3.4 Training Records

Performance Objective: Records of training participation and performance should be maintained in an auditable manner.

Finding TC-4  Plant procedures do not require that lesson plans or tests be retained as permanent records.

The Plant Training Manager indicated that it has been PORTS practice for the past several years to retain training rosters, test results, and tests and lesson plans as permanent records (75-year retention). However, a review of applicable procedures indicated that lesson plans and completed tests are not considered permanent records.

4.5.3.3.5 Maintenance Training

Performance Objective: Maintenance training and qualification programs should develop and improve the knowledge and skills necessary to perform assigned job functions.

Finding TC-5  There is no formal program to ensure that maintenance personnel are qualified to perform their assigned tasks.

PORTS hires journeyman craft personnel who, upon completion of orientation and safety training (e.g. respirator, criticality, safety) are assigned to a foreman/first line supervisor. Job specific training required to perform particular tasks is the responsibility of these foremen/first line supervisors. This

4-21

training has no formal criteria and is not documented.  When a
foreman is satisfied that an individual is able to work alone,
this person is "qualified."  PORTS has recognized that more
structure and formality is needed in maintenance training and
qualification to meet contemporary industry standards and
proposed DOE accreditation requirements.  Such programs are in
the early planning and development stages.

4.5.3.3.6 Performance Indicators

Performance Objective:  Performance indicators should be
established and used to improve training.

Finding TC-6  Plant performance indicators do not measure the
performance or quality of training.

A report entitled "Portsmouth Plant Performance Indicators" is
produced monthly.  The report includes indicators for major
functions selected by the Plant Manager.  One senior manager's
meeting each month is devoted to reviewing this report.  There
are no plant performance indicators related to training or
qualification.  Central training has, for some time, tracked
performance indicators primarily related to training development
progress.  As of this month, the first monthly tracking of plant
hours devoted to training has been instituted.  Examples of
performance indicators (along with established goals) used by
other nuclear facilities to monitor the performance of training
and qualification programs include:  the number of personnel
qualified/certified in more critical jobs, the number of
delinquent/overdue recertifications, and the
quality/effectiveness of training based on feedback from
graduates of training programs and their supervisors.

4.5.3.3.7 Visitor and Subcontractor Personnel Training

Performance Objective:  Personnel protection training programs
should ensure that facility personnel, visitors, and
subcontractors have an understanding of their responsibilities
and safe work practices.

Finding TC-7:  There are no established personnel protection
training requirements or programs for visitor or subcontractor
personnel.

PORTS has established personnel protection training and
retraining programs for MMES employees that include:  industrial
safety, nuclear criticality safety, radiation protection,
emergency preparedness, and security.  New employee orientation
addresses information in these areas that applies to all plant
personnel, with specialized courses (e.g., for radiation workers)
to provide information needed by a subset of the total plant
worker population.  However, no parallel programs have been

established for visitors or subcontractor personnel to provide them with information concerning their safety. For some areas, such as construction, line organizations have established their own programs/requirements for subcontractor personnel protection training. The Plant has relied upon escorts to ensure the safety of visitors and subcontractor personnel. This approach can be adequate for short visits, but for longer periods, or where independent movement around the plant is allowed, it is not sufficient.

4.5.3.3.8 Learning Objectives

Performance Objective: Learning objectives which specifically define the skills and knowledge expected upon training completion should be provided to instructors and students.

Finding TC-8: Lesson plans for operator training do not include appropriate learning objectives.

Lesson plans for operator training programs generally include only one learning objective. The stated objective of the lesson is that students achieve greater than 70% (or 80%) on a written examination. The intent of performance-based training is that learning objectives be derived from job performance requirements, and that they state, in measurable terms, what skills and knowledge the student is expected to achieve through the training. Test items are then derived from these learning objectives to ensure that trainees have achieved the stated learning objectives. The PORTS learning objectives reverse this process by deriving the content of training based on the content of test items.

4.5.3.3.9 Annual Realignment

Performance Objective: Training and qualification programs should ensure that personnel are properly qualified before they are assigned to job tasks.

Finding TC-9: "Annual Realignment" is lowering the overall qualification level of bargaining unit personnel.

In February of each year all PORTS bargaining unit personnel are permitted, per their contract with management, to transfer to other positions within their discipline (e.g., welder to pipefitter in the mechanical maintenance discipline). This practice is referred to as "Annual Realignment." For some time after this realignment occurs, the overall qualification level of these "realigned personnel" is lowered as they work to become proficient in their new assignments. Since, for most positions, there are no established qualification standards, each first line supervisor must determine individually when realigned personnel are "qualified" to perform their new assignments. This

4-23

realignment practice also increases the training burden on supervisors and training personnel and diverts resources from training improvement efforts.

### 4.5.4    Emergency Preparedness

#### 4.5.4.1    Overview

The review of the emergency preparedness program was focused on PORTS ability to properly respond to an emergency that may affect the surrounding community, but also included a limited review of onsite emergency preparedness. The emergency operations center (EOC) is a well planned center for the crisis management team to properly respond to an emergency. The emergency coordinator and his staff have furnished the EOC with modern equipment and supplies, as well as current emergency plans and procedures. The plans and procedures are well coordinated with local and DOE authorities. Specific scenarios and possible consequences of criticality accidents and chemical releases have been evaluated for emergency planning purposes. The computer system for emergency management is new and not yet fully operational. The EOC has been fully exercised and the team has demonstrated its capability to provide an adequate response.

There is a concern about the video tape on emergency alarms and signals that is used for training plant personnel. Many of the signals and alarms are similar and the appropriate response is not always taken by personnel upon hearing the alarms. Plant personnel expressed similar concerns.

Another concern is the lack of cross-training for security, operations, and emergency response personnel to reduce the risk of personnel injuries during a real emergency.

#### 4.5.4.2    Regulatory or DOE Order Requirement Findings

None observed

#### 4.5.4.3    Best Management Practice Findings

##### 4.5.4.3.1 Emergency Alarms

Performance Objective: Emergency assessment and notification procedures should enable the emergency response organization to correctly classify emergencies, assess the consequences, notify personnel, and recommend appropriate actions.

Finding EP-1: Some of the sounds of the different alarms are similar and the type of emergency (and the proper response) were not correctly identified in many cases.

PORTS has six different plant-wide emergency alarms plus other building/process-specific alarms. The plant-wide emergency alarms include: personnel alert, protective action/take cover, gas release, personnel accountability, evacuation, and security alert. The Team was provided the same training with respect to these alarms that is provided to PORTS employees. This is a video tape of the alarms and associated responses. Several of the Team members were confused by the number of emergency alarms and their similarities. As a result of this concern, an audio tape of the six emergency alarms was played for three process operators in Building X-330. Slightly more than half of the alarms were correctly identified by these operators. The operators further indicated that they had never heard some of the alarms (e.g., gas release) in the plant.

On October 25, 1989, during an afternoon walk-through at Building X-705, the hazardous gas release alarm sounded and, with some hesitation, all personnel decided to evacuate. All of these personnel improperly stopped to remove their shoe covers on the way out, which is contrary to fundamental safety rules for such evacuations. During the event, some personnel were uncertain what the alarm meant, saying they thought it was a criticality alarm. The portal security officer overheard a foreman say he had set off the alarm accidentally, so the security officer identified this as a false alarm when he reported it. As a result, no emergency forces responded and a security vehicle did not arrive until after at least five minutes had passed. Three problems were identified here. First, the guard should not accept hearsay comments, and the responses should have been made as if the alarm were real. Second, without a prompt response by security forces, the security protection requirements were temporarily violated. A third problem was indicated when the security officer was questioned about this and he said his orders were to detain anyone who tripped the SNM alarm as they evacuated. This third problem is also contrary to common rules for safe evacuations.

The incident eventually proved to be a false alarm caused by a foreman who accidentally bumped one of the manual buttons that activate the alarm. Since this button had a protective sheet metal guard to prevent such an accidental activation, the building superintendent arranged for a repeat test of the action that caused the false alarm. The alarm was indeed repeated on this test. Inspection of the protective guard over this button revealed that it was too flimsy and also located too close to the button to be effective.

The Team noted that most other DOE facilities have fewer emergency alarms than does PORTS, which tends to decrease the likelihood of confusion/misinterpretation.

4-25

4.5.4.3.2 Safe Emergency Egress

Performance Objective:  Personnel protection procedures and
training should minimize personnel exposure to hazards during
emergencies.

Finding EP-2:  Cross training between security, operations, and
emergency response personnel has not been conducted to reduce the
probability of personal injuries during a real emergency.

Increased security requirements for protecting special nuclear
material have significantly changed the pathways, equipment, and
staffing used to control access to some facilities.  Some
training has been provided to security, operations, and emergency
response personnel to ensure that each group responds
appropriately to an emergency.  However, little or no cross-
training has been provided between these groups to ensure that
each understands the other's emergency response role.  For
example, security guards are trained, as are other radiation
workers, to immediately evacuate if a criticality alarm sounds.
Security guards are also trained to closely watch other
evacuating personnel for any actions that suggest diversion of
special nuclear material.  Under some circumstances, deadly force
may be prescribed.  However, operations and emergency response
personnel have not been trained in the actions to expect from
security guards during such emergencies.  It is important that
the probability of accidental shootings be reduced to an absolute
minimum.

Cascade operators did not recognize the security alert alarm when
a tape recording of the alarm was played for them, and they did
not indicate a complete understanding of the expected response.
They also did not correctly identify the gas release alarm.  If
plant personnel confuse the security alert alarm with other
emergency alarms and evacuate the affected building, they could
be subject to a deadly force response by security personnel.

Management and facility custodians have not reviewed and
recognized the causes and impacts on safety of the concerns
expressed by employees about confusion concerning alarms and the
safety/security interactions.

4.5.5     Technical Support

4.5.5.1   Overview

The technical support program evaluation consisted of reviews of
the PORTS Final Safety Analysis Report (FSAR) and Operation
Safety Requirements (OSRs).

The FSAR does not meet all current requirements, is under
revision, and is not scheduled for completion until FY 1994.  It

is not clear why the augmentation of the FSAR will take over four years, although competing resource priorities is one factor. Examples of areas for which revisions are contemplated include: incorporation of seismic and tornado damage analysis modifications (e.g., installation of replacement expansion joints with a seismic design value of 0.18 g), analysis of a station blackout (loss of all AC and DC power, including diesels), and assessment of the 250 VDC control system and independent operation of the 345 Kv breakers, which resulted from the November 10, 1988 fire in the 13.8 Kv switchyard.

The procedures used to modify OSRs, and processes to assure that such changes do not affect plant safety or conflict with FSAR requirements were reviewed. No significant items of non-compliance were observed. Additionally, configuration control practices were assessed and found to be satisfactory. Document No. H-31, "Configuration Control for Safety Systems," March 22, 1988 governs configuration control of safety systems and documentation of changes. The complete as-built condition of the facility is not fully documented, but the as-built condition of all safety systems is up to date. Full-size drawings are used for permanent records, and aperture cards and computer assisted design (CAD) tapes provide backup records and are stored in a separate location. Current and future changes to the plant are controlled by procedure to ensure as-built documentation. There were no significant deficiencies noted in the configuration control or OSR processing areas and no findings were made. Specific deficiencies in incorporating OSRs into procedures are discussed in Section 4.5.1 of this report.

4.5.5.2   Regulatory or DOE Order Requirement Findings

Performance Objective:  Safety Analysis and engineering design reviews should establish a valid design base and risk analysis envelope for operations consistent with the DOE Orders and nuclear industry practice.

Finding TS-1:  The Safety Analysis baseline for the plant is unclear against current criteria, with revision not to be completed until FY 1994.

4.5.5.3   Best Management Practice Findings

None

4.5.6   Criticality Safety

4.5.6.1   Overview

A review of the criticality safety program included interviews and facility tours with members of the criticality safety group and facility custodians. Reviewed elements of the program

4-27

included organization and administration, criticality safety control parameters, evaluations of the design and operation of process equipment, operating procedures, criticality safety limits, and alarm systems. A major weakness in the program is the fact that there are only two technically qualified individuals on the criticality safety staff. They must perform criticality safety evaluations and audits and deal with a significant lack of understanding of criticality safety principles among the PORTS staff. In spite of this limited staff, an experienced criticality safety engineer still accomplishes regular observations and audits in the workplace.

A visit was made to the vault area of Building 345 to evaluate an open finding from the previous TSA follow-up performed in March 1989. An assessment of the previous finding and concern was evaluated. With the combination of additional engineered and administrative controls, (e.g., a moat was installed inside the vault to divert seepage, a system was installed to divert water into a separate reservoir, uranium containers are placed in zip lock bags, and sand bags are placed in front of the vault doors if flooding occurs) the probability of a criticality accident has been significantly reduced. Upon completion of additional corrective measures to further reduce the risk of criticality, closure of this finding is recommended.

While reassessing the above TSA finding, another concern surfaced. Additional liquid waste processes and side streams have been installed to address environmental concerns. Collection of liquids has required additional criticality evaluations and assessments. DOE 5480.5 requires that all new processes have demonstrated, adequately documented, and independently confirmed analyses to assure that the entire process will remain subcritical under both normal and credible abnormal conditions. Adequate documentation and independent confirmation of these new processes has not been completed.


4.5.6.2   Regulatory or DOE Order Requirement Findings

None observed

4.5.6.3   Best Management Practice Findings

4.5.6.3.1 Criticality Safety Posting

Performance Objective:  Approved operating procedures should address criticality safety limits and be conspicuously posted in the workplace to provide effective guidance for all of facility or operations activities.

<u>Finding CS-1</u>:  Nuclear criticality safety limits are not conspicuously posted in the workplace and in fissile material storage areas.

Criticality safety notices were found in some locations, however the notices were outdated and the responsible parties who originally signed them are no longer responsible for the operations.  Facility custodians confirmed that the criticality safety notices are located in the facility custodian's office. Criticality safety limits were not conspicuously posted in either the workplaces or the fissile material storage vaults that were visited.  Management, facility custodians, and the criticality safety staff have not recognized the importance of posting and the need for continuing awareness of criticality safety in the workplace.

4.5.6.3.2 Criticality Safety Knowledge

<u>Performance Objective</u>:  Fissile materials handlers should have a good working knowledge of the fundamentals of criticality safety.

<u>Finding CS-2</u>:  Operating personnel interviewed had minimal knowledge of the fundamentals of criticality safety.  (See Finding TC-3.)

Training in criticality safety is less than adequate.  Although the criticality safety staff reviews and approves the training program, they have not assessed the effectiveness of the training at the operating level.  Some operating personnel interviewed did not have a basic understanding of the fundamentals of criticality safety.  Some examples include:  some personnel confused contamination control with criticality safety; one individual incorrectly interpreted a sign regarding criticality limits to mean "make sure the lid is on the tank"; and process changes are made without verification and assessment of potential criticality safety concerns.  Management and facility custodians have not established a system to monitor the effectiveness of training.

**4.5.7    Radiation Protection**

4.5.7.1    <u>Overview</u>

Key elements of the PORTS radiation protection program were reviewed during this assessment.  In general, the program is adequate to protect the health and safety of PORTS employees.  In fact, external and internal radiation exposures are quite low when compared to other DOE contractor sites.  Policies and procedures have been developed to adequately define and guide the radiation protection program.  However, four findings of non-compliance with DOE 5480.11 were noted and six findings of deficiencies in the implementation of practices recommended by DOE 5480.11 and relevant standards were identified.

4-29

A number of positive aspects were noted that reflect good design and implementation of certain elements of the radiation protection program. For example, policies and procedures are established and implemented for investigating and reporting on radiation incidents. A review of the incidents reported to DOE/ORO during the first 9 months of 1989 revealed a reporting system that consistently identifies minor incidents, their causes, and corrective actions. Appropriate management attention is given to these minor incidents, which contributes to prevention of more serious incidents.

Radiation-generating devices, including analytical x-ray machines and industrial radiography machines, were properly shielded and posted. Supplemental warning lights, signs, shutters, collimators, and safety interlocks were installed as recommended by ANSI standards.

The external radiation exposure control program has succeeded in maintaining very low external radiation exposures. The average exposure to the plant's highest exposure group was only about 80 millirem in 1988. The highest individual exposure was less than 500 millirem in 1988. In addition, the thermoluminescent dosimeter (TLD) used to monitor external exposures at PORTS has been approved by the DOE Laboratory Accreditation Program.

PORTS relies on urine bioassays for internal dosimetry assessments. The technical criteria for determining which employees are included in the bioassay program and the frequency of sampling are documented and consistent with the recommendations of ANSI N343. A quality control program, including blind audit samples, has been established. Internal doses to PORTS employees are very low. In 1988, only 240 out of over 24,000 samples were over the detection limit of 2 dpm/100 ml. None of the samples exceeded the threshold for work restrictions (80 dpm/100 ml). An in vivo counting system is being procured which will enhance the internal dosimetry program.

Fixed and portable radiation detection instruments are calibrated by an instrument maintenance group that utilizes a well designed calibration facility in Building X-700. All calibrations are traceable to National Institute of Standards and Testing (NIST) (formerly National Bureau of Standards) certified sources, and comprehensive records are maintained in an easily retrievable computerized database. The efforts of the instrument calibration staff to upgrade their facility and program are commendable.

An air monitoring program that meets minimal standards is conducted in the radiological buildings, with most of the air monitors located near product withdrawal areas where the probability of airborne radioactivity is highest. However, air flow studies have not been conducted in some areas to ensure that

samplers and continuous air monitors (CAMs) are positioned in the optimum locations for detecting airborne radioactivity.

Although one finding was noted (RP-10), an effective "as low as reasonable achievable" (ALARA) program has been established, including policies and procedures, a functioning ALARA committee, and setting and reporting on meaningful ALARA goals. The ALARA program has succeeded in reducing contamination levels in the process buildings (X-326, X-330, and X-333).

In contrast to these positive aspects of the radiation protection program, ten findings are noted in this assessment, four of which are not in compliance with DOE 5480.11 and six of which indicate a need for improvement to reflect good health physics practice. For example, records of radiation exposure and other records generated by the radiation protection program are generally adequate, except as noted in Findings RP-3. Hard copies of records are maintained in retrievable files, and efforts have begun to microfilm historical records. A document has been drafted that defines the radiation protection records program and establishes requirements for its further development and maintenance.

Contamination control is a major concern at PORTS. Reductions in contamination levels have been accomplished in the process buildings but improvements in contamination control are needed in other radiological buildings, especially Building X-705 and Building X-720. Specific findings of non-compliance and deficiencies in the contamination control program are noted in Findings RP-1, RP-2, RP-5, and RP-6.

Deficiencies in the posting of radiological areas are noted in Findings RP-5 and RP-9. Fixed beta contamination in the Recovery Area in Building X-705 has not been adequately surveyed and posted.

A number of outdated radiation warning signs were posted in some radiological buildings which gave incorrect warnings.

Deficiencies in the internal audit program were noted in Finding RP-7. Efforts to initiate a MMES audit of the radiation protection program have not been effective.

The organization, administration, and implementation of the radiation protection program is inhibited by a lack of manpower, as noted in Finding RP-8. The shortage of health physicists and health physics (HP) surveyors is directly and primarily responsible for the incomplete implementation of the PORTS radiation protection program. The root cause of most of the findings in this Section can be traced back to the shortage of health physics manpower and the lack of management attention given to this problem.

4.5.7.2    Regulatory or DOE Order Requirement Findings

4.5.7.2.1 Contamination Surveys

Performance Objective:  Personnel contamination monitoring should
be performed at exits from radiological areas.

*Finding RP-1:  Contamination surveys are not performed routinely
when personnel exit some radiological areas, as required by DOE
5480.11, Section 9.g.(4)(c).

Numerous operating personnel wear plant clothing and shoes when
working in designated radiological areas (e.g., Buildings X-326,
X-330, and X-333).  These personnel typically enter the buildings
wearing personal clothing and shoes and go to a central change
room where they put on plant clothing and shoes.  They
periodically return to the change room, control room, lunch room,
and restroom, which are non-radiological areas, still dressed in
plant clothing and shoes.  Hand monitors and frisking probes are
provided for self-monitoring, but they are not rigorously used
for exit surveys.  At the end of the work day, personnel change
back into their personal clothing and shoes and exit the building
from a non-radiological area through a radiological area without
further exit surveys.

Visitors to these buildings are presently required to put on a
lab coat and shoe covers at an emergency monitoring station and
then travel to the building in a government vehicle.  After
visiting radiological areas, hand monitoring is required before
exiting the building.  Visitors then travel by government
vehicle, while wearing potentially contaminated lab coats and
shoe covers, back to the emergency monitoring station where they
remove the protective clothing and monitor their hands and
personal clothing and shoes.  Other plant personnel who escorted
the visitors were not required to meet the same protective
clothing and monitoring requirements because of an insufficient
supply of lab coats and shoe covers.

---

*  Findings RP-1 through RP-7 are marked with an asterisk because
they relate directly to requirements and recommendations of DOE
5480.11.  This Order became effective on January 1, 1989, and one
year was allowed for compliance or for submission of a compliance
plan and/or requests for waivers.  Findings RP-1 through RP-4
identify conditions which are presently in non-compliance with
("shall") requirements of DOE 5480.11.  Findings RP-5 through RP-
7 identify present deficiencies in the implementation of
practices recommended ("should") by DOE 5480.11.

A number of alternative approaches for implementing exit monitoring are being (or have been) investigated. One approach was to simply fence in all the radiological buildings and establish a single, large radiological area with a few exit control points. A disadvantage of this plan is that it invites the spread of contamination from the radiological buildings to all the clean spaces in between. Another approach is to designate the process buildings (X-326, X-330, and X-333) as radiological areas and establish exit monitoring at a single entrance to each building. However, this plan is complicated by the non-radiological areas (control room, lunch room, change room, and restrooms) centrally located on the ground floor. A third approach would involve more intensive control of contamination at its sources coupled with more frequent cleaning and surveys of non-radiological areas to assure they stay clean. Such an approach may be more effective in controlling contamination and have a less disruptive effect on operations.

Additional lab coats and shoe covers, exit monitoring equipment, and building modifications are on order to facilitate compliance with this requirement of DOE 5480.11.

4.5.7.2.2 Contamination Control

Performance Objective: Administrative procedures should be established and exercised when material and equipment with fixed contamination that exceeds the limits specified in DOE 5480.11 is released from a radiological area for use in a controlled area.

*Finding RP-2: Administrative procedures are not exercised to provide required protection and maintain control of contaminated equipment that is moved to Building X-720 for maintenance or repair.

Green contamination tags are put on various pieces of equipment by HP Surveyors before the equipment leaves Building X-705. The tags give the contamination status of the equipment (both fixed and smearable contamination remaining after decontamination) and the type of respirator required for various work activities. Green and pink tags are used depending upon contamination levels specified in the following Table.

|  | Contamination Limits (dpm/100 cm$_2$) | | | |
|  | Fixed | | Smearable | |
| Tag Color | Alpha | Beta | Alpha | Beta |
| Green | <30K | <2M | <2K | <30K |
| Pink | >30K | >2M | >2K | >30K |

K = 1,000, M = 1,000,000

The middle part of the green tag lists several maintenance operations, such as Destruction of Surface (welding, burning, grinding, buffing, drilling, machining); Airborne Probability Low (handling, inspecting); and Airborne Probability High (impact tools, sweeping). Corresponding protective equipment requirements are specified, for respirator, gloves, headcovers, and coveralls.

Tagged equipment is moved to Building X-720 where work activities are defined by maintenance foremen. Foremen are required by procedure to specify that "Half-face or full-face respirators will be worn whenever the [HP] contamination tag recommends their use while working on contaminated parts." However, requirements for protective clothing are not addressed in these procedures. It was evident that foremen were not implementing these procedures. Consequently, contamination control and protective equipment requirements are rarely imposed when working on green tagged equipment. HP Surveyors in Building X-720 have not been assigned responsibility for assuring that proper contamination control and protective equipment is required and used when working on contaminated equipment.

Green contamination tags are removed and discarded when component reassembly begins and the contamination status of individual pieces of equipment is lost. Equipment tagged with pink contamination tags is sent to a separate area in Building X-720 where special handling precautions are observed. Evidence of eating and drinking was found in this area.

4.5.7.2.3 Training of Radiation Protection Technicians

Performance Objective: Both classroom and on-the-job training and retraining should be provided to radiation protection technicians. Training records that document the level of understanding and proficiency of radiation safety personnel should be generated and retained.

*Finding RP-3: Training records for HP Surveyors do not comply with the requirements of DOE 5480.11, Section 9.m.(5).

*Finding RP-4: Limited classroom training is provided to HP Surveyors and on-the-job training is incomplete and informal, which does not comply with the requirements of DOE 5480.11, Section 9.o.(3).

There has been significant turnover of HP Surveyor personnel and professional health physicists assigned to training which has resulted in training requirements not being met (see also Finding RP-8). A classroom has not been available to the HP Department for formal training of HP Surveyors. Consequently, limited formal radiation protection training has been provided. Some on-the-job training of HP Surveyors has been done on an informal

4-34

basis, but comprehensive training and retraining has not been provided to all HP Surveyors at the required frequency.

Training records for HP Surveyors were reviewed and found to be incomplete. There was no evidence of records that documented the proficiency of personnel to perform specific job assignments, such as a witnessed demonstration of proper use of survey instruments to monitor alpha and beta contamination on equipment. Some examinations were given to HP Surveyors to test their knowledge of radiation protection principles. However, many of the exam questions were trivial (e.g., alpha particles can be stopped by a sheet of paper - true or false?). Such questions do not adequately document the level of understanding required for competent HP Surveyors. Those records of training that were retained were not filed and organized in a manner that meets the intent of ANSI N13.6.

A training and retraining program for HP Surveyors, designed to meet the requirements of DOE 5480.11, has been proposed. However, the draft program had not been approved and the resources required to implement the program are not yet available.

4.5.7.3   Best Management Practice Findings

4.5.7.3.1 Posting for Surface Contamination

Performance Objective:  Any area where surface contamination levels are greater than 10 times those specified in Attachment 2 of DOE 5480.11 should be clearly posted (e.g., "Contamination Area").

*Finding RP-5:  Spots of fixed beta contamination in excess of 50,000 dpm/100 cm$^2$ probably exist in the Building X-705 Recovery Area and are not posted in accordance with the recommendations of DOE 5480.11, Section 9.k.(2)(c).

Attachment 2 to DOE 5480.11 specifies surface radioactivity guides for both removable and fixed-plus-removable contamination for uranium (235 and 238) and beta-gamma emitters (uranium decay products). Surface contamination posting is required if removable alpha or beta contamination exceeds 10,000 dpm/100 cm$^2$. A review of numerous reports from surveys done in Building X-705 revealed that this limit was not exceeded except in two areas that are posted as "Contamination Areas." Surface contamination posting is also required if removable plus fixed alpha or beta contamination exceeds 50,000 dpm/100 cm$^2$. Periodic surveys of fixed contamination in Building X-705 are scheduled, but they have not all been done because of a shortage of HP Surveyors. Fixed beta contamination levels in excess of 50,000 dpm/100 cm$^2$ are suspected (by the HP Supervisor) in the Recovery Area, but the spots have not been clearly identified and posted.

4-35

4.5.7.3.2 Entry Control Program

Performance Objective:  Step-off pads and protective clothing should be provided for entry into contaminated areas.

*Finding RP-6:  Some interim contamination control measures are not fully implemented in accordance with the recommendations of DOE 5480.11, Section 9.1, and thus are not effective.

Some interim measures were implemented in some radiological areas to improve contamination control where the potential for higher levels was present (see also Finding RP-1).  For example, Building X-710 has certain laboratory rooms designated as radiological areas; shoe covers and lab coats were required for entry into the Uranium Sampling Lab.  However, there was no step-off pad or receptacles for dirty shoe covers or lab coats at the exit from the lab.  Used shoe covers had to be carried across the corridor to a loading dock area where there was a burnable, contaminated waste barrel.  This situation increased the probability of spreading contamination to the corridor.  Although additional contamination controls are considered good practice, it was evident that this interim contamination control measure had not been fully implemented and was not effectively meeting its intended purpose.

4.5.7.3.3 Contractor Internal Audits

Performance Objective:  Contractor internal audits of all functional elements of the radiation protection program should be performed at least every 3 years.

*Finding RP-7:  Contractor internal audits of the radiation protection program are not performed in accordance with the recommendations of DOE 5480.11, Section 9.r.

When MMES became the contractor for PORTS about 2 years ago, a plan was developed whereby health physics representatives of Portsmouth, Paducah, Oak Ridge, and the corporate office would perform independent audits of the radiation protection programs of each of the MMES sites.  Such an audit has been scheduled for PORTS site on several occasions, but no such audit has been conducted to date.  In the interim, internal audits of some of the elements of the PORTS radiation protection program have been conducted, but the audits have not been independent.  Members of the HP staff have audited parts of their own program.  Furthermore, not all of the elements of the radiation protection program have been audited on the required 3-year frequency, and some audit reports were incomplete.

4.5.7.3.4 Health Physics Staffing

Performance Objective:  Health physics staffing should be adequate to ensure effective implementation and control of radiation protection activities.

Finding RP-8:  Health physics staff resources have not been adequate to implement required elements of the radiation protection program.

The present health physics staff resources at PORTS consist of 5 health physicists, 14 HP surveyors, 5 HP technicians, 1 administrative assistant, and 1 clerk, for a total staff of 26. There are 13 other positions that are currently vacant.  Over the past two years, job offers have been made to 10 health physicists, but only 1 has accepted.  This was due in part to the below average salaries that were offered.  Another factor is that many people are unwilling to relocate to the Portsmouth area. This factor suggests that above average salaries are needed to attract and keep qualified health physicists.

The job classification and salaries of HP surveyors is substantially below average for the nuclear industry.  As a result, several qualified HP surveyors have transferred to higher paying jobs at PORTS or to other sites.  This has resulted in a high turnover rate among HP surveyors and a constant shortage of manpower.  Consequently, a greater effort is required to train new HP surveyors, which further impacts the limited professional staff.

"Q" clearances are presently required for HP staff to work in most PORTS buildings.  It now takes over a year to obtain a "Q" clearance.  This severely affects the ability to recruit and hire new staff because of lengthy delays before job offers can be made or before new staff can have access to secure facilities.

The shortage of health physicists and HP surveyors is directly and primarily responsible for the incomplete implementation of the PORTS radiation protection program.  The policies and procedures to define and guide an adequate program have been established.  The schedules and requirements to implement an adequate program have also been established.

4.5.7.3.5 Posting of Radiological Areas

Performance Objective:  Radiological areas should be clearly posted to identify areas of potential hazard.

Finding RP-9:  Outdated radiation warning signs, which give incorrect warnings, are posted in some radiological areas.

DOE 5480.11 includes new requirements for posting to be compatible with NRC posting requirements. Posting in most of the radiological areas has been changed to comply with these new requirements, but the conversion is not complete. Moreover, several outdated radiation warning signs were observed in Building X-705 that gave incorrect warnings. At least 5 "Caution - High Airborne Radioactivity" signs were posted in Building X-705 that have been outdated since 1976.

There were numerous Nuclear Criticality Safety signs that said "for NCS specifications, limits, and procedures - see information packets." The packets were out-of-date; the current information was kept in the facility manager's office.

There are several pieces of abandoned/contaminated equipment in the Recovery Area of Building X-705 that are unlabeled (or have no current labeling) and are in poor condition with regard to contamination control. In addition, PORTS is in the process of posting the empty $UF_6$ cylinder storage area. A whole body reading exterior to the cylinder of 9 mR/hr was measured for empty cylinder no. 1053 on May 28, 1987, by USEPA staff.

4.5.7.3.6 Prevention of Unnecessary Radiation Exposure

Performance Objective: Work activities should be scheduled and conducted so as to maintain radiation exposures "as low as reasonable achievable."

Finding RP-10: Inadequate precautions are taken to avoid exposures to uranium decay products when cleaning out large $UF_6$ cylinders in preparation for periodic hydrostatic tests.

PORTS has no required delay time between "heeling out" a $UF_6$ cylinder in Building X-342 and subsequent cleaning in Building X-705 prior to hydrostatic testing. Potential beta exposures from $^{234}$Th (the 28-day half-life first decay product of $^{238}$U) is the major concern. Experience in the nuclear industry has shown that when $UF_6$ has been in a cylinder for periods as short as several weeks, the residual solid, non-volatile ThF-4 remaining after "heeling out" a cylinder can produce a beta radiation field exceeding 20 rad/hr even if the heel is spread out over a large area. However, with the short half-life of $^{234}$Th, a delay period of about six months before cleaning virtually eliminates this concern.

Typically, a delay of six months or more occurs between "heel out" and cleaning at PORTS in the normal course of operations, but such a delay is not clearly required. Records indicate that in the summer of 1987, cleaning was initiated on a large number of cylinders that had been "heeled out" from one to twelve weeks earlier. Gamma exposure rates on some of these cylinders read between 15 and 30 mR/hr, and they were returned to storage and

4-38

not actually cleaned for nearly two years. A limit of 10 mR/hr through the wall has been established for prompt cleaning of cylinders, but this measurement is taken through a 5/8-inch-thick steel wall and does not reflect the intense beta activity from $^{234}$Th decay. Many cylinders have been cleaned in Building X-705 with a relatively short delay time when the exterior gamma readings were less than 10 mR/hr. For example, cylinder no. 1053 was cleaned on June 22, 1987, and had been "heeled out" on May 18, 1987. It had an exterior gamma reading of 9 mR/hr on May 28, 1987. Cylinder no. 1064 was cleaned on June 25, 1987 and had been "heeled out" on May 27, 1987. It had an exterior gamma reading of only 1 mR/hr on May 28, 1987. These data indicate that the 10 mR/hr limit does not necessarily provide adequate protection from potential beta exposures from $^{234}$Th. This concern could be eliminated if a minimum delay time of six months were required between "heeling out" and cleaning. If this were not practical in some cases, additional beta monitoring would be necessary.

## 4.5.8    Industrial Safety

### 4.5.8.1    Overview

Due to the limited time available, no attempt was made to determine the overall compliance of the PORTS facility relative to the broad scope of industrial safety. A sampling of the overall safety program was performed by touring a select group of buildings, reviewing specific records, and conducting interviews with managers and employees. The information gathered is thus limited and only intended to address specific systematic problems of a serious nature.

Tours of selected buildings indicated that the buildings had serious deficiencies within their respective areas and that certain practices and procedures were probably universal throughout the PORTS facility. Fundamental to the deficiencies was an across-the-board lack of overall understanding of industrial safety regulations and general industry practices. Observations in the facilities indicated absence of management implementation of basic safety procedures, practices, and regulations. Many of the physical observations observed in the workplace were covered in the PORTS safety manual, but not instilled into the work force. This was indicated by the lack of enforcement of plant regulations and a lack of awareness of the underlying reasons for specific safety related requirements.

### 4.5.8.2    Regulatory or DOE Order Requirement Findings

#### 4.5.8.2.1 Work Permit System

Performance Objective:  Management should ensure the effective implementation of personnel protection programs and procedures designed to control occupational hazards.

Finding IS-1:  The work permit systems in use are not rigorously followed.  Numerous violations occur on a monthly basis, some of which could potentially result in injury or death for employees who must rely on the procedures for establishing a barrier between energy sources and their work location.

- When isolation valves are noted to be leaking, there is no specific procedure or follow-up for noted deficiencies in the isolation controls.  The procedure to establish a barrier should also contain a method of identification of any anomalies within the system.

- Internal audits by the safety organization indicate that tags used to establish isolation barriers are being removed from the controlling device before authorization to remove the barriers is given.

The use of a tagout only procedure vs. a tagout and lockout procedure should only be allowed if procedures assure that isolation control devices remain in place until representatives of disciplines who are assigned to work on the equipment, and their supervisors, have completed a visual inspection of the work areas and agree that barrier control devices can be safely removed.

A review of the last 24 months of information concerning the internal safety auditing of the Hazardous Work Permit and Electrical Work Permit system resulted in the conclusion that management has a written policy which is routinely violated. This may be due, in part, to two different work permit systems being in place.  Confusion may result while handling the forms which control and track each work permit system, resulting in supervisors and employees failing to adhere to each individual system's procedures.  This results in a serious hazard potential to employees.  Management has been notified on a monthly basis of the discrepancies; records indicate that management hasn't taken stringent action to eliminated the discrepancies.  This presents an unacceptable and unnecessary risk to PORTS employees.

#### 4.5.8.2.2 National Electric Code

Performance Objective: Facility operations should comply with National Electrical Code (NEC) Standards.

Finding IS-2:  Numerous examples of NEC code violations were noted throughout the areas reviewed.

- Extension cords were used in a manner and at locations where fixed wiring was needed to meet code compliance.  This deficiency was noted in Building X-720.

- A location, which was originally Classified as a Hazard Class 1 Location, had the original installation breached by the addition of additional receptacles.  This was noted in Building X-720 electrical shop paint booth.

- Ground-Fault Circuit-Interrupters are not used in all areas where grounding of personnel is probable (i.e., eyewashes or sinks immediately adjacent to water coolers).  This deficiency was noted in Buildings X-720 and X-330.

- Obvious deterioration of the outer insulation covering on flexible cable power supply cords was noted in numerous areas.  This deficiency was noted in Buildings X-720 and X-330.

- Power cords of less than number 14 size wire were being repaired instead of replaced in violation of NEC article 400-9.

The use of extension cords for convenience outlets and installation of equipment without adequate personnel protection provisions are conditions which do not meet currently acceptable practices or National Electric Code requirements. The failure to recognize and correct these violations points to a lack of knowledge, or failure to appreciate the seriousness of safety requirements.

4.5.8.2.3 Hoisting and Rigging

Performance Objective:  Hoisting and Rigging equipment and procedures should comply with the requirements of the DOE Hoisting and Rigging Manual and 29 CFR 1910.

Finding IS-3:  Violations of the DOE Hoisting and Rigging Manual (HRM) were widespread and evident in all areas reviewed.

- Annual physical load testing of slings and rigging equipment is not performed. Equipment is not downrated and taken out of service as required per HRM section 7.2.5.

- Attached nameplates containing serial number, weight of attachment, and rated safe working load limits are not installed on removable fork lift attachments per HRM section 3.4.3.

- Hooks with a capacity of five ton size or less are not routinely provided with a device to bridge the throat opening to prevent the release of loads per HRM section 3.6.2.

- Shackles are in use with a common bolt rather than the required manufacturer's shackle pin in violation of HRM section 4.5.

- Unshouldered eyebolts have been used to lift equipment contrary to procedures specified in section 4.6 of the HRM.

- Specially engineered lifting devices are not clearly and permanently marked with capacity and physical weight in accordance with section 4.8 of the HRM.

- Lifting devices have been fabricated and used locally in Building X-720 shop areas without going through a formal design process.

- Forklift tines were suspended about 7 feet in the air over a walking surface in the Building X-700.

After examining the maintenance areas and talking with personnel who are familiar with existing hoisting and rigging practices and procedures, it is clear to the team that significant deviations from the DOE HRM are occurring. Design requirements, testing, training, inspection, and maintenance requirements from the HRM are not being instituted in the workplace. Detailed training of personnel is necessary to bring the existing program into full compliance with the HRM.

4.5.8.2.4 Personnel Lifting Devices

Performance Objective: The lifting of personnel by hoisting and rigging equipment should comply with the requirements of the DOE Hoisting and Rigging Manual.

Finding IS-4: Violations of the DOE Hoisting and Rigging Manual concerning the use and construction of personnel lifting devices were evident. Section 5.18 of the DOE HRM was violated in Buildings X-720 and X-330.

- The HRM specifies that lifting of personnel shall only be done after "A qualified person responsible for overall work-site safety shall determine that there is no practical, alternative way to perform the work, by using a ladder, scaffold, stairway, aerial lift or personnel hoist." There is no indication that this requirement is being followed.

4-42

- Platforms used for lifting personnel are not designed and constructed in accordance with sections 5.1.18 b (1)-(11) of the HRM.

- Load testing of the platform and rigging is not proof tested per section 5.1.18.c(1) of the HRM.

- The HRM requires that forklifts used to lift personnel platforms be rated to at least 200% of the total weight of the loaded personnel platform and associated equipment. Employees indicated a lack of knowledge concern this requirement.

4.5.8.2.5 Guarding

Performance Objective:  Guarding should meet the requirements of 29 CFR 1910 Subpart O, for equipment with moving and rotating parts that may present workplace hazards to employees.

Finding IS-5:  Violations of 29 CFR 1910 requirements were evident throughout the areas reviewed.

- Pedestal mounted fans for cooling personnel had fabric mesh guarding placed over the substandard original guarding material, but numerous fans had fabric openings which provide clear access to rotating blades.

- The evaporator and condenser coil fans on the refrigeration demonstration stand were inadequately guarded in Building X-720.

- Motor drives on machinery located throughout Buildings X-720 and X-330 had vendor's original guarding, which does not meet current OSHA regulations.

Guarding of equipment throughout the PORTS facility has not been systematically reviewed for compliance with OSHA requirements for certain types of machinery.  Other machinery is not addressed in a specific section of the OSHA standard, but the general duty clause is applied where necessary to cover hazardous conditions not covered in the particular standard. "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."  Current ANSI standards can also be used in determining adequacy of guarding.

4.5.8.3    Best Management Practice Findings

4.5.8.3.1 Recognition and Evaluation of Potential Hazards

Performance Objective:  Procedures and practices should clearly
require the employer to evaluate, recognize, and correct
electrical safety deficiencies within the workplace.

Finding IS-6:  Poor electrical safety practices in the workplace
present a hazard to the employees.

- A motor test stand is used which has an inadequate housing
  covering a set of three insulators that operate between 400-
  2300 Volts.  A lockout/tagout system is not used to control
  the breaker which supplies the power to the pigtail
  connectors.

- A metal workbench and metal vise are used to hold electrical
  pigtails in a stationary position so that uninsulated
  alligator clips can supply 208V power to an air conditioner
  system.

- A leaking steam valve was creating a water puddle adjacent
  to a Motor Control Center in Building X-700.

- Lighting fixtures and bulbs are exposed to physical hazards
  (such as above welding and grinding areas) and are not
  provided physical protection against flying objects.

4.5.8.3.2 Compressed Gas Cylinders

Performance Objective:  Compressed gas cylinders should be
inspected, tested, maintained, and stored to minimize
occupational safety concerns consistent with MMES Standard
Practice Procedure (SPP) H-22 and general industry practice.

Finding IS-7: Numerous compressed gas cylinders are not protected
against corrosion and are not stored properly per SPP H-22.

- An oxygen manifold setup in Building X-720 has numerous
  uncovered pigtails and connection points, which allows
  organic matter (e.g., bugs, flies) to enter the manifold
  system.

- Storage of compressed gas cylinders under a stairway in
  Building X-720 violates the Life Safety Code.

- Unsecured or inadequately secured filled compressed gas
  cylinders were located throughout Buildings X-720 and X-
  330.

- Valve protection caps were missing from numerous compressed gas cylinders in storage on the Building X-743 cylinder storage dock.

- A block of 220 compressed gas cylinders which contained a significant number of compressed hydrogen gas cylinders was inadequately secured and stored on the Building X-743 cylinder storage dock.

- Numerous cases of expired hydrostatic testing dates were noted on compressed gas cylinders.

- Numerous gas cylinders had protective paint which was significantly deteriorated, allowing corrosion to become deep seated in the cylinder's shell wall.

4.5.8.3.3 Color Coding and Component Identification

Performance Objective: Color coding and identification of safety systems should result in quick and easy identification of safety hazards.

Finding IS-8: The present scheme of safety system identification and isolation controls is inconsistent with general industry practices.

- Plant facility piping systems are not readily identifiable. Systems should be marked in such a manner that identification of the contents is apparent both on the system's piping and at discharge points.

4.5.8.3.4 Lock and Tag

Performance Objective: Lock and tag system should provide adequate protection for personnel and plant equipment.

Finding IS-9: The lock and tag system does not provide the level of protection of current nuclear industry standards.

- Standard Practice Procedure (SPP) M-5 "Stop and Danger-Do Not Operate Tags" indicates that tags are to be used to establish protective barriers. The tags of concern are the form T-131, T-132, and T-212 tags which are used for establishing barrier controls for protecting personnel and facilities. The use of these tags is confusing and does not have the formality or control of contemporary nuclear industry methods. The "Danger-Do Not Operate" and the "Stop-Do Not Operate" tag systems do not include any provision for logging the tagout, authorizing tagouts by senior operations personnel, or independently verifying the tagout/isolation.

4-45

### 4.5.9    Industrial Hygiene

#### 4.5.9.1    Overview

The status of the PORTS Industrial Hygiene (IH) program was evaluated by reviewing the PORTS Health and Safety Manual, the IH Procedures Manual, personal and area sampling data, and by having discussions with IH staff and Oil, Chemical and Atomic Workers (OCAW) union officers/workers.  Those facilities suspected of having the greatest potential for noncompliance (specifically the maintenance, support, and chemical handling operations) were visited, and complete walk-throughs with custodians were performed.  This included Buildings X-700, X-720, X-330, X-333, and the Respirator Facility in Building X-103.

The PORTS Health and Safety Manual is a well written document which generally shows considerable thought toward identifying and complying with most applicable guidelines.  However, in some cases, entire segments of an IH program, such as conducting airflow measurements on local exhaust systems, are missing.

A review of the air sampling data requested and made available indicates that the IH staff has identified air sampling needs. However, some monitoring is not being performed as often as deemed necessary per the IH Department's routine monitoring schedule.  It should be noted that while some data reveals exposures greater than accepted levels (i.e., diethylamine/ trimethylamine, coal tar pitch volatiles), most data confirms that employee exposures are being maintained within established guidelines.

During interviews, operations supervision displayed a lack of understanding of their responsibilities.  At no time did it appear that supervision did not care; rather they truly did not understand that it is their responsibility to enforce basic health and safety guidelines and to contact IH when they are unsure of their course of action.

The original standards and practices in force when the PORTS Respiratory Protection Program was established remain in place. Personnel in the Respirator Facility in Building X-103 perform their duties well but are not aware of many new regulations and practices.  A lack of understanding of the correct use of air supplied respirators and disposable respirators is obvious.  In addition, no basic document, which concisely describes the breathing air system, is available.  Recently, responsibility for the Respiratory Protection Program was shifted to the IH Department, which recognizes the program's limitations.

The PORTS Health and Safety Manual describes the Site's Hazard Communication program.  The written program meets OSHA guidelines, but implementation is inconsistent in the buildings

visited. Some interviewed employees could not display a working knowledge of the purpose of the program. Availability of material safety data sheets is good. Some shops in Building X-720 have containers adequately identified, while others have no identification.

Local exhaust equipment is available, but there is no method to ensure that the systems are operating properly. Based on the lack of documentation and conversations with PORTS personnel, local exhaust ventilation airflow measurements and equipment inspections are only performed "when needed."

Basic requirements for personal protection and workplace sanitation were not being enforced in the buildings visited. During the walk-through of the facilities, it was obvious that some OSHA, DOE, and industry-recognized good work practices are sometimes ignored. The level of housekeeping in Buildings X-700 and X-720 was poor. When questioned, supervisors and workers indicated that this is how operations have been routinely conducted. Throughout the facilities toured, operations supervision demonstrated a lack of understanding of the need for operating procedures, a failure to adhere to established guidelines, and an inability to recognize hazards.

The PORTS asbestos control program is basically sound. Air monitoring confirms that personnel are adequately protected during asbestos removals. Pipe insulation is generally in good condition. Emphasis on instituting an insulation labeling program (i.e., asbestos or asbestos free) is needed.

Air monitoring, when conducted, confirms that most jobs are adequately controlled. Availability of trained air sampling professionals has limited the amount of routine monitoring performed and leaves the program subject to criticism. The routine monitoring schedule developed by the IH Department is not being met because of the current level of staffing. In areas such as the welding shops in Buildings X-700 and X-720, additional personnel monitoring during cold weather (when the shops' doors are closed and exposures would be greatest) is needed to reduce the concerns of OCAW personnel.

Handling of the PCB issue at PORTS is improving. Past smear surveys have revealed levels of contamination in excess of PORTS guidelines. Recently, a PCB coordinator was established and this individual has worked with the IH Department to establish a sampling frequency for surface contamination.

The site has programs for heat stress, noise, and carcinogen control, but these programs were not reviewed.

4-47

4.5.9.2    <u>Regulatory or DOE Order Requirement Findings</u>

4.5.9.2.1 Respiratory Protection Program

<u>Performance Objective</u>:  DOE 5480.4 requires compliance with OSHA 29 CFR 1910, "Occupational Safety and Health Standards" and American National Standard, "Practices for Respiratory Protection", Z88.2-1980.

<u>Finding IH-1</u>:  Some respirators are not returned to the respirator facility in Building X-103 for disinfection.

PORTS Health and Safety Manual, Standard Practice Procedure H-42, requires that respirators be returned monthly.  Although the respirator facility in Building X-103 distributes delinquency notices, a review of the records confirm that some respirators have not been returned for as long as 190 days.  OSHA Section 1910.134(b)(5) requires that respirators be regularly disinfected.

<u>Finding IH-2</u>:  Routine tests for odor and water vapor in breathing air are not being done.  Results of the lab analyses for condensed hydrocarbons suggest that the analytical procedure in use may be incorrect.

Routine tests for odor and water vapor are not being performed (reference laboratory reports 102-89-231 and 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 dated 9/89 and 6/89, respectively).  The test procedure for condensed hydrocarbons may be inappropriate.  The laboratory results report condensed hydrocarbons as "condensed hydrocarbons-CH3" rather than as condensed hydrocarbons.  Similar results are reported for tests of the air in the Self Contained Breathing Apparatus (SCBA) made available by the an employee of the Fire Protection Department.  Per OSHA Section 1910.134(d)(1), air used in supplied-air respiratory protection shall meet the requirements of CGA G-7-1966, Grade D, which includes checks for odor, water vapor, and condensed hydrocarbons.

<u>Finding IH-3</u>:  The site procedure for use of the "air purifying filters" does not define the operating pressure for various air supplied respirators available at PORTS.

Different types of air supplied respirators require different pressure settings to ensure that the minimum protection factor is obtained.  Per OSHA Section 1910.134(e)(1), standard operating procedures shall be developed for respirator use.

<u>Finding IH-4</u>:   In some instances, the incorrect respirator or respirator cartridge is specified or used.

The following are examples of incorrect specification or use of respirator equipment.

4-48

- The procedure, Application of Insecticides, Pesticides, Herbicides, and Fungicides, SSG-506, Rev. 2, states to use a half face respirator with organic vapor cartridges, but PORTS does not have NIOSH-approved pesticide cartridges.

- In Building X-720, an individual painting a pipe was wearing a 3M 9910 respirator, which does not protect against paint vapors.

- Supervisors of workers who spray-paint motor housings in Building X-720 stated that 3M 9910 respirators that do not protect against paint vapors have been used during spray painting.

- Supervisors of workers in Building X-700 were unsure of which respirator to use to clean mercury spills and stated that employees may use "purple canisters", which do not protect against mercury.

Per OSHA Section 1910.134 (e)(2), the correct respirator shall be specified (and used) for each job.

Finding IH-5:  There is confusion about who is performing the routine maintenance and repairs on SCBAs.

An employee of the fire protection department stated that the respirator facility in Building X-103 does the SBA repairs while the supervisor in the respirator facility in Building X-103 stated that the fire protection department does the repairs.  A technician in the Respirator Facility in Building X-103 stated that he had previously performed repairs, but last received factory authorized training in 2/75.  Per OSHA Section 1910.134(f)(4), SCBA regulators must be repaired by a trained technician.

Finding IH-6:  In Building X-720, a painter had modified the straps to a 3M 9910 respirator, and a MSA breathing air hose was routinely used improperly with a 3M W-5006 Sand Blast Hood.

Per OSHA Section 1910.134(f)(4) and ANSI Z88.2-1980, Section 8.4, replacement parts shall be only those designed for the specific respirator being repaired.

Finding IH-7:  In Building X-700, 3M 9910 respirators were improperly stored in a cabinet alongside cleaning chemicals and equipment.  The supervisor accompanying the Team member removed the respirators.

Per OSHA 1910.134(f)(5)(i), respirators shall be stored in a protected location.

<u>Finding IH-8:</u>  PORTS has no formal procedures for inspecting SCBAs.

Per ANSI Z88.2-1980, Section 3.5.1, written procedures for inspecting respirators are required.  While adequate monthly inspections are documented, the procedures used are unofficial.

4.5.9.2.2 Hazard Communication

<u>Performance Objective:</u>  DOE 5480.4 requires compliance with OSHA 29 CFR 1910, "Occupational Safety and Health Standards."

<u>Finding IH-9:</u>  Unlabeled and/or incompletely labeled containers of hazardous materials were noted in several buildings across PORTS.

Examples of unlabeled and/or incompletely labeled containers were noted in the following facilities.

- Fire station:  bulk tank of carbon dioxide.

- Building X-330:  two 55-gallon drums near column P4.

- Building X-705:  bulk tank of propane outside NE corner.

- Building X-720 paint shop:  glass jars of lacquer thinner on workbenches, flammable storage can in flammable storage room,  plastic buckets at brush cleaning bench.

- Building X-720 carpenter shop:  jar of stain at workbench.

- Building X-720 metrology lab:  mercury reservoirs for Taylor Floating Manometers.

- Building X-720 motor painting shop:  varnish dip tank.

- Building X-700:  four drums of anthracite at North end, damaged label on phosphoric acid drum along South wall, five gallon plastic bucket of '"dry acid" in pickup truck, 11 55-gallon drums of wax, cleaners, and detergents along South wall, two squeeze bottles at the nitric acid cleaning hood, one gallon flammable storage container at S.E. corner.

Per OSHA Section 1910.1200(f)(5), except where specifically excluded, all containers of hazardous materials must be tagged or marked with the identity of the hazardous chemical and appropriate hazard warnings.

4.5.9.2.3    Engineering Controls

Performance Objective:    DOE 5480.4 requires compliance with OSHA
29 CFR 1910, "Occupational Safety and Health Standards."

Finding IH-10:    Routine inspections of local exhaust ventilation
system measurements are not performed on the ventilated dip tanks
available for use in Buildings X-700 (chromic acid, caustic,
etc.) or X-720 (vapor degreasing tank).

Discussions with PORTS Safety and Health personnel confirm that
measurements are performed only when requested or when a problem
is apparent.  Per OSHA Section 1910.94(d)(8)(i), the exhaust
systems of open surface tanks shall be inspected for evidence of
corrosion or damage.  During this inspection, exhaust flow should
be measured.

Finding IH-11:    The inside paint storage room in the Building X-
720 paint shop does not have a pilot light near the ventilation
fan's switch to indicate that the fan is 'on' or 'off'.

Per OSHA Section 1910.106(d)(4)(iv), a pilot light shall be
installed adjacent to the ventilation fan switch of an inside
flammable storage room if Class I flammable liquids are
dispensed.

Finding IH-12:    The paint spray booth in the Building X-720 motor
painting shop has no visible gauges, audible alarms, or pressure
activated devices to indicate that the filters must be replaced.

Per OSHA Section 1910.107(b)(5)(i), visible gauges, audible
alarms, or pressure activated devices are required to indicate
the filters must be replaced.

Finding IH-13:    Although the varnish baking oven in the Building
X-720 motor painting shop is equipped with alarms to indicate
failure of the ventilation system (combustible gas, low airflow,
and loss of fan), no records of periodic checks of the alarms are
available.

Discussion with supervision responsible for the varnish baking
oven confirm that such checks are not routinely made.  Per OSHA
Section 1910.108(b)(2), the varnish baking oven is an associated
drying operation of the varnish dip tank and requires alarms to
indicate failure of the ventilation system.  Alarms of this
nature require periodic checks and calibrations.

Finding IH-14:    No evidence that routine local exhaust
ventilation system measurements have been performed are available
for any of the exhaust systems in Buildings X-720 and X-700, or
the Respirator Facility in Building X-103.

Discussions with PORTS Safety and Health personnel confirm that measurements are performed only when requested or when a problem is apparent. Per ANSI Z9.2-1971, Section 9.4.3, satisfactory operation of exhaust systems requires routine maintenance, including periodic air measurements.

4.5.9.2.4    Personnel Protection

Performance Objective:  DOE 5480.4 requires compliance with OSHA 29 CFR 1910, "Occupational Safety and Health Standards" and OSHA 29 CFR 1926, "Safety and Health Regulations for Construction."

Finding IH-15:  The area around the trichloroethane degreaser in Building X-720 does not have a safety shower available.  Only an eye wash is available.

Per OSHA Section 1910.94(d)(9)(vii), a safety shower and eye wash shall be provided within 25 feet of tanks containing an irritating liquid.

Finding IH-16:  PORTS has defined the operating areas of Building X-700 as an area which requires that employees wear safety glasses, yet four employees in the facility were observed without safety glasses.

PORTS has established that workers in Building X-700 have a probability of eye injury if safety glasses are not worn.  Per OSHA Section 1910.133(a)(1), eye protection is required where there is a probability of eye injury.

Finding IH-17:  In the Building X-720 Darkroom, liquid bleach, is used and no eye wash is available in the room.

Per OSHA Section 1910.153(c), facilities for quick drenching of the eyes shall be provided for emergency use when the eyes can be exposed to corrosive materials.

Finding IH-18:  In Buildings X-700 and X-720, welding was occurring in the general areas of the shops with insufficient shielding to prevent bystanders from viewing the welding arc. Where installed, some of the welding screens did not permit air circulation at the floor.

Per OSHA Section 1910.252(e)(2)(iii), persons adjacent to welding areas shall be protected from arc welding rays by noncombustible or flameproof screens which permit air circulation at floor level.

Finding IH-19:  In a construction laydown area in Building X-330 near the nitrogen generator, approximately ten (10) sections of pipe show blistered and scorched paint where the pipes were welded and/or cut.

4-52

Per OSHA Section 1926.354(d), preservative coatings such as paint shall be removed a sufficient distance from the area to be heated (i.e. welded or cut) to ensure that the temperature of the unstripped metal will not be appreciably raised.

### 4.5.9.2.5 Workplace Sanitation

Performance Objectives: DOE 5480.4 requires compliance with OSHA 29 CFR 1910,"Occupational Safety and Health Standard."

Finding IH-20: Evidence of eating was noted in Buildings X-700 and X-720.

In Buildings X-700 and X-720, gum wrappers, an empty peanut bag, and soft drink containers were visible on the floor and in areas beyond established eating areas. Personnel in these buildings stated that they eat their lunches in areas other than established eating areas. These buildings contain hazardous chemicals and radioactive contamination. Per OSHA Section 1910.141(g)(2), employees shall not consume food or beverages in areas exposed to toxic materials.

### 4.5.9.2.6 Asbestos

Performance Objective: DOE Order 5480.4 requires compliance with 29 CFR 1926, "Safety and Health Regulations for Construction."

Finding IH-21: Current staffing levels within the IH Department do not permit air monitoring of every asbestos removal operation.

Repair activities involving asbestos insulated equipment occur without air monitoring on infrequent occasions when IH Department personnel are not available. Barring specific exclusions, per OSHA Section 1926.58(f), daily personnel monitoring of asbestos handling operations must be conducted unless supplied air respirators are used.

Finding IH-22: Currently, PORTS does not identify insulation as either asbestos containing or asbestos free.

Per OSHA Section 1926.58(k)(2)(i), labels shall be affixed to all products containing asbestos.

Finding IH-23: The PORTS asbestos inspection program is not completely effective in that there are examples of damaged, friable insulation which may contain asbestos.

Examples of damaged, friable insulation which may contain asbestos include the following: the Building X-100 south wall near the loading dock, and the Building X-700 steam line north of the building, which is damaged along elbows. A periodic

examination of all asbestos containing materials to detect
deterioration is performed per OSHA Section 1926.58, Appendix G,
but repairs are not being done in a timely manner.

4.5.9.2.7 Air Monitoring

Performance Objective:  The DOE Order on Firearms Safety
requires quarterly lead-in-air monitoring of personnel.

Finding IH-24:  Monitoring for airborne lead exposure while
personnel discharge firearms at the firing range was not
conducted during the second quarter of 1989.

Historically, lead sampling has been done as required.  Note
Findings IH-22 and IH-48.

4.5.9.3   Best Management Practice Findings

4.5.9.3.1 Respiratory Protection

Performance Objective:  Respiratory protection programs should be
maintained in accordance with current industry practices and the
breathing air compressor system should be fully described in a
concise document.

Finding IH-25:   PORTS has not inspected SCBAs for damage at the
clamp which secures the breathing tube to the face piece.

NIOSH notified SCBA users of the need to perform this inspection
through information mailings and through articles in trade
journals.  A DOE memorandum, that SCBAs should be inspected for
damage at the clamp which secures the breathing tube to the face
piece, was issued to Contractor organizations.

Finding IH-26:  Periodic checks of the high temperature alarms
and calibrations of the high temperature sensors on the oil
lubricated reciprocating compressors which supply breathing air
(as well as plant and instrument air) were inadvertently
discontinued a few years ago.

Good practice dictates that, if installed, alarms and sensors
should be periodically checked and calibrated, respectively.  Per
OSHA Section 1910.134(d)(2)(ii), if an oil-lubricated compressor
is used, it shall be equipped with a carbon monoxide monitor
and/or a high temperature alarm.

Finding IH-27:  The SCBA filling station, manufactured by Mako
Compressors, at the Fire Station is not being inspected and
serviced as thoroughly as it should.

The following observations were made regarding the Mako SCBA
filling station.

4-54

- The unit is serviced once a year by a vendor who is no longer a factory authorized representative (Phone conversation, 10/25/89, Team representative with Mako representative).

- The carbon monoxide (CO) monitor is calibrated once each year. Draeger, the manufacturer of the CO monitor, recommends that this unit be calibrated once each month.

- Results of the CO monitor calibration were listed at "0 ppm" (reference results, 4/87 and 8/89). The actual lower limit of detection should be noted (i.e., <5 ppm, should be entered).

Finding IH-28: Personnel responsible for the compressors which supply breathing air (as well as plant and instrument air) were not aware of a cross connection between the breathing air system and nitrogen and had difficulty in correctly identifying the compressor intakes. No concise document is available pertinent to the operation of the breathing air system.

When discussing the subject of possible cross connections between the breathing air system and nonrespirable gases, supervision stated that no such connections exist. However, memorandum GAT-842-81-156, dated 8/25/81, indicates that nitrogen can enter the breathing air system should the breathing air pressure fall below 10 psig. While this is highly unlikely, (because the breathing air system operates at 100 psig, well in excess of 10 psig), documentation describing the PORTS breathing air system should clearly identify this cross connection to prevent changes which could raise the nitrogen pressure so that backflow is possible. Per OSHA Section 1910.134(d)(2)(ii), breathing air intakes should be located to be protected from contaminated air. Custodians should be aware of these locations to protect the intakes from contaminated air.

Finding IH-29: The Q127 penetrometers used to test respirator cartridges in the respirator facility in Building X-103 have not been calibrated as recommended by the manufacturer (expiration sticker dated 7/89).

All instruments should be calibrated as recommended by the manufacturer. Exceptions to this policy should be well documented.

4.5.9.3.2 Hazard Communication

Performance Objective: Employees should have a working understanding of the Hazard Communication Program and have current Material Safety Data Sheets readily available.

4-55

<u>Finding IH-30:</u>  Material Safety Data Sheets (MSDSs) for some hazardous materials are not available within the workplace.

Examples include the following.

· Building X-330:  PCBs.

· Building X-720:  Rustoleum 9300 H.D. Polyamide Epoxy 9392 White Base, Rustoleum 9301 Activator, and Black Beauty (sand) blast agent.

· Respirator Facility in Building X-103:  AO 101 sanitizing solution.

Per OSHA Section 1910.1200(g)(8), MSDSs must be available in the workplace.

4.5.9.3.3 Engineering Controls

<u>Performance Objective:</u>  When necessary, local exhaust ventilation should be installed according to industry practices.  When conducted, air measurements should be performed by following consistent operating procedures and using calibrated instruments.

<u>Finding IH-31:</u>  The welding exhauster in the Building X-720 satellite welding shop does not have a movable duct.

The absence of a moveable duct would cause a welder using the exhauster to move the work to the duct, rather than the opposite, which is more desirable.  This reduces the likelihood that a welder will use the exhaust duct.  A flexible metal duct with swivel joints and telescoping sections, counterweighted to move easily, is preferable at welding stations.

<u>Finding IH-32:</u>  In Building X-720, sheetmetal mechanics perform airflow measurements when requested.  Supervisors of the mechanics stated that they do not receive formal training and the instruments are not routinely calibrated.

Good practice dictates that personnel performing airflow measurements be trained and use calibrated instruments.

<u>Finding IH-33:</u>  The "Code Personnel", identified as the group responsible for verifying that Building X-720's vapor degreaser hoist operates properly, are not aware that hoist speed must be operated at no more than 11 feet/minute.

To prevent "drag out" of vapors, it is a recognized industry practice to limit the speed of hoists to no more than 11 feet/minute.

4.5.9.3.4    Personnel Protection

Performance Objective:  Workers should be provided and trained in the use of personal protective equipment such as gloves and vacuums, and be aware of the emergency procedures for their work areas.

Finding IH-34:  An employee failed to use gloves to minimize his exposure to a paint solvent.

In the Building X-720 paint shop, an employee was asked to empty and discard a plastic pail (containing an unidentified cleaning solvent) which was clearly distorted.  The plastic pail was being degraded by the solvent.  In so doing, the employee used his bare hands to remove a spray gun from the bucket.  The employee later stated that gloves were available.

Finding IH-35:  In the Building X-720 motor painting shop, the light which indicates that it is safe to enter the confined space under the varnish dip tank illuminates when the exhaust supply fails.

Workers may assume that it is safe to enter when the light is not illuminated.  A burned out bulb would fail to illuminate even if the exhaust supply failed.  The system should be reversed so that the light remains on when it is safe to enter.  A second light near the door to the confined space is present, but supervisors in the area are not aware of its purpose.

Finding IH-36:  The supervisor of workers who would normally clean mercury spills indicated that no preventative maintenance schedule or operating procedure for the mercury vacuum cleaners are available.  Another supervisor stated that a non-HEPA filtered vacuum is used for vacuuming in Building X-700, which has radioactive contamination.

Inspection of the two mercury vacuum cleaners in Building X-700 revealed a full collection bottle on the Acme Mer-Vac vacuum, loose retaining clips on the Nilfisk vacuum, and open suction hoses on both of the vacuums.  As evidenced by the condition of the vacuum cleaners, personnel do not understand how to use and/or maintain this equipment.  Although an appropriate respirator is normally worn when the non-HEPA filtered vacuum is used, only HEPA filtered vacuums should be used in areas where radioactive contamination or highly toxic materials are present.

Finding IH-37:  An employee left a pickup truck's engine running inside Building X-700 while he walked over to talk to two other employees standing 10 feet away.

It is poor practice to leave a vehicle unattended while the engine is running.

4.5.9.3.5 Workplace Sanitation

Performance Objective:  Management should insist that good
workplace housekeeping standards be maintained and that personnel
follow basic sanitation practices which reduce the potential for
contaminating their person.

Finding IH-38:  In the Building X-720 paint shop, an employee's
lunch and thermos bottle were stored on a shelf under a work
table.  In the Building X-720 paint and carpenter shops, empty
food containers (i.e. baby food and condiment jars) are used to
store hazardous products.

It is poor practice to store lunches in areas where toxic
materials and/or radioactive contamination are present or to
store hazardous products in containers commonly associated with
foods.

Finding IH-39:  Housekeeping throughout Buildings X-700 and
X-720 are poor due, in part, to unused equipment being left in
the workplace.

Supervisors must recognize the value of keeping workplaces clean
and free of unnecessary equipment.  This makes radioactive
contamination control and general housekeeping easier.  Poor
housekeeping was observed in Building X-700, where a trailer
marked "Caution Acid" (unknown purpose) is parked along the
building, an unused battery charger and "Automatic Ram Car" are
left along the inside south wall, and an inoperative microwave
oven on a shelf along the south wall is exposed to chemical and
radioactive contamination.

Finding IH-40:  A volleyball net connected to a column in
Building X-700 is used by employees.  The floor in this area is
subject to chemical and radioactive contamination.

Practices which can result in the spread of chemical and
radioactive contamination from work areas to personnel are not
acceptable.

Finding IH-41:  Hoses, without vacuum breakers, connected to the
sanitary (potable) water system were noted with their ends
submerged, or with the potential of being submerged, in
nonpotable liquids.

Examples include a hose located one inch above the liquid level
of the sodium hydroxide dip tank in Building X-700, and in a 55-
gallon drum of Turco cleaner at the X-720 Motor Painting Shop.
Supervisors of the areas were unaware if vacuum breakers were
installed in the sanitary water systems to prevent back
siphonage.

Finding IH-42:  In Building X-700, which is designated as a no smoking area, cigarette butts are visible throughout the facility and an employee was observed smoking while taking instrument readings in the northeast portion of the Chemical Operations side of the facility.  In addition, someone has affixed a "Smoking Permitted" sign within the facility on column E1.

Site policy prohibits smoking in areas designated as "no smoking", but the policy is not vigorously enforced.

Finding IH-43:  Some portable eyewash containers are not returned to the Respirator Facility for cleaning/filling within the PORTS limit of 30 days.

Although the Respirator Facility sends a "recall notice" to the individual who obtained the unit, some containers remain in the plant up to 180 days beyond the permitted period.

4.5.9.3.6 Asbestos

Performance Objectives:  Good practice dictates that when asbestos-containing products are replaced in the workplace, the replacements be identified.

Finding IH-44:  When replacing asbestos-containing products (i.e., pipe insulation) with asbestos-free products, no attempt is made to identify these areas.

Good practice dictates that where asbestos insulation is replaced with nonasbestos insulation, these areas be identified.  This permits employees to ascertain what controls are required should additional work be performed in the future.

4.5.9.3.7 Air Monitoring

Performance Objective:  Routine monitoring of chemicals in the workplace should be performed based on the potential for exposure.  Staffing levels should be sufficient to permit the completion of the monitoring.

Finding IH-45:  A review of the monitoring schedule for 1989 shows that routine monitoring to characterize worker exposure cannot be accomplished with the current level of staff.

The IH Department has identified sampling priorities, based on professional judgment and past experience, in its Routine Monitoring Schedule.  In some cases, the sampling priorities are not being met.  In some cases, non-IH staff is performing personnel monitoring (reference arsenic survey form Code No. 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, 6/6/89).  See Findings IH-22 and IH-25 for additional details.

## 4.5.10    Radiological Engineering

### 4.5.10.1   Overview

A review of radiological engineering was performed by means of tours of the facilities and interviews with facility custodians and operations personnel.  Special attention was given to assessing potential releases of enriched uranium hexafluoride ($^{235}UF_6$) and normal uranium hexafluoride ($^{238}UF_6$) into the environment.  PORTS management has given considerable attention to reducing the number and quantity of $UF_6$ releases to the environment.

The DOE Manager at the PORTS Site Office established a committee to review $UF_6$ releases that have occurred during the first seven months of 1989.  Approximately 9000 process system openings have been performed with only 25 minor releases.  All of the releases have been small (1 to 10 grams) and have not created a concern for the health and safety to the workers, a fact which was verified by bioassay results.  More than fifty percent of the release incidents were associated with valves in $UF_6$ service. DOE has recognized this problem and has assigned the Paducah Plant the responsibility for designing better valves.  Another twenty percent of the release incidents were attributable to failure of compressor shaft seals.  Since these parts are subject to wear, minor releases must be anticipated.

Operators are trained and tested on their knowledge of operating procedures to assure that they thoroughly understand proper purging techniques.  Special pinching tools have been designed to collapse tubing and form a seal during work on instrument gas lines.  None of the 1989 $UF_6$ release incidents can be attributed to unsatisfactory purging or problems associated with instrument line work.  A $UF_6$ release collection system has been installed at the X-344 product transfer/autoclave facility.  This system consists of portable vapor collection hoods called "gulpers" which can be positioned at suspected release points, such as $UF_6$ cylinder pigtail connections.  These "gulpers" are manifolded and exhausted through a ducting system and discharged through a monitored HEPA filter system to atmosphere.

### 4.5.10.2   Regulatory and DOE Order Requirement Findings

None observed

### 4.5.10.3   Best Management Practice Findings

None observed

## 4.5.11    Special Issues

### 4.5.11.1    PORTS Medical Services

During the course of discussions with PORTS union representatives (OCAW Local 3-689), concerns were expressed about the quality of services provided by the plant medical department.  More specifically, these involved the "return to work" determinations made by the plant physician, and concerns over availability of ambulance transportation in the event of medical emergencies. These issues were not specifically addressed in a recent (April 1989) appraisal of the PORTS medical program.  To better address them, a qualified occupational medicine practitioner, Dr. George Poda, was brought to PORTS on October 31, 1989, to perform a brief evaluation.  His evaluation involved a series of interviews with employees, union representatives, and medical staff personnel, and through physical inspection of the medical services areas and employee medical files.

Based upon this review, the concern regarding the validity of medical staff determinations regarding "return to work" decisions for individual employees could not be substantiated.  Review of individual files indicates that injuries and illnesses are properly evaluated using sound medical judgment.

The concern over availability of ambulance coverage was less clearly addressed, with a discussion held by Dr. Poda with union representatives on the subject.  Dr. Poda indicated that for most traumatic injuries, time is of the essence, and prompt transportation by whatever vehicular means was available is advisable.  On this issue, PORTS issued a standard operating procedure on October 30, 1989 (No. E.2.), "Offsite Transport of Ill or Injured Employees") to clarify how such emergency transportation would be arranged.  This has been discussed with the union representative.

One finding made in Dr. Poda's review is the questionable practice of storing medical records in a Lectriever which has no internal fire suppression and is covered by an overhead sprinkler.  X-ray negatives are also stored on shelves where they would be subject to water damage from activation of the fire suppression sprinklers.

It was clear from all discussions that the relationship between organized labor and the medical department have become strained over these and other issues.  An attempt at improving communications is warranted.

### Best Management Practice Findings

Finding SI-1:  Improve storage of medical records and files to mitigate potential fire and water damage.

### 4.5.11.2  Operations with Valved Off Compressor Seals

An allegation was received through the Inspector General's ES&H Hotline from a PORTS employee regarding the operation of a number of compressors in Building 333 with "bad" seals. The concern expressed that potential releases of $UF_6$ may result from continued operation in the face of such seal failures. It was alleged that the supervisor involved knows about the seal failures, but has not shut down the compressors in response. It was also pointed out that the annunciator alarms in the Area Control Room (ACR) can be defeated by putting a piece of paper between the electrical contact points of the alarms located on the display panel. An overall concern was expressed over the attitude of middle management at Building 333 who are alleged to have ignored senior management orders and continue to ignore proper safety practices in the workplace.

In response, the Tiger Team leader visited Building 333, discussed these concerns with the Building supervisor and area foreman, and verified log entries regarding valved off seals.

Each compressor contains two seal assemblies (total of 16) for a standard PORTS compressor cell. When a seal begins to fail, a control valve will exceed its preset range (less than 10 percent, greater than 90 percent of scale) and trip a pneumatic pressure switch. This sets off an annunciator alarm in the Area Control Room. Operating Method CA 10.2-1 then requires that control be restored in the valving system, and the bad seal be identified and isolated through a valving-off procedure. The latter isolates and buffers the affected seal, permitting continued operation of the compressor while maintenance is scheduled. While the annunciator may alarm for other reasons (e.g., transient pressure changes, plugged lines, etc.), for conservative reasons a seal failure is assumed.

It was found that 28 onstream seals are currently valved off in Building 333. These are identified in the attached Cascade Status sheet for November 14, 1989. This listing was verified against a "pin board" in the ACR, as well as the ACR operator's log book. Discrepancies such as mislisting and non-listing of valved off seals (e.g., seals on 33-3-1 and 33-3-9/4B) were found through a quick crosscheck, suggesting a lack of formality in this tracking system. However, for those listed, direct verification (observed valve settings) by the reviewer indicated that proper procedures were followed for the three compressors randomly chosen for inspection.

A review of the annunciator system indicated no readily available means to defeat the system other than tampering with the electrical system itself or switching off the alarm through one of the console switches provided for that purpose. When

questioned, neither the Building supervisor nor area foreman were aware of any other means to defeat the alarm system, other than the aforementioned methods. Although each annunciator was checked, no tampering or defects were observed. The ACR is staffed with operating staff at all times (24-hour rotating shift).

It was concluded that the employee making the allegation apparently believed that the compressors were operating with these bad seals in service (i.e., not isolated). Such operation under these conditions would have, as pointed out by the employee, serious safety implications. This was found not to be the case, as explained above. However, the implication of operating this number of compressors with isolated seals over an extended period of time (up to eight months) was considered from the standpoint of its safety implications. Clearly, a small increment of risk of $UF_6$ release is assumed when maintenance backlog of this type is permitted to grow. As the attached trend chart shows, the number of total seals valved off has steadily increased over the past six months. To address this concern, extra shift coverage is being arranged to permit maintenance activities to catch up. However, balancing the need for maintenance (which requires cells to be down) with the need to sustain high levels of operation at PORTS will require management's continued attention.

Best Management Practice Findings

Finding SI-2: More systematic means for ascertaining the status of valved off seals needs to be considered given the discrepancies found in log entries and status sheets in the ACR.

4.5.11.3 Improper Operations with Chlorine

A call was received through the Inspector General's ES&H Hotline alleging that PORTS Utilities Operations personnel who work with chlorine do not follow procedures required by OSHA regulations. Specifically, masks containing only filters are used when working on leaks rather than self-contained breathing apparatus. Also, areas in which chlorine is used do not contain detectors and alarms to indicate leaks of chlorine.

In response, a Tiger Team member visited three locations in which chlorine is used at PORTS. These include Building 611, the water treatment plant, Building 6619, the sewage treatment plant, and Building 630, the utilities shop for the 330 cooling towers.

The chlorine control rooms at Buildings 611 and 6619 are nearly identical. Chlorine is dispensed from 100-pound cylinders. Automatic alarms set to detect 1 ppm of chlorine are in continuous use. An exhaust fan is available with instruction to start the fan before entering the building. No detectable odor

of chlorine was present. Personnel on duty gave somewhat different answers to the questioning of the procedures to be used in responding to a alarm. One stated that the fire department must be called. The other stated that judgment could be made and if the leak was small, attention by the operator wearing an approved cartridge mask (type GMHF-C) was allowed. If the leak is larger, a call to the fire department is necessary. The latter is consistent with the written procedures.

A visit to the chlorination facility at Building 630 found the facility unattended. The exhaust fan was on continuously (even though the sign on the door advised turning the fan on before entering). This facility dispenses chlorine from one-ton cylinders. Four cylinders are available in the chlorine control room. No monitor or alarm is available.

An interview with W. A. Kelley, Utilities Operations, confirmed that no alarmed detectors are in use at Building 630 (or the other cooling tower control rooms, 633 or 626) and that the rooms are normally unattended. MSRs have been for detectors and alarms.

An interview with J. Moore confirmed that mask type GMHF-C is effective against chlorine. This type of mask has now been changed to type GMC which is approved for chlorine use. Either type of mask contains several adsorbents, but are intended only for escape or jobs that involve very limited exposure.

Best Management Practice Finding

Finding SI-3: Chlorine detectors and alarms which have been installed at the chlorine control rooms in Buildings 611 and 6619 could be used to alert Utilities personnel of leaks at the control rooms in Buildings 626, 630, and 633. It is not appropriate for a single worker to attempt to correct a leak of chlorine regardless of size.

4.5.11.4  Odors at Building X-705 Wastewater Treatment Plant

An allegation was received through the Inspector General's ES&H Hotline that the Ion Exchange resin processing at the new wastewater treatment plant in building X-705 results in obnoxious odors.

In response, an attempt was made to contact the person who called the Hotline. However, all attempts to make the contact were unsuccessful. However, a Tiger Team member visited building X-705 to examine the only area with recognized odor problems in the area containing the ion exchange columns. Odors have been a problem only during periods when the ion exchange resin is being removed and replenished by new resin. A resin change had been carried out during the daylight shift on the day before the

visit. Odors of the resin still prevailed but were not obnoxious. It was apparent, however, that odors 24 hours earlier would have been troublesome.

An interview with J. Moore confirmed that PORTS management has been aware of the problems in this area. Sampling has shown that concentrations of dimethylamine and trimethylamine, the recognized volatile chemicals emitted when the resin is handled, are well below significant health effects levels. However, to improve worker comfort, a project is being implemented to install a dedicated local exhaust system. The project has been approved by DOE and installation is now scheduled to be completed by January 31, 1990. This installation should eliminate the odor problem.

<u>Compliance or Best Management Practice Finding</u>

None

4.5.11.5  <u>Building X-344 Contamination and Housekeeping Issues</u>

An allegation was received through the Inspector General's ES&H Hotline that the use of the X-344 Toll Enrichment Facility change room by construction personnel was causing an unacceptable commingling of contaminated and noncontaminated clothing. In a subsequent conversation with a Tiger Team member, the individual alleged a shortage of protective clothing because of overuse of the change room for construction as well as operations personnel.

In response, a Tiger Team member inspected the facility and change room, and interviewed Health Physics, Operations, and Construction Engineering Personnel. The Change Room Log for construction personnel was inspected as well.

The housekeeping in the change room was in an appalling state. Trash, and both clean and dirty laundry were found littering the floor, stuffed into pipe ends, and intermixed in laundry bins. This condition is especially troublesome since the X-344 facility has been selected as the "model facility" for PORTS. While there was a supply of clothing available at the time of the inspection, the condition of the facility supports the allegation of a shortage as outlined above. Clearly, the facility was in desperate need of attention. MMES and PEO were notified.

<u>Finding SI-4:</u>  The housekeeping practice in the X-344 change facility as evidenced by a facility inspection on 11/16 is unsatisfactory.

The change room is well designed to prevent commingling of contaminated and noncontaminated clothing. There are two separate locker rooms with a shower in between. One locker room was originally intended for contaminated entry with the other for

4-65

clean entry. However, current practice is to utilize each as if it were a clean room. This is apparently due to demand for change room capacity. Current users of the change room include radiation workers, hazmat (PCB) workers, and nonradiation workers from both the operations and construction disciplines. While in theory the self-monitoring requirements for radiation workers and the protective clothing requirements for hazmat workers would preclude the entry of contaminated clothing into the change room, the current practice represents a commingling which is undesirable and appears to be avoidable. No one interviewed could express with confidence how each work group would handle themselves if they determined themselves to be contaminated and whether or not entry into the X-344 change room would be precluded. With appropriate planning and the addition of lockers, it appears that a first class change facility to handle both contaminated and clean usage could be implemented.

Finding SI-5:  MMES should evaluate the design and current utilization of the X-344 change room to take maximum advantage of its capabilities in implementing a more controlled segregation of contaminated and clean work at PORTS.

### 4.5.11.6  Segregation of Contaminated Laundry in Building X-705

A concern was raised by union representatives regarding possible cross-contamination of work clothing at the plant laundry operation.  A walk-through review of operations was conducted by Team members on November 16, 1989, in Building 705, accompanied by DOE Area Office safety personnel, MMES health physics personnel, the Building supervisor, and the laundry operation foreperson.

Process clothing is picked up from individual PORTS buildings and brought to Building 705 in bins. Clothing items and neoprene gloves known to be contaminated are bagged in the process areas, and handled separately at the laundry. The bagged items and gloves are laundered in separate washing machines and dried in separate dryers. These items are monitored by health physics technicians on a daily basis, although no formal schedule or documentation is maintained. (Discussions with laundry room personnel indicates monitoring is typically performed on this frequency.) Items still found to be contaminated are returned for additional washing or, if fixed, disposed as contaminated waste. The technicians are located in Building 705 and are available to the laundry room foreman for spot checks for suspected contamination.

Two concerns with the above control system are apparent. First, contamination surveying of the laundry area should be more formal, with documentation of survey results. These should be performed on both a routine and spot check basis for both laundered clothing laundry equipment, and the laundry area.

Second, the potential commingling of contaminated and non-contaminated process clothing exists given the reliance on workers in the process areas to determine what is bagged for special handling. Also, bagging of items from other controlled areas (including newly created zones) is not necessarily performed prior to pickup.

<u>Finding SI-6:</u>  Contamination surveying of the Building 705 laundry room should be more formal, with documentation of survey results.

<u>Finding SI-7:</u>  Color-coding or other conventional means should be considered to preclude inadvertent commingling of contaminated work clothing being shipped to the laundry.

# 5.0 MANAGEMENT AND ORGANIZATION ASSESSMENT

## 5.0 MANAGEMENT AND ORGANIZATION ASSESSMENT

### 5.1 Purpose

The management assessment of the Portsmouth Gaseous Diffusion Plant (PORTS) has as its objective an evaluation of the ES&H program objectives and the unique demands and constraints within which the ES&H program is to be conducted, an assessment of the organizational structure and capabilities to effectively manage within that environment, and an evaluation of the effectiveness of management actions in achieving ES&H program objectives. For issues raised by the Environmental and Safety and Health Teams that can be traced to management performance, the assessment will provide its judgment as to the root cause.

### 5.2 Scope

The management assessment addresses the performance of the DOE program office, field office, and area office as well as contractor management (Martin Marietta Energy Systems [MMES]) in achieving ES&H performance objectives. It also examines the relationship of these organizations to labor and regulatory representatives involved in administration of the ES&H program at PORTS. Management is viewed in its total context, the degree to which themes and policies developed at the highest level of management can be traced through the organizational structure and found reflected in the workplace.

### 5.3 Approach

The management assessment was initiated one week after the Safety and Health and the Environmental Teams arrived on site. These Teams provided a number of observations and findings associated with ES&H performance deviations which were judged to have their origins in management behavior. Using these examples, the Management Team utilized interviews of DOE Program Office, Field Office, and Area Office personnel as well as that of the contractor; reviews of key documentation (contract, award fee performance objectives, contractor policies and procedures); and field observations to place in context the significance of the performance deviations. These same tools were used to judge the degree to which the performance deviations were recognized by responsible DOE and contractor management and the capability of the organizations to deal effectively with the need for change. Individual assessments by the Management Team were reviewed with both DOE and the contractor for accuracy; the judgments however are those of the Team.

### 5.4 Management and Organization Assessment Summary

The overall MMES management of the PORTS facility is in the process of acclimating to a change in expectations. Management

performance of the past 3 years can be characterized as reactionary, focusing on needed ES&H upgrades when prompted by external audits, appraisals, and regulatory activity. There now has been a recognition of the need to progress out of the reactionary mode, to establish realistic ES&H performance objectives, and plan for their phased implementation. There has also been a recognition of the need to improve the formal conduct of operations, although the challenges of accomplishing this are not fully understood. The management of MMES is very knowledgeable in enrichment operations, is well intentioned and committed to satisfying DOE's ES&H objectives, but lacks a broad base of nuclear experience that would facilitate achievement of cultural change.

Basic management elements are in place and functional in the PORTS organization. Organizational roles and responsibilities have been established. Appropriate organizational elements including planning, training, and independent oversight elements are represented. Fifteen findings are associated with the MMES management assessment. The majority of them deal with instances where management has established an appropriate theme for ES&H performance improvement and even may have chartered worthwhile initiatives to facilitate change. However, management has not rigorously followed through with all the comprehensive planning, training, technical capability, management presence, or human resources to assure success. The level of upward and downward communications needed to assure ownership of operational and ES&H initiatives has yet to be attained. It is noteworthy that there appears to be commonality of purpose between MMES and DOE Management relative to the need for ES&H improvement and a more disciplined conduct of operations.

There is significant evidence of MMES-OR involvement in the PORTS program, particularly in the development of initiatives having benefit for the entire uranium enrichment complex. However, program demands that would benefit from corporate-level MMES support (i.e., human resource acquisition, labor relations, cultural change) reflected little apparent assistance from the corporate level.

Four findings are directed toward DOE management of the PORTS program. Prolonged program office and field office differences relative to roles, responsibilities, and program objectives have undoubtedly had an adverse effect on the program. Plans to staff the site office with personnel proficient in operational knowledge have gone unfulfilled because of hiring difficulties. DOE actions to address these issues, until recently, have been insufficient. Resolution of roles and responsibilities and lines of authority between the program office, field office, and site office has yet to be formalized. Staffing increases proposed for each office will again challenge DOE's ability to hire-in needed disciplines. The difficulties associated with managing a remote

DOE site will remain a challenge to program and field office management.

## 5.5   Management and Organization Assessment Findings

### 5.5.1   ES&H Organization and Resources

Although some PORTS organizational manuals are outdated and need to be revised to reflect current alignments, no problems were encountered with organizational structure, mission, or authority and responsibility.  Human resources aspects of organization, however, are of significant concern. Staffing levels, security requirements, union relations, overtime rates, and knowledge level of the staff are adversely affecting the ability of PORTS to meet ES&H organizational goals.

### 5.5.1.1   Managing ES&H Resource Constraints

Because of budgetary constraints and the termination of the Gas Centrifuge Enrichment Plant (GCEP) in the mid-1980s, PORTS went through a forced manpower reduction with concomitant workforce dislocations from seniority "bumping" of the bargaining unit workforce.  This was followed almost immediately by the increased emphasis on security and ES&H activities by DOE.  The resultant effect of this new DOE ES&H emphasis was to increase staffing levels by approximately 25% over the past two years.  Existing security requirements, then and now, require essentially all of the PORTS workforce to be "Q" cleared.  It is currently taking approximately 18 months to obtain a "Q" clearance.  Thus recruitment efforts cannot fill openings in a timely fashion. The MMES management has attempted to remove some of the security-related constraints to the staffing problem through two approaches.  The first effort is to have the security classification of various aspects of the enrichment program downgraded from secret to confidential or even unclassified.  The former would enable "L" cleared personnel to be utilized with a reduction in clearance time of six to nine months.  The latter would enable uncleared personnel to be hired.  The second effort is to compartmentalize the security interests into smaller enclaves allowing greater access to the site by uncleared personnel.  These efforts have only recently begun to have an impact on the staffing problem at PORTS.  In the first case, MMES is concentrating declassification efforts at the Paducah Plant because enrichment levels there are limited to under 2%.  These changes should be easier to accomplish and be readily transferrable to PORTS.  This requested declassification was submitted to Defense Programs approximately 18 months ago.  The resultant delay has led to the second effort, which began this past summer with a study to determine which buildings or parts of buildings could be modified to reduce the security enclave to a minimum and thereby open areas to uncleared personnel and/or provide easier access and communication between working groups.

The net effect is to enable PORTS to immediately bring on board uncleared personnel who can do meaningful work while awaiting clearances. Although these actions could have been more timely and vigorously pursued, in the judgment of the Team, there is little more that local PORTS management can do to ameliorate this problem.

<u>Finding OM-1</u>: Staffing of ES&H programs at PORTS is inadequate to accomplish needed improvements; management has utilized readily available solutions and will require assistance from MMES Corporate and DOE.

Currently PORTS is 16% under its authorized manpower ceilings. In some key organizational units, this shortfall is almost 35%. (ES&H has 50 openings out of 143 slots with a large percentage of these in the health physics area.) The consequence of these shortfalls, aside from delayed attainment of goals, is that substantial amounts of overtime have been necessary for sustained periods of time. (Overtime in the hourly grades has been of the order of 18% for the past year.) As reported in the Portsmouth Plant Performance Indicators for September 1989, incident rates have increased proportionately to the hours worked. Forty percent of the Reportable Illnesses and Injuries occurred during overtime periods, suggesting that the fatigue level caused by this excessive and sustained work schedule may be a contributing factor. Because of the required overtime, the knowledge level of the staff is being adversely affected since there is limited, if any, time for training activities. Other than careful management of overtime to reduce fatigue levels, there is little management can do to resolve this problem until adequate staffing levels can be obtained.

<u>Finding OM-2</u>: Management controls must be exercised during the currently increased operating levels to ensure worker fitness for duty in the face of increased overtime.

These problems are further exacerbated by an increasing union/management adversarial relationship resulting from contractual dissatisfaction, cultural/historical factors, personality conflicts, and communications problems. The problems are in both camps. For example, the unions are dissatisfied with the change in benefit plans resulting from the MMES takeover of the PORTS contract. Management has yet to negotiate a Fitness-for-Duty program with the union and is unhappy with the contractual provision permitting annual bidding for any job within a labor classification (annual realignment clause). This annual realignment results in disruptions in the workforce, additional training requirements, and additional costs due to unqualified workers. The cultural/historical factors and personality conflicts have resulted in some breakdown in the communications and a mistrust of the motives between the parties (e.g., contamination control and return to work issues).

Finding OM-3: Increased efforts between PORTS management and the union to build trust and confidence on ES&H matters through improved communications and development of areas of common interest need to be undertaken.

### 5.5.1.2    Health Physics Staffing

As stated earlier some organizational units, such as health physics, are significantly understaffed (13 vacancies out of 39 positions); are working substantial amounts of overtime; and have high turnover rates (based on section 4.5.7.3.4 of the Health and Safety Team Assessment). The root cause of this problem has been the compensation level of this work classification. Interviews with management indicate that HP surveyors in particular are motivated to seek other jobs within PORTS, since almost any other job pays more, even with accelerated promotion to higher levels within the HP surveyor work classification. Management, at the MMES level, has undertaken a study of job classification and related pay structure for all MMES facilities, the results of which, should be available soon. Additionally, management feels that this problem will diminish with time as the current backlog of open positions is filled. However, this approach will not necessarily resolve the high turnover being experienced.

Finding OM-4: The MMES management should implement a plan to attract and retain qualified health physics surveyors, otherwise staff shortages and turnover will continue with resultant impact on training and experience level. Turnover in other ES&H disciplines should be evaluated as well.

PORTS, in its reactionary mode, established large numbers of ad hoc committees, task forces, and special work assignments to address the plethora of recommendations emanating from the large number of internal and external appraisals, all with separate tracking systems. The establishment of the Integrated Safety Assurance Plan should lead to a cohesive resolution of future and current actions to correct the deficiencies cited as will the unified tracking system currently being developed. However, experience has shown that a system needs to be developed to evaluate proposed and current actions resulting from prior appraisals to assure consistency with the Long-Range Health and Safety Management Plan (June 1989) and thereby provide effective use of resources.

Finding OM-5: Management should assure that ongoing and past corrective actions are consistent with the goals of the Long Range Health and Safety Plan and become fully integrated in terms of priority and resource allocation.

As stated above, the last several years have seen dramatic change in public, DOE, and regulatory expectations, particularly in the

ES&H area.  This has often resulted in the need for revolutionary
change, and the development of conflict between parties involved
in or impacted by these changes.  While not an exact science,
management tools for dealing with these problems have been
developed.  The rapidity of these changes, which may reasonably
be expected to continue into the future, requires that PORTS
management develop the skills and/or make available resources to
manage change and conflict better than it has done in the past.
Management actions to resolve some of the concerns discussed
earlier such as communications, training, goal development, and
oversight will aid in this process.  The importance of making
changes properly the first time is obvious.  The impact of badly
managed change, where the impacts on people are expected to be
painful and substantial in number, can be devastating to
organizational morale and effectiveness.

<u>Finding OM-6:</u>  PORTS management should develop appropriate
planning and acquire skills or obtain outside assistance to
facilitate plans for managing organizational change and conflict.

5.5.1.3   <u>Employee Training Programs</u>

The PORTS Training Program is undergoing substantive change
predicated on directives from both plant management and MMES, Oak
Ridge.  A presentation was provided to the Management Review Team
describing the upgrade program objectives, schedule
considerations, resource requirements, and project status.  Noted
shortcomings in the current training program were provided to the
Team as well as identification of the intended resolution for
each.  The Team supplemented this information by reviewing the
Health and Safety Team findings in the training area, conducting
numerous interviews, and observing operations and crafts in the
field.

The Cascade, Uranium Material Handling and Chemical Operators are
benefiting from the initial improvements of this program with
limited performance data, including the number of $UF_6$ releases
per time, trending in the right direction.  The Environmental
Subteam noted that workers were receiving insufficient training
in waste segregation and waste minimization, and on proper
inspection methods for RCRA and PCB waste storage areas.

Two aspects are inadequately addressed in the existing training
program.  First, the existing program does not currently
implement minimum performance criteria for all critical
operating, maintenance, analytical, and Health Physics job
classifications.  Second, the currently planned and scheduled
curriculum does not recognize the need to train critical
operating personnel in the "soft skills" arena such as; 1) formal
communications, 2) conduct of operations formality, 3) log
keeping, 4) watchstanding skills and 5) diagnostic skills.  Both
situations will require change for the training program to be

fully accredited. Since this may not occur at PORTS for several years, interim compensatory measures should be implemented.

Addressing the first aspect, current practice at PORTS allows firstline supervision to judge when a person is appropriately skilled to perform a task without direct supervision. Lessons learned at other large DOE-owned and commercial nuclear facilities indicate this type of system breaks down when a rapid growth occurs in the number of employees; when production schedules require substantial overtime, which lessens individual supervisory attention being allotted to each task; or when turnover occurs within the experienced supervisory and operating personnel. All of these situations exist today at PORTS.

Finding OM-7: PORTS lacks a formal policy requiring demonstrated skill levels for the performance of critical activities at the plant. On an interim basis, performance-based on-the-job training (OJT) evaluation checklists may be considered.

Addressing the second aspect, PORTS Management should establish and promulgate a policy for overall operating practices. Any "soft skills" (e.g., communications, documentation, conduct of operations) requiring upgrading to properly implement these more formalized operating practices need to be developed as part of the training curriculum and provided to the employees. On-the-job assessment and reinforcement are necessary for the "soft skills" to take root in the workplace.

Finding OM-8: PORTS Plant Training and Production Training need to assess the scoped and scheduled curriculum development tasks for adequacy in the "soft skills" area. This assessment should be consistent with MMES policy endorsing formalized conduct of operation requirements. PORTS Operations will need personnel competent in the formal conduct of operations to reinforce "soft skills" development in the workplace.

## 5.5.2 Managing Change At PORTS-Communication of ES&H Objectives

The MMES and PORTS Site Operations and ES&H personnel are responding to numerous regulatory-driven challenges to the existing practices at the plant. The Management Review Team assessed the ability of the existing organization to provide the Management actions necessary to bring PORTS into compliance with all applicable regulations. The assessment considered the line organization's ability to respond, the technical capability of the ES&H organization to properly characterize the plant status relative to compliance, and finally the supporting infrastructure to serve the changing need.

### 5.5.2.1  Consistency of Implementation

There are on-going initiatives at PORTS that are proactively following regulatory requirements, primarily in the environmental areas (e.g., water treatment plant operator licensing and Freon 114 replacement studies). Likewise, there are initiatives proceeding at a rate that is consistent with current rulemaking philosophy (i.e., phosphate to chromate inhibitor replacement program and process building operator training programs). However, there are also examples at the plant where non-compliance with existing requirements persist, as best demonstrated by the scope of specific findings in the Safety and Health Assessment.

The first conclusion that can be reached is that inconsistent PORTS management or supervisory expectations govern the several related activities which are performed to meet a common regulatory driven standard. Given similar programmatic guidance, individual activities, programs, and facilities at the plant are systematically run to be compliant with all current regulatory or statutory requirements. An example of such a facility at PORTS is the Water Treatment Plant (X-611) where individuals were generally  found to be knowledgeable, take pride in their work, and are becoming licensed through the State of Ohio beyond the facility's licensing requirements. In contrast, there are related activities that result in either non-compliant or poorly documented performance. Illustrative is the effluent water-sampling program, where procedures are routinely changed by verbal instructions or notations on blackboards.

Finding OM-9: All activities performed to comply with a regulatory requirement should be performed using standard operating procedures that prescribe MMES-approved methods designed to meet the requirements.

### 5.5.2.2  Strengthening ES&H Expectations

A second conclusion concerns the historical culture at PORTS and other similarly aged DOE-owned facilities. That perception is that health and safety risks should be maintained at a reasonably low level. Actual records at PORTS demonstrate a favorable safety and health statistical record for achieving this historical goal. Using this logic, several groundwater releases beyond limits or several violations of electrical hazards permitting procedures over a period of time could be tolerated. The results of the Teams review points to a historical culture where past practices were deemed "good enough." Contamination control is a good example of this situation. The historic posture resulted in reasonably low exposures, as measured by worker bioassay. Nevertheless, adopting a compliance-based ES&H culture requires considerable design, procurement, procedural and training tasks be completed to be compliant with DOE Orders

governing contamination control. This will need to be addressed in the integrated planning process initiated by MMES.

### 5.5.2.3 Feedback on ES&H Effectiveness

Characteristics of an effective control system (aside from those discussed above) are the accurate, timely, objective, and focused reporting of information to management. This is particularly important to management in the tracking of outstanding commitments, which is of growing importance when considering the large number of ES&H appraisals and findings. Currently PORTS has a multiplicity of tracking systems, of differing types, query capability, and reporting formats. It is, therefore, difficult for management to get a cohesive picture of the status of corrective actions and plant conditions. PORTS is developing an integrated tracking system that was scheduled to be ready for use in mid-February 1990. Management should make every effort to assure resources are available to meet or improve upon this date and place the system in use as rapidly as possible.

Over this past year, management has been developing a set of performance indicators for most organizational units. A subset of these has been developed for senior management use. While the team understands that these indicators are still being developed, it was noted that there were some significant ES&H-related indicators that were not included, such as maintenance backlog, preventative maintenance not performed within scheduled dates, procedural violations, and compliance with workplace practices. For the human performance indicators, feedback from line management observation and independent oversight audits surpassing that currently in place will be needed to accurately measure change in the workplace.

An invaluable offshoot of the control process are the "lessons learned" as a result of management assessment of performance and communication of corrective actions necessary to bring performance into line with goal achievement. They provide the internal supplement to the formal "lessons learned" program from other DOE facilities and the commercial nuclear community. For the program to be effective, all "lessons learned" (internal and external) need to be communicated to the staff at large by a formal process.

Finding OM-10: A formal process to measure and feed back human performance and to capture and disseminate "lessons learned" information from PORTS, the uranium enrichment community, as well as the commercial uranium industry, does not exist at PORTS and should be implemented.

## 5.5.3    ES&H Management Planning

Planning to accomplish the organization's mission includes
1) establishing goals and objectives and the organizational
structure to accomplish the objectives (including resources); 2)
determining and assigning responsibility to carry out the
activities, and 3) a feedback program to monitor and adjust these
activities.

### 5.5.3.1    Establishment of Planning Goals and Objectives

Management over the past several years has been in a reactive
rather than anticipatory mode of operation regarding the ES&H
program as evidenced by the large number of findings contained in
outside appraisals.  PORTS management, to their credit,
recognized this and during this past year has undertaken a number
of reflective studies culminating in the development of a "Long-
Range Health and Safety Management Plan" (the Plan) dated June
1989.  The primary purpose of this effort was to develop an
"Integrated Management Plan for Safety Assurance" that would
"permit effective assignment of plant resources, responsibility,
accountability, and tracking related to the achievement of PORTS
safety goals.  Further, this system will facilitate the
systematic identification and resolution of root cause issues
versus response to recommendations."

PORTS establishment of goals does little to assure the
workforce's "ownership" of whatever goals are established.
Interviews at all levels of the organization indicated that there
was little opportunity for the workforce to input into these
goals and very little explanation of why goals have been
established.  Often the reason given for the establishment of a
new policy or procedure is that it is to implement a DOE or TSA
recommendation.  This coupled with some perceived illogical
implementation of recommendations and bargaining unit mistrust of
management motives results in lack of "ownership" by the people
necessary to make accomplishment of goals a reality.  The Plan
does not include the known and anticipated barriers to be
encountered when implementing the Plan, or the supporting systems
that can be used to enhance the success of the Plan.  Although
the Plan does include resource requirements (human and
financial), issues such as high overtime rates, hiring problems,
union concerns, security related problems, and outside agency
interactions (EPA, the State, OSHA), are not addressed.  These
deficiencies in the planning process decrease the probability of
success and enhance the probability that the program will
continue to be reactionary rather than anticipatory.

Finding OM-11:  To successfully implement the Plan, management
needs to incorporate actions to overcome the known barriers
identified above and assure "ownership" of its goals by effective
two-way communication within the organization.

## 5.5.3.2   Effectiveness of Interim Measures

Interim measures taken by PORTS Management to effect change in ES&H programs act as an important bridge to a more compliance-driven ES&H posture.  The Team's assessment addressed whether the management actions taken were the logical initial steps that achieve near-term benefit and anticipate the longer-term goals. The review considered the facility's basic structural limitations, and detection capability relative to personnel hazards.  Finally the overall sensibility of the current situation was assessed in order to gauge how well it would be received by a knowledgeable person in the workforce.

Most interim measures were accomplished by making "people and procedural fixes" not ultimate plant "design change and construction fixes."  This was judged to be acceptable as immediate gains can be obtained much more rapidly by appropriately applying people fixes versus plant hardware enhancements.

An example of an interim measure at PORTS that does not pass the logic test is the existing contamination control posture in the Process Buildings X-326, X-330, and X-333.  While the majority of the occupied portions of these facilities are clean, from a radiological prospective, all trash being collected from these same areas is considered to be contaminated, (presenting a management posture that assumes the entire building's potential for contamination).  Personnel can enter and exit Buildings X-330 and X-333 through non-monitored doorways (presenting a management posture that the lower floor of each of these buildings are essentially clean).  The Team recognized that portal monitoring equipment is being purchased on an expedited basis and that the longer-term plant design changes will affect overall capability within the Process Buildings to locally detect and contain radioactive contamination closer to the source. Nevertheless these interim postures are contradictory.

The interim measures taken in the same facilities, related to PCB-contaminated oil leaking from the ventilation ducts, is an example where the current steps are very logical from a chemical toxicity prospective.  They identify the source, isolate the spill from the employee, and provide for periodic cleanup and removal.  Unfortunately, the wastes generated in these periodic oil leak cleanups generate add to the contaminated waste problem addressed above.  In addition, there is little segregation of materials used to clean oil from PCB versus non-PCB lines; it is all treated as PCB-contaminated waste.

The Team also recognized that the decontamination and maintenance support buildings configuration do not provide for easy near-term or permanent contamination control fixes.  This is

especially true in Building X-705, which has only limited
capability for localizing airborne contamination via facility
segmentation and limited capability to discriminate by air
sampling. Interim contamination control positions for Building
X-705 need to be further refined from their existing state noting
these two considerations.

In response to a Tiger Team concern, management has instituted a
vigorous "Walk-Through" program based on INPO guidelines. This
program has begun in three affected facilities, but eventually
will be plant-wide. To be an effective program, management needs
to develop simple checklists that reduce the administrative
burden to a minimum. Additionally, management should look into
the possibility of additional administrative assistance to these
front-line supervisors who are already overburdened with routine
administrative tasks. This assistance will aid in program
acceptance and provide the time necessary for the program to be
effective. This program will have immediate and significant
impact in improving management oversight of the workplace at the
immediate levels of supervision, reinforce managements message
regarding goals and objectives, improve management credibility,
and, because the program will be audited by management on a
continuing basis, provide the basis for rational, supportable,
and equitable personnel changes. No single action will have as
much payback, breadth, or immediacy of impact as this will.
However, for walk-throughs to be effective, they must be
performed rigorously by properly trained personnel. Management
at MMES and PEO expressed surprise that deficiencies identified
by the Environmental Subteam in quality assurance and quality
control had not been raised by internal reviews.

<u>Finding OM-12:</u>  A site-wide ES&H surveillance program modeled
after the compensatory walk-through program in X-700, 705, and
720, should be instituted promptly, with documented feedback to,
and response by, PORTS management.

5.5.3.3    <u>PORTS ES&H Management Initiatives</u>

Within the six months prior to this review, MMES has initiated
several new programs at PORTS, some of which have parallel
efforts elsewhere in MMES' uranium enrichment complex. Because
of the relatively short length of time these initiatives have
been in effect, programmatic success rates could not be measured
by the review team. Recent PORTS initiatives included:

1.   The assignment of four (4) Program Managers reporting
     to Site Operations for the Contamination Control, PCB,
     NPDES, and OSHA Implementation Programs;

2.   The establishment of eleven (11) ES&H Building
     Coordinators to interface with various onsite

organizations relative to facility status, regulatory posture, and compliance;

3.  The heightened awareness by the PORTS workforce to ES&H requirements as implemented by both formal and informal directives;

4.  The cross-pollination of PORTS program objectives, directions, characterization of problems and data with that from the other uranium enrichment facilities managed by MMES; and

5.  The Model Facility Program, targeting one PORTS facility as the focal point to achieve significant building-wide "cultural change" in the conduct of operations.

## Program Managers

The basis for establishing the Program Managers was two-fold. First, the compliance and oversight staff specialists were typically the point-persons for recurring ES&H issues and remediation efforts. Second, the PORTS ES&H compliance staff could not without support initiate the institution-wide cultural and physical plant changes required. Rapid and focused problem solving in these areas was deemed to be less than adequate by PORTS Management and the Program Managers assignments resulted. It is anticipated that the increased focus on the specific ES&H programs will produce more favorable results then achieved over the last three years.

## ES&H Building Coordinators

The ES&H Building Coordinators play key roles in the PORTS management scheme. These individuals serve as the "subject matter experts" for environmental and safety issues in their facilities. It is crucial for these individuals to infuse "real world" intelligence into the process when developing the implementation procedures which bring PORTS into compliance with ES&H Orders, MMES Policy, and PORTS program objectives. While these individuals have appropriate site-specific experiences to aid in the performance of their duties, it was found that they have only limited exposure from lessons learned at other facilities. In order to derive maximum benefit from the Building Coordinators, more interchange with outside agencies should take place.

## New ES&H Directives

The need for heightened awareness of the PORTS workforce to various ES&H considerations is recognized by PORTS Management, PORTS labor representation, OCAW, UPGWA, and DOE. While the

union is initiating a training program that addresses the special hazards encountered with the uranium enrichment process, daily implementation of requirements set forth in DOE Orders, Contract, MMES topical manuals, site policy and procedures, informational postings in the workplace, and directives by supervision were found by the Health and Safety Review Team to require improvement. It is the conclusion of the Review Teams that most of these directives state "how to comply" or "when to comply." It was found that during the process of presenting these directives to the workforce, no training is provided that demonstrates with clarity "why to comply", emphasizing the benefit derived by the employee in the workplace. This is judged to be a root cause for many of the specific findings provided in the Safety and Health Assessment report.

Finding OM-13: When MMES issues new directives to its workforce based on an ES&H requirement, the need for appropriate training or orientation should be determined and promptly implemented as part of directive issuance.

Lessons Learned

Recent efforts by PORTS to benefit from experiences obtained elsewhere in the uranium enrichment complex include the contamination control team visits to Y-12 and X-10 facilities, numerous exchanges of Paducah and PORTS PCB-control program information, and active participation in the MMES management improvement program being coordinated by Oak Ridge project personnel. While these and other information exchanges are most beneficial, the Management Review Team observed that the initial information gained from these exchanges are primarily retained by supervisory and management-level personnel. Most employee health and safety "attitudes" observed in the field by the Team are those that have developed over the years at the site. Management and supervisors need to make every attempt to share with employees the information gained in these exchanges to help initiate change in these longstanding attitudes. As an example, the Water Quality Laboratory had been audited by Ohio EPA to maintain their certification. As a result, no QA deficiencies were noted in this area. However, improvements made in the lab were not adopted for use throughout the rest of the labs.

It is noteworthy that several past decisions relative to common ES&H problems at both Paducah and PORTS resulting in fundamentally different safety-based positions are being reviewed on a priority basis. The two different postures taken by the plants relative to PCB-contaminated oil-filled capacitors and transformers is used as an example. Paducah is systematically replacing theirs while to date, PORTS is not. Both decisions were based on limiting employee exposure to PCB-contaminated oil in electrical components. Regardless of the outcome of this

5-14

reassessment, this type of open self-critical review is a key initial step in establishing real cultural change.

Model Facility Program

The model facilities program targets a portion of the overall PORTS facility for near-term upgrade to the standards of operation determined to be appropriate for the uranium enrichment program. By focusing attention on a limited portion of the facility, MMES expects by March 31, 1990, to have a demonstration of the conduct of operations, work practices, health physics, and safety practices that are intended for implementation plant-wide. Physical upgrades would be accomplished over a longer period. The program as presently envisioned captures a number of key ingredients considered essential in facilitating cultural change. It focuses on a small enough operation to be achievable with available resources. Expedited implementation will provide a visible example for others to follow. Other attributes are that the selected facility (the X-344 Toll Enrichment Facility) represents a good cross-section of the hazards encountered elsewhere at PORTS, and the designated supervisor is an advocate for improved conduct of operations, with the energy and presence to lead by example. While the program is in an early stage of development, we consider its potential for success to be high with the proper support from management.

However, for the demonstration to be successful, MMES and DOE will have to come to rapid closure on the intended standards of conduct for PORTS operations. The performance improvement plan establishes a much longer schedule for finalizing operational standards and may not support the needs of the model facilities program. Either through escalating the work of the performance improvement program or through alternative means, operational standards must be quickly established for the model facilities schedule to be met. Early demonstration is considered one of the most significant benefits of the MMES model facilities program.

Finding OM-14: Management attention needs to be given to the establishment of operational standards for the Model Facilities Program using as guidance applicable INPO and industry guides (mandated in Under Secretary Tuck's memorandum of November 2, 1989).

5.5.4    ES&H Criteria and Assessment

Management criteria encompasses the setting of performance standards consistent with planning objectives, evaluation of performance against these standards, evaluation of deviations from the planned performance, as well as adjustment activities to assure achievement of the organizational objectives. It includes such things as the use of procedures, tracking systems, performance indicators and "lessons learned" as a result of the

assessment of performance. This review focused on the ES&H control mechanisms and looked into financial or other areas only to determine the extent to which they drive or impact ES&H activities.

### 5.5.4.1 Status of ES&H Procedures

Procedures and standards, as found by the Environmental and Health and Safety Teams and verified by this team, were found to be inconsistently applied, in some cases outdated or non-existent. This, when coupled with the lack of proper supervisory oversight of the workforce, undermines management's ability to control the work. These inconsistencies also diminish management credibility with employees, contribute to the mistrust of management motives by the bargaining unit, and are an impediment to an effective ES&H program.

### 5.5.4.2 Use of Technical Procedures

The prevalent practice at PORTS is to have operators and skilled craft personnel become knowledgeable of the contents of a procedure and to then utilize the written procedure "as needed" in the field. Determining when a procedure is actually needed is based on the judgment and relative familiarity of the individual performing the task. This prevalent practice does not prescribe a graded programmatic requirement as to when and how each type of technical procedure will be used in the field.

The Management Review Team judged this practice to be inconsistent with current standards applied at other DOE and commercial nuclear facilities. The Team also finds that the current practice does not always serve the needs of the PORTS workforce based on the following reasons:

1) The facility is currently operated by an aging workforce that is rapidly being replaced by newly hired or recently transferred personnel;

2) The existing practice of "Annual Realignment" results in considerable diminishment in the skill level and experience of operators on specific workstations annually;

3) PORTS is being operated near capacity and with a significant portion of the process above atmospheric pressure; and

4) On a more subjective basis, regulatory requirements presented in the foreseeable future will prescribe more change per time than has been previously managed at PORTS.

5-16

Given these factors, the practice of committing to memory procedural content versus use of written technical procedures in the field, seems inconsistent with the formality and cultural change objectives described throughout this report.

Finding OM-15:  PORTS lacks a policy that prescribes the generation, use, and modification of the various operating, maintenance, analytical, sampling, and Health Physics procedures.

## 5.5.5    DOE Management and Oversight

### 5.5.5.1    Contractual Elements

The base contract for the PORTS facility operation is the March 1982 contract executed between DOE and Goodyear Atomic Corporation.  This was novated to MMES in November 1986.  It includes standard clauses for safety and health, nuclear safety, clean air and water, and nuclear indemnity.  The award fee performance objectives which have been used since assumption of the contract by MMES address the full spectrum of contractual activities and do not focus explicitly on expected change in ES&H performance.  For instance, the Safety, Health, and Fire Protection objective is to implement a program consistent with DOE Orders and regulatory requirements.  Safety and Health performance rated against these criteria was judged to be "excellent" for the first half of FY 89.  Environmental Protection was judged "satisfactory."  As such the award fee has not succeeded in drawing management attention toward change in culture or transition to a more compliance-based system of S&H performance measurement, when compared to environmental compliance.

The performance objectives now being formulated are much more specific with regard to ES&H performance.  The contract is being restructured to combine Paducah and Portsmouth operations in a single document unencumbered by other organizations and missions, ORNL, and related contract work scope.  These are both positive changes.  However, the award fee performance objectives continue to address the full scope of contract activities yielding a 31-page document.

Finding OM-16:  Management at DOE and MMES should determine which "critical few" areas of contractor performance provide the best incentive for achievement of management objectives, particularly those associated with ES&H improvements.

### 5.5.5.2    DOE Organization and Staffing

The Area Office provides the Department with the most direct observation of the contractors ES&H performance.  However, certain characteristics relative to the composition, and

staffing, of the site office have limited its effectiveness in being a significant influence for cultural change within the PORTS operation.

The office originally was formed to support the gas centrifuge project at PORTS. When the gas centrifuge was terminated, the office was retained to support the marketing of the technology, surplus equipment, and facilities. The staff of the office was predominantly procurement and contractually oriented. Since that time the office function has evolved into one having responsibility for measurement of contractor performance and day-to-day direction. Neither the staffing level nor technical capability have changed materially to support this change in roles. Personnel familiar with the formal conduct of operations appropriate for contemporary nuclear operations are not represented on the area office staff. While the office personnel express a genuine desire to contribute to improved ES&H performance on the part of the contractor, the absence of the technical disciplines mitigated against their effectiveness.

The program office (NE) has questioned the adequacy of the Area Office staffing level, technical capability, and grade structure relative to the program complexity and budget. Several slots have been approved for the area office, and a request for additional staffing is being prepared. These actions are commensurate with the objective to materially expand their ability to assess contractor performance. However, the office has been unsuccessful at filling positions in a timely manner. The operations engineer position, a key one relative to conduct of operations, has been vacant for over a year.

Finding OM-17:  A remedial plan to mitigate staffing deficiencies is needed for the area office to carry out its assigned responsibilities in an environment where significant ES&H improvement is needed.

Nuclear Energy is currently planning for an increase in staffing as part of the NE SEN-6-89 Implementation Plan. The Under Secretary's November 2, 1989, memorandum on conduct of operations outlines the Department's intention to implement operational standards similar to those issued by INPO for nuclear power stations. At present the program office capability to effectively manage a program to implement formal conduct of operations is limited both by staffing and technical capability. Considering the difficulty the Department has had in acquiring personnel proficient in nuclear engineering and safety, NE should anticipate the need for a targeted staffing plan if the time frame outlined in the SEN-6-89 implementation schedule is to be met.

### 5.5.5.3    Roles and Responsibilities

Since the cancellation of the Gas Centrifuge Enrichment Project and the initiation of the DOE onsite presence at PORTS, the roles and responsibilities and lines of authority for implementation of the ES&H program have been evolving and in some cases contested. During this period, differing Headquarters and operations office perceptions of the relative balance between the need for economies in operation (in order to retain market share in a competitive environment), and the need for ES&H and security upgrades have punctuated the decisionmaking process.   This differing perception has been compounded by differing views as to the respective roles of the program office and the operations office.   The effect has been the development of a somewhat adversarial relationship between the operations and program offices, uncertainty at the staff level as to responsibilities and objectives regarding ES&H performance, and resultant mixed signals to the contractor.   A lack of coordination of efforts between MMES, PEO, ORO, and DOE-HQ is evident in the NEPA process at PORTS.   As a result there has been incomplete NEPA review of many proposed activities at the site.   DOE and contractor personnel demonstrate a lack of knowledge about NEPA implementation.

When the site office was first formed, its role was to provide overview of the quality of operations by the contractor, but it lacked authority to direct contractor actions.   This caused additional uncertainty in the staff as to the role in ES&H and weakened the office in dealing with the contractor on performance deficiencies.

Recent actions have been taken to deal with both of these matters.   A dialogue has been established between the field and program office which has resolved many of the issues relative to working relationships and program objectives.   The site office was given Contracting Officer's Representative authority earlier this year, giving it the authority to provide day-to-day direction to the contractor.   However, this has left some residual questions concerning the division of authority between the OR Uranium Enrichment Division and the site office.   In addition, both the program and field offices expressed some apprehension as to whether SEN-6-89 and the implementation plan called for by that notice might again raise differing judgments as to the roles, responsibilities and lines of authority in providing direction to the PORTS program.   The Department needs to come to rapid closure on this matter to support the needs of a program undergoing significant change in ES&H performance expectations.

Finding OM-18:   Formalization of roles, responsibilities, and lines of authority for ES&H as well as operation matters is needed for the three affected DOE offices.

5.5.5.4  DOE Assessments of PORTS ES&H Program

DOE line programs have the responsibility for the adequacy of
ES&H programs at contractor sites.  This responsibility is vested
in the Operations Office, but exercised by the area office and
NE, as well.  While not verified exclusively through onsite
appraisals, the effectiveness of such reviews and contractor
follow-up bears significantly on the strength of DOE oversight.

In the past year, seven appraisals have been conducted by ORO in
the following areas:  Industrial Hygiene; Occupational Safety and
Health (3 reviews by ORO, Area Office, and ORO-Analysis,
respectively); Environmental Control; Remedial Action; Industrial
Hygiene; Health Physics; General Safety and Housekeeping; and
Pre-Tiger Team (and validation visit).

These were reviewed in the context of frequency, scope, depth,
and contractor follow-up.  Based upon this review, the following
is concluded:

- The frequency of ORO ES&H appraisals was found to be "a
  few" a year based upon identified priorities and staff
  availability.  Reliance has been recently placed upon
  consultants to address more urgent needs (e.g.,
  Occupational Safety, Pre-Tiger Team).

- The scope and depth of appraisals was found to vary
  widely between the broad-based consultant appraisals
  and the ES&H discipline reviews conducted by DOE staff.
  The former was an exhaustive assessment with derived
  root causes, while the latter varied between a walk-
  through sampling and a "top-down" program evaluation,
  with little actual workplace inspection for
  verification purposes.

- The timeliness of appraisal report transmittal from DOE
  to the contractor varied from one to seven months, the
  latter being an ORO Occupational Safety and Health
  appraisal conducted on December 12-16, 1988, and
  transmitted to MMES on July 6, 1989.

- Contractor follow-up to DOE appraisal findings and
  recommendations has been prompt (usually within a month
  of receipt), but not typically responsive to root
  causes (which are not usually identified in the
  report).  For example, the PORTS response to an August
  29, 1989, recommendation to enforce the "no eating,
  drinking, and smoking" requirement in contaminated
  zones was to revise a directive and post additional
  signs.  Obviously, this does not effectively address

5-20

the deep-rooted attitudinal problems in the workplace at PORTS.

Overall, until recently the DOE oversight of ES&H programs at PORTS by appraisal has been at the paucity level, with inadequate capabilities (one recently added safety engineer) at the Area Office and similar limitations at the Operations Office. The use of consultative support to conduct OSHA-type inspections and a pre-Tiger Team review served to identify numerous specific ES&H deficiencies, but only those readily resolvable could be corrected given available ES&H resources at the site. As a result, a number of symptomatic findings were fixed, but their root causes remain, and have resulted in further deficiencies. For example, all of the occupational safety appraisals conducted by ORO have identified a broad range of shortcomings in occupational safety, industrial hygiene, and contamination control, but subsequent corrective actions did not preclude the concerns identified by the Tiger Team Safety and Health Assessment in these areas.

Finding OM-19: Integral to the implementation of the Secretary's SEN-6 Directive, the Office of Nuclear Energy and Oak Ridge Operations Office need to implement an ES&H appraisal program for PORTS whose frequency, scope, depth, and root cause assessment, fully supports an integrated and accountable approach by the contractor to resolve long-standing safety deficiencies at the site.

## 5.5.6  Management and Organization Assessment Findings

Finding OM-1:  Staffing of ES&H programs at PORTS is inadequate to accomplish needed improvements; management has utilized readily available solutions and will require assistance from MMES Corporate and DOE.

Finding OM-2:  Management controls must be exercised during the currently increased operating levels to ensure worker fitness for duty in the face of increased overtime.

Finding OM-3:  Increased efforts between PORTS management and the union to build trust and confidence on ES&H matters through improved communications and development of areas of common interest need to be undertaken.

Finding OM-4:  The MMES management should implement a plan to attract and retain qualified health physics surveyors, otherwise staff shortages and turnover will continue with resultant impact on training and experience level.  Turnover in other ES&H disciplines should be evaluated as well.

Finding OM-5:  Management should assure that ongoing and past corrective actions are consistent with the goals of the Long-Range Health and Safety Plan and become fully integrated in terms of priority and resource allocation.

Finding OM-6:  PORTS management should develop appropriate planning and acquire skills or obtain outside assistance to facilitate plans for managing organizational change and conflict.

Finding OM-7:  PORTS lacks a formal policy requiring demonstrated skill levels for the performance of critical activities at the plant.  On an interim basis, performance-based on-the-job training (OJT) evaluation checklists may be considered.

Finding OM-8:  PORTS Plant Training and Production Training need to assess the scoped and scheduled curriculum development tasks for adequacy in the "soft skills" area.  This assessment should be consistent with MMES policy endorsing formalized conduct of operation requirements.  PORTS Operations will need personnel competent in the formal conduct of operations to reinforce "soft skills" development in the workplace.

Finding OM-9:  All activities performed to comply with a regulatory requirement should be performed using standard operating procedures that prescribe MMES-approved methods designed to meet the requirements.

Finding OM-10:  A formal process to measure and feed back human performance and to capture and disseminate "lessons learned" information from PORTS, the uranium enrichment community, as well

as the commercial uranium industry, does not exist at PORTS and should be implemented.

Finding OM-11: To successfully implement the Plan, management needs to incorporate actions to overcome the known barriers identified above and assure "ownership" of its goals by effective two-way communication within the organization.

Finding OM-12: A site-wide ES&H surveillance program modelled after the compensatory walk-through program in X-700, 705, and 720, should be instituted promptly, with documented feedback to, and response by, PORTS management.

Finding OM-13: When MMES issues new directives to its workforce based on an ES&H requirement, the need for appropriate training or orientation should be determined and promptly implemented as part of directive issuance.

Finding OM-14: Management attention needs to be given to the establishment of operational standards for the Model Facilities Program using as guidance applicable INPO and industry guides (mandated in Under Secretary Tuck's memorandum of November 2, 1989).

Finding OM-15: PORTS lacks a policy that prescribes the generation, use and modification of the various operating, maintenance, analytical, sampling, and Health Physics procedures.

Finding OM-16: Management at DOE and MMES should determine which "critical few" areas of contractor performance provide the best incentive for achievement of management objectives, particularly those associated with ES&H improvements.

Finding OM-17: A remedial plan to mitigate staffing deficiencies is needed for the area office to carry out its assigned responsibilities in an environment where significant ES&H improvement is needed.

Finding OM-18: Formalization of roles, responsibilities, and lines of authority for ES&H as well as operation matters is needed for the three affected DOE offices.

Finding OM-19: Integral to the implementation of the Secretary's SEN-6 Directive, the Office of Nuclear Energy and Oak Ridge Operations Office need to implement an ES&H appraisal program for PORTS whose frequency, scope, depth, and root cause assessment, fully supports an integrated and accountable approach by the contractor to resolve long-standing safety deficiencies at the site.

# REFERENCES

## REFERENCES

American Industrial Hygiene Association, 1988. Analytical Laboratory Audit, October 1.

Anderson, R.E., 1985. Collection of Environmental Water Samples-Grab Method, Goodyear Atomic Corporation, October 8.

Anderson, R.E., 1987. Request for Waste Acceptance and Waste Shipment Schedule Approval, Martin Marietta Energy Systems, February 27.

Applegate, K.L., 1988. Bact. Lab. Cert. Martin Marietta, Ohio Environmental Protection Agency, November 8.

Bennett, J.W., 1988. Action Description Memorandum (ADM) for Activities at the Portsmouth Gaseous Diffusion Plant (PORTS) and Oak Ridge Gaseous Diffusion Plant (ORGDP). Department of Energy, July 1.

Bennett, J.W., 1989. Action Description Memorandum (ADM) for Activities at the Portsmouth Gaseous Diffusion Plant (PORTS), Department of Energy, January 19.

Blake, R.E., 1988. Waste Minimization, Martin Marietta Energy Systems, January 15.

Blake, R.E., 1989. UST Inventory Control, Martin Marietta Energy Systems, September 28.

Boyd, D.E., 1985. Analytical Methods Used with Environmental Samples, Goodyear Atomic Corporation, December 23.

CH2M Hill, 1988. Ambient Environmental Monitoring Program Assessment Portsmouth Reservation, December 15.

DOE, 1981. Environmental Compliance Guide.

DOE, 1987. Environmental Survey - Preliminary Report - Portsmouth Uranium Enrichment Complex, Environment, Safety, and Health Division, August.

DOE-ORO, 1988. Site Residential Drinking Water Monitoring Program, October.

Donnelly, R., 1987. Ohio EPA NPDES Monthly Report - January-December, Martin Marietta Energy Systems.

Donnelly, R., 1988a. Ohio EPA NPDES Monthly Report - January-December, Martin Marietta Energy Systems.

Donnelly, R., 1988b.  Ohio EPA Request for Additional Information on NPDES Application Form 2C for the Portsmouth GDP, Martin Marietta Energy Systems, January 14.

Donnelly, R., 1989.  Response to Secretary Request for Evaluation of MTF for Projects Implemented at ORO Facilities, Martin Marietta Energy Systems, September 15.

EPA, undated.  Administrative Order by Consent.

EPA, 1989.  Administrative Order by Consent, September 8.

ERDA, 1977a.  Final Environmental Statement - Portsmouth Gaseous Diffusion Plant Expansion, September.

ERDA, 1977b.  Final Environmental Impact Statement - Portsmouth Gaseous Diffusion Plant Site, May.

GAT, 1986a.  Operating Method - Use and Handling of Waste Containers, November 12.

GAT, 1986b.  Operating Method - Operation of the Radicator, August 11.

GAT, 1989.  Portsmouth Site Facility Air Vent & Exhaust Survey.

Geraghty & Miller, Inc., 1989a.  Ground-Water Quality Assessment of Four RCRA Units, May.

Geraghty & Miller, Inc., 1989b.  Quadrant I Description of Current Conditions, May.

Geraghty & Miller, Inc., 1989c.  Quadrant II RCRA Facility Investigation Description of Current Conditions, October 23.

Geraghty & Miller, Inc., 1989d.  Quadrant I - RCRA Facility Investigation - Work Plan, Volumes I and II, May 5.

Geraghty & Miller, Inc., 1989e.  Quadrant II RCRA Facility Investigation Work Plan, October 23.

Gillespie, E.W., 1989a.  NPDES Exceedances, Department of Energy.

Gillespie, E.W., 1989b.  Ohio EPA Director's Findings and Orders - PCB Spill Cleanup Plan for the Portsmouth Gaseous Diffusion Plant, Department of Energy - Portsmouth, August 24.

Gillespie, E.W., 1989c.  Notification to OEPA-Southeast Region, Division of Water Pollution Control, November 14, 1989.

Homerosky, F., Jr., 1989. Characterization Study of Influents to the X-6619 Sewage Treatment Plant, Martin Marietta Energy Systems, March 15.

Hultgren, R.O., 1988. Monthly Operation Reporting Requirements for PORTS Water Treatment Plant, Department of Energy, June 30.

J. B. F. and Associates, 1988. Risk Assessment Study of PCB Gasket Removal.

LaGrone, J., 1987. Waste Minimization Award Program, Department of Energy - Oak Ridge Operations, June 29.

MMES, 1988a. Waste Management, Environment, Safety & Health Division, August 26.

MMES, 1988b. 20 Lab Notebook Audits from 1988.

MMES, 1989. Addendum to the Oak Ridge Reservation, Paducah Gaseous Diffusion Plant, and Portsmouth Gaseous Diffusion Plant Site Environmental Report for 1988, ES/ESH-8-Al.

Ohio EPA, 1989. Consent Decree, August 29.

ORO, 1985. Report on the Inventory Difference - PORTS GDP - Fiscal Years 1981-1984, April 5.

PEER Consultants, 1989. Final - QA/QC Appraisal of Environmental Field Sampling, Portsmouth Gaseous Diffusion Plant, April 24-28, 1989, May 25.

Pendergrass, W.R., 1988. Meteorological Site Survey of the Portsmouth Gaseous Diffusion Plant, Air Resources Laboratory.

Personal Interview with Environmental Control Department Personnel, November 9, 1989. Data Calculations for Dose Assessment.

Personal Interview with Environmental Control Department Personnel, November 9, 1989. Source and Level of Contamination in Chromated Filter Cake Stored at X-616.

Personal Interview with Environmental Control Department Personnel, October 30, 1989. Topic FIRRA Issues.

Personal Interview with Materials Control and Accountability Personnel, October 26, 1989. Inventory Difference Report - April 5, 1985.

Personal Interview with Process Personnel, October 31, 1989a. Hazardous Waste Containers Located in the PCB Electrical Storage Area.

RF-3

Personal Interview with Process Personnel, October 31, 1989b. Underground Storage Tanks.

Personal Interview with Waste Management Staff, October 26, 1989. Disposal of Non-Radioactive Land Banned Waste.

Personal Interview with Waste Management Staff, October 26, 1989. Elevation of Drums in X-744G.

Personal Interview with Waste Management Staff, October 27, 1989. Waste Minimization.

PORTS, undated a. Waste to be Incinerated at the Oak Ridge Mixed Waste.

PORTS, undated b. Environmental Control Procedures.

PORTS, undated c. Portsmouth Waste to be Incinerated at the Oak Ridge Mixed Waste Management.

PORTS, 1987. Revised RCRA Part B Permit Application, April 27.

PORTS, 1988. Revised RCRA Part A Permit Application, July 22.

PORTS, 1989a. X-705 Drains/Request for Planning and Methods Service.

PORTS, 1989b. Guideline for Receiving Hazardous Materials, August 10.

PORTS, 1989c. National Voluntary Laboratory Accreditation Program On-Site Assessment Report, January.

Rogers, J.G., R.L. Grant, et al., 1989. Portsmouth Gaseous Diffusion Plant Site Environmental Report for 1988, ES/ESH-8/V, Martin Marietta Energy Systems, May.

Rogers, J.G., W.E. Wiehle, et al., 1988. Environmental Surveillance of the U.S. Department of Energy Portmouth Gaseous Diffusion Plant and Surrounding Environs During 1987, ES/ESH-4/V4, POEF-1180, Martin Marietta Energy Systems, April.

Schwab, R.J., and J.E. Taphorn III, 1988. Halogenated Volatile Organics in Surface Water, Martin Marietta Energy Systems, August 3.

Shepler, R.L., 1986. Measured Losses and Inventory Differences - Revised Data, Goodyear Atomic Corporation, May 5.

Sheward, C.W., 1989. Draft-Implementation Plan Polychlorinated Biphenyl (PCB) Program Management, October 25.

Stewart, R.B., 1989. Administrative Order by Consent Approval Letter, U.S. Department of Justice, October 25.

Stone, A.A. and J.M. Milam, 1989. Floor Drains in X-705, Martin Marietta Energy Systems, May 25.

Strange, R.A., undated. Radioactive Effluents Report Portsmouth Gaseous Diffusion Plant Calendar Year 1988, MMES.

Tomlin, J.D., 1988. Chain-of-Custody Records Received by D/522 for Trichloroethylene Analysis of NPDES Samples, Martin Marietta Energy Systems.

Towne, D.A. and C.J Van Meter, 1983. Status Report: GAT/GDP-1115 PORTS GDP U-235 ID Investigation, November 30.

Valentine, B.L., 1985. Collection of Environmental Water Samples -Grab Method, Goodyear Atomic Corporation, October 10.

Vita, O.A., 1989. Analytical Methods for Determination Metals in NPDES Samples, Martin Marietta Energy Systems, October 30

Vournazos, J.P., 1988. Waste Minimization Procedures, Martin Marietta Energy Systems, October.

**REFERENCES**

**Safety and Health Assessment**

American National Standards Institute, Safety and Health Assessment
ANSI 288.2, 1980, Section 8.4

Arsenic Survey Code No. 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

Code of Federal Regulations, OSHA Section 1910.106 (d)(4)(iv)

Code of Federal Regulations, OSHA Section 1910.107 (b)(5)(i)

Code of Federal Regulations, OSHA Section 1910.108 (b)(2)

Code of Federal Regulations, OSHA Section 1910.1200 (q)(8)

Code of Federal Regulations, OSHA Section 1910.1200 (f)(5)

Code of Federal Regulations, OSHA Section 1910.133 (a)(1)

Code of Federal Regulations, OSHA Section 1910.134 (d)(2)(ii)

Code of Federal Regulations, OSHA Section 1910.134 (d)(1)

Code of Federal Regulations, OSHA Section 1910.134 (e)(1)

Code of Federal Regulations, OSHA Section 1910.134 (f)(4)

Code of Federal Regulations, OSHA Section 1910.134 (b)(5)

Code of Federal Regulations, OSHA Section 1910.134 (e)(2)

Code of Federal Regulations, OSHA Section 1910.141 (q)(2)

Code of Federal Regulations, OSHA Section 1910.153 (c)

Code of Federal Regulations, OSHA Section 1910.252 (e)(2)(iii)

Code of Federal Regulations, OSHA Section 1910.94 (d)(8)(i)

Code of Federal Regulations, OSHA Section 1910.94 (d)(9)(vii)

Code of Federal Regulations, OSHA Section 1926.354 (d)

Code of Federal Regulations, OSHA Section 1926.58 (f)

Code of Federal Regulations, OSHA Section 1926.58 (k)(2)(i)

Code of Federal Regulations, OSHA Section 5.1.18b (1)-(11)

Code of Federal Regulations, OSHA Section 5.1.18c (1)

MMES Action Plan Dated October 28, 1989 (See Appendix C)

Technical Safety Appraisal Reference Manual, U.S. Department of Energy, Appendix A, July, 1989

U.S. Department of Energy, DOE Order 5480.11, Occupational Radiation Protection Section 9.K.(2)(c)

U.S. Department of Energy, DOE Order 5480.11, Occupational Radiation Protection Section 9 (m)(5)

U.S. Department of Energy, DOE Order 5480.11, Occupational Radiation Protection Section 9.0 (3)

U.S. Department of Energy, Internal Memorandum to Peter N. Brush from Joseph E. Fitzgerald, "Immediate Action Concerns for Buildings 720, 700, and 705 at Portsmouth Gaseous Diffusion Plant," October 27, 1989 (See Appendix B)

# APPENDICES

## Appendix A

### BIOGRAPHICAL SKETCHES OF
### ASSESSMENT PERSONNEL

**APPENDIX A**
**TIGER TEAM**
**ENVIRONMENTAL ASSESSMENT SUBTEAM**
**COMPOSITION AND AREAS OF RESPONSIBILITY**

| Name | Affiliation | Responsibility |
|------|-------------|----------------|
| Richard Aiken | DOE/ES&H | Team Leader |
| David Shafer | DOE/ES&H | Asst. Team Leader |
| Mark Francis | NUS Corporation | Coordinator |
| Linda Ribnicky | NUS Corporation | Administrative Assistant |
| Joseph Crist | NUS Corporation | Air |
| Bill Hughes | NUS Corporation | Surface Water/ Drinking Water |
| Dennis Beissel | NUS Corporation | Groundwater/Soils & Environmental Monitoring |
| Robert McPherson | Weston Corporation | Active Waste Management |
| David Wunsch | NUS Corporation | Toxic & Hazardous Materials Management & Quality Assurance |
| Donald Vetal | NUS Corporation | Radioactive Materials Management |
| Amy Hubbard | NUS Corporation | Inactive Waste Sites/Emergency Response |
| James Daniel | DOE/NEPA | NEPA Team Leader |
| Lyle Harris | DOE/NEPA | NEPA |
| Robert Roop | Labat-Anderson Inc. | NEPA |
| Timothy Mulholland | Labat-Anderson Inc. | NEPA |
| Gary Marmer | Argonne National Lab | NEPA |

APPENDIX A

BIOGRAPHICAL INFORMATION

NAME: Richard J. Aiken

POSITION ON TIGER TEAM:  Team Leader, Environment Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| University of Virginia | Regional Planning, MA | 1979 |
| State University of New York at Albany | Political Science, BA | 1973 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| DOE, Environmental Team Leader | 4 |
| Dept of Interior, Natural Resource Damage Assessment | 1 |
| Dept of Interior, Bureau of Land Management | 5 |
| US EPA | 1 |
| George Washington University, Associate Professor | 5 |

Mr. Aiken is a member of the DOE Office of Environmental Audit where he serves as a team leader for environmental audits and surveys.  He also serves as the Program Manager for the Environmental Survey Prioritization Program.  He assisted in the planning for the Environmental Survey Program and has participated in the program since its inception.  Over the past four years, he has led seven Environmental Surveys at DOE sites.

Mr. Aiken has had 11 years experience in environmental management in three Federal agencies.  In addition to his DOE experience, he was involved in such efforts as the development of CERCLA regulations dealing with natural resource damage assessments, management and environmental analyses of proposed synfuel programs, and analysis of proposed air pollution control initiatives.  In addition, he teaches a course on Federal environmental laws and regulations at the graduate level.BIOGRAPHICAL INFORMATION

NAME: Dennis R. Beissel

POSITION ON TIGER TEAM: Groundwater/Soils Specialist

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|--------|------------------------------|------|
| Colorado State University | Geology(Hydrogeology), M.S. | 1971 |
| University of Notre Dame | Geology, B.S. | 1969 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|----------|--------------|
| Project Manager CERCLA/RCRA Projects | 6 |
| Groundwater Group Supervisor | 4 |
| Senior Hydrogeologist | 7 |
| Hydrogeologist | 2 |

Mr. Beissel is Groundwater/Soils technical specialist and a contractor Tiger Team member. He has participated in many quality assurance audits of site characterization investigations and was responsible for technical procedures development and revisions for a major U.S.EPA contract. He has been project manager for remedial investigation/feasibility studies in various parts of the US and is experienced in all aspects of hazardous and solid waste site investigations.

Mr. Beissel has over 19 years experience as a hydrogeologist. He has received Tiger Team specific training in groundwater monitoring compliance procedures as well as root cause analysis training.

NAME: Joseph G. Crist

POSITION ON TIGER TEAM: Air Specialist
                        Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| University of Notre Dame | Chemistry, B.S. | 1951 |
| Pennsylvania State University | Organic Chemistry, Ph.D. | 1953 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Project Director<br>Environmental Sciences | 3 |
| Manager<br>Environmental Evaluations | 7 |
| Manager, Technical Services<br>Environmental Affairs | 7 |
| Manager<br>Environmental Research | 6 |

Joseph G. Crist

Dr. Crist is an Air Quality and Controls technical specialist and a contractor Tiger Team member. He has participated in the DOE Environmental Survey Program since 1986 and performed surveys at nine DOE facilities as the Air specialist. In addition, he was the Air specialist for the Tiger Team assessment of the Feed Materials Processing Center.

Dr. Crist has over 20 years experience in environmental affairs projects, the most recent 10 of which were concerned with projects of the Environmental Audit/Assessment type.
He conducted the Tiger Team specific training in Air compliance assessment procedures. He has received root cause analysis training to help identify underlying reasons for environmental problem conditions. He recently authored one volume of a five volume series on Environmental Auditing titled "Reporting, Recordkeeping, and Disclosure Requirements of the Environmental Audit". BIOGRAPHICAL

NAME: James P. Daniel

POSITION ON TIGER TEAM: NEPA Coordinator/Specialist
Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Northwestern State University of Louisiana | Wildlife Management, B.S. | 1972 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Environmental Protection Specialist | 2/3 |
| Environmental Biologist/ Project Manager | 11 |
| Research Assistant | 1 1/2 |

Mr. Daniel is the NEPA Coordinator/Specialist and a DOE Tiger Team member. He has been working in the DOE Office of NEPA Project Assistance since March 1989 and routinely evaluates environmental impact statements (EISs), environmental assessments (EAs), and other related NEPA documents, including Action Description Memoranda (ADM) and Memoranda-to-File (MTF).

Mr. Daniel has over 11 years experience in preparing and reviewing EAs, EISs, and associated NEPA documentation on various energy-related projects. He has received Tiger Team specific training in NEPA compliance assessment procedures, as well as root cause analysis training to help identify underlying reasons for environmental problem conditions.

NAME: Mark R. Francis

POSITION ON TIGER TEAM: NUS Team Coordinator (Contractor Coordinator


EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Pennsylvania State University | Environmental Resource Mgmt, B.S. | 1976 |
| Wayne State University | Occupational and Environmental Health, M.S. | 1980 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Project Manager Environmental Sciences | 4 |
| Industrial Hygienist | 8 |
| Loss Prevention Specialist | 1.5 |


Mark R. Francis

Mr. Francis is an Environmental Team Coordinator and Radiation specialist for one of the Tiger Teams. He has participated in the DOE Environmental Survey Program since 1986 and performed surveys at eight DOE facilities as the radiation specialist. At five of these facilities, he served as the Team Coordinator. Additionally, he served as Team Coordinator for the West Valley Demonstration Project Environmental Tiger Team assessment.

Mr. Francis has over 13 years of experience in environmental, safety and health related professions. He has received Tiger Team specific training in radiation compliance assessment procedures, as well as root cause analysis training to help identify underlying reasons for environmental problem conditions.

NAME:  Lyle E. Harris

POSITION ON TIGER TEAM:    NEPA Specialist
                          Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|--------|------------------------------|------|
| E. Michigan University | Geology, B.S. | 1977 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|----------|--------------|
| NEPA Specialist | 2 |
| Geologist | 9 |

Mr. Harris is a NEPA Specialist and a DOE Tiger Team member.  He has been working in the DOE Office of NEPA Project Assistance since 1987 and performs routine evaluations of environmental impact statements (EISs), environmental assessments (EAs), and other related NEPA documents, including Action Description Memoranda (ADM) and Memoranda-to-File (MTF).  He has participated in one previous Environmental Tiger Team conducted at the Y-12 Plant.

Mr. Harris has 11 years experience in assessing and preparing EAs, EISs, and associated NEPA documentation on various energy- and mineral-related projects.  He has received Tiger Team specific training in NEPA compliance assessment procedures, as well as root cause analysis training to help identify underlying reasons for environmental problem conditions.

NAME: Amy E. Hubbard

POSITION ON TIGER TEAM: CERCLA/RCRA Corrective Action Specialist

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Franklin & Marshall College | Geology, B.A. | 1977 |
| University of Pennsylvania | Environmental Planning, M.R.P. | 1980 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Risk Assessment Specialist CERCLA/RCRA Projects | 5 1/2 |
| Hydrogeologist | 2 |
| Geologist | 1 1/2 |
| Assistant Planner | 3 |

Amy E. Hubbard

Ms. Hubbard is a CERCLA and RCRA corrective action specialist and a contractor Tiger Team member. She participated in the DOE Environmental Survey Program for three DOE facilities as the hydrogeology specialist. This involved assessing the potential groundwater contamination problems at the facilities. For the past seven years, she has been involved in CERCLA and RCRA investigations of hazardous waste sites.

Ms. Hubbard has ten years experience in environmental areas. She has received Tiger Team training in CERCLA compliance assessment procedures, as well as the root cause analysis training to help identify underlying reasons for environmental problems.

NAME: B. R. Hughes

POSITION ON TIGER TEAM: Surface Water Specialist
Environmental Assessment Subteam

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Massachusetts Institute of Technology | Chemical Engineering, B.S. | 1983 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Principal in developing effluent guidelines for organic chemicals, polymers synthetics fibers industry | 5 |
| Associate Engineer in the design of waste water treatment plants | 1 |

Mr. Hughes is a Surface Water/Drinking Water technical specialist and a Tiger Team member. Mr. Hughes has served on a previous DOE Tiger Team Environmental Assessment where he assisted in the review of complex chemical processes and waste streams.

Mr. Hughes has over 6 years of waste water and hazardous waste experience, activities include technical and regulatory aspects of the Safe Drinking Water Act (SDWA), the Clean Water Act (CWA), and the Resource, Conservation and Recovery Act (RCRA) and Superfund Programs. Responsibilities as staff chemical engineer include evaluation of environmental statutes, regulations and standards, development and presentation of technical guidance documents and training programs and application of environmental and regulatory statutes.

NAME: Gary J. Marmer

POSITION ON TIGER TEAM: NEPA Specialist
Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Case Institute of Technology | Physics, B.S. | 1960 |
| Auburn University | Physics, M.S. | 1962 |
| Ohio State University | Physics, Ph.D. | 1968 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Physicist | 17 |
| Assistant Physicist | 4 |

Dr. Marmer is a physicist and a contractor Tiger Team member. He is a Program Manager for Argonne National Laboratory's Energy and Environmental Systems Division. He has prepared environmental impact statements (EISs), environmental assessments (EAs), and other related NEPA documents, including DOE's High-Level Nuclear Waste Repository Program and Superconducting Super Collider.

Mr. Marmer has over 20 years experience in assessing environmental impacts for nuclear-related projects and preparing EAs, EISs, and associated NEPA documentation on various military- and energy-related projects.

NAME:  Robert B. McPherson

POSITION ON TIGER TEAM:  Waste Management Specialist
                          Environmental Assessment Sub-Team


EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|--------|------------------------------|------|
| N.C. State Univ. | Nuclear Engineering, B.S. | 1972 |
| Univ. of Florida | Env. Eng. & Health Physics, M.E. | 1973 |
| The Ohio State Univ. College of Law | Law, J.D. | 1984 |


WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|----------|--------------|
| Department Manager, Major Programs Operations | 1/2 |
| Section Manager, Environmental Compliance | 1 |
| Staff Attorney | 1 1/2 |
| Sr. Project Manager | 7 |
| Sr. Research Engineer | 2 |
| Nuclear Safety Engineer | 3 |
| Health Physicist | 1 |

Robert B. McPherson

Mr. McPherson is an Attorney and the Department Manager, Operations Department, for a Major Programs Division.  He has provided environmental regulatory compliance and licensing support to several DOE programs over the last 10 years, including hazardous and mixed waste management support for the past 4 years.

Mr. McPherson has 16 years experience as an engineer, project manager, attorney, and line manager.  He has received Tiger Team specific training in waste management compliance assessment procedures, as well as root cause analysis training to help identify underlying reasons for environmental problem conditions.

NAME: Timothy F. Mulholland

POSITION ON TIGER TEAM: NEPA Specialist
                        Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Drake University | Biology/Chemistry, B.A. | 1981 |
| University of Iowa | Chemistry, M.S. | 1983 |
| University of Iowa | Civil and Environmental Engineering, Ph.D. | 1986 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Environmental Chemist and NEPA Policy Analyst | 1 |
| Environmental Chemist | 1 |

Timothy F. Mulholland

Dr. Mulholland is a NEPA Specialist and a contractor Tiger Team member. He has reviewed several DOE projects for NEPA compliance. Projects were reviewed to determine the adequacy of existing NEPA documentation and the extent of required documentation for proposed projects. Currently developing software to assist during NEPA compliance determinations.

Dr. Mulholland has 2 years experience in environmental analyses. He has extensive experience in RI/FS work and risk assessment for RCRA and CERCLA projects, as well as experience in risk assessment for environmental impact statements.

NAME:  R. Dickinson Roop

POSITION ON TIGER TEAM:  NEPA Specialist
                         Environmental Assessment Sub-Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|--------|------------------------------|------|
| Hiram College | Biology, B.A. | 1971 |
| SUNY at Stony Brook | Ecology, M.A. | 1975 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|----------|--------------|
| Project Director | 1 month |
| Research Associate | 13 |
| Staff Ecologist | 2 |

Mr. Roop is a NEPA Specialist and a contractor Tiger Team member. He has prepared environmental impact statements (EISs), environmental assessments (EAs), and other related NEPA documents. He has participated in previous Environmental Tiger Teams, including the Y-12 Plant assessment.

Mr. Roop has over 15 years experience in assessing and preparing EAs, EISs, and associated NEPA documentation on various energy-related projects.  He has received Tiger Team specific training in NEPA compliance assessment procedures.

NAME: David S. Shafer

POSITION ON TIGER TEAM: Assistant Team Leader,
Environment Team

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|--------|------------------------------|------|
| University of Arizona | Geosciences, Ph.D | 1989 |
| University of Tennessee | Geology, M.S. | 1984 |

WORK RELATED EXPERIENCE: 7

| POSITION | NO. OF YEARS |
|----------|--------------|
| Geology Instructor/Teaching Associate | 4 |
| Park Ranger & Natural Resource Specialist | 3 |
| Physical Scientist | 1 |

Mr. Shafer is a Physical Scientist with the Office of Environmental Audit, Department of Energy in Washington, D.C. Mr. Shafer primarily has been involved with the development of the Department's environmental audit program where he developed the protocols to be used in auditing environmental management issues. In addition, he was the primary author for the protocols and checklists applicable to auditing soils, sediments, and biota issues in the Tiger Team assessments.

He recently joined DOE after completing a Ph.D in Geosciences at the University of Arizona. His graduate research was in the areas of geomorphology, climatology, and paleoecology. David has taught geology courses at the University of Arizona and Colgate University (New York), and has worked periodically for the National Park Service at Wind Cave (SD), Great Basin (NV), and Mesa Verde in Colorado.

NAME:  Donald L. Vetal

POSITION ON TIGER TEAM: Radiation Specialist

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | YEAR |
|---|---|---|
| Eastern Michigan University | Chemistry, B.A. | 1951 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Senior Executive Chemist | 4 |
| Section Manager Power Plant Chemistry Services and Executive Chemist | 8 |
| Consulting Engineer | 3 |
| Principal Engineer | 2 |
| Senior Engineer/Radiochemist | 12 |
| Radiochemist | 5 |

Mr. Vetal is a radioactive materials management (Radiation) technical specialist and is a contractor Tiger Team member. He has conducted nuclear and fossil power plant chemistry program and laboratory QA audits for over 12 years.

Mr. Vetal has over 34 years experience in the nuclear industry. He has received tiger team specific training in Radiation assessment procedures, as well as root cause analysis training for identification of underlying reasons for environmental problems.

NAME: David M. Wunsch

POSITION ON TIGER TEAM: Toxic and Hazardous Materials Management
and Quality Assurance Specialist

EDUCATIONAL EXPERIENCE:

| SCHOOL | DISCIPLINE AND DEGREE EARNED | | YEAR |
|---|---|---|---|
| Rutgers University | B.S. | Animal Science | 1971 |
| University of Guelph | M.Sc. | Physiology | 1973 |
| New York Medical College | M.S. | Pharmacology | 1977 |
| Loyola College | M.B.A. | Management | 1986 |

WORK RELATED EXPERIENCE:

| POSITION | NO. OF YEARS |
|---|---|
| Principal Environmental Scientist | 1 |
| Manager of Analytical Services | 2 |
| Laboratory Operations Manager | 2 |
| Research Scientist/Supervisor | 2 |
| Research Scientist | 4 |

Mr. Wunsch is a Toxic and Hazardous Materials Management and
Quality Assurance Specialist and a contractor Tiger Team member,
participating in one previous Tiger Team assessment as QA/TSCA
Specialist. He has been responsible for assessing potential
environmental problems with hazardous materials
storage/transportation and pesticide/herbicide use, in addition to
his review of quality assurance programs and TSCA compliance.

Mr. Wunsch has over ten years of laboratory experience and has been
involved in the writing of two laboratory QA manuals and numerous
environmental chemistry QA plans. He has been specifically trained
in Tiger Team activities and root cause analysis.

**NAME:**          Irwin Spickler

**AFFILIATION:**   USDOE/Office of Safety Compliance

**EXPERIENCE:**    29 years

- USDOE
  - Safety compliance assessment of DOE facilities including follow-up of Technical Safety Appraisals

- USAEC and USNRC
  - Nuclear regulatory and compliance activities.
- Dames and Moore
  - Consult to the nuclear industry and government.
- Pennsylvania Department of Health
  - Regulatory activities in air pollution control and occupational Health and Safety.

**EDUCATION:**     B.S. Meteorology, City College of New York
                   M.P.H. (I.H.), Industrial Hygiene, University of Michigan

**OTHER:**         Member ANS, ANSI, and IAEA Standards Committee

**NAME:**            Jerome B. Martin (Security/Safety Interface)
                     (Radiological Protection)

**AFFILIATION:**     Battelle, Pacific Northwest Laboratory (PNL).
                     Associated Section Manager, Health Physics
                     Technology Section

**EXPERIENCE:**      24 years

- Associate Section Manager, PNL

- Technical Leader, Emergency Preparedness Group, PNL

- Manager, Radiation Monitoring Section, PNL

- Associate Section Manager, Radiation Standards and Engineering Section, PNL

- Radiation Safety Officer, University of Colorado, Boulder

- Radiation Safety Officer, San Diego State University

**EDUCATION:**       B.S., Nuclear Physics, San Diego State University
                     M.S., Radiation Physics, Colorado State University

**OTHER:**           Certified by American Board of Health Physics, 1972

**NAME:** James A. Buckham

**AFFILIATION:** Private Consultant

**EXPERIENCE:** 37 years

    ° Livermore, CA; California Research and Development Corp, Project Engineer

    ° Idaho Falls, ID; Idaho National Engineering Laboratory, Idaho Chemical Processing Plant. Research engineer, research and development manager, Division Manager, Asst. General Manager.

    ° Barnwell, SC, Allied-General Nuclear Services, Executive VP and President.

    ° Gore, OK, Seguoyah Facility, Independent Oversight Team Manager.

    ° Participant in DOE Technical Safety Appraisals at Y-12 Plant, Feed Materials Production Center, Rocky Flats Plant, and West Valley Demonstration Project.

**EDUCATION:** B.S. University of Washington, Chemical Engineering
M.S. University of Washington, Chemical Engineering
PhD University of Washington, Chemical Engineering

**OTHER:** Registered Professional Engineer; Fellow Member, American Institute of Chemical Engineers; Member, American Nuclear Society; Member, American Chemical Society

**NAME:**                      John W. Klingelhoefer

**AFFILIATION:**        Battelle Memorial Institute

**EXPERIENCE:**        17 years

- Battelle Memorial Institute
    - Participated in TSAs and Tiger Team evaluations of DOE critical facilities and conducted various assessments of Safeguards and Security for the Office of Security Evaluations (OSE).

    - Managed NRC projects for security force training and conduct of emergency preparedness response exercises

    - Assisted in development of DOE Standards & Criteria for use in security inspections and evaluations

- Washington Public Power Supply System
    - Conducted safety and security interface studies and designed plant protection systems and access controls.

    - Assisted in formulating plant emergency preparedness plans and participated in all emergency response exercises.

    - Drafted all security related portions of plant licensing documents including PSARs and FSARs.

- US Army
    - Served as nuclear weapons storage detachment commander responsible for all safeguards and security functions.

**EDUCATION:**         B.S., Engineering, U.S. Military Academy

**OTHER:**               Certified Protection Professional, American Society for Industrial Security

**NAME:** Walter C. Lipinski

**AFFILIATION:** Argonne National Laboratory

**EXPERIENCE:** 39 years

- Argone National Laboratory
  - Involved, with instrumentation and control, electrical, and safety systems
  - Participated in experimental reactor programs for CP2, CP3, ZPRI, BORAX I, BORAX II, and EBR-I.
  - Participated in reactor design, construction and operation of Naval reactor, EBR-II, JANUS, ARBOR, EBWR, Cp-5, AARR, FARET, SL-1 (ALPR) and TREAT UPGRADE

- Consultant to Advisory Committee on Reactor Safeguards.

- DOE Technical Safety Appraisals and Follow-ups on N Reactor; Savannah River Reactors; Tritium Facility -Sandia; HFBR - Brookhaven; ICCP - Idaho; ATR - Idaho; ICPP - Idaho; Pu Finishing Plant - Hanford; Fast Flux Text Facility

- DOE Design Reviews on Florinel and Storage Facility - Idaho; N Reactor; Savannah River Reactors; Engineering Demonstration System Laser Isotope Separation

- DOE Special Reviews on L Reactor Restart - Savannah River; SP-100-Space Power Reactor; ATR Restart

- Tiger Team Review of Pantex

**EDUCATION:** Ph.D., Electrical Engineering - Illinois Institute of Technology 1969

M.S., Electrical Engineering - Illinois Institute of Technology 1963

B.S., Electrical Engineering - University of Illinois 1950

**OTHER:** Registered Professional Engineer - State of Illinois Member, American Nuclear Society Member, Institute of Electrical and Electronic Engineering

**NAME:**                Thomas J. Mazour

**AFFILIATION:**      Private Consultant

**EXPERIENCE:**       19 years

- Private Consultant
  - Participated in 15 TSAs and two Tiger Team evaluations of plutonium, uranium, reactor, waste management, non-nuclear and chemical processing facilities in organization and administration, operations, maintenance, training and certification, facility safety review, emergency preparedness and safety/security interface areas.

  - Supported the NRC in the conduct of training and special inspections of power reactor facilities.

  - Developed and conducted training program for DOE site surveillance personnel.

  - Supported the development of the draft DOE Training Accreditation Program.

  - Revised performance objectives and criteria for TSAs based on lessons learned from first round of these appraisals.

- Analysis and Technology, Inc.

  - Developed training review criteria and inspection procedures for the NRC.

  - Developed proposed regulations concerning operator licensing and nuclear power plant personnel training for the NRC.

  - Developed performance-based training for a DOE Category A reactor.

Thomas J. Mazour (cont'd)

- Conducted industry-wide job and task analysis for INPO for reactor operator, shift supervisor, health physic technician, chemistry technician, mechanical maintenance, and equipment operator positions.

- Evaluated the emergency operating procedures for a power reactor.

° US Navy Nuclear Submarine Program
- Served as a nuclear weapons officer and supervised the operation and maintenance of nuclear reactors.

**EDUCATION:**  ScD, candidate, Management Systems, University of New Haven (UNH)
MS, Industrial Engineering, UNH
MBA, UNH
BS, Mathematics, US Naval Academy

**OTHER:**  Registered Professional Engineer, Mechanical/Nuclear
Adjunct Instructor, University of New Haven

NAME:              Charles H. O'Donnell

AFFILIATION:      Rockwell-INEL

EXPERIENCE:       15 years

      o   Rockwell-INEL Senior Safety Engineer

- Involved in set-up and ramp-up of state-of-the-art computerized production facilities.

- Involved in the day-to-day operations and modifications of the production facilities.

      o   Background Experience

- Senior Safety Engineer for the prime operating contractor of the Idaho National Engineering Laboratory site.

- Senior Safety Engineer for the DOE Component Development Integration Facility.

- Safety Liaison between Atlantic Richfield Prudoe Bay Project's Office and their construction contractors.

- Health and Safety Engineer in Atlantic Richfield Mineral Resources Division's operation of a Copper Smelter.

EDUCATION:        B. S. Occupational Safety and Health – Montana School of Mineral Science and Technology

OTHER:            Certified Safety Professional - Comprehensive Practice

                  Certified Industrial Hygiene Technologist

                  Member of Laser Institute of America

**NAME:**                George A. Poda, MD

**AFFILIATION:**         Consultant to Oak Ridge Association University,
                        Hanford Environmental Health Foundation, and
                        Savannah River Site

**EXPERIENCE:**          39 years

                        ° EI DuPont de Nemous & Company, Inc.
                          From 1951 – 1952 Dana Plant Indiana –
                          Heavy Water (AEC)
                          – 1953 – 1955 U.S. Navy
                          – 1955 – 1966 Physician Savannah River
                            Plant
                          – 1966 – 1986 Medical Superintendent
                            Savannah River Plant

                        ° Amer-Nuclear Society – Committee to set
                          Medical Standards for Nuclear Power
                          Operations.

                        ° DOE – Several Committees – ie Physical
                          Standards PAP Program
                          Drug Testing Program
                          C.M.O. for DOE drug testing Program

                        ° Several papers relating to radiation
                          health problems & $H_2S$.

                        ° Teaching at REAC/TS and its predecessor
                          from 1862 to present. HEHF DOE audits of
                          Medical Programs of DOE sites.

**EDUCATION:**           M.D. degree University of Buffalo – 1945
                        Internship Buffalo General Hospital
                        Residency – Womens Homeopathic Hospital –
                        Philadelphia, PA.
                        Post Graduate Courses – Indiana University –
                        Columbia University, Harvard University and
                        Johns Hopkins University Medical Programs and
                        Schools.

**OTHER:**               Member Health Physics Society
                        Member AMA – S.C. Medical Association – Aiken
                        Co. Med. Society
                        Fellow American Occupational Medical Society
                        Fellow Board of Preventive
                        Medicine/Occupational Medicine

**NAME:**           Melton H. Chew

**AFFILIATION:**      M. H. Chew & Associates, Incorporated, Livermore, California

**EXPERIENCE:**      31 years

- President, M. H. Chew & Associates, Inc.: Provides technical services with expertise in operational health physics and the preparation and review of safety and environmental assessments.

- Hazards Control Safety Team Leader: Responsible for the hazards control safety support to Laser program. Responsible for safety support to 1500 programmatic personnel. Responsible for LLNL Safety Support to the Special Isotope Separation Project and Atomic Vapor Laser Isotope Projects.

- Hazards Control Safety Team Leader for Off-Site Programs: Emergency Preparedness Program and (Nest) Nuclear Emergency Search Team, interface with "Z" Division.

- Hazards Control Safety Team Leader: Responsible for the chemistry and material science safety program at Lawrence Livermore Laboratory.

- Field Health Physicist: Assigned to the Chemistry program at LLNL. Ensuring that a proper health physics program is being carried out by Health and Safety Technicians.

- Assigned to assist experimenters in the field testing of nuclear weapon systems and Plowshare experiments at the Nevada Test Site and Pacific Proving Grounds.

**EDUCATION:**      B.S., Chemistry, University of California, Berkeley

**OTHER:**          Graduate Studies in Nuclear Engineering Numerous awards nd invited papers on safety in nuclear field

**NAME:**               Edward J. Kvartek

**AFFILIATION:**     Westinghouse Savannah River Company

**EXPERIENCE:**      8 years

                  ° Du Pont Central Research & Development Department

                      – Member of Industrial Hygiene Staff

                  ° Du Pont Savannah River Plant

                      – Member of Industrial Hygiene Staff
                      – Member of Health Physics staff

                  ° Westinghouse Savannah River Company

                      – Manager of Industrial Hygiene

**EDUCATION:**      M.P.H., Environmental and Industrial Health- University of Michigan
B.S., Biology, California State College

**OTHER:**              Certified Industrial Hygienist

**APPENDIX B**

**IMMEDIATE ACTION CONCERNS
FOR PORTS BUILDINGS 720, 700, AND 705**

DOE F 1325 8
(5-83)

United States Government | **Department of Energy**

# memorandum

Oak Ridge Operations

DATE: October 27, 1989

REPLY TO
ATTN OF: Joseph Fitzgerald

SUBJECT: Immediate Action Concerns for Buildings 720, 700, and 705 at Portsmouth Gaseous Diffusion Plant (PORTS)

TO: Peter N. Brush
Acting Assistant Secretary
Environment, Safety and Health

The purpose of this memorandum is to inform you of significant safety findings resulting from the ongoing Tiger Team assessment at PORTS for which an immediate response by the contractor and DOE line programs is recommended.

As part of the Tiger Team review of PORTS, a safety and health assessment team has been reviewing the adequacy of workplace conditions and practices against DOE requirements and standards of accepted practice. This review, which commenced on October 23, 1989, has identified safety deficiencies in three maintenance support facilities [Buildings 720, 700 (chemical operations area), and 705] of sufficient significance to prompt immediate consideration of compensatory corrective actions. While, in our judgment, no imminent hazard exists to workers in those facilities, the lack of adherence to fundamental safety standards, as well as a work environment largely lacking in formality, discipline, and accountability to safety, presents an unacceptable situation.

The specific findings to date are summarized in the attachment by building number, and highlighted below. Overall, these reflect an inability by the contractor to recognize safety problems in the workplace and furthermore, where requirements and procedures exist, they are not consistently enforced by management.

From the radiation protection standpoint, these include: evidence of eating, drinking, and smoking in contaminated areas; lack of routine contamination surveys being performed; little followup and accountability to radiation survey tagging and corrective postings; little segregation of tagged contaminated and non-contaminated equipment on which maintenance is being performed; and overall complacency to inplant contamination, with aged contamination stickers observed on phones, chairs, and other frequented surfaces. Although a new contamination control policy is being implemented at PORTS in response to DOE 5480.11, restricting contamination to its source is not yet being implemented as a precept.

From the occupational safety standpoint, key deficiencies identified include: Local exhaust systems are not routinely checked for air flow adequacy; workplace hazard communication is inadequate, e.g., improper labelling and inadequate worker training; extensive electrical code violations; violations of DOE Hoisting and Rigging Manual; numerous violations of OSHA requirements and general industry practice, including machine guarding provisions, inspection and storage of compressed gas cylinders, performance of welding and cutting operations, and use of standard engineering controls. Unsafe actions on the part of workers were observed in both Buildings 700 and 720.

The Tiger Team intends to fully pursue root causes for these and other ES&H programmatic shortcomings, particularly through the activities of the management assessment team. However, it is clear that the following are contributory to the problems observed: 1) Accountability to safety is not being exercised by DOE and contractor line organizations down to the facility level; 2) an inplant surveillance program does not exist, nor do plant supervisors "walk their spaces"; 3) workers are not knowledgeable of workplace hazards and the rationale for practices prescribed; and 4) formality and discipline is lacking as a feature in most elements of the safety programs administered at these facilities.

The DOE Area Office Manager, Eugene Gillespie, and the PORTS Plant Manager, Ralph Donnelly, have been briefed on this overall concern, as well as the specifics of the deficiencies observed. To their credit, actions have already been undertaken where feasible. However, the scope and nature of these shortcomings entail a compensatory approach that will abate the more serious deficiencies and accelerate operational improvements prior to finalization of a final action plan. This has been so recommended.

Progress on this overall concern will be reported at closeout and
in the final report when prepared.

Joseph E. Fitzgerald, Jr.
Team Leader

Attachment

cc:  Leo Duffy, S-3
     Jerry Griffith, NE-1
     Joe LaGrone, OR
     Richard Starostecki, EH-30
     Ray Berube, EH-20
     Lawrence Weiner, EH-23
     William Bennett, NE-33

## FACILITY DESCRIPTION

Building 720 contains plant maintenance operations (compressor shop, motor shop, machine shop, sheet metal shop, etc.), as well as a large stores area and offices.

Building 700 is designated as a cleaning operation, where equipment is cleaned and degreased prior to being reinstalled in the cascade.

Building 705 contains disassembly and decontamination operations for failed process equipment, as well as equipment for uranium decontamination solutions.

These operations all involve radioactive contamination (primarily low-enriched uranium compounds), although only Building 705 has been restrictively zoned.

Tiger Team - Health and Safety Group

<u>General Concern in the X-705 Building</u>

Contamination control in the X-705 Building is less than adequate.

<u>Specific Concerns in the X-705 Building</u>

o   No routine contamination surveys are being performed in the
    705 Building.  They are only performed by HP Surveyors when
    requested by Operations.  As a result, the facility manager
    is not aware of the radiological condition of his facility;
    it has not been adequately characterized.

o   The minimal air sampling in the disassembly and
    decontamination area does not properly characterize the
    airborne radiological conditions in the workplace.  Having
    Operations personnel change the filters in these samplers has
    resulted in incomplete and inconsistent sampling.

o   There are several different types of work done in the 705
    Building that have varying potential for contamination, but
    they are all done in the same general contamination
    environment.  Thus, work with a lower potential for
    contamination can become unnecessarily contaminated to higher
    levels.  This is inconsistent with good ALARA practice.

o   There were a large number (about 50) of burnable contaminated
    waste barrels stored in 705 that added significantly to the
    combustible loading in the building.  Due to the accumulation
    of burnable waste in barrels without covers, the fire loading
    and fire potential has significantly increased.  In addition,
    the fire suppresion system in the area is about 40 feet above
    the floor; this condition warrants a review of the fire risk.

o   There were 5 or 6 Nuclear Criticality Safety signs that said
    for NCS specifications, limits, and procedures - see
    information packets.  The packets were out-of-date; the
    current information was kept in the facility manager's office.

o   A low level uranium analysis lab in the Recovery Area had the
    same limited contamination controls as the rest of the
    building.  There is a potential for cross contamination of
    samples in this lab.

o   There were at least 5 outdated "Caution - High Airborne
    Radioactivity - Respirator Required" signs posted in the
    Recovery Area.  These signs have been outdated since 1976.

o   There are several pieces of abandoned/contaminated equipment
    in the Recovery Area that are unlabeled (or have no currnet
    labeling) and are in poor condition with regard to
    contamination control.



o     There is a restroom and several drinking fountains located
      within the contamination control area in the 705 Building.
      The restroom has no hand monitor at its entrance and no
      precautions about glove removal or hand washing.  None of the
      drinking fountains have foot pedal controls; all require hand
      operation with contaminated hands.

o     Housekeeping in the contaminated part of the 705 Building is
      poor.  Many parts are scattered on the floor creating tripping
      hazards.  Pathways through certain areas are cluttered.  The
      entrance to the restroom was nearly blocked by 10- 5 in.
      cylinders lying on the floor being dried.

o     After touring the contaminated part of the 705 Building, the
      bottoms of our shoe covers were surveyed.  We found up to 1000
      cpm/100 cm2 (4000 dpm/100 cm2) alpha and up to 500 cpm/20 cm2
      (10000 dpm/100 cm2) beta contamination.  Loose contamination
      is readily removable from floor surfaces.

UNCLASSIFIED
WTB

Tiger Team - Health and Safety Group/Radiation Protection

General Concern in the X-720 Building

The contamination control program in the X-720 Building is not fully implemented because IHHP doesn't recommend protective equipment requirements for maintenance work on contaminated equipment.

Specific Concerns in the X-720 Building

o   Green contamination tags are put on various pieces of equipment by HP Surveyors before they leave the X-705 Building.  The tags give the contamination status of the equipment (both fixed and smearable contamination remaining after decontamination).  Green and pink tags are used under the following conditions:

|  | Contamination Limits (dpm/ 100 cm2) | | | |
|  | Fixed | | Smearable | |
| Tag Color | Alpha | Beta | Fixed | Beta |
| Green | <30K | <2M | <2K | <30K |
| Pink | >30K | >2M | >2K | >30K |

o   The middle part of the green tag lists several maintenance operations, such as Distruction of Surface (welding, burning, grinding, buffing, drilling, machining); Airborne Probability Low (handling, inspecting); and Airborne Probability High (impact tools, sweeping) and corresponding protective equipment.  However, HP Surveyors at X-705 do not recommend protective equipment because they do not know what work activities are planned for a given piece of equipment.

o   Tagged equipment is moved to the X-720 Building where work activities are defined by Maintenance foremen.  Foremen are required by procedure to specify that: "Half-face or full-face respirators will be worn whenever the IHHP contamination tag recommends their use while working on contaminated parts."  Since IHHP doesn't make such recommendations on the green tags, protective equipment requirements are rarely imposed.

o   HP Surveyors in the X-720 Building have not been assigned the responsibility for assuring that proper protective equipment is required and used when working on contaminated equipment.

o   Green contamination tags are removed and discarded when component reassembly begins and the contamination status of individual pieces of equipment is lost.

o   Equipment tagged with pink contamination tags is sent to a separate area in the X-720 Building where special handling precautions are observed.  Evidence of eating and drinking


UNCLASSIFIED
LUT B

were found in this area.

UNCLASSIFIED

Tiger Team - Health and Safety Group

General Concerns in the X-720 and X-700 Buildings.

Industry recognized good work practices in the buildings are less than adequate. Examples include the following.

  o An employee was seen smoking in the operating area (NE Area) of the X-700 Building.

  o Four employees were observed not wearing safety glasses in the X-700 Building.

  o Evidence of eating (gum wrapper and peanut bag wrapper) was noted in the X-700 Building.

o Welding is performed in open areas of the Buildings without screens or curtains to prevent unprotected personnel from being exposed to the welding arc.

Local exhaust systems are not routinely checked to verify that they are operating adequately. When conducted, some of the measurements are made using uncalibrated instruments by personnel who do not receive formal training in how to perform measurements. Examples include the following.

o The exhaust systems in the paint, carpenter, satellite welding, etc. shops in the X-720 Building are not routinely evaluated for air flow.

o The welding exhausters in the X-700 Building are not routinely evaluated for air flow.

o The sheetmetal mechanics conduct measurements, when requested. These individuals use uncalibrated instruments and receive no formal training in the correct operation of the instruments.

The Hazard Communication program is incompletely implemented in these buildings. Examples include the following.

o Numerous 55-gallon drums and secondary containers with missing and/or incomplete information are noted in these buildings.

o The chemical dip tanks in the X-700 Building have 'hand printed' hazard warnings attached which operators admit were attached in preparation for the Tiger Team.

Personnel are not trained in the proper use of engineering controls intended for health protection. Examples include the following.

o There are no operating instructions for the mercury vacuum cleaners in the X-700 building.

UNCLASSIFIE
WTB

o There are no routine checks of the combustible gas alarm installed on the motor varnish oven in the X-720 building.

o The 'code personnel', identified as the group responsible for verifying that the X-720 Building degreaser's hoist operates properly, are not aware that hoist speed must be operated at no more than 11 feet/minute.

Obvious unsafe acts occur in the X-700 Building. Examples include the following.

o A set of forks from a forklift were suspended approximately 7 feet in the air above a walking surface without any barricade to prevent personnel from walking under the load.

o Water from a steam leak is permitted to pool on the floor around a Motor Control Center.

o The operator of a pickup truck got out of the truck and left the engine running to talk to personnel approximately 10 feet away.

UNCLASSIFIED

Tiger Team - Health and Safety Group

<u>Specific Concerns in the X-720 Building</u>

o    Electrical wiring in this facility does not meet current code requirements in numerous areas.

    1.    Wiring originally designated for a Class I hazard has been compromised by the addition of an additional receptacle outlet which does not meet class I requirements.

    2.    Extension cords used instead of conduit in numerous areas.

    3.    Ground-Fault Circuit-Interrupters's are not used in areas where grounding of adjacent personnel is probable. i.e. Water fountain adjacent to deep sink area.

    4.    Poor electrical testing practices are in use.

        a)    No known engineering/safety evaluation for a motor test stand.

        b)    Use of alligator clips for supplying power while charging a air conditioner system.

o    Violations of the DOE Hoisting and Rigging Manual

    1.    Annual load testing of slings and rigging equipment are not being performed per DOE requirements.

    2.    Labeling requirements concerning capacity and Safe Working Load limits not universally applied.

    3.    Annual load testing of forklifts is not performed.

    4.    Current method of using color coding for establishing Safe Working Load Limits is a poor practice.

    5.    Lifting fixtures which have not been through a design process have been fabricated and used by personnel in the shop area.

    6.    Hooks of five ton size and less are not routinely required to have a safety latch.

    7.    Threaded shackles observed in use utilizing a common grade 5 bolt instead of the manufacture's shackle pin.

    8.    Manlifts have not been required to meet the requirements of the applicable DOE requirements.



o    Guarding on much of the machinery throughout the machine shop does not meet general industry requirements.

    1.    Pedestal personnel cooling fans.

    2.    Refrigeration demonstration stand's evaporator and condenser coil fans.

    3.    Motor drives on machinery through out the shop.

    4.    Lamps and lighting fixtures used in areas where breakage is likely.

o    Compressed Gas Cylinders not universally inspected and stored in a method consistent with general industry's practice.

    1.    Compressed Gas Cylinders were not routinely inspected and tested on a frequency which prevented deterioration of compressed gas cylinder containers.

    2.    Storage of cylinders within the building not consistent with general industry practice in numerous areas.

o    Plant compressed air supply was not regulated or controlled to ensure that _all_ employees using blow guns would not be subjected to discharge pressures exceeding 30 psi.

o    Welding and cutting areas not adequately segregated from adjacent operations by the use of welding screens.


UNCLASSIFIED

**APPENDIX C**

**DOE/ORO AND MMES RESPONSE
TO IMMEDIATE ACTION CONCERNS**



Department of Energy
Portsmouth Enrichment Office
P.O. Box 700
Piketon, Ohio 45661-0700
Phone: 614 / 897-5010

October 28, 1989

Mr. Ralph Donnelly, Plant Manager
Portsmouth Gaseous Diffusion Plant
Martin Marietta Energy Systems, Inc.
P. O. Box 628
Piketon, OH 45661

**TIGER TEAM FINDINGS - BUILDINGS X-700, X-705 AND X-720**

Dear Mr. Donnelly:

Reference is made to the Immediate Action Concerns memorandum from Joseph Fitzgerald, Tiger Team Leader to Peter N. Brush, Acting Assistant Secretary, Environment, Safety and Health regarding subject matters.

In view of the serious concerns regarding these problems, I am directing you to take the following actions:

1.  Starting Tuesday morning October 31, 1989, at 8:30 a.m, the building custodians for these three buildings are to meet with Mr. Earl Maxie, DOE Safety Engineer. The purpose of the meeting is to brief him on corrective actions initiated/completed, actions planned and building walk-through.

2.  Friday, November 3, 1989, and every Friday thereafter, I would like a detailed briefing on corrective actions, and follow-up with a walk-through to reinforce the commitment to plant employees of senior site management's concern for the seriousness of this situation.

3.  I would like a detailed corrective action plan including both immediate fixes and long range actions, with special emphasis on correcting root causes.

4.  Reinforcement to all employees that violation, disregard of safety procedures and standards will not be tolerated, and if they occur, immediate disciplinary actions will be taken.

**UNCLASSIFIE[**

October 28, 1989
Page 2


These actions shall stay in effect until I am convinced the situation has been substantially corrected and the root causes have been alleviated.

                    Sincerely,


                    Eugene W. Gillespie
                    Contracting Officer Representative

EWG:ts

UNCLASSIFIED

**MARTIN MARIETTA**

I.  ernal Correspondence

MARTIN MARIETTA ENERGY SYSTEMS, INC.

October 27, 1989
102-89-256

All Employees

**PORTS Policy Regarding Eating, Drinking, Use of Tobacco in Radiological and Chemical Use Areas**

I am concerned that during recent area inspections, some instances and evidence of eating, drinking and use of tobacco in X-720, X-700 and X-705 radiological areas and areas where chemicals are handled/processed have been observed.  This letter is being issued to remind all PORTS personnel of plant policy in this area.  There is to be no eating, drinking, chewing gum or use of tobacco in radiological areas or areas where hazardous chemicals are routinely present (uncontained) in the work environment.  Other industrial-type areas will be considered on a case-by-case basis and the policy will be communicated to the workforce.

By this letter, I am also reminding supervision at all levels that I expect them to rigorously enforce this policy.  The policy has been recently stated in the IHHP Bulletin, #2-89, for radiological areas and was stated in a letter to supervision on August 26, 1988 from the supervisor, IHHP.  If questions exist as to the suitability of a particular area for eating, drinking, use of tobacco, etc., it is the responsibility of supervision to obtain the information needed to make a determination.  The Health Physics and Industrial Hygiene Departments will provide assistance as needed.

I am confident that all PORTS personnel will work together to correct any problems in this area and assure that our policy is strictly followed.

Ralph Donnelly, X-100, MS-1223, Portsmouth (2101)

COMPENSATORY CORRECTIVE ACTION PLAN FOR TIGER TEAM CONCERNS
FOR BUILDINGS X-720, X-700 (CLEANING SIDE), AND X-705 AT THE
PORTSMOUTH GASEOUS DIFFUSION PLANT

### SHORT-TERM ACTIONS

| | |
|---|---|
| Send notice letter to all employees outlining Tiger Team findings and explaining need for immediate changes. | Donnelly 10/27/89 Complete |
| Conduct meetings with Building Supervision (through front-line foremen) and union leadership from all three buildings, explaining concerns and need for immediate changes | Shoemaker 10/27/89 Complete |
| Develop action plan for short-term fixes for specific items identified in Tiger Team letter dated 10/27/89 | Stalnaker 11/1/89 |
| Conduct similar meetings with supervision and union leadership for remainder of plant facilities, explaining concerns and need for immediate changes. | Division Managers 11/10/89 |
| Institute documented supervisory walk-through program in X-720, X-705, and X-700 including feedback to management | Lemmon/ McDermott 11/3/89 |
| Institute enhanced IH ventilation monitoring program in X-720, X-700, and X-705. | Stalnaker 11/3/89 |
| Institute documented supervisory walk-through program for remainder of plant, including feedback to management | Division Managers 11/10/89 |
| Hold series of plant updates to explain concerns and need for immediate changes. Send follow-up letter to all employees from Plant Manager. | Donnelly 11/10/89 |
| Initiate HP surveys and decontamination activities in X-705 | Stalnaker/ McDermott 11/10/89 |
| Review radiation protection and criticality safety training programs (including OCAW HazMat training) and add clarifying material concerning the difference between radiation hazards and criticality hazards. | McLaughlin/ Yocum 11/10/89 |

| | |
|---|---|
| Issue HP/NCS bulletin to all uranium workers outlining radiation hazards and criticality hazards and stressing the differences | Stalnaker/ Crawford 11/10/89 |
| Re-evaluate sign program at PORTS.  Ensure that posted signs are correct and remove unneeded or confusing signs. | Stalnaker 11/10/89 |
| Perform review of fire risk in X-705 due to large number of contaminated burnable barrels in facility.  Implement any identified necessary mitigating actions. | Calvert 11/10/89 |
| Evaluate the need for additional ESH support personnel in the plant.  Post and fill the additional jobs. | Division Managers 11/30/89 |
| Evaluate the need for safety compliance officers on shift.  Post and fill the additional jobs. | Stalnaker 11/30/89 |

## *INTERMEDIATE* ~~LONG~~ TERM ACTIVITIES

| | |
|---|---|
| Initiate enhanced IH ventilation system monitoring program throughout the plant | Stalnaker 12/1/89 |
| Evaluate the identified electrical and other OSHA-related deficiencies in X-720, X-700, and X-705 and generate abatement plan. | Sendek 12/1/89 |
| Evaluate the OSHA-related deficiencies in the remainder of the plant and generate abatement plan | Sendek 3/31/90 |
| Re-evaluate the contamination control program in X-705 and X-720 in terms of smaller contamination areas and equipment segregation and additional HP surveys.  Implement interim measures. | Landrum 12/1/89 |
| Re-evaluate the contamination control program in the remainder of the plant in terms of smaller areas.  Identify personnel and equipment needs and begin procurement.  Communicate the program re-evaluation to the other MMES facilities. | Landrum 12/31/89 |
| Re-evaluate manpower needs based on heightened concerns.  Present additional manpower needs to NE. | Bush 12/31/89 |

Re-evaluate equipment needs based on heightened          Bush
concerns.  Present additional equipment needs            12/31/89
to NE.

Conduct root cause evaluation and generate, in           Donnelly
conjunction with Tiger Team root cause findings,         12/31/89
action plan for corrective actions.

*LONG-TERM ACTIVITIES*

[To Dahl to prepare / UEPIP]



## Internal Correspondence

MARTIN MARIETTA ENERGY SYSTEMS, INC.

November 15, 1989

All Employees

### Cooperative Management/Union Agreement for Your Health and Safety

Your cooperation and assistance to the members of the Tiger Team during their review activities is most appreciated. While the Tiger Team will have completed their assessment activities at PORTS this Friday, their efforts in identifying the need for corrective actions to improve health and safety situations will necessitate the concerted interaction and cooperative efforts of us all in the months ahead. We are now asking that the cooperative and willing attitude exhibited by all employees during the Tiger Team visit continue as we initiate corrective measures addressing the concerns they have identified to make PORTS a safer and healthier place to work.

It is agreed that full compliance with all federal and state rules and regulations is essential to the continued operation of this plant from an environmental, health and safety standpoint. Attainment of this objective will require our total dedication and adherence to existing prescribed practices and procedures and, in some instances, implementation of new procedures where none currently exist in order to come into full compliance with required rules and regulations.

Should any initiatives regarding new procedures conflict with current Contract language, these items will be discussed and resolved through the proper labor relations channels prior to implementation.

We agree to undertake such actions in a professional and cooperative manner, and to work with each other in the development and implementation of new practices or procedures.

It is further agreed that expeditious and full compliance with all prescribed rules and regulations is absolutely essential and will necessitate a cooperative effort by all PORTS employees working in cooperation with management and union officials. Your assistance and cooperation is requested and required if this joint undertaking is to be accomplished for the benefit of all.

Ralph Donnelly
Plant Manager

John Knauff
President, OCAW, Local 3-689

Tom Douglas
President, UPGWA, Local 66

Appendix D

MEETING MINUTES

SUMMARY OF MEETINGS AND DISCUSSIONS
WITH REGULATORS

As part of the pre-assessment activities of the environmental assessment, both Region V of the US Environmental Protection Agency (USEPA) and the Ohio Environmental Protection Agency (OEPA) were invited to participate in whatever capacity that they felt appropriate. As a result of these invitations, during the assessment five meetings were held with representatives of the OEPA. These meetings were both at the State and the regional levels. With one exception, most of the meetings were of a technical nature and dealt with aspects of the OEPA regulatory structure and the regulator's views concerning Portsmouth compliance. The exception, discussed below, was a meeting with the OEPA Director and Deputy Director where the general views of the agency concerning the Portsmouth plant were provided. In general, it appears from all of the meetings that the State is pleased with the progress made by the Portsmouth plant in addressing their concerns.

o     <u>Subject:</u> General discussion of agency perspectives on
                  Portsmouth compliance issues.

      <u>Date:</u> October 26, 1989

      <u>Attendees</u>
      Richard Shank, Director, OEPA
      Maury Walsh, Deputy Director, OEPA
      E. G. Gillespie, DOE PEO Manager
      Ralph Donnelly, MMES Portsmouth Plant Manager
      Richard Aiken, DOE Environmental Team Leader
      Robert McPherson, Environmental Assessment Team Waste
        Management Specialist

      <u>Summary</u>

The purpose and objectives of the Tiger Teams were presented which was followed by a discussion concerning compliance issues associated with opacity at the steam plant, NPDES exceedences, and the recently concluded consent decree. The general feeling of the State towards the issue of Portsmouth compliance was positive. Both the opacity and NPDES issues involve a high degree of compliance (around 99%), but not the 100 percent expected by both DOE and Martin Marietta. The state's view was that this represented "substantial compliance" and that their enforcement response represents the lowest level of concern possible. The major problem with the consent decree was that a separate agreement was signed with USEPA which included different due dates for critical milestones. The state understands the difficul position in which this places Portsmouth.

o   <u>Date</u>:  October 30, 1989

    <u>Attendees</u>
    Brian Blair, OEPA Southeast Region
    John Rochette, OEPA Southeast Region
    Richard Aiken, DOE Environment Team Leader
    Robert McPherson, Environmental Assessment Team Waste
      Management Specialist

    <u>Subject</u>:    Waste  Handling  and  the  Consent  Decree
              Requirements

    <u>Summary</u>

Both representatives from OEPA joined the Tiger Team in conducting a waste handling inspection of the X-700 and X-720 buildings and in the team's nightly debriefs. They

noted several observations which required follow-up. These issues included both observations specific to the inspected facilities and interpretations of the State hazardous waste regulations.

o    <u>Date</u>:  November 1, 1989

<u>Attendees</u>
Susan H. Clay, OEPA Southeast Region
Len Greenwood, OEPA Southeast Region
Zachary Hamlin, OEPA Southeast Region
Fred A. Klingelhafer, OEPA Southeast Region
Richard Aiken, DOE Environment Team Leader
Joseph Crist, Environment Assessment Team Air Specialist

<u>Subject</u>:  Review of Status of Compliance with State Air
         Regulations

<u>Summary</u>

The discussion concentrated on the air permits, non-permitted sources, and performance of the steam plant. Also discussed was the State's interest in regulating chromium emissions from the Portsmouth cooling towers and the failure of Portsmouth to file for a renewal of the air permits for the landfill in a timely manner.

o    <u>Date</u>:  November 2, 1989

<u>Attendees</u>
Richard Lecsznar, OEPA Southeast Region
William Hughes, Environment Team Surface Water Specialist
Frank Homerosky, MMES
Carol VanMeter, MMES

<u>Subject</u> - Compliance Review of NPDES

<u>Summary</u>

The NPDES permit application is currently under review by OEPA. The discussion addressed the NPDES permit in general, the OEPA permit process, the Southeast region's role in that process, and the results of recent NPDES inspections. In general, the State seemed pleased with the progress made at Portsmouth.

o    <u>Date</u>: November 6, 1989

<u>Attendees</u>
Ken Dewey, OEPA Southeast Region
David Wunsch, Environment Assessment Team PCB Specialist

<u>Subject</u> - Disposition of the Decision Concerning the Need for a PCB Spill Clean-up Plan as Required by the Consent Decree

<u>Summary</u>

Portsmouth feels that the consent decree required PCB spill plan is unnecessary and have so stated in a letter to the OEPA Southeast region. The State has received Portsmouth's letter and was reviewing it at this time.

SUMMARY OF MEETINGS AND DISCUSSIONS
WITH PORTS UNION REPRESENTATIVES

As part of the environment, safety and health assessment activities being conducted by the Tiger Team, both formal and informal discussions were held with representatives of organized labor at the site. Represented were officers and members of the Oil, Chemical, and Atomic Workers Union Local 3-689 and the United Plant Guard Workers of America Union Local 66. Meetings were held with these representatives on October 11, 1989 during the pre-visit to Portsmouth, and weekly thereafter during the course of the onsite appraisal. The purpose of these meetings was for the Team to brief the union on what findings were being made, and to solicit any information or concerns that would aid in the conduct of the review.

One key issue raised by the union representatives involved the quality of medical service as it related to return-to-work determinations. Concerns were also raised regarding appropriate emergency transportation in the event of onsite accidents or illnesses. These were considered of sufficient significance to warrant a special review by a medical reviewer, Dr. George Poda of Savannah River. This review was conducted on October 31, 1989, and documented in the Tiger Team report as a special issue (Section 4.5.11.1).

Other issues involved concerns over the proper handling and disposal of wastes contaminated with PCB's, chromates, and asbestos. These issues were addressed in both the safety and environmental assessments, with no workplace safety hazards found. The unions concerns over waste minimization, however, were substantiated and figure in the Team's report.

Other issues raised, including those related to possible OSHA-related violations, ongoing grievances with safety implications, transportation of wastes onsite, and contamination control changes, were referred to the individual Team appraiser with responsibility in these respective areas, who addressed them as part of the overall assessment.

The following is a summary of specific meetings held during the course of the onsite review.

   • **Subject:** First weekly meeting with union representatives on ES&H concerns

   **Date:** October 24, 1989

   **Attendees:**

   John D. Knauff, President, OCAW Local 3-689
   Charles McNelly, Vice President, OCAW Local 3-689
   Sam Cooper, Day Shift Representative, OCAW
   Denny Adkins, Service Groups Representative, OCAW
   Herman Potter, OCAW
   Joseph Fitzgerald, Leader DOE Tiger Team
   David Shafer, Assistant Team Leader, DOE Tiger Team -- Environmental Assessment Team
   Charles O'Donnell, Industrial Safety Specialist, DOE Tiger Team
   Edward Kvartek, Industrial Hygienist, DOE Tiger Team

## Summary

The purpose and objectives of the Tiger Team were presented which was followed by discussions regarding concerns that the union wanted to bring to the attention of the Team in its review at PORTS. Such a list was requested in a pre-visit meeting with the union on October 11, 1989. Concerns that were cited are as follows:

- Handling and disposal of PCB's, chromates, asbestos -- numerous issues raised (addressed in pertinent sections of environmental and safety assessment reports)

- Quality of medical services, with particular emphasis on return-to-work determinations and emergency evacuation for medical emergencies (addressed in section 4.5.11.1)

- Isolation of worker on off-shift in GCEP area where two-way radios are not functional -- question of emergency communications (raised to DOE Area Office attention; "dead spots" exist, but 2-way radio communication possible in most floor areas, except immediately in front of certain electrical control panels)

- Operation of process systems at positive atmospheric pressure, with possible implications for safety (addressed in safety assessment)

- Lack of MMES management response and accountability to safety complaints (raised to DOE Area Office attention; some lack of MMES timeliness in past; addition of Area Office Safety engineer will help with controlling backlog and promoting timely resolution)

- Pregnant female being permitted to work in radiation environment in Buildings 342/343 (raised to DOE Area Office attention; both affected employees are on restricted duty in clean areas and have been notified and briefed on basis of restrictions and precautions required

- Lack of coordination with union on instituting new contamination control policy (improved coordination evident, e.g., MMES Internal Correspondence of November 15, 1989 regarding "Cooperative Management/Union Agreement for your Health and Safety")

- Driver being told to deliver hazardous waste onsite over a public thorofare in apparent violation of DOT regulations (addressed in environmental assessment)

- Inadequate ventilation in welding shops of Building 720 (addressed in safety and health assessment, as well as in special issues section)

Date:    October 30, 1989

Attendees

John D. Knauff, President, OCAW Local 3-689
Jeffrey Woodard, OCAW, Alternate Shift Supervisor
Joseph Fitzgerald, Leader, DOE Tiger Team
John Patterson, Team Leader, DOE Management Assessment
Jon Ousley, DOE Management Assessment team member
Dave Schweller, DOE Management Assessment team member
Jerry Martin, Health Physicist, DOE Safety Assessment team member

Subject:   Weekly debrief with union representatives; introduction of management team members

Summary

Further concerns were cited, including appropriate union input into ALARA goals, possible radiological contamination of the laundry (recent "contamination" had been attributed by management to elevated radon particulate levels), and adequacy of safety training programs.   The first concern should be resolvable in the cooperative arrangement cited in the MMES Internal Correspondence of November 16, 1989.   The laundry contamination issue is addressed in Special Issues, section 4.5.11.6; and adequacy of safety training programs is addressed in both the Safety and Assessment Report and the Management Assessment Report.

Date:     November 2, 1989

Attendees

John D. Knauff, President, OCAW Local 3-689
Charles McNelly, Vice President, OCAW Local 3-689
Joseph Fitzgerald, Leader, DOE Tiger Team
Irwin Spickler, Team Leader, DOE Safety and Health Assessment
 Team
Dave Schweller, Member, DOE Management Assessment Team

Subject:  Briefing for union representatives on safety and health findings

Summary

An informal closeout of the safety and health findings resulting from the Tiger Team review was provided union representatives prior to the scheduled November 3, 1989 closeout with MMES management. Concerns were raised by the union regarding possible overreaction by MMES to the contamination control issues raised in the Team's Immediate Action Concern memorandum of October 27, 1989. Other concerns identified involved adherence to PORTS safety procedures by outside contractors. Concerns remain over medical transportation in emergency situations which will require followup by MMES and OR. Concerns over faded radiation postings were raised again (a generic concern shared by the Team in its review). These concerns have been addressed by the Tiger Team in its report.

# APPENDIX E

## VALVED-OFF SEAL REVIEW
## REFERENCED ATTACHMENTS

.TY CST11

0730 CASCADE STATUS FOR MORNING MEETINGS

BUILDING: X-333      DATE:11/14/89      SHIFT:"A"

CELLS OFF STREAM /PRESSURES

| 33-2-9 = 14.70 PSIA | 33-3-4 = 4.19 PSIA | 33-5-8 = 14.00 PSIA |
| 33-2-6 = 14.70 PSIA | 33-4-5 = 6.67 PSIA | 33-5-2 = 14.50 PSIA |
| 33-2-4 = 14.90 PSIA | 33-4-2 = .80 PSIA | 33-7-2 = 14.75 PSIA |
| 33-3-3 = 3.50 PSIA | 33-5-1 = 16.00 PSIA | 33-8-6 = 13.50 PSIA |
| 33-3-5 = 4.19 PSIA | | 33-8-10= 8.25 PSIA |

| 24 HR NITROGEN USE | SCF: 41,266 |
| COLD TRAPPING | DRUM BANK: C        PRESS: 40 |
| NAF TRAP REGENERATION | START: N/A |
| BLEEDING TO CASCADE: | FROM: 33-2-4      TO CELL: 33-2-2 |
| | PRESS: 95      MATERIAL: PC |
| WET AIR EVACUATION: | CELL: N/A      PRESSURE: |
| CELL TREATMENT | CELL: N/A      SHOT NO.: |
| COLD RECOVERY RFRIG. | NORMAL: |
| PLANT AIR | NORMAL: |
| RECIRC/SANITARY WATER | NORMAL: |
| STEAM CONDENSATE | NORMAL: |
| LAW WITHDRAWAL | A-SIDE PCT.      NORMAL: B |
| ERS STATION | NORMAL: |
| SPACE RECORDERS | FAILED:          OK: |
| ASSAY SPECTROMETERS | FAILED:          OK: |
| B) VALVES: | A4ERXEA,AVR1,    AE2, AEA1 |
| RCW CV'S 100%: | 2-1 0 :    :4-10 0;4-8 E; 5-5 E; 6-9 0; 6-10 0 |

BAD SEALS:        1-6-6B/1A 1-7-3B; 1-10-2B/8A;  2-1-3B; 2-5-7B/4B;
                  2-8-4A;3-1-1B;3-3-4B/5B;3-5-3A;4-2-6A;4-4-2B
                  4-8-1B;4-9-1B/2B/4B/6B/7B;4-10-1A;5-5-4B;5-6-1B;
                  6-7-2B;6-10-6B/8B;7-5-1B/2B/3B/8B;8-6-8B/4B
                  3-1-7B;8-10-7B/8B

INCIDENT/ABNORMALALITES: CZL 1399 VALVE SEAT LEAKAGE FOUND
WHEN ATTEMPTING TO BACKFILL CZL CYL REJECTED
IC PUMP # 7 LOCKED UP

_____ D.A. Williams _____
FOREMAN

Case: 2:20-cv-04621-ALM-EPD Doc #: 1-2 Filed: 09/03/20 Page: 665 of 1046 PAGEID #: 743

## 5.2  Seal Check

5.2.1  Any of the following circumstances can be indicative of a defective seal(s).

1)  A seal exhaust alarm on any cell when operating conditions are normal.  CHECK IMMEDIATELY.

2)  High inleakage of nitrogen and/or oxygen.

3)  High or no seal feed flow.

4)  Lack of control in seal instrumentation.

5)  Increase in seal exhaust header pressure.  (This will occur only after the control valve has automatically opened or closed to 0% or 10% and can no longer control the set pressure.)  *100%*

5.2.2  When a defective seal is indicated, try to isolate the seal causing the problem.

NOTE:  If the system is severely out of control, control must be restored before it will be possible to identify specific problem-causing areas.  To restore control, toggle the seal exhaust solenoid valves for several or all of the seals simultaneously.  After the seal exhaust pressure comes back into control, release the toggles one at a time to determine the bad seal.

5.2.2.1  After the bad seal has been located and valved off at the seal panel, a normal seal check should be run by closing the seal exhaust solenoid valve to one stage at a time.

5.2.2.2  Record the change in the seal exhaust control valve position and any changes in the seal feed flow.

1)  If the seal exhaust control valve remains unchanged, close the manual seal exhaust block valve at the seal panel.  If closing the manual valve produces a change, the solenoid valve is probably defective.  If closing the manual does not produce a change (a change of some sort should be noted even for good seals), the seal exhaust line could possibly be plugged.

2) A defective seal is usually indicated by an abnormal change in the seal exhaust control valve position during the solenoid check.

NOTE: It is not uncommon to have very little control valve movement on a good seal. The time you want to start closing hand blocks at the seal panels is when you can't locate the bad seal by the solenoid check.

5.2.3 Check each stage as described in Items 5.2.2.1 and 5.2.2.2.

NOTE: Before the seal check can continue, defective seals should be valved off (Section 5.3) as necessary to allow the system to maintain control.

5.2.4 Figure 3 is useful for differentiating between a seal problem and an instrumentation problem. It is also helpful in pinpointing a seal problem to a particular gland.

5.3 Valving Off Bad Seals

5.3.1 When inleakage to the cascade is not high, a bad seal may be valved off for a limited period of time while awaiting maintenance. If it is decided to valve off the seal, proceed as follows:

1) Close the seal exhaust block valve.

2) Open the bypass orifice block valve for seal air.

3) Close the inner seal feed block valve.

NOTE: If inleakage to the cascade is too high to permit this course of action, the cell MUST be shut down for maintenance without delay.

5.3.2 When the oxygen line recorder indicates that air inleakage to the cascade is high:

1) Close the seal exhaust block valve.

2) Bypass the orifice for seal air to the atmospheric gland.

3) Open the nitrogen block valve.

4) Switch to nitrogen (top 3-way cock valve).

5) Close the inner seal feed block valve.

| OPERATING METHOD | NUMBER CA 10.2-1 |
|---|---|
| | PAGE 6 OF 10 |

6) Check that the seal nitrogen block valve is open (behind the cubicle downstairs).

NOTE:    If the $O_2$ inleakage is eliminated and if the $N_2$ inleakage can be tolerated, the seal can remain valved off awaiting maintenance.

5.4  Special Test for Seals That Have not Been Exposed to PG

5.4.1  Occasionally, seals are replaced, and, upon testing, continue to give bad seal indications. When this occurs, a static leak check should be performed before deciding to replace the seals.

NOTE:    A static leak check can ONLY be made on seals that have not been exposed to PG.

5.4.2  The Process Foreman has the responsibility of interpreting the results of the test and deciding upon the necessary course of action.

5.4.3  The testing rig should be at the cell location before the cell is shut down to minimize offstream time. However, to use the static machine, the cell MUST not have been onstream.

5.4.4  Maintenance will make normal seal change preparations for all cells where tests are to be made on repeat seal failures.

5.4.5  Special attention should be given to seal feed and seal exhaust lines if a bad seal indication is subsequently received.

vs

Case: 2:20-cv-04621-ALM-EPD Doc #: 1-2 Filed: 09/03/20 Page: 668 of 1046 PAGEID #: 746



COMPRESSOR SEALS VALVED OFF

EXPLANATION: ALTHOUGH THE TOTAL SEALS VALVED OFF INCREASED
SLIGHTLY DURING OCTOBER, MAINTENANCE DID CHANGE OUT
A TOTAL OF 46 SEALS.

ACTION:      MAINTENANCE INSTITUTED AN ABCD SHIFT DURING MID-
OCTOBER WHICH SHOULD PROVIDE 24 HOUR, 7 DAYS A WEEK
COVERAGE TO START ADDRESSING SEALS VALVED OFF.
CELL AVAILABILITY TO PERFORM MAINTENANCE IN X-330
AND X-333 IS STILL AN ISSUE TO BE RESOLVED.

MAINTENANCE DIVISION
W. J. LEMMON

**APPENDIX F**

**ACRONYMS**

**ACRONYMS**

| | | |
|---|---|---|
| ACLs | – | Alternate Concentration Limits |
| ACR | – | Area Control Room |
| Al | – | Aluminum |
| BMP | – | Best Management Practice |
| BOD | – | Biological Oxygen Demand |
| BUSTR | – | Ohio Bureau of Underground Storage Tank Regulation |
| Ca | – | Calcium |
| CAD | – | Computer Assisted Design |
| CAMS | – | Continuous Air Monitors |
| C2C12F4 | – | Freon – 114 |
| CECOS | – | Commercial Hazardous Waste Disposal Firm |
| CERCLA | – | Comprehensive Environmental Response, Compensation and Liability Act |
| CERCLA | – | Comprehensive Environmental Response, Compensation, and Liability Act |
| CF4 | – | Carbon Tetrafluoride |
| CFR | – | Code of Federal Regulations |
| Cl | – | Chlorine |
| ClF3 | – | Chlorine Trifluoride |
| ClF4 | – | Chlorine Tetrafluoride |
| CM/sec | – | Centimeters per second |
| CO | – | Carbon Monoxide |
| COD | – | Chemical Oxygen Demand |
| Cr | – | Chromium |
| Cr+6 | – | Chromium – hexavalent |
| Cu | – | Copper |

| Cu. yd. or | | |
|---|---|---|
| yard 3 | - | Cubic yards |
| d/m/g | - | Disintegrations per minute per gram |
| d/min/100 ml | - | Disintegrations per minute per 100 milliliters |
| DOE | - | Department of Energy |
| DSFM | - | Division of State Fire Marshall |
| EOC | - | Emergency Operations Center |
| EP Toxic | - | Extraction Procedure Toxic |
| ERDA | - | Energy Research Development Administration |
| F | - | Degrees Fahrenheit |
| FAA | - | Federal Aviation Administration |
| F2 | - | Fluorine |
| Fe | - | Iron |
| FFCA | - | Federal Facility Compliance Agreement |
| FSAR | - | Final Safety Analysis Report |
| gal | - | Gallon |
| GAT | - | Goodyear Atomic Corporation |
| GCEP | - | Gas Centrifuge Enrichment Plant |
| GDP | - | Gaseous Diffusion Plant |
| HF | - | Hydrogen Fluoride |
| HP | - | Health Physics |
| HRM | - | Hoisting and Rigging Manual |
| HSWA | - | Hazardous and Solid Waste Amendments |
| IH | - | Industrial Hygiene |
| INPO | - | Institute for Nuclear Power Operations |
| Kg/yr | - | Kilograms/year |
| Km | - | Kilometers |

| | | |
|---|---|---|
| Km2 | – | Square kilometers |
| lbs/year | – | Pounds/year |
| MCLs | – | Maximum Concentration Limits |
| MCLGs | – | Maximum Concentration Limit Guidelines |
| Ci | – | Microcuries |
| g/l | – | Micrograms/liter |
| R/h | – | Microroentgen/hour |
| mg/kg | – | Milligrams/kilogram |
| mg/l | – | Milligrams/liter |
| Mg | – | Magnesium |
| mgallon | – | Million gallons |
| MgF2 | – | Magnesium fluoride |
| MMES | – | Martin Marietta Energy Systems |
| MSDS | – | Material Safety Data Sheets |
| NAAQS | – | National Ambient Air Quality Standards |
| NE | – | Nuclear Energy |
| NEC | – | National Electrical Code |
| NEPA | – | National Environmental Policy Act |
| NESHAPS | – | National Emission Standards for Hazardous Air |
| NIST | – | National Institute of Standards and Testing |
| NOD | – | Notice of Deficiency |
| NOx | – | Nitrogen oxides |
| NPDES | – | National Pollutant Discharge Elimination System |
| NRC | – | Nuclear Regulatory Commission |
| OAC | – | Ohio Administrative Code |
| OCAW | – | Oil Chemical and Atomic Workers |
| OCM | – | Operational Change Memos |

| | | |
|------|---|---|
| ODC | – | Ohio Department of Commerce |
| ODH | – | Ohio Department of Health |
| OEPA | – | Ohio Environmental Protection Agency |
| OM | – | Operating Methods |
| ORC | – | Ohio Revised Code |
| OSHA | – | Occupational Safety Health |
| OSR | – | Operational Safety Requirements |
| OVEC | – | Ohio Valley Electric Company |
| Pb | – | Lead |
| PCBs | – | Polychlorinated Biphenyls |
| pCi/g | – | Picocuries/gram |
| PEO | – | Program Enrichment Office |
| PG | – | Process Gas |
| PKS | – | Peter Kewitt & Sons Landfill |
| ppm | – | Parts per million |
| PUEC | – | Portsmouth Uranium Enrichment Complex |
| PVC | – | Polyvinyl chloride |
| QA | – | Quality assurance |
| QC | – | Quality control |
| Rem | – | Roentgen equivalent man |
| RCRA | – | Resource Conservation and Recovery Act |
| RCW | – | Recirculating cooling water |
| S & A | – | Sampling and analysis |
| SAR | – | Safety Analysis Report |
| SARA | – | Superfund Amendments and Reauthorization Act |
| SAS | – | Semi-annual soils |
| SAV | – | Semi-annual vegetation |

| | | |
|---|---|---|
| SCBA | – | Self Contained Breathing Apparatus |
| Si | – | Silicon |
| SO2 | – | Sulfur dioxide |
| SO2 F2 | – | Sulfuryl fluoride |
| SOPs | – | Standard Operating Procedures |
| SPCC | – | Spill prevention Control and Countermeasure Plan |
| SPP | – | Standard Practice Procedure |
| SWMU | – | Solid Waste Management Unit |
| TAP | – | Toxic Air Pollutants |
| Tc | – | Technetium |
| TCE | – | Trichloroethylene |
| TCLP | – | Toxicity Characteristic Leaching Procedure |
| TLD | – | Thermoluminescent Dosimeter |
| TOC | – | Total Organic Carbon |
| TSCA | – | Toxic Substances Control Act |
| TSD | – | Treatment Storage & Disposal |
| TSS | – | Total Suspended Solids |
| UF6 | – | Uranium hexafluoride |
| USEPA | – | United States Environmental Protection Agency |
| USTs | – | Underground Storage Tanks |
| VOCs | – | Volatile Organic Compounds |
| yards3 | – | Cubic yards |
| Zn | – | Zinc |



# EXHIBIT C

PORTSMOUTH GASEOUS DIFFUSION PLANT

INCIDENTS AND RELEASES

7/2/19

| Date | Location | Grams U | Description |
|------|----------|---------|-------------|
| 06/06/83 | X-710 | 149 | Container rupture |
| 06/09/83 | X-330 | 1,900 | Misvalving |
| 08/30/83 | X-326 | 104 | Pigtail leak |
| 10/05/83 | X-326 | 2 | Incomplete purge |
| 11/01/83 | X-326 | 13? | Expansion joint failure |
| 12/04/83 | X-326 | 48,900 | Inadvertent venting |
| 12/12/83 | X-705 | 1 | Decontamination |
| 12/30/83 | X-710 | 4 | Tube rupture |
| 03/30/84 | X-705 | 141 | Inadvertent venting |
| 04/09/84 | X-745B | 1 | Value leak |
| 04/09/84 | X-330 | 1 | Pigtail leak |
| 05/07/84 | X-300 | 1 | Volatilization of deposit |
| 07/11/84 | X-700 | 30 | Inadvertent venting |
| 09/13/84 | X-745C | 675 | High pressure |
| 12/19/84 | X-326 | 16 | Incomplete purge |
| 03/05/85 | X-344 | 5 | Misvalving |
| 03/22/85 | X-333 | 3 | Seal failure |
| 03/25/85 | X-330 | 1 | Seal failure |
| 03/28/85 | X-326 | 3 | Volatilization of deposit |
| 04/04/85 | X-326 | 3 | Joint rupture |
| 04/16/85 | X-330 | 540 | Faulty valve |
| 04/16/85 | X-333 | 1 | Faulty valve |

| Date | Location | Grams U | Description |
|------|----------|---------|-------------|
| 04/19/85 | X-330 | 1 | Seal failure |
| 04/19/85 | X-330 | 1 | Seal failure |
| 04/24/85 | X-330 | 1 | Volatilization of deposit |
| 05/01/85 | X-344 | 1 | Valve leak |
| 05/03/85 | X-344 | 1 | Volatilization of deposit |
| 05/06/85 | X-326 | 1 | Tube rupture |
| 05/08/85 | X-333 | 5 | Seal leak |
| 05/15/85 | X-344 | 1 | Valve leak |
| 05/30/85 | X-344 | 1 | Pigtail leak |
| 06/06/85 | X-344 | 5,056 | Valve leak |
| 07/25/85 | X-326 | 1 | Seal failure, ERP |
| 07/31/85 | X-710 | 2 | Glass trap failure |
| 08/05/85 | X-344 | 1,415 | Valve leak, autoclave |
| 11/05/85 | X-344 | 10 | Line failure, autoclave |
| 12/30/85 | X-333 | 49,480 | Misvavling, WAE |
| 01/25/86 | X-326 | <1 | ERP |
| 02/04/86 | X-326 | <1 | ERP |
| 02/14/86 | X-333 | <1 | Seal leak from cell |
| 08/07/86 | X-300 | 6,350 | Misvalving, CR |
| 09/19/86 | X-326 | 8 | Instrument line leak,ER |
| 10/27/86 | X-326 | <1 | Comp seal failure, ERP |
| 11/03/86 | X-330 | <1 | Buffer line failure, tails |
| 03/05/86 | X-744G | <1 | Polybottle leak |
| 03/27/86 | X-333 | <1 | Faulty PI, LAW |

| Date | Location | Grams U | Description |
|------|----------|---------|-------------|
| 04/07/87 | X-344 | <1 | Autoclave |
| 04/14/87 | X-333 | <1 | Comp seal failure,LAW |
| 05/13/87 | X-326 | 70 | Samp valve leak,HASA |
| 05/87 | X-745B | Unknown | Cyl valve fell off |
| 12/12/87 | X-333 | Unknown | Valve failure,LAW |
| 02/12/88 | X-330 | 13,750 | Buffer line failure, tails |
| 04/06/88 | X-330 | <10 | Buffer val fail, surge drum |
| 05/17/88 | X-710 | 53 | Glass trap failure |
| 11/12/73 | X-705 | 233 | Uranium hexafluoride release; UF6 at 97.65 weight percent U-235 enrichment were released during cold trap draining operation in X-705 Oxide Conversion Facility; Hydrofluoric acid – acids/caustics/reducing and oxidizing agents; Uranium hexafluoride – radioactive substances; Uranyl fluoride – radioactive substances |
| 3/7/78 | X-745B | 9,582,089 | In X-745B storage lot a 14 ton thin wall cylinder (5/16" wall thickness) containing natural uranium as UF6 in the liquid state was dropped approx. 8 to 10 inches and ruptured. Conditions were such that 21,125 lb. of material were released in a period of less than 5 min. Hydrofluoric acid – acids/caustics/reducing and oxidizing agents; Uranium hexafluoride – radioactive substances; Uranyl fluoride – radiation and radioactive substances. |
| 6/10/94 | ? | | Darrell at NIOSH told FTG that Paul Truman got a large internal exposure on this date. |
| 12/9/98 | X-326 | | Oil fire. Release melted process pipes. Uranium spilled out on cell floor. |
| 12/9/09 | X-326 | | Oil fire at 6:00 a.m. Lasted all day. |

EXHIBIT D

# Village of Piketon, OH Position on Area D Proposed Nuclear and Hazardous Waste Landfill - Portsmouth Gaseous Diffusion Plant U.S. Department of Energy – Version 1.1

**6/21/2017**



**Prepared by**

THE FERGUSON GROUP LLC

1130 Connecticut Avenue, NW
Suite 300
Washington, D.C. 20036
202.331.8500
202.331.1598 fax

# Table of Contents                                   Page

1.  **Executive Summary**                                        **3**

2.  **Excerpt from DOE Responsiveness Summary**                  **4**

3.  **Village of Piketon Position on the PORTS Proposed Area D**  **5**
    **Landfill Siting**

4.  **DOE STOMP Model**                                          **9**

5.  **Conclusion**                                               **19**


**Appendix 1.  Boring Logs from RI/FS for the PORTS Area D Which**
                **Demonstrate Bedrock Fracture that exists deeper than**
                **20 feet Below Land Surface**

## 1. Executive Summary

The Village of Piketon, OH offers the following comments and recommendations concerning the U.S. Department of Energy (DOE) Record of Decision (ROD) to construct a low-level nuclear and hazardous waste landfill at the Portsmouth Gaseous Diffusion Plant (PORTS) in Pike County, Ohio. The Final Record of Decision for the Site-wide Waste Disposition Evaluation Project at the Portsmouth Gaseous Diffusion Plant (DOE/PPPO/O3 - 0513 &D2) was concurred and approved by the Ohio EPA on June 30, 2015.

The primary purpose for the ROD is to present the selected remedy for the Site-wide Waste Disposition Evaluation Project at the DOE PORTS Facility which is located within 2 miles of the Village of Piketon, Ohio.

The Village of Piketon's position following review of the Remedial Investigation and Feasibility Study (RI/FS) Report for the Site-Wide Waste Disposition Evaluation Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio, February 2014, the ROD, comments received during the public comment period held from November 12, 2014 to March 11, 2015, and at the public meeting held on November 17, 2014, is that DOE has failed to fully account for in the selected remedy the extent of fractured bedrock present below 20 feet of ground surface at the proposed location of the low-level nuclear and hazardous waste landfill in Area D of the PORTS facility. The Village of Piketon through its consultant, The Ferguson Group, has identified using DOE RI/FS boring and monitor well data extensive areas at the proposed landfill location (i.e., approximately 50% of the land area) that have documented fractures in the underlying bedrock geology which extends deeper than 20 feet below ground surface. In some areas the extent of documented bedrock fracture extends to 77 feet below the ground surface (WD-SB-35).

DOE has indicated in the ROD and subsequent documents related to the construction of the proposed landfill that it would remove the first 20 feet of land at the proposed landfill site (Area D). The Village of Piketon comments are specifically directed to the fractures that DOE has documented to exist at depths greater than 20 feet of the land surface at Area D but does not appear to have factored into the decision to construct a low-level nuclear and hazardous waste landfill. As a consequence of the pervasive and extensive extent of fracture to bedrock below 20 feet of the ground surface, The Village of Piketon does not believe Area D to be a safe and protective location for construction and burial of low-level nuclear and hazardous waste landfill. We believe there is a much greater chance of structural failure to the landfill and release of radioactive and hazardous waste to the groundwater and surface water as a consequence of the pervasive fractures present at depths greater than 20 feet of land surface. We respectively request DOE and the Ohio EPA to re-open the ROD and offer alternative remedies for disposal of wastes from the PORTS site.

## 2. Excerpt from DOE Responsiveness Summary on The Final Record of Decision for the Site-wide Waste Disposition Evaluation Project at the Portsmouth Gaseous Diffusion Plant (DOE/PPPO/O3 - 0513 &D2)

The DOE received comments and questions from Elizabeth and Josh Lamerson who at the time were fence line neighbors to the PORTS site. The Lamersons submitted a statement to DOE in response to the Proposed Plan for the Site-wide Waste Disposition and posed a series of questions including two that are germane to the Village of Piketon's position regarding the construction of a low-level nuclear and hazardous waste landfill at Area D on the PORTS facility. The Lamersons requested information on the underlying geology at Area D with a specific request to document if the bedrock below the proposed Onsite Disposal Cell (OSDC) was cracked. They also requested information on the human health and ecological risk posed from the OSDC. The following are the questions posed by the Lamersons and DOE's response.

"2.35 Comment from Elizabeth and Josh Lamerson.

Attached are our comments for the proposed alternatives for the DOE Portsmouth site [numbers have been added to the comment by DOE to provide ease in finding the requested information in the response].

Human Health/Ecological Risk [3]
- The proposal stated that human health risk was evaluated. The proposal discusses the human health risk evaluation for alternative 1 which is no action.
  o What is the long-term risk to fence line neighbors and members of the community for the OSDC?

Alternative 2 [6]
- Is the bedrock below the proposed OSDC cracked?
  o Please provide evidence to prove that the bedrock is not cracked on the DOE site and in the proposed OSDC location."

The following is DOE's responses to the Lamerson's questions.

"**Modeling for the OSDC waste acceptance criteria (WAC) showed that the geologic conditions under and around the OSDC prevent completion of any exposure "pathways" within a 1,000-year time frame**. This means that even if the man-made components and liners of the disposal facility fail, the bedrock under the OSDC restricts the movement of contamination to the point that it cannot reach any surface water bodies (e.g., streams) or groundwater sources for more than 1,000 years. If there is no pathway to people, plants, or animals, then there is no calculable risk to all humans and ecological receptors for over 1,000 years. This time frame is used for DOE planning purposes only and the protection. If there is no pathway to people, plants, or animals, then there is no calculable risk to all humans and ecological receptors for over 1,000 years. This time frame is used for DOE planning purposes only and the protection provided by the disposal cell would last much longer."

4

"As indicated on page A-1 of the Proposed Plan, the Cuyahoga shale located at the proposed location of an OSDC has been tested and found to be fractured near the surface down to a depth of approximately 20 ft. **At depths greater than 20 ft, the bedrock was found to be intact with no fractures or cracks.** Pages I-13 and I-14 in Appendix I of the RI/FS Report describe the investigation related to fractures. The OSDC liners will be built on the intact bedrock after removal of the fractured bedrock."

## 3. Village of Piketon Position on the PORTS Proposed Area D Landfill Siting

The Village of Piketon retained The Ferguson Group (TFG) to complete a third party assessment of the environmental investigations undertaken by DOE at the PORTS site. TFG was tasked with reviewing the RI/FS for the PORTS site, Proposed Plans and RODs. Specifically with respect to the questions raised by the Lamersons, TFG was tasked with reviewing the soil boring and monitor well data collected by DOE and its contractors for the Area D landfill site location.

DOE undertook an extensive subsurface investigation of the soil, bedrock and groundwater at Area D. As part of the RI/FS, DOE completed 50 soil borings to various depths. Some of the borings were converted to piezometers and to monitor wells. For each of the borings the lithology of the soil and bedrock was described in a descriptive boring log at intervals as small as one inch.

TFG reviewed all 50 borings and monitor wells completed for the Area D testing program. TFG has identified 24 soil borings/monitor wells from DOE approved boring descriptive logs that document fractures present below 20 feet of ground surface. The extent of fracture in the borings varies from 5.7 feet to 62.6 feet most of which is documented to persist below 20 feet of land surface. The geographic area of fracture in bedrock below 20 feet of the ground surface at Area D is approximately 50% of the site.

Based on DOE's own boring log information acquired during the conduct of the RI/FS which was completed prior to the issuance of the ROD and the Responsiveness Summary, it is clear that DOE misrepresented their response to the Lamersons with respect to whether the bedrock was fractured at depths greater than 20 feet of the ground surface at Area D. In addition, because the geologic conditions under and around the OSDC are not as DOE alleged in their response to the Lamersons, the Department cannot confidently assert that the modeling undertaken supports it's contention of preventing completion of any exposure "pathways" within a 1,000-year time frame.

Figure 1 is the DOE Area D Soil Boring and Monitor Well Location Map from the RI/FS report. TFG has added to this DOE map information collected from DOE Boring logs for fractures that were documented by DOE to exist below 20 feet of ground surface. For some borings TFG also included fractures that were identified to persist shallower than 20 feet of ground surface which

5



Figure 1. DOE PORTS Site Area D Boring and Monitor Well Map - Extent of Fracture in Bedrock From Generally 20 Feet Below Land Surface

then continued to depths greater than 20 feet of ground surface. Table 1 lists the borings with fractures present below 20 feet of ground surface at Area D.

**Table 1. Borings and Monitor Well with Documented Fractures in Bedrock Generally Present Below 20 Feet Ground Surface at Area D Landfill Site**

| a) Boring or Monitor Well | b) Total Extent in Feet of Bedrock Fracture either from **d)** or from deeper than 20 feet below ground surface (BGS) | c) Fracture Identified shallower than 20 Feet BGS | d) Depth BGS of Documented Bedrock Fracture that continued to depths greater than 20 feet BGS |
|---|---|---|---|
| WD-MW-05 | 34.2′ | Yes | 15.3′ BGS |
| WD-SB-23 | 28.3′ | Yes | 14.5′ BGS |
| WD-SB-24 Shallow | 18.7′ | Yes | 12′ BGS |
| WD-SB-24 Deep | 16.7′ | No | |
| WD-SB-31 | 43.8′ | No | |
| WD-SB-32 | 24.4′ | Yes | 15′ BGS |
| WD-SB-33 | 8.3′ | Yes | 14.9′ BGS |
| WD-SB-35 | 62.6′ | Yes | 9.8′ BGS |
| WD-SB-36 Shallow | 8.5′ | No | |
| WD-SB-36 Deep | 13.2′ | No | |
| WD-SB-37 | 17.2′ | Yes | 11.3′ BGS |
| WD-SB-38 Shallow | 24.15′ | Yes | 18.8′ BGS |
| WD-SB-38 Deep | 2.1′ | No | |
| WD-SB-40 | 8.5′ | Yes | 18′ BGS |
| WD-SB-41 | 5.9′ | Yes | 18′ BGS |
| WD-SB-45 | 8.8′ | Yes | 15.9′BGS |
| WD-SB-47 | 47.7′ | Yes | 12.2′ BGS |
| WD-SB-48 | 30.85′ | No | |
| WD-SB-50 (Boring terminated at 30′ BGS) | 5.7′ | No | |

| | | | |
|---|---|---|---|
| WD-SB-53 | 35.4' | Yes | 15.5' BGS |
| WD-SB-54 (Boring terminated at 40' BGS) | 20.9' | Yes | 17.4' BGS |
| WD-SB-55 (Boring terminated at 30' BGS) | 13.7' | Yes | 16.3' BGS |
| WD-SB-57 | 20.5' | Yes | 19.7' BGS |
| WD-SB-58 (Boring terminated at 30.1' BGS) | 5.6' | No | |
| WD-SB-63 | 31.1' | Yes | 18.6' BGS |
| WD-SB-65 | 27.9' | Yes | 18.1' BGS |
| WD-SB-71 | 7.9' | Yes | 17.9' BGS |

Data from the Remedial Investigation and Feasibility Study (RI/FS) Report for the Site-Wide Waste Disposition Evaluation Project at the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio, February 2014

## 4. DOE STOMP Model

On April 11, 2017 DOE gave a Power Point presentation to the Site Specific Advisory Board (SSAB) to the PORTS site on the On-Site Waste Disposal Facility (OSWDF) Area D. The Power Point included DOE's use of the Subsurface Transport Over Multiple Phases (STOMP) Model. DOE relied upon the STOMP model to analyze single and multiple phase subsurface flow and transport at the OSWDF. The Power Point included a slide that reflected that the bedrock was fractured from 5-20 feet below ground surface at Area D and that the first 20 feet of land surface would be excavated (See Figure 2).

**Figure 2. Conceptual STOMP Groundwater Model Used for The PORTS Area D Landfill Study**



Based upon the above Power Point slide, the Village of Piketon is concerned that the input parameters DOE used in the STOMP model are incorrect with respect to the degree of bedrock that is fractured both laterally and vertically at depths greater than 20 feet of land surface. The boring logs from Area D clearly reflect that approximately 50% of the land area for the OSDC has fractures present deeper than 20 feet of ground surface and, in some cases, as deep as 77 feet of land surface.

9

As a matter of general knowledge, characteristics of groundwater flow and transport in fractured bedrock aquifers or fractured water bearing units is intrinsically much more complex than granular porous media aquifers due to the nature of depth-discrete, less frequent, small pathways. This complexity can result in a relatively poor understanding of how groundwater flow and contaminant transport occurs in fractured bedrock. Very high resolution datasets are normally needed to properly understand these fractured environments.

In the case of the OSDC, the effect of widespread fractured bedrock present below 20 feet of ground surface at the proposed OSDC is to increase the hydraulic conductivity of the subsurface groundwater bearing units as a result of secondary porosity created from brittle fracture. In addition, fractured bedrock at depth must also be accounted for in landfill design to insure that the facility is not compromised from being constructed into an unstable medium. DOE should at a minimum be required to undertake the necessary studies to fully understand the impact of fractured bedrock at depths greater than 20 feet at the Area D Landfill on:

a)  groundwater flow,
b)  groundwater seepage to the land surface (DOE has documented 56 seeps at the Area D landfill), and
c)  on the proposed landfill design.

DOE has also indicated in the RI/FS document that sandstone zones in the Cuyahoga Formation at Area D are defined by Ohio Code as being zones of significant saturation. TFG has prepared a series of 4 cross section maps of the Area D landfill site which document the depth of bedrock fracture present relative to surface elevation (See Lithologic descriptions of Boring Logs From PORTS Area D). These cross sections are labeled A to A', B to B', C to C' and D to D'.

In each of the 4 cross sections where fractures deeper than 20 feet have been identified there is also present thin geologic units described from the boring logs produced for DOE as non-fractured (generally sandstone/shale stringers). These intact sandstone/shale stringers account for no more than 3.3 feet within the fracture zone interval for any borehole. For example, in borehole WD-SB-37 a non-fracture sandstone/shale stringer is identified from 23-26.3 feet below ground surface. Fractures are documented in the WD-SB-37 boring log to persist from 11.3 to 31.9 feet below ground surface with the 23-26.3 foot interval described as non-fractured.

Fractures are present at depths below the sandstone zones as identified by DOE and further described in the RI/FS report on 2-52, "The sandstone zones in the Cuyahoga Formation, the "720-ft sandstone lens zone" and the "680-ft sandstone" are considered significant zones of saturation (a "significant zone of saturation," as defined at OAC 3745-27-01, means a zone of saturation that may act as a preferential pathway of migration away from the limits of solid waste placement). These sandstones can transmit groundwater more readily than the overlying or underlying shale but they are thin (2 ft thick or less) and have a low hydraulic conductivity and a low yield. Only two piezometers demonstrated a yield greater than 0.1 gpm and testing

10



## LITHOLOGIC DESCRIPTIONS OF BORING LOGS FROM PORTS AREA D

### Section A to A'

**Boring WD-SB 65**  **Land Surface Elevation =**  **748**  **feet asl**

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 36.7 | Unfractured | 748 | 36.7 |
| 37 | to | 65 | Fractured | 713 | 27.8 |

**Boring WD-SB 24**  **Land Surface Elevation =**  **747**  **feet asl**

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 23 | Unfractured | 747 | 23 |
| 23 | to | 31 | Fractured | 724 | 8 |
| 31 | to | 62.8 | Unfractured | 716 | 32 |
| 63 | to | 78.7 | Fractured | 684 | 16 |

**Boring WD-SB 23**  **Land Surface Elevation =**  **764**  **feet asl**

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 14.5 | Unfractured | 764 | 29 |
| 15 | to | 55 | Fractured | 749 | 40 |

**Boring WD-SB 37**  **Land Surface Elevation =**  **713**  **feet asl**

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 16.3 | Unfractured | 713 | 16.3 |
| 17 | to | 32 | Fractured | 696 | 15 |

12



## LITHOLOGIC DESCRIPTIONS OF BORING LOGS FROM PORTS AREA D

### Section B to B'

**Boring WD-SB 45** — **Land Surface Elevation =** 692 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 15.9 | Unfractured | 692 | 24 |
| 16 | to | 25 | Fractured | 676 | 9 |

**Boring WD-SB 38** — **Land Surface Elevation =** 772 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 20 | Unfractured | 772 | 20 |
| 20 | to | 44 | Fractured | 752 | 24 |

**Boring WD-SB 71** — **Land Surface Elevation =** 771 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 17.9 | Unfractured | 771 | 17.9 |
| 18 | to | 26 | Fractured | 753 | 8 |

**Boring WD-SB 40** — **Land Surface Elevation =** 747 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 18 | Unfractured | 747 | 18 |
| 18 | to | 30 | Fractured | 729 | 12 |

14



# LITHOLOGIC DESCRIPTIONS OF BORING LOGS FROM PORTS AREA D

## Section C to C'

**Boring WD-SB 63**     **Land Surface Elevation =**    **738**    feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 16.8 | Unfractured | 738 | 16.8 |
| 17 | to | 50 | Fractured | 721 | 33 |

**Boring WD-SB 32**     **Land Surface Elevation =**    **721**    feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 15 | Unfractured | 721 | 17.9 |
| 15 | to | 42 | Fractured | 706 | 27 |

**Boring WD-SB 24**     **Land Surface Elevation =**    **747**    feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 23 | Unfractured | 747 | 23 |
| 23 | to | 31 | Fractured | 724 | 8 |
| 31 | to | 62.8 | Unfractured | 716 | 32 |
| 63 | to | 78.7 | Fractured | 684 | 16 |

**Boring WD-SB 71**     **Land Surface Elevation =**    **771**    feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 17.9 | Unfractured | 771 | 17.9 |
| 18 | to | 26 | Fractured | 753 | 8 |

16



# LITHOLOGIC DESCRIPTIONS OF BORING LOGS FROM PORTS AREA D

## Section D to D'

### Boring WD-SB 35  Land Surface Elevation = 727 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 9.8 | Unfractured | 727 | 9.8 |
| 10 | to | 37 | Fractured | 717 | 27 |
| 37 | to | 40 | Unfractured | 690 | 3 |
| 40 | to | 77 | Fractured | 687 | 37 |

### Boring WD-SB 32  Land Surface Elevation = 721 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 15 | Unfractured | 721 | 15 |
| 15 | to | 42 | Fractured | 706 | 27 |

### Boring WD-SB 54  Land Surface Elevation = 747 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 9 | Unfractured | 747 | 9 |
| 9 | to | 40 | Fractured | 736 | 31 |

### Boring WD-SB 48  Land Surface Elevation = 759 feet asl

| Depth (feet) | | | Lithologic Description | Top Elev. | Thickness (feet) |
|---|---|---|---|---|---|
| 0 | to | 30.8 | Unfractured | 759 | 30.8 |
| 31 | to | 61 | Fractured | 728 | 30 |

18

indicated little to no hydraulic connection to nearby piezometers and borings." Based upon the foregoing DOE statements, it is clear that groundwater flow in fractured bedrock is enhanced relative to flow through competent bedrock. As a consequence, DOE needs to account for this condition existing in the subsurface bedrock deeper than 20 feet below land surface elevation at the Area D location.

It is also important to reflect that DOE did not exclude from the on-site landfill screening process certain hydrogeologic constraints. Specifically, the Toxic Substance Control Act (TSCA) Federal requirement for geologic buffers underlying landfills was not used as a basis to delete sites from evaluation because DOE believes these buffers can be engineered to meet the standard of equivalent or superior protection. TSCA, 40 CFR 761.75(b)(3), requires a 50 foot geologic buffer between the bottom of the landfill liner system and the historical high water table level. DOE anticipates that the depth to the historical high water table for the OSDC would be less than 50 feet below the bottom of the landfill liner system. Therefore, a waiver from the TSCA requirement would be requested from the regulators based on "equivalent protectiveness" per NCP guidelines (40 CFR 300.430[f][1][ii][C][4]).

The Village of Piketon cannot support DOE's request for a TSCA waiver request. We base our decision on the fact that DOE for years failed to inform the general public or, to account for the extensive area of fracture at Area D that DOE has documented to persist to depths of at least 77 feet below the ground surface.  Absent a thorough reassessment of the hydrogeologic model for Area D which incorporates these known deep fractures as well as a supporting geotechnical/structural study that affirms the landfill's structural integrity will not be compromised by its construction in to a fractured bedrock terrain, the Village of Piketon will remain unconvinced as to the basis for granting the TSCA waiver.

## 5. Conclusion

Based on the foregoing statements conveyed in DOE RODS for the PORTS site, The Village of Piketon cannot support the construction of low-level nuclear and hazardous waste landfill at Area D of the PORTs site. It is clear to us that there is much uncertainty with respect to the scope of investigation undertaken that led to the decision to construct the landfill. We believe that a decision of such consequence to our community – the placement of a low-level nuclear and hazardous waste landfill that will contain radioactive material for millions of years – warrants the best reasoned approach, the best site selection and the most thorough scientific and engineering assessment.   The data our consultant, The Ferguson Group, has revealed is consequential and deserving of the attention of Ohio EPA and DOE.  DOE has failed to make the case for issuing a ROD for the disposal of waste from PORTS operations.   We respectfully request that DOE reopen the ROD and address through additional investigations all the concerns raised in this response document.

**Appendix 1.  Boring Logs from RI/FS for the PORTS Area D Which Demonstrate Bedrock Fracture that exists deeper than 20 feet Below Land Surface**

DOE/PPPO/03-0246&D3
PBP-ER-RIFS-WD-RPT-0010

## BORING NUMBER WD-MW-05
PAGE 1 OF 4

| Logo | Fluor B&W | |

**CLIENT** Fluor B&W Portsmouth

**PROJECT NUMBER**

**DATE STARTED** 9/7/11    **COMPLETED** 9/9/11

**DRILLING CONTRACTOR** M&W Drilling

**DRILLING METHOD** Split Spoon/Auger

**LOGGED BY** Pete Sudkamp    **CHECKED BY** Jim Fleck

**NOTES** None.

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT LOCATION** Remediation Area IV-B

**GROUND ELEVATION** 695.69 ft MSL    **HOLE SIZE** 4.25 in.

**GROUND WATER LEVELS:**

AT TIME OF DRILLING —

AT END OF DRILLING —

AFTER DRILLING —

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | (CL) Clay, brown with gray mottling, lean, moist becoming dry after 6 in., soft becoming medium stiff after 6 in., trace silt. | |
| | | | | | (CH) Clay, light brown, FAT, dry, very stiff, trace to little silt, slight to medium plastic, laminated, silt decreasing with depth. 693.2 | |
| 5 | | | | | (CL-ML) Silty Clay, light brown, dry, laminated. 690.7 | |
| | | | | | Clay, light brown, lean to FAT, dry, hard, trace to little silt, a few fine sand lenses. 690.5 | |
| 10 | | | | | Cuyahoga Formation (Competent). Weathered Shale, gray. 685.7 / 685.2 | |
| | | | | | 680 Sandstone. Sandstone, brown, sound, very fine-grained, iron oxide staining. 683.0 | |
| 15 | | | | | Weathered Shale, gray and brown, sound, very soft to soft, thinly bedded. 680.7 | |
| | | | | | Sandstone, 3.5 in. thick. 680.4 | |
| | | | | | Weathered Shale, gray, moderately fractured. | |
| 20 | | | | | | |

(Continued Next Page)





DOE/PPPO/03-0346&D3
FBP-ER-RFS-WD-RPT-0030

**BORING NUMBER WD-MW-05**
PAGE 3 OF 4

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth

**PROJECT NUMBER**

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, gray, infrequent fractures. (continued)

45.0 — 650.7
45.1 — Sandstone, 1 in. thick. — 650.6
Shale, gray, infrequent fractures.

49.0 — 646.7
Sunbury Shale. Shale, black (N1), sound, thickly bedded, scattered pyrite inclusions throughout.

Depth markers: 45, 50, 55, 60, 65

B-316
(Continued Next Page)

FBP/WD-RFS-D3-RS-MASTER/03/05/2014



DOE/PPPO/03-0346&D1
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-MW-05**
PAGE 4 OF 4

Logo    Fluor B&W

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation
**PROJECT NUMBER**                        **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Sunbury Shale. Shale, black (N1), sound, thickly bedded, scattered pyrite inclusions throughout. (continued)

68.8    826.9

Berea Sandstone. Sandstone, light gray (N7) to gray, hard, very fine-grained.

70

75

77.0    818.7
77.4    818.3   Shale, gray, silty, fractured.
Sandstone, gray, medium hard, very fine-grained.
78.3    817.4
78.8    816.9   Shale and Sandstone interbeds, fractured.
Sandstone, gray, medium hard, very fine-grained.
79.3    816.4
79.5    816.2   Shale, fractured, crumbly.
80      Sandstone, gray, medium hard, very fine-grained.
80.4    815.8

Refusal at 10.5 feet.
Bottom of borehole at 80.4 feet.

DEP-PT-05-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

**BORING NUMBER WD-SB-23**
PAGE 1 OF 6

| Logo | Fluor B&W |
|---|---|

**CLIENT**  Fluor B&W Portsmouth     **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  10/4/11    **COMPLETED**  10/5/11     **GROUND ELEVATION**  764.81 ft MSL    **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling     **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger     **AT TIME OF DRILLING**  ---

**LOGGED BY**  Pete Sudkamp    **CHECKED BY**  Jim Fleck     **AT END OF DRILLING**  ---

**NOTES**  None.     **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (CL) Sandy Clay, reddish yellow (7.5YR 6/6), some silt, trace sand, and fine gravel, lean, moist, medium stiff. | |
| | | | | 2.5 | (CL) (Clay?) with Sandstone fragments, gray, weathered, hard, dry.    762.3 | |
| 5 | | | | 4.5 | (CL) Clay, lean to FAT, with sand, dry , hard.    760.3 | |
| | | | | 6.0 | Cuyahoga Formation.  Shale, brownish yellow to brownish gray (, with partings.    758.8 | |
| 10 | | | | | | |
| | | | | 12.5 |    752.3 | |
| | | | | 12.7 | Sandstone, gray, 2 in. thick.    752.1 | |
| | | | | | No Recovery. | |
| 15 | | | | 14.5 | Cuyahoga Formation (Competent).    Weathered Shale, reddish brown, fractured, iron oxide staining.  Grading to dark gray (N3) and dark reddish gray at 17 ft.    750.3 | |
| 20 | | | | | | |

DOE-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030
R5
February 2014
PAGE 2 OF 6

**BORING NUMBER WD-SB-23**

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Cuyahoga Formation (Competent).    Weathered Shale, reddish brown, fractured, iron oxide staining. Grading to dark gray (N3) and dark reddish gray at 17 ft. *(continued)*

24.3    740.5
24.4    740.4
Sandstone, gray, 1 in. thick.
Weathered Shale, dark gray (N3), fractured, iron oxide staining.
25.6    739.2
25.8    739.0
Sandstone, gray and light brown (5YR 5/6), hard, 2 in. thick.
26.2    738.6
26.7    738.1
Weathered Shale, dark gray (N3), fractured, iron oxide staining.
Sandstone, light brown (5YR 5/6), hard, sound, 6 in. thick.
Shale, gray, soft, sound, fractured, iron oxide staining.

28.7    736.1
29.0    735.8
Sandstone, light brown (5YR 5/6), hard, 4 in. thick.
Shale, gray, fractured, iron oxide staining.

31.3    733.5
Sandstone, light brown (5YR 5/6), 12 in. thick.
32.3    732.5
Shale, gray, fractured, iron oxide staining.

37.4    727.4
37.5    727.3
Sandstone, 1 in. thick.
Shale, gray, fractured, iron oxide staining.

39.3    725.6
39.4    725.4
Sandstone, 2 in. thick.
Shale, gray, fractured, iron oxide staining.

B-132
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

**BORING NUMBER WD-SB-23**
PAGE 3 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Material Description column entries:

- 43.3 — 721.6
- 43.5 — 721.3 Sandstone, 3 in. thick.
- Shale, gray, fractured, iron oxide staining.
- 44.7 — 720.1
- 44.9 — 719.9 Sandstone, 2.5 in. thick.
- 45.6 — 719.2 Shale, gray, fractured, iron oxide staining.
- 46.0 — 718.8 Sandstone, 5 in. thick.
- Shale, gray, fractured, iron oxide staining.
- 47.8 — 717.0
- Sandstone, fractured, 14 in. thick.
- 49.0 — 715.8
- Shale, gray, fractured, iron oxide staining.
- 55.0 — 709.8
- 55.2 — 709.6 Sandstone, 2.5 in. thick.
- Shale, dark gray (N3), medium hard, sound.
- 59.7 — 705.1
- 59.8 — 705.0 Sandstone, 1 in. thick.
- Shale, dark gray (N3), medium hard, sound.
- 62.1 — 702.7
- 62.2 — 702.6 Sandstone, iron oxide staining, 1 in. thick.
- Shale, dark gray (N3), medium hard, sound.
- 63.2 — 701.6
- 63.3 — 701.5 Sandstone, light gray (N7), 1 in. thick.
- Shale, dark gray (N3), with interbedded sandstone seams.

Depth markers: 45, 50, 55, 60, 65

DE-RP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-23

**Logo**  Fluor B&W

| | |
|---|---|
| **CLIENT** Fluor B&W Portsmouth | **PROJECT NAME** OSDC Geotechnical Investigation |
| **PROJECT NUMBER** | **PROJECT LOCATION** Remediation Area IV-B |

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, dark gray (N3), with interbedded sandstone seams. *(continued)* | |
| 70 | | | | | 68.6 — Sandstone, 1 in. thick. — 696.3 / 696.2<br>68.7<br>Shale, dark gray (N3), with interbedded sandstone seams. | |
| | | | | | 71.3 — Sandstone, hard, 1 in. thick. — 693.5 / 693.4<br>71.4<br>Shale, dark gray (N3), with interbedded sandstone seams. | |
| 75 | | | | | | |
| 80 | | | | | 79.4 — Sandstone, light gray (N7), hard, 2.5 in. thick. — 685.4 / 685.2<br>79.6<br>Shale, dark gray (N3), with interbedded sandstone seams. | |
| 85 | | | | | | |
| | | | | | 86.9 — 678.0<br>680 Sandstone. Sandstone, light gray (N7 to N6), hard, fine-grained. | |

DE-PT789-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

| | Logo | Fluor B&W | **BORING NUMBER WD-SB-23** |
| --- | --- | --- | --- |

PAGE 5 OF 6

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NUMBER** _____

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
| --- | --- | --- | --- | --- | --- | --- |

88.7 — 676.1
Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound.

90

90.8 — 674.0
91.1 — 673.7
Sandstone, light gray (N7), fine-grained, 3.5 in. thick.
Shale, gray to dark gray (N3), with interbedded sandstone seams.

94.1 — 670.7
94.2 — 670.6
Sandstone, light gray (N7), fine-grained, 1 in. thick.
Shale, gray to dark gray (N3), with interbedded sandstone seams.

95

95.5 — 669.3
95.6 — 669.2
Sandstone, light gray (N7), fine-grained, 1 in. thick.
Shale, gray to dark gray (N3), with interbedded sandstone seams.

100

102.5 — 662.4
102.7 — 662.2
Sandstone, 2.5 in. thick.
Shale, gray to dark gray (N3), with interbedded sandstone seams.

105

105.1 — 659.7
105.2 — 659.6
Sandstone, 1 in. thick.
105.8 — 659.0
105.9 — 658.9
Shale, gray to dark gray (N3), with interbedded sandstone seams.
Sandstone, 1 in. thick.
Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound.

110

# BORING NUMBER WD-SB-23

| Logo | Fluor B&W |
|---|---|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. *(continued)* | |
| | | | | | 113.4 — Sandstone, 2 in. thick. — 651.3 | 651.5 |
| 115 | | | | | 113.5 Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. | 651.3 |
| | | | | | 114.6 Sandstone, 2.5 in. thick. — 650.0 | 650.2 |
| | | | | | 114.8 Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. | 650.0 |
| | | | | | 115.9 Sandstone, 2 in. thick. — 648.8 | 649.0 |
| | | | | | 116.0 Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. | 648.8 |
| | | | | | 117.9 Sandstone, 2 in. thick. — 646.8 | 647.0 |
| 120 | | | | | 118.0 Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. | 646.8 |
| | | | | | 119.4 Sandstone, 3 in. thick. — 645.2 | 645.4 |
| | | | | | 119.7 Shale, gray to dark gray (N3), with interbedded sandstone seams, medium hard, sound. | 645.2 |
| 125 | | | | | | |
| | | | | | 126.4 Sunbury Shale. Shale, black (N1), medium hard, sound. | 638.4 |
| | | | | | 127.0 | 637.8 |

Refusal at 14.5 feet.
Bottom of borehole at 127.0 feet.

DE-PT-01-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-24**
PAGE 1 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth    **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____    **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  9/26/11    **COMPLETED**  9/28/11    **GROUND ELEVATION**  747.37 ft MSL    **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling    **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger    **AT TIME OF DRILLING**  ---

**LOGGED BY**  Pete Sudkamp    **CHECKED BY**  Jim Fleck    **AT END OF DRILLING**  ---

**NOTES**  None.    **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | Clay, tan, lean to FAT clay, dry to moist, little to trace silt, roots, fine sand.  Grading to light brown at 2.5 ft., shale fragments encountered. | |
| 5 | | | | 5.0 | | 742.4 |
| | | | | | Cuyahoga Formation.  Weathered Shale, gray and brown, soft, iron oxide staining. | |
| 10 | | | | 9.5 | | 737.9 |
| | | | | | Cuyahoga Formation (Competent).  Weathered Shale, gray and brown, soft. | |
| | | | | 11.6 | | 735.8 |
| | | | | 12.0 | Sandstone, brown, hard, iron oxide staining, 5 in. thick. | 735.4 |
| | | | | | Weathered Shale, brown and gray, with interbedded sandstone seams, very soft, thick-bedded, fractured. | |
| 15 | | | | | | |
| 20 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DE-PT-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-24
PAGE 2 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Material Description entries:

Weathered Shale, brown and gray, with interbedded sandstone seams, very soft, thick-bedded, fractured. *(continued)*

22.7 — 724.7
22.9 — 724.5
Sandstone, gray, fractured, iron oxide staining, 2.5 in. thick.

Weathered Shale, brown and gray, with interbedded sandstone seams, very soft, thick-bedded, fractured.

28.8 — 718.6
29.2 — 718.2
Sandstone, 5 in. thick.

Weathered Shale, brown and gray, with interbedded sandstone seams, very soft, thick-bedded, fractured.

31.2 — 716.2
31.5 — 715.9
Sandstone, 3.5 in. thick.
31.9 — 715.5
32.2 — 715.2
Weathered Shale, brown and gray, with interbedded sandstones.

Sandstone, two beds, 1 in. thick and 2 in. thick.

Weathered Shale, brown and gray, with interbedded sandstones.

39.2 — 708.2
39.3 — 708.1
Sandstone, 2 in. thick.

Weathered Shale, brown and gray, with interbedded sandstones.

40.2 — 707.2
40.3 — 707.1
Sandstone, 1 in. thick.
40.7 — 706.7
40.9 — 706.5
Weathered Shale, brown and gray, with interbedded sandstones.

Sandstone, 2 in. thick.

Weathered Shale, brown and gray, with interbedded sandstones.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-24**
February 2014
PAGE 3 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth                    **PROJECT NAME**  OSDC Geotechnical Investigation
**PROJECT NUMBER** _____    **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 45 | | | | | Weathered Shale, brown and gray, with interbedded sandstones. *(continued)* | |
| | | | | | 46.2 — Sandstone, 1 in. thick. | 701.2 701.1 |
| | | | | | 47.3 — Weathered Shale, brown and gray, with interbedded sandstones. | 700.1 |
| | | | | | 47.4 — Sandstone, 2 in. thick. | 700.0 |
| | | | | | Weathered Shale, brown and gray, with interbedded sandstones. | |
| 50 | | | | | | |
| | | | | | 52.6 — Sandstone, 1 in. thick. | 694.8 694.7 |
| | | | | | 52.7 — Weathered Shale, brown and gray, with interbedded sandstones. | |
| 55 | | | | | 55.3 — Sandstone, 1 in. thick. | 692.1 692.0 |
| | | | | | 55.4 — Weathered Shale grading to Shale, brown and gray to gray, with interbedded sandstones, soft to medium, sound. | |
| 60 | | | | | | |
| | | | | | 62.7 — Sandstone, 1 in. thick. | 684.7 684.6 |
| | | | | | 62.8 — Shale, gray, with interbedded sandstones, fractured. | |
| 65 | | | | | | |

B-139
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE-PT-0246&D3
FBP-ER-RIFS-WD-RPT-0030

| Logo | Fluor B&W |
|------|-----------|

<div style="text-align:right">

**BORING NUMBER WD-SB-24**
PAGE 4 OF 7
February 2014

</div>

**CLIENT** Fluor B&W Portsmouth        **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____        **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray, with interbedded sandstones, fractured. (continued) | |
| 70 | | | | 70.4 | | 677.0 |
| | | | | | 680 Sandstone. Sandstone, gray, sound. | |
| | | | | 72.2 | | 675.2 |
| | | | | | Shale, gray, with interbedded sandstones, fractured. | |
| | | | | 74.2 | | 673.2 |
| | | | | 74.5 | Sandstone, gray, sound, 3.5 in. thick. | 672.9 |
| 75 | | | | | Shale, gray, with interbedded sandstones, fractured. | |
| | | | | 78.7 | | 668.7 |
| | | | | 78.9 | Sandstone, 2 in. thick. | 668.5 |
| 80 | | | | | Shale, gray, with interbedded sandstones. | |
| 85 | | | | 85.5 | | 661.9 |
| | | | | 85.7 | Sandstone, 2.5 in. thick. | 661.7 |
| | | | | | Shale, gray, with interbedded sandstones. | |
| | | | | 88.0 | | 659.4 |
| | | | | 88.1 | Sandstone, 1 in. thick. | 659.3 |
| | | | | 88.4 | | 659.0 |

<div style="text-align:center">(Continued Next Page)</div>

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

**BORING NUMBER WD-SB-24**
PAGE 5 OF 7

| Logo | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

- 88.6 / 658.8 — Shale, gray, with interbedded sandstones.
- Sandstone, 2 in. thick.
- Shale, gray, with interbedded sandstones, medium, sound. *(continued)*
- 93.2 / 654.2
- 93.3 / 654.1 — Sandstone, 1 in. thick.
- Shale, gray, with interbedded sandstones, medium, sound.
- 95.7 / 651.7
- 95.9 / 651.5 — Sandstone, 2.5 in. thick.
- Shale, gray, with interbedded sandstones, medium, sound.
- 100.4 / 647.0
- 100.6 / 646.8 — Sandstone, 2.5 in. thick.
- Shale, gray, with interbedded sandstones.
- 105.0 / 642.4
- 105.1 / 642.3 — Sandstone, 1 in. thick.
- Shale, gray, with interbedded sandstones.
- 107.3 / 640.1
- 107.5 / 639.9 — Sandstone, 2.5 in. thick.
- Shale, gray, with interbedded sandstones.
- 108.7 / 638.7 — Sunbury Shale.  Shale, black (N1), medium sound.

Depth markers: 90, 95, 100, 105, 110

*(Continued Next Page)*

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-24**

February 2014
PAGE 6 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sunbury Shale. Shale, black (N1), medium sound. *(continued)* | |
| 115 | | | | | | |
| 120 | | | | | | |
| 125 | | | | | | |
| | | | | | 128.7                  618.7 | |
| 130 | | | | | Berea Sandstone. Sandstone, gray, hard, sound, fine-grained. | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DOE/PPPO-03-2339246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-24**
Rev. 5
February 2014
PAGE 7 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth            **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____            **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 135 | | | | | Berea Sandstone.  Sandstone, gray, hard, sound, fine-grained. *(continued)* | |
| | | | | | 137.8                                                      609.6 | |
| | | | | | 138.4                                                      609.0 | |
| | | | | | Shale, gray, medium hard, thinly bedded. | |
| | | | | | Sandstone, gray, hard, sound, fine-grained. | |
| 140 | | | | | | |
| | | | | | 140.9                                                      606.5 | |
| | | | | | 141.2                                                      606.2 | |
| | | | | | Silty Shale. | |
| | | | | | Sandstone, gray, hard, sound, fine-grained. | |
| | | | | | 144.3                                                      603.1 | |

Refusal at 9.5 feet.
Bottom of borehole at 144.3 feet.

DEP-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-31**

Rev. 5
February 2014
PAGE 1 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  8/30/11     **COMPLETED**  8/31/11

**GROUND ELEVATION**  744.51 ft MSL    **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger

**AT TIME OF DRILLING**  ---

**LOGGED BY**  Pete Sudkamp     **CHECKED BY**  Jim Fleck

**AT END OF DRILLING**  ---

**NOTES**  None.

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

0.3 — 744.3 — Topsoil, black organic, cry.
0.5 — 744.0 — (CL-ML) Silty Clay, light brown, trace roots, light organic odor.

(CL) Clay, light brown (7.5YR 6/3 or 6/4), lean, trace silt, sand, and roots, medium stiff, dry.  Becomes hard with depth.

3.8 — 740.7 — Cuyahoga Formation.  Weathered Shale, brown to light brown (5YR 5/6), laminated, dry, crumbly, fractured at depth.  Sandy Shale at 8-8.5 ft.

9.5 — 735.0 — Cuyahoga Formation (Competent).    Weathered Shale, brown, soft, fractured.

14.3 — 730.2
14.4 — 730.1 — Sandstone, 1 in. thick.
Weathered Shale, brown, soft, fractured.  Grading to brown and gray at 17 ft, gray with brown seams at 20 ft, iron oxide staining.

16.2 — 728.3
16.5 — 728.0 — 720 Sandstone.  Sandy Shale, fractured.
Weathered Shale, brown and gray at 17 ft, gray with brown seams at 20 ft, iron oxide staining.

B-171

FBP/WD RIFS D3 R5 MASTER/02/05/2014

*(Continued Next Page)*

DE-PT799-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-31**

Rev. 5
February 2014
PAGE 2 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Material descriptions (with depth markers and elevation values):

Weathered Shale, brown and gray at 17 ft, gray with brown seams at 20 ft, iron oxide staining. *(continued)*

22.9 / 23.0 — Weathered Sandstone, soft to medium-hard, fractured, 1 in. thick. — 721.6 / 721.5

Weathered Shale, gray, iron oxide staining.

24.6 / 24.8 — Weathered Sandstone, fractured, iron oxide staining, 2.5 in. thick. — 719.9 / 719.7

25.6 / 25.9 — Weathered Shale, gray, fractured, iron oxide staining. — 718.9 / 718.6

Sandstone, moderately hard, 3.5 in. thick.

26.6 / 26.9 — Weathered Shale, gray, fractured, iron oxide staining. — 717.9 / 717.6

Sandstone, moderately hard, 3.5 in. thick.

Weathered Shale, gray, fractured, iron oxide staining, grading to Shale at 32ft, gray, fractured to sound, with occasional interbedded sandstone seams.

35.7 / 35.8 — Sandstone, fractured, 2 in. thick. — 708.9 / 708.7

Shale, gray, soft, sound, fractured, with occasional interbedded sandstone seams.

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DFP-P800-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**Logo**    Fluor B&W

# BORING NUMBER WD-SB-31
PAGE 3 OF 7

**CLIENT**   Fluor B&W Portsmouth     **PROJECT NAME**   OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION**   Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 45 | | | | | 43.2             701.4 <br> 43.3   Sandstone, 2 in. thick.     701.2 <br> Shale, gray, fractured. | |
| 50 | | | | | | |
| 55 | | | | | | |
| 60 | | | | | | |
| 65 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

B-173

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-PORTS-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

# BORING NUMBER WD-SB-31

**Logo**  Fluor B&W

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

**Material Descriptions (with depths and elevations):**

- **Shale, gray, fractured.** (continued)  — 67.0 / 677.5
- 680 Sandstone. Sandstone, light gray (N7), moderately hard.  — 69.0 / 675.5
- Shale, gray to dark gray (N3), medium hard?  — 70.9 / 673.6
- **Sandstone, light gray (N7), moderately hard, fractured at base.**  — 71.3 / 673.2
- Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams, sound.
- Sandstone, 1 in. thick.  — 79.8 / 664.7 ; 79.9 / 664.6
- Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams.
- Sandstone, 2 in. thick.  — 84.6 / 659.9 ; 84.8 / 659.7
- Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams.  — 85.2 / 659.3
- Sandstone, 2 in. thick.  — 85.4 / 659.1
- Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams.

**BORING NUMBER WD-SB-31**

February 2014
PAGE 5 OF 7

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Material descriptions (with depths):

- 89.6 — Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams. *(continued)* — 654.9
- 89.9 / 90 — Sandstone, 3.5 in. thick. — 654.6
- Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams.
- 94.7 — Sandstone, medium to medium hard, 3.5 in. thick. — 649.8
- 95.0 — — 649.5
- 95.8 — Shale, medium gray (N5), with interbedded fine siltstone and sandstone seams. — 648.7
- 96.0 — Sandstone, 2 in. thick?  Fracture above sandstone. — 648.5
- Shale, gray, with interbedded fine siltstone and sandstone seams, medium to medium-hard, sound.
- 105.7 — — 638.8
- Sunbury Shale.  Shale, black (N1) to dark gray (N3) and medium gray (N5), sound.  Occasional sulfide (pyrite) inclusions.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-31**
February 2014
PAGE 6 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sunbury Shale. Shale, black (N1) to dark gray (N3) and medium gray (N5), sound. Occasional sulfide (pyrite) inclusions. *(continued)* | |
| 115 | | | | | | |
| 120 | | | | | | |
| 125 | | | | | 125.3    619.2 | |
| | | | | | Berea Sandstone. Sandstone, gray, medium-hard to hard, fine-grained, sound. | |
| 130 | | | | | | |
| | | | | | 132.5    612.1 | |
| | | | | | 132.6    612.0 Shale, fractured. | |
| | | | | | 133.4    611.1 Sandstone, gray, hard, fine-grained. | |
| | | | | | 133.9    610.6 Shale, slightly weathered, sound. | |
| | | | | | Sandstone, gray, hard, fine-grained. | |

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

# BORING NUMBER WD-SB-31

February 2014
PAGE 7 OF 7

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth　　　　　　　　　　**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____　　**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 135 | | | | | Sandstone, gray, hard, fine-grained. *(continued)* | |
| | | | | | 136.0　Shale, slightly weathered, thinly bedded, fractured.　608.5 | |
| | | | | | 136.4 　　　　　　　　　　　　　　　　　608.1 | |
| | | | | | Sandstone, gray, hard, fine-grained. | |
| | | | | | 138.8　　　　　　　　　　　　　　　　　605.7 | |
| | | | | | 139.0　Shale, weathered.　　　　　　　605.5 | |
| 140 | | | | | Sandstone, gray, hard, fine-grained. | |
| | | | | | 140.3　　　　　　　　　　　　　　　　　604.2 | |

Refusal at 9.5 feet.
Bottom of borehole at 140.3 feet.

DEP-P-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-32**
February 2014
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 9/25/11      **COMPLETED** 9/25/11

**GROUND ELEVATION** 721.85 ft MSL    **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger

**AT TIME OF DRILLING** ---

**LOGGED BY** Pete Sudkamp     **CHECKED BY** Jim Fleck

**AT END OF DRILLING** ---

**NOTES** None.

**AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | 0.5 | Topsoil, vegetative matter.  _721.4_ | |
| | | | | | (CL) Clay, lean, trace silt, sand, and gravel (shale fragments), roots, moist to dry, stiff. | |
| | | | | 2.0 | _719.9_ | |
| | | | | | (CL) Clay, lean, trace silt and sand, dry, very stiff, crumbly, grading to light gray (7.5YR 7/1) at 5 ft. | |
| 5 | | | | | | |
| | | | | 7.5 | _714.4_ | |
| | | | | | Cuyahoga Formation. Weathered Shale, fractured, a few sand lenses with iron oxide staining. | |
| 10 | | | | | | |
| | | | | 12.5 | _709.4_ | |
| | | | | | (CL) Clay, brownish gray, lean, dry, hard, weathered, fissile, with clayey to silty shale fragments. | |
| 15 | | | | 15.0 | _706.9_ | |
| | | | | | Cuyahoga Formation (Competent). Weathered Shale, brown, soft to very soft, fractured. Grading to gray, slightly weathered shale with moderate fracturing at 19.3 ft, iron oxide staining. | |
| 20 | | | | | | |

B-178
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP# P800-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-32**
PAGE 2 OF 4

February 2014

| Logo | Fluor B&W |
|---|---|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | Cuyahoga Formation (Competent).  Weathered Shale, ==brown, soft to very soft, fractured.==  Grading to gray, slightly weathered shale with moderate fracturing at 19.3 ft, iron oxide staining. *(continued)* | |
| 25 | | | | | | |
| 30 | | | | | | |
| 35 | | | | | | |
| | | | | 37.7 | 680 Sandstone.  Sandstone, hard, sound, iron oxide staining.   684.2 | |
| 40 | | | | 39.9 | ==Shale, gray, medium hard, fractured, some iron oxide staining.==   682.0 | |
| | | | | 41.6 | 680.3 | |
| | | | | 42.0 | Sandstone, gray, hard, 5 in. thick.   679.9 | |
| | | | | | Shale, gray, medium to medium-hard. | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

B-179

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-32

February 2014

PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth   **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____   **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, gray, medium to medium-hard. *(continued)*

45

47.3 — 674.6
47.4 — 674.5
Sandstone, 1 in. thick.

Shale, gray, medium to medium-hard.

50

50.3 — 671.6
50.5 — 671.4
Sandstone, 2.5 in. thick.

Shale, gray, with interbedded siltstone and sandstone seams.

52.0 — 669.9
52.2 — 669.7
Sandstone, 2.5 in. thick.

Shale, gray, with interbedded siltstone and sandstone seams.

55

56.1 — 665.8
56.2 — 665.7
Sandstone, 1 in. thick.

Shale, gray, with interbedded siltstone and sandstone seams.

59.5 — 662.4
59.7 — 662.2
Sandstone, 2.5 in. thick.

60

Shale, gray, with interbedded siltstone and sandstone seams.

62.0 — 659.9
62.2 — 659.7
Sandstone, 2.5 in. thick.

Shale, gray, with interbedded siltstone and sandstone seams.

64.3 — 657.6
64.5 — 657.4
Sandstone, 1 in. thick.

65

Shale, gray, with interbedded siltstone and sandstone seams.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEPP-1808-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-32**
PAGE 4 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth    **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**    **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray, with interbedded siltstone and sandstone seams. *(continued)* 66.5  655.4 | |
| | | | | | Sandstone, 1.5 in. thick. 66.8  655.1 | |
| | | | | | Shale, gray, with interbedded siltstone and sandstone seams. | |
| 70 | | | | | | |
| 75 | | | | | 74.8  647.1 | |
| | | | | | Sunbury Shale.  Shale, black (N1), medium, sound. | |
| | | | | | 77.0  644.9 | |

Refusal at 15.0 feet.
Bottom of borehole at 77.0 feet.

DEP # PORTS-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

**BORING NUMBER WD-SB-33**
PAGE 1 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  9/10/11   **COMPLETED**  9/14/11          **GROUND ELEVATION**  742.62 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling          **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger          **AT TIME OF DRILLING**  ---

**LOGGED BY**  Pete Sudkamp   **CHECKED BY**  Jim Fleck          **AT END OF DRILLING**  ---

**NOTES**  None.          **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (CL) Clay, brown (10YR 5/3 or 4/3), lean, moist, soft, some silt, traced fine sand, trace to little roots and sandstone fragments. | |
| | | | | 2.0 | | 740.6 |
| | | | | | Gravelly Clay, brown (10YR 5/3 or 4/3), lean, with fine to medium gravel (sandstone and shale fragments), little silt, trace to medium sand. | |
| 5 | | | | | | |
| | | | | 6.0 | | 736.6 |
| | | | | | Cuyahoga Formation.  Weathered Sandy Shale, gray and brown, dry, very soft, thin bedding, crumbly. | |
| 10 | | | | | | |
| | | | | 11.0 | | 731.6 |
| | | | | | Cuyahoga Formation (Competent), Inferred.  Washout, only shale fragments recovered. | |
| | | | | 12.5 | | 730.1 |
| | | | | | Weathered Shale, brown, very soft, fractured. | |
| | | | | 14.4 | | 728.2 |
| | | | | 14.9 | Sandstone, brown, soft, 6 in. thick. | 727.7 |
| 15 | | | | | Weathered Sandy Shale, gray and brown, soft to very soft, fractured. | |
| 20 | | | | 20.0 | | 722.6 |

B-182

(Continued Next Page)

FBP-WD RIFS D3 R5 MASTER/02/05/2014

DE-PT 0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-33**
February 2014
PAGE 2 OF 6

| Logo | Fluor B&W |
|---|---|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**                        **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | | |
| | | | | 21.0 | Sandstone, brown, hard, iron oxide staining, 12 in. thick.   721.6 | |
| | | | | | Weathered Sandy Shale, gray and brown, soft to very soft, fractured. | |
| | | | | 23.2 | 719.4 | |
| | | | | 23.7 | 720 Sandstone.  Sandstone, brown, hard, 6 in. thick.   718.9 | |
| 25 | | | | | Shale, gray, with interbedded sandstones, 4-6 in. thickness typical, decreasing in thickness below 26 ft to 0.5-1 in. | |
| | | | | 26.0 | 716.6 | |
| | | | | | Shale, gray, medium hard, sound. | |
| 30 | | | | | | |
| 35 | | | | | | |
| 40 | | | | | | |
| | | | | 41.4 | 701.2 | |
| | | | | 41.5 | Sandstone, 1 in. thick.   701.1 | |
| | | | | | Shale, gray, medium hard, sound. | |
| | | | | 42.7 | 700.0 | |

B-183
*(Continued Next Page)*

| | Logo | Fluor B&W | | | | **BORING NUMBER WD-SB-33** February 2014 PAGE 3 OF 6 |

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | 42.8 | Sandstone, 1 in. thick. | 699.9 |
| | | | | | Shale, gray, medium hard, sound. *(continued)* | |
| 45 | | | | | | |
| 50 | | | | 50.6 | | 692.0 |
| | | | | 50.7 | Sandstone, 1 in. thick. | 691.9 |
| | | | | | Shale, gray. | |
| 55 | | | | | | |
| | | | | 58.8 | | 683.8 |
| | | | | 59.0 | Sandstone, 2 in. thick. | 683.7 |
| 60 | | | | | Shale, gray, medium hard, sound. | |
| 65 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DE-PT82-0246&D3
FBP-ER-RIFS-WD-RPT-0030

## BORING NUMBER WD-SB-33

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth          **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | 66.3 | Shale, gray, medium hard, sound. *(continued)* 676.3 | |
| | | | | | 680 Sandstone.  Sandstone, gray, hard, sound, vf to fine-grained. | |
| | | | | 68.4 | 674.2 | |
| | | | | | Shale, gray, medium hard, sound. | |
| 70 | | | | | | |
| | | | | 70.6 | 672.0 | |
| | | | | 71.0 | Sandstone, gray, hard, sound, vf to fine-grained. 671.6 | |
| | | | | | Shale, gray, medium hard, sound. | |
| | | | | 74.2 | 668.4 | |
| | | | | 74.4 | Sandstone, 2.5 in. thick. 668.2 | |
| 75 | | | | 74.7 | Shale, gray, medium hard, sound. 668.0 | |
| | | | | 75.8 | Sandstone, 13 in. thick. 666.9 | |
| | | | | | Shale, gray. | |
| 80 | | | | | | |
| | | | | 83.0 | 659.6 | |
| | | | | 83.2 | Sandstone, 2.5 in. thick. 659.4 | |
| | | | | | Shale, gray. | |
| 85 | | | | | | |
| | | | | 85.6 | 657.0 | |
| | | | | 85.7 | Sandstone, 1 in. thick. 656.9 | |
| | | | | | Shale, gray. | |
| | | | | 87.6 | 655.0 | |
| | | | | 87.7 | Sandstone, 1 in. thick. 654.9 | |
| | | | | | Shale, gray. | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DE-PT-0246&D3
FBP-ER-RIFS-WD-RPT-0030
R5
February 2014

| Logo | Fluor B&W |
|------|-----------|

**BORING NUMBER WD-SB-33**
PAGE 5 OF 6

**CLIENT**  Fluor B&W Portsmouth     **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray. *(continued)* | |
| 90 | | | | | | |
| 95 | | | | | 94.3    Sandstone, 2.5 in. thick.      648.3 <br> 94.5       648.1 <br> Shale, gray, with interbedded fine sandstone seams, medium hard, sound. <br> 96.4      646.2 <br> 96.6    Sandstone, 2.5 in. thick.    646.0 <br> Shale, gray, hard, sound. <br> 98.0      644.7 <br> 98.1    Sandstone, 1 in. thick.    644.6 <br> Shale, gray, hard, sound. <br> 98.9      643.7 <br> 99.1    Sandstone, 2.5 in. thick.    643.5 <br> Shale, gray, hard, sound. | |
| 100 | | | | | | |
| 105 | | | | | 106.3      636.4 <br> Shale, gray, soft, sound, slightly weathered. <br> 107.6      635.0 <br> Shale, gray, hard, sound. | |
| 110 | | | | | 111.0      631.6 | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

# BORING NUMBER WD-SB-33

| Logo | Fluor B&W | | | |
|---|---|---|---|---|

**CLIENT**  Fluor B&W Portsmouth  **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sunbury Shale. Shale, black (N1), medium hard to hard, sound, some pyrite inclusions. *(continued)* | |
| 115 | | | | | | |
| 120 | | | | | | |
| 125 | | | | | 126.0 | 616.6 |
| | | | | | Refusal at 11.0 feet. Bottom of borehole at 126.0 feet. | |

DEP-PP315-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

| Logo | Fluor B&W |
|------|-----------|

# BORING NUMBER WD-SB-35
PAGE 1 OF 4

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**     **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 9/23/11    **COMPLETED** 9/24/11     **GROUND ELEVATION** 727.23 ft MSL   **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling     **GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger     **AT TIME OF DRILLING** ---

**LOGGED BY** Pete Sudkamp    **CHECKED BY** Jim Fleck     **AT END OF DRILLING** ---

**NOTES** None.     **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | 0.3 | Organic forest bed.     727.0 | |
| | | | | | (CL-ML) Silty Clay, light brown (7.5YR 6/3 or 6/4), stiff, trace fine sand, some shale fragments. | |
| | | | | 2.5 |     724.7 | |
| | | | | | Cuyahoga Formation. Weathered Shale and Silty Clay, light brown (5YR 5/6) with gray mottling, trace sand. Grading to Weathered Shale, gray, at 5 ft. | |
| 5 | | | | | | |
| | | | | 9.8 |     717.4 | |
| 10 | | | | | Cuyahoga Formation (Competent). Shale, brown, very soft, fractured, interbedded sandstone seams at 12 ft, occasional iron oxide staining. | |
| 15 | | | | | | |
| 20 | | | | | | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DP-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

| | Logo | Fluor B&W | | | | **BORING NUMBER WD-SB-35**<br>PAGE 2 OF 4 |

**CLIENT**  Fluor B&W Portsmouth        **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____        **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | Cuyahoga Formation (Competent). Shale, brown, very soft, fractured, interbedded sandstone seams at 12 ft, occasional iron oxide staining. *(continued)* | |
| 25 | | | | | | |
| 30 | | | | | | |
| 35 | | | | | | |
| | | | | 37.0 | Shale, gray. | 690.2 |
| 40 | | | | 40.0 | | 687.2 |
| | | | | | 680 Sandstone. Silty Sandstone, red-brown, medium hard?, moderately fractured. | |
| | | | | 42.0 | | 685.2 |
| | | | | | Shale, gray, medium hard, sound, fractured. | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-PB107-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-35**
Revision 5
February 2014
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth  **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray, medium hard, sound, fractured. *(continued)* | |
| 45 | | | | 44.7 / 45.0 | Sandstone, gray, hard, 3.5 in. thick. | 682.6 / 682.3 |
| | | | | | Shale, gray, medium hard, sound, fractured. | |
| 50 | | | | | | |
| 55 | | | | 55.0 / 55.2 | Sandstone, 2.5 in. thick. | 672.2 / 672.0 |
| | | | | | Shale, gray, medium hard, sound, fractured. | |
| 60 | | | | 58.8 / 59.0 | Sandstone, 2.5 in. thick. | 668.4 / 668.2 |
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. | |
| | | | | 62.3 / 62.4 | Sandstone, 1 in. thick. | 664.9 / 664.8 |
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. | |
| 65 | | | | | | |

B-194

*(Continued Next Page)*

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP# PPPH-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-35
PAGE 4 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth  **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**  _____  **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. *(continued)* | |
| | | | | | 67.1 — 660.1 | |
| | | | | | 67.3 — Sandstone, 2.5 in. thick. — 659.9 | |
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. | |
| 70 | | | | | 69.3 — 657.9 | |
| | | | | | 69.5 — Sandstone, 2.5 in. thick. — 657.7 | |
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. | |
| 75 | | | | | 75.7 — 651.5 | |
| | | | | | 76.0 — Sandstone, 3.5 in. thick. — 651.2 | |
| | | | | | Shale, gray, with interbedded sandstone seams, fractured. | |
| | | | | | 77.2 — 650.0 | |
| | | | | | Sunbury Shale.  Shale, black (N1), medium hard, sound. | |
| 80 | | | | | | |
| | | | | | 82.0 — 645.2 | |

Refusal at 9.8 feet.
Bottom of borehole at 82.0 feet.

DEP-PPMG-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-36
PAGE 1 OF 6

| | |
|---|---|
| **Logo** | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  9/20/11     **COMPLETED**  9/22/11

**GROUND ELEVATION**  752.48 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger

**AT TIME OF DRILLING**  ---

**LOGGED BY**  Bill Reid     **CHECKED BY**  Allison Lake

**AT END OF DRILLING**  ---

**NOTES**  None.

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | | WELL DIAGRAM |
|---|---|---|---|---|---|---|---|
| 0 | | | | | | | |
| | | | | 0.5 | (CL) Sandy Clay, light brown (7.5YR 6/3 or 6/4), lean, trace silt and roots, medium stiff. | 752.0 | |
| | | | | | Clay, light reddish brown (5YR 6/3 or 6/4), lean to FAT, some sandstone fragments and roots, medium stiff. | | |
| | | | | 2.0 | | 750.5 | |
| | | | | | (CL-ML) Clay, light reddish brown (5YR 6/3 or 6/4) and gray, mottled, some roots and sandstone fragments, little sand and silt, slightly moist, crumbly.  Weathered Shale lens at 8.1 ft. | | |
| 5 | | | | | | | |
| | | | | 8.1 | | 744.4 | |
| | | | | | (CH) Clay, light reddish brown (5YR 6/3 or 6/4), FAT. | | |
| 10 | | | | 10.0 | | 742.5 | |
| | | | | | Cuyahoga Formation.  Weathered Shale, light reddish brown, fissile, grading to light brown (5YR 5/6), iron oxide staining throughout. | | |
| | | | | 12.0 | | 740.5 | |
| | | | | | Cuyahoga Formation (Competent).  Weathered Shale, brown. | | |
| | | | | 14.4 | | 738.1 | |
| | | | | 14.8 | Sandstone, gray, 5 in. thick. | 737.7 | |
| 15 | | | | 15.8 | Weathered Shale/Mudstone, brownish gray (5YR 4/1). | 736.7 | |
| | | | | 16.5 | Sandstone, brown. | 736.0 | |
| | | | | 16.9 | Weathered Shale, brown. | 735.6 | |
| | | | | 17.0 | Sandstone, brown, 1.5 in. thick. | 735.5 | |
| | | | | 17.9 | Weathered Shale, brown. | 734.6 | |
| | | | | 18.3 | Sandstone, reddish brown, 5 in. thick. | 734.2 | |
| | | | | 18.7 | Weathered Shale, brown. | 733.8 | |
| | | | | 18.9 | Sandstone, 2.5 in. thick. | 733.6 | |
| | | | | 19.3 | Weathered Shale, gray. | 733.2 | |
| | | | | 19.5 | | 733.0 | |
| 20 | | | | | Sandstone, reddish brown, 2.5 in. thick. | | |

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

**BORING NUMBER WD-SB-36**
PAGE 2 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Material Description column:

- Weathered Shale, gray, fissile. *(continued)*
- 21.1 — 731.4
- 21.5 — Sandstone, reddish brown, 5 in. thick. — 731.0
- 21.8 — Weathered Shale, gray, fissile. — 730.7
- 22.0 — Sandstone, reddish brown, 2.5 in. thick. — 730.5
- 23.1 — Weathered Shale, gray, iron oxide staining, grading to Shale, gray, fractured. — 729.4
- 23.3 — Sandstone, tan, 3 in. thick. — 729.2
- Shale, gray, fractured.
- 25.6 — 726.9
- 25.7 — Sandstone, tan and gray, 2 in. thick. — 726.8
- Shale, gray, soft, slightly weathered, fractured.
- 28.7 — 723.8
- 29.0 — Sandstone, tan, medium hard, 3 in. thick. — 723.5
- 29.7 — Shale, gray, soft, slightly weathered, fractured. — 722.8
- 29.9 — 720 Sandstone.  Sandstone, fractured, 2.5 in. thick. — 722.6
- 30.1 — Siltstone/Sandstone, gray, 2.5 in. thick. — 722.4
- Shale, gray, slightly weathered, with interbedded fine sandstone seams, fractured.  Grading to Shale, gray, less weathered.
- 35.4 — 717.1
- 36.0 — Sandstone, tan, 8 in. thick. — 716.5
- 36.5 — Shale, gray, fractured. — 716.0
- 36.9 — Sandstone, tan, 5 in. thick. — 715.6
- 37.1 — Shale, gray, fractured, laminated. — 715.4
- 37.5 — Sandstone, tan, 5 in. thick. — 715.0
- 38.2 — Shale, gray, fractured, laminated. — 714.3
- 38.4 — Sandstone, tan, 2.5 in. thick. — 714.1
- Shale, gray, medium hard, sound, thinly bedded.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

B-197
*(Continued Next Page)*

**BORING NUMBER WD-SB-36**
PAGE 3 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NUMBER**

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, gray, medium hard, sound, thinly bedded. *(continued)*

45

48.2 — 704.3
48.3 — 704.2
Silty Sandstone, 1 in. thick.

Shale, gray, medium hard, sound, thinly bedded.

50

52.5 — 700.0
52.6 — 699.9
Sandstone, 2 in. thick.

Shale, gray, medium hard, sound, thinly bedded.

55

60

63.5 — 689.0
63.6 — 688.9
Sandstone, 1 in. thick, infilled with shale.

Shale, gray, medium hard, sound, with interbedded thin sandstone seams.

65

B-198
*(Continued Next Page)*

FBP-xxxxx-xxxx-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-36**
PAGE 4 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, gray, medium hard, sound, with interbedded thin sandstone seams. *(continued)*

67.3 — 685.2
67.4 — 685.1 Sandstone, 2 in. thick.

Shale, gray, medium hard, sound, with interbedded thin sandstone seams.

70

75

76.8 — 675.7

680 Sandstone. Sandstone, gray, hard, fresh, sound, fine-grained.

78.9 — 673.6

Shale, gray, medium hard, sound, with interbedded thin sandstone seams.

80

80.9 — 671.6
81.4 — 671.1 Sandstone, gray, medium hard, sound, very fine-grained, 5 in. thick.

Shale, gray, fractured.

85

85.7 — 666.8
85.8 — 666.7 Sandstone, 2 in. thick.

Shale, gray, fractured.

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-36**

February 2014
PAGE 5 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth          **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, gray, fractured. *(continued)*

90

91.6 / 660.9
91.8 / 660.7 — Sandstone, 2 in. thick.

Shale, gray, fractured.
92.7 / 659.8
92.9 / 659.6 — Sandstone, 3 in. thick.

Shale, gray, with interbedded sandstone seams, fractured.

95

95.3 / 657.2
95.5 / 657.0 — Sandstone, 2.5 in. thick.

Shale, gray, with interbedded sandstone seams.

100

100.6 / 651.9
100.8 / 651.7 — Sandstone, 2.5 in. thick.

Shale, gray, medium hard, sound.

103.3 / 649.2
103.4 / 649.1 — Sandstone, 1 in. thick.

Shale, gray, medium hard, sound.

105

105.8 / 646.7
106.0 / 646.5 — Sandstone, 2.5 in. thick.

Shale, gray, medium hard, sound.

108.1 / 644.4
108.3 / 644.2 — Sandstone, 2 in. thick.

Shale, gray, medium hard, sound.

110

DE-PP284-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

**BORING NUMBER WD-SB-36**

PAGE 6 OF 6

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, gray, medium hard, sound. *(continued)* | |
| | | | | 112.7 | | 639.8 |
| | | | | 112.9 | Sandstone, 2 in. thick. | 639.6 |
| | | | | | Shale, gray, medium hard, sound. | |
| | | | | 114.0 | | 638.5 |
| 115 | | | | | Shale, gray?, soft to medium. | |
| | | | | 116.7 | | 635.8 |
| | | | | | Sunbury Shale.  Shale, greenish gray (5GY 6/1) to black with depth, fresh. | |
| 120 | | | | 120.0 | | 632.5 |

Refusal at 12.0 feet.
Bottom of borehole at 120.0 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

| Logo | Fluor B&W |
|------|-----------|

**BORING NUMBER WD-SB-37**
PAGE 1 OF 5

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  8/7/12    **COMPLETED**  8/7/12

**GROUND ELEVATION**  713.45 ft MSL    **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger

**AT TIME OF DRILLING**  ---

**LOGGED BY**  Jay Parker    **CHECKED BY**  William Reid

**AT END OF DRILLING**  ---

**NOTES**  93 deg F. Sunny. 41% humidity. Wind West @1mph.

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (CL-ML) Silty Clay, very pale brown (10YR 7/4), dry, very stiff, some laminated shale (float) at 0-2 ft, some fine sand at 2-4 ft. | |
| | | | | 4.0 | | 709.5 |
| 5 | | | | | Cuyahoga Formation. Weathered Shale, very pale brown (10YR 7/4), laminated, dry, very stiff, some crushed sandstone layers of < 1 in., shale changes to pale yellowish brown (10YR 6/2) to moderate brown (5YR 4/4) with depth | |
| 10 | | | | | | |
| | | | | 11.3 | | 702.2 |
| | | | | | Cuyahoga Formation (Competent).  Shale, moderate yellowish brown, highly fractured, minor siltstone/sandstone seam in from 15.3 to 16.3 ft. | |
| 15 | | | | | | |
| 20 | | | | | | |

B-202

*(Continued Next Page)*

**BORING NUMBER WD-SB-37**

| Logo | Fluor B&W |
|---|---|

**CLIENT** Fluor B&W Portsmouth

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Cuyahoga Formation (Competent). Shale, moderate yellowish brown, highly fractured, minor siltstone/sandstone seam in from 15.3 to 16.3 ft. *(continued)*

22.9 — 690.6
23.0 — Sandstone, 1 in. thick. — 690.5

Shale, moderate yellowish brown (10YR 5/4).

24.1 — 689.4
24.2 — Sandstone, 1 in. thick. — 689.3

Shale, moderate yellowish brown (10YR 5/4).

25.2 — 688.3

Shale, moderate yellowish brown (10YR 5/4), with fine siltstone seams.

26.3 — 687.2
26.6 — Shale, medium gray (N5), fractures along shale bedding planes. — 686.9
26.7 — 686.8

Sandstone, 1 in. thick.

Shale, medium gray (N5), fractures along shale bedding planes.

31.9 — 681.6
32.1 — Sandstone, 2 in. thick. — 681.4

Shale, medium gray (N5).

35.4 — 678.1
680 Sandstone. Sandstone, moderate brown (5YR 4/4).

37.4 — 676.1
Shale, medium gray (N5), with very fine siltstone seams.

39.7 — 673.8
40.0 — Sandstone, medium light gray (N6), 3 in. thick. — 673.5

Shale, medium gray (N5), siltstone seams in intervals throughout.

B-203

*(Continued Next Page)*

# BORING NUMBER WD-SB-37

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth  **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium gray (N5), siltstone seams in intervals throughout. *(continued)*

51.4 — 662.1
51.5 — 662.0
Siltstone, 1 in. thick.
Shale, medium gray (N5), with siltstone seams.

60.1 — 653.4
60.2 — 653.3
Siltstone, 1.5 in. thick.
Shale, medium gray (N5), with siltstone seams.

64.1 — 649.4
64.3 — 649.2
Siltstone, 2 in. thick.
Shale, medium gray (N5), with siltstone seams.

45

50

55

60

65

DRAFT-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**Logo**    Fluor B&W

**BORING NUMBER WD-SB-37**
February 2014
PAGE 4 OF 5

**CLIENT**   Fluor B&W Portsmouth     **PROJECT NAME**   OSDC Geotechnical Investigation

**PROJECT NUMBER**     **PROJECT LOCATION**   Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, medium gray (N5), with siltstone seams. *(continued)* | |
| | | | | 67.5 | | 646.0 |
| | | | | 67.6 | Siltstone, 1 in. thick. | 645.9 |
| | | | | | Shale, medium gray (N5), with siltstone seams. | |
| 70 | | | | | | |
| | | | | 71.8 | | 641.7 |
| | | | | 71.9 | Siltstone, 1 in. thick. | 641.6 |
| | | | | | Shale, medium gray (N5), with siltstone seams. | |
| 75 | | | | | | |
| | | | | 75.8 | | 637.7 |
| | | | | | Sunbury Shale. Shale, dark gray (N3), with pyrite nodules, decreasing with depth until 94 ft. At 94 ft, sharp increase in pyrite content. | |
| 80 | | | | | | |
| 85 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:25 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

B-205
*(Continued Next Page)*

DE-PT 0049-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

**BORING NUMBER WD-SB-37**
PAGE 5 OF 5

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth    **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____    **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 90 | | | | | Sunbury Shale. Shale, dark gray (N3), with pyrite nodules, decreasing with depth until 94 ft. At 94 ft, sharp increase in pyrite content. *(continued)* | |
| 95 | | | | | | |
| | | | | 96.0 | | 617.5 |
| | | | | 96.3 | Berea Sandstone. Sandstone, pale olive (10Y 6/2), fine-grained, with very fine bedding planes. | 617.2 |

Refusal at 11.3 feet.
Bottom of borehole at 96.3 feet.

DEP-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

| Logo | Fluor B&W | | **BORING NUMBER WD-SB-38** |
|---|---|---|---|

PAGE 1 OF 5

**CLIENT**  Fluor B&W Portsmouth                    **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____            **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  7/26/12     **COMPLETED**  9/29/12     **GROUND ELEVATION**  772.71 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling              **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger                **AT TIME OF DRILLING**  ---

**LOGGED BY**  Jay Parker     **CHECKED BY**  William Reid     **AT END OF DRILLING**  ---

**NOTES**  92 deg F.  Mostly sunny with chance of thunderstorms.  73% humidity.  Wind 6 mph.  **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | (CL-ML) Silty Clay, reddish yellow (7.5YR 6/6), dry, medium dense, mottled iron oxide staining. | |
| | | | | | 2.0  (CL-ML) Silty Clay, strong brown (7.5YR 5/6), grading to clay with trace silt at depth, dry, medium dense. Weathered reddish brown sandstone float at 3.7 to 3.9 ft. | 770.7 |
| 5 | | | | | 4.0  Cuyahoga Formation.  Weathered Shale, reddish yellow, laminated, dry, hard. | 768.7 |
| | | | | | 6.0 | 766.7 |
| | | | | | 7.0  (CL-ML) Silty Clay, reddish yellow (7.5YR 6/6), with weathered strong brown sandstone at 6.5 ft, 2 in. thick. | 765.7 |
| | | | | | Weathered reddish yellow shale, grading to grayish orange (10YR 7/4) at 8 ft, laminated, dry, dense. | |
| 10 | | | | | | |
| 15 | | | | | | |
| 20 | | | | | 18.8 | 753.9 |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT  OSDC.GPJ

DOE-PPPO-03-2348FBP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-38
PAGE 2 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**                        **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Cuyahoga Formation (Competent).  Weathered shale, grayish orange (10YR 7/4), becoming more competent and fractured with depth, dark yellowish brown (10YR 4/2) at 26 ft. *(continued)*

30.4 — 742.3
30.6 — 742.1
Sandstone, 2 in. thick.
Shale, dark yellowish brown (10YR 4/2), fractured.

35.7 — 737.0
36.0 — 736.7
Sandstone lenses, each 2 in. thick.
Shale, olive gray (5Y 4/1), fractured.

37.8 — 734.9
38.2 — 734.5
Sandstone lenses, each 2 in. thick.
38.6 — 734.1
Shale, olive gray (5Y 4/1), fractured.
38.7 — 734.0
Sandstone, moderate brown (5YR 4/4), 1.5 in. thick.
Shale, olive gray (5Y 4/1), fractured, grading to medium gray (N5) at 41.4 ft.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DE-PT-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

| | Logo | Fluor B&W | | | **BORING NUMBER WD-SB-38** |
|---|---|---|---|---|---|

**CLIENT**  Fluor B&W Portsmouth   **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____   **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, olive gray (5Y 4/1), fractured, grading to medium gray (N5) at 41.4 ft. *(continued)*  —43.7  729.1 | |
| | | | | | Sandstone, grading to red swirled pattern.  —44.2  728.5 | |
| 45 | | | | | Shale, medium gray (N5), grading to siltstone at 45.8 ft. | |
| | | | | | —45.8  726.9 | |
| | | | | | Siltstone, 1 in. thick.  —45.9  726.8 | |
| | | | | | Shale, medium dark gray (N4), with very thin sandstone lens at 46.45 ft. | |
| | | | | | —47.4  725.3 | |
| | | | | | Sandstone, reddish brown to light gray (N7).  —48.1  724.6 | |
| | | | | | Shale, medium gray (N5), with fine siltstone seams throughout. | |
| 50 | | | | | | |
| | | | | | —51.4  721.3 | |
| | | | | | 720 Sandstone.  Sandstone, dark reddish brown (10R 3/4), very hard, fine-grained.  —52.0  720.7 | |
| | | | | | Shale, with interbedded siltstone seams.  —52.6  720.1 | |
| | | | | | Sandstone, dark reddish brown (10R 3/4).  —53.3  719.4 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 55 | | | | | | |
| | | | | | —56.4  716.3 | |
| | | | | | Sandstone, 2 in. thick.  —56.6  716.1 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | —57.7  715.0 | |
| | | | | | Sandstone, 3.5 in. thick.  —58.0  714.7 | |
| | | | | | Shale, with interbedded siltstone seams.  —58.5  714.2 | |
| | | | | | Sandstone, 3.5 in. thick.  —58.8  713.9 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 60 | | | | | | |
| 65 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

**BORING NUMBER WD-SB-38**
PAGE 4 OF 5

| Logo | Fluor B&W |
|---|---|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, with interbedded siltstone seams. *(continued)* | |
| | | | | | 66.7    706.0 | |
| | | | | | 66.8 Sandstone, 1 in. thick.    705.9 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 70 | | | | | | |
| | | | | | 72.1    700.6 | |
| | | | | | 72.3 Sandstone, 1.5 in. thick.    700.5 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | 73.4    699.4 | |
| | | | | | Sandstone, 1.5 ft. thick? | |
| 75 | | | | | 74.9    697.9 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 80 | | | | | | |
| | | | | | 81.4    691.3 | |
| | | | | | 81.5 Sandstone, 1 in. thick.    691.2 | |
| | | | | | 82.2 Shale, with interbedded siltstone seams.    690.5 | |
| | | | | | 82.3 Sandstone, 1 in. thick.    690.4 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | 84.5    688.2 | |
| 85 | | | | | 84.6 Sandstone, 1 in. thick.    688.1 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | 85.5    687.2 | |
| | | | | | 85.6 Sandstone, 1 in. thick.    687.1 | |
| | | | | | Shale, with interbedded siltstone seams. | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEPP-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-38

February 2014
PAGE 5 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | 89.1 — Shale, with interbedded siltstone seams. *(continued)* — 683.7 | |
| | | | | | 89.2 — Sandstone, 1.5 in. thick. — 683.5 | |
| 90 | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | 91.9 — 680.9 | |
| | | | | | 92.0 — Sandstone, 1 in. thick. — 680.8 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 95 | | | | | | |
| | | | | | 96.1 — 676.6 | |
| | | | | | 680 Sandstone.  Sandstone, light olive gray (5Y 6/1) to dark yellowish orange (10YR 6/6), fractured, iron oxide staining in fractures and on bedding surfaces. | |
| | | | | | 98.3 — 674.4 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| 100 | | | | | 100.4 — 672.3 | |
| | | | | | 100.7 — Sandstone, 4 in. thick. — 672.0 | |
| | | | | | Shale, with interbedded siltstone seams. | |
| | | | | | 103.1 — 669.6 | |

Refusal at 18.8 feet.
Bottom of borehole at 103.1 feet.

DEP-P025-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

| | |
|---|---|
| **Logo** Fluor B&W | **BORING NUMBER WD-SB-40** PAGE 1 OF 4 |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  8/28/12     **COMPLETED**  8/29/12

**GROUND ELEVATION**  747.54 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger

**AT TIME OF DRILLING**  ---

**LOGGED BY**  Jay Parker     **CHECKED BY**  William Reid

**AT END OF DRILLING**  ---

**NOTES**  80 deg F. Partly Sunny. 65% humidity. Wind NNE @3mph.

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (SC-SM) Silty Sandy Clay, very pale brown (10YR 7/4), dry, soft to medium dense. | |
| | | | | 2.0 | | 745.5 |
| | | | | | (CL-ML) Silty Clay, very pale brown (10YR 7/4) to yellowish red (5YR 5/8), dry, medium dense to stiff. | |
| 5 | | | | | | |
| | | | | 6.0 | | 741.5 |
| | | | | | Cuyahoga Formation.  Weathered Shale, pale brown (5YR 5/2), dry, laminated, very stiff to hard, some sandstone lenses. | |
| 10 | | | | | | |
| | | | | 10.6 | | 736.9 |
| | | | | | Cuyahoga Formation (Competent).  Weathered Shale, moderate yellowish brown (10YR 5/4), highly fractured. | |
| | | | | 13.4 | | 734.1 |
| | | | | 13.5 | Sandstone lens, 1 in. thick. | 734.0 |
| | | | | | Weathered Shale, fractured, with interbedded siltstone layers. | |
| | | | | 14.8 | | 732.7 |
| 15 | | | | 14.9 | Sandstone, 1 in. thick? | 732.6 |
| | | | | | Interbedded Shale, Siltstone, and Fat Clay. | |
| | | | | 16.1 | | 731.4 |
| | | | | | Weathered Shale, olive gray (5Y 4/1),with interbedded sandstone lenses? | |
| | | | | 17.2 | | 730.3 |
| | | | | 17.3 | Sandstone, 1 in. thick? | 730.2 |
| | | | | 17.6 | Shale with Sandstone lenses? | 729.9 |
| | | | | 18.0 | Sandstone, fractured. | 729.5 |
| | | | | 18.7 | Shale? | 728.8 |
| | | | | 19.1 | Sandstone, 1 in. thick, Shale, Sandstone, 2 in. thick, fractured. | 728.4 |
| 20 | | | | | Shale? | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEP-P-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-40

Revision 5
February 2014
PAGE 2 OF 4

| | |
|---|---|
| Logo | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | 20.3 — 727.2 | |
| | | | | | 20.7 Sandstone, fractured, iron oxide staining. 726.8 | |
| | | | | | 21.5 Weathered Shale, olive gray (5Y 4/1) to medium gray (N5), becoming more competent, highly fractured. 726.0 | |
| | | | | | 21.6 Sandstone, 1 in. thick. 725.9 | |
| | | | | | 22.6 Shale. 725.0 | |
| | | | | | 22.7 Sandstone, 1 in. thick, fractured, iron oxide staining. 724.9 | |
| | | | | | Shale, fractured. | |
| 25 | | | | | 24.7 — 722.8 | |
| | | | | | 24.8 Sandstone, 1 in. thick. 722.7 | |
| | | | | | 25.2 Shale, fractured. 722.3 | |
| | | | | | 25.6 720 Sandstone.  Sandstone, fractured, iron oxide staining. 721.9 | |
| | | | | | Shale, medium gray (N5), fractured. | |
| | | | | | 27.9 — 719.6 | |
| | | | | | 28.2 Sandstone, 4 in. thick. 719.3 | |
| | | | | | 28.7 Shale, medium gray (N5), fractured. 718.9 | |
| | | | | | 29.0 Sandstone, 4 in. thick. 718.6 | |
| | | | | | 29.2 Shale, medium gray (N5), fractured. 718.3 | |
| 30 | | | | | 29.6 Sandstone, 5 in. thick. 717.9 | |
| | | | | | Shale, medium gray (N5). | |
| | | | | | 31.4 — 716.2 | |
| | | | | | 31.5 Sandstone, 1 in. thick. 716.1 | |
| | | | | | Shale, medium gray (N5), with numerous interbedded siltstone seams. | |
| | | | | | 32.6 — 715.0 | |
| | | | | | 32.7 Sandstone, 1 in. thick. 714.9 | |
| | | | | | Shale, medium gray (N5), with numerous interbedded siltstone seams. | |
| 35 | | | | | | |
| | | | | | 38.7 — 708.8 | |
| | | | | | 38.8 Sandstone, 1 in. thick. 708.7 | |
| | | | | | Shale, medium gray (N5), with numerous interbedded siltstone seams. | |
| | | | | | 39.7 — 707.8 | |
| 40 | | | | | 39.8 Sandstone, 1 in. thick. 707.7 | |
| | | | | | 40.3 — 707.2 | |
| | | | | | 40.4 Shale, medium gray (N5), with numerous interbedded siltstone seams. 707.1 | |
| | | | | | Sandstone, 1.5 in. thick. | |
| | | | | | Shale, medium gray (N5), with numerous interbedded siltstone seams. | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

**BORING NUMBER WD-SB-40**
PAGE 3 OF 4

| | Logo | Fluor B&W | |
|---|---|---|---|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** ___     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, medium gray (N5), with numerous interbedded siltstone seams. *(continued)* | |
| 45 | | | | | | |
| | | | | | 45.7 — 701.8 | |
| | | | | | 45.8 Sandstone, 1 in. thick. 701.7 | |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| | | | | | 47.0 — 700.5 | |
| | | | | | 47.1 Sandstone, 1 in. thick. 700.4 | |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 50 | | | | | | |
| | | | | | 50.9 — 696.6 | |
| | | | | | 51.1 Sandstone, 2 in. thick. 696.4 | |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 55 | | | | | 55.1 — 692.4 | |
| | | | | | 55.2 Sandstone, 1 in. thick. 692.3 | |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 60 | | | | | | |
| | | | | | 63.2 — 684.3 | |
| | | | | | 63.3 Sandstone, 1 in. thick. 684.2 | |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 65 | | | | | | |

DEP#:P388-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-40
PAGE 4 OF 4

| | Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth          **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. *(continued)* | |
| | | | | 67.1 | | 680.5 |
| | | | | 67.2 | Sandstone, 1 in. thick. | 680.4 |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 70 | | | | | | |
| | | | | 70.7 | | 676.8 |
| | | | | | 680 Sandstone. Sandstone, medium light gray (N6), competent, fine-grained. | |
| | | | | 72.7 | | 674.8 |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| 75 | | | | 75.0 | | 672.6 |
| | | | | 75.3 | Sandstone, 4 in. thick. | 672.3 |
| | | | | | Shale, medium gray (N5), with interbedded siltstone seams. | |
| | | | | 78.2 | | 669.3 |

Refusal at 10.6 feet.
Bottom of borehole at 78.2 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP #10-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-41
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 7/18/12   **COMPLETED** 7/18/12     **GROUND ELEVATION** 779.88 ft MSL   **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling

**GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger

**LOGGED BY** Jay Parker     **CHECKED BY** William Reid     **AT TIME OF DRILLING** ---

**AT END OF DRILLING** ---

**NOTES** 60% chance of thunderstorms.     **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (CL-ML) Silty Clay, reddish yellow (7/.5YR 6/8), some sand, medium stiff, damp, red mottling giving way to yellow mottling with depth. | |
| 5 | | | | | | |
| | | | | 6.0 | | 773.9 |
| | | | | | (CL-ML) Silty Clay with some Sand, light gray (10YR 7/1), dry stiff, with siltstone fragment (float) at 7.9 ft, brownish yellow, laminated. | |
| | | | | 8.0 | | 771.9 |
| | | | | | (CL-ML) Silty Clay, olive yellow (2.5Y 6/6), dry, stiff to very stiff, some siltstone fragments (float), zone of brown silty clay at 8 to 8.3 ft, some weak laminations. | |
| 10 | | | | 10.0 | | 769.9 |
| | | | | | (CL-ML) Silty Clay, light olive brown (2.5Y 5/4), damp, stiff to very stiff, fine laminated seams of siltstone at 11.8 and 12 ft. | |
| | | | | 12.0 | | 767.9 |
| | | | | | (CL-ML) Silty Clay with Weathered Shale, light yellow brown (2.5Y 6/4), very stiff, dry, trace bedding laminations in clay. | |
| | | | | 14.0 | | 765.9 |
| | | | | 14.5 | (CL-ML) Silty Clay, brownish yellow (10YR 6/8), grading to Weathered Shale at 14.5 ft. | 765.4 |
| 15 | | | | 15.3 | Cuyahoga Formation. Weathered Shale, light gray (N7), with laminations, dry, weak partings. | 764.6 |
| | | | | 15.4 | | 764.5 |
| | | | | 15.5 | Cuyahoga Formation (Competent). Sandstone, light brown (5YR 5/6), highly fractured. | 764.4 |
| | | | | 16.3 | | 763.6 |
| | | | | 16.7 | Shale. | 763.2 |
| | | | | 17.1 | Sandstone beds, 1 in. thick, 8 in. thick, with fine shale between beds. Fractured, iron oxide staining. | 762.8 |
| | | | | 17.6 | | 762.3 |
| | | | | 18.0 | Shale, pale yellowish brown (10YR 6/2) to gray. | 761.9 |
| | | | | | Sandstone, fine-grained? | |
| | | | | | Shale, pale yellowish brown (10YR 6/2) to gray, laminated. Interval not clear. | |
| | | | | | Sandstone, fractured. | |
| 20 | | | | | | |

B-222
(Continued Next Page)

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DE-PP4040-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-41
PAGE 2 OF 4

**Logo**  Fluor B&W

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

**Material descriptions (by depth):**

- 20.9 — Shale, light olive gray (5Y 6/1), finely bedded, with lenses of sandstone and siltstone throughout. *(continued)* — 759.0
- 21.3 — Sandstone, medium brown, fine-grained? — 758.6
- Shale, dark yellowish orange (10YR 6/6) grading to medium dark gray (N4), then dark yellowish orange (10YR 6/6).
- 23.3 — 756.6
- 23.8 — Sandstone, grayish orange pink (10R 8/2) to brown, fractured. — 756.1
- 24.6 — Shale, medium dark gray (N4). — 755.3
- 24.8 — Sandstone. — 755.1
- 25.1 — Shale, medium dark gray (N4), laminated. — 754.8
- 25.3 — Sandstone, 10R3/4. — 754.6
- Shale, medium light gray (N6), ==fractured,== cobble at 26.3 ft.
- 27.4 — 752.5
- Sandstone, with wavy bedding (turbidite like), bedding alternates between gray and brown. 2.1 ft thick?
- 29.5 — 750.4
- Shale, light olive gray (5Y 6/1).
- 30.8 — 749.1
- 30.9 — Sandstone, pale olive gray (10Y 6/2), 1 in. thick. — 749.0
- Shale, light olive gray (5Y 6/1).
- 32.9 — 747.0
- Sandstone, light olive gray (5Y 6/1), 1.5 in. thick.
- 34.0 — 745.9
- Shale, olive black (5Y 2/1) (fresh break), ==fractured in first 4== in.
- 40.1 — 739.8
- 40.8 — Sandstone, olive black (5Y 2/1). — 739.1
- Shale, medium dark gray (N4).
- 41.5 — 738.4
- 41.6 — Siltstone, 1 in. thick. — 738.3
- 42.0 — Shale, medium dark gray (N4). — 737.9
- 42.4 — 737.5
- 42.9 — Sandstone, light olive gray (5Y 6/1), fine-grained? — 737.0

*(Continued Next Page)*

DEPP 841-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-41

PAGE 3 OF 4

| | |
|---|---|
| Logo | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NUMBER** _____

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | 43.0 | Shale, medium dark gray (N4), with interbedded fine siltstones. *(continued)* | 736.9 |
| | | | | | Sandstone, 1 in. thick? | |
| 45 | | | | 45.0 | Shale, medium dark gray (N4), with interbedded fine siltstones. | 734.9 |
| | | | | 45.5 | Sandstone lenses, thickness unknown. | 734.4 |
| | | | | | Shale, dark gray (N3), with thin interbedded sandstones from 47 to 47.3 ft.  Bottom depth questionable. | |
| | | | | 48.3 | | 731.6 |
| | | | | 48.4 | Sandstone, thickness unknown. | 731.5 |
| | | | | | Shale, dark gray (N3), with interbedded sandstones. | |
| 50 | | | | 49.7 | | 730.2 |
| | | | | 50.0 | Sandstone, light olive gray (5Y 6/1). | 729.9 |
| | | | | | Shale, dark gray (N3), with interbedded sandstones. | |
| | | | | 51.3 | | 728.6 |
| | | | | 51.7 | Sandstone, light olive gray (5Y 6/1). | 728.2 |
| | | | | | Shale, dark gray (N3), with fine sandstone and siltstone seams throughout. | |
| | | | | 52.6 | | 727.3 |
| | | | | 52.7 | Sandstone, 1 in. thick. | 727.2 |
| | | | | 53.5 | Shale, dark gray (N3), with fine sandstone and siltstone seams throughout. | 726.4 |
| | | | | 53.8 | | 726.1 |
| 55 | | | | | Sandstone, 3 in. thick. | |
| | | | | 54.5 | Shale, dark gray (N3), with fine sandstone and siltstone seams throughout. | 725.4 |
| | | | | 54.6 | | 725.3 |
| | | | | 55.1 | | 724.8 |
| | | | | 55.2 | Sandstone, 1 in. thick. | 724.7 |
| | | | | | Shale, dark gray (N3), with fine sandstone and siltstone seams throughout. | |
| | | | | 56.3 | | 723.6 |
| | | | | 56.5 | Sandstone, 1 in. thick. | 723.4 |
| | | | | | Shale, dark gray (N3), with light olive gray (5Y 6/1) siltstone seams throughout. | |
| | | | | | Sandstone, cross-bedded. | |
| | | | | 58.5 | Shale, dark gray (N3), with light olive gray (5Y 6/1) siltstone seams throughout. | 721.4 |
| | | | | 58.8 | 720 Sandstone.  Sandstone with interbedded shale. | 721.1 |
| 60 | | | | | Shale, dark gray (N3), with light olive gray (5Y 6/1) siltstone seams throughout. | |
| | | | | 60.7 | | 719.2 |
| | | | | 60.8 | Sandstone, 1 in. thick. | 719.1 |
| | | | | 60.9 | Shale lens, 1 in. thick? | 719.0 |
| | | | | 61.3 | | 718.6 |
| | | | | 62.1 | Sandstone, light brownish gray (5YR 6/1).  Thickness questionable, 8 in. | 717.8 |
| | | | | 62.7 | Shale with interbedded sandstone lenses.  Sandstone cross-bedded at 61.9 ft? | 717.2 |
| | | | | 63.0 | | 716.9 |
| | | | | 63.4 | Sandstone, fractured. | 716.5 |
| | | | | 63.7 | Shale with interbedded sandstone lenses. | 716.2 |
| | | | | 64.0 | | 715.9 |
| | | | | | Sandstone, light brown (5YR 5/6). | |
| 65 | | | | | Shale with interbedded sandstone lenses. | |
| | | | | | Sandstone. | |
| | | | | | Shale with interbedded sandstone lenses. | |

*(Continued Next Page)*

B-221

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE/PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-41**
PAGE 4 OF 4

| Logo | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth  
**PROJECT NUMBER** _____

**PROJECT NAME**  OSDC Geotechnical Investigation  
**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | 65.9  Sandstone, 1 in. thick?  714.0 | |
| | | | | | 66.0  Shale with interbedded sandstone lenses.  713.9 | |
| | | | | | 67.5  Sandstone, 1 in. thick?  712.4 | |
| | | | | | 67.6  Shale with interbedded sandstone lenses.  712.3 | |
| | | | | | 68.8  Sandstone, 1 in. thick?  711.1 | |
| 70 | | | | | 68.9  Shale with interbedded sandstones and siltstones.  711.0 | |
| | | | | | 71.8  Sandstone, 1 in. thick.  708.1 | |
| | | | | | 71.9  Shale with interbedded sandstones and siltstones.  708.0 | |
| | | | | | 73.0  Sandstone, 1 in. thick.  706.9 | |
| | | | | | 73.1  Shale with interbedded sandstones and siltstones.  706.8 | |
| | | | | | 74.0  Sandstone, 1 in. thick.  705.9 | |
| 75 | | | | | 74.1  Shale with interbedded sandstones and siltstones.  705.8 | |
| | | | | | 76.0  703.9 | |

Refusal at 15.3 feet.
Bottom of borehole at 76.3 feet.

DEPP-213-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-45
PAGE 1 OF 4

| Logo | Fluor B&W |
|---|---|

**CLIENT** Fluor B&W Portsmouth  **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 8/21/12  **COMPLETED** 8/22/12  **GROUND ELEVATION** 692.13 ft MSL  **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling  **GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger  **AT TIME OF DRILLING** ---

**LOGGED BY** Jay Parker  **CHECKED BY** William Reid  **AT END OF DRILLING** ---

**NOTES** None.  **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | | WELL DIAGRAM |
|---|---|---|---|---|---|---|---|
| 0 | | | | | | | |
| | | | | | (CL-ML) Sandy Silty Clay, very pale brown (10YR 7/4), with some weathered sandstone, dry, medium stiff, iron oxide stained. | | |
| | | | | | 2.0 | 690.1 | |
| | | | | | (CL-ML) Silty Clay with some sand, very pale brown (10YR 7/4), dry, medium stiff, with weathered shale fragments. | | |
| 5 | | | | | | | |
| | | | | | 7.0 | 685.1 | |
| | | | | | Cuyahoga Formation.  Weathered Shale, pale brown (5YR 5/2), laminated bedding, dry, stiff to very stiff, with occasional sandstone seam.  Transitions to yellowish brown (10YR 3/8) with depth. | | |
| 10 | | | | | | | |
| | | | | | 11.5 | 680.6 | |
| | | | | | Cuyahoga Formation (Competent); 680 Sandstone. Sandstone, dark reddish brown (10R 3/4) to pale olive (10Y 6/2), iron oxide stained. | | |
| | | | | | 13.4 | 678.7 | |
| | | | | | Weathered Shale, laminated, fractured. | | |
| 15 | | | | | | | |
| | | | | | 15.4 | 676.7 | |
| | | | | | Sandstone. | | |
| | | | | | 15.9 | 676.2 | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams, laminated, fractured, iron oxide stained. | | |
| 20 | | | | | | | |

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP-PP844-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-45**

February 2014
PAGE 2 OF 4

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4), with interbedded siltstone seams, laminated, fractured, iron oxide stained. *(continued)*

22.0 / 670.1
22.1 / 670.0
Sandstone, 1 in. thick.

Shale, medium dark gray (N4), with interbedded siltstone seams, laminated, fractured, iron oxide stained.

24.8 / 667.3
25.0 / 667.2
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.

27.5 / 664.6
27.7 / 664.4
Sandstone, 2 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.

29.9 / 662.2
30.1 / 662.1
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.
31.1 / 661.0
31.3 / 660.9
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.

34.9 / 657.2
35.1 / 657.1
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.

37.1 / 655.0
37.3 / 654.9
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.

40.5 / 651.6
40.7 / 651.4
Sandstone, 2 in. thick.
Shale, medium dark gray (N4), with numerous interbedded siltstone seams.
41.9 / 650.2
42.1 / 650.1
Sandstone, 1.5 in. thick.
Shale, greenish gray (5GY 6/1), finely bedded.

*(Continued Next Page)*

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

**BORING NUMBER WD-SB-45**
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

CLIENT  Fluor B&W Portsmouth

PROJECT NAME  OSDC Geotechnical Investigation

PROJECT NUMBER

PROJECT LOCATION  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, greenish gray (5GY 6/1), finely bedded. *(continued)* | |
| 45 | | | | | | |
| | | | | | 48.9  ————  643.2 | |
| | | | | | 49.2  Sandstone, 3 in. thick.  642.9 | |
| 50 | | | | | Shale, greenish gray (5GY 6/1), finely bedded. | |
| | | | | | 50.5  ————  641.6 | |
| | | | | | Sunbury Shale.    Shale, grayish black (N2), common pyrite inclusions. | |
| 55 | | | | | | |
| 60 | | | | | | |
| 65 | | | | | | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DOE-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

| Logo | Fluor B&W |

**BORING NUMBER WD-SB-45**
PAGE 4 OF 4

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sunbury Shale.   Shale, grayish black (N2), common pyrite inclusions. *(continued)* | |
| | | | | 67.5 | | 624.6 |
| | | | | | Berea Sandstone.  Sandstone, medium light gray (N6), fine-grained, well-cemented, competent, contact an unconformity? | |
| 70 | | | | | | |
| | | | | 71.8 | | 620.3 |

Refusal at 11.5 feet.
Bottom of borehole at 71.8 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEPP-P147-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-47**
PAGE 1 OF 3

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth    **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**    **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 8/9/12    **COMPLETED** 8/9/12    **GROUND ELEVATION** 733.03 ft MSL    **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling    **GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger    **AT TIME OF DRILLING** ---

**LOGGED BY** Jay Parker    **CHECKED BY** William Reid    **AT END OF DRILLING** ---

**NOTES** 89 def F. Partly cloudy. Chance of thunderstorms. 88% humidity. Wind 6 mph.    **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | (ML) Clayey Silt, with weathered Sandstone at 0.5 ft. Sandstone is strong brown (7.5YR 5/8) | |
| | | | | 2.0 | | 731.0 |
| | | | | 2.9 | Cuyahoga Formation. Weathered Sandstone, reddish yellow (7.5YR 6/8). | 730.1 |
| | | | | | Weathered Shale, very pale yellowish brown (10YR 6/2), laminated, dry, hard to very stiff. | |
| | | | | 4.1 | | 728.9 |
| | | | | 4.3 | Cuyahoga Formation (Competent). Sandstone, moderate brown (5YR 4/4), 2 in. thick. | 728.7 |
| 5 | | | | 5.4 | Shale, dark yellowish orange (10YR 6/6) to light olive gray (5Y 6/1). | 727.6 |
| | | | | 5.5 | Sandstone. | 727.5 |
| | | | | | Shale, light olive gray (5Y 6/1), iron oxide staining, fractured. | |
| 10 | | | | 10.4 | | 722.6 |
| | | | | 10.5 | Weathered Sandstone. | 722.5 |
| | | | | | Shale, light olive gray (5Y 6/1), with interbedded sandstone and siltstone seams, iron oxide staining. | |
| | | | | 11.9 | | 721.1 |
| | | | | 12.2 | Sandstone, red, fractured, turbidite-like. | 720.8 |
| | | | | | Shale, medium light gray (N6), with some red sandstone and siltstone interbeds, ==highly fractured,== iron oxide staining. | |
| 15 | | | | | | |
| 20 | | | | | | |

B-242
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DOE-PPPO-02-2346&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-47**

February 2014
PAGE 2 OF 3

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth                    **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____    **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium light gray (N6), with some red sandstone and siltstone interbeds, highly fractured, iron oxide staining. *(continued)*

22.7 — 710.3
22.8 — 710.2
Sandstone, 1 in. thick.
Shale, medium light gray (N6), with sandstone and siltstone interbeds.

24.3 — 708.7
24.4 — 708.6
Sandstone, 1 in. thick.
Shale, medium dark gray (N4), ==fractured,== iron oxide staining.

29.5 — 703.5
29.7 — 703.4
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with very fine interbedded siltstone seams, ==fractured,== iron oxide staining.

41.2 — 691.8
41.4 — 691.7
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with very fine interbedded siltstone seams, ==fractured, ir==on oxide staining.

B-243
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-47
PAGE 3 OF 3

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining. *(continued)*

45

44.7 — 688.3
44.8 — 688.2
Sandstone, 1 in. thick.

Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining.

46.4 — 686.6
46.5 — 686.5
Sandstone, 1 in. thick.

Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining.

50

51.5 — 681.5
51.7 — 681.3
Sandstone, light gray (N7), 2 in. thick.

Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining.

55

54.9 — 678.1
680 Sandstone.  Sandstone, medium light gray (N6), fractured, iron oxide staining.

56.6 — 676.4
Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining.

58.9 — 674.2
59.1 — 673.9
Sandstone, 3 in. thick.

Shale, medium dark gray (N4), with very fine interbedded siltstone seams, fractured, iron oxide staining.

60

62.5 — 670.5

Refusal at 4.1 feet.
Bottom of borehole at 62.5 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-48**
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 7/23/12    **COMPLETED** 8/23/12     **GROUND ELEVATION** 759.6 ft MSL    **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling     **GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger     **AT TIME OF DRILLING** ---

**LOGGED BY** Jay Parker    **CHECKED BY** William Reid     **AT END OF DRILLING** ---

**NOTES** 80 deg F. Partly cloudy to overcast. 68% humidity. Wind WSW @mph. **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | (CL-ML) Silty Clay, reddish yellow (5YR 7/6), medium stiff, dry, grading to very pale brown (10YR 7/4) at 2.5 ft, to decomposed shale. | |
| | | | | 4.0 | | 755.6 |
| 5 | | | | | Cuyahoga Formation. Weathered Shale, grayish orange (10YR 7/4), laminated, firm to medium dense. | |
| 10 | | | | | | |
| 15 | | | | | | |
| 20 | | | | 19.5 | | 740.1 |

B-245
*(Continued Next Page)*

DEPP 8911-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-48

PAGE 2 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

**Material Description:**

- 20.8 — Cuyahoga Formation (Competent). Weathered Shale, grayish orange (10YR 7/4), mottled with reddish brown iron oxide staining. *(continued)* — 738.8
- Shale, light olive gray (5Y 6/1), with interbedded sandstone and siltstone seams, iron oxide staining.
- 24.1 / 24.2 — Sandstone, 1 in. thick, iron oxide staining. — 735.5 / 735.4
- 24.8 / 24.9 — Shale, light olive gray (5Y 6/1), with interbedded sandstone and siltstone seams, iron oxide staining. — 734.8 / 734.7
- Sandstone? 1 in. thick? iron oxide staining.
- 26.1 — Shale, dark yellowish orange (10YR 6/6). — 733.5
- 26.3 — Sandstone, 2 in. thick, pale reddish brown (10R 5/4), fractured, swirled bedding. — 733.3
- Shale, dark yellowish orange (10YR 6/6), with interbedded fine sandstone seams.
- 28.1 / 28.3 — Sandstone, 2 in. thick. — 731.5 / 731.3
- Shale with interbedded fine sandstone seams.
- 29.9 — 729.7
- 30.8 — 720 Sandstone. Sandstone. — 728.8
- Shale with interbedded fine sandstone and siltstone seams, fractured.
- 33.5 / 33.6 — Sandstone, fractured (vugs). — 726.1 / 726.0
- 34.0 / 34.2 — Shale with interbedded fine sandstone and siltstone seams. — 725.6 / 725.4
- Sandstone, highly fractured.
- Shale, medium dark gray (N4), fractured.
- 36.2 / 36.3 — Sandstone, 1 in. thick? — 723.4 / 723.3
- Shale, medium dark gray (N4), fractured.
- 37.2 / 37.3 — Sandstone, 1 in. thick? — 722.4 / 722.3
- Shale, medium dark gray (N4), fractured.
- 39.5 / 39.6 — Sandstone? 1 in. thick? — 720.1 / 720.0
- Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DET-PI-8520-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-48
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth  **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures. *(continued)*

45

46.5 — 713.1
46.7 — 713.0
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

48.5 — 711.1
48.6 — 711.0
Sandstone, 1 in. thick.
49.1 — 710.5
49.3 — 710.3
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

50
50.2 — 709.4
50.3 — 709.3
Sandstone, 2 in. thick.
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.
Sandstone, 1 in. thick.
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

53.7 — 705.9
53.8 — 705.8
Siltstone, 1 in. thick.
54.7 — 704.9
54.9 — 704.7
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.
Sandstone, 2 in. thick.

55
55.7 — 703.9
55.8 — 703.8
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.
Sandstone, 1 in. thick.
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

58.0 — 701.6
58.1 — 701.5
Siltstone, 1 in. thick.
Shale, medium dark gray (N4), with minor siltstone seams, occasional fractures.

60

61.1 — 698.5
61.3 — 698.3
Sandstone, 2 in. thick.
Shale, medium dark gray (N4), with numerous siltstone seams.

63.8 — 695.8
64.0 — 695.7
Sandstone, 1.5 in. thick.
Shale, medium dark gray (N4), with numerous siltstone seams.

65

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DE-PP0048-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-48
PAGE 4 OF 4

**Logo**  Fluor B&W

**CLIENT**  Fluor B&W Portsmouth  
**PROJECT NAME**  OSDC Geotechnical Investigation  
**PROJECT NUMBER**  _____  
**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, medium dark gray (N4), with numerous siltstone seams. *(continued)* | |
| 70 | | | | 69.2 / 69.4 | Sandstone, 1.5 in. thick. | 690.4 / 690.3 |
| | | | | | Shale, medium dark gray (N4), with numerous siltstone seams. | |
| 75 | | | | 75.3 / 75.4 | Sandstone, 1 in. thick. | 684.3 / 684.2 |
| | | | | 76.2 / 76.4 | Shale, medium dark gray (N4), with numerous siltstone seams. | 683.4 / 683.3 |
| | | | | | Sandstone, 1.5 in. thick. | |
| | | | | | Shale, medium dark gray (N4), with numerous siltstone seams. | |
| 80 | | | | 79.8 | 680 Sandstone. Sandstone, fractured, secondary mineralization noted in fractures, iron oxide staining pervasive. | 679.8 |
| | | | | 81.7 | Shale, medium dark gray (N4), with numerous siltstone seams. | 677.9 |
| 85 | | | | 83.8 / 84.0 | Sandstone, 3 in. thick. | 675.8 / 675.6 |
| | | | | | Shale, medium dark gray (N4), with numerous siltstone seams. | |
| | | | | 87.1 | | 672.5 |

Refusal at 19.5 feet.
Bottom of borehole at 87.1 feet.

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
February 2014

**BORING NUMBER WD-SB-50**
PAGE 1 OF 2

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 8/15/12    **COMPLETED** 8/15/12     **GROUND ELEVATION** 694.82 ft MSL    **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling     **GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger     **AT TIME OF DRILLING** ---

**LOGGED BY** William Reid    **CHECKED BY** Allison Lake     **AT END OF DRILLING** ---

**NOTES** 75 deg F. Cloudy, light rain.     **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | | WELL DIAGRAM |
|---|---|---|---|---|---|---|---|
| 0 | | | | 0.3 | Topsoil, 3 in. | 694.6 | |
| | | | | 1.5 | (ML) Silt with Sand, Rock, and Clay, light yellowish brown (10YR 6/6), grading to Clay, very pale brown (10YR 7/4) with depth. | 693.3 | |
| | | | | 3.0 | (CL-ML) Silt and Clay, light gray (10YR 7/1) and yellowish brown (10YR 5/4) mottled, some sand. | 691.8 | |
| | | | | 4.0 | (CL) Clay with some Silt, light gray (10YR 7/1). Grading to Weathered Shale, gray, at 3.8 ft. | 690.8 | |
| 5 | | | | 6.0 | Weathered Shale, pale yellowish brown (10YR 6/2), dry, crumbly, iron oxide staining near bottom of core, shale not very fissile. | 688.8 | |
| | | | | 7.0 | Cuyahoga Formation. Weathered Shale, pale yellowish brown (10YR 6/2). | 687.8 | |
| | | | | 7.8 | Cuyahoga Formation (Competent); 680 Sandstone. Sandstone, moderate brown (5YR 4/4), fractured, wash-out from 7.8-9 feet. | 687.0 | |
| | | | | 9.0 | Wash Out Zone. Balance of 680 Sandstone? | 685.8 | |
| 10 | | | | 10.8 | Weathered Shale, dark yellowish orange (10YR 6/6). | 684.1 | |
| | | | | 11.0 | Sandstone, moderate brown (5YR 4/4), hard. | 683.8 | |
| | | | | | Weathered Shale, dark yellowish orange (10YR 6/6) grading to medium dark gray (N4) at 12.1 ft. Iron oxide staining, fractured. | | |
| 15 | | | | | | | |
| 20 | | | | 19.6 | | 675.2 | |
| | | | | 19.8 | Siltstone. | 675.1 | |

B-250
(Continued Next Page)

FBP-DPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014
PAGE 2 OF 2

| Logo | Fluor B&W | **BORING NUMBER WD-SB-50** |

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**                        **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4). *(continued)*

21.5 — 673.3
21.7 — 673.2 Sandstone, moderate brown, thickness unknown.
Shale, medium dark gray (N4), fractured.

24.3 — 670.5
24.5 — 670.3 Siltstone, 2 in. thick, dark yellowish brown (10YR 4/2).
Shale, medium dark gray (N4).

25.4 — 669.4
25.6 — 669.2 Siltstone.
Shale, medium dark gray (N4), fractured.

27.2 — 667.6
27.3 — 667.5 Siltstone, 1 in. thick.
Shale, medium light gray (N6) and medium dark gray (N4), laminated, fractured.

28.8 — 666.0
Siltstone.

30 — 30.0 — 664.8

Refusal at 7.0 feet.
Bottom of borehole at 30.0 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-53
PAGE 1 OF 4

**Logo**  Fluor B&W

| | |
|---|---|
| **CLIENT**  Fluor B&W Portsmouth | **PROJECT NAME**  OSDC Geotechnical Investigation |
| **PROJECT NUMBER** _____ | **PROJECT LOCATION**  Remediation Area IV-B |
| **DATE STARTED**  8/23/12    **COMPLETED**  8/23/12 | **GROUND ELEVATION**  706.31 ft MSL   **HOLE SIZE**  4.25 in. |
| **DRILLING CONTRACTOR**  M&W Drilling | **GROUND WATER LEVELS:** |
| **DRILLING METHOD**  Split Spoon/Auger | |
| **LOGGED BY**  William Reid    **CHECKED BY**  Allison Lake | **AT TIME OF DRILLING**  --- |
| | **AT END OF DRILLING**  --- |
| **NOTES**  64 deg F, expected 90.  Partly cloudy. | **AFTER DRILLING**  --- |

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | Fill.  Gravel.  Rock stuck in tube. | |
| | | | | | 2.0 ____ Fill?  Clay, very pale brown (10YR 7/3), with some silt. | 704.3 |
| | | | | | 3.0 ____ (CL-ML) Silt and Clay, yellowish brown (10YR 6/6), moist, some gravel, dry. | 703.3 |
| 5 | | | | | 4.3 ____ (GW) Gallia Sand?  Sandstone gravel (cobbles), yellowish red (5YR 4/6). | 702.0 |
| | | | | | 6.0 ____ No Recovery. | 700.3 |
| | | | | | 8.0 ____ Cuyahoga Formation (Competent).  Weathered Shale, light gray (N7), soft, some iron oxide staining, fractured. | 698.3 |
| 10 | | | | | | |
| | | | | | 12.2 ____ 12.3 Siltstone, moderate yellowish brown (10YR 5/4), 1 in. thick. | 694.2  694.1 |
| 15 | | | | | Weathered Shale, medium gray (N5) to medium dark gray (N4) with depth, fractured, soft. | |
| | | | | | 15.4 ____ 15.5 Siltstone, moderate yellowish brown (10YR 5/4), 1 in. thick, fractured. | 691.0  690.9 |
| | | | | | Shale, medium dark gray (N4), with a few fine siltstone seams, fractured. | |
| 20 | | | | | | |

B-255

*(Continued Next Page)*

DEP-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-53
PAGE 2 OF 4

| | |
|---|---|
| **Logo** Fluor B&W | |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**  _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | Shale, medium dark gray (N4), with a few fine siltstone seams, fractured. *(continued)* | |
| | | | | 22.5 | | 683.8 |
| | | | | 22.7 | Siltstone, medium light gray (N6), 1.5 in. thick. | 683.7 |
| | | | | | Shale, medium dark gray (N4), soft. | |
| 25 | | | | | | |
| | | | | 26.3 | | 680.1 |
| | | | | | 680 Sandstone.  Sandstone, medium light gray (N6). | |
| | | | | 28.1 | | 678.3 |
| | | | | | Shale, medium dark gray (N4). | |
| 30 | | | | 30.0 | | 676.3 |
| | | | | 30.4 | Sandstone, medium light gray (N6), hard. | 675.9 |
| | | | | | Shale, medium dark gray (N4). | |
| | | | | 33.4 | | 673.0 |
| | | | | 33.5 | Siltstone, olive gray (5Y 4/1), 1.5 in. thick. | 672.8 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| | | | | 34.5 | | 671.8 |
| 35 | | | | 34.7 | Siltstone, olive gray (5Y 4/1), 2 in. thick. | 671.6 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| | | | | 37.2 | | 669.1 |
| | | | | 37.3 | Siltstone, medium dark gray (N4)? 1 in. thick. | 669.0 |
| | | | | | Shale, medium dark gray (N4), with interbedded fine siltstones, fractured. | |
| 40 | | | | | | |
| | | | | 41.4 | | 665.0 |
| | | | | 41.6 | Siltstone, olive gray (5Y 4/1). | 664.7 |
| | | | | | Shale, medium dark gray (N4), fractured. | |

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEPP-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-53
February 2014
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth  **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____  **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4), fractured. *(continued)*

662.4
44.0 Siltstone, olive gray (5Y 4/1). 662.2
44.1
44.6 Shale, medium dark gray (N4), fractured. 661.7
44.8 Siltstone, olive gray (5Y 4/1). 661.5

45

Shale, medium dark gray (N4), with interbedded fine siltstones, fractured.

50

51.9 654.4
52.2 Siltstone, olive gray (5Y 4/1). 654.2

Shale, medium dark gray (N4), fractured.

54.4 652.0
54.6 Siltstone, olive gray (5Y 4/1). 651.8

55

Shale, medium dark gray (N4), fractured.

56.5 649.8
56.7 Siltstone, olive gray (5Y 4/1). 649.7

Shale, medium dark gray (N4), fractured.

59.8 646.6
59.9 Siltstone, olive gray (5Y 4/1). 646.5

60

Shale, medium dark gray (N4), fractured.

60.9 645.4
61.0 Siltstone, olive gray (5Y 4/1). 645.3

Shale, medium dark gray (N4), with interbedded siltstone, fractured. Log indicates 68.4.

63.4 642.9
63.9 Siltstone, olive gray (5Y 4/1), with solution voids filled with shale fragments and lithified mud. Log indicates 68.9. 642.4

Shale, medium dark gray (N4).

65.0 641.4
65.0 Siltstone, olive gray (5Y 4/1). 641.3

Sunbury Shale, shale, black (N1), fresh.

*(Continued Next Page)*

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

## BORING NUMBER WD-SB-53

**Logo**  Fluor B&W

February 2014
PAGE 4 OF 4

| CLIENT | Fluor B&W Portsmouth | PROJECT NAME | OSDC Geotechnical Investigation |
|---|---|---|---|

| PROJECT NUMBER | | PROJECT LOCATION | Remediation Area IV-B |
|---|---|---|---|

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | 66.0 | | 640.3 |

Refusal at 8.0 feet.
Bottom of borehole at 66.0 feet.

FBP-ER-RIFS-WD-RPT-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-54**

PAGE 1 OF 2

| | |
|---|---|
| Logo    Fluor B&W | |

**CLIENT** Fluor B&W Portsmouth
**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**
**PROJECT LOCATION** Remediation Area IV-B

**DATE STARTED** 8/22/12   **COMPLETED** 8/22/12
**GROUND ELEVATION** 710.77 ft MSL   **HOLE SIZE** 4.25 in.

**DRILLING CONTRACTOR** M&W Drilling
**GROUND WATER LEVELS:**

**DRILLING METHOD** Split Spoon/Auger
**AT TIME OF DRILLING** ---

**LOGGED BY** William Reid   **CHECKED BY** Allison Lake
**AT END OF DRILLING** ---

**NOTES** 72 deg F. Partly cloudy.
**AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | 0.5 | Topsoil, very pale brown (10YR 7/3). 710.3 | |
| | | | | 2.0 | (SW-SM) Sand, silt, and gravel with small rock fragments, yellowish brown (10YR 5/6). 708.8 | |
| | | | | 2.5 | (SW-SM) Sand and silt, very pale brown (10YR 7/3), some gravel. 708.3 | |
| | | | | | (CL-ML) Silt and clay, yellowish brown (10YR 6/6), dry, some gravel, trace sand. Moisture content increases with depth. | |
| 5 | | | | 5.0 | (CL) Clay, light yellowish brown (10YR 6/6), some silt, weathered shale in bottom of spoon. 705.8 | |
| | | | | 6.0 | | 704.8 |
| | | | | | (CL-ML) Silt and Clay, some gravel, then weathered moderate yellowish brown (10YR 5/4) and medium bluish gray (5B 5/1) mottled shale. | |
| | | | | 8.0 | | 702.8 |
| | | | | 9.0 | Cuyahoga Formation. Weathered Shale, moderate yellowish brown (10YR 5/4), soft. 701.8 | |
| 10 | | | | | Cuyahoga Formation (Competent). Weathered Shale, moderate yellowish brown (10YR 5/4), soft, fractured. | |
| 15 | | | | 15.8 | Weathered Shale, medium gray (N5), soft, fractured. 695.0 | |
| | | | | 17.2 | | 693.6 |
| | | | | 17.4 | Siltstone, mix of moderate brown (5YR 4/4) and medium gray (N5), layered. 693.4 | |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| | | | | 19.7 | | 691.1 |
| 20 | | | | 19.8 | | 691.0 |

B-259

*(Continued Next Page)*

DE-PP-0001-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-54
PAGE 2 OF 2

| | | Fluor B&W | |
|---|---|---|---|
| **Logo** | | | |

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | | |
| | | | | 20.5 | Sandstone, moderate brown (5YR 4/4). | 690.3 |
| | | | | 20.8 | Shale, medium dark gray (N4), fractured. *(continued)* | 690.0 |
| | | | | | Sandstone, medium gray (N5). | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams, fractured. | |
| 25 | | | | | | |
| | | | | 27.5 | | 683.3 |
| | | | | 27.6 | Sandstone, laminated bedding. | 683.2 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| 30 | | | | | | |
| | | | | 31.5 | 680 Sandstone.  Sandstone, light olive gray (5Y 6/1). Fracture at 31 to 31.5 ft, infilled with completely weathered shale. | 679.3 |
| | | | | 32.9 | | 677.9 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| 35 | | | | 34.8 | | 676.0 |
| | | | | 35.2 | Sandstone, light olive gray (5Y 6/1). | 675.6 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams, fractured. | |
| 40 | | | | 40.0 | | 670.8 |

Refusal at 9.0 feet.
Bottom of borehole at 40.0 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEPP 862-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

**BORING NUMBER WD-SB-55**
PAGE 1 OF 2

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  7/31/12    **COMPLETED**  8/1/12          **GROUND ELEVATION**  675.58 ft MSL    **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling          **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger          **AT TIME OF DRILLING**  ---

**LOGGED BY**  Jay Parker    **CHECKED BY**  William Reid          **AT END OF DRILLING**  ---

**NOTES**  89 deg F.  42% humidity.  Wind S @3mph.          **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (ML) Sandy Silt, reddish yellow (7.5YR 6/6), dry, firm to stiff, mottled with red clay. | |
| | | | | 2.0 | | 673.6 |
| | | | | | (CL-ML) Silty Clay, reddish yellow (7.5YR 6/6), with red mottled areas, dry, stiff, trace sand, sandstone gravel fragments. | |
| | | | | 4.0 | | 671.6 |
| 5 | | | | | (CL-ML) Silty Clay, strong brown (7.5YR 6/8), mottled with light gray (7.5YR 7/1), dry, stiff, some sandstone gravel fragments. | |
| | | | | 6.0 | | 669.6 |
| | | | | | Cuyahoga Formation.  Weathered Shale, grayish orange (10YR 7/4), laminated, iron oxide staining. | |
| | | | | 7.9 | | 667.7 |
| | | | | 8.0 | Sandstone. | 667.6 |
| | | | | | Weathered Shale, grayish orange (10YR 7/4), laminated, iron oxide staining. | |
| 10 | | | | | | |
| | | | | 12.8 | | 662.8 |
| | | | | | Cuyahoga Formation (Competent).  Weathered Shale, grayish orange, heavily ==fractured.== | |
| 15 | | | | | | |
| | | | | 16.2 | | 659.4 |
| | | | | 16.3 | Sandstone, 1 in. thick. | 659.3 |
| | | | | | Shale, medium gray (N5), interbedded sandstones and siltstones throughout, ==fractured.== | |
| 20 | | | | | | |

DEP-PP868-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

| Logo | Fluor B&W | **BORING NUMBER WD-SB-55** |
| --- | --- | --- |
| | | PAGE 2 OF 2 |

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
| --- | --- | --- | --- | --- | --- | --- |
| 20 | | | | | Shale, medium gray (N5), interbedded sandstones and siltstones throughout, fractured. *(continued)* | |
| | | | | 23.1 | | 652.5 |
| 25 | | | | | Sunbury Shale.  Shale, medium dark gray (N4), no fractures, grading to very black shale. | |
| 30 | | | | 30.0 | | 645.6 |

Refusal at 12.8 feet.
Bottom of borehole at 30.6 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT  OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP #2-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-57
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth  
**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**  _____  
**PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  8/13/12   **COMPLETED**  8/14/12  
**GROUND ELEVATION**  710.57 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling  
**GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger  
**AT TIME OF DRILLING**  ---

**LOGGED BY**  William Reid   **CHECKED BY**  Allison Lake  
**AT END OF DRILLING**  ---

**NOTES**  80 deg F. Partly cloudy.  
**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (ML) Silt, yellowish brown (10YR 5/8) with pale brown (10YR 6/3) mottling beginning at 16 in., trace sand, crumbly. | |
| | | | | 2.0 | | 708.6 |
| | | | | | (CL-ML) Silt and Clay, yellowish brown (10YR 5/8) with some pale brown mottling, crumbly, slightly plastic, moist. | |
| 5 | | | | | | |
| | | | | 6.0 | | 704.6 |
| | | | | | (CL) Clay with some silt and rock fragments, yellowish brown (10YR 5/6), iron oxide staining along entire core. | |
| | | | | 8.0 | | 702.6 |
| | | | | | (CL-ML) Silt, Clay, and Gravel, brownish yellow (10YR 6/6), with some sandstone fragments, some iron oxide staining, slightly plastic, increasing with depth. | |
| 10 | | | | 10.0 | | 700.6 |
| | | | | | Clay and Gravel with some silt and sand, light yellowish brown (10YR 6/4) with brownish yellow (10YR 6/6) mottling, becoming brownish yellow (10YR 6/6) at 11 ft. Some gray mottling at 11.5 ft. Iron oxide staining on gravel. | |
| | | | | 12.0 | | 698.6 |
| | | | | | Cuyahoga Formation. Weathered Shale, brownish yellow (10YR 6/6) grading to dark yellowish brown (10YR 4/2), dry. light brownish gray (5YR 6/1) clay last 3 in. | |
| | | | | 14.7 | | 695.9 |
| 15 | | | | | Cuyahoga Formation (Competent). Weathered Shale, moderate yellowish brown (10YR 5/4), fissile. | |
| | | | | 19.6 | | 691.0 |
| 20 | | | | 19.7 | Sandstone, dark yellowish orange (10YR 6/6). | 690.9 |

*(Continued Next Page)*

FBP WD RIFS D3 R5 MASTER/02/05/2014

DEPP 305-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-57
February 2014
PAGE 2 OF 4

| | | |
|---|---|---|
| **Logo** | Fluor B&W | |

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | Weathered Shale, moderate yellowish brown (10YR 5/4) grading to medium gray (N5) at 21 ft, fractured. *(continued)* | |
| | | | | 23.1 | | 687.5 |
| | | | | 23.2 | Sandstone, medium gray (N5), 1 in. thick. | 687.4 |
| 25 | | | | | Weathered Shale, medium gray (N5), soft, grading to moderate yellowish brown (10YR 5/4) shale at 26.7 ft, fractured. | |
| | | | | 27.4 | | 683.2 |
| | | | | | 680 Sandstone. Sandstone, moderate brown (5YR 4/4) grading to medium light gray (N6). | |
| 30 | | | | 29.4 | | 681.2 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| | | | | 31.4 | | 679.2 |
| | | | | 31.8 | Sandstone, medium gray (N5). | 678.8 |
| | | | | | Shale, medium dark gray (N4), fractured. | |
| 35 | | | | | | |
| | | | | 35.9 | | 674.7 |
| | | | | 36.1 | Sandstone or Siltstone, 2 in. thick? | 674.5 |
| | | | | | Shale, medium dark gray (N4), medium hard, fractured. | |
| 40 | | | | | | |
| | | | | 40.6 | | 670.0 |
| | | | | 40.7 | Sandstone, brownish gray (5YR 4/1). | 669.9 |
| | | | | | Shale, medium dark gray (N4). | |
| | | | | 42.5 | | 668.1 |
| | | | | 42.7 | Sandstone? | 667.9 |

B-267

(Continued Next Page)

DEP-PB0-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-57**
February 2014
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Shale, medium dark gray (N4). *(continued)*

45

45.5 — 665.1
45.6 — Siltstone, 1 in. thick. — 665.0
45.8 — Shale, medium dark gray (N4). — 664.8
45.9 — Siltstone, brownish gray (5YR 4/1), 1 in. thick. — 664.7
Shale, medium dark gray (N4), with interbedded siltstone seams.

50

50.0 — 660.6
50.3 — Siltstone, brownish gray (5YR 4/1). — 660.3
Shale, medium dark gray (N4), medium hard, fractured.

52.5 — 658.1
52.7 — Siltstone, brownish gray (5YR 4/1). — 657.9
Shale, medium dark gray (N4).

55

55.1 — 655.5
55.2 — Siltstone, brownish gray (5YR 4/1). — 655.4
Shale, medium dark gray (N4).

56.9 — 653.7
57.1 — Siltstone, brownish gray (5YR 4/1). — 653.5
Shale, medium dark gray (N4), with interbedded siltstone seams, hard.

60

63.7 — 646.9
63.9 — Siltstone, brownish gray (5YR 4/1). — 646.7
Shale, medium bluish gray (5B 5/1).

65

65.1 — 645.5
Sunbury Shale. Shale, medium black.

B-268

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

| Logo | Fluor B&W |
|------|-----------|

**BORING NUMBER WD-SB-57**

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sunbury Shale.  Shale, medium black. *(continued)* | |
| | | | | 68.0 | 642.6 | |

Refusal at 14.7 feet.
Bottom of borehole at 68.0 feet.

| | | | | | | | |
|---|---|---|---|---|---|---|---|

**Logo** Fluor B&W

**BORING NUMBER WD-SB-58**
PAGE 1 OF 2

**CLIENT**  Fluor B&W Portsmouth   **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**   **PROJECT LOCATION**  Remediation Area IV-B

**DATE STARTED**  8/9/12   **COMPLETED**  8/13/12   **GROUND ELEVATION**  685.77 ft MSL   **HOLE SIZE**  4.25 in.

**DRILLING CONTRACTOR**  M&W Drilling   **GROUND WATER LEVELS:**

**DRILLING METHOD**  Split Spoon/Auger   **AT TIME OF DRILLING**  ---

**LOGGED BY**  William Reid   **CHECKED BY**  Allison Lake   **AT END OF DRILLING**  ---

**NOTES**  Partly cloudy.   **AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (ML) Silt, some clay and rock fragments, light gray (10YR 7/1) , iron oxide staining. | |
| | | | | | 2.0  (CL-ML) Silt, clay, and rock fragments, light gray (10YR 7/1), trace sand, iron oxide staining.  Weathered gray shale in bottom of spoon. — 683.8 | |
| | | | | | 4.0  Cuyahoga Formation.  Weathered Shale, gray to light gray (N7) with depth, fissile, iron oxide staining. — 681.8 | |
| 5 | | | | | | |
| | | | | | 7.0  Cuyahoga Formation (Competent).  Weathered Shale, light brown (5YR 5/6) grading to pale yellowish brown (10YR 6/2) (8.4 ft) to medium light gray (N6) (13 ft), soft in places, occasional fractures, iron oxide staining on fractures. — 678.8 | |
| 10 | | | | | | |
| | | | | | 13.7  Sandstone, light brown (5YR 5/6) and gray?, laminated. — 672.1 / 672.0 | |
| 15 | | | | | 13.8  14.5  Shale, medium gray (N5), with interbedded siltstone and sandstone seams, fractured. — 671.3 | |
| | | | | | 15.6  Sandstone or Siltstone, olive gray (5Y 4/1). — 670.2 | |
| | | | | | Shale, medium gray (N5), fractured. | |
| | | | | | 17.2  17.3  Sandstone, brownish gray (5YR 4/1). — 668.6 / 668.5 | |
| | | | | | 18.3  18.4  Shale, medium gray (N5), laminated. — 667.5 / 667.4 | |
| | | | | | Sandstones or Siltstone, brownish gray (5YR 4/1). | |
| | | | | | Shale, medium gray (N5). | |
| 20 | | | | | | |

B-270
*(Continued Next Page)*

DEP-PP369-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-58
PAGE 2 OF 2

| Logo | Fluor B&W |

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | Shale, medium gray (N5). *(continued)* | |
| | | | | | | |
| | | | | 21.7 | | 664.1 |
| | | | | 21.8 | Sandstone or Siltstone, brownish gray (5YR 4/1). | 664.0 |
| | | | | | Shale, medium gray (N5), medium hard. | |
| 25 | | | | 24.1 | | 661.7 |
| | | | | 24.3 | Sandstone, brownish gray (5YR 4/1), hard. | 661.5 |
| | | | | | Shale, gray to medium light gray (N6), fractured. | |
| | | | | 28.6 | | 657.2 |
| | | | | 28.8 | Sandstone, brownish gray (5YR 4/1). | 657.0 |
| 30 | | | | | Shale, medium dark gray (N4), medium hard, fractured. | |
| | | | | 30.1 | | 655.7 |

Refusal at 7.0 feet.
Bottom of borehole at 31.1 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEF-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-63
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth

**PROJECT NUMBER**

**DATE STARTED** 8/6/12    **COMPLETED** 8/9/12

**DRILLING CONTRACTOR** M&W Drilling

**DRILLING METHOD** Split Spoon/Auger

**LOGGED BY** Jay Parker    **CHECKED BY** William Reid

**NOTES** None.

**PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT LOCATION** Remediation Area IV-B

**GROUND ELEVATION** 738.67 ft MSL   **HOLE SIZE** 4.25 in.

**GROUND WATER LEVELS:**

   **AT TIME OF DRILLING** ---

   **AT END OF DRILLING** ---

   **AFTER DRILLING** ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | Cuyahoga Formation. Weathered Shale, reddish yellow (5YR 6/6) to light yellowish brown (2.5Y 6/3) (2 ft), laminated, dry, medium dense. | |
| | | | | | 3.3   735.4 | |
| | | | | | 3.4   Sandstone, strong brown (7.5YR 5/8), 1 in. thick.   735.3 | |
| 5 | | | | | Weathered Shale, light yellowish brown (2.5Y 6/3) to light gray (N7) (6ft), laminated, dry, hard. | |
| | | | | | 6.6   732.1 | |
| | | | | | 6.7   Sandstone, 1 in. thick.   732.0 | |
| | | | | | Weathered Shale, light gray (N7), laminated, dry, hard. | |
| | | | | | 7.8   730.9 | |
| | | | | | 7.9   Sandstone, 1 in. thick.   730.8 | |
| 10 | | | | | Weathered Shale, light gray (N7), laminated, dry, hard. | |
| | | | | | 11.9   726.8 | |
| | | | | | 12.0   Sandstone, 1 in. thick.   726.7 | |
| | | | | | Weathered Shale, light gray (N7) to pale yellow (14 ft), laminated, dry, hard. | |
| 15 | | | | | | |
| | | | | | 16.8   721.9 | |
| | | | | | 17.5   Cuyahoga Formation (Competent). Weathered Shale, dark yellowish brown (10YR 4/2), fractured, iron oxide staining.   721.2 | |
| | | | | | 17.6   721.1 | |
| | | | | | 18.5   Sandstone, 1 in. thick.   720.2 | |
| | | | | | 18.6   Weathered Shale, dark yellowish brown (10YR 4/2), iron oxide staining, fractured.   720.1 | |
| | | | | | 19.4   Sandstone, 1 in. thick.   719.3 | |
| 20 | | | | | 19.5   Weathered Shale, dark yellowish brown (10YR 4/2), iron   719.2 | |

*(Continued Next Page)*

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

B-278

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-PP-0701-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

# BORING NUMBER WD-SB-63
PAGE 2 OF 4

**Logo**  Fluor B&W

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER**

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 20 | | | | | oxide staining, fractured. | |
| | | | | | Sandstone, 1 in. thick. | |
| | | | | | Weathered Shale, dark yellowish brown (10YR 4/2), with interbedded sandstone seams, iron oxide staining, fractured. *(continued)* | |
| 25 | | | | 25.0 | | 713.7 |
| | | | | 25.1 | Sandstone, 1 in. thick. | 713.6 |
| | | | | | Weathered Shale, dark yellowish brown (10YR 4/2), with interbedded sandstone and siltstone seams, iron oxide staining, fractured. | |
| 30 | | | | 30.4 | | 708.3 |
| | | | | 30.5 | Sandstone, 1 in. thick. | 708.2 |
| | | | | | Weathered Shale, dark yellowish brown (10YR 4/2), with interbedded sandstone and siltstone seams, iron oxide staining, fractured. | |
| | | | | 32.7 | | 706.0 |
| | | | | 32.8 | Sandstone, 1 in. thick. | 705.9 |
| | | | | | Weathered Shale, dark yellowish brown (10YR 4/2), with interbedded sandstone and siltstone seams, iron oxide staining, fractured. | |
| 35 | | | | 36.0 | | 702.7 |
| | | | | | Shale, dark gray (N3), with interbedded sandstone and siltstone seams, fractured, iron oxide staining. | |
| 40 | | | | | | |

*(Continued Next Page)*

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEP-PPPU-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-63**
Revision 5
February 2014
PAGE 3 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth     **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, dark gray (N3), with interbedded sandstone and siltstone seams, fractured, iron oxide staining. *(continued)* | |
| 45 | | | | | | |
| | | | | 47.1 | | 691.6 |
| | | | | 47.2 | Sandstone, 1 in. thick. | 691.5 |
| | | | | | Shale, dark gray (N3), with interbedded siltstone seams, fractured. | |
| 50 | | | | 50.3 | | 688.4 |
| | | | | | 680 Sandstone.  Sandstone, moderate reddish brown (10R 4/6). | |
| | | | | 52.3 | | 686.4 |
| | | | | | Shale, dark gray (N3), with interbedded siltstone seams. | |
| | | | | 54.0 | | 684.7 |
| | | | | 54.3 | Sandstone, medium light gray (N6), 3.5 in. thick. | 684.4 |
| 55 | | | | | Shale, dark gray (N3), with interbedded siltstone seams. | |
| | | | | 57.9 | | 680.8 |
| | | | | 58.0 | Sandstone, 1 in. thick. | 680.7 |
| | | | | | Shale, dark gray (N3), with interbedded siltstone seams. | |
| 60 | | | | | | |
| | | | | 62.3 | | 676.4 |
| | | | | 62.4 | Sandstone, 1 in. thick. | 676.3 |
| | | | | | Shale, dark gray (N3), with interbedded siltstone seams. | |
| | | | | 64.2 | | 674.5 |
| | | | | 64.4 | Sandstone, 1.5 in. thick. | 674.3 |
| 65 | | | | | Shale, dark gray (N3), with numerous interbedded siltstone seams. | |

B-280

*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DER-FRS-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Revision 5
February 2014

| Logo | Fluor B&W |
|------|-----------|

**BORING NUMBER WD-SB-63**
PAGE 4 OF 4

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, dark gray (N3), with numerous interbedded siltstone seams. *(continued)* | |
| | | | | 67.3 | | 671.4 |
| | | | | 67.5 | Sandstone, 1.5 in. thick. | 671.2 |
| | | | | | Shale, dark gray (N3), with numerous interbedded siltstone seams. | |
| | | | | 69.2 | | 669.5 |
| | | | | 69.3 | Sandstone, 1 in. thick. | 669.4 |
| 70 | | | | | Shale, dark gray (N3), with numerous interbedded siltstone seams. | |
| | | | | 71.4 | | 667.3 |
| | | | | 71.6 | Sandstone, 1.5 in. thick. | 667.1 |
| | | | | | Shale, dark gray (N3), with numerous interbedded siltstone seams. | |
| | | | | 73.4 | | 665.3 |

Refusal at 16.8 feet.
Bottom of borehole at 73.4 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP P874-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

**BORING NUMBER WD-SB-65**
PAGE 1 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NUMBER**

**DATE STARTED**  8/15/12     **COMPLETED**  8/16/12

**DRILLING CONTRACTOR**  M&W Drilling

**DRILLING METHOD**  Split Spoon/Auger

**LOGGED BY**  William Reid     **CHECKED BY**  Allison Lake

**NOTES**  Sunny. 80s.

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT LOCATION**  Remediation Area IV-B

**GROUND ELEVATION**  748.87 ft MSL   **HOLE SIZE**  4.25 in.

**GROUND WATER LEVELS:**

**AT TIME OF DRILLING**  ---

**AT END OF DRILLING**  ---

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | | (CL-ML) Silt and Clay, light yellowish brown (2.5Y 6/3) to brownish yellow (10YR 6/6) with depth, trace sand, dry, crumbly. | |
| | | | | 3.5 | | 745.4 |
| 5 | | | | | Weathered Shale, light brownish gray (5YR 6/1) to dark yellowish brown (10YR 4/2), dry, crumbly, fissile. | |
| | | | | 6.0 | | 742.9 |
| | | | | | Cuyahoga Formation. Augered through, no recovery. | |
| | | | | 8.0 | | 740.9 |
| | | | | 8.1 | Cuyahoga Formation (Competent). Sandstone, light brown (5YR 5/6), hard. | 740.8 |
| | | | | 8.3 | | 740.6 |
| | | | | 8.5 | Weathered Shale, light gray (N7). | 740.4 |
| 10 | | | | | Sandstone, light brown (5YR 5/6). | |
| | | | | | Shale, light gray (N7) grading to dark yellowish orange (10YR 6/6) at 10 ft. | |
| | | | | 11.2 | | 737.7 |
| | | | | 11.4 | Sandstone. | 737.5 |
| | | | | 12.1 | Weathered Shale. | 736.8 |
| | | | | 12.6 | Sandstone or Siltstone, upper/lower units separated by 0.5 in. shale. | 736.3 |
| | | | | | Weathered Shale, medium light gray (N6) to medium gray (N5) at 12.4 ft, exhibiting increasing weathering effects with depth, ==fractured==. | |
| 15 | | | | | | |
| | | | | 15.6 | Sandstone, dark yellowish brown (10YR 4/2). | 733.3 |
| | | | | 15.9 | ==Weathered Shale, medium gray (N5), severely weathered, fractured.== | 733.0 |
| | | | | 18.0 | | 730.9 |
| | | | | 18.1 | Sandstone, light brown (5YR 5/6). | 730.8 |
| | | | | 19.2 | Weathered Shale, medium gray (N5), with interbedded sandstone seams==, fractured==. | 729.7 |
| | | | | 19.7 | Sandstone, dark yellowish orange (10YR 6/6) | 729.2 |
| 20 | | | | 20.0 | | 728.9 |

*(Continued Next Page)*

FBP WD RIFS D3 R5 MASTER/02/05/2014

DEP #: PT5-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

# BORING NUMBER WD-SB-65
PAGE 2 OF 4

| | |
|---|---|
| **CLIENT** Fluor B&W Portsmouth | **PROJECT NAME** OSDC Geotechnical Investigation |
| **PROJECT NUMBER** | **PROJECT LOCATION** Remediation Area IV-B |

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | | WELL DIAGRAM |
|---|---|---|---|---|---|---|---|
| 20 | | | | | | | |
| | | | | | 20.2 Shale, medium gray (N5). | 728.7 | |
| | | | | | 20.3 Sandstone, dark yellowish orange (10YR 6/6). *(continued)* | 728.6 / 728.4 | |
| | | | | | 20.5 / 20.6 Shale, medium gray (N5). | 728.3 | |
| | | | | | 20.9 Sandstone, dark yellowish orange (10YR 6/6). | 728.0 | |
| | | | | | 21.5 Shale, medium gray (N5). | 727.4 | |
| | | | | | 22.1 | 726.8 | |
| | | | | | 22.3 720 Sandstone. Sandstone, dark yellowish orange (10YR 6/6). | 726.6 | |
| | | | | | Weathered Shale (clay), medium gray (N5). | | |
| | | | | | 23.8 Sandstone, dark yellowish orange (10YR 6/6), two beds, with 0.5 in. shale bed in-between. | 725.1 | |
| 25 | | | | | Weathered Shale, gray. | | |
| | | | | | 24.8 Sandstone, moderate reddish brown (10R 4/6). | 724.1 | |
| | | | | | 25.4 Weathered Shale, olive gray (5Y 4/1) grading to medium dark gray (N4), with interbedded sandstone seams, fractured. | 723.5 | |
| | | | | | Sandstone, moderate yellowish brown (10YR 5/4), soft?, void with infill of shale and sandstone. | | |
| | | | | | Shale, medium light gray (N6) to medium gray (N5) and medium dark gray (N4) at 26.55 ft. | | |
| | | | | | 28.3 | 720.6 | |
| | | | | | 28.5 Siltstone, medium gray (N5). | 720.4 | |
| | | | | | Shale, medium dark gray (N4), hard. | | |
| 30 | | | | | 29.8 | 719.1 | |
| | | | | | 29.9 Siltstone, medium gray (N5). | 719.0 | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams, hard. | | |
| 35 | | | | | | | |
| | | | | | 36.6 | 712.3 | |
| | | | | | 36.7 Siltstone, grayish brown (5YR 3/2). | 712.2 | |
| | | | | | Shale, medium dark gray (N4) grading to dark gray (39 ft), with interbedded siltstone seams, fractured. | | |
| 40 | | | | | | | |
| | | | | | 41.9 | 707.0 | |
| | | | | | 42.1 Siltstone, brownish gray (5YR 4/1). | 706.8 | |

B-286
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DE-PP-876-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-65
February 2014
PAGE 3 OF 4

| Logo | Fluor B&W |
|---|---|

**CLIENT** Fluor B&W Portsmouth     **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER** _____     **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Shale, medium dark gray (N4) to dark gray (44 ft), with interbedded siltstone seams, *fractured*. *(continued)* | |
| 45 | | | | | | |
| | | | | | 46.9    Siltstone, medium light gray (N6).    702.0 | |
| | | | | | 47.0    701.9 | |
| | | | | | Shale, dark gray to medium dark gray (N4) (49.2 ft), with light gray (N7) laminations, *fractured.* | |
| 50 | | | | | | |
| | | | | | 50.9    Siltstone, brownish gray (5YR 4/1).    698.0 | |
| | | | | | 51.0    697.9 | |
| | | | | | Shale, medium dark gray (N4), laminated. | |
| | | | | | 53.5    Siltstone, light gray (N7).    695.4 | |
| | | | | | 53.6    695.3 | |
| 55 | | | | | Shale, medium dark gray (N4), laminated, *fractured.* | |
| 60 | | | | | | |
| | | | | | 64.5    684.4 | |
| 65 | | | | | Shale, dark yellowish orange (10YR 6/6), appears weathered. | |
| | | | | | 65.3    683.6 | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT_OSDC.GPJ

DEP-P 877-0246&D3
FBP-ER-RIFS-WD-RPT-0030
Rev. 5
February 2014

## BORING NUMBER WD-SB-65

PAGE 4 OF 4

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | 680 Sandstone.  Sandstone, dark yellowish brown (10YR 4/2), hard, some iron oxide staining. *(continued)* | |
| | | | | 67.2 | | 681.7 |
| | | | | | Shale, dark gray (N3). | |
| | | | | 68.9 | | 680.0 |
| | | | | 69.4 | Sandstone, medium gray (N5), hard. | 679.5 |
| 70 | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams, hard. | |
| | | | | 74.5 | | 674.4 |
| 75 | | | | 74.6 | Siltstone, brownish gray (5YR 4/1), 1.5 in. thick? | 674.3 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams. | |
| | | | | 77.2 | | 671.7 |
| | | | | 77.3 | Siltstone, dark yellowish brown (10YR 4/2). | 671.6 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone seams. | |
| | | | | 79.0 | | 669.9 |

Refusal at 8.0 feet.
Bottom of borehole at 79.0 feet.

DEP-PP-3-0246&D3
FBP-ER-RIFS-WD-RPT-0030

# BORING NUMBER WD-SB-71

Revision 5
February 2014
PAGE 1 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NUMBER** _____

**DATE STARTED**  8/16/12   **COMPLETED**  8/20/12

**DRILLING CONTRACTOR**  M&W Drilling

**DRILLING METHOD**  Split Spoon/Auger

**LOGGED BY**  Jay Parker   **CHECKED BY**  William Reid

**NOTES**  85 deg F.  Mostly sunny.  42% humidity.  Wind SW @8mph.

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT LOCATION**  Remediation Area IV-B

**GROUND ELEVATION**  771.45 ft MSL   **HOLE SIZE**  4.25 in.

**GROUND WATER LEVELS:**

**AT TIME OF DRILLING**  ---

**AT END OF DRILLING**  ---

**AFTER DRILLING**  ---

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| | | | | 4.0 | (CL-ML) Silty Clay, brownish yellow (10YR 6/8), dry, laminated shale bedding, soft to medium, grades to strong brown (7.5YR 5/6) (2ft), dry to damp, with some sand and weathered sandstone, moderately dense. | 767.5 |
| 5 | | | | | Shelby Tube. | |
| | | | | 6.0 | | 765.5 |
| 10 | | | | | Cuyahoga Formation.  Weathered Shale, gray (10YR 6/1), dry hard, moderately to sparsely laminated, some interbedded sandstone seams with depth, grading to dark yellowish orange (10YR 6/6) to pale yellowish brown (10YR 6/2) at 10 ft. | |
| 15 | | | | | | |
| | | | | 16.0 | | 755.5 |
| | | | | 16.2 | Sandstone, 2 in. thick. | 755.3 |
| | | | | | Weathered Shale, pale yellowish brown (10YR 6/2), few to no laminations, hard, dry. | |
| | | | | 17.9 | | 753.6 |
| 20 | | | | | Cuyahoga Formation (Competent).  Weathered Shale, pale olive (10Y 6/2), alternating interbedded sandstones, fractured, with iron oxide staining from 18.6 to 19 ft. | |

B-299

(Continued Next Page)

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DEP-PPPO-0246&D3
FBP-ER-RIFS-WD-RPT-0030
R5
February 2014

**BORING NUMBER WD-SB-71**
PAGE 2 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth

**PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____

**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|

Cuyahoga Formation (Competent). Weathered Shale, pale olive (10Y 6/2), alternating interbedded sandstones, fractured, with iron oxide staining from 18.6 to 19 ft. (continued)

25.0 — 746.5

Sandstone, highly fractured, iron oxide staining.
25.8 — 745.7

Weathered Shale, pale olive (10Y 6/2).

27.3 — 744.2
27.4 — 744.1
Sandstone, 1 in. thick.

Weathered Shale, grayish olive green.

29.0 — 742.5
29.1 — 742.4
Sandstone, 1 in. thick.

Shale, grayish olive green grading to medium dark gray (N4) at 32 ft, interbedded with siltstone and sandstone seams.

36.6 — 734.9
36.8 — 734.7
Sandstone, 2 in. thick.
37.0 — 734.5
Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams.
37.2 — 734.3
37.5 — 734.0
37.6 — 733.9
Sandstone, 2 in. thick.
38.2 — 733.3
Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams.
38.3 — 733.2
38.5 — 733.0
38.6 — 732.9
Sandstone, 1 in. thick.
38.8 — 732.7
38.9 — 732.6
Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams.
39.9 — 731.6
40.2 — 731.3
Sandstone, 1 in. thick.
40.7 — 730.8
40.9 — 730.6
Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams.
41.9 — 729.6
42.0 — 729.5
Sandstone, 1 in. thick.

Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams.

B-300
(Continued Next Page)

DEPP 880-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-71**

February 2014
PAGE 3 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT**  Fluor B&W Portsmouth          **PROJECT NAME**  OSDC Geotechnical Investigation

**PROJECT NUMBER** _____          **PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | | WELL DIAGRAM |
|---|---|---|---|---|---|---|---|
| | | | | | Sandstone, 1 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 43.6 / 43.7 | 727.9 / 727.8 |
| | | | | | Sandstone, 4 in. thick. | | |
| 45 | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 44.9 / 45.0 | 726.6 / 726.5 |
| | | | | | | 45.4 | 726.1 |
| | | | | | Sandstone, 2 in. thick. | 45.9 | 725.6 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 2 in. thick. | 47.0 | 724.5 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. *(continued)* | 47.4 | 724.1 |
| | | | | | | 47.7 | 723.8 |
| | | | | | Sandstone, 1 in. thick. | 47.8 / 48.2 | 723.7 / 723.3 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 1 in. thick. | 49.3 | 722.2 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| 50 | | | | | Sandstone, 6 in. thick. | 50.0 | 721.5 |
| | | | | | | 50.2 | 721.3 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 50.4 / 50.5 | 721.1 / 721.0 |
| | | | | | Sandstone, 5 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 51.9 / 52.1 | 719.6 / 719.4 |
| | | | | | Sandstone, 0.5 in. thick. | 52.6 / 52.7 | 718.9 / 718.8 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 13 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 54.7 | 716.8 |
| 55 | | | | | Sandstone, 3 in. thick. | 54.8 | 716.7 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 55.6 / 55.8 | 715.9 / 715.7 |
| | | | | | Sandstone, 1 in. thick. | 56.2 | 715.3 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 56.6 / 56.9 | 714.9 / 714.6 |
| | | | | | Sandstone, 2 in. thick. | 57.0 | 714.5 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 57.9 / 58.1 | 713.6 / 713.4 |
| | | | | | 720 Sandstone.  Sandstone, 1 in. thick. | 58.4 | 713.1 |
| | | | | | | 58.8 | 712.7 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 1 in. thick. | | |
| 60 | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | 60.2 | 711.3 |
| | | | | | Sandstone, 2 in. thick. | 60.4 | 711.1 |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 5 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| | | | | | Sandstone, 1 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |
| 65 | | | | | Sandstone, 3 in. thick. | | |
| | | | | | Shale, medium dark gray (N4), with interbedded siltstone and sandstone seams. | | |

B-301
*(Continued Next Page)*

FBP/WD RIFS D3 R5 MASTER/02/05/2014

DEP-PPPE-0246&D3
FBP-ER-RIFS-WD-RPT-0030

**BORING NUMBER WD-SB-71**
February 2014
PAGE 4 OF 5

| Logo | Fluor B&W |
|------|-----------|

**CLIENT** Fluor B&W Portsmouth      **PROJECT NAME** OSDC Geotechnical Investigation

**PROJECT NUMBER**      **PROJECT LOCATION** Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| | | | | | Sandstone, 5 in. thick. | |
| | | | | | 66.7 — Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. — 704.8 | |
| | | | | | 66.8 / 67.3 Sandstone, 2 in. thick. — 704.7 / 704.2 | |
| | | | | | 67.4 Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. *(continued)* — 704.1 | |
| | | | | | Sandstone, 1 in. thick. | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | Sandstone, 1 in. thick. | |
| 70 | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 72.6 — 698.9 | |
| | | | | | 72.8 Sandstone, 2 in. thick. — 698.7 | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 73.7 — 697.8 | |
| | | | | | 73.9 Sandstone, 2 in. thick. — 697.6 | |
| 75 | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 75.2 — 696.3 | |
| | | | | | 75.3 Sandstone, 1 in. thick. — 696.2 | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 78.0 — 693.5 | |
| | | | | | 78.1 Sandstone, 1 in. thick. — 693.4 | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 79.2 — 692.3 | |
| 80 | | | | | 79.4 Sandstone, 2 in. thick. — 692.1 | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 81.9 — 689.6 | |
| | | | | | 82.0 Sandstone, 1 in. thick. — 689.5 | |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | | 83.6 — 687.9 | |
| | | | | | 83.7 Sandstone, 1 in. thick. — 687.8 | |
| 85 | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |

FBP/WD RIFS D3 R5 MASTER/02/05/2014

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

DE-PP-0246&D3
FBP-ER-RIFS-WD-RPT-0030
R5
February 2014

## BORING NUMBER WD-SB-71
PAGE 5 OF 5

| | |
|---|---|
| Logo | Fluor B&W |

**CLIENT**  Fluor B&W Portsmouth  
**PROJECT NUMBER**  

**PROJECT NAME**  OSDC Geotechnical Investigation  
**PROJECT LOCATION**  Remediation Area IV-B

| DEPTH (ft) | SAMPLE TYPE NUMBER | BLOW COUNTS (N VALUE) | ENVIRONMENTAL DATA | GRAPHIC LOG | MATERIAL DESCRIPTION | WELL DIAGRAM |
|---|---|---|---|---|---|---|
| 90 | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. *(continued)* | |
| | | | | 92.5 | | 679.0 |
| | | | | 92.6 | Sandstone, 1 in. thick. | 678.9 |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| 95 | | | | | | |
| | | | | 97.1 | | 674.4 |
| | | | | | 680 Sandstone.  Sandstone, light olive gray (5Y 6/1). | |
| | | | | 99.1 | | 672.4 |
| 100 | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | 101.3 | | 670.2 |
| | | | | 101.6 | Sandstone, light olive gray (5Y 6/1), 4 in. thick. | 669.9 |
| | | | | | Shale, medium dark gray (N4),with interbedded siltstone and sandstone seams. | |
| | | | | 104.6 | | 666.9 |

Refusal at 17.9 feet.  
Bottom of borehole at 104.6 feet.

ENVIRONMENTAL BH - GINT STD US.GDT - 3/20/13 14:26 - C:\PROGRAM FILES (X86)\GINT\PROJECTS\GINT OSDC.GPJ

FBP/WD RIFS D3 R5 MASTER/02/05/2014

# EXHIBIT E

This Health Hazard Evaluation (HHE) report and any recommendations made herein are for the specific facility evaluated and may not be universally applicable.  Any recommendations made are not to be considered as final statements of NIOSH policy or of any agency or individual involved. Additional HHE reports are available at http://www.cdc.gov/niosh/hhe/reports

HETA 96-0198-2651
Portsmouth Gaseous Diffusion Plant
Piketon, Ohio

John Cardarelli II, M.S.

# PREFACE

The Hazard Evaluations and Technical Assistance Branch of NIOSH conducts field investigations of possible health hazards in the workplace. These investigations are conducted under the authority of Section 20(a)(6) of the Occupational Safety and Health Act of 1970, 29 U.S.C. 669(a)(6) which authorizes the Secretary of Health and Human Services, following a written request from any employer or authorized representative of employees, to determine whether any substances normally found in the place of employment have potentially toxic effects in such concentrations as used or found.

The Hazard Evaluations and Technical Assistance Branch also provides, upon request, technical and consultative assistance to Federal, State, and local agencies; labor; industry; and other groups or individuals to control occupational health hazards and to prevent related trauma and disease. Mention of company names or products does not constitute endorsement by the National Institute for Occupational Safety and Health.

# ACKNOWLEDGMENTS AND AVAILABILITY OF REPORT

This report was prepared by John Cardarelli II, of the Health-Related Energy Research Branch (HERB), Division of Surveillance, Hazard Evaluations and Field Studies (DSHEFS). Desktop publishing by Kathy Mitchell.

Copies of this report have been sent to employee and management representatives at the Portsmouth Gaseous Diffusion Plant (PORTS) and the OSHA Regional Office. This report is not copyrighted and may be freely reproduced. Single copies of this report will be available for a period of three years from the date of this report. To expedite your request, include a self-addressed mailing label along with your written request to:

<div align="center">
NIOSH Publications Office<br>
4676 Columbia Parkway<br>
Cincinnati, Ohio 45226<br>
800-356-4674
</div>

After this time, copies may be purchased from the National Technical Information Service (NTIS) at 5825 Port Royal Road, Springfield, Virginia 22161. Information regarding the NTIS stock number may be obtained from the NIOSH Publications Office at the Cincinnati address.

> **For the purpose of informing affected employees, copies of this report shall be posted by the employer in a prominent place accessible to the employees for a period of 30 calendar days.**

<div align="center">ii</div>

# Health Hazard Evaluation Report 96-0198-2651
# Portsmouth Gaseous Diffusion Plant
# Piketon, Ohio

### John Cardarelli II, MS

## SUMMARY

On June 12, 1996, the National Institute for Occupational Safety and Health (NIOSH) received a request for a Health Hazard Evaluation (HHE) to evaluate worker exposures to neutron radiation at the Portsmouth gaseous diffusion plant (PORTS) operated by the Lockheed Martin Utility Services, Inc. (LMUS) in Piketon, Ohio. Another contractor, Lockheed Martin Energy Systems (LMES), operates certain areas at this facility maintained by the Department of Energy (DOE). Workers and areas under LMES were also included in this HHE. The request was submitted by two separate union safety representatives and described the hazard as a chronic exposure to neutron radiation during various production, maintenance and security activities. It also stated that neutron doses have not been recorded in the workers' dose histories for the past 40 years. In response to this request, NIOSH conducted two site visits between November 1996 and February 1997 to:

1. Determine if potential neutron exposures exist at the site.
2. Identify neutron sources.
3. Identify work areas or job titles having the greatest potential for neutron exposures.
4. Quantify neutron doses by work area or job title.
5. Determine past reporting and recording practices regarding neutron doses.
6. Assess the feasibility of reconstructing past neutron doses.

The following paragraphs describe, summarize, and discuss the findings, results and conclusions associated with each of the listed objectives.

**Determine if potential neutron exposures exist at the site:** The LMUS PORTS is one of two operating uranium enrichment production facilities in the United States that use the gaseous diffusion process to enrich uranium. Uranium as found in nature, $U_{nat}$, is a radioactive element that contains a mixture of three isotopes: $^{238}U$, $^{235}U$, and $^{234}U$. The process is designed to enrich the $^{235}U$ isotope for use in the nation's commercial and defense nuclear programs. Uranium is primarily responsible for the presence of neutrons at the PORTS. Neutrons are produced mainly from a nuclear reaction when its decay product (an alpha particle) reacts with bonded fluorine atoms. Additionally, neutrons are produced when uranium spontaneously splits into two lighter elements (a spontaneous fission). Since these processes occur naturally, neutron radiation has been and continues to be present at the site.

**Identify neutron sources:** It is clear from the physical nature and characteristics of uranium and its compounds that appreciable neutron radiation is most likely to be present in areas where uranium is stored (cylinder yards), routinely handled (feed and withdrawal areas) or in areas where uranium forms deposits within the cascade. The point at which this source becomes a radiological concern depends on several factors including neutron production rates, enrichment, neutron moderation factors, geometry, deposit size, detection capabilities, time of exposure, and distance from the source.

**Identify work areas or job titles having the greatest potential for neutron exposures:** During the November 1996 initial survey, locations for area and personnel monitoring were selected by representatives of management and the two unions. Their selections were based primarily on uranium being present in large quantities and job titles having routine tasks in those areas. Area neutron measurements were conducted in the following locations: process buildings (X-326 and X-330), uranium storage areas (X-745 and X-345), and work areas routinely occupied by workers with selected job titles (Buildings X-705, X-344, and X-343). The job titles selected for monitoring included: Uranium Material Handler, Process Operator, Health Physics Technician, Chemical Operator, and Security Guard.

**Quantify neutron doses by work area or job title:** In the process buildings (X-326 and X-330), measured neutron doses ranged from below the limit of detection [0.2 millisieverts (mSv)] to 0.6 mSv. The highest neutron doses (2.1 to 7.1 mSv) were found in the uranium storage area maintained by the DOE (X-745). In all other locations (X-343, X-345 and X-705), measured neutron doses were at or below the limit of detection. None of the personnel monitored during this evaluation received neutron doses above the limit of detection. Although the results of a recent study conducted by the site in 1995 showed that measurable neutron doses were received by workers performing activities similar to those monitored during this evaluation.

**Determine past reporting and recording practices regarding neutron doses:** Neutron exposures have always occurred at the PORTS facility but the occupational doses have been "considered insignificant in comparison with DOE radiation protection standards" to justify routine monitoring. Therefore, personnel neutron dosimetry was not conducted at this or any other gaseous diffusion plant in the past. Recording decisions regarding high doses (>2.7 rem) were based on the philosophy that doses of this size were very unlikely when compared with past doses reported and recorded at the site. Therefore, equipment failure was often provided as the reason for the abnormal dose rather than investigating the anomaly.

**Assess the feasibility of reconstructing past neutron doses:** In early 1981, PORTS introduced thermoluminescent dosimeters (TLDs) to replace film-based dosimeters as a part of the routine radiation monitoring program. The early film badges (1950s-1980) and the first TLD badges (1981-1990) were not calibrated for and could not measure neutron exposures. Despite that limitation, an effort to reconstruct past neutron exposures was attempted by requesting historical computerized data of TLD chip readings from 1981 to the present. Data available for this purpose was limited to only the most recent data (1992-1995). Thus, it was not feasible to reconstruct potential neutron before 1992.

This health hazard evaluation has shown that under certain conditions an acute exposure to neutron radiation can occur. Therefore, a potential health hazard to neutron radiation exists at this site.

Recommendations include: employ an appropriate phantom material to monitor neutron exposures in the X-345 vault areas properly; inform workers potentially exposed to neutrons about the proper positioning of the TLDs and its angular dependence in detecting incident neutrons; revise minor errors in the neutron dose algorithm documentation; review and improve linkage issues regarding unaccounted personal doses; reevaluate the use of archive tapes to prevent further loss of historical dosimetry data; continue neutron monitoring in areas where uranium is routinely stored or handled; reevaluate past maintenance activities and personnel involved in physically removing uranium deposits for exposures associated with the *slow cooker* phenomenon; and report administrative changes or decisions regarding issues in the health physics dosimetry program (doses below the limit of detection, abnormal chip ratios, investigative reports, etc.) to the workforce to educate, inform, and solicit questions about how the changes or decisions will affect their dose histories.

Keywords: SIC 2819 (industrial inorganic chemicals, not elsewhere classified), neutrons, TLD, thermoluminescent dosimetry, TED, track-etch dosimetry, neutron dosimetry, radiation exposures, gaseous diffusion, uranium enrichment, fission, spontaneous fission, slow cookers, criticality.

v

# TABLE OF CONTENTS

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Acknowledgments and Availability of Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    HHE Authority and Plant Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Exposure vs. Dose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Uranium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Gaseous Diffusion Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Major Radiation Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Minor Radiation Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Neutrons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Uranium Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Criticality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Slow Cookers" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Historical Neutron Exposures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Pacific Northwest Laboratories Neutron Study . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Epidemiologic Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Background Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Monitoring Selections and Dosimeters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Evaluation of Historical Neutron Doses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    NVLAP vs. DOELAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Evaluation Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Results and Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Area and Personal Neutron Measurements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    General Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Area Measurement Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Comparing HHE Results to the Regulatory Limit . . . . . . . . . . . . . . . . . . . . . . . . 13
    Historical Health Physics Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Abbreviations and Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Table I
  USEC and DOE Portsmouth Facilities Selected for Monitoring ......................... 19
Table II
  Radiological Units ................................................................. 19
Table III
  Isotopes Present in Natural Uranium .............................................. 20
Table IV
  Neutron Monitoring Selections .................................................... 20
Table V
  Area Neutron Measurements ...................................................... 21
Table VI
  Personal Neutron Dosimetry Results .............................................. 23

Appendix A
  Uranium Decay Series, $^{238}$U ...................................................... 26

Appendix B
  Actinium Decay Series, $^{235}$U ..................................................... 28

Appendix C
  Requested Background Documentation .............................................. 30

# INTRODUCTION

On June 12, 1996, the National Institute for Occupational Safety and Health (NIOSH) received a request for a Health Hazard Evaluation (HHE) to evaluate worker exposures to neutron radiation at the Portsmouth gaseous diffusion plant (PORTS) operated by the Lockheed Martin Utility Services, Inc. (LMUS) in Piketon, Ohio. Worker representation was provided by the two unions at the site, Local 3-689 of the Oil, Chemical, and Atomic Workers Union International (OCAW) and Local 66 of the United Plant Guard Workers of America (UPGWA). The request described the hazard as a chronic exposure to neutron radiation during various production, maintenance and security activities. It also stated that past neutron doses have not been reported in the dose records over the past 40 years. Approximately 2,500 workers are currently employed at the PORTS and nearly 9,000 workers have been employed at the site since 1954.

## Objectives

During the period between November 1996 and February 1997, area and personal neutron dose measurements were collected using thermoluminescent dosimeters and track-etch dosimeters (TLD/TEDs) to address the following objectives:

1. Determine if potential neutron exposures exist at the site.
2. Identify neutron sources.
3. Identify work areas or job titles having the greatest potential for neutron exposures.
4. Quantify neutron doses by work area or job title.

In addition, past reporting and recording practices regarding neutron doses were reviewed to determine if past doses could be reconstructed.

## HHE Authority and Plant Operations

As a result of the Energy Policy Act of 1992,[1] the responsibility for the enforcement of occupational safety and health at PORTS was transferred from the Department of Energy (DOE) to the Department of Labor (DOL) and the Nuclear Regulatory Commission (NRC). This act also mandated that on July 1, 1993, certain buildings and activities of the DOE-owned gaseous diffusion plants be transferred to the United States Enrichment Corporation (USEC), a Congressionally-established, government-owned corporation that operates the United States' uranium enrichment facilities. This course of events permitted the submission of an HHE request by the workforce under provisions of the Occupational Safety and Health Act. Although several buildings remain under DOE control, they were included in this evaluation. Research applicable to an ongoing NIOSH mortality study was also conducted under a Memorandum of Understanding between DOE and the Department of Health and Human Services (DHHS)-NIOSH.[2]

Although USEC now operates the uranium enrichment facilities, the DOE maintains and operates certain buildings and activities at the PORTS. LMUS has been contracted to maintain and operate buildings for USEC regulated by the NRC and OSHA. Lockheed Martin Energy Systems, Inc. (LMES) maintains and operates buildings for the DOE and DOE orders. The buildings of interest to this HHE and their responsible agency are listed in Table I. This is an important distinction between LMUS and LMES because each company has a separate workforce and employs different dosimetry services.

## Exposure vs. Dose

It is important to note that the terms *exposure* and *dose* have specific meanings when used throughout this document (see Table II). *Exposure* is used when referencing the amount of ionizing radiation present at a given point

measured in **air**. *Dose* refers to the dose equivalent or the amount of ionizing radiation absorbed in the **body** adjusted for its relative biological effectiveness. The reporting metric for this evaluation is in units of **dose** with a neutron relative biological effectiveness factor of about 10, so that appropriate comparisons can be made with the regulatory limits specified in the code of federal regulations.

# BACKGROUND

## Uranium

Uranium as found in nature, $U_{nat}$, is a radioactive element that contains a mixture of three isotopes: $^{238}U$, $^{235}U$, and $^{234}U$ (Table III). It is used primarily as fuel for commercial nuclear power plants and nuclear-powered submarines but also in nuclear weapons. In general, the $^{235}U$ isotope is important to these industries because it can easily undergo fission by capturing a neutron. Fission occurs when the nucleus splits, forming at least two nuclei, releasing several neutrons and a large amount of energy. Electricity is produced when heat generated from this process is transferred to a coolant that is then used to drive turbine generators. The $^{238}U$ isotope is also important to both industries because it can be transformed into $^{239}Pu$ after capturing a neutron. Plutonium-239 is another fissile element primarily used in nuclear weapons.

Even without neutron interaction, uranium changes by undergoing natural radioactive decay. The decay chains for both uranium isotopes are shown in Appendices A and B ($^{238}U$ - Uranium Series includes $^{234}U$, $^{235}U$ - Actinium Series). In addition, there is a small probability that uranium will decay by spontaneous fission; i.e., uranium will fission on its own without assistance from a bombarding neutron. For example, the half-life for spontaneous fission in $^{238}U$ is some $6.5 \times 10^{15}$ years, as compared with its radiological half-life of $4.91 \times 10^{9}$ years. Because this phenomenon is so

rare compared to radioactive decay, it is usually not considered a significant radiological concern. However, even this very slow spontaneous fission rate can be important in the gaseous diffusion process since large amounts of uranium are present.

## Gaseous Diffusion Plants

The LMUS PORTS is one of two operating uranium enrichment production facilities in the United States: PORTS, located in Piketon, Ohio, and the Paducah Gaseous Diffusion Plant (PGDP) located in Paducah, Kentucky. Each plant uses the gaseous diffusion process to enrich uranium from the natural level of 0.71% $^{235}U$ to higher concentrations, which historically have ranged from 2% to greater than 97%. The LMUS PORTS has discontinued high assay $^{235}U$ production and currently produces a product that is between 2 to 5%, for use in fuel rods in commercial nuclear power plants. The level of enrichment is determined by physical or chemical measurements of fissionable material ($^{235}U$) present in the uranium.[3]

## Process

Production of enriched uranium at PORTS began in late 1954. The two gaseous diffusion plants (PORTS and PGDP) have operated in a complementary mode. The Paducah facility performs the initial enrichment of uranium to about 1 to 2% $^{235}U$. This material serves as a feedstock for PORTS, although the PORTS facility can also use the same feed materials that PGDP receives. The uranium is enriched by diffusing uranium hexafluoride ($UF_6$) through a porous material commonly called the barrier. Lighter molecules ($^{235}UF_6$) travel at a higher velocity than the heavier molecules ($^{238}UF_6$). When the mixture contacts the barrier, the lighter molecules strike the barrier and pass through it more readily than the heavier molecules. The maximum separation that can be achieved through the barrier is equal to the square root of the ratio of the weights of the gas molecules. Since the

square root of that ratio for $UF_6$ molecules is 1.0043, many passes through the barrier are required to reach the desired enrichment assay of $^{235}UF_6$.[4]



**Figure 1: Stage Components**

Each *stage* in the enrichment process consists of a compressor, converter (contains the barrier), and motor, (Figure 1). Between eight and 12 *stages* are linked together in series to form a *cell*. Between 10 and 20 *cells* (80 to 240 *stages*) are assembled to form a functional *unit*. These *units* are linked together to form the *cascade* for uranium enrichment. The PORTS' several thousand stages are housed in three interconnected buildings (X-333, X-330 and X-326) (Figure 2). Each cascade building has two floors, each floor covering approximately 1.5 million square feet.[5] The overall configuration results in a flow of increasingly enriched $^{235}UF_6$ toward the top of the process (X-326 building). Depleted $^{238}UF_6$ flows toward the bottom or "tails" of the process (X-333 building).

Because $UF_6$ is a solid at room temperature, it is delivered to and shipped from the facility as a solid in various cylinder types and sizes. The cylinders vary between small 5-inch-diameter cylinders to 14-ton cylinders to prevent an uncontrolled nuclear chain reaction, also known as a criticality, which releases potentially lethal amounts of ionizing radiation (neutrons and high energy photons).



**Figure 2: PORTS Facility**

## Major Radiation Sources

Major sources of radiation exposures at PORTS are low energy photons from $^{235}U$, thorium ($^{231}Th$ and $^{234}Th$), beta particles from protactinium ($^{234m}Pa$), and bremsstrahlung radiation produced by the beta particles from uranium daughters and technetium ($^{99}Tc$) (See Appendices A and B). Other potential sources within this category but with limited exposure potential to the workforce include high energy photons from calibration sources of cesium ($^{137}Cs$), radium ($^{226}Ra$), and cobalt ($^{60}Co$), and machine-generated x-rays at tube potentials ranging from 70 to 200 kilovolts (kV).[6] Bremsstrahlung refers to the secondary photon radiation associated with the deceleration of charge particles (electrons) passing through matter.[3] Very low levels of gamma and bremsstrahlung radiation (0.2 to 0.1 microsieverts per hour, $\mu$Sv/hr) are found throughout the process buildings. The highest levels (up to 50 $\mu$Sv/hr) can be found in $UF_6$ feed cylinder handling areas.[6] Technetium-99 is a beta-emitting fission product introduced into the PORTS cascade from reprocessed spent reactor fuel, referred to as recycled uranium (RU). It concentrates in the top end of the enrichment process (X-326 building) because it is lighter in relation to the uranium isotopes.

### Minor Radiation Sources

The minor sources of radiation exposures at PORTS are from trace amounts of the transuranic elements neptunium ($^{237}$Np) and plutonium ($^{238}$Pu, $^{239}$Pu, $^{240}$Pu, $^{241}$Pu). These are introduced into the enrichment process through recycled uranium. Additionally, RU contains trace amounts of uranium isotopes not found in nature, such as $^{232}$U and $^{236}$U. The radiological impact of these impurities is negligible in many cases. However, chemical processes that concentrate these radionuclides may require that certain radiological controls be employed. These exposures may become more common as the United States continues to increase the amount of RU processed at these facilities.[7]

### Neutrons

A neutron is an elementary nuclear particle, having no electrical charge, with a mass approximately the same as that of a hydrogen atom (one electron and one proton) (Figure 3). Since neutrons carry no charge, they are not affected by the electric forces surrounding atoms and interact with the nuclei of the target material. As a result, the neutron may be either totally absorbed (captured) or significantly changed in its direction or energy.



electron or beta (- charge)
mass = 9.109567 x $10^{28}$ grams

proton (+ charge)
mass = 1.67261 x $10^{24}$ grams

neutron (no charge)
mass = 1.67492 x $10^{24}$ grams

**Figure 3:** Parts of an Atom

The principle behind measuring neutron radiation is to use some type of conversion of the incident neutrons into secondary charged particles that can then be detected.[8] The usefulness of a target material used in this process is largely dependent on the cross-section (or probability of interaction) of that material relative to the energy of the colliding neutron. Neutron energies are usually categorized into three groups: thermal, intermediate, and fast. Thermal neutron energies (sometimes given as 0.025 electronvolts, eV) are typically considered to be neutrons with energies below the *cadmium cutoff, about 0.5 eV.* Cadmium is commonly used as a shield to differentiate thermal neutrons from higher-energy neutrons. Slow and intermediate neutrons typically range in energy levels between 0.5 eV and 100,000 eV. Fast neutrons have energies greater than 100,000 eV.[9, 10]

The dose (energy deposited per unit mass of tissue) received from neutrons is very difficult to measure accurately because of the difficulties in detecting the neutrons and characterizing their energies. In addition, neutron dosimetry presents a difficulty not encountered in electron or photon dosimetry. Neutrons produce photons once they enter the material, creating a problem of mixed-field dosimetry. To assess neutron doses from mixed fields, measurements are made using several thermoluminescent chips with varying sensitivities to neutrons and photons.[11]

Neutrons at PORTS are produced from a fission or spontaneous fission of the uranium isotopes. Neutrons can also be produced by reactions between alpha particles emitted by uranium isotopes (primarily $^{234}$U) with bonded fluorine atoms.[6,12] The following nuclear reactions illustrate how neutrons could be produced at this facility:

Spontaneous Fission*
$$^{235}_{92}U \rightarrow\, ^{146}_{57}La + ^{87}_{35}Br + \textbf{2 neutrons} + energy$$

Fission*
$$^{1}_{0}n + ^{235}_{92}U \rightarrow\, ^{147}_{57}La + ^{87}_{35}Br + \textbf{2 neutrons} + energy$$

Interaction*
$$^{4}_{2}\alpha + ^{19}_{9}F \rightarrow\, ^{22}_{11}Na + \textbf{neutron} + energy$$

*La = Lanthanum; Br = Bromine; Na = Sodium

It is important to note that the $^{235}U$ nucleus can fission by some 40 or so methods. Also, $^{234}U$ is primarily responsible for neutron production in the interaction example because it produces alpha particles (decays by alpha emission) at a rate of about 2,900 and 18,000 times faster than $^{235}U$ and $^{238}U$, respectively.

It is clear from the physical nature and characteristics of uranium and uranium compounds that neutron exposures are most likely to occur in areas where uranium is stored (cylinder yards) or routinely handled (feed and withdrawal areas) and in areas where uranium forms deposits within the cascade. The point at which this exposure becomes a radiological concern depends on several factors, including: neutron production/generation rates, enrichment, neutron moderation factors, geometry, deposit size, detection capabilities, time of exposure, and distance from a source.

## Uranium Deposits

The uranium enrichment process employed at PORTS requires that the uranium compound $UF_6$, be maintained in a gaseous state. However, there are four basic mechanisms by which uranium in the cascade may solidify and form a deposit: freeze-outs, inleakage, consumption, and adsorption. Freeze-outs are solidification of $UF_6$ due to inappropriate temperature and pressure conditions. Typically these are not a common problem and can be detected through interpretation of unusual instrument readings or equipment performance indicators. Inleakage of atmospheric moisture causes the formation of uranium oxyfluoride solids (uranyl fluoride or $UO_2F_2$) by water vapor reacting with the $UF_6$. Catastrophic failure of process equipment can cause large amounts of inleakage that can be readily detected. However, chronic leaks into the system produce deposits that may go undetected for longer periods of time. Consumption is the formation of uranium fluoride solids by $UF_6$ reduction reactions with cascade metals. Adsorption is the boundary layer condensation of $UF_6$ on internal equipment surfaces. Both consumption and adsorption occur

throughout the cascade under normal operating conditions and routinely remove $UF_6$ from the gas phase. Together, these two mechanisms have been termed the "retained inventory effect" to account for undetected inventory losses during normal operation conditions.[13]

Neutron and gamma measurements are used as nondestructive methods to detect and quantify known uranium deposits within the cascade. Neutron measurements serve two purposes. First, they quantify the amount of material in a piece of equipment being removed from the cascade. Secondly, they determine the type of special handling required to minimize worker exposures and to prevent a criticality.[14] Neutron measurements are primarily used when the associated gamma emissions from uranium are sufficiently attenuated or shielded by equipment like compressors and heat exchangers. Gamma-ray measurements are used to supplement neutron data in assessing the size of deposits in converters and process piping and may also be used to assess the relative concentrations of $^{234}U$, $^{235}U$, and $^{238}U$.[12]

Material balance techniques have also been employed to determine how much uranium has "fallen out" of the gaseous phase within the entire cascade. This "in-process" inventory is determined by computer calculation (using plant gauge data) and compared with the physical "book" inventory of inputs vs. outputs to obtain differences in the material balance.[12] Since neither method accounts for solidified uranium within the cascade, the difference could be used as measure of the total amount of solidified uranium within the cascade.

## Criticality

A criticality occurs when, on the average, a neutron emitted by the methods described earlier causes another nucleus to fission. When this reaction becomes self-sustaining so that one fission triggers another, the phenomenon is termed a *critical chain-reaction* (Figure 4). A controlled chain-reaction occurs in nuclear reactors whereby the *rate* of fissioning is maintained after the reactor has reached



**Figure 4**: Simple schematic of fission chain reaction.

a stage of criticality. A reactor in which the rate of fissioning is decreasing is *sub-critical,* and one in which the rate of fissioning is increasing is *super-critical.* An atomic bomb could be described as *super-super-critical.*[15]

Four main outcomes in this chain reaction determine when a criticality has been achieved: (1) a complete loss of neutrons by escape or "leakage" from the system; (2) capture of a neutron by a fissile material ($^{235}$U), resulting in a reaction other than fission (such as radiative capture); (3) capture of a neutron by a non-fissile material (impurities); and, (4) capture of a neutron by a fissile material that undergoes fission. Physical and chemical characteristics as well as engineering controls must be optimized to reduce the loss of neutrons and maintain a state of criticality. The PORTS facility has been designed and operated to minimize the possibility that these factors reach the level necessary to create a critical event. As a result, there have been no critical events in the history of the facility.

**"Slow Cookers"**

Although PORTS has never experienced a criticality, neutrons are produced at the site. A slow buildup of uranium material within the cascade causes a slight increase in the production of neutrons. If the buildup continues without

intervention, the "growing" deposit may lead to a critical or super-critical event.[16] This phenomenon of a slow build-up of uranium material that approaches criticality has been termed by the gaseous diffusion industry as a *slow cooker*. In essence, a *slow cooker* is a mass of uranium in which there is a multiplication of neutrons but at a rate below the critical threshold. *Slow cookers* are directly associated with uranium deposits which have routinely occurred at the PORTS since the plant's inception.[17, 18]

The danger associated with this phenomenon varies with the location, size, and type of deposit formed within the cascade. In general, the number of neutrons produced is proportional to the amount of uranium and the degree of enrichment. For example, an equal *number* of neutrons can be produced with either a large amount of low-enriched or depleted uranium ($^{238}$U) or a small amount of highly enriched uranium ($^{235}$U). The *energy* of the produced neutron is proportional to the percent of enrichment. Highly enriched uranium will result in more energetic neutrons. The potential neutron dose (including photon exposures) from of an unknown or unidentified *slow cooker* depends on the time of exposure, distance from the source, and the *number* and *energy* of the incident neutrons interacting with the target material (tissue).

Neutron doses specifically attributable to this phenomenon could not be addressed in this

evaluation for several reasons. First, *slow cookers* remain fixed relative to the movements of the workers within the process buildings, thereby making it very difficult to link a particular worker's dose to a specific deposit. Second, the dynamic nature of *slow cookers* makes them difficult to characterize and detect. For example, they can remain stable in size, producing a chronic low-level radiation field obscured by adjacent radiation fields, and may go undetected for long periods of time. Or they may continue to build and produce an ever increasing radiation field until they are identified, characterized, and removed from the cascade. This removal action could be completed remotely by chemical treatments or by physically removing the uranium from the cascade.

## Historical Neutron Exposures

Neutron exposures have always occurred at the PORTS facility but the occupational doses have been "considered insignificant** in comparison with DOE radiation protection standards."[7] Therefore, personal neutron dosimetry was not conducted at this or any other gaseous diffusion plant in the past.[19] In the mid-1980s, neutron exposures were evaluated using Eberline "rem-balls" in areas where uranium was stored. The resulting doses were a function of enrichment and distance from the source. Highly enriched material (5-inch cylinders) produced neutron dose rates ranging from 0.03 mSv/hr (3 mrem/hr) on contact to less than 0.005 mSv/hr (0.5 mrem/hr) at a distance of 1 meter. Lower-enriched material (10-ton cylinders) produced neutron rates around 0.005 mSv/hr (0.5 mrem/hr). Based on these results and assuming that three hours was an average exposure time per work day, an "annual neutron dose equivalent" of 0.75 mSv (75 mrem) was estimated.[20] Since this is 1.5% of the radiation protection standard, 50 mSv/yr (5000 mrem/yr), the contractor determined that dosimetry was not required.[21] It is not clear from the above-

referenced documents if the dose included contributions from gamma exposures. If it did not, then the annual estimate would be higher than 0.75 mSv but still below the radiation protection standard. The Health Physics Manual of Good Practices for Uranium Facilities, released in 1988 stated that *"if personnel are required to spend more than a few** hours per week in close proximity to containers of uranium fluoride compounds or if their assignments require them to spend time near storage or processing areas for large quantities** of uranium fluoride compounds, the exposure to neutrons should be evaluated."*[7]

It wasn't until 1992 that some workers in the Radiation Calibration Facility and the Applied Nuclear Technology Department at PORTS were placed in a routine neutron dosimetry program. In October 1994, a new monitoring concept that monitored only those workers entering a Controlled or Restricted area was initiated. Simultaneously, an area monitoring program that measured radiation levels where unmonitored workers could approach without a dosimeter (building exteriors and fences surrounding posted radiation areas) was initiated. Neutron dose equivalents from the area monitoring program were unexpectedly elevated, which led to further investigations to explain the anomaly.[22] Possible reasons for the elevated results were described as conservative assumptions about the neutron energies used in the dose algorithm and the type of calibration source used to derive the algorithm [*unmoderated* $^{252}$Cf (Californium), fast neutrons].

A recent neutron monitoring study conducted by the site in 1995 showed that neutron doses have been measured for workers performing activities similar to those involved in this evaluation.[23] The study monitored only Uranium Material Handlers performing various tasks in eight locations throughout the plant. Observed median quarterly neutron doses were the Feed Plant (0.05 mSv), X-344 Autoclave Area (0.07 mSv), Shipping and Receiving (0.07 mSv), Cylinder Lots (0.07 mSv), X-345 (0.03 mSv), X-744G (0.02 mSv), X-326 L Cage [below limit of detection or (LOD)], and the Burn Drum Area (0.04 mSv). The mean total dose (0.40 mSv) to

---

** The terms "insignificant", "few" and "large" quantities" were not defined in the referenced reports.[7, 19-21]

the workers in these areas was due primarily to photon exposures, while the neutron component ($\approx$0.05 mSv) accounted for only about 12.5%. This assumes that the dose due to internal exposures was zero. No conclusions were drawn from these data because other neutron characterization efforts that would provide more accurate information regarding neutron energies and dosimetry performance measures were underway.

## Pacific Northwest Laboratories Neutron Study

In September 1995, Pacific Northwest Laboratory (PNL) in Richland, Washington, was contracted to measure occupational neutron dose rates and to determine why PORTS lithium-based dosimetry was showing higher-than-expected neutron responses.[24] A primary consideration in neutron dosimetry is the range of neutron energies to which the workers are exposed. The study conducted by PNL staff used state-of-the-art neutron detectors and spectrometers. Data were analyzed using various software codes, neutron quality factors, and energy spectra to obtain neutron dose rates.

Results from this study suggest that the average neutron energies emitted from depleted and natural uranium cylinders ranged from 210 to 360 kilo-electronvolts (keV) depending on the type of measuring technology employed (tissue-equivalent proportional counters or lithium iodide detectors with polyethylene spheres and the highest-sensitivity $^3$He proportional counters). Slightly enriched material (2%) emitted energetic neutrons around 510 keV. Five percent enriched material emitted more energetic neutrons (770 keV). The most energetic neutrons (860 keV) were detected next to the uranium having the highest enrichment (near 97%). The range of neutron energies (210 to 860 keV) indicates that thermal neutrons (energies below 0.5 eV) are not a concern at the site.

Measurements of the neutron calibration source $^{252}$Cf, using both unmoderated and deuterium oxide ($D_2O$)- moderated techniques, denote an average neutron energy of 1403 keV and 1306 keV,

respectively. Therefore, the neutron radiation fields surrounding the PORTS cylinders had much lower energy than the fields produced by the calibration sources.[24] This may result in higher dose estimates unless the energy differential is accounted for in the dose algorithm. The PNL study concluded:

1. Routine occupational exposures to neutrons are well below the current regulatory limits specified by 10 CFR 20.[25]
2. Dose rates determined by instrumentation can be compared with the response of personal dosimeters exposed to the same neutron fields.
3. Neutron energy distributions vary with cylinder storage configurations, cylinder diameters, and uranium enrichment, which may produce different responses in personal dosimeters.
4. The typical calibration source, $D_2O$-moderated $^{252}$Cf, used for neutron dosimetry calibrations, would not lead to accurate estimates of exposures near uranium cylinders.
5. Neutrons emitted by fission vs. ($\alpha$,n) reactions could not be addressed.
6. The proper interpretation of occupational exposures depends on an accurate understanding of the energy distributions of the neutron field exposing the dosimeters.

## Epidemiologic Study

In 1982, NIOSH initiated a retrospective cohort study to evaluate mortality associated with occupational chemical and radiological exposures. A report on the study findings, issued in January 1987, revealed non-statistically significant elevations in the standardized mortality ratios (SMRs) for stomach cancer and leukemia.[26] This study is currently being updated.

Neutrons were not listed as an exposure of concern at the beginning of the update study because all references to neutron exposures (verbal and written) indicated that they were not materially present at the site.[27] During this HHE, however, NIOSH learned that potential neutron exposures have been present since 1955. Unfortunately, they are not addressed in the current NIOSH study because historical neutron dose data do not exist in a format usable for

epidemiologic analysis. Currently, there are no plans to modify the current epidemiologic study except to consider the findings of this HHE when interpreting the results of any dose-response analyses.

# METHODS

## Background Material

Upon receipt of the HHE request, background material including historical documents about neutron exposures and past practices for neutron monitoring was requested from the site (Appendix C). Most of these materials described techniques used to identify uranium deposits within the cascade. A couple of reports provided information on neutron energy spectra and identified locations with the highest potential for neutron exposures.[24, 28] These were areas where large amounts of uranium were stored or handled (cylinder inspection, storage, filling, etc.). All of the energy spectrum data used in the HHE evaluation were based on the PNL study. NIOSH did not conduct neutron spectrum measurements; however, neutron monitoring was performed using thermoluminescent dosimeters combined with track etched dosimeters (TLD/TEDs) in selected areas and on specified personnel whose job titles suggested exposure potential.

## Monitoring Selections and Dosimeters

During the November 1996 initial survey, locations for area and personnel monitoring were selected by representatives of management and the two unions. Workers in the selected job titles were given a TLD/TED badge designed to measure neutrons. The TLD/TEDs were provided by a vendor (Landauer, Inc.) accredited by the National Voluntary Laboratory Accreditation Program (NVLAP) and experienced with DOE facilities accredited by the Department of Energy Laboratory Accreditation Program (DOELAP).[29] (See NVLAP vs. DOELAP section below for further explanation). The Landauer badge, Neutrak ER, combines a TLD albedo dosimeter with an allyl diglycol carbonate-based (CR-39) technology. Neutrons above 30 to 50 keV can be detected by interactions in the CR-39 either directly or by recoil particles from the source. Lower-energy neutrons reflected from the body (albedo) are detected by the TLD component.[30] By comparing the response of these two elements, a qualitative indication of neutron energies and an estimate of the dose equivalent can be made. Thermal neutrons were not measured during this evaluation based on the findings from the PNL study.[24] In addition, neutrons at PORTS are produced at much higher energy levels than thermal energy levels.

Job titles selected for monitoring included: Uranium Material Handler, Process Operator, Health Physics Technician, Chemical Operator, and Security Guard. Table IV lists number of selected workers in each job title that agreed to participate in the HHE. Area dosimeters were placed on one-gallon polyethylene "cubitainers" filled with either 100% water (indoor measurements) or a mixture of 50% water and 50% antifreeze (outdoor measurements). The liquid-filled "cubitainers" served as tissue-equivalent phantoms. Antifreeze was deemed necessary by the investigator to prevent the solution from freezing, which might have affected neutron moderation and sensitivity of the TLD/TEDs during the winter months (November - February). Three workers agreed to serve as "field" controls and several "NIOSH" controls were employed for quality assurance purposes (see Table IV). Each dosimeter stayed in the field for approximately one calender quarter (November 5 - February 5). Then they were collected and sent to the vendor for analysis.

## Evaluation of Historical Neutron Doses

In addition to performing neutron monitoring on current workers and in selected locations, an attempt was made to evaluate potential historical doses from neutron exposures by reviewing TLD chip readings from the past dosimetry programs. In early 1981, PORTS began using TLD technology to replace their film-based dosimeters as a part of their routine

monitoring program. The early film badges (1950s-1980) and the first TLD badges (1981-1990) were neither calibrated for, nor read, neutron exposures.[20] The first TLD dosimeters originally consisted of four TLD chips. Three were sensitive to penetrating beta-gamma radiation (Lithium, Li-700) and the fourth (Li-600) was sensitive to both gamma and neutron radiation. These chips were shielded by various materials to help determine the type of dose received by the workers. The ratio between the Li-600 and Li-700 chips could be used as a semi-quantitative indicator of neutron exposure. A chip ratio outside expected ranges could suggest that a chip was damaged or that a neutron exposure had occurred. Unfortunately, the past health physics practice was to assume that most, if not all, abnormal chip ratios were due to damaged chips rather than evaluate them for potential neutron exposures.

Despite past practices regarding abnormal chip ratios, a request was made to obtain historical computerized data containing chip readings from 1981 to the present.[31] These were to be reviewed to determine if certain worker groups had higher rates of abnormal ratios than other worker groups. This would provide additional information about the existence and relative degree of past neutron exposures to the workforce. However, problems were encountered in retrieving the data. First, the storage format and type of dosimetry reading equipment changed through time and would have required substantial time and resources to recover. Secondly, the older dosimetry equipment (Harshaw 2276) was a direct-reading machine and did not create a date field when the results were stored. Finally, many archive tapes had been reused, and most of the historical data was overwritten with more recent data.[32] Consequently, data available for this purpose was limited to only the most recent measurements (1992-1995). Thus, it was not feasible to reconstruct neutron exposures from previous TLD chip readings before 1992.

## NVLAP vs. DOELAP

The PORTS is maintained and operated by separate contractors (LMUS and LMES) under different regulatory agencies (NRC and DOE), as identified in Table I. This introduces a level of complexity in evaluating the neutron exposures at the site since each contractor uses separate dosimetry services. The dosimetry services used by LMUS require accreditation through NVLAP. Dosimetry services through the DOE, used by LMES, require accreditation by DOELAP. The special radiological environments associated with the DOE facilities led DOE to develop and maintain a separate testing standard to provide adequate monitoring for their sites' unique radiation fields.[9, 33] Most facilities regulated by the NRC, such as commercial nuclear power plants, have predictable radiation fields and can use dosimetry services provided by any vendor accredited by NVLAP. Accreditation requirements differ between the two agencies. DOELAP only accredits DOE facilities, not commercial vendors, like NVLAP does. The differences between the two accreditation programs related primarily to calibration protocols (type of source, angular response, dosimeter location, and backscatter).[34] While DOE facilities use commercial vendors, it is the DOE facility that holds the accreditation, not the vendor. DOE facilities have not sought NVLAP accreditation since the DOE is more stringent and not subject to NRC regulation. NVLAP accreditation would incur additional costs to the sites, and there is no regulatory need unless they are also a NRC licensee, as is the case for PORTS.[29]

Currently, no resolution has been reached between the NRC and DOE regarding the use of a single dosimetry service for workers exposed to ionizing radiation at PORTS. Therefore, LMUS and LMES workers are monitored by separate dosimetry programs, accredited by NVLAP or DOELAP, respectively. This dual monitoring system adds another level of complexity to the challenge of assessing neutron exposures at the PORTS.

---

# EVALUATION CRITERIA

NIOSH field staff employ environmental and occupational evaluation criteria for the assessment of most chemical and physical agents as a guide to the evaluation of the hazards posed by workplace exposures. These criteria are intended to suggest levels of exposure to which most workers may be exposed for a working lifetime without experiencing adverse health effects. It is, however, important to note that not all workers will be protected from adverse health effects even though their exposures are maintained below these levels. A small percentage may experience adverse health effects because of individual susceptibility, a pre-existing medical condition, and/or a hypersensitivity (allergy). In addition, some hazardous substances may act in combination with other workplace exposures, the general environment, or with medications or personal habits of the worker to produce health effects even if the occupational exposures are controlled at the level set by the criterion. These combined effects are often not considered in the evaluation criteria. Also, some substances are absorbed by direct contact with the skin and mucous membranes, and thus potentially increase the overall exposure. Finally, evaluation criteria may change over the years as new information on the toxic effects of an agent become available. NIOSH encourages the more protective criterion.

The primary sources of occupational evaluation criteria applicable to this HHE are: (1) Nuclear Regulatory Commission Standards for Protection Against Radiation, and (2) Department of Energy Occupational Radiation Protection.[25, 35] The dose limit for ionizing radiation requires that doses combined from internal (alpha) and external (beta, gamma, and neutron) exposures be below 50 millisieverts per year (5000 mrem/yr). The following section addresses the limitations associated with comparing the results from this HHE to the current regulatory limit. Although the gaseous diffusion industry is one of the lowest-exposure industries dealing with radioactive substances, historical summary statistics regarding radiation doses in this industry neither included nor addressed neutron doses.[36] Despite this limitation, it will probably remain one of the lowest-exposure industries among those dealing with radioactive substances.

# RESULTS AND DISCUSSIONS

## Area and Personal Neutron Measurements

Area and personal neutron doses recorded by the TLD/TEDs placed by NIOSH between November 1996 and February 1997 are listed in Tables V and VI. Two areas within Building X-326, Extended Range Product Station (ERP) and Product Withdrawal Area (PW), had measured neutron doses at or slightly above the detection limit of 0.2 mSv (20 mrem) during the monitoring period. The four locations in X-330 included the Tails Withdrawal Area, a location next to a known uranium deposit, a randomly selected location within the building, and the Low Assay Withdrawal Area (LAW). Neutrons were not detected above the detection limit at the Tails Withdrawal Area, the known uranium deposit, or at the randomly selected location. However, the known uranium deposit was removed at some time during the monitoring period, which prevented assessment of potential neutron doses near a known deposit. Neutron doses ranging between 0.4 - 0.6 mSv (40 - 60 mrem) were measured at the LAW Area. In the X-343 area, where nearly 300 storage cylinders are handled monthly, the neutron results ranged between non-detectable and 0.2 mSv. All doses at the X-345 and X-705 locations were below the detection limit. The highest neutron doses were found within the X-745-c cylinder yard maintained by the DOE; they ranged between 2.1 and 7.1 mSv in section 44 and 2.1 to 5.1 mSv in section 3.

None of the workers monitored during this evaluation received neutron doses above the minimum detection limit of 0.2 mSv. However, neutrons were measured in areas commonly occupied by workers (LAW Area and cylinder yards).

## General Limitations

The results obtained from this evaluation represent only a brief period of time relative to the plant's entire history. The results from this evaluation may not fully represent past or future neutron exposure scenarios. Locations monitored during this evaluation will continue to provide a potential for future neutron exposures, depending on the amount of uranium stored, solidified, or handled in the areas. The lack of detectable neutron doses during this monitoring period **should not** be generalized in a retrospective manner nor applied to other locations or job titles. Neutron exposure potential for other areas and workers should be evaluated. Dynamic factors such as unidentified *slow cookers* or emergencies may expose workers to detectable levels of neutrons. It should also be noted that not every exposure scenario was evaluated during this HHE because several activities (removal of known uranium deposits, special decontamination activities, accidents, etc.) either did not occur or were not scheduled prior to the start of the neutron monitoring.

## Area Measurement Limitations

Area neutron measurements obtained in the X-345 building (high-assay storage vaults) were limited to the lobby area within the building. The greatest potential for neutron exposures exists in the vault areas within X-345, where the special nuclear material is stored. Neutron monitoring in the vaults was prohibited due to criticality concerns associated with the use of the NIOSH phantom material. Since the lobby area was already equipped with an approved phantom material, neutron measurements were obtained there.

Variability in the area measurements obtained from the X-745-c locations suggests that dosimeter orientation to the incident neutron radiation is an important factor in determining the dose. Detection efficiency could be reduced by nearly a factor of three, depending on the neutron angle of incidence to the TLD/TEDs.[37] This measurement variability could be a concern if a worker is performing activities near a suspected neutron source for an extended period.

## Comparing HHE Results to the Regulatory Limit

The results reported in this HHE represent only doses from neutron exposures. The regulatory limit is based on a "total" dose concept that also incorporates doses from internal (alpha) and other external (beta and gamma) exposures. Comparing the results of the neutron measurements with the regulatory limit should be done with the understanding that only a fraction of the "total" dose is represented in these results. For example, the LAW Area results ranged between 0.4-0.6 mSv (40 - 60 mrem) during the quarter. This value would represent a worker's neutron dose if he or she spent 24 hours per day for 90 days in this work area. Doses from other internal or external exposures were not obtained; however, applying a conservative assumption that neutrons account for about 12.5 percent of the total dose (assuming zero internal dose), a worker could receive a total radiation dose between 3.2 - 4.8 mSv (320 - 480 mrem) during the quarter. This represents the maximum dose a worker could receive in this radiation area, assuming operating conditions remain constant. A more realistic estimate of a worker's dose would be to adjust the time spent in the radiation area. An adjusted result using three hours per work day as an average time spent in the radiation area is shown in equation 1.

$$\frac{40mrem}{1qtr} \times \frac{1qtr}{90days} \times \frac{1day}{24hours} \times \frac{3hours}{1workday} \times \frac{65workdays}{1qtr} = 3.6\frac{mrem}{qtr} \quad (1)$$

A neutron dose of 3.6 mrem would imply a total dose of about 29 mrem (3.6 / 0.125 = 28.8) from all external sources if neutrons account for 12.5 percent of the total dose as described earlier. This value of a total dose could then be directly compared with the regulatory limit (assuming there is no internal dose component). Continuing with the 12.5 percent assumption, it would take a total external dose of about 160 mrem to measure neutrons at the TLD/TED detection limit of 20 mrem (20 / 0.125 =

160). Since most external doses due to gamma exposures are below 160 mrem, it would be unlikely that neutrons could be detected at PORTS and may explain why all the personal TLD/TED measurements were below the limit of detection.

**Historical Health Physics Practices**

In an effort to reconstruct past neutron exposures, the historical health physics monitoring and reporting practices were reviewed. LMUS and union personnel indicated that abnormal chip ratios and high doses (above 2.7 rem) were routinely assumed to be due to equipment failure ("bad badges") and little effort was made by the Health Physics Department to investigate such doses. The 2.7-rem dose supposedly occurred in the early 1970s during the removal of a uranium deposit in the X-326 building (high-assay). However, no report was found in reviewing the Health Physics Exposure Investigation Reports regarding this event. In addition, no such dose was found in reviewing the computerized Health Physics historical data provided by the site to NIOSH in support of the current epidemiologic study. Past recording and reporting activities applied to high doses were provided as reasons for the lack of historical documents and missing data. Recording decisions regarding high doses were based on the philosophy that doses of this size were very unlikely when compared with past doses reported and recorded at the site. Therefore, equipment failure was provided as the reason for the abnormal dose, and the recorded dose was entered as something other than the measured value. Official documentation of this policy for reducing assessed doses could not be found, however. A measured dose of this size may be possible if the exposure occurred near a highly enriched uranium deposit. The *slow cooker* phenomenon could explain doses in this range.

In addition, this review found that background measurements used to correct personal results have changed throughout time.[32] Depending on the type of dosimetry system used, background was handled in one of three ways: it was calculated using statistics, manually entered into the dosimetry algorithm, or determined from badges in or near the working areas. All these methods have certain limitations. The latter may **not** represent true background exposures (especially if these locations were in elevated radiation areas). Another issue regarding reporting and recording practices involves doses that could not be linked to individuals. A computerized account, setup to store these "unlinkable" doses, is commonly called the *bucket dose* account.[38] A cursory review of this account indicated that several person-rem could not be assigned to individual workers or visitors. Both approaches (background issues and *bucket doses*) reduce the reportable doses and will eventually lead to an artificially low dose history for the facility.

# CONCLUSIONS

This evaluation showed that a potential chronic low-level neutron exposure exists at this site where uranium is stored, handled, or solidified within the cascade. Areas most likely associated with neutron exposures include the Feed and Withdrawal areas, cylinder storage yards, and places where uranium deposits are formed within the cascade. Job titles most likely associated with potential neutron exposures would be those involving routine tasks in potential neutron areas (listed in Table IV). Area neutron doses ranged from less than the detection limit (0.2 mSv) to 7.1 mSv and varied with the amount of uranium present, its enrichment level, geometric configuration, and time spent near the source. While the area measurements confirmed the presence of a chronic low-level exposure to neutrons, all personal doses were below the limit of detection. Recent neutron monitoring results conducted by the site have shown reportable neutron doses. Historical health physics programs (1954 - 1992) neither calibrated nor monitored for neutron exposures. Therefore, potential neutron doses have not been included in the workers dose histories. Data from this evaluation were based on a small sample size and may reflect specific production and seasonal conditions during the 3-month period.

The current dosimetry programs at PORTS for LMUS and LMES workers are NVLAP- and DOELAP- accredited, respectively, and now account for potential neutron doses. Each contractor uses and calibrates dosimeters that are virtually identical. Although differences exist in the specific dose algorithms, it is not a substantial problem because of the general difficulty associated with assessing neutron doses.

# RECOMMENDATIONS

The following recommendations are based on observations made during the survey and document reviews. They are intended to help ensure the safety and health of the workforce. These recommendations stem from the present understanding of the workers' occupational exposures and potential health effects associated with these exposures.

1. The area TLDs used by LMES (DOE contractor) should be used with an appropriate phantom material to monitor neutron exposures in the X-345 vault areas properly.

2. To ensure maximum efficiency in detecting neutrons, workers who are likely to be exposed to neutrons should be informed about the proper positioning of the TLD and its angular dependence in detecting incident neutrons.

3. The document entitled "$D_2O$-Moderated Californium-252 Neutron Calibration Factor ($K_{nd}$) Determination" dated August 17, 1995, should be revised. A minor error in the calculation should be corrected. The Mean Net Test Response calculation used the Mean *Gross* Test Signals instead of the Mean *Net* Test Signals as referenced in the text.[39]

4. The linkage issues regarding the "bucket dose" account should be reviewed and corrected to improve record keeping and reporting activities. Where possible, the "bucket" doses should be assigned to individual workers.

5. Archive tapes should not be recycled to facilitate future dose reconstruction efforts for compliance or epidemiologic purposes.

6. Area monitoring should continue to be performed in areas where uranium is routinely stored or handled to characterize potential neutron exposures better. In addition, efforts should be taken to evaluate potential neutron doses associated with known uranium deposits within the cascade.

7. Past maintenance activities and personnel involved in physically removing uranium deposits should be evaluated to provide better insight on the doses attributable to the *slow cooker* phenomenon.

8. Administrative changes or decisions regarding issues in the health physics dosimetry program (doses below the limit of detection, abnormal chip ratios, investigative reports, etc.) should be better documented and routinely reported to the workforce to educate, inform, and solicit questions about how the changes or decisions will affect their dose records.

# ABBREVIATIONS AND TERMS

| | |
|---|---|
| CFR | Code of Federal Regulations |
| DHHS | Department of Health and Human Services |
| DOE | Department of Energy |
| DOELAP | Department of Energy Laboratory Accreditation Program |
| DOL | Department of Labor |
| ERP | Extended Range Product |
| HHE | Health Hazard Evaluation |
| LAW | Low Assay Withdrawal |
| LMUS | Lockheed Martin Utility Services |

| LOD | Limit of Detection |
| LMES | Lockheed Martin Energy Services |
| NIOSH | National Institute for Occupational Safety and Health |
| NRC | Nuclear Regulatory Commission |
| NVLAP | National Voluntary Laboratory Accreditation Program |
| OCAW | Oil, Chemical and Atomic Workers Union International |
| PGDP | Paducah Gaseous Diffusion Plant |
| PNL | Pacific Northwest Laboratories |
| PORTS | Portsmouth Gaseous Diffusion Plant |
| PW | Product Withdrawal Area |
| TEPC | Tissue Equivalent Proportional Counter |
| TLD | Thermoluminescent Dosimeter |
| OSHA | Occupational Safety and Health Act |
| RU | Recycled Uranium |
| Sv | Sievert |
| UPGWA | United Plant Guard Workers of America |
| USEC | United States Enrichment Corp. |

# REFERENCES

1. "Energy Policy Act of 1992," *U.S. Code,* Title 42, Pt. 13201 *et seq.* Oct. 24, 1992.

2. U.S. Department of Energy: *Memorandum of Understanding Between Department of Energy and Department of Health and Human Services* Washington D.C., December 19, 1990. [Memo] 14 pgs.

3. Borders, R.J. *The Dictionary of Health Physics and Nuclear Sciences Terms.* Hebron, CT: RSA Publications, 1991, p.25.

4. Martin Marietta Energy Systems, Inc. *Final Safety Analysis Report. Introduction, Summary Safety Analysis, Site, and Facility and Process Description - Part 1.* Portsmouth, OH: Martin Marietta Energy Systems, Inc. GAT/GDP-1073. Volume 1. April 1985.

5. Martin Marietta Energy Systems, Inc. *Portsmouth Uranium Enrichment Plant: Technical Site Information.* Portsmouth, OH: Martin Marietta Energy Systems, Inc. POEF-2059. June 1992.

6. Goodyear Atomic Corporation: *Thermoluminescent Dosimeter Response and Calibration* by A.C. Bassett (GAT-S-56). Piketon, OH., 1986.

7. U.S. Department of Energy: *Health Physics Manual of Good Practices for Uranium Facilities.* B.L Rich, S.L Hinnefeld, C.R. Lagerquist, W.G. Mansfield, L.H. Munson, E.R. Wagner, E.J. Vallario. (EGG-2530:UC-41) Idaho National Engineering Laboratory: Department of Energy, June 1988.

8. Knoll, G.F.: *Radiation Detection and Measurements. Second Edition.* New York: John Wiley & Sons, 1989. pp. 514-554.

9. Higginbotham, J. (ed.): *Applications of New Technology: External Dosimetry.* Madison, WI: Medical Physics Publishing, 1996. pp. 175-190, 221-254.

10. Turner, J.E.: *Atoms, Radiation, and Radiation Protection.* New York: Pergamon Press, 1986. pp. 180-187.

11. Greening, J.R.: *Fundamentals of Radiation Dosimetry. Second Edition.* Philadelphia: IOP Publishing Inc. 1985. pp. 104-108.

12. Martin Marietta: *Nondestructive Assay Measurements in Support of HEU Suspension at the Portsmouth Gaseous Diffusion Plant* by J. Bailey, R.C. Hagenauer, R.L. Mayer II, B.R. McGinnis, R.R. Royce ( POEF-TO-1). Piketon, OH., Martin Marietta, 1993.

13. Goodyear Atomic Corporation: *Characterization of Process Holdup Material at the Portsmouth Gaseous Diffusion Plant* by D.E. Boyd and R.R. Miller (GAT-NM-137). Piketon, OH.: Goodyear Atomic Corporation, 1986.

14. Martin Marietta Energy Systems: *PORTS Deposit Detection Program: Chartbook from TSA Team Revisit* by C.J. Van Meter (POEF-T-3498). Piketon, OH., Martin Marietta Energy Systems, 1988.

15. Foster. A.R., R.L. Wright: *Basic Nuclear Engineering. Fourth Edition.* Boston: Allyn and Bacon, Inc. 1983. pp. 4-6.

16. Daderstadt, J.J., L.J. Hamilton: *Nuclear Reactor Analysis.* New York: John Wiley & Sons, 1976. pp. 74-86.

17. Health Physics and Applied Nuclear Technologies Personnel: "Uranium Deposits at the PORTS." November 4-8, 1996. [Private Conversation]. Lockheed Martin, USEC; 3030 U.S. Route 23 South; P.O. Box 628; Piketon, OH 45661.

18. Goodyear Atomic Corporation: *A Guide to Operations When Checking for Uranium Deposits* by J.L. Feuerbacher (GAT-DM-758). Piketon, OH., Goodyear Atomic Corporation. 1959.

19. Goodyear Atomic Corporation: *A Guide to Operations When Checking for Uranium Deposits* by J.L. Feuerbacher (GAT-DM-758). Piketon, OH., Goodyear Atomic Corporation. 1959.

20. Lockheed Martin: "Neutron Monitoring at PORTS Prior to 1990." E.R. Wagner. Lockheed Martin, Piketon, OH., January 25, 1997. [Memo]

21. Goodyear Atomic Corporation: "Assessment of Neutron Exposure Potential for Uranium Material Handlers; GAT-102-86-112." A.C. Bassett. Goodyear Atomic Corporation, Piketon, OH., February 18, 1986. [Memo]

22. Lockheed Martin: "Neutron Dose Equivalents and Problem Report PR-PTS-95-0582; POEF-050-95-091." R. Smith. Lockheed Martin, Piketon, OH., July 14, 1995. [Memo]

23. Lockheed Martin Utility Services, Inc.: *Evaluation of Dose Potential for Uranium Material Handlers* by Safety and Health Division, External Dosimetry Program. Piketon, OH., Lockheed Martin Utility Services, Inc., 1995.

24. Pacific Northwest Laboratory: *Enriched Uranium Cylinder Neutron Characterization Measurements at the Portsmouth Gaseous Diffusion Plant* by R.I. Scherpelz, M.K. Murphy, Richland, WA., Pacific Northwest Laboratory, 1995.

25. "Standards for Protection Against Radiation," *Code of Federal Regulations* Title 10, Part 20. 1992.

26. National Institute for Occupational Safety and Health: *Mortality among Uranium Enrichment Workers* by D.P. Brown, T. Bloom (NTIS PB 87-188991). Cincinnati, OH., National Institute for Occupational Safety and Health, 1987.

27. Oak Ridge Associated Universities. "Dosimetry Records and Radiation Hazards Questionnaire." September 10, 1982. [Unpublished Information]. Oak Ridge Associated Universities; P.O. Box 117; Oak Ridge, TN. 37830.

28. Lockheed Martin Utility Services, Inc.: "PORTS Site Neutron Spectral Information; POEF-050-95-067." S. Jones. Lockheed Martin Utility Services, Inc., Piketon, OH., May 30, 1995. [Memo]

29. U.S. Department of Energy: "DOELAP / Neutron Calibration." R. Loesh, U.S. Department of Energy / DOELAP Administrator, Washington, D.C., January 13, 1997. [E-mail]

30. Hadlock, D.E.: US Progress on the Development of Neutron Dosemeters Based on CR-39. *Radiation Protection Dosimetry.* Vol. 20 No. 1/2 pp. 117-119 (1987).

31. National Institute for Occupational Safety and Health: "Follow-up Request for Historical Computerized Exposure Data." J.J. Cardarelli II, National Institute for Occupational Safety and Health. Cincinnati, OH., December 2, 1996. [Memo]

32. Bowdle, J., Truitt, M.: "Explanation for Lack of Historical Computerized Data and Background Radiation Applications." November 22 and November 26, 1996. [Private Conversation]. Lockheed Martin, USEC; 3030 U.S. Route 23 South; P.O. Box 628; Piketon, OH 45661.

33. Federal Register. Vol. 58. No. 238. Tuesday, December 14, 1993. Department of Energy. 10 CFR Part 835.

34. NCRP Report 122. *Use of Personal Monitors to Estimate Effective Dose Equivalent and Effective Dose to Workers for External Exposure to Low-LET Radiation.* National Council on Radiation Protection and Measurements. Bethesda, MD. December 1995.

35. "Occupational Radiation Protection." *Code of Federal Regulations* Title 10, Part 835. 1997.

36. NCRP Report 101. *Exposure of the U.S. Population from Occupational Radiation.* National Council on Radiation Protection and Measurements. Bethesda, MD. June 1989.

37. Decossas, J.L. and Varielle, J.C.: The Neutron Energy and Angular Response of Conventional Etching Systems Based on CR-39. *Radiation Protection Dosimetry.* Vol. 20 No. 1/2 pp. 42-47 (1987).

38. Dulin, C.: "Explanation of Bucket Dose Exposure File." November 8, 1996. [Private Conversation]. Lockheed Martin, USEC; 3030 U.S. Route 23 South; P.O. Box 628; Piketon, OH 45661.

39. Lockheed Martin Utility Service, Inc.: *$D_2O$-Moderated Californium-252 Neutron Calibration Factor ($K_{nd}$) Determination* by Safety and Health Division, External Dosimetry Program. Piketon, OH., Lockheed Martin Utility Services, Inc., 1995.

**Table I**
**USEC and DOE Portsmouth Facilities Selected for Monitoring**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)

| Facility | Description | LMUS USEC (NRC) | LMES DOE |
|----------|-------------|:---:|:---:|
| X-326 | Process Building (Highly Enriched U*) | X | |
| X-330 | Process Building | X | |
| X-333 | Process Building (Depleted U) | X | |
| X-344-A | $UF_6$* Sampling Building | X | |
| X-344-B | Maintenance Storage Building | X | |
| X-705 | Decontamination Building | X | |
| X-345 | SNM* Storage Building | | X |
| X-745 | Cylinder Storage Yards | | X |

\* SNM = Special Nuclear Material
 U = Uranium
 $UF_6$ = Uranium Hexafluoride

**Table II**
**Radiological Units[#]**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)

| Quantity | Name | Symbol | Units |
|----------|------|--------|-------|
| Exposure | coulomb per kilogram (roentgen) | (R) | $C\ kg^{-1}$ ($2.58 \times 10^{-4}\ C\ kg^{-1}$) |
| Dose Equivalent | sievert (rem) | Sv (rem) | $J\ kg^{-1}$ ($10^{-2}\ Sv$) |

[#] Old units are in brackets.

**Table III**
**Isotopes Present in Natural Uranium\***
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)

| Isotope | Abundance (%) | Half-life (Years) |
|---------|---------------|-------------------|
| $^{238}U$ | 99.2739 ± 0.0007 | 4.46 x $10^9$ |
| $^{235}U$ | 0.7204 ± 0.0007 | 7.04 x $10^8$ |
| $^{234}U$ | 0.0057 ± 0.0002 | 2.45 x $10^5$ |

\* Source: Shleien, G.  The Health Physics and Radiological Health Handbook.  Revised Edition, Scinta, Inc. Silver Spring, MD.  1992.

**Table IV**
**Neutron Monitoring Selections**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)

| Job Titles | Number |
|-----------|--------|
| Chemical operators | 11 |
| Health physics technicians | 5 |
| Laborers (painters/scrapers) | 5 |
| Maintenance | 1 |
| Process operators | 12 |
| Security guards | 5 |
| Uranium material handlers | 18 |
| Personal measurements | 57 |
| Area measurements | 33 |
| Field controls (HP, 2 Union Reps) | 3 |
| NIOSH controls | 8 |
| Total Measurements | 101 |

**Table V**
**Area Neutron Measurements**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)
November 1996 - February 1997

| Area or Control | Buildings (Area) | Location/Comments | TLD/TED Number[†] | Dose (mSv)[‡] |
|---|---|---|---|---|
| Area | X-326 | ERP (Dynamics St. #2)<br>ERP (Dynamics St. #2)<br>ERP (Dynamics St. #2) | 53<br>54<br>55 | 0.20<br>0.20<br>0.40 |
| | | PW (T-57-8-3 Bed #3)<br>PW (T-57-8-3 Bed #3)<br>PW (T-57-8-3 Bed #3) | 60<br>61<br>66 | 0.20<br>0.20<br>0.20 |
| Area | X-330 | Tails<br>Tails<br>Tails | 73<br>74<br>75 | <0.20<br><0.20<br><0.20 |
| | | Deposit; dd-4; 29AB-1<br>Deposit; dd-4; 29AB-1<br>Deposit; dd-4; 29AB-1 | 57<br>63<br>69 | <0.20<br><0.20<br><0.20 |
| | | G33; 29-3-7-7 (randomly selected)<br>G33; 29-3-7-7 (randomly selected)<br>G33; 29-3-7-7 (randomly selected) | 56<br>62<br>68 | <0.20<br><0.20<br><0.20 |
| | | LAW (near eye wash)<br>LAW (near eye wash)<br>LAW (near eye wash) | 71<br>72<br>78 | 0.60<br>0.40<br>0.60 |
| Area | X-343 | Typical Movement (300 cylinder/month)<br>Typical Movement (300 cylinder/month)<br>Typical Movement (300 cylinder/month) | 59<br>65<br>67 | <0.20<br><0.20<br>0.20 |
| Area | X-345 | Behind Phantom #5 on wall<br>Behind Phantom #5 on wall<br>Behind Phantom #5 on wall | 37<br>40<br>42 | <0.20<br><0.20<br><0.20 |
| Area | X-705 | Portal<br>Portal<br>Portal | 95<br>96<br>98 | <0.20<br><0.20<br><0.20 |

**Table V (continued)**
**Area Neutron Measurements**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)
November 1996 - February 1997

| Area or Control | Buildings (Area) | Location/Comments | TLD/TED Number[†] | Dose (mSv)[‡] |
|---|---|---|---|---|
| Area | X-745-c | DOE Lot; 11,200; 2-3%; row 22-23 Sec. 44 | 47 | 4.20 |
| | | DOE Lot; 11,200; 2-3%; row 22-23 Sec. 44 | 52 | 2.10 |
| | | DOE Lot; 11,200; 2-3%; row 22-23 Sec. 44 | 76 | 7.10 |
| | | DOE Lot; 11,200; 2-3%; row 20-21 Sec. 3, heel | 58 | 2.10 |
| | | DOE Lot; 11,200; 2-3%; row 20-21 Sec. 3, heel | 64 | 5.10 |
| | | DOE Lot; 11,200; 2-3%; row 20-21 Sec. 3, heel | 70 | 3.20 |
| Controls | | Stayed at NIOSH | 0 | <0.20 |
| | | Stayed at NIOSH | 1 | <0.20 |
| | | Stayed at NIOSH | 2 | <0.20 |
| | | Stayed at NIOSH | 92 | <0.20 |
| | | Stayed at NIOSH | 93 | <0.20 |
| | | Stayed at NIOSH | 94 | <0.20 |
| | | Stayed at NIOSH | 99 | <0.20 |
| | | Stayed at NIOSH | 100 | <0.20 |

[†] TLD/TED numbers provided only for reference purposes with sample locations.

[‡] Deep dose equivalent applies to external whole-body exposures and is the dose equivalent at a tissue depth of 1 cm (1,000 mg/cm$^2$). Dose equivalents for the monitoring period below the limit of detection are indicated by <0.20. All fast and moderate energy neutron dosimeters have a minimum reporting value of 0.20 mSv (20 mrem). A neutron quality factor of 10 has been applied to the dose estimate.

**Table VI**
**Personal Neutron Dosimetry Results**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)
November 1996 - February 1997

| Job Title | Dept. | Buildings (Area) | Comments | TLD/TED Number[†] | Dose (mSv)[†] |
|---|---|---|---|---|---|
| Chemical Operators | 771 | X-705 | Recovery | 3 | <0.20 |
| | 791 | X-344, X-345, X-744-g | Cylinder Lots | 5 | <0.20 |
| | 771 | X-705 | | 7 | <0.20 |
| | 771 | X-705 | Recovery | 8 | <0.20 |
| | 771 | X-705 | Small Parts | 9 | <0.20 |
| | 771 | X-705 | Small Parts | 10 | <0.20 |
| | 791 | X-344, X-345, X-744-g | Cylinder Lots | 11 | <0.20 |
| | 771 | X-705 | | 13 | <0.20 |
| | 771 | X-705 | Tunnel | 15 | <0.20 |
| | 771 | X-705 | Small Parts | 17 | <0.20 |
| | 721 | X-326 | Misc. | 45 | <0.20 |
| Heath Physics Techs. | 300 | X-344, X-343, X-342 | HP coverage in building | 22 | <0.20 |
| | 300 | X-705 | HP coverage in building (shift work) | 82 | <0.20 |
| | 300 | X-705 | HP coverage in building | 83 | <0.20 |
| | 300 | X-343 | HP coverage in building | 85 | <0.20 |
| | 300 | X-705 | | 86 | <0.20 |
| Laborers | 147 | Cylinder Yards | Paint and Scrap in yards (20 hrs/wk) | 77 | <0.20 |
| | 147 | Cylinder Yards | Paint and Scrap in yards (20 hrs/wk) | 79 | <0.20 |
| | 147 | Cylinder Yards | Paint and Scrap in yards (20 hrs/wk) | 80 | <0.20 |
| | 147 | Cylinder Yards | Paint and Scrap in yards (20 hrs/wk) | 81 | <0.20 |
| | 147 | Cylinder Yards | Paint and Scrap in yards (20 hrs/wk) | 84 | <0.20 |

**Table VI (continued)**
**Personal Neutron Dosimetry Results**
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)
November 1996 - February 1997

| Job Title | Dept. | Buildings (Area) | Comments | TLD/TED Number[f] | Dose (mSv)[t] |
|---|---|---|---|---|---|
| Maintenance | 469 | X-326 | General Activities | 39 | <0.20 |
| Process Operators | 720 | X-333 | Cold Recovery | 23 | <0.20 |
| | 730 | X-330 | Unit Operator | 33 | <0.20 |
| | 730 | X-330 | Tails Withdrawal | 34 | <0.20 |
| | 740 | X-326 | Relief | 38 | <0.20 |
| | 740 | X-326 | Product Withdrawal (PW) | 41 | <0.20 |
| | 720 | X-333 | ACR Low Assay Withdrawal Utility | 43 | <0.20 |
| | 730 | X-330 | Tails Withdrawal | 44 | <0.20 |
| | 740 | X-326 | Rover | 46 | <0.20 |
| | 720 | X-333 | Low Assay Withdrawal Operator | 48 | <0.20 |
| | 730 | X-330 | Unit Operator (tails env.) | 49 | <0.20 |
| | 740 | X-326 | Extended Range Product Station | 50 | <0.20 |
| | 740 | X-326 | Product Withdrawal (PW) | 51 | <0.20 |
| Security Guards | 152 | X-326, X-705, X-345 | Product Withdrawal | 14 | <0.20 |
| | 151 | X-326, X-705 | Rotation P-12 | 36 | <0.20 |
| | 152 | X-326, X-345 | Rotation P-12 - 705 | 89 | <0.20 |
| | 152 | X-345, X-705 | Rotation P-12 | 90 | <0.20 |
| | 152 | | | 91 | <0.20 |

Table VI (continued)
Personal Neutron Dosimetry Results
Portsmouth Gaseous Diffusion Plant, Piketon, Ohio (HETA 96-0198-2651)
November 1996 - February 1997

| Job Title | Dept. | Buildings (Area) | Comments | TLD/TED Number[†] | Dose (mSv)[‡] |
|---|---|---|---|---|---|
| | 791 | X-344, X-745-c, X-745-e | Cylinder Lots (movements, inspect, staging) | 4 | <0.20 |
| | 791 | X-344 | Cylinder Lots | 6 | <0.20 |
| | 791 | X-344 | | 12 | <0.20 |
| | 791 | X-344, X-745-c, X-745-e | | 16 | <0.20 |
| | 791 | X-326 | L-Cage | 18 | <0.20 |
| | 791 | X-744-G | Warehouse Storage | 19 | <0.20 |
| | 791 | X-344 | Autoclave | 20 | <0.20 |
| | 791 | X-344 | Autoclave | 21 | <0.20 |
| Uranium Material Handlers | 791 | X-344 | Shipping and Receiving | 24 | <0.20 |
| | 791 | X-344 | Autoclave | 25 | <0.20 |
| | 791 | | DOE and USEC Lots (mostly UESC) | 26 | <0.20 |
| | 791 | X-344, X-744-g | | 27 | <0.20 |
| | 791 | X-344 | Shipping and Receiving | 28 | <0.20 |
| | 791 | X-744-g | Pick-up and delivery of cylinders, oxides, etc. | 29 | <0.20 |
| | 791 | X-344 | Autoclave | 30 | <0.20 |
| | 791 | X-344 | Autoclave | 31 | <0.20 |
| | 791 | X-344 | Cylinder Lot  X-745-b, misc. | 32 | <0.20 |
| | 791 | X-345 | Vault | 35 | <0.20 |
| | | | | | |
| | All | | Safety Representative | 87 | <0.20 |
| Controls | 300 | All | Health Physics Tech. | 88 | <0.20 |
| | All | | Safety Representative | 97 | <0.20 |

[†] TLD/TED numbers provided only for reference purposes with sample locations.

[‡] Deep dose equivalent applies to external whole-body exposures and is the dose equivalent at a tissue depth of 1 cm (1,000 mg/cm²).  Dose equivalents for the monitoring period below the minimum reportable quantity are indicated by <0.20.  All fast and moderate energy neutron dosimeters

have a minimum reporting value of 0.20 mSv (20 mrem).  A neutron quality factor of 10 has been applied to the dose estimate.

**Appendix A**
**Uranium Decay Series, $^{238}$U (4n+2)[†]**

| Nuclide[§] | Half-Life | Major Radiation Energies (MeV) and Intensities[‡] | | | | | |
|---|---|---|---|---|---|---|---|
| | | α | | β | | γ | |
| | | MeV | % | MeV | % | MeV | % |
| $^{238}_{92}$U ↓ | 4.468 x 10$^9$ y | 4.15<br>4.20 | 22.9<br>76.8 | | | 0.0496 | 0.07 |
| $^{234}_{90}$Th ↓ | 24.1 d | | | 0.076<br>0.095<br>0.096<br>0.1886 | 2.7<br>6.2<br>18.6<br>72.5 | 0.0633<br>0.0924<br>0.0928<br>0.1128 | 3.8<br>2.7<br>2.7<br>0.24 |
| $^{234m}_{91}$Pa | 1.17 m | | | 2.28 | 98.6 | 0.766<br>1.001 | 0.207<br>0.59 |
| 99.87%   0.13%<br>$^{234}_{91}$Pa  $^{234}_{91}$Pa IT<br>↓      ↓ | 6.7 h | | | 22 βs<br>E Avg = 0.224<br>Emax = 1.26 | | 0.132<br>0.570<br>0.883<br>0.926<br>0.946 | 19.7<br>10.7<br>11.8<br>10.9<br>12.0 |
| $^{234}_{92}$U ↓ | 244,500 y | 4.72<br>4.77 | 27.4<br>72.3 | | | 0.053<br>0.121 | 0.12<br>0.04 |
| $^{230}_{90}$Th ↓ | 7.7 x 10$^4$ y | 4.621<br>4.688 | 23.4<br>76.2 | | | 0.0677<br>0.142<br>0.144 | 0.37<br>0.07<br>0.045 |
| $^{226}_{88}$Ra ↓ | 1600 ± 7 y | 4.60<br>4.78 | 5.55<br>94.4 | | | 0.186 | 3.28 |
| $^{222}_{86}$Rn ↓ | 3.823 d | 5.49 | 99.9 | | | 0.510 | 0.078 |
| $^{218}_{84}$Po ↓ | 3.05 m | 6.00 | ~100 | 0.33 | 0.02 | 0.837 | 0.0011 |
| 99.98%   0.02%<br>$^{214}_{82}$Pb<br>↓ | 26.8 m | | | 0.67<br>0.73<br>1.03 | 48.0<br>42.5<br>6.3 | 0.2419<br>0.295<br>0.352<br>0.786 | 7.5<br>19.2<br>37.1<br>1.1 |
| $^{218}_{85}$At ↓ | 2 s | 6.66<br>6.7<br>6.757 | 6.4<br>89.9<br>3.6 | | | 0.053 | 6.6 |
| $^{214}_{83}$Bi ↓ | 19.9 m | 5.45<br>5.51 | 0.012<br>0.008 | 1.42<br>1.505<br>1.54<br>3.27 | 8.3<br>17.6<br>17.9<br>17.7 | 0.609<br>1.12<br>1.765<br>2.204 | 46.1<br>15.0<br>15.9<br>5.0 |

## Appendix A (continued)
## Uranium Decay Series, $^{238}$U (4n+2)†

| Nuclide§ | Half-Life | α MeV | α % | β MeV | β % | γ MeV | γ % |
|---|---|---|---|---|---|---|---|
| 99.979% 0.021% $^{214}_{84}$Po ↓ ↓ | 164 µs | 7.687 | 100 | | | 0.7997 | 0.010 |
| $^{210}_{81}$Tl ↓ ↓ ↓ ↓ | 1.3 m | | | 1.32<br>1.87<br>2.34 | 25.0<br>56.0<br>19.0 | 0.2918<br>0.7997<br>0.860<br>1.110<br>1.21<br>1.310<br>1.410<br>2.010<br>2.090 | 79.1<br>99.0<br>6.9<br>6.9<br>17.0<br>21.0<br>4.9<br>6.9<br>4.9 |
| $^{210}_{82}$Pb ↓ | 22.3 y | 3.72 | 0.000002 | 0.016<br>0.063 | 80.0<br>20.0 | 0.465 | 4.0 |
| $^{210}_{83}$Bi ↓ | 5.01 d | 4.65<br>4.69 | 0.00007<br>0.00005 | 1.161 | ~100 | | |
| ~100% 0.00013% $^{210}_{84}$Po ↓ | 138.378 d | 5.305 | 100 | | | 0.802 | 0.0011 |
| $^{206}_{81}$Tl ↓ | 4.20 m | | | 1.571 | 100 | 0.803 | 0.0055 |
| $^{206}_{82}$Pb | Stable | | | | | | |

| | | |
|---|---|---|
| y | = Year | α = alpha decay |
| d | = Day | β = beta decay |
| h | = hour | γ = gamma decay |
| m | = minute | IT = Internal transition |
| s | = second | MeV = million electron volts |
| µs | = microsecond ($10^{-6}$ s) | |

† This expression describes the mass number of any member in this series, where n is an integer. For example: $^{206}$Pb (4n+2)...4(51) + 2 = 206.

‡ Intensities refer to percentage of disintegrations of the nuclide itself, not to original parent of series. Gamma %s in terms of observable emissions, not transitions.

§ Shaded areas represent the major sources of radiation exposure at the PORTS along with technetium-99, cesium-137 and machine-generated X-rays.

**Appendix B**
**Actinium Decay Series, $^{235}$U (4n+3)[†]**

| Nuclide[§] | Half-Life | Major Radiation Energies (MeV) and Intensities[‡] | | | | | |
| | | α | | β | | γ | |
| | | MeV | % | MeV | % | MeV | % |
| --- | --- | --- | --- | --- | --- | --- | --- |
| $^{235}_{92}$U ↓ | 7.038 x 10$^8$ y | 4.2 - 4.32 | 10.3 | | | 0.1438 | 10.5 |
| | | 4.336 | 17.6 | | | 0.163 | 4.7 |
| | | 4.398 | 56 | | | 0.1857 | 54 |
| | | 4.5-4.6 | 11.3 | | | 0.205 | 4.7 |
| $^{231}_{90}$Th ↓ | 25.5 h | | | 0.205 | 15 | 0.0256 | 14.8 |
| | | | | 0.287 | 49 | 0.0842 | 6.5 |
| | | | | 0.304 | 35 | | |
| $^{231}_{91}$Pa ↓ | 3.276 x 10$^4$ y | 4.95 | 23 | | | 0.0274 | 9.3 |
| | | 5.01 | 25.6 | | | 0.2837 | 1.6 |
| | | 5.029 | 20.2 | | | 0.300 | 2.3 |
| | | 5.058 | 11.1 | | | 0.3027 | 4.6 |
| | | | | | | 0.330 | 1.3 |
| $^{227}_{89}$Ac ↓ | 21.77 y | 4.94 | 0.53 | 0.019 | 10 | 0.070 | 0.017 |
| | | 4.95 | 0.66 | 0.034 | 35 | 0.100 | 0.032 |
| | | | | 0.044 | 54 | 0.160 | 0.019 |
| 98.62%  1.38% $^{227}_{90}$Th ↓ | 18.718 d | 5.757 | 20.2 | | | 0.050 | 8.5 |
| | | 5.978 | 23.3 | | | 0.236 | 11.2 |
| | | 6.038 | 24.4 | | | 0.300 | 2.0 |
| | | | | | | 0.304 | 1.1 |
| | | | | | | 0.330 | 2.7 |
| $^{223}_{87}$Fr ↓ | 21. 8 m | 5.44 | ~0.006 | 1.15 | ~100 | 0.050 | 34.0 |
| | | | | | | 0.0798 | 9.2 |
| | | | | | | 0.2349 | 3.4 |
| $^{223}_{88}$Ra ↓ | 11.43 d | 5.607 | 24.1 | | | 0.144 | 3.3 |
| | | 5.716 | 52.2 | | | 0.154 | 5.6 |
| | | 5.747 | 9.45 | | | 0.269 | 13.6 |
| | | | | | | 0.324 | 3.9 |
| | | | | | | 0.338 | 2.8 |
| $^{219}_{86}$Rn ↓ | 3.96 s | 6.425 | 7.4 | | | 0.271 | 9.9 |
| | | 6.55 | 12.1 | | | 0.4018 | 6.6 |
| | | 6.819 | 80.3 | | | | |
| $^{215}_{84}$Po | 1.78 ms | 7.386 | ~100 | 0.74 | ~0.00023 | 0.4388 | 0.04 |

### Appendix B (continued)
### Actinium Decay Series, $^{235}U$ (4n+3)[†]

| Nuclide[§] | | Half-Life | Major Radiation Energies (MeV) and Intensities[‡] | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | α | | β | | γ | |
| | | | MeV | % | MeV | % | MeV | % |
| ~100% 0.00023% $^{211}_{82}Pb$ ↓ ↓ ↓ | | 36.1 m | | | 0.26<br>0.97<br>1.37 | 4.8<br>1.4<br>92.9 | 0.405<br>0.427<br>0.832 | 3.0<br>1.38<br>2.8 |
| | $^{215}_{85}At$ ↓ | ~0.1 ms | 8.026 | ~100 | | | 0.404 | 0.047 |
| $^{211}_{83}Bi$ ↓ | | 2.14 m | 6.28<br>6.62 | 16<br>84 | 0.579 | 0.27 | 0.351 | 12.7 |
| 0.273% 99.73% $^{211}_{84}Po$ ↓ ↓ ↓ | ↓ | 0.516 s | 7.42 | 98.9 | | | 0.570<br>0.898 | 0.54<br>0.52 |
| | $^{207}_{81}Tl$ ↓ | 4.77 m | | | 1.42 | 99.8 | 0.897 | 0.24 |
| $^{207}_{82}Pb$ | | stable | | | | | | |

y  = Year  
d  = Day  
h  = hour  
m  = minute  
s  = second  
μs = microsecond ($10^{-6}$ s)

α  = alpha decay  
β  = beta decay  
γ  = gamma decay  
IT = Internal transition  
MeV = Million electron Volts

[†] This expression describes the mass number of any member in this series, where n is an integer. For example: $^{207}Pb$ (4n+3)...4(51) + 2 = 207.

[‡] Intensities refer to percentage of disintegrations of the nuclide itself, not to original parent of series. Gamma %s in terms of observable emissions, not transitions.

[§] Shaded areas represent the major sources of radiation exposure at the PORTS along with technetium-99, cesium-137 and machine-generated X-rays.

**Appendix C**
**Requested Background Documentation**

| Number | Date | Author | Title |
|---|---|---|---|
| GAT-NM-137 | 06/23/86 | Boyd, D.E. | Charac. of Process Holdup Material ... |
| GAT-S-56 | 04/20/86 | Bassett, A.C. | Thermoluminescent Dosimetry Response & Calibration |
| GAT-S-58 | 01/22/86 | Ruggles, D.J. | TLD Error Analysis |
| GAT-S-54 | 11/20/85 | Bassett, A.C. | TLD Program Processing Proc's Harshaw 2276 ver BGX1 |
| GAT-S-49 | 06/28/85 | Bassett, A.C. | Calibration of TLD Albedo Neutron Dosimeters |
| GAT-T-866 | 09/08/61 | Baker, D.D. | The Use of Radioactivity to Determine the Uranium ... |
| POEF-T-3498 | 09/14/88 | Van Meter, C.J. | Ports. Deposit Detection Program: ..TSA Team Revision ... |
| POEF-T-3452 | 06/11/87 | Lewis, D.D. | ..Neutron Detectors..Uranium Deposit..In Cascade |
| GAT-DM-1099 | 07/27/66 | Feuerbacher, J.L. | Use of a Neutron Probe for Assay Monitoring |
| GAT-DM-1085 | 10/20/65 | Feuerbacher, J.L. | Neutron Probe Monitoring for U-235 Assay of UF6 Be ... |
| GAT-DM-1017 | 10/17/62 | Feuerbacher, J.L. | Neutron Probe Readings for Safe Batches at Various ... |
| GAT-DM-833 | 04/25/60 | Feuerbacher, J.L. | Nuclear Hazards Consideration for a Storage Area ... |
| GAT-CM-758 | 06/01/59 | Feuerbacher, J.L. | A Guide to Operations when checking for Uranium Deposits ... |



Delivering on the Nation's promise:
Safety and health at work for all people
Through research and prevention

**NIOSH**

# EXHIBIT F

 

**Oil, Chemical & Atomic Workers International Union, AFL-CIO**

Piketon Local No. 3-689
P.O. Box 467
Piketon, Ohio 45661
(614) 289-2405

January 30, 1995

TO: Roger D. McDermott, Manager Health and Safety

FROM: Carl R. Hartley, A Shift Safety Representative

Dear Mr. McDermott;

On August 1, 1994, I filed an A-2010, Safety and Health Complaint for Ron Boggs. The complaint dealt with the intentional exposure of workers in the X-720 Maintenance Building.

I asked Herman Potter, Jr., O.C.A.W. Health and Safety Representative, what corrective actions Martin Marietta Utility Services has taken. He replied that the company has labeled Mr. Boggs as a chronic complainer and is trying to remove him from the X-700 building because of his health restriction.

More than a month ago I asked Joe Moore, Deputy Manager, Health and Safety, about the status of this complaint and I have not received an answer.

This was a flagrant violation of the workers' health and safety and it has been completely ignored.

What is the status of this complaint?

Sincerely,

Carl R. Hartley

Carl R. Hartley
A Shift Safety Rep.

cc: John Knauff
U.S.E.C.
DOE

A-2010 (9-90) Rev.

# SAFETY AND HEALTH SUGGESTION / COMPLAINT

| TO: (SUPERVISION) ROGER D. McDERMOTT | DEPT. AND DIVISION SAFETY | BLDG. 1000 | MAILSTOP 5009 | PHONE 5-747 | DATE 8/11/94 |
|---|---|---|---|---|---|

| LOCATION OF PRACTICE OR CONDITION | BUILDING 720 | ROOM OR AREA COMPRESSOR SHOP |
|---|---|---|

**DESCRIPTION OF PRACTICE OR CONDITION**

SEE ATTACHMENTS

**SUGGESTED CORRECTION FOR PRACTICE OR CONDITION**

SEE ATTACHMENTS

| SUGGESTED BY (EMPLOYEE NAME) CARL HARTLEY | EMPLOYEE NUMBER 6477 | DEPARTMENT AND DIVISION OCAW | DATE 8/11/94 |
|---|---|---|---|

## SUPERVISION USE ONLY

| RECEIVED BY | DATE DISCUSSED WITH EMPLOYEE (POST IN WORK AREA WITHIN 10 WORKING DAYS OF RECEIPT) |
|---|---|

### CORRECTIVE ACTION PROPOSED OR TAKEN (Include dates for initial action and follow-up activities)

| MAINTENANCE WORK REQUEST/ORDER NUMBER | CHARGE NUMBER | ESO NUMBER | SAFETY ACTION JOB ☐ YES ☐ NO |
|---|---|---|---|

## FOR SAFETY DEPARTMENT USE ONLY

| RECEIVED BY | DATE RECEIVED | DATE COMPLETED |
|---|---|---|

DESCRIPTION (2 LINE LIMIT)

STATUS (1 LINE LIMIT)

DISTRIBUTION: INITIAL COPIES TO SAFETY DEPT., MS-5015, AND SUPERVISION WITHIN 10 WORKING DAYS OF RECEIPT.
FINAL COPIES TO SAFETY DEPT., MS-5015, AND SUPERVISION UPON COMPLETION OF CORRECTIVE ACTION.
ORIGINAL COPY RETAINED BY SUPERVISION.

*(USE REVERSE SIDE FOR ADDITIONAL INFORMATION)*

NRc (07S90S15)

 

**Oil, Chemical & Atomic Workers**
**International Union, AFL-CIO**

Piketon Local No. 3-689
P.O. Box 467
Piketon, Ohio 45661
(614) 289-2405

August 1, 1994

TO: Roger D. McDermott, Manager Health and Safety

FROM: Carl R. Hartley, A Shift Safety Representative

Dear Mr. McDermott;

At 0800 hours, July 26, 1994, I received a safety complaint from Herman Potter Sr., co-chair of the X-700/705 safety subcommittee. He was processing a complaint for Ron Boggs, a welder assigned to the X-700 weld shop and he forwarded the complaint to me for resolution.

Mr. Boggs' job was to weld on an A. C. 12.5 nozzle on a "00" size compressor in the X-720 compressor shop.

The Radiological Work Permit (RWP) for the compressor indicated 7 K alpha radioactive contamination and 750 K beta fixed radioactive contamination. No pre-job briefing was held. No previous surveys were discussed. The two previous attempts to decontaminate the compressor were not discussed with the work crew.

On July 25, 1994, Boggs requested that the As Low As Reasonably Achievable (ALARA) principle be applied and requested that an attempt be made to decontaminate the removable 7 K contamination. Boggs stated that the loose contamination was located where he would be laying his hand to steady his welding torch. His concern was that he would be disturbing the contamination and exposing other workers in the building. The RWP required anti "C" coveralls and a full face respirator for anyone performing work on the compressor. He and the mechanic were adequately protected from the hazards.

The work was to be performed in the center of the X-720 compressor shop. All of the huge roll up doors for the building were open and a large floor fan was blowing on the compressor.

On July 26, 1994, I met with Bruce E. Wiseman and Chris Martin, Health Physics personnel assigned to the X-700 weld shop. Also present was John B. Schwab, an engineer acting as a substitute supervisor for Boggs.



Roger D. McDermott, page two


I asked Martin and Wiseman why they were refusing to make an attempt to decontaminate the hot spot on the compressor. They stated the 7 K loose removable contamination was acceptable and two previous attempts were made to decontaminate the compressor. They told me that they did not hold a pre-job briefing and that Boggs was not aware of the previous attempts. While we were discussing Boggs safety complaint there were two chemical operators within feet of the compressor on another job assignment and Schwab still refused to ask them to make an attempt to clean the hot spot.

During the interview Schwab stated that he had requested chemical operators on the 25th and they were promised for after lunch that day. He complained that the chemical operators did not show up until the following morning. Schwab did not utilize their service when they did arrive.

Boggs reported that he asked a chemical operations supervisor why chemical operators were not sent to X-720 as requested. The supervisor stated that he offered the use of two chemical operators but Schwab refused their service. Schwab was quoted as saying **he had already committed himself to having the compressor welded on without making another attempt to clean the hot spot.** Boggs stated that if this job had been performed in the X-700 weld shop with another supervisor the chemical operators would have made an attempt to clean the hot spot, the other workers in the building would have been protected, and the work would not have been delayed.

I asked health physics why one of the portable **NEADERMAN** hepa filters was not used to collect the radioactive smoke. Boggs was melting metal that contained 750 K beta contamination. The hepa filters are located in the X-700 weld shop and were not in use. Health physics had no response. Martin and Wiseman told me that continuous air monitoring was in place. The fact that all of the doors were open and a fan was blowing on the compressor nullified the air samples. The workers are directed to keep the doors on the process buildings closed to prevent the spread of contamination to the public. If there is a release of radioactive process gas it is contained and can be cleaned up. In the X-720 building the doors are always open during warm weather.

Roger D. McDermott, page three

On my way to X-720 to investigate this safety complaint I passed one of the plant bill boards. The message was **"BE FLEXIBLE, AVOID STRESS"**. Boggs is receiving medical treatment for hypertension. During his confrontation with Schwab his blood pressure became elevated and he should have been sent to the plant hospital to have his blood pressure checked. Schwab's response was to put him in anti "C" coveralls and a full face respirator to compound his stress. As a result of this confrontation Boggs suffered physical and mental stress. He is accustomed to better cooperation with the supervisors in the X-700 weld shop.

The workers at the Fernald site have recently reached an agreement with the Department of Energy over their law suit. The workers sued because they were not informed of the radiological hazards associated with their job nor were they protected from the hazards. This is exactly what took place in X-720. None of the other workers in the building were aware that Boggs was welding on a compressor with 750 K beta contamination nor were they protected. They were needlessly exposed to a radiological hazard. I have been told that Paducah places their compressors inside of containment devices with hepa filters on them. Why are we so far behind in contamination containment?

In summary, if configuration management had been utilized and management had been more receptive to feed back from its skilled and experienced work force this job would not have been delayed and the health and safety of the work force would have been protected.

Corrective actions:

1. Utilize configuration management.

2. Hold a pre-job briefing with all parties involved.

3. Develop a work package to formally cover all aspects of the work to be performed.

4. Purchase containment devices to protect other workers in the area as well as the public and the environment. Until then utilize the portable hepa filters.

5. Perform welding functions in the X-700 weld shop, a facility designed for this purpose.

6. Utilize the **A. L. A. R. A.** principle to control the spread of radioactive contamination.

Roger D. McDermott, page four


    7.   Ensure that temporary supervisors have received proper training.  It is evident that Schwab was working out of his environment and did not possess the necessary skills required of a shop floor supervisor.


cc:  Ron Boggs
     Herman Potter, Sr., Co-chair X-700/705 Safety Subcommittee
     Herman Potter, Jr., O.C.A.W. Safety Representative
     Dale Allen, M.M.U.S. Plant Manager
     Shawn French, U.S.E.C. Safety
     Charles Cox, NRC
     Gerold Wilkin, Co-chair Contamination Control Subcommittee
     John Orrison, D.O.E. Nuclear Safety

# PGDP (PORTS) RADIATION WORK PERMIT

Page 1 of _____

UE-SPP-ESH-9

**1. RWP NO.:** 94 - 770 - 0049 - S
YR - BLDG - NO. - R/S

**2. START DATE:** 07 / 22 / 94
MM / DD / YY

**3. EXPIRATION DATE:** 08 / 22 / 94
MM / DD / YY

**4. LOCATION:** Compressor Shop

**5. JOB DESCRIPTION:** Tack Weld diffuser plate at center of nozzle

**6. RADIOLOGICAL DATA:**

☐ See Attached Contamination Survey Results - Survey No. C- __-__-__-__ (YR - BLDG - NO. - R/S)

**Maximum Contamination Levels:**

| LOCATION: | REMOVABLE α: [dpm/100 cm²] | REMOVABLE β-γ: [dpm/100 cm²] | TOTAL α: [dpm/100 cm²] | TOTAL β-γ: [dpm/100 cm²] |
|---|---|---|---|---|
| Center of nozzle | 200 | 7000 | 4000 | 750 K |

☐ See Attached Radiation Survey Results - Survey No. R- __-__-__-__ (YR - BLDG - NO. - R/S)

**Maximum Radiation Exposure / Dose Levels:**

| LOCATION: | CONTACT β: units = mR/hr | CONTACT γ: units = | 30 cm γ: units = | 1 m γ: units = |
|---|---|---|---|---|
| Center | 5 | | | |

☐ See Attached Airborne Contamination Survey Results - Survey No. A- __-__-__-__ (YR - BLDG - NO. - R/S)

**Maximum Airborne Contamination Levels:**

| LOCATION: | α LEVEL: [µCi / ml] | β-γ LEVEL: [µCi / ml] | LOCATION: | α LEVEL: [µCi / ml] | β-γ LEVEL: [µCi / ml] |
|---|---|---|---|---|---|
| | | | | | |

**7. PROTECTIVE CLOTHING:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LAB COAT | | SURGEON CAP | | COTTON LINERS | | TOTES | X | TAPE OPENINGS | X |
| NO PERSONAL CLOTHING | X | SARANEX HOOD | | RUBBER GLOVES | | DISPOSAL SHOE COVERS | | TAPE RESP. FACE SHIELD | |
| SINGLE ANTI-C COVERALLS | X | CLOTH HOOD | X | NEOPRENE GLOVES | | WASHABLE SHOE COVERS | | OTHER: | |
| DOUBLE ANTI-C COVERALLS | | FACE SHIELD | | SURGEON GLOVES | X | BOOTIES | X | OTHER: | |
| SARANEX | | OTHER: | | LEATHER GLOVES | | BOOTS | | OTHER: | |
| OTHER: | | OTHER: | | OTHER: | | OTHER: | | OTHER: | |

**8. HP COVERAGE**

| | |
|---|---|
| START OF JOB | |
| PERIODIC - EVERY _____ MINUTES | |
| CONTINUOUS | |
| SYSTEM OR COMPONENT BREACH | |
| DURING WELD, CUT, GRINDING, ETC. | |
| HOLD POINTS: | |

**9. RESPIRATORY PROTECTION:**

| | |
|---|---|
| HALF FACE RESPIRATOR | |
| FULL FACE RESPIRATOR | X |
| HEPA PARTICULATE CANISTER | |
| GMH-F-C, CANISTER | |
| AIRLINE | |
| SCBA | |
| OTHER | |
| CONTACT INDUSTRIAL HYGIENE | |

**10. SPECIAL DOSIMETRY:**

| | |
|---|---|
| LOW RANGE SRD | |
| HIGH RANGE SRD | |
| EXTREMITY DOSIMETER - LOCATION(S): | |
| NEUTRON BADGE | |
| REPOSITION TLD TO: | |
| ALARM DOSIMETER SET AT: | |
| OTHER: | |

**11. SPECIAL INSTRUCTIONS:** ☐ SEE ATTACHMENT FOR CONTINUATION

(X) Required for welding, grinding.
Shoecovers & gloves required for general entry & setup

**12. GENERATION:**

| SERVICE SUPERVISOR / SUPERVISOR IN CHARGE: | DATE: 7/25/94 |
|---|---|
| HP APPROVAL: | DATE: 7/25/94 |

**13. CLOSURE:**

| HP CLOSURE: | DATE: |
|---|---|
| HP SUPERVISOR REVIEW: | DATE: |

UCN-17783 Pg. 1 of 2

White Copy - HP Technician Supervisor

# Interoffice Memo

**MARTIN MARIETTA**

MARTIN MARIETTA UTILITY SERVICES, INC.

DATE:     July 20, 1994
          POEF-780-94-112

TO:       Multiple Addressees

FROM:     Gregg Coons, Cascade Maintenance

SUBJECT:  Cascade Maintenance Department Organizational Changes

1. ____ The development, training and support of our front line maintenance supervisors is one of the primary focuses of our current maintenance improvement efforts. The implementation of improved work control practices, including work package utilization, strict procedure adherence, and better contamination control practices begins with our supervisors. As a part of this effort, providing flexible assignments for our supervisors between cascade facilities exposes them to the varying equipment, hazards and priorities existing within our division. It's a part of rounding out their development and it strengthens the maintenance function as a whole.

Thus, as of Monday, 7/25/94, the following moves are effective:

a.    John Sautter, who has been assigned in technical support while serving as a relief supervisor in X-330 and X-333, is now assigned as the "O" Shift mechanical supervisor in X-333 reporting to Bill Greer.

b.    Terry Robertson is now assigned to the "O" shift mechanical supervisor position in the X-326 facility reporting to Tommy Thompson. Terry has served as the "O" shift mechanical supervisor in X-333 throughout the PCB lube oil changeout and subsequent "000" cell recovery effort.

c.    C. O. Valentine and Tom DePugh are now assigned as relief supervisors in the X-330 and X-333 facilities, respectively. C. O. will report to Larry Eldridge (X-330), leaving the "O" shift in X-326 where he has supported the HEU Suspension and Overlap/Purge Cascade efforts. Tom will continue to report to Bill Greer in X-333.

Multiple Addressees                    -2-                      July 20, 1994
                                                               POEF-780-94-112


2.   Additionally, Paul Gibson, supervisor of the line recorder crew, will now report to Larry
     Eldridge, Maintenance Coordinator in the X-330 facility instead of Walt Hamilton (X-
     340). This reporting change is due to the physical location of Paul's crew and
     equipment.



GDC:ver

Multiple Addressees
        Cascade Department Managers
        Cascade Operations Facility Coordinators
        Cascade Maintenance Facility Coordinators
        Cascade Coordination
        Cascade Maintenance Supervisors
        Steve Casto
        Jerry Crandall
        Jeff Hedges
        Larry Montgomery
        Jim Morgan
        Mike Neal-Union Hall
        George Price
        Keith Zimmerman

# Interoffice Memo



CEB, INC.

July 25, 1994

Barrier Busters

Four Division Managers, Chuck Harley of Technical Operations, Roger McDermott of Safety & Health, George Price of General Plant Support, and Bob Clark of Quality Assurance have transferred to rotating shift to focus and coordinate Portsmouth Barrier Busting to facilitate our achieving the next level of excellence.

The annual report is upbeat. The cascade is less fragile than a year ago, production levels are up, our shipment record retains its integrity, our accident rate is down, recent Federal and State EPA surprise audits yielded complimentary results, and both USEC and MMUS corporate officers indicate pride in our accomplishments.

We have made progress, but as Mr. Timbers clearly signaled to us last week, we here at Portsmouth have far to go in the next 15-18 months to be considered as a candidate for continuing to operate as a production plant. We must get our production up to the 1900 MW level; we must get our factory cost down to the $60/SWU level; we must meet the requirements of EPA, DOT, OSHA, NRC, and ROA; and above all else, we must meet or exceed customer expectations. As clearly conveyed by Mr. Timbers, we must be profitable in order to keep our jobs.

Recently, we experienced losses of 31 cells on June 29 and 11 cells on July 11. Those losses cost the enterprise in many different ways not the least of which was in creation of a perception that we did it to ourselves. Unfortunately, these events also cost Portsmouth a loss in production and a loss in the recent gains to reduce cost. Those losses are directly the result of inadequate maintenance work control in GPS and CUP. Contributing factors include design and procedure errors and, in general, a lack of discipline in the entire arena of configuration management.

We must do the full job in order to not only survive but thrive in the free market. Over the next few weeks, we will begin the transition from a reactive to a proactive plant. The Division Managers on shift will assist the entire plant by:

1.  Reviewing maintenance and operations activities to ensure that configuration management and safety issues are being addressed.

2.  Observing maintenance job progress and ensuring support craft and services are delivered to ensure jobs to not stall.

3.  Reviewing manpower availability and moving to correct excess and need, and shift assignment problems immediately.

4.  Assist with the transfer of personnel being declared as excess in the support divisions to their new assignments in planning, scheduling, and materials preparation.

Barrier Busters
Page 2
July 25, 1994

5. Reviewing work permitting processes to determine actions required to streamline those processes to reduce the time currently being wasted by the work force as a result of those barriers.

These four Divisions Managers are acting with the full authority of my office and they have been empowered to take whatever actions are necessary to expedite return of cells to production, reduce cost, increase productivity, and ensure integrity of the safety envelop.

We have the opporutnity to show USEC that we are a high quality work force and can meet any challenge that confronts us. Therefore, we will not reduce our expectations. It is our intent to reach and maintain a production level that enables us to ensure our very best change for long term operation. It is also our intent to do that in a safe and regulatory compliant manner. It is our expectation that employees on plantsite accept accountability for his/her personal actions in pursuit of these objectives.

Dale Allen
Plant Manager

DIA:crw

# EXHIBIT G



April 5, 1990

Mr. K. W. Sommerfeld
Enrichment Vice President
Martin Marietta Energy Systems, Inc.
Post Office Box 2009
Oak Ridge, Tennessee 37831-8005

Dear Mr. Sommerfeld,

Burns & Roe Utility Management Consultants, Inc. is pleased to provide you with the enclosed report covering the support and assistance provided to the management of the Portsmouth Gaseous Diffusion Plant, Piketon, Ohio.

This report covers the same information already provided to the Plant Manager and his subordinates during the course of the visit.

If you have any questions, we would be glad to provide additional information.

Sincerely,

Paul Early
Team Leader



MANAGEMENT ASSISTANCE REPORT

PORTSMOUTH

GASEOUS DIFFUSION PLANT

MARCH 12 - APRIL 5, 1990

BURNS & ROE UTILITY MANAGEMENT CONSULTANTS, INC.

CONTENTS

1. Executive Summary

2. Introduction

3. Management

4. Operations

5. Maintenance Support

6. Configuration Control

7. Training

8. Radiological Controls

9. Quality Assurance/Quality Control

10. Human Resources

11. Model Facility

12. Emergency Preparedness

13. Attachments

     1. Guidelines for Model/Lead Facility Managers

     2. Scope of Work

     3. Team Membership

## 1. EXECUTIVE SUMMARY

A team of five consultants provided assistance and support to the Portsmouth Gaseous Diffusion Plant management in striving to improve performance to conform with INPO guidelines.

Of the sixteen components described in the Uranium Enrichment Performance Improvement Program, the team's comments and suggestions involve thirteen.

The cooperation and kindness provided by the employees of the Portsmouth Plant is most appreciated.

The team agrees that the managers need to develop the will to improve, to accept risk, to know the details of the activities of their units, and to understand and exercise the concepts of accountability, responsibility, and authority.

The team also agrees that managers need to coordinate their decisions with each other in mutual support of the plant mission; need to provide subordinates, and particularly the hourly workers, with the reasoning behind directives; and need to be responsive to the supportive efforts of their subordinates, particularly the hourly workers.

1

Both the Radiological Protection and the Quality Assurance/Quality Control Programs are unsatisfactory. This is a management defect which rises above the immediate managers. The presently planned contamination control program is too vague and unrealistic for implementation. A training program is necessary, and a planned characterization survey should be aggressively implemented. There is no Quality Assurance or Quality Control activity of importance which supports the plant.

The condition of Emergency Preparedness planning is also unsatisfactory. The senior managers have removed themselves, in the planning documents, from their responsibilities and control.

Collectively, the managers must create plans of action and schedules to accomplish what has to be done using the present resources on hand. Repeatedly, corrective actions are predicated on increases in the budget and additional staff, (a convenient way of deferring action items).

2

## 2. INTRODUCTION

During the period from March 12 to April 5, 1990, five
persons, experienced in nuclear power operations and the
application of INPO guidelines, visited the Portsmouth Gaseous
Diffusion Plant. They met with many of the managers, supervisors,
supporting staff, production, and maintenance personnel and
observed practices in various parts of the plant.

The Portsmouth plant staff has planned some improvements
which would enable them to meet the higher performance standards
now required. A review of the progress to date was made.

Individual meetings resulted in the transfer of information
designed to assist all levels of management to reach a better
understanding of the steps needed for further progress.
Information developed at the Paducah Plant was used to expedite
the progress at Portsmouth.

This report is a series of comments to permit recall of the
points already stressed in the visit. The symptoms indicated
identify the generic issues which should be addressed.

While this report is in sections, it should be noted that

3

suggested improvements in one area might well require activity by more than one of the many departments at Portsmouth. In addition to the following comments, other observations, comments, and suggestions which support these views have been provided in detail to various managers.

The team appreciates very much the courtesy and cooperation provided to it in its effort to provide assistance in improving performance.

Attachment 1 provides guidance for managers of model/lead facilities. The team members are listed below. Briefs of their experience are provided in Attachment 2. The assigned scope of work is shown as Attachment 3.

Byron H. Collier, Project Corporate Sponsor

Paul J. Early, Team Leader

Willis J. Ford

James P. Forsyth

Luther D. Yarger

4

## 3. MANAGEMENT

The award-fee system, as applied, may be counterproductive to improving plant performance. To improve plant performance, it is necessary to determine the root causes of the many symptoms and to have clear vision and opportunity to address appropriate corrective actions. To maximize the award-fee, however, from the contractor's viewpoint, an immediate adjustment is necessary for essentially every opinion or list of symptoms offered by the DOE employees and consultants. The contractor's employees see success in maximizing the award-fee coupled directly to their performance appraisals and pay adjustments. The DOE employees, however, see success in limiting the award-fee coupled directly to their performance appraisals, and thus they originate and track many requirements. The result is that the mission is forgotten and many symptoms are fixed while root causes languish.

The Portsmouth Plant's mission should be established and promulgated. Goals, objectives, short term action plans, and dated commitments using present resources to best advantage could then be established.

Managers need to develop the will to improve. They do not believe that radical change is necessary or that it will take

5

place. Initiative is missing. The senior managers feel that they have little room to maneuver between what they see as inhibiting forces. They have developed a barricade of paper procedures and memos behind which they await direction. They produce long range plans based on additional resources. They have not accepted the risk of implementing change with present resources.

A chasm exists between upper level management and the first line supervisors and hourly employees. This void has led to frustration and distrust on the part of the work force. The managers need to develop a healthy continuing exchange of ideas, information, and guidance between managers and the work force. Ideas and information must be solicited from subordinates. Encouragement can be by examples of appropriate consideration and promptly announced decision. Directives should be given together with the need or reasoning behind them. Labor relations problems are often being used as an excuse not to manage.

Division and Department Managers all need to coordinate their organizations in support of the plant mission. A healthy exchange of information is lacking between them in spite of the numerous "informational meetings" they hold where issues are not debated. Managers should not make decisions which impinge upon other divisions or departments without seeking their active cooperation. A large number of departmental procedures exist

6

which clearly assign responsibilities to other jurisdictions. These allow departments not to fulfill their responsibilities to support the plant mission. The managers have accepted this situation by not seeking and knowing the details of the work in progress in their areas. Dictates from various staff levels outside and inside the plant are accepted as valid without consideration of the consequences. As a result several of the programs in place use overly conservative criteria. These result in significantly excessive costs or tasks and generate undue quantities of variously contaminated waste.

There is no evidence that anyone at the upper management levels has the background to provide the guidance and direction needed to establish a realistic and practical contamination control program. The processing of visitors to the process buildings is not credible and is an embarrassment to management.

Neither the Quality Assurance/Quality Control organization nor the Radiological Controls organizations comprised of both "contamination control" and "health physics" are satisfactorily performing their duties. This is a management defect which rises above those immediate managers.

7

# 4. OPERATIONS

A Conduct of Operations manual using gaseous diffusion plant terminology and based on INPO guidelines has been published in final form.

Draft safety and caution tag procedures are under review by the electrical safety committee, the safety department, production, and maintenance personnel.

The activities of the internal group and the functional working group for operations have been reviewed. Those long term issues for which additional resources are required have been identified. Action plans for completion of short term items such as designation of "at the controls areas" in control rooms are being developed. The efforts of the two groups are complimentary.

Methods for the reduction of paperwork, improvement of communication, establishment and achievement of short and long term goals have been discussed at length.

The support of operations by staff groups is less than adequate. QA/QC, radiological protection, safety and industrial hygiene are all prone to request operations to perform administrative tasks for them. In addition, they generally do not see themselves in a support role to operations.

Several managers stated that in the past supervisors spent much more time with the workers and that things went better then. There is little apparent recognition that the same kind of communication is necessary today if matters are going to improve. The current administrative load, largely self imposed, is a major deterrent to such communication. Lack of focus caused by a lack of a clearly defined mission and goals contributes to the confusion. The result is that most of the employees are trying to manage large amounts of superfluous information with the same priority as the important issues require.

The same lack of focus in the other areas has a significant impact on the Production Division which is the organization made responsible for the implementation of programs developed by others. Procedures and policies developed by the other organizations place requirements and responsibilities on the Production Division without having been coordinated with other efforts in progress and without regard to resource requirements.

9

The concept of having fully integrated crews for each shift in each process building should be considered with the aim of improving both contamination control and maintenance/operational coordination. The control of work in radiological areas and the reduction of contaminated areas would be more easily addressed with a team effort.

A plant policy should be developed and implemented for post maintenance testing of all equipment or systems returned to Production control by a maintenance group. Post maintenance testing procedures should, where possible, ensure repaired equipment or systems are fully operational to design standards.

It was alleged in discussions that on occasion operators have defeated compressor seal alarms. Defeating any alarm is an unsatisfactory operating practice. In view of the frequent seal failures now being experienced, this allegation is disturbing. Production management should investigate this matter objectively, and provide plant management with the results of the investigation, the steps taken, and the assurance provided that this unsatisfactory practice has been corrected.

10

## 5. MAINTENANCE SUPPORT

CONDUCT OF MAINTENANCE

Both Portsmouth and Paducah Plants have issued a common Conduct of Maintenance document based on the INPO guidelines. Implementation has begun at Portsmouth by initiating an assessment process to determine how closely existing maintenance and supporting practices conform to the specific guidelines.

Presently 66 specific elements have been listed. Individuals have been tasked to determine what is needed to conform to each element. In some cases no additional activity may be necessary. These cases will be documented to show how the current process conforms with the element. The assessment process is to be completed by April 4, 1990. Division management will then review the assessments. Individuals will be assigned to carry out the actions required to meet each specific element. Completion dates and priorities will be assigned. This straightforward approach should continue to completion.

11

WORK AUTHORIZATION AND CONTROL

The Work Authorization and Control System provides good data which may be displayed in numerous ways. If modified, it could provide other valuable management information, such as an accurate backlog, delay causes, and reasons for "holds" on MSRs.

The Maintenance Service Request (MSR) backlog apparently is not all inclusive. All known work is not entered. Only work defined by submitting an MSR is entered into the system and tracked. Many deficiencies in various cells are listed only in local logs. MSRs are not prepared until the cell is isolated for other reasons. Therefore when a cell is brought off the line, the true amount of work needed on that cell is not known. Preparations for the work are not complete or planned. There may be other examples. Since the true amount of work outstanding is not fully identified in the MSR system, the sizeable backlog already identified is likely to be much larger.

About half of the defined MSR backlog is not in a "Ready-to-Run" status. While the individual planner may know why MSRs are on "hold", management does not have a means in the Work Authorization and Control system to identify problem areas.

12

Examples of the causes are the lack of part, material, tools, drawings, and procedures, and the inadequacy of repair equipment.

The age of MSRs is not reviewed or trended to identify adverse situations.

Forty percent of MSRs written are assigned Priority 2 by the requestor when by definition they are of lower priority. Priority assignments are not reviewed at an adequate managerial level to determine its validity. The priority system thus does not function as a useful tool in schedule making. Some MSRs are marked as "safety" related to get a high actual priority. Daily work schedules prepared by the planners are upset by the late introduction of MSRs for additional and unscheduled work on equipment taken out of service for repair.

Operational acceptance of equipment should be verified by the Production Division by a signature on the MSR, a post-maintenance test form, or an operational check list. The Work Authorization and Control system does not require a formal sign-off by the originator of the MSR. While the first line maintenance supervisor acknowledges that the work is complete, a determination that the equipment is capable of operating satisfactorily has not been made. The clearance of an EWP or HWP

13

does not satisfy a post-maintenance test of operability or approval of restoration of the work site.

PRODUCTIVITY

Actual delays which reduce productivity are not evaluated by management to identify and correct the causes.

The delay codes which would provide this data are not fully utilized. The fear exists that reporting a delay would adversely reflect on the performance of the first line supervisor. Many delays are not under his control; for examples, delays in obtaining radiological controls surveys, decontamination by chemical operators, or approvals on work permits. These delays can prevent the start of work and are also preventing the rescheduling of the working crafts.

The lack of transportation is frequently a cause for delay. Tools, equipment, and material must be brought to the work site. These delays can be reduced in several ways; more specialized equipment, faster turn around in vehicle maintenance, or reassignment of the work force and work to three shifts. Reassignment of the work force has been done in the cascade buildings with shift crews and self-directed teams in place.

14

Managers of shop facilities should consider if this is necessary in their areas.

Procurement procedures introduce delays in many routine maintenance and housekeeping functions. Standard parts and supplies require a lengthy requisition and approval process. The Purchasing Department is considering a blanket order process for vehicle parts and accessories. Such open purchase requisitions in other areas such as carpentry, painting, and janitorial supplies could reduce delays affecting other crafts. The 789 vehicles on site require a responsive maintenance program.

The compressor seal failure rate is presently exceeding the seal repair rate. It is now simply a matter of time, estimated as two months, before the supply of spare seals is depleted. There are two bottlenecks involved in seal repair. The issues should be addressed quickly. The alternative is to reduce power.

Delays on jobs involving several crafts and services from outside the process buildings can be reduced through improved coordination. One means would be to assign a person or persons from Chemical Operations and Health Physics, for examples, to the general supervisor of each process building and possibly X-720. They would be able to respond quickly to the needs of the work in progress since the supervisor knows the sequence of the functions

15

needed. The supervisor would then be fully responsible for the progress of the work. He would have in effect a multi-craft crew. There appears to be enough work available to warrant this arrangement. Continuing types of activities such as routine surveys or area decontamination could be used as fill-in when direct job support is not needed.

Automatic welding machines and automatic cutting machines should be obtained to dress and prepare the joint surfaces on compressors and converters in the shop as well as the fixed piping ends in the cells. These machines can be set up on portable jigs to fit each of the large pipe ends. They can deposit metal much faster and with much better quality than can be done by hand. The cutting machines can make both a better face surface and the joint notch than can be done by hand. Grinding dust will be significantly reduced making the work areas safer and cleaner. These machines have been used for years, are of proven reliability, and are available on the market.

16

MEASURING AND TEST EQUIPMENT

The Measuring and Test Equipment (M&TE) program is part of the overall calibration program. It does not meet the currently required standards except as applied to Radiac instruments. The Radiac Calibration Lab is well run with good facilities and tracking for equipments; however, independent and adequate QA/QC support has not been provided for this work.

Electronic calibrations are well documented, but the mechanical calibration area lacks the necessary standards for torque wrench, temperature, flow, and pressure calibrations.

An overall procedure for the control and calibration of M&TE equipment needs to be written to provide necessary detailed guidance. A draft procedure using INPO Good Practices for calibration and control of M&TE has been provided.

An equipment list defining M&TE equipment that should be in the system is needed. The INPO definition should be followed as guidance. Requirements for each equipment; i.e., frequency, calibration procedure, and so forth, should be provided. The equipment list and associated information should be put in the Automatic Scheduling Program for control. A separate list for

17

equipment sent to vendors for calibration should be developed. Groups outside of maintenance that may have equipment used to calibrate other systems should be included in this program.

Priority should be given to the instrument laboratory to get the standards established and the physical equipment in place. Calibration and repairs should be separated into different areas as the electronics group has done. Requisitions for 13 standards for various calibrations have been submitted but the equipment has not yet been received.

18

## 6. CONFIGURATION CONTROL

The definition of safety systems, and the complete listing and inventory of these systems is weak and of concern. Safety devices, rather than safety systems, are specified in the FSAR and are tested under an Operational Surveillance Program (OSR). The devices are individual items such as rupture disks on heat exchanger shells, indicators and alarms powered from a 120 VAC bus, or sensors such as an autoclave condensate drain conductivity cell.

The systems themselves which contain these devices are not considered safety related as defined in the FSAR, even though the proper operation of the safety related devices depends on their support, such as circuit boards, power supplies, instrumentation, or piping systems.

As a result, modifications can be made to the systems in which these safety devices are a part without engineering and design inputs, drawing changes, design basis comparison, safety evaluations, and formal management approval. The degradation of the safety device that may be caused by the system modification cannot be determined without these steps. Documentation of the design basis and all modifications for the safety devices is not available.

19

The investigation report for the calciner level probe calibration (POEF-T-3517, dated December 18, 1989) should be reviewed. It indicates a litany of major issues which confirm that the definition used at both Paducah and Portsmouth for safety systems (actually individual devices) is too narrow. The findings reported that "...all procedures for safety systems are suspect", "...no evidence available to assure that the required pre-operational check-out of the B area calciner safety system had ever been done", "...responsibility spread so broadly no area is held accountable", and "...performed only if a need was perceived by the operator."

The safety system definition should be reviewed with a consideration to revising it to determine specifically the boundaries of each system which is vital to the safe control and indication of the process system; each system which is vital in servicing the process system and feed and tolls operations; each system vital to the prevention of criticality accidents; and each vital power supply for these systems.

20

Investigation of safety systems preventive maintenance, post maintenance testing, and Maintenance Method (procedure) upgrading, disclosed a number of configuration control discrepancies. Examples of these are:

1. Components in the system not shown on the drawing.
2. Components shown on the drawing are not present in the system.
3. Wiring and control schemes not consistent drawing to drawing or drawing to system.
4. Examples of safety system dependence on non-safety system components to perform their required action.
5. Incomplete Safety System Configuration Control Sheets.

Further investigation of these discrepancies indicated management had been advised, through incident reports, that these problems exist and have existed for some time. These discrepancies were shown to exist in older installed systems as well as recently installed equipment.

## 7. TRAINING

The recent organizational change to establish an integrated Training Department should create the framework to provide performance-based training at Portsmouth GDP.

The training facilities built for the GCEP project should be made available to the plant's training efforts. Even with these facilities, limited training materials and training personnel will make the task of establishing accreditable training programs in a timely manner, a difficult one. Management support of the training program and long range Quality Assurance oversight will be necessary to ensure quality performance-based training.

Utilizing the INPO guidelines for General Employee Training (GET) (INPO 87-004), establish a training program that will provide all persons working at this plant with a uniform and adequate level of understanding of potential site emergencies, both radiological and industrial, including their individual responsibilities.

GET is a multi-discipline training program consisting of health physics, contamination control, industrial safety, industrial hygiene, security, and emergency planning. Subject matter experts will be necessary to develop and present this

22

training. Assignment of a GET supervisor is strongly recommended to ensure that initial and on-going GET training materials and presentations meet the plant needs and INPO guidelines. Perform a Job Task Analysis for GET Levels I and II Radiation Workers to ensure this training is performance-based. Include maximum applicable hands-on training for each of these training levels. A Quality Assurance oversight activity should be established to ensure quality performance of the GET program and radiation workers' performance in these areas.

The Training Manager should promptly establish, in writing, a mission statement for the Training Department. This statement should leave no doubt as to how the Training Department is to support the plant mission. In addition, the manager should establish the goals of the Training Department for both near term high priority activities, and for long term desirable activities. Each Division Training Coordinator (DTC) should promptly establish, in writing, their division's training goals and objectives in support of the Training Department mission and goals. Periodically, the Training Manager should review, one on one with each DTC, the progress made in meeting the established goals and objectives. The results of these reviews should be trended to ensure timely progress in the accreditation effort. The use of INPO Guide 86-019, Management Objectives Program, could aid in this effort.

23

The Training Manager should also ensure that the existing Training Manual for Portsmouth GDP, dated March 1989, is promptly revised to reflect the newly created training organization. This manual should include the mission statement and goals of the Training Department as well as the training goals and objectives of the individual divisions.

All classroom and laboratory training should be conducted in the best possible environmental conditions for·training. Utilization of the GCEP training facility is strongly recommended to enhance the plant's training activities. Training aids and materials should be maintained up-to-date and in the best physical condition. Training materials developed by the Goodyear Atomic Corp. for original operations and maintenance training should be validated or upgraded and folded into a plant training library. Significant Engineering Division involvement will be required for this materials upgrade to ensure training is in keeping with the current system design criteria. In those systems or equipments for which design criteria is not available, the Engineering Division should develop baseline materials to support the training staff.

24

Plant management does not have an understanding of the manhours required for training. As a result additional Production and Maintenance staffing requirements to meet the training needs are not identified. Total training hours have been coarsely estimated by the Training Department, but a breakdown by discipline is not available. As a minimum, the following information should be determined and evaluated against plant staffing plans;

a. Total annual predictable on-going training hours for each discipline.

b. Total annual overtime hours required to support the on-going training.

c. Total annual straight time hours required to support the on-going training.

The information should be updated at least quarterly to ensure predictions are accurate and trends identified. A plant goal should be that only unpredicted training should be done on, or result in, overtime.

Production training has a number of good practices in their current training programs. These include;

    a. Identified educational requirements for entry into the Production Division.

    b. Functional on-the-job-training (OJT) programs utilizing trained OJT instructors.

    c. Classroom training on operator actions/expected plant response.

    d. Organized lesson plans and disciplined presentations.

The following areas of Production training require improvement;

    a. OJT instructors are not periodically evaluated to ensure quality training is provided and adequate standards of trainee performance are sustained.

    b. There are no documented qualifications standards for specific shift stations. Therefore there is no standard to which to train or require personnel performance.

26

c. Current Chemical Operations training is inadequate for persons being introduced into a potentially hazardous work environment. It is done primarily by OJT. Manpower limitations for instructors and trainees are primary contributors to this shortcoming. At least one additional full time instructor should be assigned to Chemical Operations and adequate scheduling done to ensure that trainees receive adequate classroom training.

d. Currently, on-going training of Utility Operators is frequently done one-on-one. This significantly reduces the effectiveness of this training. To improve effectiveness, Utilities Operations management should ensure that operators are assigned to training as a shift unit or team.

e. Generically, a large part of Production training is based on current Methods (procedures). Some Methods are of lower quality than others. This leads to training statements to the effect of "This is what the Method says, but this is what we really do." An unacceptable signal is given the trainee. A vigorous program of Method upgrade should be established to ensure that when an instructor modifies a Method for use in training, a Method change is initiated and promptly completed.

27

Maintenance training has a number of good practices in their current training programs. These include;

    a. Identified educational requirements for entry into the Electronic Technician Department.

    b. A professional basic training course and on-going craft enhancement video course for Electronic Techs.

    c. Off site, craft specific training.

    d. Organized lesson plans and disciplined presentations.

An area that should be improved is the evaluation of training effectiveness. Current practice is based primarily on "feedback from the customer." OJT performance should be monitored by discipline management. Feedback to the Training Department should result in improved training materials and accelerated training schedules as necessary.

A common training weakness with divisions is that there is a need for ongoing job-specific training, but that time is not available. Plant management should ensure that training is considered part of the work to be done and is so scheduled. A second training weakness, with very few exceptions, is Job Task Analysis (JTA) versus Job Analysis. JTA identifies specific tasks associated with specific jobs and identifies Method (procedure)

28

details necessary to perform tasks as well as the performance-based training necessary to ensure quality operation. Job analysis assumes current Methods are sufficient to form the basis of training. Performance-based training is not assured. Thus accreditation of training programs at INPO levels would probably not follow a Job Analysis-based training program.

The training workload generated by the Action Plan Response to Compliance Assessment has not yet been factored into the training schedule. This is a sizable task and requires input to training from "new procedure/plan/policy" writers assigned to meet the various finding requirements. This training task should be formalized. A person or persons should be assigned the responsibility to implement the action plan. Firm dates and scheduled progress reports should be provided to plant management.

Monthly Safety meetings are a good plant practice. However, these meetings are being used as catch-all training periods. Industrial Safety and Hygiene (IS&H) should develop training materials for these meetings based on the likely hazards to be encountered by the trainees. In addition IS&H should play an active role in ensuring that this monthly training time is spent on applicable IS&H matters. Quality Assurance should provide oversight in this important training area.

29

## 8. RADIOLOGICAL CONTROLS

The presently planned contamination control program is so vague and unrealistic that the basically untrained plant employees in all divisions will probably not be able to cope with it effectively. A clearly defined training program must be established to enable the various divisions to understand and effectively implement the program. The planned program, if implemented without significant change, will adversely affect production and maintenance activities. It does not appear workable. It will not meet the intent of the DOE/ORO instructions.

Implementation of the General Employee Training Program, INPO 87-004, as recommended in the Training section of this report should meet the need of the plant's contamination control program.

The training program should be designed to help the employees understand and practice such practical matters as the reasons for and techniques of taking and reading swipes and direct surveys; using anti-contamination clothing; entering and leaving a barrier control point; using portable friskers and hand or hand/foot monitors; and segregating low level radiologically contaminated waste from other waste. Detailed lesson plans are

30

necessary, together with instruction provided directly by a subject matter expert. Video presentations could be used to support the lessons plans, but not to replace them.

At the same time, a planned characterization survey program should be aggressively implemented and completed. This would identify in detail the existence or absence of fixed and removable contamination areas in all suspect buildings. Once this has been established, frequent surveys must be carried out to maintain updated conditions on a continuing basis. There appears to be sufficient staff available, but they have not been directed or supervised properly.

Aggressive cleanup of removable contamination should be promptly initiated when found. Those surfaces found to have fixed contamination should be either mechanically cleaned, or sealed with paint or epoxy, so that residual readings are below contamination limits.

By using DOE/ORO contamination limits and nomenclature for the various radiological areas, as well as survey results, cleaning, or sealing; it is probable that nearly all areas may be declared contamination-free. (Except for the situation in X-326 which is not known to the team.)

31

Production and Maintenance personnel should join with Health Physics expertise to provide management with the recommended arrangement of regulated areas. Contamination areas could then be established, permanently or temporarily, within the regulated areas in a manner which would both rigorously contain contamination and allow reasonable access for operations and vehicular transfers of heavy equipment and tools.

The effort by Martin Marietta Energy Systems Headquarters to establish standards of performance through functional working groups is commendable. Unfortunately, in the area of Radiological Protection, the group did not have sufficient knowledge and experience of the correct measures to be taken. Management interest and guidance to the group was not sufficient to cause them to seek technical help.

The policies being established are not founded on reasonable and proven radiological controls practices. Technical assistance in fundamental training levels is needed at Portsmouth so that management and workers can all be given the understanding necessary to protect themselves properly from the hazards of radiation and contamination. This process was begun at Portsmouth by obtaining a 40 hour course from General Dynamics. The course was given to a few of the many who need it. Twenty hours of the course dealt with radiological controls and is an excellent basis

32

for the General Employment Training. It is insufficient, however, for Radiation Worker II training which requires hands-on practical usage of friskers and anti-contamination clothing.

A simple patch-up will not be sufficient. Management and workers are unaware of proper radiological protection procedures. Health Physics personnel who may have had this training have not been forceful in raising awareness or standards. No worker or manager has called into question the requirement to wash one's hands before using a hand monitor to determine the presence of contamination. While the knowledge of good practices may be present in some of the work force, it has not been called forth to question bad practices or be used to change existing practices.

Trained Chemical Operators, Production Operators, Materials Handling Operators, and Maintenance personnel should be able to take swipe surveys and direct radiation readings using portable radiac instruments. This practice would permit threshold measurements without delay. Surveys for off-site movement of product or equipment should be done for the record by Health Physics staff only.

Health Physics Technicians (Surveyors) should take definitive surveys to support establishing work areas, opening major equipments, in the course of maintenance and production activities, upon close out of spaces or work, and to check on the accuracy of swipe surveys taken by others.

Results of surveys taken by work force personnel must be recorded at the time. Maps of results of surveys taken by Health Physics staff should continue to be given directly to the local supervisor immediately following on-scene activity. The maps must be of the proper scale to indicate the locations of swipes. Engineering drawings of building floor plans are the smallest scale which should be used.

Building supervisors should require the posting of current survey maps at the scene of all work within their buildings and at all building entrances.

The present procedure for the use of hand monitors requires the user to wash his hands before having them counted in the monitor. This is an incorrect radiological controls practice. The practice permits contamination, if it were to be present, to be washed away into the plant sewage system and thus into the environment. This practice may reduce instrument maintenance but will provide a false indication that contamination is not

34

present. It then allows a worker to measure his hands as being uncontaminated when he could have been contaminated and had spread the contaminated matter to his face and clothing before washing. The purpose of the practice is to keep the machine clean instead of using the machine to detect contamination. The proper practice is to use the hand monitors first. If contaminated, the person should remain at the check point and obtain help from Health Physics. Under their supervision, the person can be fully surveyed, decontaminated, and the washings collected.

Health Physics procedures require that airborne particulate activity samples be taken at the scene whenever releases occur. The results were requested for 14 release incidents in the first three months of 1990. The information was not yet available 12 days later. On March 31, however, the reaction to smoke alarms in a cell included sampling for airborne particulate activity on both floors of the process building by the response team. The results were verbally given to the Shift Superintendent as "ok".

35

## 9. Quality Assurance/Quality Control

There is no Quality Assurance or Quality Control activity of importance which supports the plant. The Quality Assurance/Quality Control group does not have and does not exercise sufficient independence to conduct an adequate Quality Assurance program. This is apparent in all areas reviewed since, if a viable and independent QA/QC presence existed, issues which were found in Engineering, Maintenance, Training, Radiological Controls, Production, and QA itself, for example, would have been known and recognized by management. Other sections of this report identify situations where appropriate QA/QC activity should have identified an issue.

The QA manual should be revised to conform with full application of NQA-1. INPO guidelines are built upon the underlying foundation of NQA-1 and cannot be implemented without the full application of NQA-1. If the MMES position that their Quality Manual, rather than NQA-1, is maintained, as the controlling document, then the Enrichment QA groups will not be able to meet INPO guidelines, and the plants will not have been brought into line with the INPO guidelines.

36

The MMES QA manual directs the activities of all the QA organizations in the five plants. This direction does not fully implement NQA-1 philosophy or requirements such as the independence of the QA/QC functions and staff from line requirements; the qualification for auditors; and the functional definition of quality with respect to purpose.

A separate Internal Audit group exists which reports to the Plant Manager. Their functions are apparently similar to those of the Quality Assurance group. These two groups should be combined and should report to the Plant Manager so that all areas of plant functions come under independent review.

Both enrichment plant QA manuals clearly state that the Division Managers each are responsible for the scope and timing of QA activities within their divisions including the decision to investigate incidents. As a result, there is no QA activity or influence in such matters as radiac instrument calibration, inspection of overhauled equipment, radiological protection, process building activities, and training programs. The objectivity and thoroughness of investigating incidents to determine root causes and lessons learned is unsatisfactory.

37

The use of the Incident Report system is inadequate to correct or improve plant conditions. The QA department does not use them effectively to correct deficiencies through Quality Investigations.

Incident Reports

Reviews of Incident Reports (Quality Event Reports (QERs)) to decide if action is warranted are perfunctory. Reviews of QERs do not generally result in;

> a. Objective decisions regarding the need for further investigations.
> b. Thorough investigations where appropriate
> c. Determination of cause
> d. Identification of corrective actions
> e. Completion of corrective actions
> f. Training for appropriate personnel involved in like work for lessons learned.

A Quality Investigation Team should be assigned by the QA Manager, using a sufficient number of qualified and trained professionals, to make a thorough review and determine the root causes. The team should never be less than two, plus the QA specialist. The QA manager should make the decision to invoke a Quality Investigation, not the manager concerned. An incident

report dated March 9, 1990 concerning raffinate solution unexpectedly found in a tank trailer, did not have an investigation team assigned until early April.

QA has no program to follow up on uncompleted Quality Investigation Reports (QIRs). Follow up on recommended actions is done by computerized reporting once the QIR is entered by QA. The steps to get from recommended corrective actions to approved and directed actions is not clear. It is controlled by the Division Manager who ordered the investigation. QA is not involved in the decision process. Approved and directed corrective actions are identified by Division Managers and tracked as commitments by QA.

Experiences from incident reports and QIRs are not factored into the permanent training program lesson plans.

The review of about twenty-seven 1990 QERs indicated the following salient points:

a. Corrective actions are not identified as a result of many of them.

39

b. In spite of recognized personnel errors indicating a lack of training or the need for corrective training, in only one case was training scheduled. Twenty-five percent of the training scheduled is one month overdue.

c. In one, a repeated safety system/device trip had not been reviewed diligently for the cause. A Quality Investigation Team, appointed some time after the event, has not yet completed its investigation. The judgments indicated on other QERs has also been not to investigate the causes to conclusion.

d. "No further action required" or "will correct" are examples of close out statements made on QERs. No evidence of follow up to actual closure of the issues exists.

e. In one incident, heat was applied in the presence of oil and caused a fire. The Safety Department was indicated as being involved. No corrective action or training was indicated as having been accomplished.

f. In another incident, information was not passed properly between shifts leading to a spread of contamination. Supervision at the scene was inadequate. No corrective action was taken.

40

Quality Investigation Reports (QIRs)

A serious incident occurred in August 1989. Incident Report 714-89-022, QI 427, UOR POEF-QI-427-X-342-89-02 refers.

A worker was asphyxiated and recovered. The Quality Investigation was poorly made and was incomplete in its scope. No root causes for the incident were identified. The incident itself was not objectively stated. The worker did not faint as was written up in the QIR and the UOR; he was asphyxiated and recovered. Quality Assurance did not act to review and reject this QIR as insufficiently thorough. No attention was paid to the following lapses which permitted this incident to occur;

1. Spray painting 9 months earlier obscured any piping designations.
    a. Did the Maintenance Service Request (MSR) require finish painting of the pipes?
    b. Did QA/QC inspect the work upon completion?
    c. Did the Building Supervisor sign off on the work as completed?
2. The unmarked piping was identified as an issue at a safety meeting 6 months prior to the incident.
    a. Why did management not react? (Division Manager, Building Supervisor, Safety Manager, and QA Manager)

41

3. Were the uniqueness of the fittings on the breathing air system compromised by unauthorized usage on other systems? Was there a requirement that they be unique?

4. Were the fittings installed on the nitrogen system as an unauthorized modification? Is there a plant requirement prohibiting system modifications without appropriate authorization and without engineering review?

5. Have all service gas systems throughout the plant been examined to insure that the breathing air system fittings are unique?

6. Why was the Portsmouth response to the DOE generic safety letter insufficient in identifying the breathing air system problem?

42

The corrective actions were insufficiently broad to resolve all the issues raised in this report;

1. No managerial lapses were identified and corrected.

2. No organizational weaknesses which prevented an adequate investigation were identified and corrected.

3. No improvements were made of the MSR system, painting practices, acceptance of work by user, and quality control review.

4. No changes were identified or acted upon to provide better engineering control over drawings and modifications as needed/not needed.

Unusual Occurrence Reports (UORs)

For the one UOR of 1990 to date, involving a dropped cylinder containing liquid uranium hexafluoride, handwritten operating instructions were immediately promulgated with the requirement for mandatory reading. These operating instructions had not been approved by the Division Manager. No additional training was prepared for crane operators. Five recommendations were made in the QIR. No root causes of the incident were established.

43

Quality Control, instead of supporting Production and Maintenance, recently requested those supervisors to provide them with information on lifting fixtures so that the QC data base could be improved. The list provided only serial numbers and did not provide any description or identifying data. No offer of assistance was made.

Quality Assurance procedures contain a number of requirements for actions by persons other than QA persons. These actions include the initiation of various reports regarding off-normal conditions. Currently there is no effort made to provide training the "others" on their QA responsibilities.

## 10. HUMAN RESOURCES

**LABOR RELATIONS**

Several issues should be considered together to support improved operations. These issues, if resolved in favor of MMES, would significantly assist in improving safe operations, enhancing productivity, and improving economic health to Portsmouth.

1. Limit overtime so that no person works on site more than 12 straight hours.

2. Change the overtime sequence system to one requiring only qualified persons to be called for overtime requests. The present system is based on seniority and prevents calling anyone except from the top of the list, whether or not qualified and trained for the particular task at hand.

3. If shift turnovers require paying for additional time, limit overtime to 30 minutes for these cases, rather than the standard minimum of 4 hours for an unexpected call to work.

4. Control realignment to require adequate numbers of fully qualified and trained operators available on each shift at both the old and new assignments before a transfer is permitted. In turn, a shorter training period on the record, should be available to the transferee based on his prior qualifications and ability to demonstrate his knowledge of the new assignment. Each job assignment should have documented standards to ensure that adequate levels of performance can be uniformly evaluated.

5. Establish pay levels for hourly employees within position assignments which will provide increased pay for advanced performance and training after certain periods of time in grade at that position.

6. Balance/adjust pay structure to recognize risk, skills, and standard of performance required in the materials handling and process control of uranium hexafluoride.

46

MANAGEMENT/HOURLY EMPLOYEE INTERFACE

Improve the lines of communication between all levels
of management and the hourly employees in both directions.
Demonstrate to the hourly employees that management wants and is
receptive to their good ideas and comments.

Train salaried persons on operating positions so that
qualified salaried persons are available to investigate
incidents, in case of a walkout, and as an experienced source for
management succession.

POSITIVE DISCIPLINE

Encourage objective reporting on off-normal conditions
by decoupling reporting and retraining from disciplinary actions.

## 11. MODEL FACILITY

The Model Facility, X-344, has made significant progress, particularly in radiological protection, since it was last viewed in early February 1990.

The Model Facility manager has opened a receptive line of communication with his workers to obtain their ideas on improvements and concerns for proper operations. He has established a system of informing those who enter the building of his expectations regarding their activities.

The radiological control area has been markedly reduced. Requirements for the use of protective clothing are posted. Supplies of protective clothing are being built up. Supplies of reusable yellow shoe covers seem adequate. Latex surgeon's gloves are not yet available. Additional signs clearly indicating the area classification should be provided to mark the area bounded by the chains. The barrier control point is well thought out.

It is not clear, from the signs, whether a regulated area or a contamination area has been established inside of that barrier control point. The presence of protective clothing supplies indicates it is a contamination area. Since the barrier control point marks the transition from a contamination area to a

48

regulated area, a contaminated area sign should be placed on the chain to mark its purpose. The regulated area sign should be placed a few feet away from the step-off pad to mark the transition from regulated area to a non-radiological area. Another frisker should be placed there as well. Since a contaminated area must be within a regulated area, it appears that a narrow regulated area would also be necessary surrounding the contaminated area in the autoclave room.

It was noted that when work which might cause significant contamination to occur is to be done, a special work area is planned. This temporary area would be wholly enclosed within the regular contamination area and would be fitted with its own barrier control point for egress to the contaminated area. This is a good idea to prevent the possible spread of more highly contaminated material.

The X-720 building and the weld shop have taken the initiative to reduce the radiological areas and establish barrier control points. As a result, they have progressed at least equally as well as has the X-344 building.

49

## 12. EMERGENCY PREPAREDNESS

Management has totally abrogated its responsibilities for Emergency Preparedness by delegating all functions to lower echelons and without exerting control, overview, and training. Thus Emergency Preparedness at this plant is unsatisfactory.

The emergency planning function is not centrally controlled. The emergency philosophy section of the Plant Emergency Manual(POEF-1161) states "Emergency planning, execution and implementation of Emergency Planning Staff activities are the responsibilities of Division Management." Further, the manual goes on to state that "To recommend policy, establish procedure, review and update existing procedures and provide for Staff action, an Emergency Planning Staff will meet at regular intervals." This staff is a committee composed of individuals from each of the divisions. To expect these individuals to maintain a level of knowledge that will enable them to make reasonable determinations of the requirements of emergency planning in the present day is unreasonable.

50

The emergency management team only provides advice to the Plant Emergency Director. The Crisis Manager never assumes control of the emergency. The organization chart shows the Plant Manger's organization as reporting to the Plant Emergency Director by dotted line.

The assignments of responsibility are diffuse and repetitive. Each division is responsible to develop its own Divisional Emergency Manual. Copies are to be kept current at all times. Division Supervision and Facility Managers are responsible to appoint local emergency directors, local emergency squads, and building wardens in all buildings and other areas under their jurisdiction where emergency potentials exist. They are also to assure that these personnel are properly trained, equipped, and drilled. Handicapped employees who work, or visit, in any building, or area, are to be provided assistance, if needed, and when required. Division supervision and facility supervision shall plan, develop procedures and assign assistance as required, to assure handicapped personnel are evacuated to safe areas during an incident. Finally, they are required to provide documentation of an annual review of the Plant Emergency Manual and applicable Divisional Manuals to Emergency Preparedness.

Facility Custodians are required to maintain Facility Emergency Packets. These contain: an audit page; a table of contents; critical action, equipment or material listings; general building layout drawings or sketches; facility utility services; lists of facility tenant organizations; facility emergency systems and equipment; lists of hazardous, toxic and or radioactive materials, including all compressed gasses; copies of local spill plans. These packets are to be updated semi-annually or more frequently if changes occur.

Each division is required to have an emergency preparedness committee. One of the functions of this committee is to provide a copy of training documentation to Emergency Preparedness.

In the construction engineering area the emergency management department has no responsibility in the training or orientation of contractor employees.

Part II-C, page 1, paragraph 2 of the plant emergency manual addresses "Air Raid Alerts and/or warnings(all types)". It then says "During normal office hours - Monday through Friday". No other time period is addressed.

52

Secretaries are responsible for the implementation of personnel accountability plans.

SPP H-6 details 20 responsibilities of the plant emergency director. Some of these responsibilities seem more appropriate to emergency planning.

The Emergency Planning Appraisal committee inappropriately fulfills a QA function.

The operational emergency preparedness plan is vague and does not contain firm commitments for the completion of improvement items.

The emergency exercise scheduled for April 4, 1990 was delayed because most of the senior management was in Lexington for a meeting. This opportunity to test the emergency response capability under realistic conditions has been lost. Drills are conducted on day shift, during normal working hours and with advance notice. Drills on weekends, nights, and unannounced drills are not scheduled for 1990.

53

Members of the response team carry pagers so that in the event of an emergency they may be contacted. Tests of this system have a success rate of about 55 percent in contacting the responders. Memos sent to managers regarding this response level have had little effect in improving the response.

Reports of response team performance and the tracking and correction of identified deficiencies are not timely.

ATTACHMENT 1

### GUIDELINES FOR MODEL/LEAD FACILITY MANAGERS

The following is offered as guidance for the individual Model/Lead Facility Managers.

In order to achieve the Model/Lead Facility desired ultimate condition, first a thorough indoctrination of all the personnel assigned must be accomplished. An understanding of the goals and objectives in upgrading an individual facility to model/lead status, and how that supports the plant mission, "To enrich uranium safely, in an environmentally sound manner, economically on a 24 hour basis in accordance with DOE guidelines." is essential to success.

Where and how do you start? The first priority is the proper attitude of all involved in the facility, from the manager who is responsible for that facility, through all of his organization; and all who directly support the activities of the facility.

Once a conscientious decision has been made to upgrade a facility, the manager must create a realistic yet aggressive plan of action and schedule. The plan describes how the objectives will be accomplished. The plan uses resources and

1

## ATTACHMENT 1

assets presently available, plus those that can be enlisted
from direct support organizations, without depending upon or
requiring additional staffing or immediate budget
augmentation. (Long range efforts may eventually identify
and justify the need for both.)

Elevated standards of cleanliness and a positive
attitude on the part of all facility employees starts "today"
in the plan of what is to be done.

What is a "positive attitude" and how is it
demonstrated? One way is for facility team members to
immediately identify (introduce) themselves to any unknown
persons or other managers appearing in the facility, and ask
what they can do to help and is there any questions they can
answer. Being polite and courteous makes a great initial
impression. The cleanliness and orderliness of the spaces,
and the general squared away appearance of the workers, sends
a very positive message to people entering a facility.

Facility employees must establish a mind-set to
continually seek out and correct material deficiencies
accepting that superior performance and appearance is the
new norm.

2

## ATTACHMENT 1

Order your priorities. Everything cannot be accomplished overnight. Your plan of action demonstrates that you have identified what has to be done, and your schedule is evidence that you are working towards orderly accomplishment of obtaining your objectives. In order for your plan of action and schedule to have credibility, they must both be "living"; adjusted and modified as need be to make them the documents that defines where you are at any given time, and what yet has to be done.

It is unrealistic to expect allocation of money and personnel to return selected facilities to their original like-new condition. However, by having a dedicated and concerned work force, who are encouraged to be constantly aware of the need and requirement for improvement in both performance and appearance, the facilities and operations can, truly become "Model" Facilities.

3

## ATTACHMENT 2

### TEAM MEMBERSHIP

Paul J. Early, Team Leader

23 years experience in nuclear power operations
Chairman, HFIR Evaluation Committee, 1989
Member, BNL HFBR Restart Team
Senior Vice President, New York Power Authority, managing construction
of nuclear plant major modifications, etc.
Initial Senior Member, Nuclear Propulsion Examining Board
Retired Navy Rear Admiral with nuclear experience dating from 1953

Willis J. Ford

32 years experience in nuclear power operations
Member, HFIR Evaluation Committee, 1989
INPO Team Leader
Supervisor, Nuclear Operations Division, Rancho Seco
Certified Senior Reactor Operator BWR and PWR
Retired Navy Senior Chief Electronics Technician, Nuclear

James P. Forsyth

38 years experience in nuclear power operations
8 years INPO
3 1/2 years as Manager Emergency Preparedness
3 1/2 years as Manager, Events Analysis
Corporate and power plant evaluation team manager
Retired Captain, U.S. Navy

Luther D. Yarger

24 years experience in nuclear power operations
Member DOE Savannah River Reactor Oversight Office, 1989
9 years with INPO
Team leader for 23 plant evaluations; member of 27 corporate
evaluations
Retired Captain, U.S. Navy

Byron H. Collier, Project Corporate Sponsor

32 years experience in nuclear power operations
President, Burns and Roe Utility Management Consultants
Project Manager BNL HFBR Restart Organizational and Operational
Assessment
Senior Consultant to Office of Energy Research for Reactor Operations
Chief Engineer and Nuclear Project Manager, Stone & Webster
Engineering Corporation
President, Power Management Associates
President, Executive Consultants to Management
Retired Captain, U.S. Navy

EXHIBIT H

https://www.nrc.gov/OPA/pn/pn39934a.htm    Go    DEC FEB APR

8 captures
2 Sep 2000 – 19 Jul 2019

◄ 18 ►
2000 **2001** 2012    ▾ About this capture

# PNO-III-99-034a Portsmouth Gaseous Diffusion Plant

[Preliminary Notification index](#) | [News and Information](#) | [Main NRC Home Page](#) | [E-mail](#).

July 6, 1999

PRELIMINARY NOTIFICATION OF EVENT OR UNUSUAL OCCURRENCE PNO-III-99-034A

This preliminary notification constitutes EARLY notice of events of POSSIBLE safety or public interest significance. The information is as initially received without verification or evaluation, and is basically all that is known by Region III staff (Lisle, Illinois) on this date.

| Facility | Licensee Emergency Classification |
|---|---|
| U.S. Enrichment Corporation | Notification of Unusual Event |
| Portsmouth Gaseous Diffusion Plant | Alert |
| Portsmouth,Ohio | Site Area Emergency |
| Dockets: 07007002 | General Emergency |
|  | X Not Applicable |

Subject:  All Criticality Accident Alarms Administratively Declared Inoperable

On July 2, 1999, at 12:40 a.m., Eastern time, the certificatee declared an "Alert" and activated the Emergency Operations Center as required by their emergency preparedness implementing procedures after declaring the entire site's Criticality Accident Alarm System (CAAS) inoperable. The CAAS was declared inoperable after engineering plant staff, during a review of calculations, discovered that the detectors were not being calibrated to the 5 mRad/hr setpoint required by the Technical Safety Requirements (TSRs) but that the detectors may be set at a value as high as 8.57 mRad/hr. The certificatee immediately initiated the actions required by the TSRs for the inoperable CAAS, including discontinuation of specific fissile operations and restricted access to areas containing fissile material.

On July 3, 1999, at 12:10 a.m., Eastern time, the certificatee terminated the "Alert" and de-activated the Emergency Operations Center after several CAAS detectors were returned to operability following successful calibrations. The balance of the CAAS was calibrated and returned to operable status by 5:09 p.m. Plant has returned to normal operations.

There was no release of radiation at the facility.

The information presented herein has been discussed with the certificatee, and is current as of 10:30 a.m., CDT on July 6, 1999.

Contact:  P. Hiland          D. Hartland
          (630)829-9603      (740)289-3353

# EXHIBIT I

UE-612
(8-21-96)

# PROBLEM REPORT
## - Use Black Ink and Print Only -

Page 1 of 3

☐ PGDP  ☐ HQ  ☒ PORTS

BONNIE RUMBLE
Prepared By

57637
Badge Number

2500
Extension

**REPORT NUMBER**

PR PTS - 96 - 7695

Organization No.: 800    Group No.: 830   Mail Address: 5023

Discovery Date: 10/23/96   Discovery Time: PM    Building No.: 330   Shift: 0

Drawing / Specification / Procedure No.: _____  Rev.: _____  In Hand Procedure? ☐ Yes ☐ No ☒ N/A

**DESCRIPTION OR NATURE OF PROBLEM:** (Attach additional sheets if needed)

Received Report from Battelle on CAAS coverage in X-330 Building which indicates that the detector in the Northeast corner of the ground floor would not detect a criticality in the Northwest corner of the ground floor as required by the ANSI standard. See attached report.

**ACTIONS TAKEN:**

Directed Battelle to model the detector on second floor to determine if it would alarm within the ANSI standard if a criticality should occur in the Northwest corner, ground floor.
Discussed situation with Lee Fink about how to involve USEC and DOE

Was the Problem Report reviewed with Manager? ☒ Yes ☐ No   in the options if the second floor detector also fails.

**ACTIONS RECOMMENDED:**

Allow no uranium movement in Northwest corner of ground floor of X-330 and between PCB waste and North side of X-330 until Battelle provides results of the second floor detector.

Would you like to have a copy of this report when it is closed?   ☒ Yes ☐ No

TO BE COMPLETED BY THE PSS  Safety Analysis Review Required NER

| TYPE OF SSC: | | Justification/Comments/Actions: 14.28 hrs 10/25/96 |
|---|---|---|
| ☒ OSR/TSR | ☐ Q Item | - Notified NCS, NRA, Operations, DOE, |
| ☒ Safety System | ☐ AQ Item | NRC, LMES, Engineering, Safety |
| ☐ NCS | ☐ N/A | Analysis. |
| | | - PSS implemented LCO for affected |

INITIAL ASSESSMENT                Y    N   N/A
1. Operability Decision Required     ☒   ☐   ☐
2. Is Structure or Component Operable? ☒  ☐  ☐
3. Is System Operable? Degraded   ☒  ☐  ☐
   But
4. Reportable?                        ☐  ☐  ☒

Area. No movement of UF6 bearing material.

- Tails CAAS Cluster will not detect a criticality on NW side of X-330. Evaluation ongoing to determine if CAAS cluster 29-10 covers area.

Categorization Date: 10/25/96   Time: 1230

Steve Moy
PSS Signature

TO BE COMPLETED BY COMMITMENT MANAGEMENT

| Process Condition Code: | Performance Code: | Equipment Code: | Consequence Code: |
|---|---|---|---|

.0/25 '96 15:39     ID:LANIERFAX3800          FAX:              PAGE    1

PR-PTS-96-7695

# Memorandum                    **LOCKHEED MARTIN**

Lockheed Martin Utility Services, Inc.

DATE:       October 25, 1996
            POEF-822-96-053

TO:         Robbie Robinson, X-330

FROM:       Gary Crandall, Systems Engineer - CAAS

SUBJECT:    Limited Operations in the X-330

Due to the possibility of a blind spot in the CAAS coverage in the X-330 building, Systems Engineering and NCS are requesting that an area of limited operations be posted immediately. This area is in the northwest corner of the X-330 building, on the ground floor.

The area to be posted is defined by the following borders:
        from column 87-Z west to the exterior wall (near column 87-A), and
        from column 87-Z north to the exterior wall (near column 90-Z).

The perimeter of this area is to be posted with copies of the attached sign, at approximately 50 foot intervals, until further notice.

The CAAS coverage in the area in question may have been affected by the LMES waste drums stored in this part of the building. NCS is performing further analysis to determine if an actual blind spot exists. Should we find that a blind spot does exist, we will work with you to implement the appropriate corrective actions.

If you have any questions, you can reach me at ext. 4721 or page me at 289-0831.


cc:     Steve May, PSS Office
        Bonnie Rumble, NCS
        Gary Gibson, LMES
        Mark Hasty
        Chuck Harley

PR-PTS-96 - 162



**Battelle**
*... Putting Technology To Work*
505 King Avenue
Columbus, Ohio 43201-2693
Telephone (614) 424-6424
Facsimile (614) 424-5263

October 23, 1996

Ms. Bonnie Rumble
Lockheed Martin Utility Services, Inc.
Portsmouth Gaseous Diffusion Plant
Post Office Box 628
Piketon, Ohio 45661

Dear Ms. Rumble:

**Evaluation of Criticality Accident Alarm System (CAAS) Coverage in the X-330 Building Ground Floor**

As you know, we have been performing calculations on the ground floors of the process building in order to determine CAAS coverage. As indicated previously in our earlier correspondence, letter to Ms. Bonnie Rumble dated October 9, 1996, *CAAS Report Statistics Reported in POEF-SH-38, "Criticality Accident Alarm Coverage on the Operating Floors of X-333, X-326, and X-330"*, point 330-1, which was a source located in the northwest corner of the building failed to produce a dose rate of 5 mrad/hr at the detector location. 5 mrad/hr is the specified dose rate to result in a detector alarm.

Figure 1 shows the building with the source in the northwest corner. This point is denoted as point 330-1. The source has been biased toward the northeast end of the building where the detector is located in order to reduce computer run time. The particle tracks shown are actual tracks calculated by the MCNP4a radiation transport code and plotted by the SABRINA package.

The are several waste drums containing PCB contaminated solids located between the source and the CAAS cluster. As can be seen in Figure 1, these drums are providing a substantial amount of shielding between the source and the detector, allowing few neutron tracks to reach the detector. As stated in the letter mentioned previously, the result of this calculation gave a dose rate of $2.01 \pm 0.06$ mrad/hr at the nearest detector on the ground floor. In all previous calculations, the ground and cell floors were treated separately. There is a detector on the cell floor in the approximate vicinity of the source on the ground floor. It is possible that this detector may alarm. We would be happy to perform this calculation using MCNP and provide a time and cost estimate if you so desire.

PR-PTS-96-7695

Ms. Bonnie Rumble
October 23, 1996
Page 2

If you do not wish this calculation to be performed, there are other options available. In Figure 2, the drums have been removed and replaced with air. As can be seen in this figure, many of the tracks are reaching the detector. The result of this calculation gave a dose rate of $30.05 \pm 2.24$ mrad/hr, well beyond the 5 mrad/hr alarm setpoint. Obviously it can be concluded that removing the drums is the most direct method of assuring that this point is covered. Other options include raising the height of the cluster, adding another cluster, or optimizing the design of the cluster.

Clearly optimizing the design of the cluster will require much time and effort. Raising the height of the cluster may be the most economical method, but the calculation will have to be performed again and still may not result in coverage. Adding another cluster may not be economical but will most likely gain coverage. If a new detector is purchased, the placement of the detector should be analyzed, and the MCNP calculation should be performed with the new cluster in place to assure coverage.

As can be seen from the above results of the MCNP calculations, adding large quantities of shielding materials can result in loss of building coverage. PORTS should be aware that the calculations performed in POEF-SH-38 and other reports related to CAAS coverage are valid only with the configuration modeled by MCNP. If at any time large quantities of materials or any quantity of material that could result in substantial neutron shielding are added to the current configuration, PORTS should reassess building coverage.

If you need additional information or have any questions, please call Ms. Angela Brown at (614) 424-7125 or myself at (614) 424-3363.

Sincerely,

R. A. Robinson
Program Manager

Attachment
cc:    John Rapp, PORTS

PR-PTS-96-7695



Figure 1: North End of X-330 Building with PCB Contaminated Solids Waste Drums Between Source and Detector

PR-PTS-96-7695



Figure 2: North End of X-330 Building without PCB Contaminated Solids Waste Drums Between Source and Detector

# EXHIBIT J

**Office of Oversight
Environment, Safety and Health**

*Independent Investigation
of the*

# Portsmouth
# Gaseous Diffusion Plant

*Volume 1:  Past Environment,
Safety, and Health Practices*



May 2000

## Table of Contents - Volume 1

EXECUTIVE SUMMARY ................................................................ 1

1.0 INTRODUCTION .................................................................... 7

2.0 HISTORICAL OVERVIEW OF ACTIVITIES AT
    PORTSMOUTH ...................................................................... 16

    2.1 Background ...................................................................... 16
    2.2 Operations ...................................................................... 16
    2.3 Maintenance and Modifications ........................................ 20
    2.4 Unusual Events and Accidents ........................................ 20
    2.5 Worker Safety and Health Programs ................................ 22
    2.6 Waste Management .......................................................... 25
    2.7 Air and Water Emissions ................................................ 27
        2.8 Management and Oversight .................................... 28

3.0 PAST OPERATIONAL PRACTICES ........................................ 30

    3.1 Worker Safety and Health Programs ................................ 30
    3.2 Operations and Maintenance .......................................... 44
    3.3 Operations Summary ...................................................... 58

4.0 PAST ENVIRONMENTAL MANAGEMENT
    PRACTICES ...................................................................... 59

    4.1 Waste Management .......................................................... 59
    4.2 Management and Disposal of Scrap and
        Surplus Materials ...................................................... 66
    4.3 Liquid Effluents .............................................................. 67
    4.4 Atmospheric Releases of Radioactivity and Fluorine/
        Fluorides .................................................................... 71
    4.5 Environmental Management Summary .............................. 74

5.0 PAST MANAGEMENT AND OVERSIGHT PRACTICES
    AND EMPLOYEE RELATIONS ............................................ 76

    5.1 Oversight ........................................................................ 76
    5.2 Labor Relations .............................................................. 77

APPENDIX A – HISTORICAL HAZARDS .................................. 81

APPENDIX B – PRINCIPAL ACTIVITY EVALUTION
SUMMARY ............................................................................ 91

OVERSIGHT

## Abbreviations Used in This Report

| | |
|---|---|
| ALARA | As Low As Reasonably Achievable |
| AEC | Atomic Energy Commission |
| ALARA | As Low As Reasonably Achievable |
| ANSI | American National Standards Institute |
| CFR | Code of Federal Regulations |
| CIP | Cascade Improvement Program |
| CPT | Cone Penetrometer Test |
| CUP | Cascade Uprating Program |
| DAC | Derived Air Concentration |
| DCG | Derived Concentration Guide |
| DMSA | DOE Material Storage Area |
| DOE | U.S. Department of Energy |
| D&D | Decontamination and Decommissioning |
| EH | Office of Environment, Safety and Health |
| EMP | Environmental Monitoring Plan |
| EPA | Environmental Protection Agency |
| ERDA | Energy Research and Development Administration |
| ES&H | Environment, Safety, and Health |
| GAO | Government Accounting Office |
| HF | Hydrogen Fluoride or Hydrofluoric Acid |
| ISMS | Integrated Safety Management System |
| JHA | Job Hazard Analysis |
| LDB | Legionnaire's Disease Bacteria |
| LLW | Low-level Waste |
| MCL | Maximum Contaminant Level |
| MDA | Minimum Detectable Activity |
| MSDS | Material Safety Data Sheet |
| NCRP | National Committee on Radiation Protection and Measurement |
| NESHAPS | National Emission Standards for Hazardous Air Pollutants |
| NIOSH | National Institute of Occupational Safety and Health |
| NPDES | National Pollutant Discharge Elimination System |
| NRC | Nuclear Regulatory Commission |
| OCAW | Oil, Chemical, and Atomic Workers (Union) |
| OR | Oak Ridge Operations Office |
| OSHA | Occupational Safety and Health Administration |
| PAL | Plant Allowable Limit |
| PCB | Polychlorinated Biphenyl |
| PORTS | Portsmouth Gaseous Diffusion Plant |
| P/QA | Performance and Quality Assurance (Department) |
| RCG | Recommended Concentration Guide |
| RCRA | Resource Conservation and Recovery Act |
| RCW | Recirculating Cooling Water |
| RFI | RCRA Feasibility Investigation |
| RPG | Radiation Protection Guide |
| RWP | Radiation Work Permit |
| SAR | Safety Analysis Report |
| SOMC | Southern Ohio Medical Center |
| TCE | Trichloroethene |
| TLD | Thermoluminescent Dosimeter |
| TSCA | Toxic Substances Control Act |
| TSR | Technical Safety Requirement |
| UF6 | Uranium Hexafluoride |
| UNH | Uranyl Nitrate Hexahydrate |
| UPGWA | United Plant Guard Workers of America |
| USEC | United States Enrichment Corporation |
| USQ | Unreviewed Safety Question |
| VOC | Volatile Organic Compound |

# Executive Summary - Historical ES&H Practices

| | |
|---|---|
| **EVALUATION:** | Office of Oversight Investigation |
| **SITE:** | Portsmouth Gaseous Diffusion Plant |
| **DATES:** | January-May 2000 |

## Background/Scope

The Department of Energy (DOE) Office of Oversight, within the Office of Environment, Safety and Health (EH), conducted an investigation of the Portsmouth Gaseous Diffusion Plant (PORTS or Plant) from January through May 2000. This investigation was performed at the direction of the Secretary of Energy, who instructed EH to examine concerns about past operations and work practices, and current management of legacy materials at PORTS. The purposes of this investigation were to: (1) determine whether past environment, safety, and health (ES&H) activities and controls associated with uranium enrichment and supporting operations were in accordance with the knowledge, standards, and local requirements applicable at the time; (2) identify any additional ES&H concerns that had not been documented; and (3) determine whether current work practices for DOE-controlled areas of the site adequately protect workers, the public, and the environment.

Specific areas examined by the EH investigation team included past operations of the Plant, including operation of the cascades and the oxide conversion and feed manufacturing plants; historical and current maintenance and modification programs; worker health and safety programs and practices; historical and current programs and practices for the treatment, storage, and disposal of legacy and newly generated waste; and site remediation. The team also attempted to identify any evidence of potentially hazardous work that PORTS might have performed for others or that was directly related to weapons systems. This investigation examined programs and activities of various organizations responsible for ensuring protection of the workers, the public, and the environment at PORTS, including the Goodyear Atomic Corporation and subsequent management and operating contractors, DOE Headquarters offices, the DOE Oak Ridge Operations Office (OR), Portsmouth Site Office, Bechtel Jacobs, and key subcontractors. This investigation did not evaluate current Nuclear Regulatory Commission (NRC)-regulated United States Enrichment Corporation (USEC) activities, except at interfaces with DOE-controlled areas and activities.

The team interviewed former and current employees; observed work; performed walkdowns of facilities, work areas, and site grounds; conducted environmental sampling and analysis; conducted radiological surveys; and reviewed documents. Interviews were conducted with over 300 current and former employees, including DOE Headquarters, OR, and Portsmouth Site Office personnel; Bechtel Jacobs and subcontractor managers, supervisors, and workers; selected USEC personnel; and stakeholders. The team conducted facility and work area walkthroughs examining Plant operations, work practices, and hazard controls. The investigation team visited essentially all DOE-controlled Plant facilities, waste and material storage areas, and site grounds. The team collected environmental samples from groundwater wells, surface water sources, and sediments both inside and outside the perimeter security fence. The investigation team also reviewed thousands of current and historical documents, including plans, procedures, operations logs, assessments, analyses, and memoranda.

The intent of this investigation was to identify and address the overall ES&H concerns and questions of current and former workers and the public, not to determine the validity of specific allegations. Several ongoing or proposed EH initiatives should provide greater understanding of certain aspects of these issues, including a mass balance project, a medical surveillance project, and an exposure assessment project. This volume, Volume 1, addresses past ES&H activities and practices and their effectiveness in protecting

workers, the public, and the environment. The second volume, Volume 2, deals with current ES&H issues in DOE-controlled areas.

## Results

External conditions and influences have had a significant effect on the ES&H-related behavior and intentions of both management and workers at PORTS, especially during the first two decades of operation. When PORTS began production activities, World War II and the Korean conflict had recently ended, and the Cold War was a reality. The work being done was classified, involved high technology, and was important to the national defense. The "need to know" was an ingrained security policy that had a major effect on attitudes toward sensitive operations and materials. The Plant was one of the biggest employers in the area, paying wages significantly higher than available elsewhere locally. Work at PORTS was an attractive alternative to other agricultural or industrial employment options to people in the surrounding region. Management and the Atomic Energy Commission (AEC) were under pressure to maximize production. While most of the hundreds of workers interviewed by the team indicated, in response to specific questioning, that they were unafraid to ask questions about safety and they had no fear of reprisals, a few interviewees did express concerns about both. Industries of the 1950s, including AEC facilities, were largely self-regulated, and guidance and regulatory requirements were evolving. Significant industrial and environmental legislation that would focus attention and actions toward greater protection of workers and the environment was not enacted until the 1970s. Ensuring worker protection was a key part of the Oil, Chemical, and Atomic Workers Union (OCAW) activities since the union's inception in 1954.

### Operations and Maintenance

Many operations and maintenance activities at PORTS involved hazardous conditions and the potential for exposure of personnel to physical, radioactive, and chemical hazards. Enrichment process facilities with the potential for such exposures included the cascade and other process buildings; a feed manufacturing plant; an oxide conversion plant; decontamination, cleaning, and uranium recovery facilities; a smelter; and incinerators. Conditions in many work areas were extremely hot, dusty, and noisy.

Leaks and off-gassing from process equipment or components being repaired or replaced exposed workers to airborne uranium, transuranics, fission products, fluorine, and hydrogen fluoride (HF) gas. Others worked with, or were exposed to, various hazardous materials and chemicals such as asbestos, trichloroethene (TCE) and other solvents, polychlorinated biphenyls (PCBs), acids, chromium, nickel, lithium, welding fumes and gases, and mercury. Radioactive or hazardous materials were spilled or released to the environment from production related facilities and attendant work activities.

Probably the most hazardous operations at PORTS involved the operation of the oxide conversion plant, which had continuous airborne and surface radioactive contamination problems over its 21-year lifetime, from 1957 to 1978. Personnel working in this facility were exposed to transuranics from recycled reactor fuel feed and to insoluble airborne uranium oxides. Several workers, later put on permanent restriction from working in airborne-contamination areas, received significant intakes that were still detectable in their lungs decades later. Maintenance and modification activities that required breaching process systems or components also exposed workers to radioactive uranium hexafluoride ($UF_6$) process gas and HF. Decontamination activities in X-705 (Decontamination and Cleaning Building) and elsewhere involved exposures to hazardous solvents and generated the largest amount of radioactive and hazardous liquid waste on site. Personnel performing instrument calibration and trap cleaning were frequently exposed to mercury. Welders were exposed to asbestos fibers and noxious fumes from welding on nickel compounds and Freon piping. PCB-contaminated oils posed long-term personnel exposure hazards.

Hundreds of $UF_6$ releases occurred from equipment failures and during maintenance, sampling, cylinder handling, and connection and disconnection of feed and product cylinders. These releases caused many intakes of uranium and HF burns, and they contaminated work areas and the environment. Personal protective equipment was usually available, often recommended by industrial hygiene and health physics personnel, or specified in procedures. However, compliance by workers and enforcement by supervision was very inconsistent. Lack of understanding or acceptance of the consequences of non-compliance, insufficient oversight by supervision, and discomfort associated with respirators and extra clothing all contributed to this inconsistency.

The investigation team did not identify any evidence that PORTS performed any work for others that directly involved work with or burial of nuclear weapons components. With the exception of the burial of a dismantled, DOE nickel fabrication plant in the classified landfill in 1979, no evidence was found that PORTS performed any work for others involving hazardous materials. Incidental use of beryllium was identified, including the disposal of sealed plutonium/beryllium sources, use of welding rods, use of early fluorescent bulbs with a beryllium coating, use of tools fabricated from beryllium, and machining of piping components containing beryllium. Several interviews with former workers indicated that there might have been beryllium bar stock on site and in the machine shop, although no specific evidence of that was discovered. Concentrations of beryllium above background levels have been identified in a number of environmental samples taken in the late 1980s and early 1990s from various Plant locations.

## Worker Safety and Health Programs

Worker safety and health programs were established when the Plant started operation and have evolved significantly. The implementation and effectiveness of these programs varied widely and, in many ways, failed to adequately protect the safety and health of PORTS workers. Overall, however, occupational illness and injury statistics consistently reflected a much better record than industry averages for comparable manufacturing work settings.

Safety and health training methods and effectiveness also varied greatly. Initial training of operations and maintenance workers was extensive and involved the basics of radiation and industrial safety. However, the rigor of training efforts diminished quickly and, until the 1980s, on-the-job training from supervisors and more experienced workers was standard practice. Monthly safety meetings, posters, newsletters and bulletins, and safety handbooks supplemented the on-the-job training. These materials provided good information on health and safety fundamentals, including radiation protection and the use of personal protective equipment, as well as basic industrial safety information. It was not until the 1990s that a more focused and rigorous ES&H training program was established.

Protection of the safety and health of workers was a line management responsibility, and hazard identification and controls were primarily contained in work procedures and work permits developed by line organizations. Industrial safety, industrial hygiene, and health physics staff performed surveys, inspections, and event analysis and made recommendations for hazard controls and personnel protective actions. However, they had little oversight or enforcement authority until the 1970s. Staffing for all safety and health organizations was very limited well into the 1970s and was insufficient to provide adequate attention for up to 2500 employees working in numerous and varied hazardous conditions. Organizationally, these safety and health groups were located in the Industrial Relations Department and had little direct visibility and access to senior management. When Occupational Safety and Health Administration regulations were issued in the 1970s, the industrial safety group became more proactive and performed comprehensive compliance inspections.

Radioactive contamination and control limits were established to minimize personnel exposures and prevent exceeding regulatory limits. A network of stationary air samplers and portable and breathing zone samplers provided data on airborne contamination. This monitoring frequently showed that limits had been exceeded. PORTS' assumption that all uranium intakes were soluble compounds that would be excreted quickly and could be monitored effectively by urinalysis was not conservative for some locations and activities where insoluble aerosols were generated, such as in the oxide conversion plant and from maintenance activities involving grinding, cutting, and buffing. Respirator use was encouraged and recommended for high-risk operations and activities, but event investigations, safety and health staff inspections, and appraisals by OR identified frequent and continuing non-compliance with respirator requirements. As a result of OR appraisal findings in mid-1972, the site instituted several major program improvements, including issuing new procedures, surveying work areas, procuring additional respirators, training workers, and implementing a respirator fit testing program.

The exposure of workers to radioactive materials was monitored, and with some exceptions, documented exposures were within the limits applicable at the time. However, monitoring deficiencies caused exposures to airborne radioactivity to be underestimated, and actual exposures were likely higher than indicated by PORTS monitoring records. Extremity monitoring was not employed; exposures of hands, feet, and eyes in high beta radiation fields were underestimated and

could have resulted in exposures exceeding limits. A bioassay (urinalysis) program monitored internal uranium exposures and provided a means of verifying and monitoring excretion rates to limit overexposures and identify otherwise unmonitored intakes from releases or airborne contamination at work locations. In 1965, an in-vivo body counting program was initiated to monitor for insoluble enriched uranium, a material for which the urinalysis program was not sufficiently sensitive or reliable. Studies performed in 1990 indicated that the in-vivo counter's capability for analyzing transuranics was questionable, making it difficult to demonstrate that all internal exposures have been accurately detected and assessed.

Goodyear Atomic Corporation established and operated a robust and sophisticated occupational health program in the 1950s and 1960s that provided comprehensive medical examinations and maintained records for accidents and injuries, bioassay programs, and workers compensation cases. In the 1970s and 1980s, the performance of the occupational medicine program declined, as it experienced staffing difficulties and quality-of-care complaints. Under Martin Marietta Utility Services the program was strengthened in the early 1990s, with new procedures and added staffing.

## Environmental Management

Over the operating lifetime of the Plant, activities to manage wastes and liquid and air process effluents evolved in response to internal and external requirements. PORTS personnel monitored emerging regulations and established plans and strategies in response to new requirements. However, implementation of necessary changes and new compliance programs often required an extended period of time and was not always fully effective.

General guidelines for handling, storing, and disposing of waste existed in the early days of Plant operations. Throughout the Plant's history, efforts were made to minimize the loss of valuable enriched uranium in Plant waste streams. However, onsite sanitary landfills likely received some contaminated material, since waste segregation practices were not fully understood or effective. As new requirements were enacted, additional waste streams, such as hazardous wastes, were restricted from disposal in onsite landfills. Oils contaminated with PCBs and uranium were spread on roads, disposed of in oil biodegradation plots, burned in open containers, and incinerated.

The State of Ohio mandated closure of important site landfills and the incinerator in the late 1980s and early 1990s, because of concerns over continued disposal of regulated wastes. The Plant ceased offsite shipment of radioactive waste, and without approved commercial treatment and disposal facilities, large amounts of radioactive waste, mixed hazardous and radioactive waste, and radioactively contaminated PCB waste accumulated and were stored on site; much of this waste remains in storage today. Numerous inspections and appraisals by the State of Ohio Environmental Protection Agency (EPA), DOE (e.g., Tiger Team assessment), OR, and internal organizations identified performance problems in the treatment, storage, and disposal of hazardous waste. By 1988, the State of Ohio EPA sent DOE and the Plant a notice of intent to file suit for hazardous waste violations.

In the 1950s, Goodyear Atomic Corporation management was aware that contaminated surplus materials could only be shipped to properly licensed and authorized recipients and that radiological monitoring was required for all potentially contaminated materials being offered for public sale. Although significant efforts were taken to properly segregate clean and contaminated materials intended for sale to the public, there were continued segregation compliance problems and limited health physics manpower to perform surveys of sale materials, indicating a possibility that material exceeding radiological release guidelines was released from the site from the 1950s through the 1980s.

The environmental monitoring program at PORTS was initiated in 1955. In the 1970s, several new wastewater treatment systems were constructed to meet new permit requirements and to significantly reduce the levels of radionuclide emissions. The PORTS National Pollutant Discharge Elimination System permit, issued by the State of Ohio in the 1970s, required testing and reporting of specific chemical and physical properties and set limits on Plant chemical discharges. Radiological discharges have always been subject to the regulations of the AEC and its successors. Despite the discharge restrictions, legacy environmental contamination exists in ponds, local ditches, and streams.

Although Plant management was aware since the 1960s that transuranics and fission products had been introduced into Plant facilities as early as 1957, until 1975 radiological effluent monitoring was only conducted for uranium isotopes and related indicator

parameters. In 1975, technetium, and subsequently transuranic contamination, was unexpectedly discovered in liquid effluents from X-705. Technetium was also detected in airborne discharges. This discovery triggered significant long-term efforts by Plant personnel to isolate sources of technetium and transuranic contamination, develop or improve control methods, and establish appropriate monitoring protocols.

Since the Plant's inception, PORTS was proactive in tracking, assessing, and documenting the potential public dose impact from releases of fluorine or $UF_6$ to the environment. Dose estimates and release summaries are provided in annual reports starting from the early 1970s in response to AEC requirements. While it is likely that PORTS air emission estimates were done in good faith, these estimates did not reflect all the potential historical releases, including some that could have been significant, such as cell jetting. Evidence of contamination on roofs and grounds and recurring high workplace air sample results in various locations, such as the oxide conversion facility, point to significant unmonitored releases that had not been previously included in monitoring results. The Plant did not perform continuous vent monitoring of radionuclides or fluorides until the mid-1980s, and previous methods for estimating releases have been shown to be unreliable and in some cases non-conservative.

Fluorine and fluoride compounds were used in significant quantities at PORTS and both by design and by accident were vented to the atmosphere. Plant personnel have repeatedly complained of offensive fluorine fumes, breathing difficulty, and respiratory tract damage from releases at the fluorine generating facility and process buildings. The PORTS medical department rarely confirmed significant health effects, but confirmatory surveys to establish release concentrations provided unreliable results due to the rapid dissipation of released gases. Continuous environmental monitoring for fluorides has been conducted for many years, and ambient samplers sometimes indicated fluoride concentrations that exceeded release limits.

## Management, Oversight, and Industrial Relations

The AEC, the Environmental Research and Development Administration (ERDA), and DOE have always had a site presence at PORTS, but until 1989 had limited ES&H oversight capability or responsibility. OR conducted very cursory annual safety and health program appraisals from 1957 to at least 1980. However, these appraisals typically involved two or three persons for three or less days on site "addressing" a broad scope of ES&H functions, as well as corrective actions from previous appraisals. There was little evidence of field observation in these appraisals. When OR personnel did conduct field inspections, they identified numerous and significant performance problems. OR also performed detailed investigations of major $UF_6$ releases or other accidents. Although the Plant appeared to be responsive to the concerns and recommendations raised by OR, root causes and programmatic issues were rarely identified and addressed; the adverse conditions and performance reoccurred, or remained uncorrected in other Plant areas. In the 1980s, OR ES&H oversight became more rigorous and proactive, especially after the Tiger Team assessment in 1989 identified significant programmatic deficiencies and unsafe conditions and performance in the Plant. The AEC and its successors also investigated worker allegations of unsafe conditions and practices, but with inconsistent rigor and effectiveness. A 1980 review by the General Accounting Office sharply criticized DOE oversight of ES&H at the gaseous diffusion plants.

Goodyear Atomic Corporation management oversight of ES&H was reactive and often ineffective, as reflected in continuing ES&H problems through the years. The Plant responded well when Federal and state regulators raised major concerns or when new regulations were issued, implementing corrective actions and developing new programs and controls. However, Plant management often failed to ensure that ES&H staff recommendations were executed, or that ES&H requirements were implemented and enforced by first-line supervision.

Since its inception in 1954, OCAW took an aggressive approach to protect and improve employee welfare. This aggressiveness has resulted in strained relations between management and labor over the years and numerous strikes have occurred, four lasting longer than three months and two lasting well over six months. These strikes presented administrative and operational challenges to the Plant to maintain continuous production of enriched uranium. OCAW union members had filed an estimated 17,000 grievances by 1993, many addressing ES&H concerns. This process

brought attention to adverse conditions and resulted in safer and healthier working conditions and work practices.

Relations between the United Plant Guard Workers of America (UPGWA) union and Plant management were much less confrontational. Although protective forces have been an integral part of Plant activities due to security considerations, the ES&H protection provided to production workers (such as respirators and shoe covers) were not always considered or provided to security personnel when they worked in close proximity to hazardous operations or were stationed, ate lunch, and took breaks in contaminated areas. In addition, in the late 1980s and early 1990s, protective forces performed extensive training drills in radioactively contaminated buildings without appropriate protective clothing or monitoring. Hazard communications and ES&H training have not always been provided on a timely and consistent basis for protective force workers.

## Conclusions

Historical operations and practices were significantly influenced by various external conditions related to local wages, industry practices, and world political conditions. With some exceptions, documented exposures to radioactivity were monitored and did not exceed the standards of the time. Due to weaknesses in monitoring programs, such as the lack of extremity monitoring, exposure limits may have unknowingly been exceeded. In addition, communication of hazards, the rationale for and use of protective measures, accurate information about radiation exposure, and the enforcement of protective equipment use were inadequate. Further, workers were exposed to various chemical hazards for which adverse health effects had not yet been identified. Environmental practices prior to Federal and state legislation in the 1970s and 1980s resulted in many adverse impacts to the environment, although essentially all on Federal property. AEC/ERDA/DOE and contractor management failed to proactively identify ES&H vulnerabilities, clearly communicate high expectations for ES&H performance, and implement consistent, effective corrective actions to known problems. Management also failed to ensure that hazard controls were implemented by supervisors and workers, resulting in additional and higher exposures to personnel and continuing unnecessary radioactive contamination.

# 1.0 Introduction

## 1.1 Purpose and Scope

The Department of Energy (DOE) Office of Oversight, within the Office of Environment, Safety and Health (EH), conducted an investigation of the Portsmouth Gaseous Diffusion Plant (PORTS or Plant) from January through May 2000. The purposes of this investigation were to (1) determine whether historical, environment, safety, and health (ES&H) activities and controls associated with uranium enrichment and supporting operations from initiation of Plant operations in 1954 until 1997 were in accordance with the knowledge, standards, and local requirements applicable at the time; (2) identify any additional ES&H concerns that have not been documented; and (3) determine whether current DOE and DOE contractor work practices since 1997 (when the Nuclear Regulatory Commission [NRC] assumed regulatory authority of the gaseous diffusion processes, facilities, and personnel) for DOE-controlled areas of PORTS adequately protect workers, the public, and the environment. This investigation was performed at the direction of the Secretary of Energy, who instructed EH to examine concerns about past operations and work practices, and current management of legacy materials at PORTS.

The activities at PORTS are being evaluated as a single, integrated investigation coordinated with other organizations that have regulatory authority at PORTS, including the State of Ohio, the NRC, the Environmental Protection Agency (EPA), and the Occupational Safety and Health Administration (OSHA). The scope of the investigation includes: (1) ES&H practices associated with operating (i.e., uranium enrichment) and support facilities from 1954 to March 3, 1997; (2) ES&H issues associated with these facilities and properties from 1997 to the present; and (3) facilities and properties under current DOE jurisdiction. Specific PORTS operations examined by the EH investigation team include: cascade operations; feed production; oxide conversion; landlord infrastructure activities; treatment, storage, and disposal of legacy and newly generated waste; site remediation; uranium hexafluoride ($UF_6$) cylinder storage; maintenance; facility decontamination and decommissioning; and polychlorinated biphenyl (PCB) collection, treatment, and cleanup. This investigation also examined the programs and activities of the organizations responsible for ensuring protection of the workers, the public, and the environment at PORTS, including the Oak Ridge Operations Office (OR), Portsmouth Site Office, Bechtel Jacobs, and key subcontractors, as well as the effectiveness of PORTS' implementation of its management and integration contract, including the complete transfer of agreed-upon ES&H functions to subcontractor organizations.

Specific areas excluded from this investigation include all current NRC-regulated activities at PORTS, and all United States Enrichment Corporation (USEC) activities specifically involving gaseous diffusion operations. Similarly, the results of other related evaluations being conducted by DOE—such as the mass balance, exposure assessment, and medical surveillance projects—are outside the scope of this investigation.

## 1.2 Current Operations and Hazardous Materials

PORTS is located near Piketon, Ohio, approximately 25 miles northeast of Portsmouth, Ohio, and two and a half miles east of the Scioto River. PORTS is approximately 3,714 acres, of which the gaseous diffusion plant occupies about 640 acres, of which 93 acres contain Plant process buildings. The current mission of the Plant is to "enrich" uranium for use in domestic and foreign commercial power reactors. In the past, the mission also included providing materials for weapons production and naval reactor fuel. Enrichment involves increasing the percentage of the uranium-235 isotope in the material used for creating reactor fuel ($UF_6$). Uranium-235 is highly

fissionable, unlike the more common isotope uranium-238. PORTS receives slightly enriched UF$_6$ from the Paducah Gaseous Diffusion Plant (which enriches 0.7 percent uranium-235 to about 1.95 percent uranium-235 currently) and further enriches the UF$_6$ up to 5 percent uranium-235. Figures 1, 2, and 3 are site maps and an aerial view of PORTS.

Over its operating lifetime, PORTS estimates that it has processed more than 336,000 metric tons of uranium. The uranium enrichment process involves moving UF$_6$ as a compressed gas through a series of diffusion stages; PORTS has over 4,000 diffusion stages. The diffusion process generates enriched uranium product and depleted uranium tails. The product is shipped to commercial customers for conversion to fuel rods and use in reactors. The tails, containing less than 0.5 percent uranium-235, remain at PORTS in cylinders and are shipped to Paducah for use as depleted feed.

DOE is the site "landlord," owns the physical plant, and is responsible for some activities in X-326, the X-326 "L Cage" and its glovebox, the X-345 high assay sampling area, and the X-744G glovebox. DOE retains responsibility for legacy waste treatment, storage, and disposal; management of the depleted UF$_6$ cylinders; completion of the highly enriched uranium shutdown and removal program; and remediation of environmental contamination. In April 1998, DOE selected Bechtel Jacobs as the management and integrating contractor for PORTS. This contract mandates that Bechtel Jacobs subcontractors perform the majority of the work. Bechtel Jacobs recently awarded the last two major subcontracts to WASTREN to perform site services and waste management operations. Figure 4 provides organization charts for the DOE Portsmouth Site Office and Bechtel Jacobs.

USEC leased the enrichment production facilities on July 1, 1993, and contracted with Martin Marietta Utility Services, which became Lockheed Martin Utility Services, as the maintenance and operating contractor until May 1999, when USEC assumed responsibility for enrichment activities. The NRC performs regulatory oversight of USEC activities. OSHA regulates USEC occupational safety and worker health, and the State of Ohio and the EPA regulate USEC environmental activities. USEC is responsible for the process of separating uranium isotopes through gaseous diffusion and support operations. Support operations include feed and withdrawal of material from the primary process, potable and cooling water treatment, steam generation for heat, decontamination of equipment removed from the process for maintenance or replacement, recovery of uranium from various waste materials, and treatment of industrial wastes.

During the Plant's operating history, the process of enriching uranium for military and commercial applications has generated higher enriched product, tails, and radioactive and non-radioactive wastes. In addition, other radioactive and non-radioactive waste materials, not associated with naturally occurring uranium, have been introduced to the Plant and include transuranic elements (isotopes with atomic numbers greater than uranium) such as neptunium-237 and plutonium-239, fission products such as technetium-99, PCBs, and volatile organic compounds such as trichloroethene (TCE). These waste materials present differing levels of risk to workers and to the public depending upon their concentration, pathway of release, and method of exposure. Figure 5 shows the historical process of uranium enrichment and its byproducts.

## 1.3 Investigative Approach

The overall objectives of this investigation were to determine whether historical ES&H activities and controls were in accordance with the knowledge, standards, and local requirements applicable at the time; whether any additional ES&H concerns have not been documented; and whether current work and safety management practices for DOE-controlled areas of PORTS are sufficient to protect workers, the public, and the environment. Issues identified by the investigation team that are associated with the current implementation of ES&H programs are summarized in Volume 2.





**Figure 1. Map of Portsmouth Gaseous Diffusion Plant, Leased and DOE Controlled Areas**



**Figure 2. Map of Portsmouth Gaseous Diffusion Plant, Major Boundaries and Features**



**Figure 3.  Aerial View of Portsmouth Gaseous Diffusion Plant**



**DOE Portsmouth Site Office**

**Bechtel Jacobs Company**

**Figure 4. Organization Charts for the DOE Portsmouth Site Office and Bechtel Jacobs**



**Figure 5. Schematic of Historical Uranium Enrichment Process**

Interviews were conducted with over 300 current and former employees, including DOE Headquarters, OR, and Portsmouth Site Office personnel; Bechtel Jacobs and subcontractor managers, supervisors, and workers; selected USEC personnel; and stakeholders. USEC personnel were interviewed to clarify the nature of DOE activities conducted in USEC-controlled space and to better understand how USEC performs work for Bechtel Jacobs. Over 240 of these interviews resulted from a solicitation that the investigation team placed in local newspapers requesting information on past Plant operations, ES&H practices, and specific events that could have affected worker and public health and safety and environmental protection. These interviews also provided the investigation team with a preliminary indication of the degree to which ES&H practices and controls were consistent with and appropriate to the standards of the day, both past and present. This information allowed the investigation team to identify certain ES&H practices for more detailed document review.

The investigation team conducted numerous facility and work area walkthroughs examining Plant operations, work practices, and hazard controls. Essentially all DOE-controlled Plant facilities, waste and material storage areas, and grounds were visited by the investigation team. Many facilities and storage areas were examined multiple times. Job planning, maintenance, and operational activities were also observed to understand how work activities are planned and executed.

The investigation team collected 25 samples from groundwater wells, surface water sources, sediments, and soil (see Volume 2 of this report for more information). Samples were collected both inside and outside the perimeter security fence. These samples were evaluated for the presence of radioactive and non-radioactive contaminants. All samples were "split" or separated into two samples for running parallel tests, and samples were maintained under a strict chain of custody.

To supplement the interview, observation, and sampling processes, the investigation team reviewed thousands of current and historical documents, including plans, procedures, log books, assessments, analyses, and reports and correspondence. These reviews supplemented the information from interviews and clarified the chronology of events at PORTS. The investigation team also examined documents addressing past standards to provide a framework for understanding ES&H requirements and expectations. Many records were obtained from PORTS archives documenting past releases of radioactive and hazardous materials and their potential impacts on workers, the public, and the environment.

This extensive process for gathering information enabled the team to proceed in a structured fashion to (1) understand past conditions; (2) fully comprehend the issues being raised regarding past operations, past work practices, and management of legacy materials; (3) evaluate the effectiveness of actions taken by PORTS to address ES&H issues; and (4) assess current conditions at PORTS and their impact on worker and public health and safety, and the protection of the environment.

## 1.4    Data Considerations

The scope of this investigation required that the investigation team examine current as well as legacy data and information. This involved both the review and evaluation of archived material and the assessment of recorded interviews documenting individuals' recollections of previous events and conditions. The investigation team recognized the inherent difficulty of current and former workers' accurately recalling details related to activities and events happening up to and perhaps more than 40 years ago. While the interview solicitation indicated the team's desire to speak with personnel who were involved in a variety of functions at the Plant, many individuals were self-selected for the interviews; that is, their participation resulted from their personal interest in the investigation. Accordingly, the team cross-checked information from multiple sources before making judgments contained in this report.



Boxes of Records Reviewed by the Investigation Team

The identification and review of historical documentation was a tedious and time-consuming process. Due to the volume of records and other documentation generated over almost 50 years, the investigation team made a "best effort" to locate and review all pertinent documentation. Documents were examined based on focused subject searches and targeted sampling.

## 1.5   Report Structure

The results of this investigation are structured in two volumes to provide the reader with a comprehensive understanding of past and current activities at PORTS and a thorough description of operational, maintenance, and environmental management practices and their effectiveness in minimizing impacts on workers, the public, and the environment. Volume 1 describes historical ES&H practices. Volume 2 presents an assessment of current ES&H programs. To ensure that the full range of information is provided in an understandable manner, the balance of this volume is organized into a series of discussions outlining various elements of the Plant's operation in the context of when and how they were conducted.

Accordingly, Section 2 of this volume provides a historical overview and description of past activities at PORTS, within a series of functional areas that summarize key operations relating to the safety and health of workers, the public, and the environment. The objective of Section 2 is to provide an overall understanding of the major activities performed at PORTS and to indicate how these activities may have changed over time. More detailed discussions of historical operations and maintenance activities, environmental management, and line management and oversight practices are presented in the subsequent three sections.

Section 3 describes the hazards that historically existed at PORTS; past operational and maintenance activities; practices used to identify, monitor, and control these hazards; and the effectiveness of these practices in addressing hazards. Similarly, Section 4 describes past environmental management practices at PORTS and their effectiveness in mitigating impacts to the public and the environment. Finally, Section 5 reviews historical management and oversight practices as well as a discussion of employee relations.

Appendix A of Volume 1 outlines the radiological, chemical, and physical hazards present at the Plant.

Appendix B of Volume 1 summarizes the principal activities conducted at PORTS from 1952 to 1997 and provides a general assessment of the hazards presented by these activities, the controls used to mitigate the hazards, and the effectiveness of the controls.

Volume 2 of this report documents current conditions at PORTS in terms of public and environmental protection, worker health and safety, and line oversight. It examines existing pathways for hazardous materials to be transported to the environment and the extent of contamination in groundwater and in surface waters, efforts undertaken by PORTS to control contamination, results from the sampling and analysis conducted by the investigation team, the effectiveness of efforts to provide information to the public and other stakeholders, the nature and extent of risks that workers currently face at PORTS from both radiological and non-radiological hazards, the use of engineering and administrative controls to mitigate these hazards, the systems for planning and managing work, and the effectiveness of DOE and contractor management functions for ensuring protection of workers, the public, and the environment.

Appendix A of Volume 2 highlights significant issues in the implementation of current ES&H programs. The roster of the Office of Oversight investigation team is provided in Appendix B of Volume 2.

# 2.0 Historical Overview of Activities at Portsmouth

This section contains an overview of historical Plant activities at PORTS, presented chronologically within a series of functional areas, identifying key Plant conditions, operations, and practices. This section also summarizes the actual or potential effects of these conditions, operations, and practices on the safety and health of workers and the public, as well as on the environment. Sections 2.2 and 2.3 describe the historical hazards at PORTS; past operational and maintenance activities; practices used to identify, monitor, and control these hazards; and the effectiveness of these practices. Section 2.4 discusses unusual events and accidents. Sections 2.5 through 2.7 describe past practices in worker safety and health, waste management, and air and water emission control at PORTS and their effectiveness in mitigating impacts to the public and the environment. Section 2.8 reviews historical management and oversight practices and discusses employee relations.

## 2.1 Background

In July 1952, funds were designated for expansion of the domestic gaseous diffusion program, including additions to the gaseous diffusion plant at Oak Ridge, development of a new plant at Paducah, Kentucky, and construction of new $1.2 billion plant at a site to be selected later. In August 1952, the U.S. Atomic Energy Commission (AEC) announced that a 4,000-acre tract of land near the Scioto River in Pike County, Ohio, would be the location of the new gaseous diffusion plant. Selection of this site was based on the availability of sufficient acreage of relatively flat terrain, significant amounts of electrical power, a dependable water source, local labor supply, and suitable transportation systems. Construction of the Portsmouth Plant was completed in March 1956, six months ahead of schedule and more than $460 million under budget. The peak construction period was in 1954, when 22,500 workers were on site.

---

**Major Facilities at PORTS**

- *X-330, X-333, and X-326 – Gaseous Diffusion Process Buildings – 1954 to present*
- *X-344 – $UF_6$ Feed Manufacturing Plant – 1958 to 1962*
- *X-300 – Central Control Building – 1954 to present*
- *X-342, X-343 – Feed Facilities – 1954 to present*
- *X-705E – Oxide Conversion Plant – 1957 to 1978*
- *X-705 – Decontamination and Cleaning Building – 1954 to present*
- *X-700 – Maintenance Building – 1954 to present*
- *X-720 – Compressor Shop – 1954 to present*
- *X-334A – Transfer and Sampling Facility – 1975 to present*
- *X-342 – Fluorine Generation Facility – 1954 to present*

---

The Goodyear Tire & Rubber Company was named as the original management contractor. Goodyear Atomic Corporation was established as a wholly owned subsidiary of Goodyear Tire & Rubber for the purposes of managing and operating the Portsmouth Gaseous Diffusion Plant. Goodyear Atomic Corporation operated PORTS for the AEC and its successor agencies, the Energy Research and Development Administration (ERDA) and DOE, until Goodyear was replaced in 1986 by Martin Marietta Energy Systems, Inc., following Goodyear Atomic Corporation's decision not to participate in the rebid of the contract.

## 2.2 Operations

The first production cells went on line in September 1954, and the first product was withdrawn in October 1954. The purpose of the gaseous diffusion plant has been and continues to

be the enrichment of uranium, initially for military applications and subsequently for commercial reactor fuel. PORTS enriched the feed material in the form of $UF_6$ gas to assays up to more than 97 percent uranium-235. The enriched product from PORTS was sent to other DOE sites and fuel fabricators. Most $UF_6$ feed material came from Paducah, K-25, the PORTS feed manufacturing plant, and commercial customers. From 1958 through 1962, some of the PORTS $UF_6$ feed material was produced from uranium tetrafluoride or $UF_4$ (called "green salt") in the X-344 Feed Manufacturing Plant. In addition, from 1957 to 1978 a small amount $UF_6$ feed was produced in the Oxide Conversion facility in X-705E.

The main process buildings at PORTS (X-330, X-333, and X-326) contain the "cascades," which are a series of compressor, heat exchanger, control valve and motor, converter stages, and supporting piping arranged in stages, cells, and units that progressively enrich the $UF_6$ feed. Enrichment occurs as the $UF_6$ passes through barriers in the converters that allow isotopes of lower molecular weight to pass through and is slightly enriched in uranium-235 by each stage from the feed point to the top of the cascade. Conversely, the feed is depleted in uranium-235 assay from the feed point to the bottom of the cascade. At PORTS, $UF_6$ could be fed from product and withdrawn from cylinders at any part of the cascades, using mobile units. Later, fixed feed facilities were installed in X-342A and X-343 using autoclaves to heat the cylinders and feed $UF_6$ gas to the cascade. The mobile withdrawal facilities have not been used since 1991. The product withdrawal stations are located in X-333 and X-326 and the tails withdrawal station in X-330. High-assay product is withdrawn at the X-326 product withdrawal station, intermediate-assay product at the extended range product (ERP) station in X-326, and lower-assay material in X-333. Both the enriched product and the depleted tails are fed into cylinders and allowed to cool until solid; the product is shipped to customers, and the depleted material is either re-fed to the cascade or stored on site.

The process building work areas were physically hot, but generally clean and uncontaminated, except when cascade equipment was opened due to equipment failure or for maintenance or modification. The process buildings were also the source of many $UF_6$ releases during connection and disconnection of sample bottles and feed and product cylinders, and from broken instrument lines. Generally, in the cascades, the use of respirators was only specified for maintenance or

non-routine work activities. For feed, withdrawal, and sampling (activities where connections to the process systems are made and broken) additional personal protective equipment requirements and precautions were specified. These activities accounted for the majority of $UF_6$ releases and personnel exposures to process gas and hydrofluoric acid (HF) at PORTS. In 1974, as releases continued in these work tasks with the resulting spread of contamination, releases to the environment, and worker exposures, OR pressured Goodyear Atomic Corporation to conduct a focused review to identify ways to minimize releases from cascade operations. Subsequently, operational and procedural requirements were strengthened, cylinder connection hardware was redesigned, more frequent inspections and tests were conducted, ventilation systems were installed, and additional respirator use was specified. Although performance improved, compliance with operations procedures and the wearing of personal protective equipment remained inconsistent, and accidental releases still occurred. Cascade operations also routinely released small amounts of $UF_6$ to the environment through process system vents as a result of an operation called "jetting." Jetting involved venting of residual purge gases from the evacuation of process piping, assisted by compressed air, in preparation for maintenance or replacement of components. These process line vents, although constructed with various traps and monitoring devices, also provided easy pathways to the environment from inadvertent or intentional valve positioning errors or overloading of traps.

During early 1952, the AEC approved the enrichment processing of production reactor tails through the gaseous diffusion process, and feeding of reactor tails from Paducah product commenced at Portsmouth in 1955. In 1957, radiological surveys at the Paducah Plant found neptunium-237 in the enrichment cascade. Although the AEC recognized the potential for transuranic contamination of the cascades, it was not until a 1965 appraisal that OR identified a potential problem with transuranics and fission products in X-705E, and recommended studies to determine where they could concentrate in the process. Although records indicate that PORTS reviewed the potential problems posed by feeding reactor returns to the oxide conversion plant, detailed studies were not performed. Goodyear Atomic Corporation concluded that transuranics were not a significant radiological concern when compared to uranium, and tower ash (where transuranics were

expected to concentrate) could be monitored to measure the existing hazard. However, this monitoring program was not implemented. PORTS was also aware of the presence of technetium on process equipment as early as 1962, but also assumed that transuranics and fission products would not be a significant hazard to workers. No special monitoring or personnel protection controls were established. This posture persisted until 1975, when sampling and analysis of media, including pond sludge and waste samples, identified technetium-99. In 1979, a release in the X-705 annex during disassembly of a converter resulted in the internal contamination of six workers with technetium levels as high as five times the Plant restriction levels (but not in excess of regulatory limits). In 1980, analysis of cascade deposits confirmed the presence of neptunium and plutonium in the process system. These data indicate that, while Goodyear Atomic Corporation management was aware of both transuranics and technetium contaminants from incoming feed materials, they failed to recognize or evaluate potential radiological problems resulting from their concentration in the cascade.

The X-344 feed manufacturing plant converted $UF_4$ to $UF_6$ by passing the powdered green salt through elemental fluorine gas in four reaction towers. $UF_6$ was withdrawn, filtered, solidified in cold traps, reheated and transferred to cylinders, and re-fed to the cascade. Excess $F_2$ was recovered, and unreacted material fell into collectors as ash. After cooldown and decay, the ash was recycled by blending it with the green salt being fed into the top of the towers. When the plant closed in 1962, residual ash from X-344 was transported to Paducah for processing and uranium recovery. Operating conditions in the plant buildings were harsh, especially in the tower areas: high temperatures, noise, dust, and smoke. Leaks and spills of green salt and ash presented continuing problems with surface and airborne contamination. However, no reactor-returns green salt was processed in this facility. Radiation levels were high near the fluorination towers and the ash receivers, where uranium daughter products tended to concentrate. Workers in the feed plant were constantly exposed to these hazards. Although respiratory protection was required by procedure for many "dirty" jobs in the feed plant, industrial hygiene and health physics department reports and OR assessments reflected poor compliance. A 1961 OR appraisal noted that, although procedures required respiratory protection, operators in the area were not masked and



Construction of X-344

did not have masks, and the supervisor stated that they did not normally wear masks in that area.

Oxide conversion work in X-705E likely presented the most hazardous radiological and chemical exposures to workers at PORTS. The original plant design was inefficient, and many health physics concerns with airborne and surface contamination resulted from manual handling of fine uranium oxide powder. In 1965, these problems prompted a new plant design in preparation for future oxide feed from recycled reactor fuel, which would involve handling transuranics and fission products. The old system was dismantled and removed, and the new system, with more automatic processes and glovebox enclosures, was installed in X-705E in 1967. In the new design, oxide powder, in the form of $U_3O_8$, was ground and fed into a fluorination reactor (several designs were used over the years of plant operation), and the $UF_6$ was withdrawn into cold traps, where it solidified. Cold traps were removed and heated, and the liquefied $UF_6$ was drained into cylinders for feeding to the cascade. However, safe operation and maintenance of the new system was also beset with airborne uranium contamination problems including burn-through of the fluorination tower, leakage from cold traps and product withdrawal, and breaches into the system. Although respirators were recommended by the health physics staff and required by some procedures in oxide conversion operations, compliance was again inconsistent. This inconsistency was identified in industrial hygiene and health physics inspection reports from the late 1960s stating that respirators were not worn and gloves were removed from gloveboxes for some work. In 1973, an OR inspection cited numerous radiological occurrences in X-705E, including high

airborne contamination, eating and drinking in the contaminated cold trap room, numerous instances of workers not wearing required respiratory protection, and increasing lung burdens for chemical operators. In-vivo monitoring was performed on oxide conversion plant workers, and, in 1965, significant intakes of insoluble uranium were detected in at least two of these workers. These employees were put on permanent restriction and had measured lung burdens over 50 percent of allowable limits many years later. One worker still had a significant lung burden when he retired in 1985. Raw material for the oxide conversion facility was generated on site through uranium recovery operations or conversion of uranyl nitrate hexahydrate (UNH) from offsite sources, or came from oxides from commercial processors and government sources. Oxide conversion production was greatest from 1968 to 1977, when the plant generated 10,000 to 50,000 kilograms per year of uranium as $UF_6$.

The continual, and often extensive, maintenance and modification activities on contaminated process systems and the oxide conversion plant were supported by significant efforts to decontaminate and clean removed components in X-705. Large items were processed in an automated decontamination tunnel, where parts were sprayed with acid solutions several times, rinsed with water, and then hot-air dried. The acid solutions were recycled until uranium levels exceeded discard limits and were then processed to recover the uranium. Until the 1980s, rinse water was discharged through building drains; it now goes to the sanitary waste system. Fans exhaust air from the tunnel to the atmosphere through roof vents. In the early 1980s an annex was built onto X-705 to facilitate decontamination of potentially heavily contaminated cascade components, such as compressors and converters. Some smaller parts were also



**Smelter Activation**

decontaminated by hand in the seal disassembly room. Airborne activity was high, and respirators were required until air-supplied hoods were installed in the disassembly room in the mid-1970s. Empty feed/product cylinders were washed out in the low-bay area of X-705 to remove heels. In the 1950s and 1960s, cylinder cleaning was done in an open area and rinse water went into building drains. In 1971, a closed and automated cleaning system was installed, where cleaning and rinse solutions were collected and processed through the uranium recovery system.

Due to the monetary and strategic value of uranium, a wide variety of liquid and solid wastes containing uranium were processed through a solvent extraction recovery process in X-705. These operations concentrated radioactive materials, including technetium and transuranic compounds, and posed airborne hazards from both concentrated liquids and oxide powder. The uranium oxide ($U_3O_8$) produced from the calciner at the end of the recovery process provided potential exposure to insoluble uranium and transuranics. Transuranics were a special problem in 1965, 1966, 1975, and 1976, when recycled foreign reactor feed in the form of UNH was converted to oxide in the calciner. Raffinate waste was initially discharged to an onsite ditch leading to the Scioto River. Later, the X-701B settling pond was constructed; this reduced offsite contaminated effluents but increased onsite soil and groundwater contamination. In 1984, new systems in X-705 were effective in removing heavy metals and reducing radioactive materials from the building effluents.

From 1961 through 1983, a smelter operated in X-744G, melting scrap aluminum primarily from compressor improvement programs and damaged compressors. Although material went through a decontamination process before being placed in the furnace, industrial hygiene and health physics surveys indicated potential problems with airborne contamination during loading, melting, unloading, and removal. Former industrial hygiene and health physics department personnel stated during interviews that uranium contamination tended to stay with the melted aluminum. Aluminum ingots were sold for unrestricted commercial reuse or were used to make replacement parts for cascade equipment.

Non-operations and maintenance (i.e., support) personnel working in PORTS facilities, including guards, janitors, and delivery personnel, were also exposed to Plant hazards, especially unplanned releases, "wisps," "puffs," and chemical spills. From

Plant startup until the early 1990s, protective force personnel were often posted in close proximity to workers who were wearing respirator protection, while guards were not. From the early 1980s until the mid-1990s, guard force personnel performed security drills without protective clothing in spaces that were radiologically and chemically contaminated, while workers in these same spaces generally used such protection.

## 2.3   Maintenance and Modifications

Maintenance and process system modification activities have resulted in much of the radiation exposure, airborne contamination, and releases of $UF_6$ experienced at PORTS. The gaseous diffusion cascades are large complexes with thousands of components, many operating at high speeds and temperatures. Maintenance and modifications on these systems and components often required opening of systems that contained $UF_6$, deposited uranium compounds, technetium, or other hazardous materials. Many components had to be removed from the cascade buildings and taken to shops for decontamination, repair, or replacement. Maintenance and decontamination activities involved many tasks that created more hazardous conditions and opportunities for releases and exposures to workers, including welding, cutting, grinding, decontamination, and pipe crawling to retrieve debris and perform maintenance. Maintenance personnel and chemical operators decontaminating, maintaining, and modifying equipment were regularly exposed to $UF_6$, HF, TCE and other solvents, PCB-contaminated oils, welding gases, mercury, and other toxic metals. Work techniques, engineering controls, procedural requirements for personal protective equipment use, and the quality and availability of personal protective equipment (principally respirators) improved through the years, but lack of compliance was a recurring problem.

Essentially from initial startup into the 1980s, some form of process modification was in progress, with the most comprehensive and longest campaign, performed between 1972 and 1983, called the cascade improvement program and cascade uprating program (CIP/CUP). These programs replaced or upgraded key cascade components, such as converters, compressors, transformers, and motors to increase diffusion process reliability, capacity and efficiency. Line management,

specifically first-line supervision, was responsible for specifying and enforcing safety and health controls for workers performing maintenance and modification activities. The industrial hygiene and health physics department personnel performed routine surveys, monitoring of work areas, special surveys, and other activities as requested by workers or supervision. Recommendations for controls, including decontamination and personal protective equipment, were provided by industrial hygiene and health physics but were inconsistently implemented by workers and line management. Instrument technicians were exposed to mercury, $UF_6$, HF, and TCE, and in later years to technetium, when performing cleanout, decontamination, calibration, and replacement of process line instruments and chemical traps associated with line recorders.

## 2.4   Unusual Events and Accidents

During almost 50 years of operation there have been numerous operational or work related events that posed potential safety and health risks to workers and the public, and damage to the environment. Well over 400 releases of process gas or fluorine have been documented over the years, and many more minor releases occurred that may not have been documented and tabulated as events. The most frequent and notable unusual event was the release of $UF_6$ gas into work areas or the environment. These releases ranged from very small amounts (commonly referred to as puffs or wisps) that stayed within work enclosures or buildings, to significant amounts that escaped outside buildings, caused building evacuations, or resulted in HF burns or uranium intakes requiring bioassay or medical attention for dozens of workers. Plant reports reflect approximately 90 $UF_6$ releases in excess of 10 pounds of uranium. The largest release was in 1978, when over 13,000 pounds of $UF_6$ was released to the environment when a 14-ton cylinder dropped from a transporter and ruptured, emptying its contents. Releases resulted from cascade system upgrade work, equipment failures, improper valve lineups, trap overloading, and maintenance activities; cylinder handling and movement; cylinder connection and disconnection activities at feed, withdrawal, and sampling stations; and process equipment disassembly during shop maintenance activities.

The documentation of releases and subsequent evaluations and investigations at PORTS were

extensive, including technical department engineering reports, release reports, production memoranda to file, Goodyear Atomic Corporation and OR investigations, industrial hygiene and health physics department reports, and log books from the industrial hygiene and health physics, security, and fire departments. For releases greater than small puffs or wisps, analysis of the conditions, causes, and personnel exposures were analyzed to identify actions to correct causes and mitigate future events, identify personnel for special bioassays, and ensure proper survey, decontamination, and monitoring of work areas or the environs. These reports identified many employees who were exposed from these releases and required medical bioassay examinations. However, workers interviewed by the team recalled that for smaller releases (puffs), personnel were not always sent to the medical group for bioassay. Typically, after releases of $UF_6$ or $F_2$, workers directly involved or in adjacent areas would be required to provide urine specimens for bioassay to determine whether there was any internal intake and, if so, how much. If the bioassay indicated the presence of uranium or fluorides above certain limits, personnel were required to submit subsequent samples (called "recall") to monitor excretion rates until levels reached the initial threshold. If intakes were high, the person would be put on work restriction, limiting further exposure until levels returned to normal. If supervision or industrial hygiene and health physics considered that the person might have had a significant intake, the worker would be placed on work restriction immediately until the actual exposure could be determined by bioassay. The number of persons placed on recall for bioassay was as high as 40 or more per month in the 1950s, but declined significantly to a few persons per month in the 1980s.

While the documented injuries or illnesses linked directly to releases or exposures to $UF_6$ and $F_2$ were relatively infrequent, many workers did receive treatment for burns and respiratory ailments. A tails withdrawal release resulted in traumatic injuries requiring a five-day hospital stay for one worker and lengthy work restriction for another. Several worker compensation cases in the late 1950s and 1970s resulted in compensation for workers exposed to HF and other toxic materials at PORTS. Some workers had extremely high intakes of uranium detected by bioassay or in-vivo testing that put them on work restriction for months or years. For example, in 1965 ten employees sustained lung exposures greater than one-half the permissible level, and eight were reported

to the AEC as overexposures in accordance with AEC regulations. In addition, a worker who had a massive intake of $UF_6$ in 1973 was still excreting uranium six months later, and two workers in 1965 were exposed to uranium levels high enough that, as late as 1973, in-vivo testing showed greater than 50 percent of the maximum allowable body burden for uranium. Finally, one worker, still living, was put on permanent restriction in 1981, and his in-vivo monitoring before his 1985 retirement still showed high uranium readings in his lungs.

In the first few years of operation, many routine bioassays (scheduled and not the result of known events or potential exposures) came back positive. Each was investigated for source, and actions were taken where warranted. Although the response was laudable, the fact that so many routine bioassays revealed unexpected intakes indicates a lack of adequate awareness and control of contamination and/or inadequate understanding of the required response to exposure, or possible exposure. There was evidence that industrial hygiene and health physics department recommendations for engineering controls (i.e., added ventilation or containment) or cleanup of contamination were often implemented.

As better equipment was installed, major system upgrade work ended, and operational practices improved, the number and quantity of $UF_6$ releases decreased significantly. The total yearly number of documented releases also fluctuated with the amount of enrichment or maintenance activity, dropping from about 160 in the 1950s to 50 in the 1960s when the Plant operated at reduced power levels, 85 in the 1970s, and back to 120 in the 1980s. However, the average size of the releases decreased markedly in the 1980s, many less than one gram (an amount that might not have been reported in the early years). About 45 $UF_6$ releases over ten pounds occurred in the first six years of operations, with only six in the 1980s. The AEC directed several concerted attempts to reduce $UF_6$ releases in the 1970s: in 1974 after several big releases in succession, and in 1978 after the 14-ton cylinder drop accident. Following several significant releases from Plant vents in the mid-1980s, continuous monitors were installed to measure releases, piping and procedures were modified to prevent inadvertent venting, and training and management direction were provided to maximize the return of $UF_6$ to the cascade. Although many releases were due to equipment failures, the preponderance of events and unnecessary exposures and contamination spread were caused by

personnel errors, including failure to follow procedures related to operations or maintenance, failure to wear proper personal protective equipment, and improper emergency response to the release. Logbook entries by health physics technicians and event reports from the early 1980s noted repeated instances where personnel performing normal work activities or exposed in releases were not wearing respirators as required or were observed re-entering work areas after a release before required surveys and air monitoring were performed.

The spread of contamination to the environment and exposure to personnel away from the release point is affected by many things, such as release location, openings in the buildings, ventilation, immediate response by workers, weather conditions, quantity, and assay of material released. $UF_6$ gas is hydrolyzed with moisture in the air into HF gas and solid $UO_2F_2$, most of which drops quickly from the vapor cloud. HF gas is highly corrosive, and exposure can result in burns to exposed skin and the respiratory tract. Both HF and $UO_2F_2$ are environmental contaminants; HF primarily reacts with vegetation and soil, and highly soluble $UO_2F_2$ is washed into low points on the ground and into waterways. Many other events involving spills of various hazardous materials have had negative impacts on the environment. Spills of antifreeze, gasoline, sodium hydroxide, PCB oils, TCE, chromates, and lithium hydroxide, as well as $UF_6$ and $F_2$, have affected plant life and fish and contaminated waterways both on and off site. Section 4 of this report further discusses the effects of releases on the environment and monitoring programs for accidental releases.

The only work-related fatalities at PORTS identified by the investigation team resulted from several



Cleanup of March 1978 Cylinder Drop

construction accidents in the 1950s and one in the 1980s. Other significant events that did not involve the release of hazardous materials or injury to personnel were not reviewed by this investigation.

## 2.5 Worker Safety and Health Programs

Programs for worker safety and health were in existence from the beginning of Plant operation. Initial training classes for workers included the theory and protective actions for working with radioactive and hazardous materials. *Guide to Safety* handbooks including information on respirators, radiation, and industrial safety and industrial hygiene hazards and controls were developed and given to employees as early as 1955, but were infrequently updated. There were policies and procedures that addressed the radiological protection of workers. Personal protective equipment was provided and was available to workers and in work areas where hazards were greatest and protection was deemed necessary, although availability and quality were variable. The amount of formal training given to employees diminished after startup, and much of the knowledge concerning both operations and hazard communication and controls resulted from on-the-job training of new workers by more experienced personnel and supervisors. In later years, health and safety training was often given directly only to supervisors, who then trained the hourly workers, typically through monthly safety meetings. There appeared to be little effective oversight of safety meeting content or other supervisor training activities by Plant management or safety and health organizations.

The medical group, part of the Industrial Relations Division, initially administered the industrial safety, industrial hygiene, and health physics programs, with separate sections for each. In 1957, industrial hygiene and health physics were combined into a separate department and later combined with environmental management under a Superintendent of General Safety and Environmental Management. In 1977 these organizations achieved more autonomy under a newly created Technical Services group, headed by an Assistant General Manager. Documentation indicates that Goodyear Atomic Corporation had a sophisticated occupational health program providing comprehensive medical examinations for employees, including physicals and typical laboratory testing of vision and hearing. The industrial safety and industrial hygiene

and health physics staff was actively involved in responding to, evaluating, and making recommendations for corrective actions for accidents and events. The medical group administered the bioassay and in-vivo monitoring programs as well as radiological, chemical, and environmental sampling and monitoring. Increasing concerns and apparent weaknesses in the occupational medicine program were reflected in audits, AEC appraisals, safety committee meetings, and union negotiations in the 1970s. Issues with staffing, quality of service, and program management continued into the 1980s.

Many of the details on controls for radiological, industrial and chemical hazards in the workplace for routine operations were identified in work procedures, hazardous work permits, and electrical work permits issued for specific tasks, such as system entries or maintenance. In 1970 the OSHA standard drove introduction of additional permits for lockout/tagout,

---

### Basic Radiation Definitions

*Employees at PORTS could encounter four types of radiation during their employment: alpha, beta, gamma, and neutron.*

*Alpha particles are heavy, charged particles emitted from the nucleus of an atom and are primarily an internal exposure hazard through inhalation or ingestion. Because of their relative size and energy, alpha particles are much more hazardous than beta particles or gamma rays inside the body. Uranium, neptunium, and isotopes of plutonium are alpha emitters.*

*Beta particles are charged particles emitted from the nucleus of an atom and may be either internal or external exposure hazards. Enriched uranium, technetium-99, and isotopes of plutonium produce beta particles.*

*Gamma rays (and x-rays) are penetrating forms of radiation produced during decay of radioactive materials and are an external exposure hazard. Isotopes of uranium, neptunium, and plutonium produce penetrating radiation in the form of either gamma or x-rays.*

*Neutron radiation is a particulate radiation resulting from nuclear reaction and is an external exposure hazard. The main sources of neutron exposures at PORTS are spontaneous fissions in $UF_6$ cylinders in cylinder storage yards.*

---

welding, and confined spaces. Responsibility for worker safety and health protection was delegated to line supervisors, and the role of the health and safety organizations was to provide support and advice. It was not until the 1970s that the health and safety staff had direct input or authority to review procedures and permits and took on a stronger role in hazard identification and control, and compliance inspections. Safety committees and union safety representatives were active in identifying safety and health issues, but less effective in consistently bringing about satisfactory resolution. The union grievance process was often used to identify health and safety concerns, a process that again achieved mixed results.

The focus of the industrial safety program until the 1970s was on safety awareness, not on compliance or hazard analysis. Safety goals were set and statistics on accidents and occupational illnesses were kept and reported to the AEC as required. Staffing for the safety effort varied from about eight engineers in the 1950s to two during the 1960s, when production and Plant worker populations were significantly reduced. In the 1970s, with new OSHA standards, new construction, and increased production activities, the safety organization became much more involved in hazard identification and controls. In 1973, OR conducted a comprehensive safety compliance review against the new OSHA regulations, resulting in extensive upgrading of safety systems and controls.

The evolution of awareness and the application of protection and controls for significant non-radiological hazards, such as asbestos and PCBs, essentially paralleled that of the regulatory bodies and general industry. Air monitoring of hazardous job sites existed from Plant startup, and health physics personnel monitored air and surface contamination in work areas and recommended revisions to existing engineering controls or personal protective equipment, if deemed necessary. Identification of asbestos and PCBs as hazards did not emerge until the late 1970s. Procedures for the handling, storage, and disposal of PCB-contaminated oils were in place in 1977, and no formal asbestos program existed until 1980.

Workers were also exposed to a variety of toxic gases, solvents, and metals at PORTS. The hazards associated with a number of these materials were known in 1955, and precautions were included in safety bulletins and manuals. It is not clear that work procedures always addressed proper personal protective equipment or controls. Surveys and instructions from industrial hygiene appeared to be reactive to events rather than proactive. Instrument



X-720 Degreasing Apparatus

technicians and chemical operators frequently worked around mercury used in numerous process instruments and chemical traps. TCE was used in large quantities as an effective degreaser and general cleaning agent; its use was discontinued in the late 1970s, and bulk quantities of the solvent were removed. However, PORTS had lingering problems with continued use of residual supplies of TCE. A special industrial hygiene survey in 1986 identified TCE levels above the Threshold Limit Value in X-326. There was also limited evidence of incidental use of beryllium at PORTS. These may have been incidental machining of beryllium copper-alloy piping components. Tools plated with beryllium were also used. Beryllium was also used as a coating on early fluorescent light bulbs and was contained in some welding rods. Beryllium was routinely sampled in the environment in the early 1990s, and detectable beryllium concentrations above background were identified in several areas at PORTS.

In the 1950s and 1960s, the health physics staff provided exposure monitoring services, recommended training and protective measures to supervisors, maintained exposure and radiation measurement records, administered the bioassay program, investigated air samples and personnel exposures that were outside of specifications, studied Plant hazards and needed controls, and performed Plant environmental monitoring. However, the size of the health physics staff (i.e., one or two health physicists and approximately five technicians doing both industrial hygiene and health physics surveys) during the first 20 years of operation limited the amount and effectiveness of monitoring and control for the activities of up to 2,500 people in numerous and diverse hazardous work environments. While line supervision

had always been responsible for implementing recommended controls and protective measures, supervisory oversight and enforcement of personal protective equipment use were inconsistent. Non-compliant personal protective equipment use by workers can in part be attributed to the pressures to maintain normal process operations, a lack of knowledge and full understanding of the risks involved and why the protection was needed, and the physical discomfort and vision impairment associated with wearing personal protective equipment, such as respirators, in hot, dirty environments.

Most radiological work controls, including time limits on worker exposures to uranium, were based on the assumptions that the primary risks for uranium exposure were chemical, not radiological, and that uranium was soluble and would be eliminated by the body quickly through the kidneys. Thus, inhalation protection was encouraged, and bioassay urinalysis was employed from PORTS startup to monitor intakes by workers who might be exposed to uranium or fluoride materials. However, the solubility assumption may not have been appropriate for areas such as the feed and oxide conversion plants and grinding and welding operations, where small particle sizes and relatively insoluble uranium compounds were present. Limitations were established for uranium and fluoride levels and excretion rates, and work area restrictions were placed on workers with elevated uranium until concentrations returned to acceptable levels. However, urinalysis would not detect intakes of insoluble uranium reliably and at sufficient sensitivity. In the early 1960s, in-vivo radiation monitoring for insoluble radionuclides by lung counting was initiated, first by sending workers to Fernald or Oak Ridge, and later using a mobile counter periodically sent to PORTS from Oak Ridge. However, lung-counting methods were not sufficiently sensitive and were only effective for assessing relatively large intakes. In-vivo monitoring was performed primarily on a sampling basis and, in the early years, typically relied on volunteers from work areas subject to uranium exposure. Film badges were used from the beginning of Plant operation to monitor personnel exposures to beta and gamma radiation; they were assigned based on expected exposure in work areas. Until the mid-1980s, extremity monitoring was not employed, although a number of activities presented opportunities for extremity exposures significantly higher than monitored whole body exposures. Some components that required significant manual handling had contact

radiation levels above 1 rem/hour, and such a dose rate could quickly result in overexposures.

PORTS established conservative local limits as Plant Allowable Limits (PALs) for surface contamination control, compared to other gaseous diffusion plants and regulatory limits. Industrial hygiene and health physics department surveys were conducted both routinely and for specific work activities, and after events or condition changes. Portable survey instruments were available in many work areas for use by workers and supervisors, although the frequency of use and proper techniques were not monitored or enforced. Fixed hand and foot monitors were in place for some consistently contaminated areas. However, pervasive contamination problems persisted into the 1980s. It was not until 1991 that clothing and whole body monitors for exiting radiological areas were instituted Plant-wide. Respiratory protection was employed to minimize personnel exposures to airborne radiological and chemical hazards. The enrichment of high-assay uranium compounds (over 20 percent) complicated personnel protection efforts due to the higher specific activity of highly enriched uranium. In the 1950s and 1960s, the respiratory protection program principally utilized dust masks and the Army assault mask. In the late 1960s and early 1970s, better respirators were obtained, individual respirators were fitted and assigned to individuals, fit testing requirements were instituted, and additional respiratory protection training was performed. Observations by the industrial hygiene and health physics department, investigations of releases, and OR health and safety appraisals in the 1960s and 1970s collectively indicated chronic problems with workers' failure to wear respiratory protection where required and poor enforcement of respiratory requirements by line supervision. Bioassay and in-vivo monitoring results reflect the results of an inadequate respiratory protection program in the first two decades of Plant operation.

## 2.6   Waste Management

PORTS has generated large quantities of both hazardous and non-hazardous waste materials that have required storage, treatment, or disposal. These materials include construction waste, general office and kitchen trash, classified equipment, highly toxic or caustic chemicals, contaminated tools and clothing, and various radioactive substances. External requirements, treatment and disposal methods, and the overall waste management program evolved over time, resulting in more sophisticated, rigorous, and environmentally friendly processes for handling solid, hazardous, and radioactive wastes. However, as discussed below, the progression of waste handling practices and the closing of disposal locations have resulted from failures to comply with previously established guidelines and requirements for controlling hazardous and radioactive wastes.

Initially, the handling and control of hazardous waste were the responsibility of the Chemical Operations Division. Gradually, the Industrial Hygiene and Health Physics department assumed environmental compliance responsibilities. In 1986, a waste management division was created, and in 1991 this organization was elevated to being a department. Formal procedures were established as early as 1955 detailing guidelines for handling, storing, and disposing of wastes. In 1970, the position of Pollution Coordinator was created and a Pollution Control Committee was formed to establish and oversee policy. In 1979, formal procedures and associated training were developed for the use of Plant landfills, and, in 1981, additional procedures were implemented for operating the sanitary landfill, including a ban on burning of wastes. In 1990, all waste management programs and organizations are integrated, leading to a major overhaul of waste management procedures.

Starting with groundbreaking in 1952, construction wastes were disposed of in a landfill created south of the Plant, which operated until 1968. In 1998, it was closed in accordance with State of Ohio EPA and Resource Conservation and Recovery Act (RCRA) requirements. In 1982, X-734A was created as a new construction spoils area, but was closed in 1985 because requirements for excluding hazardous substances had been continuously violated. This former spoils area is currently undergoing RCRA closure. Subsequently, construction spoils were sent to the X-735 sanitary landfill. However, the sanitary landfill had to be partially shut down in 1990 when an external inspection found improper disposal of rags containing RCRA-regulated solvents. In 1998, when a new landfill was needed to meet stricter environmental controls, DOE closed X-735 and shipped non-radioactive solid wastes off site to the Pike County landfill.

Before hazardous wastes were regulated, most liquid wastes were processed in various pits and lagoons prior to discharge. Therefore, minimal quantities of waste were containerized for disposal.

Burning was also used extensively at PORTS to dispose of oily wastes until the mid-1970s. In the early 1970s an experimental program of oil biodegradation was established in two plots near X-600, identified as X-231A and X-231B. Many thousands of gallons of solvent-contaminated oil, chlorinated solvents, and over 100,000 pounds of oil soaked fuller's earth absorbent were tilled into the ground at X-231A until it was closed in 1977. X-231B operated until it was shut down in 1988 as part of a RCRA action after an Ohio EPA inspection identified significant problems and served DOE with a notice of intent to file suit for hazardous waste violations. Internal documents also reflected repeated problems with the controls on the process and management of the biodegradation program.

Large quantities of PCBs existed at the Plant, principally in electrical transformers and capacitors, but also as a contaminant in process building lubricating oils and ventilation duct gaskets. Although the industry and the AEC provided safety information concerning PCBs in 1972, the Plant did not issue specific guidance on the disposal of PCB-contaminated items until 1979 after Federal regulations were issued. Additional procedures were issued in 1983 addressing the handling of PCB waste when PCB-contaminated sludge was identified at the site sewage treatment plant. However, PORTS had continuing problems managing PCB-contaminated materials; in 1988 DOE noted that controls were insufficient to comply with commitments to the EPA, and in 1989 the DOE Tiger Team identified a lack of formal Plant procedures to implement PCB cleanup standards. These concerns resulted in the formation of PCB Implementation Teams. Currently PCB waste, regulated under the Toxic Substances Control Act (TSCA), is being stored in DOE Material Storage Areas in the process buildings.

A similar process occurred for RCRA regulated waste. After an initial aggressive approach to compliance, DOE determined that RCRA regulations did not apply and a self-regulated approach was taken. After an agreement was reached with EPA in 1987 on RCRA applicability, PORTS took several actions to return to compliance. In the early 1990s, X-7725 was upgraded to a compliant permitted RCRA facility and currently houses all stored mixed and hazardous wastes, except for some enriched mixed and radioactive wastes that are stored in the X-326 L Cage area to provide additional security.

Low-level radioactive wastes were buried in the X-749 contaminated material disposal facility starting in the late 1950s. This continued to be the primary disposal site for low-level waste until operations ceased in 1992 at the direction of the Ohio EPA. Equipment and scrap were generally subjected to decontamination prior to disposal, primarily to salvage residual uranium for re-feeding to the process. Hundreds of tons of material were disposed of in X-749 just before shutdown. A 1976 report determined that unsealed chemical trap residues disposed of in X-749 during the previous 20 years contained very water-soluble technetium. Subsequently this material was sealed prior to disposal.

Right after Plant startup, two oil-fired incinerators were used for classified burnables and uranium-contaminated wastes, including waste oil. (Waste oil was also buried in salamanders near Building X-705.) Little documentation exists concerning these incinerators, but 1962 OR assessment results were favorable. In 1971 these incinerators ceased operation after Goodyear Atomic Corporation determined that they were inefficient and did not meet smoke or particulate emission standards. A new incinerator was built in 1971. Ash was sampled for salvageable uranium and sent to the recovery process or disposed of in X-749. Again, there were problems with operation of the new incinerator. Until an enclosure was built in the late 1970s, contaminated burnables and ash were scattered by winds. Severe smoking due to plastics disposal and several events involving smoke incursion into adjacent buildings caused medical problems for occupants. In the mid-1980s, reports indicated improper incineration of materials as a result of unclear operating limits. DOE subsequently shut down the incinerator, and the State of Ohio revoked its registration. The facility was finally closed under RCRA authorities in the 1990s.



**Huntington, West Virginia, Plant**

In 1978, the DOE INCO nickel plant in Huntington, West Virginia, was dismantled, transported to PORTS, and buried in the X-749A classified landfill due to security concerns and the fact that some of the INCO plant materials were somewhat contaminated with uranium, nickel carbonyl, and asbestos.

Large volumes of scrap and surplus materials generated at PORTS were collected and stored onsite. Much of this material was sold at public auctions from the 1950s into the 1980s. These activities led to documentation of many health and safety concerns, including the failure to consistently segregate contaminated and clean materials, insufficient industrial hygiene and health physics staff to perform pre-sale surveys, inadequate controls on buyer access to scrap yards prior to sale, and surveys indicating that highly contaminated items were in the scrap yards. Therefore, it is possible that some contaminated materials were sold to the public, and buyers may have been contaminated during the auction process.

## 2.7 Air and Water Emissions

Routine, accidental, diffuse, fugitive, and planned emissions of radioactive materials and fluorine to the environment have occurred at PORTS since the beginning of operation in 1954. Site records and subsequent analysis estimated that over 23,000 pounds of uranium and 27 curies of technetium had been released into the atmosphere from 1954 to 1993. Workers complained of fluorine emissions from X-342 into the 1980s. Environmental monitoring in the early years consisted of liquid effluent sampling and sampling of vegetation and soils after identified accidental releases. Air sampling, both onsite and offsite, did not begin until the mid-1960s. Although known to exist in process systems since the early 1960s, significant amounts of technetium were not detected until 1975 when a marked increase in beta and gamma activity was measured. This increase in technetium emissions may be linked to disturbances caused by process equipment changeout and maintenance activities.

Vent emissions at PORTS were not monitored continuously until the mid-1980s. Grab sampling and radiation detectors in the vent line piping (called space recorders) provided some means of monitoring and calculating releases of uranium and fluorine. However, the unreliability of space recorders and the inaccuracy of grab sampling when compared to continuous monitoring indicate that emissions may have been underestimated. An event in 1985 released over 110 pounds of uranium into the atmosphere from the X-333 wet air evacuation vents over a period of 21 days when traps were overloaded and operators ignored space recorder alarms. Piping and valve configurations associated with process building vents also provided opportunities for operator error or intentional bypassing of traps and monitors, resulting in unmonitored releases to the atmosphere. An atmospheric vent committee in 1985 recommended that continuous monitors be installed on a number of vents. The feed production plant also contributed significant amounts of radioactive emissions to the environment from its operations between 1958 and 1962. Fluorine releases from the X-342 fluorine plant stack have been frequent and have resulted in numerous complaints from workers in the area, especially during temperature inversions, fog, or rain, when the vented gases are forced to ground level.

Accidental releases of $UF_6$ have contributed a significant portion of the estimated emissions at PORTS. The 1978 cylinder rupture event contributed almost 50 percent of those estimated emissions. Diffuse and fugitive emissions were not typically calculated until 1994, and contamination found later on roofs, grounds, and work areas reflect notable unmonitored releases. The oxide conversion facility in X-705E was the source of known fugitive emissions during its operation between 1959 and 1978. Planned releases, including venting of purge gases from the cascade cells while obtaining "negatives" for maintenance, also contributed an unknown quantity of radioactive emissions to the atmosphere.

Liquid effluents from Plant operations were typically released to the environment via drains to sanitary sewers and the cooling tower blowdown system, discharges to holding ponds, or runoff to the storm water drainage system. Discharges other than those treated or held up prior to release flowed to site outfalls and the east and west drainage ditches to Little and Big Beaver Creeks and then to the Scioto River. Effluents from the two main ditches and the south holding pond have always been routinely analyzed for radioactivity, and cooling tower blowdown has been monitored for chromium prior to discharge to the river. In 1970 the Ohio Pollution Control Board established standards for public water supplies. The Plant environmental management structure, procedures, and monitoring programs were strengthened to ensure compliance with these new regulations. In 1976, a chromium reduction facility was built for treating blowdown cooling water before discharge to the Scioto River.

The X-705 decontamination and cleaning activities have always generated the most significant liquid radiological effluent at PORTS. Decontamination solutions and other wastewater were discharged to the X-701B holding pond at rates as high as 50,000 gallons a month until the pond was closed in 1988. Other waste chemicals from laboratories in X-705, and the X-700 cleaning solvents, such as TCE, also went to the holding pond. When the holding pond was closed, a recirculation system for the treated water was installed in X-705 and a micro filtration system was added to process all waste solutions prior to discharge.

In 1975, when the beta-gamma activity in the east drainage ditch increased markedly, PORTS determined that it resulted primarily to technetium from X-705, via the X-701B holding pond. From 1974 to closure in 1988, lime was added to the influent of X-701B, causing a large sludge buildup that necessitated annual dredging and disposal. Accidental spills of TCE and other solvents, PCBs, sodium hydroxide, ethylene glycol, gasoline, and $UF_6$ have caused damage to the environment, including several significant fish kills in surrounding creeks, one of which resulted in restitution payments to the state.

## 2.8    Management and Oversight

Although, the AEC, ERDA, or DOE have had a nearly continuous site presence at PORTS, oversight of ES&H performance was not rigorous or proactive for much of PORTS history. This oversight was sometimes effective when vigorously exercised; however, consistency and follow-through on corrective actions were often lacking. On numerous occasions, the positions of management and labor differed widely, and resolution was accompanied by extreme measures, as evidenced by one unauthorized and six authorized strikes between 1954 and 1997. While economic issues were common to most strikes, safety and health were an important element in three of these seven actions. Workers compensation claims, which began to appear in the early 1950s, reveal discord between management and labor. Interviews with past and present employees and review of records indicate that there were allegations by employees that management would go to great lengths to deny or avoid compensation claims, including being untruthful and pursuing legal loopholes to avoid accountability. Collectively, the number of grievances filed, workers compensation claims submitted, and alleged acts of retaliation committed provide further support that management and labor relations were strained. From 1954 through 1993, it is estimated that more than 17,000 union worker grievances were filed, addressing a variety of issues in addition to safety and health, including work jurisdiction, discipline, overtime, work rules, and benefits.

### SIGNIFICANT PORTSMOUTH PLANT MILESTONES AND EVENTS – 1952 TO 1999

| | |
|---|---|
| *August 1952* | *Portsmouth selected as site for new gaseous diffusion plant* |
| *September 1952* | *Goodyear Tire & Rubber Company selected as the plant operator; Goodyear creates Goodyear Atomic Corporation to operate the Plant* |
| *November 1952* | *Groundbreaking and start of construction* |
| *June 1953* | *Portsmouth Training School opens* |
| *September 1954* | *First production cells go on line* |
| *November 1954* | *Portsmouth Oil, Chemical, and Atomic Workers Union (OCAW) established* |
| *January 1955* | *Goodyear Atomic starts 40-hour Basic Supervisional Training Program* |
| *June 21, 1955* | *United Plant Guard Workers established at Portsmouth* |
| *November 1955* | *First burial in classified disposal yard — X-749A* |
| *March 1956* | *Plant construction completed* |
| *October 3-4, 1956* | *Unauthorized walkout by 48 workers in X-700; later joined by 260 other workers* |
| *1957* | *Initial oxide conversion begins in X-705E* |
| *1957* | *Hearing conservation programs established* |
| *May 10-16, 1957* | *OCAW strikes* |
| *1958-1962* | *Feed production plant operates* |
| *May 2-20, 1969* | *OCAW strikes* |
| *1970* | *OSHA Act becomes law* |
| *1972-1983* | *CIP/CUP activities conducted* |
| *May 2-August 8, 1974* | *OCAW strikes* |
| *January 1975* | *NRC and ERDA assume regulatory responsibility for AEC functions* |
| *August 28-December 13,1976* | *OCAW strikes* |
| *October 1977* | *DOE assumes regulatory responsibilities from ERDA* |
| *March 1978* | *Emergency declared following cylinder rupture during which over 21,000 pounds of material are lost* |
| *October 1978* | *Oxide conversion placed in standby status and never operated again* |
| *November 1978-April 1979* | *Burial in X-749A of dismantled nickel plant and equipment from West Virginia* |
| *1979* | *Lithium relocation project completed* |
| *May 3-December 15, 1979* | *OCAW strikes* |
| *1983* | *OSHA Hazard Communication Standard issued* |
| *July and November 1985* | *EPA issues Findings of Non-Compliance with RCRA* |
| *September 1986* | *EPA and DOE sign Federal Facilities Compliance Agreement addressing 1985 RCRA violations* |
| *November 1986* | *Martin Marietta Energy Systems replaces Goodyear as the operating contractor* |
| *September 1989* | *EPA and DOE sign Administrative Consent Order (ACO) to ensure compliance with RCRA and Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)* |
| *October-November 1989* | *DOE conducts Tiger Team assessment of PORTS* |
| *May 1990* | *X-749 landfill closed* |
| *December 1990* | *Waste Management Division created* |
| *June 1991* | *Initiated shipment of waste oil to the Oak Ridge K-25 TSCA incinerator* |
| *June 11, 1991-April 6, 1992* | *OCAW strikes* |
| *November 1992* | *Energy Policy Act creates USEC to manage the Federal government's uranium enrichment enterprise* |
| *July 1993* | *USEC contracts with Martin Marietta Utility Services for operation and maintenance of enrichment plants* |
| *June 1995* | *Martin Marietta becomes Lockheed Martin following merger* |
| *June 1995* | *First shipment to USEC of Russian low enriched uranium derived from highly enriched uranium* |
| *October 1995* | *Ohio EPA approves PORTS Site Treatment Plan* |
| *1996* | *Completed decontamination and decommissioning of X-705A incinerator* |
| *April 1996* | *USEC Privatization Act is signed into law* |
| *November 1996* | *NRC grants certificate of compliance for enrichment operations* |
| *March 1997* | *Regulatory oversight of enrichment enterprise transferred from DOE to NRC* |
| *June 1997* | *EPA, Ohio EPA, and DOE sign ACO giving Ohio EPA regulatory authority for day-to-day activities* |
| *1998* | *In settlement with Ohio EPA and Ohio Attorney General, PORTS pays a $193,000 penalty related to improper storage of lithium hydroxide and uranium hexafluoride* |
| *April 1998* | *Bechtel Jacobs awarded DOE management and integration contract* |
| *May 1999* | *USEC takes over direct operation of all enrichment activities* |

# 3.0 Past Operational Practices

This section focuses on the work activities and hazards encountered by workers at PORTS from 1954 through 1997. While not all-inclusive, it is intended to provide specific information on most of the activities and significant chemical and radiological hazards encountered during normal operations and maintenance. It is structured in two parts. Section 3.1 discusses the worker safety and health programs in place to address identified hazards. Section 3.2 discusses the specific activities performed by workers, emphasizing the specific hazards and controls implemented to reduce the hazards. Appendix A discusses the PORTS radiological, chemical, and physical hazards and the potential effects of exposure to those hazards. Appendix B summarizes the principal activities conducted at PORTS from 1952 to 1997 and provides a general assessment of the hazards presented by these activities, the controls used to mitigate these hazards, and the effectiveness of the controls.

---

**OPERATIONAL PRACTICES**

- **Worker Safety and Health**
- **Operations and Maintenance**

---

## 3.1 Worker Safety and Health Programs

Safety and health programs at PORTS were established from the start of Plant operations and continue to the present day. However, the evolution of these programs varied throughout the decades from 1954 through the 1990s. Interviews and review of historical documents indicated a multitude of cases where procedures and safety precautions were not followed, personal protective equipment was not used or was inappropriate for the hazards, and workers were exposed to a variety of hazardous substances.

- ➢ *Hazard Identification and Analysis*
- ➢ *Safety and Industrial Hygiene*
- ➢ *Hazard Communication and Training*

- ➢ *Radiological Programs*
- ➢ *External Exposure Monitoring*
- ➢ *Bioassay*
- ➢ *Air Sampling*
- ➢ *Contamination Control*
- ➢ *Respiratory Protection*
- ➢ *Medical Programs*

### 3.1.1 Hazard Identification and Analysis

Historically, the Safety Department has maintained ownership of the non-radiological hazards assessment program. Fundamental tools for performing and documenting a hazard analysis were either the safety permit system or operating and maintenance procedures. From 1954 until 1972 the work permit system consisted of electrical work permits and hazardous work permits. The OSHA Act in 1970 resulted in an expansion of the safety work permit system to include permits for lockout/tagout, welding, and confined spaces. Radiological hazards and controls have been documented in radiation work permits since the late 1950s and have continued until the present time.

As early as the 1950s, hazards, precautions, and controls have been documented primarily in operating and maintenance procedures. However, it was not until the early 1970s that the Safety Department became proactive in evaluating the hazards of work activities and ensuring that procedures describing these activities included the appropriate hazard identification and controls. During the 1970s and 1980s, hazard identification and analysis activities centered on procedure reviews. A primary activity of the Safety Department during these two decades was the identification and analysis of hazards through the review of procedures, engineering design documents, and procurements. In lieu of job hazard analyses (JHAs), PORTS stressed the use of the permit system and integrating hazards and controls into operating and maintenance procedures. For major work evolutions and some accidents, management oversight risk tree analyses were performed.

The JHA process at PORTS did not evolve until the 1990s. In 1992, the safety and health work permit replaced the longstanding hazardous work permit. The safety and health work permit provided line management with increased data on potential hazards and controls. OR assessments, union safety meetings, and Goodyear Atomic Corporation corporate safety reports documented significant problems with adherence to electrical work permits and hazardous work permits from the 1950s through the 1980s.

### 3.1.2 Safety and Industrial Hygiene Programs

The safety program originated as a section within the Industrial Relations Department and remained within Industrial Relations through the mid-1970s, when the Safety Department became a section within the Technical Management Division. During these early years the safety program focused on safety awareness, rather than safety compliance or hazard analysis, as was evidenced in the significant safety poster and caption campaigns that were prevalent during this period. Early safety engineers were transitioned staff from the Human Resources Department, with no formal safety background, training, or preparation for becoming safety engineers. During this period, there were eight safety engineers. In 1958, AEC published a set of "Minimum Safety Requirements" that established safety goals, which could not always be achieved. Other safety guidance documents included industry standards, such as American Society of Mechanical Engineers (ASME) and American National Standards Institute (ANSI) standards, and DuPont safety practice guidance documents. The program was constructed on the insurance industry's loss control concept. During the 1960s, Plant activities were at a lower level, and the safety department downsized to two safety engineers and four certified code inspectors. In the early 1970s the Safety Department became more proactive in hazard identification and controls as a result of a movement of the department to the Technical Division, establishment of ERDA and OSHA, new Plant construction, and a resumption of work to the levels experienced in the 1950s. In 1973, the first comprehensive safety compliance review was performed by the AEC with respect to the new OSHA laws. Retrofits in excess of six million dollars were proposed, and numerous Plant modifications were implemented. Safety training during this period was hierarchical, with safety engineers training line

management who in turn trained the workforce. During the 1970s and 1980s, the Safety Department became more actively involved in improving safe work practices. Safety experienced an increasing level of support with the OCAW and Plant management. For example, during the first two decades, Safety Department interface with management was limited to an annual safety presentation, whereas in the 1970s and 1980, Safety was a participant in daily senior management planning meetings.

The industrial hygiene program also had its origin in the 1950s. In 1954, the Industrial Hygiene section was an autonomous organization within the Medical Group. In 1957, Industrial Hygiene combined with Health Physics, and this union remained until 1985 when the two sections split. Until 1985, the Industrial Hygiene section was minimally staffed, typically with fewer than five personnel including technicians. According to an audit by an outside agency, there was no industrial hygiene program at Goodyear Atomic Corporation in 1972. By the mid-1970s, the industrial hygiene staff consisted of only two industrial hygienists and one technician. However, by 1989 industrial hygiene staffing levels increased to almost 20 as a result of DOE's insistence in assigning one industrial hygienist to each major industrial hygiene program. In 1993, the Industrial Hygiene Department merged with the Safety Department, and the number of hygienists was cut in half.

During the first three decades, radiation control technicians also performed work typically assigned to Industrial Hygiene technicians (e.g., air sampling for chemicals, noise surveys). In the 1950s and 1960s industrial hygiene activities were performed in reaction to Plant incidents and complaints. Industrial hygiene programs in the early years focused on occupational noise, fluorine, and some solvents. TCE was phased out by the 1980s, although some of the older workers maintained inventories for personal use in violation of requirements. Compliance with personal protective equipment requirements varied throughout the decades. Although monitoring and sampling were performed before the 1970s, standards and toxicological data for interpreting the sampling results were minimal. While sampling for airborne contaminants, noise, and dust was evident throughout the Plant's history, the OSHA Act in 1970 resulted in the Industrial Hygiene Department becoming more proactive in these areas. From 1973 through 1974, Industrial Hygiene personnel sampled hazardous environments throughout the Plant and evaluated ventilation systems for compliance with the new OSHA ventilation regulations.

Safety and health procedures, to a limited extent, were evident from the commencement of Plant operations. For example, a 1954 four page Goodyear Atomic Corporation Standard Practice Procedure addressed the control of toxic, radioactive, and contaminated material. However, safety and industrial hygiene procedures were generally few, since safety precautions were generally invoked through operating and maintenance procedures and the safety permit system. Both industrial safety and industrial hygiene programs have had a positive impact on worker safety and health throughout the decades, as evidenced by low recordable injury rates, no fatalities other than construction activities, and few disabling injuries. For many years, the recordable injury rates and lost workday case rates were considerably lower than in commercial chemical processing plants.

### 3.1.3 Hazard Communication and Training Programs

Information on most safety and health hazards associated with radiation, chemicals, and related operations at PORTS was available to Plant personnel from the beginning of Plant operation. While data supporting the level of rigor to effectively communicate health and safety information to workers was limited, there is evidence that workers understood that they were working with hazardous materials and processes and that safety precautions were needed. However, there is also evidence that in many cases hazard communications were ineffective. Interviews revealed that some supervisors seriously undermined workers' understanding of PORTS hazards by telling hourly employees that they could "eat" uranium without harmful effects.



Early Fire Fighting Training

In 1953, shortly after initiation of Plant construction in November 1952, engineers were sent from PORTS to Oak Ridge and Paducah to receive training in gaseous diffusion plant operations and safety. These individuals subsequently formed the initial staff of the PORTS Training School in June 1953. A structured training course was planned and implemented that included seven days of orientation addressing safety, first aid, security, Goodyear Atomic Corporation policies, rules, regulations, and an overview of PORTS and the gaseous diffusion process.

The process flow and associated duration of instruction topics for PORTS personnel enrolled in the training school in the early 1950s is shown in Figure 6. Production, power, utilities, and maintenance personnel attended the same training on safety, orientation, the diffusion process, and security. However, their respective levels of training in basic subjects (e.g., mathematics, chemistry, and physics), process and Plant description, and on-the-job training were different. The duration and content of formal training changed after the initial operations and maintenance workforce was established, as the demand for increased production eventually led to a reduction



**Figure 6. Portsmouth Training School Program Timetable: Circa 1953-1954**

in formal classroom instruction and greater reliance on on-the-job training.

Non-operations personnel at PORTS were also informed of Plant hazards and associated safety precautions. However, it is not clear when this training was initiated or the level of rigor applied. A September 1957 grievance filed by the PORTS guard force requesting monitoring equipment to check clothing and shoes for radioactive contamination indicates that they were aware of such hazards. Internal Goodyear Atomic Corporation correspondence in November 1958 indicated that 36 janitorial workers attended eight hours of classroom instruction on personal protective equipment and associated practices; this provides additional evidence that some Plant support personnel received training on hazards and associated safety precautions.

The *Training Manual, Basic Technology*, prepared jointly by Goodyear Atomic Corporation and Carbide and Carbon Chemicals Company, dated June 1, 1953, was the first of several manuals used to train personnel responsible for operating and maintaining PORTS. Collectively, these training manuals provide evidence that the initial workforce received information on Plant hazards and safety precautions, as they contain information on harmful chemicals such as $UF_6$, carbon tetrachloride, TCE, and mercury; radiation and its effects; chemical safety; hazard controls; and protective equipment. The level of detailed safety information contained in these manuals varied, and in some cases supplemented the Training School courses. For example, the manual for maintenance personnel has more information on safety than the manual for utility personnel, but classroom instruction for maintenance employees was half that provided to utility personnel.

Models, mockups, lectures, workshops, field exercises with actual equipment, and motion pictures (later converted to videos) were also used to familiarize workers with Plant hazards and associated safety precautions. As of April 1954, Goodyear Atomic Corporation maintained a library of 263 motion picture films (16mm and 35mm) for training purposes, 32 of which were devoted specifically to safety, first aid, and orientation to atomic energy. These films eventually supplanted much of the formal classroom instruction, and may have contributed to the ineffectiveness of the PORTS safety-training program cited in OR assessments in later years.

Goodyear Atomic Corporation remained attentive to communicating safety and health hazard information to its workers throughout the 1950s and 1960s, as



Classroom Training

indicated by the training statistics tracked and presented in *Goodyear Atomic Corporation Monthly Activity Reports* for that period. However, apparently due to increasing Plant operations and the size of the workforce, the amount of formal classroom instruction provided to new hourly personnel decreased significantly. Orientation was reduced from seven to two days, and on-the-job-training became a principal means by which workers received information on operations and on safety and health hazards associated with work activities.

In 1955, Goodyear Atomic Corporation focused attention on supervisor training and developed a 40-hour classroom program that was attended by 250 supervisors. "Safety reminders" were developed for the balance of the workforce, as hourly personnel received a variety of safety-related publications. For example, in August 1954 Goodyear Atomic Corporation's Inspection and Safety Subdivision initiated regular publication of *Supervisional Safety Letters*. By 1955 additional safety literature surfaced, including *Maintenance Safety Notes*, *Electrical Safety Notes*, and the pocket-sized *Safety Handbook for Power Operators*. In late 1956 Goodyear Atomic Corporation expanded its promotional safety activities, which included erecting a billboard at the Plant entrance road for posting weekly safety-related information, initiating personal protective equipment campaigns, and issuing *Guide to Safety*, a compilation of basic safety practices applicable to PORTS. During the late 1950s and early 1960s Goodyear Atomic Corporation distributed to the workforce pocket-sized pamphlets prepared by The Industrial Commission of Ohio that addressed a variety of safety and health areas. Additionally, in August 1962 Goodyear Atomic Corporation revised the *Guide to Safety* handbook and

in January 1966 issued a companion handbook entitled *A Guide to Nuclear Safety*.

In the late 1960s and 1970s, less rigor was applied to formal training. Interviews with workers indicated that safety and health instruction in the mid-1970s was less rigorous than earlier years, as it was included in a four-week training course. A December 1978 packet prepared for Goodyear Atomic Corporation foremen containing notes and slides concerning safety policy and responsibilities, industrial hygiene, and health physics also suggests a less thorough approach to safety and health instruction. In 1976, fourteen years after the first revision to its *Guide to Safety*, Goodyear Atomic Corporation issued a second revision, thereby exhibiting a relaxed approach to routinely updating safety guidance. Nonetheless, throughout the 1970s there is evidence that hazards were being communicated to workers, albeit not as part of a formal training program. For example, Goodyear Atomic Corporation "safety letters" from 1976 and 1977 addressed technetium and ear protection, and a 1978 "notice" emphasized employee and employer rights and responsibilities, occupational safety and health training, compliance with safety standards, and safety concern resolution using the Industrial Hygiene and Health Physics and Safety Departments. In May 1979, Goodyear Atomic Corporation issued the third and final revision to its *Guide to Safety* handbook; no further revisions or distributions were made after this version was issued to employees.

Although OR assessment reports from 1980 and 1982 revealed deficiencies in the PORTS safety and health program, hazard communication to workers during the remainder of the 1980s continued to include limited structured classroom training supplemented with safety meetings and frequent safety notices. For instance, the Goodyear Atomic Corporation *IH-HP Bulletin* (later renamed the *IH-HP Employee Bulletin*) continued to disseminate safety- and health-related information on topics such as technetium, including its hazards and associated safety precautions, and updates to the hearing conservation program. Despite these informal initiatives, a December 1986 technical safety report identified Plant-wide inadequacies in the use of safety information signs, placards, and barriers. Subsequent training materials dated September 4, 1987, on chemical operations and contamination control address hazard placards and warning signs, permanent and temporary contamination zones, DOE standards, industrial hygiene and health physicist duties, and adverse safety impacts.

In the early 1990s, there are indications that PORTS was concerned about its safety and health program. For example, several pieces of 1993 internal correspondence show that Martin Marietta Utility Services directed all supervisors to conduct safety briefings at each shift to effectively communicate hazards and required all Plant personnel to adapt lessons learned from Paducah, such as its "Think Safety" and "Safety First" programs. Also evident in the 1990s is more focused attention on communicating the hazards associated with transuranics, as demonstrated by the health physics technician training program module focusing on uranium and technetium.

The effectiveness of the early and subsequent classroom instruction, on-the-job-training and other hazard communication activities, and worker understanding of chemical and radiation hazards varied considerably. Numerous self-assessments, OR audits, and occurrences routinely identified training deficiencies. While there is evidence that management took many actions to communicate hazard information to workers, these efforts were not fully effective. For example, there is evidence that protective force personnel received hazard and safety instruction from 1990 to 1995 in such topics as carcinogens, hazards, radiation, personal protective equipment, and operation of hand-held monitors. However, despite this training, from 1983 until 1995 protective force personnel continued to conduct drills (routine practice) in radioactively and chemically contaminated spaces without appropriate protection, while operations and maintenance workers generally took more rigorous precautions in these same spaces. (Protective force personnel were protected and monitored during exercises, which were staged, formal demonstrations of security capability.) This suggests deficiencies in the hazard communication and training program throughout the life of the Plant.

### 3.1.4  Radiological Programs

Since the beginning of Plant operation, policies and procedures were established for the PORTS radiation protection program. Radiation protection program policy documents stated the intent that "every reasonable effort would be undertaken to protect personnel from the potential hazards inherent in the handling and processing of radioactive materials." Controls and action points were developed to minimize personnel exposure and prevent exceeding established limits.

The health physics staff provided exposure monitoring services, recommended training and protective measures to supervisors for personnel protection, and maintained exposure and radiation measurement records. Health physics staff also administered the bioassay program, analyzed air samples and personnel exposures that were outside of specifications, studied Plant hazards and required controls, and performed Plant environmental monitoring. However, the small size of the health physics staff (e.g., five to ten people during the first 20 years) limited the effectiveness of surveillance and monitoring of hazards and work activities for the 1,500 to 2,500 employees working in many diverse environments. While the line organization supervisors were responsible for implementing radiological controls and protective measures, supervisory oversight and worker implementation of personal protective equipment and related protective measures were inconsistent. Non-compliant personal protective equipment use by workers is attributed to the pressures to maintain process operations, a lack of knowledge and understanding of the risks and why the protection was required, and the physical discomfort and sensory impairment associated with personal protective equipment, such as respirators, in hot and dirty work environments.

During the 1952-1953 period, the AEC approved the enrichment processing of production reactor tails through the gaseous diffusion process. In 1957, radiological surveys at the Paducah Plant identified that neptunium-237 was present in the enrichment cascade. Although the AEC recognized the potential for transuranic contamination of the cascades, it was not until a 1965 appraisal that OR identified a potential problem with transuranics and fission products in X-705E and recommended studies to determine where these materials could concentrate in the process. Records reflect that PORTS then reviewed the potential problems posed by feeding reactor returns to the oxide conversion plant; however, detailed studies were not performed. PORTS correspondence also indicates that health physics staff did not fully understand the presence of transuranics and technetium-99, and appropriate analytical procedures were not developed as late as 1976. During the 1970s, PORTS health physics and Plant managers participated in pre-planning for receipt and subsequent processing of recycled uranium known to contain trace quantities of neptunium-237, plutonium-239/240, and technetium-99. Planning activities included development of recommendations for material receipt specifications

and specific controls to minimize personnel exposures, including the use of containment devices and ventilation systems. Many recommendations were implemented but were not sufficient to safely operate the facility, and it was subsequently placed in standby.

During the 1960s, the PORTS health physics group became concerned with increasing alpha radiation levels in process and support facilities at the site. While no records were identified to demonstrate that this issue was satisfactorily resolved, the period coincides with the processing of recycled uranium at the Paducah Plant. In 1979, isotopic analysis of two cascade deposits revealed relative high concentration of neptunium-237 (i.e., 55 percent and 60 percent of the total alpha activity in the samples was due to Np-237, respectively). However, there was no indication of a change in the radiological control program to address this issue, even though data was available to indicate that some level of transuranic contamination was present in the cascade. Transuranic sampling for work planning and control was not actively conducted until the 1990s.

The Health Physics group actively encouraged respirator use; however, many instances of improper respirator use or non-use were identified by Health Physics, by Operations management, and in union



X-705E Withdrawal Stations

safety meeting minutes. For example, Plant management undertook disciplinary action for an individual's failure to use required personal protective equipment. Conversely, the Health Physics group repeatedly cited Operations supervision for failing to utilize respiratory protection devices as required by Plant procedures, as well as a general reluctance to implement and/or enforce Health Physics recommendations. Management's failure to enforce the use of respiratory protection devices and other protective action recommendations by Industrial Hygiene and Health Physics group adversely impacted PORTS' ability to control the potential for personnel exposure to radioactive materials including transuranics.

### 3.1.5 External Exposure Monitoring Program

Personnel external exposures were primarily monitored by the use of film badges that were assigned based upon anticipated tasks, work areas, and the results of routine and special surveys. In early Plant operations, film badges were recommended where personnel could receive or were likely to receive a dose above prescribed levels for a period of seven consecutive days. Early documents note that in many cases film badges were issued to personnel who normally were not expected to receive any significant exposure but could be called into areas requiring badges. If personnel not normally assigned film badges were required to enter areas in excess of the seven-day criteria, visitor badges were furnished. Records indicated that in several departments the employees' need for film badges varied. In those cases, film badges were issued on a statistical basis, and if some exposures were indicated, a larger percentage of employees or entire departments were issued dosimetry. This was a reasonable approach to expanding sampling.

PORTS established administrative exposure limits below regulatory quarterly exposure limits and utilized a four-week interval to trend and correct before restricting employees who exceeded the Plant control criteria. In March 1975, the Industrial Hygiene and Health Physics Department initiated a monthly monitoring program for all women assigned to areas where exposure to penetrating radiation was possible; the limit was 0.5 rem during the entire period of gestation. The site noted that neither the NCRP nor ERDA guidelines required additional monitoring for fertile women. Subsequently, Goodyear Atomic

Corporation initiated a monitored monthly program. Goodyear Atomic Corporation conducted several investigations of exposures to technetium during the late 1970s to early 1980s, and only one was deemed to require a documented dose calculation. The calculation indicated a fetal thyroid dose of 800 millirem for an employee in her first trimester of pregnancy. Goodyear Atomic Corporation evaluated this instance and required no further action.

The low specific activity and the self-shielding properties of uranium handled at the site limited dose rates at PORTS. However, certain operations were known to result in higher exposure potential. Routine whole body beta exposures in excess of PORTS investigation levels existed primarily in areas where uranium daughter products tended to concentrate. Documents reviewed and interviews conducted with former production workers and Industrial Hygiene and Health Physics Department staff members indicated that these areas included ash receivers, sintered metal filter baths, converter disassembly work, cylinder washing, oxide conversion, and the technetium and uranium recovery processes. Exposure evaluations during the mid to late 1950s indicated numerous instances of workers being placed on work restriction based on whole body exposures that were determined to be in excess of PALs. Documents also indicated that before the mid-1980s, Goodyear Atomic Corporation had never performed extremity monitoring for any operation or work activity. Documents indicated that various valves associated with pigtail operations had recorded beta readings as high as 1 rad/hour. Feed production plant ash receiver areas had floor readings of 5 rad/hour beta. Operators routinely handled these valves and equipment in X-705 and other locations where significant hand exposures could occur.

Dosimetry programs at PORTS from 1954 to 1992 were neither calibrated nor monitored for neutron exposures. A National Institute of Occupational Safety and Health (NIOSH) evaluation for PORTS studied the neutron radiation issue in 1997 and concluded that there was potential for chronic low-level neutron exposures in areas where uranium was stored (cylinder yards), handled (feed and withdrawal areas), or solidified within the cascade (deposits).

PORTS implemented a thermoluminescent dosimeter (TLD)-based dosimetry program in 1981. Shortly after implementation of the new TLDs, routine processing indicated a potential exposure of 4.8 rem

for one person. An investigation concluded that the probable cause of the high reading was contamination of the sulfur TLD chips with sulfur from an adjoining sulfur pellet, producing an erroneous reading. As a stopgap measure, PORTS placed tape over the sulfur pellets until a permanent solution could be found. In addition, coverage of the TLD chip with the company photo identification prevented monitoring of beta (skin) determinations for the 1981 calendar year.

In the mid-1990s there were allegations of falsification of dosimetry records. An internal Lockheed Martin Utility Services investigation into health physics management practices concluded that improprieties might have existed in the Plant's dosimetry program that resulted in assignment of inaccurate exposures. While the Lockheed Martin Utility Services reviewers believed the employee's allegations to be true, they could not definitively prove it. Further, they could not understand why such improper actions were taken for otherwise negligible levels of exposure.

In 1998, OSHA cited USEC for failing to preserve and maintain records of employee exposure of all employees for at least 30 years. OSHA found that "records of radiation exposures for all company employees were not adequately maintained from 1993 to 1995 in that some employees' exposures were arbitrarily assigned and based solely upon their past exposures which may have differed from exposures experienced during the period relating to the assigned dose." Furthermore, "records of radiation exposures were not accurately preserved and maintained. For the period 1993 through 1995, some TLDs that were used to measure and create a record of employee radiation doses were not evaluated, and a zero dose was assigned to an employee where the exposed TLD which was assigned to the employee was damaged." In response to the outstanding OSHA dosimetry citation, USEC initiated a dosimetry reconstruction effort. Although many adjustments were made to individual dose records for the period 1993 to 1995, these numerical adjustments appear to be minor, and adjusted exposures were found to be well below DOE limits. Administrative corrections to the site's dosimetry program to prevent reoccurrence of these issues were implemented, however the documents indicate that "the DOELAP [Laboratory Accreditation Program] TLD database, although reliable, still had overall validity concerns." Inconsistent and incomplete external exposure monitoring and data management practices have impacted PORTS' ability to demonstrate that all exposures to personnel have been measured and recorded accurately.

### 3.1.6 Bioassay Programs

#### Urinalysis Program

Workers exposure to uranium was assessed by periodically measuring the concentration of uranium in urine samples. Urine samples were collected and analyzed more frequently from individuals who had shown positive uranium bioassay results in the past. During the 1950s and 1960s, urine samples were typically analyzed for uranium, and in most cases for alpha activity. Typically, the sample collection procedure involved the collection of Monday morning urine specimens (the morning following two or more days off the job). This was non-conservative, and the collection date evolved to a "Friday" sample during the 1970s and 1980s. Considering that numerous routine urinalysis results reflected uranium intakes in the years of operation and the rate at which soluble uranium is excreted, some uranium intakes were likely not identified or properly investigated. Technetium analysis was added in the 1970s.

The PORTS restriction criterion from the start of operations to December 1956 was based on the most conservative urinary uranium excretion limit at the time. The minimum level of activity reported for uranium was 5 µg uranium/L and/or 0.3-dpm/100 ml for alpha activity. These limits were based on insoluble uranium in the lungs. However, after several years of Plant operation and experience it was determined that the allowable excretion level of uranium would be more realistic if it were based on soluble materials and



Mass Spectrometer Used to Improve Isotopic Analysis of Process Gas

toxicological consideration for the kidney. Investigation levels were subsequently raised to 50 µg uranium/L and/or 10 dpm/100 ml for alpha activity, which was not a conservative decision because actual solubility in some areas was not always known.

Positive urinalysis samples resulted in an increased frequency of collection, and each case appears to have been given individual attention, with separate records being maintained by the Industrial Hygiene and Health Physics Department. In cases of suspected inhalation of uranium, such as during releases, the department supervisor was responsible for recommending that the personnel involved submit a urine sample. Personnel were placed on accelerated sampling schedules if they were engaged in special projects or were in contact with high-assay material; worked in areas with air sampler results indicating significant levels of airborne contamination; or as a direct request from the Medical Director. All samples above a predetermined recall guide for uranium or alpha activity were followed by an immediate recall sampling until a negative result was obtained.

Throughout Plant history, there were numerous administrative restrictions for concentrations of uranium in urine above the administrative guidelines. These employees were reassigned to areas with less potential for uptake. Biological retention times for these exposures are closely related to the solubility of the compound. Information from interviews with former workers and much of the sample analysis data from the late 1950s assumed intakes to be from soluble compounds. This assumption may not have been conservative for some aerosols generated during all operations. Health and safety activity reports from the mid-1960s identified that excessive inhalation of uranium compounds was the major radiation and contamination risk at PORTS. PORTS documents also reveal that internal deposition became a problem in 1965 from handling insoluble enriched uranium, and that urine sample results were neither reliable nor as sensitive as analysis for soluble forms. Consequently, an in-vivo body counter program was initiated in 1965.

Documents reviewed for the first quarter of 1978 indicated that "Based on the weight analysis via fluorimetric detection and the monitoring frequency it is possible to exceed, undetected, the maximum permissible weekly uptake." The documents also indicated that samples were collected and analyzed for technetium. Correspondence dated as late as 1988 related to oxide repackaging stated that "Oxides of uranium are known to have different chemistry from the uranium fluoride compounds generally encountered

at the site. The current urine monitoring program is not adequate to detect significant exposures to uranium oxides in a timely fashion." This correspondence also noted that "available analysis of the oxide does not include sufficient information to determine whether exposure controls are appropriate since they are based on [transuranics] being insignificant for the purposes of dose assessment and control."

## In-Vivo Radiation Monitoring

Since the inception of the in-vivo monitoring program at PORTS in 1965, the selection of individuals for in-vivo analysis was based on work history, work environment, airborne concentrations, and past in-vivo and urine sample results. The PORTS Medical Director, upon recommendation of Industrial Hygiene and Health Physics, approved the individuals selected for restriction and subsequent removal. There were two classes of work restrictions: 1) an individual was neither to be exposed to any form of uranium material nor assigned to areas where there was potential for airborne uranium compounds; and 2) the individual was limited to work in areas where the average airborne alpha activity should not exceed a small percentage of the limit. There were two problems with the criteria. First, the large number of unexpected releases in most buildings made the first criteria difficult and unrealistic to administer. Second, a restricted individual should not have been placed in a work location with any potential airborne radiation activity. In-vivo radiation monitoring (lung counting) was initially conducted by sending individuals to either Fernald or Oak Ridge. Later, PORTS used a mobile laboratory from Oak Ridge. Data indicated that personnel were monitored at about six-month intervals for uranium, neptunium, and technetium. The analysis was generally reliable for insoluble forms of uranium since the lung was the critical organ.

In a report prepared for Martin Marietta Utility Services in 1990, the effectiveness of the mobile whole body counter was evaluated for analysis of uranium, neptunium, plutonium, and americium. Additionally, a review was conducted of historical lung counting data from Martin Marietta Utility Services sites, with particular emphasis on neptunium-237. A summary of the findings indicated that the counter's capability for analysis of those radionuclides, with the exception of uranium-235, was somewhat questionable due to system hardware limitations (i.e., use of sodium iodide detectors, resolution of spectra insufficient to identify peaks in the presence of background radiation,

efficiency calibrations did not use multiple source strength measurements for isotopes other than uranium-235). The studies of historical data indicated difficulties, including the inability to retrieve the appropriate data, lack of system access, and insufficient documentation. The root cause for most of the problems could be attributed to physical limitations of the system, lack of understanding of these limitations, and the lack of adequate training. Incomplete isotopic and uranium solubility characterization, coupled with design and analytical limitations, has impacted the Plant's ability to demonstrate that all internal exposures have been accurately detected and assessed.

### 3.1.7   Air Sampling

PORTS utilized a network of stationary air samplers at various production and non-production areas throughout the Plant. Portable and breathing zone samplers supplemented the stationary air-sampling network. Data documented frequent air sampling results in excess of PORTS limits. Industrial Hygiene and Health Physics summary reports for the late 1950s to late 1960s indicated that it was common to have stationary and portable air samples in excess of limits. These above-limit samples typically were related to process upsets, equipment failure, or maintenance activities, and were valid high readings. Although logbooks indicated many dusty operations or smoky conditions in all buildings, most of these samples were related to operations in X-326 and X-705.

In 1977, the health physics staff initiated a comprehensive air monitoring program to evaluate employee exposures to transuranic elements during compressor disassembly activities and during conversion of uranyl nitrate hexahydrate to oxide. The



Air Monitoring

study concluded that a cursory review of the processes indicated that the potential for employee exposures was minimal and that controls were adequate to reduce the exposure potential in high-risk situations. However, the same monthly summary discussed two workers being placed on restriction following entrance into an oxide conversion facility glovebox with inadequate respiratory protection and without a hazardous work permit. These issues indicate that management did not have adequate control of the program designed to protect workers from both physical and radiological hazards and that, at a minimum, respirator use at PORTS was inconsistent.

Documents during the early 1980s revealed that the methods/calculations pertaining to the air monitoring system contained three non-conservative assumptions: (1) constant sampling rates for the area air monitoring systems were determined to be non-conservative for over ten percent of the permanent sampling locations (primarily in X-705), which were noted as experiencing heavy dust loading that routinely resulted in lowering flow rates; (2) the absorption effect of the dust buildup on filters was not considered when the samples were counted, and relatively small amounts of dust on filters will prevent alpha radiation from being detected; (3) the air monitoring system utilized cellulose filters for sample collection, but the effect of particle penetration into the filter medium was not considered. This submersion of radioactive particles within the filter medium was discussed in ANSI N13.1, "Guide to Sampling Airborne Radioactive Materials in Nuclear Facilities," the consensus standard at the time. This guide stated that cellulose filter papers were not well suited for detection of alpha-emitting radioisotopes by direct counting.

It is evident that there were elevated airborne radioactive concentrations and non-conservative air sampling assumptions, coupled with continuing management and supervisory failures to actively enforce the use of appropriate respiratory protection devices. Additionally, workers were reluctant to use this equipment. Consequently, personnel exposures were likely during a variety of operations at PORTS.

### 3.1.8   Contamination Control

PORTS had a fairly conservative contamination control policy; however, historical evidence suggests that management expectations for contamination control were often not met in the field. This was particularly true in the buildings with the highest

potential for contamination, such as the main process buildings, the X-344 feed manufacturing plant, and X-705. Historical health physics records indicate that the control of radioactive contamination was considered a high management priority from the very beginning of Plant operations. A *Supervision Safety Letter* issued by Goodyear Atomic Corporation in November 1954 describes contamination as a more serious problem than exposure because it involves actual contact with a radioactive substance that can remain on or be deposited internally in the body for long periods of time. Proper contamination control practices for workers were highlighted in the safety letter. Another *Supervision Safety Letter* issued in September 1960 points out that hand counters are provided at strategic places throughout the Plant and are intended for daily use by employees, but health physics reports indicate inconsistent usage.

From the beginning of operations, PORTS had PALs for assessment and control of radioactive contamination. The PALs for contamination were primarily based on fixed and removable alpha contamination levels. There were different limits for floors, hands, clothing, and shoes. Although evidence suggests that contamination control was problematic throughout Plant life, Goodyear Atomic Corporation's limits were much more conservative than other gaseous diffusion plants, and often an order of magnitude lower than other facilities and regulatory requirements. Thus, areas considered contaminated under the Goodyear Atomic Corporation program might have been considered clean under the Oak Ridge or Paducah radiation protection programs. One reason for the lower contamination thresholds was concern over the higher-assay material at PORTS that would have resulted in higher radioactivity for the same amount of uranium released or spilled. However, the lower limits were frequently exceeded. In the 1950s to the 1970s, personnel "spot checks" indicated many readings above PAL limits.

Records of radiation and contamination surveys were readily available from the start of Plant operation. Survey records for all major buildings indicate contamination levels above limits over many years. Recommendations for decontamination of locations exceeding PALs were typically made and noted by Industrial Hygiene and Health Physics personnel on the survey forms. In some cases, follow-up surveys noted that areas continued to be contaminated above limits, with continued recommendations for decontamination. However, rigorous enforcement of decontamination requirements was not evident.

Difficulties in contamination control can likely be attributed to the pervasive nature of uranium discharges from process equipment and lack of sufficient staff and/or upper management commitment to enforce contamination control guidelines on line management, supervisors, and workers. For example, hand monitoring equipment and radiation detectors were available, but their use was not mandatory or effectively monitored. A number of audits and appraisals conducted over the years highlights the lack of adherence to requirements, procedures, and guidelines such as use of protective clothing, hand monitoring, frisking, and boundary control. Areas of PORTS not believed to have a significant potential for contamination were often overlooked, such as the X-720 maintenance shops and X-750 garage, which were routinely used to repair potentially contaminated parts and vehicles. Limited health physics survey staffing resulted in low priority and infrequent surveys for these areas.

In the mid-1950s, Goodyear Atomic Corporation evaluated the seriousness of contamination in work areas by calculating a "contamination index" for each surveyed area. The contamination index was a weighted average based on a mathematical formula that considered both the contamination levels encountered and square footage. A three-tiered approach to contamination control was utilized based on the contamination index. Areas were categorized as red, orange, and clean. An index of greater than 75 was designated as a "Red Job Assignment," calling for company-issued undergarments, coveralls, head covers, and shoe covers or yellow-toe shoes. Showering was also a policy requirement for Red Job Assignments. An index of between 10 and 75 was classified as an "Orange Job Assignment" requiring somewhat less stringent protective clothing (no head covering) and no showering requirement. An index of less than 10 was considered clean for contamination control purposes. Despite these rather formal designations, inspection reports and appraisals indicated that adherence to protective clothing and contamination control requirements was inconsistent and was influenced primarily by the first line supervisor's philosophies and work ethic.

As early as 1955, permanent Red Job areas included portions of X-705, X-744G, X-342, X-344, and X-746. Classification of other areas was subject to change based on survey results. In some cases, classifications were not performed correctly. In 1980, surveys showed that portions of X-326 met the criteria

for a Red Job area but were not categorized as such. A union grievance was filed and an investigation was performed to review the matter. Other problems with the classification system included the lack of formal restrictions on movement of personnel and equipment in and out of contaminated areas. In 1977, Industrial Hygiene and Health Physics noted that employees wearing contaminated clothing were permitted to enter clean areas such as the cafeteria, and individuals were allowed to eat and smoke in contaminated areas. A change in Goodyear Atomic Corporation standard practice procedure SPP H-8, "Health Protection Measures for Red Orange and Contaminated Job Assignments," was proposed at that time. In 1979, Goodyear Atomic Corporation established a Contamination Control Steering Committee to review the overall contamination control program at the Plant and make recommendations for implementation of a more effective and uniform policy. Contamination control problems continued to persist into the late 1980s.

Although Goodyear Atomic Corporation management and the Industrial Hygiene and Health Physics Department were concerned about the need to control contamination to levels as low as reasonably achievable (ALARA), contamination control policies and procedures were not fully effective, as evidenced by continuing radiological problem reports and PORTS emphasis on corrective actions that lasted into the 1990s. These deficiencies are likely to have resulted in additional exposures and spread of contamination over the Plant operating history.

### 3.1.9  Respiratory Protection

The PORTS Industrial Hygiene and Health Physics Department considered personnel exposures to low-enriched uranium compounds to constitute a chemical rather than radiological exposure. However, as discussed, site processes involved both soluble and insoluble forms and were designed to enrich uranium to over 97 percent, which complicated the respiratory protection issues at the site. Not only were the constituents of uranium compounds within the enrichment cycle hazardous (e.g., fluoride and acid compounds), but heavy metal poisoning could result from exposures to significant quantities of uranium. Consequently, respiratory protection programs of the time were instituted to minimize personnel exposures to these contaminants. Early in Plant life, the respiratory protection program principally utilized dust masks (paper masks) to minimize exposure to nuisance particulates (e.g., dusts and filings), and MSA masks with cartridges and the Army assault mask were used to minimize personnel exposures to chemical and radiological contaminants.

Many work activities at the site resulted in high airborne radioactive material concentrations in the work area. Based upon the results of air samples collected in those areas, Industrial Hygiene and Health Physics personnel routinely recommended using engineered controls (ventilation) or respiratory protection devices for specific tasks with identified high airborne radioactive material concentrations. Unfortunately, the Industrial Hygiene and Health Physics recommendations were made after high airborne radioactive material concentrations had been measured, and evidence indicates that although line management knew of those recommendations, they were not always implemented.

During 1973, the Industrial Hygiene and Health Physics group and Plant management took several initiatives to improve the level of respiratory protection for employees, which were driven by a 1972 safety and health appraisal. Industrial Hygiene and Health Physics developed and Plant management authorized a comprehensive program to upgrade respiratory protection practices at the site. Program elements included Plant surveys to identify respirator need and type; respirator procurement; employee training in respirator use, cleaning, and maintenance; fit testing; and procedure-controlled issuance. Plant management also identified and designated a number of Plant areas, particularly those where process gas might be present, as requiring respiratory use. These actions resulted, at least in part, from continuing problems with puffs. During this effort, 350 full-face and 150 half-face air purifying respirators (APRs) and air-supplied hood were purchased and placed into service. Purchased equipment was state-of-the-art for the period. However, deficiencies continued to occur, and it was not until 1982, during an OR assessment, that programmatic corrective actions were initiated for respiratory protection program deficiencies. The OR assessment resulted in a number of corrective actions designed to improve the program and implementation, including establishing a new respiratory fit testing facility in 1985; refitting and retraining all employees; developing a respiratory protection audit program; and reviewing and revising Goodyear Atomic Corporation procedures to include information required by the ANSI standard for respiratory protection.

Puffs, minor releases of $UF_6$ from process gas equipment, were a common occurrence despite efforts

to minimize the amount of material available for release. Frequently, solid $UF_6$ deposits became isolated from the process gas stream in closed-end volumes, such as instrument lines, that developed blockage. Records from the 1960s and 1970s indicate that in some cases, puffs occurred numerous times per week. Evidence indicates that during this period, operators did not typically wear respirators while sampling cascade process gas, despite frequent puffs of $UF_6$. Puffs were also frequently experienced in product feed and withdrawal areas when $UF_6$ cylinder pigtails were disconnected. Although Plant procedures specifically required respirator use during these evolutions, they were not typically worn. This procedural violation repeatedly resulted in the development and issuance of radiological occurrence reports to document the adverse condition, but corrective actions were not effective. Interviews with process operators indicated the belief that the uranium materials at the site were relatively harmless, resulting in unwillingness to use appropriate personal protective equipment.

The Industrial Hygiene and Health Physics group always recommended the use of respiratory protection devices in areas with high potential for airborne and/or chemical contaminants. Records indicate that the Industrial Hygiene and Health Physics group routinely interacted with operations and maintenance management and workers to advise them on the use of respiratory protection equipment and provide counsel on the types of work that would normally require respiratory protection. However, records also indicate that despite the Industrial Hygiene and Health Physics group's concern with personnel protection, that group did not have the authority to direct the use of respiratory protection. Consequently, respiratory protection was

not always utilized when high levels of airborne contaminants were present. For example, during 1972, Industrial Hygiene and Health Physics personnel assigned to X-705 reported approximately 300 radiological occurrences related to elevated airborne conditions in the oxide conversion facility. The reports indicate that as few as two and as many as 30 high airborne radioactive samples were identified during each incident, and in one case, a continuous air monitor alarm was ignored. Additionally, the reports indicated that respiratory protection was not used on many jobs for which the use of that equipment was specifically required by procedure, resulting in many special bioassay requests. Former-worker interviews and records indicated that failure to wear appropriate respiratory equipment was pervasive throughout the Plant.

Both Industrial Hygiene and Health Physics and Plant management recognized the hazards associated with contamination from transuranic compounds, and actions were taken to limit receipt of those contaminants. Although records indicate that the oxide conversion facility and some cascade deposits contained significant levels of transuranics, PORTS considered technetium-99 to be more pervasive, and respiratory protection program recommendations were subsequently based upon transferable beta contamination levels in work areas. However, work was routinely conducted without the benefit of respirators on open cascade components in process buildings, maintenance, refurbishment work, and waste handling activities. Extrapolation of analytical data would have indicated that these areas could have contained transuranic compounds. Until the early 1990s, uranium and technetium compounds were the only radiological hazards mentioned in respiratory protection guidance, even though the Plant was aware that some transuranic contaminants existed in the recycled uranium being processed at the site.

Since the beginning of Plant operation, there were significant deficiencies in respiratory program implementation. The early lack of line management support for the program directly impacted the Industrial Hygiene and Health Physics group's ability to establish controls consistent with the hazards encountered by workers at PORTS. Worker acceptance of the respiratory protection program was hampered by lack of supervisory encouragement/enforcement, inadequate training regarding the hazards, and poor equipment fit, comfort, and visibility. In addition, there was a belief that uranium was relatively harmless and could even be ingested without ill effect. Because of



**Analyses Supporting the Industrial Hygiene Program**

these issues, unnecessary worker exposures to airborne radioactive materials occurred through PORTS history.

### 3.1.10 Medical Programs

In conjunction with the AEC, Goodyear Atomic Corporation established a formalized occupational medical program following the inception of the PORTS contract. Similar to the other uranium enrichment facilities, the medical program originally managed health physics, industrial hygiene, and environmental and workers compensation activities until expansion of these individual programs necessitated their own management structure. The PORTS safety and health system developed into the traditional environment, safety and health organization by the 1980s. Although the occupational medical program received management direction from Goodyear Atomic Corporation, Martin Marietta Utility Services, and finally Lockheed Martin Utility Services, it adhered to requirements established by AEC, ERDA, and ultimately DOE.

A review of medical records and Goodyear Atomic Corporation correspondence from the 1950s and 1960s indicated the existence of a sophisticated occupational health program. Individual medical records contained documented results from comprehensive medical examinations, including standard laboratory testing, audio examinations, vision testing, radiology reports, and physician history and physical examinations. The medical records also contained information concerning industrial injury records, some health physics urine bioassay records, employee work restriction information, and workers compensation records. In some early medical records, Goodyear Atomic Corporation physicians would write individual letters to employees discussing their medical examination results and offer suggestions to improve their health and general welfare. Little evidence of industrial hygiene exposure data and work area hazards was found in the medical records that were reviewed. Medical Division correspondence indicated that health physics, industrial hygiene, and safety personnel would follow up on accident and injury reports with local supervisors. Industrial hazards, such as heat, noise, metals and production chemicals, were of ongoing concern to the medical staff. Urine bioassays were routinely collected in the medical center because they had the facilities necessary to collect the specimens. Information published in Goodyear Atomic Corporation monthly and quarterly reports demonstrates tracking of medical program activity for occupational and non-occupational visits, Plant employee injury and illness statistics, compensation case rates, health physics data (urine and film badge), and industrial hygiene data.

Audits, appraisals, safety committee meetings, and bargaining agreement negotiations beginning in the 1970s mention weaknesses in the occupational health program. Shortages of medical staff, difficulty in locating and retaining physicians and nurses, and some issues regarding the quality of service were all mentioned in correspondence from the medical program archives. Unions wanted better medical care and more coverage from medical personnel on off-shifts and weekends. Several allegations found in the Goodyear Atomic Corporation archives from union employees, as well as letter from a former Medical Department contractor, identify instances where medical treatment and record-keeping practices were less than satisfactory. A DOE Headquarters medical program appraisal in 1978 mentioned "a lack of dynamic leadership and lackadaisical [Occupational Medicine] Program," resulting in management changes. Other appraisals recommended more involvement of medical personnel in Plant activities, the need to automate health records and health information, and the establishment of a more comprehensive approach to occupational medicine. Noted improvements were made in both the effectiveness and the scope of the medical program following the selection of an experienced occupational physician.

Although DOE orders in the late 1980s and early 1990s specified stronger occupational medical program requirements, staffing and integration of the medical personnel into site management activities were continuing issues that required resolution. With the assistance of the corporate Martin Marietta Utility Services Medical Director, comprehensive medical program procedures and protocols were developed and physicians with occupational experience were recruited. Although the DOE Portsmouth Site Office did not have the expertise to assess the PORTS medical program, both DOE Headquarters and Martin Marietta Utility Services personnel regularly performed program reviews. Medical services personnel were eventually transferred to USEC following the privatization agreement; however, DOE site office personnel and some contractor staff continued to utilize USEC medical services until 1999, when an offsite medical contractor was selected to provide medical services.

## 3.2    Operations and Maintenance

This section describes historical Plant operations and maintenance activities, related hazards, and the effectiveness of controls to protect workers, the public, and the environment from hazards. Appendix B summarizes the principal hazardous activities conducted at PORTS from 1952 through 1993 and identifies the hazards presented by these activities, the controls used to mitigate the hazards, and analysis of the effectiveness of these controls.

➢ *Feed Manufacturing Plant Operations (X-344)*
➢ *Oxide Conversion (X-705E)*
➢ *Cascade Operations*
➢ *Decontamination and Uranium Recovery (X-705)*
➢ *Smelting (X-744G)*
➢ *Maintenance*
➢ *Incineration of Waste (X-705A)*
➢ *Work for Others*

### 3.2.1    Feed Manufacturing Plant Operations (X-344)

From 1958 until 1962, PORTS generated some of its feed material in a feed manufacturing plant in X-344, which converted uranium tetrafluoride ($UF_4$), commonly known as "green salt," to uranium hexafluoride ($UF_6$) by reacting the green salt with fluorine at high temperatures (2000 F). The chemical reaction for this process is:

$$UF_4 + F_2 \text{ (gas)} \rightarrow UF_6 \text{ (gas)}$$

The feed manufacturing plant consisted of four fluorination towers for processing $UF_4$ to $UF_6$, two cleanup reactor towers for scavenging excess fluorine gas, compressors and cold traps to collect the $UF_6$, cylinder fill stations, a conveyer system to unload and transport the $UF_4$ powder, 40 fluorine generation cells (in adjoining X-342), and supporting equipment and powder storage areas. The $UF_4$ powder and fluorine gas were fed into the top of the towers, and the resulting $UF_6$ was passed through filters and into cold traps where the $UF_6$ solidified. Full cold traps were isolated from the process, connected to an empty cylinder, and reheated under pressure to allow the $UF_6$ to melt and drain to the cylinder for subsequent feeding to the cascade. Full ash receivers from the towers were removed to a storage area, allowed to decay for approximately two to six months, and then blended with the incoming $UF_4$ and re-fed to the towers. Liquids from decontamination of filters and system equipment were transferred to X-705 for uranium recovery. The recovered uranium was returned to X-344 as uranium oxide and blended with the $UF_4$ stream. When the plant closed in 1962, the ash remaining in X-344 was shipped to Paducah for processing and uranium recovery.

Operating records and personnel interviews indicate that the operating and maintenance practices utilized in the feed manufacturing plant were generally consistent with accepted commercial industrial practices at the time, although the work environment was harsh. Room temperatures in the tower areas were usually in excess of 100 F, noise levels were high, and leaks in all systems were common. Exposure to uranium dust was prevalent in both operations and maintenance activities. Mechanical problems with powder hoppers, conveyers, and towers resulted in a high level of maintenance throughout the four-year life of the plant. The green salt inside broken equipment had to be cleaned out by hand by the operators, and the maintenance workers were continuously working on highly contaminated equipment. Shift logs and interviews with workers indicated that powder spills were frequent, and green salt accumulated to several inches deep in some areas each shift. The green salt was routinely swept up by the operators and reintroduced to the process. Workers performing these activities wore company-issued overalls and work gloves. Health physics surveys routinely showed high-levels of alpha-emitting contamination, even after decontamination of the areas. X-344 processed nearly 12,000 metric tons of $UF_4$ during its lifetime, but is estimated to have lost over 400 kilograms of uranium each year to the atmosphere in the forms of dust and fumes.

Based on available records, $UF_4$ feed material to X-344 was all virgin uranium; no reactor recycle material was ever introduced as $UF_4$ into this facility. From August 1958 until October 1961, purge gas from the cascades was periodically processed in the feed manufacturing plant through the cleanup reactors to recover excess fluorine. Because of this flow from the cascade, technetium could have entered the feed manufacturing plant. Filter plugging in the cleanup reactor system increased dramatically following initiation of fluorine recovery operations using the purge gas, which could be indicative of technetium contamination. Also, X-344 could have been slightly contaminated with transuranics via cross-



Construction of X-344

contamination of X-344 waste liquid batches returning as uranium oxide from the X-705 uranium recovery system.

Radiation levels in the areas around the X-344 fluorination towers were generally less than 100 mrad/hour during normal operations. For example, health physics radiation surveys in 1961 indicated that radiation levels 12 inches from the fluorination towers during operation were usually 50 mrad/hr or less, and during one six-month period, these levels never exceeded 100 mrad/hr. Inside the fluorination towers and in the downstream ash receivers, uranium daughter products tended to concentrate and create high beta radiation fields, which were shielded during normal operation. Workers were exposed to these intense beta radiation fields when the towers were opened for maintenance or unplugging operations, and when the ash receivers were changed. The ash resulting from fluorination of $UF_4$ contained the most daughter products, which were in the form of small particulates or aggregates. When the towers were operating efficiently, the daughter products were highly concentrated in the ash. Several incidents of spilled clumps or piles of ashes in the tower pits are documented as emitting up to 6 rad/hour of beta-gamma radiation on contact, of which up to 700 mrad/hour was from gamma radiation. Operators were exposed to these intense radiation fields whenever they cleared out ash plugs in the towers or changed the ash receivers. In addition, the ash receivers were hot and fuming with $UF_6$ and HF gases when they were changed.

At least one full ash receiver usually needed changing each shift. Full ash receivers were stored in a separate area inside X-344 for at least a month to allow the fuming to subside and the shorter-lived daughter products to decay. The ashes were then processed through a grinder and returned to the green salt stream being fed to the towers. The ash grinder also experienced a high rate of mechanical failure, and leaks in the system produced considerable dust, resulting in extensive airborne contamination in the immediate area. Workers were frequently exposed to this environment during operations and maintenance.

Records indicate that procedural requirements for personal protective equipment, and especially respiratory protection, were developed and implemented at the feed manufacturing plant for jobs around towers, ash receivers, and the ash grinder. According to interviews with past employees, compliance with these requirements was generally good during the time of feed manufacturing plant operation. However, records of inspections indicate that respirator use was inconsistent. For example, some walkthroughs by PORTS industrial hygiene and radiation protection technicians indicated appropriate respirator use, while a May 1961 health protection program review by the AEC Oak Ridge office provided the following observations: "Operations observed in the feed plant were dusting noticeably but operators were not masked nor in possession of masks. The supervisor indicated operators did not normally mask in the area. A check of operating procedures indicated that anyone present in the area should have been masked."

### 3.2.2 Oxide Conversion (X-705E)

Over its entire period of operation (1957 to 1978), the oxide conversion process was probably one of the most hazardous radiological and chemical operations at PORTS. The X-705E oxide conversion facility was originally designed to recover oxides of uranium, primarily from decontamination solutions in X-705 and incinerator ash, into $UF_6$ for feed into the cascade. Between 1959 and 1961, uranium oxides from spent reactor fuel were also processed in the facility. The process was contained in two areas, "E" and "H," located in the northeast corner of the X-705 building. The E area, on the ground floor, contained the oxide weighing, storage, unloading, and sampling rooms; the flame tower room; and the cold trap room. The H area was located directly above the E area and contained the flame tower cleanout port, the upper section of the feed hopper, the magnesium fluoride traps, vacuum pumps, and various filters. The H area was also used to store uranium oxide canisters, contaminated waste, idle equipment, and wash solutions.

45

The general material flow consisted of initial receipt and weighing of oxide, sampling, grinding in preparation for feeding, and then feeding the oxide into a fluorination reactor (initially a stirred bed, then a flame tower). The resulting $UF_6$ was filtered through sintered metal filters and magnesium fluoride traps to remove heavy metal contaminants, and then captured in a "cold trap." When full, the cold traps were heated, and the liquefied $UF_6$ was drained into cylinders, depending on the assay. Initially, the process consisted of a stirred bed reactor, using a belt that moved the oxide through a pipe in a fluorine atmosphere. Later, a shaken bed reactor was used because of unreliable belt operations. Both methods had very low production capabilities. A demonstration facility with a 3-inch flame tower was built and operated from 1958 through 1965, but was shut down due to health physics concerns and uranium material balance problems. Problems identified by an Oak Ridge health protection review in 1965 included potential concentration of transuranics in the processes, internal uranium exposures from enriched insoluble oxides that were not detectable by urinalysis, and inadequate air monitoring capability. Although the need to study the transuranic contamination potential and the addition of a separate tower for re-feed of tower ash were identified by the Oak Ridge review, neither activity was implemented. The presence of transuranic contamination in feed material was not adequately considered in the design or operation of the oxide conversion process.

Although the tower room typically contained the highest radiation and contamination levels, most operations and maintenance exposures did not occur in the tower room. Primary activities resulting in exposures in excess of PALs included handling of oxide powders in preparation for feeding to the towers, changing the tower feed screw, connecting and disconnecting pigtails, and performing maintenance on cold traps plugged with foreign materials.

A handwritten report entitled "Oxide Conversion as Viewed by Development" was written by a member of the Development Department (circa 1966) in response to a significant error in the uranium mass balance in X-705E. The report explained that the oxide conversion process was originally established as a waste recovery process and not a production process. The subsequent introduction of reactor returns converted X-705E into a production facility, requiring a capacity that "it was ill equipped to handle." The report further explains that uranium inventory control and health physics concerns were secondary to production schedules and costs, until "eventually the inevitable happened." The author's reference to "the inevitable" was directed primarily at the uranium inventory problem, but also refers to health physics problems. This report provides evidence that the operating contractor was aware of safety problems in X-705E; however, production schedules were viewed as more important. The report also refers to the practice of "de-smoking ash pots through the building ventilation system" as a possibility for physical losses of small quantities of uranium. Since the building ventilation system was unfiltered and reactor return materials had been processed, transuranics from the ash pots likely entered the building ventilation system and were subsequently released to the environment but not monitored.

A 1968 paper entitled "Fluorination of All Enrichments of Uranium Oxides" by the Production Division - Chemical Operations Department, presented at the Rocky Flats fluoride volatility meeting on June 24, 1968, also describes 1964 health physics concerns that led to the decision to enclose the process in a glovebox. The paper cites several concerns, such as the average assay of reactor scrap being higher than that previously handled, the quantity of material processed contributing to problems, and mandatory respiratory protection while processing oxides. In July 1967, process modifications were completed, and operations resumed in mid-November 1967.

Efforts to reduce health physics and contamination problems between 1967 and 1973 were ineffective, primarily because of poor practices by operators and supervisors. Training lecture notes from the late 1960s or very early 1970s, labeled "Health Physics in the Oxide Conversion Area," described problems with health physics practices after completion of those



Interior of X-705E

modifications. The notes indicated that it was common practice for operators to remove gloves from the gloveboxes to conduct some operations. It further discussed problems with deterioration of the gloves from the fluorine atmosphere inside the glovebox and indicated that oxide conversion was never intended to be a clean process. On January 30, 1970, an Industrial Hygiene and Health Physics internal memorandum discussed employee disregard for protective measures, lack of required protective measures in X-705E, problems in contamination control, and releases in the cold trap area from faulty cylinder valves and ruptured pigtails. It also noted that most of the exposures could be prevented with proper respiratory protection. Further, Industrial Hygiene and Health Physics found that many of the exposures could have been reduced and/or avoided by stricter adherence to operating procedures. A March 1973 OR appraisal cited ongoing poor health physics practices in X-705E, including a large number of radiological occurrences, ignored alarms, eating and drinking in the cold trap room, work performed without respiratory protection, and increasing lung burdens for some operators.

A 1976 memorandum (Memo GAT-922-76-184) identified transuranics as a problem at PORTS, especially in the oxide conversion process. PORTS had an existing inventory of transuranic-contaminated feed materials for oxide conversion and wanted to process that material. Based on recommendations from OR, Goodyear Atomic Corporation performed a variety of process improvements and test runs to model fluorination of transuranics and reduce system leaks and contamination. On September 13, 1978, Health Physics management determined that those efforts were not sufficient and recommended shutting down X-705E due to unacceptable health risks. On October 1, 1978, the oxide conversion facility was placed in a standby status; on December 14, 1978, Goodyear Atomic Corporation requested cancellation of the oxide conversion project.

It appears that during its entire operation, the oxide conversion process placed Plant personnel working in the area, as well as security guards who may have been on patrol, at risk of exposure to chemicals and airborne radioactivity. Processing of transuranic-contaminated material was not adequately anticipated in the original or subsequent designs or operation. Samples obtained after shutdown showing the presence and level of transuranic contamination in the facility indicate that worker airborne exposures could have exceeded the acceptable standards, especially given the apparent lack of discipline in respirator use.

### 3.2.3 Cascade Operations

#### Feed/Product Withdrawal

Cascade piping was designed so that $UF_6$ could be fed to or withdrawn from any part of the cascade. The cascade generally operated below atmospheric pressure to prevent leaks from escaping outside the process, thereby limiting releases to process gas trapped in piping or equipment isolated from the cascade. High-assay product was withdrawn in the top product withdrawal area of X-326; this was also carried out at below-atmospheric conditions. The highly enriched product was withdrawn by passing $UF_6$ gas directly from the cascade at the appropriate enrichment through one of six 5-inch-diameter cylinders submerged in chilled TCE. At the lower temperature, the product froze to a solid inside the cylinders. The lower temperatures minimized TCE fumes in the area. Product was also withdrawn at various points in the cascade using a mobile side withdrawal facility consisting of a refrigeration unit and a TCE bath mounted on a scale. Each major cascade building had a mobile facility. A cylinder, submerged in the refrigerated TCE bath, was connected to the cascade through a heat traced flexible copper pigtail. The product froze to a solid inside the cylinder. Neither the top product withdrawal station nor the mobile side withdrawal facilities have been used since 1991 because of the lack of demand for high-enrichment product. During the highly enriched uranium refeed program begun in the mid-1990s, high-enrichment uranium was fed for downblending by connecting cylinders in the top product withdrawal area to the upper sections of the cascade. In all cases where feed and withdrawal operations were carried out below atmospheric pressure, the potential for process gas leaks during cylinder connection was limited to the contents of the connecting lines.

In addition, there are four permanent systems that operated above atmospheric pressure: the cylinder feed system, the extended range product withdrawal system, the low-assay withdrawal system, and the tails withdrawal system. Any leakage in these areas could have exposed workers to process gas. In the 1950s, $UF_6$ gas was fed to the cascades from cylinders placed in hot water baths. In the 1960s, the hot water baths were replaced with autoclaves to prevent a release in the event of a cylinder failure during feeding operations. Each autoclave serves as a containment boundary in case of a leak and is equipped with appropriate alarms, indicators, valves, and a remote



**Product Sampling in X-326**

cylinder valve closure device. Autoclaves are currently located in X-342A and X-343. Enriched and depleted $UF_6$ gas is withdrawn by pumps from the cascade and subsequently drains to cylinders in buildings X-326 (extended range product withdrawal), X-333 (low assay withdrawal), and X-330 (tails withdrawal).

Numerous releases resulted from connecting and disconnecting cylinders. At least one event occurred when a worker attempted to move a product cylinder with its pigtail still connected, resulting in a major $UF_6$ release. After a major release of $UF_6$ in X-342 in May 1973 and pressure from OR, a three-plant $UF_6$ handling committee and testing subcommittee performed extensive evaluations and implemented changes in the design, maintenance, testing, and operating procedures for pigtail connections. The changes were effective in reducing the number and severity of releases related to cylinder connection and disconnection. Interviews and Industrial Hygiene and Health Physics inspection reports indicate that respirator use was not always consistent during pigtail connections, and workers sometimes were exposed to releases without appropriate respiratory protection. Also, respirators became clogged or saturated at high concentrations, causing some workers to remove and not use their respirators.

## *Jetting/Venting*

Before opening process equipment was opened for maintenance, trapped process gases in affected equipment had to be evacuated and the equipment purged to a $UF_6$ negative. The process for establishing a negative involved taking the cell off line, evacuating the cell to downstream cells, evacuating the remaining contents to surge drums, and then alternately purging and evacuating the cell at least three times with dry air or nitrogen to the surge drums. Once a $UF_6$ negative was established, the cell was raised to atmospheric pressure with dry air and released for maintenance.

To minimize $UF_6$ emissions to the environment, the resulting contents of the surge drums were either bled back to the cascade or passed through the cold recovery system, a refrigerated unit to trap the majority of $UF_6$ by freezing. The remaining light gases were then discharged to the environment using air-powered jets after passing through chemical traps to remove residual $UF_6$. A space recorder monitored the vent stream that exited the traps to record the amount and alert operators of excessive quantities of $UF_6$ getting through the traps. Procedures required operators to immediately investigate and attempt to reduce emissions in excess of 10 ppm $UF_6$; however, venting was allowed to continue as long as emissions did not exceed 20 ppm. In the mid-1980s, continuous sampling of jet emissions was initiated to allow periodic determination of the amounts of $UF_6$ released. The resulting composite samples were analyzed after the end of each sample period and did not provide a real-time control capability. Assuming that procedures were followed, generally less than a pound of $UF_6$ was available for release to the environment from a single cascade cell. The number and frequency of these authorized releases were not determined.

The process for preparing a cell for maintenance was tedious and sometimes time-consuming, particularly when cell isolation valves leaked or the cell contained significant uranium compound deposits. Because of the flexibility built into the design of the PORTS piping systems, alternative flow paths and practices to jet process gases to the environment were possible; some of these were not described in procedures. Reportedly, improper jetting increased during CIP/CUP due to management pressure to stay on schedule. One interviewee described a process he called "midnight rocket," which reportedly was used when operators needed to get rid of material fast. Operators would reportedly start a release, watch the space recorder indication increase, stop the release, wait for the indication to come down, and then open the valve all the way again. Depending on the pressure, temperature, and concentration of $UF_6$ in a cascade cell or surge drum when jetting was initiated, significant quantities of $UF_6$ could still have been available for release to the environment. The released $UF_6$ gas would hydrolyze with moist air to form a visible and pungent cloud of $UO_2F_2$ powder and hydrogen fluoride gas. The number and frequency of inappropriate releases were not determined.

In January 1986, a newly installed continuous vent sampler indicated that nearly 110 pounds of uranium had been released from a vent over a three-week period. An investigation concluded that: operators were not aware of the excessive emissions, despite multiple spikes on the space recorder charts; the space recorder indications were not always believed; venting continued in some cases despite elevated readings; venting was sometimes performed with the space recorders out of service; the chemical trap had not been surveyed as required, even though observations in September 1985 suggested that the trap was fully loaded; and procedures were not followed. The investigation report also documents numerous earlier examples of excessive uranium emissions, most of which were reportedly caused by valving errors or valve leaks. Because many of the events indicated ineffective use of the chemical traps, orifices were subsequently installed in jet suctions to limit flow through the traps, bypasses around traps and jets were removed, procedures were upgraded, and training was provided to assure that the staff understood management's expectation to prevent releases.

In response to these events and a later release in August 1986 due to a valving error with jets in operation, direction was given to not operate the jets without a functioning space recorder monitoring the vent, to secure the jet air supply and suction valves at all times except when venting operations were taking place, and to further modify piping and procedures to minimize the opportunity for mis-valving releases and to maximize the return of $UF_6$ to the cascade. Management guidance introduced in 1986, lab sampling, space recorder procedural requirements, and the existing practice of sending $UF_6$ back to the cascade provided strong incentives to use the jets as specified by procedures. As a result, $UF_6$ emissions were and have been significantly reduced.

### 3.2.4 Decontamination and Uranium Recovery (X-705)

Since the Plant began operation, equipment was decontaminated and uranium was recovered from decontamination solutions in X-705 (Decontamination Building). These activities were accomplished in areas that were physically separated from the oxide conversion areas. Hazards associated with decontamination and recovery included potential exposures to concentrated radioactive materials (technetium, uranium, and transuranics), acids (nitric, boric, acetic, and citric) and organic solvents (acetone,

TCE, and methyl ethyl ketone). In addition, some of the components that were handled were contaminated with asbestos and/or PCBs. The most significant occupational hazard in X-705 was exposure from inhalation of airborne radioactive material. Radioactive materials in this building were often not contained, providing the opportunity for worker exposure. Spot checks by health physics personnel often found evidence of contaminated hands, shoes, and coveralls. Acceptable PALs for airborne radioactive material were exceeded more frequently in X-705 than in other buildings. Radiological hazards were particularly significant in X-705 because transuranic materials were concentrated by the uranium recovery and oxide conversion processes, and because insoluble forms of uranium were routinely handled. Transuranics and insoluble uranium were significantly more hazardous than the soluble uranium compounds that were the principal sources of radiation dose in other Plant areas. Prior to the mid-1970s, the health physics staff assumed that all detected radioactivity was uranium. This non-conservative assumption likely caused underestimation of the radiological hazards in X-705.

Radiological monitoring and controls were implemented to control the exposure of workers to uranium in X-705. Logs of inspections and sampling indicate that the level of attention to X-705 activities by the Industrial Hygiene and Health Physics Department was commensurate with the relatively high hazards in this building. Routine surveys were conducted to monitor the concentration of radioactivity on surfaces and in the air. Uranium recovery system operators wore coveralls, safety shoes, and neoprene or rubber gloves provided by the company. Respirators were available and were required by some procedures,



Exterior of X-705

but respirator use was not strictly enforced. A clean lunchroom was provided in X-705 and was used by most workers, but smoking and eating snacks were common in process areas into the 1980s. Workers washed their hands but did not remove potentially contaminated clothing or shoe covers before entering the lunchroom. Spot checks by health physics personnel occasionally identified contamination on the coveralls and shoes of X-705 workers while in the lunchroom.

### Decontamination

Large pieces of disassembled cascade equipment were cleaned in the X-705 decontamination tunnel, which consisted of a series of five spray booths through which large equipment was transported on dollies—much like a car wash. The equipment was sprayed with nitric, citric, or acetic acid solutions in the first three booths and rinsed with sanitary water in the fourth. The equipment was dried with hot air in the fifth booth. The acid solutions were collected for reuse in criticality-safe columns in the tunnel basement. When no longer effective, the solutions were processed for uranium recovery. Fans discharged air from the tunnel to the atmosphere through building roof vents. Interviews of workers and reviews of records indicate that the decontamination tunnel has functioned as designed and has caused few worker safety or health problems. A significant exception occurred in the late 1970s when a radioactively contaminated acid cleaning solution entered the plant process steam system through a leak in a heat exchanger that was being used to heat the solution. Radioactive contamination was transported to the steam plant and to steam piping across PORTS before the problem was identified and corrected. Today, many parts of the steam plant remain contaminated from this event. In the early 1980s, the South Annex to X-705 was constructed for disassembly and decontamination of large cascade equipment contaminated with high levels of technetium. The annex was maintained at a negative pressure relative to adjacent spaces in X-705 to control the spread of contamination. Operations included disassembly of compressors and converter tube bundles, and regeneration of alumina traps. Continuous air samplers indicate that this area had the highest average airborne contamination in the X-705 complex. Workers stated that air-supplied hoods were consistently worn inside the annex when work was in progress. Air was discharged through absolute filters to reduce airborne emissions to the environment.

Contaminated compressor seals and other small parts were disassembled and decontaminated in the X-705 seal disassembly room. Airborne radioactivity was consistently high in this room. Workers recalled that respirators were worn in this room when work was in progress. Army assault masks were worn until the mid-1970s, when they were replaced with air-supplied hoods. The room was maintained at a negative pressure relative to adjacent X-705 areas, and the room exhaust was filtered prior to discharge to the environment. Small parts with visible uranium contamination were decontaminated with nitric acid at the small parts hand table. The nitric acid was recycled until it was no longer effective, after which it was sent to the uranium recovery system. Samples in the 1970s indicated high transuranic contamination in the nitric acid decontamination solutions. Workers were protected with controlled airflow through a ventilation hood over the hand tables, and respirators were not normally worn. This process was effective in removing acid fumes and airborne radioactivity, as evidenced by continuous air samples collected through the early 1990s.

Empty $UF_6$ cylinders were cleaned in X-705 to remove "heels" of nonvolatile material remaining in the cylinders after $UF_6$ vaporization. All cylinder heels contained significant concentrations of uranium daughter products, and heels from reactor tails cylinders also contained transuranics. In the 1950s and 1960s, cylinders were washed with a hose in an open area in X-705, where wash water spilled onto the floor. After November 1970, a closed cleaning system was installed, in which cylinders were placed in a turning fixture and connected to piping through which boric acid and sodium carbonate cleaning solutions and rinse water were recirculated. The



Interior of X-705

cylinders were then moved to an enclosed drying booth where they were electrically heated and dried with forced air and inspected for cleanliness. Inspectors positioned their eyes over cylinder openings to inspect interior surfaces. Because workers did not always wear eyeglasses for these inspections, there was a potential for unmonitored beta radiation exposures to the lenses of their eyes. Cleaning and rinse solutions were processed through the uranium recovery system. Wastewater from the uranium recovery system containing concentrated uranium daughter products was discharged to the X-701B holding pond.

### Uranium Recovery

Uranium recovery facilities in X-705 were used to chemically separate and recover uranium from a variety of liquid solutions and solid waste materials. Uranium in solid wastes was dissolved in nitric acid, and the resultant liquid solution was processed to produce $U_3O_8$. Sources of feed material for this process included fluorination tower ash, incinerator ash, $UF_6$ cylinder wash solutions, alumina and sodium fluoride pellets from traps in oxide conversion and the cascade, decontamination solutions, ventilation filters and vacuum cleaner particulates, uranyl nitrate hexahydrate from foreign sources containing transuranics, laboratory wastes, and materials from spills.

A solvent extraction process was used in X-705 to recover uranium from the above materials. Recovery steps included:

- Dissolving uranium oxides in nitric acid

- Removing insoluble solids in a mixer/settler and/or a filter

- Using an evaporator to reduce volume and concentrate uranium

- Separating uranium from contaminants in solvent extraction pulse columns

- Sampling the raffinate from the extraction columns, and recycling it through recovery if economically feasible or discharging it to the environment if not

- Using an evaporator to further concentrate uranyl nitrate from the extraction columns

- Drying the uranyl nitrate solution in a drum dryer (the drum dryer produced acid fumes and airborne radioactivity and was removed from service sometime before 1963)

- Oxidizing and roll milling uranium oxide in a calciner.

The calciner product, dry triuranium octoxide ($U_3O_8$) powder and associated contaminants, provided a potential for exposure of workers to insoluble uranium and transuranics. The hazards from this part of the recovery process were greatest when calcining material containing transuranics from the PORTS oxide conversion process and from foreign sources. Records indicate receipt of foreign recycled uranium compounds, in the form of uranyl nitrate hexahydrate in 1966, 1967, 1976, and 1977. This material was converted to $U_3O_8$ in the X-705 calciners. Lax procedural compliance and health physics practices during this period resulted in contamination of calciner work areas. Continuous air samples in the calcining area for the mid-1960s to the mid-1970s indicated annual average airborne radioactivity concentrations below the PALs for uranium applied at PORTS during this period; however, individual sample concentrations for this area exceeded the Plant limits for insoluble uranium. Actual concentrations were probably higher than recorded values because of the deficiencies in air



**Uranium Recovery Process**

sampling discussed previously in this report. In addition, although some of this airborne radioactivity was likely from transuranics, the contribution from transuranics was not measured and is unknown.

The aqueous raffinate from solvent extraction columns, which contained concentrated uranium daughter products and technetium, also posed a radiological hazard to system operators. Like most materials in the solution recovery system, these materials were processed wet and did not readily become airborne, although the uranium recovery system was not leaktight, and leaks were common. Most leaks were contained by drip pans placed under the equipment. Leakage of wet process materials that were dried by evaporation provided a potential for worker exposure to airborne radioactive materials.

Raffinate waste containing transuranics, uranium daughter products, and technetium was initially discharged to an onsite ditch that flowed to Little Beaver and Big Beaver Creeks, and then to the Scioto River. Subsequently, an onsite settling pond (X-701B) was added to reduce the amount of radioactive material released off site. In the early 1980s, an effluent treatment system was placed in service to remove technetium from X-705 effluents prior to discharge to X-701B.

## 3.2.5   Smelting (X-744G)

An aluminum smelter operated in X-744G from 1961 through 1983. This furnace was used to melt aluminum from used process equipment components. Disposition of the aluminum ingots is discussed in Section 4.2, "Management and Disposal of Scrap and Surplus Materials." A 1960s Industrial Hygiene and Health Physics Department study indicated the potential for airborne concentrations of uranium to be generated during furnace loading, melting, unloading, and dross (the slag layer on top of molten aluminum) removal operations. Survey records during dross removal indicated general area contamination, implying periods of airborne activity; however, limited air samples taken with special high-volume air samplers detected no uranium or alpha activity during operations. Interviews conducted with a former health physics staff member noted that any uranium contaminants smelted with the aluminum tended to stay inside the aluminum. Although smelted materials were to have been previously decontaminated in X-705, radiological floor contamination surveys during the late 1970s in the smelter area indicated that alpha



**Aluminum Smelter**

contamination levels were routinely above PALs for both fixed and removable contamination.

### 3.2.6   Maintenance

#### *Major Equipment Maintenance*

Cascade equipment was subject to failures, as well as major upgrade and modification programs throughout the life of the Plant. Major components requiring maintenance and modification included compressors, converters, and block valves. These components were frequently cut out of the process system and transported to other buildings for repair. One of the significant hazards facing workers was residual process gas and deposits inside equipment and piping systems. Operators sometimes experienced difficulty in removing process gas due to these deposits or valve leakage. Testing in 1986 identified inaccuracies with the $UF_6$ negative test protocol and the strong possibility of false negatives. Consequently, when equipment was removed for maintenance, outgassing was common, despite an earlier determination of $UF_6$ negative. Respirators were required whenever process gas piping was initially breached; however, respirator availability was limited before the mid-1970s, and requirements for use were governed by the specific work being performed by an individual. As a result, some workers in the immediate vicinity of welders cutting out components were not wearing respirators when process gas releases were encountered. In 1987, an Operating Method required all personnel within the contamination control boundaries to wear full-face respirators when opening equipment to the atmosphere. Additional protection

was required in those areas designated as containing technetium-99.

Compressors needed maintenance as a result of bearing or seal failures and compressor deblading. Bearing and seal failures could sometimes be repaired without removing the compressor from the cascade. However, compressor deblading evidenced serious internal damage, and the compressor had to be removed for repair. Workers would locate and retrieve the missing blade parts by crawling inside the piping with full personal protective equipment, including supplied-air respirators. These workers could have been exposed to uranium compound deposits, hydrogen fluoride, $UO_2F_2$, transuranics, uranium daughters, and fission products. Removed compressors were repaired in the X-720 compressor shop after disassembly and decontamination in X-705. Compressor disassembly presented significant inhalation hazards because of entrapped deposits. Although respirators were specifically recommended for this activity, use was inconsistent as reported by maintenance workers and Industrial Hygiene and Health Physics personnel. Compressor seals were disassembled in the X-705 seal dismantling room, which could be sealed and had fume exhaust hoods to minimize the spread of contamination. Workers would don air supplied respirators and gloves and close the room to disassemble the seals. Industrial Hygiene and Health Physics reports from 1974 and 1975 document contamination levels in the X-705 seal dismantling booth equal to or greater than any other found in X-705. These records also document the observed use of respirators while dismantling seals. Compressor mechanics were also exposed to TCE during vapor degreasing activities in preparation for compressor reassembly.

Converters needed maintenance as a result of cooler leaks or barrier plugging. Converters were repaired in the X-700 converter shop. In many cases, internal components were scrapped and replaced. The scrapping and disposal operations in X-705 presented a high potential for worker exposures to grinding dust, smoke, and airborne contamination. Occasionally, uranium compounds trapped within converter components were released during converter disassembly, presenting further inhalation hazards. Half-face respirators were required for the disassembly, although recollections of past employees suggest that this requirement was not strictly enforced. The shop was often filled with smoke, due to cutting and welding and an occasional asbestos blanket fire (the latter resulting from weld splatter igniting the blankets

stuffed into converters to protect internal components). Converter components were cleaned in a large TCE vapor degreaser before final reassembly.

Process block valves needed maintenance for events such as seal or bellows failure or valve leakage. The valves were removed from the cascade and shipped to X-705 for initial teardown and decontamination. Each valve has a large valve-body space where process gases and deposits could be trapped. Occasionally, workers encountered significant outgassing when opening the valve bodies; however, survey records indicate minimal area and personnel contamination. Full-face respirators were recommended by health physics when working on or moving highly contaminated components. Decontaminated block valves were repaired, refurbished, degreased, and re-assembled in X-720.

In the early 1980s, instrument mechanics modified block valves in process buildings while the valves remained in service. The modification connected the block valve body to its associated downstream cascade piping through instrument tubing. The work involved drilling into and soldering on $UF_6$ filled systems. Workers sometimes experienced puffs of trapped gases from drilling into these systems. The released material would interact with the sweat on the workers' coveralls and create a snow-like dust that sometimes filled the room and obscured visibility. After some experience with the process, wooden plugs were manufactured and supplied to the mechanics to limit releases. Initially, the mechanics wore full-face respirators, coveralls, and cotton gloves. Subsequently, they also wore disposable paper coveralls over their cloth coveralls to limit contamination. Surveys in 1982



**X-700 Converter Shop**

identified instances of airborne alpha radioactivity exceeding PALs, but also noted that the personal protective equipment worn was more than adequate.

Starting in 1956, a series of "changeout" programs was initiated to modify production equipment and support facilities to increase capacity and improve performance, the most comprehensive and intensive of which was CIP/CUP. Congress authorized CIP in 1971 to increase uranium enrichment capacity through application of improved technology. Congress authorized CUP in 1974 to increase uranium enrichment capacity by enabling operations at higher power levels. CIP/CUP was implemented during 1972-1983 and involved the employment of many new workers at PORTS. New workers were teamed with experienced workers and learned their skills through on-the-job training.

CIP/CUP was implemented while cascade production continued, and it involved major modifications to compressors, converters, process gas piping, and support systems. All of the industrial, radiological, and chemical hazards associated with normal maintenance were present along with the additional challenge of a demanding schedule for completion of each task. Dedicated cell changeout teams were established to replace cell components on an almost continuous basis. Individual cells were isolated and prepared for turnover to maintenance; cell equipment was cut out, removed, and modified; new and refurbished equipment was installed; and the cell was returned to operations. Each cell typically took about three weeks to completely refurbish. In recognition of the hazards involved, the Maintenance Department assigned a foreman to monitor safety and ensure safe work practices during CIP/CUP, in addition to the normal Safety Department staff. Reportedly, most of the problems addressed were related to industrial safety deficiencies, such as use of hard hats, safety glasses, and safety shoes, rather than radiation safety or industrial hygiene. In addition, a 1973 response to an AEC representative's observation of cell changeout activities only addressed similar industrial safety concerns. However, Industrial Hygiene and Health Physics reports for the period demonstrate mixed performance with regard to radiological safety. A 1976 report notes continued problems, such as welding or grinding of surfaces with visible radioactive contamination without respiratory protection, transportation of grossly contaminated open components without proper covering or decontamination, and entering cell housings during air-arc scarfing without respiratory protection. Later

Industrial Hygiene and Health Physics reports document improved use of personal protective equipment, improved requirements for their use, and enhanced compliance in the latter stages of CIP/CUP.

Industrial Hygiene and Health Physics surveillance reports for process gas system openings during CIP/CUP typically confirm the use of full-face respirators by welders and supporting mechanics. However, interviewees recall collocated workers, not assigned to support cutting into the system, frequently without respiratory protection and on occasion engulfed in a process gas release. Once the system was open, respirator use was normally not required except during grinding or some other dust-generating activity. Surveys of converter openings frequently confirmed worker complaints of excessive HF fumes, requiring continued respirator use or improved area ventilation. Early in the CIP/CUP campaign, efforts to prevent outgassing from equipment openings were not always implemented or effective. For instance, in 1977, 24 workers were sent for urine samples after a converter, which was suspended from a disabled crane, outgassed. In another 1977 event, workers refused to work in the area of an outgassing expansion joint that had breached its plastic flange covers until the pipe flanges were sealed by the Fire Department. Airborne alpha contamination in the immediate vicinity of the open joint was found to exceed PALs. As the CIP/CUP campaign progressed, shower caps, taped metal covers, and inflatable barriers were used over equipment openings to improve process gas containment and limit the spread of contamination.

Cell components were prepared for CIP/CUP modification in X-705 by disassembly, decontamination, and survey. Converter heads were cut off, coolers and barrier bundles were removed, the resulting parts were decontaminated and surveyed, and flanges were ground and prepped for re-welding. Subsequently, the barrier bundle was cut apart, parts were removed, the barrier was shredded, and the resulting unsalvageable scrap was placed in an old converter shell with tack welded top and bottom covers for disposal. Interviewees described converter internal fasteners as frequently covered with uranium compounds, which were the source of significant smoke, dust, and airborne contamination during component removal with air impact tools. Early in CIP/CUP, workers wore dust masks for this activity. Later, workers wore half-face respirators. One interviewee described a shortage of respirators amidst quantities of surface contamination in the X-705 high bay area during CIP/CUP while cutting and

disassembling converters. The interviewee stated that he had to cut up converters without a respirator on some occasions. At the end of the shift, he would put his respirator, if he had one, in a pile of respirators, and at the beginning of the shift, he would get the best respirator he could from the pile. The shortage of respirators is confirmed by union safety meeting minutes in the 1973 to 1975 period.

Industrial Hygiene and Health Physics records for the period demonstrate frequent monitoring of CIP/CUP work activities and recommendations for improving worker protection, both as part of their routine activities and at the request of supervision. Industrial Hygiene and Health Physics reports emphasize the importance of respirator use during certain equipment disassembly steps and document inadequate respirator use when observed. However, supervisors and workers were not always receptive to these recommendations. For example, one record documents a worker's disregard of specific direction to don a respirator before entering an airborne contamination control area. As a result, contamination and exposure controls, as well as compliance with personal protective equipment requirements, were inconsistently applied and enforced. Many interviewees did not remember seeing Industrial Hygiene and Health Physics staff monitoring conditions or work activities. Workers involved in this phase of CIP/CUP were also sometimes subject to heat stress and exposure to asbestos and PCB contamination.

### Transformer Maintenance

Many PORTS transformer dielectric oils contain PCBs. Early Material Safety Data Sheets (MSDSs) recommended avoiding prolonged skin contact with PCBs and the use of coveralls, gloves, goggles, shoe covers, and consideration of positive ventilation and respirators in confined spaces involving PCBs. Later MSDSs required chemical resistant suits with fresh air supplied masks.

During CUP, electricians sampled and tested the PCB-contaminated oil, drained PCB-contaminated oil from transformers, stored PCBs in tanks and drums, removed PCB oil from all outer surfaces with solvent, shipped transformers to offsite contractors for uprating, filtered PCBs for reuse, and refilled and topped off transformer tanks with recycled and new PCB oil. Contaminated personal protective equipment, filters, wipe rags, and oil absorbent were deposited in waste drums for subsequent disposal.

In the early 1980s, electricians drained and inspected other transformers not containing PCBs. Reportedly, they took five-gallon buckets of TCE inside the transformers for cleaning and did not wear respirators or gloves, even though the transformer tanks were recognized as confined spaces. Later, based on breathing zone air monitoring, electricians were required to wear respirators and limit TCE use to spray-bottle quantities while inside the transformers.

### Contaminated Equipment from K-25

Recognizing the benefits of reuse of cascade equipment from the shutdown Oak Ridge K-25 facility, spare components and at least one complete upgraded cell were transferred to PORTS in the 1980s and early 1990s. The components included converters, compressors, motors, and valves; some were installed in the PORTS Gas Centrifuge Enrichment Plant cascade, while others were stored as spares. Workers in the X-700 converter shop complained about the high levels of hydrogen fluoride that emanated from these converters when opened, leading shop management to require additional purging before opening for rework. The resulting purge path used a makeshift purging apparatus in the X-700 converter shop instead of one of the dedicated purge stations. On September 29, 1987, a converter that was being purged blew off its welded steel nozzle cover plate, creating a very loud noise and damaging the building. Fortunately, no serious personnel injury resulted. An incident investigation board concluded that supervision did not understand the risks involved and did not prepare a procedure for the abnormal activity. Requirements to develop a procedure for this activity were not identified;



Converter Accident

therefore, no additional hazard review or analysis was conducted before the event, which might have prevented the incident.

A 1980 Industrial Hygiene and Health Physics report documents observation and radiological surveys of the disassembly of K-25 valves in X-705 prior to rework. Surface contamination ranged up to 400,000 dpm and exposure rates of 110 mrad/hour. The job was performed with full-face respirators, paper coveralls, gloves, caps, and booties, and adjacent to a vent hood to minimize the spread of contamination. Airborne contamination levels were maintained less than the PAL, and all parts were subsequently decontaminated. Worker surveys after removal of personal protective equipment showed no contamination greater than the PAL.

### Instrument Maintenance

Instrument mechanics repaired instrument and control systems within the process buildings, the X-720 instrument shop, and various satellite locations. The principal instruments repaired were line and space recorders. Line recorders are mass spectrometers installed to measure the concentration of low molecular weight gases contaminating the process gas. Space recorders use large ionization chamber devices (sometimes referred to as space cans, because of their size and shape) for measuring radioactivity in gaseous vent streams. Excessive radioactivity might be present in gases vented or jetted from the cascade, if the equipment installed to remove $UF_6$ and technetium was overwhelmed or improperly used.

Because of the fragile nature and small size of many instrument parts, a separate cleaning and decontamination room was established in the X-720 instrument shop. The room had special ventilation to control the spread of contamination and facilitated the use of various cleaning agents, including nitric acid, hydrochloric acid, sulfuric acid, "brite dip," acetone, and water to decontaminate and clean equipment. Equipment was scrubbed and flushed in the sink, and the resulting contaminated wash fluids were then drained to a covered pit just outside the instrument shop on the northeast side of X-720. TCE was also used to clean and degrease components and was reportedly disposed of by dumping out the back door until the 1980s. Mercury-contaminated equipment was also cleaned in this room, leading to several mercury spills. In the 1970s, mercury airborne levels in excess of PALs were identified. The room also contained electroplating equipment, which used cyanide salt

solutions to plate fabricated instrument parts with nickel and silver for their use in refurbished or newly constructed instrument systems.

Before the 1980s, line recorder chemical traps reportedly were cleaned and refurbished by pouring contaminated mercury into other containers for recovery or disposal, and then flushing the traps of residual mercury with steam. This practice reportedly led to saturation of the ground with mercury and the need to post the area to prevent inadvertent entry. Maintenance practices were subsequently revised to discard and replace the mercury-filled traps, and multiple spent traps were transferred in drums to waste management for storage and disposal.

In the mid-1970s, the first evidence of technetium-99 began to appear in X-326 equipment. Some of the instruments became heavily contaminated with uranium compounds and technetium-99. Reportedly, the majority of space recorder background radiation came from technetium-99 that had plated out in the system. Instrument mechanics reported its frequent presence in instrument lines as a dark, gooey sludge having the appearance of black tobacco juice. The presence of technetium-99 resulted in significant clothing and personnel contamination and was difficult to remove. Discussion with instrument mechanics indicated that they were also concerned with the infestation of black widow spiders, since the spiders appeared to seek out the warmth of the cascade equipment cubicles and line recorders.

Industrial Hygiene and Health Physics reports generally document good use of personal protective equipment by the instrument mechanics. The instrument mechanics who were interviewed indicated that use of personal protective equipment was not always enforced, leaving it to the individual to ensure his or her protection. Reportedly, management allowed the instrument mechanics to select the personal protective equipment that they felt appropriate or to refuse jobs that they did not believe were safe. Half-face respirators were reportedly required when cutting into process instrument lines.

### Cylinder Valve Replacement

Maintenance personnel removed and replaced defective cylinder valves and, in the 1970s, wore full-face respirators and neoprene gloves during cylinder valve replacement. Full cylinders with positive or unknown pressure, and with intact valves, were repaired in the X-705 South Annex. Full cylinders with

sub-atmospheric pressure were usually repaired at the location where the problem was identified. Valves on empty cylinders were replaced in X-720 or outside in the cylinder yard. The principal hazards to workers engaged in cylinder valve replacement were radiological and chemical, involving the potential for inhalation of and exposure to $UF_6$ and its two hydrolyzed products, hydrogen fluoride and $UO_2F_2$, the "white smoke" frequently referred to in interviews of current and former staff.

In the event of a $UF_6$ release from an open or broken cylinder valve, 1960s procedures recommended using U.S. Army assault gas masks and carbon dioxide fire extinguishers and wooden plugs (the latter to slow and stop the leak). In the early 1970s, procedures required personnel entering the release area to wear neoprene-covered gloves and Army assault masks. When the $UF_6$ concentration was extensive, chemox masks or Scott air packs were specified. By the mid-1970s, emergency procedures required use of Scott air packs and impenetrable suits when entering $UF_6$ releases of unknown concentration. A Three-Plant $UF_6$ Cylinder Handling Committee, which convened in the mid-1970s, recommended a number of changes that impacted PORTS cylinder valve replacement activities. For example, subsequent procedures developed in the early 1980s provided additional guidance on equipment available to secure releases from cylinder valves, including valve cappers, wooden plugs, carbon dioxide fire extinguishers, wet rags with dry ice, and portable freeze-down devices.

### 3.2.7  Incineration of Waste (X-705A)

An oil-fired kiln-style incinerator located in X-705A operated from the mid-1950s until 1971. Although the incinerator was equipped with a cyclone separator to reduce emissions to the atmosphere, heavy black smoke and particulates were released from the stack. In 1971, a new incinerator was placed in service, which employees referred to by the manufacturer's model name, Radicator. The dual chamber Radicator operated until it too was shut down in 1986. Incinerators concentrated residual uranium by incinerating contaminated oil and burnable solids. Contaminated waste oil, paper, plastic shoe covers, cardboard, sweepings, wood, and rags were burned. Incinerator ash was shoveled and vacuumed from the combustion chambers and collected in five-inch-diameter containers to be recycled through the uranium recovery process. Measurable radioactive contamination was present on most surfaces inside



X-705A Incinerator

the 4,000 square foot building. The incinerators and building were demolished and removed in the 1990s. The principal hazard associated with operation of the incinerators was inhalation of airborne radioactive material. Uranium present in incinerator ash was likely in the form of insoluble oxides. Respirators were specified but not normally worn while handling incinerator ash.

### 3.2.8  Work for Others

Generally, PORTS employees did not perform work that did not directly support the enrichment of uranium. At the request of the AEC, Goodyear Atomic Corporation developed a capabilities brochure that was distributed by the AEC to solicit work for PORTS from other Federal government agencies, commonly referred to as "work for others." While hourly rates were developed for PORTS crafts shops and engineering personnel to perform work for others, during this investigation no evidence was found to indicate that such activities were conducted. However, information was obtained concerning two instances where PORTS performed activities to accommodate outside Federal government entities.

From 1955 until 1990, PORTS operated a disposal facility—referred to as X-749A—that accommodated the classified burial needs of PORTS and other DOE and non-DOE facilities. From November 1978 to April 1979, PORTS received a dismantled DOE nickel-working plant and associated equipment that was contaminated with nickel carbonyl and uranium for burial in X-749A. The plant, originally located in Huntington, W.Va., was built in 1952 and operated for DOE by International Nickel Company, Inc. (INCO).

It produced nickel to support PORTS, Paducah, and Oak Ridge. (See Section 4.1 for more information.)

In April 1987, PORTS received from Bettis Atomic Power Laboratory (West Mifflin, Pennsylvania) two boxes for burial at X-749A. The boxes contained specimens that had been developed for (and may have been subjected to) destructive examination, and were neither reactor fuel-related nor contaminated. The specimens were classified due to their design and chemical composition; they were metal shapes clad with either zirconium, a zirconium alloy, or hafnium.

During this investigation, no evidence was obtained indicating that PORTS performed work for others that was directly associated with nuclear weapons production (warhead or delivery system) or the burial of nuclear weapons components. Furthermore, no information was found demonstrating that classified material, such as computer tapes and records, from sources other than PORTS was buried in X-749A.

## 3.3    Operations Summary

A wide range of hazards existed at PORTS, including radioactive hazards, chemical hazards, and common industrial hazards. Radioactive hazards associated with the PORTS gaseous diffusion plant operations and supporting activities include uranium and its daughter products, transuranics, and fission products. The exposure of workers to radioactive materials was monitored, and with few exceptions, records of this monitoring indicate compliance with limits applicable at the time. However, monitoring deficiencies caused exposures to airborne radioactivity to be underestimated, and actual exposures were likely higher than indicated by PORTS monitoring records. This was the case when all radioactivity was assumed to be from uranium, even though airborne transuranic materials were present. This condition occurred in areas such as oxide conversion, uranium recovery, and the decontamination areas during the CIP/CUP programs. The failure to adequately monitor exposures of hands, feet, and eyes in high beta radiation fields, such as those in fluorination tower ash areas and during cylinder cleaning activities, caused exposures of these body parts to be underestimated and could have resulted in exposures exceeding limits.

Since the 1950s, there has been a conscientious effort by line management to identify and quantify worker hazards at PORTS, commensurate with the understanding of those hazards at the time. PORTS operations involved the use of a variety of chemicals and toxic metal hazardous materials. These included solvents (e.g., TCE, carbon tetrachloride, methylene chloride, and benzene), toxic materials (e.g., arsenic, mercury, lithium, chromium, nickel, and beryllium), toxic gases (e.g., fluorine, hydrogen fluoride, welding fumes, hydrogen cyanide, chlorine, chlorine trifluoride and its byproducts, and ammonia), acids (e.g., nitric acid and hydrochloric acid), and fungicides. The hazards and health effects of some of these substances were known from the early years of the Plant's history, such as mercury, fluorides, carbon tetrachloride, and TCE. Conversely, although asbestos and PCBs have been a significant hazard at the Plant since the Plant's construction, the hazards associated with asbestos and PCBs were initially not known, and efforts to sample and quantify airborne levels of asbestos were not initiated at PORTS until the 1970s.

Workers' failure to properly use personal protective equipment and supervisors' failure to enforce its use, especially respirators, contributed significantly to radiation and chemical exposures. Production needs in many aspects of operation and maintenance further contributed to worker exposures to radiation and chemicals. Examples include operating equipment with leaks, removing equipment without adequately venting the systems or removing deposits, and releasing uranium materials to the air without use of confinement systems.

# 4.0 Past Environmental Management Practices

PORTS operations have resulted in the release of a variety of contaminants into the environment through stack and diffuse air emissions; from discharges through sewers into lagoons, local ditches, and streams; through accidental releases; and from past waste disposal practices, such as the burial of low-level and hazardous waste.

Requirements governing the release of chemicals and radionuclides into the environment were limited in the early years of PORTS operations. The AEC established allowable limits for the release of radionuclides into the environment, but Federal and state agencies had few restrictions on discharge and disposal activities until the late 1960s. Releases from U.S. industrial operations during the 1950s and 1960s, including those at PORTS, were significant. Past PORTS operations and spills resulted in the release of radionuclides and chemicals in the vicinity of the Plant and the transport of these contaminants to local streams and groundwater. In 1989, DOE entered into legally binding agreements with EPA and the State of Ohio to remediate the site. Significant activities are still ongoing at Portsmouth to complete the actions governed by these agreements.

> ***ENVIRONMENTAL MANAGEMENT PRACTICES***
>
> - ***Waste Management***
> - ***Management and Disposal of Scrap and Surplus Materials***
> - ***Liquid Effluents***
> - ***Atmospheric Releases of Radioactivity and Fluorine/Fluorides***

## 4.1 Waste Management

- ➢ *Solid Waste Disposal*
- ➢ *Hazardous Waste Management*
- ➢ *Radioactive Waste Management*

During construction and subsequent operations at PORTS, various waste materials were generated that required storage, treatment, and disposal, either on site or at offsite disposal locations. Over the operating lifetime of the Plant, activities to manage these wastes evolved in response to internal and external requirements. The earliest of these requirements addressed controls for solid waste (trash), radioactively contaminated burnable and non-burnable waste, and highly contaminated radioactive waste. In the late 1970s and 1980s, requirements expanded to include hazardous waste (first PCBs, followed by RCRA-defined wastes), as well as tighter controls on contaminated radioactive waste. The organizational approach to performing these waste management functions also evolved from one in which several organizations managed the waste streams they each generated to an integrated approach that began in 1991 under the Waste Management Division.

A construction waste disposal area, operated by the PORTS construction contractor (Peter Kiewit), was the first of the site's disposal facilities and burial sites to be established. This was followed by development of ponds and pits, landfills, incinerators, classified waste burial grounds, and a waste oil biodegradation area. (Table 1 shows the facilities used for solid and containerized waste; ponds and pits are discussed in Section 4.3.) All these sites have been closed, and several are still being investigated and/or remedied under the RCRA closure process. However, interviews with current and former workers and review of historical documents indicated a number of additional locations where disposal or storage activities may have occurred. These locations, discussed in Volume 2, were referred to Plant management for further evaluation.

### Solid Waste Disposal

During Plant construction, the construction contractor used the construction waste disposal area south of the main Plant buildings for solid

**Table 1. Solid Waste Management Treatment and Disposal Facilities**

| Facility Name | Operating Period | Material/Waste | Status |
|---|---|---|---|
| Peter Kiewit Landfill | 1954 to 1968 | Construction waste, sanitary waste | Solid waste closure |
| X-734 Spoils Area | 1982 to 1985 | Construction waste, plastic containers, waste drums, chemical product containers | Solid waste closure; inert capped according to State of Ohio solid waste regulations |
| X-735 Sanitary Landfill | 1981 to 1997 | Sanitary waste, sewage plant coarse screenings, asbestos, floor sweepings in southern portion; northern portion also received solvent-soaked rags | Northern portion of the landfill closed as a RCRA Subtitle C Unit; southern portion closed according to State of Ohio solid waste regulations |
| X-231A Oil Biodeg-radation Plot | 1971 to 1977 | Uranium-contaminated waste oil, solvent-contaminated waste oil, oil-soaked fuller's earth, chlorinated solvents | Temporarily capped in 1987 as part of an interim remedial measure |
| X-231B Oil Biodeg-radation Plot | 1976 to1983 | Uranium-contaminated waste oil, PCBs, solvents | Temporarily capped in 1987 as part of an interim remedial measure |
| X-749 Contami-nated materials disposal facility | Northern portion operated 1955-1990; southern portion operated 1986-1990 | Alumina-trap residue, sodium fluoride, incinerator ash with trace quantities of neptunium and plutonium, chemical trap material contaminated with technetium-99, metal hydroxide sludge from the X-705 raffinate, contaminated roofing | RCRA closure activities included installing slurry walls and groundwater collection trenches in 1991; a multi-layer cap placed over the entire Landfill in 1992; landfill received RCRA certifica-tion in 1993 |
| X-749A Classified | 1955 to 1993 | Classified records; tube sheets; classified floor sweepings; compressor blades; other classified parts; nickel plant; metal shapes clad with either zirconium, a zirconium alloy, or hafnium | Unit capped according to State of Ohio solid waste regulations in 1994; being monitored |
| X-705B Incinerators | 1950s to 1986 | Contaminated solid burnable waste, classified waste, classi-fied floor sweepings, plastic contaminated waste, used oils and solvents | Dismantled and removed |
| Smelter | 1961 to 1983 | Contaminated aluminum | Closed |
| X-705 Salamanders | 1950s to 1970s | Contaminated-waste oils and solvents | Closed |

waste disposal. This location, named after the construction contractor, was called the Peter Kiewit landfill. Following construction, this area became the site's landfill and was operated until 1968. Because of the continuing need for a construction spoils area, the X-734 landfill was established. In 1982, controls for the operation of X-734 were developed, specifying that no radioactive, toxic, or environmentally hazardous substances would be permitted. Although no metal or plastic containers were to be accepted for burial, a 1985 user questionnaire and an environmental audit discovered that the area was, in fact, receiving plastic, chemical product containers, and waste drums. As a result, this area was closed in 1985. Waste materials were then sent to the X-735 landfill, where tighter controls on waste receipt were in place.

General guidelines for generating, containerizing, handling, storing, and disposing of waste were in place even in the early days of the Plant, as indicated by the issuance of an operating method (SPP R-2, "Waste Management") in July 1955. Since a radioactively-contaminated landfill was also used from the early days of Plant operation, the sanitary landfills received only slightly contaminated material, including floor sweepings from the process buildings that were contaminated. In addition, waste was segregated based on the desire to recover enriched uranium, and there was no strict enforcement on many radioactive waste streams that had little recoverable uranium. In the earlier years, sanitary waste was generated from office and cafeteria locations, flooring sweepings, ash from the coal plant, and liquid industrial waste.

By 1968, the Plant had ceased open burning of combustible wastes and established the X-735 sanitary landfill. OR evaluations in the 1970s and early 1980s indicated that this landfill was operated effectively. In



X-752 Scrap Yard with X-734 Spoils Area Directly Behind



X-735 Landfill Area

1981, a specific maintenance method for operating the sanitary landfill was implemented, which prohibited burning of waste materials. This procedure allowed receipt of coarse screenings from the sewage treatment plant, but forbade sewage sludge. Conventional solid waste was disposed of in this landfill, as well as asbestos (in designated and segregated cells). Over time, tighter controls and limits were also adopted for receipt of radioactive material (e.g., the limit set for uranium and technetium was less than 3 ppm for disposal in the X-735 landfill).

As new requirements were enacted, additional items were restricted from the X-735 landfill, including hazardous waste. As part of these new requirements, the landfills were permitted by both the Pike County Health Department and the Ohio EPA in 1989. In addition, internal and external inspections evaluated the effectiveness of controls. These inspections identified numerous concerns about the disposal of non-permitted material, culminating in a 1990 OR surveillance that determined that rags used to remove solvents in the X-720 paint shop were disposed of in the X-735 landfill. As a result, shipment of waste from the PORTS shop areas to the landfill was banned, and part of the landfill had to undergo RCRA hazardous waste facility closure. In late 1991, the Martin Marietta Utility Services Waste Management Division established "Waste Management Information Notification Bulletins" to educate PORTS personnel regarding specific items that were prohibited from disposal in the landfill.

In the early 1990s, increased regulatory requirements mandated the need for a new landfill. However, after Plant operations were split between DOE and USEC, USEC opted to use an offsite vendor

for disposal of solid waste. As a result, DOE elected not to construct a new landfill, and to close X-735 and ship solid waste to the Pike County landfill, beginning in 1998.

## Hazardous Waste Management

In 1970, in response to increased waste management activities, the Power and Utilities superintendent recommended the establishment of a pollution coordinator and creation of a pollution control committee. Previously, the Chemical Operations Division had responsibility for hazardous and toxic material disposal. Liquid waste for most industrial operations was primarily discharged to wastewater treatment and recovery systems as discussed in Section 4.3. In some cases, waste solvents were deliberately dumped on the ground outside of some buildings by maintenance personnel. As a result, the amount of hazardous waste that was containerized for disposal was very limited. As new requirements placed restrictions on the use of these facilities and systems, the Health Protection organization expanded the scope of its responsibilities to include environmental compliance activities. Additional requirements resulted in the formation of a waste management organization within the Environmental Control Department, which worked with Chemical Operations. By 1986, the Environmental Control Department had the lead responsibility for waste management; as the program continued to expand, Waste Management became a separate division.

Contaminated oil was not treated in the liquid treatment systems. Waste oils were treated based on a biodegradable disposal process developed in Oak Ridge. At the request of the Environmental Control Department, maintenance services prepared the X-231A oil biodegradation plot south of Building X-600. This practice began in the 1970s and lasted into the 1980s. During this period, approximately 24,500 gallons of waste oil contaminated with solvent and radionuclides, 124,300 pounds of oil-soaked fuller's earth, 60 gallons of TCE, and 1,000 gallons of chlorinated solvents were applied at the X-231A oil biodegradation plot. The uranium concentration at the plot averaged 5,000 mg/L. Correspondence from this time indicates several problems in operating and controlling the waste, including the presence of drums, which increased the risk of an uncontrolled oil release. Resource limitations prevented the proper application of fertilizer and the required tilling and/or disking activities. Over time, controls were implemented to



**Biodegradation Plots (Beyond Cooling Towers)**

prevent regulated waste streams from being placed on the plots; however, a June 1982 OR appraisal indicated that these controls were not always effective. A second plot (X-231B) continued to be used after the X-231A plot was closed in 1977. A July 1984 State of Ohio EPA inspection of X-231B found that no records were kept on quantities of solvents applied, that monitoring was not occurring in the unsaturated zone, and that closure and post-closure requirements needed to be addressed. By 1988, the State of Ohio EPA sent a notice of intent to file suit for hazardous waste violations. These violations included: operating the X-231B oil degradation facility without a permit; failing to establish an unsaturated zone monitoring program for X-231B; and placing hazardous waste on the X-231B plot without establishing a land treatment program or demonstrating that the waste would be completely degraded. As a result, the plot was closed and monitored for the presence of volatile organic compounds, PCBs, metals, and radioactive constituents.

As concerns regarding the management and disposal of PCBs increased in the early 1970s, both Monsanto and the AEC provided safety-related information to the Plant. In 1979, the Plant provided guidance to workers on the disposal of PCB-contaminated items. Disposal limits were set, and potential sources were evaluated for the presence of PCBs, which led to the discovery that very large gaskets in the process building ventilation systems had been treated with PCBs. These gaskets had been dripping oil that was found to significantly exceed the regulatory limit for PCBs of 50 ppm. In 1983, the Environmental Control Department determined that Chemical Operations personnel were mixing the absorbent material used for cleaning the drips with the regular floor sweepings before this mixture was sent to the

landfill for disposal. The drippings were also radioactive because the ventilation systems handled air from contaminated areas in the process building. The problems with management of PCBs required PORTS to work closely with EPA, and although some progress was made, a 1988 internal DOE memorandum stated that "the overall effort is entirely insufficient to meet the commitments made to EPA." The Tiger Team assessment also identified the absence of formal PORTS procedures to fully implement PCB cleanup standards, and as a result, a PCB implementation team was established.

Attempts were made to clean ventilation ducts to remove the collected contaminated oil; however, the extent of the problems indicated the need for a different approach involving a collection system consisting of troughs below each gasket and connected to drain lines. The collected liquids were managed as contaminated PCB waste that was later determined to have RCRA constituents. Criticality concerns dictated that the liquids be collected in polyurethane bottles to maintain configuration control until the radioactive content could be determined. Although USEC leases and operates the process buildings, this operation remains a DOE responsibility since PCBs are considered a DOE legacy waste.

In addition to PCB in the gaskets and electrical transformers, PCBs were also found in other locations and processes at the site. Historical review of records and transcribed interviews indicate that PCBs and uranium-contaminated oil were sprayed on gravel roads around PORTS as a means of dust suppression. The presence of PCB-contaminated sludge at the site's sewage treatment plant (the sludge had been used as fertilizer), drying beds, and concrete walls resulted in development of a 1983 *Operating Method for Handling Polychlorinated Biphenyl (PCB) Waste*. In the early 1990s, an incinerator at Oak Ridge was permitted to combust PCB waste that, due to radioactive contamination, could not be handled at commercially licensed TSCA disposal facilities. However, the limited capacity of the incinerator, combined with the large waste volumes from the sewage treatment plant, the gaskets, and personal protective equipment used during drip and spill cleanup, has resulted in the majority of this TSCA waste remaining in DOE Material Storage Areas in process buildings.

As RCRA regulations were being developed, PORTS identified resources and processes that would be necessary for compliance. A 1980 OR Environmental Management appraisal indicated progress in characterizing and handling hazardous

waste. These actions began in early 1980 at the request of OR. As a generator, the Plant obtained EPA number OH890008983, which allowed hazardous waste to be sent to offsite disposal vendors. PORTS developed permit applications for those facilities that would be used to treat, store, and dispose of hazardous waste. Additional actions included identifying all waste streams and the current disposal path. Ultimately, the Plant did not submit permit applications because DOE determined in 1980 that all AEC authorized activities were exempt from RCRA, although DOE did finalize development of a system to manage hazardous waste. The Environment Control Department was the lead PORTS organization in implementing these actions, supported by numerous other departments. The Maintenance Division was tasked to operate the X-752 Warehouse as an "interim status" RCRA facility after the facility had been modified to meet interim standards. A Plant waste manifest system was developed to obtain information mandated by Federal regulations for processing offsite manifests.

Although actions were taken to identify and then control regulated waste, these actions were not always effective. As a result, regulated waste was discovered in several non-permitted facilities on the site, which then required a costly RCRA closure and the loss of a feasible disposal option. As an example, between August 1984 and June 1985, approximately 85,000 pounds of metal hydroxide sludge from the X-705 raffinate was incorrectly disposed of as non-hazardous waste based on an initial characterization; this material later failed the EP Toxicity (leachability) Test for cadmium. Since this sludge had been disposed of in the X-749 radioactive burial ground, the State of Ohio EPA required a RCRA closure.

After a June 1987 EPA and DOE agreement specifying that RCRA requirements did apply to DOE facilities, permit applications were submitted to both EPA and the State of Ohio EPA. These applications included the X-752 facility and later the X-744G storage facilities, as well as several liquid and solid disposal facilities that are discussed in other sections of this report. Although the X-744G facility had been used for several years to store spent chemical trap materials, miscellaneous dried sludges, and ash from the X-705 incinerator, it was not until the late 1980s that sampling identified the presence of RCRA wastes in several of these waste streams. Due to security requirements for storing specific levels of radioactively contaminated waste, the X-326 L Cage was also added to the permit application.

Numerous inspections by the State of Ohio EPA, DOE (e.g., Tiger Team assessment), OR, and internal organizational elements continued to identify performance problems in the treatment, storage, and disposal of hazardous waste. Primarily as a result of the Tiger Team assessment and the State of Ohio EPA inspection, the waste management function was centralized in 1990s under the newly created Waste Management Department. This Department implemented many improvements, including locating dedicated field services representatives in the major facilities to assist generators with waste packaging and characterization. A very conservative approach was adopted whereby waste was considered hazardous unless clearly shown to not meet regulatory thresholds. This conservative approach, combined with a DOE moratorium on shipping radioactively contaminated waste off site, required development of increased storage capacity for mixed and hazardous waste. Therefore, in 1990 PORTS requested that the State of Ohio EPA grant an exemption allowing storage of hazardous material in the X-7725 facility without a permit. Following this request, the X-7725 facility was upgraded as a compliant permitted RCRA facility. This facility currently stores all Plant mixed and hazardous waste, with the exception of the mixed hazardous waste that has special security requirements and remains in the X-326 L Cage.

## Radioactive Waste Management

In the early days of Plant operations, the desire to recover uranium dictated controls for handling contaminated materials. Highly contaminated equipment and scrap metals were decontaminated for the recovery of enriched uranium before disposal, resulting in removal of loose contamination before the equipment or waste materials were buried or further processed on site. X-749 was the main disposal site for low-level radioactive waste (LLW). Additionally, key elements of the PORTS radioactive waste management strategy have been the burning of contaminated oils in trays, salamanders (a primitive device consisting of an upright tube mounted on a base), and incinerators and smelters.

Open burning of contaminated oils occurred from the 1950s into the 1970s. In 1959, a nuclear safety evaluation of criticality concerns in the X-705 area reported that unsampled hydrocarbon oils were being burned in three 18-inch diameter salamander oil burners. Several former workers involved in this operation stated that these oil burners were used on the west side of X-705 and that the residual ash was collected for reprocessing. A 1973 OR health protection appraisal revealed that the smoke from the salamanders (believed to contain phosgene gas) was introduced into the ventilation system and released into the X-705 high bay.

Starting in the mid-1950s, two oil-fired incinerators were installed and used to thermally decompose waste materials. One was used to destroy security burnables; the second was used for uranium-contaminated wastes generated from Plant operations. Several former employees stated that this second unit burned solid and liquid wastes and routinely produced heavy black smoke. Little documentation regarding the operation of these units was available; however, the 1962 OR health physics review stated that the incinerator was equipped with a cyclone-type filter and was not a significant contributor to environmental contamination. A 1970 internal Goodyear Atomic Corporation memorandum indicated that funds had been approved to replace the existing incinerators because they were inefficient, needed repair, and did not meet smoke and particulate emission standards.

In 1971, a pre-engineered incinerator was installed on the south side of Building X-705 at the same location as the previous waste incinerator. An air pollution source permit for operation of the incinerator was filed with the State of Ohio in 1976, and the incinerator was placed on the State registry. Several years later, an enclosure with support facilities was constructed. The Radicator (the manufacturer's product name used by Plant employees) served an important role at PORTS in the destruction of burnable waste materials collected from approximately 100 Plant locations. Use of the Radicator allowed valuable space in the X-749 low-level waste landfill to serve other uses. Incinerator ash was sampled, and if economically beneficial, the ash was sent to the X-705 uranium recovery facility. Ash with lower levels of uranium was boxed and disposed of in the X-749 landfill. Operators indicated that during the CIP/CUP initiative in the 1970s, floor sweepings were collected from areas where classified components were managed and incinerated, and the resulting ash was disposed of in the X-749A classified landfill.

A number of problems were encountered with operation of the Radicator. A July 1972 memorandum noted that winds scattered contaminated burnables and caused fine-particulate incinerator ash to become airborne, presenting a health physics hazard to personnel in the area. Although the Radicator was to be smokeless, there were periods when smoke was

observed by employees at the incinerator and by occupants of a nearby building. In 1984, the Radicator was smoking due to the heavy plastic disposal demand, which caused incomplete combustion. A Plant-wide notice directed operating organizations to deposit plastics in scrap barrels, not in burnable barrels. In 1986, two events occurred involving malfunction of the Radicator, causing the intake of smoke into the ventilation system of Building X-700, located only 200 feet from its stack. An incident report noted that the Radicator was improperly loaded with non-combustible items, that atmospheric inversion conditions prevented the vertical movement of stack gases, that deteriorating refractory lining caused heat loss and incomplete combustion, and that there was a lack of a preventive maintenance program.

Radicator operating limits were not clear to the operators, resulting in inappropriate introduction of oils and solvents to the incinerator. According to PORTS documents, between August 1984 and April 1986 the operators improperly introduced used oil and solvents into the incinerator to enhance combustion. In response to this discovery, on August 8, 1986, OR ordered that the Radicator be shut down pending development of specific procedures regarding receipt of acceptable wastes. The State of Ohio subsequently revoked the facility's registration status. Subsequent testing of the oils, solvents, and incinerator ash determined it to be hazardous waste pursuant to RCRA due to the presence of cadmium and barium. The facility never restarted and was closed under RCRA authorities in the 1990s. The termination of Radicator operations has contributed to the buildup of 1700 containers of legacy burnable waste materials that are currently stored on site. Additionally, the Plant continues to store residual incinerator ash. Analysis of this ash indicated that it contains enriched uranium and trace quantities of neptunium, plutonium, and hazardous metals. The operation of the incinerator also impacted the environment surrounding the facility, primarily through airborne particulates from the incinerator and through spills and runoff from the storage lot.

The X-749 landfill reportedly received alumina-trap residue, aluminum oxide, sodium fluoride, and incinerator ash totaling 134.2 cubic feet in 1961 when the AEC began requesting maintenance of disposal records for LLW burial. Throughout the 1960s and the early 1970s, annual disposal volumes remained in the hundreds of cubic feet, with a high of 468 cubic feet in 1965. In 1976, a report on LLW disposal at PORTS stated that much of the chemical trap material contained technetium-99, which is highly water-soluble. After that finding, this material was placed in sealed packages; however, this action followed nearly 20 years of disposal of chemical trap waste without the benefit of sealed containers. The report recommended no changes in the burial practices, since there was no evidence that solid radioactive wastes were leaching into the groundwater. In an apparent contradiction, the report recommended that percolation rates, infiltration rates, and porosity tests be conducted to determine the need for future changes in burial practices. Also recommended was the establishment of guidelines on the structure of burial containers, recognizing that using aluminum canisters for chemical trap material "obviously will confine fluorides and long-lived radionuclides for only a limited time."

Controls for disposal at X-749 were increased, and sealing of trap material continued. However, not until 1979 was action taken to develop a burial ground operating specification and provide training to address burial ground operations. In addition to the waste discussed above, contaminated roofing material, asbestos, concrete, light bulbs, and other non-burnable waste were disposed of in the trenches. Due to the inappropriate burial of waste that was determined to be regulated under RCRA, the landfill was closed at the direction of the State of Ohio EPA. Since the closure would significantly impact the site's disposal options, a concerted effort was made to place all waste that met regulatory limits in the landfill before it closed on May 15, 1990. This led to disposal of large volumes of waste that included contaminated vehicles, equipment, and the contents of large converter shells.

Burial of classified material and waste in X-749A began shortly after the Plant began operating. Early controls focused on meeting security requirements. Records show that very large amounts (250 to 300 tons) of material were disposed of, including tube sheets, and related hardware; classified floor sweepings; compressor blades; and other classified parts and records from the Plant. Extensive discussions with PORTS personnel indicate that, with one exception, only material used in or in support of the gaseous diffusion processes was buried in X-749A. This exception occurred in 1987, when two boxes of specimens from Bettis Atomic Power Laboratory were buried. Details on the contents of these two boxes are discussed under Work for Others in Section 3.2.8.

One of the largest items buried in X-749A was a nickel plant from Huntington, West Virginia. This plant, called the INCO (International Nickel Company) Nickel Plant, had been built in 1951, used until 1963, then maintained by INCO on backup status until the

AEC decided that the plant was no longer required. This plant had provided material to the Department's gaseous diffusion plants. Since the plant contained material and equipment that was still considered classified, a decision was made to bury the plant at PORTS. Investigations by a PORTS industrial hygienist identified several health and safety concerns, including asbestos and nickel carbonyl. Sampling of residual material and surfaces also indicated the presence of uranium. Special precautions were required for the asbestos, and National Emission Standards for Hazardous Air Pollutants applied to the removal and burial activities. The demolition, transport, and burial involved personnel from OR, PORTS, the plant owner (INCO), and two subcontractors. INCO supervised the demolition activities that began in late 1978, resulting in over 50 truckloads of material being transported to PORTS for burial in the classified landfill.

## 4.2 Management and Disposal of Scrap and Surplus Materials

Large volumes of scrap metal and surplus material were generated during construction, maintenance, repair, and facility upgrade activities at PORTS. These materials were either managed as waste or stored and managed as a commodity for resale. Much of the material was contaminated, and large volumes were disposed of on site. Additionally, large volumes of scrap remain in storage at the Plant pending future disposal or disposition.

Records indicate that Goodyear Atomic Corporation management was aware as early as the 1950s that contaminated surplus materials could only be shipped to properly licensed and authorized recipients, and that radiological monitoring of all potentially contaminated materials being offered for public sale was required. The handling and disposal of scrap materials were subject to a corporate waste management procedure that defined the manner of disposal and proper segregation for the different types of scrap and waste material generated. While contamination limits and specific categories changed somewhat over the years, scrap material was required to be segregated by contamination status. Drums or other containers were provided for each of the categories wherever significant quantities of scrap were generated. Containers were supposed to be marked to indicate the type of material that could be discarded in each. Line supervisors were responsible for ensuring that employees segregated all scrap materials appropriately; however, this requirement was not implemented consistently, resulting in the presence of contaminated items at designated clean locations. Many workers who were interviewed do not recall being required to segregate scrap materials and claim they simply placed all scrap materials into the same waste containers. Once containers were full, they would be removed by the Materials and Service Department and taken to the appropriate storage or disposition location. Material categorized as clean scrap was taken to the clean scrap yards for placement and preparation for public sale. Contaminated materials were managed as discussed in Section 4.1 or were sold to properly licensed recipients.

Contaminated aluminum presented unique challenges due to the large volume generated, and was often sent to the onsite smelter to be melted and cast into ingots for subsequent rework or reuse for Plant components or for public sale. These ingots were the subject of continuing concern due to the lack of requirements governing acceptable levels of volumetric contamination. Some ingots containing up to 75 ppm uranium and 1000 dpm/100 cm$^2$ of surface alpha activity were authorized by AEC for sale on the open market in the 1960s. A requirement to include the uranium content of the ingots was a condition of all such sales. AEC also urged disposition of aluminum ingots wherever possible by reworking into components for cascade use rather than public sale. Public sale of contaminated ingots was later discontinued due to the lack of definitive regulatory limits, which continues to present day.

Monthly Industrial Hygiene and Health Physics reports document that Goodyear Atomic Corporation conducted radiological surveys for other types of scrap



X-752 Scrap Yard

and surplus materials released from the Plant via public sale. A 1958 report lists a total of 28 sales, with the monitoring of an estimated 1,346 gross tons of scrap metals. In addition, surplus items, such as 84 vehicles and electrical, plumbing, chemical, and fire fighting equipment, were surveyed for contamination prior to release. A number of similar records and reports addressing radiological monitoring of scrap materials were reviewed during the investigation.

Despite the knowledge and proper corporate health and safety procedures instituted by Goodyear Atomic Corporation for scrap sales, the program encountered a number of problems, highlighted in internal memoranda and documents that began appearing in the mid-1970s. A September 1976 memorandum from Industrial Hygiene and Health Physics advised that insufficient manpower had resulted in an inability to survey each load of scrap unloaded at the concrete pad near Warehouse 15 and that recent surveys had identified a number of contaminated items. The problem escalated to a point that in September 1979, Industrial Hygiene and Health Physics recommended discontinuing the sale of scrap materials, based on concerns identified during an internal audit of the clean scrap yard. The problems included equipment directly associated with process gas, including blades, instrument lines, and peanut valves, present in material being loaded by a buyer. Surveys of these items indicated they were "highly contaminated." The buyer also stated that he had previously purchased similar items; no evidence was provided to indicate that the Plant conducted any follow-up actions. Other concerns included observing unmonitored scrap and debris being dumped into the yard and handled by the buyer without the use of gloves. In addition, process housings with visible contamination were observed in the yard. In 1980, Goodyear Atomic Corporation issued a revised plan for control of scrap and trash material, along with a revised waste disposal procedure. Despite these changes, additional problems were noted in 1981 and 1982 during follow-up inspections at the clean scrap yard.

It is clear that the Industrial Hygiene and Health Physics Department was aware of problems and made significant efforts to properly segregate contaminated materials from clean materials intended for sale to the public. However, given that the responsibility for proper scrap handling rested with line management and that only a small number of qualified health physics personnel was available to perform radiological surveys, it is evident that material exceeding appropriate radiological release guidelines was released from the Plant periodically from the 1950s through the 1980s.

## 4.3 Liquid Effluents

> *Regulated Outfalls*
> *Routine Historical Discharges*
> *Accidental Spills*

Liquid effluents have been routinely discharged from the Plant and from accidental spills and releases. Effluents were historically released in a number of ways, including via the sanitary sewage and storm water drainage systems. Effluent material that was not otherwise held up or recovered through wastewater treatment facilities and recovery systems flowed to the various Plant outfalls and ditches and ultimately into the Scioto River. Little Beaver Creek, which received effluent from the east and north sides of the Plant, received the vast majority of Plant effluents and discharged into Big Beaver Creek. Big Beaver Creek flows into the Scioto River.

The environmental monitoring program at Goodyear Atomic Corporation was initiated in 1955. Since that time, effluents have been analyzed for radioactive contaminants from the Plant's east and west drainage ditches and the south holding pond. Additionally, cooling water blowdown was monitored for chromium prior to being piped directly to the Scioto River. The Ohio Pollution Control Board adopted standards to govern public water supplies in April 1970. Goodyear Atomic Corporation established an Environmental Control Committee during April 1971 to determine the most effective program to ensure compliance with the new regulations. The Goodyear Atomic Corporation Environmental Control Department was created on June 1, 1971, to be responsible for compliance with the new regulatory activity. This department expanded as additional regulations were established.

### Regulated Outfalls

In the early 1970s, the Clean Water Act established the National Pollutant Discharge Elimination System (NPDES), which administered effluent limitations and water quality requirements for chemical releases. In 1973, sampling began in support of the NPDES permitting process whose requirements were finalized in 1975. In 1976, a chromium reduction facility for

treating cooling water blowdown before it was piped to the Scioto River was built to meet the requirement of the NPDES permit. Liquid discharge locations were maintained and monitored by the DOE and regulated by the State of Ohio.

Over the years, monitoring data from the Plant outfalls have been distributed as part of the annual site environmental report. The number of regulated outfalls has varied with Plant expansions and improvements. In the mid-1980s, there were as many as 18 NPDES outfalls, including the east drainage effluent, the X-701B holding pond, the south holding pond, the sewage treatment plants, the recirculating cooling water blowdown, X-611 sludge lagoon outfalls, and the three former Gas Centrifuge Enrichment Plant outfalls. Chemical parameters routinely monitored at the outfalls included total dissolved solids, biochemical oxygen demand, total suspended solids, oil and grease, total residual chloride, trace metals, nitrate, and ammonia. Liquid effluent discharge limits for radionuclides were not specifically promulgated by EPA but were always required and published under the AEC and ERDA regulations and later documented in DOE orders as maximum permissible concentrations or radioactive concentration guides in water. Despite the discharge restrictions, it is clear that enough radionuclides and chemicals have been released to create legacy environmental contamination. The existence of legacy contamination has been confirmed through environmental sampling data.

The X-615 sewage treatment facility was built in 1953 as part of the original infrastructure during Plant construction. The facility was intended to receive conventional sanitary waste from the process and support buildings, from such sources as sinks and floor drains. The facility was designed as a secondary treatment system using a primary clarifier, a high rated trickling filter, and a secondary clarifier with provisions for recirculation through the trickling filter. In the 1970s, a post-chlorination process was added to treat the effluent before discharge to the Scioto River. The influent to X-615 contained radionuclides, resulting in the generation of digested sludge that contained LLW. The sludge was either spread on the land adjacent to X-615 or used as fertilizer at PORTS. In the 1980s, PCBs were found in the sludge, resulting in the sludge being boxed and stored. The X-615 sewage treatment facility was replaced with X-6619 during the construction of Gas Centrifuge Enrichment Plant facilities in the mid-1980s. The X-6619 sewage treatment facility is an activated-sludge facility

utilizing the plug flow process, aerobic digestion, secondary clarification, and granular-media filtration for effluent polishing (tertiary treatment). This plant received sewage and non-conventional wastewater, such as the X-705 laundry effluent, mobile equipment maintenance shop discharge, and developer and fixer used in x-ray and microfiche development. In addition to receiving sanitary effluent from the process and support buildings, the new sewage treatment plant received effluents from the three DOE remediation pump and treat facilities. In these DOE facilities, groundwater is treated for VOCs and then the effluents containing uranium, thorium, technetium and trace transuranics are released to X-6619. The sludges from X-6619, contaminated with radionuclides and PCBs, are boxed and stored as mixed TSCA and radioactive waste. The facility effluent is discharged into Outfall 003, the upper end of a subsurface pipeline to the Scioto River.

The NPDES outfall that contained the recirculating cooling water (RCW) normally had the highest flow rate and volume. Over the years, the treatment of the RCW has been improved in order to remain in compliance with NPDES standards. At the onset of Plant operations, hexavalent chromium had been used as a corrosion inhibitor in the eight cooling towers at the Plant. In 1976, hexavalent chromium was reduced to the less toxic, trivalent form in the X-616 chromate reduction facility, thereby eliminating the more toxic, hexavalent chromium from the discharge stream. In 1991, PORTS converted the RCW treatment from a chromium-based corrosion inhibitor to a non-hazardous phosphate-based inhibitor. Currently, the RCW is discharged to the Scioto River through a separate pipeline.

## Routine Historical Discharges

Historically, the most significant liquid radiological effluent source was from the X-705 Decontamination Building, which has been used since 1955 for decontaminating and monitoring equipment exposed to uranium compounds and for recovering uranium from decontamination solutions. Operations within the X-705 Building, described in Section 3.2.4, include equipment decontamination, uranium recovery, uranium hexafluoride cylinder decontamination, a laundry service, and a chemical laboratory. The operation of this facility resulted in the release of significant quantities of chemicals, uranium, technetium, and smaller amounts of plutonium and

neptunium into the environment through the X-701B holding ponds.

Most X-705 process effluents have historically been discharged to the X-701B holding pond. The last rinse booth of the large equipment decontamination tunnel was converted to a recirculating system upon the deactivation of X-701B in 1988. In 1977, interdepartmental correspondence documents that effluents from the cleaning facilities were found to be bypassing the X-701B holding pond and discharged directly to the east drainage ditch leading to Little Beaver Creek. A contract was let to divert the effluent to the X-701B holding pond after this condition was discovered.

Uranium recovery for the entire Plant was accomplished at a solution recovery facility located within X-705. Feed solutions were digested with nitric acid, then concentrated, extracted, and calcined to produce uranium oxide. Effluents were discharged to the X-701B holding ponds. Solutions from this process were subsequently treated by a microfiltration system that was installed in 1988. This system uses microfiltration and pressure filtration technology to treat all process waters produced in the X-705 Building. Nevertheless, in the past, uranium has been the principal radioactive constituent released to the X-701 holding pond, comprising 92 percent (76.5 kg) of the total radioactivity in 1969 and 90 percent (117.0 kg) of the total in 1970.

The X-705 facility also provided laundry services for protective clothing and operated a chemical analysis laboratory. Dilute chemical solutions were discharged to X-701B during its operation. Various other sources of discharge from X-705 are known to have occurred. Some floor drains in X-705 discharged to X-701B prior to 1988. This discharge was estimated to be about

400 gallons per month. Foundation drains, roof drains, steam condensate, and cooling water were discharged via two basement sumps, each averaging 8,800 gallons per day. One of the sumps discharged into X-701B prior to 1988. Currently, the basement sump effluent is piped to the X-622T treatment facility, where it is treated through carbon filtration.

Starting in 1975, Plant records reveal that elevated technetium and transuranic contamination was unexpectedly discovered in liquid process effluents from the X-705. Before then, radiological effluent monitoring was only conducted for uranium and indicator parameters. The PORTS environmental monitoring program did not include these contaminants, which were known by Plant management to have been introduced into PORTS industrial facilities from the processing of reactor returns and from Paducah production feed material. Based on the information collected, it does not appear that personnel responsible for environmental monitoring were aware of the presence of these contaminants at PORTS.

In September 1975, the beta-gamma activity in the east drainage ditch sharply increased, judging by samples from the east drainage ditch immediately before it joined Little Beaver Creek. The Chemical Analysis Department identified the major source of this activity as beta radiation from technetium-99. The weekly sample collected on September 29, 1975, showed a technetium-99 concentration of slightly in excess of the discharge concentration guideline for uncontrolled areas. Studies by the Process Technology Department indicated that all of the technetium in the drainage ditch originated at X-705. Major radioactive effluents at X-705 were temporarily curtailed until a remedy could be put in place. By December 1980, technetium-99 levels in the discharge from the east drainage ditch had increased by approximately 350 percent over previously reported levels. Mass balances performed based on technetium-99 discharged from X-701B and Outfall 001 showed that the technetium-99 from Outfall 001 was being discharged from the X-705 Building through the X-701B holding pond. Uranium recovery raffinate discharges accounted for approximately 25 percent of total discharges of technetium-99. Other operations that had resulted in elevated technetium-99 discharges in the past were investigated and cleared. It was determined that most of the technetium was associated with rinse water from the equipment decontamination tunnel, which bypassed the uranium recovery system. The increase in technetium-99 discharges occurred shortly after the initiation of equipment changeout in the X-330/X-326



X-701B Holding Pond

process buildings. A technetium treatment system was proposed in the late 1970s and installed in the early 1980s to reduce the levels being discharged into the environment.

By 1976, transuranics had also been identified in raffinates generated by the recovery of uranium from contaminated equipment and materials processed in X-705. These raffinates were discharged to the X-701B pond. Subsequent monitoring detected transuranics at significant levels in sludges from this pond and in the effluents from the pond to the east drainage ditch. Transuranics in the effluent originated primarily in reactor-return materials processed in the X-705 Building. As an outcome of these findings, a committee was formed in December 1976 to study Plant-wide aspects of the transuranic contamination. Developing more sensitive analyses for transuranics was among the top priorities. At the time, the Goodyear Atomic Corporation analytical procedures had a limit of detection that was equal to about 7 percent of the ERDA recommended concentration guide for neptunium-237. The committee determined that the detection limits would have to be lowered to increase the effectiveness of the environmental monitoring program. In 1977, Goodyear Atomic Corporation investigated transuranic contamination in sediments in Little and Big Beaver Creeks and identified low levels of plutonium and neptunium contaminants at some of the locations sampled. Sampling for transuranics in environmental media was terminated in the mid-1980s and until recently has not been a priority of the site.

The X-701B holding pond was a major effluent source to Little Beaver Creek. It was an unlined pond used for the neutralization and settling of metal-bearing waste water, solvent-contaminated solutions, and acidic waste water. Most of the waste discharged to the pond originated at the X-700 Chemical Cleaning Facility and the X-705 Decontamination Building, which was described previously. The X-700 Chemical Cleaning Facility contained, among other cleaning processes, two vapor degreasers, one of which had been in operation since 1955; the other had been used from 1955 until the early 1980s, when it was deactivated and removed from the building. TCE was used for degreasing until 1987; 1,1,1-trichloroethane has been used since. Floor drains in the basement of X-700 previously emptied into a ceramic pipe that discharged into a sump in the basement of X-700. The sump contents were then discharged to the X-701C pit, prior to entering the X-701B holding pond, until the pit was closed in 1988. This was a major source of TCE in X-701B and the entire east drainage ditch area.

From 1974 until 1988, slaked lime was added to the X-701B influent to neutralize the low pH and induce precipitation of uranium and trace quantities of transuranics. This precipitation caused a large amount of sludge to accumulate in the pond and necessitated annual dredging of the sludge. The X-701B holding pond was constructed early in Plant operations and received process discharges until November 1988.

## Accidental Spills

In addition to the continuous discharge of process waste to primarily Little Beaver Creek, there have been numerous spill events throughout the history of the site. A variety of historical spill events and accusations of spills were reviewed as part of this investigation. The Ohio EPA emergency response records from 1978 to 1988 contained 23 reported spills at the Plant. Six of the reported spills affected watercourses adjacent to the Plant. Site records indicate dozens of other spills that were identified and investigated by Plant management. Materials commonly spilled were $UF_6$, PCB oil, and sodium hydroxide. Other materials spilled include road binder, chlorine wash water, ferric sulfate, gasoline, mercury, Freon, sulfuric acid, TCE, uranium, and lubrication oil.

Several fish kills in surrounding creeks have resulted from spills at the Plant. Ohio Department of Natural Resources fish kill records from 1970 to 1986 contained eight fish kill investigations. Over the years, most kills were due to oxygen depletion in the stream water rather than toxic conditions caused by hazardous chemicals. Instances of fish kills include:

- In 1955, a fish kill occurred in Little Beaver Creek as the result of the oxygen balance being temporarily upset by lignins washing from the X-633 cooling tower, causing a noticeable dark brown color in Little Beaver Creek.

- On April 17, 1978, several hundred dead fish were discovered in Little Beaver Creek, downstream from the confluence of the east drainage ditch. After a site investigation, the only anomalous condition discovered was the presence of elevated metal (aluminum, nickel, copper, and zinc) concentrations in the fish and creek sediments. The source of these metals was determined to be the X-701B holding pond.

- On January 24, 1980, Environmental Control Department surveyors discovered a high pH discharge at the east drainage ditch outfall. Further

investigation revealed the presence of sodium hydroxide (caustic soda) from the X-330 Nitrogen Plant in Little Beaver Creek and a number of dead minnows.

- On October 31, 1983, a fish kill due to a sodium hydroxide spill killed approximately 5,800 fish in Big Run Creek and resulted in restitution to the Division of Wildlife.

On occasion, nearby property owners have filed complaints of cattle kills with the Plant. PORTS personnel conducted a number of investigations; however, Plant emissions were not identified as a contributing cause in these investigations. One such case occurred in January 1955, when six dairy cows died on a dairy farm near the town of Wakefield. The farm was adjacent to Big Run Creek, and the owner associated the deaths in the herd with activities at the Plant. Onsite and offsite sampling of the creek was performed directly above the farmer's property. Autopsy findings and the stream water analytical results did not link the deaths of the animals to Plant discharges. This conclusion was reinforced when the results of experiments with white rats were reviewed. Creek water from the drainage near the farm was given to the rats for a period of two weeks, and they developed no clinical signs of illness.

## 4.4 Atmospheric Releases of Radioactivity and Fluorine/ Fluorides

➢ *Stack Emissions*
➢ *Accidental Releases*
➢ *Diffuse and Fugitive Emissions*
➢ *Planned or Unauthorized Releases*

Radioactive and fluorine/fluoride air emissions to the atmosphere began with Plant startup in 1954 and have continued to the present from USEC operations that are regulated by NRC. The sources of air emissions were process stacks (which included routine releases), diffuse and fugitive emissions, accidental releases, and some likely planned or unauthorized releases. During the early years of Plant operation, environmental monitoring activities focused primarily on characterizing liquid effluents to ditches and streams. Air sampling at various onsite and offsite locations was not initiated until the mid-1960s in an effort to better characterize and analyze the potential impact of radiological and non-radiological contaminants (e.g., fluorides) on the public and the environment.

PORTS has estimated that approximately 10,545 kg of uranium, comprising approximately 8 Ci, and 27 Ci of technetium-99 have been released to the atmosphere from 1955 to 1993. These emissions and the potential resulting population dose were reported by OR as the lowest of the three gaseous diffusion plants. This may be attributable in part to the increased costs, tighter limits, and related economic factors associated with production of higher assay enriched uranium.

Nearly half of all the estimated uranium released to air at PORTS was attributable to one accidental release from a 14-ton cylinder in 1978. Another 30 percent of the total uranium released is estimated to have been released during the first eight years of Plant operation, during the time that the Feed Production Plant was operational. Uranium releases dropped significantly in 1963, coinciding with the shutdown of the Feed Production Plant. Approximately 19 of the 27 estimated curies of technetium-99 were released in 1982 and 1993, corresponding to increased cleaning and maintenance of contaminated cascade equipment during those periods. While technetium-99 was known to be present in feed materials as early as the mid-1960s, it should be noted that Goodyear Atomic Corporation did not believe that any significant amounts of technetium-99 were released prior to 1975 because of relatively low beta-gamma radiation that had been measured in effluents before then. A marked increase in beta-gamma activity was discovered in 1975, well above that which could be attributed to uranium daughter activity. This led to further analysis and the conclusion that technetium-99 contamination was a potentially significant contributor to radionuclide emissions. While technetium-99 was likely introduced into the cascade feed long before 1975, the expected time period for significant accumulation and its ultimate release from the cascade was never established. The calculations and methods for evaluating radionuclide discharges were not located during this investigation.

The release of fluorides is often closely correlated with releases of uranium, because airborne releases of $UF_6$ hydrolyze with the water vapor in air to form hydrogen fluoride. However at PORTS, due to Plant design characteristics, fluorine and fluoride compounds were used in significant quantities and were required to be vented directly as waste gases. The baseline quantity of fluorides released annually at PORTS from routine operations has been estimated to be on the order



Roof Vent from X-330

of 20 to 30 tons. Concern over the need to vent fluorine and the associated environmental and human liability problems was expressed in an August 30, 1954, memorandum from the Goodyear Atomic Corporation Portsmouth General Manager to the Goodyear Atomic Corporation corporate legal department in Akron, Ohio. In the memorandum, fluorine was described as an extremely toxic and highly reactive chemical. Potential damage to foliage, crops, and livestock is discussed, as are concerns with exceeding recommended standards for air concentrations to humans. The memorandum also indicated that it was the intention of PORTS to modify Plant design within 6 to 12 months to preclude the need for venting fluorine to the atmosphere under conditions other than an emergency. Follow-up correspondence to this memorandum was not located during the investigation. Venting of fluorine has continued since the initial operation of the Plant.

## Stack Emissions

PORTS did not perform continuous vent monitoring of radionuclides or fluorides until the mid-1980s. However, the collection of grab samples and the use of space recorders provided a means of calculating the quantity of fluorides and uranium released through process stacks before then. While space recorders provided a monitoring capability for uranium, this method was far from ideal, and numerous limitations associated with the use of this instrument in emission calculations have been noted over the years, including calibration, maintenance, and procedural problems. For example, a January 1979 memorandum indicated that the X-326 top purge space recorder had been out of service for over one year. There were also recurring contamination problems associated with space recorders that rendered the data from these units unreliable for release estimation. Grab sampling techniques, which could also be used, were considered unacceptably prone to error. A Vent Committee was formed in the early 1980s to study the atmospheric vents, and a report was issued in 1985 recommending that continuous samplers be installed on a number of process vents.

Before 1984, the main source of radionuclide and fluorine releases from routine diffusion operations was the X-326 top and side purge cascade vent streams. Operational changes in 1983 reduced purge cascade radionuclide emissions to within an order of magnitude of the next two largest sources of gaseous emissions—the X-330/X-333 cold recovery and wet air evacuation system vents. Other smaller emission points included the X-345 and X-744G sampling facilities. The Feed Production Plant contributed approximately 407 kg of uranium (0.22 Ci) per year to total sitewide radionuclide emissions from 1958 until its closure in 1962. No estimates of routine releases from the oxide conversion facility were identified, since this facility did not contain process stacks. However, as discussed below, this facility was also a likely source of some radionuclide releases during its operation from 1961 to 1967. In addition to process buildings, the X-342A Fluorine Plant was a source of fluorine emissions.

It is likely that emission estimates have been made in good faith; however, these estimates do not reflect all the potential releases that were possible, including some that could have been significant. While the estimates were generally concerned with radionuclide quantities, similar concerns exist for fluorides. The potential for human error and unmonitored or unauthorized venting of contaminants has always existed at PORTS, partly because of Plant design. The vast piping and valving flexibility associated with the cascade buildings offers many configuration possibilities, including relatively simple means of rerouting both uranium and fluorine release paths to alternative locations, such as those that may be unmonitored. By simply mispositioning or adjusting a few valves, effluent streams can be rerouted to discharge locations other than that specified by the

design basis. For example, the Building X-326 Evacuation Header can still be connected to the "D" Jet, which vents at roof level without going through a trap, by unlocking and repositioning valves, thereby bypassing any monitoring systems.

## Accidental Releases

A number of accidental releases have occurred at PORTS, most of which were relatively minor from the standpoint of environmental impacts. Not all documented accidental releases involved atmospheric releases. During the investigation, several lists of accidents were reviewed. One list identified approximately 515 material releases from September 24, 1954, to November 26, 1993. The most significant release occurred in March 1978, when a 14-ton cylinder fell from its carrier and cracked open. An estimated 4,820 kg of uranium escaped into the atmosphere. Total activity was estimated at slightly less than 3 Ci, as the uranium was present at low (natural) assay. Other major releases involved a valve failure on a tails cylinder in October 1978 (releasing 560 kg of uranium and 0.125 Ci), a similar valve failure in 1969 (releasing 460 kg of uranium and 0.102 Ci), and a process malfunction in the side purge cascade in December 1983 (releasing 50 kg of uranium and 0.69 Ci). In addition, a string of accidental releases of mostly depleted uranium during the first five years of Plant operation accounted for essentially all of the known or reported uranium lost to the atmosphere from 1955 to 1958, and 20 percent of the losses in 1959 (the remaining losses came from the Feed Production Plant).

There is evidence that PORTS consistently assessed the potential public dose impact from environmental releases. Dose estimates are provided in annual site environmental reports that summarize all releases for each calendar year starting from the early 1970s. Prior to this time, heavy reliance was placed on ambient air samples for assessing impacts on the public. However, ambient air samples were not always available, and they only measured plumes that were at ground level. Lofted plumes may not have been measured depending on meteorological conditions. For example, plume lofting can occur during accidental releases of $UF_6$, since an exothermic reaction occurs between the $UF_6$ and water vapor.

In addition to accidental releases of uranium, a number of releases involving fluorine and/or fluorides have occurred. A July 5, 1973, memorandum from Industrial Hygiene notes a call from the Shift



Cylinder Rupture

Superintendent on July 4, 1973, advising that hydrogen fluoride was being released in copious amounts from the X-342 vent stack. An estimated 30- to 40-foot high column of hydrogen fluoride vapor was observed coming out the vent stack. Other accidental releases of fluorides have occurred; however, because of the need to vent fluorine from the cascade buildings, such planned releases would not be classified as accidental. Despite authorization requirements and standards for the controlled venting of fluorine from the cascade buildings, the system has weaknesses. Personnel at the Plant have made recurring reports of offensive fluorine fumes, breathing difficulty, and in some cases permanent respiratory tract damage. Offsite residents and farmers have complained of odors and damage to crops. Investigations of these complaints generally conclude that the evidence is insufficient to support a causal relationship to Plant venting. For acute cases, there is often no trace of contaminant that remains by the time a response team has arrived to investigate the alleged incident. While ambient fluoride samplers have been used for many years to measure the levels of fluorides in the environment, these samplers average the ambient concentration over a period of several days and may not be sufficient to capture a potential acute fluoride release that could result in health effects over a short duration. Notwithstanding this limitation, a number of results from the ambient samplers have shown actual fluoride concentrations that exceed guidelines established by various states for monthly maximum concentrations.

## Diffuse and Fugitive Emissions

Diffuse and fugitive emissions were generally not calculated for the Plant from 1952 through 1993. Workplace air samplers, as well as evidence of

contamination on roofs and grounds, point to unmonitored releases. For example, very high airborne concentrations of radioactive material were prevalent in the oxide conversion facility, which could have been vented to the atmosphere through penetrations, ventilation systems, doors, and windows. A February 1978 AEC memorandum referencing an investigation of the X-705 oxide conversion facility concluded that the area had unfiltered exhaust that draws air away from the high bay area, through the oxide conversion area, and through a roof stack, thereby allowing venting of releases from inside the oxide conversion facility directly to the atmosphere. As discussed in Section 3.2.2, since the facility processed reactor returns, the unmonitored releases from this location could have contained transuranics. No estimates of releases from this facility have been incorporated into sitewide release estimates or dose calculations reviewed during the investigation. After the mid-1960s, the ambient air samplers could reflect some air concentration contributions from diffuse and fugitive sources. Unfortunately, no modeling studies were performed to evaluate the relationship between these samples and emissions. Also, only low-volume samples were taken. This investigation found no information documenting how the low-volume, ambient air sampler performed for a variety of wind and weather conditions.

### Planned or Unauthorized Releases

As described in Section 3.2.3, there is evidence that planned releases may have occurred during preparation of the cascade cells for maintenance. Cell jetting may have been performed to reach a desired low concentration of uranium in the cells. These releases would occur from the roofs of the process building or possibly unauthorized locations that bypass monitoring systems. The frequency and amounts of the releases are unknown; however, significant quantities of uranium would normally be available to be released during a single jetting event. While economic considerations would provide a strong incentive to avoid jetting of higher-assay material, for some lower-assay material in the cascade this constraint would have been less significant. Because of the possibly significant quantity of uranium involved, jetting of the cascades could be an undocumented contributor to the estimated quantity of uranium released from 1955 through 1993.

## 4.5   Environmental Management Summary

Over the operating lifetime of the Plant, activities to manage wastes and liquid and air process effluents evolved in response to internal and external requirements. PORTS personnel monitored emerging regulations and established plans and strategies in response to new requirements. However, implementation of necessary changes and new compliance programs often required an extended period of time and were not always fully effective.

The generation of waste and scrap materials began with Plant construction in 1954, and general guidelines for handling, storing, and disposing of waste existed in the early days of Plant operations. Onsite sanitary landfills likely received some contaminated material, since waste segregation practices were not fully understood or effective. As new requirements were enacted, additional waste streams, such as hazardous wastes, were restricted from disposal in onsite landfills. PCB- and uranium-contaminated oils were spread on roads, disposed of in oil biodegradation plots, burned in open containers, and incinerated.

Implementation of waste management regulations and internal controls was not always effective. The State of Ohio EPA, DOE, and Goodyear Atomic Corporation conducted numerous inspections and identified performance problems in the treatment, storage, and disposal of hazardous waste. By 1988, the State of Ohio EPA sent DOE and the Plant a notice of intent to file suit for hazardous waste violations.

Several important disposal options for the site, such as the X-735 sanitary landfill, the X-749 radioactive waste landfill, and the X-705A incinerator, were lost in the late 1980s and early 1990s because of inappropriate disposal of regulated wastes.

Large volumes of contaminated metal and surplus matter were generated during construction, maintenance, repair, and facility upgrade activities. It is clear that significant efforts were taken to properly segregate contaminated materials from clean materials intended for sale to the public. However, given the known problems in contaminated scrap segregation and the limited number of qualified health physics personnel available to perform radiological surveys, it is evident that material exceeding appropriate radiological release guidelines has been released from the Plant periodically from the 1950s through the 1980s.

Liquid effluents have been routinely discharged from the Plant and from accidental spills and releases. The environmental monitoring program at Goodyear Atomic Corporation was initiated in 1955. Significant changes in liquid effluent discharge practices were required upon the establishment of Federal and state regulations in the 1970s. Several new wastewater treatment systems were constructed to meet new permit requirements and to significantly reduce the levels of radionuclide emissions. Despite the discharge restrictions imposed by the AEC and subsequently the State of Ohio, it is clear that, over the years, enough radionuclides and chemicals have been released into ponds, local ditches, and streams to create legacy environmental contamination. The existence of legacy contamination has been confirmed through environmental sampling data. In addition to the continuous discharge of process waste to local creeks, there have been numerous spill events throughout the history of the site. Spills at the Plant have resulted in several fish kills in surrounding creeks.

Starting in 1975, Plant records reveal that technetium and transuranic contamination was unexpectedly discovered in liquid process effluents from X-705. The Plant environmental monitoring program did not include these contaminants, which were known by Plant management to have been introduced into PORTS industrial facilities from the processing of reactor returns and from Paducah feed materials. Based on the information collected, it does not appear that personnel responsible for environmental monitoring were aware of the presence of these contaminants at PORTS. These discoveries triggered significant efforts by Plant personnel to isolate sources of technetium and transuranic contamination, develop or improve control methods, and establish appropriate monitoring protocols.

Radioactive and fluorine/fluoride air emissions to the atmosphere began with Plant startup and have continued to the present. The sources of air emissions were process stacks, diffuse and fugitive emissions, accidental releases, and some planned releases. Air sampling for radiological contaminants and fluorides at various onsite and offsite locations was not initiated until the mid-1960s. The principal radionuclides released to the air from PORTS operations were isotopes of uranium and technetium-99. PORTS records indicate that nearly half of all the uranium released to the air at PORTS was attributable to one accidental release from a 14-ton cylinder in 1978. Another 30 percent of the total uranium released is estimated to have been from the Feed Production Plant when it was operated during the early years of Plant production.

PORTS was proactive in assessing the potential public dose impact from environmental releases. Dose estimates and release summaries are provided in annual reports starting from the early 1970s. While it is likely that air emission estimates made by PORTS were done in good faith, these estimates do not reflect all the potential historical releases, including some that could have been significant. Diffuse and fugitive emissions were generally not calculated for the Plant from 1952 through 1993. Workplace air samplers, as well as evidence of contamination on roofs and grounds, point to unmonitored releases, including potentially significant releases from the oxide conversion facility. The Plant did not perform continuous vent monitoring of radionuclides or fluorides until the mid-1980s, relying on less precise methods to calculate releases. Evidence also exists that planned releases may have occurred through jetting of process gases from unmonitored vents in preparation for cascade cell maintenance.

Fluorine and fluoride compounds were used in significant quantities at PORTS and were required by Plant design to be vented directly as waste gases. In August 1954, concern over the need to vent fluorine and the associated environmental and human liability problems was expressed by the Goodyear Atomic Corporation Portsmouth General Manager. There have been recurring reports by Plant personnel of offensive fluorine fumes, breathing difficulty, and, in some cases, permanent respiratory tract damage. Offsite residents and farmers have complained of odors and damage to crops. Investigations of these complaints generally conclude that the evidence is insufficient to support a causal relationship to Plant venting. For possible acute cases, a timing problem is evident, in that often no trace of contaminant remains when a response team arrives to investigate the alleged incident. For chronic exposures, environmental monitoring for fluorides has been conducted for many years, and ambient samplers sometimes indicated fluoride concentrations that exceeded guidelines for acceptable concentrations.

# 5.0 Past Management and Oversight Practices and Employee Relations

## 5.1 Oversight

The AEC, ERDA, or DOE have had a nearly continuous site presence at PORTS. The AEC had a local Portsmouth Area Manager performing contractor oversight. Records reflect some indirect ES&H-related oversight activities by the Area Manager, including communication of new or revised regulations and standards, transmittal of appraisals performed by OR, and communication of concerns related to events and reporting of off-normal conditions. Records reflect limited direct Federal ES&H oversight in the early years. OR appraisals of ES&H, called "contractor health protection program reviews," were performed as early as 1957, and the AEC manual required annual ES&H assessments starting in 1961. These assessments were generally performed by two persons over three days and addressed radiation protection, criticality safety, industrial hygiene, environmental programs (scrap metal and effluent discharges), and corrective actions in response to recommendations from prior reviews. Goodyear Atomic Corporation appears to have been responsive to AEC recommendations. Although important deficiencies and issues were identified by these reviews, the size and complexity of Plant operations and the nature of the industrial hazards and environmental concerns present warranted longer and more frequent assessments using more than two assessors. These reviews consistently concluded that the PORTS health protection program (including environmental controls) was satisfactory. A more in-depth, two-week assessment conducted in 1973 by OR included field observations of Plant conditions, work performance, and interviews with workers and first-line supervisors; it concluded that the health protection program at PORTS was inadequate. However, there was no further evidence of more rigorous assessments, and the limited annual appraisals resumed until the 1980s. Starting in 1975, OR performed annual OSHA inspections of PORTS. In the 1980s, OR conducted annual environmental assessments that evaluated air emission and water discharge control programs. These assessments were expanded to include hazardous waste management programs as regulations for TSCA and RCRA were promulgated. These assessments, combined with special reviews by OR environmental personnel, identified several significant environmental concerns, as discussed in Section 4.1. The annual environmental assessments were discontinued in the late 1980s.

The AEC performed detailed investigations of the more significant events (releases and accidents), and OR or Portsmouth Site Office personnel participated in many Goodyear Atomic Corporation investigations of less serious incidents. Generally, these investigations were thorough, and many included identification of ES&H issues and specification of detailed corrective actions to address root causes. However, the continuing problems over the first 25 years with process gas and fluorine releases and with contamination control indicate that the thresholds for acceptable performance were too low and implementation of corrective actions was ineffective.

The AEC and its successor organizations also investigated worker allegations of unsafe conditions and practices, but with inconsistent rigor and results. Many of these allegations surfaced at times of contention between Goodyear Atomic Corporation and unions. For example, worker complaints to DOE during an October-November 1977 investigation and in May 1978 regarding respirator usage and related training resulted in nine recommendations concerning safety meetings, electrical work permits, hazardous work permits, heat stress, eating in contaminated areas, training, operator certification, and personal protective equipment usage. From 1979 through 1982, another major DOE investigation of worker complaints, conducted at the direction of Congress, identified performance problems in a variety of ES&H areas.

Historical weaknesses in DOE investigation of worker allegations have continued to the present program. One case in particular, raised during the transition from DOE to NRC oversight of USEC, still remains unresolved. That case involves allegations by a Plant guard who maintains that, in 1994, he was exposed to fluorine, and that his radiation exposure records were falsified. Internal investigations by Lockheed Martin Utility Services found some merit to the allegation, and the allegation was forwarded to the Oak Ridge Operations Office Inspector General in 1996. That case remains inadequately investigated and unresolved by DOE.

In 1980, the General Accounting Office (GAO) performed a review of the DOE program for ensuring the safety and health of workers at the three uranium enrichment plants. GAO determined that program implementation was inadequate. This report acknowledged that safety statistics and radiation exposures were low compared to similar industries, but stated that ES&H oversight "is not approaching the coverage required by the program" and cited a shortage of safety and health staff at OR. Also cited were delayed and inadequate corrective actions for known contamination control problems that were not addressed until the union issued formal complaints. The DOE disputed the significance of GAO's concerns.

In the 1970s and 1980s, the DOE Headquarters Environment, Safety and Health organization performed technical safety appraisals of functional areas at approximately five-year intervals. In the 1990s, OR increased ES&H oversight appraisal activities by performing more detailed functional area appraisals and providing input to ES&H elements of the award fee contracting process. The current DOE Portsmouth Site Office was formed about 1988 with approximately eight technical staff members in various disciplines to oversee production activities and ES&H performance. The 1989 DOE Tiger Team assessment identified numerous health, safety, and environmental deficiencies; ES&H program weaknesses; and management issues. OR and the DOE Headquarters Office of Nuclear Energy performed increased functional area assessments until USEC assumed operation of the Plant in 1993. As discussed in Volume 2, DOE oversight of ES&H from 1994 through 1999 was limited to Portsmouth Site Office activities.

In summary, AEC-ERDA-DOE oversight of ES&H performance was not rigorous or proactive for much of PORTS history. Although this oversight was sometimes effective when vigorously exercised, such as event investigations or the Tiger Team assessment, consistency and follow-through on corrective actions were often lacking.

## 5.2    Labor Relations

Established in 1954, the Oil, Chemical, and Atomic Workers Union (OCAW) was aggressive in its efforts to protect and improve employee welfare. This aggressiveness sometimes caused friction between Plant management and labor. On numerous occasions, the positions of management and labor differed widely, and resolution was accompanied by extreme measures, as evidenced by one unauthorized and six authorized strikes that occurred from 1954 to 1993. Furthermore, the severity of management and labor disagreements appears to have increased beginning in 1974, as suggested by the frequency and duration of strikes. While economic issues were common to most strikes, safety and health were an important element in three of these seven actions, as summarized in Table 2.

Collectively, the number of grievances filed, worker compensation claims submitted, and alleged acts of retaliation committed provide further support that management and labor relations were strained. From 1954 through 1993, it is estimated that more than 17,000 union worker grievances were filed addressing a variety of issues in addition to safety and health, including work jurisdiction, discipline, overtime, work rules, and benefits. A review of selected ES&H-related grievances filed during this period reveals that sometimes labor took issue with company actions that may not have been clearly defined by policy, and management responded to the aggrieved employees with ambiguous statements, thereby exacerbating what



**1976 OCAW Strike**

**Table 2. Portsmouth Gaseous Diffusion Plant Oil, Chemical and Atomic Workers Strike History: 1954-1993**

| Strike Period | Duration | Type | Principal Reason(s) |
|---|---|---|---|
| October 3 - 4, 1956 | 1 day | Unauthorized | Responsibilities and Safety[a] |
| May 10 – 16, 1957 | 6 days | Authorized | Wages and Safety[b] |
| May 2 – May 20, 1969 | 18 days | Authorized | Wages[c] |
| May 2 – August 8, 1974 | 98 days | Authorized | Wages[d] |
| August 28 – December 13, 1976 | 106 days | Authorized | Wages[e] |
| May 3 – December 15, 1979 | 228 days | Authorized | Wages and Health[f] |
| June 11, 1991 – April 6, 1992 | 299 days | Authorized | Overtime and Requirements[g] |

[a] Reason for the strike involved ten issues associated with work jurisdiction, employee responsibilities, treatment of grievances, showering time and facilities, seniority, overtime, safety, and uniform treatment between hourly and salaried employees.

[b] Reason for the strike involved 19 issues associated with employee fringe benefits, employee responsibilities, union contract language, safety and health program, and overtime.

[c] Reason for the strike involved issues associated with wages and contract language.

[d] Reason for the strike involved issues associated with wages and worker classification.

[e] Reason for the strike involved issues associated with wages, and medical and pension fringe benefits

[f] Reason for the strike involved eight issues associated with overtime, work responsibilities, contract language, wages, physical examinations, and fringe benefits.

[g] Reason for the strike involved issues associated with overtime administration, seniority, contract language, and following Department of Energy orders.

was already a strained relationship. For example, in February 1958, X-700 maintenance mechanics filed a grievance because they were denied cold weather outer garment contamination clothing (parkas) to control the spread of contamination when commuting to and from their assigned building or working outside. Management did not dispute the furnishing of parkas "to the extent they are available to control the spread of uranium contamination when employees on red job assignments are required to perform outside work." However, management stated that "beyond this basis for issuance, parkas are not within the scope of the clothing which the Company requires employees to wear for their own protection." Additionally, management stated that the "Company has not established either the policy or practice of furnishing parkas to all maintenance mechanics in the X-700 building when leaving or working outside that building." There are other instances in which communication between management and labor was

ineffective. For example, a 1979 grievance was filed by an employee who received a memo from management for "coming into work [in the X-700 Building] without wearing safety glasses." Records indicate that there was a misunderstanding between union members and management on the wearing of eye protection in Buildings X-700 versus X-720. Safety glasses were required at all times in X-700, while this was not true for X-720.

In contrast to the previous examples, there are records suggesting that labor grievances were filed to be confrontational, as management appeared to have been acting appropriately and in the interest of its employees' safety and health. For instance, in 1976 an employee filed a grievance protesting being admonished formally by the company for failure to follow certain operating and safety procedures, including wearing required respiratory protection equipment. This grievance was denied, as the company considered its actions "extremely liberal in view of

[its] strong position on insisting that operational and safety procedures be complied with explicitly."

Worker compensation claims, which began to appear in the early 1950s shortly after Plant startup, also reveal discord between management and labor. Interviews with past and present employees and review of records indicate that there were allegations by employees that management would go to great lengths to deny or avoid compensation claims, including being untruthful and pursuing legal loopholes to avoid accountability. For example, workers claimed that Plant management would use sampling data taken from surveys performed hours or days after an alleged exposure to disprove safety and health injuries purported to have resulted from Plant operations. Additionally, there is evidence suggesting union distrust of Plant medical opinions, leading workers to obtain the services of certain community physicians to address their medical concerns. Consequently, disagreements between management and workers concerning exposure levels for radiation, metals, and chemicals were harsh and were often heatedly debated in correspondence and during compensation testimony. In many cases, it appears that the company started from an assumption that the exposure could not have resulted from work at the Plant, and then set out to prove its premise.

Records indicate that some employees, who had contracted illnesses like leukemia or other forms of cancer, filed compensation claims to request monetary compensation for their illnesses; in the case of death, their families filed lawsuits. Some of the claims lacked technical basis, such as a case of liver cancer developed by a Goodyear Atomic Corporation employee after a brief work history at the Plant and a long history of health problems. Correspondence between the Plant medical director, a family physician, and lawyers working on this case appeared to successfully explain the lack of any relationship between Plant exposure and the disease. Other cases were not resolved so easily, and some were "showcased" on the radio, television, and in newspapers. Some employees sought damages amounting to several million dollars, claiming loss of income and punitive damage; in cases where the employee died prior to settlement, surviving relatives continued the case.

The time, money, and expertise necessary to respond to worker compensation claims prompted the program to move from the medical department to the direct control of human resources management. External legal counsel was frequently added to defend

difficult or complicated compensation cases. Discussions with a longstanding worker compensation program employee suggested that Goodyear Atomic Corporation, Martin Marietta Utility Services, and Lockheed Martin Utility Services were conscientious in following the State of Ohio workers compensation regulations.

The perceptions of some past and present employees indicate that raising safety and health issues, either by simple verbal complaints, filing formal grievances, or submitting worker compensation claims, was sometimes accompanied by management and peer retaliation. For example, an hourly worker filed a grievance in December 1978 maintaining that he was unjustly suspended for insubordination for failing to enter an area that he believed was contaminated despite the opinion of his foreman, who maintained that the area was uncontaminated. The union protested the suspension, and the grievance was sustained by an independent arbitrator.

The impact of management and labor discord on the Plant-wide safety and health program is two-fold. While alleged efforts by management to deny culpability in certain personal injury cases and authorized strikes by the union workforce may have heightened mutual distrust, the sheer number of grievances and workers compensation claims compelled the company to react and be more conservative in its approach to protecting its employees. The discord also created a heightened awareness among various stakeholders (e.g., the public and the Federal government), thereby prompting independent investigations into the safety of Portsmouth operations.

The other major union at the Plant, the United Plant Guard Workers of America (UPGWA), has had no strikes since its formation in 1955. Generally, protective force personnel appeared to be considered outside the Plant mainstream, despite the fact that they were integral to maintaining its security and were collocated with Plant operations. Interviews with some protective force personnel, combined with a lack of formal records, suggest that information on Plant hazards and associated safety precautions was insufficient, and this, combined with other factors, fostered the blind obedience exercised by the guard force in maintaining the security of PORTS. Interviews with various PORTS workers, in addition to historical photographs, provide some evidence suggesting that from Plant startup until the early 1990s, guard force personnel were generally unprotected from the hazards

associated with the operations and products they were responsible for securing. Often guard posts were in close proximity to Plant workers who were wearing respirators while protective force personnel were not, or guards were at the scene of accidental releases without appropriate respiratory protection. Even as the balance of the Plant responded to new information on hazardous materials and EPA and OSHA safety regulations, protective force training lagged. Guards continued to conduct drills and practice in spaces and amongst equipment and products they were responsible for protecting that were sometimes radiologically and chemically contaminated. As the protective force received better information and training on Plant hazards and safety precautions in the mid- to late 1990s, they focused attention on obtaining answers and compensation from management for past and present personnel who had possibly been subjected to harm.

# APPENDIX A
# HISTORICAL HAZARDS

This appendix discusses the radiological, chemical, and physical hazards present at PORTS, and the potential effects of exposure to these hazards.

## Radiological Hazards

The radioactive hazards associated with PORTS operations and supporting activities include uranium and its daughter products, transuranics, and fission products. From 1957 into the mid-1960s, numerous studies of the radiological effects of neptunium, plutonium, technetium, and other fission products and transuranic elements found low concentrations of these impurities in incoming reactor tails. However, the impurities tended to concentrate in certain areas of the oxide conversion plant, cascade, equipment, and process piping.

The policies in place at PORTS to protect personnel from the inherent hazards of handling radioactive materials were based upon preventing personnel exposures from exceeding the Radiation Protection Guides (RPGs) established by the Federal Radiation Council, the requirements of AEC manual chapters (subsequently ERDA and DOE orders), those established by the National Committee on Radiation Protection and Measurement (NCRP), and the National Bureau of Standards Handbook 69. The AEC policies in place at the time further encouraged the maintenance of radiation doses as far below applicable standards as was practical. The application of these policies from 1954 to 1990 and the expectation that employees would adhere to procedures and guidelines were essential factors in hazard identification and control at PORTS.

**Uranium** is a naturally occurring element in the earth and is mined for commercial purposes. Natural uranium is 99.3 percent uranium-238 (U-238) and 0.7 percent uranium-235 (U-235). U-235 is used as nuclear reactor fuel. Enriched uranium contains more U-235 and depleted uranium contains less U-235 than natural uranium. U-238 has a radioactive half-life (the period for material to decay to half of its initial radioactivity) of 4.47 billion years. Once in the body, uranium may concentrate in the kidneys, bones, or lungs, depending on its solubility. For insoluble forms, radiation dose to the lung is a predominant concern. The principal sources of internal uranium exposures at PORTS relate to the inhalation or ingestion of primarily soluble forms but include insoluble compounds in some areas, such as the oxide conversion (X-705E) and feed production (X-344) facilities. The maximum enrichment for PORTS until July 1964 was 97 percent. From July 1964 to 1991, the maximum enrichment for PORTS was 93 percent U-235. In the mid-1990s highly enriched foreign (French) fuel was down-blended (that is, its enrichment was reduced). $UF_6$ exists at PORTS as a gas, liquid, and solid. Other compounds of uranium, such as $UF_4$, $UO_3$, and $U_3O_8$, have been present in significant quantities in the feed manufacturing plant and the oxide conversion plant. There is evidence that workers were exposed to uranium in forms that could cause adverse health effects.

**Uranium daughter products** are produced when uranium decays by the emission of alpha radiation to produce other radioactive isotopes (called daughters). When uranium is melted or separated by chemical or physical means, less-dense daughter products, such as thorium-234 and protactinium-234m, can be concentrated. Further processing can leave significant quantities of these daughter products in oxides or ash, or on the surface of process vessels. Daughter products were present in varying amounts at the feed manufacturing plant fluorination towers (primarily from ash receivers and the sintered metal filter baths), in X-705 and X-720 from converter and compressor disassembly work, product feed/withdrawal stations, cylinder cleaning stations, raffinate from uranium recovery, in cylinder heels, and other areas of the cascade. The beta radiation dose rate from residual concentrated daughter products is much higher than from the original uranium. In addition, daughter products in the form of fine particulate (like dust) are easily transferred by contact. Exposure to daughter products from transfer to clothing, tools, or other items is likely to result in unanticipated beta radiation doses to workers. Protactinium-234m emits a high-energy beta particle, which contributes most of the beta dose from the uranium-238 daughter products.

**Transuranic elements** have atomic numbers greater than 92 (i.e., greater than uranium) and can be produced when U-238 absorbs neutrons as part of a nuclear reaction. The principal transuranic elements

of concern are neptunium and plutonium. Both are alpha emitters that have very long clearance time in the body. Transuranic elements were introduced to PORTS from processed spent reactor fuel or from reuse of cylinders containing transuranic contamination.

- **Neptunium-237** has a radioactive half-life of 2.14 million years and is far more hazardous than natural uranium. The specific radioactivity of neptunium-237 is 2,000 times higher than the radioactivity of depleted uranium. The low concentration of neptunium found in reactor tails feed material was not a significant radiological hazard, and at such levels the controls for uranium would protect personnel from exposure to neptunium. However, neptunium concentrated at certain points in the uranium conversion, enrichment, and recovery processes. The highest concentrations were associated with oxide conversion and the waste streams associated with that process (X-705E and X-701B).

- **Plutonium-239** is significantly more radioactive than neptunium but is less a hazard at PORTS because it was present in much lower concentrations. It has a radioactive half-life of 24,065 years. Once plutonium reaches the bloodstream, it accumulates primarily in the liver and skeleton. Plutonium exposure may produce acute health effects (e.g., ingestion may lead to damage to the walls of the gastrointestinal tract) or long-term effects, such as increased risk of cancer. When plutonium is inhaled, the lungs are exposed to alpha-particle radiation, increasing the risk of lung cancer, and the plutonium is eventually carried to other organs where the radiation can cause cell damage and increase the likelihood of biological effects. Recent estimates indicate that there was only a small amount of plutonium in the uranium fed into the PORTS cascade; plutonium concentrated in the oxide conversion facility. Because it remained in the ash material, most was removed with the ash residues and particulate filters in the conversion of uranium oxides to $UF_6$. Individuals most likely exposed were those changing particulate filters and emptying the ash collectors. There were small quantities of plutonium in the cascade feed areas, which could have had the potential for exposures during CIP/CUP activities.

**Fission products** are formed when neutrons split uranium-235 atoms during a nuclear reaction. They typically have atomic numbers in the range of 80 to 108 and 125 to 153. The predominant fission product of concern at PORTS was technetium.

- **Technetium-99** is a weak beta emitter with a radioactive half-life of 213,000 years and was introduced at PORTS in recycled reactor feed. The primary exposure pathways are ingestion or inhalation. Protective clothing would adequately shield the low-energy beta particles emitted by technetium. Technetium passed through the Paducah cascade as a volatile compound of fluorine, depositing on internal surfaces of the cascade and contaminating the uranium product. Similarly, technetium at PORTS contaminated many areas, including cascade equipment. The AEC did not specify a limit for technetium in $UF_6$ feed but controlled the concentration of technetium indirectly to about 10 ppm by limiting gross beta due to fission products. In addition, some customers established a 10 ppb limit on technetium in product cylinders. There was evidence that workers had some exposure to technetium.

## Chemical and Toxic Metal Hazards

The PORTS operations exposed workers to a wide variety of chemical and toxic metal hazards. Some of these hazards and their health effects were known from the early years of the Plant's history, such as mercury, fluorides, carbon tetrachloride, and TCE. However, the hazards of some substances, such as PCBs and asbestos, were not recognized until the 1970s. As knowledge of the health effects of hazardous chemicals increased, permissible exposure levels have generally decreased. Accordingly, many of the limits established in the 1950s would not be acceptable today. The issuance of the OSHA hazard communication standard in 1983 drove improvements in chemical hazard identification at PORTS. The hazard communication standard required identifying chemical hazards, labeling chemicals, documenting a chemical hazard program, training workers, and most importantly requiring that manufacturers develop and disseminate Material Safety Data Sheets (MSDSs) to chemical purchasers. The following paragraphs summarize the principal hazards of toxic metals, gases, and solvents

that PORTS workers were exposed to during the period of 1952 until 1997.

**Uranium** radiation hazards are discussed above. As a heavy metal, uranium is toxic and can damage the kidney. Both the solubility and enrichment determine the toxic chemical effects. In 1987, the National Institute of Occupational Safety and Health (NIOSH) completed a study to assess the risk of cancer mortality associated with exposure to uranium compounds at the Plant, particularly uranyl fluoride, the most prevalent compound of exposure interest. The study concluded that the workers at PORTS had experienced excess stomach cancer and excess cancer of the hematopoietic system, which included leukemia. However, the study also concluded that these excesses were not statistically significant, because they occurred in a group of workers who demonstrated less overall mortality than the U.S. population in general. (NIOSH is updating this study, and results are expected before the end of calendar year 2000.) Uranium chemical exposures have been monitored at PORTS since Plant startup. Routine bioassays were conducted as early as the 1950s, and air sampling was performed throughout the history of the Plant.

**Beryllium** is a silver-gray metallic element used as pure metal, as beryllium-copper and other alloys, and as beryllium oxide. Beryllium is useful in manufacturing due to its strength, light weight, machinability, and relatively high melting point. The severity of health hazards resulting from even minimal contact with beryllium is only now being fully understood. Beryllium can enter the body through inhalation, skin absorption, skin wounds, and ingestion. The most serious health effects come from inhaling airborne insoluble particles that deposit in the lungs. Chronic beryllium disease, which occurs in one to six percent of exposed workers, has a latency period of up to 20 years and has no known cure. There was limited evidence of incidental use of beryllium at PORTS. Besides the use and/or disposal of sealed plutonium-beryllium neutron sources, one stores department worker indicated that he had stocked beryllium bars, which were sent to the X-720 machine shop. Another worker and a supervisor believed they might have machined small quantities of beryllium in the same shop in the mid-1970s. Beryllium at PORTS may have included incidental machining of beryllium copper-alloy process piping components, such as valves. Some tools plated with beryllium were also used. Other beryllium use may have included use and disposal of fluorescent light bulbs containing beryllium oxide and use of beryllium-containing welding rods until the mid-1990s. The site routinely sampled for beryllium in the environment in the early 1990s, and detectable beryllium concentrations above background were identified in several areas at PORTS.

**Arsenic** exists in organic or inorganic forms, and all are toxic. Non-occupational exposure to arsenic can also occur from drinking water, food, polluted air, and cigarettes. Symptoms of chronic arsenic poisoning include illness and fatigue, with stomach and intestinal distress. Arsenic is a carcinogen, causing increased risk of skin, liver, and lung cancer. Arsenic has been identified in several areas in the Plant, including the X-342 fluorine generators, X-326 process gas, converter maintenance in X-700, wood preservatives in the cooling towers, and coal and coal byproducts in the steam plant. In 1993, arsenic was first discovered in X-326 process gas that resulted from arsenic-contaminated $UF_6$ feed material. A March 1994 NIOSH evaluation of worker exposures to arsenic in the process system concluded that concentrations were generally below detectable limits. Only one of the 600 air samples taken during this study was above the OSHA limit. Arsenic also naturally occurs in coal and accumulated in the boilers of the PORTS steam plant. Utility personnel, who routinely removed scale from boilers, were unaware of an arsenic hazard until the potential for it was identified in a notice from OR in the late 1980s. Subsequent sampling indicated that arsenic concentrations exceeded limits by factors of 10 to 100. Consequently, workers shifted from dust masks to air-supplied respirators for descaling. Arsenic was also present in fly ash, but the concentration was much lower than the concentration in firebox scale. Ash was routinely buried in an onsite landfill, used on site roads, and placed on a track at a local high school. Use of fly ash for this purpose is a common industrial practice, and not unique to PORTS. Toxicity tests of the fly ash in the early 1990s demonstrated that it did not meet RCRA criteria for hazardous waste. Since that time, however, fly ash and scale material have been returned to the coal mine by the coal contractor. The health effects for workers exposed to arsenic, especially in the process system, are indeterminate. General exposure levels were low, but in some cases the presence of arsenic was not recognized. In the steam plant, exposures could have exceeded limits, as is the case in all industrial coal-fired steam plants.

**Mercury** exists as an element (metallic) with inorganic and organic forms. Early symptoms of mercury poisoning include salivation and tenderness

of the gums. Mercury vapor can reach the brain cells, where it is oxidized to produce toxic effects. The major effects of chronic exposure to mercury vapor are on the central nervous system, resulting in increased excitability and tremors. Chronic elemental mercury symptoms are slow to develop and difficult to diagnose. Inorganic mercury salts, such as mercuric chloride, often cause skin problems and can result in extensive kidney damage. Organic mercurials, such as methyl mercury, can cause severe birth defects or mental retardation. Health effects of mercury were known as early as the 1950s. As early as 1955, PORTS bulletins contained precautions for avoiding mercury poisoning.

The principal uses of mercury at PORTS included thermometers, manometers, chemical traps, vacuum pumps, switches, and fluorescent lights. Manometers were used to measure differential pressures, flows, and absolute pressure. Line recorders (spectrometers) used mercury in chemical traps to remove $UF_6$ from sample streams to allow detection of low molecular weight gas contaminants contained in the process gas. Diffusion vacuum pumps were used to sustain vacuums necessary for proper operation of assay and line recorder spectrometers. Mercoid switches that contained mercury and large manometers (reported to contain pounds of mercury) were initially filled and refurbished in the X-710 and the X-720 Instrument Shop. One interviewee remembered having to reclaim several hundred pounds of mercury stored in a hood. In the 1950s and 1960s, recovery operations involved mercury distillation in the X-705 recovery area. In those years, cleanup reportedly involved brushes and dustpans for retrieval by workers wearing Army assault masks and rubber gloves. However, some former workers who were interviewed reported experience with mercury spills inside and outside buildings and handling open containers of mercury without any type of personal protective equipment. In the 1960s and 1970s, airborne mercury levels greater than PALs were identified in the instrument shop cleaning room after a spill. Chemical trap cleaning before the 1980s reportedly involved flushing, resulting in saturating a small ground area with mercury. Later, mercury vacuum cleaners and Mercury-X (a specialized cleanup product) were utilized for cleanup. In the 1980s, efforts were made to reduce mercury on site, and recovery in X-705 ceased. Evidence indicates that mercury was a significant hazard to workers from the 1950s to the 1980s. During the 1970s, a monthly Industrial Hygiene and Health Physics report had a separate section for reported mercury spills for the month. Overall, mercury was handled extensively, sometimes without adequate personal protective equipment, and could have had adverse health effects on workers.

**Lithium** is intensely corrosive and may produce burns on the skin from the formation of the hydroxides. Like most toxic metals, chronic exposure to lithium at elevated levels can result in impaired functioning of the kidneys, changes in blood pressure and blood volume, and neural and hormonal effects. From the early 1960s, 187,000 drums of lithium hydroxide monohydrate (LiOH) were stored at PORTS in five warehouses. The LiOH was transferred from OR for storage at PORTS. The LiOH stored at PORTS also contains 2-15 ppm mercury. Originally, lithium was in 55-gallon fiberboard drums, which corroded over time, spilling some of the contents on warehouse floors. During the late 1970s, a significant Plant project involved the cleanup and relocation of the lithium, moving the drums, and dismantling and moving the warehouses to provide space for the construction of the gas centrifuge plant. According to some workers interviewed, the LiOH dust during drum relocation was sometimes so thick that the lights of the forklifts were hard to see. Although dust masks were worn by some, respirators were not required. Several workers who participated in this project complained of ill effects, including high blood pressure and increased occurrence of cardiovascular ailments.

During the mid-1980s, a significant Plant project involved the overpacking of the LiOH because the warehouses in which it was stored were leaking from rain events, causing deterioration of the fiberboard drums. The 55-gallon fiberboard drums were overpacked into 85-gallon drums, and the roofs on the five warehouses were repaired. Use of the 85-gallon drums required additional warehouse space; therefore, two additional warehouses were constructed on the hill on the west side of the reservation, overlooking the perimeter road, to handle the overflow. Today, the inventory is less than half of the original amount. A commercial contractor is gradually removing the product off site.

**Chromium** salts are irritating and destructive to tissue. Mists from electrolysis baths and plating baths cause dermatitis and damage to nasal membranes. Problems extend to the respiratory tract when dusts, fumes, or mists are inhaled. Because of the toxic nature of plating bath contents, disposal must be done carefully to preclude serious environmental damage. Chromium and chromium compounds were used throughout the Plant's history in electroplating

operations and as an anti-corrosion inhibitor in recirculating water systems.

In the mid-1950s and later, sodium dichromate was added in considerable quantities to the recirculating water system, primarily as an anti-corrosive agent. For example, during one week in 1956 three trailer loads of sodium dichromate were received at Stores, totaling 160,000 pounds. Sodium dichromate typically came in 100-pound paper bags, some of which ruptured during transport. On one occasion, a worker filed a written complaint alleging that several workers had been treated in the hospital for overexposure to sodium dichromate. Industrial hygiene personnel concluded that three workers had been overexposed, as evidenced by nasal irritation experienced by the workers, and that the protective clothing at the beginning of the job was less than adequate. The Safety and Industrial Hygiene Department issued a Safety Letter, advising workers of the hazards of sodium dichromate and chromic acid and indicating the appropriate personal protective equipment. While the long-term health effects are not well known, some workers have been exposed to chromium compounds from plating operations, transport, addition of dichromates to water systems, and during maintenance of those systems.

**Nickel** metal is a hard, silvery solid with a high melting point. Nickel carbonyl, a volatile liquid and a very toxic gas, is the most acutely toxic nickel compound known, causing immediate poisoning, hemorrhagic pneumonia, and delayed lung effects. Nickel-plating workers can suffer from dermatitis caused by skin contact with nickel salts. Nickel compounds also can cause chronic eczema. Some individuals are susceptible to becoming sensitized to nickel, and once sensitized, they respond even to contact with nickel alloys. In industry, nickel-plating workers and welders exposed to various nickel compounds have developed allergic lung reactions, such as asthma; loss of the sense of smell; and severe nasal injuries, such as perforated septa and chronic sinus infections. Increased susceptibility to respiratory infections is also possible.

At PORTS, nickel-related operations were performed in several areas of the Plant. Worker exposure to nickel was possible during welding, cutting, or grinding on nickel-containing components, and during nickel spraying operations in X-720. Nickel sulfate crystals and nickel chloride were used in nickel plating operations in X-720 during the mid-1950s and later. In 1973, nickel welding fume concentrations

were measured in the X-700 converter shop, X-720 weld shop, and the X-705 seal dismantling booth and were well above limits. In addition to nickel welding and plating, grinding operations on nickel-plated tube sheets and process gas pipe flanges were common throughout the Plant's history. One of the more hazardous operations involved nickel spraying. A 1982 industrial hygiene survey of nickel spraying in X-720 identified airborne nickel concentration up to 15 times the limits. Consequently, personal protective equipment was improved to require supplied-air respirators, company-supplied welder's coveralls, leather gloves, and face shields or welder's glasses. In 1980, a feasibility study to reduce airborne nickel was performed, resulting in improved ventilation systems. In 1991, NIOSH expanded a previous 1987 NIOSH study on worker exposures at PORTS by considering worker exposures to fluorides and nickel. The results of this study are to be published by the end of calendar year 2000. In general, although many workers were exposed to nickel fumes/mist (some of which exceeded permissible exposure limits), most workers were informed and usually wore personal protective equipment to mitigate the hazard.

**Fluorine** is a pale-yellow to greenish gas with a pungent, irritating odor. **Hydrogen fluoride**, or hydrofluoric acid (HF), is a colorless gas or fuming liquid with a strong, irritating odor. Exposure routes include inhalation, skin absorption (liquid), and skin and/or eye contact. Exposures can result in a variety of symptoms, ranging from irritation of mucous membranes to severe burns. The primary sources of exposure to HF at PORTS involve the opening of normally closed systems that are used to process $UF_6$ or generate fluorine gas, leaks, or process upset events. Fluorine was used in the oxide conversion and feed manufacturing processes and was generated in X-342. Fluoride hazards were identified early in the Plant's history.

Although the potential for exposure to fluorides at PORTS is widespread and involves many workers, documented overexposures have been infrequent. For decades, the industrial hygiene and safety group has maintained airborne and biological monitoring programs for fluorides. The biological monitoring program consisted of routine and special urinalysis to determine fluoride content. Routine urine samples were submitted on a frequency consistent with expected exposure frequency and concentrations, but typically on a monthly basis. In case of a probable exposure, special samples were obtained within a few

hours after the event. Short-term air grab samples, area air samples, and personal breathing zone samples have been used to determine HF concentrations during work activities and to determine respiratory protection requirements. Workers at PORTS seldom exhibited urinary fluoride levels above limits. The highest recorded fluoride exposure level at PORTS was 45 mg/liter from the urine of a supervisor who had entered a fluoride release cloud without proper respiratory protection. Another worker was diagnosed with fluoride poisoning following exposure to $UF_6$ in 1984 at the high-assay sampling station. Before and after the X-326 stack extension in 1981, numerous workers complained of high fluorine levels causing nausea and nasal, throat, and eye irritation. Industrial hygiene sampling seldom identified concentrations above permissible limits; however, the gas dispersed rapidly, and samples may not have been representative of what workers were exposed to. A 1969 report identified HF concentrations of 3 ppm or greater outside X-705. Additionally, former worker interviews indicated that there were many releases where samples may not have been taken and where workers did not report to the Medical Department. In the early years of operation, there were a number of HF burns, and workers experienced symptoms similar to those described above.

**Chlorine**, at atmospheric conditions, is a greenish-yellow, non-combustible gas having a density about 2.5 times that of air. Its disagreeable and suffocating odor, as well as the irritation it causes to the nose and throat, generally warns even unwary persons, thus enabling them to escape substantial exposure. Chlorine was used in water and sewage treatment systems as a disinfectant. Industrial hygiene records indicate routine sampling for chlorine, such as the Chlorine Room in X-633. **Chlorine trifluoride** is a powerful oxidizing agent, igniting many organic compounds on contact, and it reacts violently with water. At room temperature and pressure, chlorine trifluoride is a colorless gas having a density of 3.14 times that of air. Chlorine trifluoride is extremely corrosive to tissue, and any contact with skin or eyes will typically result in severe damage. Its reactivity led to its use as a fluorinating agent in Portsmouth processes. Chlorinated compounds and chlorinated reaction byproducts were produced from the cascade process. The potential exposure of X-326 security guards to chlorinated compounds, among other factors, led to a NIOSH health hazard evaluation.

**Welding** has always been a common and continuing work activity at PORTS over the years, and there is a wide degree of variation in the degree of hazard that workers experienced on the job. The hazards to the eyes and skin due to sparks and fragments of hot metal were well recognized, and welders were usually well protected with face masks, gloves, and other protective clothing, including flame retardant coveralls in later years. However, the dangers from chemical exposure were not as well recognized. The type of fumes from welding depends on the metal being welded and the type of welding rod. Arc welding and plasma cutting produce irritating and oxidizing ozone gas. Degreasing fluids can remain on the metal, resulting in additional vapors. In addition, paints, grease, and other coatings may be burned and volatilized.

PORTS industrial hygienists have analyzed welding fumes since the 1950s. For example, a 1954 inspection of the machine and welding shops in X-720 identified a variety of welding fumes from welding on metals coated with cadmium, lead, mercury, and zinc. The welding included the use of fluoride welding fluxes that produced nitrogen oxides as well. One record dated in May 1957 identified significant levels of nickel and ozone in fumes from inert gas welding and heliarc welding in X-700. In 1959, elevated levels of phosgene were detected in the breathing zone of welders in X-720. In all of these early cases, ventilation requirements were evaluated, and respirators were recommended to control the hazard. A review of welding areas by Industrial Hygiene in 1973 identified nickel, uranium, copper, and iron oxide contaminants in steel metal inert gas welding in the X-720 welding shop. A Plant inspection in 1973 identified the use of cadmium and lead solders, without prior testing of local exhaust systems or without air samples to assess worker exposures. Union safety meeting minutes between 1972 and 1975 identified numerous complaints of shortages of company clothing and respiratory equipment, especially for welders.

Welders also fabricated, modified, joined, cut open, and repaired leaks on Freon systems, both within the process buildings and in X-700. The systems and components were usually drained and evacuated before cutting or welding; however, these controls were not always effective. One former worker described getting severe headaches while welding in high concentrations of Freon fumes without a respirator in the late 1970s. An Industrial Hygiene and Health Physics report addressing workers' complaints about cutting out

Freon piping in 1980 documents the exposure of eight workers to phosgene, hydrogen chloride, hydrogen fluoride, and Freon at levels exceeding safe limits. The workers had complained of a blue flash and irritating fumes. The problem appeared to result from a leaking hydrostatic test boundary valve in an adjacent cell. Welding fumes presented a variety of potential health hazards to workers from the 1950s through the 1980s. Most welding hazards were recognized and evaluated by industrial hygiene personnel, and respirators were prescribed. Some workers, however, were most likely exposed for short periods to fume concentrations greater than permissible limits, with potential for health effects.

**Hydrogen cyanide** gas, when inhaled, or the ingestion of cyanide salts, leads to cyanide poisoning. Cyanide has a characteristic "bitter almonds" odor that can aid in diagnosis. However, a significant percent of the population is genetically incapable of detecting this odor. Therapeutic treatment must be initiated immediately to be life-saving. At PORTS, both cyanide salts and solutions have been used by instrument mechanics engaged in copper and silver cyanide plating. Cyanide salt solutions and cyanide waste solutions were stored in toxic lockers in the instrument decontamination area of X-720. In 1982, Industrial Hygiene investigated the feasibility of installing a cyanide monitor to continuously sample cyanide fumes from silver plating operations. A 1980 memorandum from Industrial Hygiene stressed the importance of minimizing the onsite inventory of cyanide, and that large-scale plating operations should be avoided. Industrial hygiene personnel also required gloves, aprons, and face shields when working with cyanide waste solutions. A cyanide medical kit and a safety shower were required to be in the vicinity of any work involving cyanide solutions, waste, or salts. In most cases, cyanide storage and use appeared to be well monitored and controlled throughout the Plant's life.

**Trichloroethene** is a colorless liquid with a chloroform-like odor that is used as an industrial degreaser. TCE is a mild irritant to the respiratory tract and the skin, and is considered a potential carcinogen based on animal studies. Critical exposure pathways are inhalation, ingestion, and skin or eye contact. TCE concentrates in the respiratory system, heart, liver, kidneys, central nervous system, and skin. At PORTS, TCE became the solvent of choice in the 1970s and early 1980s. Large components were frequently cleaned in one of several vapor degreasers located in X-705, X-700, and X-720. Leaking vapor degreaser lids causing vapors and high TCE concentrations prompted a ventilation project for the building in the mid-1990s.

In the 1950s and later, bulk TCE and carbon tetrachloride were available at several locations at PORTS for dispensing to smaller containers for transport and use in hand-cleaning parts and surfaces, both in the shops and in the field. At least one interviewee remembered others using TCE to clean PCB-contaminated oil from their skin. Instrument mechanics remembered using TCE to clean control valves in the X-720 Instrument Shop and disposing of waste TCE by dumping it out the back door. The Instrument Shop also had an ultrasonic cleaner in their standards room that used TCE for degreasing. However, in response to complaints about the vapor, the unit was later removed.

A 1976 Industrial Hygiene and Health Physics report summarizing the hazards of TCE in welding areas described an incident near the X-720 Compressor Shop where airborne concentrations of TCE exceeded 700 ppm (maximum permissible concentration is 150 ppm). This occurred when an operator sprayed a suspended part with TCE over a vapor degreaser. This practice was reportedly in violation of previous recommendations. The report noted that if a welding unit had been operating in the area, which was often the case, dangerous and even fatal concentrations of phosgene could have been produced; ultraviolet rays from the welding arc can react with the chlorinated solvent vapor to produce phosgene gas. A 1980 Industrial Hygiene and Health Physics report documents the investigation of worker complaints of noxious odors while welding in the X-700 converter shop. Sampling identified TCE and phosgene in the immediate vicinity of the welders. A subsequent investigation determined that the ventilation system was not operating properly and did not provide sufficient exhaust from the chemical cleaning area to prevent TCE vapors from flowing into the converter shop.

Former workers remembered being taught not to breathe in or smoke around TCE vapors and to wear a respirator when degreasing. X-700 vapor degreaser procedures from the period 1958-1988 do not mention the use of respirators. A 1980 Industrial Hygiene and Health Physics report documents monitoring TCE concentrations during the hand-cleaning of small parts with TCE in the X-700. Based on continued problems with TCE vapor in the degreaser area, a project was funded to upgrade the ventilation. Historical evidence

indicates a significant exposure to a large number of workers using TCE in several facilities, some without appropriate protection. In the late 1980s and early 1990s, as efforts were made to improve environmental programs, the use of bulk TCE was phased out and the vapor degreasers were emptied.

Other **chlorinated hydrocarbon solvents**, such as carbon tetrachloride and methylene chloride, have been used as degreasing solvents. Chlorinated hydrocarbons cause skin irritation due to the removal of skin oils, and they are central nervous system depressants. Carbon tetrachloride is absorbed readily through the skin or lungs and produces kidney and liver damage on continued exposure. Methylene chloride is a central nervous system depressant, and when metabolized in the lungs produces carbon monoxide, which readily combines with blood hemoglobin and restricts the body's uptake of oxygen. In 1980, a worker complained of lightheadedness while degreasing a compressor with a solution containing 20 percent methylene chloride. Several former workers described using carbon tetrachloride to clean the insides of equipment before initial operations, and subsequently cleaning up dust and deposits inside converter shells with a bucket of carbon tetrachloride and a sponge. Interviewees also asserted that they did not understand the hazards of these chemicals, used no respirators or gloves, and would frequently wash their hands in these cleaning agents.

**Aromatic hydrocarbons** were in frequent use at PORTS, but generally in lesser quantities than the chlorinated hydrocarbons. Benzene, for example, was a common industrial solvent used in the X-720 electrical and instrument maintenance shops in the mid-1950s. Benzene is volatile, and extended exposure to the vapors causes damage to the central nervous system, the gastrointestinal tract, and bone marrow. Prolonged exposure has been linked to an increased risk of cancer, particularly leukemia. A 1955 internal memo notes that "the use of benzene should be avoided whenever possible by substitution of a less toxic solvent." Benzene was also a common component of paints in the 1950s, and painters in the sign painting shop were cautioned on its use. It was evident that many workers were exposed to these solvents, and some had little knowledge of or regard for the short-term or long-term health effects.

# Physical, Biological, and Common Industrial Hazards

Since the 1950s, line management has made a conscientious effort to identify and quantify worker hazards at PORTS, commensurate with the understanding of those hazards at the time. Asbestos has been a significant hazard at the Plant since construction. However, the hazards associated with asbestos were unknown, and efforts to sample and quantify airborne levels of asbestos were not initiated at PORTS until the 1970s. Throughout the decades, hazard identification resulted in changes in PORTS facilities, processes, and procedures to reduce or eliminate the hazard. However, there are numerous documented cases of inadequate procedures and procedural non-compliance by workers and supervisors, including monitoring, which show that these practices were common.

**Polychlorinated biphenyl (PCB)** is a colorless to lightly colored, viscous liquid with a mild odor. The critical pathways of exposure are inhalation, ingestion, and absorption. When humans are exposed, PCBs can affect the skin, liver, central nervous system, and respiratory system.

PCB-based oils were used at PORTS, for their stability, fire resistance and dielectric properties, in many power transformers and industrial capacitors. Until the early 1970s, these oils were periodically filtered and de-sludged, with the resulting filtrate and contaminated filter material disposed of on site. PCB oils were also used in pole-mounted transformers, synchronous condenser grounding transformers, fluorescent light ballasts, and certain oil-filled capacitors. PCB contamination was also determined to be present in cascade lubricating oil and hydraulic systems as early as 1980. During 1983, workers were informed that PCB oil contamination had been identified in the black caulking on cascade cell and unit bypass housings. PCB contamination from oil leaks was subsequently identified on other equipment, such as electrical cabling and local control center gaskets. Procedures for handling, storage, and disposal of PCB-contaminated oils were in place as early as 1977, specifying use of neoprene gloves and aprons, safety glasses, and disposable coveralls worn over regular fabric coveralls. Full-face respiratory protection was recommended when splashing was

possible. Respirators were not deemed necessary, except in confined areas with large spills or when the PCBs were heated above 55 C. Because of the hazards, additional controls were placed on handling, cleaning, and disposal of spills, leaks, and waste oils.

In 1982, PCB was discovered in the gaskets in process building ventilation duct joints. The PCB contamination from ventilation ducts was carried by oil droplets from process motors to the floor of the process buildings. Therefore, management initiated a cleanup in 1983. In the late 1980s and early 1990s, PORTS installed troughs on leaking ventilation duct joints and connecting manifolds to collect PCB-contaminated oil, prevent the spread of contamination, and assure appropriate disposal. Results of limited blood sampling of workers potentially exposed to these PCBs found only two workers with measurable levels, both reportedly less than permissible exposure limits. However, it is likely that exposures were higher based on the extensive handling of PCB-contaminated oil and the lack of precautions early in Plant life. In 1990, PORTS established and began implementing a comprehensive PCB Program Management Plan. Many components previously containing PCB-contaminated oils have since been replaced or flushed to remove PCBs. Exposure to PCBs was pervasive for some work groups. Throughout industry, including PORTS, the hazards and controls for working with PCBs were not known until the 1970s. Some workers most likely were overexposed, with unknown long-term health effects.

**Asbestos**, as airborne fibers, can be inhaled or swallowed, and these fibers can become embedded in the tissues of the lung and digestive system. Once the fibers become trapped in the lung's alveoli (air sacs), they cannot be removed. In industry and construction, years of exposure to asbestos has caused a number of disabling and fatal diseases, including asbestosis, an emphysema–like condition; lung cancer; mesothelioma, a cancerous tumor that spreads rapidly in the cells of membranes covering the lungs and body organs; and gastrointestinal cancer, caused by ingesting asbestos-contaminated food. Like PCBs, identification of asbestos as a hazard did not emerge nationally or at PORTS until the 1970s or later. Before the 1970s, asbestos was widely used at PORTS because of its resistance to heat and corrosive chemicals. Asbestos was used extensively for construction, welding, and insulation since Plant construction. Asbestos was also used in cooling tower structures, duct curtains, expansion joint coverings, building siding, and by

workers for protection against heat and weld splattering. Several former workers reported cutting asbestos blankets to size without any respirators or gloves. To work in hot areas or on hot pipes, workers would lie on asbestos blankets with large fans blowing air across the freshly cut asbestos blankets. This occurred in the late 1970s in X-333 and X-330. A number of PORTS workers in the 1950s to the 1970s were exposed to asbestos without knowledge of the hazards. The first asbestos control procedure was issued at PORTS in 1980. During 1980, divisional asbestos control managers were also assigned. Few controls were in place during the early decades, and the full extent of the long-term health effects is unknown.

**Dust, noise, and illumination** pose industrial hazards at PORTS. Many workers were exposed to high nuisance particulate (dust) concentrations and excessive noise from machinery; in some cases, work was performed in areas with poor illumination. These hazards were well recognized in the early years of the Plant. Monitoring by Industrial Hygiene often resulted in modifications to facilities and equipment. For example, in 1955 Plant industrial hygienists evaluated the impact of proposed modifications to the cascade buildings on the available lightning. A 1974 appraisal by OR identified that workers were exposed to more noise than was previously recognized, and that administrative controls (i.e., restricting workers' time in high noise areas) was not an adequate policy in lieu of issuing hearing protection devices to workers. Despite improving controls, historical documents indicate that many practices led to excess worker exposure to dust, noise, and other common industrial hazards.

**Fungicides and biocides** have also used been used at PORTS. Fungicides were used as an organic material preservative. Fungicides and pesticides can enter the body through ingestion, inhalation, and absorption pathways, with inhalation and skin absorption being the primary concerns. Health effects vary from minor headaches and nausea to debilitating conditions of the central nervous system.

The water for PORTS cooling towers was originally treated with sodium dichromate, sulfuric acid, and chlorine. Safer chemicals, such as phosphate and bromine-based dry chemical additives, were later substituted for the chromates and gaseous chlorine, to reduce environmental impact and enhance worker safety. Utility operators sprayed fungicide by climbing within the cooling tower structure on ladders and work

platforms while dressed in protective clothing and breathing apparatus. The interior surfaces were coated with the dilute fungicide-water mixture. Steam sterilization in combination with several fungicides was utilized in 1962 and 1963 to rid the cooling towers of fungal colonies. Procedures from as early as 1961 specified protective equipment of Graylite (plastic suits) or equivalent, Graylite hoods, and neoprene gloves and boots. The 1982 version of the procedure allowed mixing with neoprene gloves and a dust respirator, but required full respiratory and outer garment protection for rinsing. Reportedly, one operator on the tower acted as a safety observer, a second operator on the tower did the spraying, and a third operator on the ground mixed the chemicals. Interviewees remembered that the safety observer and the ground person wore paper dust masks before the mid-1970s, and respirators thereafter.

Reviews of Industrial Hygiene and Health Physics records and discussions with long-time employees did not identify evidence of chemical exposure monitoring while spraying fungicides and algaecides in the cooling towers. Former carpenters interviewed expressed concern for the green dust generated during cooling tower repairs and the rotted and ice-damaged wood during the early period when they did not wear respirators. They assumed that the dust contained chromates, but the inspection team identified no monitoring data to reflect the materials and concentrations to which the carpenters might have been exposed. An industrial hygiene survey in November 1976, addressing the mist of an operating cooling tower, determined that all chemicals for which they analyzed were below established limits. However, this sampling may have no correlation to concentrations possibly encountered during spraying or cutting cooling tower wood with power saws.

Cooling tower operating procedures from as early as 1984 required respiratory protection against the possible presence of bacteria while working on top of an operating tower and within heavy mist. The principal concern is Legionnaire's Disease bacteria (LDB), a naturally-occurring bacterium that has been monitored in PORTS cooling towers since 1979 and has on occasion reached potentially infectious levels. Control of LDB was implemented with halogen shock treatments, and with a control level well below assumed infectious levels. Earlier versions of the procedure also referenced concern for asbestos fibers, first detected in the cooling towers in 1975 and derived from asbestos-bearing fill material. Following asbestos abatement in the late 1980s and early 1990s, cooling tower fiber levels have dropped and are no longer a concern. Interviewees remember not wearing respirators on the towers in the early years and saw the change in requirements as an improvement in safety. The hazards associated with fungicides and biocides were identified, monitored, and controlled for some workers (e.g. cooling tower sprayers), but not for all workers (e.g., carpenters).

# APPENDIX B
# PRINCIPAL ACTIVITY EVALUATION SUMMARY

Table B-1 outlines the principal activities conducted at PORTS between 1952 and 1997, and provides an assessment of the hazards that may have been encountered by these activities, the controls available and generally used to mitigate the hazards, and the effectiveness of the controls when implemented. Acronyms are defined at the end of the table.

**Table B-1. Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Ash handling | X-344, X-705E | RAD, exposure to $UF_6$ gas, and inhalation of dust containing uranium and concentrated daughter products; TRU and fission products at X-705 only | Film badge or TLD, PPE, stay time, worker rotation, bioassay, ambient air flow | Moderately effective when used correctly | 1958-1962 (X-344)  1957-1978 (X-705) |
| Buffer modification of G-17 valve | Process buildings | RAD, $UF_6$, HF, $UO_2F_2$, uranium daughters, fission products, TRU, and heat stress | Film badge or TLD, PPE, wood plugs, ventilation, bioassay | Effective when used correctly | 1982-1983 |
| Building access (to perform various duties, such as deliveries) | All Plant facilities | See full range of hazards described for all Plant facilities | Film badge or TLD, PPE, bioassay, housekeeping, postings | Minimally effective when used correctly prior to 1988  Effective when used correctly after 1988 | 1953-1987  1988-1997 |
| Burial of classified and contaminated materials | X-749, X-749A | RAD, $UF_6$ gas, nickel carbonyl, asbestos | Film badge or TLD, PPE, stay time, bioassay | Effective when used correctly | 1953-1997 |
| Can and drum crushing | Process buildings, X-705, X-720, X-740 | RAD, $UO_3$, TRU, technetium | Film badge or TLD, PPE, bioassay | Effective when used correctly | 1997 |
| Carpentry | Cooling towers | Asbestos, arsenic, fungicides, sulfuric acid, chromates, noise, STF, Legionnaire's Disease | PPE | Effective when used correctly. | 1952-1997 |
| Collection of uranium oxide powder from calciner | X-705 | Inhalation of insoluble airborne uranium, TRU | PPE, bioassay | Moderately effective when used correctly | 1954-1997 |

**Table B-1.  Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997 (Continued)**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Crane operation | Process buildings | RAD, PG, heat stress | PPE, bioassay | Effective when used correctly | 1953-1997 |
| Cross connection of sanitary water and contaminated condensate systems | Steam plant | RAD, ingestion or inhalation of particulates | Removal of cross-connection in early 1990s | Effective when used correctly | 1979-1997 |
| Cutting or welding Freon pipe | Process buildings, X-700 | Phosgene, hydrogen chloride, burns | PPE, ventilation, Freon evacuation procedures | Effective when used correctly | 1954-1997 |
| Cylinder heel cleaning | X-705 | RAD, $UF_6$ gas, TRU, NC, chemical burns, concentrated fission and daughter products | Film badge or TLD, PPE, bioassay, ambient air flow, cylinder net weight determination, enclosed cleaning system | Moderately effective when used correctly; beta dose to eyes not measured | 1954-1997 |
| De-blading of compressor rotor and stator | X-705 | RAD, $UF_6$, HF, $UO_2F_2$, TRU, technetium, fission and uranium daughter products, noise | Film badge or TLD, PPE, bioassay, $UF_6$ Negative procedure, ventilation | Moderately effective when used correctly | 1954-1997 |
| Decontamination of equipment | Process buildings, X-705, X-720 instrument room | RAD, $UF_6$, HF, $UO_2F_2$, TRU, NC, PCBs, acids, solvents, uranium daughter and fission products, asbestos, chemical burns | Film badge or TLD, PPE, stay time, bioassay, ventilation, geometry, sampling, uranium mass determination | Moderately effective when used correctly | 1954-1997 |
| De-smoking ash pots through building ventilation | X-705E | RAD, TRU, HF, $UF_6$, $UO_2F_2$ contamination at building vents and release to environment | None | Ineffective | 1958-1966 |
| Disassembly of stuck shut G-17 cell block valves | X-705 | RAD, $UF_6$, HF, $UO_2F_2$, TRU, fission and uranium daughter products, noise, burns, NC | Film badge or TLD, PPE, bioassay, $UF_6$ Negative procedure, disassembly procedure, shop evacuation, ventilation, geometry, sampling, uranium mass determination | Effective when used correctly | 1955-1997 |
| Draining cold traps | X-705E | RAD, $UF_6$, $UO_2F_2$, HF, TRU, NC | Film badge or TLD, PPE, bioassay, geometry and sampling | Effective when used correctly | 1958-1978 |

**Table B-1.  Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997 (Continued)**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Duct maintenance | All buildings | RAD, $UF_6$, PCBs, fluorine, strychnine from pigeon feces due to poisoning | Film badge or TLD, PPE, bioassay | Effective when used correctly | 1954-1997 |
| Dumping uranium from vacuum collector to drums and returning uranium to process | X-344, X-705 | RAD and inhalation of uranium dust | Film badge or TLD, PPE, bioassay, ambient air flow | Moderately effective when used correctly | 1958-1962 (X-344)  1957-1978 (X-705) |
| Electrical maintenance | All | PCBs, solvents, electrocution, noise | PPE, work permits | Effective when used correctly | 1953-1997 |
| Fire box cleaning at steam plant (annual) | Steam Plant | Airborne arsenic from coal combustion | PPE, air monitoring after discovery of hazard in late 1989; only paper mask worn prior to 1989 | Effective when used correctly  Ineffective before 1989 | 1953-1997 |
| Flange grinding | Process buildings, X-700, X-720, X-705 | RAD, $UF_6$, HF, $UO_2F_2$, TRU and uranium daughter products, noise, heat, asbestos, cadmium, nickel fumes | Film badge or TLD, PPE, bioassay, decontamination, ventilation | Effective when used correctly | 1954-1997 |
| Groundskeeping | All | RAD, PCBs, asbestos, arsenic, fungicides, radioactive dust | Film badge or TLD, PPE, bioassay | Moderately effective when used correctly | 1952-1997 |
| Guard patrolling | All facilities and roads | See full range of hazards described for all Plant facilities | Film badge or TLD, PPE, contamination surveys, bioassay | Moderately effective when used correctly | 1953-1997 |
| Guard drills | All facilities and roads | See full range of hazards described for all Plant facilities | Film badge or TLD, contamination surveys, bioassay | Ineffective | 1983-1995 |
| Incinerator operations | X-705 Incinerator (New and Old) | RAD, PCB, barium, cadmium, radioactive dusts | Film badge or TLD, PPE, bioassay | Effective when used correctly | 1959-1985 |
| Industrial photography | All buildings | RAD, PG, $UF_6$, STF | Film badge or TLD, bioassay | Effective when used correctly | 1952-1997 |
| Instrument maintenance | X-720, X-770, and satellite instrument shops | RAD, HF, $UF_6$, TRU, uranium daughters and fission products, acids, mercury, solvents, burns, cyanide | Film badge or TLD, PPE, bioassay, decontamination, ventilation | Effective when used correctly | 1954-1997 |

**Table B-1. Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997 (Continued)**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Jetting/Venting | Process buildings | RAD, $UF_6$, HF, $UO_2F_2$, TRU and uranium daughters released to environment | Film badge or TLD, bioassay, procedures specified limiting venting to only purging cells with < 20 ppm $UF_6$ | Effective when used correctly | 1953-1997 |
| Landfill operations | Peter Kiewit, X-734, X-735 | Asbestos and ash from coal-fired plant, dust from contaminated building rubble | Administrative controls on disposal items; in early 1980s added controls on asbestos and building rubble disposal | Effective when used correctly | 1955-1997 |
| Lithium repackaging | X-740 warehouses | Lithium hydroxide monohydrate (LiOH) exposure | Respirator | Effective when used correctly | Mid-1980s |
| Lithium relocation | X-740 warehouses | LiOH exposure | Dust masks | Minimally effective when used correctly | 1977-1980 |
| Lubrication | All | PCBs, solvents | PPE, decontamination | Effective when used correctly | 1987-1990 |
| Machining | X-710, X-720 | Lead, PG, solvents, uranium, beryllium | PPE | Effective when used correctly | 1953-1997 |
| Mercury handling | Laboratory, X-705 recovery room, X-720, process buildings | Spills, mercury vapor and contamination | PPE, containment, decontamination, ventilation | Effective when used correctly | 1953-1997 |
| Operation and maintenance of uranium recovery system (by solvent extraction and other uranium solution processing and storage) | X-705 | RAD, TRU, technetium, airborne uranium, radioactive effluents, NC | Film badge or TLD, bioassay, PPE, effluents were sampled and release limits were applied, geometry and sampling | Moderately effective when used correctly | 1954-1997 |
| Plating | X-720 | Cyanide, halide, ammonia, hydrogen cyanide, acids | PPE, ventilation | Effective when used correctly | 1954-1997 |
| Product withdrawal during normal operations | X-326, X-330, X-333 | RAD, $UF_6$, TCE | Film badge or TLD, PPE, stay time, worker rotation, bioassay, ambient air flow | Effective when used correctly | 1954-1997 |
| Pulverizer operations and maintenance | X-705E, X-344 | RAD and inhalation of dust containing uranium, fission products; thorium, TRU (including Np and Pu) at X-705 only | PPE, film badges or TLD, bioassay, ambient air flow | Moderately effective when used correctly | 1957-1978 (X-705E)<br><br>1958-1962 (X-344) |

**Table B-1. Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997 (Continued)**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Receiving and using K-25 equipment | X-15, X-705, process buildings | RAD, $UF_6$, NC, HF, uranium compound deposits, TRU, technetium | Film badge or TLD, PPE, bioassay, purging, ventilation, decontamination, evacuation | Moderately effective when used correctly | 1980-1997 |
| Release response | Process and support buildings | RAD, inhalation of radioactive materials, skin contamination, chemical burns | Film badge or TLD, PPE, bioassay, ventilation, decontamination procedures, response kit | Effective when used correctly; ventilation systems were frequently inoperable | 1954-1997 |
| Removal of "000" compressors stub shaft | X-705 | RAD, $UF_6$, HF, $UO_2F_2$, TRU, fission and uranium daughter products, NC, burns, noise | Film badge or TLD, PPE, bioassay, $UF_6$ Negative procedure, ventilation, pit evacuation, sampling, uranium mass determination | Effective when used correctly | 1957-1978 |
| Removal of compressor seals | Process buildings, X-705 | RAD, HF, $UO_2F_2$, TRU, fission and uranium daughter products, burns, noise | Film badge or TLD, PPE, bioassay, $UF_6$ Negative procedure, ventilation, evacuation | Effective when used correctly | 1954-1997 |
| Removal of converter shell internal fixtures | X-705 | RAD, uranium compound deposits, $UF_6$, HF, $UO_2F_2$, TRU, fission and uranium daughter products, burns, noise | Film badge or TLD, PPE, bioassay, $UF_6$ Negative procedure, additional purge in cell, evacuation | Effective when used correctly | 1957-1993 |
| Replacement of full $UF_6$ cylinder valve | X-343 X-344 X-705 | RAD, $UF_6$, HF, $UO_2F_2$, TRU, fission and uranium daughter products | Film badge or TLD, PPE, bioassay, repair procedure, cooling cylinder to sub-atmospheric, and emergency response procedures | Effective when used correctly | 1954-1997 |
| Reproduction | X-100 reproduction facility | Naphtha; hydrochloric, sulfuric, phosphoric, citric, and acetic acids; ammonia; methyl alcohol; skin burns from carbon arc lamps; TCE | PPE | Effective when used correctly | 1952-1997 |
| Roof access | Various buildings | Venting HF, uranium, and other chemicals to roof | Bioassay; roof access controls implemented in X-710 in 1963 | Ineffective Effective when used correctly | 1954-1991 1992-1997 |
| Sand blasting | X-744G | Silicon dioxide | PPE | Effective when used correctly | 1954-1997 |

**Table B-1.  Portsmouth Gaseous Diffusion Plant Principal Hazardous Activity Evaluation Summary: 1952-1997 (Continued)**

| Activity Description | Plant Location(s) | Potential Hazard(s) | Hazard Control(s) | Hazard Control Effectiveness and Use | Time Period |
|---|---|---|---|---|---|
| Smelting | X-744G | RAD, HF, PG, airborne uranium, TRU, process heavy metals | Film badge or TLD, PPE, air samples, bioassay | Moderately effective when used correctly | 1961-1983 |
| Spraying cooling towers with fungicide and corrosion inhibitors | Cooling towers | Fungicides, sulfuric acid, arsenic, chromates, Legionnaire's Disease, asbestos, noise, STF | PPE | Effective when used correctly | 1953-1997 |
| Transformer maintenance | All | Electrocution, PCBs, asbestos, confined space, solvents | PPE, work permits, ventilation | Effective when used correctly | 1950s-1997 |
| Unplugging feed plant transfer lines, hoppers, and conveyers using sledge hammers and rods during normal operation | X-344 | RAD, $UF_6$, inhalation of uranium dust, noise | Film badge or TLD, PPE, bioassay, ambient air flow | Moderately effective when used correctly | 1958-1962 |
| Unplugging fluorination towers | X-344, X-705 | RAD, TRU (in X-705 only), NC, exposure to $UF_6$ gas, inhalation of dust containing uranium and fission products (X-705 only) | Film badge or TLD, PPE, stay time, bioassay, ambient air flow, geometry, and sampling | Moderately effective when used correctly | 1958-1962 (X-344) 1957-1978 (X-705) |
| Uranium powder conveyer, hopper, and other equipment maintenance and replacements | X-344, X-705 | RAD and inhalation of uranium dust | Film badge or TLD, PPE, bioassay, ambient air flow | Moderately effective when used correctly | 1958-1962 (X-344) 1957-1978 (X-705) |
| Welding | Process buildings, X-700, X-720 | RAD, $UF_6$ PG, HF, $UO_2F_2$, acids, uranium and fission products, asbestos, heat stress, thermal burns, phosgene, nickel fumes | Film badge or TLD, PPE, bioassay | Effective when used correctly | 1954-1997 |

**Key:**

| | | | |
|---|---|---|---|
| CIP | Cascade Improvement Program | Pu | Plutonium |
| CUP | Cascade Upgrade (or Uprating) Program | RAD | Includes one or more of alpha, beta, or gamma radiation |
| HF | Hydrogen Fluoride | STF | Slips, trips, and falls (common industrial accidents) |
| NC | Risk of nuclear criticality | TCE | Trichloroethene |
| NDA | Nondestructive Analysis | Th | Thorium |
| Np | Neptunium | TLD | Thermoluminescent Dosimeter |
| PCB | Polychlorinated Biphenyl | TRU | Transuranic |
| PG | Process gas | Note: | Bioassay includes urinalysis and/or in-vivo lung counting. |
| PPE | Personal Protective Equipment (includes one or more of: respirator, shoes, gloves, caps, eye protection, ear plugs, and contamination clothing) | | |

# EXHIBIT K

COMPANY : AMERICAN HEALTH PROFILES

JOHN BRANSFORD Home 561-334-8159

mobile 615-400-0974

Raphael Moure
Industrial Hygiene
OCAW
1636 CHAMPA St.
Denver Colo.
80201

CONFIDENTIAL

615 6615781

JOHN S. BRANSFORD, JR.
20 FOXHALL CLOSE
NASHVILLE, TENNESSEE 37215

CONFIDENTIAL

Raphel Moure
OCAW
Denver Colo.

Dear Raphael

I was sort of surprised to read in BNA about the views on compensation for sick workers with long term exposures to low level radiation (May 31, 79 edition).

Remember what I told you — even at the Pikeville AEDC/DOE Goodyear atomic plant they are "pulling the wool" over the unions eyes. Consider these facts re the medical picture

① Feb 28, 79 OLD Dr Henson still "in charge" and still asleep at the Job.

② The chief administrator had and has a 7th grade education with no self improvement (John Doellner) — totally intimidated

③ In March 79; Enter a new physician — who is also a lawyer He is a slick article W.T. Washam M.D.

④ My doctor (nameless) came in, told me many are sick but he is not permitted access — so he left.

⑤ March 12, 1979 an unmarked DoE whole had, must

Loellner, who is afraid, asked me to come with Karen Camp (knowledgeable assistant of mine) to teach Washam, Henson et al how to revamp the recordkeeping system, comply with minimum standards and then to take the whole case to AEDC (oak Ridge) for budget approval for FY 80/81.

Washam has now hired two kid lawyer types. He is directing the fight against the union from a protected position. He does not _want_ a recordkeeping system. His new excuse is that DOE has ordered Goodyear to cut $3 million out of next year's budget for administration.

I have officially told them they are in gross violation. They made me _destroy_ all the tapes and records. They refused to let the data be recorded where it _could_ be analyzed. He won't let the DOE badge scan data be married to the IH and medical. I am sick of the man's arrogance. The local hothead from OCAW (Striker) is a laughing stock for Washam et al. Kennedy's commission has questioned me extensively — I have not opened up to them fully —

I believe a letter from you showing you know certain facts or an interrogatory will do it. Do we have "wall to wall" authority there? If a security clearance is

LH and MD's with — and plenty of solid Q clearances.

Call me if you agree, Zoellner is our way in — He is afraid — He will tell on the others with a little pressure and if we promise to defend him against a discriminatory firing

John

CONFIDENTIAL

615-385-3818 home 6156615781
615-356-6700 office

P.S Will let you know about NIOSH meetings and the AAFP adoptions (Amer Acad Family Practitioners)

# EXHIBIT L

**U.S. Department of Labor**
Occupational Safety and Health Administration

**Citation and Notification of Penalty**

**Inspection Number:** 121987366
**Inspection Dates:** 12/03/97 - 01/29/98
**Issuance Date:** 02/17/98



**Company Name:** Lockheed Martin Utility Services, Inc.
**Inspection Site:** Rt. 23, Piketon, OH 45661

---

Citation 1 Item 7 Type of Violation: **Serious**

29 CFR 1910.1020(d)(1)(ii): The employer did not preserve and maintain records of employee exposure of all employees for at least thirty years:

a.  Records of radiation exposures for all company employees were not adequately maintained from 1993 to 1995 in that some employee exposures were arbitrarily assigned and based solely upon their past exposures which may have differed from exposures experienced during the period relating to the assigned dose.

b.  Records of radiation exposures were not accurately preserved and maintained in that for the period of 1993 through 1995 some thermoluminescent dosimeters (TLDs) which were used to measure and create a record of employee radiation doses, were not evaluated and a zero dose was assigned to an employee where the exposed TLD which was assigned to the employee was damaged.

| Date By Which Violation Must be Abated: | 03/06/98 |
|---|---|
| Proposed Penalty: | $ 2500.00 |



---

See pages 1 through 3 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

# EXHIBIT M

**AFFIDAVIT**

STATE OF OHIO,
COUNTY OF SCIOTO, ss:

Chester M. Davis, being first duly sworn, says that he was a Security Police Officer at the Portsmouth Gaseous Diffusion Plant from June 13, 1977 to September 30, 1999 and my address is 102 Brookside Drive, Lucasville, Ohio 45648, and my home phone number is 740-259-4635.

He further says that around August of 2016 he attended dinner for retired guards at Ritchie's in Piketon, Ohio.

I spoke to Jim Sevens who stated he was going to retire in 35 days.

I advised him to get a complete copy of his medical records before he left the plant site because Rich Corriel was pulling information from records of employees.

He stated he was aware of that and that it was classified information in employee medical records.

I was concerned as it could make it very difficult for employees to prove they were contaminated by radiation and toxic substances.

CHESTER M. DAVIS

Sworn to and signed before me, an Ohio Notary Public, by Chester M. Davis this 11th day of July , 2017.

Notary Public

Sharon K. Bentley
Notary Public, State of Ohio
My Commission Expires Feb. 25, 2021

# EXHIBIT N



Internal Correspondence



MARTIN MARIETTA ENERGY SYSTEMS, INC.

December 8, 1992
POEF-160-92-634

Steve Pullins

X-326 Performance Indicator Review

Health Physics reviews the results from the urinalysis program for the purpose of evaluating trends developing that affect the overall safe operation of the plant site. Any time an individual submits a routine sample with results greater than 4.0 dpm/100 ml, Health Physics requests the individual submit another sample to confirm the intake or evaluate the severity of the problem.

In June, it was noted that the instances of positive bioassay samples had increased. (A positive bioassay sample is defined as detectable, not necessarily exceeding the flag level.) At first this was attributed to the return of the hourly workers, resulting in a greater number of individuals submitting samples. After evaluating the data for several months, this does not appear to be the case.

The air card data for the X-326 was also evaluated to determine if the same trends were occurring. After reviewing this data, the following items are noted:

1.  The percentage of positive bioassay samples for the entire plant site has doubled since the first of the year. (See Graph 1992 Bioassay Program Summary.)

2.  The percentage of positive bioassay samples for individuals assigned to the X-326 has almost tripled. This increase was first noted in June with a major occurrence of positive bioassay samples happening in August. (See Graph 1992 Bioassay Program Summary and the Bioassay Summary which shows the yearly summary from 1989 through October 1992.)

3.  The "blank" urine results from the X-710 lab have risen from 0.4 dpm/100 ml to 1.1 dpm/100 ml. (See Graph 1992 Bioassay Program Summary.) The "blank" urine specimens are collected from individuals assigned to the X-710 whose duties do not regularly require entry to radiological areas, essentially "non-radiation workers."

4.  The X-326 1992 Air Card Program Summary (graph attached) shows a significant increase during August and September, from 0.03% of the Derived Air Concentration (DAC) to 0.2% of the DAC.

Pulling

December 8, 1992
POEF-160-92-634

DAC is calculated by dividing the ALI (ALI or Annual Limit of
Intake equates to an internal exposure of 5,000 millirem) by
standard mans occupational breathing rate and expressed in
microcurie/milliliter.  From the RadCon Manual, an area with
an airborne radioactivity concentration of 10% of the DAC
would require respiratory protection.

If an individual were to work in an airborne radioactivity
concentration of 2% of the DAC for the work year, the intake
of radioactivity would equate to 100 millirem Committed
Effective Dose Equivalent, CEDE.

Since 1989, PORTS has not had any single individual with a
committed internal dose equal to 100 millirem; however,
another increase in the air concentration of the same
magnitude noted in August in the X-326 would greatly increase
the possibility.

The air card data for October indicates the levels may be
returning to normal.  This trend is inconclusive, since it
appears some of the data has not been entered in the data
base.

A very rough calculation indicates a possible 70 dpm/100 $cm^2$
alpha contamination based on the air sample results.  While
this level of contamination is significantly less than DOE and
detection limits for hand held survey equipment (recent
routine surveys indicate no detectable removable
contamination), it could be the reason we are having instances
of Berthold hand and/or foot contaminations.

The following occurrences also indicate the X-326 radiological
conditions have degraded to a point that the HEU Suspension Project
should be re-evaluated.

1.    The X-326 Berthold results indicate 110 instances of
      detectable contamination from November 18 through December 1
      (also refer to Item 4 of this section).

2.    Instances of removable contamination in the ventilation ducts.
      (Attached are a number of surveys which indicate removable
      contamination in the X-326 ventilation ducts.)  Due to
      facility design, this condition can exist in all process
      buildings, but is highlighted due to the higher assays in the
      X-326.

Steve Collins
Page 4
December 8, 1992
POEF-160-92-634

8.  Increase the amount of HP technician coverage and thoroughly characterize removable contamination levels in the building. All swipes taken during this characterization that are not detectable by normal counting methods should be counted in a low background proportional counter to determine actual contamination values.

NOTE:   **This can only be accomplished by sacrificing support within other cascade and support facilities.**

9.  Re-evaluate the policy of, or use of, sweeping compounds and sweeping machines on a continuing basis.

If you have any further questions concerning this data or these conclusions, please do not hesitate to contact me.

Mark Granus, X-1000, MS-5020, PORTS (5975)

MWG:JFThompson:rf

Attachments (5)

cc/att:  Records Management
         Bill Strunk
         File-Health Physics - RC

 

**RTIN MARIETTA ENERGY SYSTEMS, INC.**

POST OFFICE BOX 628
PIKETON, OHIO 45661
March 5, 1993
POEF-160-93-144

Mr. Eugene W. Gillespie, Site Manager
Portsmouth Site Office
Department of Energy
Post Office Box 700
Piketon, Ohio  45661

Dear Gene:

Special Air Sample Monitoring Program in the X-326

The Health Physics (HP) Department reviews all bioassay and air data quarterly to determine if upward trends are occurring.  This is done as a reasonable measure to ensure the health and safety of all employees.

The historic Portsmouth Gaseous Diffusion Plant (PORTS) bioassay action levels are as follows:

|  | Routine | Special |
|---|---|---|
| Flag | = 8.0 dpm/100 ml | 800 dpm/100 ml |
| Investigate | = 16.0 dpm/100 ml | 1200 dpm/100 ml |
| Restriction | = 80.0 dpm/100 ml | 2000 dpm/100 ml |

The HP Department, in an effort to upgrade the Internal Dosimetry Program, had instituted some minor changes in late 1991.  The first was to change the counting protocol of the bioassay samples to lower the effective detection limit to approximately 2.0 dpm/100 ml.  The second change was to start recalling individuals for a resample at 4.0 dpm/100 ml in an effort to confirm if an intake had occurred.  This effectively changed the PORTS Bioassay Program from a program dependent on "intake detection" to a program of "intake assessment."  In other words, we now know and assess much lower exposures.

When reviewing the second quarter Calendar Year (CY) 1992 bioassay data, it was noticed that there was an apparent increase in the number of positive (detectable) samples being submitted.  There was also a dramatic increase in the number of people being recalled for confirmatory samples.

The first indication was an increase in the number of positive samples submitted in June 1992.  It is assumed that the reason for the increase was the return of the Oil, Chemical and Atomic Worker (OCAW) personnel.  Since the July bioassay data did not indicate any further increase, nothing was done at the time.  Also during this time frame, the air card data did not indicate any major increases of airborne radioactivity concentrations.

Mr. Eugene W. Gillespie                2                March 5, 1993
                                                        POEF-160-93-144

In November, while reviewing the third quarter bioassay and air-
card data, it was noticed that there was another increase in the
number of positive bioassay samples. Individuals assigned to the
X-326 Building were submitting the majority of the positive
bioassay samples, while at the same time a minor increase in the
airborne radioactivity concentration in the X-326 was noted. Most
of the levels detected were extremely low and were less than the
historic flag level of 8.0 dpm/100 ml.

This was brought to the attention of the PORTS Operations
management and corrective actions began in early December. HP and
X-326 Operations personnel began an aggressive program to determine
where the problem was occurring. This called for HP to temporarily
assign one of the Contamination Control technicians to an air
sampling and special survey program while Operations made
inspections to determine if unidentified systems leaks were
occurring. (A copy of the letter POEF-160-92-634 outlining HP's
actions and recommendations is attached.)

After approximately a week, it was apparent that the airborne
radioactivity concentrations were varying with the atmospheric
pressure. Since there have been major modifications in X-326 in
conjunction with the HEU suspension project, HP's first concern was
that the modifications were the cause. When this information was
brought to the attention of Operations personnel, a concerted
effort to bring all of the "cells" in the X-326 to a slight
negative to atmospheric pressure was undertaken.

In HP's letter POEF-160-93-011 (attached), you will find a summary
of our findings. The attached graph shows the weekly airborne
concentration averages along with the daily concentrations. As you
will notice, there is a decrease in the weekly average airborne
concentration after week one. In HP's letter POEF-160-93-098, the
attached graph shows the weekly and monthly averages during this
temporary air sampling strategy. The decrease of the airborne
concentrations to effectively "zero" or background levels, along
with the reduction in the number of recall bioassay samples (5.27%
in December to 1.04% in January and 1.087% for the first three
weeks of February), has given us enough data to suspend the special
air sampling regimen in X-326.

The special air sampling was performed by strategically placing
Breathing Zone (BZ) pumps in X-326 and assigning the HP technicians
BZ pumps while carrying out their normal duties. The BZ pumps are
utilized by both Industrial Hygiene and HP to assess job-related
hazards. The special air sampling program was using up ten extra
pumps a day, along with removing the HP technician from his
regularly assigned duties. Since the suspension of the special X-
326 coverage, there are other jobs on plant site that are requiring

Mr. Eugene W. Gillespie      3      March 5, 1993
POEF-160-93-144

special coverage. The alumina trap batching currently occurring in X-744G, along with the requests for special gaseous technetium sampling requested by X-326 management, are two such projects we are currently concerned with.

The HP Department has several additional portable air sampling stations on order to increase the air monitoring capabilities in X-326 and other buildings at PORTS. This equipment is scheduled to be on site in mid March. When this equipment is operational and personnel trained in its use, the number of air sample locations will be effectively doubled on plantsite.

In an effort to ensure management is kept aware of the potential internal dosimetry concerns, HP began submitting to division managers a monthly internal dosimetry report. (Attached are copies of the December 1992 and the January 1993 letters with attached summary sheets.) This report is currently set up to identify the individuals who have been recalled for bioassay sampling for radioactive contaminants, along with a millirem dose approximation.

In closing, we consider the special sampling program a success. A problem was discovered (while the levels were still low), corrective actions implemented, and the problem resolved.

Please contact Charley Slater at extension 5975 if you have any further questions.

Sincerely,

Ralph Donnelly
Plant Manager

RGD:JFThompson:rf

Attachments (5)

cc/att:   Bill Bennett, DOE-HQ
       Wendy Fields, 702SIA
       Mark Granus/Charley Slater
       Jay Hummer, 701SCA
       Records Management/PMO - RC
       Steve Polston, PGDP
       Bill Strunk
       File-Health Physics

*Goodyear to Air to*
*Lockheed*

- Lockheed Martin Integrated Business Solutions Response Form - ONLINE RESPONSE FORM We look forward to reviewing your qualifications, and should a match exist between your background and our current opportunities, we will contact you. Please complete this form, including your ASCII text resume, and Submit Form.
  --http://www.careermosaic.com.hk/cm/**lockheed**/lmibs2.html

- Accounting Principles - Fifth Edition - Chapter 21 Exercise 21-3 Ethical Activity **Lockheed Martin** was formed March, 1995 by the merger of the **Lockheed** and **Martin** Marietta corporations. Today **Lockheed Martin** is a highly diversified advanced technology company with core businesses in...
  --http://www.wiley.co.uk/college/weygandt5e/ie/chp21-ex3.html

- GameSpot - 3D News: Real 3D Spins Off From Lockheed Martin - NEWS 3D News: Real 3D Spins Off From **Lockheed Martin** 10:05, 15 January 1998 **Lockheed Martin** announced that it has spun off the Real 3D department as an independent corporation while **Lockheed** will still retain majority ownership. At the same time...
  --http://www.gamespot.co.uk/news/1998/01/246.html

- Lockheed Martin Engineering Management Program - Fall 1999 News - **Lockheed Martin** Engineering Management Program. A distance education graduate program offered by the University of Colorado
  --http://www.colorado.edu/EngMgmtProg/news1999f.html

- Links2Go: Lockheed Martin - Advanced Concepts Center - Links and topics related to **Lockheed Martin - Advanced Concepts Center.**
  --http://www.links2go.com/more/www.lmco.com/acc

- Corporate Profile for Lockheed Martin Missiles & Space, dated Sept. 5, 1997 - Corporate Profile for **Lockheed Martin** Missiles & Space, dated Sept. 5, 1997
  --http://www.businesswire.com/webbox/bw.090597/467628.htm

- FaradNet Capacitor Address - FaradNet® Capacitor **Address** - **Lockheed Martin** Microwave - **Lockheed Martin** Microwave Semiconductor Division 75 Technology Dr Lowell, MA 01851 USA Tel: 508-256-4113 Fax: 508-937-3748 Type: Chip Company Index ToC | About | Capacitor | Knowledge ...
  --http://www.rawspace.com/faradnet/company/c0001311.htm

- Yahoo - Lockheed Martin Team to Address Global Oceanic Air Traffic Management Modernization - Home - Yahoo! - Help [ Business | US Market | By Industry | IPO | AP | S&P | International | PRNews | BizWire | CCN ] Related Quotes^DJI ^IXIC ^SPC ^IIX ^PSE 9796.03 4847.84 1355.62 649.95 1211.32 +0.00 +0.00 -35.66 +0.00 +0.00 delayed 20 mins ...
  --http://biz.yahoo.com/prnews/991025/lckhd_mart_1.html

- Links2Go: Lockheed Martin Energy Systems - Links and topics related to **Lockheed Martin Energy Systems.**
  --http://www2.links2go.com/more/www.ornl.gov/mmes.html

- Goodyear Aerospace Corporation - Goodyear Aerospace Corporation Status Later became Loral Defense Systems Division, now it is **Lockheed-Martin** Tactical Defense Systems Division. Overview of Organization **Lockheed Martin** Corporation was formed in March 1994 with the merger of two of..
  --http://nhse.npac.syr.edu/hpccsurvey/orgs/goodyear/goodyea...

- Online Ethics Center - Mini-cases from Lockheed Martin Corporation - Mini-cases from **Lockheed Martin** Corporation Twenty mini-cases from "Graymatters," a game from **Lockheed Martin** Corporation, used with permission. The game was designed to educate the employees of **Lockheed Martin** (and other high tech corporations...
  --http://www.onlineethics.com/text/corp/graymatters/**martin**....

EXHIBIT O

Michelle R. Dobrovolny
3401 W. 55th Ave
Denver, CO 80221
720-234-0755

SEC Petition
Division of Compensation and Analysis and Support
National Institute for Occupational Safety and Health
4676 Parkway, MS-C-47
Cincinnati, OH 45226

AFFIDAVIT

I worked at the Rocky Flats Nuclear Plant Site from July of 1985 through February of 2001. I had many titles during my employment including Engineering Specialist, Secretary, and Administrative Assistant. One of my many duties was to run Engineering packages in and out of every production building on the plant site. I also worked for Safeguards and Security in which I was in charge of all top secret documents, films, prints, and so forth that were scheduled for destruction due to decommissioning. One specific duty I had was to cover for Secretaries in Building 111 when they were away on vacation, appointments, or leave. This included working directly for Bob Card, General Manager of the entire plant site. On certain occasions while assigned in Building 111 I was directed (by Bob Card) to assist in the shredding of records such as IH Processing Reports, External Dose Evaluation Data, Radiation Dose Assessment Reports, Dosimeter results, Bio-Assay, medical history questionnaires, TLD Detailed reports, and BIO Assay Analytical Reports, as well as other documents. I personally know others that were tasked with the same job of shredding medical records. These documents were shipped to Building 111 in boxes containing employees' records from Dow Chemical through Kaiser Hill. While I was uncomfortable shredding medical records I assumed that it was part of the process to close down the site and I was not going to go against Management. It wasn't until years later that I realized many of my colleagues had missing records, altered records, or incomplete files. I have been resistant to come forward with this information in fear of retaliation. My statements today will in no way benefit me as the designation of the site as an SEC will not impact the claim I have filed. I believe my claim has been denied because I been outspoken about procedures, including the document shredding described above, that occurred at Rocky Flats Plant Site.

Attached is a copy of my notes from my Franklin Planner as I was faithful in note taking while working in Building 130. I became very ill and filed safety concerns only to have that building labeled as a "Sick Building" and as a result I was banned from ever setting foot in Building 130 again. Building 111 was also labeled a "Sick Building" yet I was directed to work in that building without restriction. I feared that some time down the road I might end up sick and I might need to file for assistance because of working in Building 111 and other buildings on plant site. In February 2001 I ended up being permanently disabled due to my work at the plant site. I filed a claim that was subsequently denied. You tell me how my claim can be legitimately denied since it has been medically established that through the plant site I became permanently disabled.

I won't go on to tell you about how my life has been changed because of working at Rocky Flats because my story has been told in the Deadly Denial Series published by the Rocky Mountain News as well as many other articles in various magazines and media outlets that are available if you want to learn more.

In conclusion, I know that facts are what you need to make your decision regarding the designation of the Rocky Flats Plant Site as an SEC and I am telling you that records, including medical reports vital to establishing legitimate workplace injuries, were knowing and purposely destroyed on order from plant site management!

I affirm that the above statement is true.

10-23-12

State of Colorado
County of
The foregoing instrument was acknowledged before
me on this 23ʳᵈ day of October 20 12
by Michelle Perrodin
who is personally known to me or has produced
Colorado Drivers License as identification

Notary's Signature

My Commission Expires 12-17-2014