# EXHIBITS P-W

# EXHIBIT P

USEC/EA-94001
✓ DOE/EA-0837

# ENVIRONMENTAL ASSESSMENT
# FOR THE PURCHASE OF
# RUSSIAN LOW ENRICHED URANIUM
# DERIVED FROM THE DISMANTLEMENT
# OF NUCLEAR WEAPONS IN THE
# COUNTRIES OF THE FORMER SOVIET UNION

## JANUARY 1994



## U.S. ENRICHMENT CORPORATION
### Bethesda, Maryland



MAY 0 4 1994

OSTI

DISTRIBUTION OF THIS DOCUMENT IS UNLIMITED

USEC/EA—94001
DOE/EA-0837

# ENVIRONMENTAL ASSESSMENT

## FOR THE

## PURCHASE OF RUSSIAN LOW ENRICHED URANIUM

## DERIVED FROM THE DISMANTLEMENT OF NUCLEAR WEAPONS

## IN THE COUNTRIES OF THE FORMER SOVIET UNION

January 1994

## U. S. ENRICHMENT CORPORATION

Bethesda, Maryland

MASTER

DISTRIBUTION OF THIS DOCUMENT IS UNLIMITED

## TABLE OF CONTENTS

**Section**                                                                                    **Page**

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iv

LIST OF FIGURES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   v

LIST OF ACRONYMS AND ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . .   vi

CHEMICAL SYMBOLS AND FORMULAS . . . . . . . . . . . . . . . . . . . . . . .   vii

UNITS OF MEASURE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   vii

EXECUTIVE SUMMARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   viii

1.0  PURPOSE AND NEED FOR ACTION  . . . . . . . . . . . . . . . . . . . . . . .   1-1

2.0  DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES  . . . . . . . . . . . .   2-1
    2.1  PROPOSED ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-3
    2.2  ALTERNATIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-5
        2.2.1  No Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-5
        2.2.2  Receipt at the Paducah Gaseous Diffusion Plant . . . . . . . . . . . . . .   2-5
        2.2.3  Receipt at Fuel Fabricators, Domestic or Abroad . . . . . . . . . . . . . . .   2-6
        2.2.4  Optional Transport Mode to the United States . . . . . . . . . . . . . . . . .   2-6
        2.2.5  Transportation of LEU from Several Alternative Ports of Entry to
                Piketon, Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2-7
        2.2.6  Transport of LEU within the United States by Rail . . . . . . . . . . . . . .   2-8

3.0  DESCRIPTION OF URANIUM ENRICHMENT  . . . . . . . . . . . . . . . . . . . .   3-1
    3.1  THE URANIUM ENRICHMENT PROCESS  . . . . . . . . . . . . . . . . . . . .   3-1
    3.2  GASEOUS DIFFUSION PLANTS AT PIKETON, OHIO, AND PADUCAH,
        KENTUCKY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3-2

4.0  HEU TRANSPARENCY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4-1

5.0  DESCRIPTION OF AFFECTED ENVIRONMENT  . . . . . . . . . . . . . . . . . . .   5-1
    5.1  MARINE ENVIRONMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5-1
    5.2  PROPOSED U.S. PORTS OF ENTRY . . . . . . . . . . . . . . . . . . . . . . .   5-4
        5.2.1  Port of Hampton Roads, Virginia  . . . . . . . . . . . . . . . . . . . . .   5-4
        5.2.2  Port of Baltimore, Maryland  . . . . . . . . . . . . . . . . . . . . . . . .   5-5
        5.2.3  Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey . .   5-5
        5.2.4  Port of New York and New Jersey, New York and New Jersey . . . . . . . . .   5-5
        5.2.5  Port of Houston, Texas . . . . . . . . . . . . . . . . . . . . . . . . . . .   5-6
        5.2.6  Port of Charleston, South Carolina . . . . . . . . . . . . . . . . . . . . .   5-6
        5.2.7  Port of Savannah, Georgia . . . . . . . . . . . . . . . . . . . . . . . . .   5-6
    5.3  TRUCK AND RAIL TRANSPORTATION ROUTES . . . . . . . . . . . . . . . . .   5-6
    5.4  GASEOUS DIFFUSION PLANT AT PIKETON, OHIO  . . . . . . . . . . . . . . .   5-8
    5.5  ELECTRIC POWER INDUSTRY  . . . . . . . . . . . . . . . . . . . . . . . . .   5-9

5.6 NUCLEAR FUEL CYCLE MARKETS AND INDUSTRIES . . . . . . . . . . . . . . 5-10
    5.6.1 Uranium Mining and Milling . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-12
    5.6.2 Uranium Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-15
    5.6.3 Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-15
    5.6.4 Fuel Fabrication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-16
    5.6.5 Nuclear Power Generating Capacity . . . . . . . . . . . . . . . . . . . . . . . . 5-17
    5.6.6 The Uranium Service Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-17

6.0 ENVIRONMENTAL CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-1
  6.1 CHEMICAL FORMS AND PATHWAYS . . . . . . . . . . . . . . . . . . . . . . . . 6-1
    6.1.1 External Radiation Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-6
  6.2 POTENTIAL TRANSPORTATION IMPACTS . . . . . . . . . . . . . . . . . . . . 6-7
    6.2.1 Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-9
    6.2.2 Routine Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-13
    6.2.3 Accident Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-17
    6.2.4 Total Radiological Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-24
  6.3 POTENTIAL IMPACT AT THE PORTSMOUTH GDP . . . . . . . . . . . . . . 6-26
    6.3.1 Impact on GDP Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-28
    6.3.2 Impact on Natural Uranium Feed Inventory . . . . . . . . . . . . . . . . . . 6-29
    6.3.3 Impact on Depleted Uranium Storage . . . . . . . . . . . . . . . . . . . . . . 6-30
    6.3.4 Impact on Health, Safety and the Environment at Portsmouth GDP . . . . . . 6-31
  6.4 ECONOMIC CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-32
    6.4.1 Economic Impact on Nuclear Fuel Cycle Industries . . . . . . . . . . . . . 6-32
        6.4.1.1 Uranium Mining and Milling Industry . . . . . . . . . . . . . . . . 6-33
        6.4.1.2 Uranium Conversion Industry . . . . . . . . . . . . . . . . . . . . . 6-34
        6.4.1.3 Fuel Fabrication Industry . . . . . . . . . . . . . . . . . . . . . . . . 6-35
    6.4.2 Economic Impact on the Enrichment Industry (the U.S. Gaseous Diffusion
        Plants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-35
    6.4.3 Economic Impact on the Electric Utility Industry . . . . . . . . . . . . . . . 6-37
    6.4.4 Economic Impact on Proposed Ports of Entry . . . . . . . . . . . . . . . . . . 6-37
  6.5 CUMULATIVE IMPACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-38
    6.5.1 Cumulative Transportation Impacts . . . . . . . . . . . . . . . . . . . . . . . . 6-38
        6.5.1.1 Negligible Individual Dose . . . . . . . . . . . . . . . . . . . . . . . 6-38
        6.5.1.2 NUREG-0170 and Population Exposures . . . . . . . . . . . . . . . 6-39
        6.5.1.3 Estimated Doses for the Proposed Action . . . . . . . . . . . . . . 6-39
        6.5.1.4 Summary of Cumulative Transportation Effect Evaluation . . . . . . 6-43
    6.5.2 Cumulative Economic Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-43
  6.6 ENVIRONMENTAL CONSEQUENCES OF ALTERNATIVES . . . . . . . . . . . . 6-44
    6.6.1 No Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-44
    6.6.2 Receipt at the Paducah Gaseous Diffusion Plant . . . . . . . . . . . . . . . . 6-44
    6.6.3 Receipt at Fuel Fabricators, Domestic or Abroad . . . . . . . . . . . . . . . . 6-45
    6.6.4 Optional Transport Mode to the United States . . . . . . . . . . . . . . . . . . 6-46
    6.6.5 Transportation of LEU from Russia through Several Alternative Ports of
        Entry to Piketon, Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-46
    6.6.6 Transport of LEU within the United States by Rail . . . . . . . . . . . . . . 6-48

7.0 LIST OF PERSONS CONTACTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-1

8.0 LIST OF PREPARERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-1

9.0   LIST OF REFERENCES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9-1

10.0  GLOSSARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10-1

APPENDIX A:  TRUCK AND RAIL TRANSPORTATION RISK METHODOLOGY  . . . . . .   A-1

APPENDIX B:  MARITIME ACCIDENT ENVIRONMENTS . . . . . . . . . . . . . . . . . . . . .   B-1

APPENDIX C:  DETERMINATION OF ANNUAL PORT WORKER EXPOSURE FROM
                        COMMERCIAL RADIOACTIVE SHIPMENTS  . . . . . . . . . . . . . . . . . . .   C-1

## LIST OF TABLES

| Table | | Page |
|---|---|---|
| 2-1 | LEU Receipt Schedule | 2-2 |
| 4-1 | Samples Taken According to the Transparency Protocol | 4-2 |
| 5-1 | Low Enriched Uranium (UF$_6$) Shipments in the United States, 10/1/83-9/2/93 | 5-7 |
| 5-2 | Natural Uranium (UF$_6$) Shipments in the United States, 10/1/83-9/2/93 | 5-8 |
| 6-1 | TLVs and IDLH Levels for Airborne Concentrations of Hydrogen Fluoride and Uranium | 6-2 |
| 6-2 | Comparison of Chemical Toxicity and Radiotoxicity of Soluble Uranium at 97.5 Weight Percent U-235 and 1.14 Weight Percent U-234 Enrichment | 6-3 |
| 6-3 | Hypothetical Accident Conditions for Type B Packages | 6-9 |
| 6-4 | Description of Risk Groups | 6-14 |
| 6-5 | Total Radiological Incident-Free Risk For Proposed Action | 6-15 |
| 6-6 | Port Operations Accident Radiological Risk for the Proposed Action | 6-20 |
| 6-7 | Overland Transportation Accident Radiological Risk from Port of Entry to Piketon, Ohio for the Proposed Action | 6-21 |
| 6-8 | Integrated Air Concentration of Uranium and Hydrogen Fluoride Under Low Probability Severe Accident Conditions Assuming Exposure to Total Release Plume | 6-22 |
| 6-9 | Total Accident Radiological Risks to the Public for the Entire 20 Years of the Proposed Action | 6-23 |
| 6-10 | Total Radiological Risks of Transportation for Proposed Action | 6-25 |
| 6-11 | Impact of the Russian LEU Purchase Program on U.S. GDP Production | 6-27 |
| 6-12 | Cumulative Individual Annual Radiation Dose for Maximally Exposed Individuals in Proposed Ports of Entry (First Five Years of Proposed Action) | 6-41 |
| 6-12A | Cumulative Individual Annual Radiation Dose for Maximally Exposed Individuals in Proposed Ports of Entry (Last Fifteen Years of Proposed Action) | 6-42 |
| 6-13 | Comparison of Transportation Risk for the Two Gaseous Diffusion Plants for the Entire 20-Year Proposed Purchase Program (Person-Rem) | 6-45 |
| 6-14 | Comparison of Incident-Free and Accident Radiological Risk for the Proposed Action Based on Port of Entry | 6-47 |
| 6-15 | Total Transport Radiological Risk Assuming Rail Transport From Selected Ports of Entry for Entire 20 Year Shipping Campaign | 6-49 |

## LIST OF FIGURES

Figure                                                                Page

5-1     Map of Proposed Shipping Lanes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-2
5-2     The Nuclear Fuel Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-11
5-3     Comparison of Spot Price (1991$) with U.S. Uranium Production . . . . . . . . . . . . . 5-13
5-4     Comparison of U.S. Uranium Production with Employment . . . . . . . . . . . . . . . . . . 5-14
6-1     Toxicity of Acute Exposures to Hydrogen Fluoride . . . . . . . . . . . . . . . . . . . . . . . 6-4
6-2     Toxicity of Acute Exposures to Soluble Uranium . . . . . . . . . . . . . . . . . . . . . . . . 6-5

## LIST OF ACRONYMS AND ABBREVIATIONS

| ACRONYM | WORD |
|---------|------|
| ACGIH | American Conference of Governmental Industrial Hygienists |
| AEC | Atomic Energy Commission |
| ANSI | American National Standards Institute |
| ASME | American Society of Mechanical Engineers |
| ASTM | American Society for Testing Materials |
| AVLIS | Atomic Vapor Laser Isotope Separation |
| CEQ | Council on Environmental Quality |
| CERL | Construction Engineering Research Laboratory |
| CIS | Commonwealth of Independent States |
| DOE | U.S. Department of Energy |
| DOT | U.S. Department of Transportation |
| EA | Environmental Assessment |
| EC | European Community |
| EEI | Electric Energy, Incorporated |
| EIA | U.S. Energy Information Administration |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| FOB | Freight on Board |
| GDP | Gaseous Diffusion Plant |
| HEU | Highly Enriched Uranium |
| IAEA | International Atomic Energy Agency |
| ICRP | International Commission on Radiological Protection |
| IDLH | Immediately Dangerous to Life or Health |
| LCF | Latent Cancer Fatality |
| LEU | Low Enriched Uranium |
| LLNL | Lawrence Livermore National Laboratory |
| LWR | Light Water Reactor |
| NEPA | National Environmental Policy Act |
| NCRP | National Committee on Radiation Protection and Measurements |
| NID | Negligible Individual Dose |
| NOAA | National Oceanic and Atmospheric Administration |
| NRC | Nuclear Regulatory Commission |
| OSHA | Occupational Safety and Health Act |
| OVEC | Ohio Valley Electric Company |
| SWU | Separative Work Unit |
| TI | Transport Index |
| TLV | Threshold Limit Values |
| USEC | United States Enrichment Corporation |

## CHEMICAL SYMBOLS AND FORMULAS

| ABBREVIATION | WORD |
|---|---|
| HF | hydrogen fluoride |
| U-234 | uranium isotope 234 |
| U-235 | uranium isotope 235 |
| U-238 | uranium isotope 238 |
| $UF_6$ | uranium hexafluoride |
| $UO_2$ | uranium dioxide |
| $UO_2F_2$ | uranyl fluoride |
| $U_3O_8$ | uranium oxide (yellowcake) |

## UNITS OF MEASURE

| ABBREVIATION | WORD |
|---|---|
| Bq | becquerel |
| C | Celsius |
| Ci | curie |
| F | Fahrenheit |
| in. | inch |
| kg | kilogram |
| km | kilometer |
| mi | miles |
| mrem | millirem |
| mSv | milliSievert |
| MSWU | million separative work unit |
| MTU | metric tons uranium |
| MWe | megawatts of electricity |
| psia | pounds per square inch, absolute |
| SWU | separative work unit |
| t | tonne (1t = 1,000 kg) |

# EXECUTIVE SUMMARY

## BACKGROUND

The United States is proposing to purchase from the Russian Federation low enriched uranium (LEU) derived from highly enriched uranium (HEU) resulting from the dismantlement of nuclear weapons in the countries of the former Soviet Union. The purchase would be accomplished through a proposed contract requiring the United States to purchase 15,250 metric tons (tonnes) of LEU (or 22,550 tonnes of $UF_6$) derived from blending 500 metric tones uranium (MTU) of HEU from nuclear warheads. The LEU would be in the form of uranium hexafluoride ($UF_6$) and would be converted from HEU in Russia.

The contract would further the goals of various arms control agreements between the two nations, including the Treaty on the Nonproliferation of Nuclear Weapons and would be entered into pursuant to a government-to-government agreement to arrange for safe and prompt disposition for peaceful purposes of HEU extracted from dismantling the former Soviet Union's nuclear arsenal. In addition, the two countries must agree on the details and the procedure for transparency, which includes the process of permitting the United States to gain confidence that the HEU is actually derived from dismantled nuclear weapons, and that the HEU is blended to LEU.

The United States Enrichment Corporation (USEC) is the entity proposing to undertake the contract for purchase, sale, and delivery of the LEU from the Russian Federation. The U.S. Department of Energy (DOE) is negotiating the procedure for gaining confidence that the LEU is derived from HEU that is derived from dismantled nuclear weapons (referred to as "transparency"), and would administer the transparency measures for the contract.

An estimated 500 MTU of HEU converted to LEU would be purchased over a 20-year period beginning in fiscal year 1994 (FY94) and ending in fiscal year 2013 (FY13). The assay of LEU produced in Russia would be expected to be 3 to 5 percent uranium-235 (U-235). In total, an estimated 15,250 MTU of LEU or 22,550 metric tons (tonnes) of $UF_6$ would be transported to the United States from Russia in containerized cargo packages called SEAPAKs. Each SEAPAK would contain about 9 tonnes of $UF_6$ loaded in four standard commercial steel model 30B cylinders. The LEU would be sold by the USEC for ultimate use as commercial nuclear reactor fuel.

The proposed purchase would fulfill multiple needs and purposes, including:

- Promoting the safe and prompt disposition for peaceful purposes of HEU resulting from dismantlement of nuclear warheads in Russia.

- Furthering the objectives of the Treaty on the Non-Proliferation of Nuclear Weapons.

- Affirming the commitment of the United States and the Russian Federation that nuclear materials transferred for peaceful purposes under the agreement comply with all applicable non-proliferation, material accountability and control, physical protection, and environmental requirements.

- Providing funds to the Russian Federation for the conversion of defense enterprises, enhancing the safety of nuclear power plants, environmental clean-up of polluted areas and the construction and operation of facilities in the Russian Federation for the conversion of HEU to LEU.

- Promoting economic reforms in the Russian Federation and the transition to a market-based economy.

## PROPOSED ACTION

The proposed action consists of six principal elements:

1. Signing of a contract for purchase, sale, and delivery of LEU.

2. Negotiation and agreement on detailed procedures for transparency to gain confidence that LEU is derived from HEU that is derived from dismantled nuclear weapons.

3. Determination that the HEU extracted from nuclear weapons pursuant to the Agreement is oxidized, fluorinated, and subsequently blended with natural uranium or LEU blendstock to yield LEU end-product enriched to less than 5 percent U-235.

4. Shipment of the LEU from St. Petersburg, Russia, via the Gulf of Finland, Baltic Sea, North Sea, and Atlantic Ocean to one or more of seven proposed ports of entry (Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia) by commercial ocean freighter.

5. Transport of the LEU by commercial truck from the port of entry to the Portsmouth GDP.

6. Placement of the LEU in the GDP inventory where it would be made available to USEC utility customers to be fabricated into fuel as orders are received.

## ALTERNATIVES

The following alternatives to the proposed action are assessed in this environmental assessment (EA).

1. <u>No Action.</u>  The no action alternative maintains the status quo by not purchasing the Russian LEU.

2. <u>Receipt at the Paducah GDP.</u>  Under this alternative, the $UF_6$ would be transported in part, or in total, to the Paducah GDP at Paducah, Kentucky, instead of solely to the Portsmouth GDP.

ix

3. Receipt at Fuel Fabricators, Domestic or Abroad. The shipment of LEU from Russia or the U.S. port of entry directly to a fuel fabricator would result in the USEC acting as a broker in the shipment of LEU since no material would be shipped to or processed at the Portsmouth GDP.

4. Optional Transport Mode to the United States. Under this alternative, the UF$_6$ would be transported from Russia to the U.S. by means of military or commercial aircraft.

5. Transportation of LEU from Several Alternative Ports of Entry. Several low, medium, and high population density ports of entry are considered as alternatives.

6. Transport of LEU within the United States by Rail. With respect to the rail alternative, each rail car could hold four Model 30B cylinders of LEU in their SEAPAKs, the same as a commercial truck. However, a number of rail cars could be accommodated in any one train. For purposes of this analysis, it was reasonable to assume that for each shipment 32 Model 30B cylinders would be transported in eight rail cars of the same train.

## ENVIRONMENTAL IMPACTS

The six environments that could potentially be affected by the proposed action are marine (ocean), U.S. ports of entry, truck or rail transportation corridors, the Portsmouth GDP, the electric power industry, and the nuclear fuel cycle industry.

Ocean transport would be from St. Petersburg, Russia, to one or more of seven proposed ports of entry (Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia). From there the UF$_6$ would be transported by commercial truck to the Portsmouth GDP. The plant has been in operation as a uranium enrichment facility since the mid-1950s.

The effects of ocean and land transportation of Russian LEU are analyzed through use of a computer code known as RADTRAN 4. LEU transportation health and safety issues are addressed and include a detailed discussion of the transportation risk analysis methodology used in this EA. Radiological and chemical exposures and health effects under both routine conditions and transportation accident scenarios are analyzed. The calculated maximum annual radiation exposure to a member of the general public for incident-free transportation is estimated as 0.002 millirem (mrem), which is 50,000 times less than the U.S. Nuclear Regulatory Commission (NRC) allowable annual dose of 100 mrem.

UF$_6$ has been transported safely around the world by air, water, and land for more than 30 years. In all that time, there has never been an accident during transport involving the release of UF$_6$ from an accident-resistant package with overpack. In fact, there has not been a transportation accident in the last 30 years that has resulted in fatalities or injuries due to the chemical or radioactive nature of UF$_6$. In the last ten years (1984-1993), 16311 shipments of UF$_6$ (94,360 metric tons uranium) were safely shipped

x

within the United States. Approximately 650,000 metric tons of $UF_6$ have been safely shipped to and from the Portsmouth GDP since the beginning of its operation in the mid-1950s through March, 1993.

$UF_6$ is regularly transported as a solid material in large steel cylinders by train, truck, and ship. These cylinders typically can hold 2 1/2, 10, or 14 tons of $UF_6$. Commercial trucks routinely transport $UF_6$ between facilities in the United States and to various U.S. ports for shipment overseas. In addition, $UF_6$ is routinely transported into the United States. No special permits or applications are required to transport $UF_6$ by train, truck, or ship. The U.S. Department of Transportation's (DOT's) regulations treat $UF_6$ of the type involved here (enriched to less than 20 percent U-235) as presenting a sufficiently minimal hazard that an "unlimited" quantity of uranium can be shipped in specified packaging, referred to as Type A packaging [DOT, 1990].

The shipment of enriched $UF_6$ in Model 30B cylinders in overpacks has been incident-free with respect to releases of radioactive material. As a result, no direct experience base exists for establishing the consequences of transportation accidents. However, for purposes of assessing potential environmental impacts of an overland transportation accident, a severe accident leading to the total release of the $UF_6$ contained in four 30B cylinders in their overpacks, at 4.4 percent U-235, was analyzed. A severe accident of this type is extremely unlikely to occur. Nevertheless, as part of the analysis, this extremely low-probability severe accident is discussed in this EA. Individuals within 350 feet of such a release could inhale potentially lethal doses of hydrogen fluoride if present for exposure to the entire plume of released material. The probability of such a release occurring is estimated as 0.000000065 ($6.5 \times 10^{-8}$), or 6.5 chances out of one hundred million, for the entire 20 years of the proposed action, using Hampton Roads as the port of entry for example purposes. The estimated maximum total latent cancer fatality (LCF)[1] risk resulting from both incident-free transportation and potential accidents for the entire 20-year LEU purchase program ranges between 0.024 and 0.033, depending on the port of entry.

Incremental impacts on the environment surrounding the Portsmouth GDP resulting from a change in plant operations due to the purchase of Russian LEU are assessed and predicted to be minimal. Incremental impacts on the economic status of the communities surrounding the Portsmouth and Paducah GDPs are briefly discussed in that the Russian LEU would involve sufficient enriched uranium that it might become economically attractive to close one of the GDPs unless the anticipated increase in the market demand for USEC-enriched uranium occurs. Economic consequences in terms of impacts on nuclear fuel cycle markets and industries and the ports of entry are also discussed and estimated to be minimal. A comparison of the environmental consequences of the proposed action and the alternatives is presented.

---

[1]   A latent cancer fatality is defined as a fatal malignancy that may occur after some latent period, usually 10 or more years, and has a probability of occurrence that increases with dose.

**SECTION 1.0**

**PURPOSE AND NEED FOR ACTION**

# 1.0  PURPOSE AND NEED FOR ACTION

The United States is proposing to purchase from the Russian Federation low enriched uranium (LEU) derived from highly enriched uranium (HEU) resulting from the dismantlement of nuclear weapons in the countries of the former Soviet Union.  The purchase would be accomplished through a proposed contract requiring the United States to purchase 15,250 metric tons (tonnes) of LEU (or 22,550 tonnes of $UF_6$) derived from blending 500 MTU of HEU from nuclear warheads.  The LEU would be in the form of uranium hexafluoride ($UF_6$) and would be converted from HEU in Russia.  Under the proposed contract, LEU would be purchased beginning in fiscal year 1994 (FY94) and would continue to be purchased through fiscal year 2013 (FY13).

The contract would further the goals of various arms control agreements between the two nations, including the Treaty on the Nonproliferation of Nuclear Weapons, and would be entered into pursuant to a government-to-government agreement to arrange for safe and prompt disposition for peaceful purposes of HEU extracted from dismantling the former Soviet Union's nuclear arsenal.  In addition, the two countries must agree on the details and the procedure for transparency, which includes the process of permitting the United States to gain confidence that the LEU is derived from HEU that is derived from dismantled nuclear weapons.

The United States Enrichment Corporation (USEC) is the entity proposing to undertake the contract for purchase, sale, and delivery of the LEU from the Russian Federation.  The U.S. Department of Energy (DOE) is negotiating the procedure for gaining confidence that the LEU is derived from HEU that is derived from dismantled nuclear weapons (referred to as "transparency"), and would administer the transparency measures for the proposed contract.

The LEU purchase agreement would fulfill multiple purposes and needs including:

- Promoting the safe and prompt disposition for peaceful purposes of HEU resulting from dismantlement of nuclear warheads in Russia.

- Promoting the development and use of nuclear energy for peaceful purposes under arrangements that further the objectives of the Treaty on the Non-Proliferation of Nuclear Weapons of July 1, 1968.

- Affirming the commitment of the United States and the Russian Federation to assure that nuclear materials transferred for peaceful purposes under the Agreement comply with all applicable non-proliferation, material accountability and control, physical protection, and environmental requirements.

- Providing funds to the Russian Federation for the conversion of defense enterprises, enhancing the safety of nuclear power plants, environmental clean-up of polluted areas, and the construction and operation of facilities in the Russian Federation for the conversion of HEU to LEU.

• Promoting economic reforms in the Russian Federation and the transition to a market-based economy.

On October 24, 1992, President Bush signed the Energy Policy Act of 1992 (P.L. 102-486) which, among other things, established the USEC. Under amendments to the Atomic Energy Act of 1954, effected by the enactment of P.L. 102-486, the USEC will function as a wholly-owned government corporation authorized, among other duties, to purchase LEU derived from HEU from any state of the former Soviet Union. Thus, a corollary purpose of the proposed action is to implement a part of the national energy policy established by Congress.

The analysis contained herein has been prepared in consideration of the National Environmental Policy Act (NEPA), insofar as it addresses potential environmental impacts within the United States and in consideration of Executive Order 12114, insofar as it addresses extraterritorial impacts.

# SECTION 2.0

# DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES

## 2.0 DESCRIPTION OF PROPOSED ACTION AND ALTERNATIVES

The United States and the Russian Federation have agreed to reduce nuclear weapons stockpiles in accordance with various arms control agreements between the two nations, including the Treaty on the Nonproliferation of Nuclear Weapons. In addition, the United States and the Russian Federation have also entered into a government-to-government agreement to arrange for safe and prompt disposition for peaceful purposes of HEU extracted from dismantling the former Soviet Union's nuclear arsenal.

To advance the ultimate goals of these arms reductions agreements and pursuant to the government-to-government agreement, the United States is now proposing to purchase from the Russian Federation LEU derived from HEU resulting from the dismantlement of nuclear weapons in the countries of the former Soviet Union. The purchase would be accomplished through a proposed contract requiring the United States to purchase 15,250 metric tons (tonnes) of LEU (or 22,550 tonnes of $UF_6$) derived from blending 500 MTU of HEU from nuclear warheads. Payment for and delivery of the LEU would take place over a 20-year term beginning in FY94.

In the course of ongoing negotiations between the United States and the Russian Federation, the two governments have negotiated basic principles for the sale of such LEU, contingent upon a number of conditions. One such condition is the right of both countries to complete their respective governmental approval procedures for the proposed contract, which would include analysis of potential environmental impacts. In addition, the two countries must agree on the details of and the procedure for transparency, which refers to the process of permitting the United States to gain confidence that the LEU is derived from HEU that is derived from dismantled nuclear weapons.

DOE originally undertook the lead for the negotiations on behalf of the United States. However, Title IX of the Energy Policy Act of 1992 established the USEC and transferred many of the uranium enrichment functions from DOE to USEC, effective July 1, 1993. (Pub. L. No. 102-486, 106 Stat. 2923.) The Energy Policy Act authorizes USEC to negotiate the purchase of uranium from any nation of the former Soviet Union under a government-to-government agreement. (42 U.S.C. 2297c-7.) Accordingly, USEC is the entity proposing to undertake the contract for purchase, sale, and delivery of the LEU from the Russian Federation. However, DOE would administer transparency measures for the contract. Accordingly, DOE is negotiating the procedure for gaining confidence that the LEU derived from HEU is derived from dismantled nuclear weapons.

The LEU proposed to be purchased would be in the form of $UF_6$ with a concentration (referred to as the assay) of uranium-235 (U-235) ranging from 3 to 5 weight percent. The LEU purchased by the USEC would be derived from an estimated 500 metric tons of HEU metal with an average assay value of about 90 percent U-235. Dismantlement of nuclear warheads in Russia would provide the HEU used in the

2-1

conversion and blending process. The HEU would be converted to $UF_6$ and blended to produce low enriched $UF_6$ in the Russian Federation, which would then be shipped to the United States.

The assay of LEU produced in the Russian Federation would be less than 5 percent U-235 and would be expected to average about 4.4 percent U-235. It is assumed that the assay of the Russian HEU would be about 90 percent U-235 and that the HEU, once converted to $UF_6$, would be blended with 1.5 percent U-235 assay $UF_6$ to produce 4.4 percent U-235 LEU in $UF_6$ form for shipment. Under this set of assumptions, 10 metric tons of HEU, when blended and converted, would produce 451 metric tons of $UF_6$ at 4.4 percent U-235 assay. The 451 metric tons of $UF_6$ would contain approximately 305 metric tons uranium (MTU) and 146 metric tons of fluorine. (MTU will be used in this environmental assessment (EA) to quantify only the amount of uranium contained in a material and metric tons or tonnes (t) will be used when referring to the total mass of material.)

The Russian LEU would be shipped by commercial ocean freighter as $UF_6$ to the United States. Depending on when the contract would be signed, the LEU would be expected to be received in the United States according to the schedule shown in Table 2-1. It should be emphasized that only low enriched $UF_6$ would be received in the U.S.; the quantities of HEU are listed to provide comparative values of material.

Table 2-1. LEU Receipt Schedule

| Material | FY94...FY98 | FY99...FY13 |
| --- | --- | --- |
| HEU (MTU/yr) | 10 | 30 |
| LEU (MTU/yr) | 305 | 915 |
| $UF_6$ (t/yr) | 451 | 1,353 |

The receipt schedule indicates a total of 15,250 MTU of LEU or 22,550 tonnes of $UF_6$ to be shipped over a 20-year period. However, it is possible that one MTU of the proposed 500 MTU of HEU converted to LEU would be separately shipped, as an initial demonstration project for this proposed action.

The LEU would be shipped as $UF_6$ by commercial ocean freighter from St. Petersburg, Russia, via the Gulf of Finland, the Baltic Sea, the North Sea, and the Atlantic Ocean to one or more of seven proposed ports of entry (Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia). The list of proposed ports was developed after a series of efforts were carried out to determine

the likely routes shipping companies would use to transport cargo from St. Petersburg to the United States. To develop a picture of how shipments would be transported between St. Petersburg and the United States, shipping schedules of major shipping lines, as published in "Shipcards" by the *Journal of Commerce*, were analyzed to determine the routes of vessels on regularly scheduled liner service. USEC restricted the search to vessels on regular liner service since these vessels tend to be higher quality in both vessel integrity and crew performance and, as a result, have a much lower casualty rate than vessels operating in the tramp (unscheduled) market. Sixteen shipping companies that advertise service to St. Petersburg, Russia, were also contacted by telephone to determine the ports in the United States at which their vessels called. Contact was also made with the U.S. Maritime Administration to verify the information obtained from the *Journal of Commerce* and the shipping companies. Finally, the Piers Import/Export data base was queried to determine where shipments of radioactive materials, particularly uranium hexafluoride, have been imported into the United States in the past several years. The information obtained from this research indicated that cargo originating in St. Petersburg would most likely be either initially or eventually shipped on vessels that make port calls at one or more of the seven ports proposed as potential ports of entry. From the port of entry, the $UF_6$ would be transported by commercial truck to the USEC- leased gaseous diffusion plant (GDP) at Piketon, Ohio. There, it would be placed in inventory and made available to the commercial nuclear power reactor fuel market. Consistent with the Energy Policy Act of 1992, the USEC is now operating the Portsmouth GDP at Piketon, Ohio, which DOE formerly operated and still owns.

All shipments to the United States would adhere to both United States and international regulations and standards pertaining to the preparation, packaging, handling, safeguards, transport, and receipt of radioactive materials. These would be implemented, as appropriate, according to requirements of the U.S. Department of Transportation (DOT), the U.S. Nuclear Regulatory Commission (NRC), the DOE or the USEC, and the International Atomic Energy Agency (IAEA).

## 2.1 PROPOSED ACTION

The principal components of the proposed action and their approximate sequence are as follows:

- Complete negotiation on contract terms and transparency procedures, and sign contract for purchase, sale, and delivery of LEU.

- Determination of HEU Conversion. The first access to Russian HEU by the United States would occur as a result of DOE implementing transparency inspections. The purpose of the monitoring procedures is to gain confidence that the HEU metal has been derived from dismantled nuclear weapons and that the LEU has been produced from blended HEU. DOE proposes to gain access to the HEU metal feed to the Russian oxidation facility, HEU hexafluoride feed to the blending facility, the LEU hexafluoride blend stock feed to the blending facility, and the LEU product stream from the blending facility. DOE proposes to witness the taking of samples of the HEU metal, the HEU hexafluoride and the LEU hexafluoride blend stock, and to have the option to ship

2-3

some or all of the samples to the U.S. for analysis. DOE would have access to all facilities used to carry out the terms of the agreement (see Section 4.0.).

- Sampling to Meet LEU Specifications. The first access to Russian LEU by the USEC would occur at the product transfer facility at the enrichment plant located near Yekaterinburg, Russia, where the USEC would have the right to inspect the LEU to ensure that it was properly packaged for shipment to the United States. In addition, the USEC, or its designated representative, would have the right to witness the taking of samples to ensure that the LEU met U.S. quantity, isotopic, and chemical specifications. If the USEC would elect not to send a witness to the Yekaterinburg plant, the Russian operators of the plant would take the samples for the USEC. These samples would be shipped by air express from the Russian plant in Yekaterinburg to the Portsmouth GDP at Piketon, Ohio. The samples would contain less than 450 grams of $UF_6$ and would be placed in DOT Specification 1S Sample Cylinders. (See Title 49, Code of Federal Regulations, Part 173.420.) For shipment, the Model 1S cylinders would be packaged in DOT Specification 17C Drums. (See Title 49, Code of Federal Regulations, Part 178.115.) The $UF_6$ samples in the 1S Sample Cylinders would contain less than 15 grams of the isotope U-235. A shipping package containing less than 15 grams of U-235 is exempt from regulations applying specifically to fissile material. (See Title 49, Code of Federal Regulations, Part 173.453(a); Title 10, Code of Federal Regulations, Part 71.53(a); and International Atomic Energy Agency Safety Series No. 6, "Regulations for the Safe Transport of Radioactive Material," 1985 Edition, As amended 1990, Section 560(a).)

- LEU Shipping Containers. The conversion/blending facilities in Russia would load the LEU into DOT Model 30B cylinders provided by the USEC (see Section 6.2 for a description of these containers). DOT Model 30B cylinders have been approved for international and domestic shipments of $UF_6$. Each cylinder would hold about 2.28 tonnes (2,280 kilograms) of $UF_6$ consisting of approximately 1.5 MTU and approximately 0.8 tonnes of fluorine. All cylinders would be packaged in specification number 21PF-1B protective overpacks. (See Section 6.2 for a description of these overpacks). The overpacks would not be opened from the time they were loaded with 30B cylinders filled with LEU in Russia until they were delivered to the Portsmouth GDP in the United States. Tamper indicating devices would be attached at the Yekaterinburg plant to the valve and plug of each 30B cylinder and the 21PF-1B overpacks to provide assurance that overpacks and cylinders are not opened. The 21PF-1B overpacks containing the 30B cylinders would be loaded into specially designed 8 feet by 8 feet by 20 feet shipping containers called SEAPAKs for transport to the United States.

- Transfer of LEU to the United States at St. Petersburg, Russia. The United States would take possession freight on board (FOB) of the LEU at St. Petersburg where the integrity of the packages would be confirmed by U.S. representatives by visual inspection of the overpack and attached tamper indication devices.

- Shipment of LEU to the U.S. The LEU would be shipped to one or more of seven proposed ports of entry (Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia), via an ocean freighter meeting required safety and design standards. Each shipping container would accommodate four Model 30B cylinders with overpacks, or about 9 tonnes of $UF_6$. Assuming one container of four cylinders per ship hold or defined deck area and eight holds or defined deck areas per ship, 32 cylinders (approximately 72 tonnes) of $UF_6$ would be transported in each ocean shipment. The size of the shipments can vary somewhat, depending

on ship design and spacing requirements, but this is representative of typical shipments. Based on this shipment size, it is estimated that, during the first 5 years of shipment, seven shiploads per year, or approximately one shipload every 2 months, would be required to transport the LEU; and that for the last 15 years, 19 shiploads per year (about one shipload every 3 weeks) would be required to transport the LEU. However, it is possible that one MTU of the proposed 500 MTU of HEU converted to LEU would be separately shipped, as an initial demonstration project for this proposed action.

- <u>Transport of LEU from the port of entry to Piketon, Ohio.</u> The LEU would be transported via commercial truck from the port of entry to the Portsmouth GDP at Piketon, Ohio. The LEU may be placed in a secure staging area in the vicinity of the wharf for a short period of time while awaiting truck transportation to the Portsmouth GDP. Each truckload can accommodate four Model 30B cylinders with overpacks, or 9 tonnes of $UF_6$. Thus, there would be approximately eight truckloads of LEU for each ocean-going shipment. During the first 5 years of shipping, 50 truckloads per year (roughly four per month) would be required. For the last 15 years, 149 truckloads per year would be required (roughly 12 per month).

- <u>Receipt of LEU by Portsmouth GDP at Piketon, Ohio.</u> Upon arrival at the Portsmouth GDP, LEU composition and specifications may be verified for purposes of U.S. accountability and material acceptability. The LEU would be placed in the GDP inventory and made available to the U.S. commercial nuclear fuel fabrication market. Normal GDP enrichment and private sector fuel fabrication activities at different sites would continue to take place irrespective of the purchase of LEU by the U.S. from Russia.

## 2.2 ALTERNATIVES

This section briefly describes alternatives to the proposed action including the no action alternative.

### 2.2.1 No Action

The no action alternative would result in the U.S. deciding not to sign the contract with the Russian Federation to purchase LEU resulting from the dismantlement of nuclear weapons. It would mean that the non-proliferation, economic, environmental cleanup, and weapons conversion objectives of the U.S.-Russian Federation Agreement would not be met. It is probable that the Russians would seek other opportunities to dispose of HEU, LEU, or both on the world market.

### 2.2.2 Receipt at the Paducah Gaseous Diffusion Plant

The USEC also operates the Paducah GDP at Paducah, Kentucky. The Paducah GDP is currently authorized to process enriched uranium up to an assay of two percent U-235. Modifications are nearly complete at the plant that will permit the processing of enriched uranium with an assay of up to five percent U-235; however, these modifications are not expected to be completed before the proposed action would begin.

When the cylinders containing the $UF_6$ would arrive from Russia, the cylinders would be sampled to assure that the material meets all specifications for the manufacture of commercial nuclear reactor fuel. If the assay of the U-235 required adjustment to meet customer's requirements, the $UF_6$ would have to be fed into a gaseous diffusion plant for product quality adjustment. Since the Paducah GDP is not currently authorized to sample the $UF_6$ in the cylinders or feed the $UF_6$ if the assay is greater than two percent U-235, the Russian LEU, which would have an assay of 4.4 percent U-235, would not be able to be processed at the Paducah GDP if the $UF_6$ shipments began before authorization was granted. However, since the proposed action spans the time period in which the Paducah GDP is expected to be able to process $UF_6$ up to assays of five percent, the transportation risks of this alternative are assessed in Section 6.6.2.

## 2.2.3  Receipt at Fuel Fabricators, Domestic or Abroad

There are five fuel fabricators in the United States, with additional fuel fabricators in Japan, South Korea, Germany, the United Kingdom, France, Spain, and Sweden. However, product quality considerations make direct shipment to fuel fabricators unlikely. For some time, the USEC would want to sample each product cylinder at the GDP site prior to shipping to a fuel fabricator due to the unique nature of the process of making the LEU from HEU. Also, the Russian LEU would be delivered at U-235 assays which must be agreed to by the Russians and the USEC before customers actually place orders with the USEC. If the U-235 assay of the $UF_6$ from the Russian Federation did not closely match a customer's requirements, the U-235 assay would have to be adjusted at the Portsmouth GDP prior to delivery to the fabricators. Furthermore, since the U-234 and U-236 limits allowed in ASTM specification C996-90 (the basis for acceptance of the Russian LEU) are higher than what the fuel fabricators are currently willing to receive on a routine basis, some adjustment of the LEU product at the GDP may be required before shipment to a fuel fabricator.

## 2.2.4  Optional Transport Mode to the United States

Air transport of radioactive materials is typically used for rapid delivery when the half-life of the material is short and/or timely use of the material is required. If the speed of delivery is not a consideration, then large, frequent shipments of radioactive materials by air are unwarranted. Historically, large cylinders, such as the Model 30B, containing $UF_6$ have not been shipped by air due to the costs, which would greatly exceed costs for transport by marine vessel. However, for purposes of this analysis, the air transport alternative will be qualitatively assessed.

**2.2.5 Transportation of LEU from Several Alternative Ports of Entry to Piketon, Ohio**

The proposed ports of entry are Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia. Any of these ports could be used for a portion or all of the shipments from St. Petersburg, Russia. Nevertheless, in order to compare the risks of using alternative ports, several ports on the East Coast of the United States, other than those listed above, and one West Coast port are analyzed.

Ships transporting the LEU from St. Petersburg to the United States would use normal shipping lanes through the Gulf of Finland, the Baltic Sea, the North Sea, and the Atlantic Ocean. Since the shortest, most frequently scheduled voyages from St. Petersburg to the United States arrive at the East Coast, it is unlikely that a ship carrying cargo destined for the Portsmouth GDP would use a West Coast port. If a Gulf Coast or West Coast port of entry were used, the shipping routes through the Gulf of Mexico or the Pacific Ocean would be significantly longer than those for East Coast ports. For example, the ocean transport distance from St. Petersburg to Hampton Roads is approximately 8,900 kilometers (4,800 nautical miles), while the distance from St. Petersburg to Oakland, California is 17,300 kilometers (9,330 nautical miles) [DMAHTC, 1991]. In addition, the distance a truck or train would have to travel from a West Coast port to Piketon, Ohio, is much greater than the distances associated with East and most Gulf Coast ports of entry. As a result, transportation costs would be greater due to the greater distances the LEU would have to be shipped. Thus, West Coast ports of entry may not be desirable alternatives from a transportation cost perspective.

Military ports have not been considered as possible ports of entry because USEC would be contracting with commercial carriers to transport the LEU and those carriers would use commercial ports since commercial ports are available. In addition, OMB Circular A-76 prohibits the Federal Government from competing for services when such services can be procured from the private sector. Substantial commercial port experience with handling $UF_6$ exists and the import and/or export of LEU is a common commercial transaction [JoC, 1993]. Military vessels and ports or other measures for the physical protection of LEU shipments are neither required nor practical. Since LEU cannot be used directly to fabricate a nuclear explosive, military vessels and ports are not required for safeguarding nuclear material. Furthermore, the radioactivity of LEU is so low that dispersal by manual means or acts of sabotage would not produce a significant radiological hazard [NRC, 1977] (although it would produce a chemical hazard similar to the accident described in Section 6.2.3). In addition, military bases may not have the experience or equipment to handle commercial vessels and their cargo. For example, Kings Bay Naval Base in Kings Bay, Georgia, is a submarine base and is not equipped with gantry cranes for loading and unloading container ships. Military bases also are likely to have personnel access restrictions for entry into their facilities. For example, Kings Bay Naval Base regulations prohibit foreign nationals

from entering the Naval Base. As a result, any vessel not manned entirely by United States citizens may be prohibited from using this port.

The transportation risks associated with military ports would be similar to those of commercial ports, with differences mainly arising in the distance from the Portsmouth GDP. For example, if the port of entry were the naval base at Kings Bay, Georgia, the overland transportation risk would be slightly less than the commercial port at Fernandina Beach, Florida which is about 40 miles further away from the Portsmouth GDP, only because of the slightly higher population density along the initial leg of the Fernandina Beach-Piketon overland transportation route.

The alternative ports were selected on the basis of geographic, physical, historic, and economic criteria. As a result of the criteria used, many of the ports selected could be characterized as high population density ports. Ports have historically been established in areas with inviting geographic, physical, and population attributes. Likewise, population centers have been established and grown in areas with appealing geographic/physical features and excellent transportation access. Thus, the busiest, most experienced, and typically best equipped ports are surrounded by relatively large populations in areas with good transportation links. However, in order to include ports that do not have a high population density among the alternatives, Morehead City, North Carolina (population density is 37 persons/km$^2$), and Fernandina Beach, Florida (population density is 25 persons/km$^2$), were included for analysis as potential ports of entry. It should be noted, however, that a current resolution by the City of Fernandina Beach, Resolution Number 801, prohibits the port of Fernandina Beach from importing hazardous materials without submission of an amended application for development. It is unlikely that a small port like Morehead City or Fernandina Beach would be used since the likelihood of an ocean-going commercial vessel making a St. Petersburg-Morehead City or St. Petersburg-Fernandina Beach voyage is small. Specification of a small port, such as Morehead City or Fernandina Beach, as the port of entry would probably require either trans-shipment of the LEU or arrangement of a special port of call. Trans-shipment would increase the incident-free (or routine) dose to cargo handlers and inspectors, even during routine operations. Furthermore, either option may entail additional fees for transporting the LEU, making small ports less attractive.

## 2.2.6 Transport of LEU within the United States by Rail

The proposed action would involve transporting the LEU by commercial truck from a warehouse/terminal at the port of entry to the Portsmouth GDP at Piketon, Ohio. Each truckload would comprise 9 tonnes of UF$_6$ contained in four Model 30B cylinders in overpacks, inside SEAPAK shipping containers. There would be eight truckloads of LEU for each shipment by ocean freighter during the proposed action. For the entire 20 years of the proposed action, a total of 2485 truckloads would be required to transport the LEU.

2-8

With respect to the rail alternative, the activities leading up to transport from the port of entry would be the same as for the proposed action. The difference between the rail alternative and the proposed action would be that the LEU would be transported by rail from a warehouse/terminal in the port of entry to the Portsmouth GDP. Each rail car would hold four Model 30B cylinders of LEU in their SEAPAKs, the same as a commercial truck. However, a number of rail cars could be accommodated in any one train. For example, an entire shipload of 32 Model 30B cylinders would fill eight rail cars. For the entire 20 years of the proposed action, a total of 320 trainloads would be required to transport the LEU.

**SECTION 3.0**

**DESCRIPTION OF URANIUM ENRICHMENT**

## 3.0 DESCRIPTION OF URANIUM ENRICHMENT

The following sections describe the uranium enrichment process and the operation of the two U.S. uranium enrichment plants. The information is provided as background for understanding the environmental consequences discussed in Section 6.0

## 3.1 THE URANIUM ENRICHMENT PROCESS

Commercial technologies enrich uranium processed from mined material to the desired U-235 assay level by one of two processes: gaseous diffusion or gas centrifugation. In the U.S., gaseous diffusion is used at the Portsmouth GDP at Piketon, Ohio, and the Paducah GDP at Paducah, Kentucky. Both of these plants are now operated by the USEC. These plants operate on the principle that lighter weight gaseous isotopes have slightly higher average velocities and thus can be made to diffuse through a porous barrier (tubes filled with extremely small holes) more rapidly than heavier species. In the process, $UF_6$ is heated to at least 134°F and converted from a solid to a gas. The $UF_6$ flows through a series of compressors and converters. Each converter contains thousands of porous barrier tubes. Each compressor/converter arrangement is called a stage. The compressor increases the pressure of the gaseous $UF_6$ so that it is forced to diffuse through the barrier tubes. Because U-235 has a smaller isotopic mass than U-238, it passes through the porous barrier more quickly, increasing the U-235 content of the diffused uranium. For each porous barrier passed, two streams are created, one which is enriched and one which is depleted in the lighter U-235 isotope. The uranium in the latter stream is called depleted uranium or "tails." The fraction of the U-235 isotope remaining in the depleted uranium from an operating enrichment plant is called the "operating tails assay."

The commercial transaction for enrichment work takes place as follows: A GDP enrichment service customer, usually a utility, desires a certain quantity of LEU containing a particular assay or quantity of U-235. In order to obtain the desired quantity and assay of LEU, the utility customer delivers $UF_6$ feed material to the GDP (usually natural $UF_6$ containing 0.711 percent U-235) and purchases enrichment services from the GDP. The cost of the enrichment services to a customer is expressed in terms of dollars per separative work unit (SWU). A SWU is the conventional measure of the effort achieved in a uranium enrichment plant after separating uranium of a given U-235 content into the two streams. When customers buy services from the GDP, they are buying separative work units (SWUs).

The relative amounts of feed material delivered to, and the enrichment services purchased from, the GDP by a customer are determined by the transaction tails assay (i.e., the tails assay at which that customer transacts with the GDP, which is generally about 0.28 percent U-235). If the GDP had only one customer, and the GDP did not have its own stockpile of natural uranium feed, then the GDP would use the feed delivered by the customer to operate at the tails assay specified by the customer to produce the LEU required by the customer. The GDP would collect revenues from the customer based on the amount

3-1

of enrichment services required to produce the LEU and the price of the SWUs. When the customer takes the LEU, the customer may also take or leave at the GDP the depleted uranium that results from producing the desired LEU. Nearly all customers elect to leave their depleted uranium at the GDPs.

In operating the Portsmouth and Paducah GDPs, the USEC utilizes the feed material delivered by all of its customers to produce the LEU required by the customers. In doing so, the operating tails assay of the GDPs is the average of the transaction tails assay specified by the customers. However, because the GDPs have their own stockpile of natural $UF_6$, the GDPs can supply additional uranium feed to the plants, which will cause the operating tails assay to increase and will reduce the enrichment required to produce the LEU product. This process is called "overfeeding."

One of USEC's primary corporate goals is cost reduction. The major GDP production cost is the purchase of electric power. This represents about 70 percent of enrichment costs, since very large quantities of electric power are required to produce enriched uranium using gaseous diffusion technology. The most effective way to reduce enrichment costs is to reduce the electric power consumption of the GDPs by overfeeding the plants with feed material owned by the USEC.

## 3.2 GASEOUS DIFFUSION PLANTS AT PIKETON, OHIO, AND PADUCAH, KENTUCKY

The two gaseous diffusion plants in the United States are federal government facilities leased to the USEC by the DOE and managed for the USEC by a government contractor, Martin Marietta Utility Services, Inc. The Paducah GDP was constructed between 1951 and 1954 on a 5,000-acre site 16 miles west of Paducah, Kentucky. The Portsmouth GDP was constructed between 1952 and 1956 on a 4,000-acre site 3 miles south of Piketon, Ohio, and 22 miles north of Portsmouth, Ohio. While shipments of the Russian LEU under the proposed contract would be expected to be sent to Piketon, a description of the operation of both GDPs is included here since the Paducah GDP enriches $UF_6$ for use at the Portsmouth GDP.

Currently, the Paducah GDP is used to enrich 0.711 percent assay $UF_6$ to 1.9 percent U-235. The 1.9 percent assay $UF_6$ produced at Paducah is then transported to the Portsmouth GDP where it is enriched to the desired final product assay. The final product is transported from the Portsmouth GDP to the fuel fabricators. In addition, 0.711 percent feed is also fed to the Portsmouth GDP for enrichment. The Russian LEU would be placed in inventory at the Portsmouth GDP where, depending on the quality of the LEU and customer enrichment requirements, it may be fed into the GDP for product enhancement.

# SECTION 4.0

# HEU TRANSPARENCY

## 4.0  HEU TRANSPARENCY

HEU transparency refers to the ability of the Government of the United States, through the DOE, to gain confidence that the Russian LEU delivered to the United States under the proposed contract is derived from HEU, and that the HEU is being derived from dismantled nuclear weapons.  Additionally, transparency refers to the ability of the Government of the Russian Federation to gain confidence that LEU delivered to the United States under the contract is used for commercial nuclear fuel fabrication. The USEC is responsible for all elements of the proposed action except transparency, which is the responsibility of DOE.

"The Memorandum of Understanding Between the Government of the United States of America and the Government of the Russian Federation Relating to Transparency and Additional Arrangements Concerning the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Disposition of Highly Enriched Uranium Extracted from the Nuclear Weapons," signed on September 1, 1993, defines the measures to be used by monitors for the United States to achieve the transparency objectives.  Specific details of transparency measures remain to be negotiated.  For example, as part of these transparency measures, samples may be obtained by the United States monitors from the Russian materials.  Up to eight samples could be taken each month from the HEU metal, the HEU in the form of $UF_6$, and the LEU blendstock, as shown in Table 4-1.  Samples would be taken and packaged in U.S.-supplied containers by Russian personnel in the presence of United States observers.  The Russians would monitor the sampling process according to their health and safety procedures.  All HEU and LEU samples would be shipped via commercial airline to a DOE laboratory such as Lawrence Livermore National Laboratory (LLNL) in Livermore, California.  Samples would be analyzed at LLNL and other analytical laboratories within the United States.  Most of the sample would be consumed in the analysis process; any sample remaining after analysis may be archived at LLNL or at the Y-12 Plant in Oak Ridge Tennessee, or managed as radioactive or mixed waste.  A total of 1,920 g of U-235 in 90 percent enriched uranium metal, 13,040 g of U-235 in 90 percent enriched uranium hexafluoride, and 288 grams of U-235 in 1.5 percent enriched uranium hexafluoride could be sampled, shipped, and analyzed as part of the transparency activities for the 20-year period of the proposed contract.  Thus, although specific details of transparency remain to be negotiated, these amounts represent the largest estimate of materials that would be shipped to the United States for transparency purposes.

The environmental impacts associated with the transparency activities would be minimal.  All sampling and measurements would be performed by Russian plant personnel using equipment provided by the U.S. observation teams.  U.S. representatives would not physically handle any HEU or LEU, containers, equipment or instrumentation during the sampling process.  However, all sampling and measurements would be observed by U.S. personnel.  During shipment, the transportation regulations for commercial air transport would be followed.  These regulations specify a limit of 0.02 curies of fissile material per

Type A packaging (see Sections 2.1 and 6.2.). All quantities of HEU and LEU that would be shipped at any one time under the proposed action are categorized as Category IV nuclear materials per DOE Order 5633.3A. In accordance with DOE Order 5632.2A, Category IV materials do not require special safeguard considerations. The transportation risks associated with samples taken for transparency for incident-free and accident conditions are analyzed in Sections 6.2.2 and 6.2.3.

**Table 4-1. Samples Taken According to the Transparency Protocol**

|  | HEU Metal | HEU in the form of UF$_6$ | LEU Blendstock |
|---|---|---|---|
| Sample Mass (g) | 1 | 6.8 | 0.15 |
| Shipment Mass (g) | 8 | 54.4 | 1.2 |
| Yearly Mass (g) | 96 | 652.8 | 14.4 |
| Total Mass (g) | 1,920 | 13,056 | 288 |

**SECTION 5.0**

**DESCRIPTION OF AFFECTED ENVIRONMENT**

## 5.0 DESCRIPTION OF AFFECTED ENVIRONMENT

Six environments potentially could be affected by the proposed action: the marine environment (Section 5.1), the U.S. ports of entry (Section 5.2), the truck or rail transportation corridors (Section 5.3), the Portsmouth GDP and locale (Section 5.4), the electric power industry (Section 5.5), and nuclear fuel cycle market industries (Section 5.6).

## 5.1 MARINE ENVIRONMENT

Because the proposed action involves ocean transport, the USEC considered the environmental impacts of this proposed action on the global commons, taking into consideration Executive Order 12114 [FR, 1981].

Ships transporting the LEU from St. Petersburg, Russia, to the East Coast of the United States would use normal shipping lanes through the Gulf of Finland, the Baltic Sea, the North Sea, and the Atlantic Ocean. If a port on the Gulf of Mexico were used, the ships would also transit the Straits of Florida and the Gulf. Figure 5-1 shows the proposed shipping lanes through which shipments of $UF_6$ would pass for most East Coast ports of entry. As explained in Section 2.0 a series of efforts were carried out to determine the likely routes shipping companies would use to transport cargo from St. Petersburg, Russia to the United States. The resulting list of proposed ports did not include any ports on the West Coast. Moreover, the distance a ship would travel from St. Petersburg to the West Coast of the United States and the distance a truck would travel from the West Coast to Piketon, Ohio, and, therefore, the associated costs, are much greater than the distances and costs associated with East or Gulf Coast ports of entry. For these reasons, a West Coast port of entry was not selected as a proposed port of entry (see Section 2.0). Therefore, the marine environments associated with West Coast ports of entry are not described.

Sea water is a complex solution containing a majority of the known elements. The average salinity of ocean water is about 35 parts per thousand. A significant feature of sea water is that while the total concentration of dissolved salt varies from place to place, the ratios of the more abundant components remain almost constant. This may be taken as evidence that over geologic time the oceans have become well mixed [Pickard, 1979].

There are two major sources of deep water in the world's oceans: a northern component found in the Norwegian, Greenland, and Labrador Seas, and a southern component from the Weddell Sea. The water from the Greenland Sea flows through the Denmark Strait and flows south down the western Atlantic after being joined by deep water formed in the Labrador Sea [NEA, 1988].

5-2



**Figure 5-1. Map of Proposed Shipping Lanes**

Specific flow estimates for the North Atlantic are up to 5 x $10^6$ m$^3$/s for the total water volume crossing the whole Iceland-Scotland ridge [Steele, et al., 1962]. From the Greenland Sea the flow through the Denmark Strait has been estimated to be 5 x $10^6$ m$^3$/s [Swallow, 1960]. Water from the Arctic that enters the Atlantic leaves mainly to the south toward midlatitudes [NEA, 1988]. The continental shelf extends from the shore with an average gradient of 1 in 500. The shelf has an average width of 65 km. Most of the world's fisheries are located on the continental shelf. The continental slope averages about 4000 m vertically from the shelf to the deep-sea bottom [Pickard, 1979].

An analysis of oceanic environments prepared by the Construction Engineering Research Laboratory (CERL), U.S. Army Corps of Engineers, provides valuable data on biotic resources, including whales, plankton, marlin, and four species of tuna, found in the North Atlantic [CERL, 1990]. The Right Whale, *Eubalaena glacialis*, was not considered by CERL, but is known to frequent North Atlantic waters. The National Oceanic and Atmospheric Administration (NOAA) recently proposed designation of a critical habitat for the Right Whale [FR, 1993]. The regions considered by NOAA include portions of Cape Cod Bay, Stellwagen Bank, and waters adjacent to Georgia and Florida. The latter designations include waters out to about 15 nautical miles from shore from the Altamaha River, Georgia, to Jacksonville, Florida (approximately between 30 and 31 degrees north latitude), which includes waters off Fernandina Beach; and out to about 5 nautical miles offshore at Sebastian Inlet, Florida (approximately between 28 and 30 degrees north latitude).

The deep sea bottom-dwellers are highly diverse, with many taxonomic groups being represented by more species than in most shallow water communities [Hessler and Sanders, 1967]. However, the number of individual organisms in a given area does decrease in the deep sea and this, together with a general tendency for the average size of the organisms also to decrease, results in a dramatic reduction in standing stock or biomass on the deep ocean floor. In round figures, the total wet weight of bottom-living organisms in and on each square meter of seabed decreases from 10-100 grams on the continental shelf, to 1-10 grams on the continental slope, and to only 0.1-1.0 gram on the abyssal plain [Rice, 1978].

Uranium is one of the elements naturally present in sea water. The uranium normally found in nature consists of three isotopes having mass numbers 234, 235, and 238. The ocean water concentration of U-isotopes is as follows: U-234, 1.04-1.3 pCi/l; U-235, 0.04-0.07 pCi/l; and U-238, 0.9-1.13 pCi/l [Cherry and Shannon, 1974]. One picoCurie (pCi) = 1 x $10^{-12}$ Ci or 0.000000000001 Ci.

The relationship between environmental concentrations of radionuclides and the concentration found in organisms is important in the study of food web effects. Bioamplification, the increase in concentration in organisms progressively further up the food web (as occurs with organic pesticides in terrestrial environments) is observed in marine food webs. In the marine environment, uranium has not been found to bioamplify in fish and only slightly bioamplifies in crustaceans and mollusks [IAEA, 1985].

5-3

In the marine environment the greater portion of the background dose rate to phytoplankton, zooplankton, and pelagic fish arises from incorporated activity. Alpha-emitting isotopes, particularly polonium-210 (Po-210), a progeny of uranium, is the main source of background dose and potassium-40 contributes most of the remainder [IAEA, 1976]. Concentrations of the naturally occurring Po-210 have been measured in mid-water crustaceans and fish to depths of 1500 m. Unusually high levels were found in certain benthic organisms, indicating that these organisms were exposed to particularly high natural radiation doses. The doses received were very large by human standards—up to approximately 400 rem/yr [Cherry and Heyraud, 1982]. The exposure of these organisms (marine invertebrates and fish) appears to make the oceans the highest known natural radiation domain in our biosphere. However, in general, aquatic organisms tend to be more resistant to radiation than terrestrial mammals [NCRP, 1991].

Since 1944, man has been discharging radionuclides into the oceans where the inventory of natural radioactivity is approximately $500 \times 10^9$ Ci [NAS, 1971]. As of 1981, it was estimated that man's total input of radionuclides, about 3 billion curies, essentially from waste disposal and nuclear weapons testing, approached 0.7 percent of the natural radioactivity in the world's oceans [Needler and Templeton, 1981].

## 5.2 PROPOSED U.S. PORTS OF ENTRY

One or more U.S. ports of entry could be used for import of the LEU into the United States. The ports are: Port of Hampton Roads, Virginia; Port of Baltimore, Maryland; Port of Philadelphia and South New Jersey, Pennsylvania and New Jersey; Port of New York and New Jersey, New York and New Jersey; Port of Houston, Texas; Port of Charleston, South Carolina; and Port of Savannah, Georgia. Each of these ports is briefly described in the following sections.

### 5.2.1 Port of Hampton Roads, Virginia

The Hampton Roads port complex, also known as the Ports of Virginia, is located at the confluence of the James River and the Chesapeake Bay, 18 miles from the Atlantic Ocean. Approximately 66 million tonnes of foreign trade cargo were moved through Hampton Roads in 1991 [VPA, 1992]. Foreign imports accounted for 7.9 million tonnes of this cargo. Hampton Roads is one of the largest natural deep-water harbors in the world and is the leading port in the U.S. in terms of total foreign waterborne commerce. In 1991, Hampton Roads was the leading East Coast port in terms of total cargo. There were approximately 6,300 arrivals and sailings at the port that year [VPA, 1992]. The surrounding population density is 1,433 person/km$^2$.

The majority of nuclear material shipments to the United States by sea has been shipped through the Hampton Roads facilities. Hampton Roads has a full-time Risk Management staff and many years of experience in handling nuclear materials. Port activities include U.S. Coast Guard inspections of ships and their cargo [U.S. Coast Guard, 1985], organizing overland carriers to receive the shipping containers,

providing on-site escorts and security, clearing the port weigh station for weighing prior to leaving port, and other safety and security measures. In the period August 1992-July 1993, approximately 3,560 metric tons of uranium products and 40 metric tons of other radioactive material were imported and exported through the Hampton Roads port complex [JoC, 1993].

The port is operated by Virginia International Terminals, Inc., for the Virginia Port Authority, which is an agency of the State of Virginia. Three separate marine terminals make up this facility: the Norfolk International Terminal, the Portsmouth Marine Terminal, and the Newport News Marine Terminal. A ship is directed to one of these terminals as it approaches the port. The terminal used is primarily a function of the type of ship and cargo and the shipping company.

## 5.2.2  Port of Baltimore, Maryland

The Port of Baltimore has a large terminal for importing and exporting automobiles and is rapidly growing, especially in the handling of containerized cargo. Approximately 21.8 million metric tons of foreign trade cargo were moved through the Port of Baltimore in 1991 [MPA, 1992]. Foreign imports accounted for 8.5 million tons of this cargo. There were 2,229 ship calls at the port that year. The population density of the surrounding urban area is 3,633 persons/km$^2$. Approximately 110 metric tons of uranium products and 90 metric tons of other radioactive material passed through the Port of Baltimore between August 1992 and July 1993 [JoC, 1993].

## 5.2.3  Port of Philadelphia and South New Jersey

The Port of Philadelphia and South New Jersey handles a great deal of bulk cargo, especially coal, meat, and fruit. The port has been increasing its crane inventory and other container handling capacity to accommodate growing demand. The Philadelphia and South New Jersey marine terminals are not on the coastline, but are 100 miles (160 km) up the Delaware River from its outlet in the Atlantic Ocean and are near heavily populated areas (population density 4,664 persons/km$^2$). During 1991 there were approximately 20.7 million metric tons of foreign cargo imports moved through the port [MPA, 1992]. During 1992, 2,581 ships called at the ports. Approximately 26 metric tons of uranium products and 17 metric tons of other radioactive material passed through the Port of Philadelphia and South New Jersey between August 1992 and July 1993 [JoC, 1993].

## 5.2.4  Port of New York and New Jersey

The Port of New York and New Jersey handles the world's greatest volume of intermodal traffic, much of it ship-to-truck containers. Approximately 41.9 million metric tons of foreign trade cargo moved through the Port of New York and New Jersey in 1991 [MPA, 1992]. Foreign imports accounted for 34.8 million tons of this cargo. There were approximately 4400 container ship calls at the port during

1992. Population densities of areas near various terminals of the port include Brooklyn, 12,564 persons/km², Manhattan, 25,703 persons/km², and Elizabeth, New Jersey, 3,516/km². Approximately 1,860 metric tons of uranium products and 220 metric tons of other radioactive material passed through the Port of New York and New Jersey between August 1992 and July 1993 [JoC, 1993].

### 5.2.5 Port of Houston, Texas

The Port of Houston is not actually located on the Gulf of Mexico. Rather, access is through Galveston Bay and then 47 miles up the Houston Ship Channel. The Port of Houston Authority owns 42 general cargo wharves and two liquid cargo wharves. The Port ranked first in foreign import tonnage in the United States in 1991 with 37.2 million metric tons [MPA, 1992]. In 1992, approximately 65.3 million tons of foreign trade moved through the port [PoH, 1993]. During 1992, 5279 ships called at the port. The population density of Houston is 1161 persons/km². Approximately 690 metric tons of uranium products and 22 metric tons of other radioactive material passed through the Port of Houston between August 1992 and July 1993 [JoC, 1993].

### 5.2.6 Port of Charleston, South Carolina

The population density of Charleston is 753 persons/km². Approximately 8 million metric tons of cargo passed through the port in 1991 [MPA, 1992]. Foreign imports accounted for 2.6 million tons of this amount. Approximately 30 metric tons of uranium products passed through the Port of Charleston between August 1992 and July 1993 [JoC, 1993].

### 5.2.7 Port of Savannah, Georgia

The population density of Savannah is 998 persons/km². Approximately 9.8 million metric tons of waterborne commerce passed through the port in 1991 [MPA, 1992]. Foreign imports accounted for 4.5 million tons of this amount. Approximately 98 metric tons of uranium products passed through the Port of Savannah between August 1992 and July 1993 [JoC, 1993].

### 5.3 TRUCK AND RAIL TRANSPORTATION ROUTES

Historically, most shipments of LEU in $UF_6$ form in the U.S. have been made by commercial truck, the planned mode of transportation for the proposed action. Tables 5-1 and 5-2 contain the number of shipments and quantities of low enriched and natural uranium shipped within the United States in the past 10 years. Once the LEU arrives at one of the proposed ports of entry, it would be transported via local transportation routes to the nearest interstate highway. DOT routing regulations require that interstate system highways be used to the maximum extent possible. The HIGHWAY code [ORNL, 1992]

described in Section 6.2.1 and Appendix A was used to determine the distance traveled in areas of urban, suburban, and rural population zones for these highway routes.

Distances that trucks loaded with $UF_6$ would have to travel from the different terminals in each port of entry to the highway or interstate were measured from local maps. These distances and the population densities around the terminals were not generated by the HIGHWAY program. Instead, they were taken from actual U.S. census data.

**Table 5-1. Low Enriched Uranium (UF₆) Shipments in the United States, 10/1/83-9/2/93 [Staggs, 1993]**

| Fiscal Year* | Metric Tons Uranium | Number of Shipments |
|---|---|---|
| 1984 | 17920 | 1909 |
| 1985 | 11090 | 1965 |
| 1986 | 9520 | 1617 |
| 1987 | 7719 | 1466 |
| 1988 | 7585 | 1467 |
| 1989 | 7648 | 1354 |
| 1990 | 7632 | 1408 |
| 1991 | 8508 | 1446 |
| 1992 | 8151 | 1970 |
| 1993** | 8587 | 1709 |
| Total | 94360 | 16311 |

\*  Fiscal Year starts on October 1 and ends September 30.
\*\* October 1, 1992 through September 2, 1993.

**Table 5-2. Natural Uranium (UF₆) Shipments in the
United States, 10/1/83-9/2/93 [Staggs, 1993]**

| Fiscal Year* | Metric Tons Uranium | Number of Shipments |
|---|---|---|
| 1984 | 48766 | 2757 |
| 1985 | 33966 | 3515 |
| 1986 | 32034 | 3373 |
| 1987 | 34202 | 3156 |
| 1988 | 33240 | 3855 |
| 1989 | 36659 | 3105 |
| 1990 | 32714 | 3650 |
| 1991 | 40645 | 2948 |
| 1992 | 35538 | 2517 |
| 1993** | 52854 | 2711 |
| Total | 380618 | 31587 |

\* Fiscal Year starts on October 1 and ends September 30.
\*\*October 1, 1992 through September 2, 1993.

## 5.4 GASEOUS DIFFUSION PLANT AT PIKETON, OHIO

The Portsmouth GDP is located immediately east of the Scioto River and three miles south of Piketon, Ohio. The plant has been in operation as a uranium enrichment facility since 1955. The same activities which would be required to handle the Russian LEU, i.e., the opening of overpacks, removal of Model 30B cylinders, sampling and placement of LEU in inventory for availability to nuclear reactor fuel fabricators, have been conducted safely at the plant since the United States began to provide fuel to the nuclear power industry. No new processes or equipment would be required to accommodate the Russian LEU.

The plant site lies in Pike County, Ohio, where the winters are moderately cold and the summers are moderately warm and humid. The soils at the site are strongly acidic, and soil productivity varies from low on steep uplands to very high on terraces and flood plains; texturally, the soils are predominantly silt loams. The terrestrial community comprises gently rolling hills, many of which have dry ridge tops, dry to moist slopes, and low-lying bottom lands. The vegetational community is dominated by a tree

cover consisting of white oak, red oak, and hickory. The animal species, their abundance, and their relative distributions are typical of those found in southern Ohio. Drainage from the entire area flows into various tributaries of the Scioto River, which in turn flows into the Ohio River at Portsmouth, Ohio.

The area surrounding the site is generally sparsely populated, marginal farmland [ERDA, 1977]. The State of Ohio Department of Natural Resources identified two threatened mollusks that occur in the Scioto River, near Piketon, Ohio; neither occurs on property owned by the Portsmouth GDP.

## 5.5 ELECTRIC POWER INDUSTRY

Gaseous diffusion plants are extremely energy intensive; electricity accounts for about 70 percent of the cost of producing a SWU. The Portsmouth GDP currently averages approximately 1,650 MWe of electrical power annually for operations, and the Paducah GDP averages approximately 1,500 MWe annually. When the Atomic Energy Commission (AEC) constructed the gaseous diffusion plants in the 1950s, it was decided to obtain the tremendous amounts of power required by the plants from the commercial power industry rather than for the AEC to construct and operate its own generating plants. Since no single utility was able to supply the full requirements of the Portsmouth GDP when it was constructed, 15 operating utilities in the Ohio Valley area formed the Ohio Valley Electric Corporation (OVEC) and its wholly owned subsidiary, the Indiana-Kentucky Electric Corporation. Problems with coal supply and the desire to place its two plants in different coal markets led OVEC to split its generating facilities and construct them further from the GDP than was done at Paducah. OVEC constructed the two plants on the Ohio River and connected them with a 345 kV transmission network. The 1,303 MWe Clifty Creek Station was constructed near Madison, Indiana, and the 1,086 MWe Kyger Creek Station was constructed near Gallipolis, Ohio. The Portsmouth GDP is the sole customer of these two dedicated plants. The OVEC contract provides DOE with approximately 1,950 MWe of essentially firm power (power that a utility must stand ready to supply even when the maximum demand for power is made on the utility) on a cost-sharing basis, where the price of power is based upon the cost to generate power at the two plants.

The AEC elected to split the supply of power for the Paducah GDP between the Tennessee Valley Authority (TVA) and a group of private utilities. The private utilities formed Electric Energy Incorporated (EEI) to provide their portion of the Paducah GDP's power requirement. EEI constructed the 1,010 MWe capacity Joppa Steam Plant across the Ohio River from the Paducah GDP. The contract between AEC and EEI was a cost-sharing contract. To supply its share of the load, TVA constructed the 1,440 MWe Shawnee Steam Plant adjacent to the Paducah GDP. However, the TVA contract treated the power as system power priced at system rates.

As the cost of TVA's system power rose, DOE sought cheaper sources of electric power for the Paducah GDP and began purchasing nonfirm power. Nonfirm power refers to power that is expected to be

5-9

available either at night or on weekends, or for a few days and possibly up to several months or longer. The cost for nonfirm power is lower than that for firm power since the power is sold when available and is subject to rapid termination when system conditions indicate a need. Some of the nonfirm power used by the Paducah GDP comes from nuclear units. The use of nonfirm power also minimizes the amount of firm power under long-term contract, thus reducing the risk of paying unused demand charges in the future.

Under the terms of the present contract, DOE is entitled to 75 percent (approximately 650 MWe-yrs delivered) of the Joppa plant's annual generation through 1993, and 60 percent (approximately 510 MWe-yrs delivered) thereafter. The contract also provides a mechanism to purchase nonfirm power from EEI sponsoring companies and other interconnected utilities. Fifty-six percent of the SWUs produced at Paducah in 1992 were produced using nonfirm power.

Since all nonfirm power purchased at Paducah comes through EEI sponsors and EEI, it is not possible to establish the original generator or ultimate fuel supplier of all the nonfirm power. However, a partial list of original power suppliers has been developed as follows:

| | |
|---|---|
| Alabama Power Co. | Kansas City Power and Light Co. |
| Arkansas Power and Light Co. | Kansas Power and Light Co. |
| Big Rivers Electric Corp. | Kentucky Utilities |
| Central Illinois Public Service | Northern States Power Co. |
| Commonwealth Edison | Northern Indiana Public Service Co. |
| East Kentucky Power Cooperative | Public Service of Indiana |
| Electric Energy Inc. - Joppa | Sho-me Corporation |
| Illinois Power | Southern Illinois Power Cooperative |
| Iowa Public Service Co. | Tennessee Valley Authority |
| Iowa Southern Utilities Co. | Union Electric |
| Iowa Power and Light Co. | Wisconsin Electric Power Co. |
| Kansas Gas and Electric | |

## 5.6 NUCLEAR FUEL CYCLE MARKETS AND INDUSTRIES

The steps in the nuclear fuel cycle, depicted in Figure 5-2, consist of mining and milling, conversion, uranium enrichment, fuel fabrication, energy generation, reprocessing (in the closed fuel cycle), and storage of depleted uranium (tails). Since the late 1970s, the United States has abandoned reprocessing as part of the domestic nuclear fuel cycle. The front end of the nuclear fuel cycle consists of uranium

5-11



**Figure 5-2. The Nuclear Fuel Cycle**

mining and milling, conversion, enrichment, and fuel fabrication. Once fabricated into the form required for use as reactor fuel, the uranium is used to produce electric power. The status of the front end of the nuclear fuel cycle and nuclear power production is provided in this section, followed by a description of the market for these products and/or services.

### 5.6.1 Uranium Mining and Milling

Mining and milling produces the uranium (known as uranium oxide ($U_3O_8$) or "yellowcake"). The major uranium mining and milling producing companies, and their countries of origin, are:

- Kazakhstan State Atomic Energy & Industrial Corporation (Kazakhstan)
- Cameco (Canada)
- Cogema (France)
- Rio Tinto Zinc (United Kingdom)
- Minatom (Russia)
- Navoi Uranium Combine (Uzbekistan)
- ERA (Australia)
- Uranerz (Germany)

In 1991, the largest U.S. uranium mines were located in Texas and Wyoming and were operated by Rio Grande Resources and Pathfinder Mines, respectively. Mining accounts for about 33 percent of U.S. uranium production [DOE/EIA, 1992]. All other U.S. uranium production in 1991 (67 percent) was produced by *in situ* leaching (in Texas, Wyoming, and Nebraska) or as a byproduct of phosphate production (in Florida and Louisiana). The major uranium mining and milling locations in the world are:

- Key Lake and Rabbit Lake (Saskatchewan, Canada)
- Rossing (Namibia)
- Akouta and Arlit (Niger)
- Ranger and Olympic Dam (Australia)

In 1991, the U.S. was the fourth largest uranium producing country in the world, behind Canada, Kazakhstan and Australia, but with only marginally greater production than that of Russia and Uzbekistan. U.S. uranium production in 1992 was approximately six million pounds, less than seven percent of the Western world's uranium requirements of 90 million pounds. Much of the U.S. uranium production is owned or controlled by foreign countries. Cogema, Total, EdF (France), Uranerz (Germany), and Nuclear Electric (UK) own subsidiaries that produced uranium in the United States during 1991. Utilities from Taiwan, Korea, and Switzerland also have (or once had) interests in U.S. uranium properties, mines, or mills.

U.S. uranium oxide production historically has been quite sensitive to developments in the current market (or spot) price. Not surprisingly, employment in the U.S. uranium mining and milling industry has been quite sensitive to the level of production. These relationships are shown in Figures 5-3 and 5-4, which examine not only the historical relationships, but the future relationships based on recent projections by the U.S. Energy Information Administration (EIA).

**Figure 5-3.  Comparison of Spot Price (1991$) with U.S. Uranium Production, 1979-2005
[DOE/EIA, 1992]**



**Figure 5-4. Comparison of U.S. Uranium Production with Employment, 1975-2005
[DOE/EIA, 1992]**



Figure 5-3 compares historical and projected spot prices (expressed in constant 1991 dollars) with historical and projected U.S. uranium oxide production. As is evident, a close relationship has existed historically, and the Energy Information Administration (EIA) forecasts that this correspondence will persist into the future. Figure 5-4 shows a similarly close correspondence between changes in U.S. production and employment. As shown, immense reductions in uranium oxide production and employment have already taken place due to lower prices. Increases in uranium industry employment in the future are only possible if production increases above the levels shown.

Over the 1992-2005 period, EIA forecasts that the uranium oxide spot price, U.S. uranium oxide production, and employment in the uranium oxide production industry will all more or less double. The forecast shown in Figure 5-3 predicts spot price increases from $9.20 per pound in 1992 to $18.10 per pound in 2005, and production increases from 5.7 million pounds to 11.4 million pounds $U_3O_8$ during the same time period. Employment increases are predicted from 800 person-years in 1992 to 1800 person-years in 2005 as shown in Figure 5-4. Using this as a basis, each $1 change in price would result

in approximately a 650,000 pound change in production, and each 650,000 pound change in production would result in approximately a 110 person-year change in employment.

Employees in the uranium production industry are moderately to highly skilled. Uranium exploration, mining, and milling require personnel with varied backgrounds, including geologists, mining engineers, chemical engineers, equipment operators, maintenance workers, and administrative personnel to run these operations and market uranium. This employment is somewhat geographically concentrated, as uranium mines and processing facilities are for the most part located at uranium deposits in the western United States.

## 5.6.2 Uranium Conversion

Uranium conversion in the nuclear fuel cycle refers to the conversion of uranium oxide to uranium hexafluoride ($UF_6$) gas. There are five large-scale commercial convertors in the world:

- Comhurex (France)
- British Nuclear Fuels Limited (UK)
- Cameco (Canada)
- ConverDyn (US)
- Minatom (Russia)

ConverDyn is a new company formed by the merger of segments of the Allied Signal and General Atomics $UF_6$ marketing functions, and is the exclusive marketing agent for the $UF_6$ produced by Allied Signal. Allied Signal operates the only uranium conversion plant in the United States. This plant, located in Metropolis, Illinois, has a nameplate capacity of 12,600 MTU per year. General Atomics' Sequoyah Fuels plant, in operation until 1992, has been placed on indefinite standby status, and the existing General Atomics contracts have been taken over by ConverDyn. Other countries with uranium conversion capacity include Canada, France, South Africa, the United Kingdom, and Russia.

The current price (in constant dollars) of the uranium conversion process is less than it was ten years ago and competition is strong. Prices are apt to remain depressed until the production capacity is reduced. Presently, there is an oversupply of conversion capacity and little growth in demand.

## 5.6.3 Enrichment

The assay level of the $UF_6$ from the conversion plant is increased (enriched) at an enrichment plant to meet a utility's specified assay level of 3-5 percent U-235. There are four major enrichers in the world uranium market:

- USEC
- Eurodif
- Urenco
- Minatom

The USEC leases and operates two enrichment plants—one at Paducah, Kentucky, and the other at Piketon, Ohio—from the DOE. Eurodif operates one enrichment plant in France. Urenco, a consortium of British, Dutch and German interests, operates three plants: one in Capenhurst, United Kingdom; the second in Almelo, the Netherlands; and the third in Gronau, Germany. Minatom operates four plants in Russia: Yekaterinburg, Tomsk, Krasnoyarsk, and Angarsk. There is also a small amount of enrichment capacity in Japan and South Africa. Prior to July, 1993, when the USEC assumed responsibility for the enrichment operation, the DOE was the largest supplier of enrichment services in the world, although its position had steadily eroded since the mid-1970s. DOE's share of the world enrichment market has declined from 100 percent to about half of its previous market share. In 1991, the U.S. filled slightly under half of the Western world's enrichment requirements. At 19.2 million separative work units (SWU) per year, USEC's capacity is almost double the 10.8 million SWU/year produced by Eurodif, and the 10 million SWU/year the Russians state they are prepared to export to the West [Longenecker, 1991].

A private enrichment facility has been proposed in Louisiana, but the facility is presently only in the early stages of the NRC licensing process.

### 5.6.4 Fuel Fabrication

Fuel fabricators convert the enriched $UF_6$ to uranium oxide pellets. These pellets are placed in fuel rods and bundled according to a utility's specification. The fuel rod bundles are shipped to a utility to be placed in a reactor core.

Most countries with large civil nuclear power programs have their own fuel fabrication facilities; some with smaller programs do as well. Belgium, Brazil, France, Germany, India, Japan, South Korea, Russia, Spain, Sweden, United Kingdom, and the United States have fuel fabrication facilities for light water reactors (LWRs). The major fabricators and countries of origin are:

- Westinghouse (U.S.)
- Babcock & Wilcox Fuel Co. (U.S.)
- General Electric (U.S.)
- ABB-Combustion Engineering (U.S.)
- Siemens Nuclear Power Corporation (U.S.)

- ABB Atom (Sweden)
- Advanced Nuclear Fuels GmbH (Germany)
- British Nuclear Fuels (U.K.)
- France-Belge de Fabrication de Combustibles (France/Belgium)
- Japan Nuclear Fuel (Japan)
- Mitsubishi Nuclear Fuel (Japan)

The five U.S. companies together represent 45 percent of the Western world's fabrication capacity.

### 5.6.5 Nuclear Power Generating Capacity

The U.S. is the largest market for the products and services of the nuclear fuel cycle. It has the largest nuclear power generating capacity in the world with 111 plants producing about 100,000 megawatts of electric power (MWe) [DOE/EIA, 1992]. However, only a few plants are actively under construction. No new plants have been ordered in more than a decade and no new orders are contemplated before the mid-1990s. It is expected that no significant additional nuclear capacity will be operating in the U.S. before the year 2010 due to the time required to license, construct, and gain confidence in the new designs being developed.

The nuclear capacity in the U.S. may diminish if less cost-efficient plants are shut down prior to the end of their 40-year licensing period and/or their licenses are not renewed. Two such shutdowns have recently been announced. Thus, there are indications that the demand for nuclear fuel cycle goods and services in the U.S. will, at best, remain constant for the next twenty years and may even decrease during that period. While the growth in nuclear power programs in the rest of the world has generally slowed, it is still projected that modest growth of about 10 percent will occur [DOE/EIA, 1992].

### 5.6.6 The Uranium Service Market

The commercial nuclear fuel cycle market evolved out of the U.S. government's uranium procurement program for nuclear weapons production. The AEC initiated a procurement program which provided incentives for uranium ore exploration and agreed to buy all the uranium ore delivered at a set price. The incentives were such that, by the 1960s, the AEC had largely satisfied its needs, and the procurement program was phased out. The uranium oxide requirements for the infant nuclear energy industry at that time were much smaller than the available production capability. This led to low prices and a substantial contraction in the industry.

After the rapid increase in oil prices in 1973-1974, the pace of new orders for nuclear power plants throughout the world accelerated. Consequently, there was a perception of future shortages of uranium oxide. Uranium oxide prices quadrupled over a three-year period (1975-1978) as a result. This

5-17

prompted exploration for new supplies. Discovery of new low-cost ores and reductions in demand due to the economic impact of the second oil price shock and reactions to the accident at Three Mile Island resulted in an oversupply of uranium oxide in the late 1970s. As a result, the price of uranium oxide fell. By the early 1980s, the price of uranium oxide had declined to about the price level of the 1960s.

The price of uranium oxide has continued to decline through the 1980s and early 1990s due to the entry of the former Soviet Union into the market with its low-cost uranium oxide, and the further discovery of large, low-cost uranium ore deposits in Canada, Australia, and Africa. Currently, the price of uranium oxide in constant 1991 dollars (approximately $10 per pound) is at its lowest level since the inception of the commercial market. The current low spot market price of uranium oxide is projected to persist through 1996 and then to increase at about 6 percent annually through 2005 [DOE/EIA, 1991b].

The low price of uranium oxide has caused many of the mining and milling production facilities in the U.S. to shut down. Total U.S. production of uranium oxide has fallen from a high of 44 million pounds in 1980 to a low of eight million pounds in 1991 [DOE/EIA, 1992]. Most (67 percent) of the 1991 uranium production did not come from mining activities, but was produced either as a by-product of phosphoric acid production or by *in situ* leaching. Worldwide production outside of the historical Soviet block countries has fallen as well (from 130 million pounds in 1980 to 81 million pounds in 1990), but not nearly as precipitously as in the U.S. The large decrease in U.S. production has been partially compensated for by increases in production in Canada and Australia.

Major uranium oxide inventories are held by utilities, uranium producers, brokers and governments. The content of government stockpiles is not generally known; however, the commercially-owned inventory in the U.S. is equivalent to 120 million pounds of uranium oxide [DOE/EIA, 1992]. Of this inventory, about 40 million pounds are required for the fuel pipeline, leaving about 80 million pounds available to cover U.S. production shortfalls. The rate of inventory drawdown is projected to decrease over time with the inventory eliminated by 1998 or 1999 [DOE/EIA, 1991b].

The 1991 uranium oxide requirement of U.S. nuclear power plants was about 42 million pounds, while domestic production was only eight million pounds [DOE/EIA, 1991a]. The balance of 34 million pounds was made up from imports and inventory drawdowns of both uranium oxide and LEU. The annual domestic supply of uranium for the years 1993 - 2005 is expected to be as follows:

- domestic production         15-20 percent
- importation                 75-80 percent
- inventory drawdown          5-10 percent

The U.S. went from being a net exporter of uranium in 1980 to importing some 50 percent of requirements in 1991, and will import more than 80 percent of requirements early in the next century.

The Secretary of Energy has made the determination that the U.S. uranium mining and milling industry has not been viable in terms of production since 1984 [DOE/EIA, 1991b].

The U.S. market for nuclear fuel is different from other geographic markets in several ways. The U.S. currently has a restriction on the importation of uranium oxide and enriched uranium from the Commonwealth of Independent States (CIS). This restriction is in the form of two different types of quotas. The first allows a certain amount of CIS uranium oxide to be delivered under existing long-term contracts, while the second permits new sales of CIS uranium oxide to the U.S. based on a published price/quantity schedule.

Other countries in the world market do not have this type of quota on CIS uranium oxide. However, countries in the European Community (EC) have what may be considered an informal quota on CIS uranium oxide and enrichment services, administered by the Euratom Supply Agency which oversees nuclear fuel contracting in the EC. Euratom has pursued a policy to limit the reliance of the EC on nuclear fuel imports from any one particular country or region. To this end, and to protect nuclear fuel suppliers in the EC, Euratom has refused to approve CIS contracts if they would result in too great a reliance on CIS supplies or call for a price less than the prevailing market price.

The actions of the U.S. government and Euratom have led to creation of a two-tier price for uranium oxide, uranium conversion, and enrichment. The broker/trader Nuexco has begun publishing a Restricted American Market penalty to reflect the higher prices that U.S. consumers must pay for uranium due to the U.S. quota on CIS supplies. Effectively, this higher price also must be paid by EC utilities and other utilities which will not or cannot buy CIS supplies.

The persistence of this two-tier price depends in large part on the strength of the Euratom resolution to maintain its restriction on CIS supplies. Recently, Euratom has been under some pressure to relax its limitation on CIS supplies, but so far has not amended its policy. A two-tier price has existed before in the uranium oxide market, when it appeared that DOE might restrict the enrichment of non-U.S. uranium oxide which would be used in U.S. reactors. That two-tier price persisted for 19 months, and ended when it became evident that the U.S. would not restrict the enrichment of non-U.S. uranium oxide.

The U.S. market is also different from other geographic markets because of the greater focus of U.S. utilities on spot versus term contracting, particularly in uranium oxide. The U.S. represents a disproportionately high percentage of the world's currently unfilled nuclear fuel needs because of U.S. utilities' preference for purchasing material under spot and short-term contracts. With some exceptions, U.S. utilities are also smaller in size, both absolute and relative to the national electricity supply as a whole. In comparison, the utilities Electricite de France (France), Ontario Hydro (Canada), Nuclear Electric (UK), Synatom (Belgium), Taipower (Taiwan), and Korea Electric Power (Korea), represent the vast share of their countries' nuclear electricity generation.

The U.S. market is also different from other geographic markets due to nonproliferation considerations. U.S. utilities can accept virtually all origins of uranium oxide for consumption, subject to the quota on CIS material discussed earlier. Because the U.S. places fairly stringent restrictions on the end-use of its nuclear fuel exports, including requiring prior consent for subsequent reprocessing, some countries prefer to receive uranium oxide from origins other than the U.S. Also, the U.S. cannot export nuclear material to those countries where it has not negotiated an Agreement of Cooperation. For instance, U.S. companies cannot currently send uranium to Russia for enrichment.

There is no direct U.S. government management of the uranium mining, uranium conversion, and fabrication industries, and little direct involvement in the utility industry. The U.S. utility industry is highly regulated, although mostly by individual states. The nuclear power industry is highly regulated by the U.S. Nuclear Regulatory Commission (NRC). This is in contrast to most other countries. There is some sort of government ownership of the uranium industries in Australia, Canada, France, Gabon, Namibia, Niger, and South Africa, as well as all of the CIS republics, Czechoslovakia, Bulgaria, Germany, and Hungary. There is government ownership or participation in the uranium conversion industries in Canada, France, UK, and Russia.

# SECTION 6.0

# ENVIRONMENTAL CONSEQUENCES

## 6.0  ENVIRONMENTAL CONSEQUENCES

In order to understand the potential for environmental effects related to the proposed action and the reasonable alternatives, it is important to understand some of the chemical and physical properties of the material being transported. Under the proposed action, the low enriched uranium would be transported as uranium hexafluoride in its solid form. In this form and under normal conditions, uranium hexafluoride ($UF_6$) is relatively stable. The compound tends to remain in a solid form because of its low vapor pressure at normal atmospheric temperatures and pressures. Unless the $UF_6$ is subjected to temperatures over about 130°F and less than atmospheric pressures, it is not readily susceptible to airborne transport and, as a consequence, presents a minimal toxicological health risk. This risk is further reduced by the packaging surrounding the material which prevents the $UF_6$ from coming into contact with outside air and moisture. When uranium and its progeny undergo radioactive decay, some gamma and x-rays will be emitted, but as a result of self-shielding[1], the shielding provided by the cylinder, and the relatively low energy of the gamma and x-rays, $UF_6$ presents a minimal external radiation health risk.

## 6.1  CHEMICAL FORMS AND PATHWAYS

If the physical form of $UF_6$ changes to either a gas or a liquid, its potential for toxicological and radiological risk from both internal and external exposures increases. To change the physical form of $UF_6$ from a solid, heat and pressure must be supplied. As noted in Section 3.1, the cylinders containing the $UF_6$ are heated to at least 134°F to convert the solid $UF_6$ into a liquid and then a gaseous form for injection into the gaseous diffusion process. If released as a liquid as a result of a cylinder rupture during this heating process, $UF_6$ vaporizes instantly to particulates and gas. As a gas, $UF_6$ reacts with water vapor in the air to produce uranyl fluoride ($UO_2F_2$) and hydrogen fluoride (HF) which is seen as a white cloud. This cloud would be transported by air and is respirable.

$$UF_6 \text{ (g)} \quad + \quad 2H_2O \text{ (g)} \quad \rightarrow \quad UO_2F_2 \text{ (s)} \quad + \quad 4HF \text{ (g)} \quad + \quad heat$$

| (uranium | (water | (uranyl | (hydrogen |
| hexafluoride | vapor) | fluoride) | fluoride |
| gas) | | | gas) |

Nationally accepted standards for occupational exposure to chemicals are stated in terms of threshold limit values (TLVs), which are established by the American Conference of Governmental Industrial Hygienists (ACGIH). The TLV represents a time-weighted average air concentration to which nearly all workers

---

[1] "Self-shielding" refers to the shielding which would be provided by the material itself between radiation resulting from radioactive decay and a receptor.

can be exposed for a normal 8-hour day, 40-hour work week over a working lifetime without adverse health effects (Sax and Lewis, 1987). An air concentration of a contaminant can be compared to the TLV to determine the relative impacts to humans from an exposure. TLVs are based on the dose-response relation between the agent and its health effects on the worker. This relationship is of a graded nature; consequently, there is a lower level of exposure at which the worker will experience no deleterious effect from the substance. Due to individual variations in susceptibility and many unknown factors in the working environment and their effects on a given toxic material, the TLV of a material is not a fine distinction between a safe and dangerous condition. However, TLVs are a useful tool in evaluating the hazardous nature of a substance, and in providing personnel protection against exposures.

In addition to the TLV, there is an Immediately Dangerous to Life or Health (IDLH) level that represents the maximum concentration from which individuals could escape within 30 minutes without experiencing any escape-impairing or irreversible health effects [NIOSH, 1990]. TLVs and IDLH levels have been established for HF and for uranium, as shown in Table 6-1.

**Table 6-1. TLVs and IDLH Levels for Airborne Concentrations of Hydrogen Fluoride and Uranium** (expressed as milligrams [mg] of substance per cubic meter of air [m$^3$])

| Material | TLV (mg/m$^3$) | IDLH (mg/m$^3$) |
|---|---|---|
| HF | 2.5 | 25 |
| Uranium | 0.2 | 30 |

Fluoride component

Hydrogen fluoride is a gas at room temperature and pressure, is corrosive and has a strong, irritating odor. It exhibits chemical toxicity when ingested or when inhaled for more than a few minutes at levels of 13.3 mg/m$^3$ or greater. In the presence of water, gaseous HF reacts to form hydrofluoric acid. External contact with hydrogen fluoride at levels above 0.26 mg/m$^3$ causes severe irritation of eyes and eyelids and may result in prolonged or permanent visual defects or total destruction of the eyes. Skin contact with hydrogen fluoride may result in severe burns [Merck Index, 1983].

The health effects of internal contact (inhalation) of hydrogen fluoride depend on the concentration and duration of the exposure. Figure 6-1 shows health effects that result from inhalation of HF based on the concentration and the time of exposure. The toxicity of acute exposures to HF can be characterized into five general levels which are associated with odor or irritation: (1) below level of odor detection, (2)

smell/no health effects, (3) smell/possible irritation, (4) irritation/possible health effects, and (5) lethal [IAEA, 1991].

Uranium component

Uranium compounds $UO_2F_2$ and $UF_6$ exhibit both chemical and radiological effects when inhaled or ingested by humans. However, $UF_6$ and $UO_2F_2$ are soluble and tend to be eliminated relatively rapidly from the body. As a result, they present minimum radiological hazards. The relatively rapid elimination of highly soluble $UF_6$ and $UO_2F_2$ means that it is the chemical toxicity, rather than radiological impact, that presents the chief potential adverse health effect from an absorbed dose of soluble uranium. An absorbed dose of 0.03 milligrams (equivalent radioactivity 0.16 microcuries) of soluble uranium per kilogram of body weight normally would result in no acute heath effects (see Table 6-2). However, as the absorbed dose increases, the potential for acute health effects increases.

**Table 6-2.** Comparison of Chemical Toxicity and Radiotoxicity of Soluble Uranium at 97.5 Weight Percent U-235 and 1.14 Weight Percent U-234 Enrichment [Martin Marietta, 1985][a]

| Absorbed Dose of Soluble Uranium (mg-U/kg body weight) | Equivalent Radioactivity ($\mu$Ci) | Acute Health Effects | |
|---|---|---|---|
| | | Chemical Toxicity | Radiotoxicity |
| 0.03 | 0.16 | No effect | No effect |
| 0.058 | 0.30 | Renal injury | No effect |
| 1.63 | 8.45 | 50% lethality | No effect |
| 19.29 | 100 | Lethal | Onset of radiological effects |
| [a] Although enrichments less than 5 percent U-235 will be purchased under the proposed action, 97.5 percent U-235 is used for conservative dose calculations. | | | |

As shown in Figure 6-2, four acute health effects levels have been associated with inhalation of soluble uranium compounds: (1) no effect, (2) renal injury, (3) lethality in 50% of the exposed population ($LD_{50}$), and (4) lethal to all exposed. Estimates of uranium toxicity for exposure times greater than 60 minutes should be based on extrapolation of the 60-minute toxicity estimates shown in Figure 6-2.



**Figure 6-1.  Toxicity of Acute Exposures to Hydrogen Fluoride [IAEA, 1991]**



**Figure 6-2. Toxicity of Acute Exposures to Soluble Uranium [IAEA, 1991]**

**6.1.1 External Radiation Exposure**

Natural uranium is composed of the radioactive isotopes U-234, U-235, and U-238 which, upon decay, emit various forms of ionizing radiation. The health effects that an individual may suffer as a result of exposure to ionizing radiation depends on the type of radiation, the dose, and the rate at which it is received. Dose to an individual is expressed in rem, a unit of dose equivalent. The dose equivalent in rem is numerically equal to the absorbed dose in rad multiplied by the quality factor, the distribution factor, and any other necessary modifying factors. An acute (short-term) external exposure to large doses of radiation greater than 10 rem can result in the immediate onset of health effects. All of the incident-free doses that could result from the proposed action are much lower than 10 rem and would be received over several months (the maximum annual dose to the maximally exposed worker associated with the proposed action would be 0.0041 rem; see Section 6.2.2). A low dose delivered over a long period of time is known as a chronic exposure. Such a dose would not result in the onset of immediate health effects, but long-term exposure could contribute to an increased likelihood of cancer. During incident-free transportation, individuals near the cylinders containing the LEU would be exposed to low-levels of external radiation (gamma and x-rays) emitted by the LEU. This exposure is possible since some of the electromagnetic waves of radiation (gamma and x-rays) generated during the radioactive decay of the uranium and its daughter products in the cylinder would be able to penetrate and escape the cylinder walls. No internal exposures would be received since the $UF_6$ and any alpha and beta particles emitted during the decay of uranium would be contained within the cylinder, and therefore would not be available for inhalation or ingestion.

The National Academy of Sciences gives a lifetime risk of a radiation-induced cancer fatality of about 4 in 10,000 (0.0004 or $4 \times 10^{-4}$) fatal cancers per rem of exposure for workers (i.e., persons between 18 and 65 years old) and 5 in 10,000 (0.0005 or $5 \times 10^{-4}$) fatal cancers per rem for the general population [NAS/NRC, 1990]. For example, if a worker is exposed to one rem, that person is estimated to have a four-hundredths of a percent (0.04 percent) chance of dying from a cancer resulting from the one rem exposure. In comparison, the worker has a 20 percent chance of dying from cancer resulting from causes other than radiation [NAS/NRC, 1990]. The higher risk value given for the general population reflects the younger ages present in the general population when compared to the worker population. Children appear to be at greater risk of dying from cancer as a result of exposure to radiation than adults. The higher risk estimate for the general public (0.0005 fatal cancers per rem) has been adopted by the NRC in its regulations setting maximum radiation dose limits for protection of individual members of the public [FR, 1991]. These risk estimate values are also used in the risk analysis in this EA.

The impact of external radiation exposure to a large population (not an individual) is expressed in terms of person-rem. A person-rem is the unit used to express the sum of all doses received by individuals in a population. The same cancer risk value used to assess health effects to a large population (0.0005 or $5 \times 10^{-4}$) is used to assess the risk to an individual. The cancer risk value is based on a population of

100,000 people exposed to an acute dose of 10 rem. Thus, the application of the cancer risk value is more appropriate when used to assess the health effects for a large population exposed to high doses versus a specific individual exposed to low doses. Using the cancer risk value to assess health effects for a specific individual exposed to doses much lower than 10 rem tends to overestimate the actual cancer risk.

## 6.2 POTENTIAL TRANSPORTATION IMPACTS

The methods of analysis and the results of the analysis of risks associated with the transportation of LEU from St. Petersburg, Russia, to the Portsmouth GDP at Piketon, Ohio, are summarized in this section. The transportation risks for the alternative ports of entry are compared to those for the proposed action in Section 6.6.

It is important to recognize that low enriched $UF_6$ is a relatively stable compound that has a very low specific activity. Each Model 30B cylinder containing 2250 kilograms of $UF_6$ would have an activity of about 5 curies. $UF_6$ contains only uranium and its daughter products. The low-energy gamma and x-rays resulting from the decay of uranium and its daughter products present a minimal external radiation hazard. While the range of forces potentially brought to bear on a package during an accident is the same for any given mode of transportation or handling, regardless of the package (assuming no extraordinary measures such as convoys, escorts, etc.), the response of the package, however, differs according to the characteristics of the package and its contents. It is the package and content response that determines the consequences of an accident. The transportation analysis for the proposed action considers a range of possible accident scenarios that are the same as those applicable to shipments of spent nuclear fuel (see Section 6.2.3 "Overland"). However, adjustments were made to the calculation of accident risk to account for the difference in packaging, including number of packagings, and content response of various accidents involving breach of package betveen potential accidents associated with low enriched $UF_6$ and those associated with spent fuel.

Shipments of $UF_6$ in a solid state would be made in Model 30B cylinders that meet all U.S. and international radioactive material packaging requirements. A Model 30B cylinder meets DOT requirements for Type A packaging. Type A packaging is sometimes called strong, tight packaging. The DOT's regulations treat $UF_6$, when enriched to less than 20 percent U-235, as presenting a sufficiently minimal radiation hazard that an "unlimited" quantity of uranium can be shipped in Type A packaging [DOT, 1990]. All cylinders, including those fabricated outside of the U.S., must comply with the American National Standards Institute (ANSI) standard: ANSI N14.1-1990 Packaging for Transport. ANSI develops packaging standards in cooperation with the International Standards Organization. The standards provide specifications for package design, fabrication, loading, shipping, and requirements for valves, valve protectors, inspection, cleaning, and maintenance. DOT regulations on authorized packaging of fissile materials in 49 CFR §173.417 require that handling procedures and packaging criteria

be in accordance with the DOE report, "Uranium Hexafluoride: A Manual of Good Handling Practices" [ORO, 1991].

For purposes of safety, cylinders used to transport $UF_6$ are overpacked to provide resistance to impact and fire damage and to maintain the temperatures needed to ensure that the $UF_6$ remains at a safe temperature and pressure. A number of protective overpacks have been designed and tested in accordance with DOT and NRC regulations for the Model 30B cylinder. The DOT specification horizontally loaded overpack for the Model 30B cylinder is the 21PF-1B. The 21PF-1B overpack is a fire- and shock-resistant phenolic-foam insulated metal overpack that weighs 800 kilograms (1,750 pounds). Detailed specifications are found in 49 CFR §178.358 [DOT, 1990].

Type 30B cylinders in their overpacks are also certifiable as Type B packages. Type B packages are required to pass two series of rigorous tests: those associated with normal or routine transport and those associated with hypothetical accident conditions that might be encountered. The accident conditions are listed in Table 6-3. The result is that $UF_6$ transport packages can withstand all reasonably foreseeable accidents, including very severe accidents, involving handling and transporting the packages by ship or truck. However, to estimate the risk of an accident the probability that an accident would occur has to be estimated. Given that no accident involving the loss of radioactive material from a Type B packaging has ever occurred, the probability of an accident occurring was nevertheless estimated by conservatively extrapolating from historical data involving less secure packagings. The extrapolation provides a method to estimate the probability of a container breach during an accident even though such an accident has never occurred and is not expected to occur.

**Table 6-3. Hypothetical Accident Conditions for Type B Packages**

| ACCIDENT | CONDITIONS |
|----------|------------|
| Free Drop | Free drop through a distance of 30 feet (9m) onto a flat unyielding surface, striking the surface in a position for which maximum damage is expected. |
| Puncture | Followed by, free drop through a distance of 40 inches (1m) in a position in which maximum damage is expected onto upper end of solid steel bar. |
| Thermal | Followed by, exposure for not less than 30 minutes to thermal environment of 1475°F (800°C) |
| Immersion | Subjected to water pressure equivalent to immersion under a head of water of at least 50 feet (15m) for at least eight hours. |

Source: Title 10, Code of Federal Regulations, Part 71, Subpart F.

## 6.2.1 Methodology

Transportation risk analysis of marine and overland transportation segments, as well as port operations, was performed for this EA through the use of the computer code RADTRAN 4 [SNL, 1992]. RADTRAN 4 contains idealized mathematical models for transportation environments. These models have been formulated to yield conservative estimates (i.e., those that tend to overstate the impact) of integrated population dose in a way that can be supported by available data. For example, RADTRAN 4 estimates that, in the event of an accident, people would not be evacuated for 24 hours. In actuality, people would most likely be evacuated sooner, thereby reducing the time of exposure. The models in RADTRAN 4 do not include features of the transportation environment that either do not affect the calculated risk values or reduce conservatism.

The RADTRAN 4 computer code combines user-determined meteorological, demographic, transportation, packaging, and physical characteristics factors with health physics data to calculate the expected radiological consequence of incident-free and accidental risk of transportation of radioactive material. User-assigned parameters are defined by individual route segment links, for example, ocean passage or highway links between intersections of the various routes taken by the transportation conveyance. Environmental parameters that are quantified using values specific to each transportation link include transport distance, accident rates, and population density. All other environmental parameters, e.g., traffic densities, are left at recommended RADTRAN 4 values to yield conservative results. The reference SNL, 1992, contains details of these default values. Finally, the doses calculated by

RADTRAN are converted to cancer fatality risks using the appropriate dose-risk conversion factor for the exposed population (see Section 6.1.1.).

Input parameters that describe the route and population distribution for the overland transportation segment from the proposed ports of entry to Piketon, Ohio, are contained in the HIGHWAY [ORNL, 1992] computer routing program. The HIGHWAY program provides a flexible tool for predicting and describing highway routes for transporting radioactive materials in the United States. The HIGHWAY data base is essentially a computerized road atlas that currently describes over 240,000 miles of highways. Complete descriptions of all interstate systems and most U.S. highways (except those that parallel nearby interstate highways) are included in the data base. Many of the principal state highways and a number of local and county highways are also identified. The data base also includes locations of nuclear facilities and major airports, including the Portsmouth GDP. Routes are calculated by minimizing a combination of distance and driving time for a highway route between two points. Several routing constraints can be imposed during the calculations.

One of the special features of the HIGHWAY model is its ability to identify routes that maximize use of interstate system highways. This feature allows the user to establish baseline routes for shipments of radioactive materials that conform to DOT routing regulations, which require that interstate system highways be used to the maximum extent possible. This explains why the same major highways would be repeatedly used for shipments of radioactive materials, rather than alternate routes over non-interstate highways. Within the context of risk assessment, these routes should be considered as representative of typical routes that might be used for normal transportation between two points. Specific routes cannot be predicted because factors such as weather, construction, accidents involving other vehicles, and local and state ordinances can change the route that might be used for transportation. Other features of the model include the ability to predict routes that bypass a specific city, town, or highway segment.

Two unique features have been incorporated in HIGHWAY, Version 3.1. The first is the ability to automatically identify alternative routes. Frequently, there are a number of routes between the source and destination that vary slightly in distance and estimated driving time. Most routing models will produce only a single route. With the alternative routing feature, the HIGHWAY program offers a selection of different but nearly equal routes.

The second special feature is the capability to calculate route-specific population density statistics. The population density distribution is calculated for each highway segment in the route and is reported on a state-by-state basis. State borders are treated as nodes in HIGHWAY. The route is always broken into segments at a state border, regardless of whether the code would have otherwise designated a stretch of road intersected by a state border as a single segment. Within a state, route segments are differentiated on the basis of population density and road type. Each internodal segment (i.e., a segment with a node at each end) is broken down into smaller segments identified by population density. Each small segment

is initially classified as belonging to one of twelve "bins" or population-density ranges; these segments are then aggregated to give rural (Bins 1-5), suburban (Bins 6-9), and urban (Bins 10-12) segments. The population density reported for each rural, suburban, or urban segment is the weighted average of the densities in the segments used to generate the aggregate. Thus, each internodal segment becomes up to three aggregated segments representing rural, suburban, and urban population densities from the beginning node to the terminating node. Population densities are determined using 1990 census data and a sophisticated series of mathematical calculations which are detailed in the documentation of HIGHWAY [ORNL, 1992].

Transportation risks were calculated for each segment of the entire shipping campaign of LEU cylinders from St. Petersburg, Russia, to Piketon, Ohio. The first segment is the at-sea transport from St. Petersburg to one of the marine cargo terminals located in one of the proposed ports of entry. The risks associated with the proposed action were calculated by assuming that the Russian LEU would be shipped at two different rates (i.e., Phase 1 and Phase 2). During Phase 1 (FY 94-98), 7 shiploads of $UF_6$ would annually arrive at one or more of the proposed ports of entry. During Phase 2 (FY 99-13), 19 shiploads per year would annually arrive at one or more of the proposed ports of entry. Each shipload would contain 32 Model 30B cylinders, loaded four cylinders per SEAPAK. The port operations segment calculated the risks of getting the ships alongside the pier, then discharging their cargo. Each marine shipment is followed by eight truck shipments from the marine terminal to Piketon, Ohio. Each individual truck shipment was modeled as carrying four cylinders, or one SEAPAK.

The maritime transportation link between St. Petersburg and the U.S. port of entry was conservatively modeled by including in the analysis three intermediate port calls at U.S. ports before each conveyance vessel reaches one of the proposed ports of entry. (This same assumption is used for the alternative ports considered in Section 6.6.5). These intermediate port calls were modeled with a conservative generic model so that the results would represent the possibility that sea-going vessels might make an intermediate port call at any deep water port. It was not intended that the analysis would model any specific maritime shipping route constrained by specific intermediate port calls or would even imply that any intermediate port calls would in fact occur. The intent was to generate a conservative estimate of maritime risk. (For purposes of the accident risk assessment, the intermediate ports were assumed to be high population density ports.) The distances between the ports of St. Petersburg and the proposed ports of entry were determined using the publication "Distances Between Ports" [DMAHTC, 1991]. Once a shipment was in port, the LEU packages (actually the SEAPAKs loaded with cylinders in their overpacks) would be off-loaded from the ship by port workers and inspected by customs officials, United States Coast Guard personnel, etc. The length of their exposure was estimated at 10 minutes per person per SEAPAK. After

the shipment was off-loaded, it was assumed that it was placed in a secure staging area for up to 24 hours awaiting truck transportation to the Portsmouth GDP.[2]

Each SEAPAK was assumed to contain four cylinders of $UF_6$ with a radiation level of 0.5 millirem (mrem)/hr at one meter from the surface of the SEAPAK. This assumption is based on actual measurements of SEAPAKS containing four cylinders of $UF_6$ at approximately the same assay (i.e., 4 percent) as the proposed shipments. These measurements yielded radiation levels in the range of 0.2 to 0.4 mrem/hr at one meter from the surface of the SEAPAK [Conkel, 1993]. Thus the actual measurements have been conservatively adjusted to the level of 0.5 mrem/hr.[3]

Port workers and inspectors are not considered as radiation workers as defined by NRC's regulations. Thus, the maximum annual allowable exposure for these personnel would be 100 mrem, the same radiation dose limit established by NRC's regulations to protect individual members of the general public (i.e., this allowable exposure level is less than that allowed for potentially exposed radiation workers) [FR, 1991].

The overland transportation of LEU was modeled by identifying the most direct route from the gate of each marine terminal yard to the nearest interstate highway using detailed city maps. The most direct route generally would minimize the risk. From the city road connection to the interstate system, a representative interstate route to the gate of the Portsmouth GDP in Piketon, Ohio, was developed with the HIGHWAY routing model, as discussed above.

---

[2]    The proposed action does not include any long-term storage of the SEAPAKS at the marine terminals, or anywhere en route to the Portsmouth GDP. The 24 hour-period for the staging of SEAPAKS was selected because it is possible that on occasion the SEAPAKS will not leave the secure staging area on the same day they arrived, depending on variables such as the time of day the SEAPAKS clear customs. Nonetheless, it is unlikely that the SEAPAKS would remain in the staging area for longer than 24 hours. Indeed, it is likely that the SEAPAKS will usually remain in the staging area for less than 24 hours.

[3]    In the risk estimate prepared for a prior draft of this EA, RADTRAN applied the 0.5 mrem/hour level to a distance of one meter from the center of the packaging, pursuant to RADTRAN's standard theoretical estimates of radiation levels. This procedure resulted in an overestimation of doses to those handling the cargo because the SEAPAK is 8 feet wide by 8 feet high. Therefore, a point one meter (approximately three feet) from the center would be inside the SEAPAK. This overestimation, resulting from code calculations occurring when the distance from the package is small in comparison to package size, is corrected in this EA to reflect actual measurements. These measurements indicate that the level of radiation is less than 0.5 mrem at one meter from the outer surface of the SEAPAK (approximately seven feet from the center). These adjustments were not included in the risk analysis for a prior draft of this EA (October 1993) or for the October 1993 EA for the Purchase of LEU from the Russian Federation Pursuant to the Agreement Suspending the Antidumping Investigation of Uranium (Suspension Agreement EA) (USEC/EA-93001), but were included in the amended Suspension Agreement EA (November 1993, USEC/EA-93001(A)).

### 6.2.2 Routine Operations

Transportation health and safety consequences for the sea transit, port operations, and overland transport segments of the proposed action under routine conditions would be very small. During routine operations there would be essentially no impact on the general population as a result of the proposed action. This would also be true of any intermediate port of call.

### Marine Environment

Because the proposed action involves ocean transport, the USEC addressed the environmental impacts of this proposed action on the global commons taking into consideration Executive Order 12114.

Informal consultation was conducted with the National Marine Fisheries Service concerning the potential environmental impacts to threatened or endangered species/critical habitats, which may result from the proposed shipments of LEU from Russia. The Service indicated that, under normal transport conditions, shipment of LEU by commercial vessel would be indistinguishable from any other commercial shipment, and that impacts to threatened or endangered species or critical habitat were unlikely (see Section 7.0). Indeed, under routine operations there would be no impact on the marine environment as a result of the proposed action.

### Port and Overland

The risk from transportation of the samples taken to verify LEU acceptability, as described in Section 2.1, would be negligible. The sample amounts involved in the proposed action would be considered "limited quantities" which are excepted from most Department of Transportation regulations (except for packaging) due to the negligible risk presented by transportation of these small quantities (see 49 CFR 173.421) [DOT, 1990]. Any doses resulting from shipment of these samples would be extremely small in comparison to those resulting from the proposed action and well within the doses estimated by the NRC's Environmental Assessment NUREG-0170 (see Section 6.5.1.2).

The universe of persons reasonably assumed to be at risk from the radiological impact of routine (incident-free) operations resulting from the proposed action, including the assumptions and conditions used in the risk analysis in this EA, are described in Table 6-4.

Table 6-4. Description of Risk Groups

| Risk Group | Description |
|---|---|
| General Public | General population within 800 meters of the shipment while in transit or during stops, including those sharing the roadway with the shipment |
| Port Handlers and Inspectors | 5 persons at 1 meter from each package for 10 minutes |
| Other Port Workers | 50 persons at 50 meters for 16 hours |
| Conveyance Crew | Sea - Hold inspectors only[a]<br>Truck - Two persons at 10 meters for duration of overland segment |
| Storage Personnel | 20 persons at 100 meters for 24 hours |

[a] Ship crews, except for hold inspectors, are shielded from packages by the ship's structure and other cargo and receive only extremely small doses during transit.

During incident-free transportation, individuals near the SEAPAKs containing the cylinders filled with LEU would receive low levels of external exposure to radiation (gamma and x-rays) emitted by the LEU. No internal exposures would be received since the $UF_6$ would be contained within the cylinders. Since some low-level external exposure is unavoidable, the risk of exposure has the same value as the dose received.

The computer code RADTRAN 4 was used to calculate the total incident-free radiological dose and increased latent fatal cancer risk (LCF) for the entire 20-year period of the proposed action.[4] The LCF risk represents the total increased fatal cancer risk under the proposed action. An LCF is defined as a fatal malignancy that may occur after some latent period, usually 10 or more years, and has a probability of occurrence that increases with dose. The total incident-free radiological dose from all transportation segments for the entire 20-year period of the proposed action as calculated by RADTRAN is presented

[4] Actual radiation measurements of fully loaded UF6 cylinders did not detect any radiation above background levels at a distance of 5 meters and greater from the SEAPAK [Conkel, 1993]. These "zero" readings result from radiation levels at those distances being below the lower limit of detection of the instrument. As a result, theoretical calculations in RADTRAN were used to determine potential exposure rates, even though the exposure rates are very small and not measurable using standard radiation survey instruments, at distances between 0.5 and 800 meters from the SEAPAK. These RADTRAN calculations tend to result in conservatism in the doses and LCF risk estimated since, for example, the calculations assume there are no objects between the SEAPAK and the individuals located at various distances from the SEAPAK.

in Table 6-5. The total public person-rem dose is spread out in very small increments over a large potentially exposed population (261,000 people if Hampton Roads would be the port of entry). The large population is obtained by multiplying HIGHWAY population densities (rural, suburban and urban on a state-by-state basis) by the appropriate areas that are 800 meters wide on each side of the representative interstate highway route between the port of entry and the Portsmouth GDP and adding in the figures for the various worker populations listed in Table 6-4. The same methodology was used for each of the proposed ports of entry.

**Table 6-5. Total Radiological Incident-Free Risk For Proposed Action**

| Port of Entry | Transportation Dose Risk (Person-Rems) | | Total Risk to Public[1] | |
|---|---|---|---|---|
| | Sea Transit and Port Operations | Overland Transport | Person-Rems | LCF |
| Hampton Roads | 3.44 | 4.96 | 8.40 | 0.0037 |
| Baltimore | 3.48 | 4.05 | 7.53 | 0.0032 |
| Charleston | 3.48 | 4.80 | 8.27 | 0.0035 |
| New York | 3.43 | 5.90 | 9.33 | 0.0040 |
| Savannah | 3.50 | 5.04 | 8.54 | 0.0037 |
| Houston | 3.61 | 9.16 | 12.77 | 0.0056 |
| Philadelphia | 3.45 | 5.15 | 8.60 | 0.0037 |

[1] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

The estimated maximum exposure to an individual not actively involved in shipping the LEU represents a hypothetical maximum dose that would be received by a specific individual member of the public who lives beside the highway route. The individual is assumed to be exposed to every shipment of the campaign at a distance of 30 meters. The estimated maximum annual exposure to an individual for incident-free overland transportation would occur during the last 15 years of the proposed action, when the greatest quantity of $UF_6$ would be shipped (FY99-FY13). Each shipment is modeled by RADTRAN as passing by the individual at 24 km/hr (15 miles per hour). The maximum individual annual dose was calculated to be 0.002 (2 x $10^{-3}$) mrem for incident-free operations during the years of the greatest quantity of $UF_6$ shipments. The assumption employed in this EA was also utilized in the amended Suspension Agreement EA. This maximally exposed member of public would be the same for any port of entry since this person is assumed to be present for all shipments at the same distance from the highway route. The maximum individual dose calculated by RADTRAN can be converted into an estimate of increased lifetime risk of a radiation induced LCF by applying the National Academy of

6-15

Science's estimated risk of a radiation induced LCF for the general public: 0.0005 (5 x 10$^{-4}$ LCFs/person-rem). Thus, the maximum dose calculated by RADTRAN would translate into an increased risk of dying from a latent cancer induced by this proposed action over background (to this hypothetical individual member of the public) of 1 in one billion (0.000000001 or 1 x 10$^{-9}$).

Along the transportation corridors that would be used in implementing the proposed action or an alternative involving overland transportation in the United States, the average annual effective dose equivalent for a member of the general population from natural background radiation (including indoor radon) is 300 mrem [NCRP, 1987]. This natural background radiation dose can be compared to the estimated maximum annual individual dose of 0.002 (2 x 10$^{-3}$) mrem which would result from the proposed action.

The estimated maximum exposure to a worker represents a hypothetical maximum dose that would be received by a specific worker who inspected/handled one-third of all of SEAPAKs shipped to carry out the proposed action. Because the ships would arrive at all times of the day or night (and any day during the week), it was assumed that the maximally exposed individual worked an eight-hour shift and would be present for one-third of all shipments. It would not be expected, however, that all of the ships transporting the UF$_6$ would use the same port of entry. Therefore it is conservative to assume that a maximally exposed individual is located in one port through which all of the UF$_6$ transits. The assumption employed in this EA, that the maximum exposure of any port worker would be limited to one-third of the total proposed shipments, is thus considered to more closely approximate actual conditions than the assumption in an earlier draft of this EA (October 1993), and the original Suspension Agreement EA that a port worker would be exposed to all of the proposed shipments. The assumption employed in this EA was also utilized in the amended Suspension Agreement EA. The maximum annual dose that handlers/inspectors would receive would be 4.1 mrem, or 69 mrem for the entire 20 years of the proposed action. This total program dose translates into an increased fatal cancer risk of 2.8 out of one hundred thousand (0.000028 or 2.8 x 10$^{-5}$).

Air

As described in Sections 2.1 and 4.0, a number of HEU and LEU samples would be transported from Russia to the U.S. by air. For the purpose of this assessment, it was assumed that 50 grams of U-235 would be transported in each air shipment. The package containing the uranium samples was assumed to have a maximum dimension of 0.5 m and a dose rate of 0.25 mrem/hr at one meter. Each airplane was also assumed to have three crew members located 20 feet from the package. During flight, the dose rate received by a member of the aircraft crew from the uranium is estimated at 0.01 mrem/hr. The cargo handlers loading or unloading the cargo from the airplanes were estimated to receive 0.2 mrem from each shipment.

The National Council on Radiation Protection and Measurements (NCRP) noted that air travel at an altitude of 39,000 feet gave an enhanced cosmic-ray exposure of 0.5 mrem/hr [NCRP, 1987]. As a result, the aircraft crew would receive 0.5 mrem/hr from cosmic-rays; a substantially larger dose rate than the 0.01 mrem/hr from the uranium.

## 6.2.3 Accident Conditions

Marine Environment

Because the proposed action involves ocean transport, the USEC addressed the environmental impacts of the proposed action on the global commons taking into consideration Executive Order 12114.

During ocean transport, the most severe accident involving stress to the UF$_6$ cargo from force would be a ship collision. However, the impact of a ship into another ship at a velocity of 30 km/hr is less severe than the drop test (See Table 6-3) for a Type B package [NAC, 1989]. As a result, it would be unlikely that a significant release of UF$_6$ would occur during a ship collision.

As discussed in Appendix B, it is extremely unlikely if not impossible for an accident at sea involving collision, fire, or other mishap to result in release of all UF$_6$ from one or more cylinders due to the size of cargo ships, the protective nature of cargo compartments in a transport ship, the potential that the SEAPAKs would be stored in different holds, and the protective nature of the cylinders and their overpacks (as discussed in Section 6.2). As a result, for purposes of probability analysis, it is assumed that the proposed at-sea shipment of UF$_6$ would present no increased risk to humans for two reasons. First, an accident at sea (i.e., outside of port areas) would affect only the ship's crew and not members of the general public (in contrast to an accident in port or along an overland transport route). Second, if an accident of sufficient severity to threaten release of all of the contents of one or more of the overpacked cylinders occurred, the risk of fatality to the crew members would be as great from the general severity of the accident (e.g., fire, collision, drowning) as from release of the contents of the cylinders. Thus, the nature of the material in the overpacked cylinders adds no incremental risk of fatality to a crew member above the risk from accident incurred by any ocean cargo transport. It is also extremely unlikely, if not impossible, that the proposed shipments would present any significant risk from an accident to the marine environment, as discussed in the following paragraphs.

In 1984, the French cargo ship Mont-Louis sank after having been involved in a collision with a ferry. The cargo included thirty (30) Type 48Y cylinders of uranium hexafluoride. In view of the nature of the cargo, particularly its value, it was decided to salvage the UF$_6$ cylinders as quickly as possible and to recover the material. All 30 containers were recovered. They were all intact except one, which had a slight leak in the valve [Ringot, et al., 1987]. It is important to note that the Type 48Y cylinders were

not in overpacks. The Model 30 B cylinders used for the proposed action would be even less prone to failure than the cylinders on the Mont-Louis since the Model 30 B cylinders would be in overpacks.

Moreover, there is no significant risk to the marine environment even in the event that one or more cylinders or one or more SEAPAKs are lost at sea and not retrieved. The oceans contain significant quantities of uranium and its daughter products due to naturally occurring processes (See Section 5.1). As a result, marine organisms are exposed to relatively high levels of background radiation. The cylinders, which contain the $UF_6$, and their overpacks are designed, constructed, and tested to withstand a severe collision, as explained above, so that unretrieved cylinders lost as the result of an accident at sea are likely to remain intact. Since uranium has not been found to bioamplify in fish (and only slightly in other marine organisms) in the marine environment, even in the extremely unlikely event that both the overpack and cylinder failed, an accidental release would result in only slight increases in the exposure of marine organisms which tend to be more radiation resistant than terrestrial mammals and which are already exposed to similar concentrations of uranium.

As a result of the large volume of water, the mixing mechanisms within it, the background concentrations of uranium, and the radiation resistance of aquatic organisms, the radiological impact of the very low probability accident releasing uranium into the ocean would be localized and of short duration. Also, any cylinders accidentally lost in the ocean or coastal waters would be retrieved, if at all possible, because of the economic value of the $UF_6$. This would practically eliminate the possibility of multiple containers slowly corroding and releasing their contents over time. Even if not retrievable, the impact of a slow release would be even less severe than a catastrophic failure of a cylinder.

The second aspect of a marine accident is the chemical hazard. Uranium hexafluoride ($UF_6$) reacts with water in an exothermic reaction that releases uranyl fluoride and hydrofluoric acid (HF). The reaction is not explosive. The HF produced would dissolve very quickly in the sea water. When dissolved, the HF dissociates into $H^+$ and $F^-$ ions. These ions and the $UO_2F_2$ are the toxicological agents responsible for physiologic effects from a potential release of $UF_6$ in ocean water. If an instantaneous, complete hydrolysis of the contents of a single cylinder is assumed (highly unlikely; supporting discussion follows), the peak concentrations of $H^+$ and $F^-$ ions from a total release of $UF_6$ from a container would be approximately 2 $\mu g/l$ at a distance of 100 m. These concentrations are below toxic levels. The uranyl fluoride formed would settle on the sea-bed and slowly dissolve.

The solubility of uranyl fluoride in water at average sea water temperatures is approximately 650 g per kg of water [Linke, 1965]. An instantaneous, complete hydrolysis of the entire contents of a single Model 30B cylinder would produce localized concentrations of uranyl fluoride of approximately 2600 g per kg of water; therefore, the uranyl fluoride would dissolve over an indefinite period of time, depending upon ocean currents. However, if the worst case scenario of instantaneous dissolution of all uranyl

fluoride formed is assumed (while not possible; supporting discussion follows), the peak concentration of uranyl fluoride would be approximately 0.02 mg per kg of water at a distance of 500 m.

If a ship carrying Model 30B cylinders in overpacks containing $UF_6$ were to sink in an area where recovery was not possible, it is valid to assume that the impact on the marine environment would be minimal for the following reasons:

- While Type B packagings (equivalent to a 30B cylinder in its overpack) have only been immersion-tested to a depth of 15 m (Table 6-3), they are likely to maintain their integrity at much greater depths. Type B plutonium oxide shipping containers, which are less robust than a Model 30B cylinder in a 21PF-1B overpack, have been successfully subjected to a static crush force of 5000 pounds along each of the container's three main axes for a period of five minutes. None of the tested containers leaked [SNL, 1975].

- If the cylinders in their overpacks were to sink to a depth where external pressures could crush the containers, exposure of the solid $UF_6$ to sea water would be gradual through cracks in the containers, not catastrophic. Without vigorous mixing, hydrolysis of solid $UF_6$ is very slow. In laboratory experiments where 0.5-1.0 g of solid $UF_6$ were combined with 50 ml of water, hydrolysis was complete in approximately 10 minutes at room temperature when the reaction vessel was "violently shaken;" however, without shaking, the reaction was still incomplete after 24 hours [Shinohara, et al., 1967]. Based on these data, it is reasonable to assume that the reaction of solid $UF_6$ with sea water that gradually seeps in through cracks in the cylinder and its overpack would occur over weeks, even months, at a rate that would allow the hydrofluoric acid and the uranyl fluoride to be quickly dispersed to nontoxic levels by ocean currents.

- The total biomass per square meter decreases exponentially with ocean depth (Section 5.1); therefore, at depths where package failure might occur, the amount of flora and fauna potentially exposed to toxic levels of hydrofluoric acid and uranyl fluoride would be minimal.

For these reasons there is no risk of significant injury to the marine environment from $UF_6$ cylinders which may be lost and not retrieved in the event of an accident at sea.

Port

A port is treated as a maritime link in the RADTRAN code. This link includes a 15 km approach to the port and a stop, with unloading activities, at the port. The accident risk is calculated on the basis of an accident rate per port transit, where actual accident rate data for the port being modeled is used. It is possible to use the accident rate per port transit (as opposed to calculating the risks from accidents during channel transit, dock approach, and unloading at dock) because all accidents are treated conservatively

as occurring at dockside (i.e., dispersion is always over land). The population density of the immediate urban area of the port being modeled is used as the population density under the entire LEU plume footprint out to a distance of 80 km. This extremely conservative assumption tends to overestimate the consequences of an accident and accounts for the reason that port operations present most of the estimated accident risk from the proposed action. Appendix B contains further descriptions of the accidents modeled for the port segment of the proposed action. Table 6-6 shows the accident radiological risks for the proposed ports of entry for the port operations segment for the entire twenty years of the proposed action.

**Table 6-6. Port Operations Accident Radiological Risk for the Proposed Action[a]**

| Port of Entry | Risk to Public[b] | |
|---|---|---|
| | Person-Rem | LCF |
| Hampton Roads | 43.8 | 0.022 |
| Baltimore | 48.0 | 0.024 |
| Charleston | 48.0 | 0.024 |
| New York | 52.8 | 0.026 |
| Savannah | 42.2 | 0.021 |
| Houston | 42.9 | 0.021 |
| Philadelphia | 46.1 | 0.023 |

[a] Risk associated with an activity or event is defined as the product of the probability of undesirable outcomes and a numerical quantification of the consequences associated with these outcomes. As such, the units associated with risk estimates are the same as the units associated with the consequences since probability is a unitless quantity.

[b] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

Overland[5]

The overland transportation accident model in RADTRAN 4 assigns accident probabilities for a set of accident severity categories. The accident severity categories represent the range of credible accident conditions that could be expected to occur in the event of an accident. The least severe accident categories, which are representative of low crush forces on the package, but no fire, are the most probable accident conditions. The most severe credible accident categories, which are representative of

---

[5] The risk of fatalities resulting only from increased truck traffic is discussed in Section 6.2.4.

high crush or puncture forces on the package, severe fire, and package failure, are the least probable accident conditions. Accident impacts were calculated for the surrounding population in general using the population density of the area along the road on which the accident was presumed to occur. The population dose was then estimated by assuming that the LEU was dispersed and distributed to all members of the population residing within the entire accident plume footprint out to a distance of 80 km. Distinct population or worker groups were not differentiated for accident impacts. The radiological transportation risk was calculated for the overland transportation segments of the seven proposed ports of entry for the entire twenty years of the proposed action as shown in Table 6-7.

**Table 6-7. Overland Transportation Accident Radiological Risk from Port of Entry to Piketon, Ohio, for the Proposed Action[a]**

| Port of Entry | Risk to Public[b] | |
|---|---|---|
| | Person-Rem | LCF |
| Hampton Roads | 0.62 | 0.00031 |
| New York | 0.99 | 0.00049 |
| Charleston | 0.49 | 0.00024 |
| Baltimore | 0.61 | 0.00030 |
| Savannah | 0.47 | 0.00024 |
| Houston | 0.96 | 0.00048 |
| Philadelphia | 0.79 | 0.00039 |

[a] Risk associated with an activity or event is defined as the product of the probability of undesirable outcomes and a numerical quantification of the consequences associated with these outcomes. As such, the units associated with risk estimates are the same as the units associated with the consequences since probability is a unitless quantity.

[b] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

The chemical effects of a release of $UF_6$ during transport by truck from the port to the Portsmouth GDP were also assessed even though there has never been an accident, during transport, involving the release of radioactive material from an accident resistant package such as a Model 30B cylinder with overpack [SNL, 1991]. Further, no transportation accidents with fatalities or injuries due to the chemical or radioactive nature of $UF_6$ have occurred in the last 30 years [Kovac, 1988]. Approximately 650,000

metric tons of $UF_6$ have been safely shipped to and from the Portsmouth GDP since the beginning of its operation in the mid-1950s through March, 1993 [Donnelly, 1993]. In the past 10 years (1984-1993), 16,311 shipments of low enriched $UF_6$ (containing 94,360 metric tons uranium) were shipped in the United States without a release of $UF_6$ [Staggs, 1993]. During the most severe accident in which it is assumed (for purposes of risk analysis) that all cylinders would be subjected to a fire, which converts the solid $UF_6$ to a gas, the cylinders rupture, and all of the $UF_6$ is released from all four cylinders on the truck, lethal concentrations of hydrogen fluoride may exist up to 100 ft downwind of the release point. Based on data for spent fuel casks [Wilmot, 1981], and considering that a Type B package is likely to effect a release before a spent fuel cask will effect a release, the probability of the most severe accident (described above, i.e., all of the contents of all four cylinders are released) occurring is estimated at 0.000000065 (6.5 x 10$^{-8}$) for the 20-year period of the proposed action, using Hampton Roads as the port of entry for example purposes. Table 6-8 shows the concentrations an individual would be exposed to under this very low probability accident given that the individual is present for exposure to the entire plume of released material. Although the health effect of this very low probability event would be lethal for an individual located within 100 feet of the accident and who is also stationary for the entire duration of the plume (a very unlikely probability), the probability of the event is so low that the risk is minimal. During less severe accidents, the hydrogen fluoride may cause nasal and lung irritation and the uranium may cause renal injury or milder health effects within 800 ft downwind of the release point.

**Table 6-8.** Integrated Air Concentration of Uranium and Hydrogen Fluoride Under Low Probability Severe Accident Conditions Assuming Exposure to Total Release Plume[a]

| Distance from Accident | HF Exposure (mg HF/m$^3$)(min) | U Exposure (mg U/m$^3$)(min) |
|---|---|---|
| 100 ft. | 120,000 | 350,000 |
| 350 ft. | 30,000 | 88,000 |
| 800 ft. | 12,000 | 35,000 |

[a] Note per Figures 6-1 and 6-2, (53,000 mg HF/m$^3$)(min) is the lethal level and (35,000 mg U/m$^3$)(min) is lethal to 50 percent of those exposed.

The conclusion that the consequences of a severe accident (and the risk when taking into account the extremely low probability of a severe accident) would be minimal is consistent with an analysis by the NRC of the impacts of the January 4, 1986 accident, in which an overfilled 14-ton $UF_6$ cylinder ruptured while being heated in a steam autoclave at the Sequoyah Fuel Corporation site in Gore, Oklahoma. The rupture resulted in about half of the contents of the cylinder, or 6.7 tonnes, being deposited off-site because of wind dispersal. Extensive studies have concluded that the only measurable risk from the accident was to workers in the immediate vicinity of the ruptured cylinder. The NRC concluded that,

although it was possible that some members of the public suffered from short-term changes in kidney function caused by the chemical toxicity of uranium, the radiation exposure from the accident did not perceptibly increase the individual cancer risk for the population [NRC, 1986]. The cleanup process for that accident, as for any accident, would be sufficiently rigorous and overseen by regulatory authorities that it is expected that there would be no substantial and long-lasting impact on the environment.

<u>Total Accident Risks</u>

The total accident radiological risk is a summation of the port operations and overland transport segments of the proposed action. Table 6-9 shows the total accident risk.

**Table 6-9. Total Accident Radiological Risks to the Public for the Entire 20 Years of the Proposed Action**

| Port of Entry | Transportation Segment Risk to Public (in Person-Rem) | | Total Risk to Public[a] | |
|---|---|---|---|---|
| | Port Operations | Overland Transport | Person-Rem[b] | LCF |
| Hampton Roads | 43.8 | 0.62 | 44.5 | 0.022 |
| Baltimore | 48.0 | 0.61 | 48.6 | 0.024 |
| Charleston | 48.0 | 0.49 | 48.5 | 0.024 |
| New York | 52.8 | 0.99 | 53.8 | 0.027 |
| Savannah | 42.2 | 0.47 | 42.7 | 0.021 |
| Houston | 42.9 | 0.96 | 43.8 | 0.022 |
| Philadelphia | 46.1 | 0.79 | 46.9 | 0.023 |

[a] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

[b] Total person-rems is the rounded sum of incident-free and accident dose risks.

<u>Air</u>

As described in Sections 2.1 and 4.0, a number of HEU and LEU samples would be transported by air from Russia to the United States. For the purpose of this assessment, each aircraft was assumed to be carrying 50 grams of U-235 as cargo.

In the event of an aircraft crash which released all 50 grams of the U-235 (from the HEU and LEU samples) being transported, the maximum dose to an individual located 360 feet from the crash was estimated as 10 mrem or a latent cancer fatality risk of 0.000005 ($5 \times 10^{-6}$). At 1200 feet the dose was estimated as 2 mrem or a latent cancer fatality risk of 0.000001 ($1 \times 10^{-6}$). Assuming air shipment miles in the U.S. for both transparency and product quality samples would be similar to the truck miles under the proposed action, the probability of an air accident would be 0.004 (4 out of one thousand) [DOT, 1993] for the entire 20-year purchase program. If the assumption is made that, in the event of an aircraft crash carrying uranium samples an individual is located 1200 feet from the crash, then the risk for the entire 20-year period of the proposed action of an accident resulting in a latent cancer fatality is estimated at 0.000000004 ($4 \times 10^{-9}$) or 4 out of a billion. In comparison, there would be an expected 1.35 deaths resulting from that same aircraft accident from causes other than exposure to radiation [DOT, 1992].

## 6.2.4 Total Radiological Risks

The total radiological risks associated with the transportation of Russian LEU from St. Petersburg to Piketon, Ohio, are shown in Table 6-10. Incident-free dose estimates differentiate between workers and the general public for calculations of LCF risk. Workers are considered to be part of the general public when accident risks are determined. Therefore, the risk conversion factor of 0.0005 ($5 \times 10^{-4}$) LCF/person-rem, described in section 6.1.1, was applied to the calculation of accident risks. As shown by Table 6-10, the total transportation risk (accident and incident-free) for the entire 20 years of the proposed action, assuming for example Hampton Roads as the port of entry for all shipments, is 0.026 ($2.6 \times 10^{-2}$) LCFs (i.e., out of the entire exposed population from Hampton Roads to Piketon, Ohio, assuming this port of entry, there is a 2.6 out of 100 chance that one person out of the 261,000 people exposed would die of cancer resulting from the proposed action).

**Table 6-10. Total Radiological Risks of Transportation for Proposed Action[a,b]**

| Port of Entry | Sum of Total Accident Risk and Incident-Free Risk Estimates for Proposed Action | |
|---|---|---|
| | Person-Rem | LCF |
| Hampton Roads · | 52.9 | 0.026 |
| Baltimore | 56.1 | 0.028 |
| Charleston | 56.8 | 0.028 |
| New York | 63.1 | 0.031 |
| Savannah | 51.3 | 0.025 |
| Houston | 56.6 | 0.027 |
| Philadelphia | 55.5 | 0.027 |

[a] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

[b] These figures reflect the modifications to RADTRAN 4 and the radiological impact calculations described in Section 6.2.1, with respect to using actual radiation level measurements instead of calculated levels for the incident-free handling of the SEAPAKs. For this reason, the figures differ from the calculation of total radiological risks (which proposed Hampton Roads as the port of entry) included in Table 6-8 ("Total Radiological Risks for Transportation for Proposed Action") of an earlier draft EA (October 1993) for this proposed action.

The total transportation risk, expressed in terms of LCFs, was calculated in a risk analysis which included numerous conservative assumptions of events which are highly unlikely to occur. For example, the incident-free annual exposure risk assumes extremely unlikely coincidences such as exposure of the same worker to one-third of all shipments in the proposed action or exposure of an individual member of the public to every highway shipment of the LEU. In addition, most of the calculated total LCF risk derives from the probability analysis of potential accidents, including the most severe overland transport accident in which it is assumed that, for analytical purposes, all four cylinders on a truck release 100 percent of their contents. As noted above, the probability of this event occurring is conservatively estimated as 6.5 chances out of one hundred million (using Hampton Roads as the port of entry for example purposes). Moreover, the risk analysis includes accident scenarios which are virtually impossible. For example, the most severe overland transport accident assumes the airborne release of the contents of all four cylinders for analytical purposes. In reality, the cylinders will be transported in overpacks contained in a SEAPAK and the $UF_6$ is likely to remain in solid form even if all three forms of packaging fail in such an accident.

Accordingly, the total transportation risk analysis does not represent a prediction that a particular rate of fatal cancer incidence would be generated by the proposed action. In the absence of any transport accident resulting in the release of the cylinders' contents—an event which is extremely unlikely and which has never before occurred—the risk of contracting a fatal cancer from incident-free transport, even with conservative assumptions, is about four times lower than the estimated risk for accidental release (see Section 6.2.2).

Since the 1 tonne HEU demonstration shipment (about 45 tonnes of UF$_6$), that may be implemented prior to start-up of full shipments under the proposed action is part of the 500 tonnes of HEU that would be imported under the proposed action, the impacts and consequences of the demonstration shipment have already been included in the foregoing impact assessments.

In addition to the radiological risks of the proposed action, there is the risk of fatalities resulting from the additional truck traffic carrying the UF$_6$. The National Transportation Board estimates that for every 100 million truck miles there will be 1.5 deaths due to accidents involving trucks [DOT, 1992]. On this basis, using Hampton Roads as an example, there would be an expected 0.02 deaths from the additional truck traffic resulting from implementation of the proposed action over 20 years. In comparison, the radiological risk from truck transportation accidents for the general public from the proposed action is 0.00031 latent cancer fatalities (See Table 6-7). The routinely encountered truck fatality risk is therefore approximately one hundred times greater than the accident radiological risk.

## 6.3 POTENTIAL IMPACT AT THE PORTSMOUTH GDP

The proposed action would not require any new process activities at the Portsmouth GDP. However, there could be an increase in UF$_6$ sampling, cylinder handling, and cylinder docking activities. In this section the potential incremental impacts resulting from the proposed action on GDP process activities are examined. Table 6-11 shows the input and output streams for the GDP complex if 4.4 percent U-235 product were produced during the two phases of the proposed action.

**Table 6-11. Impact of the Russian LEU Purchase Program on U.S. GDP Production Over the Next 20 Years**

| WITHOUT OVERFEEDING: | | | | | | | |
|---|---|---|---|---|---|---|---|
| RUSSIAN LEU | FEED SUPPLIED | AMOUNT PRODUCED (4.4%) | FEED NOT USED | OPERATING TAILS ASSAY | GDP PRODUCTION | POWER REQUIREMENTS | DU[1] PRODUCED |
| (MTU) | (MTU) | (MTU) | (MTU) | | (MSWU) | (MW) | (MTU) |
| Base | 18,291 | 1,913 | ------ | 0.280% | 12.0 | 3,200 | 16,378 |
| 305 | 18,291 | 1,608 | 2,920 | 0.280% | 10.1 | 2,700 | 13,763 |
| 915 | 18,291 | 998 | 8,751 | 0.280% | 6.3 | 1,700 | 8,542 |
| WITH OVERFEEDING: | | | | | | | |
| RUSSIAN LEU | FEED SUPPLIED | AMOUNT PRODUCED (4.4%) | FEED NOT USED | OPERATING TAILS ASSAY | GDP PRODUCTION | POWER REQUIREMENTS | DU PRODUCED |
| (MTU) | (MTU) | (MTU) | (MTU) | | (MSWU) | (MW) | (MTU) |
| Base | 18,291 | 1,913 | All feed supplied is used as overfeed | 0.280% | 12.0 | 3,200 | 16,378 |
| 305 | 18,291 | 1,608 | | 0.355% | 8.8 | 2,400 | 16,683 |
| 915 | 18,291 | 998 | | 0.498% | 4.4 | 1,200 | 17,293 |

[1] DU = Depleted Uranium

6-27

### 6.3.1 Impact on GDP Production

As discussed in Section 2.0, Russia is expected to blend HEU with 1.5 percent U-235 to produce 4.4 percent U-235 LEU. Approximately 305 MTU/yr of Russian LEU would be available for the first five years, and 915 MTU/yr for the last 15 years of the proposed contract.

If the USEC is not able to increase market share, a smaller quantity of LEU would be produced at the GDPs to meet the demand for 4.4 percent U-235 of 1,913 MTU/yr. Producing less LEU means that the amounts of feed and electricity required by the GDPs would be reduced. However, as provided in their enrichment services contracts, the GDP customers would continue to deliver the same amount of natural uranium feed, that is, 18,291 MTU/yr to obtain the 1,913 MTU/yr of LEU they desire. The excess natural uranium feed could be used to overfeed the GDPs. This would further reduce the amount of separative work the GDPs must produce and therefore, the amount of electricity required. Table 6-11 summarizes the impact on GDP production, power, and feed from implementing the proposed action if market share does not increase. It should be recognized that if all of the excess feed during the last 15 years of the Agreement is overfed, the ASTM specification of 10,000 micrograms of U-234 per gram of U-235 would be slightly exceeded. This would require either an agreement with fuel fabricators to accept the product, or a change in the ASTM specifications. However, material specifications may limit the tails assay to about 0.35 percent. Under this limit on the tails assay, it would not be possible to overfeed all excess feed delivered during the years when 915 MTU of Russian LEU would be received at the GDPs.

The Russian LEU has substantial SWU value, as shown in Table 6-11. At levels of 30 MTU/yr of HEU, the enrichment work required by the diffusion plants to meet demand would be low enough that either GDP alone could meet the demand. As a result, even though the minimum demand of about 7 MSWU/yr to keep both GDPs operational from an economic standpoint would be met, there would be sufficient SWU capacity at one plant to meet forecasted demand. The socioeconomic impact of closing one of the GDPs has been previously assessed in DOE's "Socioeconomic Assessment: Partial Closure of the Paducah Uranium Enrichment Facility" [DOE, 1985c] and "Socioeconomic Assessment: Partial Closure of the Portsmouth Uranium Enrichment Facility," [DOE, 1985d]. These documents are incorporated by reference into this EA.

The assessments predict the worst-case socioeconomic impacts of plant closure on the Portsmouth and Paducah communities. However, the assessments make no allowances for personnel retention involving reassignment and retraining, if necessary, for future decontamination and decommissioning (D&D) or environmental restoration activities at the GDP. It is likely that some involuntary layoffs would be required if a decision to close a GDP were to be made. As reported by Grady et al. [Grady, 1987], experience with the closure of the Oak Ridge Uranium Enrichment Facility in 1985 verified to some extent the predictions in "Socioeconomic Assessment: Partial Closure of the Oak Ridge Uranium

6-28

Enrichment Facility" [DOE, 1985b]. The long-term socioeconomic impacts predicted in the assessment were partially offset by the ability of the other DOE facilities in Oak Ridge to hire personnel released from the facility. However, about 150 highly skilled specialized personnel could not be placed in other positions within the DOE Oak Ridge complex. Personnel with experience or education to immediately switch from uranium production-related activities to environmental or waste management activities have largely been placed in other positions. A number of ex-Oak Ridge uranium enrichment personnel now work in positions related to D&D and environmental remediation at the plant. These projects are expected to last for many years.

While the impact of closure of the Oak Ridge Uranium Enrichment Facility was moderated by the factors described, socioeconomic impacts from closure of either the Portsmouth or Paducah GDP would not be as easily mitigated. Neither Portsmouth nor Paducah have co-located DOE facilities to which personnel can transfer, nor do the local areas have large industrial bases which could easily absorb displaced workers from the GDP. As a result, the closure studies for Portsmouth and Paducah would probably be more accurate than the Oak Ridge assessment, which overestimated the impact of closure. A plant closure was estimated to result in a 11.3 and 16.7 percent increase in unemployment in Paducah and Portsmouth, respectively [Grady, 1987].

### 6.3.2 Impact on Natural Uranium Feed Inventory

Since current USEC enrichment services contracts provide for the enrichment services customers to deliver feed to the GDPs, the entire amount of feed resulting from the delivery of the Russian LEU may not be able to be overfed (see Section 6.3.1). As a result, an increasing stockpile of natural uranium feed could occur. However, natural uranium feed is a valuable resource that has been utilized in the past at the GDPs by operating the plants at a higher tails assay to reduce power costs.

If the purchase of Russian LEU results solely in additions to the inventory of natural uranium feed at the plants, there would be little physical impact other than additional cylinders placed in existing holding facilities. As shown in Table 6-11, if none of the excess natural uranium feed is used to overfeed the GDPs, 2,920 metric tons per year of natural uranium could accumulate during the FY94 through FY98 period, and 8,751 metric tons per year of feed could accumulate during the period FY99 through FY13, for a total of about 146,000 metric tons of natural uranium. This amount of natural uranium feed would be stored in about 23,000 large steel cylinders that hold about ten tons of $UF_6$ each (the same type of cylinders discussed in section 6.3.3 below). Compared with the 40,000 cylinders currently stored at the GDPs and because of the large unused areas at the GDP sites, the storage of the additional 23,000 cylinders would not significantly impact the sites.

If the decision were made not to place in inventory the excess feed which cannot be overfed to the plants, the USEC may seek to sell the uranium feed in the international market or make arrangements to sell the

LEU (which has the effect of selling the natural uranium component). The proceeds from the sale would help to offset the cost of operating the USEC plants. As shown in Table 6-11, as a limiting situation, if none of the excess natural uranium feed is used to overfeed the GDPs, 2,920 metric tons per year of natural uranium could be disposed of on the international market during FY94-FY98, and 8,751 metric tons per year of feed could be sold from FY99-FY13. These quantities of natural uranium are equivalent to about 8 million pounds of uranium oxide per year for the FY94-FY98 period, and about 23 million pounds of uranium oxide per year from FY99-FY13.

As shown in Section 5.6.1, the total U.S. production of uranium oxide during the period FY94-FY98 is expected to average about 8 million pounds per year, and for the period FY99 through FY05 (the last year of the DOE projection) is expected average about 10 million pounds per year [DOE/EIA, 1991b]. The total uranium oxide requirement for U.S. nuclear power plants for the period FY94-FY98 is expected to average about 45 million pounds per year, and for FY99-FY13 from 32 to 60 million pounds per year [DOE/EIA, 1992]. If all of the excess equivalent uranium oxide were sold on a prorated basis to the domestic and foreign producers who are expected to supply U.S. nuclear power plants, domestic producers would experience about a 20 percent reduction in deliveries during the FY94-FY98 period and about a 40 to 70 percent reduction during the FY99-FY13 period. These reductions would be especially painful for the domestic uranium production industry, and it is likely that some of the few suppliers remaining would go out of business, especially during the beginning of the next century. Since the equivalent uranium oxide is in the form of $UF_6$, such sales of $UF_6$ could affect the profits of the one U.S. conversion company, Allied Signal.

Another option for the use of the natural uranium component would utilize a provision of the proposed contract for the purchase of LEU derived from the dismantlement of Russian nuclear weapons that provides for the possible return of the natural uranium component, i.e., the 1.5 percent assay U-235 blended with the HEU to product the 4.4 percent U-235 LEU, to Russia. If the USEC did not order the natural uranium component, Russia would have the option of the return of all or part of the natural uranium component in accordance with mutually satisfactory arrangements being negotiated. Such arrangements could include provisions in order to assist the domestic uranium production industry.

## 6.3.3 Impact on Depleted Uranium Storage

Depleted uranium at the Portsmouth and Paducah GDPs is stored as $UF_6$ in 14-ton cylinders. The Portsmouth GDP currently stores about 14,000 cylinders of depleted uranium on site, with an additional 1,300 cylinders being added each year. The Paducah GDP currently stores about 25,000 cylinders, with 1,200 more cylinders being added each year. The cylinders are stored in the open air, and are stacked in rows, two high, on special storage pads. Atmospheric corrosion on the cylinders is extremely slight, and an extensive test program started in the early 1970s indicates that the oldest of the cylinders at the GDPs are expected to have a remaining service life until at least 2020, with the newest cylinders having

a service life of more than 70 years. The wall thickness for the oldest of the cylinders at the GDPs could approach 1/4-inch, the minimum thickness specified for cylinders in service, by the year 2020. However, cylinders that have a wall thickness of 1/4-inch will still provide a considerable measure of protection for the depleted uranium in the cylinders.

Based on an exhaustive inspection of all of the depleted uranium cylinders at the two GDPs, two cylinders at the Portsmouth plant were found to have a small hole in their sides. The hole in each of the cylinders was caused when a lifting lug from an adjacent cylinder bumped against the cylinder during the stacking operation. Because a relatively insoluble plug is formed when the $UF_6$ reacts with the moisture in the air, one of the cylinders was determined to have lost essentially no uranium, while the other cylinder was determined to have released less than 0.5 percent of the uranium in the cylinder to the environment, with no measurable impact. These two cylinders have been emptied and are undergoing examination to provide additional information on the ability to continue safely storing depleted uranium. All cylinders at the two plants are carefully inspected each year to assure that no new leaks have developed. In addition, improved stacking procedures have been instituted at the two plants to eliminate the possibility that a depleted uranium storage cylinder will be damaged in the future.

The proposed action would have a small impact on the number of cylinders storing depleted uranium if all excess feed were used as overfeed. As shown in Table 6-11, the import of the 305 MTU of HEU converted to LEU would result in an increase from 16,378 MTU to 16,683 MTU in the depleted uranium (DU) produced during Phase 1. This additional 305 MTU of DU would result annually in an additional 37 cylinders over the expected 2,000-2,500 cylinders to be added to storage annually during 1994-1998. During Phase 2 (1999-2013), the additional 915 MTU of DU would result in an additional 111 cylinders being annually added to storage. As a result, the proposed action would be expected to have minimal impact on DU storage.

### 6.3.4 Impact on Health, Safety and the Environment at Portsmouth GDP

Uranium hexafluoride is the most abundant hazardous material on-site at the Portsmouth GDP. Aside from nuclear considerations, $UF_6$ can be handled safely in essentially the same manner as any other corrosive and/or toxic chemical by employing procedures developed to accommodate the characteristics of the material. The level of routine exposure to chemicals is regulated by the Occupational Safety and Health Act (OSHA) standards with which the Portsmouth GDP is required to comply. Since no new processes or activities at the Portsmouth GDP are expected to result from the proposed action, the level of routine exposure to chemicals for workers is not expected to either increase or decrease as a result of the proposed action.

Because no new processes or activities at the Portsmouth GDP are expected to result from the proposed action, the level of routine radiological exposure for workers and the public is not expected to either increase or decrease as a result of the proposed action.

Historically, there have been no lethal exposures or significant injuries from accidents involving either toxic materials or radiation in about 115 plant-years of operating experience at the gaseous diffusion plants in the United States [Martin Marietta, 1991]. The proposed action would essentially require the GDPs to continue to operate under current plant conditions with the possible exceptions of lower power consumption (from overfeeding), more product inventory, and a slight increase in the number of depleted uranium cylinders placed in inventory during a twelve-month period in 1993-1994. These changes are well within the conditions under which the Portsmouth GDP can be operated safely, as described in the Final Safety Analysis Reports for the Portsmouth GDP [Martin Marietta, 1985].

## 6.4 ECONOMIC CONSEQUENCES

This assessment addresses the potential economic impacts on the nuclear fuel cycle industries, enrichment services and the gaseous diffusion plants, electric utilities, and the proposed ports of entry resulting from the importation into the U.S. of low enriched uranium (LEU) from dismantled nuclear weapons in Russia.

### 6.4.1 Economic Impact on Nuclear Fuel Cycle Industries

The basic element of this part of the analysis was to select two economic and political scenarios with which to compare the impact resulting from the proposed action. The scenarios reflect the dynamic status of the nuclear fuel cycle markets under the No Action alternative in which the U.S. does not sign a contract to purchase Russian LEU derived from HEU. Two scenarios were formulated because the nuclear fuel cycle markets and industries are in a state of flux due in part to political and economic changes that have occurred in the Commonwealth of Independent States (CIS). The CIS is becoming much more active in the nuclear fuel cycle markets than was the former Soviet Union. The two scenarios used are:

- Scenario 1: The LEU market is maintained at its current status without conversion of HEU to LEU in Russia for shipment to the U.S. (No Conversion)

- Scenario 2: HEU is converted to LEU in Russia and is sold by the Russians for resale or directly to the world market. (No U.S. purchase contract for LEU derived from 500 tonnes of HEU.)

Scenario 1 is the least likely response on the part of the Russians if the proposed action to purchase Russian LEU derived from HEU were not carried out. The Russian Federation has considerable HEU

resources which represent hard-currency value. It is extremely unlikely that all of the HEU recovered from dismantled nuclear weapons would be simply put in storage in Russia if the U.S. fails to sign the proposed contract.

Scenario 2 is the likely response of the Russian Federation if the proposed contract were not signed. The Russians have already been seeking additional markets and avenues for utilizing the SWU value in their HEU. It is likely the Russians would convert and blend large quantities of their HEU and then attempt to sell the LEU on the world market. An Agreement suspending the Antidumping Investigation on Uranium from the Russian Federation (Suspension Agreement) signed by the U.S. and the Russian Federation on October 16, 1992, limits the natural and enriched uranium sold by the Russian Federation in the U.S. until the year 2000. The quantities of material which may be sold under this Agreement rise as the price of uranium increases.

**6.4.1.1 Uranium Mining and Milling Industry**

Scenario 1—Proposed Action Versus the Situation as it Exists Today (No Conversion of HEU to LEU)

If the USEC were to not purchase the Russian LEU and the Russians did not convert and blend the HEU to LEU, the USEC would continue to receive from the utilities the feed to produce their desired enriched product, and there would be no impact on the uranium mining and milling industry. Under the proposed action, the Russian LEU could annually displace about eight million pounds of uranium production during the first five years of deliveries under the proposed contract. This represents about 19 percent of U.S. utility requirements. The impact this material would have on employment would depend on how the USEC utilizes the excess feed material. If the USEC were to overfeed uranium at the GDPs there would be no impact on domestic uranium production. If the USEC were to relieve its domestic utility customers of eight million pounds of their uranium oxide delivery obligations during the first five years of the agreement (present contracts do not provide for such relief) or sell the excess feed, the impact would be felt more heavily on foreign producers, since more than 70 percent of the uranium oxide used by U.S. utilities comes from imports. If the eight million pounds of uranium oxide were prorated between foreign and domestic producers, domestic producers would experience about a 20 percent reduction in deliveries, which could be painful in an industry the Secretary of Energy has already determined to be non-viable for eight consecutive years (see Section 6.3.2).

During the succeeding 15-year period when the quantity of the Russian LEU is tripled under the proposed action, the 24 million pounds per year of uranium oxide production that could be displaced by the Russian LEU represents about a 40 to 70 percent reduction in domestic production during that period (see Section 6.3.2). If the USEC were able to overfeed the GDPs (see Section 6.3.1), there would be little or no

impact on domestic uranium production. However, it is unlikely that USEC would be able to overfeed all of the 24 million pounds per year of displaced uranium oxide production.

### Scenario 2—Proposed Action Versus Availability of LEU from Russian HEU on the World Market (No U.S. Purchase Contract for LEU Derived from 500 Tonnes of HEU)

If the USEC were to not purchase the Russian LEU and the Russians converted and blended the HEU to LEU and then sold the LEU on the world market, the price and demand for uranium mining and milling services would decrease. However, since the U.S. uranium production industry would be insulated to some degree from any negative effect on the price of uranium ore while the Suspension Agreement is in effect, the no-purchase alternative would not have a major impact on U.S. production during this decade. On the other hand, the USEC purchase of Russian LEU would tend to result in an increase in the uranium oxide price during this decade, if it is assumed that the excess feed delivered to the GDPs would be overfed and that the Russians would otherwise sell the converted LEU in the market. However, if USEC does not overfeed the excess uranium oxide, the impact on the uranium production industry would approach that of Scenario 1.

The situation is different when the Suspension Agreement ends and the upward impact on the price stemming from the U.S. purchase is estimated to be greater, as the amounts of LEU (and hence uranium oxide equivalent of the LEU) are greater. Presuming that large amounts of this LEU could be sold in the U.S. market after the year 2000 without the USEC purchase of Russian LEU, this would depress the price and supplant U.S. uranium production. In this case, the USEC purchase would have the effect of maintaining U.S. uranium oxide production and employment at about the current levels, as long as the USEC does not sell the LEU on the open market.

### 6.4.1.2 Uranium Conversion Industry

#### Scenario 1—Proposed Action Versus the Situation as it Exists Today (No Conversion of HEU to LEU)

If the USEC were to not purchase the Russian LEU and the Russians did not convert and blend the HEU to LEU, the USEC would continue to receive from the utilities the converted oxide feed to produce their desired enriched product, and there would be no impact on the uranium conversion industry. If the USEC were to purchase the Russian LEU and relieve utilities of their obligation to deliver feed to the GDPs or sell the excess feed, the Russian LEU could displace about eight million pounds of uranium oxide, currently converted annually, during the first five years of the proposed contract. The negative impact on the conversion industry could increase during the succeeding fifteen-year period when the quantity of the Russian LEU is tripled from the initial amount imported. However, if the USEC were

to overfeed the GDPs, there would be no impact on the conversion industry. As noted in section 6.4.1.1, USEC may not be able to overfeed all of the displaced uranium oxide production.

### Scenario 2—Proposed Action Versus Availability of LEU from Russian HEU on the World Market (No U.S. Purchase Contract for LEU Derived from 500 Tonnes of HEU)

A USEC purchase of Russian LEU would be expected to protect U.S. uranium conversion activities from low-cost $UF_6$ which would be available in the world market if the Russians converted and sold their HEU. To the extent that USEC overfeeds or otherwise withholds the displaced uranium oxide production from the world market, the period of time in which the purchase would most strongly protect the domestic conversion industry is the period of time that the U.S. industry would be most insulated from lower international prices, due to both the Suspension Agreement and existing term contracts. It is still possible that the U.S. purchase would continue to have a protective influence on domestic uranium conversion after the year 2000, although it would not be as pronounced as during the pre-2001 period. In the worst case where USEC would sell all displaced uranium oxide production, the impact would be similar to Scenario 1.

### 6.4.1.3 Fuel Fabrication Industry

This is the portion of the fuel cycle that would be least affected by the proposed purchase of Russian LEU from a market standpoint, if it is affected at all. The purchase would not change the amount of fuel that would need to be fabricated, and is not expected to change the price of fabrication.

### 6.4.2 Economic Impact on the Enrichment Industry (the U.S. Gaseous Diffusion Plants)

### Scenario 1—Proposed Action Versus the Situation as it Exists Today (No Conversion of HEU to LEU)

If the USEC were to not purchase the Russian LEU and the Russians did not convert and blend the HEU to LEU, the USEC would continue to meet anticipated demand from utilities for about 12 MSWU per year from the GDPs. If the USEC were to purchase the Russian LEU and use the excess natural $UF_6$ feed delivered by utilities to overfeed the enrichment plants during each year of the first five years of the agreement, the impact would be felt primarily in the reduced electric energy consumed by the plants. The combination of producing less LEU and overfeeding could result in electric energy reductions of about 16 percent for the period 1994-1998. There would be no loss of employment at the gaseous diffusion plants.

The USEC, under the terms of the Energy Policy Act of 1992, is under an obligated lease from DOE, whereby the GDPs are available to the USEC for a certain period of time. As noted before, present

commitments for deliveries of enriched uranium are at a level of roughly 12 million SWUs per year. This is enough to support continued operation of both Portsmouth and Paducah GDPs. However, the need to commit to long-term contracts for operation of both GDPs remains in question, whether or not the USEC acquires LEU from Russian HEU.

To some extent, the availability of the Russian LEU will promote the continued operation of the GDPs, in that the availability of a supply in addition to that available from the GDPs provides the USEC with additional flexibility. A decision not to extend leases for both GDPs may be appropriate, after determining the best mix of operations and transfers to meet the Congressionally-mandated responsibilities of the USEC. That choice will be determined more by the ability of the USEC to maintain market share than by any other business factor. The availability of the Russian LEU, as opposed to Scenario 2, below, is believed to improve the opportunities for the USEC to maintain and increase market share.

### Scenario 2—Proposed Action Versus Availability of LEU from Russian HEU on the World Market (No U.S. Purchase Contract for LEU Derived from 500 Tonnes of HEU)

The international price of enrichment would be depressed if the U.S. did not purchase LEU from the Russians and the Russians sold at least some of this material on the international market. These low market prices would impair the USEC's ability to capture future business. Unfilled enrichment requirements on the part of utilities increase greatly after the year 2000, the time when the U.S.-Russian Federation Suspension Agreement ends. At this point, the additional Russian LEU could be sold to U.S. purchasers, where most of the USEC's business is located. Studies have shown that the nuclear fuel procurement policies of U.S. utilities are price sensitive—more price sensitive than their counterparts overseas—and U.S. utilities would be likely to buy large quantities of LEU, especially on the spot market. Thus, the U.S. market would presumably be the most susceptible to sales of Russian LEU. It is quite certain that under this scenario, the USEC's market share would decline, and this decline would be sufficient to induce the closure of an enrichment plant. Thus, not only would production fall, but so would market share, price, and revenues.

Using this example as a basis of comparison, the USEC purchase of Russian LEU would benefit the U.S. enrichment industry. While it cannot be guaranteed that this purchase would keep both enrichment plants operating, it would allow the USEC to maintain (or expand) its market share, which would result in higher enrichment prices, and increased revenues and the continuing viability of the enrichment enterprise. The USEC, by purchasing the Russian LEU, could more reasonably manage the impact on production employment, than if this LEU were sold by Russia elsewhere in the market.

### 6.4.3 Economic Impact on the Electric Utility Industry

The Russian LEU, particularly the larger amounts to be received during the last 15 years of the contract, could substantially reduce the amount of electricity required for the GDPs. The Russian LEU represents about 16 percent of current SWU production during the first five years and 48 percent during the succeeding fifteen years. The reduced electricity consumption would have no impact on GDP plant employment.

Under the terms of the contract between the DOE and EEI for the Paducah GDP, either party has the right to reduce the contract unilaterally by 10 percent per year or to terminate the contract entirely with a 5-year notice. Under terms of the contract between DOE and OVEC for the Portsmouth GDP, DOE has the right to reduce contract demand or to terminate the contract unilaterally with a 3-year notice. DOE also has the right to request movement of power to Paducah if it is no longer needed at Portsmouth or for OVEC to use its best efforts to dispose of power no longer needed by DOE.

The reduction in power consumption under overfeeding and non-overfeeding scenarios would require DOE to implement the terms of their contracts with either or both EEI and OVEC. The high percentage of nonfirm power used at Paducah provides an opportunity to reduce nonfirm power and enact a smaller change in the power provided under the terms of the DOE-EEI contract.

Implementing the terms of the DOE and utility contracts could have a minor impact on utilities and the coal mining activities which provide coal to the three plants providing firm power to the GDPs. The power currently produced and consumed by the GDPs is relatively inexpensive. Thus, to the extent that it is below the cost of other sources, the surplus power could be sold to one or more utilities in the region, displacing other more expensive power. Such actions would simply shift the effects of reduced production and consumption to other utilities and fuel producing states and counties. The new source of power on the grid could also mean that planned power plants would not be needed in the short term to meet increasing demands for electricity as the U.S. population increases.

### 6.4.4 Economic Impact on Proposed Ports of Entry

Each of the ports proposed as a port of entry for the Russian LEU to be shipped under the proposed action is an established port with large quantities of cargo flowing through it. The proposed quantity of Russian LEU traveling through any of the proposed ports would be extremely small compared to the present volume of cargo handled, as discussed in Section 5.2. An additional seven shiploads (assuming 32 cylinders of $UF_6$ per ship) per year over the existing port traffic could arrive at the port during the first five years of the purchase program (Phase 1), given the assumption of 451 t/yr of $UF_6$. The current port traffic could increase by 19 shiploads per year for the subsequent 15 years (Phase 2), given the assumption of 1,353 t/yr of $UF_6$. Based on this information, the proposed action would be expected to

represent an increase in the range of 0.0036 percent (Port of Houston) to 0.052 percent (Port of Charleston) in total foreign cargo imports at the proposed ports during the period of greatest shipments. The likelihood that the shipments of LEU would arrive at more than one of the ports means that the percentage increase in total cargo tonnage would be even smaller. No special port facilities or special operations would be required at any of the proposed ports to handle the Russian LEU shipments.

## 6.5 CUMULATIVE IMPACTS

This section describes the cumulative impacts resulting from the proposed action.

Since accident risk calculations in RADTRAN do not distinguish between port workers and the general public, it is not possible to determine any one individual's (port worker, truck driver, member of the general public, etc.) risk from an accident. In the event of an accident (fire, crane failure, explosion, collision, etc.) the potential radiological consequences would vary and may even be masked by more severe impacts (e.g., burning and crushing) depending on the individual's location and activity at the time of the accident. As a result, radiological accident risk to an individual is not estimated and only non-accident (incident-free) radiological doses are assessed for cumulative impacts.

### 6.5.1 Cumulative Transportation Impacts

The following sections discuss the cumulative radiological impact that the proposed action would have on the workers and the general public who potentially would be exposed as a result of the proposed action. The first section discusses the Negligible Individual Dose (NID) recommendation of the National Council on Radiation Protection and Measurements (NCRP). The second section describes the results of the "Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes," NUREG-0170 [NRC, 1977]. The third section discusses the doses received f.om the proposed action in relation to natural background, the NID, and NUREG-0170. The final section summarizes the cumulative effect evaluation.

### 6.5.1.1 Negligible Individual Dose

The National Council on Radiation Protection and Measurements (NCRP) recommends that an annual effective dose equivalent of 1 mrem (0.01mSv) or less be considered a Negligible Individual Dose (NID) per source or practice [NCRP, 1993]. The NID is defined by the NCRP as the "level of effective dose [equivalent] that can be dismissed" or as the level of average annual excess risk of fatal health effects attributable to radiation below which efforts to reduce radiation or exposure to the individual is unwarranted. The dismissal of risk was considered in relation to: (1) magnitude of dose, (2) difficulty in detection and measurement of dose and health effects, (3) natural risk for the same health effects, (4) estimated risk for the mean and variance of natural background radiation exposure levels, (5) risk to

which people are accustomed, and (6) perception of, and behavioral response to, risk levels [NCRP, 1993].

## 6.5.1.2 NUREG-0170 and Population Exposures

The proposed action is similar to LEU importation, transportation, and processing activities already taking place in the same locations and along the same routes. The transportation of radioactive materials and shipments of $UF_6$ to support the fuel cycle, in particular, were assessed in the "Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes, NUREG-0170" [NRC, 1977]. This Environmental Statement considered the risk of transporting millions of packages of radioactive materials along transportation corridors, such as the ones which would be used for the proposed action, and determined that the total annual incident-free and accident risk was minimal. The most recent study of the number of radioactive material shipments indicates no substantial change in the number of shipments or in their characteristics that would invalidate the general result of NUREG-0170 [SNL, 1985]. Since the transportation of the Russian LEU would meet the same regulations assessed in NUREG-0170, the risk is still negligible for all cumulative transportation activities. For individuals residing near principal transportation routes, NUREG-0170 estimated that the average annual individual effective dose equivalent from radioactive material transportation activities was about 0.09 mrem. This average annual individual dose remains valid for considering the cumulative impacts associated with the proposed action.

## 6.5.1.3 Estimated Doses for the Proposed Action

Calculations have been carried out to estimate the maximum occupational and public doses associated with the transportation of the Russian LEU. The calculated maximum annual exposure a member of the public would receive from routine transportation activities associated with the proposed action is 0.002 ($2 \times 10^{-3}$) mrem during the last fifteen years of the proposed action. (See Section 6.2.2.) This dose is small in comparison to the NID and to the individual dose estimated in NUREG-0170, which is the accumulation over all radioactive material shipments. Along the transportation corridors that would be used in implementing the proposed action, the average annual effective dose equivalent for a member of the general population from natural background radiation is 300 mrem [NCRP, 1987]. This natural background radiation dose can also be compared to the estimated maximum annual individual dose of 0.002 mrem that would result from the proposed action.

The maximum exposure for a worker involved in transporting the Russian LEU is predicted to result from activities associated with the unloading of the Russian LEU in port and its inspection and preparation for truck shipment to the Portsmouth GDP. Of the various types of personnel working closely with the SEAPAKs containing the overpacks and cylinders filled with the $UF_6$, the maximum exposure time per SEAPAK per person is conservatively assumed as 10 minutes [Weiner and Neuhauser, 1992]. If the

same worker were to be exposed to one-third of all cylinders shipped in seven different ships, the total annual individual dose would be approximately 1.4 mrem. Each of the ports proposed as a port of entry routinely receives commercial shipments of uranium and other radioactive materials, as discussed in Section 5.2. Based on these other import/export activities, the dose an individual port worker could receive was assessed as described in Appendix C.

An additional source of radiation exposure could be from shipments resulting from the purchase of Russian LEU under the Agreement Suspending the Antidumping Investigation on Uranium from the Russian Federation (Suspension Agreement). Shipments of LEU under the proposed 20-year program would not be expected to begin until mid to late 1994 and would not occur concurrently with Suspension Agreement shipments. However, since shipments of the weapons-derived LEU may occur during calendar year 1994 and shipment under the Suspension Agreement would take place earlier in calendar year 1994, the annual dose calculated for this period, i.e., calendar year 1994, considers shipments from both sources. The proposed 20-year contract would provide for 305 metric tons of LEU to be shipped each year during the first 5 years of the contract, and 915 tons in each of the last 15 years. This EA uses the 305-ton amount for the cumulative impact analysis because any overlap of the proposed action with the Suspension Agreement LEU purchase would occur during the first year of the proposed 20-year contract. The cumulative impact analysis in a prior draft EA for the proposed action (October 1993) used the amount of 915 tons of weapons-derived LEU, representing one of the last 15 years of that proposed contract[6].

A final source of radiation exposure could be from DOE's proposal to import approximately 700 elements of foreign research reactor spent nuclear fuel to provide urgent relief to certain foreign research reactors, to the extent such shipments overlap with the proposed action at any of the proposed ports. If the same individuals were present for one-third of all shipments under the proposed action during one of the first five years of the contract, one-third of all commercial shipments of radioactive material shipped during a twelve month period, all shipments of the urgent relief foreign research reactor fuel[7], and one-third of the LEU shipments under the Supension Agreement, the annual cumulative dose for the proposed ports of entry is shown in Table 6-12. As can be seen in Table 6-12, the cumulative dose is small for all ports of entry and well below the regulatory limit of 100 mrem/yr established by NRC regulations to protect a member of the general public [FR, 1991].

---

[6] If the volume of weapons-derived LEU to be shipped in 1994 appears to exceed 305 MTU, USEC is committed to reanalyzing the cumulative impacts of those shipments combined with the proposed action, in an additional amended EA for the antidumping suspension agreement shipments.

[7] It is assumed that Coast Guard or other type of inspection personnel would inspect each shipment of spent nuclear fuel, and that the eight-hour shift assumption (See Appendix C) would not apply. Accordingly, it is conservatively assumed that the maximum-exposed port worker would be Coast Guard or other type of inspection personnel exposed to all the proposed spent nuclear fuel shipments.

**Table 6-12. Cumulative Individual Annual Radiation Dose for Maximally Exposed Individuals in Proposed Ports of Entry[a] (First Five Years of Proposed Action)**

| Port of Entry | Dose from Port Activity (mrem) | | | | Total Annual Individual Dose |
|---|---|---|---|---|---|
| | Proposed Action | Commercial Shipments | Suspension Agreement | Foreign Reactor Spent Nuclear Fuel | |
| Hampton Roads | 1.4 | 4.2 | 0.9 | 8.0 | 14.5 |
| Baltimore | 1.4 | 2.0 | 0.9 | NA(A) | 4.3 |
| Charleston | 1.4 | 0.3 | NA(B) | 8.0 | 9.7 |
| New York | 1.4 | 10.2 | 0.9 | NA(A) | 12.5 |
| Savannah | 1.4 | 3.4 | NA(B) | 8.0 | 12.8 |
| Houston | 1.4 | 1.7 | NA(B) | NA(A) | 3.1 |
| Philadelphia | 1.4 | 0.1 | 0.9 | NA(A) | 2.4 |

[a] The values presented for each port assume that all shipments in the proposed action pass through that port. In that event, the risk to the public from the proposed action at each of the other ports would be zero.

NA(A) = not applicable since foreign research reactor spent nuclear fuel has not been proposed for shipment through this port.

NA(B) = not applicable since LEU was not proposed for shipment through this port.

For the last 15 years of the proposed action, the cumulative dose calculation must be changed. First, the Suspension Agreement shipments will have ended. Secondly, the quantities of LEU supplied under this proposed activity would increase three-fold. If the same port worker were to be exposed to one-third of all 19 shiploads per year of the Russian LEU, during the period of greatest shipment (Phase 2), the annual dose would be approximately 4.1 mrem. If the same individuals were present for one-third of all shipments under the proposed action during Phase 2 and one-third of all commercial shipments of radioactive material shipped during a 12-month period, the annual cumulative dose for the proposed ports of entry is shown in Table 6-12A. As can be seen in Table 6-12A, the cumulative dose is small for all proposed ports of entry and well below the regulatory limit of 100 mrem/yr established by NRC regulations to protect a member of the general public [FR, 1991].

**Table 6-12A: Cumulative Individual Annual Radiation Dose for Maximally
Exposed Individuals in Proposed Ports of Entry[a]
(Last Fifteen Years of Proposed Action)**

| Port of Entry | Dose from Port Activity (mrem) | | Total Annual Individual Dose |
|---|---|---|---|
| | Proposed Action | Commercial Shipments | |
| Hampton Roads | 4.1 | 4.2 | 8.3 |
| Baltimore | 4.1 | 2.0 | 6.1 |
| Charleston | 4.1 | 0.3 | 4.4 |
| New York | 4.1 | 10.2 | 14.3 |
| Savannah | 4.1 | 3.4 | 7.5 |
| Houston | 4.1 | 1.7 | 5.8 |
| Philadelphia | 4.1 | 0.1 | 4.2 |

[a]  The values presented for each port assume that all shipments in the
proposed action pass through that port. In that event, the risk to the
public from the proposed action at each of the other ports would be
zero.

The figures included in Tables 6-12 and 6-12A reflect the modifications to input into RADTRAN 4 and the radiological impact calculations described in Section 6.2.1, with respect to incident-free radiation levels of the SEAPAKs, and the assumption described in Section 6.2.2 that port workers would be exposed to a maximum of one third of the total proposed shipments and one third of commercial shipments of radioactive materials. In addition, Table 6-12 reflects the volume of Russian LEU to be shipped in the first year of the 20-year contract, as explained above. The figures in Table 6-12 also include the proposed shipment of foreign reactor spent nuclear fuel. For these reasons, the figures in Tables 6-12 and 6-12A differ from the calculations of cumulative maximum individual doses in Section 6.5.1.3 of a prior draft EA (October 1993) for the proposed action.

In addition to the urgent relief foreign reactor spent nuclear fuel importation discussed above, DOE may also import approximately 15,000 elements of foreign research reactor spent nuclear fuel over a period of up to 15 years. It is possible that such imports could overlap with the proposed action, depending on the timing and ports of entry for any such DOE proposal. However, at this time the schedule, volume, and ports of entry for any such proposal are unknown. Therefore, a cumulative impacts risk analysis

including this potential long-term importation cannot be performed in the same manner as has been performed for commercial shipments of other nuclear products, Suspension Agreement shipments of LEU, and urgent relief shipments of foreign reactor spent nuclear fuel. Nonetheless, it is likely that the potential import of 15,000 elements would involve an insignificant risk to port workers even if such imports overlap with the proposed action at the proposed ports. Assuming, for purposes of analysis, that the additional spent nuclear fuel elements are imported over a 15-year period at a constant rate (i.e., 1,000 elements per year), this would likely result in no more than 11.5 additional mrem of exposure, if all such shipments came through the same port and the same port worker were exposed to every shipment. This additional exposure would not exceed the 100 mrem NRC standard even if added to the cumulative impacts analyzed above and summarized in Tables 6-12 and 6-12A.

Finally, the Russian Federation and other nations may possess additional HEU which the United States may attempt to purchase in the future. Analysis of any potential cumulative impacts from such purchases is impossible at this time because the amount of material, the timing of delivery, the potential ports of entry, and even the nature of the material (i.e., importation as HEU or as LEU) is unknown.

### 6.5.1.4 Summary of Cumulative Transportation Effect Evaluation

The analysis performed for NUREG-0170 includes shipments of $UF_6$ to and from the Portsmouth GDP. As a result, the doses to the general public that would result from the proposed action are incorporated in NUREG's estimated average individual dose of 0.09 mrem. The maximum annual incremental dose of 0.002 ($2 \times 10^{-3}$) mrem for a member of the public from routine activities associated with the transportation of the Russian LEU would be well below the NID of 1 mrem and a small part of NUREG 0170's estimated average dose for all radioactive material shipments in the United States. This would still be true if the 0.00032 ($3.2 \times 10^{-4}$) mrem calculated maximum annual exposure a member of the public would receive from an overlap of the proposed action with the Suspension Agreement shipments of the Russian LEU were included.

### 6.5.2 Cumulative Economic Impacts

As shown in the analyses in Section 6.4, the overall economic impacts from the proposed action would be minimal. The amount of LEU involved in the proposed action could appreciably affect the USEC's current inventory of LEU, and the operation of the GDPs as discussed in Section 6.3. Other activities, such as the purchase of Russian LEU under the Suspension Agreement, involve sufficiently low quantities of uranium that these activities have little additional impact when considered in conjunction with the proposed action. A separate Environmental Assessment for the Suspension Agreement purchase has been prepared.

The results of the economic impact analyses lead to these conclusions:

- Impacts of the proposed action on uranium mining and milling, conversion, and fabrication industries are expected to be minimal, assuming the USEC overfeeds the GDPs.

- Impacts on the Portsmouth Gaseous Diffusion Plant (employment about 2,630) or the Paducah Gaseous Diffusion Plant (employment about 1,830) and surrounding communities could be substantial from an economic standpoint if a GDP were closed due to a decreased need for enrichment services. A plant closure was estimated to result in a 11.3 and 16.7 percent increase in unemployment in the Paducah and Portsmouth locales, respectively [Grady, 1987].

- Impacts on the electric utilities would result if DOE implemented the terms of existing contracts between itself and either or both EEI and OVEC regarding reduction in contract demands. The impacts are expected to be minimal since the utilities should be able to sell the relatively inexpensive power elsewhere on the national electric grid network.

- Impacts on the proposed ports and surrounding communities would be minimal.

## 6.6 ENVIRONMENTAL CONSEQUENCES OF ALTERNATIVES

The following paragraphs briefly summarize the potential transportation risks and economic impacts of the six alternatives to the proposed action.

### 6.6.1 No Action

As discussed in Section 2.2.1, no action means that the U.S. would not sign the contract with the Russian Federation to purchase LEU derived from Russian HEU over a 20-year period. The consequence of this alternative would be that the objectives of the government-to-government agreement to arrange for the safe and prompt disposition for peaceful purposes of HEU extracted from dismantling the former Soviet Union's nuclear arsenal would not be fulfilled by the proposed action. These objectives relate to non-proliferation, support of a new Russian Federation market economy, environmental cleanup in Russia, and conversion of Russian nuclear weapons to nuclear energy for peaceful purposes. The no action alternative would present no increased transportation risk. In terms of economic effects, the no action alternative would likely have a negative impact on U.S. nuclear service industries.

### 6.6.2 Receipt at the Paducah Gaseous Diffusion Plant

The Paducah GDP is not currently authorized to handle $UF_6$ with an assay greater than 2 percent U-235. As a result, the Russian LEU currently cannot be received at the Paducah GDP. In mid-1994 when the Paducah GDP is expected to be authorized to process $UF_6$ with an assay of up to five percent U-235, there would be no difference in the economic impacts of this alternative versus the proposed action.

Since the majority of the transportation risk results from port operations, there is little difference in the transportation risks for the Paducah GDP as the final destination versus the Portsmouth GDP for truck or rail modes of transportation, as shown in Table 6-13, using Hampton Roads, for example, as the proposed port of entry. Since the majority of transportation risk results from port operations, the similarity in risk between the Paducah and Portsmouth GDPs as the final destination would also hold true at the proposed ports other than Hampton Roads. The dose for the maximally exposed worker or member of the general public would be the same for either GDP for overland shipment by truck or rail.

**Table 6-13. Comparison of Transportation Risk for the Two Gaseous Diffusion Plants for the Entire 20-Year Proposed Purchase Program (Person-Rem)**

|  | Truck Transport | | Rail Transport | |
|---|---|---|---|---|
|  | Incident-Free | Accident | Incident-Free | Accident |
| Paducah GDP | 9.9 | 44.6 | 7.5 | 52.2 |
| Portsmouth GDP | 8.4 | 44.5 | 6.3 | 48.1 |

All segments of transportation (at-sea, port operations, and overland shipments) are included in these estimates.

## 6.6.3 Receipt at Fuel Fabricators, Domestic or Abroad

The likelihood of transporting the $UF_6$ obtained from Russia directly to the fuel fabricators is limited because of product quality considerations, as discussed in Section 2.2.2. However, if the $UF_6$ were sent directly to a fuel fabricator, the economic considerations would be expected to be similar to those of the proposed action.

The transportation risks of this alternative would be essentially the same or slightly reduced if the $UF_6$ were sent to the U.S. fuel fabricators directly from Russia. As discussed in Section 5.6.4, there are five fuel fabricators in the United States. They are: Westinghouse in Columbia, South Carolina; Babcock & Wilcox in Lynchburg, Virginia; General Electric in Wilmington, North Carolina; ABB-Combustion in Hematite, Missouri; and Siemens in Richland, Washington (although Babcock & Wilcox does not receive $UF_6$ from the USEC). Since Westinghouse, Babcock & Wilcox, and General Electric are in the eastern United States, the transportation distances would be about 25 to 50 percent shorter than shipping the $UF_6$ to Piketon, Ohio and then to the fuel fabricators. In these situations, the transportation risk would be reduced only slightly, since most of the risk associated with transportation comes from port operations, which are the same regardless of the ultimate destination of the $UF_6$ (see Section 6.2). If the shipments of $UF_6$ were sent directly to ABB-Combustion or Siemens, the transportation risk would be essentially the same since the direct distance to Hematite, Missouri or Richland, Washington is essentially the same as the distance to Piketon, Ohio and then from Piketon to Hematite, Missouri or Richland, Washington.

The transportation risks of this alternative would be slightly reduced if the UF$_6$ were sent directly to fuel fabricators abroad. The fuel fabricators used by utilities that obtain their enrichment services from the USEC are located in Japan, South Korea, Germany, the United Kingdom, France, Spain, and Sweden. For the fuel fabricators located in the Far East, the transportation of the UF$_6$ across Russia and then across the Sea of Japan is less than half of the transportation distance across the Atlantic Ocean and to Piketon, Ohio, and then from Piketon, Ohio, to a West Coast seaport and then across the Pacific Ocean to a fuel fabricator. Likewise, for fuel fabricators located in Europe, the transportation of the UF$_6$ directly within Europe is less than 20 percent of the transportation distance across the Atlantic Ocean and to Piketon, Ohio and then from Piketon, Ohio back across the Atlantic Ocean to the fuel fabricator.

## 6.6.4 Optional Transport Mode to the United States

Historically, large quantities of UF$_6$ have not been shipped by air because of the excessive costs in comparison to shipment by ocean-going freighter. The advantage in speed provided by air shipment has never overcome the extra costs. While unlikely, if the air option were selected, there would have to be additional considerations of route, air terminal and package selection. For example, the Model 30B cylinders in their overpacks, while accident resistant, are much more likely to fail in an air accident than in an accident involving trucks or ships. Additionally, the forces involved in an air accident may result in a greater dispersal of the LEU in the environment. However, the probability of an air accident is about twenty times less than the probability of a truck accident on a per mile basis [DOT, 1992]. As a result, the risk of an air accident, where risk is the product of probability and consequence, is about the same as the risk of a truck accident.

## 6.6.5 Transportation of LEU from Russia through Several Alternative Ports of Entry to Piketon, Ohio

Table 6-14 compares the potential transportation related doses (incident free and accident) calculated by RADTRAN for the entire 20 years of the proposed action based on the port of entry. The transportation doses include the at-sea, port operations, and overland truck transport segments of the proposed action. As can be seen from the table, there are no major differences in the doses, or their associated cancer risks, with respect to any ports of entry. The anticipated increase in port traffic would not be expected to cause any large economic or environmental impacts at the various ports.

It should be noted that the ports evaluated in Table 6-14 represent the probable upper bounds of estimated risk from two perspectives. First, from the perspective of total transport risk (incident-free and accident), Oakland, California, represents the highest estimated risk from any potentially foreseeable commercial port in the United States, assuming overland transport to Piketon, Ohio, based on distance and population density. Second, Hampton Roads represents the highest volume of commercial shipments of nuclear material (based on weight) and the Port of New York and New Jersey represents the highest volume

**Table 6-14. Comparison of Incident-Free and Accident Radiological Risk for the Proposed Action Based on Port of Entry[a]**

| Marine Terminal | Transportation Dose Risk[b] - Person-Rems | | Total Person-Rems[c] | Total LCFs[d] |
|---|---|---|---|---|
| | Incident-Free | Accident | | |
| Hampton Roads, VA | 8.4 | 44.5 | 52.9 | 0.026 |
| Baltimore, MD | 7.5 | 48.6 | 56.1 | 0.028 |
| Elizabeth, NJ | 8.6 | 53.7 | 62.3 | 0.030 |
| Philadelphia, PA | 8.6 | 46.9 | 55.5 | 0.027 |
| Charleston, SC | 8.3 | 48.5 | 56.8 | 0.028 |
| Jacksonville, FL | 9.3 | 42.8 | 52.1 | 0.025 |
| Morehead City, NC | 8.8 | 46.8 | 55.6 | 0.027 |
| Fernandina Beach, FL | 8.5 | 40.3 | 46.8 | 0.024 |
| Port of New York-New Jersey | 9.3 | 53.8 | 63.1 | 0.031 |
| Houston, TX | 12.8 | 43.8 | 56.6 | 0.027 |
| Providence, RI | 10.9 | 49.8 | 60.6 | 0.030 |
| Oakland, CA | 21.6 | 46.2 | 67.8 | 0.033 |
| Savannah, GA | 8.5 | 42.7 | 51.3 | 0.025 |

[a]   The values presented for each port assume that all shipments in the proposed action pass through that port.  In that event, the risk to the public from the proposed action at each of the other ports would be zero.

[b]   Transportation Dose Risk includes at-sea, port operations, and overland transport segments of the proposed action.

[c]   Total Person-Rems is the rounded sum of incident-free and accident dose risks.

[d]   LCF = Latent Cancer Fatality

6-47

(based on number of packages), for the period August 1992 - July 1993, of any commercial port in the United States. Thus, the risk analysis in this EA should effectively encompass all commercial ports because the total estimated risk should be no higher at any port not listed in Table 6-14. Nonetheless, Tables 6-10 and 6-14 demonstrate that the total estimated risk of the proposed action is negligible at each of the ports (proposed and alternatives) and that there is no significant difference in comparative risks among the ports.

## 6.6.6  Transport of LEU within the United States by Rail

Under this alternative, once the $UF_6$ would arrive at the port of entry, the $UF_6$ cylinders would be transported by rail to the Portsmouth GDP. (The risk assessment methodology used to calculate rail transportation risks is described in Appendix A.) Since rail shipment is an unlikely alternative, only four ports were assessed for the rail option: Hampton Roads, Virginia; Elizabeth, New Jersey; Charleston, South Carolina; and Morehead City, North Carolina. These ports were chosen to represent a range of low to high-density populations. The maritime and port operations segments of the rail alternative are assumed to be the same as those for a truck shipment (see Section 6.2.1). Once in port, the SEAPAKs would be loaded onto rail cars and transported to the Portsmouth GDP. Table 6-15 compares the risks of the rail alternative for the four ports.

As shown by Table 6-15, the comparative total radiological risk for rail transport versus truck is essentially the same for the two modes of overland transport from each of these selected ports. For example, using Hampton Roads as the port of entry, the maximum individual public dose calculated by RADTRAN for the entire shipment activity where the overland transport segment is by rail is 0.00071 mrem ($7.1 \times 10^{-4}$ mrem) during Phase 1 (FY94-98) and 0.002 mrem ($2.0 \times 10^{-3}$ mrem) during Phase 2 (FY99-13). The total radiological incident-free population dose would be 6.3 person-rems and a risk of approximately 0.0028 ($2.8 \times 10^{-3}$) LCFs. A total of approximately 224,000 people (again, assuming Hampton Roads) are assumed to receive very small increments of this population dose over the 20-year period of the proposed action. The accident risk is 48.1 person-rems or 0.024 LCFs. For these reasons, it is assumed that the comparative risk for rail transport is indistinguishable from truck transport regardless of the port of entry and that this result would hold true for entry through New York-New Jersey, Philadelphia, Houston, Savannah, and Baltimore as well. The economic impacts of this alternative would be the same as those that would result from the proposed action.

**Table 6-15:  Total Transport Radiological Risk Assuming Rail Transport
From Selected Ports of Entry for Entire
20 Year Shipping Campaign**

| Port of Entry | Transportation Dose Risk Person-Rems | | Risk to Public[1] | |
|---|---|---|---|---|
| | Incident-Free | Accident | Total Person-Rems | Total LCFS |
| Hampton Roads | 6.3 | 48.1 | 54.4 | 0.027 |
| Elizabeth, NJ | 7.3 | 62.9 | 70.2 | 0.035 |
| Charleston | 6.6 | 51.5 | 58.1 | 0.029 |
| Morehead City | 6.6 | 50.5 | 57.0 | 0.028 |

[1]  The values presented for each port assume that all shipments in the proposed action pass
through that port.  In that event, the risk to the public from the proposed action at each of the
other ports would be zero.

**SECTION 7.0**

**LIST OF PERSONS CONTACTED**

# 7.0 LIST OF PERSONS CONTACTED

James E. Drews
Safety Officer
Virginia International Terminals, Inc.
PO Box 1387
Norfolk, VA 23501
(804) 440-6170

Linda G. Ford
Director
Promotion and Public Affairs
Virginia Port Authority
600 World Trade Center
Norfolk, VA 23510
(804) 683-8000

Robert O. James
Customer Relations Representative
Virginia International Terminals, Inc.
601 World Trade Center
Norfolk, VA 23510
(804) 440-7203

Cheryl Moss
Project Manager
Nuclear Fuel Cycle
U.S. Council for Energy Awareness
1776 I Street N.W.
Suite 400
Washington, D.C. 20006-3708
(202) 293-0770

Scott Pennington
Project Manager
Uranium Fuel Section, Fuel Cycle Safety Branch
Division of Industrial and Medical Nuclear
  Safety (NMSS)
U.S. Nuclear Regulatory Commission
Washington, D.C. 20555
(301) 492-7000

Victoria B. Robas
Nassau Terminals
Port of Fernandina
P.O. Drawer 1543
Fernandina Beach, FL 32035-1543
(904) 261-0753

Lieutenant Jackie Stagliano
USCG - MSO Hampton Office
Norfolk Federal Building
200 Granby Mall
Norfolk, VA 23510-1888

Deborah Woischke
Ecological Analyst
State of Ohio
Department of Natural Areas and Resources
Fountain Square
Columbus, OH 43224-1387

Robert Ziobro
Office of Protected Resources
National Marine Fisheries Service
Silver Spring, MD 20910
(301) 713-2322

# SECTION 8.0

# LIST OF PREPARERS

## 8.0  LIST OF PREPARERS

| NAME | EDUCATION/EXPERIENCE | CONTRIBUTION |
| --- | --- | --- |
| Vicki L. Bruch | M.B.A., Management, B.S., Mechanical Engineering.  2 years experience in energy technology and its impact on markets. | economics |
| Susan Carson | Ph.D., Physical Chemistry, M.S., Chemistry, A.B., Chemistry.  3 years experience in environmental assessment and environmental technology, 8 years experience in systems analysis. | marine environment, technical review |
| G. F. Combs | B.A., Economics.  12 years experience in government and industry. | economics |
| Leo Gomez | Ph.D, Radiation Biology, M.S., Health Physics and Radiation Biology, B.S. Biology.  16 years experience in nuclear waste management and ocean disposal. | marine environment |
| Frances L. Kanipe | B.S., Computer Science.  5 years experience in computer modeling and risk analysis. | transportation |
| Roger P. Hansen | J.D., Law, B.S., Journalism.  30 years experience in environmental law and NEPA compliance. | NEPA compliance, document review and preparation |
| Christi D. Leigh | Ph.D., Chemical Engineering, M.S., Chemical Engineering, B.S., Chemical Engineering.  6 years experience in radioactive and hazardous waste management and minimization, 5 years experience in nuclear reactor safety. | process impact assessment |
| Robert E. Luna | Ph.D., Mechanical Engineering, M.B.A., Management, M.S., Engineering, B.S., Mechanical Engineering.  27 years experience in transportation risk assessment and systems analysis. | technical review, transportation |
| Charles D. Massey | Ph.D., Radiation Health, M.S., Energy Resources, M.S., Public Health, B.S., Marine Transportation.  12 years experience in NEPA, risk assessment, transportation and energy technology evaluations. | project leader, radiological risk assessment, transportation, NEPA issues |

| NAME | EDUCATION/EXPERIENCE | CONTRIBUTION |
|------|----------------------|--------------|
| LeAnn A. Miller | Ph.D., Nuclear Engineering, M.S., Nuclear Engineering & Nuclear Physics, B.S., Nuclear Engineering. 4 years experience in source term analysis and consequence assessment. | risk assessment |
| G. Scott Mills | Ph.D., Physics, B.S., Physics. 8 years experience in radiation measurement and modeling. | transportation |
| Sieglinde K. Neuhauser | Ph.D., Biology, M.S., Plant Pathology, B.S., Plant Science. 15 years experience in environmental assessment, transportation risk assessment, 5 years experience in radiation biology and genetics research. | transportation |
| Lisa P. Sanger | M.B.A., Management, B.S., Industrial Management/Management Science. 5 years experience in management information systems development, 3 years experience in project control and coordination | economics |
| Timothy A. Wheeler | M.E., Systems Engineering, B.S., Mechanical Engineering. 8 years experience in strategic planning, reactor safety probabilistic risk assessment. | transportation |
| Theodore A. Wolff | Ph.D., Biology, M.S., Public Health/Medical Parasitology, B.S., Psychology. 15 years experience in environmental assessment and analysis of transportation issues. | NEPA analysis, environmental regulations |
| Mary Young | M.S., Mechanical Engineering, B.S., Mechanical Engineering. 5 years experience in mechanical design, 2 years experience in energy policies analysis, and 1 year experience in accident analysis and consequence assessment. | process risk assessment |

# SECTION 9.0

# LIST OF REFERENCES

## 9.0  LIST OF REFERENCES

Cherry, R.D. and Heyraud, M., 1982, "Evidence of High Natural Radiation Doses in Certain Mid-Water Ocean Organisms," *Science*, 218, 54-56.

Cherry, R.D. and Shannon, L.V., 1974, "The Alpha Radioactivity of Marine Organisms," *Atomic Energy Reviews*, 12, 3-45.

Conkel, M., 1993, "Shipment Radiation Readings," Transmittal from Conkel, Portsmouth GDP to N. Haberman, DOE/NE-35.

Construction Engineering Research Laboratory (CERL), 1990, "Global Commons Environmental Assessment," U.S. Army Corps of Engineers, Champaign, IL.

Council on Environmental Quality (CEQ), 1978, "Regulations on Implementing NEPA Procedures, Part 1500-1508," 43 FR 55990, Washington, D.C.

Defense Mapping Agency Hydrographic/Topographic Center (DMAHTC), 1991, "Distances Between Ports," Pub. 151.

DOE.  See U.S. Department of Energy.

Donnelly, R.G., April 29, 1993, "UF$_6$ Shipments," Letter from Donnelly, Portsmouth GDP Plant Manager to E.W. Gillespie, DOE Site Manager.

DOT.  See U.S. Department of Transportation.

Energy Research and Development Administration (ERDA), 1977, "Final Environmental Impact Statement, Portsmouth Gaseous Diffusion Plant Site, Piketon, Ohio," Washington, D.C.

FR.  See U.S. Federal Register.

Grady, S., Braid, R., Bradburg, J., Kerley, C., 1987, "Socioeconomic Assessment of Plant Closure: Three Case Studies of Large Manufacturing Facilities," Environmental Impact Assessment Review, 7:151-165.

Hessler, R.R. and Sanders, H.L., 1967, "Faunal Diversity in the Deep-Sea," *Deep Sea Resources*, 14, 65-78.

International Atomic Energy Agency (IAEA), 1976, "Effects of Ionizing Radiation on Aquatic Organisms and Ecosystems," Technical Report Series Number 172, Vienna.

International Atomic Energy Agency (IAEA), 1985, "Sediment $K_d$s and Concentration Factors for Radionuclides in the Marine Environment," Technical Report Series Number 247, Vienna.

International Atomic Energy Agency (IAEA), 1990, "Regulations for the Safe Transport of Radioactive Material," Safety Series No. 6.

International Atomic Energy Agency (IAEA), 1991, "Interim Guidance on the Safe Transport of Uranium Hexafluoride," IAEA-TECDOC-608, Vienna.

Journal of Commerce (JoC), 1993, Piers Imports and Exports Database Journal of Commerce, New York, New York.

Kovac, F.M., 1988, "Need for Improved $UF_6$ Handling and Transportation Practice," Conference Proceedings from "Uranium Hexafluoride -- Safe Handling, Processing, and Transporting," May 24-26, 1988.

Linke, W.F., 1965, "Solubilities of Inorganic and Metal Organic Compounds," Vol. II, 4th ed.

Longenecker, J.R., 1991, "Increased Competition and New Technology. Market Trends in Uranium Enrichment for the 1990s and Beyond," in Transactions of the American Nuclear Society, ed. Irene O. Macke, American Nuclear Society, La Grange Park, Illinois.

Manning, W.F., 1986, "Action Description Memorandum (ADM) for Line-Item Projects, Paducah Gaseous Diffusion Plant (PGDP)," Memorandum dated March 5, 1986 to J. Longenecker, Deputy Assistant Secretary for Uranium Enrichment.

Martin Marietta, 1985, "Final Safety Analysis Report," Portsmouth Gaseous Diffusion Plant, GAT/GDP-1073.

Martin Marietta, 1991, "Portsmouth Gaseous Diffusion Plant Fact Sheet," Piketon, Ohio.

Maryland Port Authority (MPA), 1992, "Foreign Commerce Statistical Report," Baltimore, Maryland.

The Merck Index, 1983, 10th ed. Merck Co. Inc., Rahway, New Jersey.

National Academy of Sciences (NAS), 1971, Radioactivity in the Marine Environment, Washington, D.C.

National Academy of Science/National Research Council (NAS/NRC), 1990, "Health Effects of Exposure to Low Levels of Ionizing Radiation," BEIR V, National Academy Press, Washington, D.C.

National Council on Radiation Protection and Measurements (NCRP), 1987, NCRP Report No. 93, "Ionizing Radiation Exposure of the Population of the United States."

National Council on Radiation Protection and Measurements (NCRP), 1991, NCRP Report No. 109, "Effects of Ionizing Radiation on Aquatic Organisms," Bethesda, MD.

National Council on Radiation Protection and Measurements (NCRP), 1993, NCRP Report No. 116, "Limitation of Exposure to Ionizing Radiation."

National Institute on Occupational Safety and Health (NIOSH), 1990, Pocket Guide to Chemical Hazards, 1990, Publication No. 90-117, National Academy Press, Washington, D.C.

Needler, G.T. and Templeton, W.L., 1981, "Radioactive Waste: The Need to Calculate an Oceanic Capacity," Oceanus, 24, 6067.

NRC. See Nuclear Regulatory Commission.

Nuclear Assurance Corporation (NAC), 1989, "Sea Transportation Safety Analysis Report," Norcross, Georgia.

Nuclear Energy Agency (NEA), Office of Economic Cooperation and Development, 1988, "Dispersal of Radionuclides in the Oceans: Models, Data Sets and Regional Descriptions," NEA/OECD, Paris.

Oak Ridge National Laboratory (ORNL), 1992, "HIGHWAY 3.1 - An Enhanced Highway Routing Model: Program Description, Methodology, and Revised User's Manual," ORNL/TM-12124, Oak Ridge National Laboratory, Oak Ridge, Tennessee.

Oak Ridge Operations (ORO), 1991, "Uranium Hexafluoride: A Manual of Good Handling Practices," ORO-651 (Rev. 6), DE91015811, Contract No. DE-AC05-86OR21644, Analysis Corporation, Oak Ridge, Tennessee.

Pickard, G.L., 1979, Descriptive Physical Oceanography, 3d ed., Pergamon Press.

Port of Houston (PoH), 1993, "Facts About the Port of Houston," Houston, Texas.

Rice, A.L., 1978, "Radioactive Waste Disposal and Deep Sea Biology," Oceanol, Acta, 1, 483-491.

Ringot, C., Devillers, C., and Warniez, P., 1987, "L'Accident Du Mont-Louis Et La Securite Nucleaire," IAEA-SM-286/182, PATRAM-86, Vienna.

Sandia National Laboratories, (SNL), Albuquerque, 1975, "Final Report on Special Tests of Plutonium Oxide Shipping Containers to FAA Flight Recorder Survivability Standards," McWhirter, M., Brooks, R.O., Stomp, J.M. and Dillingham, L.A., SAND75-0446, Sandia National Laboratories, Albuquerque, New Mexico.

Sandia National Laboratories, (SNL), Albuquerque, 1985, "Transport of Radioactive Material in the United States: Results of a Survey to Determine the Magnitude of Domestic, Unclassified Shipments of Radioactive Materials," SAND84-7174, Menlo Park, CA.

Sandia National Laboratories, (SNL), Albuquerque, 1991, "Transportation Accidents/Incidents Involving Radioactive Materials (1971-1991)," Cashwell, C.E. and McClure, J.D., SAND91-2767C, TTC1141, Contract No. DE-AC04-76DP00789, Sandia National Laboratories, Albuquerque, New Mexico.

Sandia National Laboratories (SNL) Albuquerque, 1992, "RADTRAN 4: Volume 3, User Guide," Neuhauser, K.S. and Kanipe, F.L., SAND89-2370, Sandia National Laboratories, Albuquerque, New Mexico.

Sax, N.I. and Lewis, R.J., 1987, "Hazardous Chemical Desk Reference," Van Norstrand Reinhold Co.,New York, New York.

Shinohara, H., Izawa, K., Tsujimura, S. and Motojima, K., 1967, "Determination of Hydrogen Fluoride and Uranium (III) in Crude $UF_6$ by Hydrolysis and Potentiometric Titration," J. Nuc. Sci. and Tech 4 (9), pp 482-487.

SRI International, April 1985, "Transport of Radioactive Material in the United States: Results of a Survey to Determine the Magnitude and Characteristics of Domestic Unclassified Shipments of Radioactive Materials," Javitz, H.S., Lyman, T.R, Maxwell, C., Myers, E.L., Thompson, C.R., SAND84-7174, Contractor Report, Sandia National Laboratories, Albuquerque, New Mexico.

Staggs, J., 1993, "Low Enriched Uranium Shipments in the United States, "Correspondence on September 7, 1993 between J. Staggs, U.S. DOE, NE-32, and C. Massey, Sandia National Laboratories.

Steele, J.H., Barrett, J.R. and Worthington, L.V., 1962, "Deep Currents South of Iceland," *Deep-Sea Resources*, 9, 465-474.

Swallow, J.C. and Worthington, L.V., 1960, "Deep Currents in the Labrador Sea," *Deep-Sea Resources*, 16, 77-84.

U.S. Bureau of the Census (USBC), 1988, County and City Data Book 1988, U.S. Government Printing Office, Washington, D.C.

U.S. Bureau of the Census (USBC), 1991, Selected Population and Housing Characteristics: 1990, U.S. Department of Commerce, Washington, D.C.

U.S. Coast Guard, March 7, 1985, "Supervision and Monitoring of Radioactive Cargo Operations," Marine Safety Office (MSO) Instruction 16616.4, Norfolk, VA.

U.S. Department of Energy (DOE), 1985a, "Paducah Gaseous Diffusion Plant Final Safety Analysis Report."

U.S. Department of Energy (DOE), 1985c, "Socioeconomic Assessment Partial Closure of the Paducah Uranium Enrichment Facility," DOE/OR/208337-T5, U.S. Department of Energy, Oak Ridge, Tennessee.

U.S. Department of Energy (DOE), 1985d, "Socioeconomic Assessment: Partial Closure of the Portsmouth Uranium Enrichment Facility," DOE/OR/20837-T6, U.S. Department of Energy, Oak Ridge, Tennessee.

U.S. Department of Energy (DOE), 1989 "Physical Protection of Special Nuclear Material and Vital Equipment," DOE Order 5632.2A, Change 1, U.S. Department of Energy, Washington, D.C.

U.S. Department of Energy (DOE), 1993, "Control and Accountability of Nuclear Materials," DOE Order 5633.3A, U.S. Department of Energy, Washington, D.C.

U.S. Department of Energy/Energy Information Administration, (DOE/EIA), 1991a, "Domestic Uranium Mining and Milling Industry 1990: Viability Assessment," U.S. Department of Energy, Washington, D.C.

U.S. Department of Energy/Energy Information Administration, (DOE/EIA), 1991b, "Uranium Industry Annual 1991," U.S. Department of Energy, Washington, D.C.

U.S. Department of Energy/Energy Information Administration, (DOE/EIA), 1992, "World Nuclear Capacity and Fuel Cycle Requirements 1992," U.S. Department of Energy, Washington, D.C.

U.S. Department of Transportation (DOT), 1990, 49 CFR 171-177, Subchapter C, Hazardous Materials Regulations, Washington, D.C.

U.S. Department of Transportation (DOT), 1992, "National Transportation Statistics, Annual Report," DOT -VNTSC-RSPA-92-1, Washington, D.C.

U.S. Enrichment Corporation (USEC), 1993, "Environmental Assessment for the Purchase of Low Enriched Uranium from the Russian Federation Pursuant to the Agreement Suspending the Antidumping Investigation on Uranium," USEC/EA-93001, Washington, D.C.

U.S. Federal Register, January 5, 1981, "Final Guide for Implementation of Executive Order 12114," 46 FR 1007, Washington D.C.

U.S. Federal Register (FR), May 21, 1991, "Standards for Protection Against Radiation; Final Rule," U.S. Nuclear Regulatory Commission, Title 10, Part 20 et al, Washington, D.C.

U.S. Federal Register (FR), May 19, 1993, "Designated Critical Habitat: Northern Right Whale," Proposed Rule, National Oceanic and Atmospheric Administration, 58 FR29186, Washington, D.C.

U.S. Nuclear Regulatory Commission (NRC), 1977, "Final Environmental Statement on the Transportation of Radioactive Material by Air and Other Modes," NUREG-0170, Office of Standards Development, U.S. Nuclear Regulatory Commission.

U.S. Nuclear Regulatory Commission (NRC), 1986, "Assessment of the Public Health Impact From the Accidental Release of $UF_6$ at the Sequoyah Fuels Corporation Facility at Gore, Oklahoma," NUREG-1189, Volume 1, U.S. Nuclear Regulatory Commission.

Virginia Port Authority, (VPA), 1992, "1991 Foreign Trade Annual Report, Ports of Virginia," Virginia Port Authority, Norfolk, Virginia.

Weiner, R.F. and Neuhauser, K.S., 1992, "Conservatism of RADTRAN Line-Source Model for Ports on the Commonwealth, 1988," Old Dominion University, Norfolk, Virginia.

Wilmot, E.L., "Transportation Accident Scenarios for Commercial Spent Fuel," SAND80-2124, Sandia National Laboratories, Albuquerque, NM.

# SECTION 10.0

# GLOSSARY

# 10.0 GLOSSARY

**activity:** The mean number of decays per unit time of a radioactive nuclide.

**assay:** The concentration by weight percent of a particular material.

**autoclave:** A strong, pressurized, steam heated vessel.

**background radiation:** The amount of radiation to which a member of the population is exposed from natural sources, such as terrestrial radiation due to naturally occurring radionuclides in the soil, cosmic radiation originating in outer space, and naturally occurring radionuclides deposited in the human body. This amounts to about 300 mrem per year in the U.S.

**cascade:** A connected arrangement of equipment for the separation of isotopes. A single device or process usually can produce only a small amount of isotopic separation, but if a number of these are connected together the effect can be accumulated and a significant amount of separation achieved. An example is a cascade used in the gaseous diffusion process.

**commercial natural UF$_6$:** Unirradiated uranium (containing 0.711 +/- 0.0004g, U-235 per 100g U).

**Commonwealth of Independent States:** Republics that were states in the former Soviet Union.

**conveyance:** Any vehicle, aircraft, vessel, freight container, or hold, compartment, or defined deck area of an inland waterway craft or seagoing vessel.

**curie:** A unit of activity equal to 3.7 x $10^{10}$ disintegrations/s.

**depleted uranium:** Uranium whose content of the isotope uranium-235 is less than 0.711 percent, which is the uranium-235 content of natural uranium.

**diversion:** The unauthorized removal of nuclear material from its approved use or location.

**draw downs:** Reducing the inventory of natural uranium inventories by feeding the uranium inventory into the nuclear fuel cycle process.

**enriched uranium:** Uranium whose content of the isotope uranium-235 is greater than 0.711 percent, which is the uranium-235 content of natural uranium.

**feed stock:** Natural uranium required for the enrichment process.

**fissile class II:** A package that may be transported together with other packages in any arrangement but, for criticality control, in numbers not exceeding an aggregate transport index of 50. These shipments require no other nuclear criticality safety control during transportation. Individual packages may have a transportation index not less than 0.1 and not more than 10.

**fissile classification:** The categorization of fissile material packages into one of the three fissile classes, based on the controls needed to provide nuclear criticality safety during transportation.

**fissile material:** Any material consisting of or containing one or more fissile radionuclides. Fissile radionuclides are plutonium-238, plutonium-239, plutonium-241, uranium-233, and uranium-235. Neither natural nor depleted uranium are fissile material. Fissile materials are classified according to the controls needed to provide nuclear criticality safety during transportation.

**fissionable:** A material or element that is capable of undergoing a nuclear reaction in which an atomic nucleus splits into fragments, usually of comparable mass, with the evolution of approximately 100 million to several hundred million electron volts of energy.

**freight on board**: A method of delivery of commercial goods whereby payment for the freight is made prior to shipment. As a result, the buyer is responsible for shipment costs.

**gaseous diffusion process**: A method of isotopic separation based on the fact that gas atoms or molecules with different masses will diffuse through a porous barrier (or membrane) at different rates.

**half-life**: Time required for a radioactive substance to lose 50 percent of its activity by decay.

**highly enriched uranium (HEU)**: Uranium whose content of the isotope uranium-235 is greater than 20 percent.

**inventory**: book inventory - The quantity of nuclear material present at a given time as reflected by accounting records.
physical inventory - The quantity of nuclear material that is determined to be on hand by physically ascertaining its presence using techniques that include sampling, weighing, and analysis.

**ionizing radiation**: Radiation that can displace electrons from atoms or molecules, thereby producing ions.

**low enriched uranium (LEU)**: Uranium whose content of the isotope uranium-235 is between 0.711 percent to less than 20 percent.

**non-fissionable**: A material or element that is not capable of undergoing a nuclear reaction in which an atomic nucleus splits into fragments.

**overfeed**: In the gaseous diffusion process, the process by which additional uranium is fed into the enriching system (cascade) in order to reduce the amount of separative work units required and reduce the amount of electricity consumed.

**person-rem**: Unit of population exposure obtained by summing individual dose-equivalent values for all people in the exposed population. Thus, the number of person-rems contributed by 1 person exposed to 1 rem is equal to that contributed by 100,000 people each exposed to 10 $\mu$rem.

**rad**: The basic unit of absorbed dose of ionizing radiation. A dose of 1 rad means the absorption of 100 ergs of radiation energy per gram of absorbing material.

**radioactive material (RAM)**: Any material having a specific activity greater than 0.002 $\mu$Ci/g. A collective term that includes all radioisotopes, by-product materials, radium, radium compounds, and irradiated materials.

**radioactivity**: The property of some nuclides of spontaneously emitting particles or gamma radiation, emitting x radiation after orbital electron capture, or undergoing spontaneous fission.

**radioisotopes**: A radioactive atomic species of an element with the same atomic number and usually identical chemical properties.

**rem**: Unit of dose equivalent. The dose equivalent in "rem" is numerically equal to the absorbed doses in "rad" multiplied by the "quality factor," the distribution factor, and any other necessary modifying factor.

**sampling**: Testing to confirm assay and purity of a material coming to the GDP. This involves heating a $UF_6$ cylinder to convert the solid to a liquid and withdrawing a small amount for testing.

**separative work unit (SWU)**: A SWU is a measure of the separation achieved in a uranium enrichment plant after separating uranium of a given U-235 content into two components, one having a higher percentage of U-235 and one having a lower percentage of U-235.

**sievert (Sv)**: The International System of Units term for the unit of effective dose and equivalent dose; 1 Sv equals 100 rem.

**sublimation (sublime)**: Process through which a solid material turns into a gaseous material or a gaseous material turns into a solid. This activity causes the liquid state to be bypassed.

**tails assay**: the concentration by weight percent of U-235 remaining in the depleted uranium stream produced during the enrichment process.

**transportation index**: The dimensionless number (rounded up to the first decimal place) placed on the label of a package containing radioactive materials to designate the degree of control to be exercised by the carrier during transportation. The transport index is determined as follows:

- The number expressing the maximum radiation level in mrem/hr at 1 m (3.3 ft) from the external surface of the package; or
- For Fissile Class II packages or packages in a Fissile Class III shipment, the number expressing the maximum radiation level at 1 m (3.3 ft) from the external surface of the package, or the number obtained by dividing 50 by the allowable number of packages that may be transported together, whichever is larger.

**type A packaging**: Packaging designed to retain the integrity of containment and shielding required under normal conditions of transport.

**type B packaging**: Packaging designed to retain the integrity of containment and shielding required when subjected to the normal conditions of transport and hypothetical accident test conditions.

**uranium hexafluoride (UF$_6$)**: A volatile compound of uranium and fluorine. UF$_6$ gas is the process fluid in the gaseous diffusion process.

**uranium ore**: Rock containing uranium mineralization (typically 1 to 4 pounds of U$_3$O$_8$ per ton or 0.05 to 0.20 percent U$_3$O$_8$) that can be mined economically.

**uranium oxide**: Uranium concentrate or yellowcake. Abbreviated as U$_3$O$_8$.

**yellowcake**: Concentrate of uranium oxide when in pure form.

# APPENDIX A

## TRUCK AND RAIL TRANSPORTATION RISK METHODOLOGY

# APPENDIX A
## TRUCK AND RAIL TRANSPORTATION RISK METHODOLOGY

Transportation risk analysis was performed for this EA through the use of the computer code RADTRAN 4 [SNL, 1992]. RADTRAN 4 contains idealized mathematical models for transportation environments. These models have been formulated to yield conservative estimates (i.e., those that tend to overstate the impact) of integrated population dose in a way that can be supported by available data. For example, RADTRAN 4 estimates that, in the event of an accident, people would not be evacuated for 24 hours. In actuality, people would most likely be evacuated sooner, thereby reducing the time of exposure. The models in RADTRAN 4 do not include features of the transportation environment that either do not affect the calculated risk values or reduce conservatism.

The RADTRAN 4 computer code combines user-determined meteorological, demographic, transportation, packaging, and material factors with health physics data to calculate the expected radiological consequence of incident-free and accidental risk of transportation of radioactive material. User-assigned parameters are defined by individual route segment links, for example, ocean passage or highway links between intersections of the various routes taken by the transportation conveyance. Environmental parameters that are quantified using values specific to each transportation link include transport distance, accident rates, and population density. All other environmental parameters, e.g., traffic densities, are left at recommended RADTRAN 4 values to yield conservative results. The reference [SNL, 1992], contains details of these default values.

The overland transportation of LEU was modeled by identifying the most direct route from the gate of each marine terminal yard to the nearest interstate highway using detailed city maps. The most direct route generally would minimize the risk. From the city road connection to the interstate system, a representative interstate route to the gate of the Portsmouth GDP at Piketon, Ohio, was developed with the HIGHWAY [ORNL, 1992] routing model, as discussed in the next paragraph.

Input parameters that describe the route and population distribution for the overland transportation segment from the proposed port of entry to Piketon, Ohio, are contained in the HIGHWAY computer routing program. The HIGHWAY program provides a flexible tool for predicting and describing highway routes for transporting radioactive materials in the United States. The HIGHWAY data base is essentially a computerized road atlas that currently describes over 240,000 miles of highways. Complete descriptions of all interstate systems and most U.S. highways (except those that parallel nearby interstate highways) are included in the data base. Many of the principal state highways and a number of local and county highways are also identified. The data base also includes locations of nuclear facilities and major airports, including the Portsmouth and Paducah GDPs. Routes are calculated by minimizing a combination of distance and driving time for a highway route between two points. Several routing constraints can be imposed during the calculations.

One of the special features of the HIGHWAY model is its ability to identify routes that maximize use of interstate system highways. This feature allows the user to establish baseline routes for shipments of radioactive materials that conform to DOT routing regulations, which require that interstate system highways be used to the maximum extent possible. This explains why the same major highways would be repeatedly used for shipments of radioactive materials, rather than alternate routes over non-interstate highways. Within the context of risk assessment, these routes should be considered as representative of typical routes that might be used for normal transportation between two points. Specific routes cannot be predicted because factors such as weather, construction, accidents involving other vehicles, and local and state ordinances can change the route that might be used for transportation. Other features of the model include the ability to predict routes that bypass a specific city, town, or highway segment.

Two unique features have been incorporated in HIGHWAY, Version 3.1. The first is the ability to automatically identify alternative routes. Frequently, there are a number of routes between the source and destination that vary slightly in distance and estimated driving time. Most routing models will produce only a single route. With the alternative routing feature, the HIGHWAY program offers a selection of different but nearly equal routes. The second special feature is the capability to calculate route-specific population density statistics. The population density distribution is calculated for each highway segment in the route and is reported on a state-by-state basis. The population information used for this calculation is based on data from the U.S. Bureau of Census, which is routinely updated.

## Rail

The overland rail transportation of LEU was modeled by identifying the most direct rail route from each marine terminal yard to the Portsmouth GDP. The most direct route generally would minimize the risk. From the port rail spurs, a representative rail route to the gate of the Portsmouth GDP at Piketon, Ohio, was developed with the INTERLINE [ORNL, 1992] rail routing code, as discussed in the next paragraph.

Input parameters that describe the route and population distribution for the overland transportation segment from a selected representative proposed or alternative port of entry to Piketon, Ohio, are contained in the INTERLINE computer routing program. The INTERLINE program provides a flexible tool for predicting and describing rail routes for transporting radioactive materials in the United States. The data base is essentially a computerized atlas that currently describes the U.S. rail network. Complete descriptions are included in the data base. The data base also includes locations of nuclear facilities with rail service, including the Portsmouth and Paducah GDPs. Routes are calculated by maximizing distance traveled by the initial carrier company and by otherwise minimizing a combination of distance and travel time. Maximizing in this way reduces the potential number of classifications.

Within the context of risk assessment, these routes should be considered as representative of typical routes that might be used for normal transportation between two points. Specific routes cannot be predicted because factors such as weather, construction, accidents involving other vehicles and unforeseen rail abandonments, can change the route that might be used for transportation.

Routes are calculated by maximizing distance traveled on railways owned by the original carrier rail company because this approximates actual rail company practice and because time spent in classification yards is minimized. Rail stop times are considerably greater than for highway transportation because of inspections and classifications. Classifications occur at centrally located classification yards, which act as "hubs" into which come trains from a port, for example, consisting of cars bound for diverse destinations. The railcars are inspected, disassembled and reassembled into new trains that leave the classification yard on separate rail lines. A railcar that must travel a long distance and/or travel on a number of different rail companies' lines will undergo several classifications. Because the United States rail network is not extensive, total distance traveled is less flexible than for highway, but by minimizing the number of rail-company interchanges to the extent possible, INTERLINE minimizes total time in transit. Average stop time for a rail journey in the United States is 60 hours.

The INTERLINE calculates route-specific population density statistics. The population density distribution is calculated for each rail segment in the route and is reported on a state-by-state basis. The population information used for this calculation is based on 1990 data from the U.S. Bureau of Census, which is routinely updated.

**APPENDIX B**

**MARITIME ACCIDENT ENVIRONMENTS**

# APPENDIX B
# MARITIME ACCIDENT ENVIRONMENTS

## B.1 Introduction

Hypothetical maritime accidents can be described in a sequence as the vessel travels from the open ocean to dockside or vice versa. First, accidents of all severities on the open seas occur with a frequency of from $2.9 \times 10^{-4}$ to $5.8 \times 10^{-4}$ accidents per trip, with the lowest value being for the Atlantic Ocean and the highest value for the Gulf of Mexico. As a vessel nears port, it enters more congested waters (e.g., port approach channels and the open waters of a bay or harbor). Velocities tend to decrease, but accident frequencies increase because of the increased ship traffic and relative proximity of one vessel to another. Port accident statistics do not distinguish between ships in transit within port waters and stationary vessels (e.g. vessels at anchor or dockside). Accidents occur in Atlantic ports at an average rate of about 1.6 $\times 10^{-4}$ per port transit, but higher rates are recorded for some other U.S. ports (e.g., $1.5 \times 10^{-3}$ accidents per port transit in the Houston ship channel) [Warwick and Anderson, 1976]. A U.S. average rate of $2.4 \times 10^{-4}$ accidents per port transit was used for all ports in this analysis.

Historically, about 54 percent of all accidents in port and on the open seas are collisions [Warwick and Anderson, 1976]. For port accidents, only about 2.5 percent involve fires [Operations Research, 1979]. The remaining accidents (about 43 percent) are groundings and other non-collision accidents [Warwick and Anderson, 1976]. Since vessels generally move on the open seas with higher velocities than in ports, collision accidents on the open seas tend to be more severe. Although speed limits may be posted in highly congested or narrow areas of channels and harbors, the velocity of a vessel in port is usually left to the discretion of the vessel pilot and ultimately is the responsibility of the ship's master.

Almost half (45 percent) of collisions that occur in a port involve one vessel at anchor [Operations Research, 1979]. Thus, a vessel carrying radioactive material has about an equal probability of being either the struck vessel or the striking vessel.

A collision and/or fire involving a vessel carrying radioactive material that occurs at or near a dock area would present the greatest potential for public exposure because there is no intervening expanse of open water. Thus, for the purpose of conservatism in this analysis, port accidents are modeled as occurring at dockside, even though most port accidents in fact occur at other locations [Warwick and Anderson, 1976].

## B.2 Maritime Accident Environments

Historical maritime accident statistics have been examined to estimate the probabilities of subjecting a cargo hold in which radioactive material is stowed to potentially threatening environments. In previous environmental assessments, the term "crush" was used to designate the composite of mechanical forces that might occur in a real maritime accident (DOE/EA-0321, DOE/EA-0363). However, this term also has a specific meaning in package certification testing procedures, and to avoid confusion the term "mechanical forces" will be used in this analysis to represent the composite. Technically, this composite of mechanical forces may include impact, puncture, and crush forces. However, puncture forces generally do not present a threat to the packaging used to transport the $UF_6$ and the mechanical forces of concern are mainly impact and possibly, crush forces. The frequencies of occurrence of these forces and other accident environments are presented in Table B-1.

B-1

**Table B-1. Frequency of Accident Environment per Hold Port Transit [Warwick and Anderson, 1976]**

| Mechanical | Immersion | Fire |
|---|---|---|
| $2.05 \times 10^{-5}$ | $4.00 \times 10^{-4}$ | $5.28 \times 10^{-5}$ |

## B.3 Packaging Response to Immersion

For accidents in a port, the immersion environment is rather benign since port waters average less than 200 meters in depth, and a Type 30B cylinder in an overpack can easily survive immersion at a depth of 200 meters. The Mont-Louis is the only ship to ever sink while carrying $UF_6$ cylinders. All of the cylinders were recovered from the sunken ship. Present-day salvage techniques allow for easy recovery of packages at depths of up to 200 meters from the sea bed [Kage et al., 1980].

## B.4 Packaging Response to Mechanical Forces

Collisions are among the most potentially severe accidents that occur in the region of a port. Although some groundings could be severe enough to tear the ship's hull structure and perhaps even cause flooding of some cargo compartments, groundings present less of a threat of mechanical damage than collisions. Table B-2 is a profile of collision experience in nine major U.S. ports (New York, Baltimore, Hampton Roads, New Orleans, Houston, Galveston, Los Angeles/Long Beach, San Francisco, and Oakland) for cargo vessels with a displacement greater than 1000 gross tons [Warwick and Anderson, 1976].

The data in this table are derived from U.S. Coast Guard data for 1970 to 1974 [Warwick and Anderson, 1976]. During this period 296 collisions occurred out of a total of 140,000 port transits. Of these 296, only two involved severe damage, and only one of these involved fire. Thus, a severe collision was modeled in this analysis as having a probability of occurrence of about $1.4 \times 10^{-5}$.

**Table B-2. Summary of Port Collisions 1970-1974 Vessels over 1000 Gross Tons**

| Meeting | Crossing | Overtaking | Anchored | Fog | Total |
|---|---|---|---|---|---|
| 79 | 20 | 20 | 132 | 45 | 296 |
| 26.7% | 6.8% | 6.8% | 44.6% | 15.2% | 100% |

The data summarized in Table B-2 include a subset of 72 collisions that were classified as severe, based on monetary damage [Warwick and Anderson, 1976]. In only two of those cases was the damage greater than $200,000 (1975 dollars), and one of these, the Sea Witch-Esso Brussels collision, was a collision in which a fire developed after impact. The total damages for this collision were estimated at the time to be approximately $23 million. This accident is discussed in detail in Section B-5.

Another somewhat more recent survey of 777 maritime accidents and incidents in Atlantic and Gulf Ports is summarized in Table B-3 [Abkowitz and Galarraga, 1985].

**Table B-3. Accidents in Atlantic and Gulf Coast Waters and Ports
[Abkowitz and Galarraga, 1985]**

| Accident Type | Atlantic Waters | Gulf Coast Waters | Atlantic Ports | Gulf Coast Ports | Total |
|---|---|---|---|---|---|
| Collision | 7 | 25 | 71 | 320 | 423 |
| Fire/ Explosion | 0 | 11 | 9 | 8 | 18 |
| Grounding | 2 | 6 | 54 | 139 | 201 |
| Other | 20 | 23 | 34 | 58 | 135 |
| Total | 29 | 65 | 168 | 525 | 777 |

Collisions accounted for 50.4 percent of the total, which confirms the earlier finding [Warwick and Anderson, 1976] that collisions represent the most common accident threat in a port. As noted previously, it is conservative to model all accidents as occurring at the dock (i.e., adjacent to shore without intervening expanse of water).

## B.4.1 Container Drops During Off-loading

Another category of accident that is not related to ship collisions is container drops during handling. The possibility of UF$_6$ container damage occurring during handling at the dock was considered in this analysis. The ports in the proposed action handle large amounts of containerized cargo (e.g., Hampton Roads, VA handles at least 750,000 containers annually). A move is defined as an operation in which a crane picks up a container, moves it, and disengages. Virginia International Terminals, Inc. (VIT) estimates that, at most, 1 or 2 containers are dropped per year [Hawkins, 1991]. This amounts to an historical probability of a container drop of about $2.7 \times 10^{-6}$ (less than 3 in one million moves). The foremost cause of drops is container defects [Hawkins, 1991]. Since the main cause of drops is related to the container rather than to specific operations at Hampton Roads, the statistical probability can be assumed to be approximately the same at all ports considered in this analysis.

The berths at ports considered in this analysis consist of either concrete aprons constructed on friction pilings driven into the sediment or bedrock or on tamped earth contained within sheet pilings. Both are relatively yielding surfaces, and the water or the deck of a ship are even more yielding than a dock surface. Previous studies have shown that a package can be dropped onto yielding surfaces from much higher than 30 feet without sustaining damage. This is much greater than the force sustained during the regulatory drop test [Fisher, et al., 1987; Gonzales, et al., 1986].

In conclusion, the probability of a container drop is low, and no release would be expected to occur as the result of a container drop even if the drop were greater than 30 feet. Thus, container drops during unloading of the Russian LEU are not a credible means of damaging a cylinder, and this accident type is not considered further in this analysis.

B-3

**B.5 Packaging Response to Fire**

Packagings of the type used to carry the Russian LEU are designed to survive the thermal load specified in the licensing performance criteria (i.e., the thermal load from a fully engulfing fire at 1475°F for 30 minutes) with no release of contents. It is important to explain that a fire that only exceeds the regulatory fire temperature of 1475°F or that only exceeds the regulatory fire duration of 30 minutes does not mean that the packaging performance criteria necessarily have been exceeded. In order for the performance criteria to be exceeded, not only must the total thermal input to the packaging exceed that delivered during the regulatory fire, but it must be delivered to the packaging in a manner that does not permit the heat to be re-radiated by the packaging. That is the reason for the full engulfment requirement in the regulatory test—to prevent re-radiation of heat. A non-engulfing fire (e.g., a fire adjacent to a packaging) would have to be hotter and burn longer to deliver the same amount of heat to the packaging [Fisher, et al., 1987].

The data in Table B-1 indicate that fires are historically a small fraction of maritime accidents. Cargo ships are equipped with fire suppression equipment to handle most fires. Historical records regarding maritime accidents indicate that while some severe fires have occurred, they represent no more than 3 percent of all ship fires or less than seven in 10,000 maritime accidents (a frequency of 0.00069 or 6.9 x 10$^{-4}$) [Operations Research, 1979]. This 3 percent of severe ship fires often involve flammable liquids and may burn for many hours or days or until the ship sinks [Operations Research, 1979], but fires of this type occur almost exclusively on ships carrying petroleum products (e.g., oil tankers). A cargo ship carrying Russian LEU might become involved in such a fire if it were involved in a collision with a tanker whose contents subsequently ignited. As shown in the Sea Witch-Esso Brussels accident, which was a real accident involving a burning oil tanker and a containerized cargo ship that did not sink but ran aground, the accident demonstrated that even such a collision and fire does not present a threat to a cylinder of LEU stowed below deck [DOE/EA-0515].

When the consequences of a fire involving an oil tanker are considered, one should note that crude oil fires have a radiative heat flux of about 41 kilowatts per square meter. Refined hydrocarbon fuels such as JP4 aviation fuel and gasoline burn with a radiative heat flux of about 120 kilowatts per square meter. In other words, crude oil burns cooler than gasoline-type fuels. This means that a crude oil fire must burn longer than a gasoline-type fire to deliver the same amount of heat.

Since stowage regulations require that no other hazardous or flammable material be stowed in the same hold with radioactive materials, the largest potential on-board source of flammable material to sustain a major fire in a cargo ship carrying Russian LEU is the ship's fuel supply. This would be close to the reserve capacity of 40-50 MT of fuel when the ship enters a U.S. port at the end of an overseas voyage. Leaving aside the problem of devising a credible means by which this fuel supply might come to be released within a cargo hold, ignite without activation of the automatic on-board fire-suppression system, and engulf a SEAPAK, such a fire would be equivalent to an enclosed pool fire. It has been shown that "entrainment [of air] and mixing are the rate determining steps for combustion in pool fires" [Considine, 1984]. In an enclosed space such as a ship's cargo hold, the free flow of air is limited, and the rate of combustion would be less than for open pool fires of the same fuel. The production of large quantities of smoke, which is typical of "inefficient" combustion of this sort lowers the flame temperature of the burning fuel. It can also "shroud the flame reducing the amount of flame seen by the object at any one time" [Considine, 1984]. The atmospheric transmissivity of heat from a fire is also reduced by high relative humidity [Considine, 1984], which is characteristic of the marine environment. In short, the factors listed above would all act to reduce the effects of a cargo-hold fire regardless of the source of the fuel, but no attempt was made in this analysis to account for such reduction of accident severity. In

B-4

practice, mitigating measures such as flooding a hold with water could be used to prevent casks from experiencing excessive thermal loads, but again no credit was taken for these measures in this analysis.

DOT regulations governing the transport of radioactive materials would preclude the storage of more than eight cylinders of LEU (or two SEAPAKs) in one hold or defined deck area [49 C.F.R. § 176.704]. Therefore, it is reasonable to assume that in a single accident with the possible mechanisms discussed above by which a $UF_6$ cylinder might be exposed to fire no more than two SEAPAKs on a ship could experience a thermal load sufficiently great to result in a release of contents. However, for purposes of conservatism it was assumed that in the event of a severe collision and fire that there would be a total release of contents from half of the cylinders on board. For a cylinder to release some fraction of its contents as a result of thermal loads experienced during an accident, the overpack and the cylinder must have failed and the packaging must be subjected to a fire that greatly exceeds those encountered in the regulatory certification tests.

In the Sea Witch-Esso Brussels accident, severe fire conditions occurred only above-deck and only in highly localized areas (i.e., in areas smaller than that occupied by an ISO container), and not at all in below-deck areas. None of the areas where severe fire occurred were also subjected to severe impact. Nevertheless, this was probably the worst maritime accident in U.S. history involving a cargo ship. It illustrates the fact that a cargo ship occupies a large volume and that even where all necessary factors appear to be present in an accident, unless they all occur in the same relatively small volume and unless that small volume is where a $UF_6$ cylinder would be located (i.e., below deck in a cargo hold), there would be no consequences.

Finally, it can be concluded that the simultaneous occurrence within another area on the same ship during the same accident of either fire exceeding 1475°F for 4 hours or some other combination of fire and impact exceeding that required for cylinder and overpack destruction is highly improbable.

## B.6 Probability of a Severe Accident

Probability of a Severe Accident from U.S. Coast Guard Data [Operations Research, 1979]

Approximately 73 percent of the marine accidents reported to the U.S. Coast Guard (USCG) are in inland waters. The remaining 27 percent occurred on the open seas. Only the collision accident frequencies in inland waters are used in this analysis, and it is further assumed that these collisions occur in the region of a port. Since the data are for a 2-year time span, the basic accident rate is based on the number of port transits or port calls that occurred in the 2-year interval. There were approximately 39,000 port calls in each year; thus, the total number of port calls was 78,000. There were 196 collisions during the 2-year period. Therefore, the basic collision accident probability ($C_{ar}$) is

$$C_{ar} = 196/78,000 = 2.5 \times 10^{-3} \text{ collisions per port call.}$$

In the reference [Abkowitz and Galarraga, 1985] it is noted that only 5 in 72 port collisions, about 7 percent, were severe. In addition, if a radioactive material transport vessel were involved in a collision, the most damaging situation for the cargo would be when the radioactive material transport vessel was the struck vessel. Considering the dimensions of a typical cargo vessel (a displacement of about 13,000 gross tons, fitted with seven cargo holds, but with no bulkhead between holds 6 and 7, therefore, essentially six holds) only one cargo hold would be struck, and it is assumed for purposes of conservatism that one hold is loaded with 50 percent of the cylinders of $UF_6$. Therefore, assuming that there is a uniform probability of striking each hold, then the probability would be one in six or 0.167 that the radioactive material hold was struck. The probability of a severe collision is the basic collision rate times

the number of severe collisions times the probability of striking one hold. Thus, a severe collision probability is $C_{sry}$, where:

$$C_{sry} = (2.5 \times 10^{-3})(0.07)(0.167) = 2.9 \times 10^{-5} \text{ severe collisions per port call.}$$

Reference [Warwick and Anderson, 1976] examined 5 years of collision records for seven selected ports. There were 296 collisions during the 5-year period involving 602 vessels. Of these collisions, 72 involved two vessels greater than 1,000 gross tons each. Each of these 72 cases was examined for the amount of monetary damage to each vessel, because it was assumed that for there to have been any significant damage, at least one vessel would have had to sustain significant monetary loss. Of the 72 cases there were only 16 in which the reported monetary loss was greater than $100,000 for each vessel. There were only five cases in which the monetary loss was greater than $200,000, and only one of the 72 cases involved a fire that contributed to the monetary loss. Thus, the possibility of a fire following a severe collision would be 1 in 72 or about 1.4 percent. If a fire does occur on a ship, the probability that it is a severe fire is approximately 2.8 percent. Therefore, the basic accident rate given above can be modified to account for the conditional occurrence of a fire; that is,

Probability of a severe fire following a collision
$$= (2.9 \times 10^{-5})(0.014)(0.028)$$
$$= 1.1 \times 10^{-8} \text{ per port call.}$$

## Probability of a Severe Collision Followed by a Severe Fire Based on the Penetration of the Cargo Hold During the Collision

Reference [Operations Research, 1979] performed a detailed study of the probability that a cargo hold would be penetrated during a collision, thereby presenting the environments of crush, immersion, or fire to the cargo hold. For a scenario in which one cargo hold contains spent fuel or other radioactive material, the probability of crush or fire as an insult to a radioactive material package is on the order of $2.0 \times 10^{-5}$ per port call. This value can be modified, as above, to estimate the occurrence of a severe collision followed by a severe fire. That is, since 1.4 percent of the collisions are severe and followed by fire, and about 2.8 percent of the fires that occur are severe, it can be concluded that the probability of a severe collision followed by a severe fire = $(2.0 \times 10^{-5})$ times $(0.014)$ times $(0.028) = 7.8 \times 10^{-9}$ per port call.

By two relatively independent methods, the probability of occurrence of a severe collision followed by a severe fire in a port has been estimated. These estimates range from $7.8 \times 10^{-9}$ to $1.1 \times 10^{-8}$ per port call.

References

Abkowitz, M., and J. Galarraga, 1985, "Tanker Accident Rates and Expected Consequences in U.S. Ports and High Seas Regions," Conference on Recent Advances in Hazardous Materials Transportation Research: An International Exchange, Transportation Research Board, National Research Council.

Considine, M., 1984, "Thermal Radiation Hazard Ranges from Large Fuel Fires," SRD-R-297, United Kingdom Atomic Energy Authority, Culcheth, Warrington, England.

Fisher, E.L., et al., 1987, "Shipping Container Response to Severe Highway and Railway Accident Conditions," NUREG/CR-4829, Nuclear Regulatory Commission, Washington, D.C.

Gonzales, A., Pierce, J., and Stenberg, D., 1986, "Target Hardness Comparison to IAEA Unyielding Target," IAE-SM-114, SAND86-0052, Albuquerque, NM.

Hawkins, D., 1991, Letter of Information, Letter from Hawkins, Risk Manager, Virginia International Terminals.

Kage, K., Kuwashima, K., and Kijishima, H., 1980, "On the Domestic Transportation Hinoura Maru, the Ship for the Exclusive Use of Spent Nuclear Fuel," PAT Radioactive Material '80, Proceedings of the 5th International Symposium, Packaging and Transportation of Radioactive Materials, West Berlin, FRG.

Operations Research, Inc., 1979, "Hazardous Environments Experienced by Radioactive Material Packages Transported by Water," Contractor Report to Sandia National Laboratories, Silver Spring, MD.

U.S. Department of Energy (DOE), 1991, "Environmental Assessment of the Risks of the Taiwan Research Reactor Spent Fuel Project," DOE/EA-0515, Washington, D.C.

Warwick, J.E., and A.L. Anderson, 1976, "The Nature of Ship Collisions within Ports," Todd Shipyard Corp., Galveston, TX, prepared for the U.S. Maritime Administration.

# APPENDIX C

## DETERMINATION OF ANNUAL PORT WORKER EXPOSURE FROM COMMERCIAL RADIOACTIVE SHIPMENTS

## APPENDIX C

## DETERMINATION OF ANNUAL PORT WORKER EXPOSURE
## FROM COMMERCIAL RADIOACTIVE SHIPMENTS

To estimate the annual exposure rate of port workers resulting from handling of commercial radioactive shipments, the following must be determined:

Number of radioactive packages handled per year
Length of exposure time per package
Dose rate per package

Records of shipments though the Ports of New York and New Jersey, Hampton Roads, Philadelphia, Houston, Charleston, Savannah, and Baltimore for recent years were used to estimate the annual throughput of packages with radioactive contents. Radioactive materials were identified by the product code listed for each shipment. To obtain an estimate of annual radioactive shipments (both imports and exports), a list of all shipments from July 1, 1992 through June 30, 1993 was compiled from the *Piers Imports and Exports, Journal of Commerce*. The radioactive shipments were grouped into five categories and exposure rates at one meter from the outer surface of the package were assigned for each group as follows:

| | |
|---|---|
| enriched uranium hexafluoride | 0.5 mrem / hour |
| normal uranium hexafluoride | 0.2 mrem / hour |
| depleted uranium | 0.2 mrem / hour |
| uranium oxide | 0.2 mrem / hour |
| other radioactive materials | 0.2 mrem / hour |

Each shipment record in *Piers* listed the weight and number of packages included in the shipment. Package descriptions were not uniform and included units, containers, cases, boxes, drums, barrels, packages, cartons, units, cylinders, tanks, skids, or a mix of packages. The assumption was made that radioactive shipments would be stacked on skids and the total number of skids per shipment, rather than the number of packages per shipment, was needed to estimate the dose received by workers. The weight and number of individual shipments was examined for each shipment to estimate the number of skids. In most cases, boxes, cartons, barrels, and drums were assumed to be handled four to a skid. When a large number of light packages was included in one shipment, these were assumed to be handled as either 8 or 32 packages per skid.

The annual dose to port workers resulting from handling commercial radioactive shipments was estimated based on the number of shipments passing through the port and an estimated handling time of ten minutes per skid or cylinder. Each port uses three shifts per day and therefore workers were assumed to be exposed to one-third of the packages passing through the port. This is a conservative assumption given that there are typically many berths and terminals within one port, thus making it unlikely one individual would be present for even one-third of the shipments of radioactive materials.



# END

DATE FILMED

5/20/94

*i*

# EXHIBIT Q

**Affidavit:**

Jeff Walburn

On May 21st, 2019, at the YMCA in Waverly, I attended a presentation given by DOE, concerning the contaminated waste cell being constructed on the North section of the Portsmouth Gaseous Diffusion Plant property. I had the occasion to approach the topographical map and mock-up of the waste cell. The gentleman, who was stationed at this position, was an oriental man. He introduced himself as the engineer of the waste cell. He said his name was Cheow (sp?), this would be the Taiwanese spelling of the name. We had an exchange about his name, and I asked him if it was Chinese? He made it clear that he was from Taiwan, not China. I said that I understood, and that I knew the difference, and that Sun-yet-sin, was the father of his country, and that I knew that Taiwan was separate from China. He was very friendly immediately when it was clear that I understood.

The subject got around to what was going to be buried in the waste cell. I asked him what they had done with the material from the equipment and pipes from the X-326 and X-330 and would it be buried in the same location? His answer to me was 'NO. DOE gave us that material as spare parts, in return for the work we had done." I asked, "Where is it now?" He said "That's all been shipped." I stopped the conversation immediately because there was a problem with that scenario. My background in the SWAT anti-terrorism at the plant, makes me aware that any material in a pipe or compressor, south of the last quarter of the X-330 and the entire X-326 is weapons grade material and should only be transported by special methods (SST) that would have been guarded and secured from theft or subversion per DOD and DOE orders. I remember wondering "If they knew, how could DOE have allowed such a thing?

Sworn by me on this date: *Jeffery B. Walbrun* 12/28/19

And witnessed by: *Paul Brogdon* 12-20-19 Under notary
PAUL BROGDON

PAUL BROGDON
Notary Public, State of Ohio
My Commission Expires May 11, 2024

# EXHIBIT R



April 27, 2019

**TO:**            Elizabeth D. Lamerson and citizens of Pike County, Ohio

**FROM:**        Michael E. Ketterer, Ph.D., Professor Emeritus, Chemistry and Biochemistry[a]

**IN COLLABORATION WITH:** Scott C. Szechenyi, M.S., Independent Consultant[b], BS '97, MS '01, Northern Arizona University

**SUBJECT:**     Investigation of anthropogenic uranium, neptunium, and plutonium in environmental samples near Piketon, Ohio

[a]Michael.Ketterer@nau.edu            [b]Scott@isotopesignatures.com

**SUBMITTED BY:**  

1

**Summary.**   A *pro bono*, public interest study has been completed to investigate potential sources of uranium (U), neptunium (Np) and plutonium (Pu) in environmental samples from the vicinity of Piketon, OH.  The authors collaborated with a local community member, and analyzed the samples at Northern Arizona University, using modern nuclear forensics approaches.

The principal questions to be addressed were:  a) can non-natural uranium be found in the local environment, and b) can non-weapons-testing fallout neptunium and plutonium be similarly found?  We assumed the null hypotheses that all environmental U is naturally occurring, and that all Np-Pu stems from Cold War-era nuclear weapons testing fallout.

The data showed that non-natural U, and non-fallout Np and Pu are systematically present in many locations; accordingly, we tested the alternative hypotheses that, the Portsmouth Gaseous Diffusion Facility (PORTS) are the explanatory sources therein.  We observed, using isotope mixing plots, that the U, Np, and Pu are reasonably explained using fallout and PORTS/Paducah end-members described in two DOE-funded studies (Moody, 1995; Kelley *et al.,* 1999).

Several specific findings are as follows:

**1)** Enriched U is found in surface waters, sediments, and interior dusts.  This enriched U also contains $^{236}$U, a known component of "recycled U" that was processed at PORTS.  The environmental samples exhibiting enriched U have compositions consistent with mixing between natural U and PORTS U (Moody, 1995).

**2)** Non-fallout $^{237}$Np and Pu isotopes are also found in bed sediments, suspended sediments, and interior dusts.  These transuranic elements are known contaminants in feed material used at PORTS and the Paducah facilities.  The environmental samples exhibiting non-fallout Np and Pu are consistent with mixing between global "stratospheric fallout" Np-Pu (Kelley *et al.*, 1999), and material sampled from the Paducah and Portsmouth Gaseous Diffusion Plants (Moody, 1995).

**3)** The study consistently found non-fallout $^{237}$Np in suspended sediments of an unnamed creek that is draining a landfill construction area that is currently being worked.  These results indicate a probable source of $^{237}$Np in surface materials within the creek's drainage basin.

**4)** We have also encountered enriched uranium in interior spaces at a local school, and in the attic dust sampled from various residents, including a residence that was constructed in 2007.  These findings point to recent/ongoing airborne releases, as opposed to legacy contamination dating to the 20th century.

**5)** The assembled evidence indicates, with a reasonable degree of scientific certainty, that emissions from the PORTS facility account for the anthropogenic contents of U, Np, and Pu encountered in environmental samples from the Piketon vicinity.

**Introduction.** The purpose of this project was to investigate environmental samples supplied to the authors by Elizabeth D. Lamerson, as part of a study of the possible presence of anthropogenic U (uranium), neptunium (Np) and plutonium (Pu) in the environment. The study focused on environmental samples Ms. Lamerson gathered from the proximity of Piketon, Ohio. The principal questions addressed were: A) ***can non-naturally occurring U be identified in the local environment?*** and B) ***can Np and Pu be identified in the local environment that originate from source(s) other than nuclear weapons testing fallout?*** Our study used scientifically sound, legally defensible methods that are well known and accepted in the field of nuclear forensics, which mirror the approaches used by qualified laboratories/scientists throughout the world.

**Methods.** Media sampled/analyzed include: i) surface soils; ii) aquatic sediments and surface water samples from local creeks and the Scioto River; iii) "swipe" samples collected from un-inhabited interior spaces; and iv) bulk dust samples vacuumed or hand-gathered from un-inhabited interior spaces. Ms. Lamerson and other community members collected samples from public areas; additional samples were collected with appropriate access and permissions from private property. ***No samples were acquired from US Government property.*** All samples from private/residential property are de-identified as to ownership and geography, to respect the absolute confidentiality and privacy of the cooperating citizens. The authors will not reveal this location/identity information.

No attempt has been made to measure U concentrations, and accordingly, no inferences are made nor implied regarding this element's concentrations in comparison to established maximum contaminant levels (MCL's). While this has not been pursued herein, the authors acknowledge the importance of this undertaking in future studies.

The present focus on isotope (atom) ratios enables a sensitive and robust comparison between natural vs. anthropogenic (e.g., isotopically enriched or depleted) sources of uranium in many types of environmental or biological samples. All results were measured by quadrupole inductively coupled plasma mass spectrometry (Q-ICPMS), following established, well-known chemical preparation and instrumental measurement strategies (e.g., Ketterer *et al*., 2000a, 2000b, 2003). For the element uranium, the ratios measured include: $^{234}U/^{238}U$, $^{235}U/^{238}U$, and $^{236}U/^{238}U$. These dimensionless values represent the actual ratios of the number of atoms of the specified masses, present in the sample under investigation. The measurement of these three U isotope ratios permits the detection of relatively small deviations from natural U found in the Earth's crust (*via* deviations in $^{235}U/^{238}U$ and $^{234}U/^{238}U$), as well as the detection of small inputs of "recycled uranium".

Using $^{236}U/^{238}U$ ratios, one can detect the presence of small additions of U recovered from Pu production reactors, as $^{236}U$ is synthesized by neutron capture processes therein. In situations where enriched or depleted U contains a "recycled uranium" component, the detection of $^{236}U$ is itself a potentially sensitive measure of such anthropogenic inputs, as $^{236}U$ is virtually absent in Nature, and only small amounts can be accounted for by nuclear weapons testing fallout (Ketterer *et al*., 2013). Depleted uranium used in military applications commonly contains $^{236}U$ (Lloyd *et al*., 2009; Bu *et al*., 2017) and it follows that the associated enriched U produced in the same isotope separation processes, will also contain significant levels of $^{236}U$.

3

For Np and Pu, the actual atom concentrations of $^{237}$Np, and the activities of $^{239+240}$Pu were measured, along with the atom ratios $^{237}$Np/$^{239}$Pu and $^{240}$Pu/$^{239}$Pu. As is the case with the U results, the Np-Pu isotope ratios permit analogous, robust comparisons between baseline "stratospheric fallout" vs. non-fallout sources (e.g., the contaminants present in recycled U). The basis for our data interpretations of the Np-Pu results is as described by Kelley *et al.* (1999), a DOE-funded study that was conducted at Pacific Northwest National Laboratory. Our laboratory methodologies for Np and Pu measurements followed sample preparation and Q-ICPMS-based procedures discussed elsewhere (Ketterer *et al.*, 2004, Ketterer and Szechenyi, 2008). The Np-Pu results for selected samples were confirmed by Q-ICPMS at an external laboratory (Prof. José Luis Más, CITIUS, Universidad de Sevilla), in order to affirm the major inferences from our own lab work.

**Results.** The analytical results obtained in this study are presented in Table 1 (U) and Table 2 (Np-Pu). These tables display the above-mentioned ratios for the elements U, Np, and Pu.

For purposes of inferring the presence of anthropogenic U and/or non-weapons test fallout Np-Pu, the measured ratios should be compared to the following benchmarks:

| Ratio | Expected in Nature and/or contemporary baseline |
|---|---|
| $^{234}$U/$^{238}$U | 0.000055 (affected by $^{234}$U-$^{238}$U disequilibria) |
| $^{235}$U/$^{238}$U | 0.0072527 (varies within a ∼ 0.2% relative range *via* natural fractionation processes) |
| $^{236}$U/$^{238}$U | ∼ $10^{-10}$ in Nature; influenced by fallout (Ketterer *et al.*, 2013) |
| $^{237}$Np/$^{239}$Pu | 0.48 ± 0.07 (Kelley *et al.*, 1999) |
| $^{240}$Pu/$^{239}$Pu | 0.180 ± 0.014 (Kelley *et al.*, 1999) |

***It is obvious, from a cursory examination of Tables 1 and 2, that "anthropogenic U" and "non-fallout Np-Pu" are pervasive in the environment surrounding Piketon.*** This generates the obvious hypothesis, namely, that the local Portsmouth Gaseous Diffusion Facility (PORTS) facility is the explanatory source of the U-Np-Pu contamination. In order to test this hypothesis, the interpretations of these results, and inferences provided, will follow in the next sections of the report.

**End Members.** A previous study of PORTS samples was conducted as part of a larger counter-forensics program (PUBLIC); an unlimited distribution report was published by Lawrence Livermore National Laboratory (Moody, 1995). The major findings of the Moody report are discussed herein to add context and to aid interpretation of the present Piketon datasets. The Moody (1995) study conducted an interrogation of the U-Np-Pu signatures present during the ∼ 1994 sampling from within process areas at the PORTS site. The Moody (1995) U-Np-Pu signatures can serve as a reasonable "end-member", representing a snapshot of the potential PORTS releases in the environment; the other end members would consist of natural U, and the weapons-testing fallout Np-Pu signature. One must

4

bear in mind that the Moody samples are only a single sampling event, at one point in time and limited in scope/space, over a decades-long history of a large-scale facility.

It is common practice in the isotope geosciences to interpret mixing processes using "mixing plots", typically consisting of two ratios bearing a common denominator. Herein, we make use of mixing plots of $^{234}U/^{238}U$ vs. $^{235}U/^{238}U$, and $^{237}Np/^{239}Pu$ vs. $^{240}Pu/^{239}Pu$.

The null hypothesis $(H_o)$ for uranium in an unknown environmental sample is that the $^{234}U/^{238}U$ and $^{235}U/^{238}U$ are congruent with naturally occurring uranium; in other words, no other end member need be invoked to explain the observed isotope composition. On a mixing line, samples that support $H_o$ will cluster, within measurement uncertainty, of naturally occurring U ratios; samples that are statistically distinguishable on the plot from the $H_o$ cluster will be immediately apparent, and thus, one rejects $H_o$. The alternate hypothesis, $H_1$, is that the sample contains an anthropogenic component of enriched or depleted U, from an external source that requires a plausible explanation.

In a similar manner, $H_o$ for Np-Pu is that the source of these elements, if even detectable, is from nuclear weapons testing fallout, deposited globally, mainly during the 1950's and 1960's. The Kelley *et al.* (1999) study is the authoritative paper on the Np-Pu characteristics of global fallout. The Kelley study also discusses the uses of $^{237}Np$-$^{239}Pu$-$^{240}Pu$ mixing diagrams in the detection of other Np-Pu sources. The $H_1$ herein is that a non-fallout Np-Pu source is present, analogous to above discussion regarding the U hypotheses.

In any two-ratio, common-denominator mixing diagram, simple binary mixtures of two components plot along a straight line segment, spanning the end members, as was observed for global fallout mixed with Chernobyl debris (e.g., as discussed in Ketterer and Szechenyi, 2008). Additional components may, coincidentally, fall along the mixing line, although more commonly, fall well away from the line. Lastly, it is important to keep in mind that correlation does not prove causation when interpreting mixing plots, although often, there is only one realistic explanation for two-component mixing behavior.

The 1995 Moody study is important, because it defines the composition of PORTS, an important local source of environmental actinides acknowledged by the US Government (e.g., DOE, 2019). Legacy and/or contemporary/ongoing emissions from PORTS would alter the $H_o$ U-Np-Pu environment signatures, leading to rejection of either/both the U or Np-Pu null hypotheses for individual offsite samples. If $H_1$ is accepted, the Moody signatures allow one to ascertain whether PORTS is the explanatory source.

Moody's Project PUBLIC (Portsmouth/Paducah Uranium Barrier: Livermore Investigative Campaign) analyzed three samples obtained from inside the PORTS facility; the U-Np-Pu compositions of these were determined through rigorous analytical work at a DOE-funded lab (Lawrence Livermore National Laboratory), and therefore, there is no ambiguity regarding the PORTS samples' authenticity. Moody (1995) also characterized two samples from the Paducah Gaseous Diffusion Facility, a site which delivered pre-enriched feed material for further enrichment at PORTS. The Moody samples also varied in U isotope composition, and generate a mixing plot, shown in Figure 1.

Ketterer Szechenyi Piketon NAU



**Figure 1.** $^{234}U$-$^{235}U$-$^{238}U$ mixing diagram of PORTS samples mixed with natural composition uranium, from data reported by Moody, 1995, UCRL-ID-119658. The trendline has been defined for natural and PORTS samples. Paducah plant samples are plotted (but not included in trendline regression), as the Paducah cascade is considered to be one of the PORTS feedstock sources. An interesting observation by Moody indicates a slightly depleted uranium signature in samples analyzed from the Paducah plant. Natural uranium is used as the left-hand end member.

**Uranium sources.** Using naturally occurring U, global fallout Np-Pu, and the Moody U-Np-Pu signatures as potential end-members, we turn to examining whether the Piketon-vicinity environmental samples exhibit: A) rejection of either $H_o$; and B) mixing patterns that point to the Moody PORTS U-Np-Pu signatures as an explanatory source. A series of Figures (2 through 5) compare the observed isotope compositions vs. U end-members and the Moody mixing line.

Figure 2 illustrates the U isotope compositions of dust samples collected from the interior of a local Piketon-vicinity school. The dust samples, collected as "swipes", using absorbent cloths resembling "baby wipes" exhibit the following: A) the $H_o$ is rejected for at least four of the samples (red triangles) and therefore, ***these dust samples from the school must contain at least some added enriched U component***; and B) there exists a fairly consistent two-component mixing relationship. The Moody 1995 trendline is overlain for comparison.

Analogous comparisons for uranium isotope compositions are provided, using the data of Table 1, for samples from the Scioto River (Figure 3), Piketon-vicinity creeks and drainages (Figure 4), and for dusts and soils collected from Piketon-vicinity residences (Figure 5). In all cases, similar findings are evident: $H_o$ is repeatedly rejected, for many data points, and the observed patterns closely follow two-component mixing lines. Each comparison leads to the immediate conclusion, that ***many of the environmental samples contain at least some added enriched U component.***

6

In reference to uranium isotope compositions, some important findings can be garnered from the U isotope compositions of specific samples reported in Table 1. Samples 55 and 77 represent attic dust "swipes" collected in two independent sampling events from one local residence; according to the owners, the residence was constructed in 2007. Samples 55 and 77 exhibit $^{235}U/^{238}U$ of 0.00799 and 0.00896, respectively. ***These results point to the existence of recent, or contemporary/ongoing transport processes that have resulted in deposition of enriched U at this residence.*** Accordingly, the contamination cannot be accounted for by legacy emissions that occurred prior to 2001, when routine enrichment operations terminated at PORTS.

Selected samples demonstrate that the enriched U also contains $^{236}U$. The long-lived $^{236}U$ isotope is found at extremely low abundances in Nature; background, pre-nuclear era $^{236}U/^{238}U$ are ∼ $10^{-10}$ or lower. Small amounts of $^{236}U$ are also associated with nuclear weapons testing fallout, and stratospheric fallout is characterized by a $^{236}U/^{239}Pu$ atom ratio of ∼ 0.2 (Ketterer *et al.*, 2013). Fallout-derived $^{236}U/^{238}U$ are commonly ∼ $10^{-7}$ or less, and are controlled by i) fallout inventory and ii) crustal $^{238}U$ concentrations. In contrast, the overarching pattern of the Piketon-vicinity environmental samples is that they exhibit detectable $^{236}U$, wherever sufficiently elevated $^{235}U/^{238}U$ ratios are present, provided that U signal levels in the mass spectrometer allow reliable measurement of $^{236}U/^{238}U$.



**Figure 2.** $^{234}U$-$^{235}U$-$^{238}U$ mixing diagram mixing diagram of samples collected at a Piketon-vicinity school in Fall/Winter 2018-2019. The mixing line of PORTS sample data from Moody (1995) is included for comparison.

The presence of $^{236}U$ can be most reliably detected when $^{235}U/^{238}U$ is grossly elevated; a case in point can be seen in dissolved U in Little Beaver Creek, Big Beaver Creek, and in the

Ketterer Szechenyi Piketon NAU

Scioto River. Referring to Table 1, Sample 45 (Little Beaver Creek, downstream) exhibited $^{235}U/^{238}U = 0.0224$ and $^{236}U/^{238}U = 0.000075$; Sample 47 (Big Beaver Creek, downstream) had $^{235}U/^{238}U = 0.0218$ and $^{236}U/^{238}U = 0.000065$. The $^{236}U$-bearing enriched U is also found downstream in the Scioto River ($^{235}U/^{238}U = 0.0199$ and $^{236}U/^{238}U = 0.000065$). We note that these specific samples plot close to the Moody mixing lines (Figures 3 and 4). ***The implied source of this $^{236}U$ and elevated $^{235}U/^{238}U$ in surface waters is the permitted outfalls and/or non-point discharges from the PORTS facility.*** Our findings confirm the US DOE's previous findings of dissolved enriched uranium in these same locations (DOE, 2014). The latter study estimated the total 2014 outfall discharges from PORTS to be ∼ 14 kilograms, which further supports our findings in these surface waterways.

Other mass spectrometric techniques, such as triple quadrupole ICPMS, or acellerator mass spectrometry (AMS) are better suited than Q-ICPMS for measuring low-abundance $^{236}U$ (e.g., Bu *et al.*, 2017). It is, therefore, technically feasible to trace the transport of this PORTS-derived dissolved U contamination, even after large dilution, downstream into the Ohio River watershed.



**Figure 3.** $^{234}U$-$^{235}U$-$^{238}U$ mixing diagram mixing diagram of water and sediment samples collected from the Scioto River in Fall/Winter 2018-2019. The mixing line of PORTS sample data from Moody (1995) is included for comparison.

8



**Figure 4.** $^{234}$U-$^{235}$U-$^{238}$U mixing diagram of water and samples collected from Piketon-vicinity drainages in Fall/Winter 2018-2019. The mixing line of PORTS sample data from Moody (1995) is included for comparison.



**Figure 5.** $^{234}$U-$^{235}$U-$^{238}$U mixing diagram of soil and dust samples collected Piketon-vicinity residences in Fall/Winter 2018-2019. The mixing line of PORTS sample data from Moody (1995) is included for comparison.

9

Though not presented in this report, our examination of the U isotope results shows that $^{236}U/^{238}U$ vs. $^{235}U/^{238}U$ two-component mixing behavior is present. This implicit $^{236}U/^{238}U$ - $^{235}U/^{238}U$ mixing pattern cannot be explained by mixing between crustal (natural) U and weapons-test fallout; instead, the source of the $^{236}U$ is "recycled U".

During the Cold War era, the US Government was concerned with an impending shortage of U metal, and "recycled" U was recovered from Pu production reactors, and the recovered U was blended with primary ore-extracted U feed. Accordingly, most feed to the US's gaseous diffusion plants contained $^{236}U$, a practice that commenced in the 1950's. The "recycled U" also brings along other concomitants ($^{99}Tc$, $^{237}Np$, and Pu isotopes) that entered the gaseous diffusion process plants. The $^{99}Tc$ and "transuranics" represent unintended contaminants in the gaseous diffusion process, and their chemical behaviours are significantly different from U in the gaseous diffusion separation chemistry of $UF_6$ (g). The Moody (1995) study revealed the presence of $^{236}U$ (as well as $^{237}Np$ and Pu isotopes) in DOE-authenticated PORTS samples; therefore, *it is beyond question that $^{236}U$, $^{237}Np$, $^{239}Pu$, and $^{240}Pu$ are specifically associated with PORTS facility processes.*

**Neptunium and plutonium sources.** As previously stated, the Kelley *et al.* (1999) DOE study is the authoritative source describing the expected Np-Pu isotope compositions of weapons-testing "stratospheric" fallout found globally. Kelley *et al.* (1999) used plots of $^{237}Np/^{239}Pu$ vs. $^{240}Pu/^{239}Pu$ to examine mixing of the two dominant North American sources of fallout, namely, "stratospheric" and Nevada Test Site fallout. The Kelley paper also states that non-fallout sources are immediately apparent on these three-isotope mixing diagrams.

The results for the determination of $^{237}Np$ mass concentrations, $^{239+240}Pu$ activities, and the atom ratios $^{237}Np/^{239}Pu$ and $^{240}Pu/^{239}Pu$ are presented in Table 2. What is immediately apparent is that *many of the $^{237}Np/^{239}Pu$ ratios grossly exceed the expectations for global (stratospheric) fallout* as reported by Kelley *et al.* (1999). It is also quite evident that sediments obtained from Little Beaver Creek, Big Beaver Creek, and the Scioto River, all exhibit *elevated $^{237}Np$ mass concentrations, that are unrealistic for stratospheric fallout* (e.g., refer to atom concentrations given in Kelley *et al.*). These three specific $^{237}Np$-affected locations are all downstream of PORTS. The DOE (2014) AESR report also reports $^{237}Np$ activities in sediments of Big Beaver and Big Run Creeks; these activities (in pCi/g) are similar to the atom concentrations (in pg/g) reported herein. *It follows that the PORTS facility is the explanatory source of the elevated $^{237}Np$ concentrations in sediments downstream of the plant.*

*Table 2 also reveals the existence of airborne pathways for release of non-fallout $^{237}Np$*, as elevated $^{237}Np/^{239}Pu$ ratios were also detected in attic dusts in at least one residence (Sample 40), and possibly, a second residence (Sample 34). The consistently low $^{239+240}Pu$ activities render it difficult, in some cases, to perform more precise $^{240}Pu/^{239}Pu$ measurements for further signature clarification.

It is also apparent that some of the soil samples (e.g., Sample 59) appear to resemble the $^{240}Pu/^{239}Pu$ expected fallout Np-Pu that is congruent with the Kelley *et al.* (1999) signatures; these soils lack any $^{237}Np$ elevation.

Table 2 also presents results for suspended sediments collected from an unnamed creek draining the "landfill construction area". These samples exhibit very low $^{239+240}$Pu activities, and also contain U that is indistinguishable from naturally occurring sources; nevertheless, it is evident (e.g., Samples 36, 38, 44, and 58) that these suspended samples consistently exhibit elevated $^{237}$Np/$^{239}$Pu ratios that are not explainable via global (stratospheric) fallout. The series of four sediment samples from the landfill drainage area were collected at different dates and under different flow/rain event conditions. **_These results point to a possible source of $^{237}$Np in the landfill construction area._**

The above-mentioned $^{237}$Np and $^{237}$Np/$^{239}$Pu results can be viewed in the context of the Kelley _et al._ (1999) "null hypothesis" signature. It is evident that H$_o$ must be rejected for some of the samples presented in Table 2. Additional insight into the second source term is also obtained from Moody (1995). In Moody's Table 5, absolute numbers of atoms per sample are reported for three samples from PORTS, and two samples from the Paducah Gaseous Diffusion Facility. The PORTS samples have only approximate $^{239}$Pu and $^{240}$Pu atom amounts reported; hence it is difficult to affix $^{237}$Np/$^{239}$Pu and $^{240}$Pu/$^{239}$Pu signatures. Nevertheless, the three PORTS samples all point to a $^{237}$Np/$^{239}$Pu atom ratio of $\sim$ 300-400, while the better-defined Paducah samples exhibit ratios of $\sim$ 900-1000. It is also evident that the two Paducah samples, 94-7-38 and 94-7-45, both exhibit non-fallout $^{240}$Pu/$^{239}$Pu of 0.065-0.070. These Paducah $^{240}$Pu/$^{239}$Pu ratios are also very similar to the non-fallout $^{240}$Pu/$^{239}$Pu we have measured in Little Beaver Creek sediments (Sample 46), along with a large elevation in $^{237}$Np/$^{239}$Pu.

The $^{237}$Np/$^{239}$Pu and $^{240}$Pu/$^{239}$Pu results were used to construct a mixing diagram (Figure 6). Note that, because of the extreme variance in $^{237}$Np/$^{239}$Pu, the vertical axis has been plotted with a logarithmic scale; the Kelley NTS-stratospheric fallout mixing line therefore appears as a curved line at the bottom of the plot. Figure 6 illustrates that many of the samples shown in Table 2 are incongruent with the Kelley mixing line, even when precise $^{240}$Pu/$^{239}$Pu ratios were not feasible (refer to the reported standard deviations in Table 2). It is obvious that a different component must be present. Given the Moody (1995) results, and the physical proximity of the samples to the PORTS facility, the results of Figure 6 indicate that the non-fallout $^{237}$Np originates from PORTS. Our $^{237}$Np results are consistent with statements made in DOE's 2017 Monitoring Report (DOE, 2019).

**Conclusions.** To a reasonable degree of scientific certainty, the authors opine that **_the PORTS facility is the source of the anthropogenic (enriched) uranium_** found in the offsite environment. The PORTS facility, to a similar degree of reasonable scientific certainty, **_is also the source of the non-fallout $^{237}$Np and Pu, as well as the elevated Np atom concentrations encountered in the offsite environment_**. These statements are based upon: i) the obvious deviations of the signatures from natural U and/or global fallout; ii) the explanation provided by the Moody signatures; iii) the presence of non-fallout $^{236}$U as an indicator of "recycled U", and iv) the absence of any other plausible local source that explains our observed results.



**Figure 4.** $^{237}$Np-$^{239}$Pu-$^{240}$Pu mixing diagram, comparing the composition of North American nuclear weapons testing fallout (Kelley *et al.*, 1999; blue points), the samples Moody (1995; yellow points), and some of our Piketon-vicinity samples (red points). Note that the vertical scale is logarithmic; hence mixing lines appear as curved segments. On account of the low $^{240}$Pu signals measured for many of our samples, the precision of many of the $^{240}$Pu/$^{239}$Pu measurements is less than optimal (refer to Table 2); nevertheless, the Piketon-vicinity samples appear to plot along a hypothetical mixing curve with stratospheric fallout and Paducah end-members. Note that in the Kelley mixing curve, "stratospheric fallout" is at the upper right of the ellipse, and Nevada Test Site fallout appears at the lower left.

Ketterer Szechenyi Piketon NAU

**Table 1.**

| Sample | Description | 234/238 | 234/238 sd | 235/238 | 235/238 sd | 236/238 | 236/238 sd |
|---|---|---|---|---|---|---|---|
| 2 | Little Beaver Creek (downstream) at Wakefield Mound Road | ND | ND | 0.02597 | 3E-06 | ND | ND |
| 3 | Big Beaver Creek (downstream) near Wakefield Mound Road | 0.000220 | 2E-07 | 0.02520 | 3E-06 | 0.000094 | 2E-07 |
| 4 | Big Beaver Creek (upstream) near Wakefield Mound Road | ND | ND | 0.00719 | 4E-06 | ND | ND |
| 5 | Unnamed Tributary to Scioto River | 0.000149 | 1E-08 | 0.01846 | 8E-07 | 0.000055 | 4E-08 |
| 6 | Big Run at Big Run Road and Tidd Hollow Road | ND | ND | 0.01150 | 5E-06 | ND | ND |
| 7 | Groundwater | ND | ND | 0.00822 | 4E-06 | ND | ND |
| 8 | Groundwater | ND | ND | 0.00776 | 2E-06 | ND | ND |
| 9 | Creek Sample from the landfill | 0.000047 | 2E-08 | 0.00715 | 2E-07 | 0.000001 | 5E-09 |
| 11 | Soil | 0.000068 | 4E-08 | 0.00874 | 2E-07 | 0.000010 | 1E-08 |
| 12 | Attic dust | 0.000104 | 1E-07 | 0.01469 | 1E-06 | 0.000065 | 8E-08 |
| 13 | Attic dust | ND | ND | 0.00732 | 7E-07 | ND | ND |
| 14 | Groundwater | ND | ND | 0.00784 | 3E-06 | ND | ND |
| 15 | Groundwater | ND | ND | 0.00735 | 2E-06 | ND | ND |
| 16 | Attic dust | 0.000101 | 2E-07 | 0.01097 | 1E-06 | 0.000039 | 4E-08 |
| 17 | Attic dust | ND | ND | 0.01022 | 2E-06 | ND | ND |
| 18 | Attic dust | 0.000265 | 5E-07 | 0.02130 | 1E-06 | 0.000179 | 6E-08 |
| 18 rep | Attic dust | 0.000278 | 7E-07 | 0.02024 | 6E-06 | 0.000186 | 1E-06 |
| 19 | Attic dust | ND | ND | 0.00719 | 4E-06 | ND | ND |
| 19 dup | Attic dust | 0.000081 | 3E-06 | 0.01149 | 5E-05 | 0.000031 | 2E-06 |
| 20 | Outbuilding | 0.000112 | 3E-08 | 0.01185 | 7E-07 | 0.000047 | 7E-08 |
| 22 | Soil | 0.000056 | 1E-08 | 0.00747 | 5E-07 | 0.000003 | 2E-09 |
| 23 | Groundwater | 0.000077 | 6E-08 | 0.00742 | 1E-06 | ND | ND |
| 24 | Schl sample 1 | 0.000062 | 5E-06 | 0.00767 | 2E-05 | ND | ND |
| 25 | Schl sample 2 | 0.000060 | 5E-06 | 0.00723 | 8E-05 | ND | ND |
| 26 | Schl sample 3 | 0.000064 | 2E-06 | 0.00789 | 2E-05 | ND | ND |
| 26 leach | Schl sample 3 leach | ND | ND | 0.00881 | 5E-05 | ND | ND |
| 27 | Schl sample 10 | 0.000057 | 2E-06 | 0.00715 | 9E-05 | ND | ND |
| 27 leach | Schl sample 10 leach | ND | ND | 0.0075 | 1E-04 | ND | ND |
| 28 | Schl sample 11 | 0.000056 | 4E-06 | 0.00739 | 2E-05 | ND | ND |
| 28 leach | Schl sample 11 leach | ND | ND | 0.0075 | 1E-04 | ND | ND |
| 29 | Schl sample 12 | 0.000057 | 2E-06 | 0.00719 | 2E-05 | 0.000005 | 2E-07 |
| 31 | Attic dust 1 | 0.000076 | 1E-06 | 0.01026 | 6E-05 | 0.000025 | 3E-06 |
| 31 leach | Attic dust 1 leach | 0.00010 | 1E-05 | 0.01333 | 4E-05 | 0.000044 | 6E-06 |

Ketterer Szechenyi Piketon NAU

## Table 1.  (continued)

| Sample | Description | 234/238 | 234/238 sd | 235/238 | 235/238 sd | 236/238 | 236/238 sd |
|---|---|---|---|---|---|---|---|
| 32 | Outbuilding | ND | ND | 0.00785 | 8E-05 | ND | ND |
| 33 | Outbuilding | 0.000102 | 3E-06 | 0.0119 | 1E-04 | ND | ND |
| 34 | Outbuilding | 0.000074 | 6E-06 | 0.00863 | 6E-05 | 0.000013 | 1E-06 |
| 37 | Creek Sample from landfill | ND | ND | 0.0074 | 1E-04 | ND | ND |
| 39 | Attic dust | 0.0014 | 2E-05 | 0.01797 | 4E-05 | 0.000062 | 3E-06 |
| 39 rep | Attic dust | 0.000149 | 6E-06 | 0.01787 | 5E-05 | 0.000067 | 3E-06 |
| 40 | Outbuilding | 0.000095 | 4E-08 | 0.01055 | 1E-06 | ND | ND |
| 41 | Little Beaver Cr (upstrm) at Bobo Rd | ND | ND | 0.00785 | 6E-05 | ND | ND |
| 41 dup | Little Beaver Cr (upstrm) at Bobo Rd | 0.00071 | 7E-06 | 0.0080 | 6E-04 | ND | ND |
| 42 | Little Beaver Cr Sed (upstrm) at Bobo Rd | 0.000065 | 2E-08 | 0.00717 | 7E-07 | ND | ND |
| 43 | Creek Sample from landfill | ND | ND | 0.0075 | 3E-04 | ND | ND |
| 44 | Sed from Creek by landfill | 0.000058 | 3E-09 | 0.00711 | 4E-07 | ND | ND |
| 45 | Little Beaver Cr (dnstrm) at Wakefield Mound Rd | 0.000198 | 1E-06 | 0.02236 | 9E-05 | 0.000075 | 1E-06 |
| 45 rep | Little Beaver Cr (dnstrm) at Wakefield Mound Rd | 0.000207 | 6E-06 | 0.0233 | 1E-04 | 0.000070 | 1E-06 |
| 47 | Big Beaver Cr (dnstrm) near Wakefield Mound Rd | 0.000199 | 8E-07 | 0.0218 | 3E-04 | 0.00006 | 5E-06 |
| 47 dup | Big Beaver Cr (dnstrm) near Wakefield Mound Rd | 0.000187 | 3E-06 | 0.0216 | 2E-04 | 0.00006 | 1E-05 |
| 48 | Big Beaver Cr Sed (dnstrm) near Wakefield Mound Rd | 0.000093 | 4E-08 | 0.01040 | 6E-07 | 0.000018 | 2E-08 |
| 49 | Big Beaver Cr (upstrm) near Wakefield Mound Rd | ND | ND | 0.0075 | 1E-04 | ND | ND |
| 50 | Big Beaver Cr Sediment (upstream) near Wakefield Mound Rd | 0.000055 | 3E-06 | 0.00714 | 5E-05 | ND | ND |
| 51 | Unnamed Trib to Scioto River near Wakefield Mound Rd | 0.00011 | 1E-05 | 0.0126 | 1E-04 | 0.000029 | 2E-06 |
| 52 | Unnamed Trib to Scioto River Sed near Wakefield Mound Rd | 0.000060 | 4E-06 | 0.00789 | 2E-05 | ND | ND |
| 53 | Big Run at Big Run Rd and Tidd Hollow Rd | ND | ND | 0.0134 | 1E-04 | 0.000029 | 2E-06 |
| 54 | Big Run Sediment at Big Run Rd and Tidd Hollow Rd | 0.000088 | 2E-06 | 0.01122 | 6E-05 | 0.000026 | 9E-07 |
| 55 | 2007 home attic dust | ND | ND | 0.00798 | 9E-05 | ND | ND |
| 55 rep | 2007 home attic dust | 0.000061 | 4E-06 | 0.00799 | 2E-05 | ND | ND |
| 55 leach | 2007 home attic dust | 0.000062 | 2E-06 | 0.0084 | 2E-04 | ND | ND |
| 55 leach dup | 2007 home attic dust | 0.000070 | 4E-06 | 0.00841 | 4E-05 | 0.000016 | 9E-07 |
| 56 | Attic dust | 0.000079 | 3E-06 | 0.01060 | 2E-05 | 0.000029 | 5E-06 |
| 57 | Creek Sample from landfill | ND | ND | 0.0083 | 3E-04 | 0.00006 | 1E-05 |
| 58 | Sed from Creek by landfill | 0.000059 | 6E-06 | 0.00716 | 2E-05 | 0.00006 | 6E-07 |
| 59 | Soil | 0.000058 | 4E-08 | 0.00744 | 5E-07 | 0.000008 | 7E-09 |
| 60 | Schl sample 13 | 0.000052 | 6E-08 | 0.00719 | 4E-07 | 0.000004 | 4E-09 |
| 65 | Scioto River Dnstrm | 0.00018 | 1E-05 | 0.01994 | 8E-05 | 0.000065 | 5E-06 |

14

Ketterer Szechenyi Piketon NAU

**Table 1.  (continued)**

| Sample | Description | 234/238 | 234/238 sd | 235/238 | 235/238 sd | 236/238 | 236/238 sd |
|---|---|---|---|---|---|---|---|
| 65 dup | Scioto River Downstream | 0.00202 | 5E-06 | 0.01973 | 5E-05 | 0.000059 | 3E-06 |
| 67 | Scioto River Upstrm at Piketon boat ramp | 0.000069 | 3E-06 | 0.00714 | 2E-05 | ND | ND |
| 69 | Attic dust 2 | 0.000062 | 9E-06 | 0.0074 | 2E-04 | ND | ND |
| 69 leach | Attic dust 2 leach | 0.000063 | 9E-06 | 0.00740 | 7E-05 | ND | ND |
| 72 | Schl sample 5 | 0.000066 | 5E-06 | 0.0079 | 2E-04 | ND | ND |
| 73 | Schl sample 6 | 0.00074 | 4E-06 | 0.0979 | 6E-05 | ND | ND |
| 73 dup | Schl sample 6 duplicate | 0.000082 | 5E-06 | 0.0100 | 1E-04 | ND | ND |
| 74 | Schl sample 7 | 0.000076 | 5E-06 | 0.0096 | 1E-04 | ND | ND |
| 75 | Schl sample 8 | 0.000062 | 4E-06 | 0.00796 | 5E-05 | ND | ND |
| 76 | Schl sample 9 | 0.000060 | 4E-06 | 0.0075 | 1E-04 | ND | ND |
| 76 dup | Schl sample 9 duplicate | 0.00058 | 3E-06 | 0.00742 | 3E-05 | ND | ND |
| 77 | 2007 home attic dust | 0.000071 | 5E-06 | 0.0090 | 2E-04 | 0.000012 | 2E-06 |
| 78 | Little Beaver Cr (dnstrm) at Wakefield Mound Rd | 0.00017 | 1E-05 | 0.0180 | 1E-04 | 0.000054 | 4E-06 |
| 79 | Big Beaver Cr (dnstrm) near Wakefield Mound Rd | 0.00014 | 2E-05 | 0.0170 | 2E-04 | ND | ND |
| 80 | Unnamed Trib to Scioto River near Wakefield Mound Rd | 0.00013 | 1E-05 | 0.0158 | 1E-04 | 0.000038 | 6E-06 |
| 81 | Little Beaver Cr (upstrm) at Bobo Rd | ND | ND | 0.0076 | 4E-04 | ND | ND |
| 82 | Little Beaver Cr (dnstrm) at Wakefield Mound Rd | 0.00020 | 1E-05 | 0.0227 | 1E-04 | 0.000065 | 5E-06 |
| 83 | Big Beaver Cr (upstrm) near Wakefield Mound Rd | ND | ND | 0.0077 | 3E-04 | ND | ND |
| 85 | Unnamed Trib to Scioto River near Wakefield Mound Rd | 0.000132 | 9E-06 | 0.0165 | 1E-04 | 0.000044 | 6E-06 |
|  |  |  |  |  |  |  |  |
| 94-7-14 | Moody 1995 data, Portsmouth | 0.000104 | 1E-08 | 0.01738 | 1E-06 | 0.000069 | 3E-09 |
| 94-7-17 | Moody 1995 data, Portsmouth | 0.000063 | 3E-09 | 0.01108 | 9E-07 | 0.000059 | 4E-08 |
| 94-7-19 | Moody 1995 data, Portsmouth | 0.000043 | 2E-08 | 0.03927 | 2E-06 | 0.000041 | 4E-09 |
| 94-7-38 | Moody 1995 data, Paducah | 0.000020 | 1E-09 | 0.0332 | 2E-07 | 0.000040 | 1E-08 |
| 94-7-45 | Moody 1995 data, Paducah | 0.00024 | 2E-09 | 0.0387 | 3E-07 | 0.000040 | 2E-08 |
| Nat U | Moody 1995, natural U | 0.000055 |  | 0.00725 |  |  |  |

Ketterer Szechenyi Piketon NAU

**Table 2.** Results for $^{237}$Np atom concentrations (picograms per gram), $^{239+240}$Pu activities (Bq/kg), and the atom ratios $^{237}$Np/$^{239}$Pu and $^{240}$Pu/$^{239}$Pu; selected Piketon-vicinity samples were analyzed. The standard deviations (random error only) of each block of 3 to 5 sequential mass spectrometric measurements are shown. Note that large standard deviations are encountered for numerous $^{240}$Pu/$^{239}$Pu results, on account of the relatively low activities and hence, low signal levels at $^{240}$Pu. Further discussion of these results is beyond the scope/purpose of the present report.

| Sample | Description | 237/239 | 237239 sd | 240/239 | 240239 sd | Bq/kg Pu | Bqkg sd | pg/g 237 | pg/g sd |
|---|---|---|---|---|---|---|---|---|---|
| 34 | Barn dust sample | 1.23 | 0.24 | 0.216 | 0.047 | 0.70 | 0.01 | 0.21 | 0.03 |
| 34 digest dup | Barn dust sample | 1.18 | 0.21 | 0.202 | 0.085 | 0.85 | 0.14 | 0.25 | 0.03 |
| 36 | Sediment, creek by landfill | 1.29 | 0.29 | 0.188 | 0.062 | 0.05 | 0.01 | 0.02 | 0.00 |
| 38 | Sediment, creek by landfill | 2.10 | 0.15 | 0.184 | 0.051 | 0.14 | 0.01 | 0.07 | 0.01 |
| 40 | Barn dust sample | 2.81 | 0.33 | 0.224 | 0.055 | 0.27 | 0.02 | 0.18 | 0.01 |
| 42 | Little Beaver Creek sediment, upstream | 2.73 | 0.38 | 0.204 | 0.086 | 0.11 | 0.02 | 0.07 | 0.00 |
| 42 digest dup | Little Beaver Creek sediment, upstream | 2.15 | 0.09 | 0.242 | 0.084 | 0.14 | 0.02 | 0.07 | 0.00 |
| 44 | Sediment, creek by landfill | 2.82 | 0.23 | 0.211 | 0.037 | 0.12 | 0.01 | 0.08 | 0.01 |
| 46 | Little Beaver Creek sediment, downstream | 129.53 | 1.40 | 0.069 | 0.002 | 1.27 | 0.03 | 56.55 | 0.88 |
| 48 | Big Beaver Creek sediment, downstream | 101.73 | 13.02 | 0.129 | 0.047 | 0.16 | 0.03 | 4.85 | 0.36 |
| 52 | Scioto R Tributary near Wakefield Mound Rd. | 6.00 | 2.00 | 0.122 | 0.042 | 0.04 | 0.02 | 0.07 | 0.00 |
| 54 | Big Run sediment, Big Run/Tidd Hollow Rds. | 5.41 | 0.36 | 0.165 | 0.029 | 0.10 | 0.01 | 0.15 | 0.01 |
| 58 | Sediment, creek by landfill | 3.58 | 1.92 | 0.191 | 0.127 | 0.05 | 0.02 | 0.04 | 0.01 |
| 59 | Soil sample, residence | 0.11 | 0.02 | 0.171 | 0.037 | 0.53 | 0.05 | 0.02 | 0.00 |
| 59 digest dup | Soil sample, residence | 0.09 | 0.01 | 0.186 | 0.004 | 0.52 | 0.02 | 0.01 | 0.00 |
| 60 | Soil sample, near local school | 0.31 | 0.00 | 0.207 | 0.017 | 0.36 | 0.01 | 0.03 | 0.00 |
| 60 digest dup | Soil sample, near local school | 0.33 | 0.01 | 0.189 | 0.037 | 0.36 | 0.03 | 0.03 | 0.00 |
| 61 | Soil sample, near local school | 0.37 | 0.08 | 0.200 | 0.083 | 0.25 | 0.02 | 0.02 | 0.00 |
| 62 | Soil sample, residence | 0.56 | 0.09 | 0.186 | 0.028 | 0.47 | 0.05 | 0.07 | 0.01 |
| 64 | Soil sample, residence | 0.49 | 0.11 | 0.217 | 0.068 | 0.05 | 0.00 | 0.01 | 0.00 |
| 66 | Scioto River sediment, downstream | 54.34 | 6.03 | 0.143 | 0.035 | 0.11 | 0.01 | 1.75 | 0.02 |
| 66 digest dup | Scioto River sediment, downstream | 43.43 | 7.45 | 0.166 | 0.050 | 0.13 | 0.01 | 1.52 | 0.06 |
| 68 | Scioto R sediment, upstream, boat ramp | 0.58 | 0.06 | 0.267 | 0.039 | 0.06 | 0.00 | 0.01 | 0.00 |
| 70 | Soil sample, residence | 0.32 | 0.06 | 0.194 | 0.025 | 0.47 | 0.05 | 0.04 | 0.00 |

## Acknowledgments

This project has been prepared as a *pro bono*, independent, scholarly work of the authors. Although the analytical work has been conducted at the laboratories of Northern Arizona University's Department of Chemistry and Biochemistry, this work is the initiative and product of the authors alone; any results/opinions expressed represent those of the authors, and do not reflect opinions of the University, the Arizona Board of Regents, or the State of Arizona. **This work has been conducted by the authors for the benefit of the public and citizens of Pike County, and is intended for public dissemination.** The authors are grateful to the Chemistry and Biochemistry Department for laboratory access, stimulating discussions, and hosting our visits in recent months. We particularly wish to express appreciation to Prof. Jani C. Ingram, and her research group, for their generosity in sharing their laboratory space and instrumentation with us for several weeks while the work was conducted. We also thank James Biddle, Radiation Safety Officer, for making our work possible under the authority of the University's Radioactive Materials License, issued by the State of Arizona, in order to perform measurements of neptunium and plutonium isotopes. We owe *muchísimas gracias* to Prof. José Luis Mas Balbuena (Universidad de Sevilla) for providing confirmations of selected neptunium and plutonium results in the Sevilla CITIUS lab, for invigorating discussions during his visit to NAU in February 2019, and for joining us in enjoying the abundant snowfall that occurred in Flagstaff during our February *estancia*.

Finally, we owe utmost thanks and respect to Elizabeth Lamerson and her fellow citizens of Piketon for access, discussions, and cooperation!

## Literature Cited

Bu, W.; Zheng, J.; Ketterer, M.E.; Hu, S.; Uchida, S.; Wang, X., Development and application of mass spectrometric techniques for ultra-trace determination of 236-U in environmental samples-A review. Analytica Chimica Acta **2017**, 995, 1-20.

Kelley, J.M.; Bond L.A.; Beasley, T.M. "Global distribution of Pu isotopes and [237]Np", The Science of the Total Environment **1999**, 237/238:483-500.

Ketterer, M.E.; Jordan, J.A.; Szechenyi, S.C.; Hudson, D.D., Layman, R.R., "Envirogeochemical Exploration for NORM Wastes: Quadrupole ICPMS Measurements of Thorium and Uranium Isotopes", Journal of Analytical Atomic Spectrometry **2000**, 15, 1569-1573.

Ketterer, M.E.; Wetzel, W.C.; Layman, R.R.; Matisoff, G.; Bonniwell, E.C., "Isotopic Studies of Sources of Uranium in Sediments of the Ashtabula River, Ohio, USA", Environmental Science and Technology **2000**, 34, 966-972.

Ketterer, M.E.; Hafer, K.M.; Link, C.L.; Royden, C.S.; Hartsock, W.J., "Anthropogenic [236]U at Rocky Flats, Ashtabula River Harbor, and Mersey Estuary: Three Case Studies by Sector ICPMS", Journal of Environmental Radioactivity **2003**, 67, 191-206.

Ketterer, M.E., Hafer, K.M., Link, C.L., Kolwaite, D. Wilson, J., Mietelski, J.W., "Resolving global vs. local/regional Pu sources in the environment using sector ICPMS", Journal of Analytical Atomic Spectrometry **2004,** 19, 241-245.

Ketterer, M.E.; Szechenyi, S.C., "Review: Determination of plutonium and other transuranic elements by inductively coupled plasma mass spectrometry: A historical perspective and new frontiers in the environmental sciences", Spectrochimica Acta B **2008**, 63, 719-737.

Ketterer, M.E.; Groves, A.D.; Strick, B.J.; Asplund, C.S.; Jones, V.J., "Deposition of [236]U from atmospheric nuclear testing in Washington state (USA) and the Pechora region (Russian Arctic)", Journal of Environmental Radioactivity **2013**, 118, 143-149.

Ketterer Szechenyi Piketon NAU

Lloyd, N.S.; Chenery, S.R.N.; Parrish, R.P., "The distribution of depleted uranium contamination in Colonie, NY, USA", Science of the Total Environment **2009**, 408, 397-407.

Moody, K.J., "Forensic Radiochemistry of PUBLIC Site Inspection Samples", Lawrence Livermore National Laboratory **1995**, UCRL-ID-119658.

US Department of Energy, "Student Summary of the US Department of Energy Portsmouth Annual Site Environmental Report (ASER) for 2014", **2014**, Office of Environmental Management Portsmouth/Paducah Project Office.

US Department of Energy, "Portsmouth Gaseous Diffusion Plant:  Annual Site Environmental Report - 2017", **2019**, PPPO-03-5263593-19

18

# EXHIBIT S

A41A Zahn's Corner    A28 Camp Creek    A37 Otway

| Station ID | Parameter | 2015 No. of Measurements | 2015 Minimum | 2015 Maximum | 2016 No. of Measurements | 2016 Minimum | 2016 Maximum | 2017 No. of Measurements | 2017 Minimum | 2017 Maximum | 2018 No. of Measurements | 2018 Minimum | 2018 Maximum | 2019 (Jan-Mar only) No. of Measurements | 2019 Minimum | 2019 Maximum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A41A | Americium-241 | 4(4) | 6.8E-07 | 4.8E-06 | 4(4) | 2.5E-06 | 6.6E-06 | 4(4) | 1.2E-05 | 5.0E-05 | 4(3) | 1.3E-06 | 1.6E-05 | 1(1) | 0.0E+00 | 0.0E+00 |
| A41A | Neptunium-237 | 4(4) | 0.0E+00 | 1.3E-06 | 4(4) | 0.0E+00 | 4.0E-06 | 4(3) | 0.0E+00 | 1.5E-04 | 4(4) | 0.0E+00 | 2.3E-06 | 1(1) | 0.0E+00 | 0.0E+00 |
| A41A | Plutonium-238 | 4(4) | 0.0E+00 | 2.7E-06 | 4(4) | 0.0E+00 | 2.7E-06 | 4(4) | 0.0E+00 | 2.9E-06 | 4(4) | 0.0E+00 | 6.2E-06 | 1(1) | 0.0E+00 | 0.0E+00 |
| A41A | Plutonium-239/240 | 4(4) | 0.0E+00 | 2.1E-06 | 4(4) | 5.9E-07 | 3.8E-06 | 4(4) | 1.3E-06 | 5.0E-06 | 4(4) | 2.1E-06 | 7.9E-06 | 1(1) | 2.0E-06 | 2.0E-06 |
| A41A | Technetium-99 | 12(0) | 2.2E-04 | 5.9E-02 | 12(1) | 6.8E-05 | 2.5E-02 | 12(7) | 6.9E-06 | 3.6E-03 | 12(9) | 2.6E-05 | 3.3E-04 | 3(2) | 1.1E-04 | 2.3E-04 |
| A41A | Uranium | 12(0) | 3.6E-05 | 1.0E-04 | 12(0) | 3.7E-05 | 1.1E-04 | 12(11) | 4.6E-05 | 1.2E-04 | 12(7) | 4.0E-05 | 1.9E-04 | 3(3) | 6.3E-05 | 1.4E-04 |
| A41A | Uranium-233/234 | 12(0) | 1.1E-05 | 5.3E-05 | 12(0) | 1.7E-05 | 5.6E-05 | 12(11) | 1.9E-05 | 5.2E-05 | 12(7) | 2.0E-05 | 6.3E-05 | 3(2) | 1.9E-05 | 4.6E-05 |
| A41A | Uranium-235/236 | 12(12) | 0.0E+00 | 4.7E-06 | 12(12) | 7.3E-07 | 4.2E-06 | 12(12) | 5.1E-07 | 4.6E-06 | 12(12) | 0.0E+00 | 3.9E-06 | 3(3) | 4.9E-07 | 3.0E-06 |
| A41A | Uranium-238 | 12(0) | 1.2E-05 | 3.5E-05 | 12(0) | 1.2E-05 | 3.5E-05 | 12(11) | 1.5E-05 | 3.9E-05 | 12(7) | 1.3E-05 | 6.4E-05 | 3(3) | 2.1E-05 | 4.6E-05 |
| A28 | Americium-241 | 4(4) | 1.8E-06 | 2.9E-06 | 4(4) | 1.2E-06 | 3.8E-06 | 4(4) | 1.9E-06 | 8.8E-06 | 4(4) | 1.6E-06 | 8.1E-06 | 1(1) | 2.5E-06 | 2.5E-06 |
| A28 | Neptunium-237 | 4(4) | 0.0E+00 | 1.2E-06 | 4(4) | 0.0E+00 | 1.6E-06 | 4(3) | 0.0E+00 | 2.1E-06 | 4(4) | 0.0E+00 | 0.0E+00 | 1(1) | 0.0E+00 | 0.0E+00 |
| A28 | Plutonium-238 | 4(4) | 0.0E+00 | 6.8E-07 | 4(4) | 7.5E-07 | 2.5E-06 | 4(4) | 0.0E+00 | 2.5E-06 | 4(4) | 7.4E-07 | 7.0E-06 | 1(1) | 6.8E-06 | 6.8E-06 |
| A28 | Plutonium-239/240 | 4(4) | 2.0E-06 | 3.8E-06 | 4(4) | 1.9E-06 | 4.5E-06 | 4(4) | 1.9E-06 | 3.7E-06 | 4(4) | 1.5E-06 | 8.0E-06 | 1(1) | 2.7E-06 | 2.7E-06 |
| A28 | Technetium-99 | 12(0) | 1.5E-04 | 5.9E-02 | 12(1) | 4.5E-05 | 2.6E-02 | 12(9) | 0.0E+00 | 1.9E-03 | 12(10) | 0.0E+00 | 7.6E-04 | 3(2) | 6.5E-05 | 2.0E-04 |
| A28 | Uranium | 12(0) | 3.0E-05 | 1.4E-04 | 12(3) | 2.4E-05 | 9.2E-05 | 12(12) | 4.1E-05 | 1.1E-04 | 12(7) | 4.7E-05 | 1.4E-04 | 3(3) | 5.8E-05 | 8.7E-05 |
| A28 | Uranium-233/234 | 12(0) | 1.3E-05 | 5.3E-05 | 12(2) | 5.6E-06 | 3.3E-05 | 12(12) | 1.3E-05 | 3.3E-05 | 12(7) | 1.4E-05 | 6.3E-05 | 3(3) | 1.5E-05 | 2.8E-05 |
| A28 | Uranium-235/236 | 12(12) | 7.3E-07 | 4.9E-06 | 12(12) | 0.0E+00 | 4.2E-06 | 12(12) | 5.1E-07 | 3.2E-06 | 12(12) | 0.0E+00 | 4.7E-06 | 3(3) | 0.0E+00 | 3.0E-06 |
| A28 | Uranium-238 | 12(0) | 9.8E-06 | 4.7E-05 | 12(3) | 7.6E-06 | 3.0E-05 | 12(12) | 1.4E-05 | 3.5E-05 | 12(7) | 1.6E-05 | 4.7E-05 | 3(3) | 2.0E-05 | 2.9E-05 |
| A37 | Americium-241 | 4(4) | 5.9E-07 | 5.5E-06 | 4(4) | 1.2E-06 | 4.7E-06 | 4(4) | 1.9E-06 | 7.9E-06 | 4(3) | 6.5E-07 | 2.5E-05 | 1(1) | 1.2E-06 | 1.2E-06 |
| A37 | Neptunium-237 | 4(4) | 0.0E+00 | 6.7E-07 | 4(4) | 0.0E+00 | 1.3E-06 | 4(4) | 0.0E+00 | 2.0E-06 | 4(4) | 0.0E+00 | 1.2E-06 | 1(1) | 0.0E+00 | -1.2E-06 |
| A37 | Plutonium-238 | 4(4) | 6.4E-07 | 4.7E-06 | 4(4) | 0.0E+00 | 2.6E-06 | 4(4) | 6.4E-07 | 1.3E-06 | 4(4) | 0.0E+00 | 1.0E-05 | 1(1) | 7.1E-07 | 7.1E-07 |
| A37 | Plutonium-239/240 | 4(4) | 1.4E-06 | 4.3E-06 | 4(4) | 0.0E+00 | 1.5E-06 | 4(4) | 0.0E+00 | 3.8E-06 | 4(4) | 1.5E-06 | 5.5E-06 | 1(1) | 2.8E-06 | 2.8E-06 |
| A37 | Technetium-99 | 12(1) | 1.2E-04 | 4.8E-02 | 11(1) | 4.1E-05 | 2.9E-02 | 12(9) | 7.4E-06 | 3.1E-03 | 12(10) | 0.0E+00 | 3.7E-03 | 3(2) | 5.4E-05 | 4.2E-04 |
| A37 | Uranium | 12(1) | 3.6E-05 | 1.4E-04 | 11(2) | 1.8E-05 | 9.3E-05 | 12(12) | 4.2E-05 | 1.1E-04 | 12(8) | 3.1E-05 | 1.7E-04 | 3(3) | 5.3E-05 | 6.3E-05 |
| A37 | Uranium-233/234 | 12(0) | 1.3E-05 | 4.2E-05 | 11(1) | 6.6E-06 | 3.1E-05 | 12(12) | 1.2E-05 | 3.1E-05 | 12(8) | 7.8E-06 | 4.8E-05 | 3(3) | 2.1E-05 | 2.8E-05 |
| A37 | Uranium-235/236 | 12(12) | 0.0E+00 | 4.2E-06 | 11(11) | 3.0E-06 | 3.0E-06 | 12(12) | 4.9E-07 | 3.5E-06 | 12(12) | 0.0E+00 | 4.2E-06 | 3(3) | 5.2E-07 | 2.4E-06 |
| A37 | Uranium-238 | 12(0) | 1.2E-05 | 4.7E-05 | 11(2) | 6.0E-06 | 3.1E-05 | 12(12) | 1.4E-05 | 3.7E-05 | 12(8) | 1.0E-05 | 5.7E-05 | 3(3) | 1.7E-05 | 2.1E-05 |

# EXHIBIT T

BUSINESS CONFIDENTIAL

*Memorandum*                    *L O C K H E E D   M A R T I N*

---

Date:        February 16, 1996          Lockheed Martin Utility Services, Inc.
             POEF-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

To:          Dan Hupp

From:        Don Butler

Subject:     Internal Investigation into Health Physics Management
             Practices

On Thursday, February 1, 1996, at the direction of General Manager
Dale Allen, through Security Group Manager Dan Hupp, and Safety,
Safeguards, and Quality Manager Lee Fink, I and Quality Assurance
Specialist John Bellows, B/61173 (reporting to Lee Fink), initiated
an investigation into allegations of improper conduct on the part
of Health Physics supervision.  On Friday, February 2, 1996, we
were joined in our inquiries by Lockheed Martin Utility Services
(LMUS) Ethics Officer/Internal Audit Director Ron Wetherell,
B/60666.

The allegations were directed specifically at Health Physics
Supervisor Mike Smith, B/60174, by Senior Health Physics Technician
Monte (Chris) Kelley, B/60387 to her organization manager,
Production Support Organization Manager Sandra Fout, B/58554.  The
allegations concerned inconsistencies in overtime assignment,
misrepresentation of training records to outside auditors, time
card fraud, improperly changing an employee's dosage record, and
corruption in the maintenance of the DOELAP Thermal Luminescent
Dosimeter (TLD) Database.  Mike had been placed on Crisis
Suspension at 1130 hours, on February 1, 1996, by Sandra Fout,
pending the outcome of the investigation.

The following personnel were interviewed during the course of this
investigation:

- Research Staff Member John Bowdle, B/55503

- Senior Health Physics Technician Jeff Cunningham, B/60243

- Business Analyst Sally Cunningham, B/58612

- Health Physics Supervisor Rick Dively, B/60306

- Health Physicist Clyde Dulin, B/58488

- Production Support Organization Manager Sandra Fout,
  B/58554

- Research and Development Associate Rich Ginther, B/60504

- Senior Health Physic Technician Chris Kelley, B/60387

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 2
February 16, 1996
POEF-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.

- Technical Trainer Lorrie Graham, B/60180

- Health Physics Administrative Assistant Rob Litten, B/59444

- Electrical Maintenance Group Manager Gary Medukas, B/60233

- Production Control Section Manager Lisa Parker, B/58843

- Health Physics Supervisor Linda Smith, B/58682

- Health Physics Section Manager Mike Smith, B/60174

- Radiological Protection Manager Ron Smith, B/61012

- Health Physicist Jim Thompson, B/60191

**ABSTRACT**

Several allegations have been made against Mike Smith, in his role as Health Physics Section Manager. They included the following:

- Improper assignment of overtime.

    Allegation:

    It was alleged that Jeff Cunningham received large amounts of overtime (455 hours) during calendar year 1995, while Chris Kelley, with the same title and position, received virtually zero.

    Mike's Reply:

    Jeff Cunningham was the subject matter expert for the NVLAP external dosimetry system for the 8800 Series TLD Reader. Bringing that system on line by October 1, 1995, was a major priority, and Jeff was far more qualified to work with the NVLAP system than was Chris.

    Investigators' Conclusions:

    The NVLAP system was the priority for 1995, and Jeff Cunningham was best qualified to work with it. It is a fact that Mike and Jeff were friends, and that fact may have resulted in Jeff receiving more overtime opportunities than usual. On at least one occasion, however, Chris Kelley complained to Equal Employment

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 3
February 9, 1996
POEF-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

Opportunity (EEO) Representative Sally Cunningham about being forced to work overtime on weekends. This allegation thus appears to have weak support, but is neither confirmed nor denied.

- **Misrepresentation of training records for the NVLAP audit of May 1995.**

**Allegation:**

Training records indicated that, although Chris Kelley had received procedural training on the NVLAP system, she had received no "hands-on" training, and was not qualified to process dosimeters.. After speaking with Mike, however, the auditor, Jan Cussimano, prepared the following information in his report:

> "All of the staff are knowledgeable and have good experience only one staff member other than the Laboratory Technical Supervisor is fully trained and qualified to process dosimeters."

In speaking with this investigative group, Mike identified the "Laboratory Technical Supervisor" as being Jeff Cunningham, and the "one staff member" as being Chris Kelley.

**Mike's Reply:**

Mike Smith stated that although Chris had received some training, she was "not fully qualified." He did not know what had led the auditor to conclude that she was "fully trained and qualified."

**Investigators' Conclusions:**

By Mike's own admission, Chris Kelley was not fully qualified to process dosimeters. It seems probable, however, that the auditor was persuaded otherwise, either by Mike or by Jeff Cunningham. The auditor could have, however, simply been shown the limited training records, and allowed to draw his own conclusions. Gary Medukas stated that he could understand why they passed the audit in regards to training, because, after all, no TLDs were yet being processed through that system, and the auditor appeared to be pleased with the planned training program.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 4
February 9, 1996
POEF-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

- This allegation thus appears to have, at least, a limited
amount of support, but is neither confirmed nor denied.

- **Time card fraud on Saturday, September 30, 1995.**

Allegation:

Linda Smith stated that on the morning of Saturday,
September 30, 1995, she had worked overtime with Mike and
Chris Kelley. Linda said that Mike had arrived on site
with her at 0200 hours, and departed from site with her
at 1530 hours that afternoon, for a total of 13 1/2 hours
worked (Chris arrived late, but verified that she had
departed with both Linda and Mike that afternoon). In
the interim, however, Mike had spent five hours attending
classes at the Chillicothe Branch of Ohio University.

Linda had thought Mike had claimed 17 1/2 hours; in fact,
Mike had claimed 13 1/2 hours, which would have been
correct if he had spent the entire time on-site.

Mike's Reply:

Mike was unable to say exactly when he did work that day,
but stated that he was "not in the habit of overcharging
the company." He stated, however, that he had departed
plantsite at approximately 0700 hours that morning, and
was unsure when he had returned. Mike added that he did
not charge the company for time spent attending college
classes.

Investigators' Conclusions:

Mike was unable to say exactly what his arrival and
departure times had been for that day. If Linda Smith's
arrival and departure times are correct, they add up to
exactly 13 1/2 hours. Unless Mike returned to work at
approximately 1900 hours that evening and worked through
the night to make up for the missing five hours, it does
appear that the company may have been overcharged.

Rob Litten, however, stated that he had worked with Mike
"all night" that night, and Rob's overtime claim for the
day was 18 hours. If the two of them had worked
together, the fact that Rob claimed 4.5 hours more than
Mike might well indicate that Mike had deducted time from
his overtime claim to make up for attending class at Ohio
University. Ron Smith, although he was not personally

BUSINESS CONFIDENTIAL`

Internal Investigation into Health Physics Management Practices
Page 5
February 9, 1996
POEF-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

> aware of Mike's actual time on site that Saturday, stated that Mike typically worked more hours than he claimed.
>
> As a result, this allegation cannot be confirmed.

- **Improperly changing an employee's dosage on September 8, 1994.**

**Allegation:**

Linda Smith stated that, on September 8, 1994, Mike had directed her to prepare a correction sheet to change three dosages in the TLD database from 26 shallow/26 deep millirem to 0 shallow/0 deep millirem. The dosages were assigned to Guard Force Officer Jeffery Walburn, B/57795, and Linda alleged that Mike wanted the exposures changed to zero, because, "It's for a court case. It's easier to explain zero than it is 26 (shallow)/26 (deep)." Mike had allegedly gone on to say that he had earlier had a meeting with Clyde Dulin and Gary Medukas regarding the situation with Jeffery, and that the three of them had jointly decided that the change was necessary.

Later, when Linda took legal action to gain a promotion, Attorney Larry Zangrelli took a deposition from Mike regarding the dosage change (we have a copy of the results of that deposition). Mike was shown the "TLD Corrections" form of September 8, 1994, and asked, "Isn't it true that you asked Linda Smith to change the exposure records with respect to Jeffery Warburn (Walburn is the individual's correct name; the attorney mistakenly termed him as Warburn)?" "I have no idea," replied Mike. "You don't remember?" pursued Larry. "No," replied Mike. To prove that she had been so instructed, Linda subsequently checked the database for Jeffery Walburn's information. Upon checking, she observed that the dosage rates had been changed back to the previous readings. The change should have come through Linda, and it never had. Linda had no idea how it might have been changed.

**Mike's Reply of February 7, 1996:**

Mike stated that he had "no recollection" of being in such a meeting (neither did Clyde Dulin or Gary Medukas). Mike said that he had never changed a dosage due to a court action, and he had never been directed by management to make such a change. He added that he

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 6
February 9, 1996
POEF-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

submitted "thousands" of such change requests during a typical year.

After looking at the dosage figures, however, Mike said that the figures that had been changed from 26 shallow/26 deep millirem to 0 shallow/0 deep millirem, should have, in his opinion, been zeros. Mike said that the reason for this was that the previous 1990 figures, upon which the three subsequent figures had been based, had been contested figures themselves (Gary Medukas and Ron Smith dispute this opinion, stating that there was no justifiable cause for altering the figures).

There was also the fact that these figures had been subsequently changed from zeros back to the previous figures of 26 millirem. Mike stated that, having completed a dosage change, the only way that he would have directed the dosages to be changed back to the previous figures would have been if someone had complained that the manner in which the changes had been made was not consistent with Health Physics policy.

**Mike's Reply of February 9, 1996:**

When confronted with the TLD exposure readings prepared on September 7 - 9, 1994, Mike Smith stated that although he did not recall the incident, it could have happened. "If I changed these (figures), and it seems that I must've," Mike said, it was not an effort to falsify figures. He stated that had the report of September 7, 1994, been given to him, and he had observed the December 31, 1990 figure of 23 shallow/26 deep millirem, he would have directed the shallow figure of 23 millirem to be changed to 26 millirem, and the subsequent figures of 26 shallow/26 deep millirem that had been estimated from the 1990 figures to be reduced to 0 shallow/0 deep millirem.

Mike went on to say that he would have changed the figures if he had known it involved a court or not, in order to supply correct data. If he had said something like, "It's for a court case. Zero is easier to read," it would have probably been in the context of an off-hand, satirical remark.

Mike stated that he had no information to show why these figures had been subsequently changed back to the previous numbers. He added that he was unable to see any

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 7
February 9, 1996
POEF-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

justification for returning them to their original
status, as the original numbers had been in error.

Investigators' Conclusions:

It is difficult to understand why such an improper action
would have been taken upon the negligible figure of 26
millirem. If true, such an action represents a act of
gross impropriety on the part of Mike. The fact that the
figures were subsequently changed back to the previous
format further complicates the issue, as it raises the
possibility of "cold feet" for the individual responsible
for the change.

Although we believe the allegation to be true, we cannot
definitively prove it. Our reasons for believing the
allegation are as follows, and can be clarified by the
following timeline:

### TIMELINE

| | |
|---|---|
| January 31, 1994: | Linda Smith launches a complaint regarding promotion opportunities denied her. |
| July 26, 1994: | Protective Force Officer Jeffery Walburn alleges inhalation injury in X-326 Process Building |
| August 15, 1994: | Self-insurance application filed regarding above allegation. |
| August 17, 1994: | LMUS denies claim with "no specific diagnosis." |
| September 6, 1994: | LMUS requests approval for USEC to hire Bob Tait as external counsel. |
| September 7, 1994: | A printout of Jeffery Walburn's dosage history is prepared for Legal Services. |
| September 8, 1994: | Mike Smith allegedly directs Linda Smith, in the presence of Chris Kelley, to change four of Jeffery's historical dosages. |

BUSINESS CONFIDENTIAL'

Internal Investigation into Health Physics Management Practices
Page 8
February 9, 1996
POEF-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

September 9, 1994:    A printout of the sheet detailing the above changes is prepared, and inserted into the information prepared for Legal Services two days earlier.

September 16, 1994:    Jeffery requests his medical occupational information from Health Services.

September 23, 1994:    USEC approves the hiring of Bob Tait.

September 29, 1994:    LMUS schedules doctor's examination for October 18, 1994 (we believe that this examination was for Jeffery Walburn).

November 3, 1994:    The information requested on September 16, 1994, is apparently delivered to Jeffery.

November 22, 1994:    Mike Smith, Clyde Dulin, and Ed Wagner give depositions regarding Linda Smith's lawsuit

Linda subsequently discovers the dosage figures, changed on September 8, 1994, have been returned to the previous figures.

March, 1995:    The March, 1995 database indicates the original figures to be in place.

May 12, 1995:    Chris Kelley contacts Sally Cunningham with allegations regarding Health Physics impropriety. The incident involving the dosage change is included in her allegations.

December, 1995:    Linda Smith's lawsuit is settled.

• Mike has stated that he would have been the person to have authorized such a change, and, had he been presented with those figures, he would have authorized the change, in order to present valid dosage figures. Site Legal Officer Jim Olsen

BUSINESS CONFIDENTIAL'

Internal Investigation into Health Physics Management Practices
Page 9
February 9, 1996
POEF-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

advises us, however, that the individual who
authorized that alteration of dosage figures due to
a legal action could possibly face both criminal
and civil sanctions.

This investigative group was informed that code 10,
code 12, and code 15 have distinctive meanings when
the changing of dosages is contemplated. Code 10
means that while the "shallow" figure is contested,
the "deep" figure in uncontested. Code 12 means
that both the "shallow" and "deep" figures are
contested. Code 15 means that both the "shallow"
and "deep" figures are calculated. When Mike
examined the figures in my office on Wednesday,
February 7, 1996, he stated that the figures that
had been changed to zeros should have been changed
to zeros, due to the fact that the 1990 figure, on
which the three subsequent dosage figures had been
based, had itself been contested. Perhaps he
realized that on September 7, 1994, and was simply
trying to correct the figures closer to reality.
If so, it was an unwise move. The change code on
the listing of those figures was 10, indicating
that while the "shallow" figure was contested, the
"deep" figure was uncontested. Based on the
definition of the codes, Mike would have apparently
had no justification to change the "deep" figure of
the subsequent three dosages to zero.
Interestingly enough, when Linda Smith, under
Mike's direction, prepared the "TLD Corrections"
form, she was told that the figures to be changed
to zero were contested, so she entered code 12
beside the 1990 figure. Mike later advised this
investigative group that he was unaware of the
meaning of code 10, as he only used code 12 (both
"shallow" and "deep" estimated) and code 15 (both
"shallow" and "deep" calculated). The correction
of these figures was discussed with Gary Medukas
and Ron Smith, who both said that the existing
figures in the database were official figures, and,
regardless of the code, should not have been
changed when such a request (by Jeffery Walburn)
had been made.

On September 9, 1994, one day after the alleged
incident, a report of Jeffery's dosage was
prepared. We have photocopies of that report in
which the page detailing Jeffery's dosage history

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 10
February 9, 1996
POEF-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

prior to 1990 is dated at the top of the page as
September 7, 1994 (the day before the change was
made). The page detailing Jeffery's dosage history
of 1990 through 1994 is dated September 9, 1994
(the day after the change was made), and has the
corrected dosages of the previous day. The
remainder of the pages are again dated September 7,
1994. It seems apparent that when the dosage
report was prepared on September 7, 1994, someone
became concerned about four of the dosages. The
next day, September 8, 1994, Chris Kelley and Linda
Smith stated that Mike directed Linda Smith to
affect changes to those four figures immediately.
(Chris Kelley, who was there at the time, has
offered to submit to polygraph examination to
verify her account of the incident). Once
affected, a new page for the 1990 - 1994 dosages
was printed on the next day, September 9, 1994.
That altered page was then inserted into the report
printed on September 7, 1994.

With the assistance of Clyde Dulin, we checked the TLD
database for Jeffery Walburn's dosage figures as reported
in the March 1995 report. In that report, the dosage
figures had been returned to the original 26 shallow/26
deep millirem dosages. Why those figures were
subsequently changed back to their previous readings is
still unexplained.

Jim Olsen, of Legal Services, was able to confirm that
the information generated on September 7 - 9, 1994, had
not been supplied to Jeffery. Jim has also reviewed
Industrial Commission records related to the Jeffery
Walburn compensation case. Upon reviewing the files of
the Third Party Administrator, Simon Compensation
Services, no copies of the TLD records in question were
found. In addition, Jim has confirmed with John Ater
that TLD Records are only sent to the Site Legal Officer,
the external legal service, Vorys, Sater, Seymour, and
Pease, or to Simon Compensation Services. Since John
only sends to those entities, and since neither Vorys,
Sater, Seymour, and Pease nor Simon Compensation Services
has received copies, it appears that the TLD records
created on September 7 - 9, 1994, have not been delivered
to Jeffery.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 11
February 9, 1996
POEF-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

- The DOELAP TLD database is corrupted and unreliable.

Allegation:

Chris Kelley stated that the DOELAP TLD database was
corrupted by improper Health Physics practices. Lorrie
Graham, a former Health Physics Technician, was said to
have maintained extra TLD cards on the wall of the X-1000
Dosimetry Laboratory. Chris alleged that when Lorrie was
unable to get a reading with the TLD bar code reader from
an individual's TLD, she (Lorrie) would simply take a
reading from one of the TLD cards on the wall. "Lorrie
corrupted the database," stated Chris. This allegation
gave the impression that a large number of false dosages
could be listed on the TLD database, seriously affecting
the validity of the database.

Reply:

Lorrie Graham's Entries into the DOELAP TLD Database

Lorrie Graham stated that, on occasion, problems would
develop when a bar code on a dosimeter would not "scan."
In such situations, she would take one of the following
actions:

- TLDs Returned from the Field

    If the bar code would not "scan", Lorrie would
    enter the numbers by hand. If the number could not
    be read (a very rare occurrence), a code would be
    entered that would allow Lorrie to identify which
    TLD and which badge required matching.

- Preparing TLDs for Reissue

    When preparing TLDs for reissue, numbers were
    occasionally illegible. Such TLDs were taken out
    of service.

- When preparing TLDs for issue, the computer would
    on occasion indicate that the bar-code number had
    already been assigned. When that occurred, the
    identification number to which the TLD had been
    assigned would be noted for further correction. To
    assist in making these corrections, Lorrie
    acknowledged that she did maintain defective,
    unassigned TLD cards on the wall of the dosimetry

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 12
February 9, 1996
POEF-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

laboratory. During the processing of temporary TLD information, Lorrie said that the computer would, at times, indicate that the new TLD card numbers had already been assigned (John Bowdle stated, however, that this section of the computer program would not have been "smart enough" to know if the TLD card numbers had been assigned or not). In that case, Lorrie said that she would scan one of the TLD cards on the wall to enter a number into the system which would automatically be "kicked out" of the system the next time that the card was processed.

In essence, this practice allowed Lorrie to make necessary corrections at a later date. When the number was "kicked out," it served as a "flag" for further correction the next time that the badge was processed. As time went on, fewer and fewer corrections were required, until, eventually, all necessary corrections had been made.

Lorrie stated that John Bowdle was aware of this practice, as were others. As it would not result in the misassignment of a dosage rate, she had never been directed to cease the practice.

John Bowdle stated, however, such a practice would simply "multiply the work later on." He said that he had never seen a bar code that was absolutely unreadable for direct entry, even if it wouldn't scan. The idea that the computer might indicate that TLD numbers were already assigned was also questioned by John. In addition, the entry of false TLD numbers corrupted the system. Far from "fewer and fewer corrections" being required, the situation would snowball, making it virtually unmatchable.

John stated that although this practice resulted in missing exposures, it should not have resulted in the false assignment of a dosage.

In short, John said, while this practice would not have resulted in false information being entered, a lot of missing information would have been circulating around within the database. To him, this was simply a poor practice.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 13
February 9, 1996
POEF-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

### Validity of the DOELAP TLD Database

Clyde Dulin described the DOELAP TLD database as being "basically valid." "It is mostly intact," said Clyde, for site employees and subcontractors who were assigned security badge numbers by the Security Department. Visitors receiving temporary badges without a "CC" or a "J" contractor/consultant security badge would not, however, be on the database, as there was no identifier attached. Such doses would be held in the "bucket file" of unassignables, created under the direction of Clyde during the 1990 - 1991 timeframe to assure that data would not be lost. This file was researched, and the results of that research were turned over to Dosimetry Laboratory personnel toward the end of fiscal year 1995 to amend the information contained in the DOELAP TLD Database. The vast majority of these dosages (well above 90%) were "zero."

During late 1994, the responsibility for entering the demographic data into the PRNG25 file structures became solely a Health Physics responsibility. Rob Litten coordinated this effort for LMUS Health Physics, and provided linkage with Lockheed Martin Energy Systems, Inc. (LMES) Health Physics for a similar effort. During that time, demographic data dealing with current and "near-history" records was substantially recovered. Today, an "educated guess" by Clyde for exposure records on site employees and subcontractors/ consultants with security badge numbers would approach or exceed a 98% validity.

### Investigator's Conclusions:

Clyde Dulin, Jeff Cunningham, Rick Dively, and Ron Smith describe the DOELAP TLD database as being basically reliable, erring on the conservative side, if anything. While a number of unassignables obviously exist, several experienced Health Physics personnel believe that the database is quite sound (Gary Medukas and John Bowdle, however, maintained strong reservations about the validity of the DOELAP TLD Database).

The function of this database is now relegated to that of a historical file. Thus, while this allegation does contain some truth, the original assessment of large numbers of misassignments has, to say the least, not been proven.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 14
February 9, 1996
POEF-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

It is obvious that the dosimetry laboratory has had very limited supervision. By Mike Smith's own account, supplemented by the accounts of Gary Medukas, Linda Smith, and Chris Kelley, Mike was rarely ever in the laboratory. This may have contributed to the problems of the database getting out of control.

In conclusion, the absolute validity of the DOELAP TLD Database cannot, at this time, be verified.

Jeff Cunningham was closely involved with implementing the new NVLAP TLD Dosimetry system. He described the system as being far more sensitive than the old DOELAP system. It has the ability to measure for a much more detailed evaluation than had the old system, and supports the NRC certification. He added that, while the validity of the old DOELAP system was "not that good," as it had a lot of "unassigns," the validity of the new NVLAP system is "good, and getting better."

Management Recommendations

As a result of this investigation, several items have come to the investigative group's attention.

1) Management needs to give specific direction regarding the changing of dosage figures. Poor understanding of dosage codes 10, 12, 15, etc., and little guidance on "correcting" information to be released to an employee or a court subpoena will, otherwise, continue to be a problem.

2) Management needs to establish TLD database change controls.

3) Management needs to establish an audit trail of pre- and post-data involving dosage changes.

4) Differing opinions as to the validity of the historical DOELAP TLD Database may require management to obtain an independent evaluation. In particular, the actions taken by Lorrie Graham are questioned, with some "experts" believing minimal corruption has been caused, while other "experts" believe otherwise.

## BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 15
February 9, 1996
POEF-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

5) No individual operator accountability was established in the dosimetry laboratory, as all employees shared the same password.

6) Chris Kelley allegedly advised Sally Cunningham about the questionable dosage change during 1995. Sally did not pursue this information, stating that Chris had asked her to drop the issue. Obviously, an issue of this magnitude should not have been dropped, regardless of the request to do so.

7) General filing conditions in the Health Physics operating area were very poor (i.e., investigation reports, TLD cards, etc.). This is a Records Management issue also that needs to be addressed.

These are problems that must be addressed to avoid a repeat of the incident of September 8, 1994.

The remainder of this report is the result of interviews conducted with the above employees, and presented in chronological order.

**Sandra Fout (Interviewed February 1, 1996, @ 1210 hours)**

Sandra Fout stated that she had first spoken to Chris Kelley about this matter on Wednesday, January 31, 1996. Chris had approached her with a certain amount of hesitation, and had been very emotional and upset during their conversation.

The incident began, basically, as a harassment complaint by Kelley against Mike Smith, her supervisor. Chris believed that Mike had been inconsistent in offering overtime. While Mike's friend Jeff Cunningham had received approximately 455 hours of overtime for calendar year 1995 (and Smith had charged nearly 608 hours himself), Chris had received virtually none. In addition, Mike would avoid talking to Chris, and delivered work instructions to her through intermediaries.

Chris also alleged that on Saturday, September 30, 1995, Mike was working overtime, when he departed plantsite to attend a class at the Chillicothe branch of Ohio University. He was gone for approximately five hours. On the following week, however, Mike's time sheet reflected 13 overtime hours for the preceding Saturday. By Chris's observation, Mike had failed to delete the five hours of absence when computing his overtime.

Mike had also, as of January 29, 1996, placed Chris in the field. Chris had worked in the dosimetry laboratory for nearly two years,

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 17
February 9, 1996
POEF-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


John Bowdle  (Interviewed February 1, 1996, @ 1400 hours, and again
             February 8, 1996, @ 1000 hours)

We initially spoke with John Bowdle to confirm the integrity of the
Health Physics database.  John stated that the database was not
equipped with a modem, and that only Chris Kelley, Steve Lummer,
and Linda Smith had access to the single password that serviced the
database account.   The possibility existed, of course, that the
password had been shared with other Health Physics personnel,
possibly including Mike Smith himself.  To preclude the possibility
of compromise, I entered a unique password, known only to myself
and to Security Section Manager Emery Smith, into the database, and
shut down the system until the investigation was complete.   This
action was authorized by Sandra Fout, and is scheduled to be
reactivated on Friday, February 9, 1996.

John Bowdle described the Health Physics database as being
"corrupt."  It was unreliable due to such acts as the previously
mentioned bar code scanning of a defective, unassigned TLD card
(affixed to the wall of the dosimetry laboratory) to replace the
bar code scanning of an unreadable TLD.  Although John had worked
on the system on a number of occasions, its validity remained in
question.

Chris Kelley  (Interviewed February 1, 1996, @ 1500 hours,
              February 2, 1996, @ 0830 hours, and February 13, 1996
              @ 1215 hours)

Chris Kelley became employed on site on February 17, 1992.  I was
one of her original interviewers, and, from that interview forth,
have observed her to be a very highly-strung, emotional individual.

At more than one point during the interview, Chris stated that this
current situation has been extremely troubling for her; to the
point that, on one occasion, she felt virtually suicidal.  She had
consoled herself with the thought that "it's not worth killing
myself over."

Chris had difficulty with assigning dates to events during the
course of this interview.  As a result, some variance in dates may
thus be apparent.

Chris became pregnant approximately February, 1993.  One month
later, she was removed from the field, and assigned to the X-1000
Air Laboratory.  Upon the birth of her child, Chris was transferred
to the dosimeter laboratory by Mike Smith.   She received no
instructions from Mike regarding this assignment beyond, "relax,

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 18
February 9, 1996
POEF-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

read a book, don't worry about it." When she asked for training to use the Health Physics database, Mike declined.

By Chris's account, Mike did not especially like the dosimetry laboratory. He viewed it as being "prehistoric," and was very rarely ever there. Due to this absence, laboratory employees did virtually as they wished.

Problems resulted from this policy of self-direction. A large backlog of TLDs had built up over time, which caused TLD cards (contained within the TLDs) to be "read" out-of-sequence. This compromised the integrity of the database, and caused problems in "reading" other TLDs. This problem was said to have been "remedied" by former Health Physics Technician Lorrie Graham who obtained readings by holding the TLD bar code scanner to TLD cards affixed to a wall of the laboratory. Attempts to reduce the backlog of TLDs also resulted in such practices as "short-cycling" (failure to verify the entry of TLD information). This practice can result in employee TLD information never being entered into the database at all. "Lorrie corrupted the database," stated Chris.

When confronted with these problems, Chris contacted her friend, Linda Smith, who worked on the second floor of the X-1000 Facility. Linda agreed that these practices were wrong, and, upon being assigned as Acting Supervisor of the laboratory during the Summer of 1994, removed the TLD cards from the wall. She also took other measures to restore the integrity of the database. Linda continued in that position until August, 1994, when Rick Dively was appointed laboratory supervisor.

On September 8, 1994, Mike approached Linda, and directed her to change a dosimetry reading received by Jeffery Walburn during 1990, 1993, and 1994 (Chris was nearby). Earlier that year, Jeffery had been working in the X-326 MAA, when an incident had occurred that caused him to complain of a burning in his lungs. At 26 millirem, the reading was inconsequential, but Mike wanted it altered to zero. Linda asked, "Why?" Mike replied, "This is for a court case. Zeros are easier to read." Linda complied with the directive, and prepared a "TLD Corrections" form detailing the change.

Sometime later, Chris and Linda checked the database, and found that Jeffery's dosimetry reading had been changed back to 26 millirem from zero. They were unable to determine who had affected the change.

Linda Smith had a pending lawsuit against the company, due to her not receiving a promotion. On November 22, 1994 (Chris believed

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 19
February 9, 1996
POEF-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

that date to be correct), the lawsuit required depositions to be
taken from members of Health Physics supervision. Chris believed
that Clyde Dulin, Mike Smith, and Gary Medukas gave depositions;
there were others whose names Chris was unaware of.

An audit associated with the NVLAP external dosimetry authorization
for the 8800 Series TLD Reader took place during May, 1995. To
prepare for the audit, Mike Smith conducted performance-based
training with her during April, 1995, covering the following
topics:

April 5, 1995

- **Model 8800 TLD Reader: Glow Curve Evaluation**
  **EDT01.02.05, PEC**

April 6, 1995

- **External Dosimetry Program and Requirements**
  **EDT01.01.01, CLASSROOM**

- **Model 8800 TLD Reader: TLD Irradiations**
  **EDT01.02.02, PEC**

- **Calibrate Model 8800 TLD Reader**
  **EDT01.02.03, PEC**

This training had been in the form of Performance Evaluation
Checklists (PECs) and classroom instruction, with no "hands-on"
instruction involved. When the auditor, Jan Cussimano, arrived,
Mike Smith directed his employees to briefly introduce themselves,
and "disappear". Both employees complied with the directive.
Chris was later listed by the auditor as being "fully trained and
qualified to process dosimeters." Chris had not given such
information to the auditor, and, at that time, it would have been
untrue, in her eyes, as she had not received any "hands-on"
training.

Mike later said that he was amazed that his group had passed the
audit. He then instructed Chris and Linda to file away all
dosimetry records for the time period before July 1995, as "we're
going to be accountable for July 1995 to the present."

Jeff Cunningham went on vacation toward the end of September 1995.
Although he had told Mike Smith that all of his work was on line,
Chris found that none of the TLD cards had been prepared for the
issuance of the new badges on the NVLAP system change-out,
scheduled for October 1, 1995. As of this time, neither Linda nor

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 20
February 9, 1996
POEF-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

Chris had been trained on the TLD issuance process, so they
consulted the TLD manuals for several days to prepare the cards.
They worked overtime on Saturday, September 29, 1995, and on
Sunday, September 30, 1995, preparing the cards. During that time,
Mike Smith brought completed certificates of authorization to Linda
and Chris for the NVLAP external dosimetry authorization for the
8800 Series TLD Reader. "Sign these," he said. Once they signed
the certificates, Mike said, "Now you're legal." Neither employee
felt that she had received the necessary training for the system,
and training was not completed until the end of the year (Mike
Smith stated that there was no procedural requirement for the
certificates, and that he had only given them to Chris and Linda to
get them "on line").

Mike Smith claimed large amounts of overtime. During Saturday,
September 30, 1995, Mike had been working overtime with Linda and
Kelley. Chris arrived late, and found Linda and Mike already
there. They all departed together that afternoon. During the day,
Mike departed plantsite to attend a class at the Chillicothe branch
of Ohio University. He returned five hours later. During the
following week, Chris was in Mike's office, when she observed his
completed time sheet, reflecting 13 hours overtime for the previous
Saturday. None of the time spent at the university had been
deducted from the overtime claim (Ron Wetherell later verified that
Mike's hourly claim for that day had been 13.5 hours overtime).

On Sunday, October 1, 1995, Linda and Chris were again working
preparing the new TLD cards. They had been working 16 hours, when
Shift Superintendent Marty Redden, B/59059, stopped by, and sent
them home as being "unfit for duty." Later that day, Mike Smith
and Jeff Cunningham were called in, and had to "spend the night"
completing the job. It took until Thursday, October 4, 1995,
however, until "everything wasn't chaos."

Although these incidents represented serious problems to Chris, she
was also depressed by the treatment she received from Mike Smith as
her supervisor. Mike was good friends with Jeff Cunningham, and
allowed Jeff to work large amounts of unsupervised overtime. Chris
stated that she had observed Jeff -- on overtime -- sitting in the
X-1000 Facility, reading motorcycle magazines. In comparison, she
rarely received overtime opportunities.

In frustration, Chris contacted Equal Employment Opportunity
Associate Sally Cunningham, B/58612, to voice her reaction to these
incidents. Nothing ever happened.

Recently, Chris heard rumors that she was to be reassigned to the
field from the laboratory. Not wishing to return to the field, she

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 21
February 9, 1996
POEF-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

met with Ron Smith on Friday, January 26, 1996, regarding the rumor. In response, Ron assured her that she was to remain in the laboratory. On the following Monday, January 29, 1996, however, Kelley was assigned to the field by Mike Smith. Documentation verifying the reassignment was dated January 10, 1996. When confronted with the contradiction, Ron replied that, during their conversation of the previous Friday, Chris had expressed no preference in job assignments, and had thus been reassigned.

**Linda Smith** (Interviewed February 2, 1996, @ 0940 hours, and February 13, 1996, @ 1300 hours)

Linda had originally worked in the dosimetry laboratory with Tom Maggard during the early 1990s. When Tom retired during the Spring of 1993, Health Physics Technician Betsy Irwin and Lorrie Graham were assigned work with Linda.

Linda was directed by supervision to teach Lorrie the process of TLD reading and preparation. Lorrie had problems with Linda, and, to reconcile those problems, Linda was transferred to other duties; Lorrie remaining in the laboratory. During the Spring of 1994, however, Chris began to tell Linda of improper practices going on in the laboratory. The problems revolved about Lorrie's practice of "reading" TLD cards affixed to the dosimetry laboratory wall. Linda investigated, and found about 20 TLD cards affixed to the wall. She removed the badges, and advised Mike Smith of the problem. Nothing was ever done.

In addition, Lorrie was not recording the required calibrations to the TLD recording system; calibrations that might have to be performed several times per day. When these calibration fell drastically behind, Lorrie took an entire day writing calibration sheets to catch up. She also was not recording the badges that she was preparing.

During April, 1994, Linda was reassigned as line supervisor to the laboratory. Upon evaluating the laboratory technicians' work practices, Linda instructed them of the requirements to operate the machinery (wearing gloves, etc.). Lorrie did not like those requirements, and, during the Spring of 1995, bid to a new job, leaving the laboratory.

Upon Lorrie's departure, the TLDs had a backlog of 18 days. Stacks of unresolved Investigation/Situation Reports -- approximately 200 -- were found, dating from 1992 and 1993. The TLD computer program was also badly corrupted.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 23
February 9, 1996
POEF-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

Although Linda had been directed to change information on numerous occasions to reflect an estimated reading, she had never been directed to do so for a court case.

Later, when Linda took legal action to gain a promotion, Attorney Larry Zangrelli took depositions from Clyde Dulin, Mike Smith, and Ed Wagner. Under questioning, Clyde denied knowledge of the "bucket dose." Mike was shown the "TLD Corrections" form of September 8, 1994, and asked, "Did you ever require her to change a dose?" "To the best of my knowledge," replied Mike, "No." To prove that she had been so instructed, Linda subsequently checked the database for Jeffery Walburn's information. Upon checking, she observed that the dosage rates had been changed back to the previous readings. The change should have come through Linda, and it never had. Linda had no idea how it might have been changed.

Jeff Cunningham went on vacation during the latter part of September 1995. Prior to departing, he had advised Mike that his job duties, which included preparing TLD cards for the NVLAP system changeout scheduled for October 1, 1995, were up to date.

Later, when Linda and Chris (under Mike's direction) checked the status of the TLD cards, they found that they were short by about 1400 cards. In response, Mike directed them to "get on the machine (the NVLAP external dosimetry authorization for the 8800 Series TLD Reader) and start doing the annealing." Neither Linda nor Chris were trained on the reader, and neither had a password for the program. Mike then entered the system with his password, and instructed them how to load the machine. The bar code labeler wasn't working, so the labels had to be cut out by hand. Rob Litten was also helping them to work on the machine.

During the weekend of Saturday and Sunday, September 30 -- October 1, 1995, both Linda and Chris worked overtime to complete the new badge changeout. Mike Smith was also working overtime that day. They all arrived at 0200 hours. Between 0700 and 0730 hours, Mike departed plantsite to the Chillicothe branch of Ohio University to take a class. He returned between 1230 and 1300 hours. They all eventually departed plantsite together at approximately 1530 hours. During the following week, Linda observed Mike's time sheet, and noted that he had claimed "I think it was 17 1/2 hours," (Ron Wetherell later verified that Mike's hourly claim for that day had been 13.5 hours overtime).

Early the following week, Mike gave certificates of authorization to Linda and Chris to operate the reader. "Oh, gee, I'm certified to run the reader. After three days, now I'm certified." "Yeah," replied Mike, "you're now certified." In comparison, it had taken

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 24
February 9, 1996
POEF-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

Linda six months to become certified on the DOELAP machine. Linda did not receive the training for the NVLAP system until the end of the year.

Linda feels that the database is now as correct as it can be. Residual problems remain, however.

**Rick Dively  (Interviewed February 2, 1996, @ 1230 hours)**

Dively stated that during August 1994, he was placed in charge of the dosimetry laboratory. "Mike was tied up getting the NVLAP certification," said Rick, so he (Rick) was directed to supervise the laboratory. The TLD database was set up to run on a particular sequence, and that sequence, due to the "massive amount of temporaries we were receiving," was not being adhered to. There were simply too many TLDs being utilized. The laboratory personnel were placed onto a work schedule, and assigned specific duties. Steve Lummer was assigned to complete the paperwork regarding the temporary TLDs, Linda Smith to "read" the TLD cards, with Chris Kelley backing Linda up. "Linda knew it (the system) from A to Z," said Dively.

Rick stated that he had heard that TLD badge bar codes had, at one time, been affixed to the wall of the dosimetry laboratory, and utilized for auxiliary bar code reading. It had never occurred during his term of supervision there, and he would not have tolerated such a practice. Rick added that, if such a practice had occurred, it could have caused inaccuracies in the TLD database.

John Bowdle was tasked to refine the computer program; "put patches in place to keep it (the system) running," said Rick. "That system was on its way out."

Rick stated that, at times, dosage rates on the TLD database had to be altered to reflect estimated dosage. Dosage disparities could be observed through an analysis of the glow curves on the TLD card. When a faulty glow curve was observed, documentation of the incident would be delivered to Mike Smith. Mike would review the documentation, determine an estimated dosage, and send the information to Linda Smith or Chris Kelley. Linda or Chris would then prepare correction sheets for submission to the X-112 Computer Facility. At the X-112 Facility, the actual changes to the TLD database would be affected. Such paperwork would be sent to the X-112 Facility on a quarterly basis, and primarily concerned temporary TLDs.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 25
February 9, 1996
POEF-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

Rick stated that he was unaware of such a change being made on the basis of a pending court case (i.e., the allegation of September 8, 1995). He added that such a change would be unethical.

Rick described a file maintained on the TLD database termed as the "bucket dose." Temporary TLDs issued without a badge number could not be assigned, and were simply placed into a pool, or "bucket." Only if a visitor were to call, state the date that they had been on-site, and request dosage information, could the dosimetry information be potentially recovered.

Rick closed by stating that the figures in the TLD database were probably conservative, if anything.

**Jeff Cunningham  (Interviewed February 2, 1996, @ 1400 hours)**

Jeff Cunningham became employed on-site during March 1991. At that time, he was assigned to the dosimetry laboratory to assist in preparing temporary TLDs. New employees received training in how a TLD worked, and continuing training exercises were held by Mike Smith. Existing procedures were explained, and the operation of the machines was taught on an on-the-job basis. Necessary precautions were explained, such as wearing plastic gloves, and the necessity for the usage of yellow lights in the laboratory to reduce ultra-violet exposure to the teflon (these measures were covered in the quality control procedures). Working with him were Linda Smith, Tom Maggard, Carl Henderson, and Shelley McClurg.

Jeff was so employed for no more than a year, before being assigned to work on the 8800 Series TLD Reader. For about six months during 1993, Jeff was acting supervisor for the laboratory. Reporting to him were Linda Smith, Roberta Cooke, Lorrie Graham, and Chris Kelley. Following that assignment, Jeff was directed to work on the quarterly TLD exchange, a job that he continues in.

Dosimetry was not "really up to snuff" upon Jeff's arrival in 1991. These problems became more noticeable as Mike Smith began defining acceptable limits, and standards for investigation reports.

One major problem was in the large number of temporary TLDs issued. An employee was able to receive an unlimited amount of TLDs each day, and, during 1993, approximately 300 temporary TLDs per day were issued. Total processing approximated 70,000 - 100,000 TLD readings annually.

In addition, a large backlog of Investigation/Situation Reports to be processed had built up, due to the frequency of personnel

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 26
February 9, 1996
POEF-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

changes. There had also been allegations of negligence in the accumulation of that backlog.

Jeff stated, however, that, during his assignment as Dosimetry Laboratory Supervisor, he had never seen anyone scan an improper TLD with a TLD bar code reader. He had seen TLD cards on the wall, but they were no longer in service. Such scanning practices could lead to an unassignable reading, as well as an improper correction factor, in the database.

Jeff stated that, from time to time, incidents could occur that would require the changing of a dosage in the TLD database. Such incidents typically involved temporary TLDs, due to the extended handling measures. A faulty glow curve could indicate an improper reading, and an estimated value would have to be assigned to bring the reading closer to reality. In such cases, the information would be delivered to Mike Smith for evaluation. Mike would review the documentation, and determine an estimated dosage. The estimated dosage would then be sent to Linda Smith, Lorrie Graham, or Chris Kelley. Linda, Lorrie, or Chris would then prepare correction sheets for submission to the X-112 Computer Facility. At the X-112 Facility, the actual changes to the TLD database would be affected. Jeff was unsure of the frequency of such submissions to the X-112 Facility.

Jeff was also unaware of any dosage change requests being initiated on the basis of a pending court case. Such a request, he added, would "give me an aneurism."

Prior to the NVLAP system change-out, scheduled for October 1, 1995, Jeff stated that he had been preparing TLD cards on a daily basis. The NVLAP system was necessary for Nuclear Regulatory Commission (NRC) compliance, and was a number one priority. As Jeff had previously scheduled vacation for late September, however, he departed on a Caribbean cruise on September 17, 1995, intending to return on September 24, 1995. On September 24, 1995, however, Jeff had an attack of appendicitis. He went on to have his appendix removed, and returned to work on Monday, October 2, 1995. Jeff added that he'd heard that it had not gone entirely smoothly.

Jeff stated that he had been heavily involved in the development of the NVLAP external dosimetry system for the 8800 Series TLD Reader. As he had received training from both HARSHAW and Newport News Shipyards, he was qualified on that basis to be a Subject Matter Expert.

Currently, Chris Kelley, Linda Smith, and Steve Lummer were all qualified on the NVLAP system. Chris and Linda were qualified

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 27
February 9, 1996
POEF-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

prior to the NVLAP audit of May, 1995 (although Chris was nominally qualified, Linda was, in fact, not), with their Performance Evaluation Checklists (PECs) being signed off by Jeff as the trainer, and Mike Smith as the evaluator. Those records were verified by the auditor, Jan Cussimano.

Regarding the availability of overtime, Jeff stated that overtime opportunities would generally be determined by technical expertise and qualifications. Availability was also a factor. In essence, while several individuals might have the same job classification and title, not all might have the necessary expertise and training.

Jeff closed by saying that the NVLAP system is far more sensitive than was the old system. It has the ability to measure for a much more detailed evaluation than had the old system, and supports the NRC certification. He added that, while the validity of the old DOELAP system was "not that good," as it had a lot of "unassigns," the validity of the new NVLAP system is "good, and getting better."

Rob Litten   (Interviewed February 5, 1996, @ 0830 hours)

Rob Litten's work primarily deals with internal dosimetry. He would, however, work with the DOELAP 8000C TLD computerbase when problems occurred. He began working with the database during the late 1980s. Problems observed with that database processing data out-of-sequence, running programs twice, etc.

Rob initiated the practice of the "bucket dose," a computer file that receives all unassigned dosages. Such dosages would be available should a visitor contact Health Physics with a visit date, and request information regarding his dosage. Substantial dosages (exceeding 100 millirem), however, would be set aside for investigation, along with many others.

Rob stated that he had heard rumors regarding the practice of "reading" TLD cards affixed to the wall of the dosimetry laboratory. He had never witnessed the practice, but had seen bar codes on the wall of the laboratory. Such a practice, Rob felt, could result in a misassignment.

Rob stated that errors were made in individual dosages, due to damaged TLD cards. In those cases, a correction would be made with an estimated value to bring the dosage rates closer to the actual value. These corrections would be made on the conservative side; over-estimating the value, rather than under-estimating the value. On occasion, dosage readings might be reduced to zero, depending on the validity of the glow curve.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 28
February 9, 1996
POEF-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

Rob said that the dosage rate of an individual should never be changed due to a pending legal action. He added, however, that 26 millirem (the dosage recorded for Jeffery Walburn on an occasion during the Spring of 1994) was simply insignificant. In fact, dosages of 10 millirem or less, being below the lower limit of detection (LLD), were compared by Rob to being in the "grass" on a radar system. As such, these numbers were often reduced to zero on the database, as their value was meaningless (Ron Smith was unaware of, and disagreed with, this practice). Health Physics personnel apparently base their authority for this practice on Department of Energy (DOE) Order 5480.11, Radiation Protection for Occupational Workers, section 9.f.(1), dated December 21, 1988, which states as follows:

"When in-vivo and/or in-vitro measurements confirm the retention of radionuclides in the body, with respect to evaluating conformance with the limiting value for occupational exposure, the annual effective dose equivalent due to all radionuclides retained in the body from these intakes shall be assessed for as long as the annual effective dose equivalent is 10 mrem or greater."

Clyde Dulin stated, however, that the above statement applied solely to internal (i.e., urinalysis) dosimetry, not to external (i.e., TLD) dosimetry. He went on to say that dosage readings above the LLD (which was in the single digits, not at ten) should not be reduced to zero.

Rob went on to say that Guard Force Officer Paul Walton, B/58328, had recently requested his dosage records. Rob then asked me if he should release those records to Paul. After ascertaining that the standard practice was to release such records to employees after they signed a release form, I directed him to follow that standard practice, and release the records to the employee.

Regarding training for the NVLAP computerbase, Rob believed that both Chris Kelley and Linda Smith had been trained on the system prior to the NVLAP audit of May 1995 (Linda had not). He said that they had probably been trained on the operation of the system, although they might not have had hands-on training prior to the audit.

Rob stated that on Saturday, September 30, 1995, he had worked overtime to prepare for the NVLAP TLD changeout. Working with him were Chris Kelley, Linda Smith, Mike Smith, and Lois Howard. Most of the employees departed during the afternoon, but Rob and Mike worked late. More assistance was needed, so Angie Litten, Elaine Litten, and Linda Blount were brought in to assist in assembling

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 29
February 9, 1996
POEF-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

TLD badges. Mike Smith went on to work all night long into the morning of Sunday, October 1, 1995 (Ron Wetherell later verified that Mike's hourly claim for that day had been 13.5 hours overtime, and that Rob's hourly claim had been for 18 hours. If both had worked together, it would appear that Mike may indeed have subtracted his time off-site from his hourly claim).

Rob speculated that more overtime was available on the NVLAP system than on the existing TLD database, as the old system was phasing down, and the new system was phasing up. Jeff Cunningham was far more skilled on the new system than were Linda or Chris, and that fact accounted for his higher overtime figures.

Sally Cunningham  (Interviewed February 5, 1996, @ 1030 hours)

Sally Cunningham stated that she had met with Chris Kelley on two occasions during 1995. At that time, Sally was handling employee concerns for LMUS.

On her first visit, Chris wanted to know if a supervisor, Mike Smith, could force her to work overtime, against her will. The answer was, of course, "yes." Cunningham suggested that Chris speak with Smith to work the problem out to their mutual benefit.

On her second visit, Chris had concerns regarding favoritism by supervisors toward employees. Chris felt that the former U. S. Navy nuclear personnel were receiving favoritism in promotions and overtime. Jeff Cunningham, a former sailor, was working on a "new TLD system," and no one else was receiving training for it. Chris' concern was that this situation would result in Jeff being placed in line for promotion over the other employees.

In addition, a disabled employee was with her, and that employee had complaints about nicknames being used against him, regarding the disability. He also felt that he had been reassigned, simply due to his disability.

To handle these issues, Sally spoke with Health Physics supervision. She was unable, however, to prove Chris' allegations, although she was able to prove that the disabled individual had not been moved due to his disability.

Chris also spoke of an incident where a supervisor had directed the dosage of an individual to be changed to facilitate a pending legal action. Sally attempted to contact Linda Smith for more information, but Linda never called her back (Linda stated, however, that Sally had never, to her knowledge, made any attempt

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 30
February 9, 1996
POEF-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

to contact her). Sally believed that Chris had later requested that she drop the issue.

Sally stated that Health Physics had employee problems of long duration. During the past five years, a lot of new employees had entered the department, while department managers and division managers were being continually reshuffled. This combination, she felt, had been responsible for a certain amount of the employee unrest.

**Ron Smith (Interviewed February 5, 1996, @ 1215 hours)**

Ron Smith stated that only a limited amount of information had been entered into the new TLD database. The integrity of that database was sound.

Several problems existed with the old TLD database. Due to past practices of issuing temporary TLDs when a TLD was misplaced, some quarterly dosage readings may be missing. "What has been read from the TLD cards into the TLD database should be correct," Ron stated. There were simply some gaps in historical records. Efforts were currently underway to examine those records back to July 1993 to bring them further into compliance. That responsibility had been assigned to Mike Smith, with a completion date of October 1, 1995. Mike, with the assistance of Clyde Dulin, had successfully researched the majority of those records.

Ron had not heard of the practice of "reading" TLD cards from the wall of the X-1000 Dosimetry Laboratory. He added that he had arrived in late 1994, by which time Lorrie Graham, the employee who had allegedly been involved with the practice, had bid out to training. He said that a large number of unassigned readings were in the database, and that such a practice might account for the size of that number. All doses that were not listed as "zero" should have been investigated by now, Ron stated.

Regarding the NVLAP system verification audit of April, 1995, Ron recalled Mike Smith saying (prior to the audit) that he needed to get his employees trained. Ron had also seen and approved the training material (PECs), and had felt it to be of good quality. He had no personal knowledge of the training taking place, however.

Ron was also familiar with the necessity of being able to correct dosages in the TLD database. He was not, however, familiar with the practice of "zeroing out" dosages of ten millirem or below. He had recently signed a dosage rate for a contractor that was listed as eight millirem, a figure which had obviously not been "zeroed out." He was also not aware of the practice of "zeroing out"

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 32
February 9, 1996
POEF-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

The problem of entering TLD information "out of sequence" was
discussed by Graham. When TLD information was entered out of
chronological sequence, the computer database could produce
information that would have to be corrected manually. Lorrie
stated that during her time at the laboratory, however, TLD cards
were processed into the TLD database chronologically, a practice
that should have precluded any such sequential problems.

On occasion, problems would develop when a bar code on a dosimeter
would not "scan." On those occasions, Lorrie would take one of the
following actions:

- **TLDs Returned from the Field**

  If the bar code would not "scan", Lorrie would enter the
  numbers by hand. If the number could not be read (a very
  rare occurrence), a code would be entered that would
  allow Lorrie to identify which TLD and which badge
  required matching.

- **Preparing TLDs for Reissue**

  When preparing TLDs for reissue, numbers were
  occasionally illegible. Such TLDs were taken out of
  service.

- When preparing TLDs for issue, the computer would on
  occasion indicate that the bar-code number had already
  been assigned. When that occurred, the identification
  number to which the TLD had been assigned would be noted
  for further correction. To assist in making these
  corrections, Lorrie acknowledged that she did maintain
  defective, unassigned TLD cards on the wall of the
  dosimetry laboratory. During the processing of temporary
  TLD information, Lorrie said that the computer would, at
  times, indicate that the new TLD card numbers had already
  been assigned (John Bowdle stated, however, that this
  section of the computer program would not have been
  "smart enough" to know if the TLD card numbers had been
  assigned or not). In that case, Lorrie said that she
  would scan one of the TLD cards on the wall to enter a
  number into the system which would automatically be
  "kicked out" of the system the next time that the card
  was processed.

  In essence, this practice allowed Lorrie to make
  necessary corrections at a later date. When the number
  was "kicked out," it served as a "flag" for further

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 33.
February 9, 1996
POEF-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

correction the next time that the badge was processed.
As time went on, fewer and fewer corrections were
required, until, eventually, all necessary corrections
had been made.

Lorrie stated that John Bowdle was aware of this
practice, as were others. As it would not result in the
misassignment of a dosage rate, she had never been
directed to cease the practice.

John Bowdle stated, however, such a practice would simply
"multiply the work later on." He said that he had never
seen a bar code that was absolutely unreadable for direct
entry, even if it wouldn't scan. The idea that the
computer might indicate that TLD numbers were already
assigned was also questioned by John. In addition, the
entry of false TLD numbers corrupted the system. Far
from "fewer and fewer corrections" being required, the
situation would snowball, making it virtually
unmatchable.

John stated that although this practice resulted in
missing exposures, it should not have resulted in the
false assignment of a dosage.

In short, John said, while this practice would not have
resulted in false information being entered, a lot of
missing information would have been circulating around
within the database. To him, this was simply a poor
practice.

Lorrie closed by saying that she felt that the information in the
DOELAP computer database should be basically reliable.

Lorrie departed the Dosimetry Laboratory during the summer of 1994.
She went into the field as a Health Physics technician for a time,
until she eventually obtained a position in plant training.

Clyde Dulin  (Interviewed February 6, 1996, @ 0845 hours)

Clyde Dulin stated that the DOELAP TLD database was basically
valid.  "It is mostly intact," said Clyde, for site employees and
subcontractors who were assigned security badge numbers by the
Security Department.  Visitors receiving temporary badges without
a "CC" or a "J" contractor/consultant security badge would not,
however, be on the database, as there was no identifier attached.
Such doses would be held in the "bucket file" of unassignables,
created under the direction of Clyde during the 1990 - 1991

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 34
February 9, 1996
POEF-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

timeframe to assure that data would not be lost. This file was
researched, and the results of that research were turned over to
Dosimetry Laboratory personnel toward the end of fiscal year 1995
to amend the information contained in the DOELAP TLD Database. The
vast majority of these dosages (well above 90%) were "zero."

At one time (prior to 1993), assignment of TLD dosages for
employees and subcontractors/consultants (File #PRNG26) was a
Personnel Department responsibility. During the 1993 timeframe,
Personnel Department unilaterally abdicated responsibility, leaving
it to the Security Department and Health Physics Department to
assume responsibility. This action was not relayed to Security
Department or to Health Physics personnel, and was not discovered
until approximately nine months after the unilateral decision.

Security Department personnel then began entering the information
into the TLD database. Unfortunately, not all personnel
information was entered into the computer system.

The Martin Marietta split of July 1993 created further problems for
Health Physics documentation. Currently, there are Lockheed Martin
Energy Systems, Inc. (LMES) employees who appear on both the LMES
and the LMUS computer files; a problematic situation for Health
Physics accountability.

During late 1994, the responsibility for entering the demographic
data into the PRNG25 file structures became solely a Health Physics
responsibility. Rob Litten coordinated this effort for LMUS Health
Physics, and provided linkage with LMES Health Physics for a
similar effort. During that time, demographic data dealing with
current and "near-history" records was substantially recovered.
Today, an "educated guess" by Clyde for exposure records on site
employees and subcontractors/consultants with security badge
numbers would approach or exceed 98% validity.

NVLAP preparation was then coming on line. To operate a more
controlled database, a separate Health Physics Visitor Control
Center was placed into effect, giving Health Physics ultimate
control of the visitor and contractor demographic (and, thus, the
dosage) information.

Clyde stated that Rob Litten's practice of reducing dosages of ten
millirem or less to zero (based on DOE Order 5480.11, 9.f.(1)) on
the TLD database applied to internal dosimetry only. It did not
apply to external dosimetry, i.e., TLD dosimetry. Clyde added that
dosages gained from external dosimetry above the lower limit of
detection (LLD) should never be reduced to zero on the TLD
database. He added that the LLD was in the single digits, not ten.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 35
February 9, 1996
POEF-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

Clyde went on to say that when a dosage was requested to be delivered off-site, there was no policy in place to reduce a dosage to zero. The actual dosage would be released.

Clyde stated that he had no recollection of the meeting described by Linda Smith in which Clyde, Gary Medukas and Mike Smith decided to reduce Jeffery Walburn's dosage from 26 millirem to zero.

To change a dosage reading maintained on the DOELAP database, a "corrections run" would be initiated. Linda Smith, or another dosimetry laboratory clerk, would typically fill out a correction form, and deliver it to the X-112 Computer Facility for entry into the Digital Equipment Corporation (DEC) computer system. Clyde added, however, that it would be possible for himself, Rob Litten, Mike Smith, and the clerks in the dosimetry group to independently issue a correction form to the X-112 Facility for a dosage change. That same individual could also pick up the confirmatory print-out detailing the change from X-112 personnel. Such an action would, of course, be unethical.

Clyde then entered the DEC-10 1022 computer file to find the historical dosage for Jeffery Walburn, as recorded in the March 1995 data for annual personnel dosage reports. Individualized reports with results from the TLD files are sent to employees and contractors on an annual basis, and Jeffery should have received a copy of the dosage listed in this report. His records, recorded on the IHTD20.ID? file, reflected dosages of 26 shallow/26 deep, which were his original readings before the alleged change of September 8, 1994.

Mike Smith (Interviewed February 7, 1996, @ 1230 hours)

Mike was hired into the dosimetry program during late 1990 by former Health Physics Department Manager Steve Warren. "That system has been a series of catastrophes since I've been there," said Mike Smith. "It is an overused, dying system." In addition, "the personnel and knowledge was not great." As time went on, Mike Smith began to devote more of his time to the new NVLAP system to replace the existing system.

During 1994, Lorrie Graham, Chris Kelley, Linda Smith, and Roberta Cooke were working with Mike in Health Physics. "I seem to end up with the problem children." Tom Maggard was the supervisor for the dosimetry laboratory.

Upon Lorrie's departure during mid- 1994, Linda brought a box of approximately 200+ unresolved investigation reports to Mike. These investigations were generated by the technicians, and brought to

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 36
February 9, 1996
POEF-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

Mike for resolution. Between 500 and 1000 such reports were
evaluated by Mike per quarter, and it was a large-scale, on-going
job.

The sheer volume of these reports prevented Mike from conducting an
extensive investigation for each one. On occasion, he would have
to change exposure figures, due to an improper reading. The change
would be arrived at by finding the largest dose in the employee's
history, and using that to estimate a revised dosage. This revised
dosage would be a conservative dosage, and would most likely be
higher than the actual dosage received.

The subject of the dosage change of September 8, 1994 was then
discussed. Jeffery Walburn had three sets of exposure readings of
26 shallow/26 deep, which had been based on a 1990 exposure
reading. On September 8, 1994, Mike had allegedly directed these
last three sets of readings to be changed to 0 shallow/0 deep, due
to a legal action that Jeffery had launched against the
corporation. The figures were later -- apparently surreptitiously
-- returned to their previous readings. Mike stated that he had no
recollection of the incident, nor of a meeting with Clyde Dulin and
Gary Medukas in which it was jointly decided that Jeffery Walburn's
dosage should be zeroed out to assist the corporation with a
pending court case. Neither had he any recollection of having
changed those readings back to the previous figures. He stated
that he had never directed a dosage change due to a court case
under any circumstances. Mike qualified his lack of recollection
by saying that he had authorized "thousands" of legitimate dosage
changes during calendar year 1995 (far fewer changes are currently
necessary). Mike stated that Clyde Dulin, or Linda Smith might
have been able to change a dosage on their own. He, himself, would
not have known who to contact in the X-112 to affect such a change.

Mike added, however, by looking at the figures, the dosage figures
that were zeroed out, in fact, should have been zeros. The reason
for that was that the original 1990 figures on which the subsequent
figures had been based had been contested themselves (Ron Smith and
Gary Medukas strongly disagreed, and said that no justifiable
reason existed for changing the figures). The only way that the
dosages would have then been returned to their previous figures
would have been if someone had said that the changes had not been
consistent with policy.

On Saturday, September 30, 1995, Mike was working overtime in
preparation for the new badge changeout, which was going into
effect on October 1, 1995. During that morning, he had departed
plantsite at approximately 0700 hours to attend a class at the
Chillicothe Branch of Ohio University. Mike didn't recall what

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 37
February 9, 1996
POEF-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

time he had returned, but he thought he might have worked all night into the following Sunday morning. "I don't have a habit of overcharging the company, if that's what you mean," said Mike. He added that he would not charge the company for time spent attending college.

Mike stated that at the time of the NVLAP audit of 1995, Health Physics had no one qualified on the equipment. Chris Kelley had a limited amount of training (PECs, etc.), but was not fully qualified.

By September, 1995, when Chris Kelley and Linda Smith received external dosimetry authorizations, they were competent to work on the equipment. "They've gone through the basic training," said Mike.

Mike stated that he had not spent much time in the dosimetry laboratory; very little, in fact. The priority had been to "get the new system up and running," and that was where his efforts were directed.

Mike appeared shocked when the allegation concerning the dosage change of September 8, 1994 was mentioned. "Don," he said, "there is no way that I'd cheat at work." Mike later stated that he was shocked, not only that such an incident might occur, but that he might be accused of directing such a thing.

Mike Smith (Interviewed February 9, 1996, @ 1000 hours)

Upon being given a copy of the report prepared on September 7, 1994, Mike Smith stated that he did not recall the situation. He added, however, that had the report been given to him on September 7, 1994, and he had observed the December 31, 1990 figure of 23 shallow/26 deep, he would have directed those figures to be changed to 26 shallow/26 deep, and the subsequent figures of 26 shallow/26 deep that had been estimated from the 1990 figures to be reduced to 0 shallow/0 deep.

Mike Smith stated that he would have changed the figures if he had known it involved a court case or not, in order to supply correct data. If he had said something like, "It's for a court case. Zero is easier to read," it would have probably been in the context of an off-hand, satirical remark.

Mike stated that he had no information to show why these figures had been subsequently changed back to their previous numbers. He added that he was unable to see any justification for returning

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 38
February 9, 1996
POEF-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

them to their original status, as the original numbers had been in error.

**Mike Smith (Interviewed February 13, 1996, @ 1445 hours)**

Regarding dosage codes, Mike Smith stated that he used code 12 and code 15 almost exclusively. Mike said that code 12 meant that the dosage was estimated, while code 15 meant that the dosage was calculated. Mike was unaware of what code 10 implied.

Mike said that, if initiating a "TLD Corrections" form in person, he would advise dosimetry laboratory personnel of the dosages to be changed, and whether the original dosages were calculated or estimated. Laboratory personnel would then "look up" the code, and place it by the corrected figure on the form.

Mike stated that he had been required to give a deposition during the Fall of 1994. He didn't specifically recall being asked about Jeffery Walburn at the deposition. "No," Mike stated, "if they asked me about Walburn, I didn't remember."

Mike denied that he had lied under oath during the deposition. "Absolutely not," said Mike. "I didn't do this. This is insane. I don't remember lying under oath. I don't remember changing these doses. And I certainly don't remember saying, 'Oops,' and changing them back. This flies in the face of what I've done here for five years."

Mike stated that he felt that Linda Smith, if anyone, would have been the most likely to have changed the dosage figures on Jeffery's historical file back to their previous numbers. Mike stated that on the previous Friday (February 9, 1996), at 2200 hours, Jeff Cunningham told him that Linda was angry at him, because she thought he had lied at the deposition of November 22, 1996. "She thinks I lied at the deposition. She's mad at me, because she thinks I've had a hand in it (Linda's lawsuit)."

Mike added that within the last two weeks, Ron Smith had advised him that, as a result of the settlement of Linda's lawsuit, she had been promoted.

Regarding the NVLAP certification of May, 1995, Mike stated that the "Laboratory Technical Supervisor" mentioned was Jeff Cunningham, and the other "Staff Member" listed as being "fully trained and qualified to process dosimeters" was Chris Kelley.

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 39
February 9, 1996
POEF-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

Gary Medukas (interviewed February 8, 1996 @ 1230 hours)

Gary Medukas stated that he became Health Physics Department Head during October 1993. From that time until the July/August timeframe, Mike Smith reported directly to Gary. "I did a lot of coaching and counselling with Mike," said Gary. "He wasn't very polished as a manager," as he simply hadn't had the experience.

Gary said that Mike Smith spent little time in the dosimetry laboratory and the DOELAP TLD database. Mike's major priority was in bringing the NVLAP dosimetry system on line, and virtually all of his time was spent there.

Gary stated that he "did not give that system (the DOELAP system) very much when it came to accuracy. The system built around that database was not very reliable." The problems revolved around people. Problems developed with reading the old badges, imputing the data, preparing the badges, and the Guard Force interface.

There were multiple issues: lost badges, and badges that were never read. At times, if an employee who was assigned a permanent badge received temporary badges on occasion, both the permanent badge and the temporary badges would be read, giving a false high – and conservative – reading. In addition, missing readings were assigned the highest previous reading, giving a false high – and again conservative – reading.

A bad reading might occur through the use of worn-out TLDs. In addition, the original algorithm placed into the TLDs could not, to Gary's mind, detect some of the material on site. Due to these problems, valid readings were not always gained. In such cases, the highest – and a conservative – previous reading would be assigned to the dosage.

At the time of the May 1995 NVLAP audit, Chris Kelley was not, to Gary's mind, trained to process dosimeters. Jeff Cunningham might have been qualified, but no one else would have been. Gary did not know why the auditor, Jan Cussimano, would have thought otherwise. At the time of the audit, Health Physics was not processing the new badges, and thus Health Physics employees would not have been required to have training completed.

Gary recalled a request for a dose history for Jeffery Walburn being requested. Such information would have been supplied on a POEF letterhead. Gary said that (to his knowledge), whatever information would have been on the database would have been supplied to Jeffery. Corrections could have been made, but he doubted it, as dosages in excess of 500 millirem were recently

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 40
February 9, 1996
POEF-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

released to two employees on a legal request. No attempt was made to correct those figures.

Gary added that he had no recollection of a meeting with Clyde Dulin and Mike Smith in which the issue of Jeffery Walburn's dosage was discussed. Gary stated that he would never direct such a change, and that, after all, "26 (millirem) is a meaningless number." The fact that the dosage was later changed back from 0 – 0 to 26 – 26 also seemed unusual to Gary.

The issue may exist of Linda Smith being former Health Physics Department Manager Mark Granus's mother-in-law, and thus may be holding Mike Smith responsible for Mark's termination. When asked about the significance of this issue, however, Gary stated that Mark Granus had not been on bad terms with Mike Smith upon his (Mark's) departure. Mark did not hold Mike responsible for his termination, as he knew very well who was responsible. In addition, it was unclear what Linda's feelings for Mark were; in short, she probably "thought he was an asshole, but he was a good father." As a result, Gary thought it unlikely that Linda would take measures against Mike out of deference to Mark.

The Medical Department advised the investigative team that Jeffery Walburn had requested his Health Physics records on September 16, 1994. The cover sheet on that request indicates that the requested information was transmitted to Jeffery on November 3, 1994. That request would have been transmitted to the Health Physics Department, but when Gary Medukas checked the records, the response letter could not be located. Gary found that to be "odd."

The question still remains what, if anything, was supplied to the employee per that request. If the database remained the same as of that date, then the employee was provided the altered data.

Jim Thompson (Interviewed February 13, 1996, @ 1345 hours)

Jim Thompson stated that he had personally been involved in the routine changes of dosages. When asked specifically if he would correct data that was being requested by an employee or a court subpoena, he stated that he could imagine "going over these reads" when a court case was involved. "If I'm going to send something out, I'm going to review the data," Jim stated (this is the same position held by Mike Smith. Having said that, Jim had no recollection of the incident of September 8, 1994.

Jim recalled an information request regarding Jeffery Walburn's bioassay data from Industrial Hygiene. He believe the request to

BUSINESS CONFIDENTIAL

Internal Investigation into Health Physics Management Practices
Page 41
February 9, 1996
POEF-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

have originated during the latter part of 1994, but didn't recall any request for dosage information, however.

Jim stated that he was the privacy officer for Internal Dosimetry only. Dr. Walter Lyon was the privacy officer for the medical department, and handled those requests on his own.

DFB

cc: Dale Allen      Sandy Fout      Emery Smith
    John Bellows    Dan Hupp        Ron Wetherell

003452

# EXHIBIT U

This Health Hazard Evaluation (HHE) report and any recommendations made herein are for the specific facility evaluated and may not be universally applicable. Any recommendations made are not to be considered as final statements of NIOSH policy or of any agency or individual involved. Additional HHE reports are available at http://www.cdc.gov/niosh/hhe/reports

2568

HETA 94-0077-XXXX
April 1996
Lockheed Martin Utility Services, Inc.
Piketon, Ohio 45661

NIOSH INVESTIGATORS:
Steven H. Ahrenholz, Ph.D., CIH

### SUMMARY

On November 30, 1993, the National Institute for Occupational Safety and Health (NIOSH) received a confidential request for a Health Hazard Evaluation (HHE) to evaluate worker exposures to arsenic in the uranium enrichment process of the Lockheed Martin Utility Systems, Inc. (LMUS), gaseous diffusion plant in Portsmouth, Ohio. The request sought evaluation of arsenic exposoure which may occur when opening process equipment, or working on equipment removed from the process. Arsenic was first determined in process equipment in October 1993. Worker representation was provided by the Oil, Chemical, and Atomic Workers and United Plant Guard Workers of America unions.

NIOSH investigators conducted an industrial hygiene survey to address potential arsenic exposures March 1-4, 1994. A limited number of area air samples were obtained for uranium and radon. Opening and closing conferences were held with both management and labor representatives. Arsenic results and recommendations were distributed in an interim report to all parties June 28, 1994.

Arsenic samples were collected in the process building where arsenic has been known to accumulate in the production equipment. Additional samples were obtained in a maintenance facility where welding was performed on equipment removed from the process. The time weighted average (TWA) results over the sampling period for seven area samples ranged from below detectable levels (nondetectable or ND) up to 0.7 $\mu g/m^3$ of arsenic. Fourteen worker personal breathing zone (PBZ) exposure samples ranged from ND to 109 $\mu g/m^3$ of arsenic. Only six PBZ samples were above detectable levels with an average of 25 $\mu g/m^3$ of arsenic. All six of these workers wore protective clothing and supplied-air respirators required for their task. The NIOSH recommended exposure limit is 2 $\mu g/m^3$, and to maintain levels as low as feasible due to its classification as an occupational carcinogen.

Four uranium area samples were also collected on-site. TWA results over the sampling period ranged from 0.1 to 1.1 $\mu g/m^3$ of total uranium. The NIOSH REL for soluble uranium, the form present, is 50 $\mu g/m^3$. NIOSH regards uranium as an occupational carcinogen and recommends that airborne levels be maintained as low as feasible.

Recommendations include: continued exposure monitoring and exposure control aimed at keeping exposures as low as feasible; a re-evaluation of the suitability of using an air-purifying respirator for work on arsenic contaminated equipment that has been radiologically decontaminated; and avoiding the re-use of personal protective equipment that is not radiologically contaminated but may be contaminated with arsenic compounds.

The results of this NIOSH HHE demonstrate that the potential for worker exposures to arsenic in excess of the NIOSH REL of 2 $\mu g/m^3$ exists for personnel involved directly with performing maintenance activities on the uranium enrichment equipment in the X-326 process building.  All workers encountering elevated airborne arsenic concentrations were using protective clothing and supplied-air respiratory protection.  Protective measures in use against radiological contamination are considered adequate against the arsenic exposures encountered. Recommendations pertaining to exposure evaluation efforts and protective equipment considerations are provided on pages 18-19 of this report.

**KEYWORDS:** SIC 2819 (industrial inorganic chemicals, not elsewhere classified), gaseous diffusion, uranium enrichment, arsenic (CAS# 7440-38-2), uranium (CAS# 7440-61-1, 24678-82-8), uranium hexafluoride (CAS# 7783-81-5), hydrogen fluoride (CAS# 7664-39-3), contaminated process feed materials.

**Page 3 - Health Hazard Evaluation Report No. 94-0077-XXXX**

## INTRODUCTION

On November 30, 1993, the National Institute for Occupational Safety and Health (NIOSH) received a confidential request for a Health Hazard Evaluation (HHE) to evaluate worker exposures to arsenic contamination present in the uranium enrichment equipment at the Lockheed Martin Utility Systems, Inc. (LMUS), Portsmouth, Ohio, gaseous diffusion plant. (Note that at the time of the HHE request submission, the facility was Martin Marietta Utility Systems.) Worker representation was provided by the two bargaining units at this site, Local 3-689 of the Oil, Chemical, and Atomic Workers Union International (OCAW) and Local 66 of the United Plant Guard Workers of America (UPGWA). The request primarily concerned the activities of the OCAW membership involved in operations and maintenance work on the uranium enrichment process equipment. Job titles identified to be of concern included: process operators, welders, maintenance mechanics, instrument mechanics, and chemical operators. The presence of arsenic in the process equipment on-site was first discovered in October 1993.

The LMUS Portsmouth Gaseous Diffusion Plant (PORTS) located in Piketon, Ohio, came under the jurisdiction of the Department of Labor's Occupational Safety and Health Administration (OSHA), from the Department of Energy (DOE) as a result of the Energy Policy Act of 1992.[1] This act mandated that on July 1, 1993, the DOE-owned gaseous diffusion plants be transferred to the United States Enrichment Corporation (USEC), a congressionally-established government-owned corporation which will operate the United States' uranium enrichment facilities.[1] Because the PORTS facility became subject to the OSHAct, the workforce could submit a request for a HHE to NIOSH under section 20 (a) (6) of this act. NIOSH investigators conducted a site visit to evaluate worker exposures to arsenic March 1-4, 1994. Opening and closing conferences were held with management and labor representatives March 1 and 4, 1994, regarding the HHE activities. Limited sampling for uranium was also performed during this survey as a part of background work applicable to a separate NIOSH mortality study in progress at the site, under a Memorandum of Understanding between DOE and the Department of Health and Human Services (DHHS)-NIOSH.[2] An interim report presenting the arsenic sampling results along with recommendations was distributed to LMUS management, OCAW Local 3-689, and UPGWA Local 66 representatives June 28, 1994.

## BACKGROUND

The LMUS PORTS is one of two operating uranium enrichment production facilities in the United States. LMUS operates PORTS located in Piketon, Ohio and the Paducah Gaseous Diffusion Plant (PGDP) located in Paducah, Kentucky under contract to the USEC. Each plant utilizes the gaseous diffusion process to enrich uranium from a natural state of 0.7% $^{235}$U up to higher concentrations of $^{235}$U which historically have ranged from 2% to greater than 97%. The LMUS PORTS has discontinued high assay $^{235}$U production and currently produces a product that is in the range of 2 to 5% for use as fuel rods in commercial nuclear power generation.[3] The assay of the material is the determination of the amount by weight of fissionable material ($^{235}$U) present in the enriched uranium by physical or chemical measurements.[4]

**Page 4 - Health Hazard Evaluation Report No. 94-0077-XXXX**

### Process

Production of enriched uranium at PORTS began in 1955. The two gaseous diffusion plants (PORTS and PGDP) have been operated in a complementary mode. The Paducah facility performs the initial enrichment of uranium up to about 1 to 2% $^{235}U$. This material serves as a feedstock for PORTS. The PORTS facility also utilizes the same feed materials supplied by the uranium conversion facilities that PGDP receives. The uranium enrichment process uses uranium in the form of gaseous uranium hexafluoride ($UF_6$). The uranium enrichment process used at this facility, also referred to as gaseous diffusion, uses a physical separation process. Lighter molecules of $UF_6$ containing the $^{235}U$ atom or isotope diffuse more rapidly through a porous barrier in the system, leaving behind a gas stream with a slightly higher concentration of $UF_6$ molecules containing the $^{238}U$ atom. The degree of isotope separation at any one stage of the process is very small because of the small difference in molecular weight of the two uranium hexafluoride isotopes (349 vs 352).

The process equipment is an assembly of thousands of separative stages. The separative equipment consists of a compressor, converter, and motor which comprises a stage arrangement; a number of stages are assembled into a "cell", containing between eight and 12 stages. Between 10 and 20 cells are assembled to form a functional unit. These cells are linked together in series completing the formation of the "cascade" for uranium enrichment. The PORTS' several thousand stages are housed in three interconnected buildings. Each cascade building has two floors, each floor covering approximately 1.5 million square feet.[3,5] The overall configuration results in a flow of increasingly enriched $UF_6$ ($^{235}U$) toward the top of the process. Depleted $UF_6$ ($^{238}U$) flows toward the bottom or "tails" end of the process.

Uranium hexafluoride is delivered to and shipped from the facility in the solid phase. Because $UF_6$ is a solid at room temperature, the diffusion plant must be operated at temperatures and pressures that maintain the material in the gaseous state. Product withdrawal involves the condensation of gaseous $UF_6$ into cylinders for shipment.

### Process Contaminants: Sources

PORTS has been in continuous operation since 1955. Various contaminants and "light" gases have entered the process from a variety of sources over time. Acidic gases (e.g., fluorine, chlorine trifluoride, etc.) enter the cascade through process equipment maintenance activities. Chlorofluorocarbon (CFC) from the cascade cooling system equipment also escapes into the process. The presence of contaminants in process feed materials, and originating as a part of the decay series of uranium, may also contribute to the chemical agents present within the cascade process equipment.

The $UF_6$, in gaseous or liquid form, is extremely reactive with water, and slightly corrosive to most common metals. It is incompatible with organic materials such as lubricating oils.[6] The introduction of moisture into the system through small leaks (e.g., pinhole) results in the

**Page 5 - Health Hazard Evaluation Report No. 94-0077-XXXX**

formation of solid deposits within the system because of the reaction of various fluoride containing compounds due to the combination of water vapor and process gas (PG), another term for $UF_6$.

### Discovery of Arsenic in the Cascade:

Arsenic and arsenic-containing compounds were not among the chemicals historically evaluated in the feed $UF_6$ analyses, within process samples, in tests of purged process equipment for residual gases, or in the gases from the process released to the atmosphere. Arsenic-containing materials present within the uranium enrichment process equipment were first discovered when blocked copper instrument lines from the X-25-7-2 cell in the X-326 building were opened revealing a pale yellow-white viscous material similar to butter or taffy. The material released a green smoke upon exposure to atmospheric moisture. The remaining residue was highly hygroscopic. Analyses of the material by the PORTS on-site laboratory indicated that the original deposit may have been $ClO_2 \cdot AsF_6$ (chlorylarsenic hexafluoride) or $[AsCl_4^+] \cdot [AsF_6^-]$ (arsenic tetrachloride-arsenic hexafluoride). The hygroscopic reaction product was identified to be an arsenic oxide, e.g., $As_2O_5$. A second deposit in cell X-27-1-15 appeared as a light green material that released a white smoke upon exposure to atmospheric moisture. This second deposit, when immersed in water in the lab, reacted vigorously while forming an acidic solution (pH = 2). The PORTS laboratory reported that the compounds contained high levels of copper and chlorine. Although this second deposit differed in some respects from the first deposit in the X-25-7-2 instrument line, the material was also considered to be potentially $ClO_2 \cdot AsF_6$ or $[AsCl_4^+] \cdot [AsF_6^-]$.[7]

X-ray diffraction analyses were performed by PORTS' on-site laboratory on the solids remaining from these initial samples after the hydrolyzed material had been dried at ~90 °C. The diffraction patterns for each residual solids sample were similar. The crystalline material was identified as $H_5As_3O_{10}$ (hydrogen arsenate) and $Cu_2As_2O_7$ (copper arsenate). Solid material from a valve in cell X-25-7-2 and a copper tube from X-27-1-15 was identified as $Cu_2As_2O_7$.[8] Copper was considered to be a "getter" for arsenic, thus the accumulation of arsenic-containing compounds in copper process components.[9] Gettering is the absorption of gas by a getter film. The getter film may be a metallic deposit on a surface.[10]

Laboratory personnel at PGDP, which provides feed $UF_6$ for PORTS, indicated that PORTS was probably seeing $AsF_5$ (arsenic pentafluoride) complexed with HF, a metal, or other compound.[7] A high $AsF_5$ concentration was identified in the cascade process equipment in the X-326 building in the vicinity of high CFC concentrations, near the top end of the cascade process. The highest concentration of $AsF_5$ identified inside of the process equipment was 3800 parts per million (ppm) at the X-25-7-9 cell in X-326.[11] This level at this point inside the system represents an arsenic concentration of several hundred milligrams of arsenic per cubic meter ($mg/m^3$) of gas. This conversion to a milligram value for arsenic assumes cell operating conditions of an internal pressure of 1.2 pounds per square inch absolute, a 200 °F operating temperature, and an average process power consumption of 1900 Megawatts.[6]

**Page 6 - Health Hazard Evaluation Report No. 94-0077-XXXX**

### Arsenic in the Cascade Process-An Unsuspected Contaminant:

PORTS process engineers have determined that arsenic entered the cascade process as an impurity in the $UF_6$ feed material. Arsenic would have been introduced into the $UF_6$ produced through the fluorination of $UF_4$ (uranium tetrafluoride) or $U_3O_8$ (uranium octoxide) with arsenic contaminated fluorine ($F_2$). The arsenic would have been present in the fluoride-bearing ore used to produce the HF and $F_2$ with incomplete removal of the arsenic. The introduction of the arsenic contaminated $UF_6$ is suspected to have occurred during the 1980's. On-site generated $F_2$ is considered to be arsenic free even if arsenic has been present in HF received by the site since in-line trapping of contaminants would remove arsenic compounds prior to the $F_2$ use by the site. This latter potential source has been evaluated and is not considered a contributor to arsenic contamination in the cascade process. The supplier of feed material that had shipped $UF_6$ containing significant arsenic during the 1980's reportedly took action to improve operations and reduce arsenic contamination by 1990.[7] The site also implemented testing of incoming PGDP product $UF_6$ to determine if arsenic was being fed into the cascade in measurable quantities.[11]

Arsenic compounds are also considered to reside in solid $UO_2F_2$ (uranyl fluoride) deposits within the cascade equipment. These deposits would volatize arsenic during the course of cell treatments to remove uranium residues.[12] PORTS has sought to identify other locations and equipment throughout the cascade process that may have potential for arsenic contamination and worker exposures. Concerns regarding the presence of arsenic in sludges from heavy metal recovery and microfiltration in the decontamination building were also raised. PORTS determined that this material did not present a hazard because the material was not likely to become airborne and contained a very low concentration of arsenic (less than 0.003% by weight).[11,13]

### Engineering and Personal Protective Equipment Controls:

The primary activities associated with potential exposures to arsenic are opening PG systems for maintenance, dismantling process equipment, and working on arsenic contaminated equipment. The cascade process is a closed process. Equipment taken off line for maintenance or cell treatment is purged of its contents prior to work being performed. Sampling is conducted on the residual gases present within the off stream equipment to assure that the purging process has been adequate.

The presence of radioactive contaminants and the generation of HF vapor when residual $UF_6$ combines with moisture in the air requires personal protective equipment (PPE) against these hazards. Supplied-air respirators, full-face mask or hood, anticontamination (anti-Cs) coveralls, polyvinyl chloride (PVC) or rubber gloves, and PVC booties were worn by workers performing maintenance activities on the cascade process. Additional PPE included plastic coated Tyvek™ coveralls, welder's hood, flame retardant coveralls, and self-contained breathing apparatus available for use depending upon the activity and location on the process equipment.

**Page 7 - Health Hazard Evaluation Report No. 94-0077-XXXX**

LMUS-PORTS requirements for PPE change when equipment with potential arsenic-containing deposits (as well as other materials) has been wet-deconned (decontaminated) or exposed to atmospheric moisture. If the release or generation of significant gaseous arsenic compounds or high levels of particulate arsenic is unlikely, the following minimum PPE is recommended by PORTS: an MSA full-face mask with GMHF-C HEPA/acid gas canister (used routinely for protection against $UF_6$); anti-C's (routinely used for protection from radionuclides); rubber gloves; and, booties. PORTS notes that the MSA full-face mask with GMHF-C canister is not only effective against radionuclides and HF, but is also effective against arsenic (in gaseous and particulate forms).[7] A written opinion from MSA indicates that this respirator would be effective against the contaminants for which use of the GMHF-C canister was proposed. MSA identified in a letter to LMUS that the Occupational Safety and Health Administration (OSHA) in Table II of the inorganic arsenic standard (29 CFR 1910.1018) permits the use of gas masks equipped with a high efficiency filter and acid gas canister for inorganic arsenicals with significant vapor pressure.[14] Airborne inorganic arsenic concentrations under these conditions of use may not exceed 500 $\mu g/m^3$.[15]

## EVALUATION METHODS

### Airborne Chemical Contaminants:

The NIOSH site visit conducted March 1-4, 1994, consisted of personal exposure and area air monitoring for total arsenic and uranium. A coinciding NIOSH mortality study had provided the NIOSH investigators previous opportunities to conduct walk-through surveys of the areas of interest. Security access limitations and logistics, health physics surveys of sampling equipment and samples for radiological contamination before and after sample collection, and the identification of maintenance work activities necessitated additional on-site survey preparation time. The potential for radiological contamination of NIOSH equipment required that additional measures be taken prior to, during, and after the sampling activities to permit the removal of equipment and samples from the site. De-briefing of NIOSH investigators, a review of information collected with the site classification officer, and arrangements for the handling and shipment of radiologically-contaminated industrial hygiene samples were conducted at the completion of the survey. Sampling was conducted during the first and second shifts on March 2 and 3, 1994. A LMUS industrial hygiene technician conducted parallel sampling for a number of the personal and area samples collected by NIOSH investigators.

### Total Arsenic:

Preparatory information obtained from the site regarding the arsenic compounds potentially present indicated that arsenic may be present as several different chemical species, in both the gaseous and particulate phases. LMUS had been using NIOSH Sampling and Analytical Method 7901 with modifications to assess airborne arsenic exposures.[16] NIOSH Method 7901 collects particulate arsenic compounds and arsenic trioxide vapor.[17] The analyte evaluated is total arsenic. Because a gaseous form of arsenic, $AsF_5$, was possibly present, several area samples

**Page 8 - Health Hazard Evaluation Report No. 94-0077-XXXX**

were collected incorporating NIOSH Method 6001 for arsine. This method also measures total arsenic and may collect other arsenic compounds besides arsine, present in the gaseous state or an aerosol form.[17] The specifics regarding the two methods are presented in the following paragraphs along with the descriptions of the sampling trains.

### Arsenic: NIOSH Methods 7901 and 6001

#### Sampling Train Description:

All PBZ exposures for arsenic compounds were evaluated using a sampling train that consisted of an SKC® 224-PCXR8 Personal Sampling Pump operating at a flow rate of approximately 3.6 liters per minute (Lpm) and a sodium carbonate ($Na_2CO_3$) impregnated 0.8 micrometer ($\mu m$) cellulose ester membrane filter and backup pad. The Millipore® filter and backup pad were impregnated and tested for the passage of air through the treated filters by the NIOSH Measurement Research Support Branch laboratory. Filter cassettes were connected to the sampling pump by a length of Tygon® tubing. All pumps (personal and area samplers) were placed inside plastic ZipLoc® bags or wrapped in plastic to reduce the possibility of radiological surface contamination. Pumps were secured to a belt or in a pocket of the worker's coveralls inside of the Anti-C clothing. Only the cassette and the several inches of tubing at the cassette end of the sampling train were placed outside of the workers' protective clothing on their lapels.

Area air samples for arsenic compounds utilized the same sampling pump as the personal exposure samples, but with an average flow rate of 2 Lpm. This allowed for equal flow rates for the filter-only sampling train (equivalent to that worn by the workers) and the sampling train which included a standard coconut shell charcoal tube (100 milligram (mg)/50 mg front/backup sections) in-line directly behind the impregnated filter cassette. This second sampling train, as previously mentioned, was intended to explore the possibility of gaseous arsenic compounds passing through the impregnated filter. All area sample filters were mounted between four and six feet above surrounding walking surfaces.

### NIOSH Method 7901: Arsenic Trioxide as As

All filter samples for arsenic were digested and analyzed according to NIOSH Method 7901.[17] These samples were analyzed using a Perkin-Elmer Zeeman 5100 Graphite Furnace Atomic Absorption (AA) Spectrophotometer.

The following modifications of the sample preparation were utilized. Fifteen milliliters (mL) of concentrated nitric acid were added to each beaker after filters were transferred to 125 mL Phillips beakers. The samples were heated and reduced on hotplates to approximately 1 mL in volume. Six mL of 30% hydrogen peroxide was added to each beaker. The samples were heated and reduced on hotplates. The samples were then brought to volume in 25 mL volumetric flasks. Quality control samples (QCs) and preparation blanks were also digested by this process. The QCs and preparation blanks were analyzed with this set. Note that the samples submitted for arsenic analyses were analyzed in two different sets. This was due to restrictions on the handling

**Page 9 - Health Hazard Evaluation Report No. 94-0077-XXXX**

and shipment of a portion of the samples because of the presence of radiological contamination. The outside of all cassettes were screened by DataChem Laboratories for radiological contamination upon receipt. Sample cassettes sent directly by LMUS to DataChem had all security tape seals placed upon them by NIOSH investigators intact upon receipt at the Data Chem laboratory in Salt Lake City, Utah.

The analytical limit of detection (LOD) for arsenic for the two filter sets was 0.07 and 0.1 microgram per filter (μg/filter). The analytical limit of quantitation (LOQ) for arsenic was between 0.23 and 0.31 μg/filter. Results that fell between the LOD and the LOQ are semi-quantitative in nature and are reported in the results table as trace. This denotes that the contaminant was determined to be present, but at a value possessing greater variability and interpretative limitations than is associated with results above the LOQ.

### Arsenic: NIOSH Method 6001-Arsine as As

The charcoal tube samples were prepared and analyzed according to NIOSH Method 6001.[17] These samples were analyzed using a Perkin-Elmer Zeeman 5100 Graphite Furnace AA Spectrophotometer.

The following modifications were incorporated in the preparation of the samples. The front and back portions of each sorbent tube were place in separate 14 mL centrifuge tubes. Two mL of 0.01 Molar (M) nitric acid were added to each centrifuge tube. The samples were then sonicated for 30 minutes in a 25 °C ultrasonic water bath. Samples were then centrifuged for 10 minutes at 3000 revolutions per minute. Preparation blanks were also prepared by this process. The concentrations of the front and back portion of the samples were added together to give the total concentration of the sample. Since the calculated LOD/LOQ is for only the front or back portions of the sample, the calculated LOD/LOQ were doubled to account for the concentrations of the front and back portions of the sample being added together.

The LOD for arsenic in the charcoal tube samples was 0.02 μg/sample. The LOQ for arsine measured as arsenic is 0.065 μg/sample. Results from the sorbent tube samples were combined with the respective filter sample and reported as one sample result.

### Uranium: Kinetic Phosphorescence Analysis

Area samples for total uranium were collected using Gilian® Aircon-2 Constant Flow Air Samplers set at an average sampling flow rate of 10 Lpm. The uranium was collected on an untreated Millipore® 0.8 μm pore size mixed cellulose ester membrane filter. All sample durations were at least for the time period of the work activity under evaluation. This ranged from 67 to 324 minutes over all samples collected. Sampling pump operation could not be terminated until the equipment had been surveyed out of the radiation contamination area by the LMUS-PORTS health physics technician.

**Page 10 - Health Hazard Evaluation Report No. 94-0077-XXXX**

Uranium filter samples were analyzed using kinetic phosphorescence analysis (KPA) following DataChem Laboratories Standard Operating Procedure (SOP) WR-DC-342.[18] This method is used for the measurement of low-levels of elemental uranium. Appendix A briefly presents the theory pertaining to kinetic phosphorescence. This method involves the addition of a proprietary phosphate-based buffer to the liquid samples to produce uranyl phosphate. The samples are then exposed to the beam from a nitrogen laser. The decay rate of the phosphorescence of the uranyl phosphate is subsequently measured. Interferences common to this method include fluorescent interferences from organic compounds and quenchers in the form of common metals.

Sample preparation required the placement of the filters into 150 mL Griffin beakers. The walls of the filter cassettes were not washed into the sample. The filters were dissolved in nitric acid and further oxidized with three successive nitric/hydrogen peroxide wet ashes. The samples were brought to near dryness and then dissolved in 10 mL of 0.8 M nitric acid. A blank and QC were both prepared with the samples. Initial analyses of the sample solutions indicated the need to reduce the influence of quenching agents in the samples. This was done with a ten-fold dilution on all samples except the blank. The samples were reanalyzed and values observed fell within the acceptable ranges specified by the DataChem SOP.[18]

Reported uranium results were calculated from the raw data and converted from $\mu g/L$ to $\mu g/filter$. Raw data reports showed that the lifetimes (of the phosphorescent signal per sample) were acceptable for all of the samples. The correlation coefficient ($R^2$) calculated to determine the linearity of the phosphorescence decay curve and which also indicates possible method interferences was acceptable for all of the samples that were not blank. The reagent blank result was found to be below the calibration background, and below the detection limit of 0.001 $\mu g/filter$, which may be equated for industrial hygiene terminology to the LOD. The quality control filter result was 19.2 $\mu g/filter$. The true concentration was 20 $\mu g/filter$, indicating a 96% recovery of U.

Because the analyses for U were conducted by the DataChem Radiochemistry Lab following procedures and techniques differing from the industrial hygiene procedures used to analyze metals, each sample result is reported with a total propagated uncertainty (TPU) calculated at the 95% confidence level. The TPU, taking into consideration all preparation and analysis errors, was determined to be $\pm 20\%$ of the reported value for each sample. A further explanation of the determination method for TPU is presented in Appendix A.

### Special Handling Considerations

The presence of the contaminant Technetium ($^{99}Tc$) and other radionuclides associated with the uranium enrichment process (e.g., $^{235}U$) necessitated a health physics assessment to determine radiological contamination levels of the air sample filters and cassettes before they could be released for unrestricted use from the site. LMUS health physics surveyed sample cassettes and filters of LMUS parallel samples for surface alpha contamination and beta activity. A determination of the Nuclear Regulatory Commission licensing restrictions for both NIOSH and

**Page 11 – Health Hazard Evaluation Report No. 94-0077-XXXX**

DataChem Laboratories was also required before any samples exceeding unrestricted use levels could be released from the site or shipped for analysis. Samples left in the custody of LMUS for shipment directly to DataChem Laboratories for analysis were secured with tamper indicating devices (TID) (wrapped with a serially numbered and embossed brittle plastic adhesive tape). DataChem was provided with the TID numbers for verification upon receipt. Industrial hygiene samples approved by LMUS health physics for unrestricted release accompanied the NIOSH investigators upon their departure from the site for subsequent submission to DataChem.

All sampling pumps were pre- and post-calibrated daily. The placement of equipment inside of the restricted access radiation contamination zones (both personal and area sampling trains) precluded periodic checks for equipment operation once it was in place. The use of disposable coverings over sampling equipment further impaired sampling equipment access and observation.

### Quality Control Samples for Arsenic

The modifications used by DataChem in the analysis of arsenic samples were provided to LMUS. This enabled LMUS to analyze the parallel samples for arsenic following the same analytical procedures as were applied to the NIOSH samples. Quality control (QC) samples were also included in the NIOSH submission of arsenic samples. Subsequent to the disclosure of arsenic results to LMUS and labor representatives in June 1994 some additional QC samples generated by the NIOSH laboratory were submitted for analysis to DataChem.[19] QC samples were also provided to LMUS for submission to their analytical laboratory. These results reinforced confidence in the NIOSH arsenic results. A question had been raised concerning arsenic recoveries by LMUS representatives following the initial reporting of the survey results.

## EVALUATION CRITERIA AND TOXICOLOGY SUMMARIES

### General Guidelines

As a guide to the evaluation of exposures to chemical and physical agents in the workplace, NIOSH investigators employ criteria which are intended to represent levels of (airborne) contaminant exposure to which most workers may be exposed up to ten hours per day, 40 hours per week for a working lifetime without experiencing adverse health effects. It is important to note that *not all* workers will be protected from adverse health effects if their exposures are maintained below these levels. A small percentage may experience adverse health effects because of individual susceptibility, a pre-existing medical condition, and/or a hypersensitivity (allergy). Some hazardous substances may also act in combination with other workplace exposures, the general environment, or with medications or personal habits of the worker to produce health effects even though occupational exposures are controlled at the levels set by the evaluation criteria. Some substances are absorbed by direct contact with the skin and mucous membranes, or by ingestion, increasing the overall exposure above measured airborne

**Page 12 - Health Hazard Evaluation Report No. 94-0077-XXXX**

concentrations. Evaluation criteria may change over time as new information on the toxic effects of an agent become available.

The primary sources of evaluation criteria for the workplace are: NIOSH Criteria Documents and recommended exposure limits (RELs),[20] the American Conference of Governmental Industrial Hygienists' (ACGIH) Threshold Limit Values (TLVs®),[21] and Occupational Safety and Health Administration (OSHA) permissible exposure limits (PELs).[15,22] These values are usually based on a time-weighted average (TWA) exposure, which refers to the average airborne concentration of a substance over a specified time period. Frequently the time period of interest associated with TWAs is the complete 8-hour (PELs, TLVs®) or up to 10-hour (RELs) workday. Short-term exposure limits or ceiling limits also exist for some substances and are intended to supplement the TWA limits where there are recognized toxic effects from short-term exposures.

To compare results with the NIOSH, OSHA, and ACGIH criteria that are TWAs, an extrapolation of results from a sampling time of less than eight hours up to an 8-hour TWA value may be calculated. This calculation may be performed using one of two assumptions. The first assumption involves no other exposure to the compound(s) of interest over the unsampled period of the 8-hour workshift. Depending upon the contaminant, the work environment, and the individual worker's job activities this may or may not be a less conservative approach. This was the approach used in calculating 8-hour TWA values for this HHE. A second and more conservative approach to handling the unsampled time period when calculating an 8-hour TWA is to assume the exposure during the unsampled period was equal to the time period covered by the sampling process. This latter approach produces a value equivalent to dividing the sample concentration by the sample time.

A caveat regarding the evaluation criteria is that the limits *are not* fine lines between safe and dangerous concentrations of contaminants nor are they a relative index of toxicity. Recommended exposure criteria are recommendations (with the exception of OSHA PELs which are legally enforceable exposure limits) and should be used as guidelines for good practices in the workplace. Although serious injury is not believed to be likely as a result of exposures to contaminants at concentrations up to the evaluation criteria, the best practice is to maintain concentrations of all atmospheric contaminants as low as is practical.[21] The NIOSH recommendation concerning exposures to occupational carcinogens is to limit exposure levels to the lowest feasible concentrations.[23]

### Arsenic

Exposure to inorganic arsenic can produce dermatitis (skin inflammation), keratoses (horny growths on the skin), peripheral neuropathies (diseases of the nerves of the extremities), peripheral vascular diseases (diseases of the arteries and veins of the extremities), and cancer of the skin, liver, and lungs.[24] Arsenic is absorbed primarily via inhalation and ingestion. Oral ingestion from contaminated hands may result in absorption of toxicologically significant amounts of arsenic.[25]

**Page 13 - Health Hazard Evaluation Report No. 94-0077-XXXX**

Inorganic arsenic is eliminated from the body through metabolism and urinary excretion. The total amount excreted in urine accounts for about 60% of the absorbed amount. Inorganic arsenic metabolites appear in urine shortly after the start of exposure. The concentration rises slowly during the first days of the exposure, and then levels off.[24] The biological half-life of arsenic in man is 24 to 36 hours.[26] If a worker's exposure on following days is similar, the arsenic concentration in urine remains more or less the same.

The ACGIH has proposed a Biological Exposure Index (BEI) for arsenic. The BEI is 50 micrograms per gram ($\mu$g/g) of creatinine for inorganic arsenic and its metabolites in urine measured in workers at the end of the workweek.[24] The current ACGIH TLV-TWA of 10 $\mu$g/m$^3$ for arsenic and inorganic compounds is based on the prevention of systemic effects due to the inhalation of arsenic and its inorganic compounds and the clinical and epidemiological evidence for inorganic arsenic to cause lung and skin cancer.[23,26] Both NIOSH and OSHA [29 CFR 1910.1018] consider inorganic arsenic to be a potential occupational carcinogen.[15,20] The NIOSH REL (ceiling limit) is 2 $\mu$g/m$^3$, and the OSHA PEL-TWA is 10 $\mu$g/m$^3$. Table I presents the numerical occupational exposure evaluation criteria for airborne contaminants evaluated in this HHE, including arsenic. The carcinogen classification is also presented where applicable.

Sources of non-occupational exposure to arsenic are drinking water, food and polluted air.[27] Cigarette smoking is also a source of exposure to arsenic (12 to 42 $\mu$g/cigarette).[28] Therefore, arsenic is found in the urine of people who have no occupational exposure to arsenic. Concentrations of inorganic arsenic and its metabolites in the urine of the general population are usually below 10 $\mu$g/L (generally equivalent to $\mu$g/g creatinine) in European countries, but slightly higher in the United States.[29] Given the NIOSH REL for arsenic, biological monitoring by urinalysis is of little value in determining whether or not workers' arsenic exposures exceeded the REL, as normal levels of arsenic in urine could easily mask the contribution of occupational exposures near the REL.

### Uranium

The release of UF$_6$ into the air results in a rapid reaction with water vapor to produce UO$_2$F$_2$ (uranium oxyfluoride or uranyl fluoride) and HF. The reaction:

$$UF_6 + 2H_2O = UO_2F_2 + 4HF + heat$$

This toxicity discussion and the cited occupational exposure criteria will primarily address the adverse effects associated with U through its chemical activity. This HHE did not address radiological hazards associated with the uranium enrichment process at Portsmouth. No radiation exposure criteria will be presented for exposures to U.

Exposure to insoluble compounds of uranium produces respiratory irritation, whereas soluble compounds are toxic to the kidneys.[30] High doses of soluble uranium cause tissue damage in the kidneys leading to functional loss as indicated by the failure to resorb urinary protein, glucose,

**Page 14 - Health Hazard Evaluation Report No. 94-0077-XXXX**

catalase, phosphate, citrate, and creatinine. High doses of uranium also affect the blood vasculature throughout the body. Uranium may damage capillary membranes and is also known to induce damage to liver and muscle tissue. The effects of uranium on the nervous system may be similar to those associated with poisoning by other heavy metals. Transient renal injury, which occurs when one or more of the chemical components of urine indicates that there has been some structural change within the kidney, is reversible. In this situation the loss of reserve renal capacity is regarded to be small with the chemical composition of the urine quickly returning to normal ranges.[31]

Accidental exposure of workers to a mixture of $UF_6$ (uranium hexafluoride), $UO_2F_2$ (uranyl fluoride), HF (hydrofluoric acid), and live steam caused lacrimation, conjunctivitis, shortness of breath, paroxysmal cough, rales in the chest, nausea, vomiting, skin burns, transitory albuminuria, and elevation of blood urea nitrogen. Two fatalities occurred among the most heavily exposed. Urinary abnormalities continued for several weeks. Injury effects observed on the skin, eyes, and respiratory tract were caused by the irritant action of the hydrofluoric acid, whereas the transient renal changes were attributed to the uranium.[30]

Excess illness from chronic respiratory disease has been reported in epidemiologic studies of uranium mill workers. Excess mortality due to tumors of the lymphatic and hematopoietic systems, other than leukemia, have also been reported for uranium mill workers. Standardized mortality ratios for lung or bone cancer, leukemia or other respiratory or genitourinary disease were not observed to be higher among those workers with the highest mean exposures to uranium dust.[32] A series of studies at a uranium enrichment plant between 1943 and 1947 noted an excess of lung cancer deaths and central nervous system deaths. This study examined the risk of dying of lung cancer in men receiving radiation exposure to the lungs due to the inhalation of uranium or uranium containing dusts.[33]

The current ACGIH TLV-TWA of 200 $\mu g/m^3$ has been recommended for elemental uranium and its soluble and insoluble compounds since 1969. In 1969 the TLV-TWA was raised from 50 $\mu g/m^3$ to the present level based upon an absence of evidence linking occupational uranium exposures during a 25 year period that were in excess of the 1969 limit with renal, hematopoietic, or other injury. An ACGIH Short Term Exposure Limit (STEL) of 600 $\mu g/m^3$ was added in 1976. This TLV is reportedly undergoing re-evaluation by the ACGIH TLV Committee regarding the appropriateness of the TLV for carcinogenic potential due to biological actions of the agent associated with properties other than that of the nonradioactive element.[32] OSHA has a PEL-TWA of 50 $\mu g/m^3$ measured as U for soluble compounds of uranium and a PEL-TWA of 250 $\mu g/m^3$ measured as U for insoluble compounds.[22] The OSHA basis for these exposure limits was that these levels would protect workers exposed to uranium from significant risks of kidney or blood disorders and radiological damage potentially associated with exposure to these compounds at levels above the PELs.[32] The NIOSH REL for soluble uranium is 50 $\mu g/m^3$ and the REL for insoluble uranium compounds is the same as the ACGIH's TLV®.[20,21] NIOSH also recommends that uranium compounds be treated as a potential occupational carcinogen.[20] The uranium evaluation criteria presented here are also listed in Table I.

**Page 15 – Health Hazard Evaluation Report No. 94-0077-XXXX**

Uranium absorption from the respiratory tract is the most important route of entry in occupational settings. Although soluble uranium salts may be absorbed through the skin, this is considered to have a minimal contribution to the overall amount of uranium entering the body due to occupational exposures. Pulmonary absorption of uranium in humans may be as high as 20%. Ten to 30% of the uranium that reaches the circulatory system from acute exposures is bound irreversibly to bone; 10 to 20% is deposited in the kidneys; and 60 to 70% is excreted in urine during the first 24 hours after an intake.[32]

## RESULTS

### Arsenic

Samples were collected at three different locations within the X-326 process building and at one location in the X-700 converter maintenance facility. All area and personal exposure samples obtained in the X-700 building during placement and welding of back-up strips onto a converter were below detectable levels. Area and personal exposure samples for workers replacing P-nut valves on cell X-27-3-12 on the cell floor of X-326 were also all below detectable levels.

Area and personal exposures during the alumina trap changeout of top purge traps A, B, and C on the operating floor of X-326 ranged from below detectable levels up to 0.3 $\mu g/m^3$ of total arsenic. Overexposures were documented during the removal of a valve on the evacuation booster station located at the top end of the process in building X-326. The two area samples located in the immediate proximity of the removal process demonstrated an airborne arsenic concentration of 0.7 $\mu g/m^3$. The overhead crane operator's arsenic exposure was below detectable levels. Personal exposure levels to arsenic for the four workers performing the valve removal ranged from 1 to 109 $\mu g/m^3$ of arsenic. The average exposure for these four workers was 37 $\mu g/m^3$, with a standard deviation of 50 $\mu g/m^3$. The chemical operator conducting the decontamination after removal of the valve had the highest exposure. All values presented previously in this paragraph represent time-weighted averages over the actual sampling periods which were less than eight hours in duration.

Table II lists individual sample results calculated as both a TWA over the sampling period (first TWA column) as well as an 8-hour TWA with the assumption of zero exposure during the unsampled time period (second TWA column). Eight-hour TWAs calculated for all samples ranged from below detectable levels up to 22 $\mu g/m^3$ of arsenic. Table I presents the evaluation criteria for airborne arsenic.

Samples collected by the LMUS industrial hygiene technician at the same locations or for the same workers as those monitored by NIOSH investigators are presented in the Notes column of Table II. The airborne concentrations calculated both as a TWA over the sampling period as well as for an 8-hour TWA, assuming zero exposure during the unsampled time period, are presented. This information is provided for the reader's reference. LMUS sampling produced results above as well as below the NIOSH results. This provides some indication of the variability associated

**Page 16 - Health Hazard Evaluation Report No. 94-0077-XXXX**

with environmental sampling and reinforces the caveat that evaluation criteria are not to be interpreted as a fine line separating acceptable and unacceptable worker exposures.

One should note that all workers wore personal protective clothing including airline supplied-air respiratory protection. All work was performed inside of delimited radiation contamination zones. Samples were collected outside of the workers' protective clothing.

Quality control samples were submitted along with the arsenic samples collected at the PORTS following the site visit. The mean recovery for these six QC samples for arsenic accompanying the original field samples was 96% and were regarded to be within the analytical control criteria. Subsequent to this field survey and the receipt of the survey sample results, another set of quality control samples spiked with known quantities of arsenic were submitted at the request of LMUS-PORTS. LMUS-PORTS expressed interest in evaluating their site laboratory analytical capabilities for arsenic following the same analytical method with modifications as the NIOSH contract laboratory.

This request arose in light of the fact that NIOSH samples documented some of the highest arsenic exposures evaluated to date at the facility. LMUS-PORTS had followed the same sampling and analytical procedures, with modifications, as used by DataChem for the NIOSH survey samples. Table III presents previous company data for arsenic. Table IV presents the quality control sample results for both DataChem Laboratories (the NIOSH contract laboratory), and the PORTS on-site laboratory. Results are identified for arsenic QC samples provided by two sources, PORTS and NIOSH.

### Uranium

Area samples for uranium were obtained at four locations in the plant and at one off-site reference location. TWA results for uranium over the sampling period for samples obtained on-site ranged from 0.1 to 1.1 $\mu g/m^3$; 8-hour TWA values for the same samples ranged from 0.05 to 0.8 $\mu g/m^3$. A reference sample obtained in one of the NIOSH investigators hotel rooms in Portsmouth measured 0.01 $\mu g/m^3$ for an 8-hour TWA. The results of airborne uranium sampling are presented in Table V. All airborne concentrations of uranium, measured as uranium, were less than one fiftieth of the applicable industrial hygiene exposure evaluation criteria for soluble uranium compounds.

## DISCUSSION AND CONCLUSIONS

### Arsenic

The sampling data confirms LMUS findings that potential arsenic exposures occur with activities involved in opening uranium enrichment process equipment. All workers evaluated for personal exposure to arsenic compounds, with the exception of one individual, wore supplied-air respiratory protection. One worker overseeing the P-nut valve replacement was outside of the

**Page 17 - Health Hazard Evaluation Report No. 94-0077-XXXX**

radiation contamination zone. This removed him from the immediate vicinity of the work that required the higher levels of personal protective equipment. Workers wore flame retardant anti-Cs (protective coveralls), poly vinyl chloride (PVC) gloves, and shoe covers. Workers involved in the valve removal at the evacuation booster station in X-326 wore polyethylene coated Tyvek$^R$-QC disposable coveralls in addition to the other protective gear for protection against technetium. The personal protective equipment utilized by the individuals whose exposures were evaluated should have effectively prevented any exposure to the observed airborne concentrations of arsenic. The respiratory protection table (Table 2) in the OSHA arsenic standard indicates that a supplied air respiratory with a full facepiece, hood, or helmut or suit operated in positive pressure mode offers acceptable protection up to a concentration of 20,000 $\mu g/m^3$ for inorganic arsenic containing compounds possessing significant vapor pressure. A front or back mounted gas mask equipped with high-efficiency filter and acid gas canister may be used for respiratory protection against airborne inorganic arsenicals at concentrations below 500 $\mu g/m^3$.[15] Airborne levels of total arsenic evaluated during this survey were well below both of these concentrations.

A review of the available arsenic sampling results collected by the LMUS-PORTS industrial hygiene department indicates that for a number of activities where potential arsenic exposures may occur, the levels are low (below 5 $\mu g/m^3$) or nondetectable. Table III presents some historic worker exposure monitoring data conducted by the LMUS-PORTS industrial hygiene department at locations and for work similar to that conducted by NIOSH investigators March 2-3, 1994. The LMUS-PORTS results were subject to the same difficulty experienced by the NIOSH investigators in that work tasks of short duration and thus limited sampling periods may result in minimum quantifiable concentrations (MQCs) higher than the NIOSH REL. The NIOSH sample results demonstrated two exposures in excess of any observed by LMUS-PORTS as of February 25, 1994. These samples were collected at or near the segment of the cascade process referred to as the "arsenic bubble". The uranium enrichment process is a physical separation process and appears to result in the collection of different process impurities at differing points within the equipment. Company data identified arsenic concentrations inside the process up to almost 4,000 parts per million in onstream cells (several hundred $mg/m^3$ of arsenic). (A cell is an assembly of stages, each stage being the smallest complete separatory unit within the process.)

A modification of the sampling train used to evaluate airborne arsenic was incorporated into the area sampling conducted during this survey. An initial question was whether a filter sample for arsenic captured all of the arsenic present. A standard charcoal tube was placed in line behind the air sampling cassette in an effort to determine whether gaseous arsenic compounds may also be captured. Although the number of these samples was limited, all of the sorbent tubes were nondetectable for arsenic. The arsenic values for these two part samples, if above detectable levels, were due to the contaminant collected on the filter.

This evaluation did not involve assessing worker exposures during work conducted on equipment or equipment lines that contained visible deposits of arsenic-containing materials. The NIOSH data applies primarily to the tasks evaluated on the process equipment and an example of work

**Page 18 - Health Hazard Evaluation Report No. 94-0077-XXXX**

performed on a purged, cleaned, and isolated converter. The company has located tasks and work locations that present greater potential for excessive arsenic exposures based upon their body of previously collected exposure information. The routine required personal protective equipment (clothing and respiratory protection) used to prevent exposure to radiological contamination, the process gas ($UF_6$), and HF also offers substantial protection against arsenic compounds present in the process as a contaminant.

The workers should be adequately protected from arsenic hazards when utilizing the protective equipment required in radiological contamination zones; however, supplied-air respiratory protection and protective clothing should also be worn when working on arsenic-contaminated equipment in the absence of radiological contamination. LMUS documents indicate that a Mine Safety Appliances air purifying respirator may be acceptable to provide protection under these latter conditions. NIOSH does not currently approve any air purifying respirators for protection against arsenic exposures, except for the limited application of emergency escape purposes.[34]

### Uranium

The area air sample results for uranium in the X-700 and X-326 buildings during the NIOSH survey did not identify any elevated exposures (i.e., approaching current occupational exposure limits) when evaluating airborne uranium concentrations as a nonradioactive element. The presence of uranium in the process in the form of $UF_6$ will result in the formation of other hazardous and toxic contaminants upon mixing with atmospheric moisture (see page 13). Soluble forms of uranium are considered to be the primary uranium compounds present at PORTS. Low airborne uranium concentrations were not indicative of low airborne arsenic concentrations for the limited number of samples collected. The location of the samples collected in the X-326 building, which is at the product or enriched end of the process and contains a higher concentration of $^{235}U$, presents radiological health hazards due to uranium which are not adequately addressed with the mass per volume airborne concentrations. The data collected during this survey, along with the personal protective equipment in use by the workers (presented in the arsenic discussion), does not idicate a chemical health hazard to uranium.

## RECOMMENDATIONS

Exposure monitoring and exposure control for arsenic at the LMUS Piketon Gaseous Diffusion Plant should aim at reducing and maintaining arsenic exposures at the lowest level feasible. The OSHA PEL and Action Level may be used as guides in addressing exposures although measureable airborne arsenic concentrations below a target level of 5 $\mu g/m^3$ does not denote the absence of an occupational health hazard. This is because of the concerns regarding the carcinogenicity of arsenic compounds.

The amount and type of monitoring for arsenic exposures should be modified by LMUS-PORTS to focus efforts on characterizing high level or ill-defined arsenic exposures. Monitoring on a less intense basis should be continued for tasks previously evaluated and demonstrating

**Page 19 - Health Hazard Evaluation Report No. 94-0077-XXXX**

negligible arsenic exposures to insure they remain unchanged. Exposure monitoring conducted to evaluate airborne arsenic contaminants should strive to evaluate levels below the most restrictive evaluation criteria.

The workers appear to be adequately protected from arsenic hazards when utilizing the protective equipment required in radiological contamination zones; however, supplied-air respiratory protection and protective clothing should also be worn when working on arsenic- contaminated equipment in the absence of radiological contamination. LMUS-PORTS documents indicated that a Mine Safety Appliances air purfying respirator may be acceptable to provide protection under these latter conditions.[13] NIOSH does not currently approve any air purifying respirators for protection against arsenic exposures, except for the limited application of emergency escape purposes.[34]

The re-use of personal protective clothing that may have become contaminated with arsenic containing dusts should be avoided. This did not appear to be a problem for the tasks evaluated by NIOSH because of the extensive use of disposable clothing. This could become a potential problem in instances where tasks involving arsenic-contaminated materials are being worked on, but which are not subject to the constraints (and accompanying disposable protective clothing) associated with handling radiologically contaminated equipment.

## REFERENCES

1.  "Energy Policy Act of 1992," *U.S. Code*, Title 42, Pt. 13201 *et seq.* Oct. 24, 1992.

2.  U.S. Department of Energy:"Memorandum of Understanding Between Department of Energy and Department of Health and Human Services." Washington, D.C., December 19, 1990. [Memo] 14pgs.

3.  U.S. Department of Energy: Portsmouth Uranium Enrichment Plant: Technical Site Information by Lockheed Martin Energy Systems (POEF-2059). Portsmouth, OH: U.S. Department of Energy, 1992.

4.  Borders, R.J.:The Dictionary of Health Physics and Nuclear Sciences Terms. Hebron, CT:RSA Publications, 1991, p.25.

5.  United States Enrichment Corporation: Gaseous Diffusion Process. March 13, 1994. [Unpublished]. Lockheed Martin Utility Services, Inc., P.O. Box 628, Piketon, OH 45661. 205pgs.

6.  U.S. Atomic Energy Commission: AEC Gaseous Diffusion Plant Operations (ORO-658). Washington, D.C.: USAEC, Division of Technical Information Services, 1968. p.4.

**Page 20 - Health Hazard Evaluation Report No. 94-0077-XXXX**

7.  Lockheed Martin Utility Services, Inc.: IH Bulletin #1-93 Arsenic. November 1993. [Unpublished]. Lockheed Martin Utility Services, Inc., P.O. Box 628, Piketon, OH 45661. 6pgs.

8.  Lockheed Martin Utility Services, Inc.: Interoffice Memo POEF-532-93-550 Deposits from Instrument Lines in X-326. K.Ralston, D.L. Riepenhoff. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. November 22, 1993. [Memo]. 2pgs.

9.  Lockheed Martin Utility Services, Inc.: Interoffice Memo POEF-801-93-232 Arsenic Contamination Meeting Minutes. W. DeVelin. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. November 12, 1993. [Memo]. 2pgs.

10. Considine, D.M., G.D. Considine, (eds.): Van Nostrand's Scientific Encyclopedia. 7th ed. New York: Van Nostrand Reinhold, 1989.

11. Lockheed Martin Utility Services, Inc.: Interoffice Memo POEF-801-93-235 Arsenic Contamination Interim Report. W.DeVelin. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. November 18, 1993. [Memo]. 2pgs.

12. Lockheed Martin Utility Services, Inc.: Interoffice Memo POEF-801-93-221 Arsenic Meeting Minutes. W. DeVelin. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. November 2, 1993. [Memo]. 2pgs.

13. Lockheed Martin Utility Services, Inc.: Arsenic Contamination in Cascade-Executive Summary. W. DeVelin. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. December 2, 1993. [Memo]. 2pgs.

14. Mine Safety Appliances Company: Suitability of Air Purifying Respirator Against Arsenic-Containing Compounds. J.G. Mears. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. December 2, 1993. [Letter]. 2pgs.

15. Code of Federal Regulations [1989]. Inorganic arsenic. Title 29 Code of Federal Regulations, 29 CFR Part 1910.1018. Washington, DC: U.S. Government Printing Office, Federal Register.

16. Lockheed Martin Utility Services, Inc.: Analysis of Arsenic Filters. T.Shook, D.Boyd. Lockheed Martin Utility Services, Inc., Piketon, OH 45661. March 4, 1994. [Memo]. 2pgs.

17. NIOSH [1994]. Arsenic: Method Nos. 7901 (Arsenic Trioxide) and 6001 (Arsine). In: Eller,P.M., Cassinelli,M.E., eds. NIOSH Manual of Analytical Methods. 4th ed. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service,

**Page 21 - Health Hazard Evaluation Report No. 94-0077-XXXX**

Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS(NIOSH) Publication No. 94-113.

18.  DataChem Laboratories: Standard Operating Procedure: Total Uranium By Kinetic Pulsed-Laser Phosphorimetry. September 9, 1992. [Unpulblished Information]. DataChem Laboratories; 960 West LeVoy Drive; Salt Lake City, UT 84123.

19.  Ahrenholz, S.H.: "Results of Arsenic Exposure Evaluation Conducted by NIOSH." June 28, 1994. [Unpublished Information]. NIOSH-HERB, MS R-44; 4676 Columbia Parkway; Cincinnati, OH 45229.

20.  NIOSH [1992]. NIOSH Recommendations for Occupational Safety and Health Compendium of Policy Documents and Statements. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS(NIOSH) Publication No. 92-100.

21.  ACGIH [1994]. 1994-1995 Threshold Limit Values for Chemical Substances and Physical Agents and Biological Exposure Indices. Cincinnati, OH: American Conference of Governmental Industrial Hygienists.

22.  Code of Federal Regulations [1989]. Air contaminants. Title 29 Code of Federal Regulations, 29 CFR Part 1910.1000. Washington, DC: U.S. Government Printing Office, Federal Register.

23.  NIOSH [1994]. NIOSH Pocket Guide to Chemical Hazards. Cincinnati, OH: U.S. Department of Health and Human Services. Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 94-116. Pg. 342.

24.  ACGIH [1991]. Notice of intended change: arsenic and its soluble inorganic compounds, including arsine. Applied Occup Environ Hyg 6(12):1049-1056.

25.  Reels H, Bucket J, Truc J, et al [1982]. The possible role of direct ingestion on the overall absorption of cadmium or arsenic in workers exposed to Cd or $As_2O_3$ dust. Am J Ind Med 3:53-65.

26.  ACGIH [1994]. Documentation of the arsenic, elemental and inorganic compounds (except arsine) TLV. [Unpublished]. ACGIH; 1330 Kemper Meadow Dr.; Cincinnati, OH 45240.

**Page 22 - Health Hazard Evaluation Report No. 94-0077-XXXX**

27.  Ishinishi N, Tsuchiya K, Vahter M, Fowler B [1986].  Arsenic.  In:  Friberg L, Nordberg G, Vouk VB, eds.  Handbook on the Toxicology of Metals.  New York, NY:  Elsevier, pp 43-83.

28.  Foa V, Colombi A, Maroni M, Buratti M [1987].  Biological indicators for the assessment of human exposure to industrial chemicals.  Arsenic.  Luxemburg:  Commission of the European Communities.

29.  Smith TJ, Crecelius EA, Reading JC [1977].  Airborne arsenic exposure and excretion of methylated arsenic compounds.  Environ Health Perspect 19:89-93.

30.  Hathaway, G.J., N.H.Proctor, J.P.Hughes, and M.L.Fischman (eds.): Proctor and Hughes Chemical Hazards of the Workplace. 3rd ed. New York:Van Nostrand Reinhold, 1991.

31.  U.S. Nuclear Regulatory Commission: Chemical Toxicity of Uranium Hexafluoride Compared to Acute Effects of Radiation-Final Report. by S.A. McGuire (NUREG-1391) Washington, D.C.: U.S. Nuclear Regulatory Commission, Office of Nuclear Regulatory Research, 1991. pp. 2-4.

32.  ACGIH [1991]. Documentation of the Threshold Limit Values and Biological Exposure Indices. 6th ed. Cincinnati, OH: American Conference of Governmental Industrial Hygienists. pp. 1668-1674.

33.  Cookfair,D.L., W.L.Beck, C.Shy, et al.: Lung Cancer Among Workers at a Uranium Processing Plant. In: Epidemiology Applied to Health Physics,pp. 398-406. Proceedings of the Sixteenth Midyear Topical Symposium of the Health Physic Society, Alubquerque, NM, January 10-14, 1983. U.S.Dept. of Energy Report CONF-830101. National Technical Information Service, Springfield, VA (1984).

34.  NIOSH [1993]. NIOSH Certified Equipment List as of September 30, 1993. Cincinnati, OH: U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS(NIOSH) Publication No. 94-104.

35.  Reddish, D.A.: "Analysis of Total Uranium by Kinetic Phosphorescence Analyzer, Sequence 7981-L." June 14, 1994. [Unpublished Information] DataChem Laboratories; 900 West LeVoy Drive; Salt Lake City, UT 84123-9992.

**Page 23 - Health Hazard Evaluation Report No. 94-0077-XXXX**

## AUTHORSHIP AND ACKNOWLEDGEMENTS

Report Prepared by:

Steven H. Ahrenholz, Ph.D., CIH
Research Industrial Hygienist
Exposure Assessment Section
Health-related Energy Research
  Branch
Division of Surveillance, Hazard
  Evaluations, and Field Studies

Field Assistance:

John J. Cardarelli II, M.S.
Research Health Physicist
Exposure Assessment Section
Health-related Energy Research
  Branch
Division of Surveillance, Hazard
  Evaluations, and Field Studies

Laboratory Analyses:

Dave A. Reddish
Boyd E. Neilson
DataChem Laboratories
Salt Lake City, Utah

Originating Office:

Hazard Evaluations and Technical
  Assistance Branch
Division of Surveillance, Hazard
  Evaluations and Field Studies
National Institute for Occupational
  Safety and Health
4676 Columbia Parkway
Cincinnati, Ohio 45226

## DISTRIBUTION AND AVAILABILITY OF REPORT

Copies of this report may be freely reproduced and are not copyrighted. Single copies of this report will be available for a period of three (3) years after the date of this report from the NIOSH Publications Office, 4676 Columbia Parkway, Cincinnati, Ohio, 45226. To expedite your request, include a self-addressed mailing label along with your written request. After this time, copies may be purchased from the National Technical Information Service (NTIS), 5285 Port Royal Road, Springfield, Virginia 22161. Information regarding the NTIS stock number may be obtained from the NIOSH Publications Office at the Cincinnati address. The NTIS stock

**Page 24 - Health Hazard Evaluation Report No. 94-0077-XXXX**

number, as well as other information on workplace hazards may also be requested by calling 1-800-35-NIOSH (1-800-356-4674).

Copies of this report have been sent to:

1.  Lockheed Martin Utility Services, Inc., Piketon, Ohio
2.  OCAW-Local 3-689
3.  OCAW International
4.  UPGWA-Local 66
5.  Confidential requestors
6.  Occupational Safety and Health Administration, Region V

For the purposes of informing affected employees, copies of this report shall be posted by the employer in a prominent place accessible to the employees for a period of 30 calendar days.

**Page 25 – Health Hazard Evaluation Report No. 94-0077-XXXX**

Table I (continued)
Occupational Exposure Evaluation Criteria for Airborne Contaminants

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

| Country | Agent | Forms of Agent Specifically Identified with the Evaluation Criteria | Occupational Exposure Limit[f] | | Carcinogenicity Notation[g] |
|---|---|---|---|---|---|
| | | | TWA in ug/m3 | STEL in ug/m3 | |
| USA: ACGIH[c] | Arsenic | Elemental and inorganic compounds (except arsine) as arsenic | 10 | | Confirmed human carcinogen |
| USA: NIOSH[c] | | Total inorganic arsenic | | 2 | Occupational carcinogen (Maintain lowest feasible level) |
| USA: OSHA[c] | | Inorganic arsenic | 10 (Action Level 5) | | Carcinogen |
| Australia | | | 50 | | Established human carcinogen |
| Federal Republic of Germany | | D | none | none | Established human carcinogen |
| United Kingdom | | Arsenic and compounds, except arsine (D) | 100 | | |
| USA: ACGIH[c] | Uranium | Elemental uranium, soluble and insoluble compounds; as uranium | 200 | 600 | Not currently established |
| USA: NIOSH[c] | | Soluble compounds as uranium; | 50 | - | Occupational carcinogen (Maintain lowest feasible level) |
| | | insoluble compounds as uranium | 200 | 600 | |
| USA: OSHA[c] | | Soluble compounds as uranium; | 50 | | - |
| | | insoluble compounds as uranium | 250 | | |
| Australia | | Natural, soluble, and insoluble; as uranium | 200 | 600 | - |
| Federal Republic of Germany | | Uranium compounds, total dust, as uranium | 250 | 2500 (30 minutes; 1X/shift) | Due to natural radioactivity the tolerance values identified in the "Strahlenschutzverordnung" (radiation protection guidelines) of 10/13/76 are to be followed |

**Page 26 - Health Hazard Evaluation Report No. 94-0077-XXXX**

Table I (continued)
Occupational Exposure Evaluation Criteria for Airborne Contaminants

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

| Country | Agent | Forms of Agent Specifically Identified with the Evaluation Criteria | Occupational Exposure Limit[1] | | Carcinogenicity Notation[B] |
| --- | --- | --- | --- | --- | --- |
| | | | TWA in ug/m3 | STEL in ug/m3 | |
| United Kingdom | ▮▮▮▮▮▮ | Natural, soluble compounds; as uranium | 200 | 600 (10 minute STEL) | |
| | Radon | | | | |

A:  Limits are presented as Time-Weighted Averages (TWAs) calculated over a workshift (usually 8 hours) or as Short-Term Exposure Limits (STELs) calculated over a shorter (usually 15 minute) time period. A ceiling concentration denotes a level that is not to be exceeded. The OSHA Action Level denotes an exposure level at which selected protective actions within the OSHA occupational exposure standard, 29 CFR 1910.1018, must be implemented. Concentrations are given in micrograms per cubic meter of air (ug/m3).

B:  Carcinogenicity notation represents that designation for the agent by the respective country (and source) identified in the International Labour Office reference: Occupational Exposure Limits for Airborne Toxic Substances. 3ed. Occupational Safety and Health Series No. 37, International Labour Organisation, Geneva, (1991). The ACGIH value is from ACGIH [1993]. 1993-1994 threshold limit values for chemical substances and physical agents and biological exposure indices. Cincinnati, OH: American Conference of Industrial Hygienists. The NIOSH limit is taken from NIOSH [1975]. Criteria for a recommended standard: occupational exposure to inorganic arsenic-new criteria-1975. Cincinnati, OH: U.S. Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control, National Institute for Occupational Safety and Health; DHEW (NIOSH) Publication No. 75-149 and the OSHA limits from 29 CFR 1910.1018.

C:  ACGIH= American Conference of Governmental Industrial Hygienists; NIOSH= The National Institute for Occupational Safety and Health; OSHA= The Occupational Safety and Health Administration. OSHA standards are mandatory exposure limits in the United States.

D:  Source for these two entries is ACGIH [1994]. Documentation of the arsenic, elemental and inorganic compounds (except arsine) TLV. [Unpublished]. ACGIH; 1330 Kemper Meadow Dr.; Cincinnati, OH 45240.

**Page 27 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br>Area or Personal[A] | Sample Period (min) | Sample Volume $(m^3)^B$ | Airborne Concentration in $ug/m^{3C}$ | | Job Title or Area Sample Location[ED] | Notes[E]<br>(LMUS results in $ug/m^3$) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| 3/2/94 | X-326, Operat-ing Floor, Top Purge Traps A,B,C | Area | See Notes | - | - | - | At vacuum unit exhaust, on cart | Pump faulted; invalid sample LMUS Duplicate Sample Result (LMUS-Dup):<br>S-TWA 0.4<br>8-hr TWA 0.2 |
| **** | | Area | 216 | 0.444 | 0.2 | 0.1 | At vacuum unit exhaust, on cart | Alumina trap changeout LMUS-Dup:<br>S-TWA *ND*<br>8-hr TWA *ND* |
| | | Area | 209 | 0.416 | 0.3 | 0.1 | Column R-101, Operating Floor | Stationary sample location LMUS-Dup:<br>S-TWA 0.5<br>8-hr TWA 0.2 |
| | | Area | See Notes | - | - | - | Column R-101, Operating Floor | Pump faulted; invalid sample LMUS-Dup:<br>S-TWA 0.5<br>8-hr TWA 0.2 |

**Page 28 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br><br>Area or Personal[A] | Sample Period (min) | Sample Volume (m³)[B] | Airborne Concentration in ug/m³ [C] | | Job Title or Area Sample Location[D] | Notes[E]<br><br>(LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| | | Personal | 127 | 0.465 | T | T | Chemical Operator; Col L-101 | Alumina trap replacement<br>LMUS-Dup:<br>S-TWA  0.6<br>8-hr TWA 0.2 |
| | | Personal | 136 | 0.494 | ND | ND | Chemical Operator; at Col L-101 | Same as above |
| | | Personal | 137 | 0.494 | T | T | Chemical Operator; at Col L-101 | Same as above<br>LMUS-Dup:<br>S-TWA  0.7<br>8-hr TWA 0.1 |
| | X-326 Product with-drawal (PW) | Personal | 110 | 0.399 | ND | ND | Security Guard; PW exclusion zone; in guard house | Worker in adjacent area to alumina trap changeout |

**Page 29 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br><br>Area or Personal[4] | Sample Period (min) | Sample Volume $(m^3)^B$ | Airborne Concentration in $ug/m^{3C}$ | | Job Title or Area Sample Location[E][D] | Notes[E]<br><br>(LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| 3/2/94 | X-700 Conver-ter Main-tenance | Area | See Notes | - | - | - | Area, mounted on work platform railing; Inside columns A-4,B-4 A-5,B-5 | Pump faulted; invalid sample LMUS-Dup: S-TWA 0.03 8-hr TWA 0.02 |
| | | Area | 287 | 0.591 | ND | ND | Back-up strips being welded in place on con-verter | Pump faulted at 287 minutes terminating sample LMUS-Dup: S-TWA 1.6 8-hr TWA 1.1 |
| | | Personal | 306 | 1.123 | ND | ND | Converter Mechanic | Clamping backup strips onto converter prior to welding LMUS-Dup: S-TWA *ND* 8-hr TWA *ND* |

**Page 30 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type Area or Personal[d] | Sample Period (min) | Sample Volume (m³)[g] | Airborne Concentration in ug/m³ [c] | | Job Title or Area Sample Location[ff] | Notes[6] (LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| | | Personal | 5 (See Notes) | 0.019 | ND | ND | Welder | Welding patch on converter shell, Ni & steel welding using MIG and stick; pump faulted, terminating sample LMUS-Dup: S-TWA *ND* 8-hr TWA *ND* |
| 3/3/94 | X-326 Cell Floor | Area | 67 | 0.135 | ND | ND | Midway between columns P-27 & P-30, cell floor, along cell 12 of unit 27-3 | Two workers replacing P-nut valves on seal feed on cell 12 LMUS-Dup: S-TWA *ND* 8-hr TWA *ND* |
| | | Area | 68 | 0.139 | ND | ND | Same as above | Same as above LMUS-Dup: S-TWA *ND* 8-hr TWA *ND* |
| | | Personal | 57 | 0.209 | ND | ND | Instru-ment Mechanic | Changed out 6 P-nut valves; anti C's worn |

**Page 31 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type Area or Personal[d] | Sample Period (min) | Sample Volume (m³)[B] | Airborne Concentration in ug/m³ [C] | | Job Title or Area Sample Location[ED] | Notes[E] (LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| | | Personal | 59 | 0.218 | ND | ND | Instru-ment Mechanic | Changed out 6 P-nut valves; anti C's worn |
| | | Personal | 56 | 0.207 | ND | ND | Instru-ment Mechanic | Monitored work from outside contam-ination zone, no respiratory protection worn |
| 3/3/94 | X-326, cell floor, Evacua-tion Booster Station | Area | 324 | 0.645 | 0.7 | 0.5 | Located in work area where cutting out and removal took place, Columns B-60,B-61,C-60,C-61 | Removal of EEB7 valve on booster station connected to surge drum LMUS-Dup: S-TWA  3.7 8-hr TWA 1.4 |
| | | Area | 324 | 0.616 | 0.7 | 0.5 | Same as above | Same as above LMUS-Dup: S-TWA  1.3 8-hr TWA 0.8 |

**Page 32 – Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br><br>Area or Personal[A] | Sample Period (min) | Sample Volume (m³)[B] | Airborne Concentration in ug/m³ [C] | | Job Title or Area Sample Location[D] | Notes[E]<br><br>(LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| | | Personal | 52 | 0.185 | ND | ND | Mainten-ance Mechanic | Overhead crane operator wore SCBA<br>LMUS-Dup:<br>S-TWA *ND*<br>8-hr TWA *ND* |
| | | Personal | 322 | 1.176 | 33 | 22 | Welder | Burned out valve bonnet using a carbon arc, PPE incl anti Cs and airline respirator<br>LMUS-Dup:<br>S-TWA 2.7<br>8-hr TWA 0.9 |
| | | Personal | 321 | 1.172 | 1 | 0.7 | Mainten-ance Mechanic | Assisted in pulling out valve and wrapping it, PPE as above<br>LMUS-Dup:<br>S-TWA 1.1<br>8-hr TWA 0.7 |

**Page 33 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br><br>Area or Personal[A] | Sample Period (min) | Sample Volume (m³)[B] | Airborne Concentration in ug/m³ [C] | | Job Title or Area Sample Location[D] | Notes[E]<br><br>(LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| | | Personal | 313 | 1.145 | 5 | 3 | Mainten-ance Mechanic | Pulled out valve and closed lines, PPE as previous two<br>LMUS-Dup:<br>S-TWA 2.8<br>8-hr TWA 1.3 |
| | | Personal | 35 | 0.129 | 109 | 8 | Chemical Operator | Decontamination of pipe after removal of valve, wore bubble suit |
| NIOSH Analytical Method 7901 Limits of Detection and Quantitation for Sample Sequence 7981 | | | | | Limit of detection/filter: 0.07-0.1 ug<br>Limit of quantitation/filter: 0.23-0.31 ug | | | |
| Evaluation Criteria | | | | | Airborne Occupational Exposure Limit[F] | | | Carcinogen Status[G] |
| NIOSH Recommended Exposure Limit (REL) | | | | | 2 (15 minute ceiling)<br>**Lowest Feasible Level** | | | Occupational Carcinogen |

**Page 34 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE II (continued)

Arsenic Air Sampling Results in the X-326 Process Building and X-700 Converter Maintenance

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

March 2-3, 1994

| Sample Date | Building Location | Sample Type<br><br>Area or Personal[A] | Sample Period (min) | Sample Volume (m³)[B] | Airborne Concentration in ug/m³[C] | | Job Title or Area Sample Location[D] | Notes[E]<br><br>(LMUS results in ug/m³) |
|---|---|---|---|---|---|---|---|---|
| | | | | | TWA over sample period | 8-hour TWA | | |
| **OSHA Inorganic Arsenic Permissible Exposure Limit (PEL)** | | | | | 10 (8-hr TWA; 5 ug/m³ for Action Level) | | | Carcinogen |

****    Shaded cells denote that the same sample date and building location apply to the identified sample.

A:    Area samples were located in the work area within the contamination zone as close to the work location as possible. Area samples were placed by individuals inside the contamination zone at the direction of the NIOSH investigators. Personal samples were placed on the individual workers at a location approximating the collar and outside of the respiratory protection gear.

B:    Sample volume is given in cubic meters of air. - denotes not applicable.

C:    Airborne concentration of total arsenic is presented in micrograms per cubic meter of air sampled. Two values are presented: the Time-Weighted Average (TWA) calculated only for the sampling period and an 8-hour TWA calculated over a full 8 hour workshift incorporating an assumed zero exposure during the unsampled time period outside of the time period actually sampled. T indicates that arsenic was identified to be present in the sample but was below the analytical limit of quantitation. (This was less than an 8-hr TWA for this sample set of 0.1 ug/m³.) ND indicates that the concentration of arsenic, if present, was below the analytical limit of detection for these samples. (Calculated 8-hour TWA values for the ND samples ranged from below 0.5 ug/m³ to below 0.1 ug/m³.) The reader is referred to the discussion on the sampling and analytical methods used for evaluating arsenic exposures.

D:    Job Title represents the job title of the individuals sampled, area sample location provides a more specific definition of where the stationary samplers were located. Area samples were generally located at a level of between three and five feet above the floor or surrounding walking surfaces. Column designations within buildings are given by letter and number.

E:    Notes: Several invalid samples associated with pump failures are listed for completeness. The placement of sampling equipment outside of the contamination zones precluded access to equipment during its operation inside of these zones. Workers within the zones were instructed on equipment placement and the starting/stopping of sampling. Most sampling periods are longer than that required for task performance since equipment had to remain inside of the contamination zone after work was completed and until it was surveyed for radiological contamination by the health physics department and approved for release into uncontaminated areas. Lockheed Martin Utility Services-Portsmouth (LMUS-PORTS) conducted duplicate sampling at some of the locations and in the breathing zones of some of the workers selected by the NIOSH investigators. These sample results from the LMUS-PORTS industrial hygiene department are noted as LMUS-Dup(licate sample) with the results given as time-weighted averages (TWAs) over both the sampling period (S-TWA) and calculated out for an 8 hour TWA (8-hr TWA), assuming zero exposure during the unsampled time period. All values are presented as micrograms per meter cubed of air. The ND for none detected is italicized to denote that the samples were below the company's analytical limit of detection, not the NIOSH limit of detection listed at the end of the table.

PPE: (Personal Protective Equipment) Anti-Cs denote anticontamination protective clothing. Work inside of contamination zones evaluated for arsenic exposures, with the exception of the evacuation booster station valve replacement, required workers to wear flame retardant yellow Tyvek coveralls, booties, shoe covers, gloves, and a bubble hood connected to an air line. Workers

**Page 35 - Health Hazard Evaluation Report No. 94-0077-XXXX**

on the evacuation booster station valve removal wore additional white plastic coated Tyvek coveralls to protect against technitium exposures, welders hoods over full face supplied air line respirators, and welder lenses. The crane operator wore a selfcontained breathing apparatus (SCBA) because of mobility requirements associated with climbing and accessing the overhead crane cab. Workers outside of contamination zones wore company issued blue cotton coveralls, shoes, and possibly disposable latex gloves (task and area dependent).

F:      Airborne Occupational Exposure Limits are presented. The NIOSH recommended exposure limit (REL) represents a ceiling concentration which is not to be exceeded at any time, measured over any 15 minute sampling period during a workshift. NIOSH recommends that engineering controls be used to the maximum extent to maintain exposure levels at the lowest level possible. Supplementary use of personal protective equipment may be necessary to achieve this goal but represents the last choice for protection. The OSHA Permissible Exposure Limit represents an enforceable standard for exposures which would occur if the employee were not using a respirator. An Action Level represents the exposure level at which specific requirements must be implemented as required in the OSHA Inorganic Arsenic standard, 29 CFR 1910.1018.

G:      Carcinogen status represents the classification of arsenic as a cancer producing substance. Arsenic is identified by both OSHA and NIOSH as a carcinogen.

**Page 36 - Health Hazard Evaluation Report No. 94-0077-XXXX**

Table III
Comparison of Previous Company Sampling Data for Arsenic to NIOSH Results

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

| Building | Location | Sample Type | Previous Company Samples | | NIOSH Samples | |
|---|---|---|---|---|---|---|
| | | | Sample Dates | Arsenic Concentration (ug/m3)[A] | Sample Date | Arsenic Concentration (ug/m3)[A] |
| X-326 | Purge Traps | Area | 11/3/93 | ND | 3/2/94 | 0.2 |
| X-326 | Guard Shack | Area | 11/3/93 | ND | Not Applicable | - |
| X-700 | Converter Maintenance | Area | 11/3/93 | ND | 3/2/94 | ND |
| X-700 | Converter Maintenance | Personal | 11/3/93, 12/7/93 | ND-0.5 | 3/2/94 | ND |
| X-326 | Replace Peanut Valves | Personal | 12/21/93 | ND | 3/3/94 | ND |
| X-326 | Evacuation Booster Station | Personal | 11/9/93, 11/11/93 | ND-6 | 3/3/94 | 1-109 |

A:     Contaminant concentrations are presented in micrograms per cubic meter of air.  ND denotes that aresenic concentrations in the sample fell below the analytical limit of detection for the specific sample.  Nondetectable values obtained from previous company sampling results indicates that airborne nondetectable levels of arsenic ranged from below 0.05 ug/m3 to less than 0.1 ug/m3.  The nondetectable levels for the NIOSH samples ranged from below 0.09 ug/m3 to less than 5 ug/m3.  Note that the environmental limit of detection is influenced by sample size (total air volume sampled).

**Page 37 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE IV

Summary of Mean Recoveries of Arsenic in Quality Control (QC) Samples Obtained from Two Sources and
Submitted to Laboratories Used by NIOSH and PORTS

HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio

| QC Source [A] | Laboratory [B] | No. Samples [C] | Percent Recovery of Spiked Arsenic | | | Analytical Method [D] |
|---|---|---|---|---|---|---|
| | | | Range | Mean | Std. Deviation | |
| PORTS Contract Lab | PORTS Contract Lab | 20 | 43-94 | 78 | 15 | Atomic Absorption |
| | PORTS On-site Lab | 4 | 71-82 | 76 | 4 | Atomic Absorption |
| | PORTS On-site Lab | 7 C | 83-170 | 112 | 25 | Inductively Coupled Plasma |
| | NIOSH Contract Lab | 8 | 93-110 | 98 | 6 | Atomic Absorption |
| NIOSH In-house Lab | PORTS On-site Lab | 8 | 64-85 | 79 | 7 | Atomic Absorption |
| | NIOSH Contract Lab | 8 | 100-110 | 102 | 3 | Atomic Absorption |

A:  Samples spiked with arsenic were obtained from two sources, the PORTS contract laboratory (American Analytical Laboratory, Akron, OH) and the NIOSH Division of Physical Sciences and Engineering.

B:  The two analytical laboratories under comparison were the PORTS on-site analytical laboratory and the NIOSH contract laboratory (DataChem, Salt Lake City, UT). The expected recoveries for the spikes provided by American Analytical were determined from the analyses of 20 paired samples prepared at the same time as those supplied to PORTS for this comparison with the NIOSH contract lab.

C:  Number of samples analyzed by each lab from the source identified in the first column. This excludes blanks which were also submitted. The total number represents equal samples at each of the four spike levels of arsenic: 1, 3, 7, and 10 micrograms. For the PORTS on-site lab analyzing samples from the PORTS contract lab by inductively coupled plasma, one sample result at the 1 microgram level was reported as a less than and was excluded from these values presented here.

D:  PORTS reported results for two different analytical methods which the site uses. Inductively coupled plasma analysis is PORTS preferred analytical method for arsenic.

NOTE:  The mean recovery for six QC samples originally submitted with the NIOSH arsenic samples collected during the survey had a mean recovery of 96% which was reported by the lab to be in control.

**Page 38 - Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE V (continued)
Uranium Air Sample Results for Areas in X-326 Process Building and X-700 Converter Maintenance
HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio
March 2-3, 1994

| Sample Date | Building Location | Sample Period (min)[I] | Sample Volume (m³)[B] | Analytical Concentration[C] | | Airborne Concentration in ug/m³[D] | | Area Sample Location[E] | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | ug/ filter | ± TPU error in ug | TWA over sample period | 8-hour TWA | | |
| 3/1 - 3/2/94 | Hotel room | 581 | 5.824 | 0.07 | 0.016 | 0.01 | 0.01 | On table in NIOSH investi-gator's room | - |
| 3/2/94 | X-326, Operat-ing Floor, Top Purge Traps A,B,C | 209 | 2.103 | 0.3 | 0.061 | 0.1 | 0.06 | Column R-101, Operating Floor | Notes[F] |
| 3/2/94 | X-700 Conver-ter Main-tenance | 277 | 2.867 | 2.5 | 0.490 | 0.9 | 0.5 | Area, mounted on stand on work platform; Inside columns A-4,B-4 A-5,B-5 | Notes[F] |
| 3/3/94 | X-326 Cell Floor | 60 | 0.624 | 0.2 | 0.047 | 0.4 | 0.05 | Midway between columns P-27 & P-30, cell floor, along cell 12 of unit 27-3 | Two workers replacing P-nut valves on seal feed on cell 12 Notes[F] |

**Page 39 – Health Hazard Evaluation Report No. 94-0077-XXXX**

TABLE V (continued)
Uranium Air Sample Results for Areas in X-326 Process Building and X-700 Converter Maintenance
HETA 94-0077
Lockheed Martin Utility Services Uranium Enrichment Plant
Piketon, Ohio
March 2-3, 1994

| Sample Date | Building Location | Sample Period (min)[I] | Sample Volume (m³)[g] | Analytical Concentration [c] | | Airborne Concentration in ug/m³[D] | | Area Sample Location[E] | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | ug/ filter | ± TPU error in ug | TWA over sample period | 8-hour TWA | | |
| 3/3/94 | X-326, cell floor, Evacuation Booster Station | 321 | 3.248 | 3.7 | 0.740 | 1.1 | 0.8 | Located in work area where cutting out and removal took place, Columns B-60,B-61,C-60,C-61 | Removal of EEB7 valve on booster station connected to surge drum Notes[F] |

| DataChem Laboratories Standard Operating Procedure: Total Uranium by Kinetic Pulsed-Laser Phosphorimetry(ref#) | Limit of detection/filter: 0.001 ug | |
|---|---|---|
| **Evaluation Criteria Source** | **Airborne Occupational Exposure Limit[G]** | **Carcinogen Status[H]** |
| NIOSH Recommended Exposure Limits (REL) | Soluble compounds as Uranium: 50 ug/m³ Insoluble compounds as Uranium: 200 ug/m³ Maintain Exposures at Lowest Feasible Level | Occupational Carcinogen |
| OSHA Uranium Permissible Exposure Limits (PEL) | Soluble compounds as Uranium: 50 ug/m³ Insoluble compounds as Uranium: 250 ug/m³ | - |

## Page 40 - Health Hazard Evaluation Report No. 94-0077-XXXX

*A:*      All sample periods presented in minutes (min).

*B:*      Sample volumes are presented as total volume in cubic meters of air ($m^3$).

*C:*      Analytical concentrations reported as total uranium are reported in micrograms (ug) per filter. The second column accompanying the concentration of uranium per filter is the error value associated with each respective filter analysis. This is identified as the Total Propagated Uncertainty (TPU) and is presented at the 95% confidence level. This error term provides for a range of result values specific to an individual sample and is provided with radiochemistry data. The error value takes into consideration all preparation and analysis errors. The TPU for these results was determined to be plus or minus 20% of the result value.

*D:*      Airborne concentration of total uranium is presented in micrograms per cubic meter of air sampled. Two values are presented: the Time-Weighted Average (TWA) calculated only for the sampling period and an 8-hour TWA calculated over a full 8 hour workshift incorporating an assumed zero exposure during the unsampled time period outside of the time period actually sampled. The μg/filter analytical concentration was used to calculate airborne concentrations. The TPU has not been incorporated into the results in the Airborne Concentration columns.

*E:*      Area samples were located in the work area within the contamination zone as close to the work location as possible. Area samples were placed by individuals inside the contamination zone at the direction of the NIOSH investigators. Area samples were generally located at a level of between three and five feet above the floor or surrounding walking surfaces. Column designations within buildings are given by letter and number.

*F:*      Notes: The placement of sampling equipment inside the contamination zones precluded access to equipment during its operation inside of these zones. Workers within the zones were instructed concerning equipment placement and the starting/stopping of sampling. Most sampling periods are longer than that required for task performance since equipment had to remain inside of the contamination zone after work was completed and until it was surveyed for radiological contamination by the health physics department and approved for release into uncontaminated areas.

*G:*      Airborne Occupational Exposure Limits are presented. The NIOSH recommended exposure limit (REL) represents a full-shift 8-10 hour TWA. NIOSH recommends that engineering controls be used to the maximum extent to maintain exposure levels at the lowest level possible. Supplementary use of personal protective equipment may be necessary to achieve this goal but represents the last choice for protection. The OSHA permissible exposure limit represents an enforceable standard.

*H:*      Carcinogen status represents the classification of uranium as a cancer producing substance. Uranium is identified by NIOSH as a carcinogen.

**Page 41 - Health Hazard Evaluation Report No. 94-0077-XXXX**

## Appendix A

### Total Propagated Uncertainty

*(The following information is extracted from the DataChem Laboratory report for total uranium results prepared by Dave A. Reddish.[35])*

The total propagated uncertainty (TPU) is an error term (range of results). TPU generally is provided with radiochemistry data and allows the comparison of a given result to health protection or environmental protection standards with an understanding of the range the result may encompass.

In radiochemistry counting (e.g., alpha or gamma spectometry, proportional counting, liquid scintillation counting, etc.), most errors are "normally" distributed due to the nature of counting events. Therefore, errors may be determined based on the number of counting events observed, and assumptions do not have to be made about error, as a percentage of results. The absolute counting errors may be calculated based on observations, and these errors are summed in quadrature with systematic errors.

The total uranium analysis is the only non-counting type analyses performed by the DataChem Laboratories (DCL) Radiochemistry Lab. In the kinetic phosphorescence analyzer (KPA) uranium analysis, a phosphorescence intensity decay rate is measured and mathematically extrapolated back to zero time, with represents the uranium contribution, and, therefore, concentration. The KPA software does provide an error term, but this term only represents the error in the measurement, based upon the relative intensity, decay curve slope, and decay curve correlation coefficient. This term does not take into account such errors as measurement, calibration, and separation recovery uncertainties. These terms as well as the measurement errors are addressed by measuring the population standard deviation of blanks measured over time. A comparison is also made to verify that the blank standard deviation ($\sigma_{BLK}$) is consistent with the standard deviation of low-level standards (ones having a concentration nearest the detection level (MDC)). The $\sigma_{BLK}$ is multiplied by 1.96 to determine the blank TPU at the 95% confidence level.

A TPU was determined for blanks but not for the samples. Because KPA errors would not be normally distributed but would tend to follow hyperbolic functions around the calibration curve, the estimation of error at any given concentration would be difficult. The dominant statistical question that health protection specialists, health physicists, or environmental engineers would be asking about samples results is, "Is this reported result significant (a real number)?" Therefore, a relative error is determined, based on the blank statistics and then multiplied by the result for reporting a TPU. The relative error is determined as follows:

*Relative TPU (%) = 1.96 ($\sigma_{BLK}$/mean blank result) X 100%*

The reported error (TPU) follows as such:

**Page 42 - Health Hazard Evaluation Report No. 94-0077-XXXX**

*Absolute (reported) TPU = Analyte Result X (Relative TPU/100%)*

Based on control data currently maintained by DCL for blanks analyzed by KPA, the relative TPU is 20%. DCL realizes that, as the sample results increase above the MDC, their estimate for error may be too high, but, in that the analysis of the data is generally more critical near the detection level, their perception is that this methodology is appropriate to answer the data user's question as stated above.

# EXHIBIT V

**LOCKHEED MARTIN**

# *Memorandum*

**DATE:**     June 16, 1998
          POEF-X38300-98-239, Rev. 1

**TO:**       Tim Taulbee

**FROM:**     Steve Balko, Cascade HP Section Manager, MS-5020, PORTS (3136)

**SUBJECT:**  X-326 Source Vault Material Inventory, Revision 1

On June 11, 1998, a detailed inventory of all material in the X-326 source vault was conducted. The source vault is located in a contamination area and the vault is posted as a "Radiation Area." Item number 4 was incorrectly identified as five sources, when there are really six sources.

The vault is locked and Health Physics maintains the key to the lock. The following items were found in the vault:

1)  One round, blue, empty, shielded source container, serial number E31B.

2)  Two UF6 sample containers in 5 gallon containers. The sample containers were analyzed by members of the security sweep team representing the Applied Nuclear Technology group and were found to contain approximately 99% U-238.

3)  One Ray Guide Directional and Panoramic Beam Collimator, model number 527 with serial number 342.

4)  Six liquid Plutonium Sulfate Tetrahydrate sources in a yellow shipping can. The indicated weight for each source was .25 grams and the serial numbers for the sources were Pu 5, Pu 6, Pu 7, Pu 8, Pu 9, and Pu 10.

5)  One five gallon can with 2 jars labeled Ash 1 and Ash 2 and one unlabeled broken jar.

6)  One Gamma Ray Projector with 34 pounds of U-238 for shielding. The model number is 533 and the serial number is 447. The label on the side of the projector indicates a maximum capacity of 100 ci Ir-192. Additional serial numbers are IC-2 and GAT II-507. There is a DOE label on the projector.

7)  One bar of natural uranium approximately 6 inches long.

8)  Two sample jars. One jar is labeled U1 and has .4654 grams of U-233 and 18.7 ugrams of U-232. The other jar is labeled U2 and has .46 grams of U-233 and 18.5 grams of U-232.

9)  One bottle of liquid Ba-133. The bottle is labeled 20 ml with the date 1/18/79 and the number 3580179A-03.

Tim Taulbee
Page 2
June 16, 1998
POEF-X38300-98-239, Rev. 1

10) One 5 gallon can with 5 different parts of a radiography or X-ray camera.

11) One 55 gallon drum with 4 Pu-238 sources, 1 Pu-239 source, and one Cf-252 source. These sources belong to HP and Jim McCleery is the custodian. The sources are in long-term storage.

12) Four Alphatron gauges with the serial numbers Ra-1-a, Ra-1-b, Ra-1-c, and Ra-1-d.

13) One 5 gallon drum with two Ra sources in shielded containers.

14) One Ra source with the label Ra 12

15) One Ra source with the labels E1356, model number 30351, and a serial number 24.

16) Two boxes lead bricks.

17) One empty cylindrical shielded source container.

18) One lead disc in a bag.

19) One box of miscellaneous sources that appear to be made on site.

   a) One 4 inch by 4 inch piece of folded cardboard with nine 1-inch pieces of metal inside the cardboard. Labeled G2101.

   b) One fan-type source with no label.

   c) One Cs-137 source in a plastic case labeled Cs 137 9202.

   d) One Cs-137 source in a plastic case labeled Cs 137 9203.

   e) One C0-60 10 mci source in a plastic case with the date 12/2/83.

   f) Three planchettes plated with Tc-99.

   g) One small bottle labeled Am-241, 5 uci, .005 ml with the date 7/1/77.

   h) Seven unlabeled button-type sources that appear to be made on site.

20) One yellow cable that appears to be for a radiography camera.

Tim Taulbee
Page 3
June 16, 1998
POEF-X38300-98-239, Rev. 1

All these items were properly controlled and maintained in the proper area for storage of radioactive material. The only items in the vault that belong to HP are the 4 Pu-238 sources, the 1 Pu-239 source and the 1 Cf-252 source.

If you have any questions, contact Steve Balko at extension 3136.

SHB:rkf

cc:     Jeff Castle
        Rick Coriell
        Greg Corzine
        John Howard
        Ron Smith
        Jack Tully

# EXHIBIT W



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Public Health Service



National Institute for Occupational
Safety and Health
Robert A. Taft Laboratories
4676 Columbia Parkway
Cincinnati OH 45226-1998

December 21, 2015
HHE 2013-0220

Mr. Barry Ko
Occupational Safety and Health Manager
Fluor-B&W Portsmouth
PO Box 548
Piketon, Ohio 45661
Attn: Barry Ko (X-157C)

Dear Mr. Ko,

This letter is in response to a September 2013 health hazard evaluation (HHE) request to the
National Institute for Occupational Safety and Health from management and union
representatives at Fluor-B&W Portsmouth. The request concerned dismantling and
decommissioning of uranium enrichment process equipment (referred to as "cut and cap") at the
former Portsmouth Gaseous Diffusion Plant X-326 Building in Piketon, Ohio. Concerns listed on
the request included employee exposures to radionuclides, hydrogen fluoride, volatile organic
compounds, asbestos, and heavy metals such as nickel, arsenic, and beryllium. After discussions
with management and union representatives, all parties agreed that we should focus our
evaluation on exposure and health issues possibly related to hydrogen fluoride, heavy metals,
and chlorine. Health concerns included rashes and skin burning, and eye and throat irritation.
Additional concerns involved the occasional presence of a green or yellow odorless gas and
unidentified odors in and around the X-326 building. This letter summarizes our evaluation and
provides our findings and recommendations.

**Site Visit**

On December 10–11, 2013, we met with employer and union representatives at the facility to
discuss the HHE request. Our objective was to review the worker health protection program as it
relates to industrial hygiene monitoring and medical surveillance. We discussed work processes,
practices, and workplace conditions, and spoke with employees. We attended briefings about
historical and current site operations and activities, including information about historical
uranium enrichment operations and converter cell treatments used to recover uranium.
Additional information was provided regarding procedures used to clean and purge residual
contaminants within processing equipment when uranium enrichment ceased. We were briefed
on current cut and cap work and associated job-hazard analysis procedures used prior to
beginning any work activity. A site-specific job safety pocket guide provided by the company
contained information on health and safety procedures, personal protective equipment, and safety
measures related to certain jobs [Fluor-B&W Portsmouth 2013]. Finally, we discussed the results

Page 2 – Mr. Barry Ko

of recent industrial hygiene air sampling and procedures for implementing the Department of Energy's Integrated Safety Management System. We met separately with union and management representatives on the second day of our visit to learn more about their specific concerns.

We held 16 confidential medical interviews with employees; our industrial hygienists spoke separately with these employees to further address work practices and exposure concerns. These interviews were with employees who 1) had requested to speak with us, 2) we randomly selected from a job roster, or 3) were identified by the union as an informational resource because of their lengthy employment at the facility or filing of workplace event reports.

During our visit, management gave us and all opening conference participants a binder with information about historical plant operations, current work practices, industrial hygiene sampling methods, some sampling results, training programs, and pictures of cut and cap operations. We reviewed these pictures as a substitute for a walk-through tour of the actual work area. Entering the work area required extensive radiological training and personal protective equipment, which was not feasible during our visit.

In December 2013, we sent managers and union representatives a letter that summarized our observations and findings from the site visit. In 2014, we held separate and joint teleconferences with union representatives and managers, as well as a call with a chemist hired by the union who had prior experience at the facility. In these calls we discussed ongoing operations, status of employee concerns, and steps taken by managers and the union to investigate ongoing issues. In September 2014 we held a final conference call with all parties to summarize our findings and recommendations, which are highlighted below.

**Document Review/Industrial Hygiene Data Discussion**

As part of our evaluation we reviewed documents that addressed the following topics:

a. the gaseous diffusion process
b. employee training, work practices, and equipment for removing and decommissioning process equipment
c. potential exposure hazards (mostly radioactivity, metals, hydrogen fluoride, and chlorine) and exposure assessment methods
d. examples of industrial hygiene sampling data from 2011–2013 used to assess potential hazards and exposure
e. respiratory protection program and other personal protective equipment used by employees

Page 3 – Mr. Barry Ko

Industrial hygiene sampling strategies and methods were selected on the basis of a job hazard analysis that involved anticipated and previously recognized hazards associated with specific work tasks. Samples were collected each day to determine the magnitude of the hazard(s) during different tasks. However, the majority of samples collected were of short duration, and were collected using direct reading gas and vapor detector tubes. On occasion, a small number of partial-shift area air samples were also collected using portable sampling pumps. For example, we found the instantaneous air sampling results for hydrogen fluoride ranged from <0.2 –184 parts per million. The NIOSH ceiling limit for hydrogen fluoride (a value that should never be exceeded) is 6 parts per million [NIOSH 2010]. On the basis of these data, the ceiling limit for this compound was exceeded on multiple occasions. However, it should be noted that there were no personal breathing zone air samples collected. Also, the lack of information linking a specific task(s) to these samples makes it difficult to relate exposure to such a task(s).

We noticed that only a few metals were selected for analysis in air samples instead of doing a full elemental scan using NIOSH Method 7300 [NIOSH 2015]. The industrial hygiene department manager reported that full scans were performed on air samples at the beginning of the cut and cap operation and the most prevalent metals were subsequently selected for routine analysis. Furthermore, we noticed no sampling plan for nitrogen dioxide, a contaminant that could be generated during thermal cutting of metal pipes, compressors, and converters. We later learned that the identification of a possible thermal decomposition product such as nitrogen dioxide was overlooked during the job hazard analysis conducted by the industrial hygiene department. After our discussion about potential generation of nitrogen dioxide during thermal cutting, the company indicated it would purchase a direct-reading monitor to check for nitrogen dioxide at the beginning of each thermal cut. In mid-December 2013, management and union representatives informed us that a "stop work order" had been instituted due to the detection of nitrogen dioxide. Management instituted plans to use full facepiece supplied air respirators in accordance with NIOSH recommendations [NIOSH 2010] for all cutting activities until the use of local exhaust ventilation could be evaluated. During a June 2014 call, management reported that supplied air was still used during hot cutting procedures as levels of nitrogen dioxide up to 5 parts per million had been measured.

## Medical and Industrial Hygiene Interviews

During our interviews, we asked 16 employees about their workplace exposures, potential health concerns, and views regarding training and communication between employees, management, and the union. A majority of workers (10 of 16) expressed concerns about poor communication between management and employees and concerns about retaliation for reporting safety problems. Concerns included having inadequate information about chemical(s) used, chemical exposures, and potential health effects. A few employees stated they were not given copies of

Page 4 – Mr. Barry Ko

their medical test results or summary industrial hygiene sampling results. Management stated that results of personal medical tests are provided to employees as required by the Department of Energy 10 CFR Part 851 Worker Safety and Health Program. Additionally, management stated that industrial hygiene sampling results are available upon employee request and summaries of results were provided to employees during periodic safety meetings.

Five employees reported rashes that they felt were work-related; not all employees had reported their rashes to management. Two of these employees reported nickel allergy prior to working at the facility; nickel is a component of the lining of some of the process equipment. Several employees expressed concern that they felt rushed to complete job tasks and that some managers placed production goals ahead of safety. Employees believed these problems have led to near misses and accidents. Finally, several employees expressed concern about the out-sourcing of laundry and respirator cleaning services, and stated personal protective equipment was often returned dirty or appeared contaminated.

We reviewed medical records for four employees who reported health concerns they felt were associated with their work in the X-326 building. Employees reported localized and generalized rashes that improved when not at work. Onset of rash ranged from an acute single episode to a chronic recurring rash over a number of years. A definitive diagnosis was not reported in employee medical records. We determined that making a definitive diagnosis in this workplace is difficult due to the large number of potential exposures and the inability to do skin patch testing for these exposures. Two employees who reported respiratory irritation and shortness of breath received chest x-rays and pulmonary function tests; results were reported as within normal limits. These employees reported their symptoms occurred after one of the odor events investigated by the Unidentified Odor Investigation Team.

In September 2014, you gave us a copy of a final report prepared by the X-326 Unidentified Odor Investigation Team. This team was made up of representatives from management, operations, engineering, X-326 cut and cap employees, industrial hygiene, occupational medicine, and the union. This report summarized the investigation of 13 separate incidents of odors in the X-326 building from July 2013 to June 2014. Some incidents reported the detection of odors by employees while others did not. Additionally, acute health effects such as eye and respiratory irritation and headache were reported during some incidents but not in others. While this team did not find the source of these odors, the approach used by the team and the plan to communicate team investigation activities to the workforce seem appropriate.
A potential limitation of our evaluation is that we interviewed a small percentage of the approximately 200 workers involved in the cut and cap operation; however, the purpose of our interviews was to get a general sense of concerns. We did review the results of a June 2013

Page 5 – Mr. Barry Ko

Safety Barometer Survey completed by 896 employees at the Piketon site where similar concerns were reported. We encouraged management and union representatives to use these survey results to address employee perceptions and concerns.

### Recommendations

The following recommendations are offered. Most of these were discussed during our onsite evaluation, in subsequent conference calls, or in our follow-up site visit letter. Some additional recommendations are made following our review of interview results and written documents.

- Use the multidisciplinary unidentified odor investigation team approach to evaluate any new workplace safety and health concerns.
- Improve communication between employees, supervisors, management, and the union. In consultation with the union, hiring an external, third-party consultant may be useful to explore communication and retaliation concerns expressed by some employees.
- Review training materials and procedures to ensure that technical aspects of how to perform job duties as well as potential hazards and acute and long-term health effects are discussed with new employees. Provide periodic refresher training to employees. The occupational medicine consultant who implements the medical surveillance program for employees is a good resource for health-related information.
- Perform comprehensive job hazard analyses, including review of historical information, that consider all potential hazards associated with processes and work practices (e.g., nitrogen dioxide formation during thermal cutting).
- Increase the number of personal air samples (short-term and full shift) for elements (full scan), chlorine, hydrogen fluoride, and nitrogen dioxide. Fully document work tasks, sampling times, and sampling methodology for all samples. This information should be reviewed periodically to help identify tasks that substantially contribute to exposure and ensure that current controls are adequate.
- Use local exhaust ventilation equipped with appropriate filtration media (particulate, acid gases, nitrogen dioxide) as close as possible to the plume created by thermal cutting.

In October 2015, we requested that you provide NIOSH with a brief summary of the steps taken thus far to address recommendations made at the end of our site visit and on subsequent teleconferences. The letter you sent to us dated December 03, 2015 is attached. To summarize, you reported an increase in worker training related to historical operations of the X-326 building and also briefings about industrial hygiene and radiological air sampling results. Additionally, you noted an increase in the number of personal samples for some of the substances identified as potential hazards. Finally, you reported that your September 2015 National Safety Council survey results showed improved employee satisfaction with worker safety and health programs.

Page 6 – Mr. Barry Ko

We encourage you to continue to work with union health and safety personnel and employees to address issues as they arise during the continued remediation of the X-326 building and the entire Piketon facility.

This letter serves as a final report and closes this HHE request. We encourage you to share this letter with your employees. If you have questions, please contact Dr. John Gibbins at 513-841-4585, Dr. Mark Methner at 513-841-4325, or Dr. Steven Ahrenholz at 513-841-4471.

Sincerely yours,

John D.
Gibbins -S5

Digitally signed by John D. Gibbins -S5
DN: c=US, o=U.S. Government, ou=HHS,
ou=CDC, ou=People,
0.9.2342.19200300.100.1.1=1000351897,
cn=John D. Gibbins -S5
Date: 2015.12.21 08:39:27 -05'00'

John D. Gibbins, DVM, MPH
Medical Section Team Leader
Captain, U.S. Public Health Service

Mark
Methner -S5

Digitally signed by Mark Methner -S5
DN: c=US, o=U.S. Government,
ou=HHS, ou=CDC, ou=People,
cn=Mark Methner -S5,
0.9.2342.19200300.100.1.1=1000843653
Date: 2015.12.21 09:33:00 -05'00'

Mark M. Methner, PhD, CIH
Senior Industrial Hygienist
Captain, U.S. Public Health Service

Steven H.
Ahrenholz -S

Digitally signed by Steven H. Ahrenholz -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=CDC, ou=People,
0.9.2342.19200300.100.1.1=1001235010,
cn=Steven H. Ahrenholz -S
Date: 2015.12.21 11:12:44 -05'00'

Steven H. Ahrenholz, MS, PhD, CIH
Senior Industrial Hygienist
Hazard Evaluations and Technical
   Assistance Branch
Division of Surveillance, Hazard
   Evaluations and Field Studies

attachment 1: Fluor-BWXT Communication dated December 03, 2015

cc: Mr. Herman Potter
   United Steelworkers Local 1-689
   Safety Representative
   P.O. Box 467
   Piketon, Ohio 45661

Page 7 – **Mr. Barry Ko**

### References

Fluor-B&W Portsmouth [2013]. PORTS Safety Works: Employee Safety Pocket Guide. DOE PORTS D&D Project.

NIOSH [2010]. NIOSH pocket guide to chemical hazards. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2010-168c. [http://www.cdc.gov/niosh/npg/]. Date accessed: December 2015.

NIOSH [2015]. NIOSH manual of analytical methods (NMAM®). 4th ed. Schlecht PC, O'Connor PF, eds. Cincinnati, OH: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication 94-113 (August 1994); 1st Supplement Publication 96-135; 2nd Supplement Publication 98-119; 3rd Supplement 2003-154. [http://www.cdc.gov/niosh/ docs/2003-154/]. Date accessed: December 2015.

Page 8 – Mr. Barry Ko



Fluor-BWXT Portsmouth LLC
P. O. Box 548
Piketon, Ohio 45661

FBP-15-1179
December 3, 2015

740-897-2985

John D. Gibbins, DVM, MPH, dipl. ACVPM
Captain, U.S. Public Health Service
Medical Section Team Leader
National Institute for Occupational Safety and Health
1090 Tusculum Ave, MS R-10
Cincinnati, OH 45226-1998

**Subject: Fluor-BWXT Portsmouth's Continuing Activities Taken to Minimize Potential Chemical Exposures in X-326 at United States Department of Energy Portsmouth Site**

Dear Dr. Gibbins,

As you requested, here is additional summary information covering some key actions FBP has taken to minimize workers' potential for chemical exposures in X-326 work:

1) As part of Fluor-BWXT Portsmouth's (FBP's) Worker Safety and Health Program, we have a robust Industrial Hygiene (IH) and Hazard Communication program.
   a) Our programs require comprehensive characterization and hazard identification well before any work is approved and executed. In addition, as part of the hazard analysis process, extensive controls are identified and implemented before and during completion of work.
   b) Also, as part of our Worker Safety and Health Program, robust application of FBP's Nuclear Facility Safety Tenets empower workers to self-identify and raise concerns without fear of retaliation.
2) The FBP worker qualification and training program ensures their proper knowledge, skills and abilities to prevent exposures. The training includes extensive OSHA HAZWOPER training, respirator training, confined space training and radiological protection training. The X-326 project has also held regularly scheduled supplementary training such as Cascade 101 (a description of X-326 activities to get workers acquainted with the process equipment), X-326 building history, radiation control requirements for X-326, industrial hygiene protocols for Cut/Cap, briefings on industrial hygiene and radiological air sampling results, and many other worker safety subjects.
3) The FBP Worker Safety and Health Program also provides for ongoing validation of each worker's Fitness-For-Duty.
4) Highly qualified IH and Safety personnel (38 people) are solely dedicated to the X-326 facility and are fully integrated with the work being performed and their teams.
5) X-326 Facility ventilation is maintained and monitored to ensure adequate air exchange.
6) The formal Work Planning and Control Process ensures the identification of chemical hazards and controls of these hazards are effectively implemented. For example, Local exhaust ventilation with the Barlett AP 2000 HEPA Units have been used since October 14, 2011. Local exhaust ventilation is used routinely to capture metal fumes/hydrogen fluoride and are used in conjunction with the powered-air purifying or airline respirators and other PPE to minimize worker exposures.

Page 9 – Mr. Barry Ko

Dr. John D. Gibbins
FBP-15-1179
December 3, 2015
Page 2 of 2

7) We closely monitor these hazards in our workplace:

    a) Extensive personal air sampling as well as general area air sampling for chemical hazards has been performed during X-326 activities, especially during hot cutting activities. The total number of personal samples and area samples since 2012 are listed below.

| | # of Personal Samples | # of Area Samples | Total # of Samples Taken |
|---|---|---|---|
| Aluminum | 215 | 688 | 903 |
| Arsenic | 215 | 713 | 928 |
| Asbestos | 204 | 522 | 726 |
| Cadmium | 215 | 679 | 894 |
| Chromium | 215 | 714 | 929 |
| Fluorides | 108 | 5427 | 5535 |
| Iron | 215 | 714 | 929 |
| Lead | 215 | 687 | 902 |
| Manganese | 215 | 704 | 919 |
| Molybdenum | 215 | 687 | 902 |
| Nickel | 215 | 705 | 920 |
| Tungsten | 215 | 226 | 441 |
| Zinc | 215 | 710 | 925 |

    b) In addition, extensive work area air sampling for radiological hazards has also been performed in X-326. Since 2012, over 57,000 air samples for radiological hazards have been performed in X-326 task work. Based on these air sampling results, coupled with bioassay sampling, results have shown no reportable internal exposures to the X-326 project workers since inception of our work.

In addition, we have continued to show great improvements in our Worker Safety and Health Program and our safety culture. Our recently completed National Safety Council survey results that NSC reported in September 2015 showed noteworthy improvement in every measured area in just the past 2 years. Most importantly this survey result demonstrated FBP's empowerment of each worker to raise any and all safety concerns from chemical to environmental to work controls.

Should you have any comments or questions with the above information, please contact Barry Ko at (740) 897-3082 or myself, at (740) 897-3496.

Regards,

Bob French
ESH&Q Director
Fluor-BWXT Portsmouth LLC

BF/BK/ns

cc:    Ken Whittle, FBP           Garrick Schomburg, FBP
       Tim Taulbee, FBP          Connie Martin, FBP
       Barry Ko, FBP              RMDC@fbports.com