**UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT
OF OHIO EASTERN DIVISION**

| | |
|---|---|
| **Jeffery Walburn,**<br>**Charles O. Lawson Jr.,**<br>**Kimberly M. Lawson,**<br>**Karen Sue Walburn,**<br>**Chaz Lawson,**<br>**Kerrissa Lawson,**<br>**James A. Walburn,**<br>**Paul A. Brogdon,**<br>**Stephen Patrick Spriggs,**<br>**Donald Slone,**<br>**Vicki P. Slone,**<br>**Victoria Slone Moore,**<br>**Toni West,**<br>**Carl R. Hartley,**<br>**Heather R. Hartley,**<br>**Vina Colley,**<br>**Anthony Preston**<br>**David B. Rose,**<br>**Michael E. Groves,**<br>**George W. Clark,**<br>**Estate of Kathy Sue Brogdon**<br>**(deceased),**<br>**Estate of Jay Paul Brogdon**<br>**(deceased), and**<br>**John Doe(s), and Jane Doe(s),** on<br>behalf of themselves and all similarly<br>situated individuals**,** | **Civil Action No. 2:20-cv-04621-EAS-CMV**<br><br>**Judge Edmund A. Sargus**<br><br>**Magistrate Judge Chelsey M. Vascura**<br><br>**AMENDED COMPLAINT**<br><br>JURY DEMAND ENDORSED HEREIN |
| Plaintiffs, | |
| **v.** | |
| **CENTRUS ENERGY CORP.,**<br>a Delaware Corporation, individually<br>and as successor-in interest to USEC<br>Incorporated**,**<br><br>**UNITED STATES ENRICHMENT**<br>**CORP.,** a Delaware Corporation, | |

**LOCKHEED MARTIN CORP.**, a Maryland Corporation,

**URANIUM DISPOSITION SERVICES, LLC**, a Tennessee Limited Liability Company,

**BWXT CONVERSION SERVICES, LLC**, a Delaware Limited Liability Company,

**MID-AMERICA CONVERSION SERVICES**, a Delaware Limited Liability Company,

**BECHTEL JACOBS COMPANY, LLC**, a Delaware Limited Liability Company,

**LATA/PARALLAX PORTSMOUTH, LLC**, a New Mexico Limited Liability Company,

**FLUOR-BWXT PORTSMOUTH, LLC**, an Ohio Limited Liability Company,

**GOODYEAR TIRE AND RUBBER COMPANY**, an Ohio Corporation,

**MARTIN MARIETTA INC.**, a North Carolina Corporation, and

**Randy DeVault, in his individual capacity**,

**Gregory Friedman, in his individual capacity**,

**Emery Smith, in his individual capacity**,

**Richard L. Coriell, in his individual capacity**,

**Sandra Fout, in her individual capacity**

**Jack Tully, in his individual capacity**

**Clyde Dulin, in his individual capacity,**

**Dale Allen, in his individual capacity,**

**Ed Wagner, in his individual capacity,**

**Joe Deffenbaugh, in his individual capacity,**

**Steven H. Ahrenholz, in his individual capacity,**

**Daniel Poneman, in his individual capacity,**

**Larry Elliott, in his individual capacity,**

      Defendants.

## I. INTRODUCTION

Plaintiffs Jeffery Walburn, Charles O. Lawson Jr., Kimberly M. Lawson, Karen Sue Walburn, Chaz Lawson, Kerrissa Lawson, James A. Walburn, Paul A. Brogdon, Stephen Patrick Spriggs, Donald Slone, Victoria P. Slone, Victoria Slone Moore, Toni West, Carl R. Hartley, Heather R. Hartley, Vina Colley, Anthony Preston, David B. Rose, Michael E. Groves, George W. Clark, Kathy Sue Brogdon (deceased's estate), Jay Paul Brogdon (deceased's estate), John Doe(s) and Jane Doe(s), on behalf of themselves individually and all others similarly situated (collectively "Plaintiffs"), hereby file this Amended Complaint, pursuant to Fed. R. Civ. P. 15(a)(1)(A), against Defendants to recover for damages, and equitable, statutory, and injunctive relief. In support thereof, based upon their personal knowledge, information and belief, and the investigation of their counsel, Plaintiffs allege as follows:

## II. NATURE OF THE ACTION

1.      Through this Complaint, Plaintiffs seek to bring to a halt the pattern of corruption and flagrant disregard for human life perpetrated by the Defendants and the United States Department of Energy ("USDOE") in their past operation and present decommissioning, decontamination, and demolition ("D, D, & D") of the Portsmouth Gaseous Diffusion Plant ("PORTS"), the 3,777 acre nuclear industrial site in Piketon, Ohio which formerly produced highly enriched uranium ("HEU") up to 97% and higher assay, for weapons manufacturing, fuel for power plants, and the nuclear Navy.

2.      This Complaint concerns the poisoning and exposures in excess of 0.1 rem in a year and .002 rem in any one hour to radioactive isotopes, transuranic isotopes and other high assay radioactive materials, of nuclear workers, their families, school children, correctional workers, inmates, and others, through the contamination of miles of land, water, air, buildings, and people in Pike and Scioto Counties, Ohio and the surrounding counties, including but not limited to elementary, middle school, and high school students in the Scioto Valley Local School

District, Northwest Local School District, and inmates at the Southern Ohio Correctional Facility. This ongoing tragedy is the result of the failure of legislators, elected officials, regulators, businesses, and numerous individuals to prevent, stop, and mitigate the toxic exposure to workers and the community; the failure to provide proper safeguards to prevent exposure to families and offspring; and criminal and reckless acts which significantly increased both the extent and nature of toxic exposure and environmental contamination, and the resulting injuries to person, property, and business.

3.      Through the negligent, reckless, and criminal operation of the 3,777-acre site known as Portsmouth Gaseous Diffusion Plant, as well as at the Paducah Gaseous Diffusion Plant, the Defendants have created countless "nuclear incidents" under 42 U.S.C. § 2014(q), releasing radioactive isotopes, including but not limited to, uranium isotopes 234 and 235, neptunium 237 ("237 NP"), americium, plutonium ("Pu") and transuranic isotopes, poisoning workers, community members and their families, and resulting in bodily injuries, sickness, disease, including cancers, damage to DNA, death, loss of and damages to property, and reduction in property values. Defendants have caused the contamination of Pike and Scioto Counties in Ohio, surrounding counties in Ohio, such as Lawrence, Vinton, and Adams Counties, McCracken County in Kentucky, and areas far afield from the plant, with highly toxic, radioactive substances, with such cumulative exposure beyond the federal numerical dose limits set forth in 10 C.F.R. § 20.1201 and § 20.1301. The contaminants that the Defendants exposed their employees and contractors to and discharged upon the region include heavy metals, chemicals, gases, particulates, and radioactive materials including transuranic elements, some of the most harmful substances on earth. Plaintiffs cited herein and class members have been exposed to transuranic isotopes and other radioactive isotopes in excess of 0.1 rem in a year and individually exceed .002 rem in any one hour. For instance, the ingestion and inhalation, as well as from outgassing transuranic isotopes, including high assay radioactivity in the pipes and machinery transmuting

into the clothing and bodies of employees and into the families and communities, expose all to radioactivity in excess of 0.1 rem in a year and at times, individually in excess of .002 rem in any one hour.

4.     In addition to their strict liability under state and federal law for negligent, reckless, and intentional acts while engaging in abnormally dangerous activities, and their failure to protect or warn Plaintiffs, which were a direct and proximate cause of injuries to Plaintiffs, various Defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") through participation in an enterprise actively conspiring to commit criminal acts for pecuniary gain, and to suppress information regarding reckless, hazardous, and criminal operations at PORTS. These acts include, *inter alia*, secret introduction "out of specification" uranium and plutonium into the plant systems under the guise of nuclear non-proliferation, destruction of plant worker medical records, fraudulent manipulation of dosimetry badges and records therefrom, alteration of material log books, falsification or destruction of incident reports, tampering with or wiring around radiation alarm systems, mislabeling of highly radioactive materials to be shipped off-site and their subsequent removal from the plant, intentional "drifting death" atmospheric releases of toxic, radioactive gases, the concealment of evidence from the team which investigated the likely arson fire which occurred just months after the privatization of the United States Enrichment Corporation ("USEC"), and intentional misrepresentations to the United States Congress as well as the impacted community.  With regard to the fire, USEC performed the investigation, DOE owned the buildings and machinery.  NRC was tasked with reporting USEC's finding to Congress.  DOE did not properly investigate nor did NRC.  No "rule-out arson" nor "rule out espionage" investigation was performed.  Documentation related to the cause of the fire and to the material contents of the affected building was intentionally withheld from the official investigation and the true cause and impacts of the fire were covered up.

5.     The United State Department of Energy ("USDOE") and its contractors, through

their criminal acts, negligence, and reckless and intentional misconduct, have created a situation akin to a creeping Chernobyl, and they are responsible for unconscionably poisoning workers and the people, land, air, and water for miles around PORTS causing an increased risk of disease, fatal illnesses and death which may not be detectable for years, but may be passed down for many generations through damaged and mutated DNA.  Defendants' criminal conspiracy has led to both the poisoning of American citizens and their offspring and the inability of those poisoned to receive just coverage for their injuries and medical costs.

6.      Additionally, Defendants' actions related to the mischaracterization and illegal shipment of highly radioactive materials have caused the loss of control of fissile material, expanding, almost limitlessly, the potential area of exposure, and creating a dire national security risk, raising the looming possibility of weapons-grade nuclear materials reaching the wrong hands and leading to a catastrophic nuclear incident.

7.      By this Complaint, the nuclear employees, the contractors and subcontractors and their families, spouses, offspring, (referred to collectively herein as "the workers") as well as the residents and property owners who have been harmed by the Defendants' actions and inactions seek justice in this Court.  The Plaintiffs, the workers, and those who live and own property within 30 miles or more of the plant's vicinity are being, or have already been, sickened and killed by the negligent, reckless, and intentional actions of the operators of PORTS.  The costs of these actions, such as illness, sickness, death, medical treatments, loss of family members, internment of the deceased, DNA damage for generations, cancer cluster identification and treatments, school district and correctional facility protections and remediation, and loss of property values are being paid for by workers, students, teachers, correctional officers, inmates, and other residents of the region.  Cancer rates in some affected areas are 700% greater than the national average.  Scioto, Pike, Lawrence, Vinton, and Adams counties have the highest cancer rates in the state of Ohio. Now, those injured are asking this Court to hold Defendants liable for the damages caused by

their actions and inactions and to protect the injured and their communities from future harm.

8.      Plaintiffs and putative class members are individuals who have suffered economic losses, property losses, somatic—individual personal injury, genetic—offspring injuries from mutations for generations, non-economic damages, including loss of consortium, as the result of Defendants' actions.  They have brought this action within 4 years of knowledge of the violations after initiation of distinct phases of physical on-site construction and distinct remedial actions, and within four years of knowledge of the criminal enterprise causing injury to business and property. Plaintiffs identify the specific radioactive and toxic materials, including, but not limited to, uranium isotopes 234 and 235, neptunium-237, americium-241, alpha emitting radionuclides, and transuranics in the factual allegations that follow.

9.      Plaintiffs and members of various proposed classes have suffered in common an array of damages from Defendants' actions and course of conduct, including their conspiracy to alter or destroy medical records, suppress information regarding received radiation dose, suppress information regarding the release of radioactive contaminants, and their emissions of radioactive materials and transuranics which were clandestinely introduced in the enrichment process.

10.      Defendants operate or operated under an NRC license and are subject to the Price Anderson Act ("PAA").  42 U.S.C. § 2014.  The PAA applies the substantive law of the State in which the nuclear incident occurred.  28 U.S.C. § 2210. Releases of radioactive materials from the site exceed levels of radiation and concentrations of radioactive materials permissible in unrestricted areas, and releases on site exceed occupational dose limits.

### III.      PARTIES

#### A.      PLAINTIFFS:

12.      Plaintiffs Jeffery Walburn and Karen Sue Walburn, reside in Greenup County, Kentucky. Jeffery Walburn was employed for 31 years in security by Portsmouth Gaseous Diffusion Plant.

13.     Plaintiffs Charles Lawson, and Kimberly M. Lawson reside in Lucasville, Ohio. Charles Lawson was employed for 15 years in security and as Union Safety Representative and OSHA investigator at PORTS.

14.     Chaz Lawson, Charles' son, resident of Lucasville, Ohio, has lived in the area for 28 years.

15.     Kerrissa Lawson, Charles Lawson's daughter and resident of Lucasville, Ohio, has lived in the area for 33 years.

16.     Plaintiff James Anthony Walburn, resident of Ashville, OH, is the son of James Walburn, who worked at PORTS in shipping and receiving. James Anthony Walburn lived near PORTS for approximately 20 years. He grew up living in the same household with his father.

17.     Plaintiff Paul A. Brogdon has lived in Piketon area for 48 years, and he worked as a security guard at PORTS for 21 years. Plaintiff Brogdon's late wife Kathy Sue and late son Jay Paul Brogdon were both longtime residents of the area.

18.     Plaintiff Stephen Patrick Spriggs, current resident of Portsmouth, worked at PORTS as a uranium material handler for 41 years and has lived in the area for 65 years.

19.     Plaintiff Vicki Slone, Piketon resident for 66 years, has lived with husband, Plaintiff Donald Slone, within three miles of the plant for 40 years. Ms. Slone worked as a security guard at PORTS for 23 years. Plaintiff Donald Slone worked as an instrument mechanic at PORTS for 30 years.

20.     Plaintiff Victoria Slone Moore, daughter of Plaintiffs Vicki and Donald Slone, has lived in the area for 34 years and presently owns property and resides approximately 6 miles from PORTS.

21.     Plaintiff Toni West has lived all of her 39 years in the vicinity of PORTS. She grew up and still owns property one mile from PORTS, and has owned and resided at property 16 miles from PORTS for the past four years.

22.     Plaintiffs Carl R. Hartley and Heather R. Hartley (daughter) are longtime residents in the vicinity of PORTS. Carl R. Hartley was employed at PORTS for 46 years, as a process operator, power operator, centrifuge operator, and uranium material handler.

23.     Plaintiff Vina Colley has lived approximately 10 miles from plant, in McDermott Ohio, since 1978. Plaintiff Colley worked as electrician at PORTS from 1980 to 1987.

24.     Plaintiff Anthony Preston, resident of Portsmouth for 65 years, worked at PORTS for 20 years as process operator and material handler, including handling radioactive materials from Russia and Oak Ridge and other sites.

25.     Plaintiff David B. Rose has lived in McDermott Ohio for 44 years, and he worked at PORTS for 8 years.

26.     Plaintiff Michael E. Groves worked at PORTS and resides less than a mile from the plant.

27.     Plaintiff George W. Clark has lived in Jackson Ohio for 48 years, and he worked as a PORTS security police officer for 23 years.

28.     Plaintiffs John Doe(s) and Jane Doe(s) include teachers, school district workers, correctional workers, students and inmates in the school districts and correctional facility, and property owners located in the impacted counties.

29.     Plaintiffs have been damaged by the actions of Defendants, including through exposure to radioactive toxic materials and transuranics, the quantity and nature of which were concealed, and other contamination discharged from PORTS.  Plaintiffs who worked at PORTS have been damaged by the conspiracy to hide exposures, causing both physical injury and the economic burden of medical treatment for diseases caused by exposure to contaminants, toxic materials and transuranics while working at the plant falling to their private insurance and their own financial resources.  Plaintiffs whose parents or spouses worked at PORTS have been

damaged from contaminants carried home on the uniforms and bodies of PORTS workers. Plaintiffs have suffered exposure to contaminates, toxic materials and transuranics which cause disease, death, and mutations in their offspring for multiple generations.

30.     Plaintiffs also seek damages for loss of use and enjoyment of property, diminution of property value, annoyance, emotional distress, inconvenience, punitive and property damage, remediation, and injunctive and declaratory relief as necessary to protect human health and the environment and redress the wrongs perpetrated by Defendants.

**B.     DEFENDANTS**

31.     Defendant Centrus Energy Corp. ("Centrus"), formerly USEC Incorporated ("USEC Inc."), is a Delaware corporation with its principal place of business in Maryland. This action is brought against Centrus Energy Corp., individually, and as successor-in-interest to USEC Inc.

32.     Defendant United States Enrichment Corporation ("USEC") is a Delaware corporation with its principal place of business in Maryland, and it is a wholly owned subsidiary of Centrus Energy Corp.

33.     Defendant Lockheed Martin Corporation ("Lockheed Martin") is a Maryland corporation with its principal place of business in Maryland. Lockheed Martin was formed through the merger of Martin Marietta and Lockheed Corporation in 1995. Lockheed Martin is also successor in interest to Goodyear Atomic Corporation.  Martin Marietta was subcontractor from 1986 to 1995.

34.     Defendant Uranium Disposition Services, LLC ("UDS") is a Tennessee limited liability company with its principal place of business in Florida.

35.     Defendant BWXT Conversion Services, LLC ("BWXT") is a Delaware limited liability company with its principal place of business in Kentucky.

36.     Defendant Mid-America Conversion Services, LLC ("MCS") is a Delaware

limited liability company with its principal place of business in Kentucky.

37.     Defendant Bechtel Jacobs Company, LLC ("Bechtel Jacobs") is a Delaware limited liability company with its principal place of business in Tennessee.

38.     Lata/Parallax Portsmouth, LLC ("Lata/Parallax") is a New Mexico limited liability company with its principal place of business in New Mexico.

39.     Fluor-BWXT Portsmouth, LLC ("Fluor-BWXT") is an Ohio limited liability company with its principal place of business in Ohio.

40.     Randy DeVault is a Regulatory Oversight Manager with the Department of Energy.

41.     Gregory Friedman is a former Inspector General.

42.     Emery Smith is a former Security Coordinator under Lockheed Martin and USEC.

43.     Richard L. Coriell is a former employee of Lockheed Martin and USEC.

44.     Sandra Fout was a frontline manager of Lockheed Martin Utility Services.

45.     Jack Tully was a Process Foreman in the X-326 building.

46.     Clyde Dulin is a former employee of Lockheed Martin Health Physics Labs.

47.     Dale Allen is a former PORTS Plant Manager for Lockheed Martin Utility Services.

48.     Ed Wagner is the former Quality Assurance Manager over the Lockheed Martin Health Physics Labs and also worked in characterization of outbound shipments from PORTS.

49.     Joe Deffenbaugh is a former General Foreman of Area Control Room 6, in the X-326 building.

50.     Steven Ahrenholz is an Industrial Hygienist with Centers for Disease Control

and Prevention-National Institute for Occupational Safety and Health, Cincinnati.

51.     Daniel Poneman is president and chief Executive Officer of Centrus Energy Corp. and also serves on the company's board of directors.

52.     Larry Elliott is an Associate Director at the National Institute for Occupational Safety and Health (NIOSH).

## IV.     JURISDICTION AND VENUE

53.     Original jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1332(d)(2).  This Court is vested with jurisdiction by virtue of 28 U.S.C. §1332(d). Minimal diversity exists between named Plaintiffs of this putative class action, all of whom are citizens of the states of Ohio or Kentucky, and Defendant Centrus, a citizen of Delaware, its state of incorporation, and Maryland, its headquarters and principal place of business location. The proposed class exceeds 100 persons and the amount in controversy exceeds $5,000,000.00. Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under laws of the United States, namely, RICO, 18 U.S.C. § 1961 *et seq.*, the Price-Anderson Act (hereinafter "PAA"), 42 U.S.C. § 2210 et seq. This Court may also exercise subject matter jurisdiction over this action directly pursuant to § 2210(n)(2) of the PAA, which provides the United States District Court in the district where the nuclear incident takes place shall have original jurisdiction with respect to any public liability action arising out of or resulting from a nuclear incident.

54.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) because Defendants are found, have agents, and have and continue to transact their affairs in this district. Venue is also proper in this judicial district pursuant to 42 U.S.C. § 2210(n)(2)because the nuclear incidents giving rise to Plaintiffs' claims took place in this district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## V.    FACTUAL ALLEGATIONS

55.    For most of the general public of Pike and Scioto Counties, Ohio, the closure of Zahn's Corner Middle School, in Piketon, Ohio, on May 13, 2019, was when they first became aware that PORTS has been releasing extremely dangerous radioactive toxic materials, transuranics and hazardous chemicals off site and into their communities. The school, pictured below, located less than three miles from PORTS, was shut down after neptunium-237 and americium-241 were detected by a passive air monitor nearby. *See U.S. Department of Energy Portsmouth Gaseous Diffusion Plant Annual Site Assessment Report – 2017 Piketon Ohio* (Exhibit A). A subsequent study detected uranium-234 and 235 inside the school itself.



56.    While prior to the closure of Zahn's Corner Middle School, the general public

had believed that PORTS did not pose a significant threat to the health and well-being of neighboring communities, the facility has been contaminating human bodies, and the air, water, and soil of the surrounding region for decades. Throughout this off-site contamination, DOE and its contractors have systematically sought to suppress information regarding contamination. In fact, DOE had been aware of the contamination outside the school for two years, prior to notifying local authorities or the public. Similarly, at its public meeting on May 15, 2019, and to this day, DOE has failed to notify local authorities or the public of similar contamination detected 15 miles from PORTS affecting Valley Local School District, Northwest Local School District, the Southern Ohio Correctional Facility and surrounding communities. A similar pattern has been taking place in McCracken County, Kentucky at the Paducah Gaseous Diffusion Facility.

### A. Summary of Operations at PORTS

57.     PORTS was opened in approximately 1954 and was operated by Goodyear Atomic as a uranium enrichment facility providing material for nuclear bombs. In the Cold War years, reckless and dangerous practices at the plant made evident the fact that building bombs was more important to operators than concerns about worker safety and environmental contamination.

58.     Until the late 1980s the Department of Energy (DOE) was not subject to environmental regulation. Environmental regulators such as the Ohio Environmental Protection Agency ("OEPA"), had no jurisdiction over PORTS. Even today, national security concerns are invoked to limit the scope of regulation by environmental regulators.

59.     In 1986, the OEPA was allowed limited access to PORTS. The OEPA found that PORTS operators had tilled highly radioactive oils into the soil around PORTS, dumped radioactive materials and toxic chemicals into ditches that ran into the Little Beaver Creek, and even dumped carcinogenic solvents out the back door. The OEPA found a large pit full of toxic chemicals. As a result of the OEPA's limited access, in 1989, Ohio filed suit against the DOE.

60.     Until 1988, the DOE permitted the pumping of waste into PORTS's unlined pond. Numerous highly dangerous materials were pumped into the unlined pond, including radioactive uranium, technetium, plutonium, trichloroethylene and other toxins. These materials leached into the groundwater and the Little Beaver Creek, which leads to the Scioto River. Residents and property owners were completely unaware of the migration of the materials into their waters.

61.     As the Cold War ended, the enrichment process at PORTS shifted to production of enriched uranium for use in nuclear energy generation and to power the nuclear Navy. Although the use of the enriched uranium provided by PORTS shifted, the lack of concern for safety and contamination remained pervasive at PORTS. PORTS operators continued to recklessly disregard the health and safety of workers and the residents of the region. While the primary purpose of production changed to reactor grade material weapons grade material was still produced and remained in the X-330 and X-326 buildings.

62.     In 1986, a subsidiary of Martin Marietta took over PORTS management. The United States Enrichment Corporation was created as a government-owned enterprise, pursuant to the Energy Policy Act of 1992, and Martin Marietta's subsidiary managed PORTS until 1995, when Lockheed Martin took over operation of PORTS under merger of Lockheed and Martin Marietta Corporation. Lockheed Martin operated PORTS for the government-owned USEC as Lockheed Martin Utility Services ("LMUS") and Lockheed Martin Energy Systems ("LMES") until 1998, when the United States government facilitated the privatization of USEC and operations were turned over to the newly privatized entity.

63.     In response to reports by the Ohio EPA and others of inadequate safety conditions at PORTS, DOE began investigating PORTS's poor workplace safety and environmental practices. In its 1989 Tiger Team Assessment of PORTS, DOE investigators found woefully inadequate safety practices, including routine criminal acts such as wiring around alarms, mishandling of radioactive materials, worker exposure to radioactive materials, failure to monitor emissions, poor record keeping and other issues at PORTS. *See U.S. Department of Energy Tiger Team Assessment*, April 1990 (Exhibit B). The DOE found that at least 400 accidental releases of uranium gas or toxic fluorine occurred at PORTS, including a release of 9,582,089 grams of uranium in 1978. *See* image above of 14-ton cylinder of uranium, 1978; *See also* Portsmouth Gaseous Diffusion Plant Incidents and Releases (Exhibit C).

64.     Processing at PORTS ceased in May of 2001, and from 2001 to 2011, USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration. Initially, the process equipment was kept in Cold Standby, capable of restart if the need arose. Eventually, the plant transitioned to Cold Shutdown where systems were permanently disengaged, and equipment prepared for eventual decommissioning. When the process buildings were shut down, gaseous UF6 cooled and solidified in the pipes.



65.     In 2002, USEC Inc., signed a lease for use of centrifuge-related equipment and facilities at the Portsmouth Site.

66.     In 2004, USEC Inc., began operating what is known as the American Centrifuge Lead Cascade Facility ("Lead Cascade"). The Lead Cascade was a test loop intended to demonstrate the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. In 2016, USEC Inc.'s successor, Centrus, ceased uranium enrichment operations at the Lead Cascade. This was followed by removal of uranium gas from the centrifuges and process piping, dismantling of equipment, and other actions needed to ultimately decommission the facility. The Lead Cascade is currently in decommissioning phase.

67.     USEC Inc.'s, now Centrus', American Centrifuge Plant ("ACP") designed the Lead Cascade as a test loop. In 2007 construction began but was demobilized in 2009. On January 7, 2019, it was announced that the facility would be opened again, and the ACP is under construction.

68.     Centrus' centrifuge operations are carried out pursuant to source materials licenses which allow for the possession of radioactive material but do not allow for the disposal of radioactive material via air dispersion on Plaintiffs' properties.

69.     In 2002, Uranium Disposition Services, LLC, was contracted to design, build, and operate a Depleted Hexafluoride Conversion Plant ("DUF6 Conversion Plant").

70.     Depleted uranium hexafluoride (DUF6) is a coproduct of the uranium enrichment process that occurred at the Portsmouth Site. The DUF6 Conversion Plant was designed and constructed to convert inventory of DUF6 produced by the Paducah Gaseous Diffusion Plant and PORTS, to a more stable uranium oxide form for reuse, storage, and/or transportation and disposition. A coproduct of the conversion process is hydrofluoric acid (HF), which is reused industrially. The Portsmouth DUF6 inventory is expected to be processed in approximately 18 years.

71.     In 2010, BWXT Conversion Services, LLC, was contracted to operate the DUF6 Conversion Plant at the Portsmouth Site. BWXT was also responsible for continuing cylinder surveillance and maintenance (S&M) services for the inventory of DUF6, low-enrichment uranium hexafluoride (UF6), normal UF6, and other cylinders. The contract was initially scheduled to expire in September 2016 but was extended to accommodate procurement for a new DUF6 operations contract.

72.     In another distinct phase of clean-up, in 2016, within the 6-year statute of limitations, Mid-America Conversion Services, LLC was contracted to operate the DUF6 Conversion Plant. MCS is responsible for providing cylinder surveillance and maintenance for the DUF6 conversion facility and associated equipment, operating the conversion facility to convert the DUF6 from the inventory at Paducah and Portsmouth to uranium oxide; reusing, storing, transporting and/or and disposing of the DUF6 conversion process end-products; selling the aqueous hydrofluoric acid (AqHF) product; and, providing S&M services for the cylinder storage yards.

73.     Bechtel Jacobs was responsible for environmental remediation at the Portsmouth site from 1997 to 2005.

74.     LATA/Parallax Portsmouth, LLC took responsibility between 2005 and 2010, for environmental remediation at the Portsmouth site. This included activities such as removing legacy waste, HEU disposition, groundwater and soil remedial actions, maintenance, decommissioning and decontamination of facilities, surveillance, and operating the site waste storage facilities.

75.     Fluor-BWXT has been responsible for environmental remediation at the Portsmouth Site from 2010 to now and is planned to continue until at least 2024.

76.     A distinct phase of cleanup, namely, a distinct plan was agreed to for disposing of more than 2 million cubic yards of waste that would be generated from PORTS Site's decontamination and decommissioning process was agreed to in 2015. This plan includes

construction of an on-site waste disposal facility.

77.    In 2016, Mid-America Conversion Services ("MCS") received the ultra-hazardous contract along with the strict liability to operate the depleted uranium hexafluoride conversion plant, and was responsible for providing surveillance and maintenance, the associated equipment, and the cylinders of various materials, as well as converting the depleted uranium hexafluoride from PORTS and Paducah to uranium oxide, transporting, storing, selling aqueous hydrofluoric, and disposing the end product.

78.    In another distinct phase, construction activities on the waste disposal facility, including site clearing and roadway construction, began around 2017.

79.    Significant concerns exist regarding the design of the waste cell, which is located over bedrock which is vertically and horizontally cracked to within 20 feet of the Teays Valley Aquifer. It is highly probable that waste from the cell will migrate into the aquifer, irreparably damaging the aquifer. *See* The Ferguson Group, *Village of Piketon, OH Position on Area D Proposed Nuclear and Hazardous Waste Landfill - Portsmouth Gaseous Diffusion Plant U.S. Department of Energy – Version 1.1.*, June 21, 2017. (Exhibit D).

80.    Some phases of the environmental cleanup at the Portsmouth Site began in 1989, and distinct phases continue today. At all material times to this lawsuit, and within 4 years of initiation of distinct phases, and within 4 years due to equitable tolling, environmental remediation was and is being conducted, and are being challenged as violative of Defendants' duties and state and federal law as described herein.

B.    **Consistent Pattern of Failures in Plant Safety and Environmental Protection**

81.    PORTS was operated with wanton disregard for worker safety, and plant management encouraged a toxic culture of secrecy, downplaying of risk, failure to communicate critical risk-related information, sloppiness, and fear of retaliation if safety concerns were raised.

82.     First-hand accounts from workers at the plant are shocking. Safety and protection standards varied wildly between different types of workers. For example, while workers in pressurized suits would work to fix frequent leaks in the process seals, armed guards were required to stand by, with no protection at all, other than a line of colored tape. Plaintiffs Walburn and Lawson, among many others, experienced such treatment. *See John Cardarelli II, HETA 96-0198-2651 Portsmouth Gaseous Diffusion Plant Piketon, Ohio* (Exhibit E). In contrast to production staff, armed security personnel were often required to work multiple 16-hour shifts on consecutive days, with no breaks, and often without protective gear.

83.     Flagrant disregard of worker safety and the mishandling of hazardous materials was commonplace at PORTS. A letter from Plaintiff Carl Hartley to Roger McDermott, Manager Health and Safety, describes the type of scenario that was all too common. *See* Carl R. Hartley, OCAW letter to Roger McDermott, January 30, 1995 (Exhibit F). In this letter Plaintiff Hartley describes the intentional exposure of workers in the X-720 maintenance building. Unprotected workers were exposed to contamination without any attempt to mitigate it. The letter also describes the common practice of leaving the doors to the building always open during warm weather, violating protocol and releasing radioactive contamination into the atmosphere outside of the building.

84.     Retaliation against individuals raising concerns about safety violations was commonplace. Plant manager, Dale Allen, in response to concerns raised regarding safety and protection standards, was known to have choked people in meetings, bodily thrown them from chairs, sent his secretary to the hospital after hitting her with a telephone, threatened individuals with bodily harm, and verbally abused those around him.

85.     The seal alarm systems across the process buildings were illegally wired around, preventing any warning in the event of inadvertent release, which was an all too common occurrence, with seals wearing out faster than they could be repaired. *See* Burns & Roe,

*Management Assistance Report, March 12-April 15, 1990*, at p. 15 (Exhibit G). This practice dramatically increased the exposure of workers to radioactive toxic materials, transuranics and hazardous chemicals. While representatives of the Oil, Chemical, and Atomic Workers International Union ("OCAW") were informed of this practice, other workers were not notified. These workers discovered releases in the process buildings when they were suddenly covered in pungent white snow (uranyl fluoride ($UO_2F_2$) and hydrogen fluoride (HF)) and began running for fresh air.

86.     Criticality Accident Alarm Systems (CAAS) were often inoperable, obstructed, and improperly calibrated, creating significant hazards by failing to alert workers when they were being exposed to high levels of radiation. *See e.g.* Preliminary Notification of Event or Unusual Occurrence, July 6, 1999 (Exhibit H); Bonnie Rumble, Problem Report, October 23, 1996 (Exhibit I).

87.     Plant security forces were constantly unreasonably placed in harm's way, such as during transport of HEU across the facility in the "Blue Goose"—the truck used to haul cylinders of high assay materials across the massive PORTS campus from one secure vault to another. Guards were required to sit, with no protective gear and their backs up against the unshielded cylinders throughout the duration of transport, even when lunch breaks sent all the other OCAW workers away for an hour while the guard on duty waited in the open, on the floor or the vented trap. These impacts were often compounded by the "slow cooker" phenomenon, in which low level criticalities would occur within the process, dramatically increasing neutron exposure. *See* Exhibit E.

88.     OCAW union members filed an estimated 17,000 grievances by 1993, primarily related to environmental safety and health concerns. Security personnel were not provided the information regarding releases or the personal protective equipment ("PPE") provided to production workers, even though they were often required to remain in contaminated areas for

extended periods without breaks, or to eat meals. Office of Oversight, Environment, Safety and Health, *Independent Investigation of the Portsmouth Gaseous Diffusion Plant*, (May 2001) at p. 6 (Exhibit J). Consecutive 16-hour shifts for 4 days in a row, in hazardous contaminated areas without PPE provided, were common for Armed Security Patrol.

89.     Additionally, PORTS would regularly and purposefully vent raw UF6, transuranics, heavy metals, and other toxic chemicals into the atmosphere from the roof of the process buildings. These frequent releases were always done at night, and thus acquired the name "Midnight Rockets." This became the "code word" for an illegal operation whose name became a cultural moniker. These "drifting death" releases carried highly radioactive materials wherever the winds would take them. *See* Exhibit J (references to "jetting," "venting," etc.). Security personnel were required to be up on the roof when these unannounced intentional releases were performed, and they would be covered in the escaping materials.

90.     Furthermore, contractors at the PORTS site are presently venting 14-ton DUF6 cylinders into the atmosphere, with no environmental safety measures in place. Individuals involved in this venting have indicated that they are releasing 300 pounds or more of pressure off of countless cylinders, causing the environmental release of radioactive lights, cyanide, and additional contaminants. This venting is being performed as part of efforts to collect HF for sale.

91.     PORTS regularly emits dose equivalents in excess of 100 millirems per year of radionuclides into the ambient air that would cause members of the public to be exposed to in excess of federal limits. Various plaintiffs and putative class members are exposed to radiation doses in excess of regulatory limits, including hourly and yearly occupational and general public dose limits.

92.     In addition to frequent routine atmospheric releases, dumping and storage of hazardous waste, radioactive waste, and mixed waste at PORTS has been performed in a haphazard and unsafe manner, resulting in contamination of the soil and ground water, and posing

a threat to off-site land and waters. For example, plumes of radiologically contaminated trichloroethylene (solvent used in cleanup of radioactive releases) are known to be approaching (and likely have reached) areas and waters off-site, including Rock Water Campground, Little Beaver Creek, and the Scioto River. *See* Exhibit A at Figs. 6.2-6.5, 6.8.

93.     In order to minimize the visibility of grossly negligent and intentional worker exposure and environmental releases, DOE and contractors have actively conspired to conceal the extent of these activities and occurrences.

94.     Subsequent to a series of releases which injured several workers, including Plaintiff Jeff Walburn's injury which burnt him externally and inside his lungs and other organs, Plaintiff Charles Lawson, as OSHA investigator began looking into the incident and uncovered significant incidences of illegal activity and coverup. This fraudulent and criminal activity included the falsification of medical records and logbooks, including the alteration of the dose Plaintiff Walburn allegedly received. Ultimately, through vigilant investigation, initially prompted by Plaintiff Walburn's injury, it was determined that dosimetry was being illegally falsified and manipulated across PORTS. These facts were never adjudicated on their merits and are directly affecting the outcomes of Energy Employees Occupational Illness Compensation Program "2000" Claims ("EEOICPA").

95.     Dale Allen, plant manager of Lockheed Martin, had lieutenants that reported to him and were carefully placed to carry out the cover up. In hearings before the U.S. Department of Health and Human Services, Public Health Service, CDC, NIOSH, dated February 1, 2008, government officials, NIOSH Larry Elliott and Dr. James Neton both confirmed the criminal destruction of radiation exposure records, demonstrating the illegal exposures and radiation disease causation.

96.     The "sanitization" of the safety record at PORTS was planned and executed for the purpose of avoiding the law, furthering profits, and protecting efforts to achieve privatization.

The intentional destruction of records revealing safety incidents and worker exposure has been common practice at PORTS since the Goodyear Atomic days, and it likely continues to the present. This intentional and criminal destruction of records includes both radiation dose records and medical records. *See e.g.* Letter from John Bransford to Raphael Moure, June 1979 (Exhibit K); Citation and Notice of Penalty, February 17, 1998 (Exhibit L); Chester M. Davis Affidavit, July 11, 2017 (Exhibit M); Mark Grannus letter to Steve Pullins, December 8, 1992 (Exhibit N); Michelle Dobrovololny Affidavit, October 23, 2012 (describing similar practice at Rocky Flats (Exhibit O).

### C. Grossly Negligent and Criminal Pattern Continues with Russian Transuranics and Privatization

97. Under the guise of nuclear non-proliferation, an agreement known as the Russian-U.S. HEU Agreement was reached to receive and down-blend Russian warheads into low enriched uranium ("LEU") for use as fuel in nuclear power plants. However, instead of only HEU warheads, PORTS received significant quantities out of specification uranium fuel rods, plutonium and other transuranics from St. Petersburg, Russia. This material introduced into the process at PORTS both ruined the process, which was not designed to handle plutonium or other transuranics, and it dramatically increased the radiological threat inside the process buildings for working personnel.

98. Lethality studies were performed in 1994 to assess the risks associated with HEU warheads, and they did not analyze the increased health threat posed by the out of specification materials and transuranics which were ultimately brought from Russia. *See* USEC, *Environmental Assessment for the Purchase of Russian Low Enriched Uranium Derived From Dismantlement of Nuclear Weapons in the Countries of the Soviet Union*, January 1994 (Exhibit P). This failure to account for the materials actually brought into the U.S. from Russia increased the risks for workers and the American public.

99.     The introduction of Russian transuranics into the process at PORTS caused much higher levels of neutron exposure than otherwise would have occurred. Additionally, the intentional suppression of this information from workers and safety personnel by Defendants and former governmental employees prevented reasonable protective measures from being implemented.

100.    As described, *supra*, evidence of excessive rem exposure was destroyed by various Defendants. This destructive act was an attempt to avoid liability. It was also designed to protect an upcoming IPO, which destruction allowed predecessors to Defendants and Defendants to commit securities fraud, to inflate IPO stock value, and avoid liability for nuclear workers subject to disease and death from nuclear radiation.

101.    These overt acts and the conspiracy to suppress knowledge of them, were committed for the purpose of ensuring that privatization occurred. Through the criminal acts facilitating privatization, fraud was also perpetrated against the investors.

102.    Portsmouth Gaseous Diffusion Plant was operating illegally and out of bounds, under the oversight of Department of Energy and the NRC. The plant lawyers participated in the coverup and failure to notify the authorities of criminal acts. Hankett and Olson, attorneys for the plant and Bob Tait, for external representation, and the Vorys, Sater, Seymour and Pease law firm obstructed justice, committed perjury and criminally withheld information that would have terminally affected the privatization of USEC.

103.    In the face of all of these factors which should have prevented it, and with a false certificate of compliance under 10 C.F.R., Part 76, privatization was achieved. In 1998, three months after privatizing, PORTS burned. At least 30 proposals were made to refit the process and return it to operation, and all were refused.

104.    USEC investigated the fire themselves and failed to clarify or reveal transuranics

in the fire location, which transuranics they had acquired from Russia and introduced into the system, of which both DOE and NRC staff were aware, and Defendant USEC was protected through PAA.

105. While USEC's investigation yielded little to no useful information, independent investigation has suggested a likely mechanism for the ignition of the fire.

106. Recently uncovered documents and witnesses confirm that the fire was very likely arson. Critical information was intentionally hidden from the chief investigator of the fire which negates many of the conclusions reached in USEC's investigation. This likely arson fire resulted in not only in the airborne release of HEU and transuranics, but also destroyed the only facility in the United States capable of producing 97% assay HEU.

107. To this day, Defendants have conspired to cover up the existence of these incredibly dangerous materials in the pipes, fittings, and mechanics of the process buildings at PORTS, leading to further poisoning of workers and the community. The destruction of records has continued at PORTS, as a means of suppressing records of worker dose exposure and limiting payments for exposure-related illnesses.

108. The U.S. paid $1.3 billion dollars to Russia, intended to be used for plutonium storage and disposal facilities in Russia. This money was not used for such facilities, but instead used to construct civil infrastructure in Mayak, Russia, while the workers at PORTS and the surrounding community were being poisoned by the "out of specification" uranium and transuranics.

### D. Illegal Shipments of SNM

109. The standard practice for transportation of SNM on the roads is through the use of a Safe Secure Trailer ("SST") with an armed escort. SST trailers are armored and outfitted with numerous countermeasures ensuring that SNM will not fall into the wrong hands.

110.    With complete disregard for proper handling of high assay, weapons grade nuclear materials, SNM has been transported from PORTS in uncovered, unprotected trucks for years and within the 6-year statute of limitations period.

111.    On information and belief, the earliest incident of such illegal transport out of PORTS and across state lines of which Plaintiffs are aware involved the transportation of debris from the 1998 fire. In this incident, a sizeable number of brand-new trailers were loaded up with high assay materials, driven to Texas, and buried.[1]

112.    From 2013 to the present, materials identified as "spare parts" have been shipped out of PORTS in uncovered trucks with improper Department of Transportation placards. In one case, a truck with a "White 1" label (indicating non-hazardous) was driven from PORTS to the Paducah Gaseous Diffusion Plant, where it was not admitted because it was too radiologically hot.

113.    Defendants have intentionally shipped out an unknown quantity of these parts, such as compressors, which have been filled with high assay SNM since the processing plant entered cold shutdown. Defendants have sold for profit or provided these "spare parts" filled with SNM as payment for construction work. *See* Jeffery Walburn Affidavit, May 21, 2019 (Exhibit Q).

114.    Additionally, Defendants have sent highly contaminated motors to local dumps to be treated as though they were ordinary refuse.

115.    These actions reveal a complete loss of control of highly valuable and highly dangerous materials, with this diversion for pecuniary gain, and clearly presenting an immense national security risk.

---

[1] TLI Trucking was part of the radioactive nuclear material transport services, and the CEO of TLI Trucking was sentenced to 4 years in federal prison after being prosecuted by the Department of Justice for taking kickbacks from Russian organized crime.

116.     This improper transport also increases the potential exposure quotient exponentially, because material may be leaving the open trucks throughout the entirety of their clandestine journey.

**E.      Cleanup, Deactivation, Demolition, Decontamination and Decommissioning**

117.     Critical mistakes have been and continue to be made during the cleanup and shutdown of PORTS. Contaminated ground water has been permitted to spread. Airborne contamination has reached Zahn's Corner Middle School, schools in the Valley Local School District, Northwest Local School District, the Southern Ohio Correctional Facility, and homes and other areas in region surrounding PORTS. Highly dangerous and improper practices are being employed in the D, D, & D of PORTS, leading to release of contaminants and the risk of criticality.

118.     Workers and other residents have contracted various cancers, and a study by the Northern Arizona University ("NAU"), Michael E. Ketterer, *Investigation of Anthropogenic Uranium, Neptunium, and Plutonium in Environmental Samples Near Piketon, Ohio*, April 27, 2019, found numerous sites of contamination throughout Pike County. (Exhibit R). The NAU Study found uranium and plutonium in homes, schools and creeks around PORTS. DOE ultimately admitted that it had also detected americium in the air monitor near Zahn's Corner in 2017, but it failed to disclose the finding until two years after detection.  DOE has yet to publicly acknowledge contamination of other schools and the detection of released radioactive contaminants at least 15 miles from PORTS. In public statements, DOE is maintaining a 6-mile radius of impact, even while its own data shows at least a 15-mile radius. Exhibit A; Comparison table of ASER air monitor data (Exhibit S). Even in the face of clear scientific evidence that the detected radioactive materials originated at PORTS, former DOE Assistant Energy Secretary for Environmental Management, Anne Marie White, ordered DOE outreach employee Greg Simonton to lie at the May 15, 2019 public meeting in Piketon and state that the materials were

either fallout or from smoke detectors.

119. Poor practices at PORTS have exposed Plaintiffs and class members to environmental harm and internal exposure by entering into their bodies though food, liquids, cuts and inhaling, and from there continued on into the sewage systems back into the environment. Ingestion of alpha emitters is far more hazardous than external exposure and can cause harm to organs and tissue, cancer, and death.

120. Residents, such as the Plaintiffs, have reason to be concerned about this new phase of shutdown, cleanup, and new enrichment facility. The Plaintiffs and other residents who live in the vicinity of PORTS trusted the Defendants, who are in the ultra-hazardous strict liability nuclear waste business, to take extraordinary precautions in order to protect the residents from exposure to the harmful fallout of the activities conducted at PORTS. Residents and landowners were repeatedly assured that the water, air and soil were safe as all precautions were being taken to make sure the dangerous materials at PORTS would not reach the outside.

121. These assurances were false. The extent and nature of the releases within and outside of PORTS vastly exceed what has been disclosed to the public. Even today, contamination is being spread from PORTS through poor containment and improper and highly dangerous dismantling procedures, and DOE and Defendants are intentionally suppressing information about this spread.

122. Defendants have repeatedly failed to take the necessary precautions in storing radioactive toxic materials and transuranics at each distinct phase in their paid contracts to take on the duties to properly shut down PORTS. Rather than take the necessary precautions, Defendants chose to misreport the amount of contamination that was being spewed upon the land and residents in the vicinity of PORTS. As a result, the land, schools, homes, buildings, correctional facilities, creeks, water sources and people in the vicinity of PORTS have been

subjected to extremely harmful contamination by radioactive toxic materials and transuranics, which are some of the most dangerous substances known to mankind. Among the many highly toxic substances released by Defendants are Uranium isotopes, Americium, Neptunium, Plutonium, Trichloroethylene, Cesium, Thorium, various heavy metals, Polychlorinated biphenyls, and dioxin.

123.    While the first incident known to the general public occurred on May 13, 2019, when neptunium was detected by an air monitor near Zahn's Corner Middle School, contaminants that originated from PORTS have been found at least 15 miles from the site and are likely to be found even further away.

124.    Similar contamination was found at the Southern Ohio Correctional Facility in 2017, exposing the correctional workers and inmates to nuclear poison, and indicating that the Valley Local schools and communities were also exposed. *See* Exhibit A. Likewise, DOE has identified similar levels of contamination in Otway, OH, impacting Northwest Local Schools and the surrounding community. *Id.*

125.    The radioactive materials and other harmful contaminants being dispersed from PORTS have made the Plaintiffs' residences unsafe, unsaleable, and/or only saleable at a greatly reduced price. Plaintiffs' land and homes are worth substantially less value than they would be worth if not for the contamination caused by the Defendants' activities at PORTS. Additionally, the Defendants' failure to properly control the contamination from PORTS has created serious health risks for the Plaintiffs and many others.

126.    Plaintiffs seek remediation of the radioactive materials and other harmful contaminants found on their property and the properties of similarly situated residents and injunctive relief to protect the Plaintiffs and Members of the Class defined *infra*, from further harm. Plaintiffs and Class Members have suffered personal and property injuries, injury to business, and other losses as a result of the Defendants' contamination of the people, land,

schools, homes, buildings, creeks, water sources in the vicinity of PORTS. Plaintiffs' losses will grow exponentially if the Defendants are not enjoined from continuing to contaminate land, schools, homes, buildings, creeks, water sources and people in the vicinity of PORTS.

127.    In addition to the storage and decontamination of the facilities at PORTS, a massive environmental cleanup has been underway at PORTS for more than 20 years. Critical and distinct phases have taken place within the past 4 years, and information as to the violations of the duties and harm as found in this Complaint were unknown until the past 4 years and as a result the statute of limitations has been tolled. Like the storage and decontamination, the environmental cleanup of radioactive toxic materials and transuranics is an ultra-hazardous activity with strict liability to workers and residents who live in the 15-mile vicinity of PORTS,

128.    From 1997 to 2005 Defendant Bechtel Jacobs was responsible for environmental remediation at PORTS. Environmental cleanup at PORTS has been the subject of reports of wasteful practices, flawed procedures, inadequate safeguards, and numerous reports of dangerous actions during the incredibly expensive cleanup operations at PORTS.

129.    From 2001 to 2011, Defendant USEC was responsible for maintaining the gaseous diffusion plant in a safe configuration, including the control of radioactive toxic materials, transuranics and other dangerous contamination. Initially, the process equipment was kept in cold standby. During this time, the process equipment was capable of being restarted if the United States required more enriched uranium. After a period of cold standby, the facilities at PORTS were transitioned to cold shutdown. In the cold shutdown, the equipment and systems at PORTS facility were permanently disengaged, and the equipment was prepared for decommissioning. As ultra-hazardous activities with strict liability, the cold standby and the cold shutdown must be performed with extreme care. The insides of the facilities at PORTS are contaminated with radioactive materials, beryllium polychlorinated biphenyls, asbestos and other

harmful contaminates. Pipes and fittings remain filled with HEU of varying assay and transuranics. Thus, the maintenance and decommissioning of the buildings at PORTS requires extreme care to avoid the release of contaminants and transuranics, and to do so subjects the Defendants to strict liability.

130.    In 2002, Defendant USEC signed a lease for use of centrifuge-related equipment and facilities at PORTS. Defendant UDS was contracted to design, build, and operate a depleted uranium hexafluoride conversion plant. Depleted uranium hexafluoride is produced as a result of the uranium enrichment process that occurred at PORTS. The depleted uranium hexafluoride conversion plant is to be used to convert depleted uranium hexafluoride to its more stable form, of uranium oxide, that can be transported and stored at a waste storage facility. The conversion process itself produces dangerous byproducts such as hydrofluoric acid. Conversion of the entire inventory of depleted uranium hexafluoride at PORTS will take in excess of 10 years.

131.    In 2004, Defendant USEC began operating the American Centrifuge Lead Cascade Facility ("ACLCF") at PORTS. The ACLCF is a test loop used to demonstrate the effectiveness of centrifuge design and equipment by processing uranium in a closed loop. The ACLCF is a test loop for Defendant Centrus' American Centrifuge Plant ("ACP"). Construction of the ACP began in 2007 and was halted in 2009. In January 2019, in a new and distinct phase of rehabilitation, construction of the ACP at PORTS resumed. Centrus' centrifuge operations are carried out pursuant to source materials licenses that permit possession of radioactive material. The source materials licenses only permit possession of radioactive material. The licenses do not permit Centrus to disperse radioactive materials via air or water to nearby properties.

132.    From 2005 to 2010 Defendant LATA/Parallax was responsible for environmental remediation at PORTS. LATA/Parallax was responsible for groundwater and soil remedial actions, removing legacy waste, decontamination and decommissioning facilities, HEU disposition, operating the site waste storage facilities, and surveillance and maintenance activities,

as well as other activities. Like other cleanup Defendants, LATA-Parallax was the subject of complaints over the past 6 years, that they failed to follow proper procedures, wasted money and resources and failed to follow proper safety protocols during the environmental remediation at PORTS.

133.    DOE has identified five plumes of trichloroethylene contaminated groundwater beneath PORTS. *See* Exhibit A at Figs. 6.2-6.5, 6.8. At least one of the plumes is very close to a private farm and contamination was found in a monitoring well on the farm. As trichloroethylene is used at PORTS primarily to clean up radioactive releases, these plumes are almost certainly highly radioactive. The OEPA has made numerous complaints about the environmental remediation at PORTS. For example, one complaint by the OEPA concerned polluted groundwater that was allowed to spread because of the poor construction of a barrier wall. In addition to these plumes, it is known, but not disclosed by DOE in its ACERs, that plumes of radioactive contamination exist under the 7725-A building and the Emergency Operations Center ("EOC").[2]

134.    In 2010, Defendant BWXT was contracted to operate the depleted uranium hexafluoride conversion plant located at PORTS. In addition to operating the depleted uranium hexafluoride conversion plant, BWXT was also responsible for continuing cylinder surveillance and maintenance services for the inventory of uranium hexafluoride cylinders.

135.    In 2015, a new and distinct remediation plan was agreed to for disposing more than 2 million cubic yards of waste that would be generated from PORTS decontamination and decommissioning process. The disposal plan includes construction of an on-site waste disposal facility. Construction activities on the waste disposal facility, including site clearing and roadway

---

[2] Failure to disclose these plumes appears to be driven by the economic interests of companies benefiting from stock and bond financing. Companies involved, beyond CENTRUS, include JP Morgan, Computershare Trust, and Terra Power.

construction, began around 2017.

136.   In 2016, Defendant USEC's successor, Defendant Centrus, ceased uranium enrichment operations at the ACLCF located at PORTS. This distinct plan and process of rehabilitation by Centrus, of taking on this ultra-hazardous activity with strict liability, and shutting down the ACLCF also presents risks of releasing contamination. Uranium gas must be removed from the centrifuges, extensive process piping and other parts of the ACLCF. The centrifuge equipment must be dismantled and cleaned in a safe and secure manner. Like the decommissioning of the original gaseous diffusion plant, the decommissioning of the ACLCF must be handled with utmost care to avoid the release of radioactive materials and other dangerous contamination. The ACLCF is currently in decommissioning phase.

137.   In 2016, in another distinct plan and phase of rehabilitation, Defendant MCS was contracted to take on the ultra-hazardous duties and strict liability obligations to operate the depleted uranium hexafluoride conversion plant. MCS is responsible for cylinder surveillance and maintenance at the depleted uranium hexafluoride conversion plant. Surveillance and maintenance of depleted uranium hexafluoride cylinders is a serious task that entails operations critical to the prevention of the release of contamination by radioactive toxic materials and transuranics.

138.   Notwithstanding the extreme risks and strict liability associated with demolition, decontamination and decommissioning operations at PORTS, present negligent practices are causing the release of uranium, transuranics, and hazardous chemicals, as well as the growing risk of a criticality. In particular, the washing of highly radioactive dust and materials with water, and the collection of this water in a moat dramatically increases the likelihood of a criticality.

139.   The continued coverup of what weapons grade uranium materials and transuranics are actually present at PORTS, has led to the heightened and undisclosed exposure to workers, their families and the community.

F.    **Contamination of Community and Health Impacts**

140.    Plaintiffs' properties and residences have been impacted by the release of radioactive toxic materials, transuranics, and high alpha emitting radionuclides. Samples taken around Plaintiffs' residences and at other nearby locations in the vicinity of PORTS confirm an elevated presence of radioactive particles. Environmental evidence gathered thus far indicates that property and persons near PORTS have been and continue to be exposed to toxic and radioactive substances and are negatively impacted by toxic and radioactive releases from PORTS.

141.    Environmental sampling and scientific testing of properties near PORTS reveal the presence of radioactive toxic materials and transuranics consistent with those known and expected to be found inside PORTS facilities where uranium enrichment and conversion operations are conducted. Tests reveal the presence of these radioactive toxic materials and transuranics in and around buildings and properties near PORTS. The radioactive toxic materials and transuranics found in the vicinity of PORTS are not naturally occurring in the area and could not have originated from anywhere other than PORTS. Analysis of samples of the radioactive toxic materials and transuranics found in the vicinity of PORTS has linked them to hazardous, toxic, carcinogenic, radioactive toxic materials and transuranics either stored, processed, manufactured, or added at PORTS.

142.    Plaintiffs properties have all suffered harm from airborne radioactive materials, including transuranics, leaving property boundaries of PORTS. Plaintiffs' properties have received varying degrees of contamination; however, intentional and negligent airborne releases have injured properties great distances from PORTS at distances to be determined.

143.    The recent NAU study found enriched uranium in surface waters, sediments, and interior dusts in the Piketon area. The NAU Study indicated that the enriched uranium in the area could only have originated at PORTS. The study also found non-fallout neptunium and plutonium

in bed sediments, suspended sediments, and interior dusts in the Piketon area. Non-fallout neptunium was found in sediments of an unnamed creek that is draining an active landfill construction area. Enriched Uranium was found in interior spaces of Zahn's Corner Middle School, and in attic dust in the Piketon area. The NAU Study further found that emissions from PORTS are the only possible source of the enriched uranium, neptunium and plutonium encountered in environmental samples from the Piketon area. *See* Exhibit R.

144.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other materials. When radiation energy interacts with other materials, it causes a process called ionization which can damage chemical structures. When ionizing radiation passes through human cells, it can cause damage within those cells resulting in mutations in genetic material, which can lead to cancer and other harms. Latency period is the time it takes from radioactive contamination of a body to the first signs of the development of disease or cancer. Research indicates there may be as many as 33 types of cancers that have some link to nuclear contamination. Inhalation and ingestion are typically far more harmful than external exposure. This is particularly problematic here, where contaminants from PORTS are in the air, water, and animals in the surrounding area. Radioactive contamination frequently causes damage to DNA and can cause birth defects and spread to several generations of offspring.

145.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. These include damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear. Research shows that uranium has a high chemical affinity for DNA and causes genetic damage to individuals resulting in birth defect outcomes and cancer at levels much greater than previously modelled.

146.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. With genetic injury to reproductive cells, the probability of detrimental effects to the descendants of the exposed persons greatly increase. These genetic mutations can be passed down to a person's offspring even generations later, manifesting in injuries such as birth abnormalities and cancer.

147.     The harmful effects of the radioactive materials and other contaminants at PORTS have been demonstrated in real persons and acknowledged by the United States government. Plant workers and residents who live in the vicinity of PORTS have experienced highly elevated rates of cancer and other diseases, and animals and plants nearby were found to contain harmful contaminants. A local residents group identified 247 cancer cases within a six-mile radius of PORTS. Tests on deer killed by cars showed uranium isotopes in the livers of the deer. Traces of uranium were found in milk and egg samples from area farms and from vegetables in the gardens of residents in the vicinity of PORTS. And, fish from area waterways were found to contain uranium and plutonium.

### G.     Additional Facts Related to Historic and Ongoing Civil Racketeering Activity.

148.     Well aware of the health risks and injuries being caused to workers and the community, Defendants (some joining later in time) have operated an association-in-fact enterprise, the "Nuclear Fraud Enterprise" ("NFE") going back to the early days of PORTS with the purpose of achieving pecuniary gain.

149.     The history of criminal acts and disregard for safety go back to operation of PORTS by Goodyear Atomic Corporation. Goodyear, during its operation of the facility falsified dosimetry, withheld information on plutonium and transuranics at the site, and engaged in improperly moving contaminated materials through populated areas.

150. While the safety and ethical standards at PORTS have been shockingly low since the beginning, conspiracy and criminality increased with the subversion of the Russia-US HEU Purchase Agreement. Under the guise of this agreement, Russian "out of specification" uranium and transuranics from fuel rods, were introduced to the system at PORTS.

151. This material exponentially increased the hazardous exposure to workers, including neutron exposure, and provided additional impetus for cover-up. Subsequent to the introduction of out of specification uranium tainted with transuranics, efforts to secure privatization included widespread efforts to deceive the government and public about the safety of PORTS.

152. Bill Bennet at DOE, who later took charge of nuclear compliance for USEC, was informed by Mark Granus, PORTS health physics, in the early days of the program, that the Russian down-blend should be halted or reevaluated because of tripling of chemical and radiation exposures. *See* Exhibit N.

153. There exist two versions of a 1990 Tiger Team report, one done by Department of Energy, the other done by Burns and Rowe. Both documents support that plant management was incapable of running the plant, and that the plant was criminally out of compliance in (Criticality Alarm Safety System ("CASS") and was withheld in the 1994 lethality studies on shipments of warheads from Saint Petersburg, Russia to Piketon, Ohio. *See* Exhibits B and G.

154. The gross negligence and pattern of criminality at PORTS have continued through operation by subsequent Defendants, and many of the key bad actors at PORTS have been involved through to the present day. For example, Edward Wagner has been an active player in the NFE through multiple administrations and operators, intentionally and fraudulently corrupting the dosimetry badging program and mischaracterizing highly radioactive materials being diverted out of PORTS.

155. Elements of the NFE went to shocking lengths to conceal the extent to which workers were being injured and exposed at PORTS. These included manipulation and destruction

of critical records regarding hours and locations worked, release incidents, and the falsification of dosimetry badges and records.

156. Dosimetry badges that recorded too high a dose, were deemed defective, and the reading would be assigned to one of 10 random bar codes taped to the wall in front of the employee scanning bar codes from dosimetry badges. The use of these "bucket dose" accounts fraudulently suppressed the recorded doses received by individuals with high levels of neutron exposure. *See* Exhibit E, p. 15. These practices allowed the falsification of doses for security personnel and other workers who were exposed far in excess of the regulatory limits. Additionally, it allowed the dosimetry department to criminally transfer high radiation doses to office staff or other non-radiation workers.

157. Lockheed Martin, various subcontractors, along with USEC and DOE, subverted document POEF-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, February 16, 1996. from Don Butler to Dan Hupp, security manager. (Exhibit T). This report outlines the falsification and purposeful alteration of the database for all dosimetry at the Portsmouth site.

158. Plant management altered Plaintiff Walburn's dosimetry, medical records, and site logbooks regarding his injury. When the actual report was requested by the United States Senate Committee on Governmental affairs, by Senator Voinovich, an altered report was delivered to them, which had been reduced from 41 pages to 12, and had all interviews removed.

159. That altered report was delivered on March 17, 2000, the report was tendered to the committee by Steve Lehrer, the Department of Energy Senate liaison. The altered report was sent by Emery Smith who worked for USEC.  Emery Smith, who had previously worked for Lockheed Martin received a full copy of the 41 pages with Smith's name appearing on the 41st page as the recipient, from Lockheed Martin, and criminally misrepresented information before the United States Senate.

160.     During a subsequent investigation for Center for Disease Control-National Institute for Occupational Safety and Health ("NIOSH"), Doctor Steven Ahrenholz and John Cardarelli II, were present in ACR 6 (Area Control Room 6) along with General Foreman and Foreman, Joe Deffenbaugh and Jack Tully, OCAW Safety Rep Herman Potter, and Plaintiff Charles O. Lawson, when the existence of knowingly hidden logs pertaining to multiple injury incident investigations was revealed.

161.     Prior to DOE investigator of record DeVault's investigation, R.J. Cornwell, of Martin Marietta, investigated. Cornwell's investigation was peculiarly similar to Dale Allen's explanation that Charles Lawson had reported in a 3-page letter to Curt Jackson at DOE headquarters. All investigations had heretofore proceeded and been closed, based upon intentionally falsified documentation received by Department of Energy investigator of record, Randy DeVault. While the existence of two sets of logs, one clean and false, the other dirty, worn, and accurately reflecting releases and injuries, was known to various individuals at PORTS, the false logs were intentionally presented to investigators and legislators alike. Such individuals included R. J. Cornwell, at DOE, DeVault and Steven Ahrenholz, and Dr. Mitch Singal. Dr. Ahrenholz intentionally withheld his knowledge of the false logs, and he actively suppressed this information.

162.     Doctor James Neaton and Larry Elliott have confirmed that there was a criminal conspiracy at PORTS to falsify radiation dose data. Although Ahrenholz and Cardarelli were aware of this criminal activity, the true and unaltered logbooks were never entered into NIOSH reports. In fact, in a Cardarelli report outlining dose falsification, all instances of the word "criminal" were revised to read "bad practice." This included reference to manipulation of hours records, falsification of dosimetry badges, and overexposure to neutrons. *See* Exhibit E.

163.     Randy DeVault, DOE investigator of record, actively participated in the coverup of criminal activities which would have stopped the privatization of nuclear warhead operation.

Gregory Friedman, former OIG of DOE committed mail and wire fraud on at least 11 occasions, writing U.S. Representatives and Senators and lying about criminal activities at PORTS. Friedman claimed that six investigations were completed, however, Laura Slatton of the DOE/OIG stated that the six alleged DOE investigations had never actually occurred. Yvette Milam at DOE/OIG says: "It looks like a coverup to our people".

164.    Coverup and deception related to safety and environmental releases became the standard practice at PORTS, and these practices continue to this day. In addition to suppression of information regarding high assay materials in the process buildings, information regarding arsenic in the process has been intentionally withheld from the public. Steven Ahrenholz at NIOSH, and DOE, were and are aware of the arsenic contamination at PORTS *See* Steven Ahrenholz, *HETA 94-0077-2568* (Exhibit U), and the suppression of this information puts workers and the public at risk.

165.    Criminal contractors come and go, yet the failure of oversight is the same. Employees of DOE, NRC, and government contractors, as members of the NFE, have had the "fox in the hen house" miscarriage, bias, coverup and abuse necessarily found from self-investigations.

166.    Evidence suggests that the 1998 fire in the X-326 Building, three months after securing privatization, was the result of arson. The building after the fire, was in need of refitting, and at least thirty-one proposals were on the table to do so after the fire savaged the plant, USEC refused to act and claimed Price Anderson Act as the basis. The fire began in one of the most contaminated parts of the building and destroyed the reclamation process, closing the door on the United States' ability to produce 97% assay materials. One key motive for the arson was that the process was corrupted by the Russian "out of specifications" materials and the resulting excessive exposure to nuclear poison risk in the building.

167.    Upon information and belief, an intentional act caused the fire which spread from the X-333 and ultimately to the top of the purge in the X-326 building.  Twenty (20) foot flames

reached highly contaminated parts of the building and caused massive releases of uranium, toxic materials and transuranics.

168.     After the fire, even though a significant portion of the fire was in the part of the process under DOE control, USEC was allowed to perform its own investigation. For this investigation, USEC intentionally withheld from those investigating the fire critical information regarding the contents of the building, and the nature of the fire. In particular, the presence of Russian transuranics was known *See* Memorandum from Steve Balko to Tim Taulbee (Exhibit V), but this materially relevant information was intentionally withheld from the investigation team. This critical information regarding what materials were known to be present on site was purposefully withheld from Doctor David Manuta, the primary investigator of the December 9, 1998 fire. The suppression of this information corrupted the investigation and invalidated its results. Since receipt of this material information, Dr. Manuta has stated that the fire investigation should be revisited for the possibility of sabotage/arson.

169.     NRC was aware that the entire X-326 building contained enriched uranium of 20% assay or greater, and that the top of the purge, where the fire occurred, contained the highest assay materials. Regulatory authority over materials of over 10% assay belonged to DOE, not NRC. However, NRC nonetheless allowed USEC to investigate itself and NRC carried USECs' false findings to Congress.

170.     It was common knowledge that releases in the X-326 were only cleaned up to a height of 10 feet. The flames in the fire were reported to have reached at least 20 feet, and the massive plume from the fire carried highly radioactive, toxic materials far from the plant.

171.     Firefighters and workers present at the fire were only tested for uranium and technetium exposure after the fire and were not ever informed about the presence of the "out of specification" uranium, nor were they ever tested for exposure to any transuranics.

172.    Plaintiffs Lawson and Walburn have discovered a history of criminal diversion of HEU from PORTS. These materials have been and continue to be diverted from PORTS without proper safeguards for national security and environmental and human health protection. Because of the extent of concealment, the ultimate destination of the majority of these mislabeled, diverted, open truckloads of HEU remains unknown.

173.    Steven Ahrenholz returned to PORTS from 2013-2015 as part of an investigative team. During this time, he was denied entry into the X-326 building because he "was not qualified." Over the course of two years, he did not pursue qualification. Had he done so he would have seen evidence of the illegal SNM shipment operation. His visit did, however, reveal numerous continuing problems at PORTS. Although Ahrenholz intentionally omitted significant material information gathered in his investigation, such as the nature of accidents mentioned, impacts of poor or fraudulent dosimetry, extent of neutron exposure, what is mentioned in the report paints a picture of working conditions at PORTS remaining much the same. *See* Gibbens, Methner, Ahrenholz Report to Barry Ko, December 21, 2015 (Exhibit 104).

174.    Threats of bodily harm were directed at Charles O. Lawson as well as to his family. Upon information and belief, these threats were the result of Plaintiff Lawson's investigation of improper and illegal activity at PORTS.

175.    Gary Medukas, verbally threatened to bomb his car, stating: "We made Karen Silkwood disappear and we are going to make you disappear. And that red Chevy Astrovan, that your wife takes your children to school in, she is going to go out and turn the key and it's going to go boom." This was heard by Herman Potter (OCAW Safety Rep) and Tim Taulbee (Management of Dosimetry).

176.    On other occasions, management at headquarters piped phone calls to Charles Lawson during third shift while he was working, disguising their voices and pretending to be an

outside call, threatening to rape his wife and daughter and sodomize his sons and then bludgeon them to death.

177.    When Plaintiff Charles Lawson was injured at work, management ushered him out the gate and they would not allow him to work further because of his past safety efforts. Lawson was provided this explanation by Tom Douglas, President Local 66 and Jon Gahm, Vice-President of Local 66. The international union would not back the local union in this action. United Plant Guard Workers of America (UPGWA) Local 66, now known as Security Police and Fire Professionals of America (Local 66 SPFPA).

178.    Charles Lawson was forced to hand over his weapon and leave the plant, while other less capable or more disabled individuals retained their positions. This retaliation against Plaintiff Charles Lawson for his investigation and concern for safety at PORTS caused immense financial and personal hardship. These acts against Plaintiff Charles Lawson were retaliation.

179.    Threats of bodily harm were directed at Jeff Walburn, both veiled and unveiled.

180.    Subsequent to Walburn's exposure which hospitalized him and damaged his lungs, threats were repeatedly made to send him into the most hazardous and contaminated sections of the plant. Jeff Walburn's restrictions were constantly under review. Jeff Walburn recounted efforts to terminate him in his United States Senate testimony of March 22, 2000.

181.    Multiple Investigations into Plaintiffs Charles Lawson and Jeff Walburn's treatment reveal the extent of the hostility of the work environment, and even today, being "Chickicized" and "Walburned" is part of the language of the culture of fear at PORTS.

182.    Other workers who voiced safety concerns or tried to raise awareness of criminal actions at PORTS were actively targeted by the NFE and threatened, framed for criminal charges, or fraudulently disciplined. Sexual harassment was the preferred method of dismissal used by the NFE

183.    The various elements of the NFE continue to conspire to suppress information regarding the activities at and threat posed by PORTS. Russian transuranics were secretly introduced to the system, workers health and safety, and the safety of the community is presently at risk from activities of the Enterprise, which places profit and deniability above human safety.

184.    Neither workers nor the community have yet been told about the Russian transuranics. Instead, DOE and other members of the NFE maintain that that the plant is safe, the community is safe, and there is nothing to worry about. The active suppression of information regarding the nature of materials present at the plant, as well as continued concerted efforts to obscure and destroy information regarding workplace exposure has been carried out in furtherance of the NFE's objectives.

185.    One of the most tragic aspects of the inability to recreate doses received by workers at PORTS is that compensation for cancer and other diseases caused by exposures at the plant are frequently left uncovered by the EEOICPA. Although PORTS is among those sites listed as a Special Exposure Cohort, if a worker's cancer is not found on the list of approved cancers and no accurate dose reconstruction can be performed, the worker's claim will be denied. This inability to recreate doses for workers has resulted immense expenditures from private insurance companies and individual workers, for claims which should have been covered under the EEOICPA.

**H.    Factual Allegations Pertaining to RICO Defendants Named in Their Individual Capacity**

186.    RICO Defendants named in their individual capacity have all committed various predicate acts in furtherance of the interests of the NFE. The following paragraphs provide examples of these predicate acts.

187.    **Randy DeVault** was the DOE investigator of record on the September 26-27, 1994 incident at the L-Cages which left multiple workers injured over a two-day period.   In this investigation DeVault was shown "false logs" at the injury site and was lied to in his investigation

by members of Martin Marietta who was sub-contracted to USEC. When confronted with the knowledge of the false and true versions of the logs, DeVault actively suppressed information regarding the falsified documents and covered up their existence.

188. **Gregory Friedman**, in order to cover up criminal activity at PORTS which would have impacted the USEC privatization process, former OIG of DOE committed mail and wire fraud on at least 11 occasions, writing U.S. Representatives and Senators and lying about criminal activities at PORTS. Friedman falsely claimed that six investigations were completed, however, Laura Slatton of the DOE/OIG stated that none of the alleged investigations had actually taken place.

189. **Emery Smith**, while working for USEC, misrepresented POEF-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 to the United States Senate. He altered the substance of the document, removed testimony, reduced the report to 12 pages, and presented false information to the United States Senate. The 12-page document was dated February 9, 1996. The true and unaltered document which was withheld was 41 pages long, and Smiths name appears on page 41 as a recipient. On receipt of the full report, Smith worked for Lockheed Martin. Smith's failure to divulge criminal evidence of falsification of dosimetry and lying to certification labs at PORTS was purposeful and criminal, and he intentionally led the United States Senate away from the truth.

190. **Richard L. Coriell** (Rick) participated in the suspension of HEU in the cascade of the X-326 building. Coriell was the individual who signed off after the first analysis of high assay material left in the cascade after the "cold shutdown." He was responsible for sanitizing medical records of employees by removing records of incidents of injuries and contamination, for which workers received treatment at PORTS. This criminal alteration and destruction of medical records violated HIPPA and affected the outcomes of exposure under the EEOICPA. These acts contributed to the defrauding of workers and private insurance companies and negatively affected diagnostic protocols. Coriell was also a named recipient of the Source Inventory (Exhibit V), six

months prior to the December 9, 1998 X-326 fire. Coriell purposefully withheld this material information from the fire investigation team.

191.    **Sandra Fout**, manager at PORTS, by Dale Allen's order destroyed hard copies of radiation exposure records in a woodchipper set up in building X-847. This illegal destruction of made it impossible for numerous workers to determine their lifetime radiation dose. to document your lifetime record (must be maintained for 30 years and 1 day). Note that during the John Cardarelli and Steven Ahrenholz investigation of falsified dosimetry and neutron exposure, the magnetic archive ("Mag") tape backup for records, which were never to be touched, was taped over 12 times, effectively destroying all permanent records. OSHA fined USEC only $2,500.00 dollars but issued a codices letter stating that "If need be, OSHA would reopen the case". We need to review any and all bonuses Fout would have gotten and promotion she would have gotten that time period. Letters written to Charles Lawson, as the official OSHA investigator on the subject of dosimetry, Fout committed mail fraud by knowingly sending Plaintiff Lawson false letters indicating that there was nothing wrong with the dosimetry program at PORTS.

192.    **Jack Tully**, foreman in the X-326, was directly involved in the alteration and suppression of logs pertaining to multiple injuries to personnel over a 2-day period of September 26-27, 1994. Steven Ahrenholz, and John Cardarelli of NIOSH were both present along with General Foreman, Joe Deffenbaugh, Charles Lawson, and Herman Potter, both Certified OSHA Union Investigators. Tully was present at the "top of the purge", 25-7 cell X-326, with Tom Sexton, Environmental Safety and Health, along with Charlie Cox NRC Resident Inspector. Tully's name also appears on the memo of the source isotope inventory (Exhibit V), 6 months prior to the December 9, 1998. Tom Sexton has stated that, when he, Tully and Cox stood above cell 25-7, surveying the destruction, Cox said aloud: "I wonder what blew this up?" Sexton further stated that Tully said: "I know." To Tully's verbal admission Cox asked: "Are you on the investigation?", to which Tully replied: "NO, they do not want me on the investigation."

193. **Clyde Dulin** worked in the dosimetry lab at PORTS. His name was specially mentioned in the POEF-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 (Exhibit T) as one of three people ordering Linda Smith and Chris Kelly to alter Plaintiff Jeff Walburn's dosimetry badge. Clyde Dulin, is also mentioned in the POEF-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 as committing perjury on the subject of creation of the "bucket dose." The use of the bucket dose facilitated certain workers receiving far beyond the annual regulatory radiation dose limit.

194. **Dale Allen,** plant manager for Lockheed Martin Utility Systems, appears listed on the 41st page of the POEF-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 (Exhibit T). Dale Allen ordered Sandy Fout to destroy hard copy dosimetry records. He was commonly known to be extremely violent, and he regularly assaulted employees both physically and verbally. These behaviors were well known throughout the PORTS plant. After withholding information regarding criminal falsification of dosimetry at PORTS from authorities, including the Certificate of Compliance Committee (which included members of USEC, DOE, and NRC), Allen received a $1.2 million dollar bonus.

195. **Ed Wagner** was Quality Assurance (QA) over the dosimetry program at PORTS. Wagner falsified hours of work exposure in the guard department, as contained in HETA Report from John Cardarelli on "Slow Cookers" and neutron exposure with Steven Ahrenholz attending. See Exhibit E. Wagner has been implicated in the mischaracterization of SNM materials illegally leaving the PORTS site. Wagner is also implicated in the mischaracterization of highly radioactive fire debris, from the December 9, 1998 fire at the X-326.

196. **Joe Deffenbaugh**, General Foreman of the X-326 process building. Deffenbaugh was responsible for creating false logs and hiding the official logbook. In a DOE multiple day injury incident, Deffenbaugh, effectively hid the official logbook from Martin Marietta Investigator R. J. Cornwell, DOE Investigator Randy DeVault, NIOSH/CDC investigators Mitch Singal M.D., Doctor Steven Ahrenholz, Sam Maroudis, Plant Response Safety Team Investigator, Charles Lawson and Herman Potter, OSHA Certified Union Investigators.

197. **Doctor Steven H. Ahrenholz**, CIH of Health Physics, NIOSH was the investigator on the mortality study and is aware of "OUTAKES", which set limitations on the reliability for dose reconstruction. Ahrenholz is author of the 1993 HETA Report on Arsenic. (Later revisited in team investigations of PORTS by NIOSH, 2013-2015.). He is part of the investigation of the falsification of dosimetry and neutron doses, along with John Cardarelli. He was shown the false logbook, with Mitch Singal in an investigation of the September 26-27, 1994 DOE injury incident. Ahrenholz was also present when the criminally hidden logbook was produced by Joe Deffenbaugh, in the ACR-6, X-326, with witnesses. Ahrenholz suppressed information regarding the false logbook. The HETA Report was taken to Washington, D. C. and peer reviewed 4 times. At no time in the 4 reviews, was the false log mentioned. Further statements by Cardarelli, of criminality were withheld from the HETA Report. Ahrenholz was present in the investigation of the remediation workers, whose dosimetry was also lost. In the 2013-2015 investigation of PORTS concerning exposures, gases exceeding the parts per million limits, and Arsenic at the PORTS plant, Ahrenholz and his team, did not gain entry to the X-326 building, even though they had a 2-year period to do so. Ahrenholz's team were relegated to analyzing FLUOR's air samples. During the tenure of Ahrenholz's team, a $390,000 dollar DOE fine for falsification of radiation records was leveled again FLUOR, but mitigated down to $243,000 dollars. Nowhere in the Ahrenholz's team report does it mention the DOE fine.

**I.      Specified Harm to Certain Plaintiffs**

198.    Plaintiff Charles Lawson suffers from chronic beryllium disease from his 15 years working security at PORTS. Because of his exposure to beryllium at PORTS, Charles Lawson has significant impairment of his lungs, which are currently officially considered 57%-74% impaired on lungs, 2% eye, Body total 79%. Charles Lawson and at least 37 other workers at PORTS are suspected of having contracted chronic beryllium disease that is likely fatal. Many workers from PORTS who likely contracted the disease from workplace exposure are now

deceased. Plaintiff Charles Lawson also suffers malignant melanoma, contracted because of workplace exposure to spills of radioactive PCB oil and an oxide spill at the "L" cages in the X-326 building. Plaintiff Lawson was targeted by the NFE for doing his job as an OSHA investigator and bringing to light issues at PORTS which stood in the way of privatization. This targeting caused significant injury to his property and business, generating immense financial hardship.

199.    Plaintiff Jeff Walburn worked in security at PORTS for 31 years. Jeff Walburn was hospitalized in July of 1994 for serious injuries to his lungs from a toxic release at PORTS. Karen Walburn developed malignant melanoma. Jeff Walburn's brother James had Esophageal cancer and his son, James has bowel cancer. Walburn's brother in law David Fields had kidney cancer.

200.    Plaintiff Stephen Patrick Spriggs suffers exposure-related basal cell carcinoma. His son Stephen Patrick Spriggs Jr. developed Hodgkin's Lymphoma and Leukemia, and passed away in 2011, at the age of 36.

201.    Plaintiff Vicki Slone worked at PORTS in security for 23 years and has contracted over 50 cases of various cancers including basal cell carcinoma and squamous cell carcinoma. Her husband Don worked at PORTS for 30 years as an instrument mechanic and has developed two squamous cell carcinomas. Daughter Torre developed basal cell carcinoma in 2016 at age 30.

202.    Plaintiff Toni West has been unable to carry a child due to her exposure to contaminants from PORTS. She has lost many pregnancies because of her exposure.

203.    Plaintiff Anthony Preston worked at PORTS for 20 years as a process operator and material handler, including unloading U-235 from Russia and Oak Ridge. He developed exposure-related basal cell and squamous cell carcinomas in 2018 and 2019.

204.    Plaintiff Carl R. Hartley has developed numerous basal cell and squamous cell cancers related to his 46 years of employment at PORTS, including the most recent in December

of 2018.

205.     Plaintiff Vina Colley has been diagnosed with numerous medical conditions caused by exposures during her time working at PORTS, including, *inter alia*, three tumors, 65% lung impairment, skin cancer, lung nodules, and immune system disorders.

206.     Plaintiff David B. Rose developed stage 4 cancer of the head and neck and stage 4 prostate cancer, after his 8 years working at PORTS.

207.     Plaintiff George W. Clark developed basal cell carcinoma after his 23 years working security at PORTS.

208.     Plaintiff Paul A. Brogdon developed prostate cancer and four skin cancers after working 21 years as a security guard at PORTS. His wife and son have passed away from conditions related to contamination exposure.

### J.     Statutes of Limitations are Tolled and Defendants are Estopped from Asserting Statutes of Limitations as Defenses

#### 1.     Continuing Conduct

209.     Plaintiffs contend they, current workers, and the community continue to suffer harm from the unlawful actions by the Defendants. This harm includes; *inter alia*, personal injury from exposures at PORTS, facts about which the nature and extent continue to be actively suppressed, the immense financial burden of medical treatment for injuries which Defendants deny occurred at PORTS, financial hardship and emotional stress caused by retaliatory actions taken by Defendants, the looming fear of the very real and serious risk of nuclear catastrophe caused by preposterously unsafe decontamination, decommissioning and cleanup practices, health impacts and the diminution of property values due to releases of radioactive toxic materials and toxins.

210.     The continued tortious and unlawful conduct by the Defendants cause repeated and continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred

until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased, including the coverup of dose and injury received at PORTS, and the illegal transportation of radioactive materials, including transuranics. The public nuisance remains unabated. The conduct causing the damages remains unabated. The exceptionally long half-lives of the materials at issue – Plutonium-239, approximately 24,110 years; Neptunium-237, approximately 2,144,000; Uranium-238, approximately 4.5 billion years, and Uranium-235, approximately 700 million years – indicate that the threat will continue and remain essentially forever if left unaddressed and allowed to continue to spread through our air, water, and soil. Likewise, workers who are not receiving compensation for their injuries caused by Defendants' wrongdoing will continue to unjustly bear the financial burden of their injuries.

## 2. Equitable Estoppel and Fraudulent Concealment

211. Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State of Ohio, the Plaintiffs, and Plaintiffs' communities, that they were undertaking efforts to comply with their obligations under the state and federal laws, all with the goal of protecting their contracts to operate at PORTS and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State, the Plaintiffs, and Plaintiffs' communities, that they are managing decontamination and decommissioning at PORTS in a manner protecting the health and welfare of workers, their families, and the community. The half-life of these toxic materials ranges from 24 thousand to 4 and ½ billion years. The contamination threat continues and remains essentially forever and if allowed to spread through our air, water, livestock, and vegetables will only continue to get worse

212. The Defendants are deliberate in taking steps to conceal their conspiratorial behavior and active role in the poisoning of workers and the communities surrounding PORTS.

213. As set forth herein, the Defendants; suppressed, altered, and destroyed records and critical information regarding radiation exposure, the presence of transuranics at PORTS, environmental releases, and illegal shipments of HEU fissile materials.

214. Defendants also concealed from Plaintiffs the existence of Plaintiffs' claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that they were satisfying their legal duties to investigate alleged illegal actions at PORTS. They publicly portrayed themselves as committed to working diligently with regulators, and they made broad promises to change their ways, insisting they were good corporate citizens. These repeated misrepresentations misled regulators, investors, workers, and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

215. Plaintiffs did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence. Indeed, in the case of Plaintiffs Walburn and Lawson, diligence in investigation well beyond "reasonable" only uncovered within the past three years sufficient evidence of Defendants' misconduct to put them on notice of potential RICO claims. Other Plaintiffs and Putative Class Members did not know and could not have known of their RICO injuries because of Defendants' fraudulent concealment.

216. Defendants' active and intentional campaign to misrepresent and conceal; the truth about Russian plutonium and other transuranics, safety and environmental releases, dangerous Deactivation, Decontamination and Decommissioning practices and radiation disease causation deceived the medical community, consumers, the State of Ohio, and Plaintiffs' communities.

217. Further, Defendants have also intentionally concealed and prevented discovery of information including; reports, studies, investigations, and truck scale logs which would shed light

on the nature and scope of the fraud against and poisoning of the nuclear workers, their families, and the greater community.

218. Defendants intended that their actions and omissions would be relied upon, including by legislators, Plaintiffs, and Plaintiffs' communities. Plaintiffs and Plaintiffs' communities did not know and did not have the means to know the truth, due to Defendants' actions and omissions. The threat continues and remains.

219. The Plaintiffs and Plaintiffs' communities reasonably relied on Defendants' affirmative statements regarding their purported compliance with the obligations under the law.

### K. Facts Pertaining to Punitive Damages

220. As set forth above, Defendants acted deliberately to; cover up the human health and environmental impact of operations at PORTS, the spiking of the processing plant with Russian plutonium and other transuranics, the likely arson designed to destroy evidence of criminality, and the illegal shipment and diversion of SNM. Defendants persist in spreading false information to the public regarding the health risks present in their community. The threat continues and remains.

221. Defendants' conduct was so willful and deliberate that it continued in the face of numerous investigations, fines, and other warnings from state and federal governments and regulatory agencies. Defendants paid their fines, made promises to do better, and continued on with business as usual. This ongoing course of conduct knowingly, deliberately and repeatedly threatened and accomplished harm and risk of harm to public health and safety, and large-scale economic loss to communities and government liabilities across the country. The threat continues and remains.

222. Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. The Defendants' fraudulent wrongdoing was done with a particularly gross and conscious

disregard for the lives of American workers, the public, and the environment. Punitive damages are therefore warranted.

## VI. THE APPROPRIATENESS OF CLASS TREATMENT

223.    Plaintiffs seek to represent the following classes of individuals:

(1)    All current and former workers at PORTS ("Worker Class")

(2)    All spouses, and descendants, to four generations, of current and former workers at PORTS ("Family Class")

(3)    All property owners within a 50-mile radius of PORTS or such a radius as is supported by future scientific evidence ("Property Owner Class");

(4)    All residents and former residents with more than one year of residence within a 25-mile radius of PORTS or such a radius as is supported by future scientific evidence ("Resident Class");

(5)    All workers in the schools and corrections facilities, and students and inmates, impacted by the conduct of Defendants ("Working Class") ("Student Class") and ("Inmate Class");

(6)    Who are NOT Defendants, their officers, directors, employees, or Court personnel with duties related to this case.

224.    This case presents the quintessential class action for which Rule 23 of the Federal Rules of Civil Procedure was intended. Class Members are readily identifiable from public records such as tax records, property records, enrollment, employment, institutional and Census information. The class is too numerous for joinder of individual plaintiffs. There are tens of thousands of individuals who have been adversely affected by the conduct of the Defendants complained of herein. The claims of the Plaintiffs are identical to the claims of the Class. The focus of the case is on the actions and inactions of the Defendants. The harm done to the Members of the various Classes by Defendants' actions and inactions is similar, if not identical.

225.    The Claims of the Named Plaintiffs are typical of the claims of Members of the Proposed Classes. Plaintiff Jeffery Walburn was employed at PORTS for 31 years, and has

suffered bodily injury, threats, coercion, and injury to property typical of the Worker Class. Plaintiff Charles Lawson was employed at PORTS for 15 years and has been a resident of the area of contamination for more than thirty-five years.

226.    Plaintiff Charles Lawson has suffered bodily injury, threats, coercion, and injury to property typical of the Worker Class, as well as injuries typical of the Property Owner and Resident Classes.

227.    Plaintiffs Vicki and Donald Slone, landowners whose land is well within the geographic area of contamination, have suffered injury to property typical of the Worker Class, including numerous cancers caused by exposure to poisons from PORTS, but not covered by the EEOICPA, as well as injuries to property typical of the Property Owner and Resident Classes.

228.    Plaintiff Toni West, longtime resident in close proximity to PORTS, former Zahn's Corner Middle School student, and present landowner well within the geographical area of contamination, has suffered bodily injury and injury to property typical of the Property Owner and Resident Classes.

229.     Remaining named Plaintiffs' claims are also typical of the Proposed Classes, either living close to PORTS, owning property near PORTS, or having worked at PORTS, and having suffered injuries from Defendants' actions and omissions.

230.    There are common issues of law and fact that make this case well-suited for class treatment. Common issues of law and fact include:

> (a) whether Defendants' are liable for damages to the Classes for injuries resulting from the NFE's pattern of criminal behavior, including injuries to property resulting from the conspiracy to destroy and alter dose records;
>
> (b) whether Defendants are liable for damages to the Classes for intentionally and negligently allowing the release of radioactive uranium, toxic materials, transuranics, hazardous substances and wastes into the surrounding inhabited area

and their failure to warn of those materials' toxicity;

(c) the scope of damages caused by each Defendant's conduct;

(d) whether Defendants are strictly liable for conducting an ultra-hazardous activity injurious to members of the class;

(e) whether Defendants are liable for nuisance and trespass;

(f) whether Defendants may be compelled under statute or court order to take steps to protect human health and the environment, including but not limited to medical monitoring, topsoil replacement, a compliance audit and improved environmental safety measures; and

(g) whether Defendants are liable to the Class for punitive damages.

These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

231. Plaintiffs have suffered injury to business and property, economic loss, and injury to real property, and they have been subjected to severe emotional distress and health risks and impacts that are typical of the experience of Class Members. Plaintiffs' interests are identical to and aligned with those of other Class Members. Plaintiffs and Class Members have suffered an array of damages all stemming from the common facts and issues related to Defendants' criminal conspiracy and complete disregard for the health and safety of workers and the community.

232. Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the class. Plaintiffs and their counsel are aware of no conflicts of interest between Plaintiffs and absent Class Members. Plaintiffs, through their counsel have adequate financial resources to assure that the interests of the Class will be protected. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

233.     Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is proper in this case. The Defendants have acted and refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate for the class as a whole. Plaintiffs and the Class seek an injunction requiring immediate cessation of dangerous deactivation, decontamination and decommissioning practices and implementation of science-based practices at PORTS; recovery and proper disposal of HEU and other radioactive materials which have surreptitiously left PORTS, amendments to Defendants' community warning plans; a third-party compliance audit of Defendants' waste management operations and environmental health and safety program; a study of the entire affected area to identify all impacted properties which require cleanup; decontamination of homes and top-soil replacement to remediate continuing threats to human health and the environment; and implementation of a medical monitoring program to protect Plaintiffs and Class Members from on-going threats to their health.

234.     If injunctive relief is not granted, great harm and irreparable injury to Plaintiffs and Class Members will continue, the possibility of nuclear catastrophe caused by the loss of control of HEU fissile materials will continue to grow, and Plaintiffs and Class Members have no adequate remedy at law for the injuries likely to occur. Absent action from this Court, operations at PORTS will continue to damage Plaintiffs and Class Members and threaten future injury. Defendants' actions and inactions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole.

235.     Class treatment of this case is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common issues of law and fact predominate over individual issues, and a class action is superior to other available procedures for the fair and efficient adjudication of this controversy. The interests of all Class Members in establishing the liability of Defendants, and relative fault, for the release of uranium and other toxic materials and transuranics are

cohesive. The certification of a Class seeking damages is an appropriate means by which injured Plaintiffs and Class Members may assert claims to recover economic losses and property damage. Furthermore, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all Class Members and/or can otherwise be managed through available procedures.

236.    Defendants' conduct presents predominant common factual questions. Plaintiffs' claims arise out of Defendants' course of conduct resulting in radiation and chemical exposure to workers and the release of uranium and other toxic materials and transuranics, within and out of PORTS. Although Defendants' releases affected a sizeable geographic area and many individuals and businesses, they can be traced back to actions taken, or not taken, by Defendants. The claims asserted by the Plaintiffs and Classes present common liability proof that is the same for each member of each Class. Across claim categories, Plaintiffs' common proof of Defendants' liability will involve the same cast of characters, events, discovery, documents, fact witnesses, and experts.

237.    The need for proof of Plaintiffs' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses, consistent with each of the categories of claims, can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation. The affected area is sufficiently compact geographically to calculate damages for the Class with relative ease.

238.    A class action is superior to maintenance of these claims on a claim-by-claim basis. All actions arise out of the same circumstances and course of conduct. A class action

allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each Class Member.

239.    The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each Class Member, and meets all due process requirements.

240.    Certification of the Class with respect to particular common factual and legal issues concerning liability and comparative fault, as well as the necessary and appropriate amount of punitive damages, or ratio of punitive damages to actual harm, is appropriate under Rule 23(c)(4) of the Federal Rules of Civil Procedure.

241.    The particular common issues of liability, comparative fault, and the measure of punitive damages or ratio of punitive damages to actual harm are common to all Class Members no matter what type of harm or injury was suffered by each Class Member.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF RICO, 18 U.S.C. § 1961 *et seq.*—NUCLEAR FRAUD ENTERPRISE

242.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

243.    At all relevant times, Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

244.     The Defendants, with USDOE, together formed an association-in-fact enterprise, the NFE, for the purpose of pecuniary gain and avoidance of liability for poisoning the workers at PORTS and the surrounding communities.  The NFE is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961. The NFE consists of the Defendants and various federal Agencies.

245.     At all relevant times, the NFE: (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) was characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the NFE participated in the conduct of the enterprise, including patterns of racketeering activity, and each shared in the economic gain from activities at PORTS.

246.     The Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, investors, private health insurance providers, and the American public by knowingly conducting or participating in the conduct of the NFE through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

247.     The Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.* violations of 18 U.S.C. §§ 1341 and 1343) within the past four years.  The multiple acts of racketeering activity that Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The Defendants participated in the scheme to defraud the American public

through conspiracy and by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

248.     The Defendants also conducted and participated in the conduct of the affairs of the NFE through a pattern of racketeering activity by the felonious concealment, mislabeling, transport, and disposal of HEU fissile material, in violation of 18 U.S.C. § 831, thereby creating an immense national security risk.

249.     Defendants committed crimes that are punishable as felonies under the laws of the United States.  Specifically, 21 U.S.C. § 1001  makes it unlawful for any person speaking before the United States legislature on a matter within its jurisdiction to knowingly and willfully falsify, conceal, or cover up a material fact; make materially false, fictitious, or fraudulent statements or representation; or make or use any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.  A violation of 21 U.S.C. § 1001(a) is punishable by up to five years in jail, making it a felony.

250.     The Defendants' predicate acts of racketeering pursuant to 18 U.S.C. § 1961(1), include but are not limited to:

(1)     Alteration and Destruction of Medical Records

(2)     Alteration and Destruction of Dosimetry Records

(3)     Wiring around Alarms

(4)     False Statements Violations: Defendants violated 21 U.S.C. § 1001(a) by knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, testimony before and documents provided to the United States Senate.

(5)     Hobbs Act Violations: Defendants violated the Hobbs Act through repeated threats of violence and economic harm.

(6) Threats of murder: Defendants' terroristic statements to plaintiffs threatening murder constitute racketeering activity pursuant to 18 U.S.C. § 1961(1)(a).

(7) Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to conceal and cover up criminal conspiracy at PORTS.

(8) Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to conceal and cover up criminal conspiracy at PORTS.

251. The Defendants conducted their pattern of racketeering activity in this jurisdiction and elsewhere throughout the United States through this enterprise.

252. The Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

253. The Defendants hid from the general public and suppressed warnings from third parties, whistleblowers and governmental entities about the reality of criminal activity dangerous practices and conditions at PORTS, leading to massively increased radiation and chemical exposure to workers and the surrounding communities, and terrible risks to national security.

254. Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in operations at PORTS.

255. The Defendants' fraudulent scheme required the maintenance of the culture of secrecy and fear of retaliation to succeed, and the maintenance of this culture continues today.

256.     As described herein, the various Defendants engaged in a pattern of related and continuous predicate acts for decades. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the production, storage, or distribution of unimaginably dangerous materials. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

257.     The predicate acts all had the purpose of generating immense profits for the Defendants at the expense of the lives of the workers at PORTS and their families, and the surrounding communities. The predicate acts were committed or caused to be committed by the Defendants through their participation in the NFE and in furtherance of its fraudulent scheme.

258.     The pattern of racketeering activity alleged herein and the NFE are separate and distinct from each other. Likewise, the Defendants are distinct from the enterprise.

259.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

260.     Many of the precise details of the Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to Defendants' books and records. An essential part of the successful operation of the NFE alleged herein depended upon maintenance of secrecy, and many actions of the Enterprise which threaten our national security have been perpetrated and hidden, ironically, under the guise of "national security."

261.     By intentionally and actively covering up the nature and existence of the threat posed by Russian transuranics secretly added to the process at PORTS, by altering and destroying medical records and radiation dose records, and by surreptitiously removing and transporting

high assay HEU fissile materials from the site, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

262.     It was foreseeable to the Defendants that Plaintiffs would be harmed by their conspiracy to hide the nature of materials and hazards at PORTS because of the extreme danger posed by these materials, both in the past and remaining a threat today.

263.     The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

264.     The Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Defendants' pattern of racketeering activity, including their coverup of the practices at PORTS, logically, substantially and foreseeably cause an epidemic of radiation-related disease. Plaintiffs were injured by the NFE's pattern of racketeering activity and the epidemic they created.

265.     The Defendants' predicate acts and pattern of racketeering activity were a cause of the poisoning of workers and the community and contamination of the land, air and water, which has injured Plaintiffs and Putative Class Members in the form of substantial losses of money and property, that logically, directly and foreseeably arise from their exposure to radioactive materials, toxic chemicals and transuranics.

266.     Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

    (1)     Losses caused by heightened exposure-related illness reducing or eliminating the ability to continue working the same jobs.

    (2)     Losses of benefits which would be paid for disease related to workplace exposures but were denied because of Defendants' destruction and alteration of records.

    (3)     Losses caused by having to fall back on private insurance or personal financial resources because of denial of EEOICPA claims resulting from alteration of records.

(4)    Costs associated with providing care for children suffering from genetic conditions caused by their parents' exposure, and workers transport of uranium, toxic materials and transuranics to residents and areas unknown.

(5)    Losses caused by diminished property value in areas contaminated by PORTS, as well as the emotional impacts of this contamination.

267.    Plaintiffs' injuries were proximately caused by Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the increased doses resulting from Defendants' racketeering activities and the conspiracy to suppress information related to Defendants' activities, Plaintiffs would not have lost money or property.

268.    Plaintiffs' injuries were directly caused by the Defendants' pattern of racketeering activities and Defendants' are therefore liable for treble damages.

269.    As discussed *supra*, Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. The Defendants' fraudulent wrongdoing was done with a particularly gross and conscious disregard, and they are therefore liable for punitive damages.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE PRICE ANDERSON ACT

270.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

271.    The uranium and other radioactive substances processed, handled, stored, and/or disposed by Defendants at the Portsmouth Site include nuclear by-product materials, special nuclear materials, and/or source materials. 42 U.S.C. § 2014(e), (z), (aa). Any release of these by-product, special nuclear, or source materials causing bodily injury, sickness, disease, death,

loss or damage to property, or loss of use of property constitutes a "nuclear incident" under the terms of the Price-Anderson Act. 42 U.S.C. § 2014(q).

272.    Plaintiffs further assert that Defendants' acts, omissions, and intentional and negligent releases of hazardous, toxic, and radioactive waste materials have exposed Plaintiffs to highly dangerous materials. Plaintiffs have suffered bodily injury, sickness, disease, death, loss or damage to property, and loss of use of property, as a direct and proximate result of their exposures. Plaintiffs' cause of action therefore asserts legal liability based upon a series of "nuclear incidents," and is consequently a "public liability action" within the terms of the PAA (Price Anderson Act). The intent of the PAA was "not" to indemnify criminal activity.

273.    Each Defendants' conduct has caused "nuclear incidents" within the meaning of the PAA – an occurrence within the United States causing bodily injury, sickness, disease, or death, or loss or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material.

274.    Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident involved occurred, namely, Ohio, unless such law is inconsistent with the provisions of such section.

275.    Ohio substantive rules for decision provide that a person is strictly liable for harm, injury, or damage arising from an abnormally dangerous, ultra-hazardous, or unreasonably hazardous activity. Processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials which pose a significant risk of harm to persons living and working at the operation and in the vicinity of the operation constitute such abnormally dangerous, ultra-hazardous, or unreasonably hazardous activity under Ohio law.

276.    Defendants' conduct in the processing, handling, storage, and/or disposal of

hazardous, toxic, and radioactive waste materials posed significant risk of harm to persons living and working at the operation and in the vicinity of the operation. The consequences of nuclear accidents or incidents to health, property, and the environment are extremely dire, and can be measured in millions, if not billions of dollars. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials has never been a matter of common usage; indeed, private operators historically were not permitted to engage in such activities at all. The conduct of Defendants' activities at the Portsmouth Site constituted abnormally dangerous activities made worse by Defendants criminal actions.

277. Defendants owed to Plaintiffs a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic, hazardous substances and transuranics in Defendants' possession. Defendants had a duty to prevent the discharge or release of such substances that might harm Plaintiffs. Defendants also had a specific duty to warn or notify Plaintiffs of the potential hazards of exposure to radioactive, toxic, hazardous substances, and transuranics and to warn or notify Plaintiffs of the fact that, discharges or releases of these substances had occurred, were occurring, and were likely to occur in the future, and defendants consciously disregarded laws and written procedures.

278. Further, Defendants had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials. Plaintiffs conduct has caused exposure to workers and to the general public beyond the federal numerical dose limits set forth in 10 C.F.R. § 20.1201 and § 20.1301.

279. To the extent that the Defendants were acting under an NRC license, the Defendants and their activities are subject to liability under the PAA. To the extent that the Defendants were not acting under an NRC license, the Defendants and/or their activities may or may not be subject to liability under the Price-Anderson Act, depending upon the yet undiscovered

factual circumstances.

280. Defendants breached these duties by their criminal, intentional, negligent, grossly negligent, and reckless processing, handling, storage, and disposal of hazardous, toxic, and radioactive waste materials at the Portsmouth site. Such conduct was not in compliance with applicable federal, state, and local laws, regulations, and guidelines. This leads us to question, who, if anyone, is responsible for the enforcement and correction of deficiencies and violations? Defendants' criminal, intentional, negligent, grossly negligent, reckless, and illegal conduct resulted in the dramatically heightened exposure to workers at PORTS, and dangerous releases of hazardous, toxic, and radioactive substances into the communities surrounding the facility. These actual and continued releases subjected Plaintiffs to an unreasonable risk of harm, bodily injury, sickness, disease, death, and to loss or damage to property, or loss of use of property. Defendants also failed to warn Plaintiffs of the actual and threatened releases of such hazardous toxic, radioactive materials and transuranics and of the reasonably foreseeable effects of such releases. These ongoing omissions were intentional, negligent, grossly negligent, and reckless. Finally, Defendants failed to act to prevent their releases from harming Plaintiffs or notify them.

281. To the extent Defendants were or are subject to applicable federal regulations, Defendants breached their duty by violating the respective dose limits both for public, off-site, exposure, and for occupational exposure.

282. Defendants also blatantly breached their duty through criminal actions, described *supra*, such as wiring around alarm systems, manipulating dose records, improperly measuring dose, intentionally releasing highly radioactive materials into the atmosphere, illegally shipping highly radioactive materials offsite, and failure to warn workers of all the dangerous materials they were working with.

283. Defendants not subject to applicable federal regulations issued pursuant to the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, are strictly liable under Ohio law.

284. Defendants knew about the hazards associated with nuclear operations. Defendants knew or should have known that their generation, management, storage, use, disposal, release, and discharge of radioactive, toxic, and hazardous substances in connection with their operations at PORTS would result in actual injuries and increased risks to the persons, property, and economic interests of the public without taking proper safety precautions or by workers unknowingly transporting uranium, toxic materials and transuranics to residences or areas unknown.

285. Defendants' acts and omissions and their negligence were a direct and proximate cause of Plaintiffs' injuries causing both actual present harm to person and property and creating an increased risk of harm to person. Defendants' actions have also directly and proximately caused severe emotional distress for Plaintiffs and Putative Class Members. Plaintiffs are entitled to recover damages for such injuries.

286. Because Defendants' conduct was intentional, malicious, grossly negligent, and reckless, Plaintiffs seek punitive damages where available.

**THIRD CLAIM FOR RELIEF**
**NEGLIGENCE/GROSS NEGLIGENCE**

287. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

288. This claim for relief addresses injuries which fall outside the scope of the PAA, either because they do not concern "nuclear incidents," or in the event that this court determines that PAA does not apply to certain Defendants.

289. Defendants' conduct, acts, and omissions violated duties owed to Plaintiffs and the Class. Defendants' negligence proximately caused damage to Plaintiffs and the Class.

290. Defendants failed to act as a reasonably prudent plant operator under like circumstances would. Defendants failed to exercise due care and caution to prevent harm to

property and humans from their operations. Defendants often intentionally acted with wanton disregard for the health and safety of workers and the surrounding communities. With better precautionary measures, more accurate reporting, compliance with applicable regulations, and the use of reasonable care, Defendants, could have, at a minimum, mitigated the harmful effects of their failure to exercise proper care in preventing the poisoning of workers and the release of radioactive and other toxic materials from PORTS. The foreseeable risks of harm posed could have been reduced or avoided by reasonable instructions or warnings that were already in place and mandated by procedure by instructions that included auditory and visual alarms when it became clear that harmful radioactive and other toxic materials had been released into the vicinity of PORTS. Those omissions render Defendants' operations not reasonably safe and failure to do so by conscious and deliberate decisions.

291.    Defendants failure to warn complained of herein also constitutes negligence. Defendants negligently failed to warn Plaintiffs and Class Members when there were releases of radioactive and other toxic materials. Plaintiffs and Class Members were further damaged by the failure to warn. If Plaintiffs and Class Members had been properly warned of releases, they could have taken steps to mitigate the harm caused by the release of radioactive and other toxic materials. These violations were known at DOE Headquarters level.

## FOURTH CLAIM FOR RELIEF
## TRESPASS

292.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

293.    This claim for relief addresses injuries which fall outside the scope of the PAA, either because they do not concern "nuclear incidents," or in the event that this court determines that PAA does not apply to certain Defendants.

294.    Defendants' conduct as set forth herein constitutes trespass, which resulted in

damages to Plaintiffs and the Class.

295.    The release of harmful toxic materials onto the properties of the Plaintiffs and Class Members constitutes a trespass that damaged the Plaintiffs and Class Members. The release of radioactive and other toxic materials onto their properties renders their properties unfit for normal use and enjoyment and substantially reduces the fair market value of their properties.

296.    As described, *supra,* land, homes, schools, creeks, animals and plants in the vicinity of PORTS have all been found to contain harmful toxic materials that originated at PORTS. This contamination constitutes a trespass that has directly caused injury to the Plaintiffs and Class Members.

## FIFTH CLAIM FOR RELIEF
## NUISANCE

297.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

298.    This claim for relief addresses injuries which fall outside the scope of the PAA, either because they do not concern "nuclear incidents," or in the event that this court determines that PAA does not apply to certain Defendants.

299.    Defendants' conduct as set forth herein constitutes a nuisance that continues to this day and has resulted in damage to Plaintiffs and Class Members.

300.    The release of harmful toxic materials in and around the properties of the Plaintiffs and Class Members is a nuisance and renders the properties unfit for normal use and enjoyment and substantially reduces the fair market value of the properties. The nuisance caused by the toxic materials released from PORTS has directly caused injury to the Plaintiffs and Class Members.

## SIXTH CLAIM FOR RELIEF
## ULTRA-HAZARDOUS ACTIVITY/ABSOLUTE LIABILITY/STRICT
## LIABILITY

301.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

302.     This claim for relief addresses injuries which fall outside the scope of the PAA, either because they do not concern "nuclear incidents," or in the event that this court determines that PAA does not apply to certain Defendants.

303.     Defendants' conduct as set forth herein constitutes ultra-hazardous activity, which resulted in harm to Plaintiffs and Class Members, for which Defendants are strictly liable.

## SEVENTH CLAIM FOR RELIEF
## NEED FOR INJUNCTIVE AND EQUITABLE RELIEF OF MEDICAL MONITORING

304.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth in preceding paragraphs as if fully set forth herein.

305.     Plaintiffs and Class Members have been and continue to be exposed to radioactive and other toxic materials that are known to be carcinogenic and mutagenic substances. The Plaintiffs and Class Members have been exposed to radioactive and other toxic materials and transuranics at concentrations higher than is acceptable for workers or for the general populace. DOE and its affiliates have proven their lack of credibility and their willingness to withhold, suppress, and alter material information, and under no circumstances should they be responsible for conducting investigation of sub-contractors' medical evaluations; rather, a truly independent and unbiased qualified party should be responsible for such evaluations.

306.     As a result of the conduct of the Defendants complained of herein, Plaintiffs and Class Members face greatly increased risk for conditions proven to be linked to exposure to radioactive and other toxic materials. Regulators who stand accused as perpetrators cannot be relied upon as reliable and unbiased investigators.

307.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been and are currently being subjected to contamination with radioactive waste,

toxic materials, and transuranics, and they will suffer irreparable harm if an injunction is not granted requiring Defendants to conduct a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

308. Plaintiffs and Class Members require medical monitoring to mitigate the harm caused by the Defendants' actions complained of herein. Testing and continued monitoring will bring to light the onset of these medical and emotional conditions so that treatment and intervention may begin at the earliest stage.

309. Plaintiffs and Class Members will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other latent, diseases associated with exposure to radioactive particles may be identified. Monitoring is critical because of the generational impacts of radiation exposure.

310. The harms visited upon Plaintiffs and Class Members are irreparable. Money damages alone will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual Class Member nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of the Class is provided to the medical research community.

311. Furthermore, money damages will not suffice alone because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby important information is shared among the medical community so that new treatments, protocols, intervention and test may be developed.

312. Plaintiffs, on behalf of all those similarly situated, seek a Court-administered fund replenished from time-to-time by the Defendants to achieve such injunctive and equitable relief as necessary for the continuing benefit of the Class, including a court-administered medical monitoring program.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully seek all legal and equitable relief as allowed by law, including, *inter alia,* actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, *inter alia*:

(1) An Order certifying this action to proceed as a Class Action, authorizing Plaintiffs to represent the interests of the Classes (or subclasses, as appropriate) and appointing undersigned counsel to represent the Classes;

(2) Actual damages and treble damages, including pre-suit and post-judgment interest;

(3) An order enjoining any further violations of RICO;

(4) An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

(5) An order enjoining the commission of any tortious conduct, including further unsafe D, D, & D, as alleged in this Complaint;

(6) An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning releases and the health risks of activities at PORTS;

(7) An order requiring all Defendants in possession of previously sequestered medical or dose records to provide such records to the appropriate parties.

(8) An order enjoining any diversion of HEU fissile materials affecting national security, or any failure to monitor, identify, investigate, report and halt suspicious shipments from PORTS;

(9) An award of damages for Class Members who incurred any out-of-pocket expenses as a result of Defendants' acts or omissions along with an award of damages to pay for any necessary mitigation or remediation of Class Members' properties;

(10) An award of damages to compensate for loss of use and enjoyment of property, emotional distress, annoyance, nuisance, aggravation, and inconvenience as a result of Defendants' acts or omissions;

(11) An award of punitive damages for all Class Members who were exposed to radioactive materials as a result of Defendants' acts or omissions;

(12) An Order implementing a remediation and cleanup of the Plaintiffs' and Class Members' properties;

(13) An Order implementing a medical surveillance and medical monitoring program not done by DOE or its affiliates.

(14) Prejudgment and post-judgment interest;

(15) An Order establishing such administrative procedures as are reasonable to effectuate the relief granted to Plaintiffs and the Class Members;

(16) Declaratory relief clarifying the rights and obligations of the parties to each other;

(17) An order requiring Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of class notice and administration; and

(18) Such other relief as the Court or Jury may deem appropriate.

Respectfully submitted,

/s/ Nathan Hunter (0096389)
Trial Attorney
Hunter & Hunter LLC
1491 Polaris Pkwy #21416
Telephone: (234) 738-4648
Fax: (330) 294-1588
nathan@hunterfirm.org

Dick Collins
*Attorney seeking pro hac vice admission*
Collins & Truett Law Firm, P.A.
8333 Northwest 53rd Street, Suite 450
Doral, Florida 33166
Telephone: (833) 496-8529
Fax: (850) 216-2537
dick@collinstruett.com

Tim Howard
*Attorney seeking pro hac vice admission*
Howard & Associates P.A.
1415 East Piedmont Drive,
Suite 5
Tallahassee, Florida 32308
Telephone: (850) 298-4455

Fax: (850) 216-2537
tim@howardjustice.com

*Counsel for the Named Plaintiffs and
Putative Class Counsel*